1  Richard M. Pachulski (CA Bar No. 90073)
   Jeffrey W. Dulberg (CA Bar No. 181200)
2  Malhar S. Pagay (CA Bar No. 189289)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, California 90067
4  Telephone: 310/277-6910
   Facsimile: 310/201-0760
5  E-mail: rpachulski@pszjlaw.com
           jdulberg@pszjlaw.com
6          mpagay@pszjlaw.com

7  [Proposed] Attorneys for Debtor and Debtor in Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

11 | In re:                          | Case No.: 2:19-bk-24804-VZ
12 | YUETING JIA,[1]                  |
13 |                    Debtor.       | Chapter 11
14 |                                  | **NOTICE OF FILING OF BLACKLINE
15 |                                  | VERSION OF SECOND AMENDED
   |                                  | DISCLOSURE STATEMENT WITH
16 |                                  | RESPECT TO DEBTOR'S FIRST
   |                                  | AMENDED PLAN OF
17 |                                  | REORGANIZATION UNDER
   |                                  | CHAPTER 11 OF THE BANKRUPTCY
18 |                                  | CODE**

19 |                                  | <u>Hearing</u>
20 |                                  | Date:     February 6, 2020
   |                                  | Time:     11:00 a.m.
21 |                                  | Place:    Courtroom 1368
   |                                  |           Roybal Federal Building
22 |                                  |           255 E. Temple Street
   |                                  |           Los Angeles, California 90012
23 |                                  | Judge:    Hon. Vincent P. Zurzolo

24 |                                  | [Relates to Docket No. 262]

25         **PLEASE TAKE NOTICE** that Yueting Jia, debtor and debtor in possession herein, attaches

26 hereto as **Exhibit "A"** a blackline version of his *Second Amended Disclosure Statement With*

27 *Respect to Debtor's First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy*

28 ─────────────────────
   [1] The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing
   address is 91 Marguerite Drive, Rancho Palos Verdes, CA 90275.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    *Code* [Docket No. 262] compared to the *Amended Disclosure Statement With Respect to Debtor's*

2    *Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 94].[2]

3

4    Dated:    January 27, 2020                PACHULSKI STANG ZIEHL & JONES LLP

5                                             By    */s/ Malhar S. Pagay*

6                                                   Richard M. Pachulski
                                                   Jeffrey W. Dulberg
7                                                   Malhar S. Pagay

8                                                   Proposed Attorneys for Debtor and Debtor
                                                   in Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    _____

28    [2] To facilitate the review of the blackline version, the format of the previously-filed disclosure statement, in the format
required by the District of Delaware, was utilized to create the comparison.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:327245.1 46353/002

# EXHIBIT A

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067

Proposed Counsel for Debtor and
Debtor in Possession

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036

and

O'MELVENY & MYERS LLP
31st Floor, AIA Central
1 Connaught Road Central
Hong Kong, S.A.R.

Proposed Special Corporate, Litigation, and
International Counsel for Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>YUETING JIA,[1]<br><br>Debtor. | Case No.:  2:19-bk-24804-VZ<br>(*formerly 19-12220 KBO in the District of Delaware*)<br><br>Chapter 11<br><br>**SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**<br><br>Confirmation Hearing<br>Date:          TBD<br>Time:          TBD<br>Place:          Courtroom 1368<br>                    Roybal Federal Building<br>                     255 E. Temple Street<br>                    Los Angeles, California 90012<br>Judge:          Hon. Vincent P. Zurzolo |

### THIS DISCLOSURE STATEMENT HAS
### NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT

---

[1] The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing address is 91 Marguerite Drive, Rancho Palos Verdes, CA 90275.

TABLE OF CONTENTS
(continued)

Page

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. THE DEBTOR MAY NOT SOLICIT ACCEPTANCES OR REJECTIONS UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTOR IS SUBMITTING THIS DISCLOSURE STATEMENT FOR APPROVAL, BUT THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT. THE DEBTOR MAY REVISE THIS DISCLOSURE STATEMENT TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF, BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- x

In re:                                  :       Chapter 11
                                        :
Yueting Jia,[1]                         :       Case No. 19-12220 (KBO)
                                        :
                                        :
                        Debtor.         :
                                        :
-------------------------------------------------------------------- x

AMENDED DISCLOSURE STATEMENT WITH RESPECT TO DEBTOR'S PLAN
OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

PACHULSKI STANG ZIEHL & JONES LLP          O'MELVENY & MYERS LLP
919 North Market Street, 17th Floor        Times Square Tower
Wilmington, Delaware 19801                 7 Times Square
                                           New York, New York 10036
and
                                           and
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor       O'MELVENY & MYERS LLP
Los Angeles, California 90067              31st Floor, AIA Central
                                           1 Connaught Road Central
Proposed Counsel for Debtor and            Hong Kong, S.A.R.
Debtor in Possession
                                           Proposed Special Corporate, Litigation, and
                                           International Counsel for Debtor and
                                           Debtor in Possession

---

[1]   The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing address is 91 Marguerite Drive, Rancho Palos Verdes, CA 90275.

## IMPORTANT INFORMATION FOR YOU TO READ

**THE DEADLINE TO VOTE ON THE DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS MAY BE AMENDED OR MODIFIED, THE "PLAN") IS [_____], 2020 AT ~~5:00~~4:00 P.M. BEIJING TIME (THE "VOTING DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

Yueting Jia, an individual in the United States ("YT" or the "Debtor"), as debtor and debtor in possession, in the above-captioned chapter 11 case, is providing you with the information in this amended disclosure statement with respect to the Plan (as may be amended or modified, the "Disclosure Statement") because you may be a creditor entitled to vote on the Plan.[2]

The Debtor believes that the Plan is in the best interests of his creditors. All creditors entitled to vote on the Plan are urged to vote in favor of the Plan. A summary of the voting instructions is set forth in Article I.B of this Disclosure Statement and in the Disclosure Statement Order (as defined below). More detailed instructions are contained on the Ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be properly completed in accordance with the voting instructions on the ballot and **actually received** by the Voting Agent, via the e-balloting portal, regular mail, overnight courier, or personal delivery at the appropriate address, by the Voting Deadline.

The effectiveness of the Plan is subject to material conditions precedent. *See* Article ~~III~~IV.I below and Article X of the Plan. There is no assurance that these conditions will be satisfied or waived.

This Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes hereto are the only documents to be used in connection with the solicitation of votes on the Plan. YT has not authorized any person to give any information or to make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes attached hereto or incorporated by reference or referred to herein. If given or made, such information or representation may not be relied upon as having been authorized by YT. The delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED AS EXHIBIT A, THE PLAN SUPPLEMENT, AND THE RISK FACTORS DESCRIBED IN ARTICLE IX BELOW, BEFORE SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.**

**ARTICLE XI OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, WHICH ARE DISCUSSED IN ARTICLE ~~III~~IV.H OF THIS DISCLOSURE STATEMENT. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE IT MAY AFFECT YOUR RIGHTS.**

---

[2]    Except as otherwise set forth herein, capitalized terms used in this Disclosure Statement but not defined herein have the meanings used in the Plan. Unless otherwise indicated, all amounts in this Disclosure Statement are reflected in U.S. dollars.

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as part of the Plan Supplement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control. Except as otherwise indicated herein or in the Plan, YT will file all Plan Supplement documents with the Bankruptcy Court and make them available for review on the Debtor's case website located online at *https://dm.epiq11.com/yt1* no later than five (5) days before the Voting Deadline or such later date as the Bankruptcy Court may approve.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. YT reserves the right to amend or modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including the information regarding the background of YT and his businesses and the financial and valuation information regarding YT and his businesses is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of YT's attempt to settle and resolve claims and controversies pursuant to the Plan. The information contained in this Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of Allowed Claims against either the Debtor or the Reorganized Debtor. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains "Forward-Looking Statements." All statements (other than statements of historical facts) included in this Disclosure Statement regarding ~~YT's or Faraday & Future Inc.'s ("FF")~~ operations, financial position, plans, and business strategy of YT or Smart King Ltd. ("Smart King"), the parent company of Faraday & Future Inc. ("FF" and collectively with other operational entities owned and/or controlled by Smart King and together with Smart King, the "FF Group"), and statements regarding the industry in which the FF Group operates, may constitute forward-looking statements. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expect," "intend," "estimate," "anticipate," "believe," or "continue" or the negative thereof or variations thereon or similar terminology. Although the expectations reflected in such forward-looking statements are believed by YT to be reasonable at this time, YT can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from such expectations are disclosed in this Disclosure Statement, including, without limitation, in conjunction with the forward-looking statements included in this Disclosure Statement under "Risk Factors." All subsequent written and oral forward-looking statements attributable to YT, the FF Group, or persons acting on his or their behalf are qualified in their entirety by these cautionary statements.

Although stated with particularity, the potential or hypothetical recoveries included in Article ~~VIII~~VI of this Disclosure Statement, under the heading "Hypothetical Scenarios" are based on a variety of generalizations, estimates, and assumptions. Such generalizations, estimates, and assumptions are considered reasonable by YT, although they may prove to have been incorrect or unfounded; further, they

are inherently subject to significant economic, competitive, tax, and other uncertainties beyond the control of YT or the FF Group. There can be no assurance that the results will be realized, and actual results may vary materially and adversely from those projected.

**This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or YT's chapter 11 case generally, please contact Epiq Corporate Restructuring, LLC, by (i) visiting YT's case website at *https://dm.epiq11.com/yt1*, (ii) calling (855) 963-0391 (for U.S. callers), (400) 120-3077 (for Chinese callers), or (503-520-4401 (for international callers), or (iii) sending e-mail correspondence to *ProjectR@epiqglobal.com* (please reference "YT" in the subject line).

**TABLE OF CONTENTS**

Page

I. INTRODUCTION .......................................................................................................................1

A.    Material Terms of the Plan .............................................................................................2

B.    Voting on the Plan ...........................................................................................................5

    1.    Parties Entitled to Vote on the Plan ..................................................................5

    2.    Solicitation Package ...........................................................................................~~6~~7

    3.    Voting Procedures, Ballots, and Voting Deadline .............................................7

C.    Confirmation Hearing and Deadline for Objections to Confirmation .........................8

D.    Advisors ...........................................................................................................................8

II. GENERAL INFORMATION .................................................................................................~~9~~10

A.    YT's Background ...........................................................................................................~~9~~10

B.    YT's Liabilities .............................................................................................................~~10~~11

C.    YT's Interest in ~~Faraday & Future Inc.~~the FF Group ...............................................~~10~~11

    1.    Overview of the FF Group ...............................................................................~~10~~12

    2.    Corporate Structure of ~~Smart King and~~the FF Group ....................................~~11~~12

        a.    Evergrande Investment ........................................................................~~12~~13

        b.    Smart King's Current Corporate Governance ...................................~~12~~13

        c.    Stock Incentive Plans ..........................................................................~~13~~14

        d.    FF Global Partnership Program .........................................................~~14~~15

        e.    Organizational Chart ..........................................................................~~15~~16

    3.    Indebtedness of the FF ~~and Smart King 16~~Group ............................................17

    4.    ~~FF's~~FF Group's Management ...........................................................................~~16~~18

    5.    ~~2020~~Future Equity Incentive Plan .................................................................~~18~~19

    6.    ~~FF's~~The FF Group's Strategy .........................................................................~~18~~19

        a.    Secure Substantial Financing ............................................................~~18~~20

        b.    Kick-Start Production of the FF 91 ...................................................~~18~~20

        c.    Hire Talent ..........................................................................................~~19~~21

        d.    Sales Efforts .......................................................................................~~20~~21

    7.    ~~FF~~Legal Proceedings and Vendor Trust .......................................................~~20~~21

    8.    YT's Interests ...................................................................................................~~20~~22

D.    YT's Other Assets ........................................................................................................~~20~~22

    1.    Chinese Assets .................................................................................................~~20~~22

    2.    The Yidao Claims ~~Against the Wen Entities 22~~ .............................................23

i

**TABLE OF CONTENTS**
**(continued)**

Page

E.    Certain Relationships, Related Transactions, and Former Affiliates .......................... ~~23~~24

    1.    Affiliate Notes Payable ................................................................................ ~~23~~24

    ~~2.~~    ~~Ocean View~~ ................................................................................................ ~~23~~

    ~~3~~2.    LeSoar ........................................................................................................ ~~23~~25

III. THE CHAPTER 11 CASE ............................................................................................ ~~24~~25

A.    Voluntary Petition ............................................................................................ ~~24~~25

B.    Retention of Advisors for the Debtor ............................................................. ~~24~~26

C.    The Creditors' Committee ............................................................................... ~~24~~26

D.    DIP Facility ..................................................................................................... ~~24~~26

E.    Claims Process and Bar Date .......................................................................... ~~24~~26

F.    Venue Transfer ................................................................................................ 27

G.    The UST's Motion for Appointment of  a Chapter 11 Trustee ....................... 27

IV. THE PLAN ................................................................................................................... ~~25~~27

A.    Classification and Treatment of Claims Under the Plan ................................. ~~25~~28

B.    Acceptance or Rejection of the Plan; Effect of Rejection of Plan .................. ~~26~~28

C.    Plan Distributions ........................................................................................... ~~27~~29

D.    Domestic Support Obligations ........................................................................ ~~27~~29

E.    Preservation of Claims and Rights to Settle Claims ....................................... ~~27~~29

F.    Waiver of Actions Arising Under Chapter 5 of the Bankruptcy Code ........... 30

~~F~~G.    Procedures for Resolving Disputed Claims ..................................................... ~~28~~30

~~G~~H.    Executory Contracts and Unexpired Leases .................................................... ~~28~~31

~~H~~I.    Discharge, Release, Injunctive, and Exculpatory Provisions of the Plan ....... ~~29~~32

    1.    Discharge of Claims .................................................................................... ~~29~~32

    2.    Releases ....................................................................................................... ~~30~~33

        *a.*    *Releases by the Debtor* ........................................................... ~~31~~33

        *b.*    *Releases by Holders of Non-Debt Claims* ............................. ~~31~~34

        *c.*    *Standstill and Releases by Holders of Allowed Debt Claims and Allowed Late Filed Debt Claims* ............... 35

        *d.*    *Releases of Key China Business Individuals* ......................... 37

        *e.*    *Release of Wei Gan* ............................................................... 38

    3.    Exculpation and Limitation of Liability ..................................................... ~~33~~39

    4.    Injunctions .................................................................................................. ~~34~~40

        *a.*    *General* ................................................................................... ~~34~~40

**TABLE OF CONTENTS**
**(continued)**

Page

      *b.*    *Injunction Against Interference With the Plan*..................................3440

I.J.    Conditions Precedent to Confirmation and the Effective Date ...................3440

V. THE TRUST ...................................................................................................3541

    A.    Creation of the Trust ................................................................................3541

    B.    The Trust Assets .......................................................................................3542

    C.    Voting Rights With Respect to the Trust Assets .......................................3542

    D.    Late Filed Debt Claims Reserve ..............................................................3542

    E.    Appointment of the Trustee .....................................................................3642

    F.    Creditor Trust Committee .......................................................................3643

    G.    Term of the Trust .....................................................................................3743

    H.    Expenses of the Trust ...............................................................................3744

    I.    Distribution of Trust Assets .....................................................................3844

    J.    Distribution Waterfall .............................................................................3844

VI. HYPOTHETICAL SCENARIOS ...............................................................3945

VII. CERTAIN RISK FACTORS TO BE CONSIDERED .................................4046

    A.    Risks Related to the Plan .........................................................................4147

    B.    Risks Related to Smart King,the FF, Group and Theirits Business that may Adversely Affect the Trust Interests .........................................................4248

    C.    Risks Related to the Trust Interests .........................................................5764

    D.    Risks Related to the Industry ...................................................................5966

    E.    Risks Related to Smart King'sthe FF Group's Corporate Structure ..........6268

    F.    Risks Related to Smart King'sthe FF Group's Operations in the PRC .......6571

    G.    Certain Tax Risks Related to the Plan .....................................................6976

VIII. CONFIRMATION OF THE PLAN ..........................................................7077

    A.    Voting Procedures and Solicitation of Votes ...........................................7077

    B.    Confirmation Hearing .............................................................................7077

    C.    General Requirements of Section 1129 ....................................................7177

        1.    Requirements of Section 1129(a) of the Bankruptcy Code...........7177

            *a.*    *General Requirements* ...............................................7177

            *b.*    *Best Interests Test* .....................................................7278

            *c.*    *Feasibility of the Plan* ...............................................7279

        2.    Requirements of Section 1129(b) of the Bankruptcy Code...........7379

        3.    Confirmation of an Individual Chapter 11 Plan ...........................7380

**TABLE OF CONTENTS**
**(continued)**

Page

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............... ~~74~~80

X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ................................................................................................................... ~~74~~81

    A.    U.S. Tax Classification of the Trust ....................................... ~~75~~82

    B.    U.S. Federal Income Tax Treatment of Holders ................... ~~76~~83

        1.    Accrued Interest on Debt Claims ............................... ~~76~~83

        2.    Tax Treatment of the Late Filing Claims Reserve .......... ~~77~~83

        3.    Tax Classification of West Coast Conduit Entities ......... ~~77~~84

        4.    Information Reporting and Backup Withholding ............ ~~77~~84

        5.    Importance of Obtaining Professional Tax Assistance ....... ~~78~~84

XI. CONCLUSION ................................................................................................. ~~79~~86

**<u>EXHIBITS</u>**

| | |
|---|---|
| **<u>Exhibit A</u>** | **Debtor's <u>First Amended</u> Plan of Reorganization Under Chapter 11 of the Bankruptcy Code** |
| **<u>Exhibit B</u>** | **~~Trust Agreement~~<u>Plan</u> Term Sheet** |
| **<u>Exhibit C</u>** | **Management's Discussion and Analysis of Financial Condition and Results of Operations of ~~Smart King Ltd.~~<u>the FF Group</u>** |
| **<u>Exhibit D</u>** | **Summary of Selected Financial Information of ~~Smart King Ltd.~~<u>the FF Group</u>** |
| **<u>Exhibit E</u>** | **<u>Liquidation Analysis (to be filed)</u>** |

1

## I.

## INTRODUCTION

YT submits this Disclosure Statement pursuant to section 1125 of Title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of acceptances of the Plan. A copy of the Plan is attached hereto as **Exhibit A**. **Please note that to the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.**

The Plan provides for the reorganization of YT under chapter 11 of the Bankruptcy Code. Under the Plan, YT is proposing to satisfy his debts by contributing his interests in Smart King ~~Ltd. ("Smart King")~~, the parent company of FF, which consist of all of his legally recognized personal assets (other than those assets that have been frozen or seized in the People's Republic of China (the "PRC")), to a liquidating trust (the "Trust") for the benefit of his creditors as "Trust Assets." YT's interests in Smart King consist of his economic rights with respect to the 40.8% of Smart King's equity currently owned by FF Top Holding Ltd. ("FF Top") (the remaining equity of Smart King being owned by Season Smart Limited ("Season Smart"), an affiliate of Evergrande Health Industry Group ("Evergrande"), and the option holders and Class A ordinary shareholders under Smart King's equity incentive plan)).

Specifically, YT's interests consist of:

- The right to direct Pacific Technology Holding LLC ("Pacific Technology") to direct FF Top to transfer ~~147,048,823~~147,058,823 Class B shares of Smart King currently owned by FF Top, representing 10% of Smart King's equity interests, to a creditor trust at the direction of YT; and

- 100% of the preferred units of Pacific Technology, which entitle YT to (1) a priority distribution of up to $815.7 million (subject to certain adjustments) plus 8% interest per annum from Pacific Technology's 30.8% of Smart King's equity interest, after the return of capital to the management (plus 8% interest per annum), (2) a special distribution of 10% of the remaining amounts from Pacific Technology's 30.8% of Smart King's equity interest, and (3) thereafter a distribution based on YT's 20% percentage interest of the units of Pacific Technology.

The Plan contemplates that YT's assets will be transferred to the Trust through an amendment of that certain Third Amended and Restated Limited Liability Company Agreement of Pacific Technology to effect ownership of these rights by the Trust. You are encouraged to read carefully the "~~Trust Agreement~~Plan Term Sheet," a copy of which is attached as **Exhibit B** to this Disclosure Statement. This discussion is qualified in its entirety by reference to the full text of the ~~Trust Agreement~~Plan Term Sheet.

The Plan also provides for the satisfaction in full of all Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and U.S. Secured Claims. **In addition, the Plan includes certain release, injunctive, and exculpatory provisions described in greater detail below.**

This Disclosure Statement sets forth certain information regarding YT and the FF Group (particularly, Smart King~~,~~ and FF~~.~~). This Disclosure Statement also describes the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors (including those associated with securities to be issued under the Plan), the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.

On [_____], ~~2019~~2020, the Bankruptcy Court entered an order approving this Disclosure Statement as containing "adequate information," i.e., information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of Claims to make an informed judgment about the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

## A.    Material Terms of the Plan

Because of YT's significant relationship ~~to~~with the FF Group, YT believes that it is imperative to confirm the Plan as swiftly as possible to enable the FF Group to obtain necessary financing and reestablish normal relations with its suppliers and other parties that do business with YT and the FF Group. If the Plan is not consummated in a timely manner, YT believes that the value of his interest in Smart King, the parent of FF, which is his primary asset and the basis for the settlement of claims in the Plan, will be substantially reduced and may even lose its entire value. If, as a result of not being able to consummate the Plan in a timely manner, the FF Group is not able to once again pursue its business plan, it is likely that the FF Group will not be able to continue as a going concern, it may be forced to liquidate its remaining assets, and/or initiate bankruptcy proceedings, and the value of YT's interest in ~~Smart King~~the FF Group will be greatly reduced or eliminated. *See* Article ~~IX~~VII of this Disclosure Statement entitled "Risk Factors."

YT BELIEVES THAT THE IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF YT AND HIS CREDITORS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, YT URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE (I.E., THE DATE BY WHICH YOUR BALLOT MUST BE ACTUALLY RECEIVED), WHICH IS [_____], 2020, AT ~~5:00~~4:00 P.M. (BEIJING TIME).

The following table summarizes the material terms of the Plan. For a complete description of the Plan, please refer to the discussion in Article ~~III~~IV of this Disclosure Statement, entitled "THE PLAN" and the Plan itself:

| Treatment of Certain Claims | As further detailed in the Plan, the Plan contemplates the following treatment of certain Claims~~, among other Claim~~: |
| --- | --- |
| | • Administrative Expense Claims – Except to the extent that an Administrative Expense Claim has already been paid during the chapter 11 case, the holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, or the holder of an Allowed Administrative Expense Claim makes a Trust Election, and except as provided in Article 2.2 of the Plan, each holder of an Allowed Administrative Expense Claim against YT shall receive, in full and complete settlement, release, and discharge of such Claim, ~~Cash~~cash equal to the unpaid amount of such Allowed Administrative Expense Claim on the latest of (i) the Effective Date or as soon thereafter as reasonably practicable; (ii) 30 days after the date on which such Administrative Expense Claim becomes Allowed; (iii) the date on which such Administrative Expense Claim becomes due and payable in the ordinary course of YT's business or personal affairs in accordance with the terms and subject to the conditions of any agreements or understandings governing, or other documents relating |

to, such Allowed Administrative Expense Claim; and (iv) such other date as may be agreed to by such holder and YT or the Reorganized Debtor. **These Claims are unclassified under the Plan and are not entitled to vote.**

- Priority Tax Claims – Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim against YT shall receive, in full and complete settlement, release, and discharge of such Claim, Cash equal to the unpaid amount of such Allowed Priority Tax Claim on the latest of (i) the Effective Date or as soon thereafter as reasonably practicable; (ii) 30 days after the date on which such Priority Tax Claim becomes Allowed; (iii) the date on which such Priority Tax Claim becomes due and payable; and (iv) such other date as may be mutually agreed to by and among such holder and YT or the Reorganized Debtor; provided, however, that the Reorganized Debtor shall be authorized, at his option, and in lieu of payment in full, in Cash, of an Allowed Priority Tax Claim as provided above, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code. **These Claims are unclassified under the Plan and are not entitled to vote.**

- Priority Non-Tax Claims – Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment or makes a Trust Election, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, at the option of YT and in full and complete settlement, release, and discharge of, and in exchange for, such Claim (i) payment in full in Cash; or (ii) other treatment rendering such Claim Unimpaired. Any Allowed Priority Non-Tax Claim not due and owing on the Effective Date shall be paid in full, in Cash, when it becomes due and owing. **These claims are Unimpaired under the Plan and are not entitled to vote.**

- U.S. Secured Claims - Except to the extent that a holder of an Allowed U.S. Secured Claim agrees to less favorable treatment or makes a Trust Election, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed U.S. Secured Claim shall receive, at the option of YT and in full and complete settlement, release, and discharge of, and in exchange for, such Claim (i) payment in full in Cash; (ii) delivery of collateral securing any such Claim; (iii) reinstatement pursuant to section 1124 of the Bankruptcy Code; or (iv) other treatment rendering such Claim Unimpaired. **These claims are Unimpaired under the Plan and are not entitled to vote.**

- Debt Claims – Except to the extent that a holder of an Allowed Debt Claim agrees to less favorable treatment, each holder of an Allowed Debt Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange for, such Claim, its Pro Rata share of

|  | the Trust Interests, which distribution shall be made in accordance with Article 6.2 of the Plan. **These Claims are __Impaired__ under the Plan and __are__ entitled to vote.** |
|---|---|
| **Domestic Support Obligations** | On the Effective Date, YT shall make any payments to comply with any postpetition unfunded obligations on account of any Domestic Support Obligations, if any such obligations exist, as may be required for YT to be current with respect to such Domestic Support Obligations as of the Effective Date pursuant to section 1129(a)(14) of the Bankruptcy Code. After the Effective Date, YT shall timely make all payments on account of Domestic Support Obligations to the parties entitled to receive such payments, if any such obligations exist, in each case at the times and in the amounts required by the agreements and orders evidencing such Domestic Support Obligations, as such agreements may from time to time be modified in accordance with applicable law. |
| **Good Faith Compromise** | The Plan constitutes a good faith compromise and settlement of all Claims and controversies, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of YT and his estate. |

| | |
|---|---|
| **The Trust** | The Plan contemplates that the contribution of the assets to the Trust will be effected through an amendment of that certain Third Amended and Restated Limited Liability Company Agreement of Pacific Technology (the "PT LLCA") such that the Trust will own the following: (i) 100% of the Preferred PT Units (as defined below); (ii) 100% of the New PT Units (as defined below); (iii) the Warrant (as defined below); (iv) following the exercise of the Warrant and the indefeasible transfer of the Trust Smart King Shares to the Trust, the Trust Smart King Shares; (v) any financial assets of the Debtor (i.e., accounts, security, or real property) located in the PRC after satisfaction of any claims recoverable from such assets under applicable law; (vi) all interests, claims, and Causes of Action owned by the Debtor (including through any nominee) in connection with Beijing Dongfang Cheyun Information Technology Co., Ltd. (as set forth in Article II.D.2 below); (vii) property transferred to the Trust under section 542 of the Bankruptcy Code in accordance with Article 11.9 of the Plan (as discussed in Article IV.F. below); (viii) subject to certain rights of FF Global in connection with the Call Option, the disposition of such Call Option as set forth in Article 6.2(l) of the Plan; and (ix) the Trust expense funded amount contributed to the Trust by a postpetition lender as provided in the Plan Term Sheet. ~~The Plan provides that on the Effective Date, YT will contribute all his legally recognized personal assets (other than those assets that have been frozen or seized in the PRC) to the Trust as "Trust Assets," meaning: YT's economic rights to 40.8% of Smart King's equity consisting of (i) the right to direct Pacific Technology to direct FF Top to transfer 147,048,823 Class B shares of Smart King currently owned by FF Top, representing 10% of Smart King's equity interests, to the Trust, and (ii) 100% of the preferred units of Pacific Technology, which entitle YT to (1) a priority distribution of up to $815.7 million (subject to certain adjustments) from Pacific Technology's 30.8% of Smart King's equity interest, after the return of capital to the management, (2) a special distribution of 10% of the remaining amounts from Pacific Technology's 30.8% of Smart King's equity interest, and (3) thereafter a distribution based on YT's 20% percentage interest of the units of Pacific Technology.~~ |
| **~~2020~~Future Equity Incentive Plan** | In order to align incentives and reward ~~YT and other key members of management~~the Debtor for achieving FF's strategic goals, it is anticipated that ~~Smart King will adopt~~ a management incentive equity plan ~~subject to the consummation of the Plan (the "2020 Equity Incentive Plan"). The board of directors of Smart King may~~will be adopted to grant certain stock-based awards to or at the direction of the Debtor upon the achievement of financial targets upon a Distribution Event (as defined below)~~.~~, provided that the stock-based awards granted to the Debtor shall not exceed the awards set forth below in Article II.C.5 without the consent of the Trustee (which consent shall not be unreasonably withheld) (the "Future Equity Incentive Plan"). |
| **Discharge, Releases, Injunction and Exculpation** | Articles 11.3, 11.4, 11.5, and 11.6 of the Plan contain certain release, injunction, and exculpation provisions that are set forth in Article ~~III~~IV.H. below. |

| | ARTICLE 11.4(b) OF THE PLAN (*RELEASES BY HOLDERS OF NON-DEBT CLAIMS*) CONTAINS A THIRD-PARTY RELEASE. YOU ARE DEEMED TO GRANT A THIRD-PARTY RELEASE IF YOU ARE A HOLDER OF A NON-DEBT CLAIM THAT EITHER: (I) VOTES TO ACCEPT THE PLAN OR (II) IS CONCLUSIVELY DEEMED TO HAVE ACCEPTED THE PLAN. ~~CERTAIN OTHER PARTIES ARE DEEMED TO GRANT THE PLAN RELEASES. SUCH PARTIES ARE IDENTIFIED IN THE DEFINITION OF "RELEASING PARTIES" IN THE PLAN.~~ IN ADDITION, IN ACCORDANCE WITH SECTION 524(a)(3) OF THE BANKRUPTCY CODE AND PURSUANT TO A SETTLEMENT AGREEMENT UNDER BANKRUPTCY RULE 9019 REGARDING THE DEBTOR'S CLAIMS AGAINST WEI GAN AND WEI GAN'S CLAIMS AGAINST THE DEBTOR, ARTICLE 11.4(~~b~~e) OF THE PLAN RELEASES CERTAIN CLAIMS AGAINST YT'S WIFE, WEI GAN. YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER. |
| **Deadlines for Filing Complaints to Determine Non-Dischargeable Debt** | Pursuant to Bankruptcy Rule 4007(c), a complaint to determine the dischargeability of a debt under section 523(c) of the Bankruptcy Code must be filed no later than February 4, 2020 (the date that is sixty (60) days after the first date set for the meeting of creditors under section 341 of the Bankruptcy Code), unless the Bankruptcy Court extends such deadline for cause at the request of a party in interest. |

## B.    Voting on the Plan

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from holders of Claims against YT, including setting the deadline for voting, which holders of Claims are eligible to receive Ballots to vote on the Plan, and other voting procedures.

THE DISCLOSURE STATEMENT ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

### 1.    Parties Entitled to Vote on the Plan

Under the Bankruptcy Code, only holders of Claims in Impaired Classes are entitled to vote on the Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims is deemed to be Impaired under the Plan unless the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim entitles the holder thereof, ascertained with regard to applicable law, including any provisions of the Bankruptcy Code that may limit the allowed amount of such Claim.

The following table sets forth (a) a simplified summary of which Classes are entitled to vote on the Plan and which are not and (b) the estimated claims asserted against the Debtor, the estimated recovery percentage, and/or the voting status for each of the separate Classes of Claims provided for in the Plan.

| Class | Designation | Entitled to Vote | Estimated Amount | Estimated Recovery |
|-------|-------------|------------------|------------------|--------------------|
| 1 | Priority Non-Tax Claims | No (deemed to accept) | $0.00 | 100% |
| 2 | U.S. Secured Claims | No (deemed to accept) | $~~2,677,629~~2,687,629 | 100% |
| 3 | Debt Claims | Yes | $3,770,727,730.73[1] | 49.10 - 100.47% |

Accordingly, only holders of Claims in Class 3 (Debt Claims), as of ~~December 18, 2019~~February 6, 2020, the voting record date established by the Debtor for purposes of this solicitation (the "Voting Record Date"), are entitled to vote on the Plan. If your Claim is not in Class 3, you are not entitled to vote on the Plan and you will not receive a Ballot with this Disclosure Statement. If your Claim is in Class 3, you should read your Ballot and follow the listed instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

If an objection has been filed with respect to your Claim, you are not entitled to vote on the Plan (unless your Claim is only disputed in part, in which case you shall be entitled to vote solely on account of the undisputed portion of your Claim) unless you obtain an order of the Bankruptcy Court either resolving the objection or temporarily allowing your claim for voting purposes. In addition, if your Claim is identified in YT's *Schedules of Assets and Liabilities* [D.I. 28] (as amended, modified, or supplemented, the "Schedules")[3][4] as disputed, contingent, or unliquidated and a proof of claim was not (i) filed by the applicable bar date for the filing of proofs of claim established by the Court or (ii) deemed timely filed by an order of the Court prior to the Voting Deadline; such Claim shall be disallowed for voting purposes; provided, however, if as of the Voting Record Date, the applicable bar date has not yet passed, such Claim shall be entitled to vote only in the amount of $1.00. **As set forth in the Confirmation Hearing Notice and in the Disclosure Statement Order, holders of Claims who seek to have their claims temporarily allowed by the Bankruptcy Court for voting purposes must file on the docket and serve on parties entitled to receive service thereof a motion seeking such relief no later than [_____], 2020 at 4:00 p.m. (~~prevailing Eastern~~Pacific Time).**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in the chapter 11 case and how votes will be counted under various scenarios.

**Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits confirmation of a plan of reorganization, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. Please note that because the Debtor anticipates that the Plan will satisfy section 1129(a)(8) of the Bankruptcy Code, the Debtor is not presently seeking confirmation of the Plan under section 1129(b) of the Bankruptcy

---

[3] To be updated prior to the February 6, 2020 hearing.

[3][4] Copies of the Schedules may be obtained on YT's case website maintained by the Voting Agent at *https://dm.epiq11.com/yt1*.

Code. For more information on the requirements for confirmation of the Plan, please refer to Article X of this Disclosure Statement.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims of that class that cast ballots for acceptance or rejection of a plan. Thus, acceptance by a class of claims occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the holders of claims voting cast their ballots to accept the plan.

## 2.    Solicitation Package

The package of materials (the "Solicitation Package") sent to holders of Claims entitled to vote on the Plan contains:

- a copy of the notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

- a copy of this Disclosure Statement together with the exhibits thereto, including the Plan;

- a copy of the order entered by the Bankruptcy Court (D.I. [__]) (the "Disclosure Statement Order") that approved this Disclosure Statement, established the voting procedures, scheduled a Confirmation Hearing, and set the voting deadline and the deadline for objecting to Confirmation of the Plan; and

- for holders of Claims in Class 3, an appropriate form of Ballot and instructions on how to complete the Ballot.

In addition, the Plan, the Disclosure Statement, and, once they are filed, all exhibits to both documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Voting Agent, Epiq Corporate Restructuring, LLC, at *https://dm.epiq11.com/yt1*. The Debtor will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Voting Agent by (i) calling (855) 963-0391 (for U.S. callers), (400) 120-3077 (for Chinese callers), or (503-520-4401 (for international callers) or (ii) sending e-mail correspondence to *ProjectR@epiqglobal.com* (please reference "YT" in the subject line).

## 3.    Voting Procedures, Ballots, and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Please vote and return your Ballot in accordance with the instructions accompanying your Ballot.

You should carefully review (a) the Plan and the Plan Supplement, (b) this Disclosure Statement, (c) the Disclosure Statement Order, (d) the Confirmation Hearing Notice, and (e) the detailed instructions accompanying your Ballot prior to voting on the Plan. In order for your vote to be counted, you must complete and return your Ballot in accordance with the instructions accompanying your Ballot on or before the Voting Deadline.

Each Ballot has been coded to reflect your Claim. Accordingly, in voting to accept or reject the Plan, you should use the coded Ballot sent to you with this Disclosure Statement.

All Ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the Ballot and **actually received** no later than the Voting Deadline (i.e., **[_____]**, **2020, at ~~5:00~~4:00 p.m. (Beijing Time)**) by the Voting Agent via regular mail, overnight courier, or personal delivery at the appropriate address or via email or the Voting Agent's online balloting platform (in accordance with the instructions accompanying your Ballot). ***No Ballots may be submitted by electronic mail or any other means of electronic transmission, (except the Voting Agent's online balloting platform), and any Ballots submitted by electronic mail or other means of electronic transmission will* not *be accepted by the Voting Agent*.** ~~Again, Ballots should not be sent directly to the Debtor.~~

If a holder of a Claim delivers to the Voting Agent more than one timely, properly completed Ballot with respect to such Claim prior to the Voting Deadline, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the last timely, properly completed Ballot, as determined by the Voting Agent, received last from such holder with respect to such Claim.

If you are a holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot, or the procedures for voting on the Plan, please contact the Voting Agent by (ii) calling (855) 963-0391 (for U.S. callers), (400) 120-3077 (for Chinese callers), or (503-520-4401 (for international callers) or (ii) sending e-mail correspondence to *ProjectR@epiqglobal.com* (please reference "YT" in the subject line).

Before voting on the Plan, each holder of a Claim in Class 3 (Debt Claims) should read, in its entirety, this Disclosure Statement, the Plan and the Plan Supplement, the Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions accompanying the Ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorney.

**C.    Confirmation Hearing and Deadline for Objections to Confirmation**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtor has fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for **[_____], 2020, at [__]:00 [_].m. (~~prevailing Eastern~~Pacific** Time)**, before the Honorable ~~Judge Karen B. Owens~~Vincent P. Zurzolo, United States Bankruptcy Judge ~~for the District of Delaware~~, in, in Courtroom 1368 of the United States Bankruptcy Court for the Central District of ~~Delaware, located at 824 North Market Street, 6th Floor, Wilmington, Delaware 19801~~California Los Angeles Division, Roybal Federal Building, 255 E. Temple Street, Los Angeles, California 90012. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice. Any objection to Confirmation must (1) be in writing, (2) state the name and address of the objecting party and the nature of the Claim of such party, and (3) state with particularity the basis and nature of such objection. Any such objections must be filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

**D.    Advisors**

The Debtor's proposed bankruptcy counsel is Pachulski Stang Ziehl & Jones LLP. The Debtor's proposed special counsel is O'Melveny & Myers LLP. The Debtor's advisors can be contacted at:

PACHULSKI STANG ZIEHL & JONES LLP          O'MELVENY AND MYERS LLP

919 North Market Street
17th Floor
Wilmington, Delaware 19801
Attn: James E. O'Neill
Email: joneill@pszjlaw.com

- and -

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Attn: Richard M. Pachulski
        Jeffrey W. Dulberg
        Malhar S. Pagay
Email:  rpachulski@pszjlaw.com;
jdulberg@pszjlaw.com; mpagay@pszjlaw.com

Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Attn: Suzzanne Uhland
        Diana M. Perez
Email: suhland@omm.com; dperez@omm.com

- and -

O'MELVENY & MYERS LLP
31st Floor, AIA Central
1 Connaught Road Central
Hong Kong, S.A.R.
Attn: Li Han
Email: lhan@omm.com

II.

## GENERAL INFORMATION

### A.    YT's Background

The majority of YT's debt today stems from his personal guarantees or money he borrowed directly on behalf of companies that he founded or led. YT took these loans for his previous companies in good faith to fund his vision. He is now trying to fashion a trust, backed by his ownership of Smart King, to satisfy creditors, while still fulfilling the aspirations for ~~Smart King and~~the FF Group. His proposal, in short, is to align the interests of his creditors with the future of the FF Group while satisfying his debt.

YT founded LeEco, the first internet-based TV streaming service in the PRC. As founder of LeEco (formerly LeTV), he built a global technology company and led its expansion to include LeshiZhiXin, Le Vision Pictures, Le Sports, LeMobile, LeTV, and other companies. He took LeTV to a successful initial public offering on the Growth Enterprise Market (or GEM) of the Shenzhen Stock Exchange in 2010, and in 2014, Forbes China ranked him as the No. 1 CEO in the country. To meet the capital demands for such expansion, YT relied heavily on borrowing from commercial banks and other financial institutions, as it was relatively difficult for a publicly-traded company to issue new shares in the PRC at the time.

However, YT's businesses, including LeEco, required substantial investment in R&D and business expansion and, as a consequence, never generated positive cash flows. He sold some of his businesses to an investor in early 2017 to generate cash and repay certain corporate debts. Afterward, as bank financing became increasingly difficult to obtain, in July 2017, one of YT's lenders, China Merchant Bank, issued a letter to LeEco demanding payment of nearly RMB30 million in interest, although LeEco had already paid more than half of the borrowed amount. When LeEco did not make the payment by the date demanded, China Merchant Bank froze YT's and LeEco's assets. Media coverage of LeEco's financial challenges negatively impacted discussions YT was having with other equity and debt investors, and creditors sued to recover the unpaid balance of their loans. The stock price of LeTV dropped severely, which significantly impacted the collateral value of YT's LeTV shares.

Certain of YT's creditors received judgments against him and his business ventures and, prior to the commencement of the chapter 11 case, sought to recover on those judgments. Three of these creditors are Shanghai Lan Cai Asset Management Co., Ltd. ("SLC"), Shanghai Qichengyueming Investment Partnership Enterprise ("SQ"), and Jinan Rui Si Le Enterprise Management Consulting Partnership. The Beijing Arbitration Commission issued an award in favor of SLC~~, which a~~. A U.S. federal district court judge in California subsequently confirmed. ~~The federal district court~~ the award and ~~issued a writ of execution in SLC's favor~~ and issued a preliminary injunction. In connection with the enforcement of the district court judgment (which was not stayed pending appeal), SLC obtained a temporary restraining order to prevent YT from taking any action to transfer, conceal, reduce, or encumber personal assets up to the value of SLC's judgment against YT, including YT's beneficial ownership interest in FF, held through FF Top, and YT's alleged beneficial interest in certain real estate owned by Ocean View Drive, Inc. ("Ocean View"). YT appealed the federal district court's judgment to the U.S. Court of Appeals for the Ninth Circuit. In his appeal, YT argues that the district court erroneously let SLC proceed without joining a necessary party, and also incorrectly calculated interest on the arbitral judgment. The appeal is currently stayed pursuant to an order entered on November 15, 2019 by the U.S. Court of Appeals for the Ninth Circuit.

SQ also sought to enforce a foreign arbitral award issued by the China International Economic and Trade Arbitration Commission (CIETAC) against YT and ~~Leview~~LeView Holding Limited. In July

2019, a federal district court in Los Angeles entered a consent judgment confirming the arbitral award entered in favor of SQ. SQ filed a motion to amend the consent judgment in 2019. The case is currently stayed, including the motion to amend, and the court has not yet issued a writ of execution. Jinan Rui Si Le has commenced litigation in the Superior Court for the State of California, County of Los Angeles to enforce a judgment entered against YT and various affiliated entities in the PRC by the Intermediate People's Court of Jinan City, Shandong Province. The superior court has not entered judgment and the case was pending as of the filing of the chapter 11 case.

Since China Merchants Bank froze all the assets and operating accounts of YT and ~~LeECo~~LeEco group (which were worth, at the time, substantially greater than the default amount), which directly led to the cash crunch and collapse of LeEco group, YT has repaid over $3 billion worth of debts~~, with remaining. The~~ frozen assets of the LeEco group and YT in the PRC that are yet to be disposed of ~~and~~ are ~~estimated to be valued around~~worth approximately $1 billion.

**B.    YT's Liabilities**

The majority of YT's debts stem from his personal guarantees for businesses that he operated in the PRC. YT has estimated that $~~3.770~~3.77 billion in Debt Claims have been asserted against him. Many of his creditors also assert contractual, judgment, or penalty interest under Chinese law. The claims against YT fall into four general categories: (i) unsecured direct claims against YT; (ii) direct claims against YT secured by his assets in the PRC; (iii) claims against YT based on guarantees of unsecured loans to other entities; and (iv) claims against YT based on guarantees of loans to other entities secured by such entities' assets in the PRC. Approximately $3.1 billion of YT's approximately $3.77 billion of putative Debt Claims are on account of guarantees. YT cannot estimate the amount that may be recovered from collateral or the primary obligors on account of such claims. _Since the commencement of this chapter 11 case, Wei Gan, YT's spouse who has initiated a divorce proceeding, has filed a proof of claim in the amount of approximately $571 million._ In addition, in order to provide financing for his proposed restructuring, YT obtained a prepetition secured loan from Pacific Technology in the amount of $~~2,677,629~~2,687,629.

The amount of claims for distribution purposes in the Trust will ~~exclude interest accrued on, or penalties in respect of, such claim and~~include unpaid interest at the rate of four percent per annum from the time the underlying debt arose through October 14, 2019, the date YT filed his voluntary chapter 11 petition. The amount of claims for distribution purposes in the Trust will ~~also~~ be reduced to the extent that the holder of the Trust Interest receives payment from a primary obligor, recovers from collateral pledged to support direct obligations of the primary obligor, or the obligation of the primary obligor is otherwise satisfied, including by conversion of debt to equity.

**C.    YT's Interest in ~~Faraday & Future Inc.~~the FF Group**

_The discussion of the business of the FF Group and the electric vehicle industry below is qualified by, and should be read in conjunction with, the discussion of the risks related to ~~FF's~~the FF Group's business and its industry detailed elsewhere in this Disclosure Statement. This Disclosure Statement and related materials relate only to the Plan of YT and do not relate to and should not be deemed to suggest that, Smart King or FF is seeking a plan of reorganization or bankruptcy at this time. Any information about the FF Group is ~~provided~~ solely ~~to provide~~provided to creditors of YT ~~with information~~ to assist them in voting on the Plan. Although there is a discussion in this Disclosure Statement about the FF Group (including its own distressed financial position and efforts to raise funds and business prospects), such information is based on information obtained by YT for use herein and solely relates to the Plan. The information about the FF Group is believed by YT to be reliable. However, such information relates only to circumstances as of the dates the information was available and there_

*can be no assurance that subsequent occurrences have not rendered such information inaccurate. Such information about* ~~the~~ *FF* Group *is solely the responsibility of YT.*

### 1.    Overview of ~~the~~ FF Group

The FF Group is a pre-revenue ~~development stage~~development-stage global technology company headquartered in Los Angeles, California, with additional development activities and operations in the PRC~~,~~ that designs and manufactures next-generation, zero-emission smart electric vehicles and mobility ecosystem with a view to carving out a dual-market strategy and having manufacturing capabilities and operations in both the U.S. and the PRC, the two largest electric vehicle markets. The FF Group has designed a new mobility platform that integrates clean energy, intelligent design, internet vehicle connectivity, and artificial intelligence functionality to create a seamless user experience. The FF Group has assembled a global team of automotive and technology experts and innovators to achieve its goal of redefining mobility.

To date, significant capital has been deployed for research and development associated with ~~FF's~~the FF Group's electric vehicles, corporate planning, administration and development, and investment in key property and equipment. Over the last four years, the FF Group has developed a portfolio of intellectual property, established its proposed supply chain, and completed several pre-production vehicles for the FF 91, its first vehicle model. FF revealed the FF 91, in January 2017, and is working to complete the testing and validation and begin the manufacture and delivery of the FF 91 to the market.

FF has already been listed as No. 4 on The Tech Tribune's 2019 US Best Tech Startups~~, and~~. The FF Group has filed 1,322 patents, 951 in the PRC and 342 in the U.S. The FF Group continues to grow in the PRC as well. ~~In March 2019, FF entered into a 50-50 joint venture agreement with The9 Limited, a Nasdaq-listed company, to serve the market in the PRC. The venture is to manufacture, market, sell, and distribute another planned vehicle, the Icon V9, in the PRC. In August 2019, the joint venture was incorporated in Hong Kong.~~

### 2.    Corporate Structure of ~~Smart King and~~the FF Group

The FF Group commenced its operations in May 2014 when FF was incorporated ~~and founded as Faraday & Future Inc.~~ in the State of California ~~in May 2014. In July 2014, FF established LeSEE Automotive (Beijing) Co., Ltd. ("LeSee Beijing"), FF's PRC operating entity, to commence its operation in the PRC~~. To facilitate global investment in ~~FF's~~the FF Group's business and operations in different jurisdictions, the FF Group established a Cayman Islands holding structure for the entities within the group. FF Global Holdings (now known as Smart Technology Holdings Ltd.) was incorporated on May 23, 2014, in the Cayman Islands, which owned and/or controlled 100% of the shareholding of all operating subsidiaries in the group, including FF. In March 2017, the FF Group established its wholly-foreign-owned entity ("WFOE") in China, FF Automotive (China) Co., Ltd.

As part of a broader corporate reorganization, and ~~for third-party~~in connection with the investment from Season Smart, Smart King was incorporated in the Cayman Islands in November 2017, as the parent company of Smart Technology Holdings Ltd. To enable effective control over ~~FF's~~the FF Group's PRC operating entity and its subsidiaries, in November 2017, the WFOE entered into a variable interest entity ("VIE") contractual arrangement with LeSee Automotive (Beijing) Co., Ltd. ("LeSee Beijing") and LeSEE Zhile Technology Co., Ltd., who held 100% of LeSee Beijing at that time. LeSee Beijing was formed in China in July 2014 and is currently owned by LeSEE Zhile Technology Co., FF Automotive (China) Co., Ltd. and Zhigang Wang. The VIE contractual arrangement enables Smart King ~~to,~~ as the holding company of the FF Group, to exercise effective control over LeSee Beijing and its

subsidiaries, to receive substantially all of the economic benefits of such entities, and to have an exclusive option to purchase all or part of the equity interests in LeSee Beijing. ~~The VIE contractual arrangement was terminated on December 31, 2018. The new VIE structure was established on August 23, 2019. However, due to immigration requirements, the VIE structure is in the process of being adjusted.~~

Smart King is ~~a~~the holding company of the FF Group with no material operations of its own. All operations are conducted through operational entities within the FF Group, including Smart King's U.S. subsidiaries (such as FF) and its VIEs and their respective subsidiaries in the PRC. 40.8% of Smart King's equity is currently owned by FF Top and the remaining equity of Smart King is owned by Season Smart, an affiliate of Evergrande, and the option holders and Class A ordinary shareholders under Smart King's equity incentive plan. The entity that sits above Smart King's holding company structure is Pacific Technology, which holds 100% of the issued and outstanding equity interests of FF Top, and FF Global Partners LLC ("FF Global"), which holds 80% of the issued and outstanding equity interests of Pacific Technology. For more information on FF Global, please refer to the discussion in Article II.C.2.d entitled "FF Global Partnership Program."

    *a.    Evergrande Investment*

On November 30, 2017, Smart King, Evergrande (through its affiliate, Season Smart), and certain other parties entered into that certain agreement and plan of merger and subscription (as amended by the first amendment on February 9, 2018 and by the second amendment on May 23, 2018, the "Merger Agreement"). Pursuant to the Merger Agreement, Evergrande made a commitment to invest $2.0 billion in Smart King, through Evergrande's affiliate, Season Smart, in exchange for a 45% stake in Smart King. In December 2017 and June 2018, respectively, Smart King issued 65,926,748 Class A preferred shares and 752,255,070 Class A preferred shares to ~~Evergrande~~Season Smart, for gross proceeds of $800 million, with the remaining $1.2 billion to be contributed by the end of 2019 and 2020.

Disputes later arose between Smart King and ~~Evergrande~~Season Smart as to the performance of their obligations and the effectiveness of a certain amendment and consent on July 18, 2018. As a result of those disputes, ~~Evergrande~~Season Smart and its affiliated entities asserted claims and counterclaims in the amount of approximately $200,000,000 against Smart King and its affiliated entities. On December 31, 2018, Smart King and ~~Evergrande~~Season Smart entered into a restructuring agreement to resolve their prior disputes. Pursuant to the restructuring agreement, ~~Evergrande's~~Season Smart's equity interest in Smart King was reduced to 32%, and Smart King may at any time before December 31, 2023, redeem, in part or in whole, the shares of Smart King held by ~~Evergrande~~Season Smart at a predetermined redemption price. In exchange, ~~Evergrande~~Season Smart was released from its obligation to make additional investments. The restructuring agreement also provided that, among other matters, (i) each of ~~Evergrande~~Season Smart and Smart King agreed to release each other and their respective affiliates from all claims each of them may have had against the other and to withdraw from or cease all existing arbitration, litigation, and other proceedings; (ii) the parties agreed that Season Smart would no longer continue to invest in Smart King; (iii) ~~Evergrande~~Season Smart agreed that Smart King could enter into new equity financing arrangements without ~~Evergrande's~~Season Smart's approval so long as the valuation for such equity financing is not less than a specified threshold; and (iv) ~~Evergrande~~Season Smart agreed to acquire, ~~through Season Smart,~~ Evergrande FF Holding (Hong Kong) Limited, which was previously a wholly-owned subsidiary of Smart King and owned certain PRC assets of Smart King. The VIE arrangement was terminated on the same day, and was reentered into in August 2019.

Pursuant to the restructuring agreement entered between Season Smart, Smart King, and YT, Season Smart granted YT a call option with respect to the 470,588,235 fully paid redeemable preference shares of Smart King or all outstanding Smart King equity held by Season Smart (collectively, the "Option Shares"). The call option expires on December 31, 2023. The call option can be exercised in

whole or in part. The price payable for the Option Shares depends on when the call option is exercised. If the call option is exercised within a year after December 31, 2018, the effective date of the restructuring agreement, the price payable is US $600,000,000. The price payable increases annually and reaches $1,050,000,000 if the call option is exercised in the last ~~period~~year.

b.    *Smart King's Current Corporate Governance*

Under Smart King's Fifth Amended and Restated Articles of Association (the "<u>Articles</u>"), Smart King is authorized to issue (i) 400,000,000 Class A ordinary shares, (ii) 100,000,000 Class B ordinary shares, (iii) 470,588,235 Redeemable Preference Shares, (iv) 600,000,000 Class B preferred shares, and (v) 1,715,185 Class C preferred shares. Upon any transfer of Class B preferred shares to a third party, such shares will automatically convert to Class B ordinary shares. As of the date of this Disclosure Statement, there ~~is~~are no Class C preferred shares issued or outstanding, all of the issued and outstanding Class B preferred shares are held by FF Top, and all of the issued and outstanding Redeemable Preference Shares are held by Season Smart.

Holders of Class A Ordinary shares do not have any voting rights, while: (i) holders of Class B Ordinary shares are entitled to one vote per share; (ii) holders of Redeemable Preference Shares are entitled to 0.5625 votes per share; (iii) holders of Class B Preferred shares are entitled to ten votes per share; and (iv) holders of Class C preferred shares are entitled to one vote per share. The holders of shares that are entitled to voting rights vote on matters together as a single class. Season Smart has approval rights over certain matters as set forth in the Articles, including (a) any amendments to the Articles that would have an adverse effect on the rights, preferences, or privileges attached to Redeemable Preference Shares; (b) the issuance of any Redeemable Preference Shares to any person; (c) the entering into any related party transaction prior to a qualified financing that is not on arm's length terms; (d) the issuance of equity securities of any Smart King subsidiary (subject to enumerated exceptions); and (e) the issuance of any equity securities of Smart King at a price below a certain minimum price or that have a senior liquidation preference to Redeemable Preference Shares.

There is no obligation under the Articles for the board of directors of Smart King to declare dividends, and holders of Preferred shares do not have any accrued rights in the case no dividends are declared. The board of directors of Smart King also cannot declare, pay, or set aside any dividends unless and until all Redeemable Preference Shares have been redeemed and paid in full. Dividends declared by the board of directors of Smart King are not cumulative. Smart King's ability to pay dividends may depend upon dividends paid by its subsidiaries.

In the event of a dissolution or winding up of Smart King, the holders of ordinary shares and preferred shares shall be paid out by Smart King in accordance with the following waterfall. First, holders of Redeemable Preference Shares shall have all of their Redeemable Preference Shares redeemed and paid in full. Second, holders of Class B preferred shares and Class C preferred shares, on a *pari passu* basis, shall be paid their liquidation preference amount as set forth in the Articles. Third, to the extent that Smart King has surplus assets remaining after redemption of all Redeemable Preference Shares and payment of the requisite amounts to the Class B preferred shareholders, Class C preferred shareholders, holders of Class A ordinary shares, and holders of Class B Ordinary shares shall be entitled to payment out of such surplus assets.

Smart King has a ~~call option~~redemption right with respect to the Redeemable Preference Shares upon issuance of a redemption notice within the ~~five year~~five-year period beginning on December 31, 2018. Smart King is required to redeem all Redeemable Preference Shares upon any dissolution, winding up, liquidation, insolvency, declaration of bankruptcy, or change of control of Smart King. ~~Ordinary shares are not redeemable.~~

Immediately prior to any initial public offering (an "IPO") of the equity of Smart King, holders of Redeemable Preference Shares have the option to convert their Redeemable Preference Shares into the class of shares that will be held by the public shareholders of Smart King following the IPO. The number of such shares held by holders of Redeemable Preference Shares that have elected to convert their Redeemable Preference Shares shall be the number that would result in such holders owning the same percentage ownership of Smart King on a fully diluted basis that such holders owned immediately prior to the conversion.

<em>c.  Stock Incentive Plans</em>

On February 1, 2018, Smart King amended and restated its equity incentive plan originally adopted in 2015. Under the Smart King Ltd. Equity Incentive Plan (the "2018 Equity Plan"), the board of directors of Smart King or the administrator of the 2018 Equity Plan may grant up to 300,000,000 nonqualified incentive stock options, restricted shares, unrestricted shares, restricted shares units, and other stock-based awards for Class A ordinary shares to employees, directors, and consultants. As of the date of this Disclosure Statement, awards to purchase an aggregate amount of 205,791,717 Class A ordinary shares under the 2018 Equity Plan have been granted and were outstanding, and awards to purchase 34,129,939 Class A shares have been exercised.

On May 2, 2019, Smart King adopted its Short-Term Incentive Plan ("STI Plan"), under which the administrator of the STI Plan may grant up to 100,000,000 nonqualified incentive stock options, restricted shares, unrestricted shares, restricted shares units for Class B ordinary shares to employees, directors, and consultants. The options vest and become exercisable as determined by the administrator. ~~As the date of this Disclosure Statement, no awards had been granted under the STI Plan.~~

<em>d.  FF Global Partnership Program</em>

In order to incentivize like-minded management members to truly commit themselves to FF's success, YT and his team considered various governance structures for ~~Smart King~~the FF Group, including Alibaba's partnership program, partnerships in the consulting industry, and cooperatives found in industries including news media, agriculture, and home improvement. After carefully assessing these options, YT determined that a partnership modeled after Alibaba's partnership program would best advance the goals and prospects of FF. A partnership program (the "Partnership Program") through FF Global enables FF to attract top talent across industries and disciplines, who will be loyal to each other and committed to the success of FF. The establishment of the Partnership Program was intended to position FF to become a well-managed and innovative company. The Partnership Program improves the prospects of success for all ~~FF's~~the FF Group's stakeholders.

To establish the Partnership Program, the entities that owned ~~YT's~~ 40.8% of the equity interests in Smart King engaged in a series of transactions with certain management members and employees of FF. ~~YT believes that the Partnership Program lays a solid foundation for an advanced corporate governance structure and talent base, and facilitates retaining and attracting global talent across industries.~~ (the "Partners"). The Partners hold their interests in Smart King indirectly through FF Global and three other intermediary holdings companies. The Partners collectively own 100% of the equity interest in FF Global, which owns 80% of the equity interests in Pacific Technology. Pacific Technology owns 100% of the equity interest in FF Peak Holding Limited, a British Virgin Islands Company ("FF Peak"), which in turn holds 100% of the equity interests in FF Top. As of the date hereof, FF Top owned 600,000,000 Class B preferred shares of Smart King.

FF Global is managed by a committee, which consists of managers initially elected or appointed by its ~~partners~~Partners. As of the date of this Disclosure Statement, FF Global had ~~22~~25 partners. YT,

16

who is not a member of FF Global, serves as one of the managers on the committee. ~~Jiawei Wang is the managing Partner of FF Global and has veto rights over FF Global's corporate actions.~~ FF Global acts upon the committee's decisions, which are determined by the affirmative approval of a majority of the managers who are present and vote on the matter, subject to the veto rights of the managing Partner over certain matters. <u>Jiawei Wang is the current</u> <u>managing Partner of FF Global.</u> The Partners are in the process of reviewing the governance of FF Global and there may be changes to this structure in the future.

~~The Partners hold their interests in Smart King indirectly through FF Global and three other intermediary holding companies. The Partners collectively own 100% of the equity interests in FF Global, which owns 80% of the equity interests in Pacific Technology. Pacific Technology owns 100% of the equity interests in FF Peak Holding Limited, a British Virgin Islands Company ("FF Peak"), which in turn holds 100% of the equity interests in FF Top. As of the date hereof, FF Top owned 600,000,000 Class B preferred shares of Smart King.~~

According to the subscription agreements <u>between the Partners and FF Global</u>, the Partners subscribed for the units <u>of FF Global</u> at the per unit price of $0.50. The total consideration of units was to be paid in ten (10) installments with the first 10% due and payable in five (5) months after the closing and the remaining 90% being paid in nine equal, successive annual payments due and payable in five (5) months after the applicable anniversary of the respective closing date.

~~If the Series B Equity Financing (as defined below) of Smart King has a pre-money valuation of not less than $529.5 million, the $0.50 per unit purchase price shall be adjusted to $4.9 per unit. The respective Partner shall pay an additional $4.4 per unit to FF Global but such payment will only be paid after offsetting distributions or payments made by FF Global to such Partner. The increased $4.9 per unit purchase price shall apply to units that have not been paid by the Partners prior to the equity financing.~~ FF Global also has certain redemption rights and rights to reacquire the units of Partners who terminate their employment with FF <u>and its affiliates</u>.

In addition to capital contributions, several partners lent approximately $15.3 million to FF Global pursuant to certain promissory notes dated as of June 26, 2019. After receiving the funds from the Partners, on July 5, 2019, FF Global subscribed, at a purchase price of $0.50 per unit, for 362,352,941 common units of Pacific Technology, which represented 100% of the issued and outstanding common units of Pacific Technology and 80% of the total equity interest of Pacific Technology. The remaining 20% interest is owned by West Coast LLC, a Delaware limited liability company ("West Coast"), which holds 90,588,235 preferred units of Pacific Technology. As noted below, YT owns 100% of the ~~equity~~<u>economic</u> interests in West Coast <u>through a nominee agreement</u>.

On June 26, 2019, FF Global lent approximately $16.5 million to Pacific Technology, which then lent the same amount to Ever Trust LLC, a Delaware limited liability company, and Ever Trust LLC lent the same amount to FF to support FF's daily operations. When FF Global purchased the common units of Pacific Technology on July 5, 2019, part of the consideration was paid by cancelling the relevant promissory note.

After giving effect to the FF Global transactions, YT retains the following economic rights. First, YT retained the right to direct Pacific Technology to direct FF Top to transfer ~~147,048,823~~<u>147,058,823</u> Class B ordinary shares of Smart King to a creditor trust. These interests represent 10% of Smart King's equity. Second, YT retained 100% of the preferred units of Pacific Technology, which entitle YT to (1) a priority distribution of up to $815.7 million (subject to certain adjustments) <u>plus 8% interest per annum</u> from Pacific Technology's 30.8% of Smart King's equity interest, after the return of capital to the management <u>(plus 8% interest per annum)</u>, (2) a special distribution of 10% of the remaining amounts from Pacific Technology's 30.8% of Smart King's equity interest, and (3) thereafter a distribution based on the 20% percentage interest of the units of Pacific Technology.

(Modified)

* All ownership interests are 100% unless otherwise indicated.

*e.    Organizational Chart[5]*

Below is a simplified organizational chart for ~~Smart King~~the FF Group and certain of its key affiliates as of the date of this Disclosure Statement, and before giving effect to any awards under the ~~2020~~Future Equity Incentive Plan or any other equity incentives or conversion of securities:

~~(i) Includes the 10% interest of Smart King to be transferred by FF Top to the Trust upon consummation of the Plan.~~

**3.    Indebtedness of the FF ~~and Smart King~~Group**

~~Smart King~~The FF Group has received approximately $1.7 billion in funding—$900 million from YT and other sources, and, as discussed above, $800 million from Season Smart, an affiliate of

---

[5] All ownership interests are 100% unless otherwise indicated.

Evergrande. As of December 31, 2018, ~~Smart King~~the FF Group had cash and restricted cash of approximately $7.4 million, and a working capital deficit of $579.1 million.

On April 29, 2019, FF entered into a term loan agreement for a principal amount of $15.0 million with BL Mobility Fundco, LLC, as the lender, and Birch Lake Fund Management ("Birch Lake"), as the agent and collateral agent. The loan matured and was paid off on September 30, 2019. The loan was guaranteed by Smart King and several of its subsidiaries in the U.S., the Cayman Islands, and Hong Kong, and was secured by a first lien on substantially all tangible and intangible assets of the borrowers and guarantors. Proceeds of the loan were used to pay down existing liabilities and fund the working capital needs of FF. The loan bore interest at 15.50%, and a default rate of 21.50%. The loan was subject to a liquidation preference premium of up to 63.50% of the original principal amount, of which the borrowers had the right to convert 30% of the liquidation preference premium into equity interests of Smart King.

On April 29, 2019, FF entered into a note purchase agreement ("NPA") with certain purchasers, U.S. Bank National Association, as the notes agent, and Birch Lake, as the collateral agent. The notes are guaranteed by Smart King and several of its subsidiaries in the U.S., Cayman Islands, and Hong Kong. The aggregate principal amount of notes that may be issued under the NPA is $200.0 million. As of the date of this Disclosure Statement, a total of $45.0 million of notes were issued at a 10% interest rate, and are collateralized by a first lien, with second payment priority, on substantially all tangible and intangible assets of the borrowers and guarantors. The ~~originally~~original maturity date of the notes was October 31, 2019, however, FF obtained an extension of the maturity date to May, 31, 2020. In addition, the FF Group is currently seeking a new bridge financing, partly to pay off the existing notes. However, there is no assurance that any of the funding will be available on terms that are acceptable to FF or at all. In the event that FF fails to obtain an extension, and/or fails to secure capital to pay off the note, and the lender decides to foreclose on the collateral, ~~FF's~~the FF Group's business and operations will be materially disrupted, as there is no assurance the FF Group can continue as a going concern.

In addition to the loans described above, a loan in the principal amount of $10.0 million was provided by Evergrande as part of the restructuring agreement entered into by Smart King and Evergrande on December 31, 2018, which was drawn down in January 2019. The loan bears interest at an annual rate of 10% if repaid by June 30, 2019, and increases to 15% per annum thereafter. The loan matured on June 30, 2019 and Smart King is currently in default. As of July 31, 2019, the full principal amount of $10.0 million remained outstanding.

### 4. ~~FF's~~FF Group's Management

The following table sets forth information regarding ~~FF's~~the FF Group's executive officers as of the date of this Disclosure Statement.

| Directors and Executive Officers | Age | Position/Title |
| --- | --- | --- |
| Yueting Jia | ~~45~~46 | Founder and Chief Product and User Officer, Director |
| Dr. Carsten Breitfeld | 56 | Global Chief Executive Officer |
| Matthias Aydt | 62 | Vehicle Chief Engineer, Director |
| Jiawei Wang | 29 | VP of Global Capital Markets, Director |
| Chaoying Deng | 61 | VP of Government Affairs, Director |
| Chui Tin Mok | 44 | EVP of Global UP2U, Director |
| Jarret Johnson | 52 | Acting General Counsel, Secretary |

YT is ~~FF's~~the FF Group's founder and a Director of ~~FF~~Smart King, and had served as the Chief Executive Officer ~~since FF's inception in 2014~~of the FF Group from December 2017 until September 2019. Currently, YT serves as FF's Chief Product and User Officer, overseeing product definition, user experience and the overall implementation of the internet eco-system model. YT received his master's degree in Cooperation Management from Shan Xi University.

**Dr. Carsten Breitfeld** has served as FF's Global Chief Executive Officer since September 2019. Dr. Carsten Breitfeld is a veteran in the automotive industry, and had served at positions with BMW Group for approximately 20 years and served as its Group Vice President and Head of the i8 Vehicle Program, which gave birth to the i8 luxury plug-in hybrid model. From April 2016 to April 2019, Dr. Breitfeld was the Chief Executive Officer and Chairman of the Board of BYTON, a Chinese electric vehicle startup cofounded by Dr. Breitfeld and having its operations in multiple countries. Dr. Breitfeld received his Ph.D. degree in Mechanical Engineering from the University of Hannover.

**Mr. Matthias Aydt** has served as FF's Vehicle Chief Engineer since July 2017 and a director of ~~FF~~Smart King since February 2019. Prior to joining FF in July 2016, Mr. Aydt served as the vice president of Qoros Auto from 2015 to 2016, various positions at Magna Steyr from 2006 to 2014, including Branch Manager from 2011 to 2014 and Head of Project Management from 2010 to 2011, Managing Director of IVM automotive, Senior Manager at Wilhelm Karmann, Vice President at CTS Fahrzeug-Dachsystem GmBG and an engineer at Porsche. Mr. Aydt received his Bachelor of Science degree from Fachhochschule Ulm - Hochschule für Technik.

**Mr. Jiawei Wang** has served as FF's Vice President of Capital Markets since May 2018, and ~~FF's~~Smart King's director since December 2017. Prior to joining FF, Mr. Wang co-founded Galaxy Global Inc. in September 2013 and worked as a private equity analyst at Knights Investment Group from December 2013 to February 2014. Mr. Wang received his bachelor degree's in Finance from Central University of Finance and Economics ~~and his master degree in economics from New York University~~.

**Ms. Chaoying Deng** has served as FF's Vice President of Government Affairs since November 2019, and ~~FF's~~Smart King's Director since December 2017. Prior to joining FF in 2014, Ms. Deng served as the Chief Executive Officer of Red Dragonfly Entertainment from November 2010 to 2014, Vice President of Business Development at Pipeline Micro Inc. from March 2008 to July 2010, Vice President and General Manager of Quantum Leap Interactive from November 2006 to December 2007, the Director of Global Accounts Business at Fujitsu (China) Holdings Co., Ltd. from October 2001 to August 2007. Ms. Deng received her Associate of Science Degree in Electrical Engineering from Northwest University of Engineering and Master's degree in Business Administration from Hawaii Pacific University.

**Mr. Chui Tin Mok** has served as FF's Executive Vice President of UP2U since January 2019, and ~~FF's~~Smart King's Director since February 2019. Prior to joining FF, Mr. Mok founded 18Financial Group Limited in July 2017. From December 2013 to July 2017, Mr. Mok served as the group Chief Marketing Officer of LeEco from December 2013 to July 2017, Global Vice President of Sales and Marketing at Meizu Technology Co., Ltd. from September 2010 to October 2013, General Manager at Skyway (Woow Digital) Technology Ltd. from March 2008 to September 2010. Mr. Mok received his higher diploma in Building Service Engineering from Hong Kong Institute of Vocational Education, and his Executive Master's degree in Business Administration from International Business Academy of Switzerland.

**Mr. Jarret Johnson** has served as FF's Acting General Counsel since November 2018 and the Secretary of FF since September 2018. Prior to joining FF in May 2018, Mr. Johnson has served as the Assistant General Counsel at Toyota Financial Services from April 2003 to September 2017, and Vice President and General Counsel at USBX from October 2000 to April 2003. Mr. Johnson received his

bachelor's degree in Industrial Engineering and Management from Oklahoma State University, and his Juris Doctor from Loyola Law School.

### 5.    2020Future Equity Incentive Plan

In order to align incentives and reward YT and other key members of management infor achieving FF'sthe FF Group's strategic goals, it is anticipated that Smart King will adopt the 2020 Equity Incentive Plan, subject to the consummation of the Plan. Under the 2020 Equity Incentive Plan, the board of directors of Smart King maya management incentive plan will be adopted to grant certain stock-based awards to or at the direction of YT upon the achievement of financial targets upon a Distribution Event (as defined below), provided that the stock-based awards granted to YT will not exceed the awards set forth below without the consent of the Trustee (which consent shall not be unreasonably withheld). The total available equity awards under the 2020Future Equity Incentive Plan will be as follows[6]:

| Smart King Total Equity Value (in millions of USD) | $5,000 | $10,000 | $21,000 |
|---|---|---|---|
| Dilution | 2% (Post series B) | Additional 3% (Post IPO) | Additional 3% (Post IPO) |

### 6.    FF'sThe FF Group's Strategy

The FF Group aims to capture high-value users through its transformative products, technologies, and sharing platforms, while cultivating and growing its shared intelligent mobility ecosystem, to provide an ultimate user experience. In order to achieve its mission, the FF Group will continue to focus on the following initiatives:

*a.    Secure Substantial Financing*

Bringing a visionary electric vehicle to the market–from design to engineering to development to manufacturing–is capital intensive. The FF Group intends to secure long-term financing in order to focus its resources on the execution of its business plan, while in the interim, obtaining new bridge debt financing to sustain its engineering efforts and operations. The FF Group intends to use a combination of equity financing and bridge debt financing to pay off its existing debts. *See* "Management's Discussion and Analysis of Financial Condition and Results of Operations of Smart King Ltd.the FF Group," attached hereto as **Exhibit C**.

The FF has engaged Stifel, Nicolaus & Co. ("Stifel") to assist it in raising equity financing. With the assistance of Stifel, FFGroup is seeking to raise $850 million through the issuance of Series B Preferred shares (the "Series B Equity Financing"). The FF Group intends to close the Series B Equity Financing by JanuaryMarch 2020. There can be no assurance that the FF Group will be able to complete the Series B Equity Financing, or any other financing, on a timely basis and/or on reasonable commercial terms, or at all.

---

[6] Modification of the Future Equity Incentive Plan may be subject to consent of the Trustee as set forth in section V.E of this disclosure statement.

b.    *Kick-Start Production of the FF 91*

The FF 91 represents a bold new breed of electric mobility that combines high performance, precise handling, the comfort of an ultra-luxury passenger vehicle, and a unique collection of intelligent internet features. It leverages the variable platform architecture ("VPA") structure designed and engineered in-house, which is a flexible powertrain system featuring a monocoque vehicle structure in which the chassis and body are an integrated form. This integrated platform provides measurable improvements in overall vehicle rigidity, safety, and handling. It features a multi-motor configuration and an all-wheel drive system. With 3 electric motors (one in the front and two in the rear), the FF 91 is designed to be expected to produce 1,050 horsepower and 12,510 Newton meters (Nm) of torque to all four wheels, which enables the FF 91 to accelerate from zero to 60 mph in 2.39 seconds. In addition, the FF 91's all-wheel drive system offers greater traction, control and precise power distribution. This technology delivers superior acceleration and safety. It leverages rear-wheel steering for agile cornering, allowing drivers to confidently execute maneuvers.

Bringing the FF 91 to the market is critical to sharing ~~FF's~~the FF Group's vision with the world. The FF Group has finished designing and engineering the FF 91 and has identified component sourcing for virtually all of the parts required for production of the FF 91, other than the front steering gear. The FF Group is currently preparing to execute a plan to refurbish its manufacturing facility in Hanford, California, and obtain the equipment necessary to support the production of the FF 91. As of the date of this Disclosure Statement, 90% of the factory equipment was in the buy-off stage at suppliers' facilities. The FF Group expects to start production of the FF 91 within nine months after completion of the Series B Equity Financing, and to deliver approximately 100 units to the market before the IPO of its shares (targeted for as early as early-to-mid-2021). Assuming the Series B Equity Financing can be completed, the FF Group intends to complete the build-out of the Hanford, California, manufacturing facility, and once fully built-out the FF Group estimates an annual production capacity at the Hanford, California manufacturing facility for the FF 91 of up to approximately 10,000 cars per year beginning in 2021. In order to ensure the beginning of the production of the FF 91 by its earliest start-date of October 2020, the FF Group has set the following target timeline, assuming it closes the Series B Equity Financing by ~~January~~March 2020:

- launch, as early as January 2020, the User Experience Program, or user-planning-to-user ("UP2U"), which is a process designed to involve users directly and loop in their feedback at all points of the product lifecycle, including design, research & development, manufacturing, communications, sales, after sales, and charging;

- build out the Hanford, California manufacturing facility beginning no later than ~~March 2020, or~~ two months after the closing of the Series B Equity Financing;

- settle all payables due to suppliers and reengage such suppliers no later than April 2020; restart the FF 91 pre-production builds for final testing ~~in April 2020, or~~ three months after the closing of the Series B Equity Financing;

- complete testing and validation, including self-certification of United States Federal Motor Vehicle Safety Standards ("FMVSS") and National Highway Traffic Safety Administration ("NHTSA") bumper standards, compliance, and manufacturing of the FF 91 ~~in October 2020, or~~ nine months after the closing of the Series B Equity Financing; and

- deliver the first 100 units of the FF 91 to the market until ~~April 2021, or~~ fifteen (15) months after the closing of the Series B Equity Financing.

In addition, as the FF Group views the PRC as an important production base for its future products to be launched and an essential market for ~~FF's~~the FF Group's development and future growth,

22

the FF Group is planning to build up its own manufacturing capability in the PRC through its joint venture as part of ~~FF's dual-market~~FF Group's dual-home market strategy.

    *c.*     *Hire Talent*

In September 2019, FF hired a new global Chief Executive Officer, a BMW AG veteran, Dr. Carsten Breitfeld, to facilitate bringing ~~FF's~~the FF Group's vision to fruition. ~~Assuming FF~~In November 2019, FF hired Bob Kruse, an automotive industry veteran with over 30 years of experience at GM and other consulting and start-up companies, as senior vice president, Product Execution (Engineering and Manufacturing). Additionally, in January 2020, FF hired Benedikt Hartmann, who has over 30 years of experience at BMW where he led several purchasing and supplier initiatives, as senior vice president of the Global Supply Chain organization. Assuming the FF Group is able to complete the Series B Equity Financing, the FF Group intends to hire additional employees, particularly in the area of supply chain, user design and engineering, manufacturing, and other functions, to expand its talent pool and drive technological innovation.

    *d.*     *Sales Efforts*

The FF Group intends to establish an on-line and off-line sales network. A prospective buyer may place orders directly through ~~FF's~~the FF Group's mobile application or directly at the offline stores, and be serviced through the FF Group's self-owned stores that the FF Group plans to establish in certain key markets or the FF Group's partnership stores that the FF Group plans to open with its franchise partners. The FF Group also intends to launch its User Experience Program, or UP2U as early as January 2020, in order to engage prospective buyers and users.

    **7.**     **~~FF~~Legal Proceedings and Vendor Trust**

The FF ~~has~~Group and its subsidiaries have been involved in litigation with contractors and suppliers due to cash constraints it has historically faced. As part of ~~its~~FF's financing efforts and to regain support from its contractors and suppliers, on April 29, 2019, the FF Group established the Faraday Vendor Trust (the "Vendor Trust") securing past due payables up to $150 million. The Vendor Trust is being managed by Force Ten Partners as the vendor trustee. All obligations due under the Vendor Trust are collateralized by a first lien, with third payment priority, on substantially all of ~~FF's~~the FF Group's tangible and intangible assets. The FF Group intends to satisfy the payables of the suppliers participating in the trust with the Series B Equity Financing that it intends to raise. The participating vendors agreed not to bring legal claims for overdue payment and to continue to cooperate with the FF Group. Also, most of the vendors agreed to resume supply once the FF Group has secured additional funding. All participating vendors are required to forbear from exercising remedies on any payables not tendered to or accepted by the Vendor Trust. As of the date of this Disclosure Statement, vendors owed aggregate payables of approximately $141.0 million have agreed to participate in the Vendor Trust, including several major vendors who have filed lawsuits against the FF Group. The FF Group estimates that the participating payables constitute all past due payables of approximately 80% of ~~FF's~~the FF Group's suppliers. ~~As of the date of this Disclosure Statement, litigation proceedings with five vendors who did not participate in the Vendor Trust are still pending.~~

    **8.**     **YT's Interests**

As described above in in connection with FF's Partnership Program, YT retains the economic interest with respect to all of the membership interests of West Coast. Based on the valuation of Smart King as of December 31, 2018, the value of YT's interests in West Coast is $862,241,246.67. YT, through West Coast, has a preferred distribution right in connection with 30.8% of Smart King's equity

interest, which is collectively owned by YT and the management through the Partnership Program. Such right will entitle him to a priority distribution of up to $815.7 million (subject to certain adjustments) plus 8% interest per annum, after the return of capital to the management (plus 8% interest per annum), a special distribution of 10% of the remaining amounts and thereafter, a normal distribution of 20% of the balance owned by Pacific Technology. The remaining equity of Smart King is owned by ~~Evergrande~~Season Smart and the option holders and Class A ordinary shareholders under Smart King's equity incentive plan.

Additionally, YT has the right to direct Pacific Technology to direct FF Top to transfer 147,058,823 Class B shares of Smart King currently owned by FF Top, representing 10% of Smart King's equity interests, to a creditor trust at the direction of YT.

**D.    YT's Other Assets**

**1.    Chinese Assets**

Chinese authorities have frozen YT's personal assets located in the PRC. Such assets include (a) approximately $~~88,679.76~~43,619.36 in deposits with various banks, such as China CITIC Bank and China Merchants Bank Corporation; (b) real estate in the PRC worth approximately $4,773,946.48; and (c) equity interests worth approximately $221,088,159.86 in various entities, such as Leshi Information Technology Co. Ltd. (delisted) and Scent (Beijing) Technology Co. Ltd. These assets are subject to claims against YT and his ownership of equity interests is subject to the creditor claims of those entities.

YT's frozen Chinese bank deposits include the following:

| Institution Name | Account Type | Amount |
|---|---|---|
| China CITIC Bank (China) | Savings | $13,797.90 |
| China CITIC Bank (China) | Savings | $18,964.20 |
| Hua Xia Bank (China) | Savings | $10.89 |
| China Merchants Bank Corporation | Savings | $0.76 |
| Bank of China (Hong Kong) Limited | Savings | $~~55,900.96~~10,840.56 |
| China Minsheng Bank | Savings | $5.05 |
| Shanghai Pudong Development Bank | Savings | Unknown |
| Shanghai Commercial Bank | Savings | Unknown |
| Bank of Beijing | Savings | Unknown |
| China Everbright Bank | Savings | Unknown |

YT's frozen Chinese real estate interests include the following:

| Address | Value | Other Information |
|---|---|---|
| Room 2003, Unit 4, Block 6, Area 2 Shuang Hua Yuan Nan Li Chaoyang | $1,145,890.14 | Property has been seized by Shanghai High People's Court |

| | | |
|---|---|---|
| District Beijing, 100022 China | | |
| Room 2001, Unit 5 Hai Sheng Ming Yuan, No. Yi 36 Dongcheng District Beijing, 100027 China | $3,532,281.69 | Property has been seized by Shanghai High People's Court |
| Room 1602, Block 11, Ting Lan Yuan Century City, Hangzhou, Andong Town Cixi Zhejiang Province 315327 China | $95,774.65 | Pending sale at an auction by the Chinese Courts |

YT's frozen Chinese equity interests include the following:

| Name of Entity | % of Ownership | Value |
|---|---|---|
| Leshi Information Technology Co. Ltd. (delisted) | 23.08% | $219,169,850.00[47] |
| Scent (Beijing) Technology Co. Ltd. | 2.27% | $1,918,309.86[58] |
| Leshi Holding (Beijing) Co. Ltd. | 92.07% | Unknown |
| Beijing Baile Culture Media Co., Ltd. | 99% | Unknown |

### 2.    The Yidao Claims Against the Wen Entities

As set forth in the Schedules, YT's bankruptcy estate may hold claims for fraud, breach of contract, defamation and/or unjust enrichment, and other potential causes of action against Xiaodong Wen ("Wen") and various entities under his control, including SLC, TWC Group Co., Ltd., Shanghai Zheyun Business Consulting Partnership (Limited Partnership), Beijing Blue Giant Real Estate Investment Fund Management Center (Limited Partnership), and Shenzhen Jincheng Commercial Factoring Co., Ltd. (collectively, the "Wen Entities"). *See* Schedules, Schedule A/B, item 33. Through a series of transactions in 2017, after obtaining certain interests of YT and his affiliate, the Wen Entities breached their obligations, resulting in hundreds of millions of dollars in damages. YT intends to investigate these transactions for the benefit of his estate and his creditors. The Plan contemplates a transfer to the Trust of all interests, claims, and Causes of Action owned by the Debtor (including through any nominee) in connection with Beijing Dongfang Cheyun Information Technology Co., Ltd. (the "Yidao Claims").

YT believes that the following events took place and gave rise to his potential claims against the Wen Entities (for the purpose of the following transactions, all amounts are denominated in the Chinese currency *Renminbi* except where the dollar sign "$" is used):

- Through capital injection and share purchases, YT, through his nominee, accumulated 66.67% of the ownership interests in Beijing Dongfang Cheyun Information Technology Co., Ltd. ("Yidao"). Subsequently, YT invested approximately 4 billion in Yidao to facilitate its operations.

---

[47]   Based on share price prior to cessation of trading on April 26, 2019.

[58]   Based on RMB 600 million equity financing transaction in January 2018.

- Yidao borrowed 1.4 billion from Zhongtai Chuangzhan on a secured basis with the Leshi building as collateral. Of the 1.4 billion, Yidao lent 1.3 billion to Leshi Holding and kept the remaining 0.1 billion to support its operations. Currently, the value of the Leshi building exceeded 1.4 billion.

- In 2017, when Yidao faced short-term liquidity issues, YT reached out to Wen for assistance. In exchange, Wen hoped to—and later did—become the nominee holder of 66.6% of Yidao's shares. YT also agreed to gift 5% of Yidao's outstanding shares to Wen. Importantly, Wen stipulated that, upon a successful future capital raise, YT would redeem those shares based on the consideration received from Wen in connection with his assistance to Yidao.

- Yidao successfully completed a new round of financing, including a debt conversion and CITIC Bank's strategic investment of 1.5 billion. At that time, based on valuations in connection with the financing, Yidao's overall valuation exceeded 7 billion, and the value of the 66.67% of Yidao's shares of which Wen was the nominee was worth at least 4.5 billion. However, Wen breached his promise and refused to return the shares to YT. In order to reclaim the Yidao shares, YT negotiated in good faith with Wen and considered multiple proposals from Wen. Eventually, the Wen Entities promised to release the Leshi Group from a 1.3 billion claim that the Wen Entities had against the Leshi Group. The Wen Entities also promised to extend a loan in the amount of 200 million to Leshi Group. Nonetheless, Wen has continued to refuse to return the Yidao shares of which he was a nominee. Wen has also not released the 1.3 billion claim or made the 200 million loan.

In addition, YT believes that Wen directed SLC to commence an arbitration proceeding against YT on account of a $10 million debt obligation. Upon obtaining the arbitration award, the Wen Entities sought enforcement of the award in the United States in an attempt to foreclose on and potentially liquidate YT's interest in Smart King in a fire sale, which would ultimately destroy the value of Smart King at the expense of all stakeholders.

**E.    Certain Relationships, Related Transactions, and Former Affiliates**

   **1.    Affiliate Notes Payable**

As disclosed in the "Summary of ~~Selection~~Selected Financial Information of ~~Smart King Ltd.~~the FF Group" attached hereto as **Exhibit D**, certain entities affiliated or formerly affiliated with YT or ~~Smart King~~the FF Group have made loans to ~~Smart King~~the FF Group. Most of these loans originated from transactions where the affiliate borrowed funds in Renminbi from a third party and then lent the funds to ~~Smart King~~FF in United States Dollars. In two instances, an affiliate borrowed from a third party lender and then lent to another affiliate, which then lent to ~~Smart King in US~~FF in United States Dollars. Because of the obligations of each of these parties to repay the third party lenders as well as their financial creditors (and loans), neither YT nor ~~Smart King~~the FF Group is expected to recover any value if and when the notes are repaid. In addition, as discussed below, as of June 30, 2019, FF owed Ocean View ~~lent~~ $4.4 million ~~to Smart King~~.

   ~~**2. Ocean View**~~

On November 9, 2007, YT established Success Pyramid Ltd ("Success") and paid $50,000 for 50,000 shares of Success, and in August 2014, YT established Ocean View, a California corporation wholly owned by Success. During 2014 and 2015, Ocean View purchased real property located at 7, 11, 15, 19, and 91 Marguerite Drive, Rancho Palos Verdes, California. To purchase the real properties located at 7, 11, and 15 Marguerite Drive, Ocean View borrowed and later repaid $12 million from ~~Smart King~~the FF Group. In connection with Ocean View's purchase of real property located at 19 Marguerite

Drive, YT borrowed $7.4 million from Shanghai Yuetian Ltd. and contributed the same amount to Ocean View as paid-in capital. Additionally, in connection with the purchase of real property located at 91 Marguerite Drive, Ocean View borrowed $7.5 million from LeSoar Holdings Limited ("LeSoar"), an entity previously controlled by YT. Over the past 4 years, Ocean View has refinanced its original loans and entered into certain transactions through which it made loans to certain affiliated and non-affiliated entities. During this time, Ocean View made numerous loans totaling approximately $21.4 million to ~~Smart King~~FF to support its operations. Smart King has paid down its debts to Ocean View, and as of June 30, 2019, ~~Smart King~~FF owed Ocean View $4.4 million. On December 8, 2017, YT sold all his interests in Success for ~~consideration~~its net asset value of approximately $6.5 million, consisting of a promissory note in the amount of approximately $2.4 million and the assumption of YT's liabilities (including the assumption of lease agreements) in the amount of approximately $4.1 million. In 2018, the purchaser of Success paid ~~the~~in full ~~contract price of $6.4 million~~the promissory note.

~~At this time~~As of October 2019, the total assets of Ocean View include approximately $27.9 million in real property and approximately $27.3 million in loans receivable. Ocean View's liabilities total approximately $51.6 million.

**2.** ~~3.~~ **LeSoar**

LeEco established LeSoar ~~was established by a company controlled by YT~~ in 2014 to hold certain investments. LeSoar relied on financing from ~~third parties to fund its various~~LeEco for those investments. ~~One of the investments made by LeSoar was the acquisition of 10,904,079 shares of~~In 2014, LeSoar led Series C equity financing for Lucid Motors, Inc. ~~for~~and invested approximately $67 million in 10,904,079 shares of Lucid. Another investor, a Chinese state owned automobile company, also participated in the Series C equity financing. This investor's position was subsequently acquired by Blitz Technology, which coordinated with LeSoar to maximize the value of their respective investments. In September 2017, LeSoar transferred 4,292,861 shares of Lucid in satisfaction of ~~its~~certain parent ~~company~~company's liabilities ~~and in doing so, offset the loan payable to the parent company. During 2017, LeSoar faced certain liquidity issues and it was difficult to maintain normal business operations~~in the amount of $59.4 million. During 2017, in light of LeEco's financial situation, LeEco decided to maximize the value of its investment in Lucid by transferring LeSoar subject to an assumption of liabilities. On October 20, 2017, LeSoar was sold for nominal consideration to ~~Innovation Era Holding, Inc~~a third party in exchange for the assumption of LeEco Group's $71.6 million in liabilities. YT is informed that, after the sale~~to Innovation~~, LeSoar transferred 4,906,707 shares of Lucid in satisfaction of its former parent company's obligations~~and in doing so, offset the loan payable to its former parent company, which LeSoar assumed in connection with the share purchase, and that LeSoar currently owns 990,225~~. YT is further informed that, after that transfer, LeSoar had transferred substantially all of its Lucid shares ~~of Lucid Motors Inc~~.

### III.

### <u>THE CHAPTER 11 CASE</u>

A.    **Voluntary Petition**

On October 14, 2019 (the "Petition Date"), YT commenced the chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. YT has continued, and will continue until the Effective Date, to operate as a debtor in possession.

**B.      Retention of Advisors for the Debtor**

After the commencement of the chapter 11 case, YT requested approval to employ the following person and professional firms: (i) Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel; (ii) O'Melveny & Myers LLP as special corporate, litigation, and international counsel; and (iii) Robert Moon, in his capacity as chief restructuring officer of the Debtor, as the foreign representative of the Debtor's estate; and (iv) Epiq Corporate Restructuring, LLC as the Voting Agent and Noticing and Claims Agent.

**C.      The Creditors' Committee**

On October 25, 2019, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") in this chapter 11 case pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 45]. The Creditors' Committee consists of the following members: (i) Ping An Bank., Ltd. Beijing Branch; (ii) China Minsheng Trust Co., Ltd; (iii) Shanghai Leyu Chuangye Investment Management Center LP; (iv) Jiangyin Hailan Investment Holding Co., Ltd; and (v) Shanghai Qichengyueming Investment Partnership Enterprise;.

The Creditors' Committee has retained the following professional firms: (i) Lowenstein Sandler LLP, as bankruptcy counsel; (ii) Potter Anderson & CorroonPolsinelli LLP, as DelawareCalifornia co-counsel; and (iii) Alvarez & Marsal North America, LLC, as financial advisor.

**D.      DIP Facility**

In the near term, theThe Debtor will be filingexpects to file a motion for approval of postpetition financing. After the commencement of the chapter 11 case, the Debtor and his advisors contacted several potential lenders regarding the Debtor's postpetition financing needs. Ultimately, the Debtor determined that obtaining financing from Pacific Technology, an affiliate of the Debtor (the "DIP Facility"), provided the most favorable terms to the Debtor under the circumstances. With the liquidity available from the DIP Facility, the Debtor can stabilize his affairs and pay his postpetition expenses, including administrative expense claims. Please review the motion to approve the DIP Facility for further details regarding the DIP Facility.

**E.      Claims Process and Bar Date**

On October 17, 2019, the Debtor filed his (i) Schedules identifying the assets and liabilities of his estate and (ii) Statement of Financial Affairs [D.I. 28].

On November 13, 2019, the Bankruptcy Court entered an order [D.I. 87] (the "Bar Date Order") establishing the deadlines for the filing of proofs of claim in this chapter 11 case. These dates are as follows:

- the deadline for creditors (other than governmental units and certain other parties excused from filing proofs of claim under the Bar Date Order) to file proofs of Claim against the Debtor is January 24, 2020, at 5:00 p.m. (ET) (the "General Bar Date");

- the deadline for governmental units to file proofs of Claim against the Debtor is April 13, 2020, at 5:00 p.m. (ET);

- a bar date for Claims amended or supplemented by an amendment to the Schedules by the later of (a) the General Bar Date; and (b) the date that is twenty-

one (21) days after the date that notice of the applicable amendment to the Schedules is served on the claimant; and

- a bar date for any Claims arising from or relating to the rejection of executory contracts or unexpired leases, in accordance with section 365 of the Bankruptcy Code by the later of (a) the General Bar Date; (b) the date that is thirty (30) days after the entry of the order authorizing the rejection of the executory contract or unexpired lease; and (c) any date that the Bankruptcy Court may fix in the applicable order approving such rejection.

The Debtor has provided notice of the bar dates above as required by the Bar Date Order.

**F.      Venue Transfer**

On November 13, 2019, Shanghai Lan Cai Asset Management Co, Ltd. filed its *Motion (i) to Dismiss the Debtor's Chapter 11 Case or, Alternatively, (ii) to Transfer Venue to the Central District of California* [D.I. 89], seeking to dismiss the Debtor's chapter 11 case as a bad faith filing or in the alternative transfer venue of the chapter 11 case to the Central District of California. On December 18, 2019, Judge Karen B. Owens of the United States Bankruptcy Court for the District of Delaware transferred the chapter 11 case to the United States Bankruptcy Court for the Central District of California based on the interests of justice due to, among other things, that the Debtor resides in California and FF, on which the success of this chapter 11 case depends, is located in California.

**G.      The UST's Motion for Appointment of a Chapter 11 Trustee**

On December 17, 2019, the United States Trustee for the District of Delaware filed the *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [D.I. 171] (the "Trustee Motion"). On January 16, 2020, the United States Trustee for the Central District of California voluntarily dismissed the Trustee Motion without prejudice [D.I. 216].

**IV.**

**THE PLAN**

THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS **EXHIBIT A** TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS. HOLDERS OF CLAIMS AGAINST YT AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

## A.    Classification and Treatment of Claims Under the Plan

One of the key concepts under the Bankruptcy Code is that holders "Allowed" Claims may receive distributions under a chapter 11 plan. The term is used throughout the Plan and in the descriptions below. In general, an "Allowed" Claim simply means that the Debtor agrees (or the Bankruptcy Court has ruled) that the Claim, including the amount, is in fact, a valid obligation of the Debtor.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against the debtor into separate classes based upon their legal nature. Claims of substantially similar legal nature are usually classified together. Because an entity may hold multiple claims that give rise to different legal rights, the "claims" themselves, rather than their holders, are classified. As a result, under the Plan, by way of example only, an Entity that holds both a U.S. Secured Claim and a Debt Claim would have its Allowed U.S. Secured Claim classified in Class 2 and its Allowed Debt Claim classified in Class 3. To the extent of the holder's Allowed U.S. Secured Claim, the holder would be entitled to the voting and treatment rights that the Plan provides with respect to Class 2, and to the extent of the holder's Allowed Debt Claim, the holder would be entitled to the voting and treatment rights that the Plan provides with respect to Class 3.

Under a chapter 11 plan, the separate classes of claims must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan (unless the plan has deemed the class to reject the plan), and the right to receive under the chapter 11 plan, no less value than the holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code. Pursuant to section 1124 of the Bankruptcy Code, a class of claims is "impaired" unless the plan (a) does not alter the legal, equitable, and contractual rights of the holders or (b) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or non-performance of a nonmonetary obligation), reinstates the maturity of the claims in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Typically, this means the holder of an unimpaired claim will receive on the later of the effective date of the plan and the date on which amounts owing are due and payable, payment in full, in cash, with postpetition interest to the extent provided under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than the right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the chapter 11 case not been commenced.

Consistent with these requirements, as described in Article I.B. above, the Plan divides the Allowed Claims against the Debtor into three (3) distinct Classes. Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan. Under the Plan: (i) only Class 3 is Impaired and the holders of Claims in such Class are entitled to vote to accept or reject the Plan and (ii) Classes 1 and 2 are Unimpaired and the holders of Claims in such Classes are conclusively presumed to have accepted the Plan and are thus not entitled to vote on the Plan.

## B.    Acceptance or Rejection of the Plan; Effect of Rejection of Plan

Article V of the Plan sets forth certain rules governing the tabulation of votes under the Plan. These rules include that: (i) if no holders of Claims eligible to vote in a particular Class actually vote to accept or reject the Plan, the Class will be deemed to accept the Plan (Article 5.2) and (ii) if there are no holders of Claims that are eligible to vote in any particular Class, the Class shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan (Article 5.3).

In addition, Article 5.55.4 of the Plan provides that the Debtor reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any related documents in order to satisfy the "cram down" provisions of section 1129(b) of the Bankruptcy Code (described in Article XVIII.C.2. below).

## C.    Plan Distributions

Article VII of the Plan sets forth the mechanics by which Plan Distributions will be made. Article VII provides, among other things, that: (i) Plan Distributions will be made by the Debtor (Article 7.1); (ii) for tax purposes, Plan Distributions will be treated as first satisfying the principal amount of recipients' Claims (rather than interest on such Claims) (Article 7.2); (iii) holders of Claims shall generally not be entitled to postpetition interest on such Claims (except as otherwise set forth in the Plan) (Article 7.3); (iv) Plan Distributions will generally commence on the Effective Date or as soon as possible thereafter (Article 7.4); (v) Plan Distributions will be made based on the records of the Debtor as of the close of business on the Distribution Record Date, *i.e.*, the date of commencement of the Confirmation Hearing (Article 7.5); (vi) Plan Distributions will be made to applicable holders at the addresses reflected in the Debtor's books and records or other written notice of changes to such addresses (including in proofs of claim) (Article 7.6).; (vii) property distributable under the Plan on account of a Claim that is not claimed within a year after the Effective Date or the date such Claim becomes Allowed (whichever is later) shall revert to the Reorganized Debtor (or his successors or assigns) (Article 7.7); (viii) Plan Distributions shall be in complete settlement, satisfaction, and discharge of Allowed Claims (Article 7.8); (ix) Cash payments may be made by check or wire transfer or otherwise in accordance with applicable agreements or the Debtor's customary practices (Article 7.9); (x) no holder of a Claim shall receive Plan Distributions in excess of the Allowed amount of such Claim (Article 7.10); (xi) the Reorganized Debtor shall be entitled to exercise certain rights of setoff or recoupment with respect to Plan Distributions, and holders of Claims seeking to assert rights of recoupment or setoff shall be required to provide written notice of such rights in advance of the Confirmation Date (Article 7.11); (xii) the Reorganized Debtor will be authorized to take any and all actions that may be necessary or appropriate to comply with tax withholding and reporting requirements, including liquidating any portion of any Plan Distribution to generate sufficient funds to pay withholding taxes and/or requiring holders of Claims to submit appropriate tax and withholding certifications (Article 7.117.12); (xiii) Claims will be reduced and Disallowed to the extent that holders of such Claims have received payment (before or after the Effective Date) from a party other than the Debtor or Reorganized Debtor (Article 7.13(a)); and (xiv) Plan Distributions will be made in accordance with the provisions of any applicable insurance policy of the Debtor (Article 7.13(b)).

## D.    Domestic Support Obligations

Article 2.4 of the Plan provides that, on the Effective Date, the Debtor will make any payments to comply with any postpetition unfunded obligations on account of any Domestic Support Obligations, if any such obligations exist, as may be required for the Debtor to be current with respect to such Domestic Support Obligations as of the Effective Date pursuant to section 1129(a)(14) of the Bankruptcy Code. After the Effective Date, YT shall timely make all payments on account of Domestic Support Obligations to the parties entitled to receive such payments, if any such obligations exist, in each case at the times and in the amounts required by the agreements and orders evidencing such Domestic Support Obligations, as such agreements may from time to time be modified in accordance with applicable law.

## E.    Preservation of Claims and Rights to Settle Claims

Article 8.3 of the Plan provides that except as otherwise provided in the Plan (including with respect to the Yidao Claims), or in any contract, instrument, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized

Debtor shall retain and may enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss all Claims, rights, Causes of Action, suits, and proceedings, including those described in the Plan Supplement (collectively, the "Retained Actions"), whether at law or in equity, whether known or unknown, that YT or his estate may hold against any Entity (other than Claims, rights, Causes of Action, suits, and proceedings released pursuant to ~~Article~~Articles 11.4 or 11.9 of the Plan), without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. For the avoidance of doubt, Retained Actions do not include any Claim or Cause of Action released pursuant to Articles 11.4 ~~and~~or 11.9 of the Plan. The Reorganized Debtor or his successor(s) may pursue such Retained Actions, as appropriate, in accordance with the best interests of the Reorganized Debtor or his successor(s) that hold such rights.

The Plan provides that no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Action against it as any indication that the Reorganized Debtor will not, or may not, pursue any and all available Retained Actions against it. The Reorganized Debtor expressly reserves all rights to prosecute any and all Retained Actions against any Entity. Unless any Retained Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Retained Actions for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Retained Action upon, after, or as consequence of, confirmation or consummation of the Plan. For the avoidance of doubt, all Claims, Causes of Action, suits, and proceedings of YT that are not Retained Actions are waived as of the Effective Date.

**F.      Waiver of Actions Arising Under Chapter 5 of the Bankruptcy Code**

Article 11.9 of the Plan provides that without limiting any other applicable provisions of, or releases contained in, the Plan, each of the Debtor, the Reorganized Debtor, their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, hereby irrevocably and unconditionally release, waive, and discharge any and all claims or Causes of Action that they have, had or may have that are based on section 544, 547, 548, 549, and 550 of the Bankruptcy Code and analogous non-bankruptcy law for all purposes; provided, however, that notwithstanding Article 11.9 or any other provision of the Plan, in the event that the Trustee has determined that it is reasonable and good-faith evidence that an asset of the Debtor located in the United States that was property of the Debtor as of the commencement of the chapter 11 case and was not disclosed during the chapter 11 case, if any, the Trustee may, after a meet and confer with the Debtor, pursue an action for turnover of such asset under section 542 of the Bankruptcy Code within one hundred and eighty (180) days of the Effective Date; provided that such turnover action may be pursued only through a confidential arbitration process conducted by an arbitrator to be designated in the Trust Agreement. For the avoidance of doubt, none of the Claims or Causes of Action referenced in Article 11.9 of the Plan, except as excluded therein, shall constitute Retained Actions.

**G.      ~~F.~~ Procedures for Resolving Disputed Claims**

Article ~~VII~~VIII of the Plan governs the resolution of Disputed Claims. Pursuant to Article 8.1 of the Plan, only the Debtor or Reorganized Debtor will be entitled to object to Claims after the Effective Date, and any such objections must be filed and served within 180 days after the Effective Date (or, if later, the date that the proof of Claim to which the Debtor or Reorganized Debtor objects is asserted or amended in writing), or such later deadline as may be fixed by the Bankruptcy Court. The Reorganized Debtor may also seek to estimate any contingent or unliquidated Claims pursuant to section 502(c) of the

Bankruptcy Code. Article ~~8.3~~8.2 of the Plan provides that no distributions shall be made on account of Disputed Claims unless and until such Disputed Claims become Allowed.

**H.**    ~~G.~~**Executory Contracts and Unexpired Leases**

Article IX of the Plan governs the treatment of the Debtor's executory contracts and unexpired leases. Article 9.1 of the Plan provides that all executory contracts and unexpired leases of the Debtor that have not been previously assumed or rejected by the Debtor will be deemed assumed on the Effective Date (subject to payment of applicable Cure Amounts), except for executory contracts and leases (i) listed on the Schedule of Rejected Contracts and Leases to be filed as part of the Plan Supplement (which contracts shall be deemed rejected on the Effective Date), (ii) any executory contracts and unexpired leases that have previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court (which shall be treated as provided in such Final Order), and (iii) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date (which shall be treated as provided for in any Final Order resolving such motion).

Pursuant to Article 9.2 of the Plan, Claims arising from the rejection of executory contracts or unexpired leases will be treated as Debt Claims, solely to the extent evidenced by a proof of claim filed and served upon counsel for the Debtor and Reorganized Debtor within sixty (60) days after the effective date of such rejection.

Article 9.3 of the Plan governs the establishment and payment of Cure Amounts. In general, the Debtor's proposed Cure Amounts for each executory contract or unexpired lease to be assumed will be set forth on a Cure Schedule to be filed no later than ten (10) calendar days prior to the Confirmation Hearing. The proposed Cure Amounts shall become binding on the counterparties if they fail to object to the proposed Cure Amount within ten (10) calendar days of the filing of the Cure Schedule. If a counterparty does timely object to the proposed Cure Amount or the Debtor's proposed assumption of its contract generally, the Bankruptcy Court will enter an order resolving the dispute (if not resolved consensually by the parties). If the only issue raised in any such dispute is the Cure Amount, the Debtor will be authorized to assume the executory contract or unexpired lease that is the subject of such dispute so long as they reserve an amount of Cash sufficient to pay the counterparty's asserted Cure Amount. Cure Amounts will generally be paid in full in Cash within 30 days after the Effective Date or the date on which any dispute pertaining to the proposed assumption has been resolved (whichever is later).

Article 9.4 of the Plan provides that all insurance policies of the Debtor under which the Debtor has outstanding obligations as of the Effective Date will be treated as assumed executory contracts, and all other insurance policies of the Debtor will vest in the Reorganized Debtor. Pursuant to Article 9.7 of the Plan, all contracts and leases entered into by the Debtor after the Petition Date will survive and be unaffected by entry of the Confirmation Order.

Article 9.5 of the Plan contains certain reservations of rights by the Debtor concerning executory contracts and unexpired leases, including a reservation of the Debtor's rights to amend the Schedule of Rejected Contracts and Leases until and including the Effective Date.

Article 9.6 of the Plan clarifies that rejection of any executory contract or unexpired lease under the Plan will not constitute a termination of pre-existing obligations owed to the Debtor under such contracts or leases (including any continuing obligations of counterparties to provide warranties or continued maintenance obligations on goods previously purchased by the Debtor).

**I.** ~~II.~~ **Discharge, Release, Injunctive, and Exculpatory Provisions of the Plan**

Article XI of the Plan sets forth the effects and consequences of confirmation of the Plan, including the vesting of the assets of the Debtor in the Reorganized Debtor (Article 11.1), the binding effect of the Plan on holders of Claims (Article 11.2), the discharge of Claims under the Plan (Article 11.3), the preservation of injunctions or stays provided for in the chapter 11 case through the Effective Date (Article 11.7), the termination of subordination rights of holders of Claims (Article 11.8), the waiver of Claims or Causes of Actions that arise under chapter 5 of the Bankruptcy Code (Article 11.9), and the Debtor's reservation of rights in the event that the Effective Date does not occur (Article 11.10). **In addition, Articles 11.4, 11.5, and 11.6 of the Plan contain important releases, injunctions, and exculpatory provisions. These provisions are highlighted below.**

       1.       **Discharge of Claims**

**Upon the Effective Date of the Plan and the contribution of YT's assets to the Trust, YT will have fulfilled his obligations to his creditors under the Plan, which will provide a greater recovery to such creditors than a liquidation of YT's estate under chapter 7 of the Bankruptcy Code. Accordingly, upon occurrence of the Effective Date, YT intends to request, pursuant to section 1141(d)(5)(B) of the Bankruptcy Code, that the Bankruptcy Court grant the discharge of Claims against YT set forth in Article 11.3 of the Plan as of the Effective Date of the Plan.**

**Article 11.3 of the Plan provides that, except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against YT, of any nature whatsoever, whether known or unknown, or against the assets or properties of YT that arose before the Effective Date. Except as expressly provided in the Plan, on the Discharge Date (and subject to its occurrence), and pursuant to section 1141(d)(5)(B) of the Bankruptcy Code, entry of the Confirmation Order shall be deemed to act as a discharge and release under section 1141(d)(1)(A) of the Bankruptcy Code of all Claims against YT and his assets, arising at any time before the Effective Date, regardless of whether a proof of Claim was filed, whether the Claim is Allowed, or whether the holder of the Claim votes to accept the Plan or is entitled to receive a distribution under the Plan, provided, however, that in no event shall occurrence of the Discharge Date discharge YT from any obligations remaining under the Plan as of the Discharge Date. Any default by YT with respect to any Claim that existed immediately prior to or on account of the filing of the chapter 11 case shall be deemed cured on the Discharge Date.**

~~**No later than five (5) business days after the occurrence of the Discharge Date, YT or the Reorganized Debtor, as applicable, shall file with the Bankruptcy Court a notice of the occurrence of the Discharge Date, and serve such notice on all creditors. In addition, following the occurrence of the Discharge Date, YT or the Reorganized Debtor, as applicable, shall file a motion seeking entry of an order of discharge after notice and a hearing, which motion (and the discharge) shall be granted upon a showing that YT has made all payments required under the Plan.**~~ **Except as expressly provided in the Plan, any holder of a discharged Claim will be precluded from asserting against YT or any of his assets any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date. Except as expressly provided in the Plan,** ~~**and subject to the occurrence of the Discharge Date**~~**pursuant to section 1141(d)(5)(B), the Confirmation Order will be a judicial determination of discharge of all liabilities of YT to the extent allowed under section 1141 of the Bankruptcy Code, and YT will not be liable for any Claims and will only have the obligations that are specifically provided for in the Plan. Notwithstanding the foregoing, nothing contained in the Plan or the**

Confirmation Order shall discharge YT from any debt excepted from discharge under section 523 of the Bankruptcy Code by a Final Order.

By voting to accept the Plan, you are voting to accept the discharge of YT provided for in the Plan.

2. Releases

---

**ARTICLE 11.4(b) OF THE PLAN (*RELEASES BY HOLDERS OF NON-DEBT CLAIMS*) CONTAINS A THIRD-PARTY RELEASE. YOU ARE DEEMED TO GRANT A THIRD-PARTY RELEASE IF YOU ARE A HOLDER OF A NON-DEBT CLAIM THAT EITHER: (I) VOTES TO ACCEPT THE PLAN OR (II) IS CONCLUSIVELY DEEMED TO HAVE ACCEPTED THE PLAN. ~~CERTAIN OTHER PARTIES ARE DEEMED TO GRANT THE PLAN RELEASES. SUCH PARTIES ARE IDENTIFIED IN THE DEFINITION OF "RELEASING PARTIES" IN THE PLAN.~~ IN ADDITION, IN ACCORDANCE WITH SECTION 524(a)(3) OF THE BANKRUPTCY CODE, AND PURSUANT TO A SETTLEMENT AGREEMENT UNDER BANKRUPTCY RULE 9019 REGARDING THE DEBTOR'S CLAIMS AGAINST WEI GAN AND WEI GAN'S CLAIMS AGAINST THE DEBTOR, ARTICLE 11.4(~~b~~e) OF THE PLAN RELEASES CERTAIN CLAIMS AGAINST ~~THE DEBTOR'S~~YT'S WIFE, WEI GAN. YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

---

The following definitions are essential to understanding the scope of the releases being given under the Plan. The Plan defines "**Released Parties**" to mean, collectively: (a) the Debtor and the Estate; (b) ~~the Debtor's wife, Wei Gan; (c)~~ all Persons engaged or retained by the Debtor in connection with the chapter 11 case (including in connection with the preparation of and analyses relating to the Disclosure Statement and the Plan); and (~~d~~c) any and all advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, and representatives of each of the foregoing Persons and Entities (whether current or former, in each case in his, her, or its capacity as such).

The Plan defines "**Key China Business Individuals**" to mean those certain Chinese individuals who have entered into a KCBI Settlement with a KCBI Releasing Party. The Key China Business Individuals will be identified in the Plan Supplement.

The Plan defines "**Non-Debt Claim**" to mean any Claim against the Debtor that is (a) not a Debt Claim or (b) otherwise determined by the Bankruptcy Court to be a Non-Debt Claim.

The Plan defines "**Other Distributions**" to mean (a) any amounts the holder of an Allowed Debt Claim actually receives from the primary obligor or any guarantor besides the Debtor, of such Debt Claim based on such holder's contractual agreement with such primary obligor or guarantor, *minus* (b) any amounts such holder actually receives upon the disposition of any assets that (i) have already been collateralized by the Debtor or any other Person or Entity, (ii) have already been pledged by the Debtor or any other Person or Entity, and (iii) the Debtor, Wei Gan, or any other Person or Entity own, and that have been seized, attached, or frozen by Chinese judiciary authorities *minus* (c) if the primary debt obligation underlying such Debt Claim is satisfied in whole or in part by conversion to equity in any jurisdiction, the corresponding reduction in the amount of the Debt Claim on account of such conversion.

The Plan defines "**Releasing Parties**" to mean, collectively, and each solely in its capacity as such: (a) each Released Party; (b) each holder of a Non-Debt Claim that either (i) votes to accept the Plan or (ii) is conclusively deemed to have accepted the Plan; and (c) all other holders of Non-Debt Claims to the extent permitted by law.

   a.    ***Releases by the Debtor***

Article 11.4(a) of the Plan provides that, upon the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, in his individual capacity and as debtor in possession, shall be deemed forever to release, waive, and discharge (x) the Estate; (y) all Persons engaged or retained by the Debtor in connection with the ~~chapter~~Chapter 11 ~~case~~Case (including in connection with the preparation of and analyses relating to the Disclosure Statement and the Plan); and (z) any and all advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, and representatives of each of the foregoing Persons and Entities (whether current or former, in each case in his, her, or its capacity as such), from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action, and liabilities, whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws (other than the rights of the Debtor or Reorganized Debtor to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence, or circumstances taking place on or before the Effective Date, in any way relating to (i) the Debtor or the ~~chapter~~Chapter 11 ~~case~~Case; (ii) any action or omission of any Released Party with respect to any indebtedness under which the Debtor is or was a borrower or guarantor; (iii) any Released Party in any such Released Party's capacity as an employee, or agent of, or advisor to, the Debtor; (iv) the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan; (v) the business or contractual arrangements between the Debtor and any Released Party; (vi) the restructuring of Claims before or during the ~~chapter~~Chapter 11 ~~case~~Case; and (vii) the negotiation, formulation, preparation, or dissemination of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, or related agreements, instruments, or other documents, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order to have constituted willful misconduct, fraud, or gross negligence. The Reorganized Debtor shall be bound, to the same extent the Debtor is bound, by the releases and discharges set forth above.

Article 11.4(a) of the Plan further provides that, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article 11.4(a) ~~of the Plan~~ by the Debtor, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in this Article 11.4(a) is: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such ~~Claims~~claims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any Claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

   b.    ***Releases by Holders of Non-Debt Claims***

Article 11.4(b) of the Plan provides that, ~~upon~~on the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party, in consideration for the obligations of ~~YT~~the Debtor and the Reorganized Debtor under the Plan, and the Trust Interests and Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed forever to release, waive, and discharge the Released Parties from personal liability in every jurisdiction from any and all ~~Claims~~claims, obligations, suits, judgments, damages,

demands, debts, rights, remedies, actions, Causes of Action, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of ~~YT~~the Debtor, whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws or laws of any other jurisdiction or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, or circumstances taking place on or before the Effective Date, in any way relating to (i) ~~YT~~the Debtor or the ~~chapter~~Chapter 11 ~~case~~Case; (ii) any action or omission of any Released Party with respect to any indebtedness under which ~~YT~~the Debtor is or was a borrower or guarantor; (iii) any Released Party in any such Released Party's capacity as an employee, agent of, or advisor to, ~~YT~~the Debtor; (iv) the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan; (v) the business or contractual arrangements between ~~YT~~the Debtor and any Released Party; (vi) the restructuring of Claims before or during the ~~chapter~~Chapter 11 ~~case~~Case and the solicitation of votes with respect to the Plan; and (vii) the negotiation, formulation, preparation, entry into, or dissemination of the Plan (including, for the avoidance of doubt, the Plan Supplement and all documents contained or referred to therein), the Disclosure Statement, or related agreements, instruments, or other documents~~; provided, however, that the Releasing Parties shall continue to dispose of the following assets through judicial authorities in the PRC to satisfy such Releasing Party's Claim through a mechanism that will be mutually agreed to by the parties: (x) assets that have already been collateralized by YT or any other Person or Entity; (y) assets that have already been pledged by YT or any other Person or Entity; and (z) assets or interests that YT, his wife Wei Gan, or any other Person or Entity own that been seized, attached, or frozen by Chinese judiciary authorities~~. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Article 11.4(b) of the Plan further provides that, in connection with the releases described in Article 11.4(b) of the Plan, each Releasing Party shall waive all rights conferred by the provisions of section 1542 of the California Civil Code and/or any similar state or federal law. Section 1542 of the California Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Article 11.4(b) of the Plan further provides that, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article 11.4(b) of the Plan, which includes by reference each of the related provisions and the Plan, and further, shall constitute its finding that each release described in Article 11.4(b) is: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

       *c.*       *Standstill and Releases by Holders of Allowed Debt Claims and Allowed Late Filed Debt Claims*

Article 11.4(c) of the Plan provides that, to the maximum extent permitted by applicable law, each holder of an Allowed Debt Claim shall agree for a period of four (4) years after the Effective Date (the "Standstill Period") to not assert any new Causes of Action against the Debtor for personal liability or derivatively in its capacity as a creditor of a claim owed solely or jointly by the Debtor (including unwinding or alter ego type claims) in any non-U.S. jurisdiction (the "YT Claims"); *provided, however,* that such holder may continue to prosecute any actions commenced prepetition against the Debtor up to judgment and pursue Other Distributions through judicial authorities in the PRC to satisfy such holder's Debt Claim through a mechanism that will be mutually agreed to by the parties, including claims against (a) primary obligors based on such holder's contractual agreements with such primary obligors; (b) assets that have already been collateralized by the Debtor or any other Person or Entity; (c) assets that have already been pledged by the Debtor or any other Person or Entity; or (d) assets or interests that the Debtor, Wei Gan, or any other Person or Entity own, and that have been seized, attached, or frozen by Chinese judiciary authorities; *provided, however,* that the Standstill Period shall terminate in the event a Liquidation Event occurs during the Standstill Period. All limitations periods applicable to all YT Claims in any non-U.S. jurisdictions, to the extent not previously expired, shall be tolled for the duration of the Standstill Period. If reasonably requested by the Committee or the Creditor Trust Committee, as applicable, the Debtor or Reorganized Debtor, as applicable, shall enter into a global tolling agreement evidencing such tolling.

Article 11.4(c) of the Plan further provides that, within ninety (90) days after the Effective Date, each holder of an Allowed Debt Claim or Allowed Late Filed Debt Claim shall take the steps and provide the documents described in the Trust Agreement to (i) notify the applicable court or courts in the PRC (the "Chinese Court") that the Debtor and such holder have reached a settlement agreement that is embodied in and has been implemented through the Plan and (ii) request that the Chinese Court remove the Debtor from the List of Dishonest Judgment Debtors (the "China Debtor List") and lift any consumption or travel restrictions (the "China Restrictions"), as applicable, and shall refrain from taking any action during the Standstill Period to cause the Debtor to be reinstated on the China Debtor List or be subject to the China Restrictions (the "China Debtor List Covenant"). To the extent practicable, forms for holders of Allowed Debt Claims and Allowed Late Filed Debt Claims to comply with the China Debtor List Covenant shall be included in the Plan Supplement and approved as part of the Confirmation Order.

Article 11.4(c) of the Plan further provides that, before any Trust Distributions are made to the holder of an Allowed Debt Claim or an Allowed Late Filed Debt Claim, such holder shall provide an affidavit that (a) certifies such holder's compliance with the China Debtor List Covenant, (b) certifies that they have not initiated any YT Claims during the Standstill Period or after the Liability Release Date, as applicable, and (c) identifies any amounts received from Other Distributions as of the date of the affidavit.

Article 11.4(c) of the Plan further provides that, each holder of an (i) Allowed Late Filed Debt Claim, on the date of allowance of such Late Filed Debt Claim or (ii) Allowed Debt Claim, once it has received Trust Distributions and Other Distributions (from enforcement or other actions) that, in the aggregate, are equal to 20% of its Allowed Debt Claim Allocation Amount (the date upon which the foregoing condition occurs is the "Liability Release Date") (x) shall be deemed to have released the YT Claims on account of such Debt Claim or Late Filed Debt Claim in every jurisdiction and (y) agrees that it shall not assert any new, or continue to prosecute any existing, YT Claims related to such Debt Claim or Late Filed Debt Claim in every jurisdiction; *provided, however,* that the foregoing release shall not release, waive, or otherwise impact the rights of such holder to receive further Trust Distributions or to pursue and receive Other Distributions through a mechanism that will be mutually agreed to by the parties.

Article 11.4(~~b~~c) of the Plan further provides that, within ~~thirty~~ninety (~~30~~90) days ~~of the Effective Date~~after the applicable Liability Release Date with respect to Allowed Debt Claims or the date of allowance of a Late Filed Debt Claim, each holder of ~~a~~an Allowed Debt Claim ~~is obligated to~~or Allowed Late Filed Debt Claim shall (as a condition to receiving further Trust Distributions) (i) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against ~~YT and his wife Wei Gan~~the Debtor from the ~~court or~~courts and judicial authorities in all jurisdictions, including, but not limited to, the PRC, or ~~commit or~~ confirm with the judicial authorities that ~~YT or his wife Wei Gan have fulfilled all their~~the Debtor has settled all of his debt obligations or legal responsibilities to such holder and (ii) file and execute any documents requested by ~~YT~~the Debtor to evidence the above release. ~~Unless and until a holder of a Debt Claim complies with the preceding sentence and all of their obligations under the Trust Agreement, such holder shall not be entitled to exercise any rights with respect to the Trust or receive any distributions from the Trust; provided, however, that YT~~ [9] The Debtor reserves all rights to seek enforcement by the Chinese judicial authorities of the rights provided herein.

Article 11.4(~~b~~c) of the Plan further provides that, in connection with the ~~release provided~~releases described in Article 11.4(~~b~~c) of the Plan, each holder of ~~a~~an Allowed Debt Claim or Allowed Late Filed Debt Claim shall ~~be deemed to~~ waive all rights conferred by the provisions of section 1542 of the California Civil Code and/or any similar state or federal law. Section 1542 of the California Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR. ~~Holders of Debt Claims shall be deemed to understand and acknowledge the significance and consequence of their waiver of section 1542 of the California Civil Code, as well as any other federal or state statute or common law principle of similar effect, and shall be deemed to acknowledge that such waiver is a material inducement to and consideration for the property distributed to or retained by and the rights and benefits conferred upon each holder of a Debt Claim under the Plan.~~"

Article 11.4(c) of the Plan further provides that, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article 11.4(c) of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in Article 11.4(c) is: (i) in exchange for the good and valuable consideration provided by the Debtor and Reorganized Debtor, a good faith settlement and compromise of such claims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) except as otherwise provided in this Plan, a bar to any holder of an Allowed Debt Claim or Allowed Late Filed Debt Claim asserting any Claim, Cause of Action, or liability related thereto, of any kind whatsoever, against the Debtor or Reorganized Debtor.

*d.*      *Releases of Key China Business Individuals*

Article 11.4(d) of the Plan provides that, on the effective date of any settlement agreement under Bankruptcy Rule 9019 (a "KCBI Settlement") between a Key China Business Individual and a holder(s) of an Allowed Debt Claim that holds a guarantee from such Key China Business Individual (a "KCBI Releasing Party"), each KCBI Releasing Party shall be (i) deemed to have released the applicable Key China Business Individual for personal liability on account of such

---

[9] Subject to further comment from international counsel.

KCBI Releasing Party's Debt Claim in every jurisdiction and (ii) agrees that it shall not assert any new (including through the amendment of an existing action), or continue to prosecute any existing, Causes of Action related to such Debt Claim against the applicable Key China Business Individual for personal liability or derivatively in its capacity as a creditor of such Key China Business Individual in every jurisdiction. The consideration for such KCBI Settlement shall be administered by the Trust.

Article 11.4(d) of the Plan further provides that, within ninety (90) days after the effective date of a KCBI Settlement, each KCBI Releasing Party shall (i) take the steps and provide the documents described in the Trust Agreement to (x) notify the applicable Chinese Courts that the applicable Key China Business Individual and such holder have reached a settlement agreement that is embodied in and has been implemented through the Plan and (y) request that the Chinese Court remove the applicable Key China Business Individual from the China Debtor List and lift any China Restrictions, as applicable, and shall refrain from taking any action to cause the applicable Key China Business Individual to be reinstated on the China Debtor List or be subject to the China Restrictions and (ii) (x) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against the applicable Key China Business Individual from the courts and judicial authorities in all jurisdictions, including, but not limited to, the PRC, or confirm with the judicial authorities that the applicable Key China Business Individual has settled all of their debt obligations or legal responsibilities to such KCBI Releasing party and (ii) file and execute any documents requested by the Key China Business Individual to evidence the above release.

Article 11.4(d) of the Plan further provides that, in connection with the releases described in this Article 11.4(d) of the Plan, each KCBI Releasing Party shall waive all rights conferred by the provisions of section 1542 of the California Civil Code and/or any similar state or federal law. Section 1542 of the California Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Article 11.4(d) of the Plan further provides that, subject to the approval of the KCBI Settlement by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article 11.4(d) of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in Article 11.4(d) is: (i) in exchange for the good and valuable consideration provided by the Key China Business Individual, a good faith settlement and compromise of such claims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) except as otherwise provided in this Plan, a bar to any KCBI Releasing Party asserting any Claim, Cause of Action, or liability related thereto, of any kind whatsoever, against the Key China Business Individual.

### *e.* *Release of Wei Gan*

Article 11.4(e) of the Plan provides that, on the effective date of any settlement agreement under Bankruptcy Rule 9019 (a "WG Settlement") regarding the Debtor's claims against Wei Gan and Wei Gan's Claims against the Debtor, each holder of an Allowed Debt Claim shall be (i) deemed to have released Wei Gan for personal liability on account of such holder's Debt Claim in every jurisdiction and (ii) agrees that it shall not assert any new (including through the amendment

of an existing action), or continue to prosecute any existing, Causes of Action related to such Debt Claim against Wei Gan for personal liability or derivatively in its capacity as a creditor of Wei Gan in every jurisdiction. The consideration for the WG Settlement shall be administered by the Trust.

Article 11.4(e) of the Plan further provides that, within ninety (90) days after the effective date of the WG Settlement, each holder of an Allowed Debt Claim shall (i) take the steps and provide the documents described in the Trust Agreement to (x) notify the applicable Chinese Courts that Wei Gan and such holder have reached a settlement agreement that is embodied in and has been implemented through the Plan and (y) request that the Chinese Court remove Wei Gan from the China Debtor List and lift any China Restrictions, as applicable, and shall refrain from taking any action to cause Wei Gan to be reinstated on the China Debtor List or be subject to the China Restrictions and (ii) (x) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against Wei Gan from the courts and judicial authorities in all jurisdictions, including, but not limited to, the PRC, or confirm with the judicial authorities that Wei Gan has settled all of her debt obligations or legal responsibilities to such holder and (z) file and execute any documents requested by Wei Gan to evidence the above release.

Article 11.4(e) of the Plan further provides that, in connection with the releases described in this Article 11.4(d) of the Plan, each holder of an Allowed Debt Claim shall waive all rights conferred by the provisions of section 1542 of the California Civil Code and/or any similar state or federal law. Section 1542 of the California Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Article 11.4(be) of the Plan further provides that, subject to the approval of the WG Settlement by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article 11.4(be) of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in Article 11.4(be) is: (i) in exchange for the good and valuable consideration provided by the Released PartiesWei Gan, a good faith settlement and compromise of such Claimsclaims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) except as otherwise provided in the Plan, a bar to any of the Releasing Partiesholder of an Allowed Debt Claim asserting any Claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their propertyWei Gan.

3.     Exculpation and Limitation of Liability

Article 11.5 of the Plan provides that none of YT or the Reorganized Debtor, or the direct or indirect affiliates, employees, advisors, attorneys, financial advisors, accountants, investment bankers, agents, or other professionals (whether current or former, in each case, in his, her, or its capacity as such) of YT or the Reorganized Debtor, or the Released Parties shall have or incur any liability to, or be subject to any right of action by, any holder of a Claim, or any other party in interest in the chapter 11 case, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or direct or indirect affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the chapter 11 case, formulation, negotiation, preparation, dissemination, confirmation, solicitation, implementation, or administration of the Plan, the Plan Supplement and all documents

contained or referred to therein, the Disclosure Statement, any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other pre- or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of YT or confirming or consummating the Plan (including the distribution of any property under the Plan); provided, however, that the foregoing provisions of Article 11.5 of the Plan shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined by a Final Order to have constituted willful misconduct, fraud, or gross negligence and shall not impact the right of any holder of a Claim, or any other party to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan. Without limiting the generality of the foregoing, YT and YT's direct or indirect affiliates, employees, advisors, attorneys, financial advisors, accountants, investment bankers, agents and other professionals (whether current or former, in each case, in his, her, or its capacity as such) shall, in all respects, be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. The exculpated parties have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such exculpating parties from liability.

### 4.    Injunctions

*a.    General*

Article 11.6(a) of the Plan provides that all Persons or Entities who have held, hold, or may hold Claims (other than Claims that are reinstated under the Plan), and all other parties in interest in the ~~chapter~~Chapter 11 ~~case~~Case, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any Claim or Cause of Action released or settled hereunder, (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against the Released Parties, ~~YT~~the Key China Business Individuals, Wei Gan, the Debtor, or the Reorganized Debtor, or in respect of any Claim or Cause of Action released or settled hereunder; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against the Released Parties, ~~YT~~the Key China Business Individuals, Wei Gan, the Debtor, or the Reorganized Debtor; (iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties, ~~YT~~the Key China Business Individuals, Wei Gan, the Debtor, or the Reorganized Debtor; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from the Released Parties, ~~YT,~~the Key China Business Individuals, Wei Gan, the Debtor, or the Reorganized Debtor, or against the property or interests in property of ~~YT or~~ the Debtor or Reorganized Debtor, on account of such Claims; or (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims released or settled pursuant to the Plan; *provided*, *however*, that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms ~~hereof~~of the Plan and the contracts, instruments, releases, and other agreements and documents delivered under or in connection with the Plan.

b.      *Injunction Against Interference With the Plan*

**Article 11.6(b) of the Plan provides that upon entry of the Confirmation Order, all holders of Claims and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article 11.6 of the Plan.**

**J.**      ~~I.~~ **Conditions Precedent to Confirmation and the Effective Date**

Article 10.1 of the Plan sets forth the conditions precedent to confirmation of the Plan, which consist of approval of the Disclosure Statement and entry of the Confirmation Order.

Article 10.2 of the Plan sets forth the conditions precedent to the Effective Date, which consist of the Confirmation Order becoming a Final Order, the Discharge Date having occurred, the documents comprising the Plan Supplement (including the Trust Agreement) having been executed and delivered and the conditions to effectiveness thereof having been satisfied, all actions and consents necessary to implement the Plan having been effected (and all documents necessary to implement the Plan having been executed and delivered and/or filed with applicable governmental units), and the receipt of necessary governmental approvals.

Article 10.3 of the Plan permits the Debtor to waive in writing any of the conditions precedent to confirmation of the Plan or the Effective Date. Article 10.4 of the Plan provides that, in the event the Effective Date does not occur due to the failure of the conditions precedent set forth in Article X of the Plan, the Confirmation Order and Plan will be of no force and effect, no distributions shall be made, no executory contracts or unexpired leases shall be deemed assumed, assumed and assigned, or rejected by operation of the Plan, parties shall be restored to the pre-confirmation *status quo ante*, and nothing in the Plan or Disclosure Statement will (i) release any Claims against the Debtor or any ~~Claims~~claims belonging to the Debtor, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtor.

V.

**THE TRUST**

**The following definitions are essential to understanding the Trust to be established under the Plan.**

The Plan defines **"Call Option"** to mean that certain call option exercisable by the Debtor under that certain Restructuring Agreement dated as of December 31, 2018, by and among Smart King, the Debtor, Season Smart Limited, and the other parties thereto.

The Plan defines **"IPO"** to mean an initial public offering on the New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange, or any other internationally recognized stock exchange (including in the PRC) with respect to the shares of outstanding capital stock of Smart King or such other relevant listing vehicle, as applicable.

The Plan defines **"Liquidation Event"** to mean a (a) liquidation through an assignment for the benefit of creditors, a receivership, a case under chapter 7 of the Bankruptcy Code, or a similar insolvency proceeding of Smart King or future public listing vehicle for the global subsidiaries of FF, (b) a

liquidating case of FF under chapter 11 of the Bankruptcy Code, or (c) a reorganization case of FF under chapter 11 of the Bankruptcy Code that materially reduces the percentage ownership of the Trust other than by virtue of an equity investment or equity incentive.

The Plan defines **"Smart King Transfer Right"** to mean the Debtor's contractual right to direct Pacific Technology to direct FF Peak to direct FF Top to transfer the Trust Smart King Shares to the Trust.

## A.    Creation of the Trust

Article 6.2 of the Plan provides that on or after the Effective Date, the Debtor or the Reorganized Debtor shall (a) transfer the economic interests in 90,588,235 units (representing 100% of the issued and outstanding units) of West Coast (the "West Coast Interests") and (b) cause to be transferred 147,058,823 Class B shares of Smart King (the "Smart King Shares") to (i) the 2020 Creditor Liquidating Trust for the benefit of holders of Allowed Debt Claims (the "Creditor Trust") and (ii) a trust for the benefit of holders of Late Filed Debt Claims (the "Late Filed Debt Claims Reserve" and together with the Creditor Trust, the "Trust").

Each holder of an Allowed Debt Claim or Allowed Late Filed Debt Claim shall receive a beneficial interest (a "Trust Interest") in the Creditor Trust or the Late Filed Debt Claims Reserve, as applicable, based on the formulas set forth below. The Trust will preserve, hold, manage, and maximize the Trust Assets (as defined below) for use in paying and satisfying the holders' Claims upon the earlier to occur of (x) the consummation of a Liquidity Liquidation Event or a Distribution Event (each as defined below) and (y) the termination of the Trust in accordance with the Trust Agreement.

Article 6.2 of the Plan provides that on the Effective Date, the managing member of Pacific Technology shall amend that certain Third Amended and Restated Limited Liability Company Agreement of Pacific Technology dated July 5, 2019 (the "PT LLCA") to: (a) provide that the Trust is a member of Pacific Technology and the holder of 100% of the preferred membership units of Pacific Technology (the "Preferred PT Units"); (b) issue new units of Pacific Technology to the Trust (the "New PT Units"), entitling the Trust to 100% of the economic value of 147,058,823 Class B shares of Smart King (the "Trust Smart King Shares"); and (c) grant the Trust a fully paid-up warrant to receive the Trust Smart King Shares consistent with the Smart King Transfer Right with no further action by the Debtor, exercisable upon the dissolution of the Injunctions (the "Warrant").

## B.    The Trust Assets

The assets of the Trust will consist of the following: (i) the economic interest in 90,588,235 units of West Coast (representing 100% of the issued and outstanding units of West Coast); (ii) 147,058,823 Smart King Shares; 100% of the Preferred PT Units; (ii) 100% of the New PT Units; (iii) the Warrant; (iv) following the exercise of the Warrant and the indefeasible transfer of the Trust Smart King Shares to the Trust, the Trust Smart King Shares; (v) any financial assets of the Debtor (i.e., accounts, security, or real property) located in the PRC after satisfaction of any claims recoverable from such assets under applicable law; (vi) Yidao Claims; (vii) property transferred to the Trust under section 542 of the Bankruptcy Code in accordance with Article 11.9 of the Plan; (viii) subject to certain rights of FF Global in connection with respect to the Call Option, disposition of such Call Option as set forth below in Article 6.2(l) of the Plan; and (iii ix) the Trust Expense Funded Amount expense funded amount contributed to the Trust by a postpetition lender (the "Funding Source") as provided in the Trust Agreement Plan Term Sheet (collectively, the "Trust Assets").

## C.    Voting Rights With Respect to the Trust Assets

The Trustee ~~will~~shall exercise all voting rights, if any, with respect to the Trust Smart King Shares ~~as directed by FF Top Holding Ltd.; provided that the exercise of such voting rights shall be in accordance with (i) the organizational and governing documents of Smart King, (ii) such other agreements that are in effect as of the date of the Trust Agreement (including the certain Fourth Amended and Restated Memorandum and Articles of Association of Smart King, adopted as of May 15, 2019), and (iii) that certain Restructuring Agreement, dated as of December 31, 2018, by and among Smart King, YT Season Smart Limited, a company formed under the laws of the British Virgin Islands, and the other parties thereto, in each case, to the extent applicable.~~owned by the Trust after the exercise of the Warrant. Prior to the occurrence of an IPO, the Debtor will use commercially reasonable efforts to provide the Creditor Trust Committee (as defined below) with observer rights regarding the committee meetings held by the committee of managers of FF Global.

## D.    Late Filed Debt Claims Reserve

On the Effective Date, the ~~Debtor shall transfer 10% of the West Coast Interests and Smart King Shares respectively to~~Trustee shall (i) establish the Late Filed Debt Claims Reserve for the benefit of ~~holders of~~any Allowed Late Filed Debt Claims and (ii) transfer 10% of the Trust Assets to the Late Filed Debt Claims Reserve. The Late Filed Debt Claims Reserve will have no operations other than to make distributions to holders of Late Filed Debt Claims in accordance with the ~~Distribution Waterfall~~Trust Agreement and will be managed by the Trustee (as defined below) pursuant to a separate trust agreement with substantially similar governance terms as the Trust Agreement. At the conclusion of the Standstill Period, any unallocated assets in the Late Filed Debt Claims Reserve shall revert to the Creditor Trust for the ratable benefit of holders of Allowed Debt Claims.

In order for a Late Filed Debt Claim to be allowed and participate in the Late Filed Debt Claims Reserve, the Debtor and the Trustee shall make commercially reasonable efforts to agree that allowance of such Late Filed Debt Claim in a particular amount is in the best interests of the Debtor and the Trust. If the Debtor and the Trustee do not agree to the allowance or amount of any Late Filed Debt Claim, the Debtor may, upon notice and a hearing, seek entry of a Bankruptcy Court order allowing such Late Filed Debt Claim (a "Late Filed Debt Claim Order"). In seeking any Late Filed Debt Claim Order, the Debtor shall bear the burden of demonstrating to the Bankruptcy Court that allowance of such Late Filed Debt Claim is in the best interests of the Debtor and the Trust.

~~The Trustee shall have the right in its discretion to (i) exchange the Late Filed Debt Claims Reserve's portion of the West Coast Interests and Smart King Shares for direct Trust Interests in the Creditor Trust, which shall provide the beneficiaries of the Late Filed Debt Claims Reserve with the same share of distributions they are otherwise entitled to receive under the Distribution Waterfall, and (ii) distribute such Trust Interests to the beneficiaries of the Late Filed Debt Claims Reserve in exchange for their beneficial interests in the Late Filed Debt Claims Reserve.~~

~~In order for a holder of a Late Filed Debt Claim to receive a distribution from the Late Filed Debt Claims Reserve, such holder must execute a full release of the Debtor and his wife Wei Gan from personal liability on all claims in every jurisdiction. Any distribution to a Late Filed Debt Claim shall be from the Late Filed Debt Claims Reserve and holders of Late Filed Debt Claims shall have no recourse against the Creditor Trust or the Debtor.~~

## E.    Appointment of the Trustee

~~On or after the Effective Date,~~There shall be one (1) trustee (the "Trustee") ~~shall be appointed~~of the Trust. The initial Trustee will be disclosed in the Plan Supplement. Any successor Trustee shall be

selected by majority vote of the Creditor Trust Committee in accordance with the Trust Agreement, the identity of which shall be disclosed prior to confirmation of the Plan. The Trust Agreement shallwhich shall set forth certain criteria with respect to the relevant experience and independence criteriaqualifications for the Trustee.

The Trustee shall act as a fiduciary and shall not be personally liable in connection with the affairs of the Trust or to any person except for such of the Trustee's acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a final order of a court of competent jurisdiction.  In addition, the Trustee shall be indemnified by the Trust against and held harmless by the Trust from any losses, claims, damages, liabilities, or expenses (including without limitation, attorneys' fees, disbursements, and related expenses) to which the Trustee may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against the Trustee in connection with any matter arising out of or related to the Trust Agreement or the affairs of the Trust (other than in respect of acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction).  The Trustee shall be entitled to obtain customary fiduciary and/or errors and omissions liability insurance and engage independent legal counsel and financial advisors to assist with its evaluation of any matters with respect to the Trust, including any LiquidityLiquidation Event.

The Trustee shall be compensated by the Trust in an amount not to exceed $100,000 per annum (unless approved by the Creditor Trust Committee)from Trust Assets pursuant to the Trust Agreement. The Trustee shall be entitled to reimburse itself out of any available cash in the Trust, for its actual out-of-pocket expenses and shall be indemnified by the Trust from Trust Assets against and from any and all loss, liability, expense, or damage, which the Trustee may sustain in good faith and without willful misconduct, gross negligence, or fraud in the exercise and performance of any of the powers and duties of the Trustee under the Trust Agreement.

The Trustee may resign upon not less than sixty (60) days' advance written notice to the Creditor Trust Committee so long as, with such resignation to take effect once a replacement trusteeTrustee has been appointed.

The Creditor Trust Committee may remove the Trustee in the event the Trustee commits any act or omission that constitutes fraud, breach of fiduciary duty, willful misconduct, or gross negligence. Upon the removal of the Trustee as set forth in the immediately preceding sentence, the Creditor Trust Committee shall have the right to appoint a replacement Trustee, subject to approval by the Debtor (which approval shall not be unreasonably withheld).

**F.    Creditor Trust Committee**

Holders of Trust Interests will be represented by a committee that shall consist of a number of holdersno more than five (5) creditors holding of Allowed Debt Claims, or their designees (the "Creditor Trust Committee"), the responsibilities and governance of which are set forth in the Trust AgreementPlan Term Sheet. The initial members of the Creditor Trust Committee must be acceptable to the Committee and will be disclosed in the Plan Supplement.

**G.    Term of the Trust**

The term of the Trust (the "Term") will initially extend until the fifth (5th) anniversary of the Effective Date (the "Initial Term"). If the completion of an IPO occurs during the Initial Term, the Term and the Standstill Period shall be automatically extended through the conclusion of the selloff period for the Marketable Securities as set forth on Exhibit B to the Plan Term Sheet. If the completion of the IPO has not occurred during the Initial Term, the Trustee may elect to extend the Term for successive one-year

periods (or such other periods as the Trustee determines to be appropriate) to the extent necessary to allow for orderly liquidation of any remaining Trust Assets.

The term of the Trust will extend until the sixth (6th) anniversary of the effective date of the Trust Agreement (such six (6) year period, the "Initial Term"). The Creditor Trust Committee may, upon delivery of written notice to the Trustee not later than ninety (90) days prior to the expiration of the Initial Term, elect to extend the Initial Term for up to three (3) additional one (1) year periods (each, a "Creditor Extension Term") to allow for orderly liquidation of any remaining Trust Assets. Subject to the limitations set forth above, the Creditor Trust Committee may, upon delivery of written notice to the Trustee not later than ninety (90) days prior to the expiration of the then-current Creditor Extension Term, elect to extend such Creditor Extension Term.

If the completion of an IPO occurs during the Initial Term, the Debtor may, upon delivery of written notice to the Trustee and the Creditor Trust Committee not later than ninety (90) days prior to the expiration of the Initial Term, elect to extend the Initial Term for up to three (3) additional one (1) year periods (each, a "YT Extension Term") in his sole discretion to liquidate any Smart King Shares that remain unsold as of the expiration of the Initial Term.

The Trustee shall dissolve and wind up the Trust and ~~distribution~~distribute the Trust Assets upon the expiration of (i) the Initial Term if no ~~YT Extension Term or Creditor Extension Term~~extension (automatic or otherwise) is exercised**,** or (ii) the expiration of ~~the applicable YT Extension Term or Creditor Extension Term, as applicable~~extended Term of the Trust. The Trustee may dissolve the Trust before the end of the Initial Term~~, any Creditor Extension Term,~~ or any ~~YT Extension~~extended Term if: (x~~a~~) all ~~Allowed Debt Claim~~of the Trust Assets have been distributed in accordance with the Distribution ~~Amounts are fully paid and satisfied and~~Waterfall the Debtor has approved the dissolution of the Trust or (y~~b~~) ~~upon the~~a liquidation ~~, dissolution, or winding up of Smart King (a "Liquidity~~ through an assignment for the benefit of creditors, a receivership, a case under chapter 7 of the Bankruptcy Code, or a similar insolvency proceeding of Smart King or future public listing vehicle for the global subsidiaries of FF, (c) a liquidating case of FF under chapter 11 of the Bankruptcy Code, or (d) a reorganization case of FF under chapter 11 of the Bankruptcy Code that materially reduces the percentage ownership of the Trust other than by virtue of an equity investment or equity incentive (a "Liquidation Event"). Upon termination of the Trust, the Trustee will obtain a valuation of the Trust Assets as of the termination date (performed by an independent valuation firm selected by the Trustee and approved by the Creditor Trust Committee and the Debtor) and shall, as promptly as practicable following the completion of the independent valuation, distribute the Trust Assets in kind to the holders of Allowed Debt Claims in accordance with the distribution waterfall set forth on Exhibit A to the ~~Trust Agreement~~Plan Term Sheet.

## H.    Expenses of the Trust

The professional fees, costs, and other expenses incurred by the Trustee in connection with the administration of the Trust shall be paid from the proceeds of the Trust Financing and the relevant Trust Assets.

On the effective date of the Trust Agreement, the Funding Source will contribute to the Trust as part of the Trust Assets $600,000 in immediately available funds for the purposes of funding the Trust's administration during the first three (3) years of the Initial Term, including for retaining independent third party advisors (legal counsel, an independent registered accounting firm, and an independent valuation firm, among others), compensating the Trustee, and paying such other fees and expenses incidental to the management and administration of the Trust Assets during the first three (3) years of the Initial Term. For each year during the Initial Term thereafter, no later than thirty (30) days following the beginning of such year, the Funding Source shall contribute to the Trust as part of the Trust Assets $200,000 in immediately

~~available funds for the purposes of funding the Trust's administration during such year (the expenses referred to in this paragraph are referred to herein as the "Initial Trust Expenses"). For purposes of clarification, in no event shall the Funding Source be required during the Initial Term to contribute to the Trust as part of the Trust Assets more than $1,200,000.~~

~~In the event that the Debtor elects to extend the duration of the Trust beyond the Initial Term pursuant to a YT Extension Term, the Funding Source will contribute to the Trust as part of the Trust Assets $200,000 in immediately available funds for the purposes of funding the Trust's administration during such YT Extension Term (such expenses, the "YT Extension Expenses"). In the event that the Creditor Trust Committee elects to extend the duration of the Trust beyond the Initial Term, the holders of Trust Interests shall obtain financing for the Trust in the amount of $200,000 in the aggregate for each Creditor Extension Term (with each holder bearing his, her, or its pro rata share of such amount) for the purposes of funding the Trust's administration (the "Additional Trust Expenses" and, together with the Initial Trust Expenses and the YT Extension Expenses the "Trust Expense Funded Amount").~~

**I.    Distribution of Trust Assets**

~~On or after the completion of an IPO~~ on the New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange, or any other internationally recognized stock exchange with respect to the shares of outstanding capital stock of Smart King or such other relevant listing vehicle, as applicable, the <u>Upon receipt of the distributable</u> proceeds ~~received~~ by the Trust ~~from (i)~~<u>for</u> any disposition ~~of Smart King Shares or (ii),~~ <u>or</u> dividends or distributions in respect<u>,</u> of ~~the Smart King Shares or the interest in West Coast (each~~<u>any Trust Assets (such proceeds, the "Distributable Proceeds and such an event</u>, a "<u>Distribution Event</u>")<u>, the Distributable Proceeds</u> will be distributed in accordance with the Distribution Waterfall upon the earlier of (i) sixty (60) days following the occurrence of such Distribution Event, and (ii) the termination of the Trust.

The Trustee may delay or defer the distribution of any ~~proceeds~~<u>Distributable Proceeds</u> (whether cash, securities, or other property) received by the Trustee in respect of the Trust Assets if the Trustee determines that such deferral or delay is in the best interests of the holders of Trust Interests (including if ~~(i) the Trust or the Trust Assets are bound by an injunction, freeze order, judgment, or similar order or proceeding affecting such distribution or (ii)~~ such distribution would violate <u>any court order or</u> applicable law).

~~The decision as to when and how much of the Trust Assets to dispose of after an IPO will be governed in accordance with the schedule attached as Exhibit B to the Trust Agreement Term Sheet, and the Trustee will, in accordance with instructions with such schedule, sell, transfer, or otherwise dispose of any securities that are listed (the "Marketable Securities") in one or more open market transactions, private placement, or derivative transactions. The proceeds shall be distributed in accordance with the Distribution Waterfall.~~

<u>The schedule for disposition of shares of Smart King directly owned by the Trust and that are registered under securities law or listed (the "Marketable Securities") shall be governed in accordance with  Exhibit B to the Plan Term Sheet. The PT LLCA will include provisions that the managing member of Pacific Technology will use commercially reasonable efforts to dispose of Marketable Securities owned or controlled by Pacific Technology in which the Trust owns a beneficial interest on a similar schedule until the priority distribution of $815.7 million in connection with the preferred units of Pacific Technology is paid to the Trust. The Distributable Proceeds shall be distributed in accordance with the Distribution Waterfall.</u>

At any time upon the ~~Debtor's~~ request <u>of the managing member of Pacific Technology, and subject to applicable securities law</u>, the Trustee ~~will~~<u>shall</u> distribute the Marketable Securities in kind to

the holders of Trust Interests in lieu of any cash distribution. The value of the Marketable Securities ~~will~~shall be the average closing trading price for the five (5) consecutive trading days immediately prior to the distribution.

**J.    Distribution Waterfall**

The Trust Assets ~~of the Creditor Trust and the Late Filed Debt Claims Reserve~~ shall be distributed ~~to the Funding Source, holders of eligible Claims that made a Trust Election, holders of the Trust Interests, and the Debtor~~ as follows:

i.      First, ~~pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve, to the Funding Source, an amount equal to the amount contributed by the Funding Source during the Initial Term to provide for (x) the Initial Trust Expenses and (y) the YT Extension Expenses, if any;~~to repay the Trust Financing, if any, pursuant to the terms thereof and the Trust Agreement;

~~ii. Second, pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve, to each holder of Trust Interests, an amount equal to such holder's pro rata share of the Additional Trust Expenses, if any;~~

ii.     ~~iii. Third, pro rata from the Creditor Trust and the Late Filed Debt Claims Reserve~~Second, to each holder of an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim that has made a Trust Election, equal to the Allowed amount of such Claim plus the applicable interest rate provided in the Trust Agreement;

~~iv. Fourth, the remaining Trust Assets of the Late Filed Debt Claims Reserve, to holders of Late Filed Debt Claims, an amount equal to such holder's pro rata share of the remaining Trust Assets held in the Late Filed Debt Claims Reserve (after accounting for the distributions pursuant to clauses (i) through (iii) above, if any), until such holder has received aggregate distributions (in cash or in kind) pursuant to this clause (iv) equal to the lessor of (x) such holder's pro rata share of remaining Trust Assets that would be available to satisfy all Allowed Debt Claims and Late Filed Debt Claims; and (y) the full amount of such Late Filed Debt Claim as verified by the Trustee;~~

~~v. Fifth, to the Creditor Trust, 100% of the amount of the remaining Trust Assets held in the Late Filed Debt Claims Reserve (after accounting for the distributions pursuant to clauses (i) through (iv) above), if any;~~

iii.    ~~vi. Sixth, the Trust Assets remaining in the Creditor Trust after distributions pursuant to clauses (i) through (iii) above and contributions from clause (v) above, to holders~~Third, to (x) holder of Allowed Debt Claims, ~~an amount equal to such holder's pro rata share~~95% of the remaining ~~proceeds held in the Creditor Trust~~Trust Assets, if any, and (y) the Debtor, 5% of the remaining Trust Assets, if any, until ~~such~~each holder of an Allowed Debt Claim has received aggregate ~~distributions~~Trust Distributions (in cash or in kind) pursuant to this clause (~~vi~~iii) equal to the full amount of such holder's Allowed Debt Claim Distribution Amount; and

iv.     Fourth, after all holders of Allowed Debt Claims have received Trust Distributions equal to their respective Allowed Debt Claim Distribution Amounts, any remaining Trust Assets shall be allocated between the holders of Allowed Debt Claims (to be further allocated pro rata based on their respective Allowed Debt Claim Allocation Amounts)

and the Debtor, as follows:

| | The Debtor | Holders of Allowed Debt Claims |
|---|---|---|
| Amounts less than $1B | 50% | 50% |
| Amounts greater than $1B < $2B | 70% | 30% |
| Amounts greater than $2B < $3B | 80% | 20% |
| Amounts greater than $3B | 100% | - |

vii. Seventh, to the Debtor, 100% of the amount of the remaining proceeds (after accounting for the distributions pursuant to clauses (i), (ii), (iii), (iv), and (vi) above), if any.

## VI.

## HYPOTHETICAL SCENARIOS

In order to align incentives of YT with the equity holders of Smart King, including the holders of Trust Interests, Smart King will enter into the 2020Future Equity Incentive Plan with YT and certain key members of management, conditioned on the consummation of the Plan. *See* Article II.C.5 above entitled "2020Future Equity Incentive Plan." The 2020Future Equity Incentive Plan will provide equity consideration to YT based upon Smart King's valuation at the time of a Distribution Event. In addition, Smart King is currently seeking Series B Equity Financing in the amount of $850 million in order to proceed to production of FF91. The terms and conditions of the financing have not been determined. *See* Article II.C.6 above entitled "FF'sthe FF Group's Strategy."

In order to provide financing for the Restructuring, YT obtained a secured loan from Pacific Technology, an affiliate, in the amount of $2,677,629. In addition, in connection with the Trust, YT expects to obtain additional financing, and as discussed in Article VIIIII.D above, YT will be filing a motion for approval of the DIP Facility. These loans may be repaid from a priority distribution by the Trust.

The recoveries under the Restructuring are dependent on Smart King's value. In order to illustrate recoveries under different valuation scenarios of Smart King, YT has prepared the following chart with the following assumptions:

- Series B Equity Financing will dilute equity interests by 33%;
- Smart King's IPO will dilute equity interests by 25%;
- Smart King's IPO will take place in the first quarter of 2021;
- Total amount of claims for distribution purposes is $2.33 billion; and
- The 2020Future Equity Incentive Plan will be distributed in full (*see* Article II.C.5 above entitled "2020Future Equity Incentive Plan.").

The hypothetical figures set forth in the table below are estimates only and reflect various generalizations and assumptions by YT and his advisors. Such estimates, generalizations, and assumptions are considered reasonable by YT and his advisors, although they may prove to have been incorrect or unfounded; further, they are hypothetical estimates only and are inherently subject to significant economic, competitive, tax, and other risks and uncertainties beyond the control of YT, Smart King, or the FF Group, including those described in Article IX of this Disclosure Statement under "Risks Related to the FF Group and its Business that may Adversely Affect the Trust Interests," "Risks Related to the Industry," and "Risks Related to FF'sthe FF Group's Operations in the PRC."

50

| Distribution from Creditor Trust (~~Millions~~millions of USD) | Smart King Total Equity Value Under Different IPO Prices (~~Millions~~millions of USD) | | |
|---|---|---|---|
| Aggregate Distribution | $5,000~~(Post series B)~~ | $10,000~~(Post IPO)~~ | $21,000~~(Post IPO)~~ |
| Distribution to Creditors | $1,144 | $1,417 | $2,341 |
| Creditor Recovery Percentage | 49.10% | 60.82% | 100.47% |

~~As illustrated in the following table, the 2020 Equity Incentive Plan will result in various degrees of dilution, depending on Smart King's future valuation:~~

| ~~Smart King Value (in millions)~~ | ~~$5,000~~ | ~~$10,000~~ | ~~$21,000~~ |
|---|---|---|---|
| ~~Dilution~~ | ~~2% (Post series B)~~ | ~~Additional 3% (Post IPO)~~ | ~~Additional 3% (Post IPO)~~ |

## VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS IN CLASS 3 SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE FORWARD-LOOKING STATEMENTS. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. IF ANY OF THE FOLLOWING RISKS OR OTHER UNFORESEEN EVENTS ACTUALLY OCCUR, ~~FF'S~~THE FF GROUP'S BUSINESS, ITS FINANCIAL CONDITION AND THE RESULTS OF ITS OPERATIONS, AND THEREFORE THE VALUE OF THE TRUST INTERESTS COULD BE MATERIALLY AND ADVERSELY AFFECTED. YOUR TRUST INTEREST WILL ENTITLE YOU TO YOUR RESPECTIVE PORTION OF THE BENEFICIAL INTEREST IN THE TRUST, WHICH HOLDS ALL OF YT'S ECONOMIC INTEREST IN THE FF GROUP AS "TRUST ASSETS." AS A RESULT, THE VALUE OF THE TRUST ASSETS ARE ENTIRELY RELIANT ON THE VALUE OF THE EQUITY INTERESTS OF ~~FF~~SMART KING, WHICH WOULD BE DETERMINED AND AFFECTED BY ~~FF'S~~THE FF GROUP'S BUSINESS, PROSPECTS FINANCIAL CONDITION, AND RESULTS OF OPERATIONS. HOLDERS OF CLAIMS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. NO PARTY, INCLUDING, WITHOUT LIMITATION, THE DEBTOR OR THE REORGANIZED DEBTOR, UNDERTAKES AN OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

A.        **Risks Related to the Plan**

*The Plan May Not Be Confirmed*

There is no assurance that the Bankruptcy Court will confirm the Plan. Even if all Classes vote to accept the Plan, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Claims ultimately would receive with respect to their Allowed Claims.

*Failure to Consummate the Plan*

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As the date of filing this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

***If the Plan is not consummated, YT may seek restructuring alternatives that result in less value to holders of claims against YT than they would receive pursuant to the Plan.***

If YT does not consummate the Plan, he may be required to pursue an alternative plan or plans of reorganization, either under the Bankruptcy Code or otherwise. There can be no assurance that YT would be able to effect any such alternative plan or reorganization or that any such alternative plan or reorganization would be on terms as favorable to the holders of claims against YT as the terms of the Plan. In addition, certain of YT's creditors may seek relief from the automatic stay to take certain legal actions against YT, which could include foreclosure or liquidation of YT's assets. If a liquidation or protracted reorganization of YT were to occur, there is a substantial risk that the value of YT's assets (and ultimately the value of the FF Group) would be substantially eroded to the detriment of all stakeholders. If an alternative plan of reorganization could not be implemented, it is likely that YT would have to liquidate his assets, in which case it is likely that holders of claims against YT would receive less than they would have received pursuant to the Plan.

***If consummation of the Plan is delayed, the FF Group may not be able to obtain financing.***

After the consummation of the Plan, the FF Group would need to obtain financing to provide it with the financial capacity necessary to fund its operations and proceed with its business plan. Securing financing for the FF Group is dependent upon a number of factors, some of which are beyond FF's the FF Group's or YT's control. If the Plan is not consummated on a timely basis, the FF Group may be unable to negotiate acceptable terms for such an arrangement. The challenges of obtaining financing would be exacerbated by adverse conditions in the general economy and the volatility and tightness in the financial and credit markets. An inability to obtain financing on a timely basis and/or on reasonable commercial terms, or at all, could have an adverse effect on FF's the FF Group's business, financial condition, and operating results or ability to continue as a going concern.

***The exchange of the Debt Claims for Trust Interests does not reflect any independent valuation of FF Smart King.***

YT has not obtained or requested a determination from any third party as to the value of FF Smart King or the Trust Interests. In particular, the future value of the Trust Interests, including the right to receive any distributions or other payments, will depend on YT's ability to consummate the Plan, as well

as ~~FF's~~the FF Group's ability to obtain the financing necessary to fund its operations and proceed with its business plan.

***YT may withdraw, amend, cancel, or delay the Plan in his sole and absolute discretion.***

To the fullest extent permitted by applicable law, YT reserves the right to withdraw, amend, cancel, or delay the Plan (or any part of the Plan), before or after the Voting Deadline. The potential impact of any such action on the holders of Claims cannot presently be foreseen but may include a change in the economic impact of the Plan or could make it significantly less likely that YT will be able to consummate the Plan. You will not have any right to vote on, or to be consulted in connection with, YT's decision regarding whether to withdraw, amend, cancel, or delay the Plan or any part thereof.

***~~FF's~~Smart King's future value, and therefore the value of your interest in the Trust is uncertain. The hypothetical figures set forth in the table in Article VI of this Disclosure Statement are based on generalizations and assumptions that may not prove to be accurate.***

The hypothetical figures set forth in the table in Article VI of this Disclosure Statement are estimates only and reflect various generalizations and assumptions by YT and management of FF. Such estimates, generalizations and assumptions are considered reasonable by YT and management, although they may prove to have been incorrect or unfounded; further, they are hypothetical estimates only and are inherently subject to significant economic, competitive, tax, and other risks and uncertainties beyond the control of YT or the FF Group, including the additional risks set forth herein under "Risks Related to the FF Group and its Business that may Adversely Affect the Trust Interests," "Risks Related to the Industry" and "Risks Related to ~~FF's~~the FF Group's Operation in the PRC." There can be no assurance that the hypothetical returns described in such will be realized, and actual results may vary materially and adversely from the hypothetical estimates set forth therein. To the extent the future value of ~~FF~~Smart King is materially less than described in the table, the value of your interest in the Trust will be negatively affected.

**B.      Risks Related to ~~Smart King,~~the FF~~,~~ Group and ~~Their~~its Business that may Adversely Affect the Trust Interests**

***~~Smart King~~The FF Group has substantial existing indebtedness and may incur substantial additional indebtedness in the future, and ~~Smart King~~the FF Group may not be able to refinance its current borrowings on terms that are acceptable to it, or at all.***

~~Smart King~~The FF Group has a substantial amount of indebtedness as disclosed herein, and may continue to incur additional indebtedness from time to time to support its operations. If ~~Smart King~~the FF Group incurs additional debt, the risks that it faces as a result of its indebtedness and leverage could intensify. The substantial existing debt and the incurrence of any additional debt of ~~Smart King~~the FF Group could:

- limit ~~Smart King's~~the FF Group's ability to satisfy its obligations under certain debt instruments, including the bridge facility agreements;

- in the event ~~Smart King~~the FF Group is not able to renew or refinance existing indebtedness as it becomes, cause ~~Smart King~~the FF Group to seek bankruptcy protection or enter into other insolvency proceedings;

- increase its vulnerability to adverse general economic and industry conditions;

- require it to dedicate a substantial portion of its cash flow from operations to servicing and repaying indebtedness, thereby reducing the availability of cash flow to fund its working capital, capital expenditures, and other general corporate purposes;

- increase its exposure to interest rate and exchange rate fluctuations;

- limit ~~Smart King's~~the FF Group's ability to borrow additional funds and impose additional financial and other restrictions on it; and

- increase the cost of additional financing.

Because the majority of ~~Smart King's~~the FF Group's indebtedness is short-term indebtedness, ~~Smart King~~the FF Group may suffer a near-term liquidity problem if it is unable to refinance these borrowings as they become due. As of July 31, 2019, ~~Smart King's~~the FF Group's current liabilities amounted to $734.3 million, with outstanding note payables of $402.1 million to related-party lenders and third-party lenders, respectively. ~~Smart King~~The FF Group has defaulted on some of the notes, and is currently in negotiation with such lenders for extensions or conversion of notes into equity. Several other notes will mature by the end of 2019. For example, ~~FF's~~a secured note of approximately $45.0 million issued to certain purchasers pursuant to the note purchase agreement with U.S. Bank National Association became due on October 31, 2019~~, however~~. However, FF obtained an extension of the maturity date to May 31, 2020. ~~Certain of the notes entered into by the lenders and Smart King provided an increasing interest rate per annum.~~ There is no assurance that ~~Smart King~~the FF Group will be able to obtain extensions, or renew certain notes in the future at commercially acceptable rates, or obtain sufficient alternative funding on reasonable terms, or at all, to settle the notes.

The commercial banks, financial institutions and individual lenders may have concerns in providing or renewing financing for ~~FF's~~the FF Group's operations, especially if a significant portion of their lending to ~~Smart King~~the FF Group has not been repaid as of the date of this Disclosure Statement and may continue to remain outstanding for an indeterminate period of time. The United States and Chinese governments may also pass measures to tighten credit available in the markets. Any future monetary tightening measures as well as other monetary, fiscal and industrial policy changes by those governments could materially and adversely affect ~~FF's~~the FF Group's cost and availability of financing, liquidity, and access to capital, and ability to operate its business. Unless ~~Smart King~~the FF Group is successful in obtaining extensions, refinancing, or waivers with respect to certain indebtedness that is or will come due in the near future, or that is currently in default, ~~Smart King~~the FF Group is not expected to have sufficient liquidity to remain as a going concern. Furthermore, even if it is able to obtain such extensions, refinancing or waivers, ~~Smart King~~the FF Group must be able to consummate the Series B Equity Financing or a similar financing by early 2020, or ~~Smart King~~the FF Group will again face financing challenges that may call into question its ability to continue as a going concern. There can be no assurance that ~~Smart King~~the FF Group will be able to obtain any such extensions, refinancing or waivers or consummate the Series B Equity Financing or similar financing on a timely basis or on reasonable commercial terms, or at all.

***~~Smart King~~The FF Group is operating, and will continue to operate, with a working capital deficit and has limited cash availability and liquidity, and if ~~Smart King~~the FF Group cannot close equity financing as planned, there exist doubts and uncertainties as to its ability to continue as a going concern.***

~~Smart King~~The FF Group has been operating for the past one year under limited cash availability and liquidity. It incurred a net loss of $477.8 million and $103.1 million, respectively, in 2018 and during the seven months ended July 31, 2019, and had an accumulated loss of $2.15 billion as of July 31, 2019.

Given ~~Smart King's~~the FF Group's current limited cash availability and liquidity, there is a concern as to ~~Smart King's~~the FF Group's ability to pay its debts and liabilities as they come due and to continue as a going concern. For more information, *see* "Management's Discussion and Analysis of Financial Condition and Results of Operations of ~~Smart King Ltd.~~the FF Group," attached hereto as **Exhibit C.**

As ~~Smart King~~the FF Group has substantial indebtedness in the PRC and the United States, there are doubts and uncertainties about ~~Smart King's~~the FF Group's ability to service its existing debts and to continue its operations. The annual interest rates for ~~Smart King's~~the FF Group's borrowings from third party lenders generally varied from 8.99% to 13% as of December 31, 2018, which may be raised in the event of default. In order to refinance its existing borrowings, ~~Smart King~~the FF Group may need to borrow with even higher interest rates, if ~~Smart King~~the FF Group cannot close equity financing as planned The doubts and uncertainties about ~~Smart King's~~the FF Group's ability to service its debts and continue its operations may result in concerns of its creditors, suppliers, customers and other counterparties, which could hinder ~~Smart King's~~the FF Group's ability to conduct operation in the ordinary course of business and to raise financing on a reasonable terms, which may result in ~~Smart King's~~the FF Group's inability to continue as a going concern.

From time to time, ~~Smart King~~the FF Group pledged its properties in the United States as collateral for certain borrowings, which ~~Smart King~~the FF Group has not fully paid off as of the date of this Disclosure Statement. ~~For example, pursuant to the note purchase agreement dated April 29, 2019, entered into with U.S. Bank National Association and certain purchasers, and with Birch Lake as the agent and collateral agent, substantially~~Substantially all of Smart King's tangible and intangible assets have been pledged as collateral. Smart King's operations may be disrupted if it fails to pay off the borrowings and the creditors decide to take enforcement measures, which would materially and adversely affect ~~Smart King's~~the FF Group's business, results of operations, financial condition, and future prospects.

Furthermore, ~~Smart King's~~the FF Group's ability to satisfy its outstanding and future debt and other obligations by its self-generated revenues may largely depend upon its planned commercialization and the performance of FF's electric vehicles, including the FF 91 and the FF 81, which are subject to the factors, including FF's ability to secure funds, as well as factors which are beyond ~~Smart King's~~the FF Group's control, including general economic conditions, technological trends in the automotive industry and competitors in the EV electric vehicle markets by the time the electric vehicles are manufactured and sold.

***The FF Group has not commenced production of any model, and has not generated any revenue since its inception. There are uncertainties concerning its ability to develop, manufacture, market, sell and deliver electric vehicles of quality and appeal to customers, on schedule, and on a scale to achieve profitability.***

The FF Group is in its development stage. It has not generated revenue since its inception in 2014 and has not commenced production of any model as of the date of this Disclosure Statement. ~~FF's~~The FF Group's future business depends in large part on its ability to execute on its plans to develop, manufacture, market, sell and deliver its electric vehicles, including the FF 91, the FF 81 and other planned electric vehicle models that appeal to customers. In general, ~~FF's~~the FF Group's development, manufacturing, and sale of its planned volume manufactured vehicle is subject to various risks, including those with respect to:

- ~~FF's~~the FF Group's ability to secure sufficient funding;

- the appropriate selection and design of the equipment to accurately manufacture the electric vehicles within specified design tolerances;

- compliance with environmental, workplace safety and similar regulations;

- channels to secure necessary components from suppliers on acceptable terms and in a timely manner;

- ~~FF's~~the FF Group's ability to attract, recruit, hire, and train skilled employees;

- quality controls;

- ~~FF's~~the FF Group's ability to keep up with the technological development, estimated sales efforts, or after sale support, including charging;

- consumer expectations which are subject to change and affected by technological trends; and

- other delays and cost overruns.

Any of the foregoing risks could have a material adverse effect on ~~FF's~~the FF Group's business, prospects, results of operations and financial condition, and ability to continue as a going concern, and therefore the value of the Trust Interests.

***The FF Group may experience delays in realizing its projected timelines, cost, and volume targets for the production and ramp of its FF 91 vehicle, which could harm its business, prospects, financial condition, and operating results.***

~~FF's~~The FF Group's current business depends in large part on its ability to execute on its plans to manufacture, market and sell the FF 91 vehicle on a scale that may achieve profitability. Historically, the FF Group has missed its planned timeline to produce the FF 91. The FF Group has not commenced production of the FF 91. Although ~~FF's~~the FF Group's plan is to start its production within nine months after ~~Smart King~~the FF Group has completed its pending Series B Equity Financing, the commitment of any potential investors have not been secured and there is no assurance such financing will be obtained on a timely basis, on commercially reasonably terms, or at all. Assuming the FF Group secures necessary funding, the FF Group expects that its Hanford, California manufacturing facility will have the capacity to produce 10,000 units of the FF 91 beginning in 2021, while the FF Group expects to deliver 100 units to the market by the IPO of Smart King's shares (targeted for as early as early-to-mid-2021).

The FF Group has no experience to date in manufacturing vehicles, and in order to successfully produce a high volume of vehicles, the FF Group will need to complete the implementation and ramp of efficient and cost-effective manufacturing capabilities, processes and supply chains necessary to support the volumes that the FF Group is targeting. The FF 91 production plan has generally required and will require significant investments of cash and management resources.

~~FF's~~The FF Group's production plan for the FF 91 is based on many key assumptions, including:

- that the FF Group obtains the necessary financing to complete its build-out plans;

- that the FF Group will be able to fully build out its Hanford manufacturing facility in a timely manner;

- that the equipment and processes that the FF Group has selected for FF 91 production will be able to accurately manufacture high volumes of FF 91 vehicles within specified design tolerances and with high quality;

- complete ramping high volume production of FF 91 at the Hanford manufacturing facility without exceeding FF's FF Group's projected costs and on its projected timeline;

- that the FF Group will be able to maintain suppliers for the necessary components on terms and conditions that are reasonably acceptable and that the FF Group will be able to obtain components on a timely basis and in the necessary quantities to support high volume production and the number of FF 91 reservations; and

- that the FF Group will be able to attract, recruit, hire, train, and retain skilled employees, including employees on the production line, to operate its Hanford manufacturing facility for the FF 91.

If one or more of the foregoing assumptions turns out to be incorrect, FF's the FF Group's ability to meet its FF 91 projections on time and at volumes and prices that are profitable, the number of FF 91 reservations, as well as FF's the FF Group's business, prospects, reputation, operating results, and financial condition, may be materially and adversely impacted. In any such event, the value of the Trust Interests could be materially impaired.

***It is expected that there would be further increases in Smart King's the FF Group's costs and expenses that would result in continuing losses for at least the foreseeable future.***

Smart King The FF Group incurred a net loss of $477.8 million and $103.1 million, respectively, in 2018 and the seven months ended July 31, 2019, and had an accumulated loss of $2.15 billion as of July 31, 2019. Smart King The FF Group has had net losses in each quarter since its inception, and will continue to incur operating and net losses each quarter until at least the time it begins significant deliveries of the FF 91, which is not expected to occur until 2021, and may occur later. There is no assurance that the FF 91, the FF 81 or other planned electric vehicles will be commercially successful, even when they are successfully manufactured. There is also no assurance that the FF Group is to ever achieve profitability.

The rate at which Smart King the FF Group will incur costs and losses in future periods from current levels may increase significantly, as the FF Group:

- continues to develop the FF 91, FF 81 and other planned electric vehicle models;

- develops and equips its manufacturing facility in Hanford, California to produce the FF 91, and secures manufacturing capabilities in the PRC for FF's FF Group's planned electric vehicle to be manufactured and sold in the PRC;

- builds up inventories of parts and components for the FF 91;

- develops and expands its design, development, maintenance, servicing and repair capabilities;

- opens offline the FF Group's self-owned stores; and

- increases its sales and marketing activities.

These efforts may be more expensive than the FF Group currently anticipates or these efforts may not result in increases in its revenues, which would further increase its losses. As the FF Group is seeking funding to realize its business operations plan based on its estimated capital requirements, any cost overrun that deviates from its estimate may materially and adversely affect ~~FF's~~the FF Group's business, prospects, financial condition, and results of operations.

**_The Vendor Trust program established by the FF Group may not fully resolve the disputes with its contractors and suppliers._**

On April 29, 2019, as part of its financing efforts and to regain support from its contractors and suppliers, the FF Group created the Vendor Trust securing past due payables up to $150 million with substantially all of its tangible and intangible assets. Participating vendors have the benefit of a first lien with third payment priority on assets of the FF ~~and its affiliates~~Group, and are also entitled to certain interim distributions from the trust and interests. As of the date of this Disclosure Statement, vendors owed aggregate trade payable of $141.0 million have agreed to participate in the trust, which FF estimates to constitute all past due amounts for approximately 80% of its suppliers. FF intends to pay off the payables of the suppliers participating in the trust with the equity financing that it has raised. However, there is no assurance that the funding will be available. In the event that FF fails to secure capital to pay off the payables in the Vendor Trust upon its maturity, and/or the vendors decide to enforce the collateral when FF defaults, ~~FF's~~the FF Group's business and operations will be materially disrupted, and it will call into question whether the FF Group can continue as a going concern.

FF Group believes the Vendor Trust will increase its contractors' and suppliers' confidence in it and secure their continued cooperation in the production of the FF 91. However, the Vendor Trust will not be able to satisfy the overdue payments from all suppliers. ~~Although several major vendors that initiated proceedings against FF have settled their respective claims by participating in the Vendor Trust, as of the date of this Disclosure Statement, litigation proceedings with five vendors who did not participate in the Vendor Trust remain pending.~~ If the suppliers do not participate, or withdraw from, the Vendor Trust, FF Group will continue to face uncertainty in its supply chains, risks of threatened legal or administrative proceedings and persistent liquidity problems. Most importantly, FF Group may not be able to timely produce the FF 91 or launch the FF 81 or other electric vehicles as planned if certain key contractors and suppliers terminate their cooperation with FF Group and the FF Group may not find alternatives with acceptable terms, if at all.

**_The FF ~~and Smart King~~Group may have difficulties in attracting funding, and the production and ramp up of the FF 91 and the development of the FF 81 may be materially and adversely affected. As the Trust Interests derive their value from the value of the equity in the FF Group, the value of the Trust Interests may be materially impaired to the extent the value of the FF Group decreases._**

The FF Group operates in a capital intensive industry and requires a significant amount of cash to fund its operations. In particular, the FF Group needs a substantial amount of funding for the production and ramp up of the FF 91 and to develop the FF 81, including for the capital expenditures related to the build out of its Hanford, California manufacturing facility. It also needs cash to repay its existing debts and borrowings, including secured senior debts, many of which will mature ~~before~~in the ~~end~~beginning of ~~2019~~2020.

There is no assurance that the FF Group will have sufficient cash flow or other financing available for its vehicle development and production, or that it will be able to achieve sufficient pre-sales, if any, to fund its business operations. The FF ~~and Smart King~~Group will need to secure external funding through one or more private placements of its equity securities, debt financing and/or IPO, the results of which cannot be assumed. If the FF ~~and/or Smart King are~~Group is unable to obtain funding in a timely

manner or on commercially acceptable terms, or at all, its business and operation may be materially and adversely affected, and may impact whether the FF Group can continue as a going concern.

The limited operating history and financial distress of the FF Group could create obstacles for ~~FF's and Smart King's~~the FF Group's current financing plans and Smart King's future plan to launch an IPO of its shares. ~~Smart King~~The FF Group is currently seeking the Series B Equity Financing from investors for approximately $850 million. In addition, ~~Smart King's~~the FF Group's business plan envisions another substantial equity raise, which could be in the form of an IPO within 15 months after the Series B Equity Financing is secured. While ~~Smart King~~the FF Group is engaged in discussions with potential investors of the Series B Equity Financing as of the date of this Disclosure Statement, there are no commitments for additional funding and no assurance can be made as to whether funding will be available, and if so, how much and on what terms. There are uncertainties as to the timing, amount, terms and conditions of financing that the FF ~~or Smart King~~Group may be able to secure. Given ~~Smart King's~~FF Group's current indebtedness and financial situation, it may be forced to accept financing terms, if any, with more stringent undertakings and covenants, which may materially and adversely restrict and affect ~~FF's~~FF Group's business operations.

Furthermore, YT, the former chief executive officer and the current chief product and customer officer of FF, has recently been the subject of negative press related to his debts and ~~any investigation~~investigations by the China Securities Regulatory Commission into the delisting from the Shenzhen Stock Exchange~~,~~ of the shares of certain company where YT served as the chief executive offer. There is no assurance that such negative publicity, although not directly related to the FF ~~or Smart King~~Group, would not adversely affect ~~FF's or Smart King's~~the FF Group's ability to raise additional capital. Furthermore, there is no assurance that a confirmation of the Plan would ensure the FF Group's success in raising additional capital.

***~~Smart King's~~The FF Group's* issuance of convertible debt or equity securities, including pursuant to the Series B Equity Financing or *~~2020~~Future* Equity Incentive Plan, may dilute the Trust Interests held by you.**

~~Smart King~~The FF Group is planning to raise additional capital through the sale of equity and debt with convertible features, including pursuant to the Series B Equity Financing, and may continue to require additional capital through equity financing and/or sale of other equity-linked securities, including convertible debts. In addition, ~~Smart King~~the FF Group is in negotiations seeking to cause certain lenders to convert their debts into equity of ~~Smart King~~the FF Group. To the extent that ~~Smart King~~the FF Group issues additional shares, including pursuant to the Series B Equity Financing, the ownership interest of its stockholders, including the Trust, will be diluted and will affect the value of the Trust Interests.

Smart King has the 2018 Equity Plan and STI Plan (each as defined in Article II.C.2.c. above entitled "Stock Incentive Plans~~.~~") and proposes to adopt a ~~2020~~Future Equity Incentive Plan. Shares or interests in Smart King's equity issued under any of these plans will dilute the interest of the Trust in Smart King and therefore the value of your Trust Interests.

***If ~~Smart King~~the FF Group fails to comply with the undertakings and covenants under certain financial instruments or obtain consents or waivers in respect of any breach of these undertakings and/or covenants, its financial condition, results of operations and business prospects may be materially and adversely affected.***

Many financial instruments entered into by ~~Smart King~~the FF Group impose extensive restrictions and stringent conditions, which could be burdensome if ~~Smart King~~the FF Group fails to meet certain financial covenants contained therein, or to make the repayment when due and which may affect ~~Smart King's~~the FF Group's ability to raise additional capital. For instance, certain of ~~Smart King's~~the FF Group's credit facilities require the prior written consent of the lenders before ~~Smart King~~the FF Group may undertake specified corporate actions or transactions, such as increasing debt financing, providing new guarantees, selling or disposing of major assets, pledging assets, amending certain corporate registration records, and engaging in certain related-party transactions.

If ~~Smart King~~the FF Group is required to repay a significant portion or all of the existing indebtedness prior to their maturity or if ~~Smart King~~the FF Group is unable to borrow additional amounts under existing credit facilities, ~~Smart King~~the FF Group may lack sufficient financial resources to make these payments or to fund other cash requirements. ~~Smart King's~~The FF Group's lenders may also resort to judicial proceedings to enforce their rights or it may be necessary for ~~Smart King~~the FF Group to seek bankruptcy protection or enter into other insolvency proceedings.

There is no assurance that ~~Smart King~~the FF Group will be able to comply with the undertakings and covenants under its financial instruments or obtain consents or waivers in respect of any breach of these undertakings and/or covenants, if ~~Smart King~~the FF Group fails to comply, there could be material adverse consequence to ~~Smart King~~FF Group with respect to its financial condition, results of operations and business prospects materially and adversely affected, or its ability to continue as a going concern.

***FF Group has a limited operating history and faces significant entry barriers in the industry.***

FF ~~was founded~~Group commenced operations in 2014 and has built several pre-production vehicles for the FF 91, and completed the third stage of the FF 91 pre-production quality audits in September 2019. Although the FF Group expects to start production of the FF 91 nine months after ~~Smart King~~the FF Group completes the Series B Equity Financing, the commitment of the potential investors is not yet secured and FF has no experience in mass production of electric vehicles. Even if the FF Group is able to secure funding, there is no assurance that it will be able to develop efficient, automated, cost-efficient manufacturing capabilities and processes, and reliable sources of component supply to meet the quality, price, engineering, design and production standards, as well as the production volumes required to successfully mass market the FF 91 and future vehicles.

Furthermore, even if the FF Group achieves the mass production of its electric vehicles, it faces significant barriers to entry in the electric vehicle industry, including, continuity in development and production of safe and quality vehicles, corporate reputation, customer base, marketing channels, pricing policies, management and talent, value-additive service packages and technological advancement. If the FF Group fails to address any or all of these risks and barriers to entry, its business and results of operation, and the value of the Trust Interests may be materially and adversely affected.

***~~FF's~~The FF Group's business depends substantially on the continuing efforts of its key management as well as experienced and qualified personnel, and its business may be adversely affected if FF Group is unable to hire or retain qualified employees.***

~~FF's~~The FF Group's success depends substantially on the continued efforts of its executive officers and key employees. If one or more of its executive officers or key employees were unable or unwilling to continue their services with FF Group, FF Group may not be able to replace them easily, in a timely manner, or at all.

If any of ~~FF's~~the FF Group's executive officers or key employees terminates his or her services with the FF, ~~FF's~~ Group, the FF Group's business may be negatively affected. In addition, the FF Group may incur additional expenses to recruit, train and retain qualified personnel. Recently, FF hired a new global Chief Executive Officer ~~in September 2019~~and two senior vice presidents. However, there is no guarantee that FF Group will be able to attract other qualified candidates to fill certain positions in the FF Group. The failure to do so may lead to difficulties in effectively executing ~~FF's~~the FF Group's business strategies, and its business, prospects and results of operations could be materially and adversely affected. Furthermore, if any of ~~FF's~~the FF Group's executive officers or key employees joins a competitor or forms a competing company, it may lose know-how and key professionals and staff members.

***The FF Group may not be able to guarantee customers access to comprehensive charging solutions.***

The FF Group has not built any commercial charging infrastructure, and its customers will have to rely on publicly accessible charging infrastructure, which is generally considered to be insufficient, especially in the PRC. Although the FF Group has developed its proprietary and patented battery pack system with leading battery energy density of 108kWh and high charging capability of up to 200kW, the FF Group may not have competitive advantages in terms of proprietary charging infrastructure or holistic charging solutions. Some competitors may provide charging services via self-owned charging infrastructure, battery swapping and charging trucks, which the FF Group may not be able to deliver.

The charging services the FF Group may provide could fail to meet the expectations and demands of the customers, who may lose confidence in the FF Group and its vehicles. This may also deter potential customers from subscribing to purchase ~~FF's~~the FF Group's vehicles. In addition, even if the FF Group has the ability to and plans to build its own charging infrastructure, it may not be cost-effective and the FF Group may face difficulties in finding proper locations and obtaining relevant government permits and approvals. To the extent the FF Group is unable to meet its customers' expectations or demand, or faces difficulties in developing comprehensive charging solutions, its reputation and business operations and thus the value of the Trust Interests may be materially and adversely affected.

***The joint venture contemplated by The9 and the FF Group may not be successful. FF's cooperation with The9 and manufacturing partners or contractors could incur other risks.***

On March 24, 2019, the FF Group entered into the JVA with The9, an internet technology and gaming company based in Shanghai, China. Under the JVA, the FF Group will contribute to the joint venture, among other things, certain intellectual property licenses and its land use rights in Zhejiang, China to develop and manufacture an exclusive electric vehicle, the V9 MPV in the PRC, and the right of first refusal for a second project. The9 will contribute $600 million in funding to such joint venture, contingent upon the fulfillment of specified funding conditions, approximately $400 million of which will be payable to FF Group as licensing royalties and/or non-recurring engineering expenses. Each party owns a 50% stake in the joint venture and is entitled to 50% of the profits. FF Group may develop the joint venture's manufacturing capabilities in the PRC, but may also consider cooperating with third party contractors or manufacturing partners to carry out certain production tasks.

While the cooperation with The9 in the joint venture may accelerate ~~FF's~~the FF Group's time to market in the PRC, this cooperation, together with the contemplated cooperation with manufacturing partners or third party contractors, may not be successful or profitable. It is currently expected that the

joint venture may build its own manufacturing capability in the PRC and start production beginning in 2022, which could divert ~~FF's~~the FF Group's managerial and other resources. In addition, collaboration with third parties for the manufacturing of vehicles may pose risks outside ~~FF's~~the FF Group's control, including the failure of the partners to meet agreed upon timelines, capacity constraints, infringement upon or unauthorized disclosure of ~~FF's~~the FF Group's patents, trademarks, know-how and other proprietary properties, negative publicity regarding ~~FF's~~the FF Group's partners or their business. Furthermore, there can be no assurance that the FF Group will successfully ensure that its manufacturing partners maintain quality standards, and any failure to do so could adversely affect customers' perceptions of ~~FF's~~the FF Group's self-manufactured electric vehicles.

To the extent the FF Group relies on any third party contractors or manufacturing partners, risks exist that the FF Group may be unable to enter into new agreements or extend existing agreements with such third-party contractors or manufacturing partners on terms and conditions acceptable to the FF Group, if at all, and therefore may need to contract with other third parties or significantly add to its own production capacity. There can be no assurance that in such event the FF Group would be able to partner with other third parties or increase its own production capacity to meet the production needs. The expense and time required to complete any transition, and to ensure that vehicles manufactured at facilities of new third party partners are built in compliance with the quality standards and regulatory requirements, may be greater than anticipated. Any of the foregoing could adversely affect ~~FF's~~the FF Group's business, results of operations, financial condition and prospects, and thus the value of the Trust Interests.

***Government financial support, incentives and favorable policies for electric vehicle policies are subject to change. Discontinuation of any of the government subsidies or imposition of any additional taxes and subcharges could adversely affect ~~Smart King's~~FF Group's financial condition and results of operations.***

~~Smart King's~~The FF Group's PRC subsidiaries have received various financial subsidies from PRC government authorities, including subsidies in relation to ~~Smart King's~~the FF Group's patent application in the PRC, and certain project-related subsidies. The government authorities may decide to change or discontinue certain financial subsidies, which could materially and adversely affect ~~Smart King's~~the FF Group's financial condition and results of operations.

In addition, government incentives, rebates, tax credits and other financial incentives available to purchasers of electric vehicles may expire, end when the allocated funding is exhausted or be reduced or terminated. For example, California implemented regulations phasing out a $2,500 cash rebate on qualified electric vehicles for high-income consumers, which became effective in March 2016. The PRC's central government has announced a phase-out schedule for the subsidies provided for purchasers of certain electric vehicles, which provides that the amount of subsidies provided to purchasers of certain new energy vehicles in 2019 and 2020 will be reduced by 20% as compared to 2017 levels. Competitors who have already rolled out their electric vehicles before the phase-out of these government incentives may be able to expand its customer base more effectively, which could place ~~Smart King~~the FF Group at a competitive disadvantage.

According to a *Wall Street Journal* article published on September 26, 2019, which cited data from the Center for Strategic and International Studies, a U.S. think tank, in 2018, the PRC spent $58 billion on direct and indirect subsidies on new-energy vehicles, but in July 2019, the Chinese government drastically reduced subsidies on new-energy vehicles and will discontinue them in 2020. In addition, as the Chinese economy has experienced a slowdown, Chinese general vehicle sales witnessed its first decline in decades, a 3% decrease in 2018, followed by another 11% decline in the first eight months of 2019. The removal of government subsidies in the PRC has already impacted consumer behaviors as well as sales of electric vehicles in the PRC. For example, electric vehicles sales of the PRC's largest seller of

EVs, BYD Co., declined 23% in August 2019. The example shows that government subsidies will be critical to electric vehicle sales, and removal of such subsidies may materially and adversely affect the prospects, financial condition and results of operations of electric vehicle manufactures, including FF.

***The construction and operation of FF's the FF Group's manufacturing facilities in the United States and the PRC subject to regulatory approvals and permits and may be subject to delays, cost overruns or may not produce expected benefits.***

The FF Group is developing its own manufacturing facilities in Hanford, California and, may develop its manufacturing facility with its partner The9, in the PRC, which is expected to be ready for production in 2020 and 2022, respectively. Construction projects are subject to broad and strict government supervision and approval procedures, including, but not limited to, project approvals and filings, construction land and project planning approvals, environment protection approvals, pollution discharge permits, work safety approvals, fire protection approvals, and the completion of inspection and acceptance by relevant authorities. Failure to obtain the relevant approvals or permits may subject the FF Group to penalties, fines or correction actions. In addition, the FF Group will need significant additional capital to fully build out these manufacturing facilities, which is subject to risks, including risks associated with FF's the FF Group's ability to raise funds, investor confidence in FF's FF Group's future prospects, economics conditions. Any failure to complete these projects on schedule and within budget could adversely impact FF's the FF Group's launch of the FF 91 and other vehicles and production capacity, which will in turn adversely and materially affect is business, financial condition, and results of operations.

***The FF 91 and other electric vehicles may not meet the expectations of customers.***

FF's The FF Group's electric vehicles, including the FF 91, may, upon its delivery, not perform in line with customers' expectations. For example, the electric vehicles of the FF Group may not have the durability or longevity of other vehicles in the market, and may not be as easy and convenient to repair as other vehicles in the market. Any product defects or any other failure of these vehicles to perform as expected could harm FF's the FF Group's reputation and result in adverse publicity, lost revenue, delivery delays, product recalls, product liability claims, and significant warranty and other expenses, and could have a material adverse impact on FF's the FF Group's business, financial condition, operating results, and prospects.

In addition, the range of FF's the FF Group's electric vehicles on a single charge depends on the function used, time and charging patterns as well as other factors. For example, a customer's use of his or her electric vehicle as well as the frequency with which he or she charges the battery can result in additional deterioration of the battery's life and functionality.

Furthermore, the electric vehicles may contain defects in design and manufacture that may cause them not to perform as expected or that may require repairs. The FF Group has limited data regarding the long-term performance of its systems and vehicles before mass production. There can be no assurance that the FF Group will be able to detect and fix any defects in the vehicles prior to their delivery to consumers. If any of FF's the FF Group's vehicles fails to perform as expected, the FF Group may need to delay deliveries, initiate product recalls and provide servicing or updates under warranty at its own costs, which could adversely affect FF's the FF Group's brand and could adversely affect its business, prospects and results of operations, and thus the value of the Trust Interests.

***The FF Group is significantly dependent on its suppliers, many of whom are FF's the FF Group's single source for the components they supply.***

The FF 91 model incorporates over 2,000 purchased parts sourced from over 400 suppliers, many of whom are currently ~~FF's~~the FF Group's single source suppliers for the components they supply, and the FF Group expects it to be similar for any other vehicle the FF Group may produce. The supply chain exposes the FF Group to multiple potential sources of delivery failure or component shortages. Currently, the FF Group has not identified alternative sources for most of the single sourced components used in the FF 91. Generally, FF does not maintain long-term agreements with these single source suppliers. For example, ~~FF's~~FF Group's battery cell supplier helped develop ~~FF's~~the FF Group's customized battery cell, and is the sole source of ~~FF's~~FF Group's battery cell used in its battery pack.

Historically, certain suppliers ceased supplying their components and initiated arbitration proceedings against the FF Group when the FF Group failed to make overdue payments, most of which have been settled through the Vendor Trust. ~~As of the date of this Disclosure Statement, litigation proceedings with five vendors remain pending.~~ For more information on the risks regarding the Vendor Trust and disputes with ~~FF's~~the FF Group's suppliers, *see* the discussion under the headings "The Vendor Trust ~~program established by FF may not fully resolve the disputes with its contractors and suppliers,~~" ~~and "FF is subject to litigation risk that could adversely affect its reputation, business, financial condition, and results of operations~~Program Established by the FF Group May Not Fully Resolve the Disputes with its Contractors and Suppliers," and "The FF Group is Subject to Litigation Risk that Could Adversely Affect its Reputation, Business, Financial Condition, and Results of Operations." Any disruption in the supply of components, whether or not from a single source supplier, could temporarily disrupt ~~FF's~~the FF Group's production until a satisfactory alternative supplier is found, which can be time-consuming and costly. There can be no assurance that the FF Group would be able to successfully retain alternative suppliers or supplies in a timely manner or on acceptable terms, if at all. Changes in business conditions, force majeure events, changes in regulatory framework and other factors beyond ~~FF's~~the FF Group's control could also affect the suppliers' ability to deliver components in a timely manner. Any of the foregoing could materially and adversely affect ~~FF's~~the FF Group's results of operations, financial condition and prospects.

**~~FF's~~*The FF Group's* proprietary intellectual property may not be effectively protected despite its efforts.**

The FF Group has invested significant resources to develop its proprietary intellectual property. Failure to maintain or protect these rights could harm its business. As of July 31, 2019, FF had more than 425 issued patents across components, technology and processes, and 975 pending patent applications pending in the United States, the PRC, and other jurisdictions. For the pending applications, there is no assurance that the FF Group will be granted patents pursuant to its applications. Even if such patent applications succeed and these patents are granted, it is still uncertain whether these patents will be contested, circumvented or invalidated in the future.

In addition, the rights granted under any issued patents may not provide the FF Group with meaningful protection or competitive advantages. The claims under any patents that issue from ~~FF's~~the FF Group's patent applications may not be broad enough to prevent others from developing technologies that are similar or that achieve results similar to ~~FF's~~the FF Group's. It is also possible that the intellectual property rights of others could bar the FF Group from licensing and exploiting any patents that issue from ~~FF's~~the FF Group's pending applications. Numerous patents and pending patent applications owned by others exist in the fields in which the FF Group has developed and is developing its technology. These patents and patent applications might have priority over ~~FF's~~the FF Group's patent applications and could subject its patent applications to invalidation. Finally, in addition to those who may claim priority, any of ~~FF's~~the FF Group's existing or pending patents may also be challenged by others on the basis that they are otherwise invalid or unenforceable. There is also no guaranty that the FF Group will be able to renew its patents upon expiration.

Furthermore, protection of ~~FF's~~the FF Group's intellectual property rights in the different jurisdictions in which the FF Group operates may vary in their effectiveness. For example, implementation and enforcement of PRC intellectual property-related laws was historically deemed deficient and ineffective. Despite ~~FF's~~the FF Group's efforts to protect its proprietary rights, third parties may still attempt to copy or otherwise obtain and use ~~FF's~~the FF Group's intellectual property or seek court declarations that such third parties' intellectual property does not infringe upon ~~FF's~~the FF Group's intellectual property rights.

***FF Group is subject to litigation risk that could adversely affect its reputation, business, financial condition and results of operations.***

The FF Group has been involved in claims and lawsuits in the ordinary course of its business, including litigation with its contractors and suppliers over ~~FF's~~the FF Group's past due ~~payment~~payments. The FF Group has been making efforts to settle disputes with its suppliers and contractors with respect to such past due amounts. Such efforts included establishing the Vendor Trust secured by ~~FF's~~FF Group's assets in April 2019. If the FF Group continues to encounter liquidity problems or if its liquidity problems worsen, the FF Group may face additional lawsuits with its suppliers and contractors, which could materially and adversely affect its reputation and business.

In addition, the FF Group is subject to litigation risks from third parties alleging infringement of their intellectual property, which could be time-consuming and costly, regardless of whether the claims have merit. Individuals, organizations and companies, including ~~FF's~~the FF Group's competitors, may hold or obtain patents, trademarks or other proprietary rights that would prevent, limit or interfere with ~~FF's~~the FF Group's ability to make, use, develop, sell or market its vehicles or components, and may bring claims alleging ~~FF's~~the FF Group's infringement of such rights. If the FF Group is found to have infringed upon a third party's intellectual property rights, not only may it be required to pay substantial damages, but it may also be required to cease sales of its vehicles, incorporate certain components into, or using vehicles or offering goods or services that incorporate or use the challenged intellectual property, seek a license from the holder of the infringed intellectual property right, which license may not be available on reasonable terms or at all, redesign the vehicles or other goods or services, establish and maintain alternative branding for the products and services, or alter its business strategy.

Furthermore, as protection of ~~FF's~~the FF Group's intellectual property rights is critical to ~~FF's~~the FF Group's success, the FF Group may need to resort to litigation to enforce its intellectual property rights if its rights are infringed, which could result in substantial costs and diversion of ~~FF's~~the FF Group's resources.

Regardless of whether the results of the legal or administrative proceedings are favorable to the FF Group, it could still result in substantial costs, negative publicity and diversion of resources and management attention, which could materially affect ~~FF's~~the FF Group's business, prospects, operating results, and financial condition.

***FF's The FF Group's* vehicles are subject to motor vehicle standards, and the failure to satisfy such mandated safety standards would have a material adverse effect on its business and operating results.**

Motor vehicles are subject to substantial regulation under international, federal, state, and local laws. Vehicles produced by the FF Group will be required to comply with the applicable product standards and regulations in its targeted markets. For example, FF's the FF Group's vehicles in the U.S. will be subject to numerous regulatory requirements established by the NHTSA, including all applicable FMVSS. In addition, FF's the FF Group's vehicles sold in the PRC must pass various tests and undergo a certification process and be affixed with the China Compulsory Certification, or the CCC, before delivery from the factory and sales, and such certification is also subject to periodic renewal.

The FF Group may incur significant costs in complying with these regulations and may be required to incur additional costs to comply with any changes to such regulations, and any failures to comply could result in significant expenses, delays or fines. The FF Group may also fail to obtain or renew the required certification for its vehicles, which may prevent the FF Group from delivering, selling or importing its vehicles, and therefore materially and adversely affect FF's the FF Group's results of operations, financial condition, and future prospects.

**Smart King has granted, and may continue to grant options and other types of awards under its share incentive plan, which may result in increased share-based compensation expenses and dilute the value of your Trust Interests.**

Smart King has reserved approximately 27.2% of its total share capital on a fully diluted basis for issuance of options and other types of awards under its share incentive plan. As of September 26, 2019, options to purchase an aggregate of 34,129,939 Class A ordinary shares of Smart King had been granted and outstanding.

Smart King The FF Group believes the granting of share-based awards is of significant importance to its ability to attract and retain key management as well as experienced and qualified personnel, and it will continue to grant share-based compensation to employees in the future. As a result, the expenses associated with share-based compensation may increase, which may have an adverse effect on Smart King's the FF Group's results of operations. In addition, grant of share-based compensation will dilute the ownership interest of its stockholders, and therefore indirectly affect the value of the Trust Interest Interests held by you.

Furthermore, prospective candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. Thus, Smart King's the FF Group's ability to attract or retain highly skilled employees may be adversely affected if the perceived value of Smart King's the FF Group's equity or equity awards declined. Furthermore, there are no assurances that the number of shares reserved for issuance under Smart King's share incentive plans, including the 2020 Future Equity Incentive Plan, will be sufficient to grant equity awards adequate to recruit new employees and to compensate existing employees.

***FF's The FF Group's* vehicles make use of lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame.**

The FF Group partnered with a leading supplier in the development of customized lithium-ion battery cells. On rare occasions, lithium-ion cells can rapidly release the energy they store by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While the FF Group has designed the battery management system in the battery pack to be actively and continuously monitoring all battery modules over the current, voltage, and temperature conditions of the

battery pack to prevent such incidents, a field or testing failure of its vehicles or other battery packs could occur, which could subject the FF Group to product liability claims, product recalls, or redesign efforts, and lead to negative publicity. Moreover, any failure of a competitor's electric vehicle or energy storage product may cause indirect adverse publicity for the FF Group and its products.

In addition, the FF Group will need to store a significant number of lithium-ion cells at its facilities. Any mishandling of battery cells may cause disruption to business operations and cause damage and injuries.

Any of the foregoing may materially and adversely affect FF's the FF Group's results of operations, financial condition, and prospects, and thus the value of the Trust Interests.

***The FF Group will depend on revenue generated from a single model of vehicles in the foreseeable future.***

FF's The FF Group's business will initially depend substantially on the sales and success of the FF 91, which will, once successfully produced, be FF's the FF Group's only volume-manufactured vehicle in the market in the foreseeable future. Historically, automobile customers have come to expect a variety of vehicle models offered in a manufacturer's fleet and that new and improved vehicle models would be introduced frequently. Although the FF Group has been planning its second model, the FF 81, it remains uncertain when the FF Group will have sufficient funds to complete the development, launch and production of the FF 81. Given that FF's the FF Group's business will depend on the FF 91 for the foreseeable future, if the FF 91, once produced, is not well-received by the market, FF's the FF Group's business, prospects, financial condition and operating results could be materially and adversely affected.

***If the owners of FF's the FF Group's vehicle customize it with aftermarket products, the vehicle may not operate properly, which may create negative publicity and could harm FF's the FF Group's business.***

Automobile enthusiasts may seek to "hack" FF's the FF Group's vehicles to modify their performance, which could compromise vehicle safety systems. The customers may also customize their vehicles after purchase with aftermarket products, which may compromise vehicle safety systems. Such modifications are out of FF's the FF Group's control, and any unauthorized modifications could compromise the safety of the vehicles and cause injuries, which could result in adverse publicity, and negatively affect FF's the FF Group's brand, reputation, business, and operating results.

***If the FF Group fails to protect customer data and privacy, or fails to comply with various privacy and consumer protection laws to which the FF Group is subject, its reputation, financial condition and results of operations will be materially and adversely affected.***

The FF Group depends on information technology networks and systems to securely process, transmit and store electronic information. Any unauthorized disclosure of sensitive or confidential customer data, whether through cyber-attacks, system failure, employee negligence, fraud or misappropriation, could damage FF's the FF Group's reputation and its business.

In addition, the failure by the FF Group to comply with federal, state or international privacy, data protection or security laws or regulations could result in regulatory or litigation-related actions against the FF Group, legal liability, fines, damages and other costs. Substantial expenses and operational changes may be required in connection with maintaining compliance with such laws, and in particular certain emerging privacy laws are still subject to a high degree of uncertainty as to their interpretation and application. For instance, the Cyber Security Law of the PRC, which was promulgated by the Standing

Committee of the National People's Congress, or the SCNPC and became effective on June 1, 2017, requires that operators of key information infrastructures, which include, among others, public communications and information services and other important industries and fields, store, within the territory of the PRC, personal information and important data gathered and produced during operations in the PRC. Where such information and data need to be transmitted overseas based on commercial demand, a security assessment is required to be conducted in accordance with the measures formulated by the national cyberspace administration authority in concert with the relevant departments under the State Council. However, there are no detailed measures published on how such security assessments are to be conducted.

Although the FF Group has adopted security policies and measures, including encryption technology, to protect its proprietary data and customer's privacy, it may be required to expend significant resources to comply with data breach requirements if third parties improperly obtain and use the personal information of its customers or the FF Group otherwise experiences a data loss with respect to its customers' personal information. A major breach of FF's the FF Group's network security and systems could have negative consequences for its business and future prospects, including possible fines, penalties and damages, reduced customer demand for its vehicles and harm to its reputation and brand.

***The* FF *Group* *may be subject to risks associated with autonomous driving technology.***

The FF 91 is designed with autonomous driving functionalities and the FF Group plans to continue its research and development efforts ("R&D") in autonomous driving technology. However, autonomous driving technologies are subject to risks and from time to time there have been accidents associated with such technologies. For example, in March 2018, Tesla indicated that its autopilot system was engaged at the time of a fatal accident and an Uber Technologies Inc. self-driving vehicle struck a pedestrian leading to a fatality. The safety of such technologies depends in part on user interaction and users may not be accustomed to using such technologies. To the extent accidents associated with FF's the FF Group's autonomous driving systems occur, the FF Group could be subject to liability, government scrutiny and further regulation. Any of the foregoing could materially and adversely affect FF's the FF Group's results of operations, financial condition and future prospects.

***The* FF *Group* *may become subject to product liability claims, which could harm its financial condition and liquidity if it is not able to successfully defend or insure against such claims.***

The FF Group may become subject to product liability claims, which could harm its business, prospects, operating results and financial condition. The automotive industry experiences significant product liability claims and the FF Group faces the inherent risk of exposure to claims in the event its vehicles do not perform as expected or experience a malfunction that results in property damage, personal injury or death. A successful product liability claim against the FF Group could result in a substantial monetary award while generating significant negative publicity. FF's The FF Group's insurance coverage might not be sufficient to cover all potential product liability claims.

***The* FF *Group* *may be compelled to undertake vehicle recalls or take other actions, which could adversely affect its brand and financial condition.***

If FF's the FF Group's vehicles are subject to recalls in the future, it may be subject to adverse publicity, damage to the brand and liability. The FF Group might from time to time, voluntarily or involuntarily, initiate vehicle recalls if any of its vehicles, including any systems or parts sourced from suppliers and contractors, prove to be defective or noncompliant with applicable laws and regulations. Such recalls, whether voluntary or involuntary or caused by systems or components engineered or manufactured by the FF Group or the suppliers and contractors, could require that the FF Group incur

significant costs and could adversely affect ~~FF's~~the FF Group's brand, as well as its business, prospects, financial condition and results of operations and thus the value of the Trust Interests.

***The FF Group might not obtain and maintain sufficient insurance coverage, which could expose us to significant costs and business disruption.***

The FF Group may only obtain and maintain a limited liability insurance coverage for its products and business operations. A successful liability claim against the FF Group due to injuries suffered by the users of ~~Company's~~the FF Group's vehicles or services could materially and adversely affect its financial condition, results of operations and reputation. In addition, the FF Group does not have any business disruption insurance. Any business disruption event could result in substantial cost and diversion of resources.

***Any financial or economic crisis, or perceived threat of such a crisis, including a significant decrease in consumer confidence, may materially and adversely affect ~~FF's~~the FF Group's business, financial condition, and results of operations.***

The global financial markets experienced significant disruptions in 2008 and the United States, European and other economies went into recession. The recovery from the lows of 2008 and 2009 was uneven and the global financial markets are facing new challenges, including the escalation of the European sovereign debt crisis since 2011, the hostilities in the Ukraine and the economic slowdown in the Eurozone in 2014. It is unclear whether these challenges will be contained and what effects they each may have. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies that have been adopted by the central banks and financial authorities of some of the world's leading economies. Any prolonged slowdown in economic development might lead to tighter credit markets, increased market volatility, sudden drops in business and consumer confidence and dramatic changes in business and consumer behaviors.

Sales of high-end and luxury consumer products, such as the FF 91 and other electric vehicles of the FF Group, depend in part on discretionary consumer spending and are exposed to adverse changes in general economic conditions. In response to their perceived uncertainty in economic conditions, consumers might delay, reduce, or cancel purchases of such electric vehicles and ~~FF's~~the FF Group's results of operations may be materially and adversely affected.

***The FF Group faces risks related to natural disasters, health epidemics, terrorist attacks and other outbreaks, which could significantly disrupt our operations.***

The occurrence, especially in the regions and cities where the FF Group has business, of unforeseen or catastrophic events, including the emergence of a pandemic or other widespread health emergency, terrorist attacks or natural disasters, could create economic and financial disruptions, lead to operational difficulties that could impair ~~FF's~~the FF Group's ability to manage its businesses, and expose its business activities to significant losses. ~~FF's~~The FF Group's management and other teams are based in the United States and the PRC. The FF Group has a manufacturing facility in Hanford California, and may establish manufacturing facility in Zhejiang, China for certain future vehicle models. An unforeseen or catastrophic event in any of the regions mentioned above could adversely impact ~~FF's~~the FF Group's operations.

C.    **Risks Related to the Trust Interests**

***The value of the Trust Interests you are entitled to may not fully satisfy the Debt Claims you released.***

The Trust Assets consist of all of YT's economic ~~interest in Smart King~~interests in the FF Group. The rest of ~~Smart King's~~the FF Group's interests are owned by Season Smart, an affiliate of Evergrande, the management who participate in the Partnership Program, and the option holders and the Class A ordinary shareholders under Smart King's equity incentive plan. Various factors, including, but not limited to, market and economic conditions, ~~Smart King's and FF's~~the FF Group's business, operations, future prospects and financial conditions, the liquidity of the Trust Interests may affect the value of the Trust Interests you will receive, either upon transfer of the Trust Interests or upon disposition of the Trust Assets. There is no guarantee that the value of the Trust Interests you will receive will fully satisfy, or will not be substantially less than, the Debt Claim you released in exchange for your Trust Interests.

***The economic interest you may have in ~~Smart King~~the FF Group through your ownership of Trust Interests will entitle you to claims on ~~Smart King~~the FF Group that are subordinated to all creditors of ~~Smart King~~the FF Group.***

Your Trust Interests will entitle you to indirect economic interests in Smart King that are similar to the economic interests enjoyed by the Smart King's shareholders. As such, if the Smart King files for bankruptcy or is liquidated, or undergoes similar restructuring proceeding, creditors of the Smart King, including unsecured trade creditors, and any holders of preferred shares of Smart King who have priority over the shares that the Trust holds, would have priority of payment over your claims as a holder of the Trust Interests. As of July 31, 2019, the indebtedness of ~~Smart King~~the FF Group amounted to $734 million, and such indebtedness is expected to continue to increase in the foreseeable future. As a result, there is no guaranty that the value of the Trust Interests you will receive will fully satisfy, or will not be substantially less than, the Claims you released in exchange for your Trust Interests.

***If you are a PRC resident, you may have to complete the foreign exchange registration with the SAFE in order to receive any payments distributed by the Trustee for your Trust Interests, failure of which may expose you to liability and penalties under PRC law.***

Pursuant to the SAFE Circular 37, PRC residents or entities are required to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes certain material events. PRC residents are PRC individuals, institutions and foreign individuals who have a habitual residence in the PRC due to economic interests.

As the Trust is located in the U.S., the Trust Assets consist of shares and economic interests of entities outside the PRC, and payments from the disposition of or distribution related to the Trust Assets will be made in U.S. dollars, a PRC resident's holding of the Trust Interests may be deemed to be an overseas investment under the SAFE Circular 37. If you are deemed a PRC resident, you may have to complete the foreign exchange registration with your local SAFE branch and will need to update such registration if there is any material change to your controlled offshore special purpose vehicle holding the Trust Interests. Failure to do so may result in penalties and liability under PRC laws for evasion of applicable foreign exchange restrictions.

***There is no public market, and a trading market may not develop, for the Trust Interests, which could adversely affect the value and liquidity of the Trust Interests.***

The Trust Interests have not been, and will not be registered with the U.S. Securities and Exchange Commission or any state securities agency, and there is no existing market for the Trust Interests. Federal and state securities laws therefore restrict the sale or other transfer of the Trust Interests. If the Trust Interests are permitted to be traded under federal and state securities laws after their initial issuance, they may trade at a discount from their fair market value.

The Trust Interests will not be listed on any securities exchange or quoted on any automated dealer quotation system. A market may not develop for the Trust Interests and if a market does develop, it may not be sufficiently liquid for holders of the Trust Interests. If an active, liquid market does not develop for the Trust Interests, the market price and liquidity of the Trust Interests may be adversely affected.

The liquidity of the trading markets, if any, and future trading prices of the Trust Interests will depend on many factors, including, among other things, prevailing interest rates, ~~Smart King's~~the FF Group's operating results, financial performance and prospects, the market for similar securities and the overall securities markets, and may be adversely affected by unfavorable changes in any of these factors. Historically, the markets for equity securities of non-public companies such as ~~Smart King~~the FF Group have been subject to disruptions that have caused substantial volatility in the prices of securities similar to the Trust Interests. The market for the Trust Interests may be subject to disruptions that could adversely affect the value of the Trust Interests regardless of ~~Smart King's~~the FF Group's operating results, financial performance or prospects. Any such disruptions may adversely affect the value of the Trust Interests.

***You will be subject to significant restrictions on the transfer of your Trust Interests under the Trust Agreement.***

Your ability to transfer your Trust Interests will be subject to significant restrictions under the Trust Agreement. Among other restrictions, a holder may not transfer its Trust Interests if such transfer could cause the Trust to become an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or if, in the opinion of legal counsel to the Trust, the Trust could be treated as an association or publicly-traded partnership taxable as a corporation within the meaning of Section 7704 of the Internal Revenue Code. This and other restrictions on transfer may prevent you from transferring your Trust Interests, *see* the ~~Trust Agreement~~Plan Term Sheet, a copy of which is attached as **Exhibit B** to this Disclosure Statement.

71

***The distribution of the Trust Assets may be delayed.***

The Trust has an initial term of ~~six~~five (~~6~~5) years, which may be ~~extended under certain circumstances up to an additional three (3) years. For example, the Creditor Trust Committee, composed of certain creditors and acting by the vote of a majority, may request to extend the initial term of the Trust. In addition, YT may also request to extend the initial term~~automatically extended through the selloff period for Marketable Securities if the IPO of Smart King's shares on New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange or other internationally recognized stock exchange (including China) has been completed within the initial term. The Trust will be dissolved upon the expiration of the initial period or extended period, as applicable, upon which the Trust Assets will be distributed to you based on the Trust Interests you hold. However, the Trustee may delay or defer the distribution of any proceeds received in respect of the Trust Assets if the Trustee determines that such deferral or delay is in the best interests of the holders of Trust Interests, including, among others, if the Trust or the Trust Assets are bound by an injunction, freeze order, judgement, or similar order or proceeding affecting such distribution. Accordingly, the timing you will receive the distribution of the Trust Assets may be subject to change and may be delayed.

## D.    Risks Related to the Industry

***The automotive market is highly competitive and subject to disruption. the FF Group may not be successful in competing in this industry.***

The automotive market in the United States and the PRC is and will remain highly competitive. Many established and new automobile manufacturers such as Audi, BMW, Daimler, General Motors, Toyota and Volvo, as well as other companies, have entered or are reported to have plans to enter the alternative fuel vehicle market, including hybrid, plug-in hybrid and fully electric vehicles, as well as the market for self-driving technology and applications. By the time the FF Group has started delivering the FF 91, a substantial portion of the market share might have already been taken by the major players. Many of ~~FF's~~the FF Group's current and potential competitors, particularly international competitors, have significantly greater financial, technical, manufacturing, marketing and other resources than the FF Group does and are able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products than the FF Group can.

In addition, automobile customers have historically expected car manufacturers to periodically introduce new and improved vehicle models. In order to meet these expectations, the FF Group may be required to introduce new vehicle models and enhance versions of then existing vehicle models in order to compete effectively. ~~As of today, FF has not produced its initial vehicle model and has limited experience in designing, testing and manufacturing electric vehicles.~~

Furthermore, there can be no assurance that the FF Group will be able to compete successfully in global and local markets. If ~~FF's~~the FF Group's competitors introduce new cars or services that surpass the quality or performance of ~~FF's~~the FF Group's vehicles at more competitive prices, the FF Group may be forced to attract customers at prices lower than planned which may not generate attractive rates of returns. Moreover, if the FF Group fails to capture evolving trends poised to disrupt the automotive market, it may not be able to compete successfully. For example, according to BNEF Report, global shared mobility fleet (*i.e.*, ride-hailing and car-sharing) will contribute to 19% of the total kilometers traveled by passenger vehicles by 2040. As vehicle consumers are moving to rely on shared mobility fleets and view transport as a service, the demand for individual-owned vehicles will likely decrease. In addition, consumers may move to transport-as-a-service ("TaaS"), a business model which will allow passengers to be served by on-demand autonomous vehicles owned by fleets in the future, as opposed to purchasing and owning the vehicle. If ~~FF's~~the FF Group's competitors are leaders in the development of

autonomous driving technology, move to build up their respective TaaS fleets ahead of ~~the~~ FF Group, have the advantage of speed to market and capture the relevant market share, ~~the~~ FF Group may not be able to meet consumer demands and/or to compete successfully, which could materially and adversely affect its business, financial condition and results of operations.

***The electric vehicle industry and its technology are rapidly evolving. Developments in alternative technologies or improvements in the internal combustion engine may significantly reduce the demand for ~~FF's~~ the FF Group's, or all, electric vehicles.***

The electric vehicle market is rapidly evolving and may not develop as ~~the~~ FF Group anticipates. The regulatory framework governing the industry is currently uncertain and may remain uncertain in the foreseeable future. In order to adapt to the developments in this market and the relevant technologies, ~~the~~ FF Group may need to modify its business model or change its services and solutions from time to time. These changes may not achieve expected results, which could have a material adverse effect on ~~FF's~~ the FF Group's results of operations and prospects. Furthermore, ~~the~~ FF Group may be unable to keep up with changes in electric vehicle technology. Even if ~~the~~ FF Group is able to keep pace with changes in technology and develop new models, the vehicle models it may have launched before such technology changes could become obsolete more quickly than expected, which will reduce ~~FF's~~ the FF Group's return on investment.

More importantly, developments in alternative technologies, such as advanced diesel, ethanol, fuel cells or compressed natural gas, or improvements in the fuel economy of the internal combustion engine, may materially and adversely affect the electric vehicle industry as a whole, causing significant decrease in the total demand.

***~~FF's~~ The FF Group's development and future growth is dependent upon the demand for, and consumers' willingness to adopt, electric vehicles.***

Demand for electric vehicles may be affected by factors directly impacting automobile price or the cost of purchasing and operating automobiles such as sales and financing incentives, prices of raw materials, parts and components, cost of fuel and governmental regulations, including tariffs, import regulation and other taxes. Volatility in demand may lead to lower vehicle unit sales, which may result in further downward price pressure and adversely affect ~~FF's~~ the FF Group's business, prospects, financial condition and operating results.

Other factors that may influence the adoption of alternative fuel vehicles, and specifically electric vehicles, include:

- perceptions about electric vehicle quality, safety, design, performance and cost, especially if adverse events or accidents occur that are linked to the quality or safety of electric vehicles, whether or not such vehicles are produced by us or other manufacturers;

- perceptions about vehicle safety in general, in particular safety issues that may be attributed to the use of advanced technology, including electric vehicle and regenerative braking systems;

- the limited range over which electric vehicles may be driven on a single battery charge and the speed at which batteries can be recharged;

- the decline of an electric vehicle's range resulting from deterioration over time in the battery's ability to hold a charge;

- concerns about electric grid capacity and reliability;

- the availability of new energy vehicles, including plug-in hybrid electric vehicles;

- improvements in the fuel economy of the internal combustion engine;

- the availability of service for electric vehicles;

- the environmental consciousness of consumers;

- access to charging stations, standardization of electric vehicle charging systems and consumers' perceptions about convenience and cost to charge an electric vehicle;

- the availability of tax and other governmental incentives to purchase and operate electric vehicles or future regulation requiring increased use of nonpolluting vehicles;

- perceptions about and the actual cost of alternative fuel; and

- macroeconomic factors.

Any of the factors described above may cause current or potential customers not to purchase electric vehicles from us or other manufactures. If customers are not willing to adopt electric vehicles in general, the market will not develop as ~~the~~ FF Group anticipates and its business, prospects, financial condition, and operating results will be affected.

**E.    Risks Related to ~~Smart King's~~the FF Group's Corporate Structure**

***If the agreements that establish the structure for operating ~~Smart King's~~the FF Group's business in the PRC are found not to be in compliance with the relevant PRC regulations, or if these regulations change in the future, ~~Smart King~~the FF Group could be subject to severe penalties or be forced to relinquish its interests in those operations.***

~~Smart King~~The FF Group controls its operating entities in the PRC through a set of contractual arrangements entered into among its WFOE, FF Automotive (China) Co., Ltd., its VIE and VIE's shareholders. These contractual arrangements, including equity pledge agreement, call option agreement, powers of attorney, certain exclusive operational service agreement and spousal consents, enable ~~Smart King~~the FF Group to (i) exercise effective control over its VIE, and (ii) receive substantially all of the economic benefits of such VIE. As a result of these contractual arrangements, ~~Smart King~~the FF Group has control over and is the primary beneficiary of such VIE and hence consolidates the VIE's financial results into its consolidated financial statements. *See* Article II.C of this Disclosure Statement entitled "YT's Interest in ~~Faraday & Future Inc.~~the FF Group" for further information.

Although similar VIE arrangements are commonly adopted in the PRC, there are substantial uncertainties regarding the interpretation and application of the existing and future PRC laws, regulations and rules. In addition, it is uncertain whether any new PRC laws or regulations relating to variable interest entity structures will be adopted or if adopted, what they would provide. If ~~Smart King's~~the FF Group's ownership structure of its VIE, the VIE contractual arrangements, and ~~Smart King's~~the FF Group's business of its PRC subsidiaries or variable interest entities are found to be in violation of any existing or future PRC laws or regulations, or ~~Smart King's~~the FF Group's PRC subsidiaries or VIE fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion to take action in dealing with such violations or failures, including:

- discontinuing or placing restrictions or onerous conditions on ~~Smart King's~~the FF Group's activities through any transactions between its WFOE and its VIE;

- imposing fines, confiscating the income from the WFOE or the VIE, or imposing other requirements with which ~~Smart King~~the FF Group or its VIE may not be able to comply;

- requiring ~~Smart King~~the FF Group to restructure its ownership structure or activities, including terminating the contractual arrangements with its VIE and deregistering the equity pledges of such VIE, which in turn would affect ~~Smart King's~~the FF Group's ability to consolidate, derive economic benefits from, or exert effective control over its VIE; or

- restricting or prohibiting ~~Smart King's~~the FF Group's use of funding to finance its business and activities in the PRC.

The imposition of any of these penalties would result in a material and adverse effect on ~~Smart King's~~the FF Group's ability to conduct its business in the PRC. If ~~Smart King~~the FF Group loses its right to direct the activities of and receives economic benefits from its VIE due to any of these actions and ~~Smart King~~the FF Group is not able to restructure its ownership structure and operations in the PRC in a satisfactory manner, ~~Smart King's~~the FF Group's business operations in the PRC may be significantly disrupted, which could materially and adversely affect ~~Smart King's~~the FF Group's business, financial condition and results of operations.

***~~Smart King~~The FF Group relies on contractual arrangements with its VIE and the VIE's shareholders to exercise control over its business in the PRC which may not be as effective as direct ownership in providing operational control.***

~~Smart King~~The FF Group relies on contractual arrangements with its VIE and the VIE's shareholders to conduct its operations in the PRC. These contractual arrangements may not be as effective as direct ownership in providing ~~Smart King~~the FF Group with control over its VIE. For example, the VIE and its shareholders could breach their contractual arrangements with ~~Smart King~~the FF Group by, among other things, failing to conduct their operations in an acceptable manner or taking other actions that are detrimental to ~~Smart King's~~the FF Group's interests.

If ~~Smart King~~the FF Group had direct ownership of the VIE, ~~Smart King~~the FF Group would be able to exercise rights as a shareholder to effect changes in the board of directors of the VIE, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, with the current VIE structure, ~~Smart King~~the FF Group relies on the performance by the VIE and the VIE's shareholders of their obligations under the contractual arrangements to exercise control over the VIE. The shareholders of the consolidated VIE may not act in the best interests of ~~Smart King~~the FF Group or may not perform their obligations under these contractual arrangements. Such risks exist throughout the period during which ~~Smart King~~the FF Group intends to operate its business in the PRC through the contractual arrangements with the VIE. In order to enforce such arrangements, ~~Smart King~~the FF Group may have to incur substantial costs and expend additional resources. In addition, as all of ~~Smart King's~~the FF Group's VIE contractual agreements are governed by PRC law and provide for the resolution of disputes through an arbitration in the PRC, if any disputes relating to these contracts remain unresolved, ~~Smart King~~the FF Group may have to enforce its rights under these contracts through the operations of PRC law and arbitration, litigation and other legal proceedings and therefore will be subject to uncertainties in the PRC legal system. If ~~Smart King~~the FF Group is unable to effectively enforce these contractual arrangements, or if it suffers significant delay or face other obstacles in the process of enforcing these contractual arrangements, it may not be able to exert

effective control over its variable interest entities, and ~~Smart King's~~the FF Group's ability to conduct its business in the PRC may be negatively affected.

**_The PRC regulations of loans and direct investment by offshore holding companies to PRC entities may delay or prevent ~~Smart King~~the FF Group from using proceeds it receives from financing activities to make loans or additional capital contributions to its PRC subsidiaries._**

In 2015, the SAFE published the _Circular of the State Administration of Foreign Exchange on Reforming the Management Approach regarding the Settlement of Foreign Exchange Capital of Foreign-invested Enterprises_, or the SAFE Circular 19, which has come into effect since June 1, 2015. According to the SAFE Circular 19, foreign-invested enterprises are allowed to convert their registered capital from foreign exchange to Renminbi and apply such funds to equity investment within the PRC, conditioned upon the investment target's duly registration with local banks of such reinvestment and opening of a corresponding special account pending for foreign exchange settlement payment. Further, such conversion will be handled at the bank level and no approval by the SAFE is required. The SAFE Circular 19 prohibits foreign-invested enterprises from, among other things, using an Renminbi fund converted from its foreign exchange capital for expenditure beyond its business scope, investment in securities, providing entrusted loans, repaying loans between nonfinancial enterprises or purchasing real estate not for self-use. The SAFE promulgated the _Circular on Reforming and Standardizing the Foreign Exchange Settlement Management Policy of Capital Account_, or the SAFE Circular 16, effective on June 9, 2016, which reiterates some of the rules set forth in the SAFE Circular 19, but changes the prohibition against using Renminbi capital converted from foreign currency-denominated registered capital of a foreign-invested enterprise to issue Renminbi entrusted loans, to the prohibition against using such capital to issue loans to non-associated enterprises.

If ~~Smart King~~the FF Group fails to comply with such regulations, its ability to capitalize the relevant PRC subsidiaries or fund their operations may be negatively affected, which could materially and adversely affect the liquidity of the relevant PRC subsidiaries or ~~Smart King's~~the FF Group's business, financial condition, results of operations and growth prospects.

**_The shareholders of the VIE may have potential conflicts of interest with ~~Smart King~~the FF Group, which may materially and adversely affect its business._**

The shareholders of the VIE may have potential conflicts of interest with ~~Smart King~~the FF Group. These shareholders may breach, or cause the VIE to breach, or refuse to renew, the existing contractual arrangements ~~Smart King~~the FF Group has with them and the VIE, which would have a material and adverse effect on ~~Smart King's~~the FF Group's ability to effectively control the VIE and receive economic benefits from them. For example, the shareholders may be able to cause ~~Smart King's~~the FF Group's agreements with the VIE to be performed in a manner adverse to ~~Smart King~~the FF Group by, among other things, failing to remit payments due under the contractual arrangements to ~~Smart King~~the FF Group in a timely manner. There is no assurance that any or all of these shareholders will act in the best interests of ~~Smart King~~the FF Group or such conflicts will be resolved in ~~Smart King's~~the FF Group's favor. Currently, ~~Smart King~~the FF Group does not have any arrangements to address potential conflicts of interest between these shareholders and ~~Smart King. If Smart King~~the FF Group. If the FF Group cannot resolve any conflict of interest or dispute between ~~Smart King~~the FF Group and these shareholders, it would have to rely on legal proceedings, which could result in disruption of the business and subject ~~Smart King~~the FF Group to substantial uncertainties as to the outcome of any such legal proceedings.

***Contractual arrangements in relation to the VIE may be subject to scrutiny by the PRC tax authorities who may determine that ~~Smart King~~the FF Group or the VIE owes additional taxes, which could negatively affect ~~Smart King's~~the FF Group's financial condition and the value of the Trust Interests.***

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. ~~Smart King~~The FF Group could face material and adverse tax consequences if the PRC tax authorities determine that the VIE contractual arrangements were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust the income of the VIE in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by the VIE for PRC tax purposes, which could in turn increase their liabilities without reducing the WFOE's tax expenses. In addition, the PRC tax authorities may impose late payment fees and other penalties on the VIE for the adjusted but unpaid taxes according to the applicable regulations. ~~Smart King's~~The FF Group's financial position could be materially and adversely affected if the VIE's tax liabilities increase or if it is required to pay late payment fees and other penalties.

***~~Smart King~~The FF Group may lose the ability to use and enjoy assets held by the VIE that are material to the operation of ~~Smart King's~~the FF Group's business in the PRC if the VIE goes bankrupt or becomes subject to a dissolution or liquidation proceeding.***

The VIE and their subsidiaries hold, and may in the future hold, certain assets that are material to the operation of ~~Smart King's~~the FF Group's business in the PRC. Under the equity pledge agreement, without ~~Smart King's~~the FF Group's prior consent, the VIE's shareholders may not transfer its equity interests, create or permit the existence of any security interests or other encumbrance on its equity interests that may affect ~~Smart King's~~the FF Group's rights and interests, except for the performance of the call option agreement. However, if the VIE goes bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, ~~Smart King~~the FF Group may be unable to continue some or all of its operations in the PRC, which could materially and adversely affect its business, financial condition and results of operations. If the VIE undergoes a voluntary or involuntary liquidation proceeding, independent third-party creditors may claim rights to some or all of these assets, thereby hindering ~~Smart King's~~the FF Group's operations in the PRC, which could materially and adversely affect its business and results of operations.

**F.    Risks Related to ~~Smart King's~~the FF Group's Operations in the PRC**

***Changes in international trade policies, barriers to trade or the emergence of a trade war may dampen growth in the PRC, the United States and other markets where ~~Smart King~~the FF Group operates, and its business operations and results may be negatively impacted.***

~~Smart King~~The FF Group has business operations in the United States and the PRC, and partners with international leading suppliers from North America, Europe and Asia, which may subject it to risks associated with international trade conflicts. The United States administration under President Donald J. Trump has advocated for greater restrictions on international trade in general, which has significantly increased tariffs on certain goods imported into the United States, particularly from the PRC. President Trump has also taken steps toward restricting trade in certain goods. In response, the PRC and other countries have similarly imposed tariffs, and may further take other retaliatory measures. The increasing tariff may impact ~~Smart King's~~the FF Group's raw material prices and therefore may have a negative impact on ~~Smart King's~~the FF Group's operations. In addition, the resulting escalation of trade tension may lead to volatility in the financial market, which may affect ~~Smart King's~~the FF Group's ability to raise capital, and could impact the purchasing power of ~~Smart King's~~the FF Group's potential customers.

Such changes could have an adverse effect on ~~Smart King's and FF's~~the FF Group's business, financial condition, and results of operations.

***Changes in the PRC's economic, political or social conditions or government policies could have a material and adverse effect on ~~Smart King's and FF's~~the FF Group's business and results of operations.***

A portion of ~~FF's~~the FF Group's future revenues are expected to be derived in the PRC, and the FF Group has formed a joint venture with The9 to manufacture certain multi-purpose vehicles and conduct other activities in the PRC. Accordingly, ~~Smart King's and FF's~~the FF Group's results of operations, financial condition and prospects would, to a certain extent, be influenced by economic, political and legal developments in the PRC. the PRC's economy differs from the economies of most developed countries in many aspects, including, but not limited to, the degree of government involvement, control level of corruption, control of capital investment, reinvestment control of foreign exchange, allocation of resources, growth rate and development level. For approximately three decades, the PRC government has implemented economic reform measures to utilize market forces in the development of the PRC economy. It is unclear whether and how ~~Smart King's and FF's~~the FF Group's current or future business, financial condition or results of operations may be affected by changes in the PRC's economic, political and social conditions and in its laws, regulations and policies. In addition, many of the economic reforms carried out by the PRC government are unprecedented or experimental and are expected to be refined and improved over time. This refining and improving process may not necessarily have a positive effect on ~~Smart King's and FF's~~the FF Group's operations and business development.

***The legal system in the PRC is not fully developed and there are inherent uncertainties that may affect the protection afforded to ~~Smart King~~the FF Group.***

~~Smart King's~~The FF Group's business and activities in the PRC are governed by the PRC laws and regulations. The PRC legal system is generally based on written statutes. Prior court decisions may be cited for reference but have limited precedential value. Since 1979, the PRC legislation and regulations have significantly enhanced the protections afforded to various industries in the PRC. However, as these laws and regulations are relatively new and continue to evolve, interpretation and enforcement of these laws and regulations involve significant uncertainties and different degrees of inconsistency. Some of the laws and regulations are still in the developmental stage and are therefore subject to policy changes. Many laws, regulations, policies and legal requirements have only been recently adopted by the PRC central or local government agencies, and their implementation, interpretation and enforcement may involve uncertainty due to the lack of established practice available for reference. The effect of future legal developments in the PRC, including the promulgation of new laws, changes in existing laws or their interpretation or enforcement, or the preemption of local regulations by national laws cannot be predicted. As a result, there are substantial uncertainties as to the legal protection available to ~~Smart King~~the FF Group. Furthermore, due to the limited volume of published cases and the non-binding nature of prior court decisions, the outcome of the dispute resolution may not be as consistent or predictable as in other more developed jurisdictions, which may limit the legal protection available to ~~Smart King~~the FF Group.

***~~Smart King~~The FF Group may be adversely affected by the complexity, uncertainties, and changes in the PRC regulations on internet-related as well as automotive businesses and companies.***

The PRC government extensively regulates the internet industry and automotive industry, such laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations.

Several PRC regulatory authorities, such as the State Administration for Market Regulation, the National Development and Reform Commission, the Ministry of Industry and Information Technology and the Ministry of Commerce, oversee different aspects of the electric vehicle business, and ~~Smart King~~the FF Group will be required to obtain a wide range of government approvals, licenses, permits and registrations in connection with its operations in the PRC. For example, certain filings must be made by automobile dealers through the information system for the national automobile circulation operated by the relevant commerce department within ninety (90) days after the receipt of a business license. Furthermore, the electric vehicle industry is relatively immature in the PRC, and the PRC government has not adopted a clear regulatory framework to regulate the industry.

There are substantial uncertainties regarding the interpretation and application of the existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet-related as well as automotive businesses and companies. Currently, ~~Smart King's~~the FF Group's VIE holds the necessary license for ~~Smart King's~~the FF Group's operations in the PRC. There is no assurance that ~~Smart King~~the FF Group will be able to obtain all the permits or licenses related to its business in the PRC, or will be able to maintain its existing licenses or obtain new ones. In the event that the PRC government considers that ~~Smart King~~the FF Group was or is operating without the proper approvals, licenses or permits, promulgates new laws and regulations that require additional approvals or licenses, or imposes additional restrictions on the operation of any part of its business, the PRC government has the power, among other things, to levy fines, confiscate ~~Smart King's~~the FF Group's income, revoke its business licenses, and require ~~Smart King~~the FF Group to discontinue the relevant business or impose restrictions on the affected portion of its business. Any of these actions by the PRC government may have a material adverse effect on ~~Smart King's~~the FF Group's business and results of operations.

Considering its business arrangement and development plan, ~~Smart King~~the FF Group has also set up the VIE structure and intends the VIE or its subsidiary to apply for the necessary government licenses as soon as practicable to conduct the relevant support operations in the near future. However, there is no guarantee that ~~Smart King's~~the FF Group's VIE or its subsidiary, will obtain such licenses due to uncertainties from PRC governmental authorities. The PRC government may enact new laws and regulations that require additional licenses, permits, approvals and/or registrations for the operation of any of ~~Smart King's~~the FF Group's existing or future businesses in the PRC. As a result. there is no assurance that ~~Smart King~~the FF Group will, through its VIE or PRC subsidiary, have all the permits, licenses, registrations, approvals and/or business license covering the sufficient scope of business required for its business in the PRC or that it will be able to obtain, maintain or renew permits, licenses, registrations, approvals and/or business license covering sufficient scope of business in a timely manner or at all.

***~~Smart King~~The FF Group* *may be subject to penalties, including restrictions on ~~Smart King's~~the FF Group's ability to inject capital into its PRC subsidiaries, if the PRC resident shareholders or beneficial owners fail to comply with relevant PRC foreign exchange regulations.***

On July 4, 2014, the SAFE issued the *Circular on Several Issues Concerning Foreign Exchange Administration of Domestic Residents Engaging in Overseas Investment, Financing and Round-Trip Investment via Special Purpose Vehicles*, or the SAFE Circular 37. The SAFE Circular 37 requires PRC individuals, institutions and foreign individuals who have a habitual residence in the PRC due to economic interests, or collectively referred as the PRC residents, to register with the SAFE or its local branches in connection with their direct establishment or indirect control of an offshore special purpose vehicle, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests. In addition, such PRC residents must update their foreign exchange registrations with the SAFE when the offshore special purpose vehicle undergoes material events relating to any change of basic information (including change of such PRC residents, name and operation term), increases or decreases in investment amount, share

transfers or exchanges, or mergers or divisions. According to the *Circular on Further Simplifying and Improving the Administration of Foreign Exchange Concerning Direct Investment* released on February 13, 2015 by the SAFE, local banks will examine and handle foreign exchange registration for overseas direct investment, including the initial foreign exchange registration and amendment registration, under the SAFE Circular 37 from June 1, 2015.

If any shareholder holding interest in an offshore special purpose vehicle, who is a PRC resident as determined by the SAFE Circular 37, fails to fulfill the required foreign exchange registration with the local SAFE branches or its designated banks, the offshore special purpose vehicle may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions. ~~Smart King~~The FF Group has requested all of its current shareholders and/or beneficial owners to disclose whether they or their shareholders or beneficial owners fall within the ambit of the SAFE Circular 37 and urged relevant shareholders, upon learning that they are PRC residents, to register with the local SAFE branch or its designated bank as required under the SAFE Circular 37. However, ~~Smart King~~the FF Group may not be fully informed of the identities of all the shareholders or beneficial owners who are PRC residents, and it cannot provide any assurance that all of the shareholders and beneficial owners who are PRC residents will comply with ~~Smart King's~~the FF Group's requests to make, obtain or update any applicable registrations or comply with other requirements pursuant to the SAFE Circular 37 or other related rules in a timely manner. Any failure to comply with the relevant requirements could subject ~~Smart King's~~the FF Group's PRC subsidiaries and its shareholders or beneficial owners to penalties, which would limit ~~Smart King's~~the FF Group's ability to contribute additional capital to its PRC subsidiaries and negatively affect ~~Smart King's~~the FF Group's business operation in the PRC.

***Smart King may rely on dividends and other distributions on equity paid by its PRC subsidiaries to fund any cash and financing requirements it may have, and any limitation on the ability of the PRC subsidiaries to make payments to Smart King could have a material and adverse effect on ~~Smart King's~~the FF Group's ability to conduct its business.***

Smart King is a holding company, and may rely on dividends and other distributions on equity paid by the PRC subsidiaries for cash and financing requirements, including the funds necessary to service ~~Smart King's~~the FF Group's debts. Current PRC regulations permit ~~Smart King's~~the FF Group's PRC subsidiaries to pay dividends to Smart King only out of their accumulated after-tax profits upon satisfaction of relevant statutory conditions and procedures, if any, determined in accordance with Chinese accounting standards and regulations. In addition, each of these PRC subsidiaries is required to set aside at least 10% of its after-tax profits each year, if any, to fund certain reserve funds until the total amount set aside reaches 50% of its registered capital. Additionally, if ~~Smart King's~~the FF Group's PRC subsidiaries incur debts on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends or make other distributions to Smart King.

Any limitation on the ability of ~~Smart King's~~the FF Group's PRC subsidiaries to pay dividends or make other distributions to Smart King could materially and adversely limit its ability to grow, make investments or acquisitions that could be beneficial to ~~Smart King~~the FF Group, or pay dividends or debts.

***Fluctuations in exchange rates between Renminbi and U.S. dollar could result in currency exchange losses.***

~~Smart King's~~The FF Group's reporting currency and a substantial portion of its operating costs and expenses are denominated in U.S. dollars, while operating currency in the PRC for ~~Smart King's~~the

FF Group's PRC subsidiaries are denominated in Renminbi. Appreciation or depreciation in the value of Renminbi relative to U.S. dollar would affect ~~Smart King's~~the FF Group's financial results reported in U.S. dollar terms without giving effect to any underlying change in its business, financial condition or results of operations. Renminbi may appreciate or depreciate significantly in value against U.S. dollar in the long term, depending on the fluctuation of the basket of currencies against which it is currently valued, or it may be permitted to enter into a full float, which may also result in a significant appreciation or depreciation of Renminbi against U.S. dollar.

~~Smart King~~The FF Group has not entered into any hedging transactions in an effort to reduce its exposure to foreign currency exchange risk. While it may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and ~~Smart King~~the FF Group may not be able to hedge its exposure adequately or at all. In addition, ~~Smart King's~~the FF Group's currency exchange losses may be magnified by the PRC exchange control regulations that restrict its ability to convert Renminbi into foreign currency.

***Governmental control of currency conversion may limit ~~Smart King's~~the FF Group's ability to utilize its future revenues effectively.***

The PRC government imposes controls on the convertibility of Renminbi into foreign currencies and, in certain cases, the remittance of currency out of the PRC. Under existing PRC foreign exchange regulations, payments of current account items, such as profit distributions and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval from the SAFE, by complying with certain procedural requirements. However, approval from or registration with appropriate governmental authorities is required where Renminbi is to be converted into foreign currency and remitted out of the PRC to pay capital expenses such as the repayment of loans denominated in foreign currencies.

Since 2016, the PRC government has tightened its foreign exchange policies again and stepped up scrutiny of major outbound capital movement. More restrictions and a substantial vetting process have been put in place by the SAFE to regulate cross-border transactions falling under the capital account. The PRC government may also restrict access in the future to foreign currencies for current account transactions, at its discretion. ~~Smart King~~The FF Group expects to receive a portion of its revenues in Renminbi. If the foreign exchange control system prevents ~~Smart King~~the FF Group from obtaining sufficient foreign currencies to satisfy its foreign currency demands, ~~Smart King~~the FF Group may not be able to pay dividends or debts in foreign currencies to the shareholders or creditors.

***~~Smart King~~The FF Group may be deemed to be a PRC resident enterprise under the Enterprise Income Tax Law, or the EIT Law, and be subject to the PRC taxation on its worldwide income, which may significantly increase ~~Smart King's~~the FF Group's income tax expenses and materially decrease its profitability.***

Under the EIT Law that took effect on January 1, 2008, enterprises established outside of the PRC whose "*de facto* management bodies" are located in the PRC are considered to be "resident enterprises" and will generally be subject to a uniform 25% corporate income tax on their global income (excluding dividends received from "resident enterprises"). In addition, a circular issued by the State Taxation Administration, or the SAT, on April 22, 2009 and amended on January 29, 2014 sets out certain standards for determining whether the "*de facto* management bodies" of an offshore enterprise funded by Chinese enterprises as controlling shareholders is located in the PRC. Although this circular applies only to offshore enterprises funded by Chinese enterprises as controlling shareholders, rather than those funded by Chinese or foreign individuals or foreign enterprises as controlling shareholders (such as the company), the determining criteria set forth in the circular may reflect SAT's general position on how

the "*de facto* management bodies" test should be applied in determining the tax resident status of offshore enterprises, regardless of how they are funded. Although ~~Smart King~~the FF Group is not funded by Chinese enterprises as controlling shareholders, substantial uncertainties remain as to whether ~~Smart King~~the FF Group or any of its non-PRC subsidiaries will be deemed a PRC resident enterprise for the EIT purposes. If ~~Smart King~~the FF Group or any of its subsidiaries registered outside the PRC are to be deemed a "resident enterprise" under the EIT Law, ~~Smart King's~~the FF Group's income tax expenses may increase significantly, and its profitability could decrease materially.

***~~Smart King's~~The FF Group's leased property interest in the PRC may be defective, which could cause significant disruption to its business.***

Under the applicable PRC laws and regulations, all lease agreements are required to be registered with the local housing authorities. The landlords of certain of ~~Smart King's~~the FF Group's leased premises in the PRC may have not completed the registration of their ownership rights or these leases with the relevant authorities. Failure to complete these required registrations may expose such landlords, lessors and ~~Smart King~~the FF Group to potential monetary fines. If these registrations are not obtained in a timely manner, or at all, ~~Smart King~~the FF Group may be subject to monetary fines or may have to relocate its offices, which will incur the associated losses and adversely affect the normal business operations.

## G.    Certain Tax Risks Related to the Plan

***Tax Classification of the Trust for U.S. federal income tax purposes is subject to uncertainty.***

The Trustee likely will report the Trust as a "liquidating trust" under Treasury Regulation Section 301.7701-4(d) (a "Liquidating Trust"). In general, a Liquidating Trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a "pass-through" entity) of which the holders of beneficial interests in the trust are the owners and grantors. However, there is uncertainty as to the appropriate tax classification of the Trust. Thus, there is no assurance the Trustee's intended treatment of the Trust as a Liquidating Trust would withstand a challenge by the Internal Revenue Service (the "IRS"). If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and its creditor-beneficiaries could be different and potentially less favorable. *See* Article XI.A of this Disclosure Statement entitled "U.S. Tax Classification of the Trust."

***U.S. federal income tax classification of the entities through which West Coast indirectly owns its economic interest in ~~Smart King~~the FF Group is subject to uncertainty.***

Each of the entities through which West Coast indirectly owns the stock of ~~Smart King~~the FF Group are intended to be treated as "pass-through" entities for tax purposes. There is some uncertainty as to whether that will be the case due to an inadvertent election with respect to one of those entities that has since been withdrawn and late elections with respect to other entities. While that withdrawal and the late lections are believed to have been effective under published procedures, there is no assurance the IRS will agree. If any of the entities through which West Coast owns its economic interest in ~~Smart King~~the FF Group were to be treated as a corporation for U.S. federal income tax purposes, the resulting adverse tax consequences could include corporate level taxes levied on any proceeds from the disposition of stock of ~~Smart King~~the FF Group indirectly owned by West Coast as well as potential taxes imposed on any distribution of such proceeds by such entity that are allocable to the holders. Such dividends could by subject to tax at a 30% tax rate (subject to reduction under an applicable treaty). *See* Article ~~XIX~~X.B.3 "Tax Classification of West Coast Conduit Entities."

***The treatment of accrued but unpaid interest on a Debt Claim is uncertain.***

Holders of Debt Claims who receive Trust Interests under the Plan may have taxable ordinary income equal to the value of the Trust Interests they receive to the extent of any accrued and unpaid interest on the debt they hold that is extinguished or retired. YT intends to take the position that no portion of the Trust Interests received by a holder of Debt Claims under the Plan is allocable to accrued and unpaid interest or subject to withholding. However, this conclusion is not free from doubt, and it is possible that the IRS could assert that the value of any Trust Interest received by a holder should be allocated first to accrued and unpaid interest prior to allocating any portion of such amounts to principal. Such argument, if successful, would result in holders being required to report ordinary income on such value for U.S. federal income tax purposes. Holders of Debt Claims should carefully review the discussion set forth in Article ~~XIX~~X.B.1 of this Disclosure Statement under the heading "Accrued Interest on Debt Claims" and should discuss the potential for interest income and other possible tax consequences with their own tax advisors.

**VIII.**

**<u>CONFIRMATION OF THE PLAN</u>**

**A.**    **Voting Procedures and Solicitation of Votes**

The voting procedures and the procedures governing the solicitation of votes are described above in Article I.B (*Voting on the Plan*) and in the Disclosure Statement Order, which has been sent to you with this Disclosure Statement if you are entitled to vote on the Plan.

**B.**    **Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan of reorganization. As set forth in the Disclosure Statement Order, the Confirmation Hearing has been scheduled for [_____], 2020, commencing at [___]:00 [__].m. (~~prevailing Eastern Time~~Pacific time), before the Honorable ~~Karen B. Owens~~Vincent P. Zurzolo, United States Bankruptcy Judge, ~~at~~in Courtroom 1368 of the United States Bankruptcy Court for the Central District of ~~Delaware, 824 Market~~California Los Angeles Division, Roybal Federal Building, 255 E. Temple Street, ~~6th Floor, Wilmington, Delaware 19801~~Los Angeles, California 90012. The Confirmation Hearing may be

adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing and filed with the Bankruptcy Court.

Objections, if any, to confirmation of the Plan must be filed and served so that they are received on or before [_____], 2020, at 5:004:00 p.m. (prevailing Eastern TimePacific time). Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. Objections must be timely served upon the following parties: (i) the Office of the United States Trustee for the Central District of Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington, DE 19801California, 915 Wilshire Blvd., Suite. 1850, Los Angeles, California 90017 (Attn: DavidKelly L. BuchbinderMorrison, Esq.); (ii) proposed counsel for the Debtor, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067 (Attn: Jeffrey W. Dulberg, Esq. and Malhar S. Pagay, Esq.) and Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn: James E. O'Neil, Esq.); (iii) proposed special counsel for the Debtor, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036 (Attn: Suzzanne Uhland, Esq. and Diana M. Perez, Esq.); and (iv) counsel to the Creditors' Committee, Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068 (Attn: Jeffrey D. Prol, Esq., Andrew D. Behlmann, Esq., and Jeremy D. Merkin, Esq.) and Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: Christopher M. Samis, Esq., L. Katherine Good, Esq., and Aaron H. StulmanPolsinelli LLP, 2049 Century Park East, 29th floor, Los Angeles, CA 90067 (Attn: Randye B. Soref, Esq.).

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C.    General Requirements of Section 1129

### 1.    Requirements of Section 1129(a) of the Bankruptcy Code

#### a.    *General Requirements*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means proscribed by law;

- Any payment made or promised by the Debtor under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the Plan and incident to the chapter 11 case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

- With respect to each Class of Claims, each holder of an Impaired Claim either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or

retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of "Best Interests Test," below;

- Each Class of Claims has either accepted the Plan or is Unimpaired under the Plan;

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Non-Tax Claims will be paid in full, in Cash, on the Effective Date and that holders of Priority Tax Claims may receive on account of such Claims deferred Cash payments, over a period not exceeding five (5) years after the Petition Date, of a value as of the Effective Date, equal to the Allowed amount of such Claims with interest from the Effective Date;

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor of the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. *See* discussion of "Feasibility," below; and

- All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

  b.    *Best Interests Test*

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The first step in meeting the best interests test is to determine the dollar amount that would be generated from the liquidation of YT's assets and properties in a liquidation of his assets under a chapter 7 bankruptcy case. The total amount available would be the sum of the proceeds from such a forced disposition of his assets by a chapter 7 trustee and the cash held by YT at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets (to the extent of the value of the collateral securing such claims), the costs and expenses of the liquidation and such additional administrative expenses and priority claims that may result from the use of chapter 7 for the purposes of liquidation. Finally, the present value of the resultant residual balance (taking into account the time necessary to accomplish the liquidation) is allocated to creditors in the strict order of priority in accordance with section 726 of the Bankruptcy Code, which requires that no junior claim holder receive any distribution until all senior claim and interest holders are paid in full. The amounts so allocated can then be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and interest holders in a chapter 11 case, including: the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and the substantial increases in claims that would be satisfied on a priority basis or on a parity with creditors in a chapter 11 case, YT has determined that confirmation of the Plan will provide each

creditor with a recovery that is not less than it would receive pursuant to a liquidation under chapter 7 of the Bankruptcy Code. ~~Moreover, YT believes that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be further impaired as compared to the value of distributions under the Plan because such distributions in chapter 7 may not occur for a substantial period of time. For example, the distribution of the proceeds of the liquidation may be significantly delayed by the need to resolve all objections to claims and prepare for distributions.~~ YT will file a liquidation analysis with the Bankruptcy Court ~~no later than ten (10) days~~ prior to the ~~Voting Deadline~~ February 6, 2020 hearing.

  *c.*  *Feasibility of the Plan*

  In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Debtor demonstrate that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so-called feasibility test. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed his ability to meet his obligations under the Plan. YT believes, based on this analysis, that the Plan provides a feasible means of reorganization from which there is a reasonable expectation that, following the Confirmation Date, he will possess the resources to meet his obligations under the Plan. However, the Bankruptcy Court may not agree with such a determination or accept the forecasts or the assumptions underlying this determination.

  **2.**  **Requirements of Section 1129(b) of the Bankruptcy Code**

  Section 1129(b) of the Bankruptcy Code provides for confirmation (or "cramdown") of a plan of reorganization even if the plan is not accepted or deemed accepted by all impaired classes of claims, as long as at least one impaired class of claims has voted to accept the plan and certain other requirements are met.

  Under the cram-down provisions of the Bankruptcy Code, if a class of secured claims rejects the plan, the plan may still be confirmed if (a) the holders retain the liens securing their claims and receive cash payments totaling at least the amount of their claim, of a value, as of the effective date, of at least the value of the holders' interest in the estate's interest in such property, (b) the property is sold with the holders' liens attaching to the proceeds of the sale or (c) the holders realize the "indubitable equivalent of such claims." If a class of unsecured claims rejects the plan, the plan may still be confirmed if the plan provides that (i) each holder of a claim included in the rejecting class receives or retains on account of that claim property that has a value, as of the plan's effective date, equal to the allowed amount of that claim or (ii) the holder of any claim that is junior to the claims of the rejecting class will not receive or retain any property on account of such junior claim.

  Because the Debtor anticipates that the Plan will satisfy section 1129(a)(8) of the Bankruptcy Code, the Debtor is not presently seeking confirmation of the Plan under section 1129(b) of the Bankruptcy Code. However, if Class 3 (Debt Claims) fails to accept the Plan by the requisite statutory majorities, YT reserves the right to propose any modifications to the Plan and to confirm the Plan as modified, without re-solicitation, to the extent permitted by the Bankruptcy Code.

  **3.**  **Confirmation of an Individual Chapter 11 Plan**

  The Plan is an individual plan under chapter 11 of the Bankruptcy Code. Section 1123(a)(8) of the Bankruptcy Code requires that an individual chapter 11 plan "provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the

plan." Further, section 1129(a)(15) of the Bankruptcy Code provides that if a creditor objects to confirmation of an individual chapter 11 plan, the plan may only be confirmed if:

> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

> (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

YT will demonstrate that the value of his assets exceeds his projected disposable income and thus, section 1129(a)(15) of the Bankruptcy Code is satisfied because he has no disposable income. As part of this analysis, YT will show that his future earnings are not necessary for execution of the Plan.

Article 11.3 of the Plan provides that, except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against YT, of any nature whatsoever, whether known or unknown, or against the assets or properties of YT that arose before the Effective Date. Except as expressly provided in the Plan, on the Discharge Date (and subject to its occurrence), and pursuant to section 1141(d)(5) of the Bankruptcy Code, entry of the Confirmation Order shall be deemed to act as a discharge and release under section 1141(d)(1)(A) of the Bankruptcy Code of all Claims against YT and his assets, arising at any time before the Effective Date, regardless of whether a proof of Claim was filed, whether the Claim is Allowed, or whether the holder of the Claim votes to accept the Plan or is entitled to receive a distribution under the Plan, provided, however, that in no event shall occurrence of the Discharge Date discharge YT from any obligations remaining under the Plan as of the Discharge Date. Any default by YT with respect to any Claim that existed immediately prior to or on account of the filing of the chapter 11 case shall be deemed cured on the Discharge Date.

## IX.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the following alternatives are available: (i) confirmation of another chapter 11 plan; (ii) conversion of the chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or (iii) dismissal of the chapter 11 case leaving holders of Claims to pursue available non-bankruptcy remedies. These alternatives to the Plan are not likely to benefit holders of Claims.

If the Debtor, or any other party in interest (if the Debtor's exclusive period in which to file a plan has expired), could attempt to formulate a different plan, such a plan might involve either a reorganization of the Debtor or conversion of the chapter 11 case to a liquidation of the Debtor's assets under chapter 7. YT has explored numerous alternatives in connection with the extensive process of formulating and developing the Plan. YT has concluded that the Plan, as described in this Disclosure Statement, enables stakeholders to realize the most value under the circumstances. YT has evaluated the effects of a liquidation of his assets. In considering this alternative, he has taken into account the nature, status, and underlying values of his tangible and intangible assets, the ultimate realizable value of such assets, and the extent to which certain of his assets are subject to the liens and security interests of secured creditors. YT believes that liquidation under chapter 7 would result in smaller distributions being made to holders of Claims than those provided for in the Plan. If the chapter 11 case is dismissed, holders of Claims would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against the Debtor. The failure of plan confirmation and dismissal of the chapter 11 case would result in a race to the courthouse

that could leave many creditors with no recovery at all. Accordingly, the Debtor believes that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

## X.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain material U.S. federal income tax consequences applicable to the Trust and the holders of Trust Interests ("Holders"). This summary is based on the Internal Revenue Code, the Treasury Regulations promulgated thereunder (whether final, temporary, or proposed), administrative rulings, and judicial decisions, all as in effect on the date hereof. Each of the foregoing authorities is subject to change, which change could apply with retroactive effect and could affect the accuracy of the statements and conclusions set forth in this discussion. Neither YT nor the Trust will request a ruling from the IRS as to the U.S. federal income tax consequences to YT, the Trust or the Holders. This summary is not binding on the IRS, and the IRS is not precluded from taking a position that is different from, and contrary to, the positions described in this summary.

This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential U.S. federal income tax considerations that may apply to a Holder. This summary does not take into account the individual facts and circumstances of any particular Holder that may affect the U.S. federal income tax consequences to such holder, including specific tax consequences to a holder under an applicable tax treaty. In addition, this summary does not address the U.S. federal alternative minimum, U.S. federal estate and gift, U.S. state and local, or non-U.S. tax consequences of the Trust or the ownership of the Trust Interests.

This discussion assumes that each Holder is a non- U.S. person (a "Non-U.S. Holder"). For this purpose, a Non-U.S. Person means a person or entity that is not:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States or any subdivision thereof;

- an estate the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source;

- a partnership (or an entity or arrangement treated as a partnership for U.S. federal income tax purposes); or

- a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the Trust and one or more U.S. persons have the authority to control all substantial decisions of the Trust, or (2) the Trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes.

Any person who would not be considered a Non-U.S. Holder under U.S. federal income tax rules and regulations should consult their own tax advisor.

This discussion also assumes that the income of the Trust will consist solely of gains from the sale of Company stock and interest on short-term debt instruments or money deposits.

Finally, this discussion also assumes that (i) West Coast and each of those entities through which West Coast directly and indirectly owns the stock of ~~Smart King~~the FF Group (the "West Coast Conduit Entities") are treated as "pass-through" entities (i.e., either partnerships or disregarded entities) for U.S. federal income tax purposes, (ii) none of the Trust, West Coast or the West Coast Conduit Entities will at any time engage in the conduct of a trade or business within the United States and (iii) the Trust will use commercially reasonable efforts to provide a requesting Holder with any certification available under applicable law that is reasonably required to enable such Holder to dispose of its Trust Interest without incurring a U.S. withholding tax.

A failure of any of the assumptions described above may result in different, potentially adverse tax consequences to a Holder. Each Holder is strongly urged to consult its own tax advisor regarding its receipt and ownership of a Trust Interest.

## A.    U.S. Tax Classification of the Trust

The tax classification of the Trust for U.S. federal income tax purposes is subject to some uncertainty. The Trust is expected to be reported as a "Liquidating Trust" described in Treasury Regulation Section 301.7701-4(d). In general, a Liquidating Trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a "pass-through" entity) of which the beneficial owners are treated as the owners and grantors (but *see* discussion regarding the Late Filing Claims Reserve below). While the following discussion assumes that the Trust would be so treated for federal income tax purposes, no ruling has been or will be requested from the IRS concerning the tax status of the Trust as a Liquidating Trust. In addition, the IRS has issued several revenue procedures setting forth the general criteria for obtaining an IRS ruling as to the qualification of a trust as a Liquidating Trust. Not all of the criteria set forth in those revenue procedures will be met by the Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Trust as a Liquidating Trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Trust and the Holders could vary from those discussed herein (including the potential for an entity-level tax imposed on the Trust). There are, however, reasonable arguments that the Trust could be classified as a non-grantor trust or as a partnership for U.S. federal income tax purposes if it is not treated as a Liquidating Trust, both of which are also "pass-through" entities. Such alternative characterizations should not result in entity-level taxes to the Trust (assuming, in the case of a non-grantor trust, income of the trust is timely distributed to its beneficial owners) or materially adversely affect the tax treatment of the Holders.

Assuming the Trust is properly classified as a Liquidating Trust, the Trust will not be subject to U.S. federal income taxes at the entity level. Instead, the income, deductions and credits generated by the assets of the Trust will pass through and be allocated among the Holders for U.S. federal income tax purposes in accordance with their deemed ownership interests in the Trust.

## B.    U.S. Federal Income Tax Treatment of Holders

The assets of the Trust will be treated for U.S. federal income tax purposes as having been transferred directly to the Holders in exchange for their Debt Claims (with each such Holder receiving an undivided interest therein determined on the basis of the amount of its Debt Claim and the priority of distributions set forth in the Trust Agreement), and then by such Holders to the Trust in exchange for the Trust Interests. Thereafter, the income, deductions and credits generated by the assets of the Trust will be allocated among the Holders for U.S. federal income tax purposes in accordance with their Trust Interests.

Subject to the discussion under "Accrued Interest on Debt Claims" and "Information Reporting and Backup Withholding," a Non-U.S. Holder generally should not be subject to U.S. federal income

taxation either upon receipt of a Trust Interest nor on its allocable share of the income of the Trust or on any gain realized by such Non-U.S. Holder upon the sale, exchange or retirement of the Trust Interest, unless:

- the recognized income or gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States, and if required by an applicable tax treaty, attributable to a permanent establishment maintained by the Non-U.S. holder in the United States; or

- the non-U.S. Holder is an individual present in the U.S. for one-hundred-eighty-three (183) days or more during the taxable year of the sale, and certain other requirements are met.

A Non-U.S. Holder whose income with respect to the Trust is effectively connected to the conduct of a U.S. trade or business will generally be taxed as if it were a United States person unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income at a rate of 30% unless a treaty applies to reduce such rate.

## 1. Accrued Interest on Debt Claims

To the extent that any portion of the Trust Interests received by a Holder is attributable to accrued and unpaid interest on its Debt Claim, such amount may be includible in such Holder's gross income as ordinary interest income subject to a 30% tax rate (which rate is reduced by treaty to 10% if the Holder is citizen or resident of the PRC) if such accrued interest has not been included previously in such Holder's gross income for U.S. federal income tax purposes. The applicable Treasury Regulations generally require that any payment on a debt instrument first be allocated to interest to the extent of any accrued and unpaid interest. However, the allocation of amounts paid to a debt holder as between principal on the one hand and accrued and unpaid interest on the other hand is presently unclear, particularly in the distressed context. YT does not intend to report to any Holder any amount attributable to accrued and unpaid interest notwithstanding the previously mentioned Treasury Regulation. However, given this Treasury Regulation, YT intends to disclose this position to the IRS, and holders may, in consultation with their own tax advisors, wish to do the same. The IRS could argue that the value of any Trust Interest received by a Holder should be allocated first to accrued and unpaid interest up to the total amount of accrued and unpaid interest prior to allocating any portion of such amounts to principal. Such argument, if successful, would result in holders being required to report ordinary interest income on such value for U.S. federal income tax purposes.

## 2. Tax Treatment of the Late Filing Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations or the receipt of an adverse determination by the IRS upon audit if not disputed by the Trustee), the Trustee intends to (i) treat the Late Filing Claims Reserve as a non-grantor trust in accordance with the trust provisions of the IRC (sections 641 et seq.), or such other entity deemed appropriate by the Trustee in its sole discretion, (ii) file all applicable tax and information returns and, if applicable, timely pay all taxes that may become due consistently with such treatment, and (iii) to the extent permitted by applicable law, report consistently for federal, state and local income tax purposes. In general, a non-grantor trust is taxed on any income allocated to it except to the extent such income is timely distributed to its beneficiaries, in which case the income is reported by the beneficiaries.

### 3.    Tax Classification of West Coast Conduit Entities

As stated above, this discussion assumes that each of the West Coast Conduit Entities is treated as a "pass-through" entity (i.e., a partnership or disregarded entity) for U.S. federal income tax purposes. In this regard, one of those entities, Pacific Technology, is intended to be treated and will be reported as a partnership for such purposes. However, an election was mistakenly filed with the IRS to treat Pacific Technology as a corporation. Subsequently, Pacific Technology filed a request for withdrawal of such election. In addition, late elections to be classified as disregarded entities were filed for FF Top and FF Peak. While advisors to YT and the West Coast Conduit Entities believe that the withdrawal of the inadvertent election and the late elections should be effective to cause each of the West Coast Conduit Entities to be classified as a "pass-through" entity based on published guidance and procedures from the IRS governing such elections, there is no assurance that the IRS will agree with that determination. If any of the West Coast Conduit Entities were to be treated as a corporation for U.S. federal income tax purposes, the resulting adverse tax consequences could include corporate level taxes levied on any proceeds from the disposition of stock of ~~Smart King~~the FF Group held indirectly by such entity as well as potential taxes imposed on any distribution of such proceeds by such entity that are ultimately allocable to the Holders. Such dividends could by subject to tax at a 30% tax rate (subject to reduction under an applicable treaty).

### 4.    Information Reporting and Backup Withholding

Assuming the West Coast Constituent Entities are treated as "pass-through" entities, a Non-U.S. Holder that has provided the Trustee (or, in connection with the sale, exchange or retirement of a Trust Interest, certain applicable intermediaries) with a validly completed original of the appropriate version of IRS Form W-8 will not be subject to backup withholding or information reporting with respect to the receipt of Trust Interests, payments made by the Trust derived from the sale of the stock of ~~Smart King~~the FF Group, or proceeds from a sale, exchange or retirement of a Trust Interest unless, in each case, the Trustee or applicable payor has actual knowledge or reason to know that the Non-U.S. Holder is a United States person.

Backup withholding is not an additional tax. A Non-U.S. Holder generally will be entitled to credit any amounts withheld under the backup withholding rules against the holder's U.S. federal income tax liability, if any, or may claim a refund if certain information is timely provided to the IRS.

### 5.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ASSOCIATED WITH THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**XI.**

**CONCLUSION**

YT believes the Plan is in the best interests of all of his creditors and urges the holders of Debt Claims to vote to accept the Plan, and to evidence such acceptance by returning their signed Ballots so that they will be received by the Voting Agent no later than ~~5:00~~4:00 p.m. (Beijing Time) on [_____], 2020.

Dated: ~~November 15, 2019~~_____, 2020

Respectfully Submitted,

YUETING JIA
Debtor and Debtor in Possession

_____
.

| Summary report: Litera® Change-Pro for Word 10.8.0.80 Document comparison done on 1/27/2020 11:27:31 PM | |
|---|---|
| **Style name:** OMM Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** dm://OMM_US/77267404/8 | |
| **Modified DMS:** dm://OMM_US/77363618/7 | |
| **Changes:** | |
| Add | 1410 |
| Delete | 910 |
| Move From | 33 |
| Move To | 33 |
| Table Insert | 4 |
| Table Delete | 2 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 1 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 2393 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document entitled (*specify):* **NOTICE OF FILING OF BLACKLINE VERSION OF SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **January 28, 2020,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____**,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **January 28, 2020,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA HAND DELIVERY**
The Honorable Vincent P. Zurzolo
United States Bankruptcy Court
Central District of California
255 East Temple Street, Suite 1360 / Courtroom 1368
Los Angeles, CA  90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 28, 2020 | Mary de Leon | /s/ *Mary de Leon* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:327236.1 46353/002

**SERVICE INFORMATION FOR CASE NO. 19-bk-24804-VZ**

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>

- Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com
- David W. Meadows    david@davidwmeadowslaw.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com,
  jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Emily Young    pacerteam@gardencitygroup.com,
  rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:327236.1 46353/002