1    Richard M. Pachulski (CA Bar No. 90073)
Jeffrey W. Dulberg (CA Bar No. 181200)
2    Malhar S. Pagay (CA Bar No. 189289)
PACHULSKI STANG ZIEHL & JONES LLP
3    10100 Santa Monica Blvd., 13th Floor
Los Angeles, California  90067
4    Telephone: 310/277-6910
Facsimile:  310/201-0760
5    E-mail: rpachulski@pszjlaw.com
         jdulberg@pszjlaw.com
6        mpagay@pszjlaw.com

7    Attorneys for Debtor and Debtor in Possession

8                    **UNITED STATES BANKRUPTCY COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10                         **LOS ANGELES DIVISION**

| 11 | In re: | Case No.: 2:19-bk-24804-VZ |
|----|--------|----------------------------|
| 12 | YUETING JIA,[1] | Chapter 11 |
| 13 | Debtor. | **NOTICE OF MOTION AND MOTION FOR ORDER (A) AUTHORIZING DEBTOR IN POSSESSION TO (I) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 362, AND 364, AND (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-PETITION LENDER PURSUANT TO 11 U.S.C. §364; AND (B) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§361, 362, AND 364; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ROBERT MOON AND MATTHIAS AYDT IN SUPPORT THEREOF** |

Date:      March 19, 2020
Time:      9:30 a.m.
Place:     United States Bankruptcy Court
           255 E. Temple Street,
           Los Angeles, CA  90012
Courtroom: 1368
Judge:     Hon. Vincent P. Zurzolo

---

[1] The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing address is 91 Marguerite Drive, Rancho Palos Verdes, CA 90275.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    **TO THE HONORABLE VINCENT P. ZURZOLO, UNITED STATES BANKRUPTCY**
2    **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR'S**
     **PROPOSED POST-PETITION LENDER, THE OFFICIAL COMMITTEE OF**
3    **UNSECURED CREDITORS, ALL ENTITIES KNOWN TO ASSERT LIENS IN THE**
     **DEBTOR'S ASSETS, AND OTHER PARTIES IN INTEREST:**

4         **PLEASE TAKE NOTICE** that Yueting Jia, the above-captioned debtor and debtor in

5    possession (the "Debtor" or "Borrower"), hereby moves (the "Motion") this Court for entry of an

6    order:

7         a.    authorizing the Debtor to obtain post-petition financing from Pacific Technology

8    Holding LLC ("PTH" or the "DIP Lender"), consisting of that certain Secured Debtor-In-Possession

9    Promissory Note (the "DIP Note") by and among the DIP Lender and the Borrower in the maximum

10   principal amount of $6,400,000.[2]  Advances to be made available as set forth therein, to be used for

11   the payment of Administrative Expenses as described herein and in the DIP Note, on the terms and

12   conditions set forth herein and in the form order (the "Order") attached hereto as **Exhibit "C"**;

13        b.    authorizing the Debtor to execute and enter into the DIP Note and to perform all such

14   other and further acts as may be required in connection with the documents relating thereto;

15        c.    authorizing the Debtor to use proceeds of the DIP Note solely as expressly permitted

16   in the DIP Note and in accordance with the terms of the Order;

17        d.    granting to the DIP Lender automatically perfected (i) first priority security interests

18   in all of Borrower's right, title and interest in the Non-China Collateral (as defined in the DIP Note)

19   upon which there are either pre-existing permitted senior liens or no pre-existing liens, to the extent

20   provided herein, and granting superpriority administrative expense status (as defined below) and (ii)

21   junior and subordinated security interests in all of Borrower's right, title and interest in the China

22   Collateral;[3]

23

24

25   [2] The DIP lender has placed $1,250,000 in trust with counsel to the Committee for the purpose of paying allowed fees
     and expenses of Committee professionals pursuant to orders of the court permitting payment of such fees and expenses.
26   The Debtor will also place $100,000 into an administrative expense escrow account which will be held in trust by the
     Debtor's counsel and receive all proceeds of the DIP Loan contemplated herein.
27   [3] This security grant shall be subject in all respects to the Minute Order entered September 3, 2019 in Case No: 2:18-CV-
     10255 SJO (MRWx) in the United States District Court for the Central District of California (the "Minute Order"),
28   attached to the DIP Note as **Exhibit 1** to the extent the Minute Order remains enforceable in light of the chapter 11 case
     and has not been avoided or disallowed therein.

DOCS_LA:327777.7 46353/002

e.      authorizing the Debtor to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Note as such amounts become due and payable; and

f.      vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Order and the DIP Note.

**PLEASE TAKE FURTHER NOTICE** that this Motion is made pursuant to sections 105, 362, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, and Local Bankruptcy Rule 4001-2 (the "Local Bankruptcy Rules"), and is made on the grounds that the authorization of the requested financing is within the Debtor's sound business judgment and in the best interest of the Debtor's estate.  Access to the DIP Note proceeds will allow the Debtor to maintain his affairs and pay costs of administering his chapter 11 case, thereby maximizing recoveries for creditors.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based on this Notice and Motion, the Declaration of Robert Moon (the "Moon Declaration") and Declaration of Matthias Aydt (the "Aydt Declaration") attached hereto  and incorporated herein, and the arguments of counsel and other admissible evidence properly brought before the Court at or before the hearing on this Motion. In addition, the Debtor requests that the Court take judicial notice of all documents filed with the Court in this case.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), if you wish to oppose the Motion, you must file a written response with the Court and serve a copy of it upon the undersigned counsel no later than fourteen (14) days prior to the hearing on the Motion.  The failure to properly file and serve an opposition may be deemed consent to the relief requested in the Motion or a waiver of any right to oppose the Motion.

**PLEASE TAKE FURTHER NOTICE** that counsel to the Debtor will serve this Notice and Motion, the attached *Memorandum of Points and Authorities*, the Moon Declaration, and the Aydt Declaration upon:  (a) the Office of the United States Trustee, (b) the Official Committee of Unsecured Creditors, (c) counsel to the DIP Lender, and (d) any known parties that assert a lien on the Debtor's assets.  A copy of the motion is also available on the Debtor's case website at

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

https://dm.epiq11.com/YT1.  The Debtor submits that such notice complies with the Federal Rules
of Bankruptcy Procedure, the Local Rules of Bankruptcy Procedure, the Local Rules of this Court to
the extent applicable, and is sufficient and that no other or further notice be given.

**WHEREFORE** the Debtor respectfully requests that the Court grant the relief requested
herein and grant such other and further relief as the Court deems just and proper.

Dated:  February 27, 2020                    PACHULSKI STANG ZIEHL & JONES LLP


By: */s/ Jeffrey W. Dulberg*
       Richard M. Pachulski
       Jeffrey W. Dulberg
       Malhar S. Pagay

Attorneys for Debtor and Debtor in Possession

DOCS_LA:327777.7 46353/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

**Page**

I.      GENERAL BACKGROUND ................................................................................... 1

II.     NEGOTIATION OF PLAN TERM SHEET AND DIP FINANCING ...................... 2

III.    BACKGROUND TO PROPOSED DIP LOAN ..................................................... 3

IV.     SPECIFIC NEED FOR FINANCING AND TERMS THEREOF .......................... 5

V.      MATERIAL TERMS OF FINANCING ................................................................. 7

VI.     STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 4001-2 ........... 10

VII.    BASIS FOR RELIEF .......................................................................................... 10

        A.      The Debtor Should be Permitted to Obtain Post-Petition Financing Pursuant to

                Section 364(c) of the Bankruptcy Code ................................................. 10

        B.      The DIP Lender is an Affiliate of the Debtor .......................................... 11

        C.      The Debtor Was Unable to Obtain Financing on More Favorable Terms .................. 11

        D.      The Proposed Financing is Necessary to both Preserve and Maximize

                the Value of the Debtor's Estate ............................................................ 11

        E.      The Terms of the Proposed Financing are Fair, Reasonable,

                and Appropriate ..................................................................................... 12

        F.      Entry Into the Proposed Financing Reflects the Debtor's

                Sound Business Judgment ...................................................................... 12

        G.      PTH is Entitled to a Finding of that it has Extended Credit

                to the Debtor in Good Faith Pursuant to Bankruptcy Code Section 364(e) ............... 14

VIII.   NOTICE .............................................................................................................. 15

IX.     CONCLUSION ................................................................................................... 15

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:327777.7 46353/002

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*,
789 F.2d 1085 (4th Cir. 1986) ........................................................................................ 12

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*
*(In re Papercraft Corp.)*,
211 B.R. 813 (W.D. Pa. 1997) ........................................................................................ 14

*Gavin v. Tousignant (In re Ultimate Escapes Holdings, LLC)*,
No. 12-50849 (BLS), 2014 WL 5861765, at *9 (Bankr. D. Del. Nov. 12, 2014) .......................... 15

*Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*,
318 U.S. 523 (1943) ........................................................................................................ 13

*In re Ames Dep't Stores, Inc.*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990) ............................................................................... 12

*In re Aqua Assoc.*,
123 B.R. 192 (Bankr. E.D. Pa. 1991) .............................................................................. 10

*In re Curlew Valley Assocs.*,
14 B.R. 506 (Bankr. D. Utah 1981) ................................................................................. 13

*In re Farmland Indus., Inc.*,
294 B.R. 855 (Bankr. W.D. Mo. 2003) ............................................................................ 12

*In re Simasko Prod. Co.*,
47 B.R. 444 (D. Colo. 1985) ............................................................................................ 13

*In re Sky Valley, Inc.*,
100 B.R. 107 (Bankr. N.D. Ga. 1988) .............................................................................. 11

*In re Western Pacific Airlines, Inc.*,
223 B.R. 567 (Bankr. D. Colo. 1997) ............................................................................... 12

*Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp*
*(In re Enron Corp.)*,
335 B.R. 22 (S.D.N.Y. 2005) ........................................................................................... 15

*Richmond Leasing Co. v. Capital Bank, N.A.*,
762 F.2d 1303, 1311 (5th Cir. 1985) ............................................................................... 13

*Trans World Airlines, Inc. v. Travelers Int'l AG*
*(In re Trans World Airlines, Inc.)*,
163 B.R. 964 (Bankr. D. Del. 1994) ........................................................................... 12, 13

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ii

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Unsecured Creditors' Comm. Mobil Oil Corp. v.*
   *First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.),*
   65 B.R. 358 (W.D. Mich. 1986) ............................................................................................ 12

**Statutes**

11 U.S.C. Section 105 ............................................................................................................. 1, 15

11 U.S.C. Section 327 ............................................................................................................. 6, 7

11 U.S.C. Section 328 ............................................................................................................. 6, 7

11 U.S.C. Section 330 ............................................................................................................. 6, 7

11 U.S.C. Section 361 ................................................................................................................. 1

11 U.S.C. Section 362 ........................................................................................................ 1, 7, 15

11 U.S.C. Section 363 ................................................................................................... 1, 6, 7, 15

11 U.S.C. Section 363(b) ............................................................................................................ 13

11 U.S.C. Section 364 ..................................................................................................... 1, 12, 15

11 U.S.C. Section 364(c) ....................................................................................................... 10, 11

11 U.S.C. Section 364(c)(2) ....................................................................................................... 10

11 U.S.C. Section 364(c)(3) ....................................................................................................... 10

11 U.S.C. Section 364(d) ........................................................................................................... 12

11 U.S.C. Section 364(e) ...................................................................................................... 14, 16

11 U.S.C. Section 503(b)(l) ....................................................................................................... 10

11 U.S.C. Section 507 ................................................................................................................. 15

11 U.S.C. Section 1102(a)(1) ....................................................................................................... 1

11 U.S.C. Section 1103 ............................................................................................................. 6, 7

11 U.S.C. Section 1107(a) ............................................................................................................. 1

11 U.S.C. Section 1108 ................................................................................................................. 1

28 U.S.C. Section 1930 ............................................................................................................. 6, 8

DOCS_LA:327777.7 46353/002

**Rules**

Fed. R. Bankr. P. 2002 ................................................................................................. 15

Fed. R. Bankr. P. 4001 ................................................................................................. 15

Fed. R. Bankr. P. 4001(b) ............................................................................................... 7

Fed. R. Bankr. P. 4001(c) ........................................................................................... 7, 10

Local Bankruptcy Rule 4001-2 ............................................................................. 7, 10, 15

Local Bankruptcy Rule 4001-2(a) ................................................................................. 10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:327777.7 46353/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## MEMORANDUM OF POINTS AND AUTHORITIES

Yueting Jia, the above-captioned debtor and debtor in possession (the "Debtor" or "Borrower"), hereby files this Memorandum of Points and Authorities in support of his *Motion For Order (A) Authorizing Debtor In Possession To (I) Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§105, 362, 363, And 364, And (II) Granting Liens And Superpriority Claims To Post-petition Lender Pursuant To 11 U.S.C. §364; and (B) Modifying Automatic Stay Pursuant To 11 U.S.C. §§361, 362, And 364* (the "Motion"),[4] and represents as follows:

## I.

## GENERAL BACKGROUND

On October 14, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.  The Debtor continues to operate and manage his affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

The Debtor commenced this case in order to restructure over $3.7 billion in debt, the overwhelming majority of which arose from obligations he guaranteed to support his businesses in China and also to support Faraday Future (the "Company" or "FF"),[5] a Gardena, California based global technology company engaged in the development of next-generation mobility ecosystems.

On October 25, 2019, the Office of the United States Trustee ("OUST") appointed the Official Committee of Unsecured Creditors (the "Committee") in this chapter 11 case pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 45].  The Committee consists of the following members: (i) Ping An Bank., Ltd. Beijing Branch; (ii) China Minsheng Trust Co., Ltd; (iii) Shanghai Leyu Chuangye Investment Management Center LP; (iv) Jiangyin Hailan Investment Holding Co., Ltd; and (v) Shanghai Qichengyueming Investment Partnership Enterprise.

On December 18, 2019, the Delaware Bankruptcy Court entered its order [Docket No. 178] transferring the case to the Central District of California.

---

[4] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Motion or the DIP Note, as applicable.

[5] *See* https://www.ff.com/

DOCS_LA:327777.7 46353/002

## II.

## <u>NEGOTIATION OF PLAN TERM SHEET AND DIP FINANCING</u>

As discussed below, in connection with the mediation ordered by this Court, the Debtor and the Committee have reached agreement on the terms of both the debtor-in-possession financing sought to be approved in this Motion (the "<u>DIP Financing</u>") and the terms of a chapter 11 plan of reorganization supported by the Committee (the "<u>Consensual Plan</u>"). The terms of the Consensual Plan are set forth in the term sheet attached hereto as **Exhibit "B"**. Both the DIP Financing and the Consensual Plan are the result of many weeks of constructive arm's length diligence and negotiations by the Debtor, the Committee, the DIP Lender and their respective professionals.

Soon after the appointment of the Committee, the Debtor and the Committee began discussing the path to a consensual plan of reorganization and potential source of DIP Financing. The Committee repeatedly emphasized to the Debtor that an investigation into potential claims by the estate and a financial analysis of FF would require sufficient funding earmarked for the Committee. In fact, the Committee conditioned its willingness to negotiate with respect to a consensual plan on evidence that DIP financing would be available. Initially, Pacific Technology Holding LLC ("<u>PTH</u>" or the "<u>DIP Lender</u>") wired $50,000 into a trust account at Lowenstein Sandler LLP, counsel for the Committee, to cover expenses that the Committee incurred due to the November 2019 visit to FF's facilities in Gardena, California and to be held in trust pending court approval of DIP financing. The use of the funds for reimbursement of the Committee's expenses remains subject to both court approval of such expenses and court approval of the DIP financing. On December 2, 2019, PTH placed an additional $450,000 in the trust account on the same terms to support the Committee's due diligence efforts and, more importantly, pursue a consensual plan for the benefit of the entire creditor body.

After the venue transfer, the Debtor continued to negotiate with the Committee. On December 20, 2019, PTH placed an additional $750,000, for a total of $1,250,000, into the Lowenstein Sandler trust account to facilitate the Committee's investigation of potential causes of action possessed by the estate and diligence regarding the Debtor's assets including his interests in FF. PTH advanced the funds with the understanding that such funds were unconditionally held in

DOCS_LA:327777.7 46353/002

trust and subject to court approval of any fees and expenses, and in good faith, with the intent of providing proof of the financing subject only to court approval. Meanwhile, the Debtor agreed to the Committee's desired due diligence process and populated data rooms with documents responding to the Committee's numerous requests.

In connection with the Committee's investigation, the Debtor facilitated interviews conducted by the Committee's counsel and financial advisors. In addition, the Debtor participated in a two-day confidential deposition by the Committee and an individual member of the Committee, where the Debtor provided information regarding, among other things, his involvement in any alleged transactions that may be subject to avoidance under Chapter 5 of the Bankruptcy Code. Lastly, the Debtor's advisors met on several occasions with the Committee's advisors to discuss the various transactions in detail.

In accordance with the Court's mediation order, the Debtor, the Committee, and other creditors including Shanghai Lan Cai Asset Management Co., Ltd. and Shanghai Qichengyueming Investment Partnership mediated under the auspices of Judge Mitchel Goldberg (ret.) during the week of February 3, 2020. At the end of the mediation sessions, the Debtor and the Committee reached an agreement on the material terms of the Consensual Plan. The Committee conditioned its agreement to the Consensual Plan on acceptable DIP financing to be provided by PTH. The Debtor and the Committee, on one hand, and PTH, on the other, participated in extensive negotiations of DIP financing. On February 24, 2020, such negotiations culminated in an agreement on the terms of a DIP Note to be funded by PTH, largely through contributions by the FF Global Members, who agreed to provide an additional $5.15 million for a total of $6.4 million.

## III.

## BACKGROUND TO PROPOSED DIP LOAN

Prior to the Petition Date, the Debtor recognized a need for outside financing and began the process of considering potential funding sources.  The Debtor, through his advisors, discussed with various third parties the opportunity to provide financing to the Debtor, but no alternative funding proposals were provided to the Debtor.  Separately, the Debtor's professionals requested the Committee's professionals to ascertain whether an alternative source of financing might be available

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

on preferable terms.  PTH was ultimately found to be the only source of DIP financing available to the Debtor.

Through West Coast LLC (US-DE) ("West Coast"), the Debtor indirectly owns the economic rights of 100% of the preferred membership units in PTH that entitles him to a priority distribution and thereafter a residual distribution based on his 20% interest in PTH. These economic rights are part of the key assets to be contributed to a liquidating trust (the "Trust") under the consensual plan of reorganization (the "Consensual Plan"). FF Global Partners LLC ("FF Global"), the managing member of PTH, owns the remaining 80% of PTH. Matthias Aydt, who is also the Senior Vice President of Product Definition and Business Development at Faraday & Future Inc. ("FF"), serves as FF Global's President, Secretary, and Treasurer.

Key executives of the Company formed FF Global in connection with the adoption of the "Partnership Program"—an innovative corporate governance and management retention structure based on the Alibaba model. The implementation of the Partnership Program enabled the Company to attract new senior management, including Dr. Carsten Breitfeld—a BMW AG veteran—as CEO and Robert A. Kruse, Jr.—who has over 30 years of experience at General Motors—as senior vice president, Product Execution (Engineering and Manufacturing). As a result, the Debtor now serves as the Chief Product and User Officer.

The members of FF Global (the "FF Global Members") consist of FF's senior executives who have subscribed to the units of FF Global and thus indirectly own equity interests in FF. Hence, the members are vested in the success of FF. Many, like Aydt, are long-term members of the FF team.  But all of the members are inspired by the Debtor's vision to create a next-generation mobility ecosystem and attracted to the opportunity to pursue a truly disruptive technology.

Although FF has fully developed the FF 91, the first production vehicle and flagship model, it cannot go into production and be delivered to end users without successful equity financing. FF aims to have an IPO within approximately 12 to 15 months following the conclusion of equity financing.  But these efforts to obtain equity financing stalled as the Debtor's financial condition worsened and aggressive creditors began to enforce foreign judgments against the Debtor in the US and execute those judgments against his US assets—consisting almost exclusively of his interests in

FF.  The uncertainty of the Debtor's continued economic interest in FF and his leadership position effectively ended any interest in providing equity financing to FF.

Because FF's fate is tied to the success of the Debtor's chapter 11 case, the FF Global Members are eager for the Debtor to emerge from the chapter 11 process so that FF itself can procure equity financing, produce the FF 91, and eventually succeed.  It is for this reason that the FF Global Members, through PTH, provided prepetition secured financing to the Debtor in the amount of $2,687,629 and why the FF Global Members have agreed to provide the DIP financing by making further capital contributions to PTH.  Upon the request from FF Global, the FF Global Members have agreed to make capital contributions to FF from their personal funds.

As noted above, the Committee conditioned its agreement to the term sheet for the Consensual Plan on the Debtor obtaining satisfactory DIP Financing from PTH. During mediation and the weeks following, the Debtor and the Committee, on one hand, and PTH, on the other, participated in extensive negotiations of DIP financing. On February 25, 2020, such negotiations culminated in an agreement on the terms of a DIP Note to be funded by PTH, largely through contributions by the FF Global Members, who agreed to provide additional advances for a total of $6.4 million.

## IV.

## SPECIFIC NEED FOR FINANCING AND TERMS THEREOF

As more fully set forth herein and in the Declaration of Robert Moon (the "Moon Declaration") attached hereto, the Debtor requires the DIP Financing in order to permit, among other things, the payment of the Debtor's ongoing administrative obligations as a debtor in possession under chapter 11 of the Bankruptcy Code.  The Debtor does not have sufficient available resources  to pay budgeted and anticipated allowed professional expenses of the Debtor or the Committee without post-petition financing.  The Debtor's ability to pay these expenses is essential to the Debtor's successful financial restructuring and confirmation of the Consensual Plan.

Moreover, as set forth in the Declaration of Matthias Aydt (the "Aydt Declaration") annexed hereto, FF's fate is tied to the success of the Debtor's chapter 11 case.  The FF Global Members – made up of highly-seasoned members of FF's executive team – are eager for the Debtor to emerge

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5

from the chapter 11 process so that FF itself can procure equity financing, produce the FF 91, and eventually succeed. It is for this reason that the FF Global Members, through PTH, provided prepetition financing to the Debtor in the amount of $2,687,629 and why the FF Global Members have agreed to provide, via PTH, the DIP financing. Upon the request from FF Global, the FF Global Members have agreed to make capital contributions to FF from their personal funds.

After a careful review of his financing options, the Debtor concluded that the DIP Lender's proposed terms would allow the Debtor to meet his goals and provide the Debtor with sufficient liquidity on the best available economic terms. The Debtor now seeks to move forward with the proposed DIP Note on the terms to be finalized in any order of this Court. The DIP Lender is unwilling to provide financing to the Debtor on an unsecured or subordinated basis.

The DIP Financing will be used to (i) pay allowed fees, costs and expenses associated with the DIP Note and by persons and firms retained pursuant to Sections 327, 328, 330, 363 and/or 1103 of the Bankruptcy Code by (a) the Debtor, and (b) the Committee; (ii) pay fees due from time to time pursuant to 28 U.S.C. § 1930; (iii) pay expenses listed in the *Cash Flow Projections for the 13 Week Period: 10/14/2019 through 1/6/2020* filed with the Bankruptcy Court (Docket No. 63) (the "Initial Cash Flow") and estimated fees and expenses to be incurred by the Debtor's general insolvency and special counsel listed in the *Debtor's Chapter 11 Status Report* (Docket No. 199) (the "Status Report"), and (iv) to otherwise use as operating cash flow for expenses similar to the expenses indicated in the Initial Cash Flow and Status Report covering a subsequent period, subject to DIP Lender's consent (with such consent not to be unreasonably withheld). There is no roll-up of the pre-petition secured loan made by PTH contemplated hereunder.

Accordingly, by this Motion, the Debtor seeks the entry of the Order (in the form attached hereto as **Exhibit "C"**), *inter alia*:

a.    authorizing the Debtor to obtain post-petition financing from PTH, consisting of that certain Secured Debtor-In-Possession Promissory Note (the "DIP Note"), in the form attached hereto as **Exhibit "A"**, by and among the DIP Lender and the Borrower to be used for the payment of Administrative Expenses as described herein and in the DIP Note, on the terms and conditions set forth in the Order;

6

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

b.      authorizing the Debtor to execute and enter into the DIP Note and to perform all such other and further acts as may be required in connection with the documents relating thereto;

c.      authorizing the Debtor to use proceeds of the DIP Note solely as expressly permitted in the DIP Note and in accordance with the terms of the Order;

d.      granting to the DIP Lender automatically perfected (i) first priority security interests in all of Borrower's right, title and interest in the Non-China Collateral (as defined in the DIP Note) upon which there are either pre-existing permitted senior liens or no pre-existing liens, to the extent provided herein, and granting superpriority administrative expense status (as defined below) and (ii) junior and subordinated security interest in all of Borrower's right, title and interest in the China Collateral;[6]

e.      authorizing the Debtor to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Note as such amounts become due and payable;

f.      vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Order and the DIP Note; and

g.      granting the Debtor such other and further relief as is just and proper.

## V.

## **MATERIAL TERMS OF FINANCING**

Pursuant to Bankruptcy Rules 4001 (b) and 4001(c), and Local Bankruptcy Rule 4001-2, the relevant provisions of the DIP Financing Agreement are as follows:[7]

| Term | Description |
|---|---|
| DIP Lender | Pacific Technology Holding LLC.  DIP Note, p. 1 |
| Borrower | Debtor |
| DIP Loan | The Debtor seeks authorization for a loan amount of $6,400,000 (the "<u>DIP Note</u>").  DIP Note, p. 1. |

---

[6] This security grant shall be subject in all respects to the Minute Order entered September 3, 2019 in Case No: 2:18-CV-10255 SJO (MRWx) in the United States District Court for the Central District of California (the "<u>Minute Order</u>"), attached to the DIP Note as **Exhibit 1** to the extent the Minute Order remains enforceable in light of the Chapter 11 Case and has not been avoided or disallowed therein.

[7]  The following chart summarizes the material terms and conditions of the DIP Note.  In the event of any inconsistency with the DIP Note, the terms and conditions of the DIP Note shall control.

| Term | Description |
|---|---|
| Use of Proceeds | The proceeds of the DIP Note shall be used to (a) pay allowed fees, costs and expenses associated with the DIP Note and by and by persons and firms retained pursuant to Sections 327, 328, 330, 363 and/or 1103 of the Bankruptcy Code by (i) Borrower and (ii) the Committee; (b) pay fees, cost and expenses from time to time pursuant to 28 U.S.C. § 1930; (c) pay expenses listed in the Cash Flow Projections for the 13 Week Period: 10/14/2019 through 1/6/2020 filed with the Bankruptcy Court (Dkt No. 63) (the "Initial Cash Flow") and the Debtor's Chapter 11 Status Report (Dkt No. 199); and (d) to otherwise use as operating cash flow for expenses similar to the expenses indicated in the Initial Cash Flow covering a subsequent period, subject to Lender's consent (such consent not to be unreasonably withheld).  Nothing herein shall in any way prejudice or prevent Lender from objecting to any request, motion or application in the Chapter 11 Case, including applications for compensation for services rendered or reimbursement of expenses. DIP Note, pp. 5-6. |
| Interest Rate | Simple interest at 8.75% per annum, paid-in-kind.  No fees.  DIP Note p. 2. |
| Default Interest | N/A |
| Security | A valid, continuing first priority security interest in all of Borrower's right, title and interest in the Non-China Collateral (as defined below) in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever the same may be located, in order to secure prompt, full, faithful and timely payment and performance of the obligations under the DIP Note, including without limitation all accrued and unpaid interest owing hereunder and any other obligations arising hereunder (including interest and other amounts that, but for the filing of a petition in bankruptcy with respect to Borrower, would accrue on such obligations, whether or not a claim is allowed against Borrower for such amounts in the related bankruptcy proceeding) (collectively, the "Obligations"), whether at stated maturity, acceleration or otherwise, together with all extensions or renewals thereof, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owned with others, and whether or not such Obligations under the DIP Note are from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such Obligations that are paid, to the extent all or any party of such payment is avoided or recovered directly or indirectly from DIP Lender as a preference, fraudulent transfer or otherwise. "Collateral" shall include all of Borrower's interests in all of the following types of personal property, wherever located and whether now owned or hereafter acquired, including any assets or obligations originating or relating to any property or entity (the "Collateral") and such Collateral located or domiciled in the United States, the Cayman Islands, or any place else in the world other than China (collectively, the "Non-China Collateral"):<br><br>(i)      all Accounts;<br><br>(ii)     all Chattel Paper;<br><br>(iii)    all Money and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts; |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:327777.7 46353/002

| Term | Description |
|---|---|
| | (iv)    all Documents; |
| | (v)    all General Intangibles (including membership interests and rights, whether owned directly or indirectly, whether such interests are deemed a General Intangible or a Security, and whether held in a domestic or foreign corporation, a domestic or foreign limited liability company, a domestic or foreign Ltd. including as recognized in the Cayman Islands (each such form of organization, an "Entity"), consisting of (a) all economic rights, including without limitation, all rights to share in the profits and losses of the Entity, and all rights to receive distributions of the assets of the Entity; and (b) governance rights, including without limitation, all rights to vote, consent to action and otherwise participate in management and direction of the Entity), Payment Intangibles and Software (for the avoidance of doubt, to the extent such General Intangibles are located or domiciled any place in the world other than China, such General Intangibles shall be considered "Non-China Collateral" and to the extent such General Intangibles are located or domiciled in China, such General Intangibles shall be considered "China Collateral" (as further defined below)); |
| | (vi)    all Goods, including Inventory, Equipment and Fixtures; |
| | (vii)    all Instruments; |
| | (viii)    all Investment Property; |
| | (ix)    all Letter-of-Credit Rights and other Supporting Obligations; |
| | (x)    all Records; |
| | (xi)    all Commercial Tort Claims; and |
| | (xii)    all Proceeds and Accessions with respect to any of the foregoing Collateral. |
| | Terms used, but not otherwise defined herein shall have the meaning set forth in Division 9 of the California Uniform Commercial Code in effect on the date hereof (the "UCC"). |
| | This security grant is subject in all respects to the Minute Order entered September 3, 2019 in Case No: 2:18-CV-10255 SJO (MRWx) in the United States District Court for the Central District of California (the "Minute Order"), attached to the DIP Note as Exhibit 1 to the extent the Minute Order remains enforceable in light of the Chapter 11 Case and has not been avoided or disallowed therein. |
| Carve-Out | Not Applicable |
| Events of Default | Customary events of default set forth in the DIP Note. |
| Remedies | Customary remedies set forth in the DIP Note not including relief from the automatic stay |
| Waivers | Customary waivers, including the modification of the automatic stay in connection with the DIP Lender's enforcement of remedies following an |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

9

| Term | Description |
|------|-------------|
|  | Event of Default, *limited* to the Debtor's consent to an Application to Shorten Notice for a Motion for Relief from Stay |
| Governing Law | California and as to potential international law, the laws of the United States of America. |

## VI.

## STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 4001-2

Pursuant to Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-2(a), the Debtor is concurrently herewith filing the mandatory form 4001-2 for cash collateral and/or debtor-in-possession financing motions or stipulations.

## VII.

## BASIS FOR RELIEF

### A.    The Debtor Should be Permitted to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code

Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that debtors seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).

In evaluating proposed post-petition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.    the credit transactions are necessary to preserve assets of the estate;

c.    the terms of the credit agreement are fair, reasonable, and adequate;

d.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

e.    the proposed financing agreement adequately protects the pre-petition secured parties.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

For the reasons discussed below, the Debtor satisfies the standards required to obtain post-petition financing in this case on a secured basis as to the Collateral under sections 364(c) (2), and (3) of the Bankruptcy Code.

**B.      The DIP Lender is an Affiliate of the Debtor**

PTH is a Delaware limited liability company.  As noted above, through West Coast, the Debtor indirectly owns the economic rights of 100% of the preferred membership units in PTH that entitles him to a priority distribution and thereafter a residual distribution based on his 20% interest in PTH.  As discussed above, the FF Global Members and the managing members of PTH are funding the DIP financing to support the Debtor's chapter 11 case.

**C.      The Debtor Was Unable to Obtain Financing on More Favorable Terms**

Under current circumstances, the Debtor is not able to obtain alternative financing from outside parties on an unsecured or junior secured basis.

The DIP Lender offered the best – indeed the only – available economic proposal under the circumstances.  Notwithstanding PTH's interest in seeing the Debtor successfully reorganize, the DIP Lender is unwilling to lend to the Debtor except on a fully secured and first priority basis as to the Collateral.

The Debtor respectfully submits that his efforts to obtain post-petition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code.  *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**D.      The Proposed Financing is Necessary to both Preserve and Maximize the Value of the Debtor's Estate**

The Debtor seeks to use the proceeds of the DIP Loan in order to allow the Debtor to complete a restructuring via the Consensual Plan.  The DIP Loan represents the best and only known source of funding to support this chapter 11 case.  The Debtor requires the DIP Financing in order to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    permit, among other things, the payment of the Debtor's ongoing administrative obligations as a

2    debtor in possession under chapter 11 of the Bankruptcy Code, a critical element required for

3    demonstrating the feasibility of the proposed Consensual Plan.

4         Without access to the DIP Loan, the Debtor will face irreparable damage to the Debtor's

5    efforts to maximize the value of his estate for the benefit of all constituents. Accordingly, the

6    Debtor strongly urges the Court to authorize the DIP Loan on the terms contemplated herein.

7    **E.    The Terms of the Proposed Financing are Fair, Reasonable, and Appropriate**

8         In considering whether the terms of post-petition financing are fair and reasonable, courts

9    consider the terms in light of the relative circumstances of both the debtor and the potential lender.

10   *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured*

11   *Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil*

12   *Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire

13   funds).

14        The Consensual Plan, which is only made possible by the DIP Loan, will result in an

15   agreement that is designed to permit the Debtor to maximize the value of his assets and to effectuate

16   an orderly restructuring process. The terms of the borrowing itself are non-controversial and provide

17   PTH with standard rights and remedies for DIP financing of this nature. The Debtor submits that the

18   proposed terms of the DIP Loan are fair, reasonable, and appropriate under the circumstances. *See,*

19   *e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th

20   Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from

21   every possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997)

22   (authorizing post-petition financing that would preserve the value of the debtor's assets).

23   **F.    Entry Into the Proposed Financing Reflects the Debtor's Sound Business Judgment**

24        A debtor's decision to enter into a post-petition lending facility under section 364 of the

25   Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World Airlines,*

26   *Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del.

27   1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent

28   business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

12

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business

2   judgment).

3       Bankruptcy courts routinely accept a debtor's business judgment on many business decisions,

4   including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P.*

5   *& Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of

6   leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.,* 47 B.R. 444, 449

7   (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").

8   Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions]

9   would slow the administration of the debtor's estate and increase its cost, interfere with the

10   Bankruptcy Code's provision for private control of administration of the estate, and threaten the

11   court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d

12   1303, 1311 (5th Cir. 1985).

13       Bankruptcy courts generally will defer to a debtor in possession's business judgment

14   regarding the need for and the proposed use of funds, unless such decision is arbitrary and

15   capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans*

16   *World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based

17   facility based upon prudent business judgment of the debtor), and generally will not second-guess a

18   debtor in possession's business decisions involving "a business judgment made in good faith, upon a

19   reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at

20   513-14 (footnotes omitted).

21       Here, the Debtor has not been able to identify any party willing to lend to the Debtor and

22   certainly not on terms as favorable as those offered by PTH.  It is undeniable that the Debtor's business

23   judgement to enter into the DIP Loan should be approved under these difficult circumstances where no

24   comparable fund source exists.

25       For the reasons set forth above, the Debtor's sound business judgment clearly supports

26   approval of the DIP Loan in order to allow the Debtor to gain access to needed financing and thereby

27   maximize value for all constituents through this restructuring process.

28

13

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**G.      PTH is Entitled to a Finding of that it has Extended Credit to the Debtor in Good Faith Pursuant to Bankruptcy Code Section 364(e).**

While PTH is an affiliate of the Debtor based on the indirect and minority 20% interest held by the Debtor's nominee, PTH is nonetheless entitled to a good faith finding.  All parties to the case have negotiated with the Debtor, through the Debtor's professionals, since the Petition Date (on in the case of the Committee, since its appointment) knowing that the only source of financing for the chapter 11case would be from PTH.  This was disclosed and stated in filings as early as November 15, 2019, including in the Debtor's "Amended Disclosure Statement with Respect to Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code." *See* Dkt. 94, p. 34.  Indeed, $1,250,000 of the proposed DIP Loan was advanced by PTH as follows: (i) initially $50,000 was wired into a trust account at Lowenstein Sandler LLP, counsel for the Committee, to cover expenses that the Committee incurred due to the November 2019 visit to FF's facilities in Gardena, California; (ii) $450,000 was wired into the same trust account on December 2, 2019, to support the Committee's due diligence efforts and, (iii) $750,000 was wired into the same trust account on December 20, 2019, to support the Committee's further investigation of the Debtor's financial affairs.

At all material times, the Committee has been aware that the financing for the case would be advanced by PTH, and the terms on which it would be advanced, which is reflected in the DIP Note. The DIP Note is not over-reaching.  The interest rate is not excessive (8.75%).   It does not provide for automatic relief from stay upon a Default (as defined in the Note), but rather only consent by the Debtor (and not by the Committee) to a hearing on shortened notice with respect to a motion for relief from stay.

Transactions between a debtor in possession and an affiliate are subject to a heightened "inherent fairness" standard of review.  *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *see also Official Comm. of*

14

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Unsecured Creditors of Enron Corp. v. Enron Corp (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b)."); *Gavin v. Tousignant (In re Ultimate Escapes Holdings, LLC)*, No. 12-50849 (BLS), 2014 WL 5861765, at *9 (Bankr. D. Del. Nov. 12, 2014) (entire fairness must be proven where independence of decision making is at risk due to "extraneous considerations or influences).    Here, given the need for the financing, and its expected treatment under the Consensual Plan, the DIP Loan satisfies the inherent fairness standard.

## VIII.

## NOTICE

The Debtor has provided notice of this Motion to the following parties, or their counsel, if known:  the Office of the United States Trustee; counsel for the DIP Lender; counsel for the Committee; any party of record that has asserted a lien in the Debtor's assets; and all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  A copy of the motion is also available on the Debtor's case website at https://dm.epiq11.com/YT1. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## IX.

## CONCLUSION

The Debtor requires access to the DIP Note proceeds in order for the Debtor to have sufficient liquidity to conduct his chapter 11 case, pay budgeted expenses and provide funding for estate professionals and establish, in part, the ability to confirm the Consensual Plan by satisfying allowed administrative priority claims.  Accordingly, the Debtor strongly urges the Court to authorize the Debtor to borrow pursuant to the DIP Note on the terms contemplated herein and the accompanying Order.

Based upon the foregoing, the Debtor requests entry of the Order under sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2: (a) authorizing the Debtor to incur post-petition debt and enter into the DIP Note, (b) granting liens and superiority claims in favor of the DIP Lender, (c) authorizing the Debtor to pay the

principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Note as such amounts become due and payable, (d) modifying the automatic stay, (e) making a finding of good faith pursuant to Section 364(e), and (f) granting related relief.

Dated:  February 27, 2020                    PACHULSKI STANG ZIEHL & JONES LLP


By: */s/ Jeffrey W. Dulberg*
                              Richard M. Pachulski
                              Jeffrey W. Dulberg
                              Malhar S. Pagay

                              Attorneys for Debtor and
                              Debtor in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DECLARATION OF ROBERT MOON

I, Robert Moon, under penalty of perjury, declare as follows:

1.      I am the managing member of PQBDN, the financial advisor for debtor, Yueting Jia. I submit this Declaration (the "Declaration") in support of the *Motion For Order (A) Authorizing Debtor In Possession to (I) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§105, 362, 363, and 364, and (II) Granting Liens and Superpriority Claims to Post-petition Lender Pursuant to 11 U.S.C. §364; and (B) Modifying Automatic Stay Pursuant to 11 U.S.C. §§361, 362, 363, and 364* (the "DIP Motion").  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor, or my opinion based on my experience with the Debtor's operations and financial condition.  In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor, I have relied upon these employees accurately recording, preparing, or collecting such documentation and other information.

2.      The Debtor commenced this case in order to restructure over $3.7 billion in debt, the overwhelming majority of which arose from obligations he guaranteed to support his businesses, including Faraday Future (the "Company" or "FF"), a global technology company engaged in the development of next-generation mobility ecosystems.  To that end, he is pursuing court approval of a plan of reorganization ("Consensual Plan") that will allow him both to address creditors' claims and eliminate uncertainty about the ownership of the Company with the goal of placing the company in a stronger position to obtain financing for future competitive and strategic initiatives.

3.      Attached hereto as **Exhibit "A"** is a true and correct copy of the DIP Note.  The Debtor requires the proceeds of the DIP Note to permit, among other things, the payment of the Debtor's ongoing administrative obligations as a debtor in possession under chapter 11 of the Bankruptcy Code.  The Debtor does not have sufficient available resources to pay budgeted and anticipated allowed professional expenses without post-petition financing.  The Debtor's ability to pay these expenses and others in accordance with his budget is essential to the Debtor's successful financial restructuring and confirmation of his proposed Consensual Plan.  The DIP Note presents

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the estate with the best economic terms available and provides the Debtor with adequate liquidity to satisfy ongoing administrative expenses associated with this chapter 11 case.

4.      The DIP Note proceeds will be used to (i) pay allowed fees, costs and expenses associated with the DIP Note and by and by persons and firms retained pursuant to Sections 327, 328, 330, 363 and/or 1103 of the Bankruptcy Code by (a) the Debtor, and (b) the Committee; (ii) pay fees due from time to time pursuant to 28 U.S.C. § 1930; (iii) pay expenses listed in the *Cash Flow Projections for the 13 Week Period: 10/14/2019 through 1/6/2020* filed with the Bankruptcy Court (Docket No. 63) (the "Initial Cash Flow") and estimated fees and expenses to be incurred by the Debtor's general insolvency and special counsel listed in the *Debtor's Chapter 11 Status Report* (Docket No. 199) (the "Status Report"), and (iv) to otherwise use as operating cash flow for expenses similar to the expenses indicated in the Initial Cash Flow and Status Report covering a subsequent period, subject to DIP Lender's consent (with such consent not to be unreasonably withheld). There is no roll-up of the pre-petition secured loan made by the DIP Lender (as defined below) contemplated hereunder.

5.      Faced with approximately $3.7 billion in debt claims and competing lawsuits from creditors in the Peoples' Republic of China ("China") and the United States, the Debtor commenced an out-of-court exchange offer, backed by a prepackaged plan of reorganization (the "Plan"), which offered to exchange any and all rights related to the debt claims for a number of interests in a liquidating trust that will hold all of Debtor's legally recognized personal assets (other than those assets that have been frozen or seized in China), including his interests in the Company.  Due to increased pressure by a tiny minority of the Debtor's creditors, and to avoid a race to the courthouse, the Debtor determined it was in the best interests of all his creditors to terminate the exchange offer and file the chapter 11 case to implement the restructuring through the Plan.  The Debtor subsequently reset hearings related to confirmation of the Plan and intends to seek confirmation of a the Consensual Plan following negotiations with the Committee.

6.      Prior to the Petition Date, the Debtor recognized a need for outside financing and began the process of considering potential funding sources.  The Debtor, through his advisors, discussed with various third parties the opportunity to provide financing to the Debtor, but no

2

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

alternative funding proposals were provided to the Debtor.  Separately, the Debtor's professionals requested the Committee's professionals to ascertain whether an alternative source of financing might be available on preferable terms.  PTH was ultimately found to be the only source of DIP financing available to the Debtor.

7.    After a careful review of his financing options, the Debtor concluded that the DIP Lender's proposed terms would allow the Debtor to meet his goals and provide the Debtor with sufficient liquidity on the best available economic terms.  The Debtor now seeks to move forward with the proposed DIP Note on the terms to be finalized in any order of this Court.  The DIP Lender is unwilling to provide financing to the Debtor on an unsecured or subordinated basis.

8.    PTH is a Delaware limited liability company.  I am informed and believe that through West Coast, the Debtor indirectly owns the economic rights of 100% of the preferred membership units in PTH that entitles him to a priority distribution and thereafter a residual distribution based on his 20% interest in PTH.   As discussed above, the FF Global Members and the managing members of PTH are funding the DIP financing to support the Debtor's chapter 11 case.

9.    In connection with the mediation ordered by this Court, the Debtor and the Committee reached agreement on the terms of both the DIP financing sought to be approved in this Motion (the "DIP Financing") and the terms of a chapter 11 plan of reorganization supported by the Committee (the "Consensual Plan").  A true and correct copy of the Consensual Plan terms sheet containing the key terms of the Consensual Plan is attached hereto as **Exhibit "B"**.  Both the DIP Financing and the Consensual Plan are the result of many weeks of constructive arm's length diligence and negotiations by the Debtor, the Committee, and their respective professionals.

10.    Soon after the appointment of the Committee, the Debtor and the Committee began discussing the path to a consensual plan of reorganization and a potential source of DIP Financing. The Committee repeatedly emphasized to the Debtor that an investigation into potential claims by the estate and a financial analysis of FF require sufficient funding earmarked for the Committee.  In fact, the Committee conditioned its willingness to negotiate a consensual plan upon receiving such funding in an escrow account.  Initially, PTH wired $50,000 into a trust account at Lowenstein

3

Sandler, counsel for the Committee, to cover expenses that it incurred in the November 2019 visit to FF's facilities in Gardena, California.

11. On December 2, 2019, PTH placed an additional $450,000 in the trust account on the same terms to support the Committee's due diligence efforts and, more importantly, to pursue a consensual plan for the benefit of the entire creditor body

12. The Debtor and the Committee continued intense negotiations over these issues and, prior to the January 23, 2020 status conference, the Debtor agreed to the Committee's desired due diligence process and populated data rooms with documents responding to the Committee's numerous requests. PTH also placed an additional $750,000 into the same trust account to facilitate the Committee's understanding of the chapter 11 case and an investigation of potential causes of action controlled by the estate. In connection with the Committee's investigation, the Debtor facilitated a series of interviews by Lowenstein and Alvarez & Marsal (the Committee's financial advisor) of management members of the FF Group. In addition, the Debtor participated in a two-day confidential deposition by the Committee and an individual member of the Committee, where he provided information regarding, among other things, his involvement in any alleged transactions that may be subject to chapter 5 actions.  Lastly, the Debtor's advisors met on several occasions with the Committee's advisors to discuss the various transactions in detail.

13. As reflected in the Committee's Reservation of Rights filed prior to the January 23, 2020, status conference, the Debtor and the Committee had resolved most of their differences, with only a handful of potential issues remaining.  In accordance with the Court's mediation order, the Debtor, the Committee, and other creditors including Shanghai Lan Cai Asset Management Co., Ltd.) and Shanghai Qichengyueming Investment Partnership mediated before Judge Mitchel Goldberg (ret.) during the week of February 3, 2020. At the end of the mediation sessions, the Debtor and the Committee reached an agreement on the material terms of the Consensual Plan. The Committee conditioned its agreement to the Consensual Plan on the implementation of DIP financing to be provided by PTH. The Debtor and the Committee, on one hand, and PTH, on the other, participated in extensive negotiations of DIP financing. On February 24, 2020, such negotiations culminated in an agreement on the terms of a DIP Note to be funded by PTH, largely

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

through contributions by the FF Global Members, who agreed to provide an additional $5.15 million for a total of $6.4 million.

14.    While PTH an affiliate of the Debtor, based on the indirect, and minority 20% interest held by the Debtor's nominee, PTH is nonetheless entitled to a good faith finding.  All parties to the case have negotiated with the Debtor, through its professionals since the Petition Date (on in the case of the Committee, since its appointment) knowing that the only source of financing for the chapter 11 case would be from PTH.  Indeed, $1,250,000 of the proposed DIP Loan was advanced by PTH as follows: $500,000 on December 2, 2019, and $750,000 on December 20, 2019, and has been held in the client trust account of Lowenstein Sandler, LLP,  counsel to the Official Unsecured Creditors Committee (the "Committee").  At all material times, the Committee has been aware that the financing for the case would be advanced by PTH, and the terms on which it would be advanced, which is reflected in the DIP Note.   The DIP Note is not over-reaching.  The interest rate is not excessive (8.75%).  It does not provide for automatic relief from stay upon a Default (as defined in the Note), but rather only consent by the Debtor (and not by the Committee) to a hearing on shortened notice with respect to a motion for relief from stay.

15.    Under current circumstances, the Debtor is not able to obtain alternative financing from outside parties on an unsecured or junior secured basis.

16.    The DIP Lender offered the best – indeed the only – available economic proposal under the circumstances.  The DIP Lender is unwilling to lend to the Debtor except on a fully secured and first priority basis as to the Collateral.

17.    The Debtor seeks to use the proceeds of the DIP Loan in order to allow the Debtor to complete a restructuring via the Consensual Plan.  The DIP Loan represents the best and only known source of funding to support this chapter 11 case.

18.    Without access to the DIP Loan, the Debtor will face irreparable damage to the Debtor's efforts to maximize the value of his estate for the benefit of all constituents.  Accordingly, the Debtor strongly urges the Court to authorize the DIP Loan on the terms contemplated herein.

DOCS_LA:327777.7 46353/002

1        I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true

2  and correct to the best of my information, knowledge and belief.

3  Dated: February 26, 2020

4                                     Robert Moon

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6

DOCS_LA:327777.3 46353/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DECLARATION OF MATTHIAS AYDT

I, Matthias Aydt, under penalty of perjury, declare as follows:

1.      I am the Senior Vice President of Product Definition and Business Development at Faraday Future (the "Company" or "FF"), and I serve as President, Secretary, and Treasurer of FF Global Partners LLC ("FF Global").

2.      I submit this Declaration (the "Declaration") in support of the *Motion For Order (A) Authorizing Debtor In Possession to (I) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§105, 362, 363, and 364, and (II) Granting Liens and Superpriority Claims to Post-petition Lender Pursuant to 11 U.S.C. §364; and (B) Modifying Automatic Stay Pursuant to 11 U.S.C. §§361, 362, 363, and 364* (the "DIP Motion").  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor, or my opinion based on my experience with the Debtor's operations and financial condition.  In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor, I have relied upon these employees accurately recording, preparing, or collecting such documentation and other information.

3.      Through West Coast LLC, a Delaware limited liability company ("West Coast"), the Debtor indirectly owns the economic rights of 100% of the preferred membership units in Pacific Technology Holding LLC ("PTH" or the "DIP Lender") that entitles him to a priority distribution and thereafter a residual distribution based on his 20% interest in PTH. These economic rights are part of the key assets to be contributed to a liquidating trust (the "Trust") under the Debtor's consensual plan of reorganization (the "Consensual Plan"). FF Global Partners LLC ("FF Global"), the managing member of PTH, owns the remaining 80% of PTH.

4.      Key executives of the Company formed FF Global in connection with the adoption of the "Partnership Program"—an innovative corporate governance and management retention structure based on the Alibaba model. The implementation of the Partnership Program enabled the Company to attract new senior management, including Dr. Carsten Breitfeld—a BMW AG veteran—as CEO and Robert A. Kruse, Jr.—who has over 30 years of experience at General

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Motors—as Senior Vice President, Product Execution (Engineering and Manufacturing). As a result, the Debtor now serves as FF's Chief Product and User Officer.

5.      The members of FF Global (the "FF Global Members") consist of FF's senior executives who have subscribed to the units of FF Global and thus indirectly own equity interests in FF. Hence, the members are vested in the success of FF. Many, like myself, are long-term members of the FF team. All of the members are inspired by the Debtor's vision to create a next-generation mobility ecosystem and attracted to the opportunity to pursue a truly disruptive technology.

6.      Although FF has fully developed the FF 91, the first production vehicle and flagship model,[8] it cannot go into production and be delivered to end users without its own successful equity financing. FF aims to have an IPO within approximately 12 to 15 months following the conclusion of equity financing.  But these efforts to obtain equity financing stalled as the Debtor's financial condition worsened and aggressive creditors began to enforce foreign judgments against the Debtor in the US and execute those judgments against his US assets—consisting almost exclusively of his interests in FF.  The uncertainty of the Debtor's continued economic interest in FF and his leadership position effectively ended any interest in providing equity financing to FF.

7.      Because FF's fate is tied to the success of the Debtor's chapter 11 case, the FF Global Members are eager for the Debtor to emerge from the chapter 11 process so that FF itself can procure equity financing, produce the FF 91, and eventually succeed.  It is for this reason that the FF Global Members, through PTH, provided prepetition financing to the Debtor in the amount of $2,687,629 and why the FF Global Members have agreed to provide the DIP financing.  Upon the request from FF Global, the FF Global Members have agreed to make capital contributions to FF from their personal funds.

8.      As noted above, the Debtor is pursuing his reorganization in order to revive FF's efforts to obtain financing. After he filed for bankruptcy protection, some of the potential financing sources perceived his chapter 11 case as a positive development, but others who are less familiar with the chapter 11 process did not. Even those who viewed it positively have taken a "wait and see"

---

[8] Digital Trends named the FF 91 as one of the best vehicles at the 2020 Consumer Electronics Show. *See* https://www.digitaltrends.com/cars/faraday-future-ff91-electric-vehicle-first-drive-features-price-photos-video-release-date-ces-2020/

2

approach. Despite the Debtor and FF's management's continued assurance of transparency and progress, unanticipated delay in the reorganization process, and unsubstantiated allegations in certain pleadings by the Debtor's judgment creditors have created confusion and made it increasingly difficult for the potential financing sources to commit to any equity financing. Furthermore, FF itself is increasingly struggling with liquidity due to the lack of financing.

9.      At this time, leading bankers for the electric vehicle industry are awaiting the announcement of the Consensual Plan before commencing their internal process to evaluate equity financing for FF. Following the announcement, it is urgent that the Debtor moves forward in the plan confirmation process as expeditiously as possible. Potential investors are reluctant to expend resources on due diligence or structuring of the financing until they are relatively confident that the Debtor will successfully emerge from the chapter 11 process.

10.      FF has been struggling with liquidity issues for the past two years, resulting from Evergrande's withdrawal of its commitment to provide the full $2 billion investment— originally intended for moving the FF 91 to the production stage. FF has been subsisting on bridge financing and cost-cutting measures, including a company-wide 20% payroll reduction in 2018. While continued delay has exacerbated FF's liquidity crisis, FF has looked to FF Global for support to fund FF's payroll. The FF Global Members, who have provided crucial funding support and are currently providing the DIP financing, are not deep-pocketed and only have limited resources. If FF has to close down due to the delay in confirming the Consensual Plan, the loss of extraordinarily talented executives would be inevitable and the financing sources would have to fund any effort to attract new talents. As a result, it would become impracticable, if not impossible, to convince the various interested parties to provide the equity financing to FF.

11.      Because potential financing sources are unwilling to invest in the diligence process without witnessing further progress in the chapter 11 case, the announcement of the Consensual Plan is the first step for FF to obtain financing. By establishing the Trust and demonstrating the Debtor's continued commitment to and alignment with the success of FF, the Consensual Plan will restore stability to FF's capital structure. But if the Consensual Plan cannot become effective by the end of May, it is unclear whether FF will be able to manage its liquidity or find bridge financing to continue

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3

1   its own operations so that it can be in a position to pursue the equity financing needed for the launch

2   of the FF 91.

3       12.     While PTH is an affiliate of the Debtor based on the indirect and minority 20%

4   interest held by the Debtor's nominee, PTH is nonetheless entitled to a good faith finding. All

5   parties to the case have negotiated with the Debtor, through the Debtor's professionals, since the

6   Petition Date (on in the case of the Committee, since its appointment) knowing that the only source

7   of financing for the chapter 11 case would be from PTH. Indeed, $1,250,000 of the proposed DIP

8   Loan was advanced by PTH as follows: (i) initially $50,000 was wired into a trust account at

9   Lowenstein Sandler LLP, counsel for the Committee, to cover expenses that the Committee incurred

10  due to the November 2019 visit to FF's facilities in Gardena, California; (ii) $450,000 was wired

11  into the same trust account on December 2, 2019, to support the Committee's due diligence efforts

12  and, (iii) $750,000 was wired into the same trust account on December 20, 2019, to support the

13  Committee's further investigation of the Debtor's financial affairs. At all material times, the

14  Committee has been aware that the financing for the case would be advanced by PTH, and the terms

15  on which it would be advanced, which is reflected in the DIP Note. The DIP Note is not over-

16  reaching. The interest rate is not excessive (8.75%). It does not provide for automatic relief from

17  stay upon a Default (as defined in the Note), but rather only consent by the Debtor (and not by the

18  Committee) to a hearing on shortened notice with respect to a motion for relief from stay.

19      I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true

20  and correct to the best of my information, knowledge and belief.

21  Dated: February 27, 2020

22                                          Matthias Aydt

23

24

25

26

27

28

# EXHIBIT A

## SECURED DEBTOR IN POSSESSION PROMISSORY NOTE

$6,400,000.00                                                    February 27, 2020

FOR VALUE RECEIVED, the undersigned, Yueting Jia, an individual and resident of California ("**Borrower**"), as debtor and debtor-in-possession in the Chapter 11 Case (as defined below) hereby promises to pay to the order of Pacific Technology Holding LLC, a Delaware limited liability company ("**Lender**"), the principal amount equal to the aggregate amount of the Advances (as defined below) made by Lender to Borrower from time to time together with interest accrued on the unpaid principal amount of this secured promissory note (this "**Note**"), payable as provided herein.  This Note is issued in connection with the filing by Borrower on October 14, 2019 (the "**Petition Date**") of a voluntary petition for relief, under 11 U.S.C. §§ 101 et seq. (as now and hereafter in effect, or any successor statute, the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") (such proceeding being administered under Case No. 19-24804 is hereinafter referred to as the "**Chapter 11 Case**"). Borrower continues to manage his estate and assets as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

To evidence Borrower's obligation to repay the Advances (as defined below), Borrower has authorized the issuance of this Note in the aggregate principal amount of the Advances.  Provided that no Event of Default (as defined below) has occurred and is continuing, Lender agrees to loan to Borrower advances under this Note (the "**Advances**" and each, an "**Advance**") in accordance with the following schedule (the "**Advance Schedule**"):

| | |
|---|---|
| Entry of the Borrowing Order (as defined below) (such Advance, the "**Initial Advance**") | $    $1,400,000 |
| Five (5) business days after entry of the Borrowing Order | $    $1,250,000 |
| Earlier of five (5) business days after approval of a disclosure statement for the Chapter 11 Plan (as defined below) for Borrower and March 31, 2020 | $    $1,750,000 |
| Earlier of nine (9) days prior to the hearing confirming the Chapter 11 Plan and April 30, 2020 | $    $1,500,000 |
| Two (2) days after entry of the order confirming the Chapter 11 Plan | $    $500,000 |

With respect to the Initial Advance, Lender's obligation to make $1,250,000 of such Initial Advance shall be satisfied directly by Lender's funds in the amount of $1,250,000 currently held in the client trust account of Lowenstein Sandler LLP, which funds shall constitute an Advance

1

hereunder upon entry of the Borrowing Order and shall be automatically authorized to be released from time to time solely for the payment of allowed fees and expenses of the professionals retained by the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case. With respect to each other Advance, Lender shall wire such Advance to the client trust account of Pachulski Stang Ziehl & Jones LLP and such funds shall be automatically authorized to be released from time to time in accordance with the Borrowing Order.

ARTICLE I
TERMS OF PAYMENT

SECTION 1.01. <u>Payments</u>. Payment of the principal amount of this Note or, if less, the aggregate outstanding and unpaid principal amount of this Note and any other outstanding Obligations required to be paid hereunder shall be made on the earlier of (a) July 1, 2020 and (b) the effective date (the "**Effective Date**") of the Borrower's plan of reorganization under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Plan**") that is confirmed pursuant to an order entered by the Bankruptcy Court (the "**Maturity Date**"); <u>provided</u> that in the event any unpaid principal or other Obligations (as defined in Section 4.01) under this Note are not repaid on the Effective Date, the Maturity Date (solely with respect to such unpaid principal or other Obligations) shall automatically be extended for one year from the Effective Date (the "**Extension Term**") so long as (i) all liens securing such loans remain perfected first priority liens on the Collateral, subject only to the liens securing the Trust Financing (as defined below) (ii) all Obligations continue to be obligations of the entity to which the Collateral is transferred, including the creditors' trust formed pursuant to the Chapter 11 Plan (the "**Creditors' Trust**") and (iii) the interest rate per annum shall be increased to twelve percent (12%) per annum. For the avoidance of doubt, all Available Funds (as defined below) shall be used to repay the unpaid principal or other Obligations under this Note on the Maturity Date and the unpaid principal or other Obligations remaining after such repayment shall be due and payable during the Extension Term. The principal on this Note is payable in lawful money of the United States in immediately available funds at such place as Lender may from time to time designate in writing to Borrower. Whenever any payment hereunder shall be stated to be due on a day other than a business day, such payment shall be made on the next succeeding business day, and such extension of time shall in such case be included in the computation of payment of interest.

SECTION 1.02. <u>Prepayments</u>.

(a) Commencing on the Effective Date, this Note is subject to mandatory prepayment pursuant to Section 1.02(b). The Creditor's Trust may, on any business day, prepay the then outstanding principal amount of this Note in whole or in part, together with accrued interest to the date of such prepayment on the principal amount prepaid without premium or penalty.

(b) The Creditors' Trust shall prepay the aggregate outstanding unpaid principal amount of this Note, in whole or in part, solely with any proceeds of the financing for the Creditors' Trust, whether obtained on the Effective Date or during the Extension Term, in excess of (1) $1,500,000 required to fund the Creditors' Trust (the "**Trust Financing**") and (2) the amount necessary to make payments required to be made in connection with the Chapter 11 Plan (such excess amount, the "**Available Funds**"). For the avoidance of doubt, neither the $1,500,000 of the Trust Financing nor any of the amounts due and/or actually paid from Wei Gan to the Creditor Trust pursuant to the Plan shall constitute Collateral or be used to pay any amounts owing under this Note.

2

SECTION 1.03. <u>Interest</u>. Interest shall accrue on the outstanding principal amount of this Note at a rate per annum equal to 8.75%. Interest shall be payable in arrears on the first business day of each calendar month commencing on the first such date to occur after the first Advance has been made by increasing the then aggregate principal amount of the Advances outstanding on such date by the amount of such accrued interest.

SECTION 1.04. <u>Computations</u>. All computations of interest shall be made on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable.

SECTION 1.05. <u>Super Priority Administrative Nature of Obligations</u>. All Obligations under this Note shall constitute allowed super-priority administrative expense claims in the Chapter 11 Case against Borrower; provided that such super-priority administrative expense claims shall not be payable from proceeds of any causes of action arising under Chapter 5 of the Bankruptcy Code or other similar state law. Except as expressly provided herein, all Obligations under this Note shall be secured by, and Borrower hereby grants, pursuant to Section 364(d)(1) of the Bankruptcy Code, priming liens on the Collateral (as defined below) of Borrower as of the Petition Date pursuant to this Note and any order of the Bankruptcy Court entered in the Chapter 11 Case after the hearing under Bankruptcy Rule 4001(e)(2) with any modifications thereto reasonably acceptable to Lender, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent or joinder of Lender (the "**Borrowing Order**"). All liens granted hereunder and under the Borrowing Order shall be deemed validly perfected against Borrower, Borrower's bankruptcy estate, any trustee appointed in the Chapter 11 Case (including any trustee appointed upon conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code), Borrower's successors and assigns and all creditors and parties in interest in the Chapter 11 Case, notwithstanding the discharge of Borrower pursuant to Section 1141 of the Bankruptcy Code, the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Chapter 11 Case or any subsequent Chapter 7 case or the release of any Collateral. The liens created in this Note shall remain valid and perfected without the necessity that Lender file financing statements, make recordings on real property records or otherwise perfect its liens under applicable law. Notwithstanding the foregoing, Lender may file financing statements and make recordings on real property records to evidence the liens granted hereunder, and Borrower shall cooperate with Lender in signing such documents as Lender may reasonably require to make such filings.

ARTICLE II
EVENTS OF DEFAULT

SECTION 2.01.        <u>Events of Default</u>. If any of the following events ("**Events of Default**") shall occur and be continuing:

(a)        Borrower shall fail to pay all or any part of the principal when due, or shall fail to pay any installment of interest or other amount payable hereunder within three (3) business days of the date when due; or

3

(b)    Borrower shall fail to perform or observe any other term, covenant or agreement contained in this Note other than any such term referred to in any other subsection of this Section 2.01 on his part to be performed or observed and such default shall not have been remedied or waived within ten (10) days after the occurrence thereof;

(c)    any representation or warranty made by Borrower in this Note shall be false or misleading; or

(d)    (i) the entry of an order which has not been withdrawn, dismissed or reversed (A) authorizing Borrower in the Chapter 11 Case to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code, or authorizing any person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (except as provided in any Borrowing Order) authorizing the use of cash collateral without Lender's prior written consent under Section 363(c) of the Bankruptcy Code; (B) appointing an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case; (C) without the prior written consent of Lender, dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (D) the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a lien on any portion of the Collateral or on any other property or assets of Borrower having a fair market value in excess of $5,000,000 or (2) with respect to any lien of, or the granting of any lien on any Collateral or any other property or assets of Borrower to, any State or local environmental or regulatory agency or authority; (E) amending, supplementing, staying, reversing, vacating or otherwise modifying any Borrowing Order, this Note or Lender's rights, benefits, privileges or remedies under any Borrowing Order or this Note; (F) without the prior written consent of Lender, filing the Chapter 11 Plan for Borrower or any modification thereto; (G) consolidating or combining Borrower with any other person except pursuant to a confirmed plan of reorganization with the prior written consent of Lender as contemplated in the plan of reorganization; (H) approving, or there shall arise, any other super-priority administrative expense claim (other than those specifically referred to in Section 1.05) having any priority over the super-priority administrative expense priority of the Obligations in respect of the Chapter 11 Case; or (I) confirming the Chapter 11 Plan for Borrower that does not provide for the payment in full in cash of the Obligations on the effective date of such plan; or (ii) the filing by Borrower of a motion, application or other petition to effect or consent to any order referred to in the foregoing clause (i); or

(e)    (i) one or more judgments or orders as to post-Petition Date liability or indebtedness in excess of $50,000 shall be entered against Borrower not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage and either (A) enforcement proceedings shall have been commenced and shall be continuing by any creditor upon such judgment or orders or (B) there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgments or orders, by reason of a pending appeal or otherwise, shall not be in effect; or (ii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against Borrower which could reasonably be expected to result in a material adverse effect and there shall be any period of ten (10) consecutive days during which a stay of enforcement

4

of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

       (f)    at any time after the execution and delivery thereof; (i) this Note, for any reason other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void, (ii) Lender shall not have or shall cease to have a valid and perfected and unavoidable lien prior to all other perfected and unavoidable liens in any Collateral purported to be covered by this Note in either case for any reason other than the failure of Lender to take any action within its control, or (iii) Borrower shall contest the validity or enforceability of this Note or any provision thereof in writing or deny in writing that it has any further liability, including with respect to future advances by Lender, under this Note or any provision thereof to which it is a party;

**THEN** upon the occurrence and during the continuance of any Event of Default, Lender may declare (i) the unpaid principal amount of and accrued interest on this Note and (ii) all other Obligations immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower, and the same shall forthwith become, immediately due and payable, and any obligation of Lender to make this Note shall thereupon terminate.

Further upon the occurrence and during the continuance of any Event of Default, Borrower consents to and shall not object to Lender seeking a hearing on shortened notice for relief from the automatic stay and upon such relief, Lender may (i) exercise all rights and remedies of Lender set forth in this combined Note with grant of security interest, in addition to all rights and remedies allowed by, the United States and of any state thereof, including, but not limited to, the UCC. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative and not alternative.

Borrower waives, (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties or other property at any time held by Lender on which Borrower may in any way be liable and hereby ratify and confirm whatever Lender may lawfully do in this regard, (ii) subject to the notice and relief from stay provisions of the preceding paragraph, all rights to notice and hearing prior to Lender's taking possession or control of, or to Lender reply, attachment or levy upon, the Collateral, or any bond or security which might be required by any court prior to allowing Lender to exercise any of its remedies, and (iii) the benefit of all valuation, appraisal and exemption laws.  Borrower acknowledges it has been advised by counsel of his choice with respect to the effect of the foregoing waivers and this Note and the transactions evidenced by this Note.

ARTICLE III
USE OF PROCEEDS

       SECTION 3.01.  The proceeds of this Note shall be used to (a) pay allowed fees, costs and expenses associated with this Note and by and by persons and firms retained pursuant to Sections

5

327, 328, 330, 363 and/or 1103 of the Bankruptcy Code by (i) Borrower and (ii) the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Chapter 11 Case; (b) pay fees, cost and expenses from time to time pursuant to 28 U.S.C. § 1930; (c) pay expenses listed in the *Cash Flow Projections for the 13 Week Period: 10/14/2019 through 1/6/2020* filed with the Bankruptcy Court (Dkt No. 63) (the "**Initial Cash Flow**") and the *Debtor's Chapter 11 Status Report* (Dkt No. 199); and (d) to otherwise use as operating cash flow for expenses similar to the expenses indicated in the Initial Cash Flow covering a subsequent period, subject to Lender's consent (such consent not to be unreasonably withheld). Nothing herein shall in any way prejudice or prevent Lender from objecting to any request, motion or application in the Chapter 11 Case, including applications for compensation for services rendered or reimbursement of expenses.

ARTICLE IV
SECURITY GRANT

SECTION 4.01. Borrower hereby grants, pledges, assigns, transfers, hypothecates and sets over to Lender a valid, continuing first priority security interest in all of Borrower's right, title and interest in the Non-China Collateral (as defined below) in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever the same may be located, in order to secure prompt, full, faithful and timely payment and performance of the obligations under this Note, including without limitation all accrued and unpaid interest owing hereunder and any other obligations arising hereunder (including interest and other amounts that, but for the filing of a petition in bankruptcy with respect to Borrower, would accrue on such obligations, whether or not a claim is allowed against Borrower for such amounts in the related bankruptcy proceeding) (collectively, the "**Obligations**"), whether at stated maturity, acceleration or otherwise, together with all extensions or renewals thereof, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owned with others, and whether or not such Obligations under the Note are from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such Obligations that are paid, to the extent all or any party of such payment is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer or otherwise. "Collateral" shall include all of Borrower's interests in all of the following types of personal property, wherever located and whether now owned or hereafter acquired, including any assets or obligations originating or relating to any property or entity (the "**Collateral**") and such Collateral located or domiciled in the United States, the Cayman Islands, or any place else in the world other than China (collectively, the "**Non-China Collateral**"):

(i)      all Accounts;

(ii)      all Chattel Paper;

(iii)      all Money and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

(iv)      all Documents;

(v)      all General Intangibles (including membership interests and rights, whether owned directly or indirectly, whether such interests are deemed a General Intangible or a Security, and whether held in a domestic or foreign corporation, a domestic or foreign

limited liability company, a domestic or foreign Ltd. including as recognized in the Cayman Islands (each such form of organization, an "**Entity**"), consisting of (a) all economic rights, including without limitation, all rights to share in the profits and losses of the Entity, and all rights to receive distributions of the assets of the Entity; and (b) governance rights, including without limitation, all rights to vote, consent to action and otherwise participate in management and direction of the Entity), Payment Intangibles and Software (for the avoidance of doubt, to the extent such General Intangibles are located or domiciled any place in the world other than China, such General Intangibles shall be considered "Non-China Collateral" and to the extent such General Intangibles are located or domiciled in China, such General Intangibles shall be considered "China Collateral" (as further defined below));

    (vi)    all Goods, including Inventory, Equipment and Fixtures;

    (vii)    all Instruments;

    (viii)    all Investment Property;

    (ix)    all Letter-of-Credit Rights and other Supporting Obligations;

    (x)    all Records;

    (xi)    all Commercial Tort Claims; and

    (xii)    all Proceeds and Accessions with respect to any of the foregoing Collateral.

    Terms used, but not otherwise defined herein shall have the meaning set forth in Division 9 of the California Uniform Commercial Code in effect on the date hereof (the "**UCC**"). **This security grant is subject in all respects to the Minute Order entered September 3, 2019 in Case No: 2:18-CV-10255 SJO (MRWx) in the United States District Court for the Central District of California (the "Minute Order"), attached hereto and incorporated herein as <u>Exhibit B</u> to the extent the Minute Order remains enforceable in light of the Chapter 11 Case and has not been avoided or disallowed therein.**

    SECTION 4.02.    To the maximum extent permitted by applicable law, Borrower hereby grants, pledges, assigns, transfers, hypothecates and sets over to Lender a valid, continuing junior and subordinated security interest in all of Borrower's right, title and interest in the Collateral located in China (the "**China Collateral**") in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever the same may be located, in order to secure the Obligations, whether at stated maturity, acceleration or otherwise, together with all extensions or renewals thereof, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owned with others, and whether or not such Obligations under this Note are from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such Obligations that are paid, to the extent all or any party of such payment is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer or otherwise. **This security grant is subject in all respects to the Minute Order, attached hereto and incorporated herein as <u>Exhibit 1</u> to the extent the Minute Order remains enforceable in light of the Chapter 11 Case and has not been avoided or**

**disallowed therein.**

SECTION 4.03.    Borrower agrees that from time to time, at the expense of Borrower and solely with respect to the Non-China Collateral, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Lender may request, in order to perfect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, Borrower will, solely with respect to the Non-China Collateral:  (a) execute (if necessary) and file such financing or continuation statements, or amendments thereto, (b) execute and deliver, and cause to be executed and delivered, agreements establishing that Lender has control of the Investment Property of Borrower, and (c) execute and deliver such further instruments and take such further action as Lender may reasonably request to effect the intent and purposes hereof, to perfect and continue perfected Lender's security interests in the Collateral.  Borrower hereby authorizes Lender to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Non-China Collateral.

SECTION 4.04.    Solely with respect to the Non-China Collateral, Borrower hereby irrevocably appoints Lender as Borrower's attorney-in-fact, effective upon the occurrence and during the continuance of an Event of Default hereunder, with full authority in the place and stead of Borrower and in the name of Borrower, Lender or otherwise, from time to time in Lender's discretion, to take any action and to execute any instrument that Lender may deem necessary or advisable to accomplish the purposes of this Note, including, without limitation:

(i)    to obtain and adjust insurance required to be maintained by Borrower;

(ii)    to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(iii)    to receive, endorse and collect any drafts or other Instruments, Documents, Chattel Paper and other documents in connection with clauses (i) and (ii) above;

(iv)    to file any claims or take any action or institute any proceedings that Lender may deem necessary for the collection of any of the Non-China Collateral or otherwise to enforce or protect the rights of Lender with respect to any of the Non-China Collateral;

(v)    to pay or discharge liens levied or placed upon the Non-China Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by Lender in its reasonable discretion, any such payments made by Lender to become obligations of Borrower to Lender, due and payable immediately without demand;

(vi)    to sign and endorse any documents relating to the Non-China Collateral; and

(vii)    sell the Non-China Collateral at one or more public or private sales.

SECTION 4.05.    The powers conferred on Lender hereunder are solely to protect

8

its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Lender shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Lender accords its own property.

SECTION 4.06.    In addition to all other rights and remedies provided for herein or otherwise available to it and subject to the provisions set forth above in Section 2.01, including with respect to the automatic stay, Lender may exercise, solely in respect of the Non-China Collateral, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Non-China Collateral), and also may, to the extent applicable, (a) require Borrower to, and Borrower hereby agrees that he will at his expense and upon request of Lender forthwith, assemble all or part of the Non-China Collateral as directed by Lender and make it available to Lender at a place to be designated by Lender that is reasonably convenient to both parties, (b) subject to the rights of third parties, enter onto the property where any Non-China Collateral is located and take possession thereof with or without judicial process, (c) prior to the disposition of the Non-China Collateral, store, process, repair or recondition the Non-China Collateral or otherwise prepare the Non-China Collateral for disposition in any manner to the extent Lender deems appropriate, (d) subject to the rights of third parties, take possession of Borrower's premises or place custodians in exclusive control thereof, remain on such premises and use the same and any of Borrower's equipment for the purpose of completing any work in process, taking any actions described in the preceding clause (c) and collecting any Obligation, (e) sell the Non-China Collateral or any part thereof in one or more parcels at public or private sale, at any of Lender's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable, (f) exercise dominion and control over and refuse to permit further withdrawals from any Deposit Account maintained with Lender and provide instructions directing the disposition of funds in Deposit Accounts not maintained with Lender, and (g) provide entitlement orders with respect to security entitlements and other Investment Property constituting a part of the Non-China Collateral and, without notice to Borrower, transfer to or register in the name of Lender or any of its nominees any or all of the Non-China Collateral constituting Investment Property. Lender may be the purchaser of any or all of the Collateral at any such sale and Lender, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Non-China Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Non-China Collateral payable by Lender at such sale. Borrower hereby waives any claims against Lender arising by reason of the fact that the price at which any Non-China Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Non-China Collateral to more than one offeree. If the proceeds of any sale or other disposition of the Non-China Collateral are insufficient to pay all the Obligations, Borrower shall be liable for the deficiency and the reasonable fees of any attorneys employed by Lender to collect such deficiency.

SECTION 4.07.    Upon the unconditional satisfaction of the Obligations in full, (a) the security interest in the Collateral in favor of Lender granted hereby shall automatically terminate without any further action on the part of Borrower or Lender, and (b) Borrower and his

designees shall be authorized to file such terminations of such security interest as Borrower reasonably deems necessary, and Lender shall execute and deliver, at Borrower's expense, such further evidence of the termination or release of such security interest as Borrower may reasonably request.

ARTICLE V
REPRESENTATIONS AND
WARRANTIES

SECTION 5.01.    Borrower hereby represents and warrants to Lender that the following are true and accurate as of the date hereof and that each will be true and accurate as of each applicable date that any Advance is disbursed, in each case subject to, and upon entry of the Borrowing Order:

(a)    He has all requisite power, and legal capacity to execute and deliver this Note and to carry out and perform his obligations hereunder.

(b)    This Note, together with other related documents and filings, constitutes his legal, valid and binding obligations in accordance with its terms.

(c)    The execution, delivery and performance by Borrower of this Note, and the creation or perfection of the security interest in favor of Lender hereunder (i) does not and will not contravene, breach or violate any terms of any agreement, document, instrument or applicable Borrowing Order to which Borrower is a party or by which assets or properties of Borrower are bound, (ii) is not in violation or in default of any provision of national, federal or state statute, rule or regulation applicable to Borrower, or (iii) is not in violation or in default of any judgment, order, writ or decree (including, without limitation, the Bankruptcy Court).    The execution, delivery and performance of this Note by Borrower and the creation or perfection of the security interest in favor of Lender hereunder do not require any consent, waiver or approval under or give rise to any right of termination, amendment, acceleration or cancellation of any agreement, document or instrument to which Borrower is a party, except for the Bankruptcy Court.

(d) This Note and the Borrowing Order are effective to create in favor of Lender, a legal, valid and enforceable security interest in the Collateral and proceeds thereof, which shall constitute a fully perfected lien on, and security interest in, all right, title and interest of Lender in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other person.  Without limiting the foregoing, neither the filing of any UCC-1 financing statement nor the obtaining of "control" (as defined in the UCC) of Collateral is required to create or perfect any such security interest or lien. The Obligations shall, pursuant to the Borrowing Order, be secured by the liens on the Collateral, and such Borrowing Order, as entered and final, to be in forms reasonably acceptable to Lender.

1

## ARTICLE VI
## COVENANTS

SECTION 6.01.        So long as any Obligation shall remain unpaid or Lender shall have any Advances due hereunder, Borrower will not, without the written consent of Lender (consent not to be unreasonably withheld):

(a)    Liens, Etc.  Create or suffer to exist any lien upon or with respect to any of his assets or properties, whether now owned or hereafter acquired, or assign or grant a security interest in any right to receive income, in each case to secure any indebtedness or contingent obligation of any person, or apply to the Bankruptcy Court for the authority to do any of the foregoing, other than (i) liens in favor of Lender (A) pursuant to this Note or (B) authorized by the Borrowing Order; and (ii) liens in existence as of the Petition Date.

(b)    Indebtedness and Contingent Obligations.  Create or suffer to exist any indebtedness or contingent obligations other than ordinary course obligations as referenced above in Section 3.01 and the Trust Financing as referenced above in Section 1.02(b).

(c)    Conduct of Business.  Engage in any business other than associated with the Chapter 11 Case.

(d)    Chapter 11 Claims.  Without limiting the provisions of this Section, incur, create, assume, suffer or permit any claim or lien or encumbrance against his or any of his property or assets in the Chapter 11 Case to be senior to the claims of Lender against Borrower in respect of the Obligations hereunder, or apply to the Bankruptcy Court for authority to do so, except to the extent permitted herein.

(e)    Limitation on Repayments.  (i) Make any payment or prepayment on any redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any pre-Petition Date obligations of such person, except as expressly ordered by the Bankruptcy Court, (ii) pay any interest on any pre-Petition Date obligations of such person (whether in cash, in kind securities or otherwise), or (iii) make any payment or create or permit any lien pursuant to any provision of the Bankruptcy Code, or apply to the Bankruptcy Court for the authority to do any of the foregoing, in each case.

SECTION 6.02.        Good Faith Finding.  Unless otherwise waived by Lender, the Borrowing Order shall include a good faith finding under Section 364(e) of the Bankruptcy Code.

## ARTICLE VII
## MISCELLANEOUS

SECTION 7.01.        Notices, Etc.  Except as otherwise set forth in this Note, all notices and other communications provided for hereunder shall be in writing (including e-mail) and mailed or delivered:

if to Borrower:

Yueting Jia
(Address to be provided)
E-Mail: to be provided.

with a copy (which shall not constitute notice) to:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attention: Suzzanne Uhland
E-Mail: suhland@omm.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd. 13th Floor
Los Angeles, CA 90067-4003
Attention: Jeffrey Dulberg
E-Mail: jdulberg@pszjlaw.com

and if to the Lender:

Pacific Technology Holding LLC
1209 Orange Street,
Wilmington, DE 19801
Attention: Managing Members
E-mail: to be provided.

with a copy (which shall not constitute notice) to:

Law Offices of David W. Meadows
1801 Century Park East, Suite 1235
Los Angeles, CA  90067
Attention: David W. Meadows, Esq.
E-Mail: david@davidwmeadowslaw.com

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties.  Unless otherwise provided herein, any notice or demand which is required or permitted to be given under this Note shall all be deemed to have been sufficiently given and received the earlier of (i) when received, (ii) when delivered personally, (iii) one (1) business day after being delivered by e-mail (with receipt of appropriate confirmation), or (iv) one (1) business day after being deposited with an overnight courier service of recognized standing having specified next day delivery at such address, e-mail address as set forth above.

1

SECTION 7.02.   <u>Amendments and Waiver</u>. Any provision of this Note may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by Borrower and Lender, or in the case of a waiver, by Lender. No failure or delay by Lender in exercising any right, power or privilege hereunder shall operate as a waiver nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege.

SECTION 7.03. <u>Remedies</u>.  No remedy made available by any of the provisions of this Note is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity. Borrower hereby waives presentment for payment, demand, notice of dishonor, protest and notice of protest of this Note.

SECTION 7.04. <u>Assignment</u>.  This Note shall be binding upon, inure to the benefit of and be enforceable by any successor in interest to Lender; <u>provided</u> that either party shall not directly or indirectly assign any of its rights or obligations under this Note (including by way of security interest) without the prior written consent of the other party. Any assignment or transfer in contradiction of this Section 7.04 shall be null and void.

SECTION 7.05. <u>Severability</u>.  In case any particular provision of this Note shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Note or affecting the validity or enforceability of this Note or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Note or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 7.06. <u>Governing Law</u>. This Note shall be governed by, and construed in accordance with, the laws of the State of California and as to any issue of international insolvency law or other applicable international law, this Note and all related grants of security shall be governed by the laws of the United States of America,  without giving effect to any conflicts of laws principles thereof that would otherwise require the application of the law of any other jurisdiction, whether domestic or international.

SECTION 7.07. <u>Time of the Essence</u>. Time is of the essence with regard to this Note.

*[Signature Pages Follow]*

1

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed and delivered thereunto duly authorized as of the date first above written.

**BORROWER:**

**YUETING JIA**

Acknowledged and Agreed:

**LENDER:**

**PACIFIC TECHNOLOGY HOLDING LLC**

By:_____

Name: MATTHIAS AYDT

Title: PRESIDENT

*Signature Page to Secured Promissory Note*

**Exhibit 1**

**[see attached]**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF
CALIFORNIA

AMENDED **CIVIL MINUTES - REDACTED**

|  |  |
|---|---|
| Priority | _____ |
| Send | _____ |
| Enter | _____ |
| Closed | _____ |
| JS-5/JS-6 | _____ |
| Scan Only | _____ |

**CASE NO.:** **2:18-CV-10255 SJO (MRWx)**      **DATE:** September 3, 2019

**TITLE:**      **Shanghai Lan Cai Asset Management Co., Ltd. v. Jia Yueting**
========================================================================
**PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                                    Not Present
Courtroom Clerk                                  Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**      **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                        Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER GRANTING PETITIONER'S APPLICATION FOR PRELIMINARY INJUNCTION** [Docket No. 55]**; ORDER DENYING PETITIONER'S EX PARTE APPLICATION AS MOOT** [Docket No. 72]

This matter comes before the Court on Petitioner Shanghai Lan Cai Asset Management Company Limited's ("SLCAM" or "Petitioner") Motion for Preliminary Injunction ("Motion"), filed August 1, 2019. Respondent Jia Yueting ("Respondent" or "Jia" or "Yueting") filed an Opposition to the Motion on August 13, 2019. Petitioner filed a Reply on August 20, 2019. The Court found this matter suitable for oral argument and vacated the hearing set for September 3, 2019. For the following reasons, the Court **GRANTS** the Motion.

I.      FACTUAL AND PROCEDURAL BACKGROUND

This action involves Petitioner's effort to confirm an arbitral award issued by the Beijing Arbitration Commission ("BAC"). (Petition To Enforce Foreign Arbitral Award ("Petition"), ECF No. 1.) The BAC determined that Respondent is liable to Petitioner on certain loans that had not been repaid. BAC ordered Petitioner to repay an amount totaling over 83,000.000.00 RMB (Chinese Currency). (Petition at 1.)

A detailed summary of the facts at issue in the arbitration is unnecessary for purposes of the instant Motion. At the outset of this litigation, this Court issued a temporary restraining order, "enjoining Respondent from transferring, concealing, reducing, encumbering, or otherwise making unavailable the Attachment Property until SLC's Petition is adjudicated, and a final judgment is reached in this action." (Order Granting Temporary Restraining Order at 5, ECF No. 11.) On March 26, 2019, this Court issued an order confirming the arbitration award. (Order Confirming Arbitral Award, ECF No. 31.) The Court subsequently entered a judgment against Jia. (Judgment, ECF No. 35.)

After this Court entered judgment in this matter, the central issue in this case has become enforcing the judgment against Respondent Jia. Petitioner contends that Respondent has not complied with this Court's judgment and has not displayed any intention to comply with the

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  __2:18-CV-10255 SJO (MRWx)__          **DATE:**  __August 30, 2019__

judgment.  On May 1, 2019, Respondent filed a motion to alter this Court's judgment, arguing that this Court had employed an erroneous interest rate in calculating the judgment.  (*See* Motion To Alter Arbitral Award, ECF No. 41.)  This Court denied this motion on May 29, 2019. (*See* Order Denying Motion To Alter Judgment, ECF No. 49.)

Petitioner subsequently brought the instant Motion, seeking a preliminary injunction similar to the temporary restraining order that this Court had already issued in the instant case. (*See generally* Mot., ECF No. 55.)  Petitioner asks this Court to issue a preliminary injunction that prevents Respondent from transferring, concealing, reducing, encumbering, or otherwise making unavailable non-exempt assets up to the value of the judgment entered by this Court.  (Mot. at 2.)  According to Petitioner, Jia has sought to avoid paying the judgment and has signaled no intention to satisfy his debt to Petitioner.

On August 29, 2019, Petitioner brought a second ex parte application for a temporary restraining order.  (*See* Ex Parte Application, ECF No. 72.)  This application seeks to prevent Jia from taking any steps with respect to his beneficial interest in Faraday & Future Inc., pending a ruling on the instant Motion.  (Ex Parte Application at 1.)  According to Petitioner, Jia plans to resign as CEO of Faraday & Future, thus hampering Petitioner's ability to collect on its judgment against Jia.  (Ex Parte Application at 1.)

These proceedings followed.

II.    DISCUSSION

To obtain a preliminary injunction, Petitioner, the moving party, must show:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005).  The Ninth Circuit also employs a sliding scale test whereby the existence of "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).  "These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases."  *Big Country Foods, Inc. v. Board of Educ. of the Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir.1989).  Overall, a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

Petitioner moves for a preliminary injunction under California Code Section 526, which authorizes courts to enter injunctions in numerous circumstances, including "[w]hen . . . a party to the action

CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

**CASE NO.:** <u>2:18-CV-10255 SJO (MRWx)</u>      **DATE:** <u>August 30, 2019</u>

is doing, or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the rights of another party . . . and tending to render the judgment ineffectual." Cal. Civ. Proc. Code § 526(a)(3). Although Respondent argues that this Court cannot issue a post-judgment preliminary injunction under Procedural Code Section 526, this is an incorrect statement of the law. Alongside Federal Rule of Civil Procedure 69(a), California Civil Procedure Code Section 526 vests this Court with broad authority to enforce a final judgment. "The execution of final judgments is governed by Federal Rule of Civil Procedure ("Rule") 69(a), which provides: 'A money judgment is enforced by a writ of execution, unless the court directs otherwise. **The procedure on execution-and in proceedings supplementary to and in aid of judgment or execution-must accord with the procedure of the state where the court is located**, but a federal statute governs to the extent it applies.' Fed. R. Civ. P. 69(a). . . .The [California Code of Civil Procedure] provides procedures for the assignment of assets, **issuance of restraining orders**, and issuance of turnover orders." *UMG Recordings, Inc. v. BCD Music Grp., Inc.*, No. CV07-05808 SJO FFMX, 2009 WL 2213678, at *1 (C.D. Cal. July 9, 2009) (emphasis added).

      A.    <u>Likelihood of Success on the Merits</u>

The Court considers the preliminary injunction factors in turn. As a threshold matter, Petitioner is very likely to prevail on its action to enforce the judgment against Jia. This Court has already upheld the arbitral award issued by the BAC against Jia. Respondent must comply with the judgment issued by this Court. Petitioner's likelihood of success on the merits is very high.

      B.    <u>Irreparable Harm</u>

Petitioner will suffer irreparable harm in the absence of injunctive relief. As the Court held in its prior order on Petitioner's first Ex Parte Application, "Petitioner has made the threshold showing necessary to show irreparable harm in the absence of preliminary injunctive relief. **Respondent Jia's record of paying creditors is poor at best.**" (Order Granting Temporary Restraining Order at 4 (emphasis added).) The Court went on to note that Respondent is subject to other litigation in this district concerning his failure to pay creditors and that Respondent is on the Chinese government list of debt defaulters. (Order Granting Temporary Restraining Order at 4.)

These circumstances have not changed. In fact, since this Court's order on the first Ex Parte Application, Respondent has failed to comply with the judgment of this Court, confirming that Petitioner will suffer irreparable harm in the absence of an injunction. Aside from his lack of compliance with this Court's judgment, Respondent also has not posted a supersedeas bond to stay execution of the judgment. In these circumstances, there is little doubt that Petitioner will continue to suffer irreparable harm – including the loss of a judgment to which it is rightfully entitled – in the absence of preliminary injunctive relief.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  **2:18-CV-10255 SJO (MRWx)**        **DATE:**  **August 30, 2019**

C.    Balance of Equities and the Public Interest

The Court next considers the balance of equities and the possible harm that a preliminary injunction will cause Jia. Although Jia has a property interest in the property that Petitioner seeks to enjoin, Petitioner has a final judgment against Jia. Petitioner has the right to collect on this judgment. This interest outweighs any interest that Respondent may have in his property.

D.    Public Interest

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on nonparties, the public interest will be at most a neutral factor in the preliminary injunction analysis." *Smith*, 2012 WL 12883909, at *6 (quoting *Stormans v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009)). Here, the preliminary injunction would only impact Petitioner and Respondent's interests and does not extend to non-parties. Therefore, this factor is neutral.

III.    RULING

The Court **GRANTS** Petitioner's Motion and issues a preliminary injunction, enjoining Respondent from taking any step to transfer, conceal, reduce, encumber, or otherwise make unavailable—either personally or through instructions to another—any non-exempt assets up to the value of this Court's judgment against Respondent. The property that is subject to this injunction includes:

> 1. Jia's beneficial interest in Faraday & Future Inc., of which the immediate owner is FF Top Holding Limited;
> 2. Jia's beneficial interest in the property located at                                    , of which the immediate owner is Ocean View Drive, Inc.;
> 3. Jia's beneficial interest in the property located at                                         , of which the immediate owner is Ocean View Drive, Inc.; and
> 4. Jia's beneficial interest in the property located at                                    , of which the immediate owner is Ocean View Drive, Inc.

Having granted the preliminary injunction, the Court **DENIES** Petitioner's second Ex Parte Application as Moot.

IT IS SO ORDERED.

# EXHIBIT B

<u>**YT - Plan Term Sheet**</u>

This term sheet (the "<u>Term Sheet</u>") sets forth the material terms upon which Yueting Jia ("<u>YT</u>" or the "<u>Debtor</u>") shall, on and subject to the occurrence of the effective date (the "<u>Effective Date</u>") of a chapter 11 plan consistent in all material respects with this Term Sheet (the "<u>Plan</u>"), transfer substantially all of his available assets (as described more fully below, the "<u>Trust Assets</u>") to a creditors' trust (the "<u>Trust</u>") to be formed pursuant to the Plan, the Trust Agreement (as defined below), and this Term Sheet for the benefit of holders of allowed Debt Claims (as defined below).

As of the date of this Term Sheet, certain of the Trust Assets may be subject to certain limitations and prohibitions imposed by (i) preliminary injunctions, freezing orders, and/or similar orders from courts in the British Virgin Islands (the "<u>BVI Injunction</u>") and the United States federal courts situated in the state of California (the "<u>U.S. Injunctions</u>" and collectively with the BVI Injunction, the "<u>Injunctions</u>"), (ii) that certain Fifth Amended and Restated Memorandum and Articles of Association of Smart King Ltd. ("<u>Smart King</u>") adopted as of October 12, 2019 (the "<u>SK M&A</u>"), and (iii) that certain Restructuring Agreement, dated as of December 31, 2018, by and among Smart King, YT, Season Smart Limited, a company formed under the laws of the British Virgin Islands ("<u>Season Smart</u>"), and the other parties thereto (the "<u>Restructuring Agreement</u>").

| | |
|---|---|
| **Purpose** | The Plan will, among other things, grant each holder of an Allowed Debt Claim (as defined below) or Late Filed Debt Claim (as defined below) a beneficial interest (a "<u>Trust Interest</u>") in the Trust or the Late Filed Debt Claims Reserve (as defined below), as applicable, based on the formulas set forth herein.<br><br>The Trust will preserve, hold, manage, and maximize the Trust Assets pursuant to a trust agreement (the "<u>Trust Agreement</u>") in form and substance acceptable to the Official Committee of Unsecured Creditors (the "<u>Committee</u>") for the benefit of the holders of the Trust Interests. The Trust Agreement will be included in the plan supplement and will be approved in connection with confirmation of the Plan. |
| **Existing Corporate Structure** | As of the date of this Term Sheet and continuing until the Effective Date, as a material inducement for the Committee to approve this Term Sheet and support the Plan, YT represents to the Committee, and on or before the Effective Date, YT and Wei Gan, as applicable, shall execute declarations to such effect in form and substance reasonably acceptable to the Committee (respectively, the "<u>YT Declaration</u>" and the "<u>Wei Gan Declaration</u>" and collectively, the "<u>Declarations</u>"), as follows:<br><br>(a) YT owns 100% of the issued and outstanding economic interests in West Coast LLC ("<u>West Coast</u>") through a nominee, Lian Bossert. |

(b) The sole asset of West Coast is 100% of the preferred membership units (the "Preferred PT Units") of Pacific Technology Holding LLC, a Delaware limited liability company ("Pacific Technology"), which comprise 20% of the currently issued and outstanding membership interests of Pacific Technology.

(c) Pacific Technology is the sole owner of FF Peak Holding Limited, a company organized in the British Virgin Islands ("FF Peak").

(d) FF Peak is the sole owner of FF Top Holding Ltd., a company organized in the British Virgin Islands ("FF Top").

(e) FF Top owns 40.8% of the issued and outstanding Class B shares of Smart King (the "Smart King Shares").

(f) YT has a contractual right to direct Pacific Technology to direct FF Peak to direct FF Top to transfer 147,058,823 of the Smart King Shares (the "Trust Smart King Shares") to the Trust (the "Smart King Transfer Right").

(g) Pursuant to Section 16 of the Third Amended and Restated Limited Liability Company Agreement of Pacific Technology (the "PT LLCA"), the Preferred PT Units entitle West Coast to receive certain distributions of capital from Pacific Technology from time to time (the "Preferred Unit Distribution Rights"),[1] consisting of (1) a priority distribution of up to $815.7 million, *plus* interest at 8% per annum, after the return of capital to the management (plus 8% interest per annum) but before any other capital is distributed from Pacific Technology, *plus* (2) a special distribution of 10% of all remaining distributions of capital from Pacific Technology, *plus* (3) its pro rata share (i.e., 20%) of all remaining distributions of capital from Pacific Technology.

(h) YT owns a call option (the "Call Option") pursuant to the Restructuring Agreement, entitling YT to purchase Season Smart's shares in Smart King under certain circumstances.

(i) YT is the sole owner of Ford Field International Limited, a company organized in the British Virgin Islands ("Ford Field").

(j) YT and Wei Gan own no direct or indirect ownership interests in (including through any nominee, trust, or similar arrangement), do not

---

[1] The description of the Preferred Unit Distribution Rights in this Term Sheet is not intended to limit the actual terms of Section 16 of the PT LLCA.

| | |
|---|---|
| | directly or indirectly control, and do not hold a beneficial interest in any of the entities listed on **Exhibit D** attached hereto, or any of their respective parent companies or subsidiaries. |
| **Corporate Structure and Governance** | On the Effective Date, the managing member of Pacific Technology shall amend the PT LLCA to:<br><br>• provide that the Trust is a member of Pacific Technology and the holder of 100% of the Preferred PT Units,<br><br>• issue new units of Pacific Technology to the Trust (the "New PT Units"), entitling the Trust to 100% of the economic value of the Trust Smart King Shares, and<br><br>• grant the Trust a fully paid-up warrant to receive the Trust Smart King Shares consistent with the Smart King Transfer Right with no further action necessary by YT, exercisable upon the dissolution of the Injunctions (the "Warrant").<br><br>The Plan and the order confirming the Plan (the "Confirmation Order") shall (a) provide, pursuant to section 363 of the Bankruptcy Code, that the Preferred PT Units and the New PT Units shall vest in the Trust free and clear of any and all liens, claims, encumbrances, contractual restrictions, and other interests, *provided* that the Preferred PT Units and the New PT Units shall be subject to the PT LLCA as amended on the Effective Date pursuant to, and consistent in all material respects with, this Term Sheet and the Plan and (b) for so long as the Preferred PT Units are outstanding, prohibit Pacific Technology and its managing member from amending the PT LLCA in any manner that adversely affects the rights and claims provided to the Trust as set forth in the Plan and this Term Sheet.<br><br>Upon the dissolution of the Injunctions, the Trustee may exercise the Warrant and direct FF Top to transfer the Trust Smart King Shares directly to the Trust pursuant to the SK M&A, *provided* that the Trustee shall exercise the Warrant no later than in connection with the IPO (as defined below). Upon the indefeasible transfer of the Trust Smart King Shares to the Trust pursuant to the Warrant, the New PT Units shall be deemed permanently retired. |
| **Assets of the Trust** | The Trust Assets shall consist of the following property of YT on the Effective Date:<br><br>(a) 100% of the Preferred PT Units;<br><br>(b) 100% of the New PT Units; |

(c) the Warrant;[2]

(d) following the exercise of the Warrant and the indefeasible transfer of the Trust Smart King Shares to the Trust, the Trust Smart King Shares;

(e) all financial assets of YT (i.e., accounts, securities, or real property) wherever located, whether owned directly or through any nominee, including, but not limited, to any Seized China Assets (defined below) of YT in existence as of the Effective Date and remaining after the satisfaction of any claims recoverable from such assets under applicable law but excluding (i) any exempt assets of YT under section 522 of the Bankruptcy Code, (ii) income of the Debtor after the Petition Date (defined below) listed on Schedule J [Docket No. 28], and (iii) the Debtor's rental agreement with Warm Time Inc. and any income derived from such rental agreement, or the proceeds thereof, *provided* that the inclusion of such assets in the Trust does not include the right to assert (x) any YT Claims except as set forth in the "Standstill, China Restrictions, and Releases of Claims" section of this Term Sheet or (y) causes of action of YT's estate except for those expressly permitted in the "Bankruptcy Actions" section of this Term Sheet;

(f) all interests, claims, and causes of action owned by YT (including through any nominee) in connection with Beijing Dongfang Cheyun Information Technology Co., Ltd. in existence of the Effective Date;

(g) the rights to recover property in accordance with the "Bankruptcy Actions" section of this Term Sheet and all proceeds thereof;

(h) the Call Option, subject to certain rights of FF Global Partners LLC ("FF Global") as set forth below in the "Call Option" section of this Term Sheet, which Call Option may not be exercised or transferred by the Trust without the consent of FF Global;

(i) the proceeds of the Trust Financing (defined below) as set forth below in the "Trust Financing" section of this Term Sheet; and

(j) YT's interests in Ford Field.

After the occurrence of the Effective Date, YT may engage, at YT's sole expense, an independent valuation firm to conduct a valuation of the Trust Assets (other than the proceeds of the Trust Financing) as of the Effective Date. The Trustee shall cooperate in good faith with such independent valuation firm as it conducts its valuation.

---

[2] Structure to be confirmed by tax counsel.

4

| | |
|---|---|
| **Non-Debt Claims** | On the Effective Date, holders of Allowed[3] Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and U.S. Secured Claims (each as defined in the Plan) will receive cash equal to the unpaid amount of their claims, except to the extent any such holder agrees to less favorable treatment or elects to receive Trust Distributions (as defined below) on the dates of distributions to holders of the Trust Interests in accordance with the distribution waterfall set forth on **Exhibit A** attached hereto and as further set forth in the Trust Agreement (the "Distribution Waterfall"). <br><br> On the Effective Date, each holder of an Allowed China Secured Claim (as defined in the Plan) will receive, at the option of the Debtor and in full and complete settlement, release, and discharge of, and in exchange for, such Allowed China Secured Claim (a) the proceeds of the sale or disposition of the collateral securing such Allowed China Secured Claim in accordance with applicable law, to the extent of the value of such holder's secured interest in such collateral, (b) other treatment rendering such Allowed China Secured Claim unimpaired, or (c) such other treatment as may be mutually agreed to by and among such holder and the Debtor or the Reorganized Debtor, as applicable. For the avoidance of doubt, the Allowed amount of a China Secured Claim shall equal the value of collateral securing such Allowed China Secured Claim in accordance with section 506(a) of the Bankruptcy Code. |
| **Seized China Assets** | "Seized China Assets" means any assets that (a) (i) have already been collateralized by YT or an obligor, guarantor, or pledgor, (ii) have already been pledged by YT or an obligor, guarantor, or pledgor, or (iii) YT, or an obligor, guarantor, or pledgor owns *and* (b) have been seized, attached, or frozen by Chinese judiciary authorities in connection with Chinese enforcement actions on account of any Debt Claims. |
| **Debt Claims** | "Debt Claim" means any claim (as defined in section 101(5) of the Bankruptcy Code) against YT that is (a) not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, China Secured Claim, or U.S. Secured Claim (each as defined in the Plan), (b) otherwise determined by the Bankruptcy Court (as defined in the Plan) to be a Debt Claim, or (c) a Deficiency Claim (as defined below). |

---

[3] "Allowed" means, with respect to any claim, such claim or portion thereof (a) that has been listed by YT in his schedules of assets and liabilities as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (b) as to which the deadline for objecting or seeking estimation has passed, and no objection or request for estimation has been filed; (c) as to which any objection or request for estimation has been filed has been settled, waived, withdrawn, or denied by a final order; or (d) that is allowed pursuant to (i) a final order of the Bankruptcy Court or (ii) the Plan.

|  | "Allowed Debt Claim Allocation Amount" means the Allowed amount of a Debt Claim together with any unpaid interest at the rate of four percent per annum from the time the underlying debt arose through October 14, 2019, the date YT filed his voluntary chapter 11 petition (the "Petition Date").

"Allowed Debt Claim Distribution Amount" means the Allowed Debt Claim Allocation Amount *minus* (a) any amounts the holder of such Debt Claim actually receives from the primary obligor or any guarantor besides YT, of such Debt Claim based on such holder's contractual agreement with such primary obligor or the enforcement of an existing collection action against a guarantor, *minus* (b) if the primary debt obligation underlying such Debt Claim is satisfied in whole or in part by conversion to equity in any jurisdiction, the corresponding reduction in the amount of the Debt Claim on account of such conversion (items (a) and (b) collectively, "Other Distributions"). For the avoidance of doubt any Other Distributions received by a holder of an Allowed Debt Claim shall be first applied to reduce the principal amount of such Debt Claim, and any remaining consideration to satisfy any accrued but unpaid interest.

"Late Filed Debt Claim" means a Debt Claim filed after the applicable deadline set by the Bankruptcy Court to file claims in the chapter 11 case but before the occurrence of a Distribution Event (defined below).

The aggregate amount recoverable by any holder of a Debt Claim through Other Distributions shall be reduced by the amount of any distributions paid from the Trust ("Trust Distributions") on account of such Debt Claim.

"Deficiency Claim" means that portion of a Secured China Claim that is determined pursuant to section 506(a) of the Bankruptcy Code or through agreement, to exceed the value of the claimant's interest in the collateral securing such Claim. For the avoidance of doubt, all Deficiency Claims shall be treated as Debt Claims. |
| **Late Filed Debt Claims Reserve** | On the Effective Date, the Trustee shall (a) establish a separate trust (the "Late Filed Debt Claims Reserve") for the benefit of any Late Filed Debt Claims and (b) transfer 10% of the Trust Assets to the Late Filed Debt Claims Reserve. The Late Filed Debt Claims Reserve will have no operations other than to make distributions to holders of Late Filed Debt Claims and will be managed by the Trustee pursuant to a separate trust agreement with substantially similar governance terms as the Trust Agreement.  At the conclusion of the Standstill Period (defined below), any unallocated assets in the Late Filed Debt Claims Reserve shall |

|  | revert to the Trust for the ratable benefit of holders of Allowed Debt Claims and YT pursuant to the Distribution Waterfall. |
|  | In order for a Late Filed Debt Claim to be Allowed and participate in the Late Filed Debt Claims Reserve, YT and the Trustee shall make commercially reasonable efforts to agree that allowance of such Late Filed Debt Claim in a particular amount is in the best interests of YT and the Trust. |
|  | If YT and the Trustee do not agree to the allowance or amount of any Late Filed Debt Claim, the dispute shall be resolved pursuant to the Plan Arbitration Procedures (defined below). In seeking the allowance of any Late Filed Debt Claim Order, YT shall bear the burden of demonstrating to the Bankruptcy Court that allowance of such Late Filed Debt Claim is in the best interests of YT and the Trust. |
| **Voting Rights with respect to Trust Assets** | The Trustee shall exercise all voting rights, if any, with respect to the Trust Smart King Shares owned by the Trust after the exercise of the Warrant. |
|  | Prior to the occurrence of an IPO (as defined below), (i) the Trustee shall have observer rights regarding the committee meetings held by the committee of managers of FF Global; and (ii) YT will use commercially reasonable efforts to provide the Trustee with observer rights with respect to the boards of Smart King, Faraday & Future Inc., a California corporation, FF Inc., a California corporation, and all other material, direct or indirect, operating subsidiaries of Smart King that hold separate board meetings. |
| **Term of the Trust** | The term of the Trust (the "<u>Term</u>") will initially extend until the fifth anniversary of the Effective Date (the "<u>Initial Term</u>"). The Term shall not extend beyond the tenth anniversary of the Effective Date unless the chapter 11 case is reopened to obtain a court order extending the Term. |
|  | If the completion of an initial public offering on the New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange, or any other internationally recognized stock exchange (including China) with respect to the shares of outstanding capital stock of Smart King or such other relevant listing vehicle, as applicable (an "<u>IPO</u>"), occurs during the Initial Term, the Term and the Standstill Period shall be automatically extended through the conclusion of the selloff period for the Marketable Securities (as defined below) as set forth on **<u>Exhibit B</u>** attached hereto. |
|  | If the completion of an IPO has not occurred during the Initial Term, the Trustee may elect to extend the Term for successive one-year periods |

| | |
|---|---|
| | (or such other periods as the Trustee determines to be appropriate) to the extent necessary to allow for orderly liquidation of any remaining Trust Assets.<br><br>The Trustee shall dissolve and wind up the Trust and distribute the Trust Assets upon the expiration of (a) the Initial Term, if no extension (automatic or otherwise) is exercised, or (b) the expiration of any extended Term of the Trust.<br><br>Certain aspects of the Trust will be subject to automatic amendment based on aggregate distributions set forth in the Distribution Waterfall, as set forth in this Term Sheet and Exhibit A hereto.<br><br>The Trustee may dissolve the Trust before the end of the Initial Term or any extended Term if: (a) all of the Trust Assets have been distributed in accordance with the Distribution Waterfall, including any distributions to YT; or (b) a Liquidation Event (defined below) has occurred.<br><br>Upon termination of the Trust, the Trustee shall obtain a valuation of the Trust Assets as of the termination date (performed by an independent valuation firm selected by the Trustee and approved by the Creditor Trust Committee and YT) and shall, as promptly as practicable following the completion of the independent valuation, distribute the Trust Assets in kind to the creditors and YT in accordance with the Distribution Waterfall. |
| **Trustee** | There shall be one trustee (the "Trustee") of the Trust. The initial Trustee shall be disclosed in the disclosure statement. Any successor Trustee shall be selected by majority vote of the Creditor Trust Committee (as defined below), subject to approval by YT (which approval shall not be unreasonably withheld), in accordance with the Trust Agreement, which shall set forth certain criteria with respect to the relevant experience and qualifications for the Trustee.<br><br>The Trustee shall act as a fiduciary and shall not be personally liable in connection with the affairs of the Trust or to any person except for such of the Trustee's acts or omissions that constitute fraud, willful misconduct, or gross negligence as determined by a final order of a court of competent jurisdiction.  In addition, the Trustee shall be indemnified by the Trust against and held harmless by the Trust from any losses, claims, damages, liabilities, or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Trustee may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against the Trustee in connection with any matter arising out of or related to the Trust Agreement or the affairs of the Trust (other than in respect of acts |

| | |
|---|---|
| | or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a final order of a court of competent jurisdiction). The Trustee shall be entitled to obtain customary fiduciary and/or errors and omissions liability insurance and engage independent legal counsel and financial advisors to assist with its evaluation of any matters with respect to the Trust, including any Liquidation Event.<br><br>The Trustee shall be compensated by the Trust from Trust Assets pursuant to the Trust Agreement. The Trustee shall be entitled to reimburse itself out of any available cash in the Trust, for its actual out-of-pocket expenses and shall be indemnified by the Trust from Trust Assets against and from any and all loss, liability, expense, or damage that the Trustee may sustain in good faith and without willful misconduct, gross negligence, or fraud in the exercise and performance of any of the powers and duties of the Trustee under the Trust Agreement.<br><br>The Trustee may resign upon not less than sixty days' advance written notice to the Creditor Trust Committee, with such resignation to take effect once a replacement Trustee has been appointed.<br><br>The Creditor Trust Committee may remove the Trustee in the event the Trustee commits any act or omission that constitutes fraud, breach of fiduciary duty, willful misconduct, or gross negligence. Upon the removal of the Trustee as set forth in the immediately preceding sentence, the Creditor Trust Committee shall have the right to appoint a replacement Trustee, subject to approval by YT (which approval shall not be unreasonably withheld). |
| **Trust Financing** | As a condition precedent to the occurrence of the Effective Date, YT and/or the Committee shall have obtained committed financing, on terms and conditions acceptable to the Committee and YT, in an amount not less than $1,500,000 to fund the operation of the Trust for the Initial Term, *plus* such amount as necessary to make payments required to be made in connection with the Plan (the "<u>Trust Financing</u>").[4] The proceeds of the Trust Financing in excess of payments required to be made under the Plan shall be deposited into the Trust on the Effective Date and shall be Trust Assets. |
| **Trust Expenses** | The professional fees, costs, and other expenses incurred by the Trustee in connection with the administration of the Trust shall be paid from the proceeds of the Trust Financing and the relevant Trust Assets. |

---

[4] The parties will work to reach an agreement with respect to the necessary level of Trust Financing.

| | |
|---|---|
| **Liquidation Event** | The term "Liquidation Event" means, with respect to Pacific Technology, Smart King, any of their respective material direct or indirect subsidiaries, or any future public listing vehicle for the global subsidiaries of Smart King or Pacific Technology, each of the following events to the extent that the event materially reduces the direct or indirect percentage ownership in Smart King or such other future public listing vehicle by the Trust other than by virtue of an equity investment by a bona fide third party: (a) the commencement of an assignment for the benefit of creditors, a receivership, a case under chapter 7 of the Bankruptcy Code, or a similar insolvency proceeding; (b) the effective date of a liquidating plan under chapter 11 of the Bankruptcy Code, or (c) the effective date of a reorganization plan under chapter 11 of the Bankruptcy Code, *provided* that internal reorganizations (including mergers or dissolutions for tax or other purposes) that do not adversely impact the value of the Trust's direct or indirect interests in Smart King or such other future public listing vehicle are not intended to be Liquidation Events. |
| **Distributions; Creditor Claims Waterfall** | Upon receipt of the distributable proceeds by the Trust from any disposition, or dividends or distributions in respect, of any Trust Assets (such proceeds, the "Distributable Proceeds" and such an event, a "Distribution Event"), the Distributable Proceeds will be distributed in accordance with the Distribution Waterfall upon the earlier of (a) sixty days following the occurrence of such Distribution Event, and (b) the termination of the Trust.<br><br>The Trustee may delay or defer the distribution of any Distributable Proceeds (whether cash, securities, or other property) received by the Trustee in respect of the Trust Assets to the creditors if the Trustee determines that such deferral or delay is in the best interests of the creditors (including if such distribution would violate any court order or applicable law). |
| **Disposition of Smart King Shares after the IPO** | The schedule for disposition of shares of Smart King directly owned by the Trust and that are registered under securities law or listed (the "Marketable Securities") shall be governed in accordance with **Exhibit B** attached hereto. The PT LLCA will include provisions that the managing member of Pacific Technology will use commercially reasonable efforts to dispose of Marketable Securities owned or controlled by Pacific Technology in which the Trust owns a beneficial interest on a similar schedule until the priority distribution of $815.7 million (plus accrued amounts) under the PT LLCA in connection with |

| | |
|---|---|
| | the Preferred PT Units is paid to the Trust.[5] The Distributable Proceeds shall be distributed in accordance with the Distribution Waterfall.<br><br>At any time upon the request of the managing member of Pacific Technology, and subject to applicable securities law, the Trustee shall distribute the Marketable Securities in kind to the creditors in lieu of any cash distribution. The value of the Marketable Securities shall be the average closing trading price for the five consecutive trading days immediately prior to the distribution. |
| **Creditor Trust Committee** | The creditors shall be represented by a committee (the "<u>Creditor Trust Committee</u>"), which shall consist of no more than five creditors holding Allowed Debt Claims, or their designees. The members of the Creditor Trust Committee, when taking any action in their capacity as such, shall serve as fiduciaries to the beneficiaries of the Trust and not act in their individual interests. The initial members of the Creditor Trust Committee must be acceptable to the Committee and will be disclosed in the plan supplement. Any replacement members of the Creditor Trust Committee will be selected by the Trustee in accordance with the qualification requirements to be set forth in the Trust Agreement. The Creditor Trust Committee shall act by the vote of a majority (over 50%) of the members thereof, unless otherwise specified in the Trust Agreement.<br><br>The members of the Creditor Trust Committee shall not be compensated, but shall be reimbursed for all reasonable out-of-pocket expenses incurred in connection with their service on the Creditor Trust Committee, other than the fees and expenses of counsel to individual members of the Creditor Trust Committee. The Creditor Trust Committee may employ advisors for specified purposes, and the Trustee will pay the fees and expenses of any such advisors retained by the Creditor Trust Committee.<br><br>The Trustee shall not take any of the following actions without the approval of the Creditor Trust Committee:<br><br>&bull; incur expenses on behalf of the Trust in excess of US$50,000; *provided*, *however*, that such approval shall be deemed granted if not specifically denied within ten business days after a written request from the Trustee; |

---

[5] The amended PT LLCA will include a provision to obtain a valuation of Pacific Technology to provide the managing member with the right to purchase under circumstances to be agreed upon by the managing member and the Creditor Trust Committee in their respective sole discretion and will include a right of first refusal for Pacific Technology or its managing member to purchase any shares or units proposed to be sold by the Trust, *provided* that the right of first refusal shall be on terms no less favorable than those offered to the third-party purchaser.

|  | |
|---|---|
|  | <ul><li>retain and pay professionals, including legal counsel, independent accounting firms, valuation firms, or third parties to assist with the administration of the Trust Assets; *provided, however*, that such approval shall be deemed granted if not specifically denied within ten business days after a written request from the Trustee;</li><li>except as provided in the Trust Agreement, sell or transfer any Trust Assets;</li><li>invest any moneys held by the Trust other than in bank deposits and U.S. Treasury securities; *provided, however*, that such approval shall be deemed granted if not specifically denied within ten business days after a written request from the Trustee;</li><li>settle or compromise any litigation claim in excess of US$5 million; *provided, however*, that such approval shall be deemed granted if not specifically denied within ten business days after a written request from the Trustee;</li><li>take any action that would result in the Trust becoming an "investment company" within the meaning of the Investment Company Act of 1940, as amended;</li><li>amend the Trust Agreement in any manner that is adverse to the creditors;</li><li>initiate an action under section 548 of the Bankruptcy Code as set forth below in "Bankruptcy Actions," which initiation shall require an affirmative vote of four members of the Creditor Trust Committee irrespective of any quorum requirement in the Trust Agreement; or</li><li>initiate an action under section 542 of the Bankruptcy Code as set forth below in "Bankruptcy Actions," which initiation shall require an affirmative vote of at least three members of the Creditor Trust Committee irrespective of any quorum requirement in the Trust Agreement.</li></ul> As noted in the Distribution Waterfall, the Creditor Trust Committee will be replaced by YT when aggregate distributions under the Distribution Waterfall reach certain levels. |
| **Information Rights** | The Trustee shall cause to be prepared and distributed to the Creditor Trust Committee (for further distribution to the creditors): <ul><li>within forty-five days after the end of each calendar quarter and within ninety days after the end of each calendar year (a) a statement of net assets of the Trust, (b) a statement of changes in net assets of the Trust, (c) a statement of cash flows of the Trust, (d) a schedule summarized by type of investments and assets, indicating acquisitions and dispositions, and (e) a summary</li></ul> |

| | |
|---|---|
| | listing of the status of the resolution of claims involving the Trust or any of the Trust Assets, if any. |
| **FF Information** | The Trustee shall be provided the following information on a confidential, professionals eyes only basis, to the extent such information is otherwise prepared by Smart King or Faraday & Future Inc. ("FF") for reporting to their financing sources or shareholders (the Trustee may share such information on confidential and aggregated basis with the Creditor Trust Committee):<br><br>• within ninety days after the end of each calendar year, audited consolidated financial statements of Smart King or such other future public listing vehicle for the global subsidiaries of Smart King;<br><br>• within forty-five days after the end of each of the first three quarters in each year of Smart King, a consolidated balance sheet of Smart King and its subsidiaries, together with related consolidated statement of operations and retained earnings, consolidated statement of stockholders' equity, and consolidated statement of cash flows for such fiscal quarter;<br><br>• not more than ninety days after the beginning of each year of Smart King, an annual business plan and budget of Smart King and its subsidiaries;<br><br>• such other regular financial reporting, if any, prepared by Smart King for its lenders and shareholders.<br><br>In addition, the Trustee shall be provided such other of FF's financial information provided to the Partner Executive Committee of FF Global (the "Partner Executive Committee") when such information is provided to the Partner Executive Committee. |
| **Transferability of Trust Interests** | The Trust Interests may be transferred upon notice to the Trustee and compliance with Fed. R. Bankr. P. 3001(e) and any applicable law.<br><br>Notwithstanding the foregoing, the Trust Interests may not be transferred to the extent that such transfer would (a) based on the advice of counsel to the Trust, jeopardize the Trust's tax treatment; (b) cause the Trust to become subject to any governmental controls or regulations that affect the administration of the Trust and the Trust Assets, including, but not limited to, any SEC reporting requirements; (c) violate applicable law (including any securities law) or any instrument to which the Trust is a party or by which it is bound; or (d) cause the Trust to become an "investment company" within the meaning of the Investment Company Act of 1940, as amended. |

| | |
|---|---|
| **Future Equity Incentive Plan** | In order to align incentives and reward YT for achieving FF's strategic goals, it is anticipated that a management incentive equity plan will be adopted to grant certain stock-based awards to or at the direction of YT upon the achievement of financial targets upon a Distribution Event, *provided* that the stock-based awards granted to YT shall not exceed the awards set forth in **Exhibit C** attached hereto without the consent of the Trustee (which consent shall not be unreasonably withheld). |
| **Governing Law** | This Term Sheet shall be governed and construed in accordance with the laws of the State of California, without regard to its choice of law principles. The Trust Agreement will be governed and construed in accordance with the laws of the State of Delaware, without regard to its choice of law principles. |
| **Amendments to Trust Agreement** | The Trust Agreement will not be amended without the approval of the Creditor Trust Committee (other than the automatic amendments specified in the Distribution Waterfall). |
| **Subsequent Equity Investment; Equity Incentives** | Nothing in this Term Sheet shall be construed as to prohibit or restrict in any manner any subsequent equity investment or equity incentive in Smart King or any of its subsidiaries by any person, *provided* that in no event shall any equity incentive program adopted by Smart King or any other direct or indirect subsidiary of Pacific Technology grant YT any equity interest greater than, or on terms more favorable than, as set forth on **Exhibit C**, without the consent of the Trustee (which consent shall not be unreasonably withheld). |
| **Call Option** | Upon the occurrence of the Effective Date, the Call Option shall vest in the Trust free and clear of any and all liens, claims, encumbrances, contractual restrictions, and other interests pursuant to section 363 of the Bankruptcy Code, *provided* that the Plan shall require (a) the Trustee to obtain the consent of the Partner Executive Committee prior to any exercise or transfer of the Call Option by the Trust; and (b) the Trustee, upon request by FF Global, to directly transfer or transfer the underlying economic rights of the Call Option (including by exercising the Call Option and thereafter conveying the related shares in Smart King to the applicable counterparty) as requested by FF Global in connection with a bona fide unrelated third-party financing, as follows: (i) 50% of the Call Option to the counterparty to a bona fide unrelated third-party financing providing Smart King and its subsidiaries with not less than $100 million of net proceeds, (ii) 100% of the Call Option to the counterparty to a bona fide unrelated third-party financing providing Smart King and its subsidiaries with not less than $250 million of net proceeds, or (iii) a ratable percentage of the Call Option to the counterparty to a bona fide unrelated third-party financing providing |

| | |
|---|---|
| | Smart King and its subsidiaries with net proceeds greater than $100 million and less than $250 million (i.e., an additional 1% of the Call Option for each additional $3 million of net proceeds beyond $100 million) ((i), (ii), or (iii), a "Qualifying Financing"), *provided* that FF Global may request the Trustee to transfer the Call Option for a financing of Smart King and its subsidiaries other than a Qualifying Financing subject to the consent of Trustee and approval by a majority of the Creditor Trust Committee in their respective business judgment. Any consideration paid, if any, in exchange for the transfer of the Call Option either as part of a separate transaction providing for such transfer or attributable to the transfer of the Call Option in a financing transaction, whether in conjunction with a Qualifying Financing or otherwise, shall be paid directly to the Trust and shall constitute Trust Assets. |
| **Standstill, China Restrictions, and Releases of Claims**[6] | **Standstill.** To the maximum extent permitted by applicable law, each holder of an Allowed Debt Claim shall agree for a period of four years after the Effective Date (the "Standstill Period") to not assert any new Causes of Action (as defined in the Plan) against YT for personal liability directly or derivatively in its capacity as a creditor of a claim owed solely or jointly by YT (including unwinding or alter ego type claims) in any non-U.S. jurisdiction (the "YT Claims"); *provided, however,* that such holder may continue to prosecute any actions commenced prepetition against YT up to judgment and pursue Other Distributions through judicial authorities in the People's Republic of China to satisfy such holder's Debt Claim through a mechanism that will be mutually agreed to by the parties, including claims against primary obligors solely based on such holder's contractual agreements with such primary obligors (for the avoidance of doubt, such holder may not bring unwinding or alter ego type claims against such primary obligors); *provided, however,* that the Standstill Period shall terminate in the event a Liquidation Event occurs during the Standstill Period.

**Tolling.** YT shall stipulate in the Confirmation Order that all limitations periods applicable to all YT Claims in any non-U.S. jurisdictions, to the extent not previously expired, are tolled for the duration of the Standstill Period. If reasonably requested by the Committee or the Creditor Trust Committee, as applicable, YT shall enter into a global tolling agreement evidencing such tolling.

**China Restrictions.** Each holder of an Allowed Debt Claim or Allowed Late Filed Debt Claim shall, within ninety days after the later to occur |

---

[6] For the avoidance of doubt, nothing in this section of the Term Sheet shall affect the rights of holders of Allowed China Secured Claims to pursue the collateral securing such claim as set forth in the "Non-Debt Claims" section of this Term Sheet.

of (a) the Effective Date and (b) the date such Debt Claim or Late Filed Debt Claim becomes Allowed, take the steps and provide the documents described in the Trust Agreement to (i) notify the applicable court or courts in the People's Republic of China (the "Chinese Courts") that YT and such holder and, subject to the Wei Gan Settlement,[7] Wei Gan and such holder, have reached a settlement agreement that is embodied in and has been implemented through the Plan and (b) request that the Chinese Courts remove YT and, subject to the Wei Gan Settlement, Wei Gan from the List of Dishonest Judgment Debtors (the "China Debtor List") and lift any consumption or travel restrictions (the "China Restrictions"), as applicable, and shall refrain from taking any action during the Standstill Period to cause YT and, subject to the Wei Gan Settlement, Wei Gan, to be reinstated on the China Debtor List or be subject to the China Restrictions (the "China Debtor List Covenant"). To the extent practicable, forms for holders of Allowed Debt Claims and Allowed Late Filed Debt Claims to comply with the China Debtor List Covenant shall be included in the plan supplement and approved as part of the Confirmation Order.[8]

Before any Trust Distributions are made to the holder of an Allowed Debt Claim or an Allowed Late Filed Debt Claim, such holder shall provide an affidavit that (a) certifies such holder's compliance with the China Debtor List Covenant, (b) certifies that they have not initiated any YT Claims during the Standstill Period or after the Liability Release Date, as applicable, (c) identifies any amounts received from Other Distributions as of the date of the affidavit, and (d) certifies such holder's compliance with Annex I to this Plan Term Sheet and the release of Wei Gan's personal liability.

**Effectiveness of YT Release.** Each holder of an (a) Allowed Late Filed Debt Claim, on the date of allowance of such Late Filed Debt Claim or (b) Allowed Debt Claim, once it has received Trust Distributions and Other Distributions (from enforcement or other actions) that, in the aggregate, are equal to 20% of its Allowed Debt Claim Allocation Amount (the date upon which the foregoing condition occurs is the "Liability Release Date") (i) shall be deemed to have released the YT Claims on account of such Debt Claim or Late Filed Debt Claim in every jurisdiction and (ii) agrees that it shall not assert any new, or continue to prosecute any existing, YT Claims related to such Debt Claim or Late Filed Debt Claim in every jurisdiction; *provided*, *however*, that the foregoing release shall not release, waive, or otherwise impact the rights of such holder to receive further Trust

---

[7] The Wei Gan Settlement is set forth in Annex I to this Term Sheet.
[8] Under review and discussion with international counsel.

| | Distributions or to pursue and receive Other Distributions through a mechanism that will be mutually agreed to by the parties. |
| --- | --- |
| | Within ninety days after the applicable Liability Release Date with respect to Allowed Debt Claims or the date of allowance of a Late Filed Debt Claim, each holder of an Allowed Debt Claim or Allowed Late Filed Debt Claim shall (as a condition to receiving further Trust Distributions, including any Trust Distributions upon the termination or dissolution of the Trust) (a) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against YT from the courts and judicial authorities in all jurisdictions, including, but not limited to, the Chinese Courts, or confirm with the judicial authorities that YT has settled all of his debt obligations or legal responsibilities to such holder and (b) file and execute any documents requested by YT to evidence the above release. YT reserves all rights to seek enforcement by the Chinese judicial authorities of the rights provided herein. |
| **Parties' Expenses** | Each party shall be responsible for its respective fees and expenses incurred in connection with the preparation and negotiation of this Term Sheet and the Trust Agreement. |
| **Discharge** | As a condition to the Effective Date, the Declarations shall have been delivered to the Committee. YT shall receive a discharge of all claims dischargeable under U.S. bankruptcy law upon the Effective Date to the greatest extent permissible under section 1141(d)(1)(A) of the Bankruptcy Code, and the Plan and Confirmation Order will permanently enjoin any creditor from pursuing YT personally in the United States in connection with any claim discharged under the Plan, without prejudice to the rights of any party with standing to seek to enforce the Plan or any of YT's obligations thereunder. If the discharge under the Confirmation Order is revoked for any reason, (a) the Confirmation Order shall be of no further force or effect, (b) the Plan shall be null and void in all respects, (c) no distributions under the Plan shall be made, and (d) the Debtor and all holders of claims shall be restored to the *status quo ante* as of the day immediately preceding entry of the Confirmation Order. |
| **DIP Financing** | YT will seek approval of debtor in possession financing from Pacific Technology (the "DIP Financing"). YT's obligations under the DIP Financing shall be treated as a superpriority administrative claim and secured by both YT's non-China and China assets. |
| **Plan Arbitration Procedures** | The plan supplement shall designate an arbitrator acceptable to YT and the Committee in their respective discretion (the "Arbitrator") and set forth confidential arbitration procedures (the "Plan Arbitration |

|  | Procedures") for the resolution of all Plan-related disputes (including, without limitation, disputes related to the allowance or amount of any Late Filed Debt Claim) arising between YT, on the one hand, and the Trust, the Trustee, and/or the Creditor Trust Committee, on the other hand, *provided* that the Plan or the Trust Agreement may designate another forum for resolution of particular disputes. For the avoidance of doubt, notwithstanding the Plan Arbitration Procedures, the Bankruptcy Court shall retain ultimate supervisory jurisdiction over the administration of the Trust until the end of the Term. |
|---|---|
| **Bankruptcy Actions** | The Plan shall provide that: <br><br> • In the event the Trustee (with the approval of the Creditor Trust Committee as set forth in the "Creditor Trust Committee" section of this Term Sheet) determines that it has reasonable and good-faith evidence that (a) an asset, other than any of the Seized China Assets or assets subject to seizure in China was property of YT as of the Petition Date but was not disclosed by a document or testimony in his capacity as a chapter 11 debtor during the chapter 11 case, including, without limitation, in any disclosure statement, schedules, statements of financial affairs, section 341 meeting of creditors, confidential depositions, and materials posted in the creditor data room (the "Chapter 11 Disclosures"), *provided* that the Declarations shall supersede the Chapter 11 Disclosures, the Trustee may pursue an action for turnover of such asset under section 542 of the Bankruptcy Code through the Plan Arbitration Procedures; or (b) YT was the transferor of a transfer avoidable pursuant to section 548(a)(1)(A) of the Bankruptcy Code, the Trustee may pursue an action to avoid and recover such transfer pursuant to sections 548(a)(1)(A) and 550 of the Bankruptcy Code, as applicable, through the Plan Arbitration Procedures, *provided* that such transfer did not arise out of any transaction or occurrence disclosed in the Chapter 11 Disclosures, *provided further* that the Declarations shall supersede the Chapter 11 Disclosures (collectively, (a) and (b) are the "Bankruptcy Actions"). <br><br> • Any Bankruptcy Actions must be commenced within one hundred eighty days after the Effective Date (the "Bankruptcy Actions Limitations Period"), *provided* that the Trustee shall meet and confer with YT prior to commencing any Bankruptcy Action, and the Bankruptcy Actions Limitations Period with respect to such Bankruptcy Action shall be automatically tolled for a period of thirty days while the parties meet and confer, subject to extension by mutual agreement. |

|  | • Upon the expiration of the Bankruptcy Actions Limitations Period, any Bankruptcy Actions that have not been timely asserted pursuant to the foregoing procedures shall be deemed satisfied and released, effective as of the Effective Date. |
|---|---|

Dated:  February 27, 2020

On behalf of the Debtor and Debtor in Possession

On behalf of the Official Committee of Unsecured Creditors

/s/ Suzzanne Uhland

Suzzanne Uhland (CA Bar No. 136852)
Diana M. Perez (NY Bar No. 4636403)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: 212-326-2000
Facsimile: 212-326-2061
Email:   suhland@omm.com
        dperez@omm.com

*Special Corporate, Litigation, and International
Counsel for Debtor and Debtor in Possession*

/s/ Andrew D. Behlmann

Jeffrey D. Prol (pro hac vice)
Andrew D. Behlmann (pro hac vice)
Michael A. Kaplan (pro hac vice)
Jeremy D. Merkin (pro hac vice)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: 973-597-2500
Facsimile: 973-597-2400
Email:   jprol@lowenstein.com
        abehlmann@lowenstein.com
        mkaplan@lowenstein.com
        jmerkin@lowenstein.com

*Co-Counsel to the Official Committee of
Unsecured Creditors*

/s/ Richard M. Pachulski

Richard M. Pachulski (CA Bar No. 90073)
Jeffrey W. Dulberg (CA Bar No. 181200)
Malhar S. Pagay (CA Bar No. 189289)
**PACHULSKI STANG ZIEHL & JONES LLP**
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: 310-277-6910
Facsimile: 310-201-0760
Email:   rpachulski@pszjlaw.com
        jdulberg@pszjlaw.com
        mpagay@pszjlaw.com

*Counsel to the Debtor and Debtor in Possession*

/s/ Randye B. Soref

Randye B. Soref (SBN 99146)
Tanya Behnam (SBN 322593)
**POLSINELLI LLP**
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
Telephone: 310-556-1801
Facsimile: 310-556-1802
Email:   rsoref@polsinelli.com
        tbehnam@polsinelli.com

*Co-Counsel  for the Official Committee of
Unsecured Creditors*

## Exhibit A

## Creditor Claims Waterfall[1]

Trust Assets shall be distributed as follows:

(a) First, to repay the Trust Financing, if any, pursuant to the terms thereof and the Trust Agreement;

(b) Second, to repay the DIP Facility if extended past the Effective Date pursuant to the terms of the Secured Debtor in Possession Promissory Note, by and among Pacific Technology, as Lender, and the Debtor, as Borrower and the Trust Agreement;

(c) Third, to each holder of an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim that has elected to receive Trust Interests in full and complete settlement, release, and discharge of their claim against YT, equal to the Allowed amount of such claim;

(d) Fourth, to pay Trust Distributions allocated (i) 95% to holders of Allowed Debt Claims, and (ii) 5 % to YT (or the economic equivalent of such Trust Distributions as set forth in the Trust Agreement), until each holder of an Allowed Debt Claim has received aggregate Trust Distributions (in cash or in kind) pursuant to this clause (c) equal to the full amount of such holder's Allowed Debt Claim Distribution Amount; and

(e) Fifth, after all holders of Allowed Debt Claims have received Trust Distributions equal to their respective Allowed Debt Claim Distribution Amounts, any remaining Trust Distributions shall be allocated between the holders of Allowed Debt Claims (to be further allocated pro rata based on their respective Allowed Debt Claim Allocation Amounts) and YT, as follows:

| | YT | Holders of Allowed Debt Claims |
|---|---|---|
| Amounts less than $1B | 50% | 50% |
| Amounts greater than $1B $\leq$ $2B[2] | 70% | 30% |
| Amounts greater than $2B $\leq$ $3B | 80% | 20% |
| Amounts greater than $3B $\leq$ $4B | 90% | 10% |

---

[1] Tax issues related to distributions for the Late Filed Claims Reserve are under discussion.

[2] Upon reaching such distribution level, the Trust Agreement will be automatically amended to replace the Creditor Trust Committee with YT.

| Amounts greater than $4B[3] | 95% | 5% |
|---|---|---|

---

[3] Upon reaching such distribution level, the Trust Agreement will be automatically amended to provide for a separation of YT's interests in the Trust from the residual 5% interest of holders of Allowed Debt Claims. After such separation, holders of Allowed Debt Claims shall not receive any distribution from YT's interests constituting 95% of amounts greater than $4 billion. YT shall not receive any distribution from the residual 5% interest of holders of Allowed Debt Claims.

**Exhibit B**

| Restrictions on the Sale of Trust Smart King Shares Post-IPO[1] | |
|---|---|
| Entry into Lockup Agreement | The Trust will enter into a lockup agreement (the "Lockup Agreement") with the same terms and conditions regarding the sale of the Trust Smart King Shares of any lockup and sale restriction agreement that the insiders and management of FF are subject to in connection with the underwriting. |
| In connection with IPO | The Trust may sell the lesser of (a) what is permitted under the Lockup Agreement and (b) 5% of the shares such holder owns at the time of the IPO. |
| Subsequent Sales | The Trust may sell the lesser of (a) what is permitted under the Lockup Agreement and (b): <br><br> • No more than 1% per month in year 1 after any "no sale" period; <br> • No more than 2% per month in year 2 after any "no sale" period; <br> • No more than 3% per month in year 3 after any "no sale" period; <br> • No more than 4% per month in year 4 after any "no sale" period; and <br> • No limitation after year 4. |

---

[1] These sale restrictions only apply to the Trust Smart King Shares and do not apply to the preferred units of Pacific Technology that are being transferred to the Trust, which shall be governed by the terms of the PT LLCA.

**Exhibit C[1]**

**Future Equity Incentive Plan**

The total available equity awards under the Future Equity Incentive Plan will be as follows:

| Smart King Total Equity Value (millions of USD): | $5,000 | $10,000 | $21,000 |
|---|---|---|---|
| Dilution of outstanding and reserved shares on the date of valuation | 2% | Additional 3% | Additional 3% |

---

[1] For disclosure purposes only.

**<u>Exhibit D</u>**

**Entities**

a.  Atieva, Inc. D/B/A Lucid Motors, Inc.;
b.  BAIC Motor Vehicle Co. Ltd.;
c.  Blitz Technology Hong Kong Co. Limited;
d.  Blue Sea Legend LLC;
e.  Evergrande Health Industry Group;
f.  Hankey Capital LLC;
g.  Hengtian Zhongyan Investment Management Co., Ltd.;
h.  Innovation Era Holding Ltd.;
i.  Ki Lun Trading Ltd.;
j.  Kin Kin (Hong Kong) Limited;
k.  Lanfeng (HK) Holding Limited;
l.  LeSoar Holdings Limited;
m.  Liberal Faith Limited (BVI);
n.  Lucid Motors, Inc.;
o.  Ningbo Hangzhou Bay New District Lenuo Investment Management Co., Ltd.;
p.  Ocean View Drive, Inc.;
q.  Royod LLC;
r.  Segomind, Inc.;
s.  Shing Wai Trading Limited;
t.  Shou Yi Lian Jie (Beijing) Technology Ltd. Co.;
u.  Success Pyramid Ltd.;
v.  Warm Time, Inc.; and
w.  Yi Jia Living Trust

**Annex I to YT - Plan Term Sheet**

| | |
|---|---|
| **Wei Gan Settlement** | In exchange for, and subject to (a) a Cash contribution from Wei Gan in the amount of $1,000,000 to the Trust on the Effective Date, which shall constitute Trust Assets (the "Effective Date Wei Gan Payment"), (b) a Cash payment of $250,000 to the Trust no later than ninety days after the Effective Date (the "Second Wei Gan Payment"), (c) Wei Gan's agreement not to assert any other prepetition or postpetition Claims against the Debtor or the Trust, and (d) execution of the Wei Gan Declaration (collectively, (a), (b), (c), and (d) are the "Wei Gan Release Consideration"), the following shall occur:

(a)     Upon the Effective Date Wei Gan Payment, (i) the China Debtor Covenant shall apply to Wei Gan; and (ii) Wei Gan's alleged Debt Claim against the Debtor [Claim No. 20004] shall be treated as an Allowed Debt Claim in the amount of $250,000,000.

(b)     Upon the Second Wei Gan Payment, (the date upon which the foregoing condition occurs is the "Wei Gan Liability Release Date"), (i) Wei Gan's alleged Debt Claim against the Debtor [Claim No. 20004] shall be treated as an Allowed Debt Claim in the amount of $500,000,000; and (ii) each holder of an (x) Allowed Late Filed Debt Claim, on the date of allowance of such Late Filed Debt Claim or (y) Allowed Debt Claim (A) shall, in addition to the discharge of community claims under section 524(a) of the Bankruptcy Code, be deemed to have released any Causes of Action against Wei Gan for personal liability or derivatively in its capacity as a creditor of a claim owed solely or jointly by Wei Gan (including unwinding or alter ego type claims) in any jurisdiction (the "Wei Gan Claims") on account of such Debt Claim or Late Filed Debt Claim to the maximum extent permitted by applicable law and (B) agrees that it shall not assert any new, or continue to prosecute any existing, Wei Gan Claims related to such Debt Claim or Late Filed Debt Claim in every jurisdiction.

Within ninety (90) days after the Wei Gan Liability Release Date with respect to an Allowed Debt Claim or the date of allowance of an Allowed Late Filed Debt Claim, each holder of an Allowed Debt Claim or Allowed Late Filed Debt Claim shall (as a condition to receiving further Trust Distributions, including any Trust Distributions upon dissolution of the Trust) (a) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against Wei Gan from the courts and judicial authorities in all jurisdictions, including, but not limited to, the Chinese Courts, or confirm with the judicial authorities that Wei Gan has settled all of her debt obligations or legal responsibilities to such holder and (b) file and execute any documents requested by Wei Gan to evidence the above release. Wei Gan reserves all rights to seek enforcement by the Chinese judicial authorities of the rights provided herein. |

|  | For the avoidance of doubt, upon the Wei Gan Liability Release Date, any Causes of Action against Wei Gan shall be deemed released and satisfied.<br><br>Notwithstanding anything to the contrary herein, pursuant to the divorce proceeding pending in the People's Court of Chaoyang District, Beijing, China ,Wei Gan and the Debtor's three minor children may be awarded spousal and/or child support, which obligations shall be satisfied in accordance with Article 2.4 of the Plan but, for the avoidance of doubt, shall not constitute claims against the Trust or otherwise have any claim against or interest in Trust Assets. |

# EXHIBIT C

Richard M. Pachulski (CA Bar No. 90073)
Jeffrey W. Dulberg (CA Bar No. 181200)
Malhar S. Pagay (CA Bar No. 189289)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail: rpachulski@pszjlaw.com
      mpagay@pszjlaw.com
      jdulberg@pszjlaw.com

Attorneys for Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

In re:

YUETING JIA[1],

          Debtor.

Case No.: 2:19-bk-24804-VZ

Chapter 11

**ORDER PURSUANT TO SECTIONS 105, 362 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (1) AUTHORIZING POST-PETITION FINANCING AND (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY AND (3) MODIFYING THE AUTOMATIC STAY**

**[Related to Docket No. ___]**

Date:      March 19, 2020
Time:     9:30 a.m.
Place:    United States Bankruptcy Court
         255 E. Temple Street,
         Los Angeles, CA 90012
Courtroom: 1368
Judge:    Hon. Vincent P. Zurzolo

Yueting Jia, the above-captioned debtor and debtor-in-possession (the *"Debtor"*), having

moved on February 27, 2020 (the *"Motion"*) for an order authorizing it to (i) incur post-petition

secured indebtedness, (ii) grant security interests and superpriority claims and (iii) modify the

automatic stay pursuant to sections 105(a), 362, and 364(c), (d), and (e) of title 11 of the United States

---

[1] The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing address is 91 Marguerite Drive, Rancho Palos Verdes, CA 90275.

DOCS_LA:327997.1 46353/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Code, 11 U.S.C. §§ 101-1532 (as amended, the *"Bankruptcy Code"*), and Rules 2002, 4001 and 9014, and Local Bankruptcy Rule 4001-2 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*), and having sought the following relief:

(a)    the Court's authorization, pursuant to sections 105(a), 362, and 364(c), (d), and (e) of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001 and 9014, and Local Bankruptcy Rule 4001-2 for the Debtor, in his capacity as borrower (the *"Borrower"*) to implement the debtor-in-possession financing on the terms in the attached promissory note (the *"DIP Note"*), a copy of which is attached hereto as Exhibit "1", with Pacific Technology Holding LLC (the *"DIP Lender"*), to obtain advances on a secured basis, in an aggregate principal amount not to exceed $6,400,000 (the *"DIP Loan"*) on the terms of the DIP Note (together with any and all documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, as may be amended hereafter from time to time, collectively, the *"DIP Note Documents"*);

(b)    the Court's ordering, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, that the obligations of the Debtor under the DIP Note Documents (collectively, the *"DIP Obligations"*) are:

   i.    granted superpriority administrative claim status, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 of the Bankruptcy Code; and

   ii.    secured under sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code by valid and fully perfected, first priority priming liens on and senior security interests in all of the Non-China Collateral (as defined below), and all "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed now existing or hereafter acquired or created;

   iii.    secured by valid and fully perfected, junior and subordinated security interests in all of the China Collateral (as defined below);

(c)    the Court's finding, pursuant to Bankruptcy Rule 4001(c)(3), that notice of the hearing (the "*Hearing*") to consider entry of this order is sufficient having been given to (i) the Office of the

United States Trustee (the *"U.S. Trustee"*), (ii) counsel to the DIP Lender, (iii) counsel to any party of record that has asserted a lien in the Debtor's assets, (iv) counsel to the Committee (as defined below), and (v) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (collectively, the *"Notice Parties"*); and such notice being sufficient and adequate, and no other or further notice being required; and

(d)     the Hearing having been held; and based upon all of the pleadings filed with the Court, the evidence presented at the Hearing and the entire record herein; and the Court having heard and resolved or overruled all objections to the relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, his estate, and his creditors; and after due deliberation and consideration, and sufficient cause appearing therefor:

IT IS HEREBY FOUND:

## I.     Procedural Findings of Fact

A.     **Petition Date.**  On October 14, 2019 (the "*Petition Date*"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central District of California, Northern Division (the "*Court*").  The Debtor has continued in the management and operation of his business and property as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Case.

B.     **Committee Appointed.**  On October 25, 2019, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "*Committee*") in this chapter 11 case pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 45].  The Committee consists of the following members:  (i) Ping An Bank, Ltd. Beijing Branch; (ii) China Minsheng Trust Co., Ltd.; (iii) Shanghai Leyu Chuangye Investment Management Center LP; (iv) Jiangyin Hailan Investment Holding Co., Ltd.; and (v) Shanghai Qichengyueming Investment Partnership Enterprise.

C.     **Venue Transfer.**  On December 18, 2019, the Delaware Bankruptcy Court entered its order [Docket No. 178] transferring the case to the Central District of California.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:327997.1 46353/002

D.      **Jurisdiction and Venue.**  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby.  Consideration of the Motion constitutes a "core" proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Case and proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      **Notice.**  The Hearing is being held pursuant to the authorization of Bankruptcy Rules 2002, 4001(c) and (d) and 9014.  Notice of the Hearing and the emergency relief requested in the Motion has been provided by the Debtor, to certain parties in interest, including each of the Notice Parties.  Under the circumstances, such notice of the Hearing and the relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rules 2002 and 4001.

## II.     Findings Regarding the Post-Petition Financing

F.      **Need for Post-Petition Financing**.  A need exists for the Debtor to obtain funds from the DIP Loan in order to administer his Chapter 11 Case and proceed toward confirmation of a consensual plan of reorganization on the terms negotiated with, and supported by, the Committee (the "*Consensual Plan*"), and to administer and preserve the value of his estate.  The ability of the Debtor to confirm a plan, and to maximize a return for all creditors requires the availability of the DIP Loan, the absence of which would immediately and irreparably harm the Debtor, his estate, creditors, and the possibility for a successful reorganization or sale of the Debtor's assets.

G.      **No Credit Available on More Favorable Terms**.  The Debtor has been unable to obtain any of the following:

(1)      unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2)      credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3)      credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien, or

(4)      credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Note Documents and this Order.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:327997.1 46353/002

The Debtor is unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (as defined below).

H.    **Conditions Precedent to DIP Lender's Extension of Financing.** The DIP Lender has indicated a willingness to provide financing to the Debtor in accordance with the DIP Note and the other DIP Note Documents and subject to the following:

(1)    the entry of this Order, and

(2)    findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is a good faith financier, and that the DIP Lender's post-petition claims, superpriority claims, security interests, and Liens and other protections granted pursuant to this Order and the DIP Loan will not be affected by any subsequent reversal, modification, vacation, or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

I.    **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.** The Debtor was not able to identify any party willing to lend to the Debtor and certainly not on terms as favorable as those offered by the DIP Lender. Under such difficult circumstances where no comparable fund source exists along with the need for the Debtor to gain access to needed financing and thereby maximize value for all constituents, it is determined that the terms and conditions of the DIP Loan, the DIP Note, and the other DIP Note Documents (i) are fair, reasonable, and the best available under the circumstances, (ii) reflect the Debtor's exercise of prudent business judgment consistent with his fiduciary duties, and (iii) are supported by reasonably equivalent value and consideration. The DIP Lender is an affiliate of the Debtor, based on the indirect, and minority 20% ownership interest held by the Debtor in the DIP Lender, and all parties to the case have negotiated with the Debtor, through its professionals, since the Petition Date knowing that the only source of financing for the Chapter 11 Case would be from the DIP Lender. Further, at all material times, the Committee has been aware that the financing for the case would be advanced by the DIP Lender, and the terms on which it would be advanced, as reflected in the DIP Note. The interest rate under the DIP Note (8.75%) is not unreasonable or excessive. The DIP Note also does not provide for automatic relief from the automatic stay upon a Default (as defined in the Note), but rather only consent by the Debtor (and not by the Committee) to a hearing on shortened notice with respect to a motion for relief from the automatic stay. Based on the forgoing and given the need for the financing,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and its expected treatment under the Consensual Plan, the DIP Loan was negotiated in good faith and at arms' length between the Debtor and the DIP Lender, and the use of the proceeds to be extended under the DIP Loan will be so extended in good faith, and for valid business purposes and uses, and the DIP Loan satisfies the heightened inherent fairness standard for transactions between a debtor-in-possession and an affiliate, as a consequence of which the DIP Lender is entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

J.    **Relief Essential; Best Interest.**  The relief requested in the Motion (and as provided in this Order) is necessary, essential, and appropriate for the administration of his Chapter 11 Case and proceeding towards the Consensual Plan as well as the preservation of the Debtor's assets and personal property.  It is in the best interest of the Debtor's estate that the Debtor be allowed to establish the DIP facility contemplated by the DIP Note Documents. The Debtor has demonstrated good and sufficient cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1.    The Motion is granted in accordance with the terms and conditions set forth in this Order, the DIP Note, and the other DIP Note Documents.

## I.    DIP LOAN

**A.    Approval of Entry into the DIP Note Documents**

2.    The Debtor is expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Note Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Order and the DIP Note Documents, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtor under the DIP Loan and for the creation and perfection of the DIP Liens described in and provided for by this Order and the DIP Note Documents.  Subject to the terms and conditions of this Order and the DIP Note, the Debtor is hereby authorized under the DIP Loan to borrow up to a total committed amount of $6,400,000 in accordance with the terms and conditions of the DIP Note.  The Debtor is hereby authorized and directed to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Note and all other DIP Note Documents as such become due, including, without limitation, reasonable attorneys',

6

financial advisors', and accountants' fees, and disbursements of and incurred by the DIP Lender as and to the extent provided for in the DIP Note, which amounts shall not otherwise be subject to approval of this Court. Upon execution and delivery, the DIP Note Documents shall represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms.

**B.    Application of DIP Loan Proceeds**

3.    The proceeds of the DIP Loan shall be used, in each case, in a manner consistent with the terms and conditions of the DIP Note Documents.

**C.    The DIP Liens**

4.    Effective immediately upon the entry of this Order, the DIP Lender is hereby granted pursuant to sections 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, a valid, continuing, binding, enforceable, non-avoidable, and automatically perfected first priority post-petition security interests and Liens (collectively, the "***Non-China DIP Liens***"), senior and superior in priority to all other secured and unsecured creditors of the Debtor and his estate, except, in each case, as otherwise provided in this Order, in all of the Debtor's right, title and interest in the Non-China Collateral (as defined below) in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever the same may be located, in order to secure prompt, full, faithful and timely payment and performance of the DIP Obligations, whether at stated maturity, acceleration or otherwise, together with all extensions or renewals thereof, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owned with others, and whether or not such DIP Obligations are from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such DIP Obligations that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from the DIP Lender as a preference, fraudulent transfer or otherwise. "DIP Collateral" shall include all of the Debtor's interests in all of the following types of personal property, wherever located and whether now owned or hereafter acquired, including any assets or obligations originating or relating to any property or entity (the "***DIP Collateral***") and such DIP Collateral located or domiciled in the United States, the Cayman Islands or any place else in the world other than China (collectively, the "***Non-China Collateral***"):

DOCS_LA:327997.1 46353/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(i)    all Accounts;

(ii)    all Chattel Paper;

(iii)    all Money and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

(iv)    all Documents;

(v)    all General Intangibles (including membership interests and rights, whether owned directly or indirectly, whether such interests are deemed a General Intangible or a Security, and whether held in a domestic or foreign corporation, a domestic or foreign limited liability company, a domestic or foreign Ltd. including as recognized in the Cayman Islands (each such form of organization, an "***Entity***"), consisting of (a) all economic rights, including without limitation, all rights to share in the profits and losses of the Entity, and all rights to receive distributions of the assets of the Entity; and (b) governance rights, including without limitation, all rights to vote, consent to action and otherwise participate in management and direction of the Entity), Payment Intangibles and Software (for the avoidance of doubt, to the extent such General Intangibles are located or domiciled any place in the world other than China, such General Intangibles shall be considered "Non-China Collateral" and to the extent such General Intangibles are located or domiciled in China, such General Intangibles shall be considered "China Collateral");

(vi)    all Goods, including Inventory, Equipment and Fixtures;

(vii)    all Instruments;

(viii)    all Investment Property;

(ix)    all Letter-of-Credit Rights and other Supporting Obligations;

(x)    all Records;

(xi)    all Commercial Tort Claims; and

(xii)    all Proceeds and Accessions with respect to any of the foregoing Collateral;

Terms used, but not otherwise defined in this Paragraph 4 shall have the meaning set forth in Division 9 of the California Uniform Commercial Code in effect on the date hereof (the "***UCC***"). **The security grant in the DIP Note and in this paragraph 4 is subject in all respects to the Minute Order entered September 3, 2019 in Case No: 2:18-CV-10255 SJO (MRWx) in the United States District Court for the Central District of California (the "*Minute Order*"), attached to the DIP Note and incorporated therein as Exhibit 1 to the extent the Minute Order remains enforceable in light of the Chapter 11 Case and has not been avoided or disallowed therein.**

5.    Effective immediately upon the entry of this Order, the DIP Lender is hereby granted

8

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

pursuant to sections 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, a valid, continuing, binding, enforceable, non-avoidable, and automatically perfected second priority post-petition security interests and Liens (collectively, the "*China DIP Liens*", and together with the Non-China DIP Liens, collectively, the "*DIP Liens*"), senior and superior in priority to all other unsecured creditors, and junior and subordinated in priority to all other secured creditors of the Debtor and his estate, except, in each case, as otherwise provided in this Order, in all of the Debtor's right, title and interest in the DIP Collateral located in China (the "*China Collateral*") in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever the same may be located, in order to secure prompt, full, faithful and timely payment and performance of the DIP Obligations, whether at stated maturity, acceleration or otherwise, together with all extensions or renewals thereof, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owned with others, and whether or not such DIP Obligations are from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such DIP Obligations that are paid, to the extent all or any party of such payment is avoided or recovered directly or indirectly from the DIP Lender as a preference, fraudulent transfer or otherwise. **The security grant in the DIP Note and in this Paragraph 5 is subject in all respects to the Minute Order, attached to the DIP Note and incorporated therein as Exhibit 1 to the extent the Minute Order remains enforceable in light of the Chapter 11 Case and has not been avoided or disallowed therein.**

**D.    DIP Lien Priority**

6.    The DIP Liens granted to the DIP Lender as provided herein, are:

(a)    granted pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code,

(b)    first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the Non-China Collateral, and

(c)    junior, valid, secondary, perfected, unavoidable and subordinate to any security, mortgage, or collateral interest or Lien or claim to the China Collateral.

The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the DIP Note Documents. The DIP Liens shall

not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Case and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to Case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "**Successor Case**", and collectively the "**Successor Case**"), and/or upon the dismissal of the Chapter 11 Case. The DIP Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or the assertion by the Debtor of the "equities of the case" exception of section 552 of the Bankruptcy Code and, upon entry of this Order, shall not be subject to section 506(c) of the Bankruptcy Code.

**E.      Enforceable Obligations**

7.      The DIP Note Documents shall constitute and evidence the valid and binding obligations of the Debtor, and shall be enforceable against the Debtor, his estate, and any successors thereto, and their creditors in accordance with their terms.

**F.      Superpriority Administrative Claim Status**

8.      All DIP Obligations shall be an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**" and, together with the DIP Liens, collectively, the "**DIP Protections**") with priority in the Chapter 11 Case (and any Successor Case) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and his estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of this Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment; provided, however, that the DIP Protections shall not attach to or be payable from any Bankruptcy Recoveries.

9.      No costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations, or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

10

with any other claims of the DIP Lender arising hereunder.

## II.    POST-PETITION LIEN PERFECTION

10.    This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of lien, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.

11.    Notwithstanding the foregoing, the DIP Lender may, in its discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of liens, and other similar instruments and documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of liens, and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Case.

12.    The Debtor shall execute and deliver to the DIP Lender all such financing statements, deeds of trust, mortgages, security agreements, notices of liens, and other similar instruments and documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto.

13.    The DIP Lender, in its discretion, may file a photocopy of this Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Order.

14.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Note Documents as necessary to

DOCS_LA:327997.1 46353/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(a) permit the DIP Lender to execute, file and record such documents that evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto as the DIP Lender determines, in its discretion, is appropriate; and

(b) exercise such rights and remedies arising from the occurrence of an Event of Default as and solely to the extent authorized in paragraphs 16-20 below.

### III.    DIP EVENT OF DEFAULT, AND REMEDIES

### G.    Events of Default

15.    Each of following shall constitute an "***Event of Default***", unless otherwise waived by the DIP Lender in its sole discretion:

a)    The Debtor shall fail to pay all or any part of the principal of the DIP Loan when due, or shall fail to pay any installment of interest or other amount payable under the DIP Note within three (3) business days of the date when due;

b)    The Debtor shall fail to perform or observe any other term, covenant or agreement contained in the DIP Note other than any such term referred to in any other subsection in this Paragraph 15 on his part to be performed or observed and such default shall not have been remedied or waived within ten (10) days after the occurrence thereof;

c)    Any representation or warranty made by the Debtor in the DIP Note of this Order shall be false or misleading;

d)    (i) The entry of an order which has not been withdrawn, dismissed or reversed (A) authorizing the Debtor in the Chapter 11 Case to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code, or authorizing any person to recover from any portions of the DIP Collateral any costs or expenses of preserving or disposing of such DIP Collateral under Section 363(c) of the Bankruptcy Code, or (except as provided in this Order) authorizing the use of cash collateral without the DIP Lender's prior written consent under Section 363(c) of the Bankruptcy Code; (B) appointing an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case; (C) without the prior written consent of the DIP Lender, dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (D) the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a lien on any portion of the DIP Collateral or on any other property or assets of the Debtor having a fair market value in excess of $5,000,000 or (2) with respect to any lien of, or the granting of any lien on any DIP Collateral or any other property or assets of the Debtor to, any State or local environmental or regulatory agency or authority; (E) amending, supplementing, staying, reversing, vacating or otherwise modifying this Order, the DIP Note or the DIP Lender's rights, benefits, privileges or remedies under this Order or the DIP Note; (F) without the prior written consent of the DIP Lender, filing a plan of reorganization for the Debtor or any modification thereto; (G) consolidating or combining the Debtor with any other person except pursuant to a confirmed plan of reorganization with the prior written consent of the DIP Lender as contemplated in the plan of reorganization; (H) approving, or there shall arise, any other super-priority administrative expense claim (other than those specifically referred to in Section 1.05 of the DIP Note or otherwise specified in this Order) having any priority over the super-priority administrative expense priority of the DIP Obligations in respect of the Chapter 11 Case; or (I) confirming a plan of reorganization for the Debtor that does not provide for the payment in full in cash of the Obligations on the effective date of such plan;

or (ii) the filing by the Debtor of a motion, application or other petition to effect or consent to any order referred to in the foregoing clause (i);

e)    (i) One or more judgments or orders as to post-Petition Date liability or indebtedness in excess of $50,000 shall be entered against the Debtor not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage and either (A) enforcement proceedings shall have been commenced and shall be continuing by any creditor upon such judgment or orders or (B) there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgments or orders, by reason of a pending appeal or otherwise, shall not be in effect; or (ii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against the Debtor which could reasonably be expected to result in a material adverse effect and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

f)    At any time after the execution and delivery thereof; (i) the DIP Note, for any reason other than the satisfaction in full of all DIP Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void, (ii) the DIP Lender shall not have or shall cease to have a valid and perfected and unavoidable lien prior to all other perfected and unavoidable liens in any DIP Collateral purported to be covered by the DIP Note in either case for any reason other than the failure of the DIP Lender to take any action within its control, or (iii) the Debtor shall contest the validity or enforceability of the DIP Note or any provision thereof in writing or deny in writing that it has any further liability, including with respect to future advances by the DIP Lender, under the DIP Note or any provision thereof to which it is a party.

## H.    Rights and Remedies Upon Event of Default

16.    Upon the occurrence and during the continuance of any Event of Default, the DIP Lender may declare (i) the unpaid principal amount of and accrued interest on the DIP Note and (ii) all other DIP Obligations immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Debtor, and the same shall forthwith become, immediately due and payable, and any obligation of the DIP Lender to make the DIP Note shall thereupon be terminated.

17.    Further, upon the occurrence and during the continuance of any Event of Default, the Debtor consents to and shall not object to the DIP Lender seeking a hearing on shortened notice for relief from the automatic stay and upon such relief, the DIP Lender may (i) exercise all rights and remedies of the DIP Lender set forth in this Order and the DIP Note with grant of security interest, in addition to all rights and remedies allowed by, the United States and of any state thereof, including, but not limited to the UCC.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative and not alternative.

13

18.     The Debtor waives, (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties or other property at any time held by the DIP Lender on which the Debtor may in any way be liable and hereby ratify and confirm whatever the DIP Lender may lawfully do in this regard, (ii) subject to the notice and relief from stay provisions of the preceding Paragraph 17 above, all rights to notice and hearing prior to the DIP Lender's taking possession or control of, or to the DIP Lender reply, attachment or levy upon, the DIP Collateral, or any bond or security which might be required by any court prior to allowing the DIP Lender to exercise any of its remedies, and (iii) the benefit of all valuation, appraisal and exemption laws.  The Debtor acknowledges it has been advised by counsel of his choice with respect to the effect of the foregoing waivers and the DIP Note and the transactions evidenced by the DIP Note.

19.     Subject to the provisions of Paragraphs 16-18 above, upon the occurrence of an Event of Default, the DIP Lender is authorized to exercise its remedies and proceed under or pursuant to the DIP Note Documents and applicable law.  All proceeds realized from any of the foregoing shall be applied to the DIP Obligations and in accordance with the provisions of the DIP Note Documents and this Order.

20.     Nothing included herein shall prejudice, impair, or otherwise affect the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtor.

## IV.    CERTAIN OTHER PROVISIONS

### A.    Extension Term

21.     At the Debtor's election, the Maturity Date may be extended for one (1) year (the "*Extension Term*") so long as (i) all liens securing such loans remain perfected first priority liens on the DIP Collateral, subject only to the liens securing the $1,500,000 required to fund the Creditors' Trust (as defined below), (ii) all obligations of the DIP Note continue to be obligations of the entity to which the DIP Collateral is transferred, including the creditors' trust formed pursuant to the Debtor's plan of reorganization under Chapter 11 of the Bankruptcy Code (the "*Creditors' Trust*")

14

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and (iii) the interest rate per annum shall be increased to twelve percent (12%) per annum.

## V.    OTHER RIGHTS AND OBLIGATIONS

### A.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order

22.    Based on the findings set forth in this Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Loan contemplated by this Order, in the event any or all of the provisions of this Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification, amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby.

23.    Notwithstanding any such modification, amendment, or vacation, any claim granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment, or vacation of any DIP Protections granted to the DIP Lender shall be governed in all respects by the original provisions of this Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Note are made in reliance on this Order, the obligations owed the DIP Lender prior to the effective date of any stay, modification, or vacation of this Order shall not, as a result of any subsequent order in the Chapter 11 Case or in any Successor Case, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Order and/or the DIP Note Documents.

### B.    Binding Effect

24.    The provisions of this Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor), the Committee or any other committee in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 Case.

DOCS_LA:327997.1 46353/002

**C.    No Third Party Rights**

25.    Except as expressly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

**D.    Amendments**

26.    The Debtor and the DIP Lender, as applicable, may amend, modify, supplement, or waive any provision of the DIP Note Documents without further approval of the Court unless such amendment, modification, supplement, or waiver (i) increases the interest rate, (ii) increases the amount of the DIP Loan, or (iii) changes the maturity date of the DIP Loan (other than the Extension Term).  Except as set forth above, all waivers, modifications, or amendments of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtor and the DIP Lender and approved by the Court.

**E.    Survival of Order**

27.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

    (a)    confirming any plan in the Chapter 11 Case,

    (b)    converting the Chapter 11 Case to a Case under chapter 7 of the Bankruptcy Code,

    (c)    dismissing the Chapter 11 Case,

    (d)    withdrawing of the reference of the Chapter 11 Case from this Court, or

    (e)    providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in this Court.

28.    The terms and provisions of this Order including the DIP Protections granted pursuant to this Order and the DIP Note Documents shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Order until all of the outstanding DIP Obligations have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Loan which survive such discharge by their terms).

29.    Unless and until the DIP Obligations have been indefeasibly repaid in full in cash (or other arrangements for payment of the Prepetition Debt and the DIP Obligations satisfactory to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DIP Lender in their reasonable discretion have been made) and the DIP Loan has been terminated, the protections afforded to the DIP Lender pursuant to this Order and under the DIP Note Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a **plan of reorganization or liquidation pursuant to Chapter 11 of the Bankruptcy Code in the Debtor's Chapter 11 Case** or converting the Chapter 11 Case into a Successor Case, and the DIP Liens and the DIP Superpriority Claim shall continue in the Chapter 11 Case and in any Successor Case, and such DIP Liens and DIP Superpriority Claim shall maintain their respective priorities as provided by this Order.

**F.**     **Inconsistency**

30.     In the event of any inconsistency between the terms and conditions of the DIP Note Documents and of this Order, the provisions of this Order shall govern and control.

**G.**     **Enforceability**

31.     This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

**H.**     **Objections Overruled**

32.     All objections to the Motion, to the extent not withdrawn or resolved, are hereby overruled.

**I.**     **Waiver of Any Applicable Stay**

33.     Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Order.

**J.**     **Proofs of Claim**

34.     The DIP Lender will not be required to file proofs of claim in the Chapter 11 Case or in any Successor Case.

**K.**     **Headings**

35.     The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

17

DOCS_LA:327997.1 46353/002

## L.    Retention of Jurisdiction

36.    The Court has and will retain jurisdiction to enforce this Order according to its terms.

| | |
|---|---|
| *Counsel for the Debtor:*<br>Richard M. Pachulski<br>Jeffrey W. Dulberg<br>Malhar S. Pagay<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>Telephone: 310/277-6910<br>Facsimile: 310/201-0760<br>E-mail: rpachulski@pszjlaw.com<br>       mpagay@pszjlaw.com<br>       jdulberg@pszjlaw.com | *Office of the U.S. Trustee:*<br>Kelly L Morrison, Esq.<br>915 Wilshire Blvd., Suite 1850<br>Los Angeles, CA 90017<br>Telephone: 213/894-2656<br>Facsimile: 213/894-2603<br>Email: kelly.l.morrison@usdoj.gov |
| *Special Corporate, Litigation, and International Counsel for Debtor:*<br>Suzzanne Uhland<br>Diana Perez<br>O'MELVENY & MYERS LLP<br>Times Square Tower<br>7 Times Square<br>New York, NY 10036<br>Telephone: 212/326-2000<br>E-mail: suhland@omm.com<br>       dperez@omm.com | |

DOCS_LA:327997.1 46353/002

| **Counsel for the DIP Lender:** | **Counsel for Official Committee of Unsecured Creditors** |
|---|---|
| David W. Meadows<br>Law Offices of David W. Meadows<br>1801 Century Park East, Suite 1235<br>Los Angeles, CA  90067<br>Telephone: (310) 557-8490<br>Facsimile:  (310) 557-8493<br>Email:  david@davidwmeadowslaw.com | Andrew D. Behlmann<br>Jeremy D. Merkin<br>Jeffrey D. Prol<br>Lowenstein Sandler LLP<br>One Lowenstein Drive<br>Roseland, NJ 07068<br>Telephone:  973/597-2500<br>Facsimile:   973/597-2400<br>Email:   abehlmann@lowenstein.com<br>          jmerkin@lowenstein.com<br>          jprol@lowenstein.com<br><br>- and –<br><br>Randye B. Soref<br>Tanya Behnam<br>Polsinelli LLP<br>2049 Century Park East, Suite 2900<br>Los Angeles, CA 90067<br>Telephone:  310/556-1801<br>Facsimile:   310/556-1802<br>Email:   rsoref@polsinelli.com<br>          tbehnam@polsinelli.com |

### ###

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit "1"**

**DIP Note**

**(To Be Attached to Entered Order**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13ᵗʰ Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document entitled (*specify)*:  **NOTICE OF MOTION AND MOTION FOR ORDER (A) AUTHORIZING DEBTOR IN POSSESSION TO (I) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 362, AND 364, AND (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-PETITION LENDER PURSUANT TO 11 U.S.C. §364; AND (B) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§361, 362, AND 364; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ROBERT MOON AND MATTHIAS AYDT IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **February 27, 2020,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **February 27, 2020,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **February 27, 2020,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**VIA PERSONAL DELIVERY**
United States Bankruptcy Court
Central District of California
Attn:  Hon. Vincent Zurzolo
Edward R. Roybal Federal Bldg./Courthouse
255 East Temple Street, Suite 1360
Los Angeles, CA  90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 27, 2020 | Nancy H. Brown | /s/ *Nancy H. Brown* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                               **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:327335.1 46353/002

## SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ

### 1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>

- Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com
- Jerrold L Bregman    ecf@bg.law, jbregman@bg.law
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Stephen D Finestone    sfinestone@fhlawllp.com
- Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com
- Ben H Logan    blogan@omm.com
- David W. Meadows    david@davidwmeadowslaw.com
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

DOCS_LA:327335.1 46353/002