Richard M. Pachulski (CA Bar No. 90073)
Jeffrey W. Dulberg (CA Bar No. 181200)
Malhar S. Pagay (CA Bar No. 189289)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail:  rpachulski@pszjlaw.com
           jdulberg@pszjlaw.com
           mpagay@pszjlaw.com

Attorneys for Debtor and Debtor in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| In re: | Case No.: 2:19-bk-24804-VZ |
|---|---|
| YUETING JIA,[1] | Chapter 11 |
| Debtor. | **DECLARATION OF YUETING JIA IN SUPPORT OF DEBTOR'S OPPOSITION TO MOTION TO DISMISS DEBTOR'S CHAPTER 11 CASE BY CREDITOR SHANGHAI LAN CAI ASSET MANAGEMENT CO., LTD.**<br><br>[Relates to Docket Nos. 358 and 359]<br><br>Date:        March 19, 2020<br>Time:        9:30 a.m.<br>Place:       United States Bankruptcy Court<br>               255 E. Temple Street<br>               Los Angeles, California 90012<br>Courtroom: 1368<br>Judge:       Hon. Vincent P. Zurzolo |

I, Yueting Jia, under penalty of perjury, declare as follows:

1.      I am the debtor and debtor in possession (the "Debtor"), and I filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing the above-captioned bankruptcy case (the "Chapter 11 Case") on October 14, 2019 (the "Petition Date").

---

[1] The last four digits of the Debtor's federal tax identification number are 8972.  The Debtor's mailing address is 91 Marguerite Drive, Rancho Palos Verdes, CA  90275.

2.      I submit this Declaration (the "Declaration") in support of the *Debtor's Opposition to the Motion to Dismiss Debtor's Chapter 11 Case by Creditor Shanghai Lan Cai Asset Management Co., Ltd.* [Docket No. 358] (the "Opposition").[2]

3.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of books and records, relevant documents and other information prepared or collected by my employees, advisors and representatives, or my opinion based on my experience.  In making my statements based on my review of books and records, relevant documents and other information prepared or collected by my professionals, advisors and employees, I have relied upon these professionals, advisors and employees accurately recording, preparing or collecting such documentation and other information.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

4.      I am familiar with the contents of the Opposition and would testify that the facts set forth therein are true and correct to the best of my knowledge.

5.      I am not fluent in English.  Accordingly, in the ordinary course of my business and personal affairs that require me to communicate in English either orally or in writing, I employ interpreters/translators who are fluent in both English and Chinese.  I am utilizing such interpreters/translators in connection with matters that arise in connection with my Chapter 11 Case and intend to continue to do so.  I have reviewed the Opposition and this Declaration with the assistance of such interpreters/translators and can confirm that the factual statements contained therein are true and correct to the best of my knowledge.

6.      I commenced the above Chapter 11 Case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").   My case was originally docketed under Case No. 19-12220 (KBO).  On December 18, 2019, the Delaware Bankruptcy Court entered an order transferring venue of this Chapter 11 Case to this Court.

7.      On October 17, 2019, I filed my schedules and statement of financial affairs (the "Schedules") [Docket No. 28] in which, on Schedule B, Item No. 19, I indicate that I own 100% of

---

[2] Unless otherwise noted, capitalized terms used in this Declaration have the same meanings ascribed in the Opposition.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

West Coast LLC ("WC"). Record ownership in WC is held by a nominee pursuant to a certain WC Nominee Agreement (as hereinafter defined). I retain all economic interests in WC.

8. Prior to the formation of the FF Global Partnership Program in 2019, I owned 100% of the economic interests in Pacific Technology Holding LLC ("PTH") through a nominee agreement. After the formation of the FF Global Partnership Program, FF Global Partners LLC owns 100% of the issued and outstanding common units of PTH and 80% of the total equity interest in PTH. The remaining 20% interest is owned by WC which holds 90,588,235 preferred units of PTH (the "Preferred PT Units"). I own 100% of the economic interests in WC through the WC Nominee Agreement.

9. On July 31, 2019, I entered into a nomination agreement with WC and Lian Bossert (the "WC Nominee Agreement") pursuant to which Lian Bossert was named as the nominee (the "WC Nominee"). A true and correct copy of the WC Nominee Agreement is attached hereto as **Exhibit "A."** My signature appears at the end of the WC Nominee Agreement. I am familiar with the signature of Lian Bossert who also signed the WC Nominee Agreement.

10. In accordance with the terms of the WC Nomination Agreement, the WC Nominee is the record owner of the ownership units of WC, WC is the record owner of the Preferred PTH Units and I retain all economic interests associated with the equity of WC and PTH as set forth in the Limited Liability Company Agreement of West Coast LLC (the "WC LLC Agreement") and the Third Amended and Restated Limited Liability Company Agreement of Pacific Technology Holding LLC, as amended by the First Amendment to the Third Amended and Restated Limited Liability Company Agreement (the "PTH LLC Agreement"). True and correct copies of the WC LLC Agreement and the PTH LLC Agreement are attached hereto as **Exhibits "B"** and **"C,"** respectively. I am familiar with the WC LLC Agreement and the PTH LLC Agreement and, if called to testify, would testify that Exhibits "B" and "C" attached hereto are true and correct copies of these agreements. Prior to the formation of WC, the WC Nominee was the record holder of the Preferred PTH Units.

11. Pursuant to Section 16 of the PTH LLC Agreement, the Preferred PTH Units entitle me, through WC, to receive certain distributions of capital from PTH from time to time which

consist of (a) a priority distribution of up to $815.7 million, plus interest at 8% per annum, after the return of capital to the management (plus 8% interest per annum), plus (b) a special distribution of 10% of all remaining distributions of capital from PTH, plus (c) a pro rata share (i.e., 20%) of all remaining distributions of capital from PTH (collectively, the "PTH Distributions Rights").    Also, pursuant to Section 14(c) of the PTH LLC Agreement, I retained the right to direct the transfer of 147,058,823 Class B ordinary shares of Smart King Ltd. (n/k/a FF Intelligent Mobility Global Holdings Ltd.) ("Smart King"), the parent company of Faraday Future ("Faraday" or "FF"), to a creditor trust (the "PTH Transfer Rights").

12.     Shortly after the Official Committee of Unsecured Creditors (the "Committee") was appointed in my case, I, together with my advisors, began discussing the path to a consensual plan of reorganization and the scope of due diligence required by the Committee in order for it to have the necessary frame of reference to consider my proposals to effectuate a restructuring.  I facilitated the Committee's due diligence process through my Chapter 11 Case by playing a role or advising my professionals to participate in the following:

    a.     Negotiated the terms of non-disclosure agreements regarding confidential information to be provided by me and FF to permit the smooth flow of information to the Committee.

    b.     Working with my advisors, I provided the Committee with access to multiple data rooms populated with thousands of pages of documents containing my financial and business information and that of FF and Smart King.

    c.     On November 22, 2019, I conducted an all-day meeting at Faraday with Faraday's management, as well as thirteen (13) Committee representatives, creditor representatives and Committee professionals, in order to provide an overview of FF's business operations and financial condition, and to discuss the Plan.

    d.     On November 25, 2019,  representatives of creditors (nearly all of whom traveled from the People's Republic of China) visited Faraday's headquarters for a separate, full day of meetings that included comprehensive presentations

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

regarding Faraday's business operations and financial condition and sessions allowing creditors to ask questions and voice concerns regarding the my proposed restructuring.  Thirty-five (35) creditor representatives and two (2) representatives of the Committee participated in this meeting.

e.     On January 6 and 7, 2020, my advisors and I facilitated the Committee's investigative interviews of seven witnesses relating to my financial affairs and FF's business operations.

f.     On January 17 and 18, 2020, I participated in a two-day deposition by the Committee and an individual member of the Committee, where I provided additional information regarding issues arising during the course of the Committee's due diligence over the previous three months.  A representative of the Office of the United States Trustee was present at the January 17, 2020 session.

g.     Throughout the due diligence process, my advisors met with the Committee's advisors on several occasions to discuss the parallel due diligence and consensual plan formulation processes.

h.     On February 6, 2020, the Court entered its *Order (I) Requiring Parties to Participate in Mediation; and (II) Setting Further Status* Conference [Docket No.  308] (the "Mediation Order"). In accordance with the Mediation Order, that same week, I along with the Committee and other creditors seeking to participate in the mediation (SLC and SQ) attended mediation sessions with the Hon. Mitchel R. Goldberg (ret.).  At the conclusion of the mediation sessions, I reached an agreement with the Committee regarding the material terms of the Plan.

i.     On February 27, 2020, the material terms of the Negotiated Plan were memorialized in the executed Plan Term Sheet filed with the DIP Motion and, on March 2, 2020, I filed my Second Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code and accompanying Disclosure Statement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

13.      I commenced the Chapter 11 Case with the goal of negotiating a consensual chapter 11 plan which would be in the best interest of all of my creditors.  Through my efforts, with the assistance of my advisors and the efforts of the Committee and its professionals, I was able to reach an agreement on the material terms of a chapter 11 plan that has now been filed.  Each step of the way, from the inception of my Chapter 11 Case through to the date hereof, I have proceeded in good faith and will continue to do so to accomplish my goal of a successful reorganization.

1         I declare under penalty of perjury under the United States of America that the foregoing is

2    true and correct.

3    Executed this __3__ day of March 2020, at Gardena, California.

4

5                        Yueting Jia

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# Exhibit A

## NOMINEE AGREEMENT

THIS NOMINEE AGREEMENT (the "**Agreement**") is made and entered into as of July 31, 2019, by and among West Coast LLC, a Delaware limited liability company (the "**Company**"), Jia YueTing ("**YT**") and Lian Bossert (the "**Nominee**"). Capitalized terms used herein but not defined shall have the respective meanings set forth in the Limited Liability Company Agreement of West Coast LLC, dated as of July 31, 2019 (the "**LLC Agreement**").

WHEREAS, the Nominee was the record owner of 90,588,235 Preferred Units (the "**Pacific Units**") of Pacific Technology Holding LLC, a Delaware limited liability company ("**Pacific Technology**") and the parties hereto have previously entered into certain agreements in connection with the Nominee's ownership of the Pacific Units, including a Nomination Agreement, Power of Attorney Agreement, Membership Interests Power, and Letter from YT to the Nominee regarding such grant of power of attorney from YT to Nominee (collectively, the "**Previous Nominee Agreements**") desire to record their arrangements with respect to the Pacific Units;

WHEREAS, the Nominee has formed the Company and desires to hold the Pacific Units indirectly through the Company;

WHEREAS, concurrently with the entry of this Agreement, the Nominee will assign and contribute all Pacific Units to the Company in exchange for 90,588,235 units in the Company, which represents all of the membership interest in the Company (the "**Units**"); and

WHEREAS, the parties hereto desire to enter into this Agreement to replace the Previous Nominee Agreements.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1.  Certain Definitions. In this Agreement:

(a)     "**Control Affiliate**" means YT and any person or entity controlling, controlled by or under common control with, directly or indirectly, YT.

(b)     "**Employee Affiliate**" means any person employed by (or who is the spouse, relative or relative of a spouse, in each case residing in the home of a person employed by) a Control Affiliate.

(c)     "**Other Affiliate**" means any person or entity that has a substantial business relationship with a Control Affiliate and which is not itself a Control Affiliate.

(d)     "**Pacific LLC Agreement**" means the Third Amended and Restated Limited Liability Company Agreement of Pacific Technology dated as of July 5, 2019.

(e)     "**Securities Act**" means the Securities Act of 1933, as amended.

(f)     "**Transfer**" means, with respect to a member of the Company or Pacific Technology, to sell, assign, pledge, encumber, transfer or otherwise dispose of, whether directly or indirectly, voluntarily or involuntarily or by operation of law, all or a portion of its, his or her

membership interest in the Company or Pacific Technology.    The terms **"Transfers"**, **"Transferred"** and **"Transferring"** shall have correlative meanings.

(g)    **"Unit Equivalent"** means at any time any security convertible into, exchangeable for, or carrying the right to acquire units or subscriptions, warrants, options, rights or other arrangements obligating the Company to issue or dispose of any units of membership interests or any units of any other voting class or series of stock of the Company, regardless whether such security is convertible, exchangeable or exercisable at such time.

(h)    **"YT Affiliate"** means with respect to YT any person or entity who is a Control Affiliate, Employee Affiliate or Other Affiliate.

SECTION 1.  Nominee Arrangement Generally. The Nominee shall be the record owner of the Units and shall be the holder of all voting rights associated with ownership of the Units as set forth in the LLC Agreement. The Company shall be the record owner of the Pacific Units and shall be the holder of all voting rights associated with ownership of the Pacific Units as set forth in the Pacific LLC Agreement. YT shall retain all economic interests associated with ownership of the Units and the Pacific Units as set forth in the LLC Agreement and the Pacific LLC Agreement.

SECTION 2.  Voting Powers. At all times prior to the termination of the nominee arrangement created hereby, the Nominee shall have the exclusive right to vote the Units, or give written consent, in person or by proxy, at all meetings of members of the Company, and in all proceedings in which the vote or consent, written or otherwise, of the holders of Units may be required or authorized by law. The Nominee shall vote all Units in accordance with this Agreement. The Nominee shall have full power and authority, and he is hereby empowered and authorized, to vote the Units as in his sole judgment he believes to be in the best interest of the members of the Company generally, it being understood that the Nominee will exercise his independent judgment in determining the best interests of the members of the Company, and to do any and all other things and take any and all other actions as fully as any Unitholder of the Company might do if personally present at a meeting of the members of the Company. YT agrees that he will not communicate with the Nominee in connection with any proceeding in which the vote or consent of the holders of Units may be required or authorized by law or otherwise seek to influence the Nominee in the exercise of his right to vote or consent in any such proceedings. YT shall promptly provide to the Nominee from time to time such information as is reasonably necessary (including certificates and/or other documents) in order to enable the Nominee to carry out the foregoing obligations.

SECTION 3.  Dividends. If Pacific Technology pays or issues dividends or makes other distributions on the Pacific Units, the Company shall accept and receive such dividends and distributions. If the Company pays or issues dividends or makes other distributions on the Units, the Nominee shall accept and receive such dividends and distributions. Upon receipt of dividends and distributions, the amount shall be distributed promptly by the Nominee or the Company, as the case may be, pursuant to transfer instructions set forth on Schedule A attached hereto. In the performance of their duties to deliver cash dividends under this Agreement, the Nominee and the

2

Company shall not be obligated to risk their own funds and will not be liable for taxes or other charges related to the delivery of such dividends or distributions.

SECTION 4.    Termination. (a) The nominee arrangement created hereby shall terminate on the earliest to occur of:

(i)      ten years from the date hereof; and

(ii)     the written election of YT at any time.

An election pursuant to Section 4(b) shall be effective upon the third day following delivery of notice thereof to the Nominee.

(b) Upon the termination of this Agreement, the Nominee and the Company shall immediately Transfer the Units, Pacific Units or any other voting or beneficial interest in Pacific Technology to YT and take all necessary actions to procure that all equity interests in Pacific Technology, directly or indirectly held by the Nominee or the Company, be held by YT on the book of the Company or Pacific Technology, as the case may be.

SECTION 5.    Compensation. In consideration of the services provided to YT by the Nominee and the Company under this Agreement, YT shall pay or procure the annual payment of US $60,000, payable on the last business day of each calendar year to the Nominee; *provided* that the payment for the services in 2019 shall be prorated from the date of this Agreement and if terminated earlier than December 31 of a given year, such payment for such given year shall be prorated based on the days that the services are provide within such given year. For the avoidance of doubt, parties hereto hereby acknowledge and agree that the compensation paid hereunder serves as consideration for services provided by the Nominee under this Agreement and shall in no event be considered or treated as consideration for the transfer of record ownership of the Units or the Pacific Units.

SECTION 6.    Exercise, Conversion, Exchange or Cancellation of Units or Pacific Units. The Nominee and the Company shall, upon written instruction of YT, submit to the Company or Pacific Technology, as the case may be, for exercise, conversion, exchange or cancellation any Unit or Pacific Unit in which YT has a beneficial interest hereunder. Such notice shall state (a) whether such Units or Pacific Units are to be exercised, converted, exchanged or cancelled, (b) the date on which such Units or Pacific Units are to be submitted to the Company or Pacific Technology (which date shall not be less than five days after the Nominee or the Company's receipt of such notice), (c) the number and type of Units or Pacific Units to be submitted to the Company or Pacific Technology and (d) the consideration, if any, to be received upon such exercise, conversion, exchange or cancellation from the Company or Pacific Technology. The notice shall be accompanied by any exercise price or other payment and any agreement, certificate or other documentation required in connection with such exercise, conversion, exchange or cancellation. On the date specified in such notice, and against receipt from the Company or Pacific Technology of the specified consideration, if any, the Nominee or the Company shall deliver by first class mail: (x) to the Company or Pacific Technology, any exercise price or other payment and any agreement, certificate or other documentation delivered

3

to the Nominee or the Company by YT with such notice and (y) to YT the consideration, if any, received by the Nominee pursuant to such exercise, conversion, exchange or cancellation.

SECTION 7.  Increase or Decrease in Number of Units or Pacific Units. In the event of an increase in the number of Units or Pacific Units by virtue of a unit split or the decrease in the number of Units or Pacific Units because of a contraction of the units or a change in the number of outstanding units of the Company or Pacific Technology as a result of some other recapitalization in which the Company or Pacific Technology receives no consideration for the issuance of the additional or reduced number of units, the new additional or changed number of Units or Pacific Units shall be held by the Nominee or the Company, as the case may be.

SECTION 8. Successor Nominee. There shall initially be one Nominee created hereby. Upon the bankruptcy, suspension, incapacity, resignation or removal (in accordance with Section 9 below) of the initial Nominee, YT shall appoint a successor Nominee.

SECTION 9.  Removal/Resignation of Nominee.

(a)  A Nominee may be removed by YT:

(i)  if it is determined by a court of competent jurisdiction that either (A) the Nominee or the Company has willfully and materially violated the terms of this Agreement, or (B) the Nominee has been guilty of malfeasance, misfeasance or dereliction of duty hereunder;

(ii)  if the Nominee or the Company shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall have consented to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall have made a general assignment for the benefit of creditors, or shall have failed generally to pay its debts as they become due, or shall have taken any action to authorize any of the foregoing; or

(iii)  if an involuntary case or other proceeding shall have been commenced against the Nominee or the Company seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall have remained undismissed and unstayed for a period of 60 days, or an order for relief shall have been entered against the Nominee or the Company under the federal bankruptcy laws as now or hereafter in effect.

(b)  If YT determine that a basis exists for removal of the Nominee under Section 9(a) above, he shall deliver written notice of such determination to the Nominee stating the basis for such removal.

4

OMM_US:77110088.3

(c)     The Nominee shall resign his position as such (i) upon ten days' written notice to YT but only if a successor Nominee, appointed as provided for in <u>Section 8</u> above, has agreed to serve as such effective upon the effectiveness of the resignation of the Nominee then acting, or (ii) in any event upon 2 days' written notice to YT. Upon the removal or resignation of the Nominee, the Nominee shall transfer and assign all Units to the successor Nominee or to YT according to YT's instruction and shall take all other actions that are necessary to affect such transfer or assignment.

SECTION 10.   <u>Transfer Restrictions; Transfer</u>. The Nominee shall not Transfer the Units, and the Company shall not Transfer the Pacific Units to any person without the prior written consent of YT. Upon the Transfer of any of the Units or Pacific Units, the proceeds shall be distributed promptly by the Nominee or the Company, as the case may be, pursuant to transfer instructions set forth on <u>Schedule A</u> attached hereto.

SECTION 11.   <u>Expenses</u>. Reasonable expenses lawfully incurred in the administration of the Nominee or the Company's duties hereunder shall be reimbursed to it by YT. The provisions of this <u>Section 11</u> shall survive the termination of this Agreement.

SECTION 12.   <u>Merger, Etc</u>. Upon any merger, consolidation, reorganization or dissolution of the Company or Pacific Technology or the sale of all or substantially all of the assets of the Company or Pacific Technology pursuant to which shares of capital stock or other voting securities of another company are to be issued in payment or exchange for or upon conversion of Units or Pacific Units and other voting securities, the shares of said other company shall automatically be and become subject to the terms of this Agreement and be held by the Nominee or the Company hereunder in the same manner and upon the same terms as the Units or Pacific Units. At the request of YT, the Nominee and the Company shall transfer, sell or exchange or join with YT in such transfer, sale or exchange of Units, Pacific Units and other voting securities in exchange for shares or units of another Company, and in said event the shares, units and other voting securities of the other Company received by the transferor shall be and become subject to this Agreement and be held by the Nominee or the Company hereunder in the same manner as the Units or the Pacific Units.

SECTION 13.   <u>Notices</u>. All notices, reports, statements and other communications directed to the Nominee from the Company or to the Company from Pacific Technology, other than communications pertaining to the voting of the Units or the Pacific Units, shall be forwarded promptly by the Nominee or the Company to YT. All notices, notices of election and other communications required hereby shall be given in writing by overnight courier, telegram or facsimile transmission and shall be addressed, or sent, to the appropriate addresses as set forth beneath the signature of each party hereto, or at such other address as to which notice is given in accordance with this <u>Section 13</u>.

SECTION 14.   <u>Indemnity, Etc</u>.

(a)     YT agrees to indemnify the Nominee from and against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expense whatsoever reasonably incurred in investigating, preparing or defending against any litigation,

5

commenced or threatened, or any claims whatsoever) (the "**Indemnified Claims**") arising out of or based upon this Agreement or the actions or failures to act of the Nominee hereunder or thereunder, except to the extent such loss, liability, claim, damage or expense is caused by or results from the Nominee's gross negligence or willful misconduct (as determined by a final and unappealable order of a court of competent jurisdiction).

(b)     The Nominee shall be entitled to the prompt reimbursement for his out-of-pocket expenses (including reasonable attorneys' fees and expenses) incurred in investigating, preparing or defending against any litigation, commenced or threatened, arising out of or based upon this Agreement, or the actions or failures to act of the Nominee hereunder or thereunder, without regard to the outcome of such litigation; *provided, however*, that the Nominee shall be obligated to return any such reimbursement if it is subsequently determined by a final and unappealable order of a court of competent jurisdiction that the Nominee was grossly negligent or engaged in willful misconduct in the matter in question.

(c)     In order for the Nominee to be entitled to any indemnification provided for under this <u>Section 14</u> in respect of, arising out of or involving a claim made by any person not a party hereto against the Nominee (a "**Third Party Claim**"), the Nominee must notify YT in writing of such Third Party Claim (setting forth in reasonable detail the facts giving rise to such Third Party Claim (to the extent known by the Nominee) and the amount or estimated amount (to the extent reasonably estimable) of losses arising out of such Third Party Claim) promptly after receipt by the Nominee of notice of such Third Party Claim. Thereafter, the Nominee shall deliver to YT, promptly after the Nominee's receipt thereof, copies of all notices and documents (including court papers) received by the Nominee relating to the Third Party Claim.

(d)     If a Third Party Claim is made against the Nominee, YT shall be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by YT. Any such participation or assumption shall not constitute a waiver by any party of any attorney-client privilege in connection with such Third Party Claim. If YT assumes the defense of a Third Party Claim in accordance with this <u>Section 14</u>, the Nominee shall have the right to participate in the defense thereof and to employ counsel (not reasonably objected to by YT), at his own expense, separate from the counsel employed by YT, it being understood that YT shall control such defense.

(e)     If YT assumes the defense of a Third Party Claim, YT shall not settle such Third Party Claim without the prior written consent of the Nominee (which consent shall not be unreasonably withheld, conditioned or delayed), except that YT shall have the right to settle such Third Party Claim without the consent of the Nominee if such settlement (i) does not involve any admission by the Nominee of any violation of law, (ii) does not involve an injunctive or equitable or any other relief against the Nominee other than monetary damages, and (iii) expressly and unconditionally releases the Nominee from all liabilities and obligations with respect to such Third Party Claim.

(f)     If YT does not elect to assume the defense of the Third Party Claim, the Nominee may assume the defense of a Third Party Claim; *provided* that (i) YT shall have the right to participate in the defense thereof and to employ counsel (not reasonably objected to by the

6

Nominee), at his own expense, separate from the counsel employed by the Nominee, it being understood that the Nominee shall control such defense. If the Nominee assumes the defense of a Third Party Claim, the Nominee shall not settle such Third Party Claim without the prior written consent of YT (which consent shall not be unreasonably withheld, conditioned or delayed).

(g)     The provisions of this Section 14 shall survive the termination of this Agreement or the removal of the Nominee.

SECTION 15. Confidentiality.

(a) The terms and conditions of this Agreement, all exhibits and schedules attached hereto and thereto, the transactions contemplated hereby and thereby, including their existence, and all information furnished by each party hereto and by representatives of such party to the other party hereof or any of the representatives of such party (collectively, the "**Confidential Information**"), shall be considered Confidential Information and shall not be disclosed by any party hereto to any third party except in accordance with the provisions set forth below.

(b) Notwithstanding the foregoing, each party may disclose (i) the Confidential Information to its current accountants, custodian or legal counsels, or its Affiliates and their respective employees who need to know such information solely for the purpose of the transaction contemplated in this Agreement, in each case only where such persons or entities are informed of the confidential nature of the Confidential Information and are under appropriate nondisclosure obligations substantially similar to those set forth in this Section 15, (ii) such Confidential Information as is required to be disclosed pursuant to routine examination requests from governmental authorities with authority to regulate such party's operations, in each case as such party deems appropriate in good faith, and (iii) the Confidential Information to any person to which disclosure is approved in writing by the other party. Any party hereto may also provide disclosure as required by applicable law, rules, regulations or legal process (including, pursuant to any applicable tax, securities, other laws of any jurisdiction or any applicable stock exchange or rules or regulations), as set forth in Section 15(c) below.

(c) Except as set forth in Section 15(b) above, in the event that any party is requested or becomes legally compelled (including without limitation, pursuant to any applicable tax, securities, other laws of any jurisdiction, or any applicable stock exchange rules or regulations) to disclose the existence of this Agreement or any Confidential Information, such party (the "**Disclosing Party**") shall provide the other party hereto with prompt written notice of that fact and shall consult with the other party hereto regarding such disclosure. At the request of any other party, the Disclosing Party shall, to the extent reasonably possible and with the cooperation and reasonable efforts of the other parties, seek a protective order, confidential treatment or other appropriate remedy. In any event, the Disclosing Party shall furnish only that portion of the information that is legally required and shall exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such information.

(d) Notwithstanding any other provision of this Section 15, the confidentiality obligations of the parties shall not apply to: (i) information which a restricted party learns from a third party which the receiving party reasonably believes to have the right to make the disclosure,

OMM_US:77110088.3

*provided* that the restricted party complies with any restrictions imposed by the third party; (ii) information which is rightfully in the restricted party's possession prior to the time of disclosure by the protected party and not acquired by the restricted party under a confidentiality obligation; or (iii) information which enters the public domain without breach of confidentiality by the restricted party.

SECTION 16. <u>Reversion to YT</u>. As security for the faithful performance of this Agreement, the Nominee and the Company agree, immediately upon receipt of the fully executed version of this Agreement, to deliver to YT: (i) an Assignment and Admission Agreement in the form of <u>Exhibit A</u> attached to this Agreement, executed by the Nominee and by the Nominee's spouse, if any, or the Company (with the date and number of units left blank) (the "**Assignment**"), and (ii) a power of attorney in the form of <u>Exhibit B</u> hereto granting YT the authority to date and fill in the blanks of the Assignment upon termination of this Agreement pursuant to the terms hereof. Upon the complete execution of the Assignment by either the Nominee or by YT on the Nominee or the Company's behalf pursuant to this <u>Section 16</u>, ownership of the Units or Pacific Units shall fully revert to YT and, for the avoidance of doubt, the Nominee shall no longer hold any rights with respect to the Units or Pacific Units.

SECTION 17. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts all of which counterparts together shall constitute one agreement.

SECTION 18. <u>Choice of Law</u>. This Agreement is intended by the parties to be governed and construed in accordance with the laws of the State of Delaware.

SECTION 19. <u>Bond</u>. The Nominee shall not be required to provide any bond to secure the performance of his duties hereunder.

SECTION 20. <u>Reliance</u>. The Nominee and the Company acknowledge that YT will rely on the Nominee and the Company abiding by the terms of this Agreement, including, without limitation, that (x) the Nominee and the Company will exercise independent judgment in voting the Units or Pacific Technology and will not consult with any YT Affiliate regarding the voting of such Units or Pacific Units and (y) the Nominee and the Company will not consent to any amendment or waiver of this Agreement prohibited by <u>Section 21</u> hereof whether or not such amendment or waiver is approved by each of the parties hereto.

SECTION 21. <u>Amendments and Waivers</u>. This Agreement may not be amended or waived in any material respect, unless an independent, nationally recognized counsel, who are experts in matters involving the federal securities law, provides to YT an opinion (which opinion and counsel shall be satisfactory to YT) that, immediately after such amendment or waiver, YT should not be an "affiliate" of the Company or Pacific Technology within the meaning of Rule 144 under the Securities Act.

SECTION 22. <u>Benefits and Assignment</u>. Nothing in this Agreement, expressed or implied, shall give or be construed to give any persons, firm or Company, other than the parties hereto and their successors and assigns, any legal claim under any covenant, condition or provision hereof, all the covenants, conditions and provisions contained in this Agreement being for the sole

8

benefit of the parties hereto and their successors and assigns. No party may assign any of its rights or obligations under this Agreement without the written consent of all the other parties, which consent may not be unreasonably withheld.

SECTION 23. <u>Termination of the Previous Nominee Agreements</u>. Upon complete execution of this Agreement by the parties hereto, the Previous Nominee Agreements shall each respectively be terminated immediately, and each of YT and the Nominee shall be fully released from such party's obligations to the other under each such Previous Nominee Agreements.

SECTION 24. <u>Severability</u>. In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

1. **No Partnership**. The Nominee and his or her agents and employees will perform their duties and obligations under this Agreement as independent contractors. Nothing contained in this Agreement will be construed as creating an employment, agency, partnership, joint owner, or joint venture relationship between the parties.

*[Remainder of page intentionally left blank. Signature page follows.]*

9

EXECUTED as of the date and year first above written.

**LIAN BOSSERT**
as Nominee

By: _____

**WEST COAST LLC**

By: _____
Name: Jin Jin
Title: President and Secretary

**JIA YUETING**

By: _____

*[Signature Page to Nominee Agreement]*

EXECUTED as of the date and year first above written.

**LIAN BOSSERT**
as Nominee

By: _____

**WEST COAST LLC**

By: _____
Name: Jin Jin
Title: President and Secretary

**JIA YUETING**

By: _____

*[Signature Page to Nominee Agreement]*

EXECUTED as of the date and year first above written.

**LIAN BOSSERT**
as Nominee

By: _____

**WEST COAST LLC**

By: _____
Name: Jin Jin
Title: President and Secretary

**JIA YUETING**

By: _____

*[Signature Page to Nominee Agreement]*

**SCHEDULE A**

**TRANSFER INSTRUCTIONS**

All payments shall be made by check mailed to 91 Marguerite, Rancho Palos Verdes, CA90275.

OMM_US:77110088.3

# EXHIBIT A

## <u>ASSIGNMENT AND ADMISSION AGREEMENT</u>

## ASSIGNMENT AND ADMISSION AGREEMENT

This Assignment and Admission Agreement, dated as of _____ ___, 20___ (this "**Agreement**"), is entered into by and between Lian Bossert ("**Assignor**") and Jia YueTing ("**Assignee**").

## BACKGROUND

A.    West Coast LLC (the "**Company**") has been formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. § 18-101, *et seq.*) (the "**Act**") and is governed by the Act and the Limited Liability Company Agreement of the Company, dated as of July 31, 2019, as amended from time to time (the "**LLC Agreement**").

B.    The Assignor is a member of the Company and, immediately prior to the execution of this Agreement, holds 90,588,235 units, which represents 100% of the membership interest in the Company (the "**Units**").

C.    The Assignor desires to assign, transfer and convey his interest in the Units (collectively, his "**Interests**") to the Assignee, and the Assignees desires to acquire the Interests, in the manner as set forth herein.

D.    Pursuant to transfer of the Interests, Assignee desires to be admitted to the Company as a member of the Company, and the undersigned desires to continue the Company as set forth herein.

NOW, THEREFORE, the undersigned, in consideration of the premises, covenants and agreements contained herein, does hereby agree as follows:

1.    <u>Assignment</u>.    For value received, the receipt and sufficiency of which are hereby acknowledged, upon the execution of this Agreement by the parties hereto, the Assignor does hereby assign, transfer and convey his Interests to the Assignee, such that Assignee shall hold 100% of the membership interests in the Company after such transfer or assignment.

2.    <u>Admission</u>. Effective contemporaneously with the assignment described in <u>Section 1</u> of this Agreement, Assignee shall be admitted to the Company as a member of the Company and hereby agrees to be bound by all the terms and conditions of the LLC Agreement.

3.    <u>Continuation of the Company</u>. The parties hereto agree that the assignment of the Interests and the admission of the Assignee as a member of the Company shall not dissolve the Company.

4.    <u>Cooperation</u>. Assignee agrees to be bound by all of the provisions of the LLC Agreement to the same extent as though the Assignee had executed the LLC Agreement. Each of the parties hereto agrees to cooperate at all times from and after the date hereof with respect to all of the matters described herein, and to execute such further assignments, releases, assumptions, amendments of the LLC Agreement, notifications and other documents as may

be reasonably requested for the purpose of giving effect to, or evidencing or giving notice of, the transactions contemplated by this Agreement.

5.    <u>Miscellaneous; Governing Law</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns. This Agreement may be executed in counterparts and delivered via fax, email or scanned copies, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

*[Remainder of page intentionally left blank – signature pages follow.]*

OMM_US:77121331.1

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

<u>ASSIGNOR:</u>

**LIAN BOSSERT**

By: _____

<u>ASSIGNEE:</u>

**JIA YUETING**

By: _____

## ASSIGNMENT AND ADMISSION AGREEMENT

This Assignment and Admission Agreement, dated as of _____ ___, 20___ (this "**Agreement**"), is entered into by and between West Coast LLC, a Delaware limited liability company ("**Assignor**") and Jia YueTing ("**Assignee**").

## BACKGROUND

A.      Pacific Technology Holding LLC (the "**Company**") has been formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. § 18-101, *et seq.*) (the "**Act**") and is governed by the Act and the Third Amended and Restated Limited Liability Company Agreement of the Company, dated as of July 5, 2019, as amended from time to time (the "**LLC Agreement**").

B.      The Assignor is a member of the Company and, immediately prior to the execution of this Agreement, holds 90,588,235 preferred units in the Company (the "**Units**").

C.      The Assignor desires to assign, transfer and convey his interest in the Units (collectively, his "**Interests**") to the Assignee, and the Assignees desires to acquire the Interests, in the manner as set forth herein.

D.      Pursuant to transfer of the Interests, Assignee desires to be admitted to the Company as a member of the Company, and the undersigned desires to continue the Company as set forth herein.

NOW, THEREFORE, the undersigned, in consideration of the premises, covenants and agreements contained herein, does hereby agree as follows:

1.      <u>Assignment</u>.    For value received, the receipt and sufficiency of which are hereby acknowledged, upon the execution of this Agreement by the parties hereto, the Assignor does hereby assign, transfer and convey all of the Units to the Assignee.

2.      <u>Admission</u>. Effective contemporaneously with the assignment described in <u>Section 1</u> of this Agreement, Assignee shall be admitted to the Company as a member of the Company and hereby agrees to be bound by all the terms and conditions of the LLC Agreement.

3.      <u>Continuation of the Company</u>. The parties hereto agree that the assignment of the Interests and the admission of the Assignee as a member of the Company shall not dissolve the Company.

4.      <u>Cooperation</u>. Assignee agrees to be bound by all of the provisions of the LLC Agreement to the same extent as though the Assignee had executed the LLC Agreement. Each of the parties hereto agrees to cooperate at all times from and after the date hereof with respect to all of the matters described herein, and to execute such further assignments, releases, assumptions, amendments of the LLC Agreement, notifications and other documents as may

4

be reasonably requested for the purpose of giving effect to, or evidencing or giving notice of, the transactions contemplated by this Agreement.

5.    <u>Miscellaneous; Governing Law</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns. This Agreement may be executed in counterparts and delivered via fax, email or scanned copies, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

*[Remainder of page intentionally left blank – signature pages follow.]*

OMM_US:77121331.1

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

ASSIGNOR:

**WEST COAST LLC**

By: _____

ASSIGNEE:

**JIA YUETING**

By: _____

*[Signature Page to Instrument of Transfer]*

**EXHIBIT B**

**POWER OF ATTORNEY**

The undersigned, by way of security and in order more fully to secure the performance of its obligations under the Nominee Agreement between the undersigned, West Coast LLC, a Delaware limited liability company ("**West Coast**") and Jia Yueting ("**YT**") dated as of July 31, 2019 (the "**Nominee Agreement**") hereby irrevocably appoints YT to be its attorney:

(a)    to execute and complete in favour of YT the Assignment and Admission Agreement between the undersigned and YT pursuant to which the undersigned shall assign and transfer all the units and membership interests in West Coast to YT (the "**Assignment**");

(b)    to sign, execute, seal and deliver and otherwise perfect and do any such legal assignments and other assurances, charges, authorities and documents to complete the transactions contemplated by the Assignment and other documents or acts which may be required for the full exercise of all or any of the powers conferred or which may be deemed proper on or in connection with any of the purposes aforesaid.

The power hereby conferred is irrevocable and shall be a general power of attorney and the undersigned hereby ratifies and confirms and agrees to ratify and confirm any instrument, act or thing which any such attorney may execute or do.  In relation to the power referred to herein, the exercise by YT of such power shall be conclusive evidence of its right to exercise the same.

EXECUTED by the undersigned as of July 31, 2019.

**LIAN BOSSERT**

By: _____

13

OMM_US:77110088.3

## POWER OF ATTORNEY

The undersigned, by way of security and in order more fully to secure the performance of its obligations under the Nominee Agreement between the undersigned, Lian Bossert and Jia Yueting ("**YT**") dated as of July 31, 2019 (the "**Nominee Agreement**") hereby irrevocably appoints YT to be its attorney:

(a)      to execute and complete in favour of YT the Assignment and Admission Agreement between the undersigned and YT pursuant to which the undersigned shall assign and transfer all the units and membership interests in Pacific Technology Holding LLC, a Delaware limited liability company ("**Pacific Technology**") to YT (the "**Assignment**");

(b)      to sign, execute, seal and deliver and otherwise perfect and do any such legal assignments and other assurances, charges, authorities and documents to complete the transactions contemplated by the Assignment and other documents or acts which may be required for the full exercise of all or any of the powers conferred or which may be deemed proper on or in connection with any of the purposes aforesaid.

The power hereby conferred is irrevocable and shall be a general power of attorney and the undersigned hereby ratifies and confirms and agrees to ratify and confirm any instrument, act or thing which any such attorney may execute or do.  In relation to the power referred to herein, the exercise by YT of such power shall be conclusive evidence of its right to exercise the same.

EXECUTED by the undersigned as of July 31, 2019.

**WEST COAST LLC**

By: _____
            Name: Jin Jin
            Title: President and Secretary

14

# Exhibit B

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## WEST COAST LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") of West Coast LLC (the "**Company**") is entered into and shall be effective as of July 31, 2019, by Lian Bossert (the "**Member**").

The Member desires to form a limited liability company pursuant to the laws of the State of Delaware.  Accordingly, the Member agrees as follows:

1. <u>Formation</u>. The Member has formed a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act (as amended from time to time, the "**Act**") and subject to the terms, provisions and conditions set forth in this Agreement.

2. <u>Filing</u>. The organization of the Company was initially effective upon the filing of the Company's Certificate of Formation with the Delaware Secretary of State on July 23, 2019.

3. <u>Name</u>.  The name of the Company shall be "West Coast LLC."

4. <u>Term</u>. The term of the Company shall continue until the occurrence of an event specified in Section 15 and the subsequent winding up and dissolution of the Company in accordance with this Agreement and the Act.

5. <u>Purpose</u>. The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act.

6. <u>Members and Units</u>.

   A) <u>Units Generally</u>. The membership interests of the Member will be represented by issued and outstanding Units, which may be divided into one or more types, class or series as determined by the Member. Each type, class or series of Units will have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. As of the date hereof, the Company is authorized to issue two classes of Units, designated as "Common Units" and "Preferred Units." The Company will maintain a schedule, attached hereto as <u>Exhibit A</u> hereto ("**Members Schedule**"), of all members, their respective mailing addresses and the amount and series of Units held by them, and will update the Members Schedule upon the issuance or transfer to any new or existing member. As of the date hereof, all Preferred Units are held by the Member. The Members Schedule will be kept confidential but will be available for review at the Company to all holders of Units.

   B) <u>Issuance of Units</u>. Upon the affirmative approval of the Member, the Company shall be authorized to issue up to 90,588,235 Units. One or more

additional members of the Company may be admitted to the Company with the consent of the Member. Such persons will be admitted to the Company upon their execution of this Agreement, a written undertaking substantially in the form of the Joinder Agreement as set forth on <u>Exhibit B</u> hereto, or an amendment hereto.

7.    <u>Certificates of Membership Interest</u>. Membership interests in the Company shall not be represented by a certificate.

8.    <u>Capital Contributions</u>. The Member has made the initial capital contribution set forth on the Members Schedule.  No interest shall accrue on any capital contribution and the Member shall not have the right to withdraw or be repaid any capital contribution except as provided in this Agreement.  Additional capital contributions, if any, shall be made by the Member in the amount and upon the terms and conditions as the Member may determine.

9.    <u>Capital Accounts</u>. A Capital Account shall be maintained for the Member in accordance with the provisions of Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

10.    <u>Allocations</u>.

A)    <u>Profits and Losses</u>.    The profits and losses (and items thereof) of the Company shall be allocated in accordance with the Member's Percentage Interest.

B)    <u>Tax Allocations</u>.  Except as otherwise provided in this Section 10. B), all items of income, gain, loss or deduction for federal, state and local income tax purposes will be allocated in the same manner as the corresponding "book" items are allocated under Section 10. A).  In accordance with Section 704(c) of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations issued with respect thereto, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, or after Company assets has been revalued under Regulation Section 1.704-1(b)(2)(iv), shall, solely for tax purposes, be allocated to the Member so as to take into account any variation between the adjusted basis of such property to the Company for federal income tax purposes and its book basis using any reasonable method permitted under the regulations that is selected by the Member.

11.    <u>Distributions</u>. Each distribution to the Member of cash or other assets of the Company shall be made in accordance with its Percentage Interest in such amounts and at such times as shall be determined by the Member.

12.    <u>Management</u>. The Company will be member-managed, and the business and affairs of the Company will be managed by or under the direction of, and the right and power to act for or to bind the Company will be vested exclusively in, the Member, provided that the Member may appoint, employ or otherwise contract with any persons (including but not limited to officers of the Company) for the transaction of the business of the Company or

OMM_US:77096022.4

the performance of services for or on behalf of the Company, and the Member may delegate to any such persons such authority to act on behalf of the Company as the Member may from time to time deem appropriate.

13.    Bank Accounts. Without limiting the generality of Section 12, the Member (or any officer or authorized signatory so authorized by the Member) shall be authorized to endorse checks, drafts or other evidences of indebtedness made payable to the order of the Company, but only for the purpose of depositing the same into a Company account. The Member (or any officer or authorized signatory so authorized by the Member) shall be authorized to sign on behalf of the Company all checks drawn on the Company account.

14.    Tax Treatment. The Company shall elect to be classified as a disregarded entity for federal, state and local income tax purposes.

15.    Limited Liability. Except as otherwise provided by the Act, no Member, manager, nor any officer, employee or other agent of the Company will be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Member, manager or an officer, employee or other agent of the Company. No Member, manager, officer, employee or other agent of the Company shall owe any fiduciary duties or obligations to the Company.

16.    Exculpation and Indemnification. To the fullest extent permitted by law, the Company will indemnify, defend, protect and hold harmless the Member and each officer, employee or other agent of the Company who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, by reason of any act or omission or alleged act or omission arising out of such person's activities as a Member, officer, employee or other agent or otherwise on behalf of the Company if such activities were performed in good faith either on behalf of the Company or in furtherance of the interests of the Company, and were performed or omitted in a manner reasonably believed by such person to be within the scope of the authority conferred by this Agreement, against losses, damages or expenses for which such person has not otherwise been reimbursed (including, without limitation, attorneys' and accountants' fees and expenses, judgment fines and amounts paid in settlement), actually and reasonably incurred by such person in connection with such action, suit or proceeding, so long as such person was not guilty of gross negligence or willful misconduct with respect to such act or omission.

17.    Dissolution. The Company shall be wound up and dissolved upon the first to occur of the following:

      A)    the written election by the Member to dissolve the Company; or

      B)    the entry of a decree of judicial dissolution pursuant to the Act or dissolution otherwise being required under the Act.

Upon the occurrence of one of the foregoing, the Member shall proceed to wind up the affairs of the Company and liquidate its property and assets.

- 3 -

18.    <u>Registered Agent</u>. The registered agent for service of process on the Company in the State of Delaware shall be The Corporation Trust Company, with its address at 1209 Orange Street, Wilmington, DE 19801, or any successor as appointed by the Member by filing an amendment to the Company's Certificate of Formation.

19.    <u>Amendments</u>. This Agreement may be amended only by written instrument executed by the Member.

20.    <u>Governing Law; Jurisdiction</u>. This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware.

21.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Member and its successors and assigns.

*[Remainder of Page Intentionally Left Blank]*

- 4 -

**IN WITNESS WHEREOF,** the undersigned has executed this Agreement as of the date first above written.

_____

Lian Bossert

*[Signature Page to LLC Agreement]*

## EXHIBIT A

## MEMBERS SCHEDULE

| Member | Capital Contribution | Number of Units | Percentage Interest |
|---|---|---|---|
| Lian Bossert | $444,738,412, represented by 90,588,235 Preferred Units of Pacific Technology Holding LLC, a Delaware limited liability company (**"Pacific Technology"**), which represents twenty percent (20%) of the issued and outstanding equity interests in Pacific Technology | 90,588,235 Units | 100% |

\* \* \*

A-1

## EXHIBIT B

## FORM OF JOINDER AGREEMENT

Reference is hereby made to the Limited Liability Company Agreement, dated as of July 31, 2019, as amended from time to time (the "**LLC Agreement**"), among the Members named in the LLC Agreement and West Coast LLC, a Delaware limited liability company (the "**Company**"). Pursuant to and in accordance with Section 6 of the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement and agrees that, upon execution of this Joinder Agreement, such Person or Entity shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the representations, warranties, covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall have the status of a holder of the number of limited liability company membership interest set forth on the signature line below.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the LLC Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of _____, 20__.


[NEW MEMBER]


By_____
    Name:
    Title:

    _____ % membership interest


ACCEPTED AND ACKNOWLEDGED as of the date above written:

WEST COAST LLC

By: _____
    Name: Jin Jin
    Title:

B-1

## NOMINEE AGREEMENT

THIS NOMINEE AGREEMENT (the "**Agreement**") is made and entered into as of July 31, 2019, by and among West Coast LLC, a Delaware limited liability company (the "**Company**"), Jia YueTing ("**YT**") and Lian Bossert (the "**Nominee**"). Capitalized terms used herein but not defined shall have the respective meanings set forth in the Limited Liability Company Agreement of West Coast LLC, dated as of July 31, 2019 (the "**LLC Agreement**").

WHEREAS, the Nominee was the record owner of 90,588,235 Preferred Units (the "**Pacific Units**") of Pacific Technology Holding LLC, a Delaware limited liability company ("**Pacific Technology**") and the parties hereto have previously entered into certain agreements in connection with the Nominee's ownership of the Pacific Units, including a Nomination Agreement, Power of Attorney Agreement, Membership Interests Power, and Letter from YT to the Nominee regarding such grant of power of attorney from YT to Nominee (collectively, the "**Previous Nominee Agreements**") desire to record their arrangements with respect to the Pacific Units;

WHEREAS, the Nominee has formed the Company and desires to hold the Pacific Units indirectly through the Company;

WHEREAS, concurrently with the entry of this Agreement, the Nominee will assign and contribute all Pacific Units to the Company in exchange for 90,588,235 units in the Company, which represents all of the membership interest in the Company (the "**Units**"); and

WHEREAS, the parties hereto desire to enter into this Agreement to replace the Previous Nominee Agreements.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1. <u>Certain Definitions</u>. In this Agreement:

(a) "**Control Affiliate**" means YT and any person or entity controlling, controlled by or under common control with, directly or indirectly, YT.

(b) "**Employee Affiliate**" means any person employed by (or who is the spouse, relative or relative of a spouse, in each case residing in the home of a person employed by) a Control Affiliate.

(c) "**Other Affiliate**" means any person or entity that has a substantial business relationship with a Control Affiliate and which is not itself a Control Affiliate.

(d) "**Pacific LLC Agreement**" means the Third Amended and Restated Limited Liability Company Agreement of Pacific Technology dated as of July 5, 2019.

(e) "**Securities Act**" means the Securities Act of 1933, as amended.

(f) "**Transfer**" means, with respect to a member of the Company or Pacific Technology, to sell, assign, pledge, encumber, transfer or otherwise dispose of, whether directly or indirectly, voluntarily or involuntarily or by operation of law, all or a portion of its, his or her

membership interest in the Company or Pacific Technology.    The terms **"Transfers"**, **"Transferred"** and **"Transferring"** shall have correlative meanings.

        (g)    **"Unit Equivalent"** means at any time any security convertible into, exchangeable for, or carrying the right to acquire units or subscriptions, warrants, options, rights or other arrangements obligating the Company to issue or dispose of any units of membership interests or any units of any other voting class or series of stock of the Company, regardless whether such security is convertible, exchangeable or exercisable at such time.

        (h)    **"YT Affiliate"** means with respect to YT any person or entity who is a Control Affiliate, Employee Affiliate or Other Affiliate.

    SECTION 1.    <u>Nominee Arrangement Generally</u>. The Nominee shall be the record owner of the Units and shall be the holder of all voting rights associated with ownership of the Units as set forth in the LLC Agreement. The Company shall be the record owner of the Pacific Units and shall be the holder of all voting rights associated with ownership of the Pacific Units as set forth in the Pacific LLC Agreement. YT shall retain all economic interests associated with ownership of the Units and the Pacific Units as set forth in the LLC Agreement and the Pacific LLC Agreement.

    SECTION 2.    <u>Voting Powers</u>. At all times prior to the termination of the nominee arrangement created hereby, the Nominee shall have the exclusive right to vote the Units, or give written consent, in person or by proxy, at all meetings of members of the Company, and in all proceedings in which the vote or consent, written or otherwise, of the holders of Units may be required or authorized by law. The Nominee shall vote all Units in accordance with this Agreement. The Nominee shall have full power and authority, and he is hereby empowered and authorized, to vote the Units as in his sole judgment he believes to be in the best interest of the members of the Company generally, it being understood that the Nominee will exercise his independent judgment in determining the best interests of the members of the Company, and to do any and all other things and take any and all other actions as fully as any Unitholder of the Company might do if personally present at a meeting of the members of the Company. YT agrees that he will not communicate with the Nominee in connection with any proceeding in which the vote or consent of the holders of Units may be required or authorized by law or otherwise seek to influence the Nominee in the exercise of his right to vote or consent in any such proceedings. YT shall promptly provide to the Nominee from time to time such information as is reasonably necessary (including certificates and/or other documents) in order to enable the Nominee to carry out the foregoing obligations.

    SECTION 3.    <u>Dividends</u>. If Pacific Technology pays or issues dividends or makes other distributions on the Pacific Units, the Company shall accept and receive such dividends and distributions. If the Company pays or issues dividends or makes other distributions on the Units, the Nominee shall accept and receive such dividends and distributions. Upon receipt of dividends and distributions, the amount shall be distributed promptly by the Nominee or the Company, as the case may be, pursuant to transfer instructions set forth on <u>Schedule A</u> attached hereto. In the performance of their duties to deliver cash dividends under this Agreement, the Nominee and the

2

Company shall not be obligated to risk their own funds and will not be liable for taxes or other charges related to the delivery of such dividends or distributions.

SECTION 4.   Termination. (a) The nominee arrangement created hereby shall terminate on the earliest to occur of:

(i)      ten years from the date hereof; and

(ii)     the written election of YT at any time.

An election pursuant to Section 4(b) shall be effective upon the third day following delivery of notice thereof to the Nominee.

(b) Upon the termination of this Agreement, the Nominee and the Company shall immediately Transfer the Units, Pacific Units or any other voting or beneficial interest in Pacific Technology to YT and take all necessary actions to procure that all equity interests in Pacific Technology, directly or indirectly held by the Nominee or the Company, be held by YT on the book of the Company or Pacific Technology, as the case may be.

SECTION 5.   Compensation. In consideration of the services provided to YT by the Nominee and the Company under this Agreement, YT shall pay or procure the annual payment of US $60,000, payable on the last business day of each calendar year to the Nominee; *provided* that the payment for the services in 2019 shall be prorated from the date of this Agreement and if terminated earlier than December 31 of a given year, such payment for such given year shall be prorated based on the days that the services are provide within such given year. For the avoidance of doubt, parties hereto hereby acknowledge and agree that the compensation paid hereunder serves as consideration for services provided by the Nominee under this Agreement and shall in no event be considered or treated as consideration for the transfer of record ownership of the Units or the Pacific Units.

SECTION 6.   Exercise, Conversion, Exchange or Cancellation of Units or Pacific Units. The Nominee and the Company shall, upon written instruction of YT, submit to the Company or Pacific Technology, as the case may be, for exercise, conversion, exchange or cancellation any Unit or Pacific Unit in which YT has a beneficial interest hereunder. Such notice shall state (a) whether such Units or Pacific Units are to be exercised, converted, exchanged or cancelled, (b) the date on which such Units or Pacific Units are to be submitted to the Company or Pacific Technology (which date shall not be less than five days after the Nominee or the Company's receipt of such notice), (c) the number and type of Units or Pacific Units to be submitted to the Company or Pacific Technology and (d) the consideration, if any, to be received upon such exercise, conversion, exchange or cancellation from the Company or Pacific Technology. The notice shall be accompanied by any exercise price or other payment and any agreement, certificate or other documentation required in connection with such exercise, conversion, exchange or cancellation. On the date specified in such notice, and against receipt from the Company or Pacific Technology of the specified consideration, if any, the Nominee or the Company shall deliver by first class mail: (x) to the Company or Pacific Technology, any exercise price or other payment and any agreement, certificate or other documentation delivered

3

to the Nominee or the Company by YT with such notice and (y) to YT the consideration, if any, received by the Nominee pursuant to such exercise, conversion, exchange or cancellation.

SECTION 7.    Increase or Decrease in Number of Units or Pacific Units. In the event of an increase in the number of Units or Pacific Units by virtue of a unit split or the decrease in the number of Units or Pacific Units because of a contraction of the units or a change in the number of outstanding units of the Company or Pacific Technology as a result of some other recapitalization in which the Company or Pacific Technology receives no consideration for the issuance of the additional or reduced number of units, the new additional or changed number of Units or Pacific Units shall be held by the Nominee or the Company, as the case may be.

SECTION 8. Successor Nominee. There shall initially be one Nominee created hereby. Upon the bankruptcy, suspension, incapacity, resignation or removal (in accordance with Section 9 below) of the initial Nominee, YT shall appoint a successor Nominee.

SECTION 9.    Removal/Resignation of Nominee.

(a)    A Nominee may be removed by YT:

(i)    if it is determined by a court of competent jurisdiction that either (A) the Nominee or the Company has willfully and materially violated the terms of this Agreement, or (B) the Nominee has been guilty of malfeasance, misfeasance or dereliction of duty hereunder;

(ii)    if the Nominee or the Company shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall have consented to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall have made a general assignment for the benefit of creditors, or shall have failed generally to pay its debts as they become due, or shall have taken any action to authorize any of the foregoing; or

(iii)    if an involuntary case or other proceeding shall have been commenced against the Nominee or the Company seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall have remained undismissed and unstayed for a period of 60 days, or an order for relief shall have been entered against the Nominee or the Company under the federal bankruptcy laws as now or hereafter in effect.

(b)    If YT determine that a basis exists for removal of the Nominee under Section 9(a) above, he shall deliver written notice of such determination to the Nominee stating the basis for such removal.

4

OMM_US:77110088.3

(c)    The Nominee shall resign his position as such (i) upon ten days' written notice to YT but only if a successor Nominee, appointed as provided for in Section 8 above, has agreed to serve as such effective upon the effectiveness of the resignation of the Nominee then acting, or (ii) in any event upon 2 days' written notice to YT. Upon the removal or resignation of the Nominee, the Nominee shall transfer and assign all Units to the successor Nominee or to YT according to YT's instruction and shall take all other actions that are necessary to affect such transfer or assignment.

SECTION 10.  Transfer Restrictions; Transfer. The Nominee shall not Transfer the Units, and the Company shall not Transfer the Pacific Units to any person without the prior written consent of YT. Upon the Transfer of any of the Units or Pacific Units, the proceeds shall be distributed promptly by the Nominee or the Company, as the case may be, pursuant to transfer instructions set forth on Schedule A attached hereto.

SECTION 11.    Expenses. Reasonable expenses lawfully incurred in the administration of the Nominee or the Company's duties hereunder shall be reimbursed to it by YT. The provisions of this Section 11 shall survive the termination of this Agreement.

SECTION 12.  Merger, Etc. Upon any merger, consolidation, reorganization or dissolution of the Company or Pacific Technology or the sale of all or substantially all of the assets of the Company or Pacific Technology pursuant to which shares of capital stock or other voting securities of another company are to be issued in payment or exchange for or upon conversion of Units or Pacific Units and other voting securities, the shares of said other company shall automatically be and become subject to the terms of this Agreement and be held by the Nominee or the Company hereunder in the same manner and upon the same terms as the Units or Pacific Units. At the request of YT, the Nominee and the Company shall transfer, sell or exchange or join with YT in such transfer, sale or exchange of Units, Pacific Units and other voting securities in exchange for shares or units of another Company, and in said event the shares, units and other voting securities of the other Company received by the transferor shall be and become subject to this Agreement and be held by the Nominee or the Company hereunder in the same manner as the Units or the Pacific Units.

SECTION 13.  Notices. All notices, reports, statements and other communications directed to the Nominee from the Company or to the Company from Pacific Technology, other than communications pertaining to the voting of the Units or the Pacific Units, shall be forwarded promptly by the Nominee or the Company to YT. All notices, notices of election and other communications required hereby shall be given in writing by overnight courier, telegram or facsimile transmission and shall be addressed, or sent, to the appropriate addresses as set forth beneath the signature of each party hereto, or at such other address as to which notice is given in accordance with this Section 13.

SECTION 14. Indemnity, Etc.

(a)    YT agrees to indemnify the Nominee from and against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expense whatsoever reasonably incurred in investigating, preparing or defending against any litigation,

5

commenced or threatened, or any claims whatsoever) (the "**Indemnified Claims**") arising out of or based upon this Agreement or the actions or failures to act of the Nominee hereunder or thereunder, except to the extent such loss, liability, claim, damage or expense is caused by or results from the Nominee's gross negligence or willful misconduct (as determined by a final and unappealable order of a court of competent jurisdiction).

(b)    The Nominee shall be entitled to the prompt reimbursement for his out-of-pocket expenses (including reasonable attorneys' fees and expenses) incurred in investigating, preparing or defending against any litigation, commenced or threatened, arising out of or based upon this Agreement, or the actions or failures to act of the Nominee hereunder or thereunder, without regard to the outcome of such litigation; *provided, however,* that the Nominee shall be obligated to return any such reimbursement if it is subsequently determined by a final and unappealable order of a court of competent jurisdiction that the Nominee was grossly negligent or engaged in willful misconduct in the matter in question.

(c)    In order for the Nominee to be entitled to any indemnification provided for under this Section 14 in respect of, arising out of or involving a claim made by any person not a party hereto against the Nominee (a "**Third Party Claim**"), the Nominee must notify YT in writing of such Third Party Claim (setting forth in reasonable detail the facts giving rise to such Third Party Claim (to the extent known by the Nominee) and the amount or estimated amount (to the extent reasonably estimable) of losses arising out of such Third Party Claim) promptly after receipt by the Nominee of notice of such Third Party Claim. Thereafter, the Nominee shall deliver to YT, promptly after the Nominee's receipt thereof, copies of all notices and documents (including court papers) received by the Nominee relating to the Third Party Claim.

(d)    If a Third Party Claim is made against the Nominee, YT shall be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by YT. Any such participation or assumption shall not constitute a waiver by any party of any attorney-client privilege in connection with such Third Party Claim. If YT assumes the defense of a Third Party Claim in accordance with this Section 14, the Nominee shall have the right to participate in the defense thereof and to employ counsel (not reasonably objected to by YT), at his own expense, separate from the counsel employed by YT, it being understood that YT shall control such defense.

(e)    If YT assumes the defense of a Third Party Claim, YT shall not settle such Third Party Claim without the prior written consent of the Nominee (which consent shall not be unreasonably withheld, conditioned or delayed), except that YT shall have the right to settle such Third Party Claim without the consent of the Nominee if such settlement (i) does not involve any admission by the Nominee of any violation of law, (ii) does not involve an injunctive or equitable or any other relief against the Nominee other than monetary damages, and (iii) expressly and unconditionally releases the Nominee from all liabilities and obligations with respect to such Third Party Claim.

(f)    If YT does not elect to assume the defense of the Third Party Claim, the Nominee may assume the defense of a Third Party Claim; *provided* that (i) YT shall have the right to participate in the defense thereof and to employ counsel (not reasonably objected to by the

6

Nominee), at his own expense, separate from the counsel employed by the Nominee, it being understood that the Nominee shall control such defense. If the Nominee assumes the defense of a Third Party Claim, the Nominee shall not settle such Third Party Claim without the prior written consent of YT (which consent shall not be unreasonably withheld, conditioned or delayed).

(g)    The provisions of this <u>Section 14</u> shall survive the termination of this Agreement or the removal of the Nominee.

SECTION 15. <u>Confidentiality</u>.

(a) The terms and conditions of this Agreement, all exhibits and schedules attached hereto and thereto, the transactions contemplated hereby and thereby, including their existence, and all information furnished by each party hereto and by representatives of such party to the other party hereof or any of the representatives of such party (collectively, the "**Confidential Information**"), shall be considered Confidential Information and shall not be disclosed by any party hereto to any third party except in accordance with the provisions set forth below.

(b) Notwithstanding the foregoing, each party may disclose (i) the Confidential Information to its current accountants, custodian or legal counsels, or its Affiliates and their respective employees who need to know such information solely for the purpose of the transaction contemplated in this Agreement, in each case only where such persons or entities are informed of the confidential nature of the Confidential Information and are under appropriate nondisclosure obligations substantially similar to those set forth in this <u>Section 15</u>, (ii) such Confidential Information as is required to be disclosed pursuant to routine examination requests from governmental authorities with authority to regulate such party's operations, in each case as such party deems appropriate in good faith, and (iii) the Confidential Information to any person to which disclosure is approved in writing by the other party. Any party hereto may also provide disclosure as required by applicable law, rules, regulations or legal process (including, pursuant to any applicable tax, securities, other laws of any jurisdiction or any applicable stock exchange or rules or regulations), as set forth in <u>Section 15(c)</u> below.

(c) Except as set forth in <u>Section 15(b)</u> above, in the event that any party is requested or becomes legally compelled (including without limitation, pursuant to any applicable tax, securities, other laws of any jurisdiction, or any applicable stock exchange rules or regulations) to disclose the existence of this Agreement or any Confidential Information, such party (the "**Disclosing Party**") shall provide the other party hereto with prompt written notice of that fact and shall consult with the other party hereto regarding such disclosure. At the request of any other party, the Disclosing Party shall, to the extent reasonably possible and with the cooperation and reasonable efforts of the other parties, seek a protective order, confidential treatment or other appropriate remedy. In any event, the Disclosing Party shall furnish only that portion of the information that is legally required and shall exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such information.

(d) Notwithstanding any other provision of this <u>Section 15</u>, the confidentiality obligations of the parties shall not apply to: (i) information which a restricted party learns from a third party which the receiving party reasonably believes to have the right to make the disclosure,

7

*provided* that the restricted party complies with any restrictions imposed by the third party; (ii) information which is rightfully in the restricted party's possession prior to the time of disclosure by the protected party and not acquired by the restricted party under a confidentiality obligation; or (iii) information which enters the public domain without breach of confidentiality by the restricted party.

SECTION 16.  <u>Reversion to YT</u>. As security for the faithful performance of this Agreement, the Nominee and the Company agree, immediately upon receipt of the fully executed version of this Agreement, to deliver to YT: (i) an Assignment and Admission Agreement in the form of <u>Exhibit A</u> attached to this Agreement, executed by the Nominee and by the Nominee's spouse, if any, or the Company (with the date and number of units left blank) (the "**Assignment**"), and (ii) a power of attorney in the form of <u>Exhibit B</u> hereto granting YT the authority to date and fill in the blanks of the Assignment upon termination of this Agreement pursuant to the terms hereof.  Upon the complete execution of the Assignment by either the Nominee or by YT on the Nominee or the Company's behalf pursuant to this <u>Section 16</u>, ownership of the Units or Pacific Units shall fully revert to YT and, for the avoidance of doubt, the Nominee shall no longer hold any rights with respect to the Units or Pacific Units.

SECTION 17.  <u>Counterparts</u>. This Agreement may be executed in multiple counterparts all of which counterparts together shall constitute one agreement.

SECTION 18.  <u>Choice of Law</u>. This Agreement is intended by the parties to be governed and construed in accordance with the laws of the State of Delaware.

SECTION 19.  <u>Bond</u>. The Nominee shall not be required to provide any bond to secure the performance of his duties hereunder.

SECTION 20.  <u>Reliance</u>. The Nominee and the Company acknowledge that YT will rely on the Nominee and the Company abiding by the terms of this Agreement, including, without limitation, that (x) the Nominee and the Company will exercise independent judgment in voting the Units or Pacific Technology and will not consult with any YT Affiliate regarding the voting of such Units or Pacific Units and (y) the Nominee and the Company will not consent to any amendment or waiver of this Agreement prohibited by <u>Section 21</u> hereof whether or not such amendment or waiver is approved by each of the parties hereto.

SECTION 21.  <u>Amendments and Waivers</u>. This Agreement may not be amended or waived in any material respect, unless an independent, nationally recognized counsel, who are experts in matters involving the federal securities law, provides to YT an opinion (which opinion and counsel shall be satisfactory to YT) that, immediately after such amendment or waiver, YT should not be an "affiliate" of the Company or Pacific Technology within the meaning of Rule 144 under the Securities Act.

SECTION 22.  <u>Benefits and Assignment</u>. Nothing in this Agreement, expressed or implied, shall give or be construed to give any persons, firm or Company, other than the parties hereto and their successors and assigns, any legal claim under any covenant, condition or provision hereof, all the covenants, conditions and provisions contained in this Agreement being for the sole

8

benefit of the parties hereto and their successors and assigns. No party may assign any of its rights or obligations under this Agreement without the written consent of all the other parties, which consent may not be unreasonably withheld.

SECTION 23. <u>Termination of the Previous Nominee Agreements</u>. Upon complete execution of this Agreement by the parties hereto, the Previous Nominee Agreements shall each respectively be terminated immediately, and each of YT and the Nominee shall be fully released from such party's obligations to the other under each such Previous Nominee Agreements.

SECTION 24. <u>Severability</u>. In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

1. **<u>No Partnership</u>**. The Nominee and his or her agents and employees will perform their duties and obligations under this Agreement as independent contractors. Nothing contained in this Agreement will be construed as creating an employment, agency, partnership, joint owner, or joint venture relationship between the parties.

*[Remainder of page intentionally left blank. Signature page follows.]*

9

EXECUTED as of the date and year first above written.

**LIAN BOSSERT**
as Nominee

By: _____

**WEST COAST LLC**

By: _____
Name: Jin Jin
Title: President and Secretary

**JIA YUETING**

By: _____

*[Signature Page to Nominee Agreement]*

EXECUTED as of the date and year first above written.

**LIAN BOSSERT**
as Nominee

By: _____

**WEST COAST LLC**

By: _____
Name: Jin Jin
Title: President and Secretary

**JIA YUETING**

By: _____

*[Signature Page to Nominee Agreement]*

EXECUTED as of the date and year first above written.

**LIAN BOSSERT**
as Nominee

By: _____

**WEST COAST LLC**

By: _____
Name: Jin Jin
Title: President and Secretary

**JIA YUETING**

By: _____

*[Signature Page to Nominee Agreement]*

## SCHEDULE A

## <u>TRANSFER INSTRUCTIONS</u>

All payments shall be made by check mailed to 91 Marguerite, Rancho Palos Verdes, CA90275.

OMM_US:77110088.3

# EXHIBIT A

## ASSIGNMENT AND ADMISSION AGREEMENT

## ASSIGNMENT AND ADMISSION AGREEMENT

This Assignment and Admission Agreement, dated as of _____ ___, 20___ (this "**Agreement**"), is entered into by and between Lian Bossert ("**Assignor**") and Jia YueTing ("**Assignee**").

## BACKGROUND

A.  West Coast LLC (the "**Company**") has been formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. § 18-101, *et seq.*) (the "**Act**") and is governed by the Act and the Limited Liability Company Agreement of the Company, dated as of July 31, 2019, as amended from time to time (the "**LLC Agreement**").

B.  The Assignor is a member of the Company and, immediately prior to the execution of this Agreement, holds 90,588,235 units, which represents 100% of the membership interest in the Company (the "**Units**").

C.  The Assignor desires to assign, transfer and convey his interest in the Units (collectively, his "**Interests**") to the Assignee, and the Assignees desires to acquire the Interests, in the manner as set forth herein.

D.  Pursuant to transfer of the Interests, Assignee desires to be admitted to the Company as a member of the Company, and the undersigned desires to continue the Company as set forth herein.

NOW, THEREFORE, the undersigned, in consideration of the premises, covenants and agreements contained herein, does hereby agree as follows:

1.  <u>Assignment</u>.    For value received, the receipt and sufficiency of which are hereby acknowledged, upon the execution of this Agreement by the parties hereto, the Assignor does hereby assign, transfer and convey his Interests to the Assignee, such that Assignee shall hold 100% of the membership interests in the Company after such transfer or assignment.

2.  <u>Admission</u>. Effective contemporaneously with the assignment described in <u>Section 1</u> of this Agreement, Assignee shall be admitted to the Company as a member of the Company and hereby agrees to be bound by all the terms and conditions of the LLC Agreement.

3.  <u>Continuation of the Company</u>.  The parties hereto agree that the assignment of the Interests and the admission of the Assignee as a member of the Company shall not dissolve the Company.

4.  <u>Cooperation</u>. Assignee agrees to be bound by all of the provisions of the LLC Agreement to the same extent as though the Assignee had executed the LLC Agreement. Each of the parties hereto agrees to cooperate at all times from and after the date hereof with respect to all of the matters described herein, and to execute such further assignments, releases, assumptions, amendments of the LLC Agreement, notifications and other documents as may

be reasonably requested for the purpose of giving effect to, or evidencing or giving notice of, the transactions contemplated by this Agreement.

5.   <u>Miscellaneous; Governing Law</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns. This Agreement may be executed in counterparts and delivered via fax, email or scanned copies, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

*[Remainder of page intentionally left blank – signature pages follow.]*

2

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

<u>ASSIGNOR</u>:

**LIAN BOSSERT**

By: _____

<u>ASSIGNEE</u>:

**JIA YUETING**

By: _____

OMM_US:77121331.1

## ASSIGNMENT AND ADMISSION AGREEMENT

This Assignment and Admission Agreement, dated as of _____ ___, 20___ (this "**Agreement**"), is entered into by and between West Coast LLC, a Delaware limited liability company ("**Assignor**") and Jia YueTing ("**Assignee**").

### BACKGROUND

A.    Pacific Technology Holding LLC (the "**Company**") has been formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. § 18-101, *et seq.*) (the "**Act**") and is governed by the Act and the Third Amended and Restated Limited Liability Company Agreement of the Company, dated as of July 5, 2019, as amended from time to time (the "**LLC Agreement**").

B.    The Assignor is a member of the Company and, immediately prior to the execution of this Agreement, holds 90,588,235 preferred units in the Company (the "**Units**").

C.    The Assignor desires to assign, transfer and convey his interest in the Units (collectively, his "**Interests**") to the Assignee, and the Assignees desires to acquire the Interests, in the manner as set forth herein.

D.    Pursuant to transfer of the Interests, Assignee desires to be admitted to the Company as a member of the Company, and the undersigned desires to continue the Company as set forth herein.

NOW, THEREFORE, the undersigned, in consideration of the premises, covenants and agreements contained herein, does hereby agree as follows:

1.    <u>Assignment</u>.    For value received, the receipt and sufficiency of which are hereby acknowledged, upon the execution of this Agreement by the parties hereto, the Assignor does hereby assign, transfer and convey all of the Units to the Assignee.

2.    <u>Admission</u>. Effective contemporaneously with the assignment described in <u>Section 1</u> of this Agreement, Assignee shall be admitted to the Company as a member of the Company and hereby agrees to be bound by all the terms and conditions of the LLC Agreement.

3.    <u>Continuation of the Company</u>. The parties hereto agree that the assignment of the Interests and the admission of the Assignee as a member of the Company shall not dissolve the Company.

4.    <u>Cooperation</u>. Assignee agrees to be bound by all of the provisions of the LLC Agreement to the same extent as though the Assignee had executed the LLC Agreement. Each of the parties hereto agrees to cooperate at all times from and after the date hereof with respect to all of the matters described herein, and to execute such further assignments, releases, assumptions, amendments of the LLC Agreement, notifications and other documents as may

4

be reasonably requested for the purpose of giving effect to, or evidencing or giving notice of, the transactions contemplated by this Agreement.

5.     <u>Miscellaneous; Governing Law</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns. This Agreement may be executed in counterparts and delivered via fax, email or scanned copies, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

*[Remainder of page intentionally left blank – signature pages follow.]*

5

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

<u>ASSIGNOR</u>:

**WEST COAST LLC**

By: _____

<u>ASSIGNEE</u>:

**JIA YUETING**

By: _____

*[Signature Page to Instrument of Transfer]*

## EXHIBIT B

## POWER OF ATTORNEY

The undersigned, by way of security and in order more fully to secure the performance of its obligations under the Nominee Agreement between the undersigned, West Coast LLC, a Delaware limited liability company ("**West Coast**") and Jia Yueting ("**YT**") dated as of July 31, 2019 (the "**Nominee Agreement**") hereby irrevocably appoints YT to be its attorney:

(a)    to execute and complete in favour of YT the Assignment and Admission Agreement between the undersigned and YT pursuant to which the undersigned shall assign and transfer all the units and membership interests in West Coast to YT (the "**Assignment**");

(b)    to sign, execute, seal and deliver and otherwise perfect and do any such legal assignments and other assurances, charges, authorities and documents to complete the transactions contemplated by the Assignment and other documents or acts which may be required for the full exercise of all or any of the powers conferred or which may be deemed proper on or in connection with any of the purposes aforesaid.

The power hereby conferred is irrevocable and shall be a general power of attorney and the undersigned hereby ratifies and confirms and agrees to ratify and confirm any instrument, act or thing which any such attorney may execute or do.  In relation to the power referred to herein, the exercise by YT of such power shall be conclusive evidence of its right to exercise the same.

EXECUTED by the undersigned as of July 31, 2019.


**LIAN BOSSERT**


By: _____

13

## POWER OF ATTORNEY

The undersigned, by way of security and in order more fully to secure the performance of its obligations under the Nominee Agreement between the undersigned, Lian Bossert and Jia Yueting ("**YT**") dated as of July 31, 2019 (the "**Nominee Agreement**") hereby irrevocably appoints YT to be its attorney:

(a)     to execute and complete in favour of YT the Assignment and Admission Agreement between the undersigned and YT pursuant to which the undersigned shall assign and transfer all the units and membership interests in Pacific Technology Holding LLC, a Delaware limited liability company ("**Pacific Technology**") to YT (the "**Assignment**");

(b)     to sign, execute, seal and deliver and otherwise perfect and do any such legal assignments and other assurances, charges, authorities and documents to complete the transactions contemplated by the Assignment and other documents or acts which may be required for the full exercise of all or any of the powers conferred or which may be deemed proper on or in connection with any of the purposes aforesaid.

The power hereby conferred is irrevocable and shall be a general power of attorney and the undersigned hereby ratifies and confirms and agrees to ratify and confirm any instrument, act or thing which any such attorney may execute or do.  In relation to the power referred to herein, the exercise by YT of such power shall be conclusive evidence of its right to exercise the same.

EXECUTED by the undersigned as of July 31, 2019.


**WEST COAST LLC**


By: _____
        Name: Jin Jin
        Title: President and Secretary

14

# Exhibit C

EXECUTION VERSION

# THIRD AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# PACIFIC TECHNOLOGY HOLDING LLC

This Third Amended and Restated Limited Liability Company Agreement (this "**Agreement**") of PACIFIC TECHNOLOGY HOLDING LLC (the "**Company**") is made and entered into as of July 5, 2019 (the "**Effective Date**") by and among the Company, Lian Bossert (the "**Non-Managing Member**"), FF Global Partners LLC, a Delaware limited liability company ("**FF Global**") and each other Person who is admitted as a member of the Company from time to time in accordance with the provisions of this Agreement (each a "**Member**" and collectively, the "**Members**").

## RECITALS

WHEREAS, the Company was formed on July 26, 2018 under the provisions of the Delaware Limited Liability Company Act (6 *Del.C.* §18-101, *et seq.*), as amended from time to time (the "**Act**"), as a result of the filing of a Certificate of Formation with the Secretary of State of the State of Delaware;

WHEREAS, the Non-Managing Member has entered into that certain Limited Liability Company Agreement of the Company, dated as of May 7, 2019 pursuant to which he was named the "**Managing Member**" of the Company (the "**LLC Agreement**");

WHEREAS, FF Global has entered into that certain Subscription Agreement with the Company pursuant to which FF Global subscribed for and the Company issued to FF Global an aggregate of 362,352,941 Common Units (the "**Subscription Agreement**") at $0.50 per Common Unit;

WHEREAS, the Non-Managing Member desires to admit FF Global as a Member of the Company and to amend and restate the LLC Agreement to appoint FF Global as the "**Managing Member**" in the Non-Managing Member's place, as set forth more particularly herein; and

WHEREAS, this Agreement amends, restates, supersedes and replaces the LLC Agreement in its entirety.

NOW, THEREFORE, the Members agree as follows:

1.  **Name**.  The name of the Company is "Pacific Technology Holding LLC".

2.  **Organization**.  The Company has been organized as a Delaware limited liability company pursuant to the provisions of the Act.  Membership in and management of the Company shall be governed by the terms and conditions set forth in this Agreement.

**3.**      **Purpose**.  The purpose and business of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary, customary, convenient or incidental to the foregoing.

**4.**      **Powers**.  In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have the power and is hereby authorized to:

(a)      acquire by purchase, lease, contribution of property or otherwise, own, hold, sell, convey, transfer or dispose of any real, personal or intangible property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(b)      act as a trustee, executor, nominee, bailee, director, officer, manager, agent or in some other fiduciary capacity for any Person and to exercise all of the powers, duties, rights and responsibilities associated therewith;

(c)      take any and all actions necessary, convenient or appropriate as trustee, executor, nominee, bailee, director, officer, manager, agent or other fiduciary, including the granting or approval of waivers, consents or amendments of rights or powers relating thereto and the execution of appropriate documents to evidence such waivers, consents or amendments;

(d)      operate, purchase, maintain, finance, improve, own, sell, convey, assign, mortgage, lease or demolish or otherwise dispose of any real, personal or intangible property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(e)      borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, secure the same by mortgage, pledge or other lien on the assets of the Company; and prepay in whole or in part, refinance, recast, increase, modify or extend any indebtedness of the Company and, in connection therewith, execute any extensions, renewals or modifications of any mortgage or security agreement securing such indebtedness;

(f)      invest any funds of the Company pending use, payment or distribution of the same pursuant to the provisions of this Agreement;

(g)      enter into, perform and carry out contracts of any kind, including, without limitation, contracts with any Person affiliated with a Member, necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes of the Company;

(h)      employ or otherwise engage employees, managers, contractors, advisors, attorneys and consultants and pay reasonable compensation for such services;

(i)      enter into partnerships, limited liability companies, trusts, associations, corporations or other ventures with other Persons in furtherance of the purposes of the Company; and

(j)    do such other things and engage in such other activities related to the foregoing as may be necessary, convenient or incidental to the conduct of the business of the Company, and have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

5.    **Principal Office**.  The principal business office of the Company shall be located at such location as may hereafter be determined by the Managing Member.

6.    **Filings; Agent for Service of Process.**

(a)    Certificate of Formation.  A Certificate of Formation has been filed with the Secretary of State of the State of Delaware.  The Managing Member or an Officer shall execute, deliver and file (i) any amendments to the Certificate of Formation deemed necessary or desirable by the Managing Member and (ii) any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

(b)    Registered Agent.  The name and address of the registered agent and office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

7.    **Members**.

(a)    Member.  Exhibit A attached hereto and as amended from time to time sets forth for each Member of the Company, such Member's name and present mailing address and the amount and series of Units of the Member in the Company.

(b)    Initial Capital Contribution.  The Members have subscribed for and own that percentage of the Company's membership interests as set forth beside each such Member's name under the column entitled "Percentage Interest" on Exhibit A attached hereto, as amended from time to time.  Each Member has contributed (or will contribute) certain cash, assets or property to the Company in exchange for such membership interests in the amount set forth beside each such Member's name under the column entitled "Capital Contribution" on Exhibit A attached hereto, as amended from time to time.  Each Member acknowledges and agrees that, as part of its initial Capital Contribution to the Company, the Managing Member is permitted to make Capital Contributions after the date of this Agreement in an aggregate amount up to $181,176,470.60 without the consent of the Non-Managing Member as further described in Exhibit A attached hereto.

(c)    Additional Contributions.  No Member shall be required to make or, except as contemplated above, be permitted to make any additional Capital Contributions to the Company without the consent of the Managing Member.

(d)    Additional Members.  One or more additional members, including substitute members, may be admitted to the Company with the consent of the Managing Member.  Prior to

3

the admission of any such additional members to the Company, the Members shall amend this Agreement to make such changes as the Members shall determine to be necessary to reflect the fact that the Company shall have such additional members (or substitute members). Each additional member (or substitute member) shall execute and deliver a supplement or counterpart to this Agreement (each, a "**Joinder**"), as necessary, under which it shall become a "Member" hereunder. The Managing Member may amend Exhibit A hereto to reflect such additional or substitute members as may be required from time to time.

(e)     Membership Interests; Certificates. Upon any Member's request, the Company will issue a certificate to such Member representing the membership interests held by such Member.

**8.     Management by Managing Member.**

(a)     Member-Managed. In accordance with Section 18-402 of the Act, management of the Company shall be vested in the "Managing Member". The Managing Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. The Managing Member has the authority to bind the Company. As of the date hereof, the Managing Member shall be FF Global.

(b)     Officers. The Managing Member may, from time to time as the Managing Member deems advisable, appoint officers of the Company (each an "**Officer**" and collectively, the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person. Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this Section 8 may be revoked at any time by the Managing Member.

(c)     Reliance. Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Managing Member as to the identity and authority of a manager, an Officer or other person to act on behalf of the Company or any Member.

(d)     Certain Tax Matters.

(i)     FF Global Partners LLC, or such other Person designated by the Managing Member shall be designated the "partnership representative" (the "**Partnership Representative**") as defined in Code Section 6223 and the Company and the Members shall complete any necessary actions (including executing any requested certificates or other documents) to effectuate such designation. The Partnership Representative may make any elections available to be made as Partnership Representative, and shall make the election described in Code Section 6226(a)(1) (as in effect following the effective date of its amendment by Section 1101 of the Bipartisan Budget

4

Act of 2015) to impose any adjustment to taxes proposed by the IRS with respect to the Company on the Persons that held membership interests in the Company during the tax period(s) of such proposed adjustment, in accordance with each such Person's distributive share of the Company's net income for such tax period(s).

(ii)    The Partnership Representative shall receive no compensation for its services as such. All reasonable and documented third party costs and expenses incurred by the Partnership Representative in performing his, her or its duties as such (including legal and accounting fees and expenses) shall be borne by the Company. Nothing herein shall be construed to restrict the Company from engaging an accounting firm to assist the Partnership Representative in discharging his, her or its duties hereunder. The Company shall indemnify and hold harmless the Partnership Representative with respect to any Proceeding brought against it in connection with any Proceeding related to the Partnership Representative acting in their respective capacities as such, except in actions in which the Partnership Representative is found to have acted fraudulently or willfully negligent with respect to its rights and responsibilities as the Partnership Representative.

(iii)    Notwithstanding anything to the contrary herein, neither the Partnership Representative nor the Managing Member shall take any action with respect to tax matters of the Company (including any settlement or compromise of any tax dispute of the Company) that would disproportionately affect the tax liability of a Member or its direct or indirect owners in a material and adverse manner without such Member's prior written consent.

(iv)    The Managing Member may make, or cause to be made, all elections of the Company for U.S. federal income and all other tax purposes.

(v)    Each Member agrees that such Member will not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(vi)    At the expense of the Company, the Managing Member will endeavor to cause the complete and accurate preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and its Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, and no later than one hundred twenty (120) days after the end of such Fiscal Year, the Managing Member will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year. Upon request of any Member, the Company will provide tax data in electronic form as reasonably requested within one hundred twenty (120) days after the end of such Fiscal Year. The Managing Member will have the right to select the external firm that prepares the Company's tax returns.

5

(vii)    All funds of the Company will be deposited in its name, or in such name as may be designated by the Managing Member, in such checking, savings or other accounts, or held in its name in the form of such other investments as will be designated by the Managing Member. The funds of the Company will not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company will be made exclusively upon the signature or signatures of such Officer or Officers as the Managing Member may designate.

9.    **Units Generally; Issuance of Additional Interest; Redemption**. The membership interests of the Members will be represented by issued and outstanding Units, which may be divided into one or more types, classes or series as determined by the Managing Member. Each type, class or series of Units will have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. As of the date hereof, the Company is authorized to issue two classes of Units, designated as "Common Units" and "Preferred Units." The Company will maintain a schedule, attached hereto as Exhibit A, of all Members, their respective mailing addresses and the amount and series of Units held by them (the "**Members Schedule**"), and will update the Members Schedule upon the issuance or Transfer to any new or existing Member. As of the date hereof, all Preferred Units are held by the Non-Managing Member. The Members Schedule will be kept confidential but will be available for review at the Company to all holders of Units.

(b)    Upon the affirmative approval of the Managing Member, the Company shall be authorized to issue up to 362,352,941 Common Units. With the consent of the Managing Member, the Company may create and issue to Members or additional Persons who may be admitted to the Company as Members (a) additional Common Units (including other classes or series thereof having different rights), (b) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into membership interests and (c) warrants, options or other rights to purchase or otherwise acquire membership interests in the Company (any of the foregoing, "**Additional Interests**"); In connection with any approved issuance of Additional Interests to any Person hereunder, such Person shall, at the Company's request, execute and deliver a Joinder and enter into such other documents and instruments to effect such issuance as are required by the Managing Member. Upon the issuance of any Additional Interests and the payment of the Capital Contribution with respect thereto (if any), the Capital Account of the recipient of such Additional Interests shall be adjusted pursuant to Section 13.

(c)    Holders of the Preferred Units shall have rights, privileges and preference to receive Distributions and allocation of Economic Interests in preference to holders of the Common Units including the special allocation rights described in Section 16.

(d)    Upon the Transfer of any Preferred Units from the Non-Managing Member to a third party or to FF Global, all of the Preferred Units so Transferred shall automatically convert into Common Units without any further action of the Managing Member.

(e)     Each Member acknowledges and agrees that, to the extent that any Member holding the Common Units (i) breaches the terms of this Agreement or any other agreements or contracts between such Member and the Company or (ii) conducts his or herself in any manner which is detrimental to the Company, as determined by the Managing Member in its sole discretion, then the Company has the right, but not the obligation, to redeem any or all of the Common Units then held by such Member at a price determined by the Managing Member, which shall not be less than the original purchase price paid by such Member for such Common Units. All Units that are redeemed pursuant to this Section 9(e) shall be cancelled immediately.

(f)     If either Faraday & Futures Inc., a California corporation, or Smart King files for bankruptcy or undergoes any similar Proceeding, the Company shall redeem all of the Units issued to holders of the Common Units at a price equal to the amount of purchase price that has been paid by such Member to the Company prior to and as of the date of such redemption *plus* reasonable interest determined by the Company in its sole discretion; *provided, that* such interest shall in no event exceed six percent (6%) per annum.  All Units that are redeemed pursuant to this Section 9(f) shall be cancelled immediately.

(g)     To the extent any holder of the Common Units redeems any Units issued to its members and has such Units cancelled, the Company may redeem a corresponding amount of Units from such holder of Common Units at the same consideration as such holder redeems its own Units. All Units that are redeemed pursuant to this Section 9(g) shall be cancelled immediately.

(h)     In the event that a Qualified IPO has not been consummated by Smart King or any other listing vehicle, as the case may be, on or prior to the sixth (6th) anniversary of the Effective Date, then at the written request to the Company (the "**Redemption Request**") by the holders of a majority of the then outstanding Common Units (the "**Common Units Majority**"), the Company shall redeem all but not less than all of the Common Units held by such holder(s). "**Qualified IPO**" shall mean the closing of the initial public offering of Smart King or other listing vehicle, as applicable, with a post-money market valuation (based on the price per share offered to the public in the offering) of at least US$1.5 billion on the New York Stock Exchange, Nasdaq Global Market System, Hong Kong Stock Exchange or any other exchange or quotation system that is approved by the Board of Directors of Smart King.

(i)     The total redemption price for the Common Units redeemed pursuant to this Section 9(h) shall be equal to (i) the amount of the total purchase price that has been paid by such holder as of the date of the redemption and (ii) eight percent (8%) compounded interest per annum thereupon until the date of such redemption (the "**Redemption Price**").

(ii)     The closing of the redemption of the Common Units pursuant to this Section 9(h) (the "**Redemption Closing**") will take place within one hundred and twenty (120) days of the date of the Redemption Request at the offices of the Company, or such earlier date or other place as the Common Units Majority and the Company may mutually agree in writing.  At the Redemption Closing, subject to applicable laws, the Company shall, from any source of assets or

funds legally available therefor, redeem each Common Unit by paying in cash therefor the Redemption Price against surrender by such holder at the Company's principal office of the certificate representing such Common Unit. From and after the Redemption Closing, if the Company makes the Redemption Price available to a holder of a Common Unit, all rights of the holder of such Common Unit (except the right to receive the Redemption Price therefor) will cease with respect to such Common Unit, and such Common Unit will not thereafter be Transferred on the books of the Company or be deemed outstanding for any purpose whatsoever.

10.     **Other Business**. The Members may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

11.     **Exculpation and Indemnification**. The Members shall not be subject to any fiduciary or other duties to the maximum extent permitted by applicable law. No Member or Officer shall be liable to the Company, or any other Person or entity who has an interest in the Company, for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Officer in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Member or Officer by this Agreement, except that a Member or Officer shall be liable for any such loss, damage or claim incurred by reason of such Member's or Officer's willful misconduct. To the fullest extent permitted by applicable law, a Member or Officer shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Member or Officer by reason of any act or omission performed or omitted by such Member or Officer in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Member or Officer by this Agreement, except that no Member or Officer shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Member or Officer by reason of willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 11 shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof.

12.     **Term**. The term of the Company shall be perpetual unless the Company is dissolved and terminated in accordance with Section 17.

13.     **Capital Accounts**.

(a)     Capital Accounts. A separate capital account (a "**Capital Account**") shall be maintained for each Member in accordance with Section 1.704-1(b)(2)(iv) of the U.S. Treasury Regulations promulgated under the Code (the "**Treasury Regulations**"), and this Section 13 shall be interpreted and applied in a manner consistent with said Section of the Treasury Regulations. The Company will maintain Capital Accounts for each Member in accordance with the following provisions:

8

(i)    the Company will credit to each Member's Capital Account (A) such Member's Capital Contributions, (B) such Member's distributive share of Net Profit and any items in the nature of income or gain which are specially allocated to such Member pursuant to this Agreement, and (C) the amount of any Company liabilities assumed by such Member or to which any property distributed to such Member is subject;

(ii)    the Company will debit from each Member's Capital Account (A) the amount of cash distributed to such Member pursuant to any provision of this Agreement, (B) the Gross Asset Value of any Company assets (other than cash) distributed to such Member pursuant to any provision of this Agreement, (C) such Member's distributive share of Net Loss and any items in the nature of expenses or losses which are specially allocated to such Member pursuant to this Agreement, and (D) the amount of any liabilities of such Member considered, under Section 752 of the Code, to be assumed by the Company or to which any property contributed by such Member to the Company is subject;

(iii)    in the event any interest is Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred interest;

(iv)    in determining the amount of any liability for purposes of subparagraphs (i) and (ii) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations; and

(v)    the foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations; and in the event that the Managing Member shall determine it is prudent to modify the manner in which the Capital Accounts, or any additions thereto or subtractions therefrom, are computed in order to comply with such Treasury Regulations, the Managing Member may make such modification, *provided* that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 17 hereof upon the dissolution of the Company.

**14.    Assignments.**

(a)    A Member may not Transfer in whole or in part such Member's membership interests in the Company to any Person without the prior written consent of the Managing Member; *provided, however*, that, without the consent of the Managing Member, the non-Managing Member may Transfer its Units to any Person at any time in accordance with the terms and subject to the conditions set forth in that certain Restructuring Agreement, made as of December 31, 2018, by and among  Season Smart Limited, FF Top Holding Ltd., FF Peak Holding Ltd., Yueting Jia, the Company, Smart King and other parties thereto.

9

(b)    Notwithstanding anything to the contrary herein, any otherwise permitted Transfer shall be null and void if such Transfer would cause the Company to become a "publicly traded partnership" within the meaning of Code Section 7704(b) or fail to satisfy the "private placement" safe harbor from treatment as a "publicly traded partnership" (as described in Treasury Regulations Section 1.7704-1(h)).

(c)    Notwithstanding the terms of this Agreement, the Members are aware that FF Top Holdings Ltd., a British Virgin Islands company and a Subsidiary of the Company ("FF Top"), holds 600 million Class B preferred shares in Smart King Ltd., a Cayman Islands company and also a Subsidiary of the Company ("Smart King"), and that FF Top proposes to Transfer 147,058,823 ordinary shares of Smart King to YT's creditor trust or a third Person designated by YT (the "Proposed Smart King Transfer"), and hereby approve and authorize the Proposed Smart King Transfer and the transactions contemplated thereby. For the avoidance of doubt, there is no need for the Members to approve the Proposed Smart King Transfer and any actions by the Members with respect to, in relation to and/or for the purpose of the Proposed Smart King Transfer are hereby authorized, approved and ratified.

**15.    Fiscal Year**.  The fiscal year shall be the twelve (12)-month period ending on December 31 of each applicable calendar year ("**Fiscal Year**"), or such other period as determined by the Managing Member.

**16.    Partnership Status; Distributions; Allocations**.

(a)    <u>Partnership Status for Tax Purposes</u>.  The Members intend that the Company shall be treated as a partnership for U.S. federal and, if applicable, state income tax purposes, and the Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  Neither the Company nor any Member shall make any election or take any other action inconsistent with such intent.

(b)    <u>Distributions</u>.  All distributions of cash or other assets of the Company (a "**Distribution**") shall be made solely to the Members when and as determined by the Managing Member, subject to the Act and in accordance to the following:

(i)    First, so long as at the time of a proposed Distribution, the holders of the Common Units shall not have received an aggregate Distribution (in cash or in kind) equal to their Capital Contribution, 100% of the Distributions shall be made to such holders of the Common Units in proportion to their respective Capital Contribution plus an interest of 8% per annum.

(ii)    Second, holders of the Preferred Units shall receive all Distributions until the aggregate amount distributed to such holders shall equal to $1.02 billion plus an interest of 8% per annum.

(iii)    Third, holders of the Preferred Units shall receive 10% of the remaining Distributions (after the Distributions in paragraphs (i) and (ii) above).

10

(iv)     Thereafter, Distributions shall be made to all Members in proportion to their respective Percentage Interests.

(c)     <u>Tax Distributions</u>.  Notwithstanding any other provision of this Agreement to the contrary, to the extent that the Company has distributable cash, the Company may, in the sole discretion of the Managing Member, make pro rata Distributions to each Member at least equal to such Member's Cumulative Tax Liability less the cumulative amount of Distributions received by such Member under <u>Section 16(b)</u> (each a "**Tax Distribution**").  Such Tax Distributions, to the extent paid, shall be made on a quarterly basis or at such earlier times as the Managing Member deems appropriate and shall be treated as advances of, or offsets to, future Distributions under this Agreement (as determined by the Managing Member).  The term "**Cumulative Tax Liability**" means the product of (i) the cumulative excess of taxable income over taxable losses or tax credits (to the extent usable against such income) of the Company allocated to a Member pursuant to this Agreement and (ii) the highest combined marginal federal, state and local tax rates (including any tax on "net investment income") applicable at the time of the relevant allocation to any Member, for an individual or corporation resident in New York City, New York (taking into account any tax imposed on "net investment income" as well as the deductibility of state and local income taxes for U.S. federal income tax purposes).  Any and all Tax Distributions under this <u>Section 16(c)</u> shall be treated as advances of Distributions and shall be taken into account in determining the amount of Distributions to the Members under <u>Section 16(b)</u> and <u>Section 17</u>.

(d)     <u>Distributions in Kind</u>.  Subject to any requirements set forth in <u>Section 16(b)</u>, the Managing Member is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company; *provided, however*, that Tax Distributions will only be made in cash.  In any non-cash Distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the fair market value of such securities or property would be distributed among the Members pursuant to <u>Section 16(b)</u>.  Any Distribution of securities will be subject to such conditions and restrictions as the Managing Member determines are required or advisable to ensure compliance with the Act.  In furtherance of the foregoing, the Managing Member may require that the Members execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

(e)     <u>Allocation of Net Income and Net Loss. General Allocation of Net Profit and Net Loss</u>.  After giving effect to the special allocations set forth in <u>Section 16(f)</u>, Net Profit or Net Loss, as the case may be, for any Fiscal Year or other period for which such allocation is made shall be allocated among the Members in a manner such so as to ensure, to the extent possible, that the Capital Accounts of the Members as of the end of such period conform, in the reasonable judgment of the Managing Member, with the economics of this Agreement in

11

accordance with <u>Section 16(b)</u> and <u>Section 17.</u> The allocations made pursuant to this <u>Section 16(e)</u> are intended to comply with the provisions of Section 704(b) of the Code and the Treasury Regulations thereunder and, in particular, to reflect the Economic Interests in the Company of the Members as set forth in this Agreement, and this <u>Section 16(e)</u> shall be interpreted in a manner consistent with such intention.

(f)      <u>Special Allocations.</u>  The Managing Member shall make special allocations under this <u>Section 16(f)</u> in accordance with the provisions of the Treasury Regulations under Section 704 of the Code, minimum gain chargeback, including Member minimum gain chargeback, qualified income offset and gross income allocation as they deem necessary in order to cause the allocations under this <u>Section 16(f)</u> to comply with the provisions of Section 704 of the Code and the Treasury Regulations thereunder.

(g)      <u>Other Allocation Rules</u>. For purposes of determining the Net Profit, Net Loss or any other items applicable to any period, Net Profit, Net Loss and any other such items shall be determined on a daily, monthly or other basis, as determined by the Managing Member in its reasonable discretion using any permissible method under Section 706 of the Code and the Treasury Regulations promulgated thereunder.

(ii)      Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be allocated among the Members in the same proportions as they share Net Profit or Net Loss, as the case may be, for the Fiscal Year or other period for which such allocation is made.

(iii)      In accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated to the Members so as to take account of the variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial value on the date of contribution to the Company as determined by the Managing Member in its reasonable discretion.  Allocations of income, gain, loss and deduction with respect to any such assets shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its value in the same manner as under Section 704(c) of the Code and the Treasury Regulations promulgated thereunder.  Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this paragraph (c) are solely for federal, state and local taxes and shall not affect, or in any way be taken into account in computing any Member's Capital Account or share of Net Profit, Net Loss or other items or Distributions pursuant to any provision of this Agreement.

(iv)      All elections, decisions and other matters concerning the allocation of profits, gains and losses among the Members, and accounting procedures, not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Managing Member in its reasonable discretion.

12

(h)    Tax Allocations. Notwithstanding any provision of this Agreement, each item of income, gain, loss, deduction or credit as determined for U.S. federal income tax purposes shall be allocated in the same manner as the related items are allocated under Section 16(e), *provided* that the Managing Member may adjust such allocations as may be necessary or desirable to ensure that such allocations are in accordance with the interests of the Members in the Company, or otherwise comply with the applicable provisions of the Code and Treasury Regulations (including, for the avoidance of doubt, Section 704(c) of the Code and the regulations promulgated thereunder). All matters concerning allocations for U.S. federal, state and local income tax purposes (including accounting procedures) not expressly provided for by the terms of this Agreement shall be determined in good faith by the Managing Member in a manner intended to satisfy the requirements of the Code, Treasury Regulations and applicable provisions of the U.S. federal, state or local tax laws. Allocations pursuant to this Section 16(h) are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

(i)    Allocations in Respect of Transferred Units. In the event of a Transfer during any Fiscal Year made in compliance with the provisions of Section 14 of this Agreement, Net Profit, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year will be determined, except as reasonably determined by the Managing Member, using the interim closing of the books method in accordance with applicable Treasury Regulations.

**17.    Dissolution; Liquidation.**

(a)    The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of each Member, (ii) the occurrence of any other event that terminates the continued membership of the last remaining Member in the Company unless the business of the Company is continued in a manner permitted by the Act, or (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)    Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Managing Member shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Members under this Agreement shall continue.

(c)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and Distribution of the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Members in accordance with Section 16(b) hereof.

13

(d)    Following the completion of the winding up of the activities of the Company, the Managing Member shall file a certificate of cancellation in accordance with the Act.  Upon filing of the certificate of cancellation, the existence of the Company shall cease, except for the purpose of suits, other Proceedings and appropriate action as provided in the Act.  The Managing Member shall have the authority to distribute any Company property discovered after dissolution and take such other action as may be necessary on behalf of and in the name of the Company.

(e)    Proceeds from a Sale Event, or a sale or liquidation of all or substantially all of the assets of the Company, after payment of, or adequate provision for, the debts and obligations of the Company, including the expenses of its liquidation and dissolution, the payment of any liabilities to its officers or Members, if any, other than liabilities to Members for Distributions shall be distributed promptly after the consummation of any such event and applied in the following priorities:

(i)    First, to fund reserves to the extent deemed appropriate by the Managing Member for contingent, conditional, unmatured or other liabilities of the Company not otherwise paid or provided for; *provided* that, upon the expiration of such period of time as the Managing Member shall deem advisable, the balance of such reserves remaining after payment of such liabilities shall be distributed in the manner hereinafter set forth; and

(ii)    Thereafter, to the Members in accordance with Section 16(b).

**18.    Miscellaneous.**

(a)    Amendments.  This Agreement may be amended only by the consent of each Member and only in writing pursuant to a document specifically designating it as an amendment to this Agreement.

(b)    Governing Law.  This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware, exclusive of its conflict of laws principles.  In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable provision, which being valid, legal and enforceable, comes closest to the economic effect and intent of the parties underlying the invalid, illegal or unenforceable provision.

(c)    Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provisions hereof.

(d)    Severability.  In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be

14

affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

(e)    Creditors.  None of the provisions of this Agreement shall be for the benefit of or enforced by any creditor of the Company or the Members.

(f)    Survival of Indemnity.  All rights to indemnification permitted in this Agreement and payment of associated expenses shall not be affected by the termination, dissolution or bankruptcy of the Company or the withdrawal, insolvency or bankruptcy of any Member.

(g)    Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the parties hereto and the parties entitled to indemnification pursuant to Section 11) any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

(h)    Entire Agreement.  This Agreement, together with the Certificate of Formation, and all related Annexes, Exhibits and Schedules, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter. To the extent there is any conflict or inconsistency between the terms of this Agreement and any other agreements entered or to be entered into by and between any Member and the Company, this Agreement shall prevail.

(i)    Definitions.  For purposes of this Agreement:

(i)    "**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with, such Person.

(ii)    "**Capital Contribution**" means with respect to any Member, the total amount of cash and the initial Gross Asset Value of property (other than cash) contributed or deemed contributed to the capital of the Company made by or on behalf of such Member, whether as an initial Capital Contribution or as an additional Capital Contribution.

(iii)    "**Code**" means the Internal Revenue Code of 1986, as amended

(iv)    "**Control**" (including the terms "**Controlling**," "**Controlled by**" and "**under Common Control with**") means, with respect to any Person, the possession, directly or indirectly, of the power to direct the policies and management of such Person, whether through ownership of voting securities, by contract or otherwise.

(v)    "**Depreciation**" means, for each Taxable Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for U.S. federal income tax purposes with respect to an asset for such period, except that if the Gross Asset Value of an asset differs from its adjusted basis for U.S. federal income tax purposes at the beginning of such period, Depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value

15

as the U.S. federal income tax depreciation, amortization or other cost recovery deduction for such period bears to such beginning adjusted tax basis; *provided, however*, that if the adjusted basis for U.S. federal income tax purposes of an asset at the beginning of such period is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managing Member.

(vi)    **"Economic Interest"** means a Member's share of the Company's Net Profits, Net Losses and Distributions pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members, or any right to receive information concerning the business and affairs of the Company.

(vii)    **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

(viii)    **"Gross Asset Value"** means, with respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes, except as follows:

(A)    The initial Gross Asset Value of any asset contributed or deemed contributed by a Member to the Company will be the fair market value of such asset as reasonably determined by the Managing Member at the time it is accepted by the Company, unreduced by any liability secured by such asset, as reasonably determined by the Managing Member.

(B)    The Gross Asset Values of all Company assets will be adjusted to equal their respective fair market values, unreduced by any liabilities secured by such assets, as reasonably determined by the Managing Member as of the following times, if the Managing Member reasonably determines that such adjustment is necessary or appropriate to reflect the relative membership interests of the Members in the Company: (i) the acquisition of additional membership interests by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the Distribution by the Company to a Member of more than a de minimis amount of cash or property as consideration for membership interests; (iii) the liquidation or dissolution of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of a membership interest in the Company (other than a de minimis interest), including without limitation a grant of membership interests intended to be "profits interests" for U.S. federal income tax purposes, as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member of the Company; (v) the acquisition of an interest in the Company by any new or existing Member upon the exercise of a noncompensatory option or warrant in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(s); and (vi) at such other times as the Managing Member shall reasonably determine necessary or advisable in order to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2. If any noncompensatory options or warrants are outstanding upon the occurrence of an event described in paragraph (B)(1) through (B)(vi) of this definition,

16

the Company shall adjust the Gross Asset Values of its properties in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(f)(1) and 1.704-1(b)(2)(iv)(h)(2).

(C)    The Gross Asset Value of any asset of the Company distributed to any Member will be adjusted to equal the fair market value of such asset, unreduced by any liability secured by such asset, on the date of Distribution as reasonably determined by the Managing Member.

(D)    The Gross Asset Values of the Company's assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided, however*, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (D) to the extent that an adjustment pursuant to subparagraph (B) above is made in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (D).

(E)    If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (A), (B) or (D) of this definition, such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

(ix)    "**Net Profit**" or "**Net Loss**" means, mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such period, determined in accordance with Section 703(a) of the Code, with the adjustments provided in the regulations thereunder and the regulations under Section 704 of the Code; provided, however, that items which are specially allocated pursuant to Section 16(e) hereof shall not be taken into account in computing Net Profit or Net Loss.

(x)    "**Percentage Interest**" means, with respect to each Member, such Member's percentage of the Company's membership interests as set forth on Exhibit A hereto (as the same may be amended from time to time).

(xi)    "**Person**" means an individual, a corporation, a partnership, a joint venture, a trust, an unincorporated organization, a limited liability company, a government and any agency or political subdivision thereof.

(xii)    "**Proceeding**" means any claim, suit, action, proceeding, arbitration, administrative notice, administrative action or investigation.

(xiii)    "**Sale Event**" means any of the following: (i) the acquisition, directly or indirectly, by any "Person" or "group" (as such terms are used in Section 13(d)(3) of the Exchange Act) (other than one or more of the Members or any of their Affiliates), in a single transaction or in a related series of transactions, of beneficial ownership (within the meaning of Rule 13d-3 under

the Exchange Act) of more than 50% of the total voting power or the voting securities of the Company, whether as a result of the issuance of securities, any merger, consolidation, recapitalization, tender offer or exchange offer, reclassification, liquidation or dissolution or otherwise or (ii) the sale, transfer or disposition (including by way of license, lease or otherwise) of all or substantially all of the assets of the Company (on a consolidated basis) to any Person or group (other than the Company or its wholly-owned Subsidiaries or its wholly-owned Subsidiaries).

(xiv)    "**Subsidiary**" means, with respect to any Person, any entity of which (i) 30% of the total voting power of shares of stock or equivalent ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, trustees or other members of the applicable governing body thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if no such governing body exists at such entity, a majority of the total voting power of shares of stock or equivalent ownership interests of the entity is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or Control the managing member or general partner of such limited liability company, partnership, association or other business entity.

(xv)    "**Taxable Year**" means the taxable year of the Company determined under Section 706 of the Code.

(xvi)    "**Transfer**" means, with respect to a Member, to sell, assign, pledge, encumber, transfer or otherwise dispose of, whether directly or indirectly, voluntarily or involuntarily or by operation of law, all or a portion of its, his or her membership interest in the Company. The terms "**Transfers**", "**Transferred**" and "**Transferring**" shall have correlative meanings.

(xvii)    "**Unit**" means a unit representing a fractional part of the membership interests of the Members and will include all types and classes of units, including Preferred Units and Common Units; *provided, however*, that any type or class of Unit will have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the membership interests represented by such type or class or series of Unit will be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

*(Remainder of page intentionally left blank. Signature pages follow.)*

18

**IN WITNESS WHEREOF,** the undersigned have duly executed this Agreement effective as of the above stated date.

<u>MANAGING MEMBER</u>:

**FF GLOBAL PARTNERS LLC**

By: _____
Name: Nan Yang
Title: Secretary

<u>NON-MANAGING MEMBER</u>:

**LIAN BOSSERT**

_____
Lian Bossert

**IN WITNESS WHEREOF,** the undersigned have duly executed this Agreement effective as of the above stated date.

**MANAGING MEMBER**:

**FF GLOBAL PARTNERS LLC**

By: _____
Name: Nan Yang
Title:  Secretary

**NON-MANAGING MEMBER**:

**LIAN BOSSERT**

_____
Lian Bossert

**Exhibit A**

| Name of Member | Address of Member | Units | Percentage Interest | Capital Contribution |
|---|---|---|---|---|
| FF Global Partners LLC | FF Global Partners LLC N, Rolling Hills Estate CA 90274 | 362,352,941 Common Units | 80% | $16,464,147.31 |
| Lian Bossert | 850 Wilcox Ave Apt 201, Los Angeles CA 90038 | 90,588,235 Preferred Units | 20% | $444,738,412, represented by one ordinary share of FF Peak Holding Ltd., a business company incorporated under the laws of the British Virgin Islands ("**FF Peak**"), which represents all of the issued and outstanding equity interests in FF Peak |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document entitled (*specify*):  ***DECLARATION OF YUETING JIA IN SUPPORT OF DEBTOR'S OPPOSITION TO MOTION TO DISMISS DEBTOR'S CHAPTER 11 CASE BY CREDITOR SHANGHAI LAN CAI ASSET MANAGEMENT CO., LTD.*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **<u>March 3, 2020,</u>** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **<u>March 3, 2020,</u>** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**<u>VIA PERSONAL DELIVERY</u>**
United States Bankruptcy Court
Central District of California
Attn:  Hon. Vincent Zurzolo
Edward R. Roybal Federal Bldg./Courthouse
255 East Temple Street, Suite 1360
Los Angeles, CA  90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 3, 2020 | Sophia L. Lee | /s/ *Sophia L. Lee* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                    **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:327335.1 46353/002

**SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ**

1.  <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>

- *Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com*
- *Jerrold L Bregman    ecf@bg.law, jbregman@bg.law*
- *Jeffrey W Dulberg    jdulberg@pszjlaw.com*
- *Stephen D Finestone    sfinestone@fhlawllp.com*
- *Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com*
- *Ben H Logan    blogan@omm.com*
- *David W. Meadows    david@davidwmeadowslaw.com*
- *John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com*
- *Kelly L Morrison    kelly.l.morrison@usdoj.gov*
- *Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com*
- *Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com*
- *Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com*
- *Benjamin Taylor    btaylor@taylorlawfirmpc.com*
- *United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov*
- *Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:327335.1 46353/002