| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br>Richard M. Pachulski (CA Bar No. 90073)<br>Jeffrey W. Dulberg (CA Bar No. 181200)<br>Malhar S. Pagay (CA Bar No. 189289)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Boulevard, 13th Floor<br>Los Angeles, CA  90067<br>Telephone:  310/277-6910<br>Facsimile:  310/201-0760<br>Email: rpachulski@pszjlaw.com<br>　　　jdulberg@pszjlaw.com<br>　　　mpagay@pszjlaw.com | FOR COURT USE ONLY |
| ☒  *Attorney for:* Debtor | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>YUETING JIA,<br><br>　　　　　　　　　　　　Debtor(s). | CASE NO.: 2:19-bk-24804-VZ<br><br>CHAPTER: 11 |
| | **NOTICE OF OBJECTION TO CLAIM** |
| | DATE:  May 7, 2020<br>TIME:　 1:30 p.m.<br>COURTROOM: 1368<br>PLACE: 255 East Temple Street<br>　　　　　Los Angeles, CA  90012 |

1. TO *(specify claimant and claimant's counsel, if any)*:　E-Town International Holding (HongKong) Co., Limited

2. NOTICE IS HEREBY GIVEN that the undersigned has filed an objection to your Proof of Claim (Claim No. 16) filed in the above referenced case. The Objection to Claim seeks to alter your rights by disallowing, reducing or modifying the claim based upon the grounds set forth in the objection, a copy of which is attached hereto and served herewith.

3. **Deadline for Opposition Papers**: You must file and serve a response to the Objection to Claim not later than 14 days prior to the hearing date set forth above.

   **IF YOU FAIL TO TIMELY RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

Date:　April 2, 2020

Date Notice Mailed: April 2, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Printed name of law firm

*/s/ Malhar S. Pagay*
Signature

Malhar S. Pagay
Printed name of attorney for objector

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012*　　　　　　　　　　　　Page 1　　　　　　　**F 3007-1.1.NOTICE.OBJ.CLAIM**
DOCS_LA:328789.1 46353/002

1   Richard M. Pachulski (CA Bar No. 90073)
    Jeffrey W. Dulberg (CA Bar No. 181200)
2   Malhar S. Pagay (CA Bar No. 189289)
    PACHULSKI STANG ZIEHL & JONES LLP
3   10100 Santa Monica Blvd., 13th Floor
    Los Angeles, CA  90067
4   Telephone: 310/277-6910
    Facsimile: 310/201-0760
5   Email:    rpachulski@pszjlaw.com
              jdulberg@pszjlaw.com
6             mpagay@pszjlaw.com
7
    Attorneys for Debtor and Debtor in Possession
8

9                  **UNITED STATES BANKRUPTCY COURT**

10                 **CENTRAL DISTRICT OF CALIFORNIA**

11                      **LOS ANGELES DIVISION**

12  | In re: | Case No.: 2:19-bk-24804-VZ |
|---|---|
13  | YUETING JIA,[1] | Chapter 11 |
14  | Debtor. | **DEBTOR'S NOTICE OF OMNIBUS OBJECTION AND OMNIBUS OBJECTION FOR AN ORDER DISALLOWING DUPLICATE CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF LUETIAN SUN IN SUPPORT THEREOF** |

**This Objection Affects The Following Claimants:**
**Beijing Huaxing Mobile Asset Mgt Center, Claim 27** (Duplicate of Claim 20023)
**Beijing Jiaxin Tengda Information Consulting Co., Ltd., Scheduled Claim 220000060** (Duplicate of Claim 20019)
**China Soft Growing Invest Wuxi Partshp, Claim 61** (Duplicate of Claim 19)
**Chongqing LeTV Commercial Factoring Co., Ltd., Claims 21** and **24** (Duplicates of Claim 20015)
**E-Town Intl Holding (HK) Co Ltd., Claim 16** (Duplicate of Claim 20017)
**Honghu Da, Claim 6** (Duplicate of Claim 20008)
**Huizhou Speed Secondcurve Management LP, Claim 20002** (Duplicate of Claim 20001)
**Jiangyin Hailan Invest. Holding Co. Ltd., Claim 20009** (Duplicate of Claim 7)
**Linfen Investment Group Co., Ltd., Scheduled Claim**

---

[1] The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing address is 91 Marguerite Drive, Rancho Palos Verdes, CA 90275.

*(left margin, vertical)* PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**220000540** (Duplicate of Claim 30)
**Nanchang O-Film Photoelectric Technology Co., Ltd,
Claim 38** (Duplicate of Claim 33)
**O-Film Global (HK) Trading Limited, Claim 34**
(Duplicate of Claim 33)
**O-Film Global (HK) Trading Limited, Claim 37**
(Duplicate of Claim 33)
**Pingan Bank Co Ltd Beijing Branch, Claim 20041**
(Duplicate of Claim 20036)
**Shenzhen Yingda Capital Management Co.,
Scheduled Claim 220000860** (Duplicate of Claim
20034)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 42**
(Duplicate of Claim 20027)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 43**
(Duplicate of Claim 20029)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 44**
(Duplicate of Claim 20030)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 45**
(Duplicate of Claim 20031)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 46**
(Duplicate of Claim 20032)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 47**
(Duplicate of Claim 20039)
**Tianjin Yingxin Xinheng Investment Consulting Co.,
Ltd., Claim 28** (Duplicate of Claim 20020)
**Weihua Qiu, Scheduled, Claim 220000960** (Duplicate
of Claim 12)
**Weihua Qiu, Claim 39** (Duplicate of Claim 12)
**Western Securities Co., Ltd., Claim 32** (Duplicate of
Claim 20028)
**Wuxi Leyike Investment Enterprise, Claim 20025**
(Duplicate of Claim 20007)
**Xizang Jinmeihua Investment Co., Ltd., Scheduled
Claim 220001030** (Duplicate of Claim 29)

Date:        May 7, 2020
Time:        1:30 p.m.
Place:       Courtroom 1368
             Royal Federal Building
             255 E. Temple Street
             Los Angeles, California 90012

Judge:       Hon. Vincent P. Zurzolo

**PLEASE TAKE NOTICE** that, on May 7, 2020, beginning at 1:30 p.m. (Pacific Time), or

as soon thereafter as counsel  may be heard before the Hon. Vincent P. Zurzolo, in Courtroom 1368

of the Edward R. Roybal Federal Building and Courthouse, located at 255 E. Temple Street, Los

Angeles, California 90012, pursuant to the *Order (I) Approving the Fourth Amended Disclosure*

*Statement; (II) Approving the Voting Procedures and Tabulation Procedures; (III) Setting the Date*

*and Time for the Confirmation Hearing and Related Deadlines; (IV) Waiving Certain Local Rules and Procedures Related to the Timing and Approval of the Fourth Amended Disclosure Statement and Confirmation of the Third Amended Plan; and (V) Granting Related Relief* [Docket No. 485] (the "Disclosure Statement Order"), which provides, in pertinent part, that if the Debtor has served an objection or request for estimation as to a claim by April 2, 2020, such claim shall be temporarily disallowed for voting purposes only (and not for purposes of allowance or distribution), except to the extent and in the manner as may be set forth in such objection or as ordered by the Court before the voting deadline, i.e., April 30, 2020 at 4:00 p.m. (Beijing Time),[2] Yueting Jia (the "Debtor" or "YT"), debtor and debtor in possession herein, hereby objects to and moves to disallow (the "Objection") the claims (the "Duplicate Claims") listed below in the column entitled "Duplicate Claims to Be Disallowed" filed by the listed claimants (the "Claimants") on the grounds that the Duplicate Claims are identical to those claims listed in the column entitled "Surviving Claims." The Debtor requests that the Court take judicial notice of both the Duplicate Claims to Be Disallowed and the Surviving Claims, which are annexed as Exhibits 1-27 to the Request for Judicial Notice (the "RFJN"), filed concurrently herewith.

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Beijing Huaxing Mobile Asset Mgt Center | 27 | 20023 | Duplicate Claim | 1 |
| Beijing Jiaxin Tengda Information Consulting Co., Ltd. | 220000060 (scheduled claim) | 20019 | Creditor, Beijing Jiaxin Tengda Information Consulting Co., Ltd., also uses the name Jiaxindechuang BJ Tech Group Co Ltd. The Debtor scheduled Beijing Jixain Tengda Information Consulting Co., Ltd. in the amount of $1,458,406. However, the creditor asserted the same debt using the name Jiaxindechuang BJ Tech Group Co Ltd. in filed claim number 20019 in | 2 |

---

[2] Disclosure Statement Order, 6 at ¶ 17(e).

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| | | | the amount of $1,975,674.74, and, consequently, has received two separate ballots to vote a single debt in connection with the Debtor's Plan. The filed proof of claim should supersede the scheduled claim despite the difference in names. | |
| China Soft Growing Invest Wuxi Partshp | 61 | 19 | Duplicate Claim | 3 |
| Chongqing LeTv Commercial Factoring LLC | 21 | 20015 | Duplicate Claim | 4 |
| Chongqing LeTv Commercial Factoring LLC | 24 | 20015 | Duplicate Claim | 5 |
| E-Town Intl Holding (HK) Co Ltd | 16 | 20017 | Duplicate Claim | 6 |
| Honghu Da | 6 | 20008 | Duplicate Claim | 7 |
| Huizhou Speed Secondcurve Management LP, | 20002 | 20001 | Duplicate Claim | 8 |
| Jiangyin Hailan Invest Holding Co Ltd. | 20009 | 7 | Creditor, Jiangyin Hailan Invest Holding Co. Ltd. filed Claim 20009 in the amount of $89,635,814.27, however, the back-up attached to Claim 20009 totals $69,635,814.27, which amount is duplicative of Claim 7. Therefore, Claim 20009 should be disallowed. | 9 |
| Linfen Investment Group Co. Ltd. | 220000540 | 30 | This creditor filed a proof of claim for the same debt under a similar but different name (Linfen Investment Construction Development Co. Ltd.) and, consequently, received ballots for both scheduled and filed claims. The filed proof of claim should supersede the scheduled claim and, with respect | 10 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| | | | to the Plan, the amount to be voted on account of the scheduled claim should be disallowed. | |
| Nanchang OFilm Photoelectric Tech Co Ltd. | 38 | 33 | Duplicate Claim | 11 |
| O-Film Global (HK) Trading Limited | 34 | 33 | The creditor, in its complaint against the Debtor, describes it and Nanchang OFilm Photoelectric Tech Co Ltd. as sister companies and co-plaintiffs. The lawsuit asserts a single claim of $24,095,428.00 against the Debtor. Accordingly, multiple claims asserted in the same amount are duplicative. | 12 |
| O'Film Global (HK) Trading Limited | 37 | 33 | Duplicate Claim | 13 |
| Pingan Bank Co Ltd Beijing Branch | 20041 | 20036 | Duplicate Claim | 14 |
| Shenzhen Yingda Capital Management Co. | 220000860 | 20034 | This creditor inadvertently received ballots both for scheduled and filed claims, so the amount to be voted on account of the scheduled claim should be disallowed. | 15 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 42 | 20027 | Duplicate Claim | 16 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 43 | 20029 | Duplicate Claim | 17 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 44 | 20030 | Duplicate Claim | 18 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 45 | 20031 | Duplicate Claim | 19 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 46 | 20032 | Duplicate Claim | 20 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 47 | 20039 | Duplicate Claim | 21 |
| Tianjin Yingxin Xinheng Investment | 28 | 20020 | Duplicate Claim | 22 |

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Consulting Co. Ltd. | | | | |
| Weihua Qiu | 220000960 (scheduled claim) | 12 | This creditor inadvertently received ballots both for scheduled and filed claims, so the amount to be voted on account of the scheduled claim should be disallowed. | 23 |
| Weihua Qiu | 39 | 12 | Duplicate claim | 24 |
| Western Securities Co., Ltd. | 32 | 20028 | Duplicate Claim | 25 |
| Wuxi Leyike Investment Enterprise | 20025 | 20007 | Duplicate Claim | 26 |
| Xizang Jinmeihua Investment Co., Ltd. | 220001030 (scheduled claim) | 29 | In Chinese, Tibet is called Xizang.  The creditor filed its claim using the name Tibet Jinmeihua Investment Co. Ltd. and, consequently, has received two separate ballots to vote a single debt in connection with the Debtor's Plan.  The filed proof of claim should supersede the scheduled claim despite the difference in names. | 27 |

True and correct copies of the Claims are attached to the Notices of Objection to Claims, which have been served on each claimant, attaching their corresponding claim(s).

**PLEASE TAKE FURTHER NOTICE** that the Objection has been served upon the Claimants and all parties entitled thereto and is based upon the supporting Memorandum of Points and Authorities and Declaration of Luetian Sun, the statements, arguments and representations of counsel who appear at the hearing regarding the Objection, the files and records in the above-captioned case, any evidence properly before the court prior to or at the hearing regarding the Objection and all matters of which the court may properly take judicial notice.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f),

2    responses to the Objection must be filed with the Court and served upon the Debtor's counsel at the

3    address in the upper left-hand corner of this Objection **no later than fourteen (14) days prior to**

4    **the hearing date**.  Responses must contain a written statement of all reasons why the Objection is

5    opposed and must include declarations and copies of all documentary evidence on which the

6    responding party intends to rely.  Responses must be filed either electronically or at the following

7    location:

8                                United States Bankruptcy Court
                                Attention:  Clerk's Office
9                                255 E. Temple Street
                                Los Angeles, CA 90012
10

11    **IF YOU DO NOT OPPOSE THE OBJECTION YOU DO NOT NEED TO FILE ANY**

12    **PAPERS, SIGN ANY FURTHER AGREEMENTS OR TAKE ANY FURTHER ACTION.**

13    **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f),

14    the failure to timely file and serve written opposition may be deemed by the Court to be consent to

15    the granting of the relief requested in the Objection.

16    **PLEASE TAKE FURTHER NOTICE** that if a response is timely filed and served upon the

17    Debtor's counsel, the Court, in its discretion, may treat the initial hearing as a status conference if it

18    determines that the Objection involves disputed factual issues or will require presentation of

19    substantial evidence or argument.

20    **WHEREFORE,** the Debtor respectfully requests that the Court enter an order (i) sustaining

21    the Objection; (ii) disallowing the Duplicate Claims in their entirety; and (iii) granting the Debtor

22    such other and further relief as may appropriate under the circumstances.

23
      Dated:    April 2, 2020                    PACHULSKI STANG ZIEHL & JONES LLP
24

25                                               By    */s/ Malhar S. Pagay*
26                                                     Richard M. Pachulski
                                                       Jeffrey W. Dulberg
27                                                     Malhar S. Pagay

                                                       Counsel for Debtor and Debtor in
28                                                     Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 102, 105 and 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 3007 and 3018(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II.

## BACKGROUND

### A.    Commencement of the Chapter 11 Case

On October 14, 2019 (the "Petition Date"), the Debtor commenced this case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). The Debtor continues in possession of his property and manages his affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On October 25, 2019, the U.S. Trustee appointed the Official Committee of Unsecured Creditors  pursuant to section 1102(a)(1) of the Bankruptcy Code (the "Committee") [Docket No. 45]. The Committee consists of the following members: (a) Ping An Bank., Ltd. Beijing Branch; (b) China Minsheng Trust Co., Ltd; (c) Shanghai Leyu Chuangye Investment Management Center LP; (d) Jiangyin Hailan Investment Holding Co., Ltd; and (e) Shanghai Qichengyueming Investment Partnership Enterprise.

On November 13, 2019, the Court entered an order setting January 24, 2020, as the general deadline (the "Bar Date") for the filing of proofs of claim or proofs of interest against the Debtor's estate.  In accordance with the Court's Order establishing the Bar Date, notice of the Bar Date was given by mail to the Debtor's creditors and interest holders.

On December 18, 2019, Judge Karen B. Owens of the Delaware Bankruptcy Court transferred the Chapter 11 Case to this Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**B.** **Approval of the Debtor's Disclosure Statement**

On March 20, 2020, the Court entered the Disclosure Statement Order, pursuant to which the Court approved the Debtor's *Fourth Amended Disclosure Statement with Respect to Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 465] in respect of the *Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 464] (the "Plan"), and granted other relief.

The Disclosure Statement Order provides, in pertinent part, that if the Debtor has served an objection or request for estimation as to a claim by April 2, 2020, such claim shall be temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, or as ordered by the Court before the voting deadline, i.e., April 30, 2020 at 4:00 p.m. (Beijing Time). Disclosure Statement Order, 6 at ¶ 17(e).

### III.

### ARGUMENT

**A.** **Procedural Requirements for Objections to Claims**

Bankruptcy Rule 3007 governs the procedure for objections to claims. It provides as follows: "An objection to an allowance of a claim shall be in writing and filed. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant . . . at least thirty days prior to the hearing." Fed. R. Bankr. P. 3007.

Pursuant to Bankruptcy Rule 3007, a copy of the Objection will be mailed to Claimants at the addresses provided by Claimants in the Claims, and, where available and if different from the address provided on the proof of claim, on each Claimant's address registered with the National Enterprise Credit Information Publicity System (http://www.gsxt.gov.cn/index.html), a government-run, national, enterprise credit inquiry system in the People's Republic of China, at least thirty days prior to the hearing date for consideration of the Objection. Accordingly, by the time of the hearing hereon, the Debtor will have complied with Bankruptcy Rule 3007.

**B.    The Court Must Determine the Allowance of a Claim Subject to Objection**

With certain exceptions, section 502(b) of the Bankruptcy Code requires, in relevant part, that if a party in interest objects to a claim, "the Court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that -- (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured …."

**C.    Burden of Proof**

All allegations set forth in a properly filed proof of claim are taken as true and, if the allegations set forth all facts necessary to establish a claim and are not self-contradictory, the proof of claim constitutes *prima facie* evidence of the validity and amount of the claim.  11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).  However, a claimant must attach copies of writings upon which claims are based in order to carry its burden of establishing a *prima facie* case against the debtor. *Hardin v. Gianni (In re King Investments Inc.)*, 219 B.R. 848, 858 (B.A.P. 9th Cir. 1998).  Further, a claim should not be allowed if that claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law.  11 U.S.C. § 502(b)(1).

Once the objector raises "facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves," *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991), then "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Ashford v. Consolidated Pioneer Mortgage (In re Consolidated Pioneer Mortgage)*, 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995), aff'd, 91 F.3d 151 (9th Cir. 1996). "[T]he ultimate burden of persuasion is always on the claimant."  *Holm*, 931 F.2d at 623.  In considering an objection to a claim, a bankruptcy court may take judicial notice of the underlying records in a bankruptcy case.  *O'Rourke v. Seaboard Surety Co., (In re ER Fergert, Inc.)*, 887 F.2d 955, 957-958 (9th Cir. 1998).

**D.    Disallowance for Plan Voting Purposes**

Courts recognize that Bankruptcy Rule 3018(a) permits a party in interest to seek to disallow a claim for voting purposes. Ultimately, the determination of whether to temporarily allow a claim

for voting purposes lies within the discretion of the bankruptcy court. See *Armstrong v. Rushton (In re Armstrong)*, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003) ("There is no guidance in the Bankruptcy Code to courts as to determine whether to permit the temporary allowance of a claim; it is left to the court's discretion."). Indeed, courts have broad authority to determine whether to allow or disallow a claim for purposes of voting under Bankruptcy Rule 3018(a). *See, e.g., In re Mangia Pizza Invs., L.P.,* 480 B.R. 669, 679 (Banker. W.D. Tex. 2012); *In re Zolner*, 174 B.R. 629, 633 (Bankr. N.D. Ill. 1994) (noting that a court must exercise its discretion to allow or disallow a claim under Bankruptcy Rule 3018(a) based on reasoned analysis); *In re Goldstein,* 114 B.R. 430, 433 (Bankr. E.D. Pa. 1990); Collier on Bankr. ¶ 9-3018[5] (16th ed. rev. 2012) ("The court, however, regardless of the circumstances, has the discretion to allow or disallow all or part of the claim for voting purposes.").

In some cases noted in the chart below, the Debtor has been advised that a Claimant inadvertently has been provided with multiple ballots to vote on the Debtor's Plan on account of a single debt. Where that has occurred, the Debtor has requested that the Court disallow one of those Duplicate Claims for voting purposes.

**E.    The Objection and Request for Relief**

In most instances, the Duplicate Claim and the relevant Surviving Claim are the exact same claim in the same amount filed by the Claimant using the same name, and therefore the Duplicate Claim can be disallowed readily. The chart below provides further explanation for the request for disallowance where the claims may not be exact duplicates of one another, but fall within the Duplicate Claims category that is the subject of this Objection. For example, slight variations in the name or entity utilized by a Claimant to assert a debt against the Debtor or issues of translation from Chinese to English have required a more careful review to determine that two claims are, in fact, the same.

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Beijing Huaxing Mobile Asset Mgt Center | 27 | 20023 | Duplicate Claim | 1 |
| Beijing Jiaxin Tengda Information Consulting Co., Ltd. | 220000060 (scheduled claim) | 20019 | Creditor, Beijing Jiaxin Tengda Information Consulting Co., Ltd., | 2 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| | | | also uses the name Jiaxindechuang BJ Tech Group Co Ltd. The Debtor scheduled Beijing Jixain Tengda Information Consulting Co., Ltd. in the amount of $1,458,406. However, the creditor asserted the same debt using the name Jiaxindechuang BJ Tech Group Co Ltd. in filed claim number 20019 in the amount of $1,975,674.74, and, consequently, has received two separate ballots to vote a single debt in connection with the Debtor's Plan. The filed proof of claim should supersede the scheduled claim despite the difference in names. | |
| China Soft Growing Invest Wuxi Partshp | 61 | 19 | Duplicate Claim | 3 |
| Chongqing LeTv Commercial Factoring LLC | 21 | 20015 | Duplicate Claim | 4 |
| Chongqing LeTv Commercial Factoring LLC | 24 | 20015 | Duplicate Claim | 5 |
| E-Town Intl Holding (HK) Co Ltd | 16 | 20017 | Duplicate Claim | 6 |
| Honghu Da | 6 | 20008 | Duplicate Claim | 7 |
| Huizhou Speed Secondcurve Management LP, | 20002 | 20001 | Duplicate Claim | 8 |
| Jiangyin Hailan Invest Holding Co Ltd. | 20009 | 7 | Creditor, Jiangyin Hailan Invest Holding Co. Ltd. filed Claim 20009 in the amount of $89,635,814.27, however, the back-up attached to Claim 20009 totals $69,635,814.27, which amount is duplicative of Claim 7. Therefore, Claim 20009 should be disallowed. | 9 |

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Linfen Investment Group Co. Ltd. | 220000540 | 30 | This creditor filed a proof of claim for the same debt under a similar but different name (Linfen Investment Construction Development Co. Ltd.) and, consequently, received ballots for both scheduled and filed claims. The filed proof of claim should supersede the scheduled claim and, with respect to the Plan, the amount to be voted on account of the scheduled claim should be disallowed. | 10 |
| Nanchang OFilm Photoelectric Tech Co Ltd. | 38 | 33 | Duplicate Claim | 11 |
| O-Film Global (HK) Trading Limited | 34 | 33 | The creditor, in its complaint against the Debtor, describes it and Nanchang OFilm Photoelectric Tech Co Ltd. as sister companies and co-plaintiffs. The lawsuit asserts a single claim of $24,095,428.00 against the Debtor. Accordingly, multiple claims asserted in the same amount are duplicative. | 12 |
| O'Film Global (HK) Trading Limited | 37 | 33 | Duplicate Claim | 13 |
| Pingan Bank Co Ltd Beijing Branch | 20041 | 20036 | Duplicate Claim | 14 |
| Shenzhen Yingda Capital Management Co. | 220000860 | 20034 | This creditor inadvertently received ballots both for scheduled and filed claims, so the amount to be voted on account of the scheduled claim should be disallowed. | 15 |
| Tianjin Jairui Huixin | 42 | 20027 | Duplicate Claim | 16 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Corp. Mgt LLC | | | | |
| Tianjin Jairui Huixin Corp. Mgt LLC | 43 | 20029 | Duplicate Claim | 17 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 44 | 20030 | Duplicate Claim | 18 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 45 | 20031 | Duplicate Claim | 19 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 46 | 20032 | Duplicate Claim | 20 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 47 | 20039 | Duplicate Claim | 21 |
| Tianjin Yingxin Xinheng Investment Consulting Co. Ltd. | 28 | 20020 | Duplicate Claim | 22 |
| Weihua Qiu | 220000960 (scheduled claim) | 12 | This creditor inadvertently received ballots both for scheduled and filed claims, so the amount to be voted on account of the scheduled claim should be disallowed. | 23 |
| Weihua Qiu | 39 | 12 | Duplicate claim | 24 |
| Western Securities Co., Ltd. | 32 | 20028 | Duplicate Claim | 25 |
| Wuxi Leyike Investment Enterprise | 20025 | 20007 | Duplicate Claim | 26 |
| Xizang Jinmeihua Investment Co., Ltd. | 220001030 (scheduled claim) | 29 | In Chinese, Tibet is called Xizang. The creditor filed its claim using the name Tibet Jinmeihua Investment Co. Ltd. and, consequently, has received two separate ballots to vote a single debt in connection with the Debtor's Plan. The filed proof of claim should supersede the scheduled claim despite the difference in names. | 27 |

By this Objection, the Debtor simply seeks to have disallowed the Duplicate Claims leaving

the Surviving Claims unaffected by this Objection.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## IV.

## **GENERAL RESERVATION OF RIGHTS**

The Debtor expressly reserves the right to amend, modify or supplement this Objection, and to file additional, other, or further objections to any proofs of claim filed in this Chapter 11 Case, including, without limitation, objections as to the amounts asserted therein, or any other claims (filed or not) against the Debtor, regardless of whether such claims are subject to this Objection. Should one or more of the grounds of objection stated in this Objection be denied, the Debtor reserves his rights to object on other stated grounds or on any other grounds he discovers during the pendency of this Chapter 11 Case. In addition, the Debtor reserves the right to file counterclaims against the holders of any such claims.

## V.

## **NOTICE**

The Debtor will serve copies of this Objection on: (a) the Claimants, (b) the Office of the United States Trustee, (c) counsel to the Committee, and (d) all parties who have requested notices in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.

## VI.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and granting the Debtor such other and further relief as is just and proper.

Dated:      April 2, 2020                    PACHULSKI STANG ZIEHL & JONES LLP


                                             */s/ Malhar S. Pagay*
                                             Richard M. Pachulski
                                             Jeffrey W. Dulberg
                                             Malhar S. Pagay

                                             *Attorneys for Debtor and Debtor in Possession*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DECLARATION OF LUETIAN SUN

I, Luetian Sun, declare as follows:

1.      I am one of Debtor's advisors who assist the Debtor with various financial and business matters.  I also have served as Faraday & Future, Inc.'s ("FF") Investor Relations Coordinator since January 2019.  Prior to joining FF, I received a bachelor's degree in civil engineering from Beijing University's School of Civil Engineering and Architecture and a Master of Business Administration degree from the University of California at Riverside.

2.      I am in regular communication with the Debtor's professionals, including legal counsel.

3.      I submit this Declaration (the "Declaration") in support of the Debtor's *Omnibus Objection for an Order Disallowing Duplicate Claims* (the "Objection").

4.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

5.      At the direction of the Debtor, I have reviewed and analyzed the Claims that are the subject of the Objection, and have discussed my findings with both the Debtor and his legal counsel. Based on my analysis, I have determined that the Duplicate Claim are duplicative of other claims and should therefore be disallowed in their entirety.

6.      Also, in order to facilitate notice and service of the Objection, I researched each Claimant's address registered with the National Enterprise Credit Information Publicity System (http://www.gsxt.gov.cn/index.html), a government-run, national, enterprise credit inquiry system in the People's Republic of China.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of April, 2020, at Los Angeles , California.

*Luetian Sun*

_____
Luetian Sun

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S NOTICE OF OMNIBUS OBJECTION AND OMNIBUS OBJECTION FOR AN ORDER DISALLOWING DUPLICATE CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF LUETIAN SUN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **April 2, 2020,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **April 2, 2020,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

United States Bankruptcy Court
Central District of California
Attn:  Hon. Vincent Zurzolo
Edward R. Roybal Federal Bldg./Courthouse
255 East Temple Street, Suite 1360
Los Angeles, CA  90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** <u>(state method for each person or entity served)</u>:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 2, 2020 | Nancy H. Brown | /s/ Nancy H. Brown |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:328782.1 46353/002

# SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ

## 1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)

- Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com
- Jerrold L Bregman    ecf@bg.law, jbregman@bg.law
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Lei Lei Wang Ekvall    lekvall@swelawfirm.com,
  lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Stephen D Finestone    sfinestone@fhlawllp.com
- Richard H Golubow    rgolubow@wghlawyers.com,
  pj@wcghlaw.com;jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com
- Ben H Logan    blogan@omm.com
- Robert S Marticello    Rmarticello@swelawfirm.com,
  gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- David W. Meadows    david@davidwmeadowslaw.com
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Victor A Sahn    vsahn@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf
  .inforuptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Felix T Woo    fwoo@ftwlawgroup.com, admin@ftwlawgroup.com
- Claire K Wu    ckwu@sulmeyerlaw.com,
  mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- David B Zolkin    dzolkin@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                            F 9013-3.1.PROOF.SERVICE
DOCS_LA:328782.1 46353/002

RECEIVED

DEC 1 1 2019

LEGAL SERVICES

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Yueting Jia |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | District of Delaware |
| Case number | 19-12220(KBO) |

Filed: USBC - Central District of California
Yueting Jia   (B10)
19-24804 (VPZ)

YT1



0000000016

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

E-Town International Holding (HongKong) Co., Limited
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  E-Town INTL Holding (HK) Co., LTD

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

E-Town INTL Holding (HK) Co., LTD
Name

Yicheng Fortune,No.22, Ronghua Middle Road
Number       Street

Beijing
City                       State            ZIP Code

Contact phone +86 13801220419

Contact email  yuanwei@etowncapital.com

Where should payments to the creditor be sent? (if different)

Name

Number        Street

City                       State            ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  __8__  __9__  __7__  __2__

**7. How much is the claim?**    $_____83,349,315.07__ . Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Convertible Note

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                              $_____

Amount of the claim that is secured:      $_____

Amount of the claim that is unsecured:   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | Amount entitled to priority |
|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends; whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.    $ _____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12 / 11 / 2019
                  MM / DD / YYYY

*For and on behalf of*
*E-Town International Holding (Hong Kong) Co., Limited*
赤菟國際控股(香港)有限公司

Signature: *Wei Yuan*                    Authorized Signature(s)

Print the name of the person who is completing and signing this claim:

Name        Wei                    Yuan
            First name        Middle name        Last name

Title       Project Manager

Company     E-Town International Holding( HongKong) Co., Limited
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     23-25 FLOORS, BLOCK A,YICHENG WEALTH,22 RONGHUA ROAD,BDA
            Number        Street
            BEIJING,100176
            City                    State        ZIP Code

Contact phone   +86 13801220419            Email  yuanwei@etowncapital.com

**To: Yueting Jia**

    **Claims Processing Center**

    **c/o Epiq Corporate Restructuring, LLC**

This is from E-Town International Holding (Hong Kong) Co., Limited (the "**E-Town**"), one of the creditors of YT Jia case.

According to "NOTICE OF BAR DATES AND PROCEDURES FOR FILLING PROOFS OF CLAIM",we are now explain the calculation logic for the amount of claim.

May 05, 2015, E-Town and Yueting Jia and Leview Mobile Ltd. singed the "Convertible Notes Purchase Agreement" and "Convertible Note"(the "**Agreement**"). Yueting Jia signed the Letter of Guarantee for the Agreement. E-Town purchase $ 50,000,000 convertible notes from Yueting Jia and Leview Mobile Ltd.

According to the Agreement, the outstanding amount under this note will be calculated with the method as below:

    *Outstanding amount x (1+15% x actual days elapsed since Issuance Date/365).*

Amount of debt to the creditor on the date of the bankruptcy filling(which is Oct 14,2019 for YT Jia case) is: $83,349,315.07 based on the method below.

    *$500,000,000 x (1+15% x (Oct 14, 2019- May 05, 2015)/365*

Best Regards.

*For and on behalf of*
*E-Town International Holding (Hong Kong) Co., Limited*
亦莊國際控股(香港)有限公司

E-Town International Holding (Hong Kong) Co., Limited
*Authorized Signature(s)*

亚桓國際控股(香港)有限公司

*Authorized Signature(s)*

**Execution Version**

# CONVERTIBLE NOTE PURCHASE AGREEMENT

among

## E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD

## LEVIEW MOBILE LTD.,

## LE LTD.,

## YUETING JIA,

and

## LESAI MOBILE TECHNOLOGY (BEIJING) CO., LTD.

Dated May 5, 2015

# TABLE OF CONTENTS

SECTION 1 INTERPRETATION ......................................................................................3

SECTION 2 SALE AND PURCHASE OF THE CONVERTIBLE NOTE ...................................9

SECTION 3 CONDITIONS PRECEDENT TO COMPLETION ...............................................9

SECTION 4 COMPLETION ACTIONS ...........................................................................12

SECTION 5 OBLIGATIONS OF THE COMPANY, THE OWNER AND ...............................13

THE INVESTOR BETWEEN EXECUTION AND COMPLETION ..........................................13

SECTION 6 REPRESENTATIONS AND WARRANTIES.....................................................13

SECTION 7 COVENANTS, UNDERTAKINGS AND AGREEMENTS......................................14

SECTION 8 CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS ...........................20

SECTION 9 FEES AND EXPENSES...............................................................................21

SECTION 10 INDEMNIFICATION .................................................................................21

SECTION 11 TERMINATION .......................................................................................22

SECTION 12 NOTICES...............................................................................................24

SECTION 13 MISCELLANEOUS...................................................................................24

SECTION 14 GOVERNING LAW AND DISPUTE RESOLUTION ........................................26

**SCHEDULES**

SCHEDULE 1  CONSIDERATION ALLOCATION

SCHEDULE 2  SHAREHOLDING STRUCTURE OF THE GROUP

SCHEDULE 3  COLLECTIVE WARRANTIES

SCHEDULE 4  INVESTOR WARRANTIES

**EXHIBITS**

EXHIBIT A  FORM OF CONVERTIBLE NOTE

EXHIBIT B  FORM OF SHARE MORTGAGE

*Authorized Signature(s)*

**CONVERTIBLE NOTE PURCHASE AGREEMENT** (this "Agreement") made on
\_\_\_\_, 2015,

**AMONG:**

(1)    **LEVIEW MOBILE LTD.**, an exempted company incorporated and existing
under the laws of the Cayman Islands with its company number 296318 and
registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana
Bay, Grand Cayman, Cayman Islands (the "Company");

(2)    **LE LTD.**, an exempted company incorporated and existing under the laws of
the Cayman Islands with its company number 295848 and registered office at
Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman,
Cayman Islands (the "Cayman Co");

(3)    **YUETING JIA (贾跃亭)**, holder of PRC Identification Card Number of
14262319731215081X, Linfen City, Shanxi Province, PRC (the "Owner");

(4)    **LESAI MOBILE TECHNOLOGY (BEIJING) CO., LTD. (乐赛移动科技
（北京）有限公司)**, a wholly foreign-owned enterprise organized and existing
under the laws of China with its registered office at 16/F, Leshi Building, No.
105, Yaojiayuan Road, Chaoyang District, Beijing, 100025, PRC (the "WFOE");
and

(5)    **E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD.（亦
庄国际控股（香港）有限公司）**, an exempted company incorporated and
existing under the laws of Hongkong with its registered office at
Room B 21/F Legend Tower 7 Shing Yip Street, Kwun Tong, Kowloon, Hong
Kong (the "Investor").

**RECITALS:**

Upon the terms and conditions set forth in this Agreement, the Company intends to
issue and sell to the Investor, and the Investor intends to acquire, that amount of
certain convertible redeemable note in the form of Exhibit A (the "Convertible
Note"), as indicated opposite the Investor's name in Schedule 1 attached hereto.

**AGREEMENT:**

**SECTION 1**
**INTERPRETATION**

1.1    Definitions. In this Agreement, unless the context otherwise requires the
following words and expressions have the following meanings:

"Accounting Standards" means the International Financial Reporting Standards
(IFRS) or the Accounting Principles Generally Accepted in China (Chinese
GAAP) adopted by the Company and applied on a consistent basis.

3

"Affiliate" of a Person (the "Subject Person") means (a) in the case of a Person other than a natural person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with the Subject Person and (b) in the case of a natural person, any other Person that directly or indirectly is Controlled by the Subject Person or is a Relative of the Subject Person. In the case of an Investor, the term "Affiliate" includes (v) any shareholder of the Investor, (w) any of such shareholder's general partners or limited partners, (x) the fund manager managing such shareholder (and general partners, limited partners and officers thereof) and (y) trusts controlled by or for the benefit of any such individuals referred to in (v), (w) or (x).

"Basic Documents" means this Agreement, the Convertible Note, the Company Charter Documents and the Onshore Contracts.

"Big Four Accounting Firms" means Deloitte Touche Tohmatsu Limited, PricewaterhouseCoopers, Ernst & Young Global Limited and Klynveld Peat Marwick Goerdeler.

"Board" means the board of directors of the Company as from time to time constituted.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the PRC, HKSAR or Cayman Islands are required or authorized by law or executive order to be closed or on which a tropical cyclone warning no. 8 or above or a "black" rainstorm warning signal is hoisted in HKSAR at any time between 9:00 a.m. and 5:00 p.m. Hong Kong time.

"BVI Co" means Lele Holding Ltd., a business company incorporated and existing under the laws of the British Virgin Islands with its company number 1859050 and registered office at P.O. Box 905, Quastisky Building, Road Town, British Virgin Islands.

"China" or the "PRC" means the People's Republic of China and for the purpose of this Agreement shall exclude HKSAR, Taiwan and the Macau Special Administrative Region.

"Collective Warranties" means the representations, warranties and undertakings of the Company and the Owner set forth in Schedule 3.

"Company Account" means a bank account opened by the Company outside of HKSAR with a bank approved by the Investor and having a mandate requiring the signatures of both a representative of the Investor and the Company to withdraw, transfer or pay any funds from such account.

"Company Charter Documents" means the Memorandum of Association and Articles of Association of the Company.

"Completion Date" means the date on which the closing of the purchase of the Convertible Note occurs as contemplated under Section 2.1.

4

"Control" of a Person means (a) ownership of more than 50% of the shares in issue or other equity interests or registered capital of such Person or (b) the power to direct the management or policies of such Person, whether through the ownership of more than 50% of the voting power of such Person, through the power to appoint a majority of the members of the board of directors or similar governing body of such Person, through contractual arrangements or otherwise.

"Encumbrance" means (a) any mortgage, charge (whether fixed or floating), pledge, lien (other than lien created by operation of law), hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, and (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person.

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital or joint venture or other ownership interest.

"Existing Business" means the business of researching, designing, developing, manufacturing, selling and marketing of mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Governmental Authority" means any nation or government or any province or state or any other political subdivision thereof; any entity or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality or any political subdivision thereof, any court, tribunal or arbitrator, the governing body of any securities exchange and any other self-regulatory organization.

"Group" means collectively the BVI Co, the Cayman Co, the Company, the HK Co, the WFOE, the Onshore Companies and any other Person in which the BVI Co, the Cayman Co, the Company, the HK Co or the WFOE directly or indirectly owns a majority interest and "Group Member" means any of them.

"HK Co" means Leview Mobile HK Limited, a limited company incorporated and existing under the laws of HKSAR with its company number 2205943 and registered office at RM 504, 5/F Valley Centre, No. 80-82 Morrison Hill Road, Wanchai, HKSAR.

"HKSAR" means the Hong Kong Special Administrative Region of the PRC.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Investor Warranties" means the representations, warranties and undertakings of the Investor set forth in Schedule 4.

"Lefeng Mobile" means Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司), a company incorporated under the laws of the PRC.

"Leview Holding" means Leview Holding (Beijing) Co., Ltd. (乐视控股（北京）有限公司), a company incorporated under the laws of the PRC.

"Mortgaged Shares" means (i) 4,300 Ordinary Shares owned by the Cayman Co in the Company, and (ii) any shares acquired in respect of Mortgaged Shares by reason of a stock split, stock dividend, reclassification or otherwise.

"Onshore Companies" means Beijing Pala Culture & Media Co., Ltd. (北京百乐文化传媒有限公司), Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司) and Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd. (乐视移动智能信息技术（北京）有限公司), which incorporated under the laws of the PRC, and "Onshore Company" means any of them.

"Onshore Contracts" means agreements entered into between WFOE, Lefeng Mobile, the Owner or any of their Affiliates, prior to or simultaneously with the Completion Date, including an exclusive consulting and services agreement, an exclusive call option agreement, an equity pledge agreement, a voting right proxy agreement and a business operation agreement, each in the form and the substance reasonably satisfactory to the Investor.

"Ordinary Shares" means the ordinary shares having a par value of US$0.0001 per share in the capital of the Company.

"Party" or "Parties" means any signatory or the signatories to this Agreement and any Person who subsequently becomes a party to this Agreement pursuant to the terms and conditions hereof.

"Person" means any natural person, firm, company, governmental authority, joint venture, partnership, association or other entity (whether or not having separate legal personality).

6

"Related Party" means (a) any shareholder of any Group Member, (b) any director of any Group Member, (c) any officer of any Group Member, (d) any Relative of a shareholder, director or officer of any Group Member, (e) any Person in which any Group Member, any shareholder, director or officer of any Group Member has any interest other than a passive shareholding of less than five percent in a publicly listed company, or over which a Related Party exercises Control or significant influence through contractual arrangements, voting, management or directorship position or ownership, and (f) any other Affiliate of any Group Member.

"Relative" of a natural person means the spouse of such person, and any parent, grandparent, child, grandchild, sibling, uncle, aunt, nephew, or niece of such person or such person's spouse.

"Restructuring" means the restructuring the result of which (i) is the corporate structure set forth in Schedule 2A hereof as of the date of this Agreement and as of the Completion Date respectively; and (ii) will be the corporate structure set forth in Schedule 2B hereof within the timeframe after the Completion Date agreed upon by the Investor, the Owner and the Company in this Agreement.

"RMB" means the renminbi yüan, the lawful currency of the PRC.

"Share Mortgage" means the share mortgage agreement to be entered into by and between Cayman Co and the Investor within 30 days following the Completion Date, pursuant to which the Mortgaged Shares shall be mortgaged to the Investor for the benefit of the Investor to secure the payment and other obligations of the Company under the Convertible Note.

"Tax" or "Taxes" means all forms of taxation, estate, duties, deductions, withholdings, duties, imposts, levies, fees, charges, social security contributions and rates imposed, levied, collected, withheld or assessed by any local, municipal, regional, urban, governmental, state, national or other body in the PRC or elsewhere having competent jurisdiction and any interest, additional taxation, penalty, surcharge or fine in connection therewith.

"US$" means United States Dollars, the lawful currency of the United States of America.

"Warranties" means the Collective Warranties and the Investor Warranties.

1.2    Terms Defined Elsewhere in this Agreement.  The following terms are defined in this Agreement as follows:

| | |
|---|---|
| "Agreement" | Preamble |
| "Company" | Preamble |
| "Completion" | Section 2.1 |
| "Compliance Certificate" | Section 3.1(d) |
| "Confidential Information" | Section 8.1 |
| "Consideration" | Section 2.1 |
| "Convertible Note" | Recitals |

| | |
|---|---|
| "Disposed Shares" | Section 7.4(a) |
| "Disposition" | Section 7.4(a) |
| "Disposition Notice" | Section 7.4(a) |
| "Dispute" | Section 14.2 |
| "Election Period" | Section 7.3(d) |
| "Financing Terms" | Section 8.1 |
| "HKIAC" | Section 14.2 |
| "Indemnified Party" | Section 10.1 |
| "Indemnifying Party" | Section 10.1 |
| "Investor" | Preamble |
| "Losses" | Section 10.1 |
| "New Securities" | Section 7.3(a) |
| "Owner" | Preamble |
| "Preemptive Right" | Section 7.3(a) |
| "Pro Rata Share" | Section 7.3(b) |
| "Representatives" | Section 8.1 |
| "Tag-along Right" | Section 7.4(b) |
| "Tag-along Shares" | Section 7.4(b) |
| "Undertaking" | Section 4.2(b) |
| "WFOE" | Preamble |

1.3    Interpretation.

(a)    Directly or Indirectly.  The phrase "directly or indirectly" means directly, or indirectly through one or more intermediate Persons or through contractual or other arrangements, and "direct or indirect" has the correlative meaning.

(b)    Gender and Number.  Unless the context otherwise requires, all words (whether gender-specific or gender neutral) shall be deemed to include each of the masculine, feminine and neuter genders, and words importing the singular include the plural and vice versa.

(c)    Headings.  Headings are included for convenience only and shall not affect the construction of any provision of this Agreement.

(d)    Include not Limiting.  "Include," "including," "are inclusive of" and similar expressions are not expressions of limitation and shall be construed as if followed by the words "without limitation."

(e)    Law.  References to "law" shall include all applicable laws, regulations, rules and orders of any Governmental Authority,  securities exchange or other self-regulating body, any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment; and "lawful" shall be construed accordingly.

(f) <u>References to Documents</u>. References to this Agreement include the Schedules and Exhibits, which form an integral part hereof. A reference to any Section, Schedule or Exhibit is, unless otherwise specified, to such Section of, or Schedule or Exhibit to this Agreement. The words "<u>hereof</u>," "<u>hereunder</u>" and "<u>hereto</u>," and words of like import, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular Section hereof or Schedule or Exhibit hereto. A reference to any document (including this Agreement) is to that document as amended, consolidated, supplemented, novated or replaced from time to time.

(g) <u>Time</u>. If a period of time is specified and dates from a given day or the day of a given act or event, such period shall be calculated exclusive of that day.

(h) <u>Writing</u>. References to writing and written include any mode of reproducing words in a legible and non-transitory form including emails and faxes.

(i) <u>Language</u>. This Agreement is drawn up in the English language. If this Agreement is translated into any language other than English, the English language text shall prevail.

## SECTION 2
## SALE AND PURCHASE OF THE CONVERTIBLE NOTE

2.1 <u>Sale and Purchase</u>. Upon the terms and subject to the applicable conditions of this Agreement, the Company shall issue and sell to the Investor, and the Investor shall purchase from the Company, a Convertible Note in the principal amount as indicated opposite the Investor's name in <u>Schedule 1</u> attached hereto (the "<u>Consideration</u>") on the Completion Date (the "<u>Completion</u>").

2.2 <u>Consideration</u>. Subject to Section 9 and the other terms and conditions of this Agreement, the Investor shall pay a Consideration payable at Completion, by means of wire transfer of immediately available funds to the Company Account.

2.3 <u>Use of Proceeds</u>. The Company shall use the Consideration received from the Investor on the Completion Date to fund (a) the expansion of the business of the Company in accordance with the business plan approved by the Board, and (b) other uses approved by the Board.

## SECTION 3
## CONDITIONS PRECEDENT TO COMPLETION

3.1 <u>Conditions Precedent to Obligations of Investor at Completion</u>. The obligation of the Investor to complete the purchase of the Convertible Note at the Completion is subject to the fulfillment, prior to or simultaneously with the Completion, of the following conditions, any one or more of which may be waived by the Investor in writing, *provided* that if any of the following conditions is waived by the Investor on or before the Completion, the Company,

the Owner and the WFOE shall cause such conditions to be fulfilled promptly after the Completion if requested by the Investor in writing:

(a)    the Collective Warranties remaining true and correct in all material respects on the Completion Date as provided in Section 6.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Completion Date;

(b)    each of the Group Members, the Onshore Companies and the Owner having performed and complied in all material respects with all of its agreements and obligations contained in the Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Completion;

(c)    the Investor having completed its business, legal and financial due diligence review of the Company and its subsidiaries and the results of that review shall be satisfactory to the Investor.

(d)    each of the Group Members and the Onshore Companies having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of the Basic Documents to which it is a party, and the transactions contemplated hereby and thereby, and having provided complete and correct copies of all resolutions (and all attachments thereto) described below to the Investor (certified by the Compliance Certificate to be true, complete and correct copies as of the Completion Date) which corporate procedures shall include without limitation:

   (i)    approval by the Board and the shareholders of the Company, each to the extent required by the applicable law and Company Charter Documents, of the following:

      (1)    the authorization and issuance to the Investor of a Convertible Note in a principal amount equal to the Consideration; and

      (2)    the execution, delivery and performance by the Company of each Basic Document to which it is a party, and all the transactions contemplated by such Basic Documents;

   (ii)    approval by the boards of directors and, if required, the shareholders of each other Group Member and the Onshore Companies, to the extent required by the applicable law and the constitutional documents of the relevant entity, of the execution, delivery and performance by such entity, of each Basic Document to which it is a party, and all the transactions contemplated by such Basic Documents to which it is a party.

10

International Holding (Hong Kong) Co., Limited
_Authorized Signature(s)_

(e)   all consents and approvals of, notices to and filings or registrations with any Governmental Authority or any other Person required to consummate the transactions contemplated under this Agreement and the other Basic Documents (to the extent that such transactions are to be completed on or prior to the Completion Date), shall have been obtained or made (including all required approvals for the Restructuring and all required approvals and registration of the establishment of the WFOE and the direct or indirect ownership by any PRC residents of an interest in the Company including registrations pursuant to the Notice on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Corporate Financing and Roundtrip Investment through Offshore Special Purpose Vehicles issued by State Administration of Foreign Exchange on July 4, 2014 and any subsequent similar rules, amendments or supplements of the PRC) and copies thereof having been provided to the Investor;

(f)   there being no Governmental Authority or other Person that has:

(i)   instituted or threatened in writing any legal, arbitral or administrative proceedings against the Owner, any Group Member, or the Onshore Companies to restrain, prohibit or otherwise challenge the purchase of the Convertible Note by the Investor and the mortgage of the Mortgaged Shares to the Investor or any of the other transactions contemplated under the Basic Documents (including without limitation, the Restructuring); or

(ii)   proposed or enacted any statute or regulation which would prohibit, materially restrict or materially delay implementation of the transactions contemplated under the Basic Documents (including without limitation, the Restructuring), or the operation of the Group as a whole after the Completion as contemplated in the Basic Documents;

(g)   the Owner, the WFOE and the relevant Onshore Companies having entered into the Onshore Contracts to which it/he/she is a party, each in form and substance reasonably satisfactory to the Investor;

(h)   the Company having delivered to the Investor a certificate, dated the Completion Date and signed by an authorized signatory of the Company (the "Compliance Certificate"), certifying that the conditions set forth in this Section 3.1 to be satisfied by the Group Members, have been satisfied;

3.2    Conditions Precedent to Obligations of Company at Completion. The Company's obligation to complete the allotment and issuance of the Convertible Note at the Completion is subject to the fulfillment, prior to or simultaneously with the Completion, of the following conditions, any one or more of which may be waived by the Company:

(a)    the Investor Warranties remaining true and correct in all material respects on the Completion Date as provided in Section 6.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Completion Date;

(b)    the Investor having performed and complied in all material respects with all of its agreements and obligations contained in this Agreement and the other Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Completion;

(c)    the Investor having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party, and the transactions contemplated hereby and thereby; and

(d)    each of the Basic Documents to which an Investor is a party having been executed by the Investor and delivered to the Company.

## SECTION 4
## COMPLETION ACTIONS

4.1    Time and Place of Completion. The Completion shall take place at 4:00 p.m. Beijing time on the third Business Day after all the conditions precedent set forth in Sections 3.1 and 3.2 (other than those conditions precedent that by their terms cannot be fulfilled until the Completion) are satisfied or waived or, at such other time and place as the Parties may agree.

4.2    Actions at Completion. At the Completion,

(a)    the Company shall deliver to the Investor a duly authorized and executed Convertible Note in a principal amount equal to the Consideration, payable to the order of the Investor and registered in the name of the Investor;

(b)    subject to Section 9.1, the Investor shall pay the Consideration by wire transfer of immediately available funds to the Company Account.

## SECTION 5
## OBLIGATIONS OF THE COMPANY, THE OWNER AND

## THE INVESTOR BETWEEN EXECUTION AND COMPLETION

5.1    Notices of Breaches by the Company, the WFOE and the Owner. From the date
hereof until the Completion Date, except as disclosed in the Basic Documents
or otherwise as contemplated thereunder, the Company and the WFOE shall,
and the Company and the Owner shall cause each of the other Group Members
and Onshore Companies to, conduct its respective business in a manner so as to
ensure that the Collective Warranties continue to be true and correct on and as
of the Completion Date as if made on and as of Completion Date.  The
Company, the WFOE and the Owner shall give the Investor prompt notice of
any event, condition or circumstance occurring prior to the Completion Date
that would constitute a breach of any Collective Warranty if such Collective
Warranty were made as at any date between the date hereof and the Completion
Date, or that would constitute a breach of any terms and conditions contained in
this Agreement.

5.2    Business Operation.  From the date hereof until the Completion Date, the
Company and the Owner shall, and shall cause each other Group Member
where applicable to, (i) carry on their respective business in the ordinary course;
(ii) comply in all material respects with all applicable law and other
requirements relating to the operation of their respective businesses; and (iii)
with no less diligence and efforts that would be applied in the absence of the
transactions contemplated hereunder.

5.3    Notifications. Until the Completion, each Party shall promptly notify the other
Parties in writing of any fact, change, condition, circumstance or occurrence or
nonoccurrence of any event of which it is aware that will or is reasonably likely
to result in any of the conditions set forth in Section 3 becoming incapable of
being satisfied.

5.4    Further Action.  The Parties shall use all reasonable efforts to take, or cause to
be taken, all appropriate action, to do or cause to be done all things necessary,
proper or advisable under applicable law, and to execute and deliver such
documents and other papers, as may be required to carry out the provisions of
this Agreement and consummate and make effective the transactions
contemplated by this Agreement.

## SECTION 6
## REPRESENTATIONS AND WARRANTIES

6.1    Collective Warranties.  The Company, the WFOE and the Owner, severally and
jointly, represent, warrant and undertake to the Investor in the terms of the
Collective Warranties and acknowledge that the Investor in entering into this
Agreement is relying on such Collective Warranties.

6.2 <u>Investor Warranties</u>. The Investor represents, warrants and undertakes to the Company in the terms of the Investor Warranties and acknowledges that the Company in entering into this Agreement is relying on the Investor Warranties.

6.3 <u>Knowledge of Claims</u>. No investigation by or on behalf of any Party shall prejudice any claim made by such Party under the indemnity contained in Section 10 or operate to reduce any amount recoverable thereunder, provided that a Party shall have no liability for (i) any breach of or inaccuracy in the Warranties made by such Party to the extent the Indemnified Party has actual knowledge, at or prior to the Completion of such breach or inaccuracy, (ii) any breach of or failure to perform any covenant or obligations of such Party which are required to be performed at or prior to the Completion hereunder, to the extent that the Indemnified Party has actual knowledge, at or prior to the Completion of such breach or failure.

6.4 <u>Separate and Independent</u>. The Collective Warranties shall be separate and independent and save as expressly provided shall not be limited by reference to any other paragraph or anything in this Agreement or the Schedules.

6.5 <u>Bring-Down to Completion</u>. The Warranties shall be deemed to be repeated as at the Completion Date as if they were made on and as of the Completion Date, other than such Warranties as are made specifically as of another specified date, which shall be true and correct as of such date, and all references therein to the date of this Agreement were references to the Completion Date.

6.6 <u>Survival of Warranties</u>. All of the Warranties shall survive the Completion for a period of 18 months after the Completion, *provided* that the warranties set forth in Section 2, 10 and 12 of <u>Schedule 3</u> and Section 2 and 4 of <u>Schedule 4</u> should survive indefinitely.

## SECTION 7
## COVENANTS, UNDERTAKINGS AND AGREEMENTS

7.1 <u>Delivery of Share Mortgage</u>. Within 30 days following the Completion Date, the Investor and the Cayman Co shall execute a Share Mortgage, which is substantially consistent with the form attached as <u>Exhibit B</u> hereof, and the Company shall deliver to the Investor a copy of the Register of Mortgages and Charges of the Company certified by the registered office provider of the Company which evidences the mortgage of the Mortgaged Shares to the Investor and all the other documentation required to be delivered to the Investor pursuant to the terms of the Share Mortgage.

7.2 <u>Conversion</u>.

    (a)    After the Completion Date, the Investor shall have the right to convert the Convertible Notes into preferred shares of the Company, the Cayman Co, or the Onshore Companies(depends on the body of Qualified Financing) on the Qualified Financing as defined in the Convertible Note in accordance with the terms and conditions of the Convertible Note.

14

For and on behalf of
新莊國際控股(香港)有限公司
Authorized Signature(s)

(b)     The Owner and the Cayman Co undertake, and shall procure to the
extent permitted by law , that the Investor shall enjoy the same rights set
forth under this Section 7 in the event that the Convertible Note held by
the Investor is converted to the Cayman Co shares or Onshore
Companies shares, at the election of the Investor, as specified under
Section 6 of the Convertible Note.

7.3     Preemptive Right.

(a)     The Company hereby grants to the Investor the right of first refusal to
purchase the Investor's Pro Rata Share (as defined below), of all (or any
part) of any Equity Securities (the "New Securities") that the Company
may from time to time issue after the Completion Date (the "Preemptive
Right").

(b)     An Investor's "Pro Rata Share" for purposes of the Preemptive Right is
the ratio of (a) the number of Ordinary Shares held by the Investor on or
after the conversion, or, prior to the conversion, the number of Ordinary
Shares that would have been held by the Investor as if the Convertible
Note held by the Investor were converted into preferred shares, in each
case, as if on a fully-converted basis immediately prior to the issuance of
the New Securities (assuming full conversion of all preferred shares and
full conversion or exercise of all outstanding convertible securities,
rights, options and warrants held by the Investor), to (b) the total number
of Ordinary Shares (including preferred shares on an as-converted basis
and assuming that all outstanding options or warrants) then outstanding
immediately prior to the issuance of New Securities (assuming full
conversion of preferred shares and full conversion or exercise of all
outstanding convertible securities, rights, options and warrants).

(c)     In the event the Company proposes to undertake an issuance of New
Securities, it shall give the Investor written notice of its intention,
describing the type of New Securities, and their price and the terms upon
which the Company proposes to issue the same. The Investor shall have
10 days after any such notice is mailed or delivered to agree to purchase
the Investor's Pro Rata Share of such New Securities and to indicate
whether the Investor desires to exercise its Preemptive Right for the
price and upon the terms specified in the notice by giving written notice
to the Company and stating therein the quantity of New Securities to be
purchased.

(d)     In the event the Investor fails to exercise fully the Preemptive Right, if
any within said 10 day-period (the "Election Period"), the Company
shall have 120 days thereafter to sell or enter into an agreement
(pursuant to which the sale of New Securities covered thereby shall be
closed, if at all, within 120 days from the date of said agreement) to sell
that portion of the New Securities with respect to which the Investor's
Preemptive Right set forth in this Section 7.3(a) was not exercised, at a
price and upon terms no more favorable to the purchasers thereof than
specified in the Company's notice to the Investor delivered pursuant to

Section 7.3(c). In the event the Company has not sold within such 120-day period following the Election Period, or such 120-day period following the date of said agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investor in the manner provided in this Section 7.3.

7.4   Tag-along Right.

(a)   Following any conversion of the Convertible Notes held by the Investor, if any of the shares (the "Disposed Shares") in the Company held by the Owner is to be sold to any third party (the "Disposition"), the Investor may elect to exercise its tag-along right (the "Tag-along Right") and participate on a pro-rata basis in the Disposition on the same terms and conditions as set forth in the written notice (the "Disposition Notice") to the Company and the Investor sent by the Owner, which notice shall state:(i) the name of the Owner, (ii) the name and address of the proposed purchaser, (iii) the number of shares to be disposed; (iv) the amount and form of the proposed consideration for the Disposition, (v) any other material business relations between the Owner and the purchaser, and (vi) the other terms and conditions of the proposed Disposition. In the event that the proposed consideration for the Disposition includes consideration other than cash, the Disposition Notice shall include a calculation of then fair market value of such consideration and an explanation of the basis for such calculation.

(b)   To exercise its Tag-along Right, the Investor must give the Owner, as applicable, written notice to that effect within 40 days after delivery of the Disposition Notice, and upon giving such notice the Investor shall be deemed to have effectively exercised the Tag-along Right. A Investor may sell all or any part of that number of Shares (the "Tag-along Shares") held by the Investor equal to the product obtained by multiplying (x) the number of Disposed Shares by (y) a fraction, the numerator of which is the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) at the time owned by the Investor and the denominator of which is the aggregate number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) owned by the Investor.

7.5   Information Rights. After the Completion Date, the Company shall regularly deliver to the Investor information relating to the daily business operation of the Company, including but not limited, to the following documents or reports:

(a)   within 90 days after the end of each fiscal year of the Company, a consolidated income statement and statement of cash flows for the Company for such fiscal year and a consolidated balance sheet for the Company as of the end of the fiscal year, audited and certified by one of the Big Four Accounting Firms accepted by the Board, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period;

(b)    (i) within 45 days after the end of each quarter, a consolidated income statement and statement of cash flows for the Company for such quarter and a consolidated balance sheet for the Company as of the end of such quarter, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period, and (ii) promptly following the end of each quarter an up-to-date capitalization table, and both items (i) and (ii) shall be certified by the chief financial officer or the financial controller of the Company;

(c)    within 20 days of the end of each month, a consolidated unaudited income statement and statement of cash flows for such month and a consolidated balance sheet for the Company as of the end of such month, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period (except for customary year-end adjustments and except for the absence of notes) and certified by the chief financial officer of the Company;

(d)    a comprehensive operating budget forecasting the Company's revenues, expenses, and cash position for the following fiscal year within 30 days prior to the end of each fiscal year, in reasonable detail on a monthly basis, broken down by different operating subsidiaries and associated companies; and

(e)    as soon as practicable, any other information reasonably determined by the Board or reasonably requested by the Investor.

7.6    <u>Inspection Rights</u>. After the Completion Date, the Company and the WFOE shall, and the Company and the Owner shall cause each of the other Group Members to, give to the Investor and its Representatives reasonable access, upon reasonable prior notice, to the premises and the books and records, and instruct its officers and employees to furnish all information and explanations to the Investor or any such Persons as the Investor may reasonably request during normal business hours, under the supervision of a Company officer and in such a manner as not to interfere with the normal business operations of the Company or any other Group Member.

7.7    <u>Appointment of Board Observer</u>.

From the Completion Date until the occurrence of any Qualified Financing, the Investor shall be entitled to designate one individual that is an employee or officer of the Investor or any of its Affiliates (the "<u>Observer</u>") to attend all meetings of the Board and all committees thereof (whether in person, by telephone or other) in a non-voting observer capacity.

7.8    <u>Reserved Matters</u>. From the Completion Date until the occurrence of the Qualified Financing, the following matters in connection with the Company shall be subject to the Investor's prior written consent:

(a)    any amendment or modification to the Company Charter Documents;

(b)    any material change to the nature or scope of the business of the Company;

(c)    any material merger, amalgamation, scheme or arrangement, reorganization, restructuring, or consolidation of the Company or any of its subsidiaries;

(d)    any liquidation, winding up, dissolution, disposition, reorganization, or arrangement of the Company or any of its subsidiaries;

(e)    any change to the size or composition of the board of directors of the Company or any of its subsidiaries;

(f)    any change to the accounting policies or the auditor of the Company not in compliance with the International Financial Reporting Standards, Generally Accepted Accounting Principles or Hong Kong Financial Reporting Standards;

(g)    appointment or removal of any key employees of the Company;

(h)    determination or adjustment of the pricing basis of transactions between the Company and any of its related parties;

(i)    any related party transaction entered into by the Company in excess of US$10 million (or its equivalent in other currencies) individually or in excess of US$90 million in the aggregate over any 12 consecutive calendar months period; and

(j)    any other material matters of the Company.

7.9    Dividend. After the full conversion of the Convertible Note held by the Investor into preferred shares upon occurrence of the initial Qualified Financing, the Investor shall be entitled to participate any dividend distribution declared by the Company from time to time.

7.10    Business Plan. The Company shall formulate and implement a five-year business operation plan, which shall be approved by the Investor and shall set forth the Company's development strategy, financial forecast, operational capital expenditure plan and implementation plan.

7.11    Lock-up. Subject to a 90-day prior written notice to the Investor, the Owner may transfer or assign, directly or indirectly, his interest in the Company or Cayman Co at any time prior to the full conversion or redemption of the Convertible Note; *provided* that the forgoing transfer or assignment will not result in the Owner ceasing to be the Company's and the Cayman Co's actual controlling person; *provided* further that if the forgoing transfer or assignment will result in the Owner ceasing to the Company's and the Cayman Co's actual controlling person, such transfer or assignment will be subject to the Investor's prior written consent.

7.12    Restructuring.

    (a)    The Company, the Cayman Co and the WFOE shall, and the Owner shall cause the applicable Group Members and the Onshore Companies to:

        (i)    complete all the steps of the Restructuring in accordance with all applicable laws and reasonably satisfactory to the Investor within 6 months after the Completion Date, which will result in a corporate structure consistent with the structure set forth in Schedule 2B hereof; and

        (ii)    duly perform each Onshore Contract to which it is a party in accordance with the terms thereof.

    (b)    So long as any of the Convertible Note remains outstanding, the Owner shall not without the prior consent of the Investor, sell, give, assign, hypothecate, pledge, encumber, grant a security interest in or otherwise dispose of, or suffer to exist (whether by operation of law or otherwise) any Encumbrance on any equity interest in the Onshore Companies.

    (c)    All the following assets related to the Existing Business held or owned by any Affiliate of the Owner other than the Group and the Onshore Companies shall be transferred or assigned to the Onshore Companies or the WFOE, as the case may be, within 12 months following the Completion Date, which may be extended subject to the Investor's prior written consent:

(i)     all the employment agreements of Xing FENG (冯幸), Lin MA (马麟), Zhizhong AN (安志忠), Zhanliang CUI (崔战良) and Zhisheng DONG (董志升);

(ii)     all the relevant Intellectual Property (including but not limited to trademark and relevant patents);

(iii)     all the material contracts, including but not limited to, purchase contracts with suppliers and sales contracts with customers; and

(iv)     all the applicable licenses or permits required by law or applicable Governmental Authority to conduct the Existing Business.

(d)     As the Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd need to use the Video Content of Leview Internet Information & Technology Corp.,Bei Jing （"Leview Internet"） for its Existing Business, the Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd shall sign the Video Content Using and Profit Distribution Agreement with Leview Internet in a fair and reasonable price under the normal commercial terms pursuant to definitive agreements of the Qualified Financing.

## SECTION 8
## CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS

8.1     <u>General Obligation</u>. Each Party undertakes to the other Parties that it shall not reveal, and that it shall procure that its directors, equity interest holders, partners, representatives, members, advisors (including auditors, accountants, consultants, financial advisors and attorneys), financing sources, officers, employees and agents (collectively, "<u>Representatives</u>") do not reveal, the Confidential Information to any third party without the prior written consent of other Parties or use any Confidential Information in such manner that is detrimental to the Company or the concerned Party, as the case may be. Each Party shall be responsible for any breach of obligations set forth herein by any of its Affiliates, its Representatives or its Affiliates' Representatives, and shall procure that its Affiliates, its Representatives or its Affiliates' Representatives shall comply with the obligations set forth in this Section 8 as of it were a party to this Agreement. The term "<u>Confidential Information</u>" as used in this Section 8 means, (a) any information concerning the organization, business, technology, safety records, investment, finance, marketing, business plans, transactions or affairs of any Party or any Group Member or any of their respective directors, officers or employees (whether conveyed in written, oral or in any other form and whether such information is furnished before, on or after the date of this Agreement) and (b) the terms and existence of this Agreement, the Convertible Note and the Onshore Contracts (other than the Basic Documents that are required by law or any applicable Governmental Authority to be publicly filed or disclosed) (collectively, the "<u>Financing Terms</u>"); <u>provided</u>, that Confidential Information does not include information that (i) is or becomes publicly known

or available through no breach of this Agreement, (ii) is rightfully acquired free of restrictions on its disclosure, or (iii) is independently developed without any use of or reference to any Confidential Information.

8.2    Exceptions. The provisions of Section 8.1 shall not apply to:

(a)    disclosure by a Party to its Representative, *provided* that such Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(b)    disclosure by a Party to its Affiliates and their respective Representatives, *provided* that such Affiliate and Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(c)    disclosure, after giving prior notice to the other Parties to the extent practicable under the circumstances and subject to any practicable arrangements to protect confidentiality, to the extent required under the rules of any stock exchange on which the shares of a Party or its parent company are listed or by law or any applicable Governmental Authority and only to the extent required thereby; or

(d)    disclosure of any Confidential Information other than the Financing Terms by any Group Member, the Owner or their Representatives of any of such Confidential Information to a third party in connection with any existing or proposed transaction or other contractual relationship of any Group Member or their Affiliates, *provided* that such third party (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality.

8.3    Publicity. Except as required by law, by any Governmental Authority, by any relevant stock exchange on which the shares of a Party or its parent company are listed or otherwise agreed by all the Parties, no public release or public announcement concerning the relationship or involvement of the Parties shall be made by any Party.

## SECTION 9    FEES AND EXPENSES

9.1    General. Each Party shall pay all of its own costs and expenses incurred in connection with or relating to the negotiation, execution, delivery and performance of the Basic Documents and the transaction contemplated thereby Each of the Parties hereto shall bear its own costs and expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the other Basic Documents and the transactions contemplated hereby and thereby.

## SECTION 10    INDEMNIFICATION

10.1    Scope of Indemnification. Each Party (an "Indemnifying Party") shall indemnify and hold the other Parties and their directors, officers and agents

(collectively, the "Indemnified Party") harmless from and against any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever, including but not limited to any investigative, legal and other expenses incurred in connection with, and any amounts paid in settlement of, any pending or threatened legal action or proceeding, but excluding consequential damages, special or incidental damages, indirect damages, punitive damages, lost profits, and diminution in value (collectively, "Losses") resulting from or arising out of: (i) the breach of any warranty of such Indemnifying Party contained in the Basic Documents or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of such Indemnifying Party contained in the Basic Documents for reasons other than gross negligence or willful misconduct of the Indemnified Party. The Company, the WFOE and the Owner shall jointly and severally indemnify the Investor and its directors, officers, and agents harmless and against any Losses resulting from or arising out of: (i) the breach of any warranty of the Company, the WFOE and the Owner contained in this Agreement or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of the Company, the WFOE or the Owner contained in this Agreement for reasons other than gross negligence or willful misconduct of the Indemnified Party. In calculating the amount of any Losses of an Indemnified Party hereunder, there shall be subtracted the amount of any insurance proceeds and third-party payments received by the Indemnified Party with respect to such Losses.

10.2    Notice of Claims; Procedures. If an Indemnified Party makes any claim against an Indemnifying Party for indemnification, the claim shall be in writing and shall state in general terms the facts upon which such Indemnified Party makes the claim. In the event of any claim or demand asserted against an Indemnified Party by a third party upon which the Indemnified Party may claim indemnification, the Indemnifying Party shall give written notice to the Indemnified Party within 30 days after receipt from the Indemnified Party of the claim referred to above, indicating whether such Indemnifying Party intends to assume the defense of the claim or demand. If an Indemnifying Party assumes the defense, such Indemnifying Party shall have the right to fully control and settle the proceeding, provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed. If the Indemnifying Party elects not to assume the defense or fails to make such an election with the 30-day period, the Indemnified Party may, at its option, defend, settle, compromise or pay such action or claim; provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

## SECTION 11    TERMINATION

22

*Authorized Signature(s)*

11.1   Effective Date; Termination.  This Agreement shall become effective upon execution by all of the Parties and shall continue in force until terminated in accordance with Section 11.2.

11.2   Events of Termination.  This Agreement may be terminated at any time prior to the Completion as follows:

(a)    at the election of the Investor, if the Company, WFOE or the Owner has materially breached any Collective Warranty, or any other covenant or agreement of the Company, WFOE or the Owner contained in any Basic Document, which breach cannot be cured or, if it is capable of being cured, is not cured within 30 days after the Company, WFOE and the Owner being notified in writing of the same and which breach would give rise to the failure to satisfy a condition set forth in Section 3.1;

(b)    at the election of the Company, if the Investor has materially breached any Investor Warranty, or any other covenant or agreement of the Investor contained in the Basic Documents, which breach cannot be cured or, if capable of being cured, is not cured within 30 days after the Investor being notified in writing of the same and which breach would give rise to the failure to satisfy a condition set forth in Section 3.2; or

(c)    by written consent of the Company, WFOE, the Owner and the Investor.

11.3    Survival. If this Agreement is terminated in accordance with Section 11.2, it shall become void and of no further force and effect, except for the provisions of Section 8 (Confidentiality; Restriction on Announcements), Section 9 (Fees and Expenses), Section 10 (Indemnification), this Section 11.3, Section 12 (Notices), Section 13 (Miscellaneous), and Section 14 (Governing Law and Dispute Resolution); provided, however, that such termination shall, unless otherwise agreed by the Parties, be without prejudice to the rights of any Party in respect of a breach of this Agreement prior to such termination.

## SECTION 12    NOTICES

12.1    Notices. Each notice, demand or other communication given or made under this Agreement shall be in writing in English and delivered or sent to the relevant Party at its address or fax number set out below (or such other address or fax number as the addressee has by five days' prior written notice specified to the other Parties). Any notice, demand or other communication given or made by letter between countries shall be delivered by air mail. Any notice, demand or other communication so addressed to the relevant Party shall be deemed to have been delivered, (a) if delivered in person or by messenger, when proof of delivery is obtained by the delivering party; (b) if sent by post within the same country, on the third day following posting, and if sent by post to another country, on the seventh day following posting; and (c) if given or made by fax, upon dispatch and the receipt of a transmission report confirming dispatch.

12.2    Addresses and Fax Numbers. The initial address and facsimile for each Party for the purposes of this Agreement are:

if to the Investor:

Room B 21/F Legend Tower 7 Shing Yip Street, Kwun Tong, Kowloon, Hong Kong
Attention: Peng Chuan(彭川)
if to the Company, the WFOE or the Owner:

16/F, Leshi Building, No. 105, Yaojiayuan Road, Chaoyang District, Beijing, 100025, PRC
Attention: Wei DENG (邓伟)

## SECTION 13 MISCELLANEOUS

13.1    Enforcement Action. For the avoidance of doubt, any obligation on the part of the Investor to make the investment hereunder is made solely to the Company, the WFOE and the Owner, and no other Person shall have any right to enforce such obligation against the Investor.

13.2    No Partnership. The Parties expressly do not intend hereby to form a partnership, either general or limited, under any jurisdiction's partnership law. The Parties do not intend to be partners one to another, or partners as to any

24

third party, or create any fiduciary relationship among themselves, solely by virtue of the Investor's status as the holder of the Convertible Note and the Investor's status as the mortgagee of the Mortgaged Shares.

13.3   Amendment. This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the Parties.

13.4   Waiver. No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. Without limiting the foregoing, no waiver by a Party of any breach by any other Party of any provision hereof shall be deemed to be a waiver of any subsequent breach of that or any other provision hereof.

13.5   Entire Agreement. This Agreement (together with the other Basic Documents and any other documents referred to herein or therein) constitutes the whole agreement between the Parties relating to the subject matter hereof and supersedes any prior agreements or understandings relating to such subject matter.

13.6   Severability. Each and every obligation under this Agreement shall be treated as a separate obligation and shall be severally enforceable as such and in the event of any obligation or obligations being or becoming unenforceable in whole or in part. To the extent that any provision or provisions of this Agreement are unenforceable they shall be deemed to be deleted from this Agreement, and any such deletion shall not affect the enforceability of this Agreement as remain not so deleted.

13.7   Counterparts. This Agreement may be executed in one or more counterparts including counterparts transmitted by telecopier or facsimile, each of which shall be deemed an original, but all of which signed and taken together, shall constitute one document.

13.8   Consent to Specific Performance. The Parties declare that it is impossible to measure in money the damages that would be suffered by a Party by reason of the failure by any other Party to perform any of the material obligations hereunder and that, in addition to all other remedies, each Party will be entitled to seek specific performance and to seek injunctive or other equitable relief as a remedy for any such breach or failure to perform its material obligations hereunder.

13.9   Transfer; Assignment. This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns. This Agreement shall not be assigned without the express written consent of all the Parties (which consent may be granted or withheld in the sole discretion of any Party), and any purported assignment without such consent shall be void.

## SECTION 14
## GOVERNING LAW AND DISPUTE RESOLUTION

14.1   GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE PRC LAWS

14.2    Dispute Resolution.

(a)    In the event of any dispute regarding the performance of this Agreement (a "Dispute"), the parties shall consult and negotiate with each other and attempt to reach an amicable settlement. If there is no settlement of the Dispute within thirty (30) days of the occurrence of the Dispute, then any Party has the right in its sole discretion to initiate arbitration proceedings at the China International Economic and Trade Arbitration Commission in Beijing ("CIETAC").

(b)    The arbitration proceedings shall be conducted in accordance with the then effective rules of CIETAC, and any arbitration award shall be final and binding on the Parties. The arbitration tribunal shall consist of three (3) members appointed in accordance with the CIETAC arbitration procedures and rules. The Parties agree that the arbitrators may be selected outside of the Panel of Arbitrators of CIETAC.

IN WITNESS WHEREOF this Agreement has been executed on the day and year first above written.

**COMPANY:**

*For and on behalf of*
*Leview   Mobile   Ltd.*
**LEVIEW MOBILE LTD.**

By: _____
    *Authorized Signature(s)*
Name:
Title:

**CAYMAN CO:**

**LE LTD.**

By: _____
    Name:
    Title:

**WFOE:**

**LESAI MOBILE TECHNOLOGY
(BEIJING) CO., LTD.
(乐赛移动科技（北京）有限公司)**

By: _____
Name:
Title:

**OWNER:**

**YUETING JIA (贾跃亭)**

_____

**PRC Identification Card Number:**

IN WITNESS WHEREOF this Agreement has been executed on the day(s) and year first above written.

INVESTOR:

E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD.
（亦庄国际控股（香港）有限公司）

By: _____

Name: _____

Title: Authorized Signatory

# SCHEDULE 1
## CONSIDERATION ALLOCATION

| Entity | Principal Amount of Convertible Note |
|---|---|
| E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD | US$50,000,000 |

## SCHEDULE 2

## SHAREHOLDING STRUCTURE OF THE GROUP

## SCHEDULE 2A

## SHAREHOLDING STRUCTURE OF THE GROUP AS OF THE DATE OF THIS AGREEMENT



**SCHEDULE 2B**

**SHAREHOLDING STRUCTURE OF THE GROUP AFTER COMPLETION OF RESTRUCTURING**



,2

## SCHEDULE 3

## COLLECTIVE WARRANTIES

### Definitions

In this Schedule, capitalized terms not otherwise defined have the meanings set forth in this Agreement, and the following terms have the meanings specified:

"Contracts" means all contracts, agreements, licenses, engagements, leases, financial instruments, purchase orders, commitments and other contractual arrangements, that are currently subsisting and not terminated or completed.

"Environmental Laws" means any and all applicable current PRC or non-PRC national, federal, state, or local Law, statutes, rules, regulation, orders, ordinances, guidance documents, judgments, authorizations by any Governmental Authority, or any other requirement of any Governmental Authority relating to (a) environmental matters, (b) the generation, use, storage, transportation or disposal of hazardous substances, or (c) occupational safety and health, industrial hygiene, handling and disposal of medical waste, land use or the protection of human, plant or animal health or welfare.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Liabilities" means all indebtedness and other liabilities of any nature whatsoever, actual or contingent, and whether or not of a nature required to be disclosed in the accounts of the Group.

"Litigation" has the meaning set forth in Section 11 of this Schedule 3.

"Permits" means all permits, consents, approvals, authorizations, franchises, certifications and licenses from, and all registrations with, any Governmental Authority.

### The Warranties

The Company, the WFOE and the Owner hereby, severally and jointly, represent and warrant to the Investor that the following representations and warranties are true and complete as of the date hereof and the Completion Date, except as otherwise stated.

1.    **CORPORATE MATTERS**

    (a)    Organization, Good Standing and Qualification. Each of the Group Members and the Onshore Companies has been duly incorporated and organized, is validly existing and, where applicable, is (i) in good

standing and (ii) in compliance with all registration and approval requirements. Each of the Group Members and the Onshore Companies has the corporate power and authority to own and operate its assets and properties and to carry on its business as currently conducted and as contemplated to be conducted.

(b)  **Charter Documents.** The Company Charter Documents and the constitutional documents of the Onshore Companies furnished to the Investor are effective, have not been superseded and are true and complete.

(c)  **Capitalization and Shareholding Structure of the Group.** The shareholding structure of the Group set forth in Schedule 2A are true, complete and correct description of the share capital of such entity on the date hereof and on the Completion Date. Immediately following the Completion, the authorized capital of the Company will consist of only one class of shares, namely, 50,000 Ordinary Shares, par value US$0.0001 per share, 100% of which are duly and validly issued, fully paid, nonassessable, and outstanding, and were issued in accordance with all applicable laws.

(d)  **Options, Warrants and Reserved Shares.** Except for (A) the Convertible Note, and (B) the preferred shares issuable upon conversion of the Convertible Note and any rights to be granted pursuant to the Basic Documents, there are no outstanding options, warrants, rights (including conversion or preemptive rights) or agreements for the subscription or purchase from any Group Member of any Equity Securities of any Group Member or any securities convertible into or ultimately exchangeable or exercisable for any Equity Securities of any Group Member.

(e)  **Other Rights With Respect to Shares.** Except as provided in the Basic Documents, no voting or similar agreements exist in relation to the Equity Securities of any Group Member that are presently outstanding or that may hereafter be issued.

(f)  **Subsidiaries.** Save for the HK Co and the WFOE, the Company does not directly or indirectly own any interests in or Control any other entities. Neither of the HK Co or the WFOE directly or indirectly owns any interests in or Controls any other entities.

(g)  **Corporate Records.** The registers of shareholders, resolutions and all other documents of the Group required to be kept or filed with any relevant Governmental Authority have been kept, filed or submitted for filing.

(h)  **Competitive Activities.** The Owner does not hold any equity interests in any entity that carries on any business that competes with the business of any Group Member, or the Onshore Company as presently conducted or

for and on behalf of
大莊國際控股（香港）有限公司 Holding (Hong Kong) Co., Limited

Authorized Signature(s)

as contemplated to be conducted, except the ownership of shares in
publicly traded companies representing less than five percent of the
outstanding share capital of such company.

2.    **AUTHORIZATION AND VALIDITY OF TRANSACTIONS**

   (a)   <u>Authorization</u>. Each of the Company, the Owner, the other Group
Members and the Onshore Companies has the power and authority to
execute, deliver and perform the Basic Documents to which it/he is a
party. All actions on the part of the Company, the Owner, the other
Group Members and the Onshore Companies necessary for the
authorization, execution, delivery of and the performance of all of its/his
obligations under the Basic Documents have been taken or will be taken
prior to the Completion. All actions on the part of the Company and the
Owner necessary for the authorization, allotment, issuance and delivery
of the Convertible Note have been taken or will be taken prior to the
Completion.

   (b)   <u>Valid Issuance of Stock</u>. The preferred shares when issued upon
conversion of the Convertible Note will be duly authorized and validly
issued, fully paid and non-assessable, free of restrictions on transfer
other than restrictions on transfer under this Agreement, the Convertible
Note and any applicable securities or corporate laws.

   (c)   <u>Enforceability</u>. The Basic Documents to which any Group Member, the
Owner or the Onshore Company is a party will, when executed, be the
valid and binding obligation of such Group Member, the Owner or the
Onshore Company, enforceable against such Group Member, the Owner
or the Onshore Company, as applicable, in accordance with their
respective terms, except where such enforceability may be limited by (i)
applicable bankruptcy, insolvency, reorganization, moratorium; (ii)
similar laws affecting creditors' rights generally; or (iii) any
indemnification provisions contained in the Basic Documents.

   (d)   <u>Consents and Approvals</u>. On or prior to the Completion Date, all
consents, approvals, orders or authorizations of, or registrations,
qualifications, designations, declarations or filings with, any
Governmental Authority or any other Person required in connection with
the execution, delivery and performance by the Group, the Onshore
Companies and the Owner of the Basic Documents or the consummation
of the transactions contemplated hereby or thereby (including without
limitation, the Restructuring) have been duly obtained in compliance
with all applicable laws.

   (e)   <u>No Breach</u>. The execution and delivery by any Group Member, the
Onshore Company and the Owner of each of the Basic Documents to
which it is a party and the implementation and performance by such
Group Member, the Onshore Company and the Owner of all the

transactions contemplated under such Basic Documents (including without limitation, the Restructuring) do not and will not:

(i) breach or constitute a default under the Company Charter Documents or the constitutional document of any other Group Member or the Onshore Company;

(ii) result in a breach of, or constitute a default under, any Contract to which any Group Member, the Onshore Company or the Owner is a party or by which such Group Member, the Onshore Company or the Owner or their respective property or assets is bound or result in the creation or increasing of any obligation on such Group Member, the Onshore Company or the Owner (whether to make payment or otherwise) to any Person; or

(iii) result in a violation or breach of or default under any applicable law.

except, in the case of clauses (ii) and (iii), as could not materially and adversely affect the ability of any Group Member, the Onshore Company or the Owner to carry out its obligations under, and to consummate the transactions contemplated by, the Basic Documents to which it is a party.

3. **LEGAL COMPLIANCE**

(a) <u>No Violation of Law.</u> None of the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation, which may have a material adverse effect on the ability of any Group Member to conduct its business as currently conducted or as contemplated to be conducted.

(b) Permits and Registrations. Each Group Member and the Onshore Company has all Permits and has completed all government registrations necessary for the conduct of its business as currently conducted and as contemplated to be conducted and to own its assets. None of the Group Members or the Onshore Company is in material breach of or default under any such Permit, and there is no reason to believe any such Permit shall be suspended, cancelled or revoked.

4. **ENVIRONMENTAL ISSUES**

Each Group Member and the Onshore Company is currently in compliance with all Environmental Laws and has at all times complied with all Environmental Laws in all material aspects.

5. **PROPERTIES AND ASSETS**

(a) <u>Status of Properties and Assets.</u> Each Group Member and the Onshore Company owns or has the right to use all material properties and assets currently used by it in the conduct of its business as currently conducted

and contemplated to be conducted. The properties and assets owned by the Group and Onshore Company are free and clear of all Encumbrances. The tangible assets and real property of each Group Member and the Onshore Company have been properly maintained and are in working condition, and are in all respects in a condition that is adequate for the intended uses of such assets, subject to continued repair and replacement in accordance with past practice.

(b)    General Liabilities. None of the Group Members or the Onshore Company has any obligations or liabilities or any nature, whether accrued, absolute or contingent, whether liquidated or unliquidated, and whether now due or to become due, except for trade or business obligations and liabilities incurred in the ordinary course of business since such entity's inception.

## 6. CONTRACTS AND TRANSACTIONS

(a)    Validity of Material Contracts.

   (i)    No Group Member or the Onshore Company is in breach of or has knowledge of the invalidity of or grounds for rescission, avoidance or repudiation of any material contract to which the Group Member or the Onshore Company is a party, nor has any Group Member or the Onshore Company received notice of any intention to terminate any such material contract.

   (ii)   To the best knowledge of the Company, the WFOE and the Owner, no party with whom a Group Member or an Onshore Company has entered into any material contract is in default thereunder, except for defaults which would not have a material adverse effect on the financial condition of the Group or the Onshore Companies; to the best knowledge of the Company, the WFOE and the Owner, there are no circumstances likely to give rise to any such default.

(b)    Brokers and Finders. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Company and the Owner.

## 7. FINANCIAL MATTERS

(a)    Liabilities. Neither the Group nor the Onshore Companies with respect to its Existing Business has any Liabilities other than (i) Liabilities reflected or reserved against in their respective accounts, a true and complete copy of which has been delivered to the Investor; (ii) Liabilities incurred in the ordinary course of business; or (iii) Liabilities in relation to the Basic Documents. No Group Member or the Onshore Company has guaranteed any indebtedness of any other Person.

(b)    Financial Materials. All the accounts, books, registers, ledgers and financial and other material records of whatsoever kind of each Group Member and the Onshore Company which have been provided to the Investor are accurate and complete in all material respects; and they present a true and fair view of the financial, contractual and trading position of each Group Member and the Onshore Company and of its respective facilities and machinery, fixed and current assets and liabilities (actual and contingent), debtors, creditors and work-in-progress.

## 8.    TAX, RECORDS AND RETURNS

(a)    Compliance with Laws. None of the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation regarding Tax which may result in any liability or criminal or administrative sanction or otherwise having a material adverse effect on any Group Member or the Onshore Company, other than such violation that has been rectified or resolved and does not have any foreseeable liability or criminal or administrative sanction or otherwise.

(b)    Tax Returns and Payments. Each Group Member or the Onshore Company has filed all tax returns and reports as required by law, and such returns and reports are true and correct in all material respects. Each Group Member or the Onshore Company has paid all taxes and other assessments due and none of the Group Members is or will become liable to pay any fine, penalty, surcharge or interest in relation to Tax with respect to activities of any Group Member prior to the Completion Date. There have been no extraordinary examinations or audits of any tax returns or reports by any applicable Governmental Authority. There are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

(c)    Deductions and Withholdings. Each Group Member and the Onshore Company has made all deductions and withholdings in respect, or on account, of any Tax from any payments made by it which it is obliged or entitled to make and has duly accounted in full to the appropriate authority for all amounts so deducted or withheld.

(d)    Preferred Tax Treatments. All exemptions, reductions and rebates of Taxes granted to the Group by a Governmental Authority are in full force and effect and have not been terminated. To the knowledge of the Company, the WFOE and the Owner, the transactions contemplated under the Basic Documents will not, and, there is no other circumstance or event that will, result in any such exemption, reduction or rebate being cancelled or terminated, whether retroactively or for the future.

9.    **OPERATIONS**

(a)    Current Operations.  There is no existing fact or circumstance that will have a material adverse effect on the ability of any Group Member or the Onshore Company to conduct its business as currently conducted and contemplated to be conducted.

(b)    General Change.  Since the date hereof, there has been no material adverse change in the financial position of the Group or the Onshore Company relating to the Existing Business.

10.    **EMPLOYEES**

(a)    Status of Employees.

(i)    No Group Member, or the Onshore Company has at any time since its establishment had, or is being threatened in writing by, any strike, collective work stoppage or other material labor dispute.

(ii)    The Group and the Onshore Company each has complied in all material respects with all applicable laws regarding employees, employee benefits, employee safety and labor matters for all of their employees.

(b)    Employment Agreements and Compensation Arrangements.  Except as required by law, the labor contract and employee non-competition, intellectual property assignment and confidentiality agreement between the WFOE and each key employee, no Group Member is a party to or is bound by any currently effective employment contract (other than contracts that can be terminated on an at-will basis), deferred compensation agreement, pension, provident, superannuation, life assurance, disability or other similar schemes or arrangements, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation agreement.

11.    **CLAIMS AND PROCEEDINGS**

(a)    No Litigation.  No Group Member, the Onshore Company, or the Owner is engaged in or has been notified that it is the subject of any litigation, arbitration or administrative or criminal proceedings (collectively, "Litigation"), whether as plaintiff, defendant or otherwise.  None of the shareholders or equity interest holders of any Group Member, or the Onshore Company, directors of any such entity is engaged in or has been notified that it is the subject of any Litigation, whether as plaintiff, defendant or otherwise, which has had or may have an adverse effect on any Group Member, or the Onshore Company.  There is no judgment, decree, or order of any court in effect against any Group Member or the Onshore Company.  There is no judgment, decree, or order of any court in effect with respect to the Existing Business against Lefeng Moible or the Owner.  None of the Group Members or the Onshore Company is in

default with respect to any order of any Governmental Authority to which it/he is a party or by which it/he is bound. Neither Lefeng Mobile nor the Owner is in default with respect to any order of any Governmental Authority with respect to the Existing Business to which it/he is a party or by which it/he is bound.

(b)    <u>No Pending Proceedings</u>. No Litigation is pending or, to the knowledge of the Owner, the Company and the WFOE, threatened against any Group Member, or the Onshore Company; no Litigation in relation to the Existing Business is pending or, to the knowledge of the Owner, the Company and the WFOE against Lefeng Moible or the Owner.

(c)    <u>No Undertaking; No Injunction</u>. None of the Group Members, or the Onshore Company nor any shareholder, director, officer or agent of any of the foregoing entities is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force. Neither Lefeng Mobile nor any of its shareholder, director, officer or agent is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force in relation to Existing Business.

(d)    <u>No Insolvency</u>. No order has been made and no resolution has been passed for the winding up or liquidation as dissolution of any Group Member or the Onshore Company. No distress, execution or other process has been levied on the whole or a substantial part of the assets of any Group Member or the Onshore Company. None of the Group Members or the Onshore Company is insolvent or unable to pay its debts as they fall due.

(e)    <u>No Investigation or Inquiry</u>. No Group Member, the Onshore Company, or the Owner (in relation to the foregoing entities) is the subject of any investigation or inquiry by any Governmental Authority with respect to the Existing Business and there are no facts which are likely to give rise to any such investigation or inquiry.

## 12.    INTELLECTUAL PROPERTY

(a)    Each Group Member and the Onshore Company owns or otherwise has the right or license to use all Intellectual Property as necessary for the operation of the Existing Business without, to the knowledge of the Company and the Owner, any violation or infringement of the rights of any third party, free and clear of all Encumbrances. There is no claim, proceeding or litigation pending or, to the knowledge of the Company and the Owner, threatened against any Group Member or the Onshore Company, contesting their right to use its Intellectual Property, asserting the misuse thereof, or asserting the infringement or other violation of any Intellectual Property of any third party.

(b)    There are no pending proceedings or claims in which any Group
Member or the Onshore Company alleges that any Person is infringing
upon, or otherwise violating, its Intellectual Property rights. Nor have
any such proceedings or claims been served, instituted or asserted by any
Group Member or the Onshore Company.

(c)    None of the key employees of any Group Member and the Onshore
Company is obligated under any Contract, or subject to any judgment,
decree or order of any court or administrative agency, that would
interfere with the use of his or her best efforts to promote the interests of
his/her employer, or that would conflict with the business of his/her
employer as presently conducted, or that would prevent such employees
from assigning to his/her employer inventions conceived or reduced to
practice or copyrights for materials developed in connection with
services rendered to it.

13.    **RESTRUCTURING**

The Restructuring has been carried on by the Company in compliance with
applicable laws.

14.    **DISCLOSURE**

(a)    <u>No Misrepresentation</u>. No representation, warranty or statement by the
Company, the WFOE and the Owner in this Agreement, any other Basic
Document, or in any Exhibit, Schedule, Appendix, statement or
certificate furnished to the Investor pursuant to any Basic Document,
contains any untrue statement of a material fact or omits to state a
material fact necessary to make the statements made herein, in the light
of the circumstances under which they were made, not misleading.

(b)    Full Disclosure. There is no fact or circumstance relating to the affairs
of any Group Member and the Onshore Companies which has not been
disclosed to the Investor and which if the disclosed information might
reasonably have been expected to influence the decision of the Investor
to purchase the Convertible Note.

## SCHEDULE 4

## INVESTOR WARRANTIES

1.  <u>Organization, Good Standing and Qualification</u>. The Investor and its general partner have been duly established or incorporated and organized, is validly existing and, where applicable, in good standing.

2.  <u>Authorization</u>. The Investor has the full power, authority and legal right to own assets and carry on its business. The Investor and its general partner are not in receivership or liquidation or have taken any steps to enter into liquidation, and no petition has been presented for the winding-up of the Investor. There are no grounds on which a petition or application could be based for the winding-up or appointment of a receiver of the Investor or its general partner.

3.  The execution, delivery and performance of this Agreement by the Investor will not:

    (a)  violate any provision of its partnership agreement or the Memorandum of Association or Articles of Association of the Investor's general partner;

    (b)  require the Investor to obtain any consent, approval or action of, or make any filing with or give any notice to, any Governmental Authority or any other third party pursuant to any agreement to which the Investor is a party or by which the Investor is bound;

    (c)  conflict with or result in any material breach or violation of any of the terms and conditions of, or constitute (or with notice or lapse of time or both constitute) a default under, any agreement to which the Investor is a party or by which the Investor is bound;

    (d)  violate any court order, judgment, injunction, award, decree or writ against, or binding upon, the Investor or upon its securities, properties or business; or

    (e)  violate any law or regulation of the country where the Investor is incorporated or any other jurisdiction in which the Investor maintains a business presence.

4.  <u>Enforceability</u>. The Investor, acting through its general partner, has the full power and authority to enter into, execute and deliver the Basic Documents to which it is a party and to perform the transactions contemplated hereby and thereby. The execution and delivery by the Investor, acting through its general partner, of the Basic Documents to which it is a party and the performance by the Investor of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other action of the Investor. Assuming the due authorization, execution and delivery hereof by the other parties hereto, the Basic Documents to which the Investor is a party constitutes the legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium;(ii) similar laws

affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

5.    Financing. The Investor has sufficient immediately available funds to pay, in cash, the Consideration at the Completion.

6.    Litigation. As of the date hereof, no Litigation by or against the Investor is pending or, to the best knowledge of the Investor, threatened in writing, which could affect the legality, validity or enforceability of the Basic Documents to which it is a party, or the consummation of the transactions contemplated hereby and thereby.

7.    Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Investor.

# EXHIBIT A

## FORM OF CONVERTIBLE NOTE

# EXHIBIT B

## FORM OF SHARE MORTGAGE

亦庄国際控股(香港)有限公司

*Authorized Signature(s)*

**Execution Version**

# CONVERTIBLE NOTE

US$50,000,000          May 5, 2015

FOR VALUE RECEIVED, the undersigned, Leview Mobile Ltd., a company incorporated and existing under the laws of the Cayman Islands (the "**Company**"), hereby promises to pay, subject to the terms and conditions of this Convertible Note (this "Note"), to the order of E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO.,LTD. (亦庄国际控股（香港）有限公司）, an exempted limited corporation (the "**Holder**"), the principal amount of fifty million United States Dollars (US$50,000,000 ) (the "**principal amount**").

This Note is issued pursuant to, and in accordance with, the Convertible Note Purchase Agreement, dated May 5, 2015, by and among the Company and the parties named therein (as amended, supplemented or modified from time to time, the "**Purchase Agreement**"). This Note has the benefit of the Security as set out in Section 3. Le Ltd. (the "**Cayman Co**") granted a share mortgage of the issued share capital of the Company (as amended, supplemented or modified from time to time, the "**Share Mortgage**") to the Holder.

Meanwhile Mr. Yueting Jia (the "**Owner**"), a PRC resident and ultimate controlling shareholder of both Cayman Co and the Company, together with Leview Holding, a PRC company which is controlled by Mr. Yueting Jia, have jointly and severably provide undertakings to perform all obligations under this Note, the Purchase Agreement, and the Share Mortgage (as amended, supplemented or modified from time to time, the "**Transaction Documents**").The Holder is entitled to the benefit of the Transaction Documents, subject to the terms and conditions set forth herein and therein, may enforce the agreements contained herein and therein and exercise the remedies provided for hereby and thereby or otherwise available in respect hereto and thereto.

All capitalized terms not otherwise defined in this Note shall have the meanings attributed to such terms in the Purchase Agreement.

## 1     FORM, STATUS AND TITLE

### 1.1     Form

This Note is issued in registered form and denominated in US$.

### 1.2     Status

This Note constitutes senior, direct, unsubordinated, unconditional and secured obligations of the Company.

### 1.3     Title

Title to this Note passes only by transfer and registration in the register of Noteholders. A holder of any Note will (except as otherwise required by law) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any interest in it or any writing on, or the theft or loss of, the certificate issued in respect of it) and no person will be liable for so treating the holder. In this Note, "**Noteholder**" or holder in relation to this Note means the person in whose name a Note is registered.

## 2     INTEREST

The interest of this Note is 15% per annum and shall accrue on this Note and shall be calculated by using the then outstanding principal amount times 15% multiplied by actual number of days elapsed since the Issuance Date divided by 365 days. The Company shall pay to the Holder all interest payable hereunder at the Maturity Date or at the date of conversion pursuant to Section 6 of this Note, as the case may be.

**3    SECURITY**

The payment obligations and the performance of all the obligations of the Company under this Note are secured by the Share Mortgage (the "**Security**") and undertakings provided by Leview Holding. and Mr. Yueting Jia. The Security shall terminate in its entirety and have no further force and effect at the time that this Notes cease to be outstanding either as a result of redemption or conversion in accordance with the terms hereunder.

**4    PAYMENT**

**4.1    Currency**

All payments by the Company hereunder shall be made in US dollars in immediately available funds.

**4.2    Timing**

All payments by the Company shall be made, not later than 5:00 p.m. (Hong Kong time) on the due date, by remittance to such bank account as the Holder may notify the Company not less than 3 Business Days in advance from time to time.

**4.3    Holidays**

If any payment pursuant to this Note shall be due on a day that is not a Business Day, such payment shall be made without default on the next succeeding day which is a Business Day, and any interest-bearing portions of the payment (if any) shall not accrue interest during such extension.

**5    REDEMPTION**

**5.1    Redemption on Maturity**

(a)    The Holder shall have the right to require the Company to redeem this Note on the Maturity Date at the Redemtion Price by delivering a Redemption Notice to the Company following the Redemption Procedure set forth in Section 5.3.

**5.2    Redemption on Event of Default**

(a)    Upon the occurrence and during the continuance of an Event of Default, the Holder may, by notice in writing to the Company(the "**Default Notice**"), request the Event of Default to be remedied within ten (10) Business Days or other time the Holder may deem to be reasonable.

(b)    Upon the Company's failure to remedy the default in accordance with the Default Notice, the Holder shall be entitled to declare this Note in whole, and require the Company to redeem this Note on the Redemption Date at the Redemptin Price by delivering a Redemption Notice to the Company following the Redemption Procedure set forth in Section 5.3 .

**5.3    Redemption Procedures**

2

*Authorized Signature(s)*

(a)  On or before the Redemption Date, the Holder shall surrender this Note to the Company, in the manner and at the place designated in the Redemption Notice. Upon the surrender of this Note to the Company, the applicable Redemption Price shall be payable to the order of the Holder. This Note if redeemed in whole, or the portion of this Note redeemed if redeemed in part, as the case may be, shall be cancelled, and to the extent that only a portion of this Note is redeemed, the Company shall issue to the Holder a replacement note in the same form as this Note reflecting the remaining outstanding principal amount.

(b)  The Redemtion Date for Section 5.1 shall be Maturity Date, and for Section 5.2 shall be 3rd business day after the date of Redemption Notice.

(c)  The Holder upon exercise of its redemption right shall have the right to redeem the Note at the Redemption Price, which is calculated as the total outstanding principal amount with respect to this Note, plus any accrued and unpaid interest at 15% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Issuance Date divided by 365 days; the payment is to be made by cash, and the Holder may request for the cash payment to come from the Owner or other companies and institutions.

(d)  the payment shall become due and payable on the Redemption Date, and calculated from and including the Issuance Date until the payment date, plus any accrued and unpaid interest.

(e)  If a Redemption Notice shall have been duly given, and if on the Redemption Date the applicable Redemption Price payable upon redemption of this entire Note or the portion of this Note if redeemed in part, as the case may be, on such Redemption Date is paid in full to the Holder, then notwithstanding that this Note shall not have been surrendered, all rights (including right to interest, if any) with respect to such entire Note redeemed or such portion of this Note redeemed, as the case may be, shall forthwith after the Redemption Date terminate.

## 6    CONVERSION

### 6.1    Conversion on Qualified Financing

(a)  Should a Qualified Financing occur prior to the Maturity Date, the Holder shall have the right, but not the obligation, to convert the then outstanding amount owing under this Note, in whole, into preference shares subject to Section 6.2(c) in accordance with the method as follows:

   (i)  if converted to the Company shares:

$$\frac{\text{outstanding principal amount} \times (1 + 15\% \times \text{actual days elapsed since Issuance Date} /365)}{80\% \times \text{per share price as at the Company's Qualified Financing}}$$

   (ii)  If converted to Cayman Co or he Onshore Companies shares and by then Cayman Co or he Onshore Companies has had a first Qualified Financing

$$\frac{\text{outstanding principal amount} \times (1 + 15\% \times \text{actual days elapsed since Issuance Date} /365)}{80\% \times \text{per share price as at Cayman Co's or he Onshore Companies first Qualified Financing}}$$

3

or

    (iii)    if converted to Cayman Co shares and by then the Cayman Co has not had a first Qualified Financing, the Holder shall negotiate with the Owner of the valuation (the "**Valuation**") and the shares shall be calculated as follows:

outstanding principal amount x (1 + 15% x actual days elapsed since Issuance Date /365)

80% x per share price as at the Valuation

    (b)    Within 30 Business Days after the request of the Holder, the Owner shall procure that the Company shall deliver to the Holder all legal, financial and business information, the final form of the transaction documents with respect to the financing, and such other materials related thereto that may be reasonably requested by the Holder.

    (c)    Except for Section 6.1(a)(iii), Qualified Financing Securities issued to the Holder (and its Affiliates) upon conversion of this Note shall be identical with respect to rights, preferences and designations as, and shall rank pari passu with, the Qualified Financing Securities issued to the Investors in the Qualified Financing and the Holder shall otherwise be entitled to rights under the applicable Qualified Financing definitive documents, as the case may be, on parity with the Investors thereunder.

**6.2**    **Conversion Procedures**

    (a)    Subject to compliance with the procedures set forth in Section 6, the conversion rights set forth in this Note shall be exercised by the surrender of this Note by the Holder at any time during usual business hours on a Business Day, at the registered office of the Company (or such other office or agency of the Company as the Company and the Holder may agree), accompanied by a Conversion Notice specifying (i) that the Holder elects to convert the entire Note and (ii) subject to the transfer restrictions provided in Section 9.2, the name or names (with address) in which a certificate or certificates for the Relevant Securities are to be issued. This Note shall be delivered to the Company (together with the Conversion Notice) for cancellation and shall be cancelled by it. From the time of delivery of such certificate until the relevant register of the Company is duly updated to reflect such conversion, the Company shall hold this Note in trust for the Person(s) in whose name the Relevant Securities shall be issuable upon such conversion.

    (b)    As soon as practicable and in any event within 5 Business Days after the date of the Conversion Notice, the Company shall:

    (i)    take all actions and execute all documents necessary to effect the issuance and to the extent the Relevant Securities are in the form of equity securities, registration of such Relevant Securities on the register of the Company (including, where applicable, giving all necessary instruction to the relevant share registry to effect such issuance) and deliver to the Holder certified copies of the register of members reflecting the Relevant Securities in the name of the Holder or its nominee or assignee,

4

Authorized Signature(s)

(ii)    deliver to the Holder (x) where the Relevant Securities are in the form of equity securities, certificate(s) representing the number of validly issued, fully paid and non-assessable Relevant Securities calculated in accordance with Section 6, as the case may be and (y) where the Relevant Securities are in the form of equity-linked securities, certificate(s) representing the principal amount of Relevant Securities calculated in accordance with Section 6.1(a)(i) or 6.1(a)(ii), and

### 6.3    Fractional Shares

If the conversion of this Note would result in the issuance of any fractional share, the Company shall, at its option, round upwards and issue one additional share or pay to the Holder the portion of the principal amount convertible into such fractional share.

### 6.4    Availability of Equity Securities

The Company covenants that it will at all times reserve and maintain authority to issue the maximum number of Equity Securities issuable upon conversion of this Note. The Company covenants that all Equity Securities, when issued or delivered pursuant to Section 6.2, shall be duly and validly issued, shall rank *pari passu* with all other Equity Securities issued in the Qualified Financing, as the case may be, and where they are in the form of equity securities non-assessable, fully paid, free and clear of all Encumbrances, other than Encumbrances arising under the Transaction Documents or created, imposed or agreed in writing by the Holder.

### 6.5    Reorganization, Reclassification

Subject to the terms of the Purchase Agreement, in case of any merger, amalgamation, arrangement or consolidation of the Company or any capital reorganization, reclassification or other change of outstanding Ordinary Shares (each, a "**Transaction**"), the Company shall execute and deliver to the Holder at least 30 days prior to effecting such Transaction a certificate, signed by a Director of the Company, stating that the rights of the Holder shall continue to be recognized and not prejudiced by the Transaction and appropriate provision shall be made therefor in the agreement, if any, relating to such Transaction. The provisions of this Section 6.5 and any equivalent thereof in any such certificate similarly shall apply to successive transactions.

### 6.6    Legend

The Holder agrees to the imprinting, so long as required by law, of a legend on certificates representing all of the Holder's Relevant Securities issuable upon conversion of this Note in substantially the following form:

LEVIEW MOBILE LTD. (THE "COMPANY") IS A COMPANY INCORPORATED UNDER THE LAWS OF THE CAYMAN ISLANDS, AND THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL NOT BE SOLD, ASSIGNED, TRANSFERRED, EXCHANGED, MORTGAGED, PLEDGED OR OTHERWISE DISPOSED OF OR ENCUMBERED WITHOUT COMPLIANCE WITH THE ARTICLES OF ASSOCIATION OF THE COMPANY, DATED FEBRUARY 3, 2015, AMONG THE COMPANY AND THE SHAREHOLDERS OF THE COMPANY, AS AMENDED AND RESTATED FROM TIME TO TIME. COPIES OF SUCH ARTICLES OF ASSOCIATION ARE ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY.   THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES OR SECURITIES ISSUED UPON CONVERSION THEREOF ON THE

5

BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF SUCH ARTICLES OF ASSOCIATION.

**7    COVENANTS**

**7.1    Covenants**

The Company covenants to the Holder that, from the date hereof until all amounts owing under this Note have been paid in full or this Note has been redeemed or converted in full, the Company shall:

(a)    punctually pay the principal and/or any interest (if any) payable on this Note, and any other amount due and payable under this Note in the manner specified in this Note;

(b)    give written notice promptly to the Holder: (i) of any condition or event that constitutes an Event of Default (as defined below) or Potential Event of Default, (ii) that any Person has given any notice to a Group Member or taken any other action with respect to any claimed Event of Default or Potential Event of Default or (iii) of the occurrence of any event or change that has caused or evidences, either in any individual case or in the aggregate, a Material Adverse Change, by delivering a certificate specifying the nature and period of existence of such condition, event or change, or specifying the notice given or action taken by any such Person and the nature of such claimed Event of Default, Potential Event of Default, default, event or condition;

(c)    comply in all material respects with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, non-compliance with which could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Change; and

(d)    execute and deliver, or cause to be executed and delivered, upon the request of the Holder and at the Company's expense, such additional documents, instruments and agreements as the Holder may reasonably determine to be necessary to carry out the provisions of this Note, the Purchase Agreement and the Share Mortgage and the transactions and actions contemplated hereunder and thereunder.

**7.2    Other Corporate Actions**

The Company covenants to the Holder that, from the date hereof until all amounts owing under this Note have been paid in full or all Notes have been redeemed in full, the Company shall not, and that the Company shall not allow any other Group Member to, take any of the actions, or take or omit to take any action that would have the effect of any of the actions set forth in Section 7 of the Purchase Agreement.

**7.3    Taxation**

All payments made by the Company under or in respect of the Notes, will be made without deduction or withholding for or on account of any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the PRC, Cayman Islands or Hong Kong or any authority thereof or therein having power to tax, unless deduction or withholding of such taxes, duties, assessments or governmental charges is compelled by law. In such event, the Company will pay such additional amounts as will result in the receipt by the Holder of the net amounts after such deduction or withholding equal to the amounts which would otherwise have been receivable by the Holder

赤莊國際控股(香港)有限公司
Authorized Signature(s)

the Holder had no such deduction or withholding been required except that no such additional amounts shall be payable:

(a) for or on account of:

(i) any tax, duty, assessment or other governmental charge that would not have been imposed but for:

(1) the existence of any present or former connection between the Holder or beneficial owner of such Note and the PRC, Cayman Islands or Hong Kong other than merely holding such Note or the receipt of payments thereunder, including, without limitation, such Holder or beneficial owner being or having been a national, domiciliary or resident of the PRC, Cayman Islands or Hong Kong or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

(2) the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment became due and payable pursuant to the terms thereof or was made or duly provided for; or

(3) the failure of the Holder or beneficial owner to comply with a timely request from the Company or any successor, addressed to the Holder or beneficial owner, as the case may be, to provide certification, information, documents or other evidence concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the PRC, Cayman Islands or Hong Kong, or to make any declaration or satisfy any other reporting requirement relating to such matters, if and to the extent that due and timely compliance with such request is required by statute, regulation or administrative practice of the PRC, Cayman Islands or Hong Kong to reduce or eliminate any withholding or deduction as to which additional amounts would have otherwise been payable to such Holder;

(ii) any estate, inheritance, gift, sale, transfer, capital gains, excise, personal property or similar tax, assessment or other governmental charge;

(iii) any tax, duty, assessment or other governmental charge that is payable otherwise than by withholding from payments under or with respect to the Notes; or

(iv) any combination of taxes, duties, assessments or other governmental charges referred to in the preceding clauses (i), (ii) or (iii), or

(b) with respect to any payment on such Note to a Holder, if the Holder is a fiduciary, partnership or person other than the sole beneficial owner of that payment to the extent that such payment would be required to be included in the income under the laws of the PRC, Cayman Islands or Hong Kong, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that partnership or a beneficial owner who would not have been entitled to such additional amounts had that beneficiary, settlor, partner or beneficial owner been the Holder thereof.

References in this Note to principal shall be deemed also to refer to any additional amounts which may be payable under this Note.

## 8    EVENTS OF DEFAULT

### 8.1    Events of Default

The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)    the Company shall fail to pay debt that is due and payable or any other amount (if any) when due in accordance with the terms hereof;

(b)    the change of actual controller of the Company or LMIIT;

(c)    any representation, warranty, covenant, undertaking, certification or statement made by or on behalf of the Company in any Transaction Documents or in any certificate or other document delivered pursuant thereto shall have been materially incorrect, misleading or false in any material respect when made (a "**Breach**") and, if capable of being remedied, has not been remedied within thirty (30) days after being notified in writing of such Breach by the Holder; provided that such Breach has caused or is likely to cause a Material Adverse Change on the business of the Group as a whole or on the rights and liabilities of the Holder under the Transaction Documents;

(d)    any breach of the undertakings and covenants as specified in Sections 7.4, 7.5, 7.6 7.7 and 7.12 of the Purchase Agreement.

(e)    the Company, LMIIT or any of their respective significant or material subsidiaries shall commence any case, proceeding or other action (1) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to any Group Member, or seeking to adjudicate any Group Member bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to any Group Member or its debts, or (2) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for any Group Member or for all or any substantial part of its assets; (the "**Liquidation Event**") ;

(f)    the involuntary delisting of Leshi Internet Information Technology Corp., Beijing (乐视网信息技术（北京）有限公司, 300104.CH);

(g)    the Company shall fail to deliver the Relevant Securities when such Relevant Securities are required to be delivered following conversion of this Notes in accordance with the terms hereof.

### 8.2    Notice by the Company

Upon the occurrence of an Event of Default, the Company shall give the Holder prompt notice of the occurrence of such Event of Default.

### 8.3    Consequence of Event of Default

Upon the occurrence and during the continuance of an Event of Default, the Holder may firstly send a Default Notice and then call for redemption as specified in the redemption procedure under Section 5.2.

## 9    REGISTRATION AND TRANSFER OF NOTE

### 9.1    Register

亦莊國際控股(香港)有限公司

*Authorized Signature(s)*

The Company shall keep a register in which the Company shall provide for the registration and transfer of this Note, in which the Company shall record the name and address of the Holder and the name and address of each permitted transferee. The Holder shall notify the Company of any change of name or address and promptly after receiving such notification the Company shall record such information in such register.

9.2    Transfer

(a)    Notwithstanding anything to the contrary in the Purchase Agreement, (a) this Note and all rights hereunder may only be transferred by the Holder in whole or in part, at any time and from time to time to one or more of its Affiliates to the extent permitted by applicable laws and regulations, and the Company shall assist the Holder in consummating any such transfer and (b) from and upon the occurrence of any of the events set out in Section 8.1(a), the Holder may at any time and from time to time transfer this Note in whole or in part to any Person without any restriction, to the extent permitted by applicable laws and regulations.

(b)    Any transfer in violation of this Section 9.2 shall be null and void. A transfer of this Note may be effected only by a surrender hereof to the Company and the issuance by the Company of a new Note or Notes in replacement thereof, which shall be registered by the Company in accordance with Section 9.1 once an executed copy of the replacement note has been executed by the transferee. The Company shall not be responsible for payment of any transfer taxes in connection with the transfer of this Note.

10    DEFINITIONS

10.1    Definitions

In this Note, unless the context otherwise requires the following words and expressions have the following meanings:

"Affiliate" of a Person (the "Subject Person") means any other Person that directly or indirectly Controls, is Controlled by or is under common Control with the Subject Person.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the PRC, HKSAR or Cayman Islands are required or authorized by law or executive order to be closed or on which a tropical cyclone warning no. 8 or above or a "black" rainstorm warning signal is hoisted in HKSAR at any time between 9:00 a.m. and 5:00 p.m. Hong Kong time.

"Cayman Co" means Le Ltd., an exempted company incorporated and existing under the laws of the Cayman Islands with its company number 295848 and registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands.

"Company" means Leview Mobile Ltd., an exempted company incorporated and existing under the laws of the Cayman Islands with its company number 296318 and registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands.

"Control" of a Person means (a) ownership of more than 50% of the shares in issue or other equity interests or registered capital of such Person or (b) the power to direct the management or policies of such person, whether through the ownership of more than 50% of the voting power of such Person, through the power to appoint a majority of the members of

9

the board of directors or similar governing body of such Person, through contractual arrangements or otherwise.

"**Conversion Notice**" means a written notice in the form of Exhibit 2 attached hereto delivered by the Holder to the Company.

"**Default Notice**" has the meaning set forth in Section 5.2(a).

"**Director**" means a director of the Company (including any duly appointed alternate director).

"**Encumbrance**" means (a) any mortgage, charge (whether fixed or floating), pledge, lien (other than lien created by operation of law), hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, and (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person.

"**Equity Securities**" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital or joint venture or other ownership interest.

"**Event of Default**" has the meaning set forth in Section 8.1.

"**Group Member**" has the meaning set forth in the Purchase Agreement.

"**Holder**" means E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD which holds the Note.

"**Issuance Date**" means the date of this Note.

"**LMIIT**" means Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd.( 乐视移动智能信息技术（北京）有限公司), a company incorporated under the laws of the PRC.

"**Liquidation Event**" means any event described in Section 8.1(e).

"**Material Adverse Change**" means any material adverse change in, and any change in circumstances that has a material adverse impact on the business, operations, results of operations, financial condition, prospects, assets or liabilities of the Group as a whole.

"**Maturity Date**" means the three years anniversary of the Issuance Date.

"**Note**" means this convertible note as a whole document.

"**Ordinary Shares**" means the ordinary shares having a par value of US$0.0001 per share in the capital of the Company.

"**Owner**" has the meaning set forth in the Purchase Agreement.

"**Person**" means any natural person, firm, company, governmental authority, joint venture, partnership, association or other entity (whether or not having separate legal personality).

Authorized Signature(s)

"Potential Event of Default" means a condition or event that, after notice or lapse of time or both, would be reasonably expected to constitute an Event of Default.

"Purchase Agreement" has the meaning set forth in the recitals of this Note.

"Qualified Financing" means the first issue of preferred shares or equity-linked convertible debt securities of the Company after the Issuance Date but on or before the Maturity Date to institutional investors (other than the Holder) on terms and conditions that would be reasonably acceptable to prudent, sophisticated investors in light of the circumstances, or any other issuance of equity securities of the Company after Issuance Date.

"Qualified Financing Securities" means the securities to be issued by the Company in connection with the Qualified Financing.

"Redemption Date" has the meaning set forth in Section 5.3 (b).

"Redemption Notice" means a written notice in the form of Exhibit 1 attached hereto delivered by the Holder to the Company.

"Redemption Price" has the meaning set forth in Section 5.3 (c).

"Redemption Procedure" has the meaning set forth in Section 5.3.

"Relevant Securities" means Qualified Financing Securities or other securities into which this Note may be convertible.

"Security" has the meaning set forth in Section 3.

"Share Mortgage" has the meaning set forth in the recitals of this Note.

"Transaction Documents" has the meaning set forth in the recitals of this Note.

"Valuation" has the meaning set forth in Section 6.1(a).

## 10.2  Headings

Section headings in this Note are included herein for convenience of reference only and shall not constitute a part of this Note for any other purpose.

## 11  GOVERNING LAW; JURISDICTION

Any dispute or claim arising out of or in connection with or relating to this Note shall be settled in accordance with Section 14 (*Governing Law and Dispute Resolution*) of the Purchase Agreement.

## 12  MISCELLANEOUS

### 12.1  Notices

Any notice or communication provided for by this Note shall be in writing and shall be delivered in person, sent by facsimile, mailed first class with postage prepaid, or sent by internationally recognized overnight delivery service addressed to the Company or the Holder at its addresses or facsimile numbers specified in the Purchase Agreement, as to any such party, at such other address or facsimile number as may be designated by it in a notice to the other parties hereto.  All notices, demands and other communications shall be deemed to have been duly given when delivered by hand, if personally delivered; when delivered by courier, if delivered by commercial courier service; 5 Business Days after being

deposited in the mail, postage prepaid, if mailed; and when receipt is mechanically acknowledged, if faxed.

### 12.2  Enforcement

The Company agrees to pay on demand all of the losses, costs and expenses (including, without limitation, reasonable attorneys' fees, court costs and disbursements) that the Holder reasonably incurs in connection with enforcement and collection of this Note.

### 12.3  No Set-off

All payments on or in respect of this Note or the indebtedness evidenced hereby shall be made to the Holder without set-off counterclaim and free and clear of and without any deductions of any kind.  The Company hereby waives diligence, demand, presentment, protest or notice of any kind.

### 12.4  Waiver

The Company waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note.  Unless otherwise provided herein, the Company agrees that no omission or delay by the Holder in exercising any right under this Note shall operate as a waiver, and the single or partial exercise of any such right or rights shall not preclude any other further exercise of such right or rights.

### 12.5  Amendment

This Note may not be amended or modified except by a written agreement executed by the Company and the Holder.

### 12.6  Language

This Note is drawn up in the English language.  If this Note is translated into any language other than English, the English language text shall prevail.

### 12.7  Replacement

Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Note, the Company will issue a replacement note to the Holder of like tenor, and the Holder will reimburse the Company for its reasonable out-of-pocket expenses incurred in connection with such issuance.

In witness whereof, the undersigned has duly executed this Note on the date first above written.

Executed by

LEVIEW MOBILE LTD.

By: _____

Name: _____

Title: Authorized Signatory

AGREED AND ACCEPTED:

E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD. （亦庄国际控股（香港）有限公司）

By: _____

Name: _____

Title: Authorized Signatory

**EXHIBIT 1**
**FORM OF REDEMPTION NOTICE**

[date]

To:    Leview Mobile Ltd.
    *[Address]*

Re:    Redemption Notice in relation to the Convertible Note No.[•] of Leview Mobile Ltd. (the
    "**Note**"), dated as of [•], 2015 with an aggregate outstanding principal amount of US$[•].
    Capitalized terms used herein and not otherwise defined shall have their respective
    meanings as set forth in the Note.


Dear Sirs,

We, the Holder, hereby deliver this Redemption Notice pursuant to Section 5.1/5.2/5.3 of the Note
and hereby notify the Company of the exercise of the redemption right set forth in Section 5.1/5.2/5.3
of the Note to redeem [all of the outstanding principal amount of the Note]/[such principal amount of
the Note equal to US$ [•]] [together with accrued and unpaid interest thereon] at the applicable
Redemption Price calculated pursuant to Section 5.3(c)(the "**Redemption Price**").

Aggregate outstanding principal amount to be redeemed: US$ [•]

Aggregate accrued but unpaid interest with respect to the principal amount to be redeemed, if any:
US$ [•]

Redemption Date: [•]

Please kindly transfer to us the Redemption Price calculated pursuant to Section 5.3(c) in
accordance with the provisions of Section 5.1/5.2/5.3 of the Note.


Very truly yours,
[Holder]


By: _____
Name: _____
Title: _____

Authorized Signature(s)

## EXHIBIT 2
## FORM OF CONVERSION NOTICE

[date]

**To:**   Leview Mobile Ltd./Le Ltd.
          ***[Address]***

**Re:**   Conversion Notice in relation to the Convertible Note No. [●] of Leview Mobile Ltd. (the
          "Note"), dated as of [●] 2015 with an aggregate outstanding principal amount of US$[●].
          Capitalized terms used herein and not otherwise defined shall have their respective
          meanings as set forth in the Note.

Dear Sirs,

We, the Holder, hereby deliver this Conversion Notice pursuant to Section 6.2 of the Note and
hereby notify the Company of the exercise of the conversion right set forth in Section 6.1 of the Note
to convert all of the outstanding amount of the Note to the Relevant Securities at the applicable
Conversion Price.

  a) Aggregate outstanding principal amount to be converted: US$ [●]

  b) Aggregate accrued but unpaid Interest with respect to the principal amount to be converted, if
     any: US$ [●]

  c) Applicable Conversion Price:  US$[●]

  d) Total Relevant Securities to be issued upon conversion: [●] Qualified Financing
     Securities/Ordinary Shares (which equals (a)/(c))

This is an Conversion to:  Leview Mobile Ltd. _____  or Le Ltd. _____

Please kindly issue to us such number of Relevant Securities issuable upon conversion of the Note
in accordance with this Conversion Notice and the provisions of Section 6.1 of the Note to the
following entity(ies):

  (1)    Name: [      ]
         Address: [      ]
         Number of Relevant Securities to be issued: [ ]

  (2)    [Repeat if necessary]

[Please kindly pay to us the aggregate accrued but unpaid interest of US$ [●] in accordance with this
Conversion Notice and the provision of the Note by remittance to the bank account set forth below:

Bank Account: [●]

Very truly yours,
[Holder]

By:      _____
Name: _____
Title: _____

E-Town International Holding (Hong Kong) Co., Limited

Authorized Signature(s)

# 担保函

2015 年 5 月 5 日

至：北京亦庄国际投资发展有限公司

乐视控股（北京）有限公司（"乐视控股"）及本人境外关联方
LEVIEW MOBILE 已于 2015 年 5 月 5 日向贵司境外关联方亦庄国际
控股（香港）有限公司（"债券持有人"）发行面额 US$50,000,000
的可转债，LEVIEW MOBILE 将根据交易文件的约定，在偿还条件触
发时，向债券持有人偿还可转债本金及约定的利息（以下简称"还款
义务"）。

为此，乐视控股及贾跃亭（以下合称"保证人"）承诺并保证，
如果 LEVIEW MOBILE 未能依照交易文件的约定完全履行其还款义
务，保证人将依照交易文件的相关约定代为承担向债券持有人的还款
义务，并对上述还款承担无限连带担保责任。如果 LEVIEW MOBILE
逾期不偿还上述可转债本金及约定的利息，保证人同意，每逾期一日
向债券持有人支付相当于前述本金及利息每日万分之一的违约金。

保证人：

贾跃亭（签字）：

乐视控股（北京）有限公司（盖章）

E

M

A

I

L

E

D

_____C Murray_____          _____1/17/2020_____

CASE MANAGER                    DATE

| United States Bankruptcy Court for the Central District Of California - Los Angeles Division | Your Mail ID is | 159210012 |
|---|---|---|

**Name of Debtor:** Yueting Jia

**Case Number:** 19-24804

**For Court Use Only**

Claim Number: 0000020017

File Date: 01/19/2020 01:13:10

# Proof of Claim (Official Form 410)

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**
**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.
A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.
**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

04/19

| Part 1: | Identify the Claim |
|---|---|

**1.   Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim):   E-TOWN INTL HOLDING(HK) CO LTD

Other names the creditor used with the debtor: _____

**2.   Has this claim been acquired from someone else?**   ☑ No   ☐ Yes.   From whom? _____

**3.   Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Name    E-TOWN INTL HOLDING(HK) CO LTD

Address    23-25 FLOORS, BLOCK A,YAICHENG WEALTH

22 RONGHUA ROAD ECONOMIC & TECHNOLOGICAL

DEVELOPMENT ZONE DAXING DISTRICT

City    BEIJING

State _____  ZIP Code 100176

Country (if International): CHINA

Phone: _____

Email: _____

**Where should payments to the creditor be sent?** (if different)

Name _____

Address _____

_____

_____

City _____

State _____  ZIP Code _____

Country (if International): _____

Phone: _____

Email: _____

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.

Claim number on court claims register (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes.

Who made the earlier filing?

_____

Page 1 of 3

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes.
Last 4 digits of the debtor's account or any number you use to identify the debtor:

8972
____  ____  ____  ____

**7. How much is the claim?**

$  83,349,315.07    unliquidated

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.    The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:

_____

**Basis for perfection:**

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any
default as of the date of the petition:    $_____

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed  ☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of petition.**

$_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property:

_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507 (a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. **Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9):** $_____

| Part 3: | Sign Below |
| --- | --- |

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Wei Yuan*                                          01/19/2020 01:13:10
_____          _____
Signature                                              Date

**Provide the name and contact information of the person completing and signing this claim:**

Name        WEI YUAN

Address     23-24 FLOORS, BLOCK A

            YICHENG WEALTH, 22 RONGHUA MIDDLE ROAD

            BEIJING ECONOMIC-TECH DEVELOPMENT AREA

City        BEIJING

State                                          Zip    100176

Country (in international)    P.R. CHINA

Phone       +86 13801220419

Email       yuanwei@etowncapital.com

# 担保函

2015 年 5 月 5 日

至：北京亦庄国际投资发展有限公司

　　乐视控股（北京）有限公司（"乐视控股"）及本人境外关联方 LEVIEW MOBILE 已于 2015 年 5 月 5 日向贵司境外关联方亦庄国际控股（香港）有限公司（"债券持有人"）发行面额 US$50,000,000 的可转债，LEVIEW MOBILE 将根据交易文件的约定，在偿还条件触发时，向债券持有人偿还可转债本金及约定的利息（以下简称"还款义务"）。

　　为此，乐视控股及贾跃亭（以下合称"保证人"）承诺并保证，如果 LEVIEW MOBILE 未能依照交易文件的约定完全履行其还款义务，保证人将依照交易文件的相关约定代为承担向债券持有人的还款义务，并对上述还款承担无限连带担保责任。如果 LEVIEW MOBILE 逾期不偿还上述可转债本金及约定的利息，保证人同意，每逾期一日向债券持有人支付相当于前述本金及利息每日万分之一的违约金。

保证人：

贾跃亭（签字）：

乐视控股（北京）有限公司（盖章）

**Execution Version**

# CONVERTIBLE NOTE

US$50,000,000                                                                                       May 5, 2015

FOR VALUE RECEIVED, the undersigned, Leview Mobile Ltd., a company incorporated and existing under the laws of the Cayman Islands (the "**Company**"), hereby promises to pay, subject to the terms and conditions of this Convertible Note (this "Note"), to the order of E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO.,LTD.（亦庄国际控股（香港）有限公司），an exempted limited corporation (the "**Holder**"), the principal amount of fifty million United States Dollars (US$50,000,000 ) (the "**principal amount**").

This Note is issued pursuant to, and in accordance with, the Convertible Note Purchase Agreement, dated May 5, 2015, by and among the Company and the parties named therein (as amended, supplemented or modified from time to time, the "**Purchase Agreement**"). This Note has the benefit of the Security as set out in Section 3. Le Ltd. (the "**Cayman Co**") granted a share mortgage of the issued share capital of the Company (as amended, supplemented or modified from time to time, the "**Share Mortgage**") to the Holder.

Meanwhile Mr. Yueting Jia (the "**Owner**"), a PRC resident and ultimate controlling shareholder of both Cayman Co and the Company, together with Leview Holding, a PRC company which is controlled by Mr. Yueting Jia, have jointly and severably provide undertakings to perform all obligations under this Note, the Purchase Agreement, and the Share Mortgage (as amended, supplemented or modified from time to time, the "**Transaction Documents**").The Holder is entitled to the benefit of the Transaction Documents, subject to the terms and conditions set forth herein and therein, may enforce the agreements contained herein and therein and exercise the remedies provided for hereby and thereby or otherwise available in respect hereto and thereto.

All capitalized terms not otherwise defined in this Note shall have the meanings attributed to such terms in the Purchase Agreement.

**1      FORM, STATUS AND TITLE**

**1.1      Form**

This Note is issued in registered form and denominated in US$.

**1.2      Status**

This Note constitutes senior, direct, unsubordinated, unconditional and secured obligations of the Company.

**1.3      Title**

Title to this Note passes only by transfer and registration in the register of Noteholders.  A holder of any Note will (except as otherwise required by law) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any interest in it or any writing on, or the theft or loss of, the certificate issued in respect of it) and no person will be liable for so treating the holder.  In this Note, "**Noteholder**" or holder in relation to this Note means the person in whose name a Note is registered.

**2      INTEREST**

The interest of this Note is 15% per annum and shall accrue on this Note and shall be calculated by using the then outstanding principal amount times 15% multiplied by actual number of days elapsed since the Issuance Date divided by 365 days. The Company shall pay to the Holder all interest payable hereunder at the Maturity Date or at the date of conversion pursuant to Section 6 of this Note, as the case may be.

**3    SECURITY**

The payment obligations and the performance of all the obligations of the Company under this Note are secured by the Share Mortgage (the "**Security**") and undertakings provided by Leview Holding. and Mr. Yueting Jia. The Security shall terminate in its entirety and have no further force and effect at the time that this Notes cease to be outstanding either as a result of redemption or conversion in accordance with the terms hereunder.

**4    PAYMENT**

**4.1    Currency**

All payments by the Company hereunder shall be made in US dollars in immediately available funds.

**4.2    Timing**

All payments by the Company shall be made, not later than 5:00 p.m. (Hong Kong time) on the due date, by remittance to such bank account as the Holder may notify the Company not less than 3 Business Days in advance from time to time.

**4.3    Holidays**

If any payment pursuant to this Note shall be due on a day that is not a Business Day, such payment shall be made without default on the next succeeding day which is a Business Day, and any interest-bearing portions of the payment (if any) shall not accrue interest during such extension.

**5    REDEMPTION**

**5.1    Redemption on Maturity**

(a)    The Holder shall have the right to require the Company to redeem this Note on the Maturity Date at the Redemtion Price by delivering a Redemption Notice to the Company following the Redemption Procedure set forth in Section 5.3.

**5.2    Redemption on Event of Default**

(a)    Upon the occurrence and during the continuance of an Event of Default, the Holder may, by notice in writing to the Company(the "**Default Notice**"), request the Event of Default to be remedied within ten (10) Business Days or other time the Holder may deem to be reasonable.

(b)    Upon the Company's failure to remedy the default in accordance with the Default Notice, the Holder shall be entitled to declare this Note in whole, and require the Company to redeem this Note on the Redemption Date at the Redemptin Price by delivering a Redemption Notice to the Company following the Redemption Procedure set forth in Section 5.3 .

**5.3    Redemption Procedures**

2

(a)    On or before the Redemption Date, the Holder shall surrender this Note to the Company, in the manner and at the place designated in the Redemption Notice. Upon the surrender of this Note to the Company, the applicable Redemption Price shall be payable to the order of the Holder.  This Note if redeemed in whole, or the portion of this Note redeemed if redeemed in part, as the case may be, shall be cancelled, and to the extent that only a portion of this Note is redeemed, the Company shall issue to the Holder a replacement note in the same form as this Note reflecting the remaining outstanding principal amount.

(b)    The Redemtion Date for Section 5.1 shall be Maturity Date, and for Section 5.2 shall be 3rd business day after the date of Redemption Notice.

(c)    The Holder upon exercise of its redemption right shall have the right to redeem the Note at the Redemption Price, which is calculated as the total outstanding principal amount with respect to this Note, plus any accrued and unpaid interest at 15% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Issuance Date divided by 365 days; the payment is to be made by cash, and the Holder may request for the cash payment to come from the Owner or other companies and institutions.

(d)    the payment shall become due and payable on the Redemption Date, and calculated from and including the Issuance Date until the payment date, plus any accrued and unpaid interest.

(e)    If a Redemption Notice shall have been duly given, and if on the Redemption Date the applicable Redemption Price payable upon redemption of this entire Note or the portion of this Note if redeemed in part, as the case may be, on such Redemption Date is paid in full to the Holder, then notwithstanding that this Note shall not have been surrendered, all rights (including right to interest, if any) with respect to such entire Note redeemed or such portion of this Note redeemed, as the case may be, shall forthwith after the Redemption Date terminate.

## 6    CONVERSION

### 6.1    Conversion on Qualified Financing

(a)    Should a Qualified Financing occur prior to the Maturity Date, the Holder shall have the right, but not the obligation, to convert the then outstanding amount owing under this Note, in whole, into preference shares subject to Section 6.2(c) in accordance with the method as follows:

(i)    if converted to the Company shares:

outstanding principal amount x (1 + 15% x actual days elapsed since Issuance Date /365)

80% x per share price as at the Company's Qualified Financing

(ii)    if converted to Cayman Co or he Onshore Companies shares and by then Cayman Co or he Onshore Companies has had a first Qualified Financing

outstanding principal amount x (1 + 15% x actual days elapsed since Issuance Date /365)

80% x per share price as at Cayman Co's or he Onshore Companies first Qualified Financing

3

or

    (iii)    if converted to Cayman Co shares and by then the Cayman Co has not had a first Qualified Financing, the Holder shall negotiate with the Owner of the valuation (the "**Valuation**") and the shares shall be calculated as follows:

<u>outstanding principal amount x (1 + 15% x actual days elapsed since Issuance Date /365)</u>

80% x per share price as at the Valuation

(b)    Within 30 Business Days after the request of the Holder, the Owner shall procure that the Company shall deliver to the Holder all legal, financial and business information, the final form of the transaction documents with respect to the financing, and such other materials related thereto that may be reasonably requested by the Holder.

(c)    Except for Section 6.1(a)(iii), Qualified Financing Securities issued to the Holder (and its Affiliates) upon conversion of this Note shall be identical with respect to rights, preferences and designations as, and shall rank pari passu with, the Qualified Financing Securities issued to the investors in the Qualified Financing and the Holder shall otherwise be entitled to rights under the applicable Qualified Financing definitive documents, as the case may be, on parity with the investors thereunder.

**6.2    Conversion Procedures**

(a)    Subject to compliance with the procedures set forth in Section 6, the conversion rights set forth in this Note shall be exercised by the surrender of this Note by the Holder at any time during usual business hours on a Business Day, at the registered office of the Company (or such other office or agency of the Company as the Company and the Holder may agree), accompanied by a Conversion Notice specifying (i) that the Holder elects to convert the entire Note and (ii) subject to the transfer restrictions provided in Section 9.2, the name or names (with address) in which a certificate or certificates for the Relevant Securities are to be issued. This Note shall be delivered to the Company (together with the Conversion Notice) for cancellation and shall be cancelled by it. From the time of delivery of such certificate until the relevant register of the Company is duly updated to reflect such conversion, the Company shall hold this Note in trust for the Person(s) in whose name the Relevant Securities shall be issuable upon such conversion.

(b)    As soon as practicable and in any event within 5 Business Days after the date of the Conversion Notice, the Company shall:

    (i)    take all actions and execute all documents necessary to effect the issuance and to the extent the Relevant Securities are in the form of equity securities, registration of such Relevant Securities on the register of the Company (including, where applicable, giving all necessary instruction to the relevant share registry to effect such issuance) and deliver to the Holder certified copies of the register of members reflecting the Relevant Securities in the name of the Holder or its nominee or assignee,

4

(ii)  deliver to the Holder (x) where the Relevant Securities are in the form of equity securities, certificate(s) representing the number of validly issued, fully paid and non-assessable Relevant Securities calculated in accordance with Section 6, as the case may be and (y) where the Relevant Securities are in the form of equity-linked securities, certificate(s) representing the principal amount of Relevant Securities calculated in accordance with Section 6.1(a)(i) or 6.1(a)(ii), and

**6.3    Fractional Shares**

If the conversion of this Note would result in the issuance of any fractional share, the Company shall, at its option, round upwards and issue one additional share or pay to the Holder the portion of the principal amount convertible into such fractional share.

**6.4    Availability of Equity Securities**

The Company covenants that it will at all times reserve and maintain authority to issue the maximum number of Equity Securities issuable upon conversion of this Note. The Company covenants that all Equity Securities, when issued or delivered pursuant to Section 6.2, shall be duly and validly issued, shall rank *pari passu* with all other Equity Securities issued in the Qualified Financing, as the case may be, and where they are in the form of equity securities non-assessable, fully paid, free and clear of all Encumbrances, other than Encumbrances arising under the Transaction Documents or created, imposed or agreed in writing by the Holder.

**6.5    Reorganization, Reclassification**

Subject to the terms of the Purchase Agreement, in case of any merger, amalgamation, arrangement or consolidation of the Company or any capital reorganization, reclassification or other change of outstanding Ordinary Shares (each, a "**Transaction**"), the Company shall execute and deliver to the Holder at least 30 days prior to effecting such Transaction a certificate, signed by a Director of the Company, stating that the rights of the Holder shall continue to be recognized and not prejudiced by the Transaction and appropriate provision shall be made therefor in the agreement, if any, relating to such Transaction. The provisions of this Section 6.5 and any equivalent thereof in any such certificate similarly shall apply to successive transactions.

**6.6    Legend**

The Holder agrees to the imprinting, so long as required by law, of a legend on certificates representing all of the Holder's Relevant Securities issuable upon conversion of this Note in substantially the following form:

LEVIEW MOBILE LTD. (THE "COMPANY") IS A COMPANY INCORPORATED UNDER THE LAWS OF THE CAYMAN ISLANDS, AND THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL NOT BE SOLD, ASSIGNED, TRANSFERRED, EXCHANGED, MORTGAGED, PLEDGED OR OTHERWISE DISPOSED OF OR ENCUMBERED WITHOUT COMPLIANCE WITH THE ARTICLES OF ASSOCIATION OF THE COMPANY, DATED FEBRUARY 3, 2015, AMONG THE COMPANY AND THE SHAREHOLDERS OF THE COMPANY, AS AMENDED AND RESTATED FROM TIME TO TIME. COPIES OF SUCH ARTICLES OF ASSOCIATION ARE ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY.    THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES OR SECURITIES ISSUED UPON CONVERSION THEREOF ON THE

BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF SUCH ARTICLES OF ASSOCIATION.

## 7    COVENANTS

### 7.1    Covenants

The Company covenants to the Holder that, from the date hereof until all amounts owing under this Note have been paid in full or this Note has been redeemed or converted in full, the Company shall:

(a)    punctually pay the principal and/or any interest (if any) payable on this Note, and any other amount due and payable under this Note in the manner specified in this Note;

(b)    give written notice promptly to the Holder: (i) of any condition or event that constitutes an Event of Default (as defined below) or Potential Event of Default, (ii) that any Person has given any notice to a Group Member or taken any other action with respect to any claimed Event of Default or Potential Event of Default or (iii) of the occurrence of any event or change that has caused or evidences, either in any individual case or in the aggregate, a Material Adverse Change, by delivering a certificate specifying the nature and period of existence of such condition, event or change, or specifying the notice given or action taken by any such Person and the nature of such claimed Event of Default, Potential Event of Default, default, event or condition;

(c)    comply in all material respects with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, non-compliance with which could reasonably be expected to result in, individually or in the aggregate, a Material Adverse Change; and

(d)    execute and deliver, or cause to be executed and delivered, upon the request of the Holder and at the Company's expense, such additional documents, instruments and agreements as the Holder may reasonably determine to be necessary to carry out the provisions of this Note, the Purchase Agreement and the Share Mortgage and the transactions and actions contemplated hereunder and thereunder.

### 7.2    Other Corporate Actions

The Company covenants to the Holder that, from the date hereof until all amounts owing under this Note have been paid in full or all Notes have been redeemed in full, the Company shall not, and that the Company shall not allow any other Group Member to, take any of the actions, or take or omit to take any action that would have the effect of any of the actions set forth in Section 7 of the Purchase Agreement.

### 7.3    Taxation

All payments made by the Company under or in respect of the Notes, will be made without deduction or withholding for or on account of any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the PRC, Cayman Islands or Hong Kong or any authority thereof or therein having power to tax, unless deduction or withholding of such taxes, duties, assessments or governmental charges is compelled by law. In such event, the Company will pay such additional amounts as will result in the receipt by the Holder of the net amounts after such deduction or withholding equal to the amounts which would otherwise have been receivable by the Holder

6

the Holder had no such deduction or withholding been required except that no such additional amounts shall be payable:

(a) for or on account of:

    (i) any tax, duty, assessment or other governmental charge that would not have been imposed but for:

        (1) the existence of any present or former connection between the Holder or beneficial owner of such Note and the PRC, Cayman Islands or Hong Kong other than merely holding such Note or the receipt of payments thereunder, including, without limitation, such Holder or beneficial owner being or having been a national, domiciliary or resident of the PRC, Cayman Islands or Hong Kong or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

        (2) the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment became due and payable pursuant to the terms thereof or was made or duly provided for; or

        (3) the failure of the Holder or beneficial owner to comply with a timely request from the Company or any successor, addressed to the Holder or beneficial owner, as the case may be, to provide certification, information, documents or other evidence concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the PRC, Cayman Islands or Hong Kong, or to make any declaration or satisfy any other reporting requirement relating to such matters, if and to the extent that due and timely compliance with such request is required by statute, regulation or administrative practice of the PRC, Cayman Islands or Hong Kong to reduce or eliminate any withholding or deduction as to which additional amounts would have otherwise been payable to such Holder;

    (ii) any estate, inheritance, gift, sale, transfer, capital gains, excise, personal property or similar tax, assessment or other governmental charge;

    (iii) any tax, duty, assessment or other governmental charge that is payable otherwise than by withholding from payments under or with respect to the Notes; or

    (iv) any combination of taxes, duties, assessments or other governmental charges referred to in the preceding clauses (i), (ii) or (iii), or

(b) with respect to any payment on such Note to a Holder, if the Holder is a fiduciary, partnership or person other than the sole beneficial owner of that payment to the extent that such payment would be required to be included in the income under the laws of the PRC, Cayman Islands or Hong Kong, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that partnership or a beneficial owner who would not have been entitled to such additional amounts had that beneficiary, settlor, partner or beneficial owner been the Holder thereof.

References in this Note to principal shall be deemed also to refer to any additional amounts which may be payable under this Note.

**8      EVENTS OF DEFAULT**

**8.1    Events of Default**

The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)      the Company shall fail to pay debt that is due and payable or any other amount (if any) when due in accordance with the terms hereof;

(b)      the change of actual controller of the Company or LMIIT;

(c)      any representation, warranty, covenant, undertaking, certification or statement made by or on behalf of the Company in any Transaction Documents or in any certificate or other document delivered pursuant thereto shall have been materially incorrect, misleading or false in any material respect when made (a "**Breach**") and, if capable of being remedied, has not been remedied within thirty (30) days after being notified in writing of such Breach by the Holder; provided that such Breach has caused or is likely to cause a Material Adverse Change on the business of the Group as a whole or on the rights and liabilities of the Holder under the Transaction Documents;

(d)      any breach of the undertakings and covenants as specified in Sections 7.4, 7.5, 7.6 7.7 and 7.12 of the Purchase Agreement.

(e)      the Company, LMIIT or any of their respective significant or material subsidiaries shall commence any case, proceeding or other action (1) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to any Group Member, or seeking to adjudicate any Group Member bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to any Group Member or its debts, or (2) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for any Group Member or for all or any substantial part of its assets; (the "**Liquidation Event**") ;

(f)      the involuntary delisting of Leshi Internet Information Technology Corp., Beijing (乐视网信息技术（北京）有限公司, 300104.CH);

(g)      the Company shall fail to deliver the Relevant Securities when such Relevant Securities are required to be delivered following conversion of this Notes in accordance with the terms hereof.

**8.2    Notice by the Company**

Upon the occurrence of an Event of Default, the Company shall give the Holder prompt notice of the occurrence of such Event of Default.

**8.3    Consequence of Event of Default**

Upon the occurrence and during the continuance of an Event of Default, the Holder may firstly send a Default Notice and then call for redemption as specified in the redemption procedure under Section 5.2.

**9      REGISTRATION AND TRANSFER OF NOTE**

**9.1    Register**

The Company shall keep a register in which the Company shall provide for the registration and transfer of this Note, in which the Company shall record the name and address of the Holder and the name and address of each permitted transferee. The Holder shall notify the Company of any change of name or address and promptly after receiving such notification the Company shall record such information in such register.

**9.2    Transfer**

(a)    Notwithstanding anything to the contrary in the Purchase' Agreement, (a) this Note and all rights hereunder may only be transferred by the Holder in whole or in part, at any time and from time to time to one or more of its Affiliates to the extent permitted by applicable laws and regulations, and the Company shall assist the Holder in consummating any such transfer and (b) from and upon the occurrence of any of the events set out in Section 8.1(a), the Holder may at any time and from time to time transfer this Note in whole or in part to any Person without any restriction, to the extent permitted by applicable laws and regulations.

(b)    Any transfer in violation of this Section 9.2 shall be null and void. A transfer of this Note may be effected only by a surrender hereof to the Company and the issuance by the Company of a new Note or Notes in replacement thereof, which shall be registered by the Company in accordance with Section 9.1 once an executed copy of the replacement note has been executed by the transferee. The Company shall not be responsible for payment of any transfer taxes in connection with the transfer of this Note.

**10    DEFINITIONS**

**10.1    Definitions**

In this Note, unless the context otherwise requires the following words and expressions have the following meanings:

"**Affiliate**" of a Person (the "Subject Person") means any other Person that directly or indirectly Controls, is Controlled by or is under common Control with the Subject Person.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in the PRC, HKSAR or Cayman Islands are required or authorized by law or executive order to be closed or on which a tropical cyclone warning no. 8 or above or a "black" rainstorm warning signal is hoisted in HKSAR at any time between 9:00 a.m. and 5:00 p.m. Hong Kong time.

"**Cayman Co**" means Le Ltd., an exempted company incorporated and existing under the laws of the Cayman Islands with its company number 295848 and registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands.

"**Company**" means Leview Mobile Ltd., an exempted company incorporated and existing under the laws of the Cayman Islands with its company number 296318 and registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands.

"**Control**" of a Person means (a) ownership of more than 50% of the shares in issue or other equity interests or registered capital of such Person or (b) the power to direct the management or policies of such person, whether through the ownership of more than 50% of the voting power of such Person, through the power to appoint a majority of the members of

9

the board of directors or similar governing body of such Person, through contractual arrangements or otherwise.

"**Conversion Notice**" means a written notice in the form of Exhibit 2 attached hereto delivered by the Holder to the Company.

"**Default Notice**" has the meaning set forth in Section 5.2(a).

"**Director**" means a director of the Company (including any duly appointed alternate director).

"**Encumbrance**" means (a) any mortgage, charge (whether fixed or floating), pledge, lien (other than lien created by operation of law), hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, and (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person.

"**Equity Securities**" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital or joint venture or other ownership interest.

"**Event of Default**" has the meaning set forth in Section 8.1.

"**Group Member**" has the meaning set forth in the Purchase Agreement.

"**Holder**" means E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD which holds the Note.

"**Issuance Date**" means the date of this Note.

"**LMIIT**" means Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd.( 乐视 移动智能信息技术（北京）有限公司), a company incorporated under the laws of the PRC.

"**Liquidation Event**" means any event described in Section 8.1(e).

"**Material Adverse Change**" means any material adverse change in, and any change in circumstances that has a material adverse impact on the business, operations, results of operations, financial condition, prospects, assets or liabilities of the Group as a whole.

"**Maturity Date**" means the three years anniversary of the Issuance Date.

"**Note**" means this convertible note as a whole document.

"**Ordinary Shares**" means the ordinary shares having a par value of US$0.0001 per share in the capital of the Company.

"**Owner**" has the meaning set forth in the Purchase Agreement.

"**Person**" means any natural person, firm, company, governmental authority, joint venture, partnership, association or other entity (whether or not having separate legal personality).

"**Potential Event of Default**" means a condition or event that, after notice or lapse of time or both, would be reasonably expected to constitute an Event of Default.

"**Purchase Agreement**" has the meaning set forth in the recitals of this Note.

"**Qualified Financing**" means the first issue of preferred shares or equity-linked convertible debt securities of the Company after the Issuance Date but on or before the Maturity Date to institutional investors (other than the Holder) on terms and conditions that would be reasonably acceptable to prudent, sophisticated investors in light of the circumstances, or any other issuance of equity securities of the Company after Issuance Date.

"**Qualified Financing Securities**" means the securities to be issued by the Company in connection with the Qualified Financing.

"**Redemption Date**" has the meaning set forth in Section 5.3 (b).

"**Redemption Notice**" means a written notice in the form of Exhibit 1 attached hereto delivered by the Holder to the Company.

"**Redemption Price**" has the meaning set forth in Section 5.3 (c).

"**Redemption Procedure**" has the meaning set forth in Section 5.3.

"**Relevant Securities**" means Qualified Financing Securities or other securities into which this Note may be convertible.

"**Security**" has the meaning set forth in Section 3.

"**Share Mortgage**" has the meaning set forth in the recitals of this Note.

"**Transaction Documents**" has the meaning set forth in the recitals of this Note.

"**Valuation**" has the meaning set forth in Section 6.1(a).

**10.2    Headings**

Section headings in this Note are included herein for convenience of reference only and shall not constitute a part of this Note for any other purpose.

**11    GOVERNING LAW; JURISDICTION**

Any dispute or claim arising out of or in connection with or relating to this Note shall be settled in accordance with Section 14 (*Governing Law and Dispute Resolution*) of the Purchase Agreement.

**12    MISCELLANEOUS**

**12.1    Notices**

Any notice or communication provided for by this Note shall be in writing and shall be delivered in person, sent by facsimile, mailed first class with postage prepaid, or sent by internationally recognized overnight delivery service addressed to the Company or the Holder at its addresses or facsimile numbers specified in the Purchase Agreement, as to any such party, at such other address or facsimile number as may be designated by it in a notice to the other parties hereto.  All notices, demands and other communications shall be deemed to have been duly given when delivered by hand, if personally delivered; when delivered by courier, if delivered by commercial courier service; 5 Business Days after being

deposited in the mail, postage prepaid, if mailed; and when receipt is mechanically acknowledged, if faxed.

**12.2    Enforcement**

The Company agrees to pay on demand all of the losses, costs and expenses (including, without limitation, reasonable attorneys' fees, court costs and disbursements) that the Holder reasonably incurs in connection with enforcement and collection of this Note.

**12.3    No Set-off**

All payments on or in respect of this Note or the indebtedness evidenced hereby shall be made to the Holder without set-off counterclaim and free and clear of and without any deductions of any kind. The Company hereby waives diligence, demand, presentment, protest or notice of any kind.

**12.4    Waiver**

The Company waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note. Unless otherwise provided herein, the Company agrees that no omission or delay by the Holder in exercising any right under this Note shall operate as a waiver, and the single or partial exercise of any such right or rights shall not preclude any other further exercise of such right or rights.

**12.5    Amendment**

This Note may not be amended or modified except by a written agreement executed by the Company and the Holder.

**12.6    Language**

This Note is drawn up in the English language. If this Note is translated into any language other than English, the English language text shall prevail.

**12.7    Replacement**

Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Note, the Company will issue a replacement note to the Holder of like tenor, and the Holder will reimburse the Company for its reasonable out-of-pocket expenses incurred in connection with such issuance.

**In witness whereof,** the undersigned has duly executed this Note on the date first above written.

Executed by

LEVIEW MOBILE LTD.

*For and on behalf of*

*Leview    Mobile    Ltd.*

By: _____

Name: ................................................

*Authorized  Signature(s)*

Title: Authorized Signatory

AGREED AND ACCEPTED:

*For and on behalf of*

*E-Town International Holding (Hong Kong) Co., Limited*

E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD.（亦庄国际控股（香港）有限公司）

By ................................................

*Authorized  Signature(s)*

Name:

Title: Authorized Signatory

# EXHIBIT 1
## FORM OF REDEMPTION NOTICE

[date]

**To:**   Leview Mobile Ltd.
      *[Address]*

**Re:**   Redemption Notice in relation to the Convertible Note No.[•] of Leview Mobile Ltd. (the "**Note**"), dated as of [•], 2015 with an aggregate outstanding principal amount of US$[•]. Capitalized terms used herein and not otherwise defined shall have their respective meanings as set forth in the Note.

Dear Sirs,

We, the Holder, hereby deliver this Redemption Notice pursuant to Section 5.1/5.2/5.3 of the Note and hereby notify the Company of the exercise of the redemption right set forth in Section 5.1/5.2/5.3 of the Note to redeem [all of the outstanding principal amount of the Note]/[such principal amount of the Note equal to US$ [•]] [together with accrued and unpaid interest thereon] at the applicable Redemption Price calculated pursuant to Section 5.3(c)(the "**Redemption Price**").

Aggregate outstanding principal amount to be redeemed: US$ [•]

Aggregate accrued but unpaid Interest with respect to the principal amount to be redeemed, if any: US$ [•]

Redemption Date: [•]

Please kindly transfer to us the Redemption Price calculated pursuant to Section 5.3(c) in accordance with the provisions of Section 5.1/5.2/5.3 of the Note.

Very truly yours,
[Holder]

By: _____
Name: _____
Title: _____

# EXHIBIT 2
## FORM OF CONVERSION NOTICE

[date]

**To:**    Leview Mobile Ltd./Le Ltd.
      ***[Address]***

**Re:**    Conversion Notice in relation to the Convertible Note No. [●] of Leview Mobile Ltd. (the
      "**Note**"), dated as of [●] 2015 with an aggregate outstanding principal amount of US$[●].
      Capitalized terms used herein and not otherwise defined shall have their respective
      meanings as set forth in the Note.

Dear Sirs,

We, the Holder, hereby deliver this Conversion Notice pursuant to Section 6.2 of the Note and
hereby notify the Company of the exercise of the conversion right set forth in Section 6.1 of the Note
to convert all of the outstanding amount of the Note to the Relevant Securities at the applicable
Conversion Price.

a) Aggregate outstanding principal amount to be converted: US$ [●]

b) Aggregate accrued but unpaid Interest with respect to the principal amount to be converted, if
any: US$ [●]

c) Applicable Conversion Price:  US$[●]

d) Total Relevant Securities to be issued upon conversion: [●] Qualified Financing
Securities/Ordinary Shares (which equals (a)/(c))

This is an Conversion to:  Leview Mobile Ltd. _____ or Le Ltd. _____

Please kindly issue to us such number of Relevant Securities issuable upon conversion of the Note
in accordance with this Conversion Notice and the provisions of Section 6.1 of the Note to the
following entity(ies):

(1)    Name: [       ]
      Address: [       ]
      Number of Relevant Securities to be issued: [ ]

(2)    [Repeat if necessary]

[Please kindly pay to us the aggregate accrued but unpaid interest of US$ [●] in accordance with this
Conversion Notice and the provision of the Note by remittance to the bank account set forth below:

Bank Account: [●]

Very truly yours,
[Holder]

By:        _____
Name:  _____
Title:    _____

**Execution Version**

**CONVERTIBLE NOTE PURCHASE AGREEMENT**

among

**E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD**

**LEVIEW MOBILE LTD.,**

**LE LTD.,**

**YUETING JIA,**

and

**LESAI MOBILE TECHNOLOGY (BEIJING) CO., LTD.**

**Dated May 5, 2015**

# TABLE OF CONTENTS

SECTION 1 INTERPRETATION ................................................................................. 3

SECTION 2 SALE AND PURCHASE OF THE CONVERTIBLE NOTE ....................................... 9

SECTION 3 CONDITIONS PRECEDENT TO COMPLETION ............................................... 9

SECTION 4 COMPLETION ACTIONS ....................................................................... 12

SECTION 5 OBLIGATIONS OF THE COMPANY, THE OWNER AND ................................... 13

THE INVESTOR BETWEEN EXECUTION AND COMPLETION ........................................... 13

SECTION 6 REPRESENTATIONS AND WARRANTIES .................................................... 13

SECTION 7 COVENANTS, UNDERTAKINGS AND AGREEMENTS ..................................... 14

SECTION 8 CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS ........................... 20

SECTION 9 FEES AND EXPENSES ........................................................................... 21

SECTION 10 INDEMNIFICATION ............................................................................ 21

SECTION 11 TERMINATION .................................................................................. 22

SECTION 12 NOTICES ......................................................................................... 24

SECTION 13 MISCELLANEOUS .............................................................................. 24

SECTION 14 GOVERNING LAW AND DISPUTE RESOLUTION ........................................ 26

## SCHEDULES

SCHEDULE 1  CONSIDERATION ALLOCATION

SCHEDULE 2  SHAREHOLDING STRUCTURE OF THE GROUP

SCHEDULE 3  COLLECTIVE WARRANTIES

SCHEDULE 4  INVESTOR WARRANTIES

## EXHIBITS

EXHIBIT A  FORM OF CONVERTIBLE NOTE

EXHIBIT B  FORM OF SHARE MORTGAGE

**CONVERTIBLE NOTE PURCHASE AGREEMENT** (this "Agreement") made on
_____, 2015,
**AMONG:**

(1)     **LEVIEW MOBILE LTD.**, an exempted company incorporated and existing
under the laws of the Cayman Islands with its company number 296318 and
registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana
Bay, Grand Cayman, Cayman Islands (the "Company");

(2)     **LE LTD.**, an exempted company incorporated and existing under the laws of
the Cayman Islands with its company number 295848 and registered office at
Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman,
Cayman Islands (the "Cayman Co");

(3)     **YUETING JIA (贾跃亭)**, holder of PRC Identification Card Number of
14262319731215081X, Linfen City, Shanxi Province, PRC (the "Owner");

(4)     **LESAI MOBILE TECHNOLOGY (BEIJING) CO., LTD. (乐赛移动科技
（北京）有限公司)**, a wholly foreign-owned enterprise organized and existing
under the laws of China with its registered office at 16/F, Leshi Building, No.
105, Yaojiayuan Road, Chaoyang District, Beijing, 100025, PRC (the "WFOE");
and

(5)     **E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD.（亦
庄国际控股（香港）有限公司）**, an exempted company incorporated and
existing under the laws of Hongkong with its registered office at
Room B 21/F Legend Tower 7 Shing Yip Street, Kwun Tong, Kowloon, Hong
Kong (the "Investor").

**RECITALS:**

Upon the terms and conditions set forth in this Agreement, the Company intends to
issue and sell to the Investor, and the Investor intends to acquire, that amount of
certain convertible redeemable note in the form of Exhibit A (the "Convertible
Note"), as indicated opposite the Investor's name in Schedule 1 attached hereto.

**AGREEMENT:**

**SECTION 1**
**INTERPRETATION**

1.1     Definitions.  In this Agreement, unless the context otherwise requires the
following words and expressions have the following meanings:

"Accounting Standards" means the International Financial Reporting Standards
(IFRS) or the Accounting Principles Generally Accepted in China (Chinese
GAAP) adopted by the Company and applied on a consistent basis.

3

"Affiliate" of a Person (the "Subject Person") means (a) in the case of a Person other than a natural person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with the Subject Person and (b) in the case of a natural person, any other Person that directly or indirectly is Controlled by the Subject Person or is a Relative of the Subject Person. In the case of an Investor, the term "Affiliate" includes (v) any shareholder of the Investor, (w) any of such shareholder's general partners or limited partners, (x) the fund manager managing such shareholder (and general partners, limited partners and officers thereof) and (y) trusts controlled by or for the benefit of any such individuals referred to in (v), (w) or (x).

"Basic Documents" means this Agreement, the Convertible Note, the Company Charter Documents and the Onshore Contracts.

"Big Four Accounting Firms" means Deloitte Touche Tohmatsu Limited, PricewaterhouseCoopers, Ernst & Young Global Limited and Klynveld Peat Marwick Goerdeler.

"Board" means the board of directors of the Company as from time to time constituted.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the PRC, HKSAR or Cayman Islands are required or authorized by law or executive order to be closed or on which a tropical cyclone warning no. 8 or above or a "black" rainstorm warning signal is hoisted in HKSAR at any time between 9:00 a.m. and 5:00 p.m. Hong Kong time.

"BVI Co" means Lele Holding Ltd., a business company incorporated and existing under the laws of the British Virgin Islands with its company number 1859050 and registered office at P.O. Box 905, Quastisky Building, Road Town, British Virgin Islands.

"China" or the "PRC" means the People's Republic of China and for the purpose of this Agreement shall exclude HKSAR, Taiwan and the Macau Special Administrative Region.

"Collective Warranties" means the representations, warranties and undertakings of the Company and the Owner set forth in Schedule 3.

"Company Account" means a bank account opened by the Company outside of HKSAR with a bank approved by the Investor and having a mandate requiring the signatures of both a representative of the Investor and the Company to withdraw, transfer or pay any funds from such account.

"Company Charter Documents" means the Memorandum of Association and Articles of Association of the Company.

"Completion Date" means the date on which the closing of the purchase of the Convertible Note occurs as contemplated under Section 2.1.

4

"Control" of a Person means (a) ownership of more than 50% of the shares in issue or other equity interests or registered capital of such Person or (b) the power to direct the management or policies of such Person, whether through the ownership of more than 50% of the voting power of such Person, through the power to appoint a majority of the members of the board of directors or similar governing body of such Person, through contractual arrangements or otherwise.

"Encumbrance" means (a) any mortgage, charge (whether fixed or floating), pledge, lien (other than lien created by operation of law), hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, and (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person.

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital or joint venture or other ownership interest.

"Existing Business" means the business of researching, designing, developing, manufacturing, selling and marketing of mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Governmental Authority" means any nation or government or any province or state or any other political subdivision thereof; any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality or any political subdivision thereof, any court, tribunal or arbitrator, the governing body of any securities exchange and any other self-regulatory organization.

"Group" means collectively the BVI Co, the Cayman Co, the Company, the HK Co, the WFOE, the Onshore Companies and any other Person in which the BVI Co, the Cayman Co, the Company, the HK Co or the WFOE directly or indirectly owns a majority interest and "Group Member" means any of them.

"HK Co" means Leview Mobile HK Limited, a limited company incorporated and existing under the laws of HKSAR with its company number 2205943 and registered office at RM 504, 5/F Valley Centre, No. 80-82 Morrison Hill Road, Wanchai, HKSAR.

"HKSAR" means the Hong Kong Special Administrative Region of the PRC.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Investor Warranties" means the representations, warranties and undertakings of the Investor set forth in Schedule 4.

"Lefeng Mobile" means Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司), a company incorporated under the laws of the PRC.

"Leview Holding" means Leview Holding (Beijing) Co., Ltd. (乐视控股（北京）有限公司), a company incorporated under the laws of the PRC.

"Mortgaged Shares" means (i) 4,300 Ordinary Shares owned by the Cayman Co in the Company, and (ii) any shares acquired in respect of Mortgaged Shares by reason of a stock split, stock dividend, reclassification or otherwise.

"Onshore Companies" means Beijing Pala Culture & Media Co., Ltd. (北京百乐文化传媒有限公司), Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司) and Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd. (乐视移动智能信息技术（北京）有限公司), which incorporated under the laws of the PRC, and "Onshore Company" means any of them.

"Onshore Contracts" means agreements entered into between WFOE, Lefeng Mobile, the Owner or any of their Affiliates, prior to or simultaneously with the Completion Date, including an exclusive consulting and services agreement, an exclusive call option agreement, an equity pledge agreement, a voting right proxy agreement and a business operation agreement, each in the form and the substance reasonably satisfactory to the Investor.

"Ordinary Shares" means the ordinary shares having a par value of US$0.0001 per share in the capital of the Company.

"Party" or "Parties" means any signatory or the signatories to this Agreement and any Person who subsequently becomes a party to this Agreement pursuant to the terms and conditions hereof.

"Person" means any natural person, firm, company, governmental authority, joint venture, partnership, association or other entity (whether or not having separate legal personality).

"Related Party" means (a) any shareholder of any Group Member, (b) any director of any Group Member, (c) any officer of any Group Member, (d) any Relative of a shareholder, director or officer of any Group Member, (e) any Person in which any Group Member, any shareholder, director or officer of any Group Member has any interest other than a passive shareholding of less than five percent in a publicly listed company, or over which a Related Party exercises Control or significant influence through contractual arrangements, voting, management or directorship position or ownership, and (f) any other Affiliate of any Group Member.

"Relative" of a natural person means the spouse of such person, and any parent, grandparent, child, grandchild, sibling, uncle, aunt, nephew, or niece of such person or such person's spouse.

"Restructuring" means the restructuring the result of which (i) is the corporate structure set forth in Schedule 2A hereof as of the date of this Agreement and as of the Completion Date respectively; and (ii) will be the corporate structure set forth in Schedule 2B hereof within the timeframe after the Completion Date agreed upon by the Investor, the Owner and the Company in this Agreement.

"RMB" means the renminbi yuan, the lawful currency of the PRC.

"Share Mortgage" means the share mortgage agreement to be entered into by and between Cayman Co and the Investor within 30 days following the Completion Date, pursuant to which the Mortgaged Shares shall be mortgaged to the Investor for the benefit of the Investor to secure the payment and other obligations of the Company under the Convertible Note.

"Tax" or "Taxes" means all forms of taxation, estate, duties, deductions, withholdings, duties, imposts, levies, fees, charges, social security contributions and rates imposed, levied, collected, withheld or assessed by any local, municipal, regional, urban, governmental, state, national or other body in the PRC or elsewhere having competent jurisdiction and any interest, additional taxation, penalty, surcharge or fine in connection therewith.

"US$" means United States Dollars, the lawful currency of the United States of America.

"Warranties" means the Collective Warranties and the Investor Warranties.

1.2    Terms Defined Elsewhere in this Agreement.  The following terms are defined in this Agreement as follows:

| | |
|---|---|
| "Agreement" | Preamble |
| "Company" | Preamble |
| "Completion" | Section 2.1 |
| "Compliance Certificate" | Section 3.1(d) |
| "Confidential Information" | Section 8.1 |
| "Consideration" | Section 2.1 |
| "Convertible Note" | Recitals |

| | |
|---|---|
| "Disposed Shares" | Section 7.4(a) |
| "Disposition" | Section 7.4(a) |
| "Disposition Notice" | Section 7.4(a) |
| "Dispute" | Section 14.2 |
| "Election Period" | Section 7.3(d) |
| "Financing Terms" | Section 8.1 |
| "HKIAC" | Section 14.2 |
| "Indemnified Party" | Section 10.1 |
| "Indemnifying Party" | Section 10.1 |
| "Investor" | Preamble |
| "Losses" | Section 10.1 |
| "New Securities" | Section 7.3(a) |
| "Owner" | Preamble |
| "Preemptive Right" | Section 7.3(a) |
| "Pro Rata Share" | Section 7.3(b) |
| "Representatives" | Section 8.1 |
| "Tag-along Right" | Section 7.4(b) |
| "Tag-along Shares" | Section 7.4(b) |
| "Undertaking" | Section4.2(b) |
| "WFOE" | Preamble |

1.3    Interpretation.

(a)    Directly or Indirectly.  The phrase "directly or indirectly" means directly, or indirectly through one or more intermediate Persons or through contractual or other arrangements, and "direct or indirect" has the correlative meaning.

(b)    Gender and Number.  Unless the context otherwise requires, all words (whether gender-specific or gender neutral) shall be deemed to include each of the masculine, feminine and neuter genders, and words importing the singular include the plural and vice versa.

(c)    Headings.  Headings are included for convenience only and shall not affect the construction of any provision of this Agreement.

(d)    Include not Limiting.  "Include," "including," "are inclusive of" and similar expressions are not expressions of limitation and shall be construed as if followed by the words "without limitation."

(e)    Law.  References to "law" shall include all applicable laws, regulations, rules and orders of any Governmental Authority,  securities exchange or other self-regulating body, any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment; and "lawful" shall be construed accordingly.

8

(f) <u>References to Documents</u>. References to this Agreement include the Schedules and Exhibits, which form an integral part hereof. A reference to any Section, Schedule or Exhibit is, unless otherwise specified, to such Section of, or Schedule or Exhibit to this Agreement. The words "<u>hereof</u>," "<u>hereunder</u>" and "<u>hereto</u>," and words of like import, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular Section hereof or Schedule or Exhibit hereto. A reference to any document (including this Agreement) is to that document as amended, consolidated, supplemented, novated or replaced from time to time.

(g) <u>Time</u>. If a period of time is specified and dates from a given day or the day of a given act or event, such period shall be calculated exclusive of that day.

(h) <u>Writing</u>. References to writing and written include any mode of reproducing words in a legible and non-transitory form including emails and faxes.

(i) <u>Language</u>. This Agreement is drawn up in the English language. If this Agreement is translated into any language other than English, the English language text shall prevail.

## SECTION 2
## SALE AND PURCHASE OF THE CONVERTIBLE NOTE

2.1 <u>Sale and Purchase</u>. Upon the terms and subject to the applicable conditions of this Agreement, the Company shall issue and sell to the Investor, and the Investor shall purchase from the Company, a Convertible Note in the principal amount as indicated opposite the Investor's name in <u>Schedule 1</u> attached hereto (the "<u>Consideration</u>") on the Completion Date (the "<u>Completion</u>").

2.2 <u>Consideration</u>. Subject to Section 9 and the other terms and conditions of this Agreement, the Investor shall pay a Consideration payable at Completion, by means of wire transfer of immediately available funds to the Company Account.

2.3 <u>Use of Proceeds</u>. The Company shall use the Consideration received from the Investor on the Completion Date to fund (a) the expansion of the business of the Company in accordance with the business plan approved by the Board, and (b) other uses approved by the Board.

## SECTION 3
## CONDITIONS PRECEDENT TO COMPLETION

3.1 <u>Conditions Precedent to Obligations of Investor at Completion</u>. The obligation of the Investor to complete the purchase of the Convertible Note at the Completion is subject to the fulfillment, prior to or simultaneously with the Completion, of the following conditions, any one or more of which may be waived by the Investor in writing, *provided* that if any of the following conditions is waived by the Investor on or before the Completion, the Company,

the Owner and the WFOE shall cause such conditions to be fulfilled promptly after the Completion if requested by the Investor in writing:

(a)      the Collective Warranties remaining true and correct in all material respects on the Completion Date as provided in Section 6.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Completion Date;

(b)      each of the Group Members, the Onshore Companies and the Owner having performed and complied in all material respects with all of its agreements and obligations contained in the Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Completion;

(c)      the Investor having completed its business, legal and financial due diligence review of the Company and its subsidiaries and the results of that review shall be satisfactory to the Investor.

(d)      each of the Group Members and the Onshore Companies having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of the Basic Documents to which it is a party, and the transactions contemplated hereby and thereby, and having provided complete and correct copies of all resolutions (and all attachments thereto) described below to the Investor (certified by the Compliance Certificate to be true, complete and correct copies as of the Completion Date) which corporate procedures shall include without limitation:

       (i)      approval by the Board and the shareholders of the Company, each to the extent required by the applicable law and Company Charter Documents, of the following:

             (1)      the authorization and issuance to the Investor of a Convertible Note in a principal amount equal to the Consideration; and

             (2)      the execution, delivery and performance by the Company of each Basic Document to which it is a party, and all the transactions contemplated by such Basic Documents;

       (ii)      approval by the boards of directors and, if required, the shareholders of each other Group Member and the Onshore Companies, to the extent required by the applicable law and the constitutional documents of the relevant entity, of the execution, delivery and performance by such entity, of each Basic Document to which it is a party, and all the transactions contemplated by such Basic Documents to which it is a party.

(e)    all consents and approvals of, notices to and filings or registrations with any Governmental Authority or any other Person required to consummate the transactions contemplated under this Agreement and the other Basic Documents (to the extent that such transactions are to be completed on or prior to the Completion Date), shall have been obtained or made (including all required approvals for the Restructuring and all required approvals and registration of the establishment of the WFOE and the direct or indirect ownership by any PRC residents of an interest in the Company including registrations pursuant to the Notice on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Corporate Financing and Roundtrip Investment through Offshore Special Purpose Vehicles issued by State Administration of Foreign Exchange on July 4, 2014 and any subsequent similar rules, amendments or supplements of the PRC) and copies thereof having been provided to the Investor;

(f)    there being no Governmental Authority or other Person that has:

   (i)    instituted or threatened in writing any legal, arbitral or administrative proceedings against the Owner, any Group Member, or the Onshore Companies to restrain, prohibit or otherwise challenge the purchase of the Convertible Note by the Investor and the mortgage of the Mortgaged Shares to the Investor or any of the other transactions contemplated under the Basic Documents (including without limitation, the Restructuring); or

   (ii)    proposed or enacted any statute or regulation which would prohibit, materially restrict or materially delay implementation of the transactions contemplated under the Basic Documents (including without limitation, the Restructuring), or the operation of the Group as a whole after the Completion as contemplated in the Basic Documents;

(g)    the Owner, the WFOE and the relevant Onshore Companies having entered into the Onshore Contracts to which it/he/she is a party, each in form and substance reasonably satisfactory to the Investor;

(h)    the Company having delivered to the Investor a certificate, dated the Completion Date and signed by an authorized signatory of the Company (the "Compliance Certificate"), certifying that the conditions set forth in this Section 3.1 to be satisfied by the Group Members, have been satisfied;

11

3.2    Conditions Precedent to Obligations of Company at Completion. The Company's obligation to complete the allotment and issuance of the Convertible Note at the Completion is subject to the fulfillment, prior to or simultaneously with the Completion, of the following conditions, any one or more of which may be waived by the Company:

(a)    the Investor Warranties remaining true and correct in all material respects on the Completion Date as provided in Section 6.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Completion Date;

(b)    the Investor having performed and complied in all material respects with all of its agreements and obligations contained in this Agreement and the other Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Completion;

(c)    the Investor having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party, and the transactions contemplated hereby and thereby; and

(d)    each of the Basic Documents to which an Investor is a party having been executed by the Investor and delivered to the Company.

**SECTION 4**
**COMPLETION ACTIONS**

4.1    Time and Place of Completion. The Completion shall take place at 4:00 p.m. Beijing time on the third Business Day after all the conditions precedent set forth in Sections 3.1 and 3.2 (other than those conditions precedent that by their terms cannot be fulfilled until the Completion) are satisfied or waived or, at such other time and place as the Parties may agree.

4.2    Actions at Completion. At the Completion,

(a)    the Company shall deliver to the Investor a duly authorized and executed Convertible Note in a principal amount equal to the Consideration, payable to the order of the Investor and registered in the name of the Investor;

(b)    subject to Section 9.1, the Investor shall pay the Consideration by wire transfer of immediately available funds to the Company Account.

## SECTION 5
## OBLIGATIONS OF THE COMPANY, THE OWNER AND
## THE INVESTOR BETWEEN EXECUTION AND COMPLETION

5.1    <u>Notices of Breaches by the Company, the WFOE and the Owner</u>. From the date hereof until the Completion Date, except as disclosed in the Basic Documents or otherwise as contemplated thereunder, the Company and the WFOE shall, and the Company and the Owner shall cause each of the other Group Members and Onshore Companies to, conduct its respective business in a manner so as to ensure that the Collective Warranties continue to be true and correct on and as of the Completion Date as if made on and as of Completion Date. The Company, the WFOE and the Owner shall give the Investor prompt notice of any event, condition or circumstance occurring prior to the Completion Date that would constitute a breach of any Collective Warranty if such Collective Warranty were made as at any date between the date hereof and the Completion Date, or that would constitute a breach of any terms and conditions contained in this Agreement.

5.2    <u>Business Operation</u>. From the date hereof until the Completion Date, the Company and the Owner shall, and shall cause each other Group Member where applicable to, (i) carry on their respective business in the ordinary course; (ii) comply in all material respects with all applicable law and other requirements relating to the operation of their respective businesses; and (iii) with no less diligence and efforts that would be applied in the absence of the transactions contemplated hereunder.

5.3    <u>Notifications</u>. Until the Completion, each Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 3 becoming incapable of being satisfied.

5.4    <u>Further Action</u>. The Parties shall use all reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

## SECTION 6
## REPRESENTATIONS AND WARRANTIES

6.1    <u>Collective Warranties</u>. The Company, the WFOE and the Owner, severally and jointly, represent, warrant and undertake to the Investor in the terms of the Collective Warranties and acknowledge that the Investor in entering into this Agreement is relying on such Collective Warranties.

6.2 <u>Investor Warranties</u>. The Investor represents, warrants and undertakes to the Company in the terms of the Investor Warranties and acknowledges that the Company in entering into this Agreement is relying on the Investor Warranties.

6.3 <u>Knowledge of Claims</u>. No investigation by or on behalf of any Party shall prejudice any claim made by such Party under the indemnity contained in Section 10 or operate to reduce any amount recoverable thereunder, provided that a Party shall have no liability for (i) any breach of or inaccuracy in the Warranties made by such Party to the extent the Indemnified Party has actual knowledge, at or prior to the Completion of such breach or inaccuracy, (ii) any breach of or failure to perform any covenant or obligations of such Party which are required to be performed at or prior to the Completion hereunder, to the extent that the Indemnified Party has actual knowledge, at or prior to the Completion of such breach or failure.

6.4 <u>Separate and Independent</u>. The Collective Warranties shall be separate and independent and save as expressly provided shall not be limited by reference to any other paragraph or anything in this Agreement or the Schedules.

6.5 <u>Bring-Down to Completion</u>. The Warranties shall be deemed to be repeated as at the Completion Date as if they were made on and as of the Completion Date, other than such Warranties as are made specifically as of another specified date, which shall be true and correct as of such date, and all references therein to the date of this Agreement were references to the Completion Date.

6.6 <u>Survival of Warranties</u>. All of the Warranties shall survive the Completion for a period of 18 months after the Completion, *provided* that the warranties set forth in Section 2, 10 and 12 of <u>Schedule 3</u> and Section 2 and 4 of <u>Schedule 4</u> should survive indefinitely.

## SECTION 7
## COVENANTS, UNDERTAKINGS AND AGREEMENTS

7.1 <u>Delivery of Share Mortgage</u>. Within 30 days following the Completion Date, the Investor and the Cayman Co shall execute a Share Mortgage, which is substantially consistent with the form attached as <u>Exhibit B</u> hereof, and the Company shall deliver to the Investor a copy of the Register of Mortgages and Charges of the Company certified by the registered office provider of the Company which evidences the mortgage of the Mortgaged Shares to the Investor and all the other documentation required to be delivered to the Investor pursuant to the terms of the Share Mortgage.

7.2 <u>Conversion</u>.

(a) After the Completion Date, the Investor shall have the right to convert the Convertible Notes into preferred shares of the Company, the Cayman Co, or the Onshore Companies(depends on the body of Qualified Financing) on the Qualified Financing as defined in the Convertible Note in accordance with the terms and conditions of the Convertible Note.

14

(b)    The Owner and the Cayman Co undertake, and shall procure to the extent permitted by law , that the Investor shall enjoy the same rights set forth under this Section 7 in the event that the Convertible Note held by the Investor is converted to the Cayman Co shares or Onshore Companies shares, at the election of the Investor, as specified under Section 6 of the Convertible Note.

7.3    Preemptive Right.

(a)    The Company hereby grants to the Investor the right of first refusal to purchase the Investor's Pro Rata Share (as defined below), of all (or any part) of any Equity Securities (the "New Securities") that the Company may from time to time issue after the Completion Date (the "Preemptive Right").

(b)    An Investor's "Pro Rata Share" for purposes of the Preemptive Right is the ratio of (a) the number of Ordinary Shares held by the Investor on or after the conversion, or, prior to the conversion, the number of Ordinary Shares that would have been held by the Investor as if the Convertible Note held by the Investor were converted into preferred shares, in each case, as if on a fully-converted basis immediately prior to the issuance of the New Securities (assuming full conversion of all preferred shares and full conversion or exercise of all outstanding convertible securities, rights, options and warrants held by the Investor), to (b) the total number of Ordinary Shares (including preferred shares on an as-converted basis and assuming that all outstanding options or warrants) then outstanding immediately prior to the issuance of New Securities (assuming full conversion of preferred shares and full conversion or exercise of all outstanding convertible securities, rights, options and warrants).

(c)    In the event the Company proposes to undertake an issuance of New Securities, it shall give the Investor written notice of its intention, describing the type of New Securities, and their price and the terms upon which the Company proposes to issue the same. The Investor shall have 10 days after any such notice is mailed or delivered to agree to purchase the Investor's Pro Rata Share of such New Securities and to indicate whether the Investor desires to exercise its Preemptive Right for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.

(d)    In the event the Investor fails to exercise fully the Preemptive Right, if any within said 10 day-period (the "Election Period"), the Company shall have 120 days thereafter to sell or enter into an agreement (pursuant to which the sale of New Securities covered thereby shall be closed, if at all, within 120 days from the date of said agreement) to sell that portion of the New Securities with respect to which the Investor's Preemptive Right set forth in this Section 7.3(a) was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Company's notice to the Investor delivered pursuant to

Section 7.3(c). In the event the Company has not sold within such 120-day period following the Election Period, or such 120-day period following the date of said agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investor in the manner provided in this Section 7.3.

7.4    <u>Tag-along Right</u>.

(a)    Following any conversion of the Convertible Notes held by the Investor, if any of the shares (the "<u>Disposed Shares</u>") in the Company held by the Owner is to be sold to any third party (the "<u>Disposition</u>"), the Investor may elect to exercise its tag-along right (the "<u>Tag-along Right</u>") and participate on a pro-rata basis in the Disposition on the same terms and conditions as set forth in the written notice (the "<u>Disposition Notice</u>") to the Company and the Investor sent by the Owner, which notice shall state:(i) the name of the Owner, (ii) the name and address of the proposed purchaser, (iii) the number of shares to be disposed; (iv) the amount and form of the proposed consideration for the Disposition, (v) any other material business relations between the Owner and the purchaser, and (vi) the other terms and conditions of the proposed Disposition. In the event that the proposed consideration for the Disposition includes consideration other than cash, the Disposition Notice shall include a calculation of then fair market value of such consideration and an explanation of the basis for such calculation.

(b)    To exercise its Tag-along Right, the Investor must give the Owner, as applicable, written notice to that effect within 40 days after delivery of the Disposition Notice, and upon giving such notice the Investor shall be deemed to have effectively exercised the Tag-along Right. A Investor may sell all or any part of that number of Shares (the "<u>Tag-along Shares</u>") held by the Investor equal to the product obtained by multiplying (x) the number of Disposed Shares by (y) a fraction, the numerator of which is the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) at the time owned by the Investor and the denominator of which is the aggregate number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) owned by the Investor.

7.5    <u>Information Rights</u>.    After the Completion Date, the Company shall regularly deliver to the Investor information relating to the daily business operation of the Company, including but not limited, to the following documents or reports:

(a)    within 90 days after the end of each fiscal year of the Company, a consolidated income statement and statement of cash flows for the Company for such fiscal year and a consolidated balance sheet for the Company as of the end of the fiscal year, audited and certified by one of the Big Four Accounting Firms accepted by the Board, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period;

(b)    (i) within 45 days after the end of each quarter, a consolidated income statement and statement of cash flows for the Company for such quarter and a consolidated balance sheet for the Company as of the end of such quarter, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period, and (ii) promptly following the end of each quarter an up-to-date capitalization table, and both items (i) and (ii) shall be certified by the chief financial officer or the financial controller of the Company;

(c)    within 20 days of the end of each month, a consolidated unaudited income statement and statement of cash flows for such month and a consolidated balance sheet for the Company as of the end of such month, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period (except for customary year-end adjustments and except for the absence of notes) and certified by the chief financial officer of the Company;

(d)    a comprehensive operating budget forecasting the Company's revenues, expenses, and cash position for the following fiscal year within 30 days prior to the end of each fiscal year, in reasonable detail on a monthly basis, broken down by different operating subsidiaries and associated companies; and

(e)    as soon as practicable, any other information reasonably determined by the Board or reasonably requested by the Investor.

7.6    Inspection Rights.  After the Completion Date, the Company and the WFOE shall, and the Company and the Owner shall cause each of the other Group Members to, give to the Investor and its Representatives reasonable access, upon reasonable prior notice, to the premises and the books and records, and instruct its officers and employees to furnish all information and explanations to the Investor or any such Persons as the Investor may reasonably request during normal business hours, under the supervision of a Company officer and in such a manner as not to interfere with the normal business operations of the Company or any other Group Member.

7.7    Appointment of Board Observer.

From the Completion Date until the occurrence of any Qualified Financing, the Investor shall be entitled to designate one individual that is an employee or officer of the Investor or any of its Affiliates (the "Observer") to attend all meetings of the Board and all committees thereof (whether in person, by telephone or other) in a non-voting observer capacity.

7.8    Reserved Matters.  From the Completion Date until the occurrence of the Qualified Financing, the following matters in connection with the Company shall be subject to the Investor's prior written consent:

(a)    any amendment or modification to the Company Charter Documents;

(b)    any material change to the nature or scope of the business of the
Company;

(c)    any material merger, amalgamation, scheme or arrangement,
reorganization, restructuring, or consolidation of the Company or any of
its subsidiaries;

(d)    any liquidation, winding up, dissolution, disposition, reorganization, or
arrangement of the Company or any of its subsidiaries;

(e)    any change to the size or composition of the board of directors of the
Company or any of its subsidiaries;

(f)    any change to the accounting policies or the auditor of the Company not
in compliance with the International Financial Reporting Standards,
Generally Accepted Accounting Principles or Hong Kong Financial
Reporting Standards;

(g)    appointment or removal of any key employees of the Company;

(h)    determination or adjustment of the pricing basis of transactions between
the Company and any of its related parties;

(i)    any related party transaction entered into by the Company in excess of
US$10 million (or its equivalent in other currencies) individually or in
excess of US$90 million in the aggregate over any 12 consecutive
calendar months period; and

(j)    any other material matters of the Company.

7.9    Dividend. After the full conversion of the Convertible Note held by the Investor into preferred shares upon occurrence of the initial Qualified Financing, the Investor shall be entitled to participate any dividend distribution declared by the Company from time to time.

7.10    Business Plan. The Company shall formulate and implement a five-year business operation plan, which shall be approved by the Investor and shall set forth the Company's development strategy, financial forecast, operational capital expenditure plan and implementation plan.

7.11    Lock-up. Subject to a 90-day prior written notice to the Investor, the Owner may transfer or assign, directly or indirectly, his interest in the Company or Cayman Co at any time prior to the full conversion or redemption of the Convertible Note; *provided* that the forgoing transfer or assignment will not result in the Owner ceasing to be the Company's and the Cayman Co's actual controlling person; *provided* further that if the forgoing transfer or assignment will result in the Owner ceasing to the Company's and the Cayman Co's actual controlling person, such transfer or assignment will be subject to the Investor's prior written consent.

7.12    Restructuring.

    (a)    The Company, the Cayman Co and the WFOE shall, and the Owner shall cause the applicable Group Members and the Onshore Companies to:

        (i)    complete all the steps of the Restructuring in accordance with all applicable laws and reasonably satisfactory to the Investor within 6 months after the Completion Date, which will result in a corporate structure consistent with the structure set forth in Schedule 2B hereof; and

        (ii)    duly perform each Onshore Contract to which it is a party in accordance with the terms thereof.

    (b)    So long as any of the Convertible Note remains outstanding, the Owner shall not without the prior consent of the Investor, sell, give, assign, hypothecate, pledge, encumber, grant a security interest in or otherwise dispose of, or suffer to exist (whether by operation of law or otherwise) any Encumbrance on any equity interest in the Onshore Companies.

    (c)    All the following assets related to the Existing Business held or owned by any Affiliate of the Owner other than the Group and the Onshore Companies shall be transferred or assigned to the Onshore Companies or the WFOE, as the case may be, within 12 months following the Completion Date, which may be extended subject to the Investor's prior written consent:

(i)     all the employment agreements of Xing FENG (冯幸), Lin MA (马麟), Zhizhong AN (安志忠), Zhanliang CUI (崔战良) and Zhisheng DONG (董志升);

(ii)    all the relevant Intellectual Property (including but not limited to trademark and relevant patents);

(iii)   all the material contracts, including but not limited to, purchase contracts with suppliers and sales contracts with customers; and

(iv)   all the applicable licenses or permits required by law or applicable Governmental Authority to conduct the Existing Business.

(d)    As the Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd need to use the Video Content of Leview Internet Information & Technology Corp.,Bei Jing（"Leview Internet"）for its Existing Business, the Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd shall sign the Video Content Using and Profit Distribution Agreement with Leview Internet in a fair and reasonable price under the normal commercial terms pursuant to definitive agreements of the Qualified Financing.

## SECTION 8
## CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS

8.1    General Obligation. Each Party undertakes to the other Parties that it shall not reveal, and that it shall procure that its directors, equity interest holders, partners, representatives, members, advisors (including auditors, accountants, consultants, financial advisors and attorneys), financing sources, officers, employees and agents (collectively, "Representatives") do not reveal, the Confidential Information to any third party without the prior written consent of other Parties or use any Confidential Information in such manner that is detrimental to the Company or the concerned Party, as the case may be. Each Party shall be responsible for any breach of obligations set forth herein by any of its Affiliates, its Representatives or its Affiliates' Representatives, and shall procure that its Affiliates, its Representatives or its Affiliates' Representatives shall comply with the obligations set forth in this Section 8 as of it were a party to this Agreement. The term "Confidential Information" as used in this Section 8 means, (a) any information concerning the organization, business, technology, safety records, investment, finance, marketing, business plans, transactions or affairs of any Party or any Group Member or any of their respective directors, officers or employees (whether conveyed in written, oral or in any other form and whether such information is furnished before, on or after the date of this Agreement) and (b) the terms and existence of this Agreement, the Convertible Note and the Onshore Contracts (other than the Basic Documents that are required by law or any applicable Governmental Authority to be publicly filed or disclosed) (collectively, the "Financing Terms"); provided, that Confidential Information does not include information that (i) is or becomes publicly known

or available through no breach of this Agreement, (ii) is rightfully acquired free of restrictions on its disclosure, or (iii) is independently developed without any use of or reference to any Confidential Information.

8.2    Exceptions. The provisions of Section 8.1 shall not apply to:

(a)    disclosure by a Party to its Representative, *provided* that such Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(b)    disclosure by a Party to its Affiliates and their respective Representatives, *provided* that such Affiliate and Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(c)    disclosure, after giving prior notice to the other Parties to the extent practicable under the circumstances and subject to any practicable arrangements to protect confidentiality, to the extent required under the rules of any stock exchange on which the shares of a Party or its parent company are listed or by law or any applicable Governmental Authority and only to the extent required thereby; or

(d)    disclosure of any Confidential Information other than the Financing Terms by any Group Member, the Owner or their Representatives of any of such Confidential Information to a third party in connection with any existing or proposed transaction or other contractual relationship of any Group Member or their Affiliates, *provided* that such third party (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality.

8.3    Publicity. Except as required by law, by any Governmental Authority, by any relevant stock exchange on which the shares of a Party or its parent company are listed or otherwise agreed by all the Parties, no public release or public announcement concerning the relationship or involvement of the Parties shall be made by any Party.

## SECTION 9    FEES AND EXPENSES

9.1    General. Each Party shall pay all of its own costs and expenses incurred in connection with or relating to the negotiation, execution, delivery and performance of the Basic Documents and the transaction contemplated thereby Each of the Parties hereto shall bear its own costs and expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the other Basic Documents and the transactions contemplated hereby and thereby.

## SECTION 10    INDEMNIFICATION

10.1    Scope of Indemnification. Each Party (an "Indemnifying Party") shall indemnify and hold the other Parties and their directors, officers and agents

(collectively, the "Indemnified Party") harmless from and against any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever, including but not limited to any investigative, legal and other expenses incurred in connection with, and any amounts paid in settlement of, any pending or threatened legal action or proceeding, but excluding consequential damages, special or incidental damages, indirect damages, punitive damages, lost profits, and diminution in value (collectively, "Losses") resulting from or arising out of: (i) the breach of any warranty of such Indemnifying Party contained in the Basic Documents or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of such Indemnifying Party contained in the Basic Documents for reasons other than gross negligence or willful misconduct of the Indemnified Party. The Company, the WFOE and the Owner shall jointly and severally indemnify the Investor and its directors, officers, and agents harmless and against any Losses resulting from or arising out of: (i) the breach of any warranty of the Company, the WFOE and the Owner contained in this Agreement or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of the Company, the WFOE or the Owner contained in this Agreement for reasons other than gross negligence or willful misconduct of the Indemnified Party. In calculating the amount of any Losses of an Indemnified Party hereunder, there shall be subtracted the amount of any insurance proceeds and third-party payments received by the Indemnified Party with respect to such Losses.

10.2    Notice of Claims; Procedures. If an Indemnified Party makes any claim against an Indemnifying Party for indemnification, the claim shall be in writing and shall state in general terms the facts upon which such Indemnified Party makes the claim. In the event of any claim or demand asserted against an Indemnified Party by a third party upon which the Indemnified Party may claim indemnification, the Indemnifying Party shall give written notice to the Indemnified Party within 30 days after receipt from the Indemnified Party of the claim referred to above, indicating whether such Indemnifying Party intends to assume the defense of the claim or demand. If an Indemnifying Party assumes the defense, such Indemnifying Party shall have the right to fully control and settle the proceeding, provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed. If the Indemnifying Party elects not to assume the defense or fails to make such an election with the 30-day period, the Indemnified Party may, at its option, defend, settle, compromise or pay such action or claim; provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

## SECTION 11    TERMINATION

11.1    <u>Effective Date; Termination</u>.  This Agreement shall become effective upon execution by all of the Parties and shall continue in force until terminated in accordance with Section 11.2.

11.2    <u>Events of Termination</u>.  This Agreement may be terminated at any time prior to the Completion as follows:

    (a)    at the election of the Investor, if the Company, WFOE or the Owner has materially breached any Collective Warranty, or any other covenant or agreement of the Company, WFOE or the Owner contained in any Basic Document, which breach cannot be cured or, if it is capable of being cured, is not cured within 30 days after the Company, WFOE and the Owner being notified in writing of the same and which breach would give rise to the failure to satisfy a condition set forth in Section 3.1;

    (b)    at the election of the Company, if the Investor has materially breached any Investor Warranty, or any other covenant or agreement of the Investor contained in the Basic Documents, which breach cannot be cured or, if capable of being cured, is not cured within 30 days after the Investor being notified in writing of the same and which breach would give rise to the failure to satisfy a condition set forth in Section 3.2; or

    (c)    by written consent of the Company, WFOE, the Owner and the Investor.

11.3    Survival. If this Agreement is terminated in accordance with Section 11.2, it shall become void and of no further force and effect, except for the provisions of Section 8 (Confidentiality; Restriction on Announcements),Section 9 (Fees and Expenses), Section 10 (Indemnification), this Section 11.3, Section 12 (Notices), Section 13 (Miscellaneous), and Section 14 (Governing Law and Dispute Resolution); provided, however, that such termination shall, unless otherwise agreed by the Parties, be without prejudice to the rights of any Party in respect of a breach of this Agreement prior to such termination.

## SECTION 12   NOTICES

12.1    Notices. Each notice, demand or other communication given or made under this Agreement shall be in writing in English and delivered or sent to the relevant Party at its address or fax number set out below (or such other address or fax number as the addressee has by five days' prior written notice specified to the other Parties). Any notice, demand or other communication given or made by letter between countries shall be delivered by air mail. Any notice, demand or other communication so addressed to the relevant Party shall be deemed to have been delivered, (a) if delivered in person or by messenger, when proof of delivery is obtained by the delivering party; (b) if sent by post within the same country, on the third day following posting, and if sent by post to another country, on the seventh day following posting; and (c) if given or made by fax, upon dispatch and the receipt of a transmission report confirming dispatch.

12.2    Addresses and Fax Numbers. The initial address and facsimile for each Party for the purposes of this Agreement are:

if to the Investor:

Room B 21/F Legend Tower 7 Shing Yip Street, Kwun Tong, Kowloon, Hong Kong
Attention: Peng Chuan(彭川)
if to the Company, the WFOE or the Owner:

16/F, Leshi Building, No. 105, Yaojiayuan Road, Chaoyang District, Beijing, 100025, PRC
Attention: Wei DENG (邓伟)

## SECTION 13 MISCELLANEOUS

13.1    Enforcement Action. For the avoidance of doubt, any obligation on the part of the Investor to make the investment hereunder is made solely to the Company, the WFOE and the Owner, and no other Person shall have any right to enforce such obligation against the Investor.

13.2    No Partnership. The Parties expressly do not intend hereby to form a partnership, either general or limited, under any jurisdiction's partnership law. The Parties do not intend to be partners one to another, or partners as to any

24

third party, or create any fiduciary relationship among themselves, solely by virtue of the Investor's status as the holder of the Convertible Note and the Investor's status as the mortgagee of the Mortgaged Shares.

13.3    Amendment. This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the Parties.

13.4    Waiver. No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. Without limiting the foregoing, no waiver by a Party of any breach by any other Party of any provision hereof shall be deemed to be a waiver of any subsequent breach of that or any other provision hereof.

13.5    Entire Agreement. This Agreement (together with the other Basic Documents and any other documents referred to herein or therein) constitutes the whole agreement between the Parties relating to the subject matter hereof and supersedes any prior agreements or understandings relating to such subject matter.

13.6    Severability. Each and every obligation under this Agreement shall be treated as a separate obligation and shall be severally enforceable as such and in the event of any obligation or obligations being or becoming unenforceable in whole or in part. To the extent that any provision or provisions of this Agreement are unenforceable they shall be deemed to be deleted from this Agreement, and any such deletion shall not affect the enforceability of this Agreement as remain not so deleted.

13.7    Counterparts. This Agreement may be executed in one or more counterparts including counterparts transmitted by telecopier or facsimile, each of which shall be deemed an original, but all of which signed and taken together, shall constitute one document.

13.8    Consent to Specific Performance. The Parties declare that it is impossible to measure in money the damages that would be suffered by a Party by reason of the failure by any other Party to perform any of the material obligations hereunder and that, in addition to all other remedies, each Party will be entitled to seek specific performance and to seek injunctive or other equitable relief as a remedy for any such breach or failure to perform its material obligations hereunder.

13.9    Transfer; Assignment. This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns. This Agreement shall not be assigned without the express written consent of all the Parties (which consent may be granted or withheld in the sole discretion of any Party), and any purported assignment without such consent shall be void.

## SECTION 14
## GOVERNING LAW AND DISPUTE RESOLUTION

14.1    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE PRC LAWS

14.2    Dispute Resolution.

(a)    In the event of any dispute regarding the performance of this Agreement (a "Dispute"), the parties shall consult and negotiate with each other and attempt to reach an amicable settlement. If there is no settlement of the Dispute within thirty (30) days of the occurrence of the Dispute, then any Party has the right in its sole discretion to initiate arbitration proceedings at the China International Economic and Trade Arbitration Commission in Beijing ("CIETAC").

(b)    The arbitration proceedings shall be conducted in accordance with the then effective rules of CIETAC, and any arbitration award shall be final and binding on the Parties. The arbitration tribunal shall consist of three (3) members appointed in accordance with the CIETAC arbitration procedures and rules. The Parties agree that the arbitrators may be selected outside of the Panel of Arbitrators of CIETAC.

IN WITNESS WHEREOF this Agreement has been executed on the day and year first above written.

**COMPANY:**

*For and on behalf of*
Leview Mobile Ltd.
**LEVIEW MOBILE LTD.**

By:_____
*Authorized Signature(s)*
Name:
Title:

**CAYMAN CO:**

**LE LTD.**

By:_____
Name:
Title:

**WFOE:**

**LESAI MOBILE TECHNOLOGY
(BEIJING) CO., LTD.
(乐赛移动科技（北京）有限公司)**

By:_____
Name:
Title:

**OWNER:**

**YUETING JIA (贾跃亭)**

_____

**PRC Identification Card Number:**

IN WITNESS WHEREOF this Agreement has been executed on the day and year first above written.

**INVESTOR:**

**E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD.**
（亦庄国际控股（香港）有限公司）

*For and on behalf of*
*E-Town International Holding (HongKong) Co. Limited*
亦莊國際控股(香港)有限公司

By: _____

Name: _____
*Authorized Signature(s)*

Title: Authorized Signatory

## SCHEDULE 1
## CONSIDERATION ALLOCATION

| Entity | Principal Amount of Convertible Note |
|---|---|
| E-TOWN INTERNATIONAL HOLDING (HONGKONG) CO., LTD | US$50,000,000 |

# SCHEDULE 2

## SHAREHOLDING STRUCTURE OF THE GROUP

**SCHEDULE 2A**

**SHAREHOLDING STRUCTURE OF THE GROUP AS OF THE DATE OF THIS AGREEMENT**



## SCHEDULE 2B

## SHAREHOLDING STRUCTURE OF THE GROUP AFTER COMPLETION OF RESTRUCTURING



**SCHEDULE 3**

**COLLECTIVE WARRANTIES**

**Definitions**

In this Schedule, capitalized terms not otherwise defined have the meanings set forth in this Agreement, and the following terms have the meanings specified:

"Contracts" means all contracts, agreements, licenses, engagements, leases, financial instruments, purchase orders, commitments and other contractual arrangements, that are currently subsisting and not terminated or completed.

"Environmental Laws" means any and all applicable current PRC or non-PRC national, federal, state, or local Law, statutes, rules, regulation, orders, ordinances, guidance documents, judgments, authorizations by any Governmental Authority, or any other requirement of any Governmental Authority relating to (a) environmental matters, (b) the generation, use, storage, transportation or disposal of hazardous substances, or (c) occupational safety and health, industrial hygiene, handling and disposal of medical waste, land use or the protection of human, plant or animal health or welfare.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Liabilities" means all indebtedness and other liabilities of any nature whatsoever, actual or contingent, and whether or not of a nature required to be disclosed in the accounts of the Group.

"Litigation" has the meaning set forth in Section 11 of this Schedule 3.

"Permits" means all permits, consents, approvals, authorizations, franchises, certifications and licenses from, and all registrations with, any Governmental Authority.

**The Warranties**

The Company, the WFOE and the Owner hereby, severally and jointly, represent and warrant to the Investor that the following representations and warranties are true and complete as of the date hereof and the Completion Date, except as otherwise stated.

1. **CORPORATE MATTERS**

   (a) Organization, Good Standing and Qualification. Each of the Group Members and the Onshore Companies has been duly incorporated and organized, is validly existing and, where applicable, is (i) in good

standing and (ii) in compliance with all registration and approval requirements. Each of the Group Members and the Onshore Companies has the corporate power and authority to own and operate its assets and properties and to carry on its business as currently conducted and as contemplated to be conducted.

(b)    Charter Documents. The Company Charter Documents and the constitutional documents of the Onshore Companies furnished to the Investor are effective, have not been superseded and are true and complete.

(c)    Capitalization and Shareholding Structure of the Group. The shareholding structure of the Group set forth in Schedule 2A are true, complete and correct description of the share capital of such entity on the date hereof and on the Completion Date. Immediately following the Completion, the authorized capital of the Company will consist of only one class of shares, namely, 50,000 Ordinary Shares, par value US$0.0001 per share, 100% of which are duly and validly issued, fully paid, nonassessable, and outstanding, and were issued in accordance with all applicable laws.

(d)    Options, Warrants and Reserved Shares. Except for (A) the Convertible Note, and (B) the preferred shares issuable upon conversion of the Convertible Note and any rights to be granted pursuant to the Basic Documents, there are no outstanding options, warrants, rights (including conversion or preemptive rights) or agreements for the subscription or purchase from any Group Member of any Equity Securities of any Group Member or any securities convertible into or ultimately exchangeable or exercisable for any Equity Securities of any Group Member.

(e)    Other Rights With Respect to Shares. Except as provided in the Basic Documents, no voting or similar agreements exist in relation to the Equity Securities of any Group Member that are presently outstanding or that may hereafter be issued.

(f)    Subsidiaries. Save for the HK Co and the WFOE, the Company does not directly or indirectly own any interests in or Control any other entities. Neither of the HK Co or the WFOE directly or indirectly owns any interests in or Controls any other entities.

(g)    Corporate Records. The registers of shareholders, resolutions and all other documents of the Group required to be kept or filed with any relevant Governmental Authority have been kept, filed or submitted for filing.

(h)    Competitive Activities. The Owner does not hold any equity interests in any entity that carries on any business that competes with the business of any Group Member, or the Onshore Company as presently conducted or

as contemplated to be conducted, except the ownership of shares in publicly traded companies representing less than five percent of the outstanding share capital of such company.

2.    **AUTHORIZATION AND VALIDITY OF TRANSACTIONS**

(a)    Authorization. Each of the Company, the Owner, the other Group Members and the Onshore Companies has the power and authority to execute, deliver and perform the Basic Documents to which it/he is a party. All actions on the part of the Company, the Owner, the other Group Members and the Onshore Companies necessary for the authorization, execution, delivery of and the performance of all of its/his obligations under the Basic Documents have been taken or will be taken prior to the Completion. All actions on the part of the Company and the Owner necessary for the authorization, allotment, issuance and delivery of the Convertible Note have been taken or will be taken prior to the Completion.

(b)    Valid Issuance of Stock. The preferred shares when issued upon conversion of the Convertible Note will be duly authorized and validly issued, fully paid and non-assessable, free of restrictions on transfer other than restrictions on transfer under this Agreement, the Convertible Note and any applicable securities or corporate laws.

(c)    Enforceability. The Basic Documents to which any Group Member, the Owner or the Onshore Company is a party will, when executed, be the valid and binding obligation of such Group Member, the Owner or the Onshore Company, enforceable against such Group Member, the Owner or the Onshore Company, as applicable, in accordance with their respective terms, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium; (ii) similar laws affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

(d)    Consents and Approvals. On or prior to the Completion Date, all consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any Governmental Authority or any other Person required in connection with the execution, delivery and performance by the Group, the Onshore Companies and the Owner of the Basic Documents or the consummation of the transactions contemplated hereby or thereby (including without limitation, the Restructuring) have been duly obtained in compliance with all applicable laws.

(e)    No Breach. The execution and delivery by any Group Member, the Onshore Company and the Owner of each of the Basic Documents to which it is a party and the implementation and performance by such Group Member, the Onshore Company and the Owner of all the

transactions contemplated under such Basic Documents (including without limitation, the Restructuring) do not and will not:

(i) breach or constitute a default under the Company Charter Documents or the constitutional document of any other Group Member or the Onshore Company;

(ii) result in a breach of, or constitute a default under, any Contract to which any Group Member, the Onshore Company or the Owner is a party or by which such Group Member, the Onshore Company or the Owner or their respective property or assets is bound or result in the creation or increasing of any obligation on such Group Member, the Onshore Company or the Owner (whether to make payment or otherwise) to any Person; or

(iii) result in a violation or breach of or default under any applicable law.
except, in the case of clauses (ii) and (iii), as could not materially and adversely affect the ability of any Group Member, the Onshore Company or the Owner to carry out its obligations under, and to consummate the transactions contemplated by, the Basic Documents to which it is a party.

3.    **LEGAL COMPLIANCE**

(a) <u>No Violation of Law.</u>  None of the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation, which may have a material adverse effect on the ability of any Group Member to conduct its business as currently conducted or as contemplated to be conducted.

(b) Permits and Registrations.  Each Group Member and the Onshore Company has all Permits and has completed all government registrations necessary for the conduct of its business as currently conducted and as contemplated to be conducted and to own its assets.  None of the Group Members or the Onshore Company is in material breach of or default under any such Permit, and there is no reason to believe any such Permit shall be suspended, cancelled or revoked.

4.    **ENVIRONMENTAL ISSUES**

Each Group Member and the Onshore Company is currently in compliance with all Environmental Laws and has at all times complied with all Environmental Laws in all material aspects.

5.    **PROPERTIES AND ASSETS**

(a) <u>Status of Properties and Assets.</u>  Each Group Member and the Onshore Company owns or has the right to use all material properties and assets currently used by it in the conduct of its business as currently conducted

and contemplated to be conducted. The properties and assets owned by the Group and Onshore Company are free and clear of all Encumbrances. The tangible assets and real property of each Group Member and the Onshore Company have been properly maintained and are in working condition, and are in all respects in a condition that is adequate for the intended uses of such assets, subject to continued repair and replacement in accordance with past practice.

(b)    General Liabilities. None of the Group Members or the Onshore Company has any obligations or liabilities or any nature, whether accrued, absolute or contingent, whether liquidated or unliquidated, and whether now due or to become due, except for trade or business obligations and liabilities incurred in the ordinary course of business since such entity's inception.

6.    **CONTRACTS AND TRANSACTIONS**

(a)    Validity of Material Contracts.

(i)    No Group Member or the Onshore Company is in breach of or has knowledge of the invalidity of or grounds for rescission, avoidance or repudiation of any material contract to which the Group Member or the Onshore Company is a party, nor has any Group Member or the Onshore Company received notice of any intention to terminate any such material contract.

(ii)    To the best knowledge of the Company, the WFOE and the Owner, no party with whom a Group Member or an Onshore Company has entered into any material contract is in default thereunder, except for defaults which would not have a material adverse effect on the financial condition of the Group or the Onshore Companies; to the best knowledge of the Company, the WFOE and the Owner, there are no circumstances likely to give rise to any such default.

(b)    Brokers and Finders. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Company and the Owner.

7.    **FINANCIAL MATTERS**

(a)    Liabilities. Neither the Group nor the Onshore Companies with respect to its Existing Business has any Liabilities other than (i) Liabilities reflected or reserved against in their respective accounts, a true and complete copy of which has been delivered to the Investor; (ii) Liabilities incurred in the ordinary course of business; or (iii) Liabilities in relation to the Basic Documents. No Group Member or the Onshore Company has guaranteed any indebtedness of any other Person.

(b)    <u>Financial Materials</u>. All the accounts, books, registers, ledgers and
financial and other material records of whatsoever kind of each Group
Member and the Onshore Company which have been provided to the
Investor are accurate and complete in all material respects; and they
present a true and fair view of the financial, contractual and trading
position of each Group Member and the Onshore Company and of its
respective facilities and machinery, fixed and current assets and
liabilities (actual and contingent), debtors, creditors and work-in-
progress.

## 8.    TAX, RECORDS AND RETURNS

(a)    <u>Compliance with Laws</u>. None of the Group Members or the Onshore
Company is or has at any time been in violation of any applicable law or
regulation regarding Tax which may result in any liability or criminal or
administrative sanction or otherwise having a material adverse effect on
any Group Member or the Onshore Company, other than such violation
that has been rectified or resolved and does not have any foreseeable
liability or criminal or administrative sanction or otherwise.

(b)    Tax Returns and Payments. Each Group Member or the Onshore
Company has filed all tax returns and reports as required by law, and
such returns and reports are true and correct in all material respects.
Each Group Member or the Onshore Company has paid all taxes and
other assessments due and none of the Group Members is or will become
liable to pay any fine, penalty, surcharge or interest in relation to Tax
with respect to activities of any Group Member prior to the Completion
Date. There have been no extraordinary examinations or audits of any
tax returns or reports by any applicable Governmental Authority. There
are in effect no waivers of applicable statutes of limitations with respect
to taxes for any year.

(c)    <u>Deductions and Withholdings</u>. Each Group Member and the Onshore
Company has made all deductions and withholdings in respect, or on
account, of any Tax from any payments made by it which it is obliged or
entitled to make and has duly accounted in full to the appropriate
authority for all amounts so deducted or withheld.

(d)    <u>Preferred Tax Treatments</u>. All exemptions, reductions and rebates of
Taxes granted to the Group by a Governmental Authority are in full
force and effect and have not been terminated. To the knowledge of the
Company, the WFOE and the Owner, the transactions contemplated
under the Basic Documents will not, and, there is no other circumstance
or event that will, result in any such exemption, reduction or rebate
being cancelled or terminated, whether retroactively or for the future.

9.  **OPERATIONS**

    (a)    <u>Current Operations</u>.  There is no existing fact or circumstance that will have a material adverse effect on the ability of any Group Member or the Onshore Company to conduct its business as currently conducted and contemplated to be conducted.

    (b)    <u>General Change</u>.  Since the date hereof, there has been no material adverse change in the financial position of the Group or the Onshore Company relating to the Existing Business.

10.  **EMPLOYEES**

    (a)    <u>Status of Employees</u>.

        (i)    No Group Member, or the Onshore Company has at any time since its establishment had, or is being threatened in writing by, any strike, collective work stoppage or other material labor dispute.

        (ii)    The Group and the Onshore Company each has complied in all material respects with all applicable laws regarding employees, employee benefits, employee safety and labor matters for all of their employees.

    (b)    <u>Employment Agreements and Compensation Arrangements</u>.  Except as required by law, the labor contract and employee non-competition, intellectual property assignment and confidentiality agreement between the WFOE and each key employee, no Group Member is a party to or is bound by any currently effective employment contract (other than contracts that can be terminated on an at-will basis), deferred compensation agreement, pension, provident, superannuation, life assurance, disability or other similar schemes or arrangements, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation agreement.

11.  **CLAIMS AND PROCEEDINGS**

    (a)    <u>No Litigation</u>.  No Group Member, the Onshore Company, or the Owner is engaged in or has been notified that it is the subject of any litigation, arbitration or administrative or criminal proceedings (collectively, "<u>Litigation</u>"), whether as plaintiff, defendant or otherwise.  None of the shareholders or equity interest holders of any Group Member, or the Onshore Company, directors of any such entity is engaged in or has been notified that it is the subject of any Litigation, whether as plaintiff, defendant or otherwise, which has had or may have an adverse effect on any Group Member, or the Onshore Company.  There is no judgment, decree, or order of any court in effect against any Group Member or the Onshore Company.  There is no judgment, decree, or order of any court in effect with respect to the Existing Business against Lefeng Moible or the Owner.  None of the Group Members or the Onshore Company is in

default with respect to any order of any Governmental Authority to which it/he is a party or by which it/he is bound. Neither Lefeng Mobile nor the Owner is in default with respect to any order of any Governmental Authority with respect to the Existing Business to which it/he is a party or by which it/he is bound.

(b)     <u>No Pending Proceedings</u>.  No Litigation is pending or, to the knowledge of the Owner, the Company and the WFOE, threatened against any Group Member, or the Onshore Company; no Litigation in relation to the Existing Business is pending or, to the knowledge of the Owner, the Company and the WFOE  against Lefeng Moible or the Owner.

(c)     <u>No Undertaking; No Injunction</u>.  None of the Group Members, or the Onshore Company nor any shareholder, director, officer or agent of any of the foregoing entities is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force.  Neither Lefeng Mobile nor any of its shareholder, director, officer or agent is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force in relation to Existing Business.

(d)     <u>No Insolvency</u>.  No order has been made and no resolution has been passed for the winding up or liquidation as dissolution of any Group Member or the Onshore Company.  No distress, execution or other process has been levied on the whole or a substantial part of the assets of any Group Member or the Onshore Company.  None of the Group Members or the Onshore Company is insolvent or unable to pay its debts as they fall due.

(e)     <u>No Investigation or Inquiry</u>.  No Group Member, the Onshore Company, or the Owner (in relation to the foregoing entities) is the subject of any investigation or inquiry by any Governmental Authority with respect to the Existing Business and there are no facts which are likely to give rise to any such investigation or inquiry.

12.    **INTELLECTUAL PROPERTY**

(a)     Each Group Member and the Onshore Company owns or otherwise has the right or license to use all Intellectual Property as necessary for the operation of the Existing Business without, to the knowledge of the Company and the Owner, any violation or infringement of the rights of any third party, free and clear of all Encumbrances. There is no claim, proceeding or litigation pending or, to the knowledge of the Company and the Owner, threatened against any Group Member or the Onshore Company, contesting their right to use its Intellectual Property, asserting the misuse thereof, or asserting the infringement or other violation of any Intellectual Property of any third party.

(b)    There are no pending proceedings or claims in which any Group Member or the Onshore Company alleges that any Person is infringing upon, or otherwise violating, its Intellectual Property rights. Nor have any such proceedings or claims been served, instituted or asserted by any Group Member or the Onshore Company.

(c)    None of the key employees of any Group Member and the Onshore Company is obligated under any Contract, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her best efforts to promote the interests of his/her employer, or that would conflict with the business of his/her employer as presently conducted, or that would prevent such employees from assigning to his/her employer inventions conceived or reduced to practice or copyrights for materials developed in connection with services rendered to it.

**13.    RESTRUCTURING**

The Restructuring has been carried on by the Company in compliance with applicable laws.

**14.    DISCLOSURE**

(a)    <u>No Misrepresentation</u>.  No representation, warranty or statement by the Company, the WFOE and the Owner in this Agreement, any other Basic Document, or in any Exhibit, Schedule, Appendix, statement or certificate furnished to the Investor pursuant to any Basic Document, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein, in the light of the circumstances under which they were made, not misleading.

(b)    Full Disclosure.  There is no fact or circumstance relating to the affairs of any Group Member and the Onshore Companies which has not been disclosed to the Investor and which if the disclosed information might reasonably have been expected to influence the decision of the Investor to purchase the Convertible Note.

# SCHEDULE 4

## INVESTOR WARRANTIES

1.  Organization, Good Standing and Qualification. The Investor and its general partner have been duly established or incorporated and organized, is validly existing and, where applicable, in good standing.

2.  Authorization. The Investor has the full power, authority and legal right to own assets and carry on its business. The Investor and its general partner are not in receivership or liquidation or have taken any steps to enter into liquidation, and no petition has been presented for the winding-up of the Investor. There are no grounds on which a petition or application could be based for the winding-up or appointment of a receiver of the Investor or its general partner.

3.  The execution, delivery and performance of this Agreement by the Investor will not:

    (a)  violate any provision of its partnership agreement or the Memorandum of Association or Articles of Association of the Investor's general partner;

    (b)  require the Investor to obtain any consent, approval or action of, or make any filing with or give any notice to, any Governmental Authority or any other third party pursuant to any agreement to which the Investor is a party or by which the Investor is bound;

    (c)  conflict with or result in any material breach or violation of any of the terms and conditions of, or constitute (or with notice or lapse of time or both constitute) a default under, any agreement to which the Investor is a party or by which the Investor is bound;

    (d)  violate any court order, judgment, injunction, award, decree or writ against, or binding upon, the Investor or upon its securities, properties or business; or

    (e)  violate any law or regulation of the country where the Investor is incorporated or any other jurisdiction in which the Investor maintains a business presence.

4.  Enforceability. The Investor, acting through its general partner, has the full power and authority to enter into, execute and deliver the Basic Documents to which it is a party and to perform the transactions contemplated hereby and thereby. The execution and delivery by the Investor, acting through its general partner, of the Basic Documents to which it is a party and the performance by the Investor of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other action of the Investor. Assuming the due authorization, execution and delivery hereof by the other parties hereto, the Basic Documents to which the Investor is a party constitutes the legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium;(ii) similar laws

affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

5.    Financing.  The Investor has sufficient immediately available funds to pay, in cash, the Consideration at the Completion.

6.    Litigation.  As of the date hereof, no Litigation by or against the Investor is pending or, to the best knowledge of the Investor, threatened in writing, which could affect the legality, validity or enforceability of the Basic Documents to which it is a party, or the consummation of the transactions contemplated hereby and thereby.

7.    Brokers.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Investor.

# EXHIBIT A

## FORM OF CONVERTIBLE NOTE

# EXHIBIT B

## FORM OF SHARE MORTGAGE

**Fill in this information to identify the case:**

Debtor 1 ___Yueting Jia___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the:  District of Delaware

Case number ___19-12220(KBO)___

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. Who is the current creditor? | E-Town International Holding (HongKong) Co., Limited | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor  E-Town INTL Holding (HK) Co., LTD | |

| | | |
| --- | --- | --- |
| 2. Has this claim been acquired from someone else? | ☑ No | |
| | ☐ Yes.  From whom? _____ | |

| | | |
| --- | --- | --- |
| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | E-Town INTL Holding (HK) Co., LTD | |
| | Name | Name |
| | Yicheng Fortune,No.22, Ronghua Middle Road | |
| | Number      Street | Number      Street |
| | Beijing | |
| | City            State            ZIP Code | City            State            ZIP Code |
| | Contact phone +86 13801220419 | Contact phone _____ |
| | Contact email yuanwei@etowncapital.com | Contact email _____ |
| | | |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |

| | | |
| --- | --- | --- |
| 4. Does this claim amend one already filed? | ☑ No | |
| | ☐ Yes.  Claim number on court claims registry (if known) _____ | Filed on ___/___/_____ <br> MM / DD / YYYY |

| | |
| --- | --- |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
| | ☐ Yes.  Who made the earlier filing? _____ |

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:   _8_   _9_   _7_   _2_

**7. How much is the claim?**    $_____83,349,315.07_ . Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Convertible Note

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                              $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured: $_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| | | | Amount entitled to priority |
|---|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12 / 11 / 2019
            MM / DD / YYYY

*For and on behalf of*
*E-Town International Holding (Hong Kong) Co., Limited*
亦莊國際控股(香港)有限公司

*Wei yuan*
Signature

*Authorized Signature(s)*

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Wei | | Yuan |
| | First name | Middle name | Last name |
| Title | Project Manager | | |
| Company | E-Town International Holding( HongKong) Co., Limited | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 23-25 FLOORS, BLOCK A,YICHENG WEALTH,22 RONGHUA ROAD,BDA | | |
| | Number        Street | | |
| | BEIJING,100176 | | |
| | City | State       ZIP Code | |
| Contact phone | +86 13801220419 | Email yuanwei@etowncapital.com | |

**To: Yueting Jia**

    **Claims Processing Center**

    **c/o Epiq Corporate Restructuring, LLC**

This is from E-Town International Holding (Hong Kong) Co., Limited (the "**E-Town**"), one of the creditors of YT Jia case.

According to "NOTICE OF BAR DATES AND PROCEDURES FOR FILLING PROOFS OF CLAIM",we are now explain the calculation logic for the amount of claim.

May 05, 2015, E-Town and Yueting Jia and Leview Mobile Ltd. singed the "Convertible Notes Purchase Agreement" and "Convertible Note"(the "**Agreement**"). Yueting Jia signed the Letter of Guarantee for the Agreement. E-Town purchase $ 50,000,000 convertible notes from Yueting Jia and Leview Mobile Ltd.

According to the Agreement, the outstanding amount under this note will be calculated with the method as below:

*Outstanding amount × (1+15% × actual days elapsed since Issuance Date/365).*

Amount of debt to the creditor on the date of the bankruptcy filling(which is Oct 14,2019 for YT Jia case) is: $83,349,315.07 based on the method below.

*$500,000,000 × (1+15% × (Oct 14, 2019- May 05, 2015)/365*

Best Regards.

For and on behalf of
E-Town International Holding (Hong Kong) Co., Limited
亦莊國際控股(香港)有限公司

E-Town International Holding (Hong Kong) Co., Limited
Authorized Signature(s)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document entitled (*specify*):  **NOTICE OF OBJECTION TO CLAIM [Claim #16]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>April 3, 2020,</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. <u>SERVED BY UNITED STATES MAIL</u>:**
On (*date*) <u>April 3, 2020,</u> I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

United States Bankruptcy Court
Central District of California
Attn:  Hon. Vincent Zurzolo
Edward R. Roybal Federal Bldg./Courthouse
255 East Temple Street, Suite 1360
Los Angeles, CA  90012

☐ Service information continued on attached page

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 3, 2020    Nancy H. Brown | /s/ *Nancy H. Brown* |
|---|---|
| *Date*              *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

DOCS_LA:328782.1 46353/002

**F 9013-3.1.PROOF.SERVICE**

**SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ**
**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- Jerrold L Bregman    ecf@bg.law, jbregman@bg.law
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Lei Lei Wang Ekvall    lekvall@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Stephen D Finestone    sfinestone@fhlawllp.com
- Richard H Golubow    rgolubow@wghlawyers.com, pj@wcghlaw.com;jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com
- Ben H Logan    blogan@omm.com
- Robert S Marticello    Rmarticello@swelawfirm.com, gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- David W. Meadows    david@davidwmeadowslaw.com
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Victor A Sahn    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Felix T Woo    fwoo@ftwlawgroup.com, admin@ftwlawgroup.com
- Claire K Wu    ckwu@sulmeyerlaw.com, mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- David B Zolkin    dzolkin@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012*    Page 2    **F 3007-1.1.NOTICE.OBJ.CLAIM**
DOCS_LA:328789.1 46353/002