| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br>Richard M. Pachulski (CA Bar No. 90073)<br>Jeffrey W. Dulberg (CA Bar No. 181200)<br>Malhar S. Pagay (CA Bar No. 189289)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Boulevard, 13th Floor<br>Los Angeles, CA  90067<br>Telephone:  310/277-6910<br>Facsimile:  310/201-0760<br>Email: rpachulski@pszjlaw.com<br>        jdulberg@pszjlaw.com<br>        mpagay@pszjlaw.com<br><br>☒ *Attorney for:* Debtor | FOR COURT USE ONLY |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>YUETING JIA,<br><br>                          Debtor(s). | CASE NO.: 2:19-bk-24804-VZ<br>CHAPTER: 11<br><br>**NOTICE OF OBJECTION TO CLAIM**<br><br>DATE:   May 7, 2020<br>TIME:    1:30 p.m.<br>COURTROOM: 1368<br>PLACE: 255 East Temple Street<br>             Los Angeles, CA  90012 |

1. TO *(specify claimant and claimant's counsel, if any):*    Beijing Huaxing Mobile Asset Mgt Center

2. NOTICE IS HEREBY GIVEN that the undersigned has filed an objection to your Proof of Claim (Claim #27) filed in the above referenced case. The Objection to Claim seeks to alter your rights by disallowing, reducing or modifying the claim based upon the grounds set forth in the objection, a copy of which is attached hereto and served herewith.

3. **Deadline for Opposition Papers**: You must file and serve a response to the Objection to Claim not later than 14 days prior to the hearing date set forth above.

   **IF YOU FAIL TO TIMELY RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

Date:   April 2, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Printed name of law firm

*/s/ Malhar S. Pagay*
Signature

Date Notice Mailed: April 2, 2020

Malhar S. Pagay
Printed name of attorney for objector

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012*                                    Page 1
DOCS-LA 328680 v1

**F 3007-1.1.NOTICE.OBJ.CLAIM**

1   Richard M. Pachulski (CA Bar No. 90073)
    Jeffrey W. Dulberg (CA Bar No. 181200)
2   Malhar S. Pagay (CA Bar No. 189289)
    PACHULSKI STANG ZIEHL & JONES LLP
3   10100 Santa Monica Blvd., 13th Floor
    Los Angeles, CA  90067
4   Telephone: 310/277-6910
    Facsimile: 310/201-0760
5   Email:    rpachulski@pszjlaw.com
              jdulberg@pszjlaw.com
6             mpagay@pszjlaw.com
7
    Attorneys for Debtor and Debtor in Possession
8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                  LOS ANGELES DIVISION

12  In re:                            Case No.: 2:19-bk-24804-VZ

13  YUETING JIA,[1]                    Chapter 11

14                      Debtor.        **DEBTOR'S NOTICE OF OMNIBUS
                                       OBJECTION AND OMNIBUS OBJECTION
15                                     FOR AN ORDER DISALLOWING
                                       DUPLICATE CLAIMS; MEMORANDUM OF
16                                     POINTS AND AUTHORITIES AND
                                       DECLARATION OF LUETIAN SUN IN
17                                     SUPPORT THEREOF**

18                                     <u>**This Objection Affects The Following Claimants:**</u>
                                       **Beijing Huaxing Mobile Asset Mgt Center, Claim 27**
19                                     (Duplicate of Claim 20023)
                                       **Beijing Jiaxin Tengda Information Consulting Co.,**
20                                     **Ltd., Scheduled Claim 220000060** (Duplicate of Claim
                                       20019)
21                                     **China Soft Growing Invest Wuxi Partshp, Claim 61**
                                       (Duplicate of Claim 19)
22                                     **Chongqing LeTV Commercial Factoring Co., Ltd.,**
                                       **Claims 21** and **24** (Duplicates of Claim 20015)
23                                     **E-Town Intl Holding (HK) Co Ltd., Claim 16**
                                       (Duplicate of Claim 20017)
24                                     **Honghu Da, Claim 6** (Duplicate of Claim 20008)
                                       **Huizhou Speed Secondcurve Management LP, Claim**
25                                     **20002** (Duplicate of Claim 20001)
                                       **Jiangyin Hailan Invest. Holding Co. Ltd., Claim**
26                                     **20009** (Duplicate of Claim 7)
                                       **Linfen Investment Group Co., Ltd., Scheduled Claim**
27

28  [1] The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing address is
    91 Marguerite Drive, Rancho Palos Verdes, CA 90275.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**220000540** (Duplicate of Claim 30)
**Nanchang O-Film Photoelectric Technology Co., Ltd, Claim 38** (Duplicate of Claim 33)
**O-Film Global (HK) Trading Limited, Claim 34** (Duplicate of Claim 33)
**O-Film Global (HK) Trading Limited, Claim 37** (Duplicate of Claim 33)
**Pingan Bank Co Ltd Beijing Branch, Claim 20041** (Duplicate of Claim 20036)
**Shenzhen Yingda Capital Management Co., Scheduled Claim 220000860** (Duplicate of Claim 20034)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 42** (Duplicate of Claim 20027)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 43** (Duplicate of Claim 20029)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 44** (Duplicate of Claim 20030)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 45** (Duplicate of Claim 20031)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 46** (Duplicate of Claim 20032)
**Tianjin Jairui Huixin Corp. Mgt LLC, Claim 47** (Duplicate of Claim 20039)
**Tianjin Yingxin Xinheng Investment Consulting Co., Ltd., Claim 28** (Duplicate of Claim 20020)
**Weihua Qiu, Scheduled, Claim 220000960** (Duplicate of Claim 12)
**Weihua Qiu, Claim 39** (Duplicate of Claim 12)
**Western Securities Co., Ltd., Claim 32** (Duplicate of Claim 20028)
**Wuxi Leyike Investment Enterprise, Claim 20025** (Duplicate of Claim 20007)
**Xizang Jinmeihua Investment Co., Ltd., Scheduled Claim 220001030** (Duplicate of Claim 29)

Date:     May 7, 2020
Time:     1:30 p.m.
Place:    Courtroom 1368
           Roybal Federal Building
           255 E. Temple Street
           Los Angeles, California 90012

Judge:    Hon. Vincent P. Zurzolo

**PLEASE TAKE NOTICE** that, on May 7, 2020, beginning at 1:30 p.m. (Pacific Time), or as soon thereafter as counsel may be heard before the Hon. Vincent P. Zurzolo, in Courtroom 1368 of the Edward R. Roybal Federal Building and Courthouse, located at 255 E. Temple Street, Los Angeles, California 90012, pursuant to the *Order (I) Approving the Fourth Amended Disclosure Statement; (II) Approving the Voting Procedures and Tabulation Procedures; (III) Setting the Date*

2

*and Time for the Confirmation Hearing and Related Deadlines; (IV) Waiving Certain Local Rules*

*and Procedures Related to the Timing and Approval of the Fourth Amended Disclosure Statement*

*and Confirmation of the Third Amended Plan; and (V) Granting Related Relief* [Docket No. 485]

(the "Disclosure Statement Order"), which provides, in pertinent part, that if the Debtor has served

an objection or request for estimation as to a claim by April 2, 2020, such claim shall be temporarily

disallowed for voting purposes only (and not for purposes of allowance or distribution), except to the

extent and in the manner as may be set forth in such objection or as ordered by the Court before the

voting deadline, i.e., April 30, 2020 at 4:00 p.m. (Beijing Time),[2] Yueting Jia (the "Debtor" or

"YT"), debtor and debtor in possession herein, hereby objects to and moves to disallow (the

"Objection") the claims (the "Duplicate Claims") listed below in the column entitled "Duplicate

Claims to Be Disallowed" filed by the listed claimants (the "Claimants") on the grounds that the

Duplicate Claims are identical to those claims listed in the column entitled "Surviving Claims."  The

Debtor requests that the Court take judicial notice of both the Duplicate Claims to Be Disallowed

and the Surviving Claims, which are annexed as Exhibits 1-27 to the Request for Judicial Notice (the

"RFJN"), filed concurrently herewith.

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Beijing Huaxing Mobile Asset Mgt Center | 27 | 20023 | Duplicate Claim | 1 |
| Beijing Jiaxin Tengda Information Consulting Co., Ltd. | 220000060 (scheduled claim) | 20019 | Creditor, Beijing Jiaxin Tengda Information Consulting Co., Ltd., also uses the name Jiaxindechuang BJ Tech Group Co Ltd.  The Debtor scheduled Beijing Jixain Tengda Information Consulting Co., Ltd. in the amount of $1,458,406. However, the creditor asserted the same debt using the name Jiaxindechuang BJ Tech Group Co Ltd. in filed claim number 20019 in | 2 |

---

[2] Disclosure Statement Order, 6 at ¶ 17(e).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| | | | the amount of $1,975,674.74, and, consequently, has received two separate ballots to vote a single debt in connection with the Debtor's Plan. The filed proof of claim should supersede the scheduled claim despite the difference in names. | |
| China Soft Growing Invest Wuxi Partshp | 61 | 19 | Duplicate Claim | 3 |
| Chongqing LeTv Commercial Factoring LLC | 21 | 20015 | Duplicate Claim | 4 |
| Chongqing LeTv Commercial Factoring LLC | 24 | 20015 | Duplicate Claim | 5 |
| E-Town Intl Holding (HK) Co Ltd | 16 | 20017 | Duplicate Claim | 6 |
| Honghu Da | 6 | 20008 | Duplicate Claim | 7 |
| Huizhou Speed Secondcurve Management LP, | 20002 | 20001 | Duplicate Claim | 8 |
| Jiangyin Hailan Invest Holding Co Ltd. | 20009 | 7 | Creditor, Jiangyin Hailan Invest Holding Co. Ltd. filed Claim 20009 in the amount of $89,635,814.27, however, the back-up attached to Claim 20009 totals $69,635,814.27, which amount is duplicative of Claim 7. Therefore, Claim 20009 should be disallowed. | 9 |
| Linfen Investment Group Co. Ltd. | 220000540 | 30 | This creditor filed a proof of claim for the same debt under a similar but different name (Linfen Investment Construction Development Co. Ltd.) and, consequently, received ballots for both scheduled and filed claims. The filed proof of claim should supersede the scheduled claim and, with respect | 10 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| | | | to the Plan, the amount to be voted on account of the scheduled claim should be disallowed. | |
| Nanchang OFilm Photoelectric Tech Co Ltd. | 38 | 33 | Duplicate Claim | 11 |
| O-Film Global (HK) Trading Limited | 34 | 33 | The creditor, in its complaint against the Debtor, describes it and Nanchang OFilm Photoelectric Tech Co Ltd. as sister companies and co-plaintiffs. The lawsuit asserts a single claim of $24,095,428.00 against the Debtor. Accordingly, multiple claims asserted in the same amount are duplicative. | 12 |
| O'Film Global (HK) Trading Limited | 37 | 33 | Duplicate Claim | 13 |
| Pingan Bank Co Ltd Beijing Branch | 20041 | 20036 | Duplicate Claim | 14 |
| Shenzhen Yingda Capital Management Co. | 220000860 | 20034 | This creditor inadvertently received ballots both for scheduled and filed claims, so the amount to be voted on account of the scheduled claim should be disallowed. | 15 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 42 | 20027 | Duplicate Claim | 16 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 43 | 20029 | Duplicate Claim | 17 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 44 | 20030 | Duplicate Claim | 18 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 45 | 20031 | Duplicate Claim | 19 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 46 | 20032 | Duplicate Claim | 20 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 47 | 20039 | Duplicate Claim | 21 |
| Tianjin Yingxin Xinheng Investment | 28 | 20020 | Duplicate Claim | 22 |

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Consulting Co. Ltd. | | | | |
| Weihua Qiu | 220000960 (scheduled claim) | 12 | This creditor inadvertently received ballots both for scheduled and filed claims, so the amount to be voted on account of the scheduled claim should be disallowed. | 23 |
| Weihua Qiu | 39 | 12 | Duplicate claim | 24 |
| Western Securities Co., Ltd. | 32 | 20028 | Duplicate Claim | 25 |
| Wuxi Leyike Investment Enterprise | 20025 | 20007 | Duplicate Claim | 26 |
| Xizang Jinmeihua Investment Co., Ltd. | 220001030 (scheduled claim) | 29 | In Chinese, Tibet is called Xizang. The creditor filed its claim using the name Tibet Jinmeihua Investment Co. Ltd. and, consequently, has received two separate ballots to vote a single debt in connection with the Debtor's Plan. The filed proof of claim should supersede the scheduled claim despite the difference in names. | 27 |

  True and correct copies of the Claims are attached to the Notices of Objection to Claims, which have been served on each claimant, attaching their corresponding claim(s).

  **PLEASE TAKE FURTHER NOTICE** that the Objection has been served upon the Claimants and all parties entitled thereto and is based upon the supporting Memorandum of Points and Authorities and Declaration of Luetian Sun, the statements, arguments and representations of counsel who appear at the hearing regarding the Objection, the files and records in the above-captioned case, any evidence properly before the court prior to or at the hearing regarding the Objection and all matters of which the court may properly take judicial notice.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f),

responses to the Objection must be filed with the Court and served upon the Debtor's counsel at the

address in the upper left-hand corner of this Objection **no later than fourteen (14) days prior to**

**the hearing date**. Responses must contain a written statement of all reasons why the Objection is

opposed and must include declarations and copies of all documentary evidence on which the

responding party intends to rely. Responses must be filed either electronically or at the following

location:

> United States Bankruptcy Court
> Attention: Clerk's Office
> 255 E. Temple Street
> Los Angeles, CA 90012

**IF YOU DO NOT OPPOSE THE OBJECTION YOU DO NOT NEED TO FILE ANY**

**PAPERS, SIGN ANY FURTHER AGREEMENTS OR TAKE ANY FURTHER ACTION.**

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f),

the failure to timely file and serve written opposition may be deemed by the Court to be consent to

the granting of the relief requested in the Objection.

**PLEASE TAKE FURTHER NOTICE** that if a response is timely filed and served upon the

Debtor's counsel, the Court, in its discretion, may treat the initial hearing as a status conference if it

determines that the Objection involves disputed factual issues or will require presentation of

substantial evidence or argument.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order (i) sustaining

the Objection; (ii) disallowing the Duplicate Claims in their entirety; and (iii) granting the Debtor

such other and further relief as may appropriate under the circumstances.

Dated:    April 2, 2020                            PACHULSKI STANG ZIEHL & JONES LLP

By      */s/ Malhar S. Pagay*
        Richard M. Pachulski
        Jeffrey W. Dulberg
        Malhar S. Pagay

        Counsel for Debtor and Debtor in
        Possession

7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 102, 105 and 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 3007 and 3018(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II.

## BACKGROUND

### A.    Commencement of the Chapter 11 Case

On October 14, 2019 (the "Petition Date"), the Debtor commenced this case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). The Debtor continues in possession of his property and manages his affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On October 25, 2019, the U.S. Trustee appointed the Official Committee of Unsecured Creditors  pursuant to section 1102(a)(1) of the Bankruptcy Code (the "Committee") [Docket No. 45]. The Committee consists of the following members: (a) Ping An Bank., Ltd. Beijing Branch; (b) China Minsheng Trust Co., Ltd; (c) Shanghai Leyu Chuangye Investment Management Center LP; (d) Jiangyin Hailan Investment Holding Co., Ltd; and (e) Shanghai Qichengyueming Investment Partnership Enterprise.

On November 13, 2019, the Court entered an order setting January 24, 2020, as the general deadline (the "Bar Date") for the filing of proofs of claim or proofs of interest against the Debtor's estate.  In accordance with the Court's Order establishing the Bar Date, notice of the Bar Date was given by mail to the Debtor's creditors and interest holders.

On December 18, 2019, Judge Karen B. Owens of the Delaware Bankruptcy Court transferred the Chapter 11 Case to this Court.

**B.      Approval of the Debtor's Disclosure Statement**

On March 20, 2020, the Court entered the Disclosure Statement Order, pursuant to which the Court approved the Debtor's *Fourth Amended Disclosure Statement with Respect to Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 465] in respect of the *Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 464] (the "Plan"), and granted other relief.

The Disclosure Statement Order provides, in pertinent part, that if the Debtor has served an objection or request for estimation as to a claim by April 2, 2020, such claim shall be temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, or as ordered by the Court before the voting deadline, i.e., April 30, 2020 at 4:00 p.m. (Beijing Time).  Disclosure Statement Order, 6 at ¶ 17(e).

**III.**

**ARGUMENT**

**A.      Procedural Requirements for Objections to Claims**

Bankruptcy Rule 3007 governs the procedure for objections to claims.  It provides as follows: "An objection to an allowance of a claim shall be in writing and filed.  A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant . . . at least thirty days prior to the hearing." Fed. R. Bankr. P. 3007.

Pursuant to Bankruptcy Rule 3007, a copy of the Objection will be mailed to Claimants at the addresses provided by Claimants in the Claims, and, where available and if different from the address provided on the proof of claim, on each Claimant's address registered with the National Enterprise Credit Information Publicity System (http://www.gsxt.gov.cn/index.html), a government-run, national, enterprise credit inquiry system in the People's Republic of China, at least thirty days prior to the hearing date for consideration of the Objection.  Accordingly, by the time of the hearing hereon, the Debtor will have complied with Bankruptcy Rule 3007.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**B.**    **The Court Must Determine the Allowance of a Claim Subject to Objection**

With certain exceptions, section 502(b) of the Bankruptcy Code requires, in relevant part, that if a party in interest objects to a claim, "the Court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that -- (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured …."

**C.**    **Burden of Proof**

All allegations set forth in a properly filed proof of claim are taken as true and, if the allegations set forth all facts necessary to establish a claim and are not self-contradictory, the proof of claim constitutes *prima facie* evidence of the validity and amount of the claim.  11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).  However, a claimant must attach copies of writings upon which claims are based in order to carry its burden of establishing a *prima facie* case against the debtor. *Hardin v. Gianni (In re King Investments Inc.)*, 219 B.R. 848, 858 (B.A.P. 9th Cir. 1998).  Further, a claim should not be allowed if that claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law.  11 U.S.C. § 502(b)(1).

Once the objector raises "facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves," *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991), then "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Ashford v. Consolidated Pioneer Mortgage (In re Consolidated Pioneer Mortgage)*, 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995), aff'd, 91 F.3d 151 (9th Cir. 1996). "[T]he ultimate burden of persuasion is always on the claimant."  *Holm*, 931 F.2d at 623.  In considering an objection to a claim, a bankruptcy court may take judicial notice of the underlying records in a bankruptcy case.  *O'Rourke v. Seaboard Surety Co., (In re ER Fergert, Inc.)*, 887 F.2d 955, 957-958 (9th Cir. 1998).

**D.**    **Disallowance for Plan Voting Purposes**

Courts recognize that Bankruptcy Rule 3018(a) permits a party in interest to seek to disallow a claim for voting purposes. Ultimately, the determination of whether to temporarily allow a claim

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

for voting purposes lies within the discretion of the bankruptcy court.  See *Armstrong v. Rushton (In re Armstrong)*, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003) ("There is no guidance in the Bankruptcy Code to courts as to determine whether to permit the temporary allowance of a claim; it is left to the court's discretion.").  Indeed, courts have broad authority to determine whether to allow or disallow a claim for purposes of voting under Bankruptcy Rule 3018(a). *See, e.g., In re Mangia Pizza Invs., L.P.,* 480 B.R. 669, 679 (Banker. W.D. Tex. 2012); *In re Zolner*, 174 B.R. 629, 633 (Bankr. N.D. Ill. 1994) (noting that a court must exercise its discretion to allow or disallow a claim under Bankruptcy Rule 3018(a) based on reasoned analysis); *In re Goldstein,* 114 B.R. 430, 433 (Bankr. E.D. Pa. 1990); Collier on Bankr. ¶ 9-3018[5] (16th ed. rev. 2012) ("The court, however, regardless of the circumstances, has the discretion to allow or disallow all or part of the claim for voting purposes.").

In some cases noted in the chart below, the Debtor has been advised that a Claimant inadvertently has been provided with multiple ballots to vote on the Debtor's Plan on account of a single debt.  Where that has occurred, the Debtor has requested that the Court disallow one of those Duplicate Claims for voting purposes.

**E.    The Objection and Request for Relief**

In most instances, the Duplicate Claim and the relevant Surviving Claim are the exact same claim in the same amount filed by the Claimant using the same name, and therefore the Duplicate Claim can be disallowed readily.  The chart below provides further explanation for the request for disallowance where the claims may not be exact duplicates of one another, but fall within the Duplicate Claims category that is the subject of this Objection.  For example, slight variations in the name or entity utilized by a Claimant to assert a debt against the Debtor or issues of translation from Chinese to English have required a more careful review to determine that two claims are, in fact, the same.

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Beijing Huaxing Mobile Asset Mgt Center | 27 | 20023 | Duplicate Claim | 1 |
| Beijing Jiaxin Tengda Information Consulting Co., Ltd. | 220000060 (scheduled claim) | 20019 | Creditor, Beijing Jiaxin Tengda Information Consulting Co., Ltd., | 2 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| | | | also uses the name Jiaxindechuang BJ Tech Group Co Ltd.  The Debtor scheduled Beijing Jixain Tengda Information Consulting Co., Ltd. in the amount of $1,458,406.  However, the creditor asserted the same debt using the name Jiaxindechuang BJ Tech Group Co Ltd. in filed claim number 20019 in the amount of $1,975,674.74, and, consequently, has received two separate ballots to vote a single debt in connection with the Debtor's Plan.  The filed proof of claim should supersede the scheduled claim despite the difference in names. | |
| China Soft Growing Invest Wuxi Partshp | 61 | 19 | Duplicate Claim | 3 |
| Chongqing LeTv Commercial Factoring LLC | 21 | 20015 | Duplicate Claim | 4 |
| Chongqing LeTv Commercial Factoring LLC | 24 | 20015 | Duplicate Claim | 5 |
| E-Town Intl Holding (HK) Co Ltd | 16 | 20017 | Duplicate Claim | 6 |
| Honghu Da | 6 | 20008 | Duplicate Claim | 7 |
| Huizhou Speed Secondcurve Management LP, | 20002 | 20001 | Duplicate Claim | 8 |
| Jiangyin Hailan Invest Holding Co Ltd. | 20009 | 7 | Creditor, Jiangyin Hailan Invest Holding Co. Ltd. filed Claim 20009 in the amount of $89,635,814.27, however, the back-up attached to Claim 20009 totals $69,635,814.27, which amount is duplicative of Claim 7. Therefore, Claim 20009 should be disallowed. | 9 |

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Linfen Investment Group Co. Ltd. | 220000540 | 30 | This creditor filed a proof of claim for the same debt under a similar but different name (Linfen Investment Construction Development Co. Ltd.) and, consequently, received ballots for both scheduled and filed claims.  The filed proof of claim should supersede the scheduled claim and, with respect to the Plan, the amount to be voted on account of the scheduled claim should be disallowed. | 10 |
| Nanchang OFilm Photoelectric Tech Co Ltd. | 38 | 33 | Duplicate Claim | 11 |
| O-Film Global (HK) Trading Limited | 34 | 33 | The creditor, in its complaint against the Debtor, describes it and Nanchang OFilm Photoelectric Tech Co Ltd. as sister companies and co-plaintiffs.  The lawsuit asserts a single claim of $24,095,428.00 against the Debtor.  Accordingly, multiple claims asserted in the same amount are duplicative. | 12 |
| O'Film Global (HK) Trading Limited | 37 | 33 | Duplicate Claim | 13 |
| Pingan Bank Co Ltd Beijing Branch | 20041 | 20036 | Duplicate Claim | 14 |
| Shenzhen Yingda Capital Management Co. | 220000860 | 20034 | This creditor inadvertently received ballots both for scheduled and filed claims, so the amount to be voted on account of the scheduled claim should be disallowed. | 15 |
| Tianjin Jairui Huixin | 42 | 20027 | Duplicate Claim | 16 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Name of Claimant | Duplicate Claim to be Disallowed | Surviving Claim | Explanation | Exhibit No. to RFJN |
|---|---|---|---|---|
| Corp. Mgt LLC | | | | |
| Tianjin Jairui Huixin Corp. Mgt LLC | 43 | 20029 | Duplicate Claim | 17 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 44 | 20030 | Duplicate Claim | 18 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 45 | 20031 | Duplicate Claim | 19 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 46 | 20032 | Duplicate Claim | 20 |
| Tianjin Jairui Huixin Corp. Mgt LLC | 47 | 20039 | Duplicate Claim | 21 |
| Tianjin Yingxin Xinheng Investment Consulting Co. Ltd. | 28 | 20020 | Duplicate Claim | 22 |
| Weihua Qiu | 220000960 (scheduled claim) | 12 | This creditor inadvertently received ballots both for scheduled and filed claims, so the amount to be voted on account of the scheduled claim should be disallowed. | 23 |
| Weihua Qiu | 39 | 12 | Duplicate claim | 24 |
| Western Securities Co., Ltd. | 32 | 20028 | Duplicate Claim | 25 |
| Wuxi Leyike Investment Enterprise | 20025 | 20007 | Duplicate Claim | 26 |
| Xizang Jinmeihua Investment Co., Ltd. | 220001030 (scheduled claim) | 29 | In Chinese, Tibet is called Xizang. The creditor filed its claim using the name Tibet Jinmeihua Investment Co. Ltd. and, consequently, has received two separate ballots to vote a single debt in connection with the Debtor's Plan. The filed proof of claim should supersede the scheduled claim despite the difference in names. | 27 |

By this Objection, the Debtor simply seeks to have disallowed the Duplicate Claims leaving the Surviving Claims unaffected by this Objection.

**IV.**

**GENERAL RESERVATION OF RIGHTS**

The Debtor expressly reserves the right to amend, modify or supplement this Objection, and to file additional, other, or further objections to any proofs of claim filed in this Chapter 11 Case, including, without limitation, objections as to the amounts asserted therein, or any other claims (filed or not) against the Debtor, regardless of whether such claims are subject to this Objection.  Should one or more of the grounds of objection stated in this Objection be denied, the Debtor reserves his rights to object on other stated grounds or on any other grounds he discovers during the pendency of this Chapter 11 Case.  In addition, the Debtor reserves the right to file counterclaims against the holders of any such claims.

**V.**

**NOTICE**

The Debtor will serve copies of this Objection on:  (a) the Claimants, (b) the Office of the United States Trustee, (c) counsel to the Committee, and (d) all parties who have requested notices in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.

**VI.**

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and granting the Debtor such other and further relief as is just and proper.

Dated:      April _2_, 2020              PACHULSKI STANG ZIEHL & JONES LLP


                                         */s/ Malhar S. Pagay*
                                         Richard M. Pachulski
                                         Jeffrey W. Dulberg
                                         Malhar S. Pagay

                                         *Attorneys for Debtor and Debtor in Possession*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## DECLARATION OF LUETIAN SUN

I, Luetian Sun, declare as follows:

1.      I am one of Debtor's advisors who assist the Debtor with various financial and business matters.  I also have served as Faraday & Future, Inc.'s ("FF") Investor Relations Coordinator since January 2019.  Prior to joining FF, I received a bachelor's degree in civil engineering from Beijing University's School of Civil Engineering and Architecture and a Master of Business Administration degree from the University of California at Riverside.

2.      I am in regular communication with the Debtor's professionals, including legal counsel.

3.      I submit this Declaration (the "Declaration") in support of the Debtor's *Omnibus Objection for an Order Disallowing Duplicate Claims* (the "Objection").

4.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

5.      At the direction of the Debtor, I have reviewed and analyzed the Claims that are the subject of the Objection, and have discussed my findings with both the Debtor and his legal counsel. Based on my analysis, I have determined that the Duplicate Claim are duplicative of other claims and should therefore be disallowed in their entirety.

6.      Also, in order to facilitate notice and service of the Objection, I researched each Claimant's address registered with the National Enterprise Credit Information Publicity System (http://www.gsxt.gov.cn/index.html), a government-run, national, enterprise credit inquiry system in the People's Republic of China.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of April, 2020, at Los Angeles , California.

Luetian Sun
_____
Luetian Sun

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067**

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S NOTICE OF OMNIBUS OBJECTION AND OMNIBUS OBJECTION FOR AN ORDER DISALLOWING DUPLICATE CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF LUETIAN SUN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **April 2, 2020,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **April 2, 2020,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

United States Bankruptcy Court
Central District of California
Attn: Hon. Vincent Zurzolo
Edward R. Roybal Federal Bldg./Courthouse
255 East Temple Street, Suite 1360
Los Angeles, CA 90012

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 2, 2020 | Nancy H. Brown | | /s/ Nancy H. Brown |
|---|---|---|---|
| *Date* | *Printed Name* | | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                              **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:328782.1 46353/002

# SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ

## 1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)

- Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com
- Jerrold L Bregman    ecf@bg.law, jbregman@bg.law
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Lei Lei Wang Ekvall    lekvall@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Stephen D Finestone    sfinestone@fhlawllp.com
- Richard H Golubow    rgolubow@wghlawyers.com, pj@wcghlaw.com;jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com
- Ben H Logan    blogan@omm.com
- Robert S Marticello    Rmarticello@swelawfirm.com, gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- David W. Meadows    david@davidwmeadowslaw.com
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Victor A Sahn    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Felix T Woo    fwoo@ftwlawgroup.com, admin@ftwlawgroup.com
- Claire K Wu    ckwu@sulmeyerlaw.com, mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- David B Zolkin    dzolkin@ztlegal.com, maraki@ztlegal.com;sfritz@ztlegal.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

DOCS_LA:328782.1 46353/002

**F 9013-3.1.PROOF.SERVICE**

RECEIVED

JAN 21 2020

LEGAL SERVICES

United States Bankruptcy Court for the Central District Of California - Los Angeles Division

| Name of Debtor: | Yueting Jia |
| Case Number: | 19-24804 |

**For Court Use Only**

Claim Number:

File Date:

Filed: USBC - Central District of California
Yueting Jia    (B10)
19-24804 (VPZ)

# Proof of Claim (Official Form 410)

YT1

0000000027

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

04/19

## Part 1:    Identify the Claim

**1.    Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim):    BEIJING HUAXING MOBILE ASSET MGT CENTER

Other names the creditor used with the debtor: _____

**2.    Has this claim been acquired from someone else?**    ☑ No    ☐ Yes.    From whom? _____

**3.    Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name    BEIJING HUAXING MOBILE ASSET MGT CENTER | Name _____ |
| Address    NO.1077, HUIHE SOUTH STREET | Address _____ |
|    GAO BEIDIAN | _____ |
|    CHAOYANG DISTRICT | _____ |
| City    BEIJING | City _____ |
| State _____ ZIP Code 100123 | State _____ ZIP Code _____ |
| Country (if International):    CHINA | Country (if International): _____ |
| Phone:    +008613810354868 | Phone: _____ |
| Email:    218611o@qq.com | Email: _____ |

| 4. Does this claim amend one already filed? | 5. Do you know if anyone else has filed a proof of claim for this claim? |
|---|---|
| ☑ No | ☑ No |
| ☐ Yes. | ☐ Yes. |
| Claim number on court claims register (if known) _____ | Who made the earlier filing? _____ |
| Filed on _____    MM / DD / YYYY | |

Page 1 of 3

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes.

Last 4 digits of the debtor's account or any number you use to identify the debtor:

9502 _ _ _ _ _ _

**7. How much is the claim?**

$ 28,280,121.43    unliquidated

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Contract/Executory Contract

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe:

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed) _____%
☐ Fixed ☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of petition.

$_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property:

_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507(a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

Amount entitled to priority

$_____

$_____

$_____

$_____

$_____

---

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9): $_____

| Part 3: | Sign Below |
|---|---|

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:*<br>☑ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent.  Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other co-debtor.  Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Xiaoxing Ge*<br>_____    _____<br>Signature                                                  Date<br><br>**Provide the name and contact information of the person completing and signing this claim:** |

| | |
|---|---|
| Name | Xin Wang |
| Address | No.1077, Huihe South Street |
| | Gao beidian |
| | Chaoyang District |
| City | Beijing |
| State | Zip 100123 |
| Country (in international) | China |
| Phone | +008613810354868 |
| Email | 2186110@qq.com |

Do Not File

# 债权证据清单

## Proofs of Claim List

1. 借款合同- 中文

   Loan Contract- English Translation

2. 关于《借款合同》之补充协议- 中文

   Supplementary Agreement- English Translation

3. 承诺函（由乐视控股提供担保）- 中文

   Commitment Letter- English Translation

4. 投资者权利协议（Investor Rights Agreement）- 仅英文 (In English Only)

5. 电汇凭证- 中文

   Certificate of Telegraphic Transfer- English Translation

6. 电子银行回单- 中文

   Bank Electronic Receipt- English Translation

## Statement of Proofs of Claim

The loan amount is RMB 100 million Yuan, and the Interest on borrowings is 15% per year, the loan period is three years, starting from the date when the borrowing is actually received and ending at the expiration of the three-year period. In addition, If the Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd. (hereinafter referred to as the "target company") does not repay the loan after the due date, the lender has the right to recover the loan. And according to bank regulations, a five over ten thousand penalty fee will be charged per day.

On June 17, 2015, Beijing Huaxing Mobile Asset Management Center (LLP) transferred the first part of loan to the target company. On October 15, 2015, Beijing Huaxing Mobile Asset Management Center (LLP) transferred the second part of loan to the target company. Later, the target company was unable to repay the debts when the loan was due. According to the attached Commitment Letter, Leshi Holding (Beijing) Co Ltd., promises and guarantees that if the target company fails to fully fulfill its repayment obligations in accordance with the agreement in the transaction document, Leshi Holding (Beijing) Co Ltd. will assume the repayment obligation to Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies in accordance with the relevant agreements in the transaction documents.

We hereby, pursuant to the below attached four contracts and two proofs,

propose the claim for the debt. The total claim amount is RMB 193 million Yuan, including the principal RMB 100 million Yuan, the three year's interest RMB 45 million Yuan, the overdue interest RMB 22 million yuan, the overdue penalty fee RMB 27 million yuan. The claim amount is equivalent to 28.28 million US dollars at the exchange rate of $1 equivalent to RMB 6.86 Yuan.



# 借款合同

出借方：北京华兴移动资产管理中心（有限合伙）

借款方：乐视移动智能信息技术（北京）有限公司

借款方为进行经营活动，向出借方申请借款，经双方协商，特订立本合同，以便共同遵守。

一、借款种类：人民币

二、借款用途：经营所需

三、借款金额人民币 壹亿 元整（100，000，000.00 元）。

四、借款利息为每年百分之十五。

五、借款和还款期限：借款时间共叁年，自 2015 年 5 月 29 日起，至 2018 年 5 月 29 日止。

六、还款方式：现金

七、出借方将借款汇至借款方以下银行账户：

户名：

账号：

开户行：

八、保证条款

1、借款方必须按照借款合同规定的用途使用借款，不得挪作他用，不得用借款进行违法活动。

2、借款方必须按照合同规定的期限还本付息。





3、借款方有义务接受出借方的检查、监督借款的使用情况，了解借款方的计划执行、经营管理、财务活动、物资库存等情况。借款方应提供有关的计划、统计、财务会计报表及资料。

4、乐视控股（北京）有限公司及其实际控制人贾跃亭为还款责任提供连带保证。

九、违约责任

1、借款方如逾期不还借款，出借方有权追回借款，并按银行规定加收每日万分之五的罚息。

2、出借方未按期提供借款，应按违约数额和延期天数，付给借款方违约金。违约金数额的计算应与加收借款方的罚息计算相同。



十、争议解决：因执行本合同发生争议，由当事人双方协商解决。协商不成的，双方同意由出借方所在地有管辖权的人民法院管辖。

十一、其他

1、本合同非因不可抗力情况发生，任何一方当事人不得擅自变更或解除合同。当事人一方发生不可抗力，应及时采用书面形式通知其他当事人并提供证明。



2、本合同经双方同意后可以变更或解除。合同解除的，借款方已占用的借款和应付的利息，仍应按本合同的规定偿付。

3、出借方有权在借款期间内将本协议的债权转让给其关联方，借款方在此承诺并知悉上述转让事宜，不影响借款方继续履行本协议

约定的义务。

4、本合同如有未尽事宜，须经合同双方当事人共同协商，作出

补充规定，补充规定与本合同具有同等效力。

5、本合同正本一式二份，出借方、借款方各执一份。


出借方（盖章）：北京乐视移动资产管理中心（有限合伙）

法人代表或授权代表（签字）：


借款方（盖章）：乐视移动智能信息技术（北京）有限公司（公章）

法人代表或授权代表签字：


签约日期：2015 年 5 月 18 日

签约地点：北京

## Loan Contract

Lender: BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)

Borrower: LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD.,

In order to carry out business activities, the borrower applies for a loan from the lender. After consultation between the two parties, the contract is hereby concluded for mutual compliance.

I. Type of Loan: RMB

II. The purpose of borrowing: required for business

III. The amount of the loan is RMB 100 million yuan (100, 000, 000 yuan).

IV. Interest on borrowings is 15% per year

V. Borrowing and repayment period: The borrowing period is three years, starting from May 29, 2015 and ending on May 29, 2018.

VI. Repayment Method: Cash

VII. The lender remits the loan to the following bank accounts of the borrower:

    Account name:

    Account number:

    Account bank:

VIII. Guarantee Clause

1. The borrower must use the loan for the purpose specified in the loan contract. They shall not be diverted for other purposes and not be used for illegal activities.

2. The borrower must pay the principal and interest within the time limit stipulated in the contract.

3. The borrower is obliged to accept the inspection of the lender, supervise the use of the loan, understanding the borrower's plan execution, business management, financial activities, material inventory, etc. The borrower shall provide relevant plans, statistics,



financial accounting statements and information.

4. Leshi Holding (Beijing) Co Ltd. and its actual controller, Jia Yueting, provide joint guarantees for repayment responsibilities.

IX. Liability For Breach of Contract

1. If the borrower does not repay the loan after the due date, the lender has the right to recover the loan. And according to bank regulations, a five over ten thousand penalty fee will be charged per day.

2. The lender fails to provide the loan on schedule. They shall pay the borrower a penalty fee based on the amount of default and the number of days of extension. The calculation of the amount of liquidated damages shall be the same as the calculation of penalties added to the borrower.

X. Dispute Settlement: Disputes arising from the execution of this contract shall be resolved through consultation between the parties. If the negotiation fails, the two parties agree that The People's Court which has jurisdiction over the place where the lender is located.

XI. Others

1. In this contract, no party may alter or terminate the contract without authorization, except a result of force majeure. If either party meets force majeure, they shall promptly notify the other parties in writing and providing proof.

2. This contract can be changed or cancelled after mutual agreement. If the contract is terminated, the borrower's occupied loans and interest payable shall still be repaid in accordance with the provisions of this contract.





3. The lender has the right to transfer the creditor's rights of this agreement to its related parties during the borrowing period. The borrower hereby promises and is aware of the above transfer. The transfer of the creditor's rights do not affect the borrower's continued performance of its obligations under this agreement.

4. If there are unfinished matters in this contract, supplementary provisions shall be made

through mutual negotiation between the parties to the contract. The supplementary provisions have the same effect as this contract.

5. The original of this contract is made in duplicate, each of the lender and the borrower shall hold one copy.


Lender (stamp) : BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)

Signature of the legal representative or authorized representative (Signature):



Borrower (stamp) : LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD.,

Signature of the legal representative or authorized representative (Signature):


Signing date: May 28, 2015

Signing address: Beijing




乐视移动智能信息技术（北京）有限公司

与

北京华兴移动资产管理中心（有限合伙）

关于《借款合同》之



# 补充协议

中国·北京

二〇一五年六月

# 补充协议

本《借款合同》之补充协议（以下简称"本协议"）由以下双方于 2015 年 6 月 9 日在北京市签署：

甲　　方：乐视移动智能信息技术（北京）有限公司
地　　址：北京市朝阳区姚家园路 105 号乐视大厦 16 层
法定代表人：贾跃民

乙　　方：北京华兴移动资产管理中心（有限合伙）
地　　址：北京市建国门外大街永安东里 8 号 7 层 707 室
负　责　人：葛九松






鉴于：

1. 各方已于 2015 年 5 月 18 日在北京签署《借款合同》（"原协议"），该协议已经生效且各方均在按协议约定履行。

2. 原协议第五条约定，"借款时间共叁年，自 2015 年 5 月 29 日起，至 2018 年 5 月 29 日止。"但是，乙方作为出借人，截至本协议签署日因故尚未支付借款，实质上影响到借款利息的起算日期，双方同意修改该条款的表述。

故此拟定如下条款，以资共同遵守：

**第1条　修改内容**

各方一致同意，将原协议第五条中如下内容：

"借款时间共叁年，自 2015 年 5 月 29 日起，至 2018 年 5 月 29 日止。"

修改为：

"借款时间共叁年，自借款实际到账之日起，至叁年期限届满之日止（其他交易协议另有约定的，从其约定）。"。

**第2条　其余条款修改**

各方确认，除第五条修改外，原协议其他条款保持不变。



补充协议：2 / 3

**第3条    本协议其他事项**

3.1    各方理解并同意，各方就本次修改进行接触、磋商、谈判、合同/协议的起草、修改、签署、执行、任何合同/协议的条款及条件，以及任何一方向另一方提供的与本次交易相关的任何信息，若无其他方事先同意，任何一方均不得向公众公开或向任何第三方披露。若因法律法规、证券交易所规则规定或政府有权机构强制要求需要进行披露，披露方应（在其力所能及且相关法律或要求允许范围内）在做出此种披露之前合理时间内，与其他方磋商并尽最大努力（与对方合作）获得对所披露资料进行保密化处理。本条所约定保密责任不因本协议的履行、终止、解除或被判无效或不予执行等任何情形而影响其法律约束力，且永久有效。

3.2    原协议与本协议约定不一致的，依本协议约定执行；本协议没有约定的，仍按原协议约定执行。

3.3    本协议须经各方授权代表签署或盖章后方生效，一式二份，各方各留存一份，每份均具有同等法律效力。

[本行以下无正文]

甲方：乐视移动智能信息技术（北京）有限公司
（章）

签署人：

职务：

乙方：北京华兴移动资产管理中心（有限合伙）
（章）

签署人：

职务



LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY
(BEIJING) CO.,LTD.

AND

BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)

About the loan contract's

Supplementary Agreement



BEIJING, CHINA

In June, 2015

## Supplementary Agreement

This Supplemental Agreement to the <Loan Contract> (hereinafter referred to as the "Agreement,") was signed by the following parties in Beijing on June 9, 2015:

**First Party: LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO.,LTD.**

Address: 16th floor of Leshi Building, 105 Yaojia Yuan Road, Chaoyang District, Beijing.

Legal representative: Jia Yuemin

**Second Party: BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)**

Address: Room 707, 7th Floor, No. 8 Yongan East Lane, Jianguo men wai Road, Beijing.

Person in charge: Ge Jiusong

**Given these situations:**

1. The parties have signed the <Loan Contract> ("original agreement") in Beijing on May 18, 2015. The agreement has taken effect and all parties are performing according to the agreement.

2. Article 5 of the original agreement stipulated that "the borrowing period is three years, starting from May 29, 2015 and ending on May 29, 2018." However, as the lender, second party has not yet been issued for some reason as of the date of this agreement The payment of the loan substantially affected the starting date of the interest on the loan, and the two parties agreed to modify the formulation of the clause.



Therefore, the following clauses are formulated for mutual compliance:

**Article 1  Modify Content**

The parties agreed to change the original agreement in article 5 of the following contents:

"The borrowing period is three years, starting from May 29, 2015 and ending on May 29, 2018." into:

"The borrowing period is three years, starting from the date when the borrowing is actually received and ending at the expiration of the three-year period (if otherwise agreed by other transaction agreements, such agreement shall prevail).

**Article 2 Other Terms Modified**

All parties confirmed that, with the exception of the amendment to Article 5, other provisions of the original agreement remained unchanged.

**Article 3 Other Matters of This Agreement**

3.1 Each party understands and agrees that the parties have made contacted, negotiated, negotiated, drafted, modified, signed, executed, executed the contract / agreement, the terms and conditions of any contract / agreement, and provided to the other party any information related to this transaction in this agreement. Without the prior consent of the other party, neither party can make it public or disclose to any third party. If disclosure is required by laws, regulations, stock exchange rules, or mandated by a government authority, the disclosing party shall (within its ability and permitted by relevant laws or requirements), within a reasonable time before making such disclosure, communicate with others The parties negotiate and do their best (in cooperation with the other party) to obtain confidentiality of the disclosed information. The obligation of confidentiality stipulated in this article does not affect its legal binding force due to any circumstances such as the performance, termination, release or invalidation or non-enforcement of this agreement, and it is permanently valid.

3.2 If the original agreement does not agree with this agreement, it shall be implemented in accordance with this agreement: if there is no agreement in this agreement, it shall still be implemented in accordance with the original agreement.

3.3 This agreement takes effect after being signed or stamped by authorized representatives of each party, in duplicate, each party retains one, each of this agreement has the same legal benefits.

(No text below this line)

**First Party: LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO.,LTD. (STAMP)**

Signer:

Position:

**Second Party: BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP) (STAMP)**

Signer:

Position:



**EXECUTION VERSION**

**INVESTOR RIGHTS AGREEMENT**

among

**BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)**

**LEVIEW MOBILE & INTELLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD.,**

**LEVIEW MOBILE LTD.,**

**LE LTD.,**

and

**YUETING JIA**

**Dated May 18, 2015**

## TABLE OF CONTENTS

SECTION 1 INTERPRETATION................................................................................4

SECTION 2 CONDITIONS PRECEDENT TO COMPLETION...................................10

SECTION 3 OBLIGATIONS OF THE COMPANY, THE OWNER AND THE
INVESTOR BETWEEN EXECUTION AND COMPLETION..................................12

SECTION 4 REPRESENTATIONS AND WARRANTIES........................................12

SECTION 5 INVESTOR RIGHTS..............................................................................13

SECTION 6 CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS......26

SECTION 7 FEES AND EXPENSES.........................................................................27

SECTION 8 INDEMNIFICATION............................................................................27

SECTION 9 TERMINATION....................................................................................28

SECTION 10 NOTICES............................................................................................29

SECTION 11 MISCELLANEOUS.............................................................................29

SECTION 12 GOVERNING LAW AND DISPUTE RESOLUTION.........................32

SCHEDULES

SCHEDULE 1  SHAREHOLDING STRUCTURE OF THE GROUP

SCHEDULE 2  COLLECTIVE WARRANTIES

SCHEDULE 3  INVESTOR WARRANTIES

**INVESTOR RIGHTS AGREEMENT** (this "Agreement") made on May   . 2015,
AMONG:

(1)    **LEVIEW MOBILE & INTELLIGENT INFORMATION TECHNOLOGY
(BEIJING) CO., LTD.** (乐视移动智能信息技术（北京）有限公司), a
company organized and existing under the laws of China with its registered
office at No. 2, Linkong Erlu, Wenhuaying Country, Gaoliying Town, Shunyi
District, Beijing, PRC (the "Borrower");

(2)    **LEVIEW MOBILE LTD.**, an exempted company incorporated and existing
under the laws of the Cayman Islands with its company number 296318 and
registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana
Bay, Grand Cayman, Cayman Islands (the "Company");

(3)    **LE LTD.**, an exempted company incorporated and existing under the laws of
the Cayman Islands with its company number 295848 and registered office at
Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman,
Cayman Islands (the "Cayman Co");

(4)    **YUETING JIA** (贾跃亭), holder of PRC Identification Card Number of
14262319731215081X, Linfen City, Shanxi Province, PRC (the "Owner"); and

(5)    **BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER
(LLP)**( 北京华兴移动资产管理中心（有限合伙）), a limited partnership
established and existing under the laws of China with its registered office at
Room 707, 7th Floor, No. 8 Yongan Dongli, Jianguo Menwai Avenue, Beijing,
PRC (the "Investor").

**RECITALS:**

(A) The Investor intends to invest into the Company or the Cayman Co;

(B) To facilitate the investment by the Investor in the Company or the Cayman Co,
prior to or on the date of the execution of this Agreement, the Borrower, the
Investor and the affiliates of the Investor entered into an loan agreement (the "Loan
Agreement"), pursuant to which the Investor and its affiliates will offer certain loan
with a principal amount of RMB100,000,000 (the "Debt"); and

(C) The Parties desire to enter into this Agreement and make the respective
representations, warranties, covenants and agreements set forth herein on the terms
and conditions set forth herein.

**AGREEMENT:**

# SECTION 1
## INTERPRETATION

1.1    Definitions.  In this Agreement, unless the context otherwise requires the
following words and expressions have the following meanings:

"Accounting Standards" means the International Financial Reporting Standards
(IFRS) or the Accounting Principles Generally Accepted in China (Chinese
GAAP) adopted by the Company and applied on a consistent basis.

"Affiliate" of a Person (the "Subject Person") means (a) in the case of a Person
other than a natural person, any other Person that directly or indirectly Controls,
is Controlled by or is under common Control with the Subject Person and (b) in
the case of a natural person, any other Person that directly or indirectly is
Controlled by the Subject Person or is a Relative of the Subject Person.  In the
case of an Investor, the term "Affiliate" includes (v) any shareholder of the
Investor, (w) any of such shareholder's general partners or limited partners, (x)
the fund manager managing such shareholder (and general partners, limited
partners and officers thereof) and (y) trusts controlled by or for the benefit of
any such individuals referred to in (v), (w) or (x).

"Basic Documents" means this Agreement, the Loan Agreement, the Company
Charter Documents and the Onshore Contracts.

"Big Four Accounting Firms" means Deloitte Touche Tohmatsu Limited,
PricewaterhouseCoopers, Ernst & Young Global Limited and Klynveld Peat
Marwick Goerdeler.

"Board" means the board of directors of the Company as from time to time
constituted.

"Business Day" means any day other than a Saturday, Sunday or other day on
which commercial banks in the PRC, HKSAR or Cayman Islands are required
or authorized by law or executive order to be closed or on which a tropical
cyclone warning no. 8 or above or a "black" rainstorm warning signal is hoisted
in HKSAR at any time between 9:00 a.m. and 5:00 p.m. Hong Kong time.

"BVI Co" means Lele Holding Ltd., a business company incorporated and
existing under the laws of the British Virgin Islands with its company number
1859050 and registered office at P.O. Box 905, Quastisky Building, Road Town,
British Virgin Islands.

"China" or the "PRC" means the People's Republic of China and for the purpose
of this Agreement shall exclude HKSAR, Taiwan and the Macau Special
Administrative Region.

"Collective Warranties" means the representations, warranties and undertakings
of the Company and the Owner set forth in Schedule 2.

4

"Company Charter Documents" means the Memorandum of Association and Articles of Association of the Company.

"Control" of a Person means (a) ownership of more than 50% of the shares in issue or other equity interests or registered capital of such Person or (b) the power to direct the management or policies of such Person, whether through the ownership of more than 50% of the voting power of such Person, through the power to appoint a majority of the members of the board of directors or similar governing body of such Person, through contractual arrangements or otherwise.

"Encumbrance" means (a) any mortgage, charge (whether fixed or floating), pledge, lien (other than lien created by operation of law), hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, and (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person.

"Event of Default" has the meaning set forth in Section 5.1(b)(i) of this Agreement.

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital or joint venture or other ownership interest.

"Existing Business" means the business of researching, designing, developing, manufacturing, selling and marketing of mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Governmental Authority" means any nation or government or any province or state or any other political subdivision thereof; any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality or any political subdivision thereof; any court, tribunal or arbitrator, the governing body of any securities exchange and any other self-regulatory organization.

"Group" means collectively the BVI Co, the Cayman Co, the Company, the HK Co, the WFOE (upon its incorporation) the Onshore Companies and any other Person in which the BVI Co, the Cayman Co, the Company, the HK Co or the WFOE directly or indirectly owns a majority interest and "Group Member" means any of them.

"HK Co" means Leview Mobile HK Limited, a limited company incorporated and existing under the laws of HKSAR with its company number 2205943 and registered office at RM 504, 5/F Valley Centre, No. 80-82 Morrison Hill Road, Wanchai, HKSAR.

"HKSAR" means the Hong Kong Special Administrative Region of the PRC.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Issuance Date" means the date on which Investor disburses the loan to the Borrower pursuant to the Loan Agreement.

"Investor Warranties" means the representations, warranties and undertakings of the Investor set forth in Schedule 3.

"Lefeng Mobile" means Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司), a company incorporated under the laws of the PRC.

"Maturity Date" means the third-year anniversary of the Issuance Date.

"Mortgaged Shares" means (i) 5% of the Ordinary Shares owned by the Cayman Co in the Company on the date of the closing of the Note's conversion into the Convertible Note, if applicable, and (ii) any shares acquired in respect of Mortgaged Shares by reason of a stock split, stock dividend, reclassification or otherwise.

"Onshore Companies" means Beijing Pala Culture & Media Co., Ltd. (北京百乐文化传媒有限公司), Lefeng Mobile and the Borrower, which incorporated under the laws of the PRC, and "Onshore Company" means any of them.

"Onshore Contracts" means agreements to be entered into between the WFOE, Lefeng Mobile, the Owner or any of their Affiliates, including an exclusive consulting and services agreement, an exclusive call option agreement, an equity pledge agreement, a voting right proxy agreement and a business operation agreement, each in the form and the substance reasonably satisfactory to the Investor.

**"Ordinary Shares" means the ordinary shares having a par value of US$0.0001 per share in the capital of the Company.**

"Party" or "Parties" means any signatory or the signatories to this Agreement and any Person who subsequently becomes a party to this Agreement pursuant to the terms and conditions hereof.

"Person" means any natural person, firm, company, governmental authority, joint venture, partnership, association or other entity (whether or not having separate legal personality).

"Redemption Date" has the meaning set forth in Section 5.1(c)(ii) of this Agreement.

"Related Party" means (a) any shareholder of any Group Member, (b) any director of any Group Member, (c) any officer of any Group Member, (d) any Relative of a shareholder, director or officer of any Group Member, (e) any Person in which any Group Member, any shareholder, director or officer of any Group Member has any interest other than a passive shareholding of less than five percent in a publicly listed company, or over which a Related Party exercises Control or significant influence through contractual arrangements, voting, management or directorship position or ownership, and (f) any other Affiliate of any Group Member.

"Redemption Price" has the meaning set forth in Section 5.1(c)(iii) of this Agreement.

"Relevant Securities" means Qualified Financing Securities or other securities into which the Note or the Convertible Note may be convertible.

"Qualified Financing" means any issue of preferred shares or equity-linked convertible debt securities of the Company after the Issuance Date but on or before the Maturity Date to institutional investors (other than the Investor) on terms and conditions that would be reasonably acceptable to prudent, sophisticated investors in light of the circumstances, or any other issuance of equity securities of the Company after Issuance Date.

"Qualified Financing Securities" means the securities to be issued by the Company in connection with the Qualified Financing.

"Relative" of a natural person means the spouse of such person, and any parent, grandparent, child, grandchild, sibling, uncle, aunt, nephew, or niece of such person or such person's spouse.

"Restructuring" means the restructuring the result of which (i) is the corporate structure set forth in Schedule 1A hereof as of the date of this Agreement and as of the Issuance Date respectively; and (ii) will be the corporate structure set forth in Schedule 1B hereof within the timeframe after the Issuance Date agreed upon by the Investor, the Owner and the Company in this Agreement.

"RMB" means the renminbi yuan, the lawful currency of the PRC.

7

"US$" means United States Dollars, the lawful currency of the United States of America.

"Warranties" means the Collective Warranties and the Investor Warranties.

"WFOE" means Lesai Mobile Technology (Beijing) Co., Ltd. (乐赛移动科技（北京）有限公司), a wholly foreign-owned enterprise to be organized and existing under the laws of China.

1.2    Terms Defined Elsewhere in this Agreement.  The following terms are defined in this Agreement as follows:

| Term | Location |
|---|---|
| "Agreement" | Preamble |
| "Borrower" | Preamble |
| "Breach" | Section 5.1(b)(i)(3) |
| "Company" | Preamble |
| "Cayman Co" | Preamble |
| "Confidential Information" | Section 6.1 |
| "Convertible Note" | Section 5.2(a)(i)(1) |
| "Convertible Notice" | Section 5.2(c)(i) |
| "Default Notice" | Section 5.1(b)(iii) |
| "Disposed Shares" | Section 5.4(a) |
| "Disposition" | Section 5.4(a) |
| "Disposition Notice" | Section 5.4(a) |
| "Dispute" | Section 12.2(a) |
| "Election Period" | Section 5.3(d) |
| "Financing Terms" | Section 6.1 |
| "HKIAC" | Section 12.2(a) |
| "Investor" | Recitals |
| "Indemnified Party" | Section 8.1 |
| "Indemnifying Party" | Section 8.1 |
| "Investor" | Preamble |
| "Investment Consideration" | Section 5.2(a)(iii) |
| "Losses" | Section 8.1 |
| "Loan Agreement" | Recitals |
| "Note" | Recitals |
| "New Securities" | Section 5.3(a) |
| "Observer" | Section 5.7 |
| "Owner" | Preamble |
| "Preemptive Right" | Section 5.3(a) |
| "Pro Rata Share" | Section 5.3(b) |
| "Redemption Notice" | Section 5.1(a) |
| "Redemption Request" | Section 5.1(c)(i) |
| "Representatives" | Section 6.1 |
| "Tag-along Right" | Section 5.4(a) |
| "Tag-along Shares" | Section 5.4(b) |
| "Transaction" | Section 5.2(f) |
| "Valuation" | Section 5.2(b)(i)(3) |

8

1.3    Interpretation.

    (a)    <u>Directly or Indirectly</u>.  The phrase "<u>directly or indirectly</u>" means directly, or indirectly through one or more intermediate Persons or through contractual or other arrangements, and "<u>direct or indirect</u>" has the correlative meaning.

    (b)    <u>Gender and Number</u>.  Unless the context otherwise requires, all words (whether gender-specific or gender neutral) shall be deemed to include each of the masculine, feminine and neuter genders, and words importing the singular include the plural and vice versa.

    (c)    <u>Headings</u>.  Headings are included for convenience only and shall not affect the construction of any provision of this Agreement.

    (d)    <u>Include not Limiting</u>.  "<u>Include</u>," "<u>including</u>," "<u>are inclusive of</u>" and similar expressions are not expressions of limitation and shall be construed as if followed by the words "<u>without limitation</u>."

    (e)    <u>Law</u>.  References to "<u>law</u>" shall include all applicable laws, regulations, rules and orders of any Governmental Authority, securities exchange or other self-regulating body, any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment; and "<u>lawful</u>" shall be construed accordingly.

    (f)    <u>References to Documents</u>.  References to this Agreement include the Schedules and Exhibits, which form an integral part hereof.  A reference to any Section, Schedule or Exhibit is, unless otherwise specified, to such Section of, or Schedule or Exhibit to this Agreement.  The words "<u>hereof</u>," "<u>hereunder</u>" and "<u>hereto</u>," and words of like import, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular Section hereof or Schedule or Exhibit hereto.  A reference to any document (including this Agreement) is to that document as amended, consolidated, supplemented, novated or replaced from time to time.

    (g)    <u>Time</u>.  If a period of time is specified and dates from a given day or the day of a given act or event, such period shall be calculated exclusive of that day.

    (h)    <u>Writing</u>.  References to writing and written include any mode of reproducing words in a legible and non-transitory form including emails and faxes.

    (i)    <u>Language</u>.  This Agreement is drawn up in the English language.  If this Agreement is translated into any language other than English, the English language text shall prevail.

## SECTION 2
## CONDITIONS PRECEDENT TO COMPLETION

2.1    Conditions Precedent to Obligations of Investor at Completion. The obligation of the Investor to complete the purchase of the Note at the Issuance Date is subject to the fulfillment, prior to or simultaneously with the Issuance Date, of the following conditions, any one or more of which may be waived by the Investor in writing, *provided* that if any of the following conditions is waived by the Investor on or before the Issuance Date, the Company, the Owner and the Borrower shall cause such conditions to be fulfilled promptly after the Issuance Date if requested by the Investor in writing:

(a)    the Collective Warranties remaining true and correct in all material respects on the Issuance Date as provided in Section 4.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Issuance Date;

(b)    each of the Group Members, the Onshore Companies and the Owner having performed and complied in all material respects with all of its agreements and obligations contained in the Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Issuance Date;

(c)    the Investor having completed its business, legal and financial due diligence review of the Company and its subsidiaries and the results of that review shall be satisfactory to the Investor;

(d)    each of the Group Members and the Onshore Companies having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of the Basic Documents to which it is a party, and the transactions contemplated hereby and thereby;

(e)    all consents and approvals of, notices to and filings or registrations with any Governmental Authority or any other Person required to consummate the transactions contemplated under this Agreement and the other Basic Documents (to the extent that such transactions are to be completed on or prior to the Issuance Date), shall have been obtained or made (including all required approvals for the Restructuring and all required approvals and registration of the establishment of the WFOE and the direct or indirect ownership by any PRC residents of an interest in the Company including registrations pursuant to the Notice on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Corporate Financing and Roundtrip Investment through Offshore Special Purpose Vehicles issued by State Administration of Foreign Exchange on July 4, 2014 and any subsequent similar rules, amendments or supplements of the PRC) and copies thereof having been provided to the Investor;

(f)    there being no Governmental Authority or other Person that has:

    (i)    instituted or threatened in writing any legal, arbitral or administrative proceedings against the Owner, any Group Member, or the Onshore Companies to restrain, prohibit or otherwise challenge the purchase of the Note by the Investor or any of the other transactions contemplated under the Basic Documents (including without limitation, the Restructuring); or

    (ii)    proposed or enacted any statute or regulation which would prohibit, materially restrict or materially delay implementation of the transactions contemplated under the Basic Documents (including without limitation. the Restructuring), or the operation of the Group as a whole after the Issuance Date as contemplated in the Basic Documents;

(g)    the Investor having received (i) a legal opinion from Walkers, the Cayman Islands counsel of the Company, and (ii) a legal opinion from King & Wood Mallesons, the PRC counsel of the Company, in each case, dated as of the Issuance Date and in the form and substance satisfactory to the Investor.

2.2    <u>Conditions Precedent to Obligations of Company at Completion</u>.  The Company's obligation to procure the Borrower to complete the issuance of the Note at the Issuance Date is subject to the fulfillment, prior to or simultaneously with the Issuance Date, of the following conditions, any one or more of which may be waived by the Company or the Borrower:

(a)    the Investor Warranties remaining true and correct in all material respects on the Issuance Date as provided in Section 4.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Issuance Date;

(b)    the Investor having performed and complied in all material respects with all of its agreements and obligations contained in this Agreement and the other Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Issuance Date;

(c)    the Investor having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party, and the transactions contemplated hereby and thereby; and

(d)    each of the Basic Documents to which an Investor is a party having been executed by the Investor and delivered to the Company or the Borrower.

11

## SECTION 3
## OBLIGATIONS OF THE COMPANY, THE OWNER AND THE
## INVESTOR BETWEEN EXECUTION AND COMPLETION

3.1    Notices of Breaches by the Company, the Borrower and the Owner. From the date hereof until the Issuance Date, except as disclosed in the Basic Documents or otherwise as contemplated thereunder, the Company and the Borrower shall, and the Company and the Owner shall cause each of the other Group Members and Onshore Companies to, conduct its respective business in a manner so as to ensure that the Collective Warranties continue to be true and correct on and as of the Issuance Date as if made on and as of Issuance Date. The Company, the Borrower and the Owner shall give the Investor prompt notice of any event, condition or circumstance occurring prior to the Issuance Date that would constitute a breach of any Collective Warranty if such Collective Warranty were made as at any date between the date hereof and the Issuance Date, or that would constitute a breach of any terms and conditions contained in this Agreement.

3.2    Business Operation. From the date hereof until the Issuance Date, the Company and the Owner shall, and shall cause each other Group Member or the Borrower where applicable to, (i) carry on their respective business in the ordinary course; (ii) comply in all material respects with all applicable law and other requirements relating to the operation of their respective businesses; and (iii) with no less diligence and efforts that would be applied in the absence of the transactions contemplated hereunder.

3.3    Notifications. Until the Issuance Date, each Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 2 becoming incapable of being satisfied.

3.4    Further Action. The Parties shall use all reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

## SECTION 4
## REPRESENTATIONS AND WARRANTIES

4.1    Collective Warranties. The Company, the Cayman Co, the Borrower and the Owner, severally and jointly, represent, warrant and undertake to the Investor in the terms of the Collective Warranties and acknowledge that the Investor in entering into this Agreement is relying on such Collective Warranties.

4.2    Investor Warranties. The Investor represents, warrants and undertakes to the Company in the terms of the Investor Warranties and acknowledges that the Company in entering into this Agreement is relying on the Investor Warranties.

4.3     Knowledge of Claims. No investigation by or on behalf of any Party shall prejudice any claim made by such Party under the indemnity contained in Section 8 or operate to reduce any amount recoverable thereunder, provided that a Party shall have no liability for (i) any breach of or inaccuracy in the Warranties made by such Party to the extent the Indemnified Party has actual knowledge, at or prior to the Issuance Date of such breach or inaccuracy, (ii) any breach of or failure to perform any covenant or obligations of such Party which are required to be performed at or prior to the Issuance Date hereunder, to the extent that the Indemnified Party has actual knowledge, at or prior to the Issuance Date of such breach or failure.

4.4     Separate and Independent. The Collective Warranties shall be separate and independent and save as expressly provided shall not be limited by reference to any other paragraph or anything in this Agreement or the Schedules.

4.5     Bring-Down to Completion. The Warranties shall be deemed to be repeated as at the Issuance Date as if they were made on and as of the Issuance Date, other than such Warranties as are made specifically as of another specified date, which shall be true and correct as of such date, and all references therein to the date of this Agreement were references to the Issuance Date.

4.6     Survival of Warranties. All of the Warranties shall survive the Issuance Date for a period of 18 months after the Issuance Date, *provided* that the warranties set forth in Sections 2, 10 and 12 of Schedule 2 and Sections 2 and 4 of Schedule 3 should survive indefinitely.

**SECTION 5**
**INVESTOR RIGHTS**

5.1     Redemption.

    (a)     Redemption on Maturity. The Investor shall have the right to require the Borrower to redeem the Note on the Maturity Date or upon or immediately following the second-year anniversary of the Issuance Date at the Redemption Price (defined as below) by delivering a prior written notice (the "Redemption Notice") to the Borrower following the Redemption Procedure set forth in Section 5.1(c).

    (b)     Redemption on Event of Default.

        (i)     The occurrence of any one or more of the following events shall constitute an "Event of Default":

            (1)     the Borrower or the Company shall fail to pay debt that is due and payable or any other amount (if any) when due in accordance with the terms hereof;

            (2)     the change of actual controller of the Company or the Borrower;

13

(3)     any representation, warranty, covenant, undertaking, certification or statement made by or on behalf of the Company or the Borrower in any Basic Documents or in any certificate or other document delivered pursuant thereto shall have been materially incorrect, misleading or false in any material respect when made (a "Breach") and, if capable of being remedied, has not been remedied within thirty (30) days after being notified in writing of such Breach by the Investor; provided that such Breach has caused or is likely to cause a material adverse change on the business of the Group as a whole or on the rights and liabilities of the Investor under the Basic Documents;

(4)     any breach of the undertakings and covenants as specified in Sections 5.5, 5.6, 5.7 and 5.8 of this Agreement.

(5)     the Company, the Borrower or any of their respective significant or material Affiliates shall commence any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to any Group Member, or seeking to adjudicate any Group Member bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to any Group Member or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for any Group Member or for all or any substantial part of its assets;

(6)     the involuntary delisting of Leshi Internet Information Technology Corp., Beijing (乐视网信息技术（北京）股份有限公司, 300104.CH);

(7)     the Company shall fail to deliver the Relevant Securities when such Relevant Securities are required to be delivered following conversion of the Note or the Convertible Note (defined as below) in accordance with the terms hereof.

(ii)    Upon the occurrence of an Event of Default, the Company shall give the Investor a prompt notice of the occurrence of such Event of Default.

(iii)   Upon the occurrence and during the continuance of an Event of Default, the Investor may, by notice in writing to the Borrower (the "Default Notice"), request the Event of Default to be remedied within ten (10) Business Days or other time the Investor may deem to be reasonable.

14

(iv) Upon the Borrower's or any of its applicable Affiliates' failure to remedy the default in accordance with the Default Notice, the Investor shall be entitled to declare the Note in whole, and require the Borrower to redeem the Note on the Redemption Date at the Redemption Price by delivering a Redemption Notice to the Borrower following the Redemption Procedure set forth in Section 5.1(c).

(c) Redemption Procedures.

(i) On or before the Redemption Date, the Investor shall surrender a request for redemption (the "Redemption Request") to the Borrower, in the manner and at the place designated in the Redemption Notice. Upon the surrender of the Redemption Request to the Borrower, the applicable Redemption Price shall be payable to the order of the Investor.

(ii) The Redemption Date for Section 5.1(a) shall be Maturity Date or the second-year anniversary of the Issuance Date, as the case may be, and for Section 5.1(b) shall be 3rd Business Day after the date of Redemption Notice.

(iii) The Investor upon exercise of its redemption right shall have the right to redeem the Note at the Redemption Price, which is calculated as the total outstanding principal amount with respect to the Note, plus any accrued and unpaid interest at 15% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Issuance Date divided by 365 days; the payment is to be made by cash, and the Investor may request for the cash payment to come from the Owner or other companies and institutions designated by the Owner.

(iv) The payment shall become due and payable on the Redemption Date, and calculated from and including the Issuance Date until the payment date, plus any accrued and unpaid interest.

(v) If prior to the Maturity Date the Investor is unable to exercise its right to convert the Note into any shares in the Company or the Cayman Co, as the case may be, as the result of the non-occurrence e of any Qualified Financing for a reason attributable to the Borrower, the Company, the Cayman Co or the Owner, the Investor upon exercise of its redemption right shall have the right to redeem the Note at a new redemption price, which is calculated as the total outstanding principal amount with respect to the Note, plus any accrued and unpaid interest at 25% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Issuance Date divided by 365 days; the payment is to be made by cash, and the Investor may request for the cash payment to come from

15

the Owner or other companies and institutions designated by the Owner.

(vi)   If the Investor, at its own election, does not exercise its right to convert the Note which the Investor may subscribe prior to the Qualified Financing into preferred shares of the Company or the Cayman Co or subscribe or receive any shares of the Company or the Cayman Co on the Qualified Financing prior to the Maturity Date as provided in Section 5.2(a)(i), the Investor shall be entitled to redeem the Note at the Redemption Price in accordance with Section 5.1(c)(iii).

5.2   Conversion.

(a)   General.

(i)   After the Issuance Date, the Investor shall have the right to, or have one of its qualified offshore Affiliates to:

(1)   convert the Note into certain convertible notes (the "Convertible Note") to be issued by the Company, which may be, at the election of the Investor, converted into preferred shares of the Company or the Cayman Co at any time agreed by the Parties prior to any Qualified Financing in accordance with this Section 5.2; or

(2)   directly convert the Note into certain preferred shares of the Company or the Cayman Co on the Qualified Financing.

(ii)   Upon the Investor's exercise of its right to convert the Note into the Convertible Note, the Mortgaged Shares shall be mortgaged to the Investor for the benefit of the Investor to secure the payment and other obligations of the Company under the applicable transaction documents.

(iii)   Upon the Investor's exercise of its right to directly convert the Note into preferred shares of the Company or the Cayman Co on a Qualified Financing, the Investor agrees to invest certain amount of cash in a foreign currency (the "Investment Consideration") into the Company or the Cayman Co in exchange for certain number of preferred shares of the Company or the Cayman Co, and upon the receipt of the Investor Consideration, the Borrower undertakes and covenants to, or the Company and the Owner shall cause the Borrower to, subject to the compliance with applicable PRC laws and the agreement of parties on the details:

(1)    use the Investment Consideration to redeem the Note and release the Investor's payment obligation under the Note; or

(2)    use other funds to redeem the Note and release the Investor's obligation under the Note, the amount of which shall be equal to the Investment Consideration.

(iv)    The Owner and the Cayman Co undertake, and shall procure to the extent permitted by law, that the Investor shall enjoy the same rights set forth under this Section 5, in the event that the Note or the Convertible Note held by the Investor is converted to the Cayman Co shares, at the election of the Investor, on the Qualified Financing as specified under this Section 5.2.

(b)    <u>Conversion on Qualified Financing</u>. The Investor shall be entitled to exercise its right of conversion as specified under this Section 5.2(b).

(i)    Should a Qualified Financing occur prior to the Maturity Date, the Investor shall have the right, but not the obligation, to convert the then outstanding amount owing under Note or the Convertible Note, in whole, into preference shares subject to Section 5.2(c) in accordance with the method as follows:

(1)    if converted to the Company shares:

$$\frac{\text{outstanding principal amount x (1 + 15\% x actual days elapsed since Issuance Date /365)}}{80\% \text{ x per share price as at the Company's Qualified Financing}}$$

(2)    if converted to Cayman Co shares and by then Cayman Co has had a first Qualified Financing:

$$\frac{\text{outstanding principal amount x (1 + 15\% x actual days elapsed since Issuance Date /365)}}{80\% \text{ x per share price as at Cayman Co's first Qualified Financing}}$$

or

(3)    if converted to Cayman Co shares and by then the Cayman Co has not had a first Qualified Financing, the Investor shall negotiate with the Owner of the valuation (the "<u>Valuation</u>") of the Cayman Co and the shares shall be calculated as follows:

$$\frac{\text{outstanding principal amount x (1 + 15\% x actual days elapsed since Issuance Date /365)}}{80\% \text{ x per share price as at the Valuation}}$$

(ii)    Within 30 Business Days after the request of the Investor, the Owner shall procure that the Company shall deliver to the Investor all legal, financial and business information, the final form of the transaction documents with respect to the financing,

17

and such other materials related thereto that may be reasonably requested by the Investor.

(iii)    Except for Section 5.2(b)(i)(3), Qualified Financing Securities issued to the Investor upon conversion of the Note or the Convertible Note shall be identical with respect to rights, preferences and designations as, and shall rank *pari passu* with, the Qualified Financing Securities issued to the investors in the Qualified Financing and Investor shall otherwise be entitled to rights under the applicable Qualified Financing definitive documents, as the case may be, on parity with the investors thereunder.

(c)    Conversion Procedures.

(i)    Subject to compliance with the procedures set forth in Section 5.2, the conversion rights set forth in this Agreement shall be exercised by the Investor at any time during usual business hours on a Business Day, at the registered office of the Company (or such other office or agency of the Company as the Company and the Investor may agree), accompanied by a conversion notice (the "Convertible Notice") specifying (i) that the Investor elects to convert the entire Note or the Convertible Note and (ii) subject to the transfer restrictions as agreed, the name or names (with address) in which a certificate or certificates for the Relevant Securities are to be issued.

(ii)    As soon as practicable and in any event within 5 Business Days after the date of the Conversion Notice, the Company shall:

(1)    take all actions and execute all documents necessary to effect the issuance and to the extent the Relevant Securities are in the form of equity securities, registration of such Relevant Securities on the register of the Company (including, where applicable, giving all necessary instruction to the relevant share registry to effect such issuance) and deliver to the Investor certified copies of the register of members reflecting the Relevant Securities in the name of the Investor or its nominee or assignee, and

(2)    deliver to the Investor (x) where the Relevant Securities are in the form of equity securities, certificate(s) representing the number of validly issued, fully paid and non-assessable Relevant Securities calculated in accordance with Section 5.2, as the case may be and (y) where the Relevant Securities are in the form of equity-linked securities, certificate(s) representing the principal amount of Relevant Securities calculated in accordance with Section 5.2(b)(i)(1) or 5.2(b)(i)(2).

18

(d) Fractional Shares. If the conversion of the Note or the Convertible Note would result in the issuance of any fractional share, the Company shall, at its option, round upwards and issue one additional share or pay to the Investor the portion of the principal amount convertible into such fractional share.

(e) Availability of Equity Securities. The Company covenants that it will at all times reserve and maintain authority to issue the maximum number of Equity Securities issuable upon conversion of the Note or the Convertible Note. The Company covenants that all Equity Securities, when issued or delivered pursuant to Section 5.2(e), shall be duly and validly issued, shall rank *pari passu* with all other Equity Securities issued in the Qualified Financing, as the case may be, and where they are in the form of equity securities non-assessable, fully paid, free and clear of all Encumbrances, other than Encumbrances arising under the Basic Documents or created, imposed or agreed in writing by the Investor.

(f) Reorganization, Reclassification. Subject to the terms of the applicable agreement with respect to the Note or the Convertible Note, in case of any merger, amalgamation, arrangement or consolidation of the Company or any capital reorganization, reclassification or other change of outstanding Ordinary Shares (each, a "Transaction"), the Company shall execute and deliver to the Investor at least 30 days prior to effecting such Transaction a certificate, signed by a director of the Company, stating that the rights of the Investor shall continue to be recognized and not prejudiced by the Transaction and appropriate provision shall be made therefor in the agreement, if any, relating to such Transaction. The provisions of this Section 5.2(f) and any equivalent thereof in any such certificate similarly shall apply to successive transactions.

(g) Legend. The Investor shall agree to the imprinting, so long as required by law, of a legend on certificates representing all of the Investor's Relevant Securities issuable upon conversion of the Note or the Convertible Note in substantially the following form:

LEVIEW MOBILE LTD. (THE "COMPANY") IS A COMPANY INCORPORATED UNDER THE LAWS OF THE CAYMAN ISLANDS, AND THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL NOT BE SOLD, ASSIGNED, TRANSFERRED, EXCHANGED, MORTGAGED, PLEDGED OR OTHERWISE DISPOSED OF OR ENCUMBERED WITHOUT COMPLIANCE WITH THE ARTICLES OF ASSOCIATION OF THE COMPANY, DATED FEBRUARY 3, 2015, AMONG THE COMPANY AND THE SHAREHOLDERS OF THE COMPANY, AS AMENDED AND RESTATED FROM TIME TO TIME. COPIES OF SUCH ARTICLES OF ASSOCIATION ARE ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES OR

SECURITIES ISSUED UPON CONVERSION THEREOF ON THE
BOOKS OF THE COMPANY UNLESS AND UNTIL THE
TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE
TERMS OF SUCH ARTICLES OF ASSOCIATION.

5.3    Preemptive Right.

(a)    The Company hereby grants to the Investor the right of first refusal to
purchase the Investor's Pro Rata Share (as defined below), of all (or any
part) of any Equity Securities (the "New Securities") that the Company
may from time to time issue after the Issuance Date (the "Preemptive
Right").

(b)    An Investor's "Pro Rata Share" for purposes of the Preemptive Right is
the ratio of (a) the number of Ordinary Shares held by the Investor on or
after the conversion, or, prior to the conversion, the number of Ordinary
Shares that would have been held by the Investor as if the Note or the
Convertible Note held by the Investor were converted into preferred
shares, in each case, as if on a fully-converted basis immediately prior to
the issuance of the New Securities (assuming full conversion of all
preferred shares and full conversion or exercise of all outstanding
convertible securities, rights, options and warrants held by the Investor),
to (b) the total number of Ordinary Shares (including preferred shares on
an as-converted basis and assuming that all outstanding options or
warrants) then outstanding immediately prior to the issuance of New
Securities (assuming full conversion of preferred shares and full
conversion or exercise of all outstanding convertible securities, rights,
options and warrants).

(c)    In the event the Company proposes to undertake an issuance of New
Securities, it shall give the Investor written notice of its intention,
describing the type of New Securities, and their price and the terms upon
which the Company proposes to issue the same. The Investor shall have
10 days after any such notice is mailed or delivered to agree to purchase
the Investor's Pro Rata Share of such New Securities and to indicate
whether the Investor desires to exercise its Preemptive Right for the
price and upon the terms specified in the notice by giving written notice
to the Company and stating therein the quantity of New Securities to be
purchased.

(d)    In the event the Investor fails to exercise fully the Preemptive Right, if
any within said 10 day-period (the "Election Period"), the Company
shall have 120 days thereafter to sell or enter into an agreement
(pursuant to which the sale of New Securities covered thereby shall be
closed, if at all, within 120 days from the date of said agreement) to sell
that portion of the New Securities with respect to which the Investor's
Preemptive Right set forth in this Section 5.3(a) was not exercised, at a
price and upon terms no more favorable to the purchasers thereof than
specified in the Company's notice to the Investor delivered pursuant to
Section 5.3(c). In the event the Company has not sold within such 120-

day period following the Election Period, or such 120-day period following the date of said agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investor in the manner provided in this Section 5.3.

5.4    Tag-along Right.

(a)    Following any conversion of the Note or the Convertible Note held by the Investor, if any of the shares (the "Disposed Shares") in the Company directly or indirectly held by the Owner is to be sold to any third party (the "Disposition"), the Investor may elect to exercise its tag-along right (the "Tag-along Right") and participate on a pro-rata basis in the Disposition on the same terms and conditions as set forth in the written notice (the "Disposition Notice") to the Company and the Investor sent by the Owner, which notice shall state:(i) the name of the Owner, (ii) the name and address of the proposed purchaser, (iii) the number of shares to be disposed; (iv) the amount and form of the proposed consideration for the Disposition, (v) any other material business relations between the Owner and the purchaser, and (vi) the other terms and conditions of the proposed Disposition. In the event that the proposed consideration for the Disposition includes consideration other than cash, the Disposition Notice shall include a calculation of then fair market value of such consideration and an explanation of the basis for such calculation.

(b)    To exercise its Tag-along Right, the Investor must give the Owner, as applicable, written notice to that effect within 40 days after delivery of the Disposition Notice, and upon giving such notice the Investor shall be deemed to have effectively exercised the Tag-along Right. The Investor may sell all or any part of that number of Shares (the "Tag-along Shares") held by the Investor equal to the product obtained by multiplying (x) the number of Disposed Shares by (y) a fraction, the numerator of which is the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) at the time owned by the Investor and the denominator of which is the aggregate number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) owned by the Investor and other convertible note holders plus the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) then owned by the Owner, as applicable.

5.5    Information Rights. After the Issuance Date, the Company or the Borrower shall regularly deliver to the Investor information relating to the daily business operation of the Company and the Borrower, including but not limited, to the following documents or reports:

(a)    within 90 days after the end of each fiscal year of the Company and the Borrower, a consolidated income statement and statement of cash flows for the Company and the Borrower for such fiscal year and a consolidated balance sheet for the Company and the Borrower as of the end of the fiscal year, audited and certified by one of the Big Four

21

Accounting Firms accepted by the Board, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period;

(b)     (i) within 45 days after the end of each quarter, a consolidated income statement and statement of cash flows for the Company and the Borrower for such quarter and a consolidated balance sheet for the Company and the Borrower as of the end of such quarter, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period, and (ii) promptly following the end of each quarter an up-to-date capitalization table, and both items (i) and (ii) shall be certified by the chief financial officer or the financial controller of the Company and the Borrower;

(c)     within 20 days of the end of each month, a consolidated unaudited income statement and statement of cash flows for such month and a consolidated balance sheet for the Company and the Borrower as of the end of such month, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period (except for customary year-end adjustments and except for the absence of notes) and certified by the chief financial officer of the Company and the Borrower;

(d)     a comprehensive operating budget forecasting the Company's and the Borrower's revenues, expenses, and cash position for the following fiscal year within 30 days prior to the end of each fiscal year, in reasonable detail on a monthly basis, broken down by different operating subsidiaries and associated companies; and

(e)     as soon as practicable, any other information reasonably determined by the Board or reasonably requested by the Investor.

22

5.6    Inspection Rights. After the Issuance Date, the Company and the Borrower shall, and the Company and the Owner shall cause each of the other Group Members to, give to the Investor and its Representatives reasonable access, upon reasonable prior notice, to the premises and the books and records, and instruct its officers and employees to furnish all information and explanations to the Investor or any such Persons as the Investor may reasonably request during normal business hours, under the supervision of a Company officer and in such a manner as not to interfere with the normal business operations of the Company or any other Group Member.

5.7    Appointment of Board Observer. As long as the Note or the Convertible Note is outstanding or the Investor holds any share in the Company after conversion, the Company shall procure that the Investor shall be entitled to, from time to time, at its own expense, and at any time, to designate one individual that is an employee or officer of the Investor or any of its Affiliates (the "Observer") to attend all meetings of the Board and all committees thereof (whether in person, by telephone or other) in a non-voting observer capacity.

5.8    Reserved Matters. From the Issuance Date until the occurrence of the Qualified Financing, the following matters in connection with the Company shall be subject to the Investor's prior written consent:

(a)    any amendment or modification to the Company Charter Documents;

(b)    any material change to the nature or scope of the business of the Company;

(c)    any material merger, amalgamation, scheme or arrangement, reorganization, restructuring, or consolidation of the Company or any of its subsidiaries;

(d)    any liquidation, winding up, dissolution, disposition, reorganization, or arrangement of the Company or any of its subsidiaries;

(e)    any change to the size or composition of the board of directors of the Company or any of its subsidiaries;

(f)    any change to the accounting policies or the auditor of the Company not in compliance with the International Financial Reporting Standards, Generally Accepted Accounting Principles or Hong Kong Financial Reporting Standards;

(g)    appointment or removal of any key employees of the Company;

(h)    determination or adjustment of the pricing basis of transactions between the Company and any of its related parties;

(i)    any related party transaction entered into by the Company in excess of US$10 million (or its equivalent in other currencies) individually or in

23

excess of US$90 million in the aggregate over any 12 consecutive calendar months period; and

(j)     any other material matters of the Company.

5.9     Dividend.  After the full conversion of the Note or the Convertible Note held by the Investor into preferred shares upon occurrence of the initial Qualified Financing, the Investor shall be entitled to participate any dividend distribution declared by the Company from time to time.

5.10    Business Plan.  The Company shall formulate and implement a five-year business operation plan, which shall be approved by the Investor and shall set forth the Company's development strategy, financial forecast, operational capital expenditure plan and implementation plan.

5.11    Lock-up.  Subject to a 90-day prior written notice to the Investor, the Owner may transfer or assign, directly or indirectly, his interest in the Company or Cayman Co at any time prior to the full conversion or redemption of the Note or the Convertible Note; *provided* that the forgoing transfer or assignment will not result in the Owner ceasing to be the Company's and the Cayman Co's actual controlling person; *provided* further that if the forgoing transfer or assignment will result in the Owner ceasing to the Company's and the Cayman Co's actual controlling person, such transfer or assignment will be subject to the Investor's prior written consent.

5.12    Restructuring.

(a)     The Company, the Cayman Co and the Borrower shall, and the Owner shall cause the applicable Group Members and the Onshore Companies to:

(i)     complete all the steps of the Restructuring in accordance with all applicable laws and reasonably satisfactory to the Investor within 6 months after the Issuance Date, which will result in a corporate structure consistent with the structure set forth in Schedule 1B hereof; and

(ii)    duly perform each Onshore Contract to which it is a party in accordance with the terms thereof.

(b)     So long as any of the Note or the Convertible Note remains outstanding, the Owner shall not without the prior consent of the Investor, sell, give, assign, hypothecate, pledge, encumber, grant a security interest in or otherwise dispose of, or suffer to exist (whether by operation of law or otherwise) any Encumbrance on any equity interest in the Onshore Companies.

(c)     All the following assets related to the Existing Business held or owned by any Affiliate of the Owner other than the Group and the Onshore Companies shall be transferred or assigned to the Onshore Companies or

24

the WFOE, as the case may be, within 12 months following the Issuance Date, which may be extended subject to the Investor's prior written consent:

(i)     all the employment agreements of Xing FENG (冯幸), Lin MA (马麟), Zhizhong AN (安志忠), Zhanliang CUI (崔战良) and Zhisheng DONG (董志升);

(ii)    all the relevant Intellectual Property;

(iii)   all the material contracts, including but not limited to, purchase contracts with suppliers and sales contracts with customers; and

(iv)   all the applicable licenses or permits required by law or applicable Governmental Authority to conduct the Existing Business.

## SECTION 6
## CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS

6.1  General Obligation.  Each Party undertakes to the other Parties that it shall not reveal, and that it shall procure that its directors, equity interest holders, partners, representatives, members, advisors (including auditors, accountants, consultants, financial advisors and attorneys), financing sources, officers, employees and agents (collectively, "Representatives") do not reveal, the Confidential Information to any third party without the prior written consent of other Parties or use any Confidential Information in such manner that is detrimental to the Company or the concerned Party, as the case may be.  Each Party shall be responsible for any breach of obligations set forth herein by any of its Affiliates, its Representatives or its Affiliates' Representatives, and shall procure that its Affiliates, its Representatives or its Affiliates' Representatives shall comply with the obligations set forth in this Section 6 as of it were a party to this Agreement.  The term "Confidential Information" as used in this Section 6 means, i) any information concerning the organization, business, technology, safety records, investment, finance, marketing, business plans, transactions or affairs of any Party or any Group Member or any of their respective directors, officers or employees (whether conveyed in written, oral or in any other form and whether such information is furnished before, on or after the date of this Agreement) and ii) the terms and existence of this Agreement, the Loan Agreement and the Onshore Contracts (other than the Basic Documents that are required by law or any applicable Governmental Authority to be publicly filed or disclosed) (collectively, the "Financing Terms"); provided, that Confidential Information does not include information that (i) is or becomes publicly known or available through no breach of this Agreement, (ii) is rightfully acquired free of restrictions on its disclosure, or (iii) is independently developed without any use of or reference to any Confidential Information.

6.2  Exceptions.  The provisions of Section 6.1 shall not apply to:

(a)  disclosure by a Party to its Representative, *provided* that such Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(b)  disclosure by a Party to its Affiliates and their respective Representatives, *provided* that such Affiliate and Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(c)  disclosure, after giving prior notice to the other Parties to the extent practicable under the circumstances and subject to any practicable arrangements to protect confidentiality, to the extent required under the rules of any stock exchange on which the shares of a Party or its parent company are listed or by law or any applicable Governmental Authority and only to the extent required thereby; or

(d)  disclosure of any Confidential Information other than the Financing Terms by any Group Member, the Owner or their Representatives of any

26

of such Confidential Information to a third party in connection with any existing or proposed transaction or other contractual relationship of any Group Member or their Affiliates, *provided* that such third party (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality.

6.3    Publicity.  Except as required by law, by any Governmental Authority, by any relevant stock exchange on which the shares of a Party or its parent company are listed or otherwise agreed by all the Parties, no public release or public announcement concerning the relationship or involvement of the Parties shall be made by any Party.

## SECTION 7    FEES AND EXPENSES

7.1    General.  Each Party shall pay all of its own costs and expenses incurred in connection with or relating to the negotiation, execution, delivery and performance of the Basic Documents and the transaction contemplated thereby Each of the Parties hereto shall bear its own costs and expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the other Basic Documents and the transactions contemplated hereby and thereby.

## SECTION 8    INDEMNIFICATION

8.1    Scope of Indemnification.  Each Party (an "Indemnifying Party") shall indemnify and hold the other Parties and their directors, officers and agents (collectively, the "Indemnified Party") harmless from and against any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever, including but not limited to any investigative, legal and other expenses incurred in connection with, and any amounts paid in settlement of, any pending or threatened legal action or proceeding, but excluding consequential damages, special or incidental damages, indirect damages, punitive damages, lost profits, and diminution in value (collectively, "Losses") resulting from or arising out of:  (i) the breach of any warranty of such Indemnifying Party contained in the Basic Documents or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of such Indemnifying Party contained in the Basic Documents for reasons other than gross negligence or willful misconduct of the Indemnified Party.  The Company, the Borrower and the Owner shall jointly and severally indemnify the Investor and its directors, officers, and agents harmless and against any Losses resulting from or arising out of:  (i) the breach of any warranty of the Company, the Borrower and the Owner contained in this Agreement or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of the Company, the Borrower or the Owner contained in this Agreement for reasons other than gross negligence or willful misconduct of the Indemnified Party. In calculating the amount of any Losses of an Indemnified Party hereunder, there shall be subtracted the amount

27

of any insurance proceeds and third-party payments received by the Indemnified Party with respect to such Losses.

8.2    Notice of Claims; Procedures.  If an Indemnified Party makes any claim against an Indemnifying Party for indemnification, the claim shall be in writing and shall state in general terms the facts upon which such Indemnified Party makes the claim.  In the event of any claim or demand asserted against an Indemnified Party by a third party upon which the Indemnified Party may claim indemnification, the Indemnifying Party shall give written notice to the Indemnified Party within 30 days after receipt from the Indemnified Party of the claim referred to above, indicating whether such Indemnifying Party intends to assume the defense of the claim or demand.  If an Indemnifying Party assumes the defense, such Indemnifying Party shall have the right to fully control and settle the proceeding, provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed.  If the Indemnifying Party elects not to assume the defense or fails to make such an election with the 30-day period, the Indemnified Party may, at its option, defend, settle, compromise or pay such action or claim; provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

## SECTION 9    TERMINATION

9.1    Effective Date; Termination.  This Agreement shall become effective upon execution by all of the Parties and shall continue in force until terminated in accordance with Section 9.2.

9.2    Events of Termination.  This Agreement may be terminated at any time prior to the Issuance Date as follows:

(a)    at the election of the Investor, if the Company, the Borrower, the WFOE, if applicable, or the Owner has materially breached any Collective Warranty, or any other covenant or agreement of the Company, the Borrower, the WFOE, if applicable, or the Owner contained in any Basic Document, which breach cannot be cured or, if it is capable of being cured, is not cured within 30 days after the Company, the WFOE, if applicable, and the Owner being notified in writing of the same;

(b)    at the election of the Company, if the Investor has materially breached any Investor Warranty, or any other covenant or agreement of the Investor contained in the Basic Documents, which breach cannot be cured or, if capable of being cured, is not cured within 30 days after the Investor being notified in writing of the same; or

(c)    by written consent of the Company, WFOE, if applicable, the Owner and the Investor.

28

9.3    Survival. If this Agreement is terminated in accordance with Section 9.2, it shall become void and of no further force and effect, except for the provisions of Section 6 (Confidentiality; Restriction on Announcements), Section 7 (Fees and Expenses), Section 8 (Indemnification), this Section 9, Section 10 (Notices), Section 11 (Miscellaneous), and Section 12 (Governing Law and Dispute Resolution); provided, however, that such termination shall, unless otherwise agreed by the Parties, be without prejudice to the rights of any Party in respect of a breach of this Agreement prior to such termination.

## SECTION 10   NOTICES

10.1    Notices. Each notice, demand or other communication given or made under this Agreement shall be in writing in English and delivered or sent to the relevant Party at its address or fax number set out below (or such other address or fax number as the addressee has by five days' prior written notice specified to the other Parties). Any notice, demand or other communication given or made by letter between countries shall be delivered by air mail. Any notice, demand or other communication so addressed to the relevant Party shall be deemed to have been delivered, iii) if delivered in person or by messenger, when proof of delivery is obtained by the delivering party; iv) if sent by post within the same country, on the third day following posting, and if sent by post to another country, on the seventh day following posting; and v) if given or made by fax, upon dispatch and the receipt of a transmission report confirming dispatch.

10.2    Addresses and Fax Numbers. The initial address and facsimile for each Party for the purposes of this Agreement are:

if to the Investor:

Room 707, 7th Floor, No. 8 Yongan Dongli, Jianguo Menwai Avenue, Beijing, PRC Attention: Xiaosong Ge (葛小松) Facsimile: +86 13699278536

if to the Company, the Borrower or the Owner:

16/F, Leshi Building, No. 105, Yaojiayuan Road, Chaoyang District, Beijing, 100025, PRC Attention: Wei DENG (邓伟)

## SECTION 11 MISCELLANEOUS

11.1    Enforcement Action. For the avoidance of doubt, any obligation on the part of the Investor to make the investment hereunder is made solely to the Company,

29

the Borrower, the WFOE, if applicable, and the Owner, and no other Person shall have any right to enforce such obligation against the Investor.

11.2    <u>No Partnership</u>.  The Parties expressly do not intend hereby to form a partnership, either general or limited, under any jurisdiction's partnership law. The Parties do not intend to be partners one to another, or partners as to any third party, or create any fiduciary relationship among themselves, solely by virtue of the Investor's status as the holder of the Note or the Convertible Note.

30

11.3    Amendment. This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the Parties.

11.4    Waiver. No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. Without limiting the foregoing, no waiver by a Party of any breach by any other Party of any provision hereof shall be deemed to be a waiver of any subsequent breach of that or any other provision hereof.

11.5    Entire Agreement. This Agreement (together with the other Basic Documents, any other documents referred to herein or therein and any documents executed to implement the transactions contemplated by the Basic Documents) constitutes the whole agreement between the Parties relating to the subject matter hereof and supersedes any prior agreements or understandings relating to such subject matter.

11.6    Severability. Each and every obligation under this Agreement shall be treated as a separate obligation and shall be severally enforceable as such and in the event of any obligation or obligations being or becoming unenforceable in whole or in part. To the extent that any provision or provisions of this Agreement are unenforceable they shall be deemed to be deleted from this Agreement, and any such deletion shall not affect the enforceability of this Agreement as remain not so deleted.

11.7    Counterparts. This Agreement may be executed in one or more counterparts including counterparts transmitted by telecopier or facsimile, each of which shall be deemed an original, but all of which signed and taken together, shall constitute one document.

11.8    Consent to Specific Performance. The Parties declare that it is impossible to measure in money the damages that would be suffered by a Party by reason of the failure by any other Party to perform any of the material obligations hereunder and that, in addition to all other remedies, each Party will be entitled to seek specific performance and to seek injunctive or other equitable relief as a remedy for any such breach or failure to perform its material obligations hereunder.

11.9    Transfer; Assignment. This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns. This Agreement shall not be assigned without the express written consent of all the Parties (which consent may be granted or withheld in the sole discretion of any Party), and any purported assignment without such consent shall be void, *provided* that, to the extent permitted by the applicable laws, the Investor shall be entitled to transfer or assign its rights and obligations under the Basic Documents to any of its Affiliates with a prior written notice to the Company.

## SECTION 12
### GOVERNING LAW AND DISPUTE RESOLUTION

12.1    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE HKSAR APPLICABLE TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN SUCH JURISDICTION, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF ANY JURISDICTION.

12.2    Dispute Resolution.

    (a)    Any dispute, controversy or, claim or difference of any kind whatsoever arising out of, relating to or in connection with this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof, the validity, scope and enforceability of this arbitration provision and any dispute regarding no-contractual obligations arising out of or relating to it (the "Dispute") shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center (the "HKIAC") in accordance with the HKIAC arbitration rules in force at the time of the commencement of the arbitration.  However, if such rules are in conflict with the provisions of this Section 12.2, including the provisions concerning the appointment of arbitrators, the provisions of this Section 12.2 shall prevail.

    (b)    The law of this arbitration clause shall be Hong Kong law. The seat of arbitration shall be Hong Kong.

    (c)    The number of arbitrators shall be three and the language of the arbitration proceedings and written decisions or correspondence shall be English.

    (d)    Any party to the Dispute shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the tribunal.

IN WITNESS WHEREOF this Agreement has been executed on the day and year first above written.

COMPANY:

LEVIEW Mobile LTD.

By: _____

Name: Yuemin JIA (贾跃民)

Title: Director

*Authorized Signature(s)*

CAYMAN CO:

LE LTD.

For and on behalf of
Le Ltd.

By: _____

Name: Yueting JIA (贾跃亭)

Title: Director

*Authorized Signature(s)*

BORROWER:

LEVIEW MOBILE & INTELLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD.

(乐视移动智能信息技术（北京）有限公司)

By: _____

Name: Yuemin JIA (贾跃民)

Title: Legal Representative

OWNER:

YUETING JIA (贾跃亭)

_____

PRC Identification Card Number:

IN WITNESS WHEREOF this Agreement has been executed on the day and year first above written.

INVESTOR:

**BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)**（北京华兴移动资产管理中心（有限合伙）.

Acting through its general partner

**HUAXINGHE Investment Fund Management (Beijing) Co., Ltd.**（华兴和投资基金管理（北京）有限公司)

By:

Name:

Title: Authorized Signatory

34

SCHEDULE 1
SHAREHOLDING STRUCTURE OF THE GROUP



SCHEDULE 1A

SHAREHOLDING STRUCTURE OF THE GROUP AS OF THE DATE OF THIS AGREEMENT

## SCHEDULE 1B

### SHAREHOLDING STRUCTURE OF THE GROUP AFTER COMPLETION OF RESTRUCTURING



SCHEDULE 2

COLLECTIVE WARRANTIES

**Definitions**

In this Schedule, capitalized terms not otherwise defined have the meanings set forth in
this Agreement, and the following terms have the meanings specified:

"Contracts" means all contracts, agreements, licenses, engagements, leases, financial
instruments, purchase orders, commitments and other contractual arrangements, that are
currently subsisting and not terminated or completed.

"Environmental Laws" means any and all applicable current PRC or non-PRC national,
federal, state, or local Law, statutes, rules, regulation, orders, ordinances, guidance
documents, judgments, authorizations by any Governmental Authority, or any other
requirement of any Governmental Authority relating to (a) environmental matters, (b)
the generation, use, storage, transportation or disposal of hazardous substances, or (c)
occupational safety and health, industrial hygiene, handling and disposal of medical
waste, land use or the protection of human, plant or animal health or welfare.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks,
service marks, trade names, trade dress and domain names, together with the goodwill
associated exclusively therewith, (c) copyrights, including copyrights in computer
software, (d) confidential and proprietary information, including trade secrets and
know-how, and (e) registrations and applications for registration of the foregoing, in
each case, relating to the business of researching, designing, developing, manufacturing,
selling or marketing mobile phones and other personal devices, as well as other related
internet or mobile internet business.

"Liabilities" means all indebtedness and other liabilities of any nature whatsoever,
actual or contingent, and whether or not of a nature required to be disclosed in the
accounts of the Group.

"Litigation" has the meaning set forth in Section 11 of this Schedule 2.

"Permits" means all permits, consents, approvals, authorizations, franchises,
certifications and licenses from, and all registrations with, any Governmental Authority.

**The Warranties**

The Company, the WFOE, if applicable, and the Owner hereby, severally and jointly,
represent and warrant to the Investor that the following representations and warranties
are true and complete as of the date hereof and the Issuance Date, except as otherwise
stated.

1.      CORPORATE MATTERS

        (a)      Organization, Good Standing and Qualification.  Each of the Group
                 Members and the Onshore Companies has been duly incorporated and

organized, is validly existing and, where applicable, is (i) in good standing and (ii) in compliance with all registration and approval requirements. Each of the Group Members and the Onshore Companies has the corporate power and authority to own and operate its assets and properties and to carry on its business as currently conducted and as contemplated to be conducted.

(b)    Charter Documents. The Company Charter Documents and the constitutional documents of the Onshore Companies furnished to the Investor are effective, have not been superseded and are true and complete.

(c)    Capitalization and Shareholding Structure of the Group. The shareholding structure of the Group set forth in Schedule 1A are true, complete and correct description of the share capital of such entity on the date hereof and on the Issuance Date. Immediately following the Issuance Date, the authorized capital of the Company will consist of only one class of shares, namely, 50,000 Ordinary Shares, par value US$0.0001 per share, 100% of which are duly and validly issued, fully paid, nonassessable, and outstanding, and were issued in accordance with all applicable laws.

(d)    Options, Warrants and Reserved Shares. Except for (A) the Note or the Convertible Note, if applicable, and (B) the preferred shares issuable upon conversion of the Note or the Convertible Note and any rights to be granted pursuant to the Basic Documents, there are no outstanding options, warrants, rights (including conversion or preemptive rights) or agreements for the subscription or purchase from any Group Member of any Equity Securities of any Group Member or any securities convertible into or ultimately exchangeable or exercisable for any Equity Securities of any Group Member.

(e)    Other Rights With Respect to Shares. Except as provided in the Basic Documents, no voting or similar agreements exist in relation to the Equity Securities of any Group Member that are presently outstanding or that may hereafter be issued.

(f)    Subsidiaries. Save for the HK Co and the WFOE, if applicable, the Company does not directly or indirectly own any interests in or Control any other entities. Neither of the HK Co or the WFOE, if applicable, directly or indirectly owns any interests in or Controls any other entities.

(g)    Corporate Records. The registers of shareholders, resolutions and all other documents of the Group required to be kept or filed with any relevant Governmental Authority have been kept, filed or submitted for filing.

(h)    Competitive Activities. The Owner does not hold any equity interests in any entity that carries on any business that competes with the business of

any Group Member, or the Onshore Company as presently conducted or as contemplated to be conducted, except the ownership of shares in publicly traded companies representing less than five percent of the outstanding share capital of such company.

2.    **AUTHORIZATION AND VALIDITY OF TRANSACTIONS**

    (a)    Authorization. Each of the Company, the Owner, the other Group Members and the Onshore Companies has the power and authority to execute, deliver and perform the Basic Documents to which it/he is a party. All actions on the part of the Company, the Owner, the other Group Members and the Onshore Companies necessary for the authorization, execution, delivery of and the performance of all of its/his obligations under the Basic Documents have been taken or will be taken prior to the Issuance Date.

    (b)    Valid Issuance of Stock. The preferred shares when issued upon conversion of the Note or the Convertible Note will be duly authorized and validly issued, fully paid and non-assessable, free of restrictions on transfer other than restrictions on transfer under this Agreement, the Note or the Convertible Note and any applicable securities or corporate laws.

    (c)    Enforceability. The Basic Documents to which any Group Member, the Owner or the Onshore Company is a party will, when executed, be the valid and binding obligation of such Group Member, the Owner or the Onshore Company, enforceable against such Group Member, the Owner or the Onshore Company, as applicable, in accordance with their respective terms, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium; (ii) similar laws affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

    (d)    Consents and Approvals. On or prior to the Issuance Date, all consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any Governmental Authority or any other Person required in connection with the execution, delivery and performance by the Group, the Onshore Companies and the Owner of the Basic Documents or the consummation of the transactions contemplated hereby or thereby (including without limitation, the Restructuring) have been duly obtained in compliance with all applicable laws.

    (e)    No Breach. The execution and delivery by any Group Member, the Onshore Company and the Owner of each of the Basic Documents to which it is a party and the implementation and performance by such Group Member, the Onshore Company and the Owner of all the transactions contemplated under such Basic Documents (including without limitation, the Restructuring) do not and will not:

(i)    breach or constitute a default under the Company Charter Documents or the constitutional document of any other Group Member or the Onshore Company;

(ii)    result in a breach of, or constitute a default under, any Contract to which any Group Member, the Onshore Company or the Owner is a party or by which such Group Member, the Onshore Company or the Owner or their respective property or assets is bound or result in the creation or increasing of any obligation on such Group Member, the Onshore Company or the Owner (whether to make payment or otherwise) to any Person; or

(iii)    result in a violation or breach of or default under any applicable law,
except, in the case of clauses (ii) and (iii), as could not materially and adversely affect the ability of any Group Member, the Onshore Company or the Owner to carry out its obligations under, and to consummate the transactions contemplated by, the Basic Documents to which it is a party.

## 3.    LEGAL COMPLIANCE

(a)    <u>No Violation of Law.</u>  None of the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation, which may have a material adverse effect on the ability of any Group Member to conduct its business as currently conducted or as contemplated to be conducted.

(b)    <u>Permits and Registrations</u>.  Each Group Member and the Onshore Company has all Permits and has completed all government registrations necessary for the conduct of its business as currently conducted and as contemplated to be conducted and to own its assets.  None of the Group Members or the Onshore Company is in material breach of or default under any such Permit, and there is no reason to believe any such Permit shall be suspended, cancelled or revoked.

## 4.    ENVIRONMENTAL ISSUES

Each Group Member and the Onshore Company is currently in compliance with all Environmental Laws and has at all times complied with all Environmental Laws in all material aspects.

## 5.    PROPERTIES AND ASSETS

(a)    <u>Status of Properties and Assets</u>.  Each Group Member and the Onshore Company owns or has the right to use all material properties and assets currently used by it in the conduct of its business as currently conducted and contemplated to be conducted.  The properties and assets owned by

the Group and Onshore Company are free and clear of all Encumbrances. The tangible assets and real property of each Group Member and the Onshore Company have been properly maintained and are in working condition, and are in all respects in a condition that is adequate for the intended uses of such assets, subject to continued repair and replacement in accordance with past practice.

(b)    <u>General Liabilities</u>. None of the Group Members or the Onshore Company has any obligations or liabilities or any nature, whether accrued, absolute or contingent, whether liquidated or unliquidated, and whether now due or to become due, except for trade or business obligations and liabilities incurred in the ordinary course of business since such entity's inception.

6.    **CONTRACTS AND TRANSACTIONS**

(a)    <u>Validity of Material Contracts</u>.

    (i)    No Group Member or the Onshore Company is in breach of or has knowledge of the invalidity of or grounds for rescission, avoidance or repudiation of any material contract to which the Group Member or the Onshore Company is a party, nor has any Group Member or the Onshore Company received notice of any intention to terminate any such material contract.

    (ii)    To the best knowledge of the Company, the WFOE and the Owner, no party with whom a Group Member or an Onshore Company has entered into any material contract is in default thereunder, except for defaults which would not have a material adverse effect on the financial condition of the Group or the Onshore Companies; to the best knowledge of the Company, the WFOE and the Owner, there are no circumstances likely to give rise to any such default.

(b)    <u>Brokers and Finders</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Company and the Owner.

7.    **FINANCIAL MATTERS**

(a)    <u>Liabilities</u>. Neither the Group nor the Onshore Companies with respect to its Existing Business has any Liabilities other than (i) Liabilities reflected or reserved against in their respective accounts, a true and complete copy of which has been delivered to the Investor; (ii) Liabilities incurred in the ordinary course of business; or (iii) Liabilities in relation to the Basic Documents. No Group Member or the Onshore Company has guaranteed any indebtedness of any other Person.

(b)    Financial Materials.  All the accounts, books, registers, ledgers and financial and other material records of whatsoever kind of each Group Member and the Onshore Company which have been provided to the Investor are accurate and complete in all material respects; and they present a true and fair view of the financial, contractual and trading position of each Group Member and the Onshore Company and of its respective facilities and machinery, fixed and current assets and liabilities (actual and contingent), debtors, creditors and work-in-progress.

## 8.    TAX, RECORDS AND RETURNS

(a)    Compliance with Laws.  None of the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation regarding Tax which may result in any liability or criminal or administrative sanction or otherwise having a material adverse effect on any Group Member or the Onshore Company, other than such violation that has been rectified or resolved and does not have any foreseeable liability or criminal or administrative sanction or otherwise.

(b)    Tax Returns and Payments.  Each Group Member or the Onshore Company has filed all tax returns and reports as required by law, and such returns and reports are true and correct in all material respects. Each Group Member or the Onshore Company has paid all taxes and other assessments due and none of the Group Members is or will become liable to pay any fine, penalty, surcharge or interest in relation to Tax with respect to activities of any Group Member prior to the Completion Date.  There have been no extraordinary examinations or audits of any tax returns or reports by any applicable Governmental Authority.  There are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

(c)    Deductions and Withholdings.  Each Group Member and the Onshore Company has made all deductions and withholdings in respect, or on account, of any Tax from any payments made by it which it is obliged or entitled to make and has duly accounted in full to the appropriate authority for all amounts so deducted or withheld.

(d)    Preferred Tax Treatments.  All exemptions, reductions and rebates of Taxes granted to the Group by a Governmental Authority are in full force and effect and have not been terminated.  To the knowledge of the Company, the WFOE, if applicable, and the Owner, the transactions contemplated under the Basic Documents will not, and, there is no other circumstance or event that will, result in any such exemption, reduction or rebate being cancelled or terminated, whether retroactively or for the future.

9.    **OPERATIONS**

 (a) <u>Current Operations</u>.  There is no existing fact or circumstance that will have a material adverse effect on the ability of any Group Member or the Onshore Company to conduct its business as currently conducted and contemplated to be conducted.

 (b) <u>General Change</u>.  Since the date hereof, there has been no material adverse change in the financial position of the Group or the Onshore Company relating to the Existing Business.

11.    **EMPLOYEES**

 (a) <u>Status of Employees</u>.

  (i) No Group Member, or the Onshore Company has at any time since its establishment had, or is being threatened in writing by, any strike, collective work stoppage or other material labor dispute.

  (ii) The Group and the Onshore Company each has complied in all material respects with all applicable laws regarding employees, employee benefits, employee safety and labor matters for all of their employees.

 (b) <u>Employment Agreements and Compensation Arrangements</u>.  Except as required by law, the labor contract and employee non-competition, intellectual property assignment and confidentiality agreement between the WFOE, if applicable, and each key employee, no Group Member is a party to or is bound by any currently effective employment contract (other than contracts that can be terminated on an at-will basis), deferred compensation agreement, pension, provident, superannuation, life assurance, disability or other similar schemes or arrangements, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation agreement.

11.    **CLAIMS AND PROCEEDINGS**

 (a) <u>No Litigation</u>.  No Group Member, the Onshore Company, or the Owner is engaged in or has been notified that it is the subject of any litigation, arbitration or administrative or criminal proceedings (collectively, "<u>Litigation</u>"), whether as plaintiff, defendant or otherwise.  None of the shareholders or equity interest holders of any Group Member, or the Onshore Company, directors of any such entity is engaged in or has been notified that it is the subject of any Litigation, whether as plaintiff, defendant or otherwise, which has had or may have an adverse effect on any Group Member, or the Onshore Company. There is no judgment, decree, or order of any court in effect against any Group Member or the Onshore Company.  There is no judgment, decree, or order of any court in effect with respect to the Existing Business against Lefeng Mobile or the Owner.  None of the Group Members or the Onshore Company is in

default with respect to any order of any Governmental Authority to which it/he is a party or by which it/he is bound. Neither Lefeng Mobile nor the Owner is in default with respect to any order of any Governmental Authority with respect to the Existing Business to which it/he is a party or by which it/he is bound.

(b)    No Pending Proceedings. No Litigation is pending or, to the knowledge of the Owner, the Company and the WFOE, if applicable, threatened against any Group Member, or the Onshore Company; no Litigation in relation to the Existing Business is pending or, to the knowledge of the Owner, the Company and the WFOE, if applicable, against Lefeng Mobile or the Owner.

(c)    No Undertaking; No Injunction. None of the Group Members, or the Onshore Company nor any shareholder, director, officer or agent of any of the foregoing entities is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force. Neither Lefeng Mobile nor any of its shareholder, director, officer or agent is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force in relation to Existing Business.

(d)    No Insolvency. No order has been made and no resolution has been passed for the winding up or liquidation as dissolution of any Group Member or the Onshore Company. No distress, execution or other process has been levied on the whole or a substantial part of the assets of any Group Member or the Onshore Company. None of the Group Members or the Onshore Company is insolvent or unable to pay its debts as they fall due.

(e)    No Investigation or Inquiry. No Group Member, the Onshore Company, or the Owner (in relation to the foregoing entities) is the subject of any investigation or inquiry by any Governmental Authority with respect to the Existing Business and there are no facts which are likely to give rise to any such investigation or inquiry.

12.    INTELLECTUAL PROPERTY

(a)    Each Group Member and the Onshore Company owns or otherwise has the right or license to use all Intellectual Property as necessary for the operation of the Existing Business without, to the knowledge of the Company and the Owner, any violation or infringement of the rights of any third party, free and clear of all Encumbrances. There is no claim, proceeding or litigation pending or, to the knowledge of the Company and the Owner, threatened against any Group Member or the Onshore Company, contesting their right to use its Intellectual Property, asserting the misuse thereof, or asserting the infringement or other violation of any Intellectual Property of any third party.

(b)    There are no pending proceedings or claims in which any Group Member or the Onshore Company alleges that any Person is infringing upon, or otherwise violating, its Intellectual Property rights. Nor have any such proceedings or claims been served, instituted or asserted by any Group Member or the Onshore Company.

(c)    None of the key employees of any Group Member and the Onshore Company is obligated under any Contract, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her best efforts to promote the interests of his/her employer, or that would conflict with the business of his/her employer as presently conducted, or that would prevent such employees from assigning to his/her employer inventions conceived or reduced to practice or copyrights for materials developed in connection with services rendered to it.

13.    **RESTRUCTURING**

The Restructuring has been carried on by the Company in compliance with applicable laws.

14.    **DISCLOSURE**

(a)    No Misrepresentation. No representation, warranty or statement by the Company, the WFOE, if applicable, and the Owner in this Agreement, any other Basic Document, or in any Exhibit, Schedule, Appendix, statement or certificate furnished to the Investor pursuant to any Basic Document, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein, in the light of the circumstances under which they were made, not misleading.

(b)    Full Disclosure. There is no fact or circumstance relating to the affairs of any Group Member and the Onshore Companies which has not been disclosed to the Investor and which if the disclosed information might reasonably have been expected to influence the decision of the Investor to purchase the Note.

## SCHEDULE 3

## INVESTOR WARRANTIES

1.  <u>Organization, Good Standing and Qualification</u>. The Investor and its general
    partner have been duly established or incorporated and organized, is validly
    existing and, where applicable, in good standing.

2.  <u>Authorization</u>. The Investor has the full power, authority and legal right to own
    assets and carry on its business. The Investor and its general partner are not in
    receivership or liquidation or have taken any steps to enter into liquidation, and
    no petition has been presented for the winding-up of the Investor. There are no
    grounds on which a petition or application could be based for the winding-up or
    appointment of a receiver of the Investor or its general partner.

3.  The execution, delivery and performance of this Agreement by the Investor will
    not:

    (a)  violate any provision of its partnership agreement or the Memorandum
         of Association or Articles of Association of the Investor's general
         partner;

    (b)  require the Investor to obtain any consent, approval or action of, or make
         any filing with or give any notice to, any Governmental Authority or any
         other third party pursuant to any agreement to which the Investor is a
         party or by which the Investor is bound;

    (c)  conflict with or result in any material breach or violation of any of the
         terms and conditions of, or constitute (or with notice or lapse of time or
         both constitute) a default under, any agreement to which the Investor is a
         party or by which the Investor is bound;

    (d)  violate any court order, judgment, injunction, award, decree or writ
         against, or binding upon, the Investor or upon its securities, properties or
         business; or

    (e)  violate any law or regulation of the country where the Investor is
         incorporated or any other jurisdiction in which the Investor maintains a
         business presence.

4.  <u>Enforceability</u>. The Investor, acting through its general partner, has the full
    power and authority to enter into, execute and deliver the Basic Documents to
    which it is a party and to perform the transactions contemplated hereby and
    thereby. The execution and delivery by the Investor, acting through its general
    partner, of the Basic Documents to which it is a party and the performance by
    the Investor of the transactions contemplated hereby and thereby have been duly
    authorized by all necessary corporate or other action of the Investor. Assuming
    the due authorization, execution and delivery hereof by the other parties hereto,
    the Basic Documents to which the Investor is a party constitutes the legal, valid
    and binding obligation of the Investor, enforceable against the Investor in
    accordance with its terms, except as such enforceability may be limited by (i)
    applicable bankruptcy, insolvency, reorganization, moratorium;(ii) similar laws

affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

5.     Financing.  The Investor has sufficient immediately available funds to pay, in cash, the principal amount of the Note at the Issuance Date.

6.     Litigation.  As of the date hereof, no Litigation by or against the Investor is pending or, to the best knowledge of the Investor, threatened in writing, which could affect the legality, validity or enforceability of the Basic Documents to which it is a party, or the consummation of the transactions contemplated hereby and thereby.

## 承诺函

　　为境外融资之目的，我公司乐视控股（北京）有限公司的关联方乐风移动有限公司，英文名称为 Leview Mobile Ltd.，（以下简称"目标公司"）拟向北京华兴移动资产管理中心（有限合伙）及其关联公司发行可转换债券（以下简称"可转债"）。

　　为本次可转债发行，目标公司及其相关方已于 2015 年 5 月 18 日与北京华兴移动资产管理中心（有限合伙）签署有关认购可转债的交易文件 INVESTOR RIGHTS AGREEMENT 及借款合同（以下合称"交易文件"），约定目标公司境内关联方向北京华兴移动资产管理中心（有限合伙）及其关联公司借款壹亿元人民币，北京华兴移动资产管理中心（有限合伙）及其关联公司有权获得目标公司发行的等值美元的可转债。目标公司将根据交易文件的约定，在偿还条件触发时，向北京华兴移动资产管理中心（有限合伙）及其关联公司偿还可转债本金及约定的利息（以下简称"还款义务"）。

　　为此，乐视控股（北京）有限公司承诺并保证，如果目标公司未能依照交易文件的约定完全履行其还款义务，乐视控股（北京）有限公司将依照交易文件的相关约定代为承担向北京华兴移动资产管理中心（有限合伙）及其关联公司的还款义务。

　　特此承诺。

承诺人：乐视控股（北京）有限公司

日期：2015 年 5 月 18 日

1

## Commitment Letter

For the purpose of overseas financing, Leshi Holding (Beijing) Co Ltd.'s affiliated company Leview Mobile Ltd., (hereinafter referred to as the "target company") intends to issued convertible bonds (hereinafter referred to as "convertible bonds") to Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies.

For the issuance of convertible bonds, the target company and its affiliated companies have signed the INVESTOR RIGHTS AGREEMENT and loan contract (hereinafter collectively referred to as the "transaction document") concerning the subscription of convertible bonds on May 18, 2015, agreeing that the domestic affiliated companies of the target company will borrow RMB 100 million from Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies. Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies shall have the right to obtain convertible bonds equivalent to us dollars issued by the target company.

According to the terms of the transaction documents, the target company will repay the principal of the convertible bonds and the agreed interest (hereinafter referred to as "repayment obligation") to Beijing Huaxing Mobile Asset Management Center (Limited Partnership) its affiliated companies when the repayment conditions are triggered.

In this condition, Leshi Holding (Beijing) Co Ltd., promises and guarantees that if the target company fails to fully fulfill its repayment obligations in accordance with the agreement in the transaction document, Leshi Holding (Beijing) Co Ltd. will assume the repayment obligation to Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies in accordance with the relevant agreements in the transaction documents.

Hereby Promise.

Promisee: Leshi Holding (Beijing) Co Ltd.

Date: 18/05/2015



CHINA MINSHENG BANK

**Certificate of Telegraphic Transfer (Receipt)**    1 No. 107605053

☐ Normal   ☐ Urgent      Date of Consignation:   17/06/2015

| Payer | Full Name | BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP) | Payee | Full Name | LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO.,LTD. |
|---|---|---|---|---|---|
| | Account number | 694190069 | | Account number | 693489502 |
| | Place of remitting | Beijing | | Place of remitting | Beijing |
| Remitting Bank | | 0167 | paying bank | | China Minsheng Bank Beijing Jianguomen Sub- branch |

| Amount | RMB 63,000,000.00 yuan | 6 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|

Payment Password

Additional Information And usage:

Borrowings

Stamp of Remitting Bank                     Recheck:     Bookkeeping:

# 中国民生银行
## CHINA MINSHENG BANK

凭证号：9800000000002

| 付款人 | 全称 | 北京华兴移动资产管理中心（有限合伙） | 收款人 | 全称 | 北京华兴移动资产管理中心（有限合伙） |
|---|---|---|---|---|---|
| | 账号 | 694190069 | | 账号 | 694764035 |
| | 开户行 | 中国民生银行北京西大望路支行 | | 开户行 | 中国民生银行总行营业部 |
| 金额 | 人民币：37,000,000.00 | | 金额大写 | 人民币：叁仟柒佰万元整 | |
| 用途 | 投资款打到托管账户用于乐视手机投资款 | | 记账时间 | 2015-10-15 16:14:09 | |
| 交易流水号 | 3135120151015045186191156 1F9FA95C9E0760E100S0009/22051 | | | | |

*当日回单不作为收、付款方交易确认的最终依据，请勿作为记账。

| CHINA MINSHENG BANK | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | Bank Certificate No.980000 | |
| Payer | Full Name | BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP) | Payee | Full Name | BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP) | |
| | Account number | 694190069 | | Account number | 694764035 | |
| | Bank | China Minsheng Bank Beijing West Dawang Road Sub-branch | | Bank | China Minsheng Bank Banking Department | |
| Amount | RMB 37,000,000.00 | | Amount of Capital | RMB 37,000,000.00 | | |
| Purpose | The investment is transferred to the escrow account for the purpose of Leshi mobile phone investment | | Accounting time | 15/10/2015 16:14:09 | | |
| Transaction Serial Number | 31351201510150451861911561F9FA95C9E0760D1008O0005002015 | | | | | |

E
M
A
I
L
E
D

_____C Murray_____          _____1/21/2020_____

CASE MANAGER                          DATE

| United States Bankruptcy Court for the Central District Of California - Los Angeles Division | |
|---|---|
| **Name of Debtor:** Yueting Jia | **For Court Use Only** |
| **Case Number:** 19-24804 | Claim Number:    0000020023 |
| | File Date:    01/21/2020 02:37:52 |

# Proof of Claim (Official Form 410)

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

04/19

---

| Part 1: | Identify the Claim |
|---|---|

**1.   Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim):    BEIJING HUAXING MOBILE ASSET MGT CENTER

Other names the creditor used with the debtor: _____

**2.   Has this claim been acquired from someone else?**    ☑ No   ☐ Yes.   From whom? _____

**3.   Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name    BEIJING HUAXING MOBILE ASSET MGT CENTER | Name _____ |
| Address    NO.1077, HUIHE SOUTH STREET | Address _____ |
|    GAO BEIDIAN | _____ |
|    CHAOYANG DISTRICT | _____ |
| City    BEIJING | City _____ |
| State _____ ZIP Code 100123 | State _____ ZIP Code _____ |
| Country (if International):    CHINA | Country (if International): _____ |
| Phone:    +008613810354868 | Phone: _____ |
| Email:    2186110@qq.com | Email: _____ |

| 4. Does this claim amend one already filed? | 5. Do you know if anyone else has filed a proof of claim for this claim? |
|---|---|
| ☑ No | ☑ No |
| ☐ Yes. | ☐ Yes. |
| Claim number on court claims register (if known) _____ | Who made the earlier filing? |
| Filed on _____ | _____ |
| MM / DD / YYYY | |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes.

Last 4 digits of the debtor's account or any number you use to identify the debtor:

9502 ___ ___ ___ ___

**7. How much is the claim?**

$ 28,280,121.43          unliquidated
_____

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Contract/Executory Contract
_____

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                     $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:** $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

                                          ☐ Fixed ☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of petition.**

$_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507 (a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property:

_____

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

---

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9): $_____

| Part 3: | Sign Below |
|---------|------------|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Xiaosong Ge*                                                   01/21/2020 02:37:52

Signature                                                        Date

Provide the name and contact information of the person completing and signing this claim:

Name        Xin Wang

Address     No.1077, Huihe South Street

            Gao beidian

            Chaoyang District

City        Beijing

State                                          Zip    100123

Country (in international)        China

Phone       +008613810354868

Email       2186110@qq.com

# 债权证据清单

## Proofs of Claim List

1. 借款合同- 中文

   Loan Contract- English Translation

2. 关于《借款合同》之补充协议- 中文

   Supplementary Agreement- English Translation

3. 承诺函（由乐视控股提供担保）- 中文

   Commitment Letter- English Translation

4. 投资者权利协议（Investor Rights Agreement）- 仅英文 (In English Only)

5. 电汇凭证- 中文

   Certificate of Telegraphic Transfer- English Translation

6. 电子银行回单- 中文

   Bank Electronic Receipt- English Translation

## Statement of Proofs of Claim

The loan amount is RMB 100 million Yuan, and the Interest on borrowings is 15% per year, the loan period is three years, starting from the date when the borrowing is actually received and ending at the expiration of the three-year period. In addition, If the Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd. (hereinafter referred to as the "target company") does not repay the loan after the due date, the lender has the right to recover the loan. And according to bank regulations, a five over ten thousand penalty fee will be charged per day.

On June 17, 2015, Beijing Huaxing Mobile Asset Management Center (LLP) transferred the first part of loan to the target company. On October 15, 2015, Beijing Huaxing Mobile Asset Management Center (LLP) transferred the second part of loan to the target company. Later, the target company was unable to repay the debts when the loan was due. According to the attached Commitment Letter, Leshi Holding (Beijing) Co Ltd., promises and guarantees that if the target company fails to fully fulfill its repayment obligations in accordance with the agreement in the transaction document, Leshi Holding (Beijing) Co Ltd. will assume the repayment obligation to Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies in accordance with the relevant agreements in the transaction documents.



We hereby, pursuant to the below attached four contracts and two proofs,

propose the claim for the debt. The total claim amount is RMB 193 million Yuan, including the principal RMB 100 million Yuan, the three year's interest RMB 45 million Yuan, the overdue interest RMB 22 million yuan, the overdue penalty fee RMB 27 million yuan. The claim amount is equivalent to 28.28 million US dollars at the exchange rate of $1 equivalent to RMB 6.86 Yuan.



# 借款合同

出借方：北京华兴移动资产管理中心（有限合伙）

借款方：乐视移动智能信息技术（北京）有限公司

借款方为进行经营活动，向出借方申请借款，经双方协商，特订立本合同，以便共同遵守。

一、借款种类： 人民币

二、借款用途： 经营所需

三、借款金额人民币 壹亿 元整（100,000,000.00 元）。

四、借款利息为每年百分之十五 。

五、借款和还款期限：借款时间共叁年，自 2015 年 5 月 29 日起，至 2018 年 5 月 29 日止。

六、还款方式： 现金

七、出借方将借款汇至借款方以下银行账户：

户名：

账号：

开户行：

八、保证条款

1、借款方必须按照借款合同规定的用途使用借款，不得挪作他用，不得用借款进行违法活动。

2、借款方必须按照合同规定的期限还本付息。





3、借款方有义务接受出借方的检查、监督借款的使用情况，了解借款方的计划执行、经营管理、财务活动、物资库存等情况。借款方应提供有关的计划、统计、财务会计报表及资料。

4、乐视控股（北京）有限公司及其实际控制人贾跃亭为还款责任提供连带保证。

九、违约责任

1、借款方如逾期不还借款，出借方有权追回借款，并按银行规定加收每日万分之五的罚息。

2、出借方未按期提供借款，应按违约数额和延期天数，付给借款方违约金。违约金数额的计算应与加收借款方的罚息计算相同。



十、争议解决：因执行本合同发生争议，由当事人双方协商解决。协商不成的，双方同意由出借方所在地有管辖权的人民法院管辖。

十一、其他

1、本合同非因不可抗力情况发生，任何一方当事人不得擅自变更或解除合同。当事人一方发生不可抗力，应及时采用书面形式通知其他当事人并提供证明。



2、本合同经双方同意后可以变更或解除。合同解除的，借款方已占用的借款和应付的利息，仍应按本合同的规定偿付。

3、出借方有权在借款期间内将本协议的债权转让给其关联方，借款方在此承诺并知悉上述转让事宜，不影响借款方继续履行本协议

约定的义务。

4、本合同如有未尽事宜，须经合同双方当事人共同协商，作出补充规定，补充规定与本合同具有同等效力。

5、本合同正本一式二份，出借方、借款方各执一份。

出借方（盖章）：北京伟兴移动资产管理中心（有限合伙）

法人代表或授权代表（签字）：

借款方（盖章）：乐视移动智能信息技术（北京）有限公司（公章）

法人代表或授权代表签字：

签约日期：2015 年 5 月 18 日

签约地点：北京

# Loan Contract

Lender: BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)

Borrower: LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD.,

In order to carry out business activities, the borrower applies for a loan from the lender. After consultation between the two parties, the contract is hereby concluded for mutual compliance.

I. Type of Loan: RMB

II. The purpose of borrowing: required for business

III. The amount of the loan is RMB 100 million yuan (100, 000, 000 yuan).

IV. Interest on borrowings is 15% per year

V. Borrowing and repayment period: The borrowing period is three years, starting from May 29, 2015 and ending on May 29, 2018.

VI. Repayment Method: Cash

VII. The lender remits the loan to the following bank accounts of the borrower:

    Account name:

    Account number:

    Account bank:

VIII. Guarantee Clause

1. The borrower must use the loan for the purpose specified in the loan contract. They shall not be diverted for other purposes and not be used for illegal activities.

2. The borrower must pay the principal and interest within the time limit stipulated in the contract.

3. The borrower is obliged to accept the inspection of the lender, supervise the use of the loan, understanding the borrower's plan execution, business management, financial activities, material inventory, etc. The borrower shall provide relevant plans, statistics,



financial accounting statements and information.

4. Leshi Holding (Beijing) Co Ltd. and its actual controller, Jia Yueting, provide joint guarantees for repayment responsibilities.

IX. Liability For Breach of Contract

1. If the borrower does not repay the loan after the due date, the lender has the right to recover the loan. And according to bank regulations, a five over ten thousand penalty fee will be charged per day.

2. The lender fails to provide the loan on schedule. They shall pay the borrower a penalty fee based on the amount of default and the number of days of extension. The calculation of the amount of liquidated damages shall be the same as the calculation of penalties added to the borrower.

X. Dispute Settlement: Disputes arising from the execution of this contract shall be resolved through consultation between the parties. If the negotiation fails, the two parties agree that The People's Court which has jurisdiction over the place where the lender is located.

XI. Others

1. In this contract, no party may alter or terminate the contract without authorization, except a result of force majeure. If either party meets force majeure, they shall promptly notify the other parties in writing and providing proof.



2. This contract can be changed or cancelled after mutual agreement. If the contract is terminated, the borrower's occupied loans and interest payable shall still be repaid in accordance with the provisions of this contract.

3. The lender has the right to transfer the creditor's rights of this agreement to its related parties during the borrowing period. The borrower hereby promises and is aware of the above transfer. The transfer of the creditor's rights do not affect the borrower's continued performance of its obligations under this agreement.

4. If there are unfinished matters in this contract, supplementary provisions shall be made

through mutual negotiation between the parties to the contract. The supplementary provisions have the same effect as this contract.

5. The original of this contract is made in duplicate, each of the lender and the borrower shall hold one copy.

Lender (stamp) : BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)

Signature of the legal representative or authorized representative (Signature):

Borrower (stamp) : LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD.,

Signature of the legal representative or authorized representative (Signature):

Signing date: May 28, 2015

Signing address: Beijing




乐视移动智能信息技术（北京）有限公司

与

北京华兴移动资产管理中心（有限合伙）

关于《借款合同》之



_____

# 补充协议

_____

中国·北京

二〇一五年六月

# 补充协议

本《<借款合同>之补充协议》（以下简称 **"本协议"**）由以下双方于 2015 年 6 月 9 日在北京市签署：

　　甲　　方：乐视移动智能信息技术（北京）有限公司

　　地　　址：北京市朝阳区姚家园路 105 号乐视大厦 16 层

　　法定代表人：贾跃民

　　乙　　方：北京华兴移动资产管理中心（有限合伙）

　　地　　址：北京市建国门外大街永安东里 8 号 7 层 707 室

　　负　责　人：葛九松





鉴于：

1. 各方已于 2015 年 5 月 18 日在北京签署《借款合同》（"原协议"），该协议已经生效且各方均在按协议约定履行。

2. 原协议第五条约定，"借款时间共叁年，自 2015 年 5 月 29 日起，至 2018 年 5 月 29 日止。"但是，乙方作为出借人，截至本协议签署日因故尚未支付借款，实质上影响到借款利息的起算日期，双方同意修改该条款的表述。

故此拟定如下条款，以资共同遵守：

**第1条　修改内容**

各方一致同意，将原协议第五条中如下内容：

"借款时间共叁年，自 2015 年 5 月 29 日起，至 2018 年 5 月 29 日止。"

修改为：

"借款时间共叁年，自借款实际到账之日起，至叁年期限届满之日止（其他交易协议另有约定的，从其约定）。"。

**第2条　其余条款修改**

各方确认，除第五条修改外，原协议其他条款保持不变。



补充协议：2/3

**第3条　本协议其他事项**

3.1　各方理解并同意，各方就本次修改进行接触、磋商、谈判、合同/协议的起草、修改、签署、执行、任何合同/协议的条款及条件，以及任何一方向另一方提供的与本次交易相关的任何信息，若无其他方事先同意，任何一方均不得向公众公开或向任何第三方披露。若因法律法规、证券交易所规则规定或政府有权机构强制要求需要进行披露，披露方应（在其力所能及且相关法律或要求允许范围内）在做出此种披露之前合理时间内，与其他方磋商并尽最大努力（与对方合作）获得对所披露资料进行保密化处理。本条所约定保密责任不因本协议的履行、终止、解除或被判无效或不予执行等任何情形而影响其法律约束力，且永久有效。

3.2　原协议与本协议约定不一致的，依本协议约定执行；本协议没有约定的，仍按原协议约定执行。

3.3　本协议须经各方授权代表签署或盖章后方生效，一式二份，各方各留存一份，每份均具有同等法律效力。

[本行以下无正文]

甲方：乐视移动智能信息技术（北京）有限公司　　　乙方：北京华兴移动资产管理中心（有限合伙）
（章）　　　　　　　　　　　　　　　　　　　　　　（章）

签署人：　　　　　　　　　　　　　　　　　　　　签署人：

职务：　　　　　　　　　　　　　　　　　　　　　职务：



# LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO.,LTD.

## AND

## BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)

### About the loan contract's

Supplementary Agreement



**BEIJING, CHINA**

**In June, 2015**

## Supplementary Agreement

This Supplemental Agreement to the <Loan Contract> (hereinafter referred to as the "Agreement,") was signed by the following parties in Beijing on June 9, 2015:

**First Party: LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO.,LTD.**

Address: 16th floor of Leshi Building, 105 Yaojia Yuan Road, Chaoyang District, Beijing.

Legal representative: Jia Yuemin

**Second Party: BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)**

Address: Room 707, 7th Floor, No. 8 Yongan East Lane, Jianguo men wai Road, Beijing.

Person in charge: Ge Jiusong

**Given these situations:**

1. The parties have signed the <Loan Contract> ("original agreement") in Beijing on May 18, 2015. The agreement has taken effect and all parties are performing according to the agreement.

2. Article 5 of the original agreement stipulated that "the borrowing period is three years, starting from May 29, 2015 and ending on May 29, 2018." However, as the lender, second party has not yet been issued for some reason as of the date of this agreement The payment of the loan substantially affected the starting date of the interest on the loan, and the two parties agreed to modify the formulation of the clause.

Therefore, the following clauses are formulated for mutual compliance:

**Article 1  Modify Content**

The parties agreed to change the original agreement in article 5 of the following contents:

"The borrowing period is three years, starting from May 29, 2015 and ending on May 29, 2018." into:

"The borrowing period is three years, starting from the date when the borrowing is actually received and ending at the expiration of the three-year period (if otherwise agreed by other transaction agreements, such agreement shall prevail).

**Article 2 Other Terms Modified**

All parties confirmed that, with the exception of the amendment to Article 5, other provisions of the original agreement remained unchanged.

**Article 3 Other Matters of This Agreement**

3.1 Each party understands and agrees that the parties have made contacted, negotiated, negotiated, drafted, modified, signed, executed, executed the contract / agreement, the terms and conditions of any contract / agreement, and provided to the other party any information related to this transaction in this agreement. Without the prior consent of the other party, neither party can make it public or disclose to any third party. If disclosure is required by laws, regulations, stock exchange rules, or mandated by a government authority, the disclosing party shall (within its ability and permitted by relevant laws or requirements), within a reasonable time before making such disclosure, communicate with others The parties negotiate and do their best (in cooperation with the other party) to obtain confidentiality of the disclosed information. The obligation of confidentiality stipulated in this article does not affect its legal binding force due to any circumstances such as the performance, termination, release or invalidation or non-enforcement of this agreement, and it is permanently valid.

3.2 If the original agreement does not agree with this agreement, it shall be implemented in accordance with this agreement: if there is no agreement in this agreement, it shall still be implemented in accordance with the original agreement.

3.3 This agreement takes effect after being signed or stamped by authorized representatives of each party, in duplicate, each party retains one, each of this agreement has the same legal benefits.

(No text below this line)

**First Party: LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO.,LTD. (STAMP)**

Signer:

Position:

**Second Party: BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP) (STAMP)**

Signer:

Position:

EXECUTION VERSION

INVESTOR RIGHTS AGREEMENT

among

BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)

LEVIEW MOBILE & INTELLIGENT INFORMATION TECHNOLOGY
(BEIJING) CO., LTD.,

LEVIEW MOBILE LTD.,

LE LTD.,

and

YUETING JIA

Dated May 18, 2015

# TABLE OF CONTENTS

SECTION 1 INTERPRETATION.................................................................................... 4

SECTION 2 CONDITIONS PRECEDENT TO COMPLETION................................. 10

SECTION 3 OBLIGATIONS OF THE COMPANY, THE OWNER AND THE
INVESTOR BETWEEN EXECUTION AND COMPLETION.................................. 12

SECTION 4 REPRESENTATIONS AND WARRANTIES........................................ 12

SECTION 5 INVESTOR RIGHTS............................................................................... 13

SECTION 6 CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS....... 26

SECTION 7 FEES AND EXPENSES........................................................................... 27

SECTION 8 INDEMNIFICATION.............................................................................. 27

SECTION 9 TERMINATION....................................................................................... 28

SECTION 10 NOTICES................................................................................................ 29

SECTION 11 MISCELLANEOUS............................................................................... 29

SECTION 12 GOVERNING LAW AND DISPUTE RESOLUTION........................ 32

**SCHEDULES**

SCHEDULE 1  SHAREHOLDING STRUCTURE OF THE GROUP

SCHEDULE 2  COLLECTIVE WARRANTIES

SCHEDULE 3  INVESTOR WARRANTIES

**INVESTOR RIGHTS AGREEMENT** (this "Agreement") made on May    , 2015,
**AMONG:**

(1)    **LEVIEW MOBILE & INTELLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD. (乐视移动智能信息技术（北京）有限公司), a** company organized and existing under the laws of China with its registered office at No. 2, Linkong Erlu, Wenhuaying Country, Gaoliying Town, Shunyi District, Beijing, PRC (the "Borrower");

(2)    **LEVIEW MOBILE LTD.,** an exempted company incorporated and existing under the laws of the Cayman Islands with its company number 296318 and registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands (the "Company");

(3)    **LE LTD.,** an exempted company incorporated and existing under the laws of the Cayman Islands with its company number 295848 and registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands (the "Cayman Co");

(4)    **YUETING JIA (贾跃亭),** holder of PRC Identification Card Number of 14262319731215081X, Linfen City, Shanxi Province, PRC (the "Owner"); and

(5)    **BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)( 北京华兴移动资产管理中心（有限合伙）),** a limited partnership established and existing under the laws of China with its registered office at Room 707, 7th Floor, No. 8 Yongan Dongli, Jianguo Menwai Avenue, Beijing, PRC (the "Investor").

**RECITALS:**

(A) The Investor intends to invest into the Company or the Cayman Co;

(B) To facilitate the investment by the Investor in the Company or the Cayman Co, prior to or on the date of the execution of this Agreement, the Borrower, the Investor and the affiliates of the Investor entered into an loan agreement (the "Loan Agreement"), pursuant to which the Investor and its affiliates will offer certain loan with a principal amount of RMB100,000,000 (the "Debt"); and

(C) The Parties desire to enter into this Agreement and make the respective representations, warranties, covenants and agreements set forth herein on the terms and conditions set forth herein.

**AGREEMENT:**

3

## SECTION 1
## INTERPRETATION

1.1     <u>Definitions</u>.  In this Agreement, unless the context otherwise requires the
following words and expressions have the following meanings:

"<u>Accounting Standards</u>" means the International Financial Reporting Standards
(IFRS) or the Accounting Principles Generally Accepted in China (Chinese
GAAP) adopted by the Company and applied on a consistent basis.

"<u>Affiliate</u>" of a Person (the "<u>Subject Person</u>") means (a) in the case of a Person
other than a natural person, any other Person that directly or indirectly Controls,
is Controlled by or is under common Control with the Subject Person and (b) in
the case of a natural person, any other Person that directly or indirectly is
Controlled by the Subject Person or is a Relative of the Subject Person.  In the
case of an Investor, the term "<u>Affiliate</u>" includes (v) any shareholder of the
Investor, (w) any of such shareholder's general partners or limited partners, (x)
the fund manager managing such shareholder (and general partners, limited
partners and officers thereof) and (y) trusts controlled by or for the benefit of
any such individuals referred to in (v), (w) or (x).

"<u>Basic Documents</u>" means this Agreement, the Loan Agreement, the Company
Charter Documents and the Onshore Contracts.

"<u>Big Four Accounting Firms</u>" means Deloitte Touche Tohmatsu Limited,
PricewaterhouseCoopers, Ernst & Young Global Limited and Klynveld Peat
Marwick Goerdeler.

"<u>Board</u>" means the board of directors of the Company as from time to time
constituted.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on
which commercial banks in the PRC, HKSAR or Cayman Islands are required
or authorized by law or executive order to be closed or on which a tropical
cyclone warning no. 8 or above or a "black" rainstorm warning signal is hoisted
in HKSAR at any time between 9:00 a.m. and 5:00 p.m. Hong Kong time.

"<u>BVI Co</u>" means Lele Holding Ltd., a business company incorporated and
existing under the laws of the British Virgin Islands with its company number
1859050 and registered office at P.O. Box 905, Quastisky Building, Road Town,
British Virgin Islands.

"<u>China</u>" or the "<u>PRC</u>" means the People's Republic of China and for the purpose
of this Agreement shall exclude HKSAR, Taiwan and the Macau Special
Administrative Region.

"<u>Collective Warranties</u>" means the representations, warranties and undertakings
of the Company and the Owner set forth in <u>Schedule 2</u>.

4

"Company Charter Documents" means the Memorandum of Association and Articles of Association of the Company.

"Control" of a Person means (a) ownership of more than 50% of the shares in issue or other equity interests or registered capital of such Person or (b) the power to direct the management or policies of such Person, whether through the ownership of more than 50% of the voting power of such Person, through the power to appoint a majority of the members of the board of directors or similar governing body of such Person, through contractual arrangements or otherwise.

"Encumbrance" means (a) any mortgage, charge (whether fixed or floating), pledge, lien (other than lien created by operation of law), hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, and (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person.

"Event of Default" has the meaning set forth in Section 5.1(b)(i) of this Agreement.

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital or joint venture or other ownership interest.

"Existing Business" means the business of researching, designing, developing, manufacturing, selling and marketing of mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Governmental Authority" means any nation or government or any province or state or any other political subdivision thereof; any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality or any political subdivision thereof, any court, tribunal or arbitrator, the governing body of any securities exchange and any other self-regulatory organization.

"Group" means collectively the BVI Co, the Cayman Co, the Company, the HK Co, the WFOE (upon its incorporation) the Onshore Companies and any other Person in which the BVI Co, the Cayman Co, the Company, the HK Co or the WFOE directly or indirectly owns a majority interest and "Group Member" means any of them.

"HK Co" means Leview Mobile HK Limited, a limited company incorporated and existing under the laws of HKSAR with its company number 2205943 and registered office at RM 504, 5/F Valley Centre, No. 80-82 Morrison Hill Road, Wanchai, HKSAR.

"HKSAR" means the Hong Kong Special Administrative Region of the PRC.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Issuance Date" means the date on which Investor disburses the loan to the Borrower pursuant to the Loan Agreement.

"Investor Warranties" means the representations, warranties and undertakings of the Investor set forth in Schedule 3.

"Lefeng Mobile" means Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司), a company incorporated under the laws of the PRC.

"Maturity Date" means the third-year anniversary of the Issuance Date.

"Mortgaged Shares" means (i) 5% of the Ordinary Shares owned by the Cayman Co in the Company on the date of the closing of the Note's conversion into the Convertible Note, if applicable, and (ii) any shares acquired in respect of Mortgaged Shares by reason of a stock split, stock dividend, reclassification or otherwise.

"Onshore Companies" means Beijing Pala Culture & Media Co., Ltd. (北京百乐文化传媒有限公司), Lefeng Mobile and the Borrower, which incorporated under the laws of the PRC, and "Onshore Company" means any of them.

"Onshore Contracts" means agreements to be entered into between the WFOE, Lefeng Mobile, the Owner or any of their Affiliates, including an exclusive consulting and services agreement, an exclusive call option agreement, an equity pledge agreement, a voting right proxy agreement and a business operation agreement, each in the form and the substance reasonably satisfactory to the Investor.

**"Ordinary Shares" means the ordinary shares having a par value of US$0.0001 per share in the capital of the Company.**

6

"Party" or "Parties" means any signatory or the signatories to this Agreement and any Person who subsequently becomes a party to this Agreement pursuant to the terms and conditions hereof.

"Person" means any natural person, firm, company, governmental authority, joint venture, partnership, association or other entity (whether or not having separate legal personality).

"Redemption Date" has the meaning set forth in Section 5.1(c)(ii) of this Agreement.

"Related Party" means (a) any shareholder of any Group Member, (b) any director of any Group Member, (c) any officer of any Group Member, (d) any Relative of a shareholder, director or officer of any Group Member, (e) any Person in which any Group Member, any shareholder, director or officer of any Group Member has any interest other than a passive shareholding of less than five percent in a publicly listed company, or over which a Related Party exercises Control or significant influence through contractual arrangements, voting, management or directorship position or ownership, and (f) any other Affiliate of any Group Member.

"Redemption Price" has the meaning set forth in Section 5.1(c)(iii) of this Agreement.

"Relevant Securities" means Qualified Financing Securities or other securities into which the Note or the Convertible Note may be convertible.

"Qualified Financing" means any issue of preferred shares or equity-linked convertible debt securities of the Company after the Issuance Date but on or before the Maturity Date to institutional investors (other than the Investor) on terms and conditions that would be reasonably acceptable to prudent, sophisticated investors in light of the circumstances, or any other issuance of equity securities of the Company after Issuance Date.

"Qualified Financing Securities" means the securities to be issued by the Company in connection with the Qualified Financing.

"Relative" of a natural person means the spouse of such person, and any parent, grandparent, child, grandchild, sibling, uncle, aunt, nephew, or niece of such person or such person's spouse.

"Restructuring" means the restructuring the result of which (i) is the corporate structure set forth in Schedule 1A hereof as of the date of this Agreement and as of the Issuance Date respectively; and (ii) will be the corporate structure set forth in Schedule 1B hereof within the timeframe after the Issuance Date agreed upon by the Investor, the Owner and the Company in this Agreement.

"RMB" means the renminbi yuan, the lawful currency of the PRC.

"US$" means United States Dollars, the lawful currency of the United States of America.

"Warranties" means the Collective Warranties and the Investor Warranties.

"WFOE" means Lesai Mobile Technology (Beijing) Co., Ltd. (乐赛移动科技（北京）有限公司), a wholly foreign-owned enterprise to be organized and existing under the laws of China.

1.2 <u>Terms Defined Elsewhere in this Agreement</u>.  The following terms are defined in this Agreement as follows:

| | |
|---|---|
| "Agreement" | Preamble |
| "Borrower" | Preamble |
| "Breach" | Section 5.1(b)(i)(3) |
| "Company" | Preamble |
| "Cayman Co" | Preamble |
| "Confidential Information" | Section 6.1 |
| "Convertible Note" | Section 5.2(a)(i)(1) |
| "Convertible Notice" | Section 5.2(c)(i) |
| "Default Notice" | Section 5.1(b)(iii) |
| "Disposed Shares" | Section 5.4(a) |
| "Disposition" | Section 5.4(a) |
| "Disposition Notice" | Section 5.4(a) |
| "Dispute" | Section 12.2(a) |
| "Election Period" | Section 5.3(d) |
| "Financing Terms" | Section 6.1 |
| "HKIAC" | Section 12.2(a) |
| "Investor" | Recitals |
| "Indemnified Party" | Section 8.1 |
| "Indemnifying Party" | Section 8.1 |
| "Investor" | Preamble |
| "Investment Consideration" | Section 5.2(a)(iii) |
| "Losses" | Section 8.1 |
| "Loan Agreement" | Recitals |
| "Note" | Recitals |
| "New Securities" | Section 5.3(a) |
| "Observer" | Section 5.7 |
| "Owner" | Preamble |
| "Preemptive Right" | Section 5.3(a) |
| "Pro Rata Share" | Section 5.3(b) |
| "Redemption Notice" | Section 5.1(a) |
| "Redemption Request" | Section 5.1(c)(i) |
| "Representatives" | Section 6.1 |
| "Tag-along Right" | Section 5.4(a) |
| "Tag-along Shares" | Section 5.4(b) |
| "Transaction" | Section 5.2(f) |
| "Valuation" | Section 5.2(b)(i)(3) |

1.3     Interpretation.

(a)     Directly or Indirectly.  The phrase "directly or indirectly" means directly, or indirectly through one or more intermediate Persons or through contractual or other arrangements, and "direct or indirect" has the correlative meaning.

(b)     Gender and Number.  Unless the context otherwise requires, all words (whether gender-specific or gender neutral) shall be deemed to include each of the masculine, feminine and neuter genders, and words importing the singular include the plural and vice versa.

(c)     Headings.  Headings are included for convenience only and shall not affect the construction of any provision of this Agreement.

(d)     Include not Limiting.  "Include," "including," "are inclusive of" and similar expressions are not expressions of limitation and shall be construed as if followed by the words "without limitation."

(e)     Law.  References to "law" shall include all applicable laws, regulations, rules and orders of any Governmental Authority,  securities exchange or other self-regulating body, any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment; and "lawful" shall be construed accordingly.

(f)     References to Documents.  References to this Agreement include the Schedules and Exhibits, which form an integral part hereof.  A reference to any Section, Schedule or Exhibit is, unless otherwise specified, to such Section of, or Schedule or Exhibit to this Agreement.  The words "hereof," "hereunder" and "hereto," and words of like import, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular Section hereof or Schedule or Exhibit hereto.  A reference to any document (including this Agreement) is to that document as amended, consolidated, supplemented, novated or replaced from time to time.

(g)     Time.  If a period of time is specified and dates from a given day or the day of a given act or event, such period shall be calculated exclusive of that day.

(h)     Writing.  References to writing and written include any mode of reproducing words in a legible and non-transitory form including emails and faxes.

(i)     Language.  This Agreement is drawn up in the English language.  If this Agreement is translated into any language other than English, the English language text shall prevail.

9

**SECTION 2**
**CONDITIONS PRECEDENT TO COMPLETION**

2.1    <u>Conditions Precedent to Obligations of Investor at Completion</u>. The obligation of the Investor to complete the purchase of the Note at the Issuance Date is subject to the fulfillment, prior to or simultaneously with the Issuance Date, of the following conditions, any one or more of which may be waived by the Investor in writing, *provided* that if any of the following conditions is waived by the Investor on or before the Issuance Date, the Company, the Owner and the Borrower shall cause such conditions to be fulfilled promptly after the Issuance Date if requested by the Investor in writing:

(a)    the Collective Warranties remaining true and correct in all material respects on the Issuance Date as provided in Section 4.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Issuance Date;

(b)    each of the Group Members, the Onshore Companies and the Owner having performed and complied in all material respects with all of its agreements and obligations contained in the Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Issuance Date;

(c)    the Investor having completed its business, legal and financial due diligence review of the Company and its subsidiaries and the results of that review shall be satisfactory to the Investor;

(d)    each of the Group Members and the Onshore Companies having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of the Basic Documents to which it is a party, and the transactions contemplated hereby and thereby;

(e)    all consents and approvals of, notices to and filings or registrations with any Governmental Authority or any other Person required to consummate the transactions contemplated under this Agreement and the other Basic Documents (to the extent that such transactions are to be completed on or prior to the Issuance Date), shall have been obtained or made (including all required approvals for the Restructuring and all required approvals and registration of the establishment of the WFOE and the direct or indirect ownership by any PRC residents of an interest in the Company including registrations pursuant to the Notice on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Corporate Financing and Roundtrip Investment through Offshore Special Purpose Vehicles issued by State Administration of Foreign Exchange on July 4, 2014 and any subsequent similar rules, amendments or supplements of the PRC) and copies thereof having been provided to the Investor;

(f)  there being no Governmental Authority or other Person that has:

    (i)  instituted or threatened in writing any legal, arbitral or administrative proceedings against the Owner, any Group Member, or the Onshore Companies to restrain, prohibit or otherwise challenge the purchase of the Note by the Investor or any of the other transactions contemplated under the Basic Documents (including without limitation, the Restructuring); or

    (ii)  proposed or enacted any statute or regulation which would prohibit, materially restrict or materially delay implementation of the transactions contemplated under the Basic Documents (including without limitation, the Restructuring), or the operation of the Group as a whole after the Issuance Date as contemplated in the Basic Documents;

(g)  the Investor having received (i) a legal opinion from Walkers, the Cayman Islands counsel of the Company, and (ii) a legal opinion from King & Wood Mallesons, the PRC counsel of the Company, in each case, dated as of the Issuance Date and in the form and substance satisfactory to the Investor.

2.2  <u>Conditions Precedent to Obligations of Company at Completion</u>.  The Company's obligation to procure the Borrower to complete the issuance of the Note at the Issuance Date is subject to the fulfillment, prior to or simultaneously with the Issuance Date, of the following conditions, any one or more of which may be waived by the Company or the Borrower:

(a)  the Investor Warranties remaining true and correct in all material respects on the Issuance Date as provided in Section 4.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Issuance Date;

(b)  the Investor having performed and complied in all material respects with all of its agreements and obligations contained in this Agreement and the other Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Issuance Date;

(c)  the Investor having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party, and the transactions contemplated hereby and thereby; and

(d)  each of the Basic Documents to which an Investor is a party having been executed by the Investor and delivered to the Company or the Borrower.

## SECTION 3
## OBLIGATIONS OF THE COMPANY, THE OWNER AND THE INVESTOR BETWEEN EXECUTION AND COMPLETION

3.1    <u>Notices of Breaches by the Company, the Borrower and the Owner</u>.  From the date hereof until the Issuance Date, except as disclosed in the Basic Documents or otherwise as contemplated thereunder, the Company and the Borrower shall, and the Company and the Owner shall cause each of the other Group Members and Onshore Companies to, conduct its respective business in a manner so as to ensure that the Collective Warranties continue to be true and correct on and as of the Issuance Date as if made on and as of Issuance Date.  The Company, the Borrower and the Owner shall give the Investor prompt notice of any event, condition or circumstance occurring prior to the Issuance Date that would constitute a breach of any Collective Warranty if such Collective Warranty were made as at any date between the date hereof and the Issuance Date, or that would constitute a breach of any terms and conditions contained in this Agreement.

3.2    <u>Business Operation</u>.  From the date hereof until the Issuance Date, the Company and the Owner shall, and shall cause each other Group Member or the Borrower where applicable to, (i) carry on their respective business in the ordinary course; (ii) comply in all material respects with all applicable law and other requirements relating to the operation of their respective businesses; and (iii) with no less diligence and efforts that would be applied in the absence of the transactions contemplated hereunder.

3.3    <u>Notifications</u>.  Until the Issuance Date, each Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 2 becoming incapable of being satisfied.

3.4    <u>Further Action</u>.  The Parties shall use all reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

## SECTION 4
## REPRESENTATIONS AND WARRANTIES

4.1    <u>Collective Warranties</u>.  The Company, the Cayman Co, the Borrower and the Owner, severally and jointly, represent, warrant and undertake to the Investor in the terms of the Collective Warranties and acknowledge that the Investor in entering into this Agreement is relying on such Collective Warranties.

4.2    <u>Investor Warranties</u>.  The Investor represents, warrants and undertakes to the Company in the terms of the Investor Warranties and acknowledges that the Company in entering into this Agreement is relying on the Investor Warranties.

12

4.3 <u>Knowledge of Claims</u>. No investigation by or on behalf of any Party shall prejudice any claim made by such Party under the indemnity contained in Section 8 or operate to reduce any amount recoverable thereunder, provided that a Party shall have no liability for (i) any breach of or inaccuracy in the Warranties made by such Party to the extent the Indemnified Party has actual knowledge, at or prior to the Issuance Date of such breach or inaccuracy, (ii) any breach of or failure to perform any covenant or obligations of such Party which are required to be performed at or prior to the Issuance Date hereunder, to the extent that the Indemnified Party has actual knowledge, at or prior to the Issuance Date of such breach or failure.

4.4 <u>Separate and Independent</u>. The Collective Warranties shall be separate and independent and save as expressly provided shall not be limited by reference to any other paragraph or anything in this Agreement or the Schedules.

4.5 <u>Bring-Down to Completion</u>. The Warranties shall be deemed to be repeated as at the Issuance Date as if they were made on and as of the Issuance Date, other than such Warranties as are made specifically as of another specified date, which shall be true and correct as of such date, and all references therein to the date of this Agreement were references to the Issuance Date.

4.6 <u>Survival of Warranties</u>. All of the Warranties shall survive the Issuance Date for a period of 18 months after the Issuance Date, *provided* that the warranties set forth in Sections 2, 10 and 12 of <u>Schedule 2</u> and Sections 2 and 4 of <u>Schedule 3</u> should survive indefinitely.

**SECTION 5**
**INVESTOR RIGHTS**

5.1 <u>Redemption</u>.

(a) <u>Redemption on Maturity</u>. The Investor shall have the right to require the Borrower to redeem the Note on the Maturity Date or upon or immediately following the second-year anniversary of the Issuance Date at the Redemption Price (defined as below) by delivering a prior written notice (the "<u>Redemption Notice</u>") to the Borrower following the Redemption Procedure set forth in Section 5.1(c).

(b) <u>Redemption on Event of Default</u>.

(i) The occurrence of any one or more of the following events shall constitute an "<u>Event of Default</u>":

(1) the Borrower or the Company shall fail to pay debt that is due and payable or any other amount (if any) when due in accordance with the terms hereof;

(2) the change of actual controller of the Company or the Borrower;

13

(3)    any representation, warranty, covenant, undertaking, certification or statement made by or on behalf of the Company or the Borrower in any Basic Documents or in any certificate or other document delivered pursuant thereto shall have been materially incorrect, misleading or false in any material respect when made (a "Breach") and, if capable of being remedied, has not been remedied within thirty (30) days after being notified in writing of such Breach by the Investor; provided that such Breach has caused or is likely to cause a material adverse change on the business of the Group as a whole or on the rights and liabilities of the Investor under the Basic Documents;

(4)    any breach of the undertakings and covenants as specified in Sections 5.5, 5.6, 5.7 and 5.8 of this Agreement.

(5)    the Company, the Borrower or any of their respective significant or material Affiliates shall commence any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to any Group Member, or seeking to adjudicate any Group Member bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to any Group Member or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for any Group Member or for all or any substantial part of its assets;

(6)    the involuntary delisting of Leshi Internet Information Technology Corp., Beijing (乐视网信息技术（北京）股份有限公司, 300104.CH);

(7)    the Company shall fail to deliver the Relevant Securities when such Relevant Securities are required to be delivered following conversion of the Note or the Convertible Note (defined as below) in accordance with the terms hereof.

(ii)    Upon the occurrence of an Event of Default, the Company shall give the Investor a prompt notice of the occurrence of such Event of Default.

(iii)    Upon the occurrence and during the continuance of an Event of Default, the Investor may, by notice in writing to the Borrower (the "Default Notice"), request the Event of Default to be remedied within ten (10) Business Days or other time the Investor may deem to be reasonable.

(iv)    Upon the Borrower's or any of its applicable Affiliates' failure to remedy the default in accordance with the Default Notice, the Investor shall be entitled to declare the Note in whole, and require the Borrower to redeem the Note on the Redemption Date at the Redemption Price by delivering a Redemption Notice to the Borrower following the Redemption Procedure set forth in Section 5.1(c).

(c)    <u>Redemption Procedures</u>.

(i)    On or before the Redemption Date, the Investor shall surrender a request for redemption (the "<u>Redemption Request</u>") to the Borrower, in the manner and at the place designated in the Redemption Notice. Upon the surrender of the Redemption Request to the Borrower, the applicable Redemption Price shall be payable to the order of the Investor.

(ii)    The Redemption Date for Section 5.1(a) shall be Maturity Date or the second-year anniversary of the Issuance Date, as the case may be, and for Section 5.1(b) shall be 3rd Business Day after the date of Redemption Notice.

(iii)    The Investor upon exercise of its redemption right shall have the right to redeem the Note at the Redemption Price, which is calculated as the total outstanding principal amount with respect to the Note, plus any accrued and unpaid interest at 15% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Issuance Date divided by 365 days; the payment is to be made by cash, and the Investor may request for the cash payment to come from the Owner or other companies and institutions designated by the Owner.

(iv)    The payment shall become due and payable on the Redemption Date, and calculated from and including the Issuance Date until the payment date, plus any accrued and unpaid interest.

(v)    If prior to the Maturity Date the Investor is unable to exercise its right to convert the Note into any shares in the Company or the Cayman Co, as the case may be,  as the result of the non-occurrence e of any Qualified Financing for a reason attributable to the Borrower, the Company, the Cayman Co or the Owner, the Investor upon exercise of its redemption right shall have the right to redeem the Note at a new redemption price, which is calculated as the total outstanding principal amount with respect to the Note, plus any accrued and unpaid interest at 25% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Issuance Date divided by 365 days; the payment is to be made by cash, and the Investor may request for the cash payment to come from

15

the Owner or other companies and institutions designated by the
Owner.

(vi)   If the Investor, at its own election, does not exercise its right to
convert the Note which the Investor may subscribe prior to the
Qualified Financing into preferred shares of the Company or the
Cayman Co or subscribe or receive any shares of the Company
or the Cayman Co on the Qualified Financing prior to the
Maturity Date as provided in Section 5.2(a)(i), the Investor shall
be entitled to redeem the Note at the Redemption Price in
accordance with Section 5.1(c)(iii).

5.2   <u>Conversion</u>.

(a)   <u>General</u>.

(i)   After the Issuance Date, the Investor shall have the right to, or
have one of its qualified offshore Affiliates to:

(1)   convert the Note into certain convertible notes (the
"<u>Convertible Note</u>") to be issued by the Company, which
may be, at the election of the Investor, converted into
preferred shares of the Company or the Cayman Co at
any time agreed by the Parties prior to any Qualified
Financing in accordance with this Section 5.2; or

(2)   directly convert the Note into certain preferred shares of
the Company or the Cayman Co on the Qualified
Financing.

(ii)   Upon the Investor's exercise of its right to convert the Note into
the Convertible Note, the Mortgaged Shares shall be mortgaged
to the Investor for the benefit of the Investor to secure the
payment and other obligations of the Company under the
applicable transaction documents.

(iii)   Upon the Investor's exercise of its right to directly convert the
Note into preferred shares of the Company or the Cayman Co on
a Qualified Financing, the Investor agrees to invest certain
amount of cash in a foreign currency (the "<u>Investment
Consideration</u>") into the Company or the Cayman Co in
exchange for certain number of preferred shares of the Company
or the Cayman Co, and upon the receipt of the Investor
Consideration, the Borrower undertakes and covenants to, or the
Company and the Owner shall cause the Borrower to, subject to
the compliance with applicable PRC laws and the agreement of
parties on the details:

16

        (1)    use the Investment Consideration to redeem the Note and release the Investor's payment obligation under the Note; or

        (2)    use other funds to redeem the Note and release the Investor's obligation under the Note, the amount of which shall be equal to the Investment Consideration.

    (iv)    The Owner and the Cayman Co undertake, and shall procure to the extent permitted by law, that the Investor shall enjoy the same rights set forth under this Section 5, in the event that the Note or the Convertible Note held by the Investor is converted to the Cayman Co shares, at the election of the Investor, on the Qualified Financing as specified under this Section 5.2.

(b)    <u>Conversion on Qualified Financing</u>. The Investor shall be entitled to exercise its right of conversion as specified under this Section 5.2(b).

    (i)    Should a Qualified Financing occur prior to the Maturity Date, the Investor shall have the right, but not the obligation, to convert the then outstanding amount owing under Note or the Convertible Note, in whole, into preference shares subject to Section 5.2(c) in accordance with the method as follows:

        (1)    if converted to the Company shares:

$$\frac{\text{outstanding principal amount x } (1 + 15\% \text{ x actual days elapsed since Issuance Date /365})}{80\% \text{ x per share price as at the Company's Qualified Financing}}$$

        (2)    if converted to Cayman Co shares and by then Cayman Co has had a first Qualified Financing:

$$\frac{\text{outstanding principal amount x } (1 + 15\% \text{ x actual days elapsed since Issuance Date /365})}{80\% \text{ x per share price as at Cayman Co's first Qualified Financing}}$$

or

        (3)    if converted to Cayman Co shares and by then the Cayman Co has not had a first Qualified Financing, the Investor shall negotiate with the Owner of the valuation (the "<u>Valuation</u>") of the Cayman Co and the shares shall be calculated as follows:

$$\frac{\text{outstanding principal amount x } (1 + 15\% \text{ x actual days elapsed since Issuance Date /365})}{80\% \text{ x per share price as at the Valuation}}$$

    (ii)    Within 30 Business Days after the request of the Investor, the Owner shall procure that the Company shall deliver to the Investor all legal, financial and business information, the final form of the transaction documents with respect to the financing,

and such other materials related thereto that may be reasonably requested by the Investor.

(iii) Except for Section 5.2(b)(i)(3), Qualified Financing Securities issued to the Investor upon conversion of the Note or the Convertible Note shall be identical with respect to rights, preferences and designations as, and shall rank *pari passu* with, the Qualified Financing Securities issued to the investors in the Qualified Financing and Investor shall otherwise be entitled to rights under the applicable Qualified Financing definitive documents, as the case may be, on parity with the investors thereunder.

(c) Conversion Procedures.

(i) Subject to compliance with the procedures set forth in Section 5.2, the conversion rights set forth in this Agreement shall be exercised by the Investor at any time during usual business hours on a Business Day, at the registered office of the Company (or such other office or agency of the Company as the Company and the Investor may agree), accompanied by a conversion notice (the "Convertible Notice") specifying (i) that the Investor elects to convert the entire Note or the Convertible Note and (ii) subject to the transfer restrictions as agreed, the name or names (with address) in which a certificate or certificates for the Relevant Securities are to be issued.

(ii) As soon as practicable and in any event within 5 Business Days after the date of the Conversion Notice, the Company shall:

(1) take all actions and execute all documents necessary to effect the issuance and to the extent the Relevant Securities are in the form of equity securities, registration of such Relevant Securities on the register of the Company (including, where applicable, giving all necessary instruction to the relevant share registry to effect such issuance) and deliver to the Investor certified copies of the register of members reflecting the Relevant Securities in the name of the Investor or its nominee or assignee, and

(2) deliver to the Investor (x) where the Relevant Securities are in the form of equity securities, certificate(s) representing the number of validly issued, fully paid and non-assessable Relevant Securities calculated in accordance with Section 5.2, as the case may be and (y) where the Relevant Securities are in the form of equity-linked securities, certificate(s) representing the principal amount of Relevant Securities calculated in accordance with Section 5.2(b)(i)(1) or 5.2(b)(i)(2).

(d)     Fractional Shares. If the conversion of the Note or the Convertible Note would result in the issuance of any fractional share, the Company shall, at its option, round upwards and issue one additional share or pay to the Investor the portion of the principal amount convertible into such fractional share.

(e)     Availability of Equity Securities. The Company covenants that it will at all times reserve and maintain authority to issue the maximum number of Equity Securities issuable upon conversion of the Note or the Convertible Note. The Company covenants that all Equity Securities, when issued or delivered pursuant to Section 5.2(c), shall be duly and validly issued, shall rank *pari passu* with all other Equity Securities issued in the Qualified Financing, as the case may be, and where they are in the form of equity securities non-assessable, fully paid, free and clear of all Encumbrances, other than Encumbrances arising under the Basic Documents or created, imposed or agreed in writing by the Investor.

(f)     Reorganization, Reclassification. Subject to the terms of the applicable agreement with respect to the Note or the Convertible Note, in case of any merger, amalgamation, arrangement or consolidation of the Company or any capital reorganization, reclassification or other change of outstanding Ordinary Shares (each, a "Transaction"), the Company shall execute and deliver to the Investor at least 30 days prior to effecting such Transaction a certificate, signed by a director of the Company, stating that the rights of the Investor shall continue to be recognized and not prejudiced by the Transaction and appropriate provision shall be made therefor in the agreement, if any, relating to such Transaction. The provisions of this Section 5.2(f) and any equivalent thereof in any such certificate similarly shall apply to successive transactions.

(g)     Legend. The Investor shall agree to the imprinting, so long as required by law, of a legend on certificates representing all of the Investor's Relevant Securities issuable upon conversion of the Note or the Convertible Note in substantially the following form:

LEVIEW MOBILE LTD. (THE "COMPANY") IS A COMPANY INCORPORATED UNDER THE LAWS OF THE CAYMAN ISLANDS, AND THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL NOT BE SOLD, ASSIGNED, TRANSFERRED, EXCHANGED, MORTGAGED, PLEDGED OR OTHERWISE DISPOSED OF OR ENCUMBERED WITHOUT COMPLIANCE WITH THE ARTICLES OF ASSOCIATION OF THE COMPANY, DATED FEBRUARY 3, 2015, AMONG THE COMPANY AND THE SHAREHOLDERS OF THE COMPANY, AS AMENDED AND RESTATED FROM TIME TO TIME. COPIES OF SUCH ARTICLES OF ASSOCIATION ARE ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY.  THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES OR

19

SECURITIES ISSUED UPON CONVERSION THEREOF ON THE
BOOKS OF THE COMPANY UNLESS AND UNTIL THE
TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE
TERMS OF SUCH ARTICLES OF ASSOCIATION.

5.3    Preemptive Right.

(a)    The Company hereby grants to the Investor the right of first refusal to
purchase the Investor's Pro Rata Share (as defined below), of all (or any
part) of any Equity Securities (the "New Securities") that the Company
may from time to time issue after the Issuance Date (the "Preemptive
Right").

(b)    An Investor's "Pro Rata Share" for purposes of the Preemptive Right is
the ratio of (a) the number of Ordinary Shares held by the Investor on or
after the conversion, or, prior to the conversion, the number of Ordinary
Shares that would have been held by the Investor as if the Note or the
Convertible Note held by the Investor were converted into preferred
shares, in each case, as if on a fully-converted basis immediately prior to
the issuance of the New Securities (assuming full conversion of all
preferred shares and full conversion or exercise of all outstanding
convertible securities, rights, options and warrants held by the Investor),
to (b) the total number of Ordinary Shares (including preferred shares on
an as-converted basis and assuming that all outstanding options or
warrants) then outstanding immediately prior to the issuance of New
Securities (assuming full conversion of preferred shares and full
conversion or exercise of all outstanding convertible securities, rights,
options and warrants).

(c)    In the event the Company proposes to undertake an issuance of New
Securities, it shall give the Investor written notice of its intention,
describing the type of New Securities, and their price and the terms upon
which the Company proposes to issue the same. The Investor shall have
10 days after any such notice is mailed or delivered to agree to purchase
the Investor's Pro Rata Share of such New Securities and to indicate
whether the Investor desires to exercise its Preemptive Right for the
price and upon the terms specified in the notice by giving written notice
to the Company and stating therein the quantity of New Securities to be
purchased.

(d)    In the event the Investor fails to exercise fully the Preemptive Right, if
any within said 10 day-period (the "Election Period"), the Company
shall have 120 days thereafter to sell or enter into an agreement
(pursuant to which the sale of New Securities covered thereby shall be
closed, if at all, within 120 days from the date of said agreement) to sell
that portion of the New Securities with respect to which the Investor's
Preemptive Right set forth in this Section 5.3(a) was not exercised, at a
price and upon terms no more favorable to the purchasers thereof than
specified in the Company's notice to the Investor delivered pursuant to
Section 5.3(c). In the event the Company has not sold within such 120-

20

day period following the Election Period, or such 120-day period following the date of said agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investor in the manner provided in this Section 5.3.

5.4    <u>Tag-along Right</u>.

(a)    Following any conversion of the Note or the Convertible Note held by the Investor, if any of the shares (the "<u>Disposed Shares</u>") in the Company directly or indirectly held by the Owner is to be sold to any third party (the "<u>Disposition</u>"), the Investor may elect to exercise its tag-along right (the "<u>Tag-along Right</u>") and participate on a pro-rata basis in the Disposition on the same terms and conditions as set forth in the written notice (the "<u>Disposition Notice</u>") to the Company and the Investor sent by the Owner, which notice shall state:(i) the name of the Owner, (ii) the name and address of the proposed purchaser, (iii) the number of shares to be disposed; (iv) the amount and form of the proposed consideration for the Disposition, (v) any other material business relations between the Owner and the purchaser, and (vi) the other terms and conditions of the proposed Disposition. In the event that the proposed consideration for the Disposition includes consideration other than cash, the Disposition Notice shall include a calculation of then fair market value of such consideration and an explanation of the basis for such calculation.

(b)    To exercise its Tag-along Right, the Investor must give the Owner, as applicable, written notice to that effect within 40 days after delivery of the Disposition Notice, and upon giving such notice the Investor shall be deemed to have effectively exercised the Tag-along Right. The Investor may sell all or any part of that number of Shares (the "<u>Tag-along Shares</u>") held by the Investor equal to the product obtained by multiplying (x) the number of Disposed Shares by (y) a fraction, the numerator of which is the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) at the time owned by the Investor and the denominator of which is the aggregate number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) owned by the Investor and other convertible note holders plus the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) then owned by the Owner, as applicable.

5.5    <u>Information Rights</u>. After the Issuance Date, the Company or the Borrower shall regularly deliver to the Investor information relating to the daily business operation of the Company and the Borrower, including but not limited, to the following documents or reports:

(a)    within 90 days after the end of each fiscal year of the Company and the Borrower, a consolidated income statement and statement of cash flows for the Company and the Borrower for such fiscal year and a consolidated balance sheet for the Company and the Borrower as of the end of the fiscal year, audited and certified by one of the Big Four

Accounting Firms accepted by the Board, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period;

(b)     (i) within 45 days after the end of each quarter, a consolidated income statement and statement of cash flows for the Company and the Borrower for such quarter and a consolidated balance sheet for the Company and the Borrower as of the end of such quarter, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period, and (ii) promptly following the end of each quarter an up-to-date capitalization table, and both items (i) and (ii) shall be certified by the chief financial officer or the financial controller of the Company and the Borrower;

(c)     within 20 days of the end of each month, a consolidated unaudited income statement and statement of cash flows for such month and a consolidated balance sheet for the Company and the Borrower as of the end of such month, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period (except for customary year-end adjustments and except for the absence of notes) and certified by the chief financial officer of the Company and the Borrower;

(d)     a comprehensive operating budget forecasting the Company's and the Borrower's revenues, expenses, and cash position for the following fiscal year within 30 days prior to the end of each fiscal year, in reasonable detail on a monthly basis, broken down by different operating subsidiaries and associated companies; and

(e)     as soon as practicable, any other information reasonably determined by the Board or reasonably requested by the Investor.

5.6     Inspection Rights. After the Issuance Date, the Company and the Borrower shall, and the Company and the Owner shall cause each of the other Group Members to, give to the Investor and its Representatives reasonable access, upon reasonable prior notice, to the premises and the books and records, and instruct its officers and employees to furnish all information and explanations to the Investor or any such Persons as the Investor may reasonably request during normal business hours, under the supervision of a Company officer and in such a manner as not to interfere with the normal business operations of the Company or any other Group Member.

5.7     Appointment of Board Observer. As long as the Note or the Convertible Note is outstanding or the Investor holds any share in the Company after conversion, the Company shall procure that the Investor shall be entitled to, from time to time, at its own expense, and at any time, to designate one individual that is an employee or officer of the Investor or any of its Affiliates (the "Observer") to attend all meetings of the Board and all committees thereof (whether in person, by telephone or other) in a non-voting observer capacity.

5.8     Reserved Matters. From the Issuance Date until the occurrence of the Qualified Financing, the following matters in connection with the Company shall be subject to the Investor's prior written consent:

(a)     any amendment or modification to the Company Charter Documents;

(b)     any material change to the nature or scope of the business of the Company;

(c)     any material merger, amalgamation, scheme or arrangement, reorganization, restructuring, or consolidation of the Company or any of its subsidiaries;

(d)     any liquidation, winding up, dissolution, disposition, reorganization, or arrangement of the Company or any of its subsidiaries;

(e)     any change to the size or composition of the board of directors of the Company or any of its subsidiaries;

(f)     any change to the accounting policies or the auditor of the Company not in compliance with the International Financial Reporting Standards, Generally Accepted Accounting Principles or Hong Kong Financial Reporting Standards;

(g)     appointment or removal of any key employees of the Company;

(h)     determination or adjustment of the pricing basis of transactions between the Company and any of its related parties;

(i)     any related party transaction entered into by the Company in excess of US$10 million (or its equivalent in other currencies) individually or in

23

excess of US$90 million in the aggregate over any 12 consecutive calendar months period; and

(j)    any other material matters of the Company.

5.9    <u>Dividend</u>. After the full conversion of the Note or the Convertible Note held by the Investor into preferred shares upon occurrence of the initial Qualified Financing, the Investor shall be entitled to participate any dividend distribution declared by the Company from time to time.

5.10    <u>Business Plan</u>. The Company shall formulate and implement a five-year business operation plan, which shall be approved by the Investor and shall set forth the Company's development strategy, financial forecast, operational capital expenditure plan and implementation plan.

5.11    <u>Lock-up</u>. Subject to a 90-day prior written notice to the Investor, the Owner may transfer or assign, directly or indirectly, his interest in the Company or Cayman Co at any time prior to the full conversion or redemption of the Note or the Convertible Note; *provided* that the forgoing transfer or assignment will not result in the Owner ceasing to be the Company's and the Cayman Co's actual controlling person; *provided* further that if the forgoing transfer or assignment will result in the Owner ceasing to the Company's and the Cayman Co's actual controlling person, such transfer or assignment will be subject to the Investor's prior written consent.

5.12    <u>Restructuring</u>.

(a)    The Company, the Cayman Co and the Borrower shall, and the Owner shall cause the applicable Group Members and the Onshore Companies to:

    (i)    complete all the steps of the Restructuring in accordance with all applicable laws and reasonably satisfactory to the Investor within 6 months after the Issuance Date, which will result in a corporate structure consistent with the structure set forth in <u>Schedule 1B</u> hereof; and

    (ii)    duly perform each Onshore Contract to which it is a party in accordance with the terms thereof.

(b)    So long as any of the Note or the Convertible Note remains outstanding, the Owner shall not without the prior consent of the Investor, sell, give, assign, hypothecate, pledge, encumber, grant a security interest in or otherwise dispose of, or suffer to exist (whether by operation of law or otherwise) any Encumbrance on any equity interest in the Onshore Companies.

(c)    All the following assets related to the Existing Business held or owned by any Affiliate of the Owner other than the Group and the Onshore Companies shall be transferred or assigned to the Onshore Companies or

24

the WFOE, as the case may be, within 12 months following the Issuance Date, which may be extended subject to the Investor's prior written consent:

(i)       all the employment agreements of Xing FENG (冯幸), Lin MA (马麟), Zhizhong AN (安志忠), Zhanliang CUI (崔战良) and Zhisheng DONG (董志升);

(ii)      all the relevant Intellectual Property;

(iii)     all the material contracts, including but not limited to, purchase contracts with suppliers and sales contracts with customers; and

(iv)     all the applicable licenses or permits required by law or applicable Governmental Authority to conduct the Existing Business.

## SECTION 6
## CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS

6.1    General Obligation.  Each Party undertakes to the other Parties that it shall not reveal, and that it shall procure that its directors, equity interest holders, partners, representatives, members, advisors (including auditors, accountants, consultants, financial advisors and attorneys), financing sources, officers, employees and agents (collectively, "Representatives") do not reveal, the Confidential Information to any third party without the prior written consent of other Parties or use any Confidential Information in such manner that is detrimental to the Company or the concerned Party, as the case may be.  Each Party shall be responsible for any breach of obligations set forth herein by any of its Affiliates, its Representatives or its Affiliates' Representatives, and shall procure that its Affiliates, its Representatives or its Affiliates' Representatives shall comply with the obligations set forth in this Section 6 as of it were a party to this Agreement.  The term "Confidential Information" as used in this Section 6 means, i) any information concerning the organization, business, technology, safety records, investment, finance, marketing, business plans, transactions or affairs of any Party or any Group Member or any of their respective directors, officers or employees (whether conveyed in written, oral or in any other form and whether such information is furnished before, on or after the date of this Agreement) and ii) the terms and existence of this Agreement, the Loan Agreement and the Onshore Contracts (other than the Basic Documents that are required by law or any applicable Governmental Authority to be publicly filed or disclosed) (collectively, the  "Financing Terms"); provided, that Confidential Information does not include information that (i) is or becomes publicly known or available through no breach of this Agreement, (ii) is rightfully acquired free of restrictions on its disclosure, or (iii) is independently developed without any use of or reference to any Confidential Information.

6.2    Exceptions.  The provisions of Section 6.1 shall not apply to:

(a)    disclosure by a Party to its Representative, *provided* that such Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(b)    disclosure by a Party to its Affiliates and their respective Representatives, *provided* that such Affiliate and Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(c)    disclosure, after giving prior notice to the other Parties to the extent practicable under the circumstances and subject to any practicable arrangements to protect confidentiality, to the extent required under the rules of any stock exchange on which the shares of a Party or its parent company are listed or by law or any applicable Governmental Authority and only to the extent required thereby; or

(d)    disclosure of any Confidential Information other than the Financing Terms by any Group Member, the Owner or their Representatives of any

of such Confidential Information to a third party in connection with any existing or proposed transaction or other contractual relationship of any Group Member or their Affiliates, *provided* that such third party (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality.

6.3    Publicity. Except as required by law, by any Governmental Authority, by any relevant stock exchange on which the shares of a Party or its parent company are listed or otherwise agreed by all the Parties, no public release or public announcement concerning the relationship or involvement of the Parties shall be made by any Party.

## SECTION 7    FEES AND EXPENSES

7.1    General. Each Party shall pay all of its own costs and expenses incurred in connection with or relating to the negotiation, execution, delivery and performance of the Basic Documents and the transaction contemplated thereby Each of the Parties hereto shall bear its own costs and expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the other Basic Documents and the transactions contemplated hereby and thereby.

## SECTION 8    INDEMNIFICATION

8.1    Scope of Indemnification. Each Party (an "Indemnifying Party") shall indemnify and hold the other Parties and their directors, officers and agents (collectively, the "Indemnified Party") harmless from and against any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever, including but not limited to any investigative, legal and other expenses incurred in connection with, and any amounts paid in settlement of, any pending or threatened legal action or proceeding, but excluding consequential damages, special or incidental damages, indirect damages, punitive damages, lost profits, and diminution in value (collectively, "Losses") resulting from or arising out of: (i) the breach of any warranty of such Indemnifying Party contained in the Basic Documents or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of such Indemnifying Party contained in the Basic Documents for reasons other than gross negligence or willful misconduct of the Indemnified Party.  The Company, the Borrower and the Owner shall jointly and severally indemnify the Investor and its directors, officers, and agents harmless against any Losses resulting from or arising out of:  (i) the breach of any warranty of the Company, the Borrower and the Owner contained in this Agreement or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of the Company, the Borrower or the Owner contained in this Agreement for reasons other than gross negligence or willful misconduct of the Indemnified Party. In calculating the amount of any Losses of an Indemnified Party hereunder, there shall be subtracted the amount

27

of any insurance proceeds and third-party payments received by the Indemnified Party with respect to such Losses.

8.2    Notice of Claims; Procedures. If an Indemnified Party makes any claim against an Indemnifying Party for indemnification, the claim shall be in writing and shall state in general terms the facts upon which such Indemnified Party makes the claim. In the event of any claim or demand asserted against an Indemnified Party by a third party upon which the Indemnified Party may claim indemnification, the Indemnifying Party shall give written notice to the Indemnified Party within 30 days after receipt from the Indemnified Party of the claim referred to above, indicating whether such Indemnifying Party intends to assume the defense of the claim or demand. If an Indemnifying Party assumes the defense, such Indemnifying Party shall have the right to fully control and settle the proceeding, provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed. If the Indemnifying Party elects not to assume the defense or fails to make such an election with the 30-day period, the Indemnified Party may, at its option, defend, settle, compromise or pay such action or claim; provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

## SECTION 9   TERMINATION

9.1    Effective Date; Termination. This Agreement shall become effective upon execution by all of the Parties and shall continue in force until terminated in accordance with Section 9.2.

9.2    Events of Termination. This Agreement may be terminated at any time prior to the Issuance Date as follows:

    (a)    at the election of the Investor, if the Company, the Borrower, the WFOE, if applicable, or the Owner has materially breached any Collective Warranty, or any other covenant or agreement of the Company, the Borrower, the WFOE, if applicable, or the Owner contained in any Basic Document, which breach cannot be cured or, if it is capable of being cured, is not cured within 30 days after the Company, the WFOE, if applicable, and the Owner being notified in writing of the same;

    (b)    at the election of the Company, if the Investor has materially breached any Investor Warranty, or any other covenant or agreement of the Investor contained in the Basic Documents, which breach cannot be cured or, if capable of being cured, is not cured within 30 days after the Investor being notified in writing of the same; or

    (c)    by written consent of the Company, WFOE, if applicable, the Owner and the Investor.

28

9.3  Survival. If this Agreement is terminated in accordance with Section 9.2, it shall become void and of no further force and effect, except for the provisions of Section 6 (Confidentiality; Restriction on Announcements), Section 7 (Fees and Expenses), Section 8 (Indemnification), this Section 9, Section 10 (Notices), Section 11 (Miscellaneous), and Section 12 (Governing Law and Dispute Resolution); provided, however, that such termination shall, unless otherwise agreed by the Parties, be without prejudice to the rights of any Party in respect of a breach of this Agreement prior to such termination.

## SECTION 10  NOTICES

10.1  Notices. Each notice, demand or other communication given or made under this Agreement shall be in writing in English and delivered or sent to the relevant Party at its address or fax number set out below (or such other address or fax number as the addressee has by five days' prior written notice specified to the other Parties). Any notice, demand or other communication given or made by letter between countries shall be delivered by air mail. Any notice, demand or other communication so addressed to the relevant Party shall be deemed to have been delivered, iii) if delivered in person or by messenger, when proof of delivery is obtained by the delivering party; iv) if sent by post within the same country, on the third day following posting, and if sent by post to another country, on the seventh day following posting; and v) if given or made by fax, upon dispatch and the receipt of a transmission report confirming dispatch.

10.2  Addresses and Fax Numbers. The initial address and facsimile for each Party for the purposes of this Agreement are:

if to the Investor:

Room 707, 7th Floor, No. 8 Yongan
Dongli, Jianguo Menwai Avenue,
Beijing, PRC
Attention: Xiaosong Ge (葛小松)
Facsimile: +86 13699278536

if to the Company, the Borrower or
the Owner:

16/F, Leshi Building, No. 105,
Yaojiayuan Road, Chaoyang District,
Beijing, 100025, PRC
Attention: Wei DENG (邓伟)

## SECTION 11 MISCELLANEOUS

11.1  Enforcement Action. For the avoidance of doubt, any obligation on the part of the Investor to make the investment hereunder is made solely to the Company,

29

the Borrower, the WFOE, if applicable, and the Owner, and no other Person shall have any right to enforce such obligation against the Investor.

11.2 <u>No Partnership</u>. The Parties expressly do not intend hereby to form a partnership, either general or limited, under any jurisdiction's partnership law. The Parties do not intend to be partners one to another, or partners as to any third party, or create any fiduciary relationship among themselves, solely by virtue of the Investor's status as the holder of the Note or the Convertible Note.

11.3  <u>Amendment</u>.  This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the Parties.

11.4  <u>Waiver</u>.  No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision.  No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy.  Without limiting the foregoing, no waiver by a Party of any breach by any other Party of any provision hereof shall be deemed to be a waiver of any subsequent breach of that or any other provision hereof.

11.5  <u>Entire Agreement</u>.  This Agreement (together with the other Basic Documents, any other documents referred to herein or therein and any documents executed to implement the transactions contemplated by the Basic Documents) constitutes the whole agreement between the Parties relating to the subject matter hereof and supersedes any prior agreements or understandings relating to such subject matter.

11.6  <u>Severability</u>.  Each and every obligation under this Agreement shall be treated as a separate obligation and shall be severally enforceable as such and in the event of any obligation or obligations being or becoming unenforceable in whole or in part.  To the extent that any provision or provisions of this Agreement are unenforceable they shall be deemed to be deleted from this Agreement, and any such deletion shall not affect the enforceability of this Agreement as remain not so deleted.

11.7  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts including counterparts transmitted by telecopier or facsimile, each of which shall be deemed an original, but all of which signed and taken together, shall constitute one document.

11.8  <u>Consent to Specific Performance</u>.  The Parties declare that it is impossible to measure in money the damages that would be suffered by a Party by reason of the failure by any other Party to perform any of the material obligations hereunder and that, in addition to all other remedies, each Party will be entitled to seek specific performance and to seek injunctive or other equitable relief as a remedy for any such breach or failure to perform its material obligations hereunder.

11.9  <u>Transfer; Assignment</u>.  This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns.  This Agreement shall not be assigned without the express written consent of all the Parties (which consent may be granted or withheld in the sole discretion of any Party), and any purported assignment without such consent shall be void, *provided* that, to the extent permitted by the applicable laws, the Investor shall be entitled to transfer or assign its rights and obligations under the Basic Documents to any of its Affiliates with a prior written notice to the Company.

31

**SECTION 12**
**GOVERNING LAW AND DISPUTE RESOLUTION**

12.1   GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE HKSAR APPLICABLE TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN SUCH JURISDICTION, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF ANY JURISDICTION.

12.2   Dispute Resolution.

   (a)   Any dispute, controversy or, claim or difference of any kind whatsoever arising out of, relating to or in connection with this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof, the validity, scope and enforceability of this arbitration provision and any dispute regarding no-contractual obligations arising out of or relating to it (the "Dispute") shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center (the "HKIAC") in accordance with the HKIAC arbitration rules in force at the time of the commencement of the arbitration.  However, if such rules are in conflict with the provisions of this Section 12.2, including the provisions concerning the appointment of arbitrators, the provisions of this Section 12.2 shall prevail.

   (b)   The law of this arbitration clause shall be Hong Kong law. The seat of arbitration shall be Hong Kong.

   (c)   The number of arbitrators shall be three and the language of the arbitration proceedings and written decisions or correspondence shall be English.

   (d)   Any party to the Dispute shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the tribunal.

32

IN WITNESS WHEREOF this Agreement has been executed on the day and year first above written.

**COMPANY:**

For and on behalf of LTD.
Leview Mobile Ltd.

By: _____

Name: Yuemin JIA (贾跃民)          *Authorized Signature(s)*

Title: Director

**CAYMAN CO:**

LE LTD.

*For and on behalf of*
Le Ltd.

By: _____

Name: Yueting JIA (贾跃亭)

Title: Director          *Authorized Signature(s)*

**BORROWER:**

**LEVIEW MOBILE & INTELLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD.**
(乐视移动智能信息技术（北京）有限公司)

By: _____

Name: Yuemin JIA (贾跃民)

Title: Legal Representative

**OWNER:**

**YUETING JIA (贾跃亭)**

_____

**PRC Identification Card Number:**

IN WITNESS WHEREOF this Agreement has been executed on the day and year first above written.

**INVESTOR:**

**BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP)**( 北京华兴移动资产管理中心（有限合伙）

Acting through its general partner

**HUAXINGHE Investment Fund Management (Beijing) Co., Ltd.**( 华兴和投资基金管理（北京）有限公司)

By: _____

Name: _____

Title: Authorized Signatory

34

## SCHEDULE 1
### SHAREHOLDING STRUCTURE OF THE GROUP

**SCHEDULE 1A**

**SHAREHOLDING STRUCTURE OF THE GROUP AS OF THE DATE OF THIS AGREEMENT**



## SCHEDULE 1B

### SHAREHOLDING STRUCTURE OF THE GROUP AFTER COMPLETION OF RESTRUCTURING



**SCHEDULE 2**

**COLLECTIVE WARRANTIES**

**<u>Definitions</u>**

In this Schedule, capitalized terms not otherwise defined have the meanings set forth in this Agreement, and the following terms have the meanings specified:

"<u>Contracts</u>" means all contracts, agreements, licenses, engagements, leases, financial instruments, purchase orders, commitments and other contractual arrangements, that are currently subsisting and not terminated or completed.

"<u>Environmental Laws</u>" means any and all applicable current PRC or non-PRC national, federal, state, or local Law, statutes, rules, regulation, orders, ordinances, guidance documents, judgments, authorizations by any Governmental Authority, or any other requirement of any Governmental Authority relating to (a) environmental matters, (b) the generation, use, storage, transportation or disposal of hazardous substances, or (c) occupational safety and health, industrial hygiene, handling and disposal of medical waste, land use or the protection of human, plant or animal health or welfare.

"<u>Intellectual Property</u>" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"<u>Liabilities</u>" means all indebtedness and other liabilities of any nature whatsoever, actual or contingent, and whether or not of a nature required to be disclosed in the accounts of the Group.

"<u>Litigation</u>" has the meaning set forth in Section 11 of this <u>Schedule 2</u>.

"<u>Permits</u>" means all permits, consents, approvals, authorizations, franchises, certifications and licenses from, and all registrations with, any Governmental Authority.

**<u>The Warranties</u>**

The Company, the WFOE, if applicable, and the Owner hereby, severally and jointly, represent and warrant to the Investor that the following representations and warranties are true and complete as of the date hereof and the Issuance Date, except as otherwise stated.

1.    **CORPORATE MATTERS**

      (a)    Organization, Good Standing and Qualification. Each of the Group Members and the Onshore Companies has been duly incorporated and

organized, is validly existing and, where applicable, is (i) in good
standing and (ii) in compliance with all registration and approval
requirements. Each of the Group Members and the Onshore Companies
has the corporate power and authority to own and operate its assets and
properties and to carry on its business as currently conducted and as
contemplated to be conducted.

(b)     Charter Documents. The Company Charter Documents and the
constitutional documents of the Onshore Companies furnished to the
Investor are effective, have not been superseded and are true and
complete.

(c)     Capitalization and Shareholding Structure of the Group. The
shareholding structure of the Group set forth in Schedule 1A are true,
complete and correct description of the share capital of such entity on
the date hereof and on the Issuance Date. Immediately following the
Issuance Date, the authorized capital of the Company will consist of
only one class of shares, namely, 50,000 Ordinary Shares, par value
US$0.0001 per share, 100% of which are duly and validly issued, fully
paid, nonassessable, and outstanding, and were issued in accordance
with all applicable laws.

(d)     Options, Warrants and Reserved Shares. Except for (A) the Note or the
Convertible Note, if applicable, and (B) the preferred shares issuable
upon conversion of the Note or the Convertible Note and any rights to be
granted pursuant to the Basic Documents, there are no outstanding
options, warrants, rights (including conversion or preemptive rights) or
agreements for the subscription or purchase from any Group Member of
any Equity Securities of any Group Member or any securities
convertible into or ultimately exchangeable or exercisable for any Equity
Securities of any Group Member.

(e)     Other Rights With Respect to Shares. Except as provided in the Basic
Documents, no voting or similar agreements exist in relation to the
Equity Securities of any Group Member that are presently outstanding or
that may hereafter be issued.

(f)     Subsidiaries. Save for the HK Co and the WFOE, if applicable, the
Company does not directly or indirectly own any interests in or Control
any other entities. Neither of the HK Co or the WFOE, if applicable,
directly or indirectly owns any interests in or Controls any other entities.

(g)     Corporate Records. The registers of shareholders, resolutions and all
other documents of the Group required to be kept or filed with any
relevant Governmental Authority have been kept, filed or submitted for
filing.

(h)     Competitive Activities. The Owner does not hold any equity interests in
any entity that carries on any business that competes with the business of

any Group Member, or the Onshore Company as presently conducted or as contemplated to be conducted, except the ownership of shares in publicly traded companies representing less than five percent of the outstanding share capital of such company.

2. **AUTHORIZATION AND VALIDITY OF TRANSACTIONS**

(a) <u>Authorization</u>. Each of the Company, the Owner, the other Group Members and the Onshore Companies has the power and authority to execute, deliver and perform the Basic Documents to which it/he is a party. All actions on the part of the Company, the Owner, the other Group Members and the Onshore Companies necessary for the authorization, execution, delivery of and the performance of all of its/his obligations under the Basic Documents have been taken or will be taken prior to the Issuance Date.

(b) <u>Valid Issuance of Stock</u>. The preferred shares when issued upon conversion of the Note or the Convertible Note will be duly authorized and validly issued, fully paid and non-assessable, free of restrictions on transfer other than restrictions on transfer under this Agreement, the Note or the Convertible Note and any applicable securities or corporate laws.

(c) <u>Enforceability</u>. The Basic Documents to which any Group Member, the Owner or the Onshore Company is a party will, when executed, be the valid and binding obligation of such Group Member, the Owner or the Onshore Company, enforceable against such Group Member, the Owner or the Onshore Company, as applicable, in accordance with their respective terms, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium; (ii) similar laws affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

(d) <u>Consents and Approvals.</u> On or prior to the Issuance Date, all consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any Governmental Authority or any other Person required in connection with the execution, delivery and performance by the Group, the Onshore Companies and the Owner of the Basic Documents or the consummation of the transactions contemplated hereby or thereby (including without limitation, the Restructuring) have been duly obtained in compliance with all applicable laws.

(e) <u>No Breach</u>. The execution and delivery by any Group Member, the Onshore Company and the Owner of each of the Basic Documents to which it is a party and the implementation and performance by such Group Member, the Onshore Company and the Owner of all the transactions contemplated under such Basic Documents (including without limitation, the Restructuring) do not and will not:

(i) breach or constitute a default under the Company Charter Documents or the constitutional document of any other Group Member or the Onshore Company;

(ii) result in a breach of, or constitute a default under, any Contract to which any Group Member, the Onshore Company or the Owner is a party or by which such Group Member, the Onshore Company or the Owner or their respective property or assets is bound or result in the creation or increasing of any obligation on such Group Member, the Onshore Company or the Owner (whether to make payment or otherwise) to any Person; or

(iii) result in a violation or breach of or default under any applicable law.

except, in the case of clauses (ii) and (iii), as could not materially and adversely affect the ability of any Group Member, the Onshore Company or the Owner to carry out its obligations under, and to consummate the transactions contemplated by, the Basic Documents to which it is a party.

## 3. LEGAL COMPLIANCE

(a) <u>No Violation of Law.</u> None of the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation, which may have a material adverse effect on the ability of any Group Member to conduct its business as currently conducted or as contemplated to be conducted.

(b) <u>Permits and Registrations.</u> Each Group Member and the Onshore Company has all Permits and has completed all government registrations necessary for the conduct of its business as currently conducted and as contemplated to be conducted and to own its assets. None of the Group Members or the Onshore Company is in material breach of or default under any such Permit, and there is no reason to believe any such Permit shall be suspended, cancelled or revoked.

## 4. ENVIRONMENTAL ISSUES

Each Group Member and the Onshore Company is currently in compliance with all Environmental Laws and has at all times complied with all Environmental Laws in all material aspects.

## 5. PROPERTIES AND ASSETS

(a) <u>Status of Properties and Assets.</u> Each Group Member and the Onshore Company owns or has the right to use all material properties and assets currently used by it in the conduct of its business as currently conducted and contemplated to be conducted. The properties and assets owned by

the Group and Onshore Company are free and clear of all Encumbrances. The tangible assets and real property of each Group Member and the Onshore Company have been properly maintained and are in working condition, and are in all respects in a condition that is adequate for the intended uses of such assets, subject to continued repair and replacement in accordance with past practice.

(b)     General Liabilities.  None of the Group Members or the Onshore Company has any obligations or liabilities or any nature, whether accrued, absolute or contingent, whether liquidated or unliquidated, and whether now due or to become due, except for trade or business obligations and liabilities incurred in the ordinary course of business since such entity's inception.

6.     **CONTRACTS AND TRANSACTIONS**

(a)     Validity of Material Contracts.

    (i)     No Group Member or the Onshore Company is in breach of or has knowledge of the invalidity of or grounds for rescission, avoidance or repudiation of any material contract to which the Group Member or the Onshore Company is a party, nor has any Group Member or the Onshore Company received notice of any intention to terminate any such material contract.

    (ii)     To the best knowledge of the Company, the WFOE and the Owner, no party with whom a Group Member or an Onshore Company has entered into any material contract is in default thereunder, except for defaults which would not have a material adverse effect on the financial condition of the Group or the Onshore Companies; to the best knowledge of the Company, the WFOE and the Owner, there are no circumstances likely to give rise to any such default.

(b)     Brokers and Finders.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Company and the Owner.

7.     **FINANCIAL MATTERS**

(a)     Liabilities.  Neither the Group nor the Onshore Companies with respect to its Existing Business has any Liabilities other than (i) Liabilities reflected or reserved against in their respective accounts, a true and complete copy of which has been delivered to the Investor; (ii) Liabilities incurred in the ordinary course of business; or (iii) Liabilities in relation to the Basic Documents. No Group Member or the Onshore Company has guaranteed any indebtedness of any other Person.

(b)    Financial Materials.  All the accounts, books, registers, ledgers and
financial and other material records of whatsoever kind of each Group
Member and the Onshore Company which have been provided to the
Investor are accurate and complete in all material respects; and they
present a true and fair view of the financial, contractual and trading
position of each Group Member and the Onshore Company and of its
respective facilities and machinery, fixed and current assets and
liabilities (actual and contingent), debtors, creditors and work-in-
progress.

## 8.    TAX, RECORDS AND RETURNS

(a)    Compliance with Laws.  None of the Group Members or the Onshore
Company is or has at any time been in violation of any applicable law or
regulation regarding Tax which may result in any liability or criminal or
administrative sanction or otherwise having a material adverse effect on
any Group Member or the Onshore Company, other than such violation
that has been rectified or resolved and does not have any foreseeable
liability or criminal or administrative sanction or otherwise.

(b)    Tax Returns and Payments.  Each Group Member or the Onshore
Company has filed all tax returns and reports as required by law, and
such returns and reports are true and correct in all material respects.
Each Group Member or the Onshore Company has paid all taxes and
other assessments due and none of the Group Members is or will become
liable to pay any fine, penalty, surcharge or interest in relation to Tax
with respect to activities of any Group Member prior to the Completion
Date.  There have been no extraordinary examinations or audits of any
tax returns or reports by any applicable Governmental Authority.  There
are in effect no waivers of applicable statutes of limitations with respect
to taxes for any year.

(c)    Deductions and Withholdings.  Each Group Member and the Onshore
Company has made all deductions and withholdings in respect, or on
account, of any Tax from any payments made by it which it is obliged or
entitled to make and has duly accounted in full to the appropriate
authority for all amounts so deducted or withheld.

(d)    Preferred Tax Treatments.  All exemptions, reductions and rebates of
Taxes granted to the Group by a Governmental Authority are in full
force and effect and have not been terminated.  To the knowledge of the
Company, the WFOE, if applicable, and the Owner, the transactions
contemplated under the Basic Documents will not, and, there is no other
circumstance or event that will, result in any such exemption, reduction
or rebate being cancelled or terminated, whether retroactively or for the
future.

9.    **OPERATIONS**

(a)    <u>Current Operations</u>.  There is no existing fact or circumstance that will
have a material adverse effect on the ability of any Group Member or the
Onshore Company to conduct its business as currently conducted and
contemplated to be conducted.

(b)    <u>General Change</u>.  Since the date hereof, there has been no material
adverse change in the financial position of the Group or the Onshore
Company relating to the Existing Business.

11.    **EMPLOYEES**

(a)    <u>Status of Employees</u>.

(i)    No Group Member, or the Onshore Company has at any time since
its establishment had, or is being threatened in writing by, any
strike, collective work stoppage or other material labor dispute.

(ii)    The Group and the Onshore Company each has complied in all
material respects with all applicable laws regarding employees,
employee benefits, employee safety and labor matters for all of
their employees.

(b)    <u>Employment Agreements and Compensation Arrangements</u>.  Except as
required by law, the labor contract and employee non-competition,
intellectual property assignment and confidentiality agreement between
the WFOE, if applicable, and each key employee, no Group Member is a
party to or is bound by any currently effective employment contract
(other than contracts that can be terminated on an at-will basis), deferred
compensation agreement, pension, provident, superannuation, life
assurance, disability or other similar schemes or arrangements, bonus
plan, incentive plan, profit sharing plan, retirement agreement or other
employee compensation agreement.

11.    **CLAIMS AND PROCEEDINGS**

(a)    <u>No Litigation</u>.  No Group Member, the Onshore Company, or the Owner
is engaged in or has been notified that it is the subject of any litigation,
arbitration or administrative or criminal proceedings (collectively,
"Litigation"), whether as plaintiff, defendant or otherwise.  None of the
shareholders or equity interest holders of any Group Member, or the
Onshore Company, directors of any such entity is engaged in or has been
notified that it is the subject of any Litigation, whether as plaintiff,
defendant or otherwise, which has had or may have an adverse effect on
any Group Member, or the Onshore Company. There is no judgment,
decree, or order of any court in effect against any Group Member or the
Onshore Company.  There is no judgment, decree, or order of any court
in effect with respect to the Existing Business against Lefeng Mobile or
the Owner.  None of the Group Members or the Onshore Company is in

default with respect to any order of any Governmental Authority to which it/he is a party or by which it/he is bound. Neither Lefeng Mobile nor the Owner is in default with respect to any order of any Governmental Authority with respect to the Existing Business to which it/he is a party or by which it/he is bound.

(b)     No Pending Proceedings. No Litigation is pending or, to the knowledge of the Owner, the Company and the WFOE, if applicable, threatened against any Group Member, or the Onshore Company; no Litigation in relation to the Existing Business is pending or, to the knowledge of the Owner, the Company and the WFOE, if applicable, against Lefeng Mobile or the Owner.

(c)     No Undertaking; No Injunction. None of the Group Members, or the Onshore Company nor any shareholder, director, officer or agent of any of the foregoing entities is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force. Neither Lefeng Mobile nor any of its shareholder, director, officer or agent is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force in relation to Existing Business.

(d)     No Insolvency. No order has been made and no resolution has been passed for the winding up or liquidation as dissolution of any Group Member or the Onshore Company. No distress, execution or other process has been levied on the whole or a substantial part of the assets of any Group Member or the Onshore Company. None of the Group Members or the Onshore Company is insolvent or unable to pay its debts as they fall due.

(e)     No Investigation or Inquiry. No Group Member, the Onshore Company, or the Owner (in relation to the foregoing entities) is the subject of any investigation or inquiry by any Governmental Authority with respect to the Existing Business and there are no facts which are likely to give rise to any such investigation or inquiry.

12.     **INTELLECTUAL PROPERTY**

(a)     Each Group Member and the Onshore Company owns or otherwise has the right or license to use all Intellectual Property as necessary for the operation of the Existing Business without, to the knowledge of the Company and the Owner, any violation or infringement of the rights of any third party, free and clear of all Encumbrances. There is no claim, proceeding or litigation pending or, to the knowledge of the Company and the Owner, threatened against any Group Member or the Onshore Company, contesting their right to use its Intellectual Property, asserting the misuse thereof, or asserting the infringement or other violation of any Intellectual Property of any third party.

(b)    There are no pending proceedings or claims in which any Group Member or the Onshore Company alleges that any Person is infringing upon, or otherwise violating, its Intellectual Property rights. Nor have any such proceedings or claims been served, instituted or asserted by any Group Member or the Onshore Company.

(c)    None of the key employees of any Group Member and the Onshore Company is obligated under any Contract, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her best efforts to promote the interests of his/her employer, or that would conflict with the business of his/her employer as presently conducted, or that would prevent such employees from assigning to his/her employer inventions conceived or reduced to practice or copyrights for materials developed in connection with services rendered to it.

## 13.    RESTRUCTURING

The Restructuring has been carried on by the Company in compliance with applicable laws.

## 14.    DISCLOSURE

(a)    <u>No Misrepresentation</u>. No representation, warranty or statement by the Company, the WFOE, if applicable, and the Owner in this Agreement, any other Basic Document, or in any Exhibit, Schedule, Appendix, statement or certificate furnished to the Investor pursuant to any Basic Document, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein, in the light of the circumstances under which they were made, not misleading.

(b)    Full Disclosure. There is no fact or circumstance relating to the affairs of any Group Member and the Onshore Companies which has not been disclosed to the Investor and which if the disclosed information might reasonably have been expected to influence the decision of the Investor to purchase the Note.

## SCHEDULE 3

## INVESTOR WARRANTIES

1.  <u>Organization, Good Standing and Qualification</u>. The Investor and its general partner have been duly established or incorporated and organized, is validly existing and, where applicable, in good standing.

2.  <u>Authorization</u>. The Investor has the full power, authority and legal right to own assets and carry on its business. The Investor and its general partner are not in receivership or liquidation or have taken any steps to enter into liquidation, and no petition has been presented for the winding-up of the Investor. There are no grounds on which a petition or application could be based for the winding-up or appointment of a receiver of the Investor or its general partner.

3.  The execution, delivery and performance of this Agreement by the Investor will not:

    (a)  violate any provision of its partnership agreement or the Memorandum of Association or Articles of Association of the Investor's general partner;

    (b)  require the Investor to obtain any consent, approval or action of, or make any filing with or give any notice to, any Governmental Authority or any other third party pursuant to any agreement to which the Investor is a party or by which the Investor is bound;

    (c)  conflict with or result in any material breach or violation of any of the terms and conditions of, or constitute (or with notice or lapse of time or both constitute) a default under, any agreement to which the Investor is a party or by which the Investor is bound;

    (d)  violate any court order, judgment, injunction, award, decree or writ against, or binding upon, the Investor or upon its securities, properties or business; or

    (e)  violate any law or regulation of the country where the Investor is incorporated or any other jurisdiction in which the Investor maintains a business presence.

4.  <u>Enforceability</u>. The Investor, acting through its general partner, has the full power and authority to enter into, execute and deliver the Basic Documents to which it is a party and to perform the transactions contemplated hereby and thereby. The execution and delivery by the Investor, acting through its general partner, of the Basic Documents to which it is a party and the performance by the Investor of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other action of the Investor. Assuming the due authorization, execution and delivery hereof by the other parties hereto, the Basic Documents to which the Investor is a party constitutes the legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium;(ii) similar laws



affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

5.    Financing.  The Investor has sufficient immediately available funds to pay, in cash, the principal amount of the Note at the Issuance Date.

6.    Litigation.  As of the date hereof, no Litigation by or against the Investor is pending or, to the best knowledge of the Investor, threatened in writing, which could affect the legality, validity or enforceability of the Basic Documents to which it is a party, or the consummation of the transactions contemplated hereby and thereby.

# 承诺函

　　为境外融资之目的，我公司乐视控股（北京）有限公司的关联方乐风移动有限公司，英文名称为 Leview Mobile Ltd.，（以下简称"目标公司"）拟向北京华兴移动资产管理中心（有限合伙）及其关联公司发行可转换债券（以下简称"可转债"）。

　　为本次可转债发行，目标公司及其相关方已于 2015 年 5 月 18 日与北京华兴移动资产管理中心（有限合伙）签署有关认购可转债的交易文件 INVESTOR RIGHTS AGREEMENT 及借款合同（以下合称"交易文件"），约定目标公司境内关联方向北京华兴移动资产管理中心（有限合伙）及其关联公司借款壹亿元人民币，北京华兴移动资产管理中心（有限合伙）及其关联公司有权获得目标公司发行的等值美元的可转债。目标公司将根据交易文件的约定，在偿还条件触发时，向北京华兴移动资产管理中心（有限合伙）及其关联公司偿还可转债本金及约定的利息（以下简称"还款义务"）。

　　为此，乐视控股（北京）有限公司承诺并保证，如果目标公司未能依照交易文件的约定完全履行其还款义务，乐视控股（北京）有限公司将依照交易文件的相关约定代为承担向北京华兴移动资产管理中心（有限合伙）及其关联公司的还款义务。

　　特此承诺。

承诺人：乐视控股（北京）有限公司

日期：2015 年 5 月 18 日

1

## Commitment Letter

For the purpose of overseas financing, Leshi Holding (Beijing) Co Ltd.'s affiliated company Leview Mobile Ltd., (hereinafter referred to as the "target company") intends to issued convertible bonds (hereinafter referred to as "convertible bonds") to Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies.

For the issuance of convertible bonds, the target company and its affiliated companies have signed the INVESTOR RIGHTS AGREEMENT and loan contract (hereinafter collectively referred to as the "transaction document") concerning the subscription of convertible bonds on May 18, 2015, agreeing that the domestic affiliated companies of the target company will borrow RMB 100 million from Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies. Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies shall have the right to obtain convertible bonds equivalent to us dollars issued by the target company.

According to the terms of the transaction documents, the target company will repay the principal of the convertible bonds and the agreed interest (hereinafter referred to as "repayment obligation") to Beijing Huaxing Mobile Asset Management Center (Limited Partnership) its affiliated companies when the repayment conditions are triggered.

In this condition, Leshi Holding (Beijing) Co Ltd., promises and guarantees that if the target company fails to fully fulfill its repayment obligations in accordance with the agreement in the transaction document, Leshi Holding (Beijing) Co Ltd. will assume the repayment obligation to Beijing Huaxing Mobile Asset Management Center (Limited Partnership) and its affiliated companies in accordance with the relevant agreements in the transaction documents.

Hereby Promise.

Promisee: Leshi Holding (Beijing) Co Ltd.

Date: 18/05/2015



**CHINA MINSHENG BANK**

**Certificate of Telegraphic Transfer (Receipt)**    1 No. 107605053

☐ Normal  ☐ Urgent    Date of Consignation:  17/06/2015

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Payer** | **Full Name** | BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP) | | **Payee** | **Full Name** | LEVIEW MOBILE & INTERLLIGENT INFORMATION TECHNOLOGY (BEIJING) CO.,LTD. | | | | | | |
| | **Account number** | ■■■■ | | | **Account number** | ■■■■ | | | | | | |
| | **Place of remitting** | Beijing | | | **Place of remitting** | Beijing | | | | | | |
| **Remitting Bank** | | 0167 | | **paying bank** | China Minsheng Bank Beijing Jianguomen Sub- branch | | | | | | | |
| **Amount** | | RMB 63,000,000.00 yuan | | | 6 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

| | |
|---|---|
| | Payment Password |
| | Additional Information And usage: Borrowings |
| Stamp of Remitting Bank | Recheck:    Bookkeeping: |

中国民生银行
CHINA MINSHENG BANK

凭证号：9800000000002

| 付款人 | 全称 | 北京华兴移动资产管理中心（有限合伙） | 收款人 | 全称 | 北京华兴移动资产管理中心（有限合伙） |
|---|---|---|---|---|---|
| | 账号 | ■■■■■ | | 账号 | ■■■ |
| | 开户行 | 中国民生银行北京西大望路支行 | | 开户行 | 中国民生银行总行营业部 |
| 金额 | 人民币：37,000,000.00 | | 金额大写 | 人民币：叁仟柒佰万元整 | |
| 用途 | 投资款打到托管账户用于乐视手机投资款 | | 记账时间 | 2015-10-15 16:14:09 | |
| 交易流水号 | 313512015101504518619115610F9FA95C9E0760E1008000042B2051 | | | | |

*当日回单不作为收、付款方交易确认的最终依据，请勿正式记账。

| CHINA MINSHENG BANK | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Bank Certificate No.980000 |
| Payer | Full Name | BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP) | Payee | Full Name | BEIJING HUAXING MOBILE ASSET MANAGEMENT CENTER (LLP) | |
| | Account number | ▮▮▮▮▮ | | Account number | ▮▮▮▮▮ | |
| | Bank | China Minsheng Bank Beijing West Dawang Road Sub-branch | | Bank | China Minsheng Bank Banking Department | |
| Amount | RMB 37,000,000.00 | | Amount of Capital | RMB 37,000,000.00 | | |
| Purpose | The investment is transferred to the escrow account for the purpose of Leshi mobile phone investment | | Accounting time | 15/10/2015 16:14:09 | | |
| Transaction Serial Number | 31351201510150451861911561F9FA95C9E0700510080000500 2015 | | | | | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**10100 Santa Monica Boulevard, 13ᵗʰ Floor, Los Angeles, CA  90067**

 A true and correct copy of the foregoing document entitled (*specify*):  ***NOTICE OF OBJECTION TO CLAIM
[Claim 27]*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>April 3, 2020,</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2. <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) <u>April 3, 2020,</u> I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

United States Bankruptcy Court
Central District of California
Attn:  Hon. Vincent Zurzolo
Edward R. Roybal Federal Bldg./Courthouse
255 East Temple Street, Suite 1360
Los Angeles, CA  90012

☐  Service information continued on attached page

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 3, 2020 | Nancy H. Brown | /s/ *Nancy H. Brown* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                  **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:328782.1 46353/002

**SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ**
**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- Jerrold L Bregman    ecf@bg.law, jbregman@bg.law
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Lei Lei Wang Ekvall    lekvall@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Stephen D Finestone    sfinestone@fhlawllp.com
- Richard H Golubow    rgolubow@wghlawyers.com,
  pj@wcghlaw.com;jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com
- Ben H Logan    blogan@omm.com
- Robert S Marticello    Rmarticello@swelawfirm.com,
  gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- David W. Meadows    david@davidwmeadowslaw.com
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Victor A Sahn    vsahn@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.in
  foruptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Felix T Woo    fwoo@ftwlawgroup.com, admin@ftwlawgroup.com
- Claire K Wu    ckwu@sulmeyerlaw.com,
  mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- David B Zolkin    dzolkin@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.