| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br><br>Richard M. Pachulski (CA Bar No. 90073)<br>Jeffrey W. Dulberg (CA Bar No. 181200)<br>Malhar S. Pagay (CA Bar No. 189289)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Boulevard, 13th Floor<br>Los Angeles, CA  90067<br>Telephone:  310/277-6910<br>Facsimile:  310/201-0760<br>Email: rpachulski@pszjlaw.com<br>      jdulberg@pszjlaw.com<br>      mpagay@pszjlaw.com<br><br>☒ *Attorney for:* Debtor | FOR COURT USE ONLY |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>YUETING JIA,<br><br>                        Debtor(s). | CASE NO.: 2:19-bk-24804-VZ<br><br>CHAPTER: 11 |
| | **NOTICE OF OBJECTION TO CLAIM** |
| | DATE:  May 7, 2020<br>TIME:    1:30 p.m.<br>COURTROOM: 1368<br>PLACE: 255 East Temple Street<br>         Los Angeles, CA  90012 |

1. TO *(specify claimant and claimant's counsel, if any)*: Beijing Lan Capital Investment Fund Management LLP (a.k.a. Blue Giant) and Jie Feng

2. NOTICE IS HEREBY GIVEN that the undersigned has filed an objection to your Proof of Claim (Claim No. 54) filed in the above referenced case. The Objection to Claim seeks to alter your rights by disallowing, reducing or modifying the claim based upon the grounds set forth in the objection, a copy of which is attached hereto and served herewith.

3. **Deadline for Opposition Papers**: You must file and serve a response to the Objection to Claim not later than 14 days prior to the hearing date set forth above.

   **IF YOU FAIL TO TIMELY RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

Date:  April 3, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Printed name of law firm

*/s/ Malhar S. Pagay*
Signature

Date Notice Mailed: April 3, 2020

Malhar S. Pagay
Printed name of attorney for objector

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

1  Richard M. Pachulski (CA Bar No. 90073)
   Jeffrey W. Dulberg (CA Bar No. 181200)
2  Malhar S. Pagay (CA Bar No. 189289)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA  90067
4  Telephone: 310/277-6910
   Facsimile: 310/201-0760
5  Email:    rpachulski@pszjlaw.com
              jdulberg@pszjlaw.com
6              mpagay@pszjlaw.com
7
   Attorneys for Debtor and Debtor in Possession
8

9            **UNITED STATES BANKRUPTCY COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11               **LOS ANGELES DIVISION**

12  | In re: | Case No.: 2:19-bk-24804-VZ |
    |---|---|
13  | YUETING JIA,[1] | Chapter 11 |
14  | Debtor. | **DEBTOR'S NOTICE OF OBJECTION** |
15  | | **AND OBJECTION TO CLAIM 54 FILED BY BEIJING LAN CAPITAL** |
    | | **INVESTMENT LLP aka BLUE GIANT;** |
16  | | **MEMORANDUM OF POINTS AND** |
    | | **AUTHORITIES AND DECLARATIONS** |
17  | | **OF YUETING JIA AND SHAN HE IN** |
    | | **SUPPORT THEREOF** |
18  | | |
19  | | Date:        May 7, 2020 |
20  | | Time:        1:30 p.m. |
    | | Place:       Courtroom 1368 |
21  | |             Roybal Federal Building |
    | |             255 E. Temple Street |
22  | |             Los Angeles, California 90012 |
23  | | Judge:       Hon. Vincent P. Zurzolo |

24        **PLEASE TAKE NOTICE** that, on May 7, 2020, beginning at 1:30 p.m. (Pacific Time), or

25  as soon thereafter as counsel  may be heard before the Hon. Vincent P. Zurzolo, in Courtroom 1368

26  of the Edward R. Roybal Federal Building and Courthouse, located at 255 E. Temple Street, Los

27

28  ---
    [1] The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing address is
    91 Marguerite Drive, Rancho Palos Verdes, CA 90275.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Angeles, California 90012, pursuant to the *Order (I) Approving the Fourth Amended Disclosure Statement; (II) Approving the Voting Procedures and Tabulation Procedures; (III) Setting the Date and Time for the Confirmation Hearing and Related Deadlines; (IV) Waiving Certain Local Rules and Procedures Related to the Timing and Approval of the Fourth Amended Disclosure Statement and Confirmation of the Third Amended Plan; and (V) Granting Related Relief* [Docket No. 485] (the "Disclosure Statement Order"), which provides, in pertinent part, that if the Debtor has served an objection or request for estimation as to a claim by April 2, 2020, such claim shall be temporarily disallowed for voting purposes only (and not for purposes of allowance or distribution), except to the extent and in the manner as may be set forth in such objection or request, or as ordered by the Court before the voting deadline, i.e., April 30, 2020 at 4:00 p.m. (Beijing Time),[2] Yueting Jia, the debtor and debtor in possession herein (the "Debtor" or "YT"), will object (the "Objection") to claim number 54, filed by Beijing Lan Capital Investment LLP aka Blue Giant  (the "Claim"), in accordance with a share transfer agreement dated June 30, 2017 (the "Share Transfer Agreement") entered into by and among the Debtor, Meng Wu, LESHI Holding (Beijing) Ltd. Co. ("LESHI"), and the Claimant, pursuant to which Meng Wu agreed to transfer equity interests of a third party to the Claimant in exchange for the cancellation of debt in the amount of $97.91 million[3] that LESHI owed under a certain loan agreement.  Pursuant to the Share Transfer Agreement, the Debtor's liability to the Claimant has been canceled.

A true and correct copy of the Claim is attached to the *Notice of Objection to Claim*, which has been served on Claimant.  The Objection seeks to disallow the Claim only in connection with voting on the *Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 464] and does not impact the ultimate allowance of the Claim or distributions the Claimant may be entitled to receive on account of the Claim.

**PLEASE TAKE FURTHER NOTICE** that the Objection has been served upon Claimant and all parties entitled thereto and is based upon the supporting Memorandum of Points and

---

[2] Disclosure Statement Order, 6 at ¶ 17(e).
[3] This amount has been converted from the $692 million Chinese Yuan to US Dollars using 7.0676, the closing rate published by the Wall Street Journal as of October 14, 2019, the Petition Date. *See* https://www.wsj.com/market-data/quotes/fx/USDCNY/historical prices<https://www.wsj.com/market data/quotes/fx/USDCNY/historical-prices

DOCS_LA:328760.1 46353/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Authorities and Declarations of Yueting Jia and Shan He, the statements, arguments and representations of counsel who appear at the hearing regarding the Objection, the files and records in the above-captioned case, any evidence properly before the court prior to or at the hearing regarding the Objection and all matters of which the court may properly take judicial notice.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), responses to the Objection must be filed with the Court and served upon the Debtor's counsel at the address in the upper left-hand corner of this Objection no later than fourteen (14) days prior to the hearing date. Responses must contain a written statement of all reasons the Objection is opposed and must include declarations and copies of all documentary evidence on which the responding party intends to rely. Responses must be filed either electronically or at the following location:

United States Bankruptcy Court
Attention: Clerk's Office
255 E. Temple Street
Los Angeles, CA 90012

**IF YOU DO NOT OPPOSE THE OBJECTION YOU DO NOT NEED TO FILE ANY PAPERS, SIGN ANY FURTHER AGREEMENTS OR TAKE ANY FURTHER ACTION.**

**PLEASE TAKE FURTHER NOTICE** that if a response is not timely filed and served, the Debtor will request that the court grant the relief requested in the Objection without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that if a response is timely filed and served upon the Debtor's counsel, the Court, in its discretion, may treat the initial hearing as a status conference if it determines that the Objection involves disputed factual issues or will require presentation of substantial evidence or argument.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order (i) sustaining the Objection; (ii) disallowing the Claim in its entirety for voting purposes; and (iii) granting such other and further relief as may appropriate under the circumstances.

.

Dated:    April 2, 2020                    PACHULSKI STANG ZIEHL & JONES LLP

                                           By    */s/ Malhar S. Pagay*
                                                  Richard M. Pachulski
                                                  Jeffrey W. Dulberg
                                                  Malhar S. Pagay

                                                  Counsel for Debtor and Debtor in
                                                  Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 102, 105 and 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 3007 and 3018(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II.

## BACKGROUND

### A.    Commencement of the Chapter 11 Case

On October 14, 2019 (the "Petition Date"), the Debtor commenced this case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). The Debtor continues in possession of his property and manages his affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On October 25, 2019, the U.S. Trustee appointed the Official Committee of Unsecured Creditors  pursuant to section 1102(a)(1) of the Bankruptcy Code (the "Committee") [Docket No. 45]. The Committee consists of the following members: (i) Ping An Bank., Ltd. Beijing Branch; (ii) China Minsheng Trust Co., Ltd; (iii) Shanghai Leyu Chuangye Investment Management Center LP; (iv) Jiangyin Hailan Investment Holding Co., Ltd; and (v) Shanghai Qichengyueming Investment Partnership Enterprise.

On November 13, 2019, the Court entered an order setting January 24, 2020, as the general deadline (the "Bar Date") for the filing of proofs of claim or proofs of interest against the Debtor's estate.  In accordance with the Court's Order establishing the Bar Date, notice of the Bar Date was given by mail to the Debtors' creditors and interest holders.

On December 18, 2019, Judge Karen B. Owens of the Delaware Bankruptcy Court transferred the Chapter 11 Case to this Court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**B.    Approval of the Debtor's Disclosure Statement**

On March 20, 2020, the Court entered the Disclosure Statement Order, pursuant to which the Court approved the Debtor's *Fourth Amended Disclosure Statement with Respect to Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 465] in respect of the *Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 464] (the "Plan"), and granted other relief.

The Disclosure Statement Order provides, in pertinent part, that if the Debtor has served an objection or request for estimation as to a claim by April 2, 2020, such claim shall be temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, or as ordered by the Court before the voting deadline, i.e., April 30, 2020 at 4:00 p.m. (Beijing Time). Disclosure Statement Order, 6 at ¶ 17(e).

**C.    The Claim**

Tao Yun Capital Co. Ltd. ("Tao Yun") (*a.k.a.* TWC Group Co., Ltd), Beijing Lan Capital Investment Fund Management, and Shenzhen Jincheng Commercial Factoring Co Ltd. (each a "TWC Claimant" and collectively, the "TWC Claimants") are related entities under common control of an individual. Such common control is evidenced by the fact that the same individual by the name of Jie Feng filed proofs of claim on behalf of all of the TWC Claimants (## 53, 54, 56). The proofs of claim at issue indicate that Feng is a project manager at TWC Group Co., Ltd.

To substantiate their claims, each of the TWC Claimants, including the Claimant, attached to their proofs of claim documents evincing obligations owed by LESHI Holding (Beijing) Ltd. Co. ("LESHI") which the Debtor personally guaranteed.

Pursuant to section 2.02 of the Share Transfer Agreement, attached hereto as **Exhibit "A,"** entered into by and among the Debtor, Meng Wu, LESHI, and Tao Yun, Meng Wu agreed to transfer equity interests of a third party to Tao Yun in exchange of a cancellation of debt in the amount of $97.91 million[4] that LESHI or its related companies owed under the Loan Agreement. The provision states, in part, in English:

---

[4] This amount has been converted from the $692 million Chinese Yuan to US Dollars using 7.0676, the closing exchange

(b) The second part of the Transaction Consideration is in the form of credit deduction, **Taoyun Capital and its related parties** and the Actual Controller of LeEco and the LeEco Related Entities **agree to deduct the consideration for the Transaction in the amount of RMB 692 million** using the claims contained in the package loans totaled RMB 692 million yuan. After this Agreement is signed and becomes effective, the above claims are deemed to have been deducted.

(c) The Transferor and the Actual Controller of LeEco hereby clarify and confirm that after the completion of the above two parts, the Transferee shall be deemed to have paid the full consideration for the Transaction.

(Emphasis added).  Attached hereto as **Exhibit "B"** is an English translation of the Share Transfer Agreement.

**III.**

**ARGUMENT**

**A.**   **Procedural Requirements for Objections to Claims**

Bankruptcy Rule 3007 governs the procedure for objections to claims.  It provides as follows: "An objection to an allowance of a claim shall be in writing and filed.  A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant . . . at least thirty days prior to the hearing." Fed. R. Bankr. P. 3007.

Pursuant to Bankruptcy Rule 3007, a copy of the Objection will be mailed to Claimants at the addresses provided by Claimants in the Claims, and, where available and if different from the address provided on the proof of claim, on each Claimant's address registered with the National Enterprise Credit Information Publicity System (http://www.gsxt.gov.cn/index.html), a government-run, national, enterprise credit inquiry system in the People's Republic of China, at least thirty days prior to the hearing date for consideration of the Objection.  Accordingly, by the time of the hearing hereon, the Trustee will have complied with Bankruptcy Rule 3007.

**B.**   **The Court Must Determine the Allowance of a Claim Subject to Objection**

With certain exceptions, section 502(b) of the Bankruptcy Code requires, in relevant part,

---

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

rate  published by the Wall Street Journal as of October 14, 2019, the Petition Date. *See* https://www.wsj.com/market-data/quotes/fx/USDCNY/historical prices<https://www.wsj.com/market data/quotes/fx/USDCNY/historical-prices

DOCS_LA:328760.1 46353/002

that if a party in interest objects to a claim, "the Court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that -- (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured …."

## C.    **Burden of Proof**

All allegations set forth in a properly filed proof of claim are taken as true and, if the allegations set forth all facts necessary to establish a claim and are not self-contradictory, the proof of claim constitutes *prima facie* evidence of the validity and amount of the claim.  11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).  However, a claimant must attach copies of writings upon which claims are based in order to carry its burden of establishing a *prima facie* case against the debtor. *Hardin v. Gianni (In re King Investments Inc.)*, 219 B.R. 848, 858 (B.A.P. 9th Cir. 1998).  Further, a claim should not be allowed if that claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law.  11 U.S.C. § 502(b)(1).

Once the objector raises "facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves," *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991), then "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Ashford v. Consolidated Pioneer Mortgage (In re Consolidated Pioneer Mortgage)*, 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995), aff'd, 91 F.3d 151 (9th Cir. 1996). "[T]he ultimate burden of persuasion is always on the claimant." *Holm*, 931 F.2d at 623.  In considering an objection to a claim, a bankruptcy court may take judicial notice of the underlying records in a bankruptcy case. *O'Rourke v. Seaboard Surety Co., (In re ER Fergert, Inc.)*, 887 F.2d 955, 957-958 (9th Cir. 1998).

## D.    **The  Claim Should Be Disallowed for Plan Voting Purposes**

Courts recognize that Bankruptcy Rule 3018(a) permits a party in interest to seek to disallow a claim for voting purposes. Ultimately, the determination of whether to temporarily allow a claim for voting purposes lies within the discretion of the bankruptcy court.  See *Armstrong v. Rushton (In re Armstrong)*, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003) ("There is no guidance in the Bankruptcy

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Code to courts as to determine whether to permit the temporary allowance of a claim; it is left to the court's discretion."). Indeed, courts have broad authority to determine whether to allow or disallow a claim for purposes of voting under Bankruptcy Rule 3018(a). *See, e.g., In re Mangia Pizza Invs., L.P.,* 480 B.R. 669, 679 (Banker. W.D. Tex. 2012); *In re Zolner*, 174 B.R. 629, 633 (Bankr. N.D. Ill. 1994) (noting that a court must exercise its discretion to allow or disallow a claim under Bankruptcy Rule 3018(a) based on reasoned analysis); *In re Goldstein,* 114 B.R. 430, 433 (Bankr. E.D. Pa. 1990); Collier on Bankr. ¶ 9-3018[5] (16th ed. rev. 2012) ("The court, however, regardless of the circumstances, has the discretion to allow or disallow all or part of the claim for voting purposes.").

The $97.91 million in cancellation of LESHI's debt for which the Debtor personally guaranteed exceeds the $90.43 million aggregate principal amount asserted against the Debtor by the TWC Claimants as indicated on claim numbers 53, 54 and 56. As the debt for which the Debtor guaranteed was canceled pursuant to the Share Transfer Agreement, no interest should have accrued from the time the underlying debt arose. The TWC Claimants' debt, guaranteed by the Debtor, has been extinguished, thereby eliminating the Debtor's guarantee liability. Therefore, the Claim should be disallowed.

**IV.**

**GENERAL RESERVATION OF RIGHTS**

The Debtor expressly reserves the right to amend, modify or supplement this Objection, and to file additional, other, or further objections to any proofs of claim filed in this Chapter 11 Case, including, without limitation, objections as to the amounts asserted therein, or any other claims (filed or not) against the Debtor, regardless of whether such claims are subject to this Objection. Should one or more of the grounds of objection stated in this Objection be denied, the Debtor reserves his rights to object on other stated grounds or on any other grounds he discovers during the pendency of this Chapter 11 Case. In addition, the Debtor reserves the right to file counterclaims against the holders of any such claims.

**V.**

**NOTICE**

The Debtor will serve copies of this Objection on: (a) the Claimant, (b) the Office of the

United States Trustee, (c) counsel to the Committee, and (d) all parties who have requested notices in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.

## VI.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and granting the Debtor such other and further relief as is just and proper.

Dated:      April 2, 2020              PACHULSKI STANG ZIEHL & JONES LLP


                                       <u>/s/ Malhar S. Pagay</u>
                                       Richard M. Pachulski
                                       Jeffrey W. Dulberg
                                       Malhar S. Pagay

                                       *Attorneys for Debtor and Debtor in Possession*

## **DECLARATION OF YUETING JIA**

I, Yueting Jia, debtor herein, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I submit this declaration (the "Declaration") in support of the *Objection to Claim 54 Filed by Beijing Lan Capital Investment LLP aka Blue Giant* (the "Objection")[5]. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

2.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of books and records, relevant documents and other information prepared or collected by my employees, advisors and representatives, or my opinion based on my experience. In making my statements based on my review of books and records, relevant documents and other information prepared or collected by my professionals, advisors and employees, I have relied upon these professionals, advisors and employees accurately recoding, preparing or collecting such documentation and other information.

3.      I am not fluent in English. Accordingly, in the ordinary course of my business and personal affairs that require me to communicate in English either orally or in writing, I employ interpreters/translators who are fluent in both English and Chinese. I am utilizing such interpreters/translators in connection with matters that arise in connection with my Chapter 11 Case and intend to continue to do so. I have reviewed the Objection and Declaration, as necessary, with the assistance of such interpreters/translators.

4.      Upon information and belief, Tao Yun Capital Co. Ltd. ("Tao Yun") (*a.k.a.* TWC Group Co., Ltd), Beijing Lan Capital Investment Fund Management, and Shenzhen Jincheng Commercial Factoring Co Ltd. (each a "TWC Claimant" and collectively, the "TWC Claimants") are related entities under common control of an individual. Such common control is evidenced by the fact that the same individual by the name of Jie Feng filed proofs of claim on behalf of all of the

---

[5] Capitalized terms not defined in this declaration shall have the same meaning ascribed to them as set forth in the Objection.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

TWC Claimants (## 53, 54, 56). The proofs of claim at issue indicate that Feng is a project manager at TWC Group Co., Ltd.

5. To substantiate their claims, each of the TWC Claimants, including the Claimant, attached to their proofs of claim documents evincing obligations owed by LESHI Holding (Beijing) Ltd. Co. ("LESHI"), which I guaranteed.

6. Pursuant to section 2.02 of the Share Transfer Agreement, attached hereto as **Exhibit "A,"** entered into by and among me, Meng Wu, LESHI, and Tao Yun, Meng Wu agreed to transfer equity interests of a third party to Tao Yun in exchange of a cancellation of debt in the amount of $97.91 million[6] that LESHI or its related companies owed under the Loan Agreement.

7. Attached hereto as **Exhibit "B"** is an English translation of the Share Transfer Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2nd day of April, 2020, at Gardena, California.

YUETING JIA

---

[6] This amount has been converted from the $692 million Chinese Yuan to US Dollars using 7.0676, the closing exchange rate  published by the Wall Street Journal as of October 14, 2019, the Petition Date. *See* https://www.wsj.com/market-data/quotes/fx/USDCNY/historical prices<https://www.wsj.com/market data/quotes/fx/USDCNY/historical-prices

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**DECLARATION OF SHAN HE**

I, Shan He, declare as follows:

1.    I am a Chinese translator, simultaneous interpreter and localization project manager employed since April 2017 by (a) Yueting Jia, the debtor and debtor in possession (the "<u>Debtor</u>"), that has filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") commencing the above-captioned bankruptcy case (the "<u>Chapter 11 Case</u>"), and (b) Faraday Future ("<u>FF</u>"), an entity in which the Debtor holds an indirect interest.

2.    I am a native speaker of Chinese (Mandarin) and maintain full professional fluency in English.  I hold a Bachelor of Science degree in English from Beijing Language and Culture University and a Master of Arts in Translation and Interpretation (Chinese – English) degree from the Monterey Institute of International Studies ("<u>MIIS</u>").  I am certified in Simultaneous and Consecutive Interpretation between English and Chinese by MIIS.  I currently provide translation services for the Debtor and his General Counsel.  Prior to my work with the Debtor and FF, I have provided interpretation and translation services for a variety of organizations, including the United Nations Institute for Training & Research (UNITAR), Syntes Language Group, and the Austrian Embassy.

3.    The Debtor is not fluent in English.  Accordingly, in the ordinary course of his business and personal affairs that require him to communicate in English either orally or in writing, he employs interpreters/translators like me who are fluent in both English and Chinese.

4.    I am in regular communication with the Debtor's professionals, including legal counsel.

5.    At the direction of the Debtor, I have reviewed that certain share transfer agreement dated June 30, 2017 (the "<u>Share Transfer Agreement</u>"), entered into by and among the debtor, Meng Wu, LESHI, and Tao Yun, attached hereto as **Exhibit "A"** and **Exhibit "B,"** an English translation of the Share Transfer Agreement.

6.    To the best of my knowledge, the English translation accurately reflects the contents and meaning of the original Share Transfer Agreement.

1        I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3        Executed on this __2nd__ day of April, 2020, at ___Long Beach___, California.

4

5                          *Shan He*

6                _____

                            Shan He

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# EXHIBIT A

吴孟

与

上海哲蕴商务咨询合伙企业（有限合伙）

关于

北京东方车云信息技术有限公司

---

# 股权转让协议

---



2017 年 6 月 30 日

# 北京东方车云信息技术有限公司

# 股权转让协议

本《股权转让协议》（以下称为"**本协议**"）由以下各方（单称为"**一方**"，合称为"**各方**"）于 2017 年 6 月 30 日在中国北京市东城区签署：

**受让方**：上海哲蕴商务咨询合伙企业（有限合伙）（"**哲蕴**"）

住所地：上海市浦东新区周市路 416 号 4 层

**转让方**：吴孟

身份证号：14273319730105007x

**标的公司/公司**：北京东方车云信息技术有限公司

住所地：北京市丰台区南四环西路 188 号十六区 1 号楼七层-1(园区)

**一揽子借款之债务方**：乐视控股（北京）有限公司（"**乐视控股**"）

住所地：北京市朝阳区姚家园路 105 号 3 号楼 10 层 1102

**一揽子借款之债权方**：韬蕴资本集团有限公司（"**韬蕴资本**"）

住所地：

**乐视实控人**：贾跃亭

身份证号：

鉴于：

(1) 北京东方车云信息技术有限公司（"**标的公司**"）是一家依据中国法律成立的且有效存续的有限责任公司，法定代表人为彭钢，成立日期为 2010 年 5 月 21 日，截止本协议签署日其注册资本金为 1,100 万元人民币，所有股东均已全部实缴出资完毕，标的公司及 Easy Go Inc.（Cayman）（"**Easy Go**"）共同作为提供预约用车服务的电子商务平台易到用车（"**易到集团**"）的唯一知识产权持有方和运营实体。

(2) 吴孟（"**转让方**"），中国公民，系标的公司的控股股东及乐视控股关联方，合法持有标的公司 66.67%的股权。

(3) 上海哲蕴商务咨询合伙企业（有限合伙）（"**受让方**" 或 "**哲蕴**"）系一家依据中国法律合法成立且有效存续的有限合伙企业。

(4) 乐视控股（北京）有限公司（"**乐视控股**"）是一家依据中国法律成立的且有效存续的有限责任公司，乐视控股作为本协议第 2.02 条（b）款所述一揽子借款之债务方。

(5) 贾跃亭，作为乐视控股及其他相关主体实际控制人（"**乐视实控人**"），直接或间接控制包括但不限于，乐视控股（北京）有限公司、乐视移动智能信息技术（北京）有限公司、乐视体育产业发展（北京）有限公司、乐乐互动音乐文化发展（北京）有限公司、乐视音乐文化产业发展（北京）有限公司，北京百瑞文化传媒有限公司，以及 Lucky Clover（以上乐视实控人直接或间接控制的上述公司统称"**乐视相关主体**"）。

(6) 韬蕴资本集团有限公司（"**韬蕴资本**"），是一家依据中国法律成立的且有效存续的有限责任公司，法定代表人为温晓东。

(7) 转让方拟按照本协议的条款和条件将其持有的标的公司 66.67%的股权（"**标的股权**"）转让给受让方，同时乐视实控人应促使 Easy Go 的控股股东 Lucky Clover Limited（"**Lucky Clover**"）将其持有的 Easy Go 66.67%的股权（"**Easy Go 股权**"）转让给韬蕴资本指定境外关联方，并另行签署相应境外股权转让协议。

(8) 韬蕴资本及其关联方与乐视实控人、乐视相关主体之间就一揽子借款（"**一揽子借款**"）的部分或全部债权中用于抵扣标的股权及 Easy Go 股权交易对价（合称 "**本次交易**"）已达成共识。

有鉴于此，各方经友好协商，本着平等互利的原则，根据《中华人民共和国合同法》、《中华人民共和国公司法》等相关法律法规，就上述股权转让及一揽子借款中相关债权作为本协议项下本次交易交易对价的支付等事宜，订立本协议并拟定如下条款，以资共同遵守。

## 第1条 股权转让及受让

### 第1.01款 易到集团估值

在本次交易前，易到集团估值截止本协议签署日转让方、受让方、韬蕴资本、乐视实控人、乐视相关主体同意按照 6.6 亿美元计（1 美元兑 6.80 元人民币汇率换算合计为 44.88 亿元人民币），但以本协议签署后受让方完成本协议第 1.02 款（b）条所述尽职调查且不存在足以影响本次交易的重大不利事件为前提。

### 第1.02款 交易对价、尽职调查及交易对价调整

(a)　交易对价：

本次交易转让股权为转让方合法持有的标的公司 66.67% 的股权（**"标的股权"**）及 Easy Go 的控股股东 Lucky Clover 合法持有的 Easy Go 66.67% 的股权（**"Easy Go 股权"**），受让方同意以 4.4 亿美元（1 美元兑 6.80 元人民币汇率换算合计为 29.92 亿元人民币）的总对价（**"交易对价"**）进行收购，其中本次交易完成后标的股权由受让方持有，Easy Go 股权由韬蕴资本指定境外关联方持有。但本协议签署后将由受让方完成独立的尽职调查，且本协议的生效以不存在足以对本次交易产生重大不利影响为前提。

(b)　尽职调查：

在本协议签署后，受让方将对易到集团进行全面的法律及财务尽职调查（**"尽职调查"**），转让方、标的公司、乐视实控人保证对尽职调查提供其所需的相应材料和必要协助，其中应包括易到集团未来 3 年的财务预测数据。

(c)　对易到集团估值和交易对价的调整：

截止本协议签署日，转让方、标的公司、乐视实控人保证已充分披露的易到集团总负债金额应不超过 23 亿元人民币，如易到集团存有超过 23 亿元人民币的其他未清偿债务的，包括但不限于尚未清偿的银行借款、民间借款、其他欠款或任何或有债务的（合称 **"超额未清偿负债"**），将全部由转让方、乐视控股和乐视实控人承担连带清偿责任。届时将根据专业中介机构的建议，受让方可就易到集团估值、标的股权及 Easy Go 股权交易对价进行相应调整，并可从受让方支付的交易对价中扣减相应价款，或向相关连带责任人追偿。

### 第2条 交割

#### 第2.01款 交割时间及地点

(a)　各方应于本协议文首所述日期在中国北京市东城区签署本协议。

(b)　本协议签署生效后四十五个工作日内，完成全部转让标的股权的工商变更登记。

(c)　本协议签署生效后，在满足本协议约定的各项条件的前提下，受让方应按本协议第 2.02 款 -2.03 款约定日期及方式进行债权债务的抵消及向标的公司进行付款（**"付款"**）。

### 第2.02款  交易对价的抵扣安排

本次交易应为承债式收购，交易对价分为两部分：

(a)    第一部分交易对价为债务承担部分，受让方同意承担的易到集团总负债金额不超过 23 亿元人民币。在办理完毕标的股权及 Easy Go 股权转让的工商变更登记后，则视为受让方已承担该部分债务。

(b)    第二部分交易对价为债权抵扣部分，韬蕴资本及其关联方与乐视实控人、乐视相关主体之间就一揽子借款债权中的部分，即共计 6.92 亿元人民币抵扣本次交易交易对价的 6.92 亿元人民币。在本协议签订生效后，上述债权即视为抵扣完毕。

(c)    转让方、乐视实控人在此明确并确认，上述两部分事宜履行完毕后，即视为受让方已完成全部交易对价的支付。

### 第2.03款  对标的公司的支付安排

就本协议第 2.02 款（b）项债务承担，为解决易到集团中标的公司的经营性现金流不足，受让方将向标的公司提供数笔款项支付，具体各笔款项支付时间由受让方与标的公司另行协商确定，但第一笔款项 4.3 亿元人民币应在本协议签订后 2 个工作日内支付。

标的公司名下的指定收款账户如下：

| |
|---|
| 账户名称：北京东方车云信息技术有限公司<br>开户行：平安银行上海安亭支行<br>账号：11015642476000 |

标的公司应保证本条所述款项支付应全部用于清偿易到集团不超过 23 亿元人民币的总债务。同时上述总债务中所欠除转让方、乐视实控人及乐视相关主体外的第三方债务应最优先进行清偿（"**第三方债务**"），在第三方债务完全清偿完毕前，不得向转让方、乐视实控人及乐视相关主体进行清偿。

### 第2.04款  费用及税金

(a)    本次交易的相关费用，由各方承担各自相应的费用。

(b)    各方应当依所适用法律承担应由各方自行承担的因交易而发生的税金，依法必须由一方履行代扣代缴义务的除外（但是一方主张且实际履行该等代扣代缴义务时应提前举证相关法律依据并获得其他方同意）。


### 第3条 标的股权、Easy Go 股权变更

### 第3.01款  增资

在本协议签订生效后至履行本协议第 3.02、3.03 款完成前，转让方或乐视控股应完成对标的公司 2.3 亿美元增资的工商变更登记事宜。

**第3.02款 标的股权工商变更**

在本协议签订生效后四十五个工作日内，标的公司应当在工商管理登记机关办理完毕股权转让涉及的工商变更登记事宜，在获得工商变更登记后换发标的公司新《企业法人营业执照》的复印件（应加盖公司公章）应递交给标的公司。

对于工商变更事宜，各方应给予相应的协助（如需）。

**第3.03款 Easy Go 股权变更**

在本协议签订生效后三个工作日内，各方应促使韬蕴资本指定境外关联方、Lucky Clover、乐视实控人完成境外股权转让协议签订及生效，并于境外股权转让协议约定期限内完成 Easy Go 股权变更登记。

对于变更事宜，各方应给予相应的协助（如需）。

## 第4条 股权回购

**第4.01款 股权回购**

经受让方、韬蕴资本指定境外关联方、转让方、乐视实控人等利益相关方协商一致，经各方认可的时间，转让方可以届时协商一致的合理的价格（暂定 15%年化利率）主张回购部分或全部股权（"回购"）。

## 第5条 转让方的陈述与保证

**第5.01款** 转让方是完全民事行为能力人。

**第5.02款** 转让方拥有所有必要的权力、授权与能力签署并交付所有交易文件，履行其在本协议及其他交易文件项下的义务，以及对其法律后果承担法律责任。每一份交易文件经签署并交付后即构成对公司及现有股东合法有效且具有法律约束力的义务，并可按照其各自条款执行。

**第5.03款** 转让方在此向受让方陈述及保证，除非事先另有声明，截至本协议签署日，转让方的陈述在重大方面均为真实、准确及完整的陈述。

**第5.04款** 转让方应及时获取公司对本协议的约定的股权转让的决议文件，以及其他股东放弃优先购买权的法律文件。

第5.05款 转让方是标的股权的合法所有人，标的的股权之上未设置质押等担保物权或任何其他第三方权利。

第5.06款 截至本协议签署日，转让方除已向受让方披露内容外，标的公司不存在任何导致或可能导致税收争议、税收处罚或相关司法程序的情形；标的公司未涉及任何争议、处罚或司法程序，包括但不限于任何诉讼、仲裁、行政程序、强制措施或执行程序等；标的公司并不存在未披露的超额未清偿债务或可能产生上述债务的事由；因本协议签署之日前原因产生的上述税收处罚、诉讼、仲裁、行政程序、强制措施、执行措施、超额未清偿债务等，由标的公司负责解决，但因此引发的标的股权上的责任及损害赔偿应由转让方承担。

第5.07款 本签署、交付和履行本协议以及及其作为一方就本协议不会：违反或抵触适用于其任何资产、财产或业务的任何法律法规或政府指令。

## 第6条 受让方的陈述与保证

第6.01款 受让方为依法设立并有效存续的企业法人，具有与订立及履行本协议相适应的民事主体资格及权利能力。本协议经各方正式授权、签署及交付，即构成对受让方的合法、有效并具有约束力的义务，且该义务可根据本协议的条款强制执行。受让方不受制于任何普遍影响其债权人权利的破产、重组、资不抵债、诉讼程序或其他诉求。

第6.02款 除需依法取得签署、执行本协议的授权外，受让方签署、履行本协议不会违反其营业执照、股东协议、有限合伙协议、章程（视适用情况而定）或类似组织文件的任何规定，不会违反任何相关法律或任何政府授权，不会违反其作为当事人一方（或受之约束）的其他任何协议，也不存在将影响其履行本协议项下任何义务的能力的、已经发生且尚未了结的诉讼、仲裁或其他司法或行政程序。

第6.03款 受让方用于支付交易对价第一部分债权抵扣的资金来源合法，不存在违反任何适用法律法规规定的情形，不会因此造成对公司的任何索赔或致使公司承担任何赔偿责任。

第6.04款 本签署、交付和履行本协议以及其作为一方就本协议不会：违反或抵触其组织文件的规定以及违反或抵触适用于其任何资产、财产或业务的任何法律法规或政府指令。

## 第7条 违约责任

第7.01款 任何一方违反本协议的约定，给对方造成任何损失，均应承担相应的赔偿责任，并支付对方因此支付的包括律师费在内的所有诉讼费用。若任何一方逾期支付任何应付款项，则每逾期一日，应向对方支付应付未付款项万分之五的罚息。

## 第8条 他项条款

### 第8.01款 解释及解释原则

(a)    本协议中，"应"、"应当"均为强制性的，与"必须"具有同等含义；"可以"为授权性的，行为人有权决定作为，也有权决定不作为。凡属一方之权利，该方既可以行使，也可以不行使，选择及决定的自由在于该方。

(b)    "书面"系指能通过正常可视化手段予以辨认的可记录信息的任何形式，包括但不限于传真、电子传输、电子邮件、手机微信、信函等。

(c)    凡提及或用到"本协议项下"包括本协议全部条款及其项、目、句、词及字。"条"包括且仅包括指定该条全部条、款、项、目、句，及其短语、词语和单字，"款"包括且仅包括指定款及其全部项目句及字词短语，"项"包括且仅包括指定条款指定项及其全部目、句及字词短语。

(d)    凡提及"各方"，应包括本协议序言部分所列全部各方，各方就其自身在本协议项下的权利与义务仅仅承担个别的、独立的且非连带的法律责任（除非另有明确约定）。

(e)    "包括"或"包括但不限于"仅充当列举之用，不应被解释为限制、限定或排除其后列举例证之外其他任何可包括项或应包括项。

(f)    "交付"系指动产或权利凭证等可移动物在主体之间转移占有之法律事实。

(g)    "法律"系指普遍或特别适用于本协议项下特定事项的法律。在满足本协议第8.12款有关管辖法律之约定条件下，凡提及"所适用法律"，均不仅仅指由特定国家或地区立法机关依所适用程序制定并颁布实施的法律，亦包括由地方立法机关、国家或地方司法机关或行政机关依所适用程序制定、颁布且被该国家或地区普遍接受为具有普遍性法律约束力的规范性文件，无论其被命名为法律、条例、规定、规则、决定、命令、意见、通知或是其他。该等法律在本协议签署时应正被实施、执行且具有普遍性法律约束之效力，并包括有权机关不时颁布实施的法律修正案或不时修订后颁布实施的新法律。

(h)    "裁决"系指有管辖权之法庭依所适用法律规定程序法及实体法做出地判决或裁定；或有管辖权之仲裁庭依本协议约定选择适用的仲裁程序及实体法做出地仲裁裁决。

(i)    凡提及"诉讼程序"，应包括诉讼程序及仲裁程序。其中，诉讼程序应包括刑事诉讼、民事诉讼及行政诉讼；仲裁程序应包括劳动仲裁、商事仲裁、国际仲裁等各类仲裁。

(j)    "内"、"之内"均包括本数/日；"超过"均不包括本数/日。

(k)    凡使用任何金额及数字，若大小写不一致，或阿拉伯数字与中文数字不一致，均以大写或中文数字为准。

(l)    凡提及"日"，系指一个日历日，从北京时间凌晨零点开始计算，经过 24 小时为一日。凡提及"工作日"或"营业日"，系指除了周六、周日或中华人民共和国或其他国家或地区根据所适用法律确定为节日、假日及休息日以外之任何一日或多日。除上下文另有要求外，如本协议项下任何权利或义务可供行使或履行之日为非工作日，则该项权利或义务应顺延至该日之后第一个工作日行使或履行。"之日"包括当日，"次日"为指称当日之第二日。

(m)    凡提及"元"或"圆"，系指中华人民共和国通用货币人民币元。凡提及"美元"，系指美利坚合众国法定通用货币。除非明确约定使用美元或其他货币，本协议项下任何付款义务均应以人民币计价、结算及支付。

(n)    凡提及"中文"，应指中华人民共和国大陆地区通用的符合中华人民共和国国家语言文字工作委员会颁布实施的汉语言文字使用规范的简体汉字。

### 第8.02款 保密

(a)    本协议项下保密信息，(i) 就任何个人而言，包括《中华人民共和国居民身份证》或其他国家或地区《护照》等身份证件上全部记载信息，该人士电话号码、手机号码或其他联系方式、家庭住址、办公地址、婚姻、财产信息等；(ii) 就任何单位而言，保密信息包括其专利技术、软件源代码、专有技术（know-how）、商业秘密、产品开发计划、定价策略、经营方式、投资、受让、重组、银行贷款、发债、上市计划、员工招收计划、财务会计信息等；(iii) 就本协议项下任何事项或交易而言，包括前期接触、洽谈、见面、会议、通讯、邮件、信函、传真、交易协议（包括本协议）起草、修改、磋商、签署、付款、交割等；(iv) 上述信息或其他信息，若已被采取适当保密措施，或已被标识"保密"字样，信息持有方不愿意公开或被他人知悉，且若被公开或被他人知悉，将对信息持有方造成经济损失，或造成其他重大不利影响，则构成本协议项下保密信息。

(b)    除非被强制披露，任何获得、接受、保存、使用、复制及传递保密信息者，均有义务采取适当保密措施，以使其不被披露、泄露或被他人知晓。所谓强制披露，系指根据法律、司法或行政机关要求不得不予以披露，包括根据所适用法律或证券交易所规则向任何有关政府部门或证券交易所披露。若发生强制披露，披露一方应在其力所能及且所适用法律允许范围内，于做出此种披露前合理时间内，与保密信息提供方磋商，并尽最大努力对所披露信息进行保密化处理。然而，为完成本协议项下或交易之目的，一方可以将保密信息向其关联方或法律顾问、财务顾问等中介机构进行披露，但应确保信息接受方充分知晓、理解并同意承担保密义务，该等义务其法律责任大小应与披露方一致。此外，各方均不得为任何其他目的、以任何方式使用保密信息。

(c)    若存在任何信息，已被本协议或本协议任何一方同意或允许披露，或在披露之时已经可公开获得或已被公开获得且该等公开非归责于任何一方或其关联方，或其获得信息渠道来源于任何善意第三方，则信息获得方在获得信息范围内不承担保密责任。但是，任何情形下，任何信息不应仅因任何规定可以不承担保密责任而被认定为非保密信息。

## 第8.03款 生效、变更与终止

(a)    本协议经各方法定代表人或其授权代表人或本人签字及/或盖章("**签署**")后正式成立并正式生效。

(b)    各方一经于本协议签署页签署，即视为其完全理解、承认本协议各方在本协议项下约定条款及条件的权利，同意在本协议生效后履行本协议项下全部及各项义务，愿意受该全部各项条款及条件的约束，并承担由此产生的任何法律责任。各方同意，在本协议签署页或标明签字处仅加盖公章而无法定代表人或其授权代表人签字，或者公章为公司财务专用章等非合同专用章，或者法定代表人未亲笔签字而授权他人签字，或者任何签字人于签字时或签字后未获得书面授权等情形均不影响本协议的生效。任何以本协议仅有盖章而无签字、非法定代表人签字、非公司合同章或授权代表人未获授权等为理由对本协议效力提出的异议均为无效。

(c)    本协议非经各方协商一致不得修改变更。协商一致后，另行签署书面补充协议，对本协议的修改方为有效。若因本协议任何一方提起或发起诉讼或仲裁程序，最终致使本协议任何条款或措辞被有合法管辖权的法院、法庭或仲裁庭依法裁决无效或不予执行（"**无效条款**"），需要对本协议任何条款或措辞进行修改，各方应通过善意协商，以最大程度符合本协议之根本目的为基本原则，共同完成修改程序，从而使得本协议中所拟事项以及各方权利义务能最大限度按照本协议签署之初所拟定计划完成与实现。若在裁决生效之后十五（15）日以内，各方仍无法就协议修改达成一致意见，则：

(i)    本协议可不做任何修改，且该等无效条款应被视为及解释为本协议自始未拟定或包含该等等无效条款；或，

(ii)    若无效条款事实上构成本协议根本条款，或无效条款无效或自始不存在将致使本协议根本目的无法实现，或致使本协议无法继续履行，则本协议终止。

(d)    本协议各方应尽自己合理的最大努力遵守并履行本协议各项约定，除以下情形之外，本协议非经各方协商一致不得终止：

(i)    若任何有管辖权的法院、法庭或仲裁庭依所适用法律裁决本协议全部或部分条款无效、被撤销或不予执行，或者任何政府部门决定终止本协议全部或部分条款，则本协议或相应条款应当终止；

(ii)    若任何一方严重违反本协议约定，导致本协议根本目的无法实现或本协议无法继续履行，本协议应当终止；

(iii)    依本协议第 7 条而终止。

(e)    在上述情形下，决定终止协议的一方应当向对方发出终止通知，通知生效之日起本协议即行终止。

## 第8.04款 权利与义务转移

非经各方一致同意，本协议项下任何权利义务均不得转移给其他任何第三方。任

何权利义务的转移，转让一方均需事先书面通知其他方，征得同意后方可进行。

### 第8.05款 不放弃

除非法律法规另有规定或本协议另有约定，如任何一方不行使、或未能行使、或延迟行使其在本协议项下或根据本协议而获赋予的任何权利、权力或补救行动，不构成该方放弃该等或任何其他权利、权力或补救行动。任何一方放弃其部分权利，不构成其对其他未明确放弃之权利的放弃或豁免。

### 第8.06款 通知

(a)    除非另有约定，所有本协议项下通知、诉求、权利主张、要求及其他信息交互（"通知"），均应以书面形式做出，并以专人递交、快递服务、传真、或挂号邮件（邮资预付并要求回执）交付。尽管如此，若各方按照商业惯例或过往交易习惯通过电子通讯方式进行通知，且收收方对此并无异议，则该等通知应视为与书面通知具有同等法律效力。为本协议之目的，所谓电子通讯方式，系指使用电子邮件、手机等移动通讯设备短信息、微信、QQ 或 SKYPE 等即时通讯方式传递信息或发出通知。若约定以电子通讯方式进行通知，则接收方应当提供准确号码或账户，保证通知能够及时送达。通知应当发送到到各方于本协议签署页所提供地址，或协议签署后变更地址，只要任何一方根据实际情形变更地址，且将变更后地址即时通知了其他方。任何通知均应当明确所涉协议事项内容、完成要求及条件、截止时限，以中文书写。通知若为报告事件，除应当明确事件所涉时间、地点、经过、起因、经过及结果外，还应当尽合理努力提供相应证据。若为更正通知，还应指出具体错误或瑕疵。

(b)    依本协议所发送的通知在满足下列任意情形时即为有效送达（"送达"）：

(i)    若以电子通讯方式发送通知，则通知以电子邮件等成功发送或显示发送成功之时日视为有效送达；

(ii)    若由专人递交，则在专人递交之日视为有效送达；

(iii)    若以挂号信件发出，则在寄出日（以邮戳为凭）后第七日视为有效送达；

(iv)    若以快递方式发送，则于交与快递服务发送后第三日视为有效送达。

(c)    就上述任何一种送达而言，若接收人于视为送达日之次日通知发送人并明确表示未收到发送通知，则通知应认定为未送达，双方应立即协商并确定重新发送通知（"重发通知"）。 重发通知则适用上述视为送达规则。 就任一通知而言，若因接收方提供地址不真实或不准确，致使通知不能送达，或尽管通知已经送达，但接收方未及时接收、处理或知悉通知内容，导致通知之目的未能实现（"通知失败"），使接收方遭受损失，则应由接收方自行承担全部损失；若因通知失败导致发送方损失，发送方有权就此从接收方获得赔偿或补偿。

### 第8.07款 完整性

本协议构成各方之间就协议事项所达成之完整协议，本协议具有取代各方之前就

协议事项所达成任何及全部其他书面或口头协议之法律效力。

### 第8.08款 可分割性

若本协议任何条款或规定在任何司法辖区被视为无效或不可执行，则该等条款或规定应仅在该等无效或不可执行的范围内无效，其余部分不因此受到影响，应当仍旧完全有效。本协议任何条款在某一个司法辖区无效或不可执行，不影响其在其他司法辖区内的法律效力，其在其他司法辖区仍应完全有效。此外，若本协议任何条款被视为无效或不可执行，但若将其部分删除则变为有效或可执行，则该等条款应在最小范围内做出必要修改以使其有效并可执行。

### 第8.09款 独立条款

本协议违约责任条款、保密条款、通知条款、管辖法律和争议解决条款，在法律效力上具有充分独立性，本协议全部（或部分）无效、被撤销或终止，不影响该等条款的法律效力，该等条款仍继续有效。

### 第8.10款 标题

本协议中，任何标题仅为阅读方便，不对本协议任何条款构成总结或解释，也不对解释任何条款产生任何影响。

### 第8.11款 语言

本协议用中华人民共和国通用简体中文书写、解释、留存及履行。任何一方均可就各自需要翻译成其他任何语言文字。但是，若任何其他语言文本之文义与本协议语言文本之文义在书写格式、解释及履行过程中发生任何冲突、不一致、相违背等情形，均应以中文文本为准。

### 第8.12款 管辖法律和争议解决

本协议、本协议项下任何交易、行动、行为或安排，以及各方在本协议项下全部权利及义务，均应受中华人民共和国法律管辖，根据该等法律进行解释。

本协议项下发生任何争议，任何一方均有权向本协议签署地有管辖权人民法院提起诉讼。

### 第8.13款 文本

本协议正本捌份，各方各执壹（1）份，剩余贰（2）份用于登记机关备案（如需），每份均具有同等法律效力。

（以下有意留白）

（本页为《股权转让协议》的签字页）

签署方：上海哲蕴商务咨询合伙企业（有限合伙）（公章）

签字：

职务：

签署方：吴孟

签字：

签署方：北京东方车云信息技术有限公司（公章）

签字：

职务：

签署方：乐视控股（北京）有限公司（公章）

签字：

职务：

签署方：韬蕴资本集团有限公司（公章）

签字：

职务：

签署方：贾跃亭

签字：




# EXHIBIT B

Wu Meng

And

Shanghai Zheyun Business Consulting Partnership (Limited Partnership)

Regarding

Beijing Dongfang Cheyun Information Technology Co., Ltd.

---

**Equity transfer agreement**

---

June 30, 2017

Beijing Dongfang Cheyun Information Technology Co., Ltd.
**Equity transfer agreement**

This Equity Transfer Agreement (hereinafter referred to as this "Agreement") is entered into by and among the following parties (individually referred to as "Party" and collectively referred to as "Parties") on June 30, 2017 in Dongcheng District, Beijing, China:

**Transferee: Shanghai Zheyun Business Consulting Partnership (Limited and Partner) ("Zheyun")**

Address: 4th Floor, No. 416, Zhoushi Road, Pudong New Area, Shanghai

**Transferor: Wu Meng**

ID No.: 14237319730105507x

**Target Company/Company: Beijing Dongfang Cheyun Information Technology Co., Ltd.**

Address: 7th Floor, Building 1, No.1, No. 188, West South Fourth Ring Road, Fengtai District, Beijing (Park)

**The debtor of the loan package: LETV Holdings (Beijing) Co., Ltd. ("LETV Holdings")**

Address: 1102, 10th Floor, Building 3, No. 105, Yaojiayuan Road, Chaoyang District, Beijing

**The creditor of the loan package: Taoyun Capital Group Co., Ltd. ("Taoyun Capital")**

Domicile:

**Actual Controller of LeEco: Jia Yueting**

ID No.:

**Whereas:**

(1)  Beijing Dongfang Cheyun Information Technology Co., Ltd. ("Target Company") is a limited liability Company established and validly existing under the laws of the PRC. The legal representative is Peng Gang. It was established on May 21, 2010. As of the date hereof, its registered capital is RMB 11 million. All shareholders have paid their contributions. The Target Company and Easy Go Ino. (Cayman) ("Easy Go") jointly serve as the intellectual property holder and operating entity of Easy Go Car Use ("Easy Go Group"), which is the e-commerce platform for providing scheduled car services.

(2) Wu Meng (the "Transferor"), a Chinese citizen, the controlling shareholder of the Target Company and the related party of **LETV Holdings**, legally holding 66.67% of the equity of the Target Company.

(3)  Shanghai Zheyun Business Consulting Partnership (Limited Partnership) ("Transferee" or "Zhe Yun") is a limited partnership legally established and validly existing under the laws of the PRC.

(4) **LETV Holdings** (Beijing) Co., Ltd. ("**LETV Holdings**") is a limited liability Company established and validly existing under the laws of the PRC. **LETV Holdings** is the debtor of the package loan as described in Article 2.02(b) of this Agreement. .

(5)  Jia Yueting, as the actual controller of **LETV Holdings** and other related entities ("Actual Controller of LeEco"), directly or indirectly controls including but not limited to, **LETV Holdings** (Beijing) Co., Ltd., LeEco Mobile Intelligent Information Technology (Beijing) Limited Company, LeEco Sports Industry Development (Beijing) Co., Ltd., Lele Interactive Music Culture Development (Beijing) Co., Ltd., LeEco Music Culture Industry Development (Beijing) Co., Ltd., Beijing Bairui Culture Media Co., Ltd., and Lucky Clover (the above-mentioned companies directly or indirectly controlled by the Actual Controller of LeEco are collectively referred to as "LeEco Related Entities".

(6)  Taoyun Capital Group Co., Ltd. ("Taoyun Capital") is a limited liability Company legally established and validly existing under the laws of the PRC. The legal representative is Wen Xiaodong.

(7)  The Transferor intends to transfer 66.67% of the equity of the Target Company (the "Target Equity") held by the Transferor to the Transferee in accordance with the terms and conditions of this Agreement, and the Actual Controller of LeEco shall procure Lucky CloverLimited   ("Lucky Clover"), the controlling shareholder of Easy Go, to transfer its 66.67% equity interest in Easy Go ("Easy Go Equity") to the designated overseas affiliates of Yunyun Capital and separately sign the corresponding overseas equity transfer agreement.

(8) Taoyun Capital and its related parties have reached consensus with the Actual Controller of LeEco and the LeEco Related Entities on payment of the consideration for the Target Equity and Easy Go Equity by deduction of the part or all of the claims in the package loans (collectively referred to as the "Transaction").

**I**n view of this, through friendly consultations, based on the principle of equality and mutual benefit and in accordance with the Contract Law of the People's Republic of China, the Company Law of the People's Republic of China and other relevant laws and regulations, all Parties have reached this Agreement on the above-mentioned equity transfer and payment of the consideration for the Transaction contemplated hereunder using the related claims in the package loans as follows.

**Article 1 Equity Transfer**

**Article 1.01 Valuation of Easy GoGroup**

Prior to this Transaction, the Transferor, the Transferee, Taoyun Capital, the Actual Controller of LeEco, and the LeEco Related Entities agreed that Easy Go Group was valued at US$660 million as of the signing date hereof (converted to RMB 4.488 billion yuan according to the exchange rate of 1 USD to RMB 6.80 yuan) on the premises that the Transferee shall complete the due diligence as described in Article 1.02(b) hereof and there is no significant adverse event that would affect the Transaction after the signing of this Agreement.

**Article 1.02 Transaction Consideration, Due Diligence and Transaction Consideration Adjustment**

(a) Transaction Consideration:

The equities to be transferred in this Transaction includes 66.67% of the equity of the Target Company legally held by the Transferor (the "Target Equity") and 66.77% of the equity of Easy Go legally held by Lucky Clover, the controlling shareholder of Easy Go ("Easy Go Equity"). The Transferee agreed to acquire for the total consideration (the "Transaction Consideration") of US$ 440 million (converted to RMB 2.992 billion yuan at the exchange rate of 1 USD to 6.80 yuan).After the completion of the Transaction the Target Equity will be held by the Transferee and the equity of Easy Go will be held by the designated affiliates of Taoyun Capital. However, after the signing of this Agreement, the Transferee will complete the independent due diligence, and the effectiveness of this Agreement shall be preconditional upon non-existence of material adverse impact on the Transaction.

(b) Due Diligence:

After the signing of this Agreement, the Transferee will conduct a comprehensive legal and financial due diligence ("Due Diligence") on the Ease Group, and the Transferor, the Target Company, and the Actual Controller of LeEco undertake to provide all necessary due materials and assistance in the due diligence, including the financial forecast data of Easy Go Group for the following 3 years.

(c) Adjustments to Valuation of Easy Go Group and Transaction Consideration:

As of the signing date of this Agreement, the Transferor, the Target Company, and the Actual Controller of LeEco guarantee that the total debt of the Easy Go Group that has been fully disclosed shall not exceed RMB 2.3 billion. The Transferor, **LETV Holdings** and the Actual Controller of LeEco shall be jointly and severally liable for the outstanding debts of Easy Go Group exceeding RMB 2.3 billion, including but not limited to outstanding bank loans, private loans, other arrears or any contingent liabilities (collectively referred to as "Excess Unliquidated Liabilities").In such case, according to the professional advices of intermediary agency, the Transferee may adjust the valuation of the Easy Go Group and the considerations for the Target Equity and the Easy Go Equity, and deduct the corresponding amount from the Transaction Consideration paid by the Transferee, or recover the amount from the relevant jointly liable person.

**Article 2 Closing**

**Article 2.01    Time and Location of Closing**

(a) The Parties shall sign this Agreement on the date fist written above in Dongcheng District, Beijing, China.

(b) Within 45 working days after this Agreement is signed and comes into effect, the changes in the industrial and commercial registration for the equity transfer shall be completed.

(c) After this Agreement is signed and comes into effect, the Transferee shall cancel the creditor's rights and debts and make payment to the Target Company on the date and in the method specified in paragraphs 2.02-2.03 hereof on the premise of satisfying the conditions stipulated herein. ("Payment")

**2.02    Deduction of Transaction Consideration**

The Transaction shall be a debt-based acquisition, and the consideration for the Transaction is divided into two parts:

(a) The first part of the Transaction Consideration is in the form of debt commitment, and the Transferee agrees to bear the total debt of the Easy Go Group not

exceeding RMB 2.3 billion. After the completion of the change in the registration for equity and the industrial and commercial registration change for the Target Equity transfer and the Easy Go Equity transfer, the Transferee shall be deemed to have assumed the debt.

(b) The second part of the Transaction Consideration is in the form of credit deduction, Taoyun Capital and its related parties and the Actual Controller of LeEco and the LeEco Related Entities agree to deduct the consideration for the Transaction in the amount of RMB 692 million using the claims contained in the package loans totaled RMB 692 million yuan. After this Agreement is signed and becomes effective, the above claims are deemed to have been deducted.

(c) The Transferor and the Actual Controller of LeEco hereby clarify and confirm that after the completion of the above two parts, the Transferee shall be deemed to have paid the full consideration for the Transaction.

**Article 2.03 Payment Arrangements for Target Company**

With respect to the debt commitment under Article 2.02(b) of this Agreement, in order to solve the problem of insufficient operating cash flow of the Target Company within the Easy Go Group, the Transferee will provide money to the Target Company in several installments, the specific payment time of which shall be negotiated separately by the Transferee and the Target Company. However, the first installment of 430 million yuan shall be paid within 2 working days after the signing of this Agreement.

The designated collection account under the Target Company name is as follows:

| |
|---|
| Account Name: Beijing Dongfang Cheyun Information Technology Co., Ltd. |
| Bank: Ping An Bank Shanghai Anting Branch |
| Account No.: 11015642476000 |

The Target Company shall guarantee that the money paid according to this Article shall be used for paying off the total debts of the Easy Go Group not exceeding RMB 2.3 billion. At the same time, the debt owed to the third party other than the Transferor, the Actual Controller of LeEco and LeEco Related Entities as included in the above-mentioned total debts shall be given the highest priority for settlement ("Third Party Debt"). No payment shall be made to the Transferor, the Actual Controller of LeEco and LeEco Related Entities until the third party debt is fully settled.

**Article 2.04 Fees and Taxes**

(a) The relevant expenses of this Transaction shall be borne by each Party respectively.

(b) Each Party shall, in accordance with applicable law, bear the taxes in connection with the Transaction, except that the Party shall perform the withholding obligation in accordance with the law (however, when asserting and actually performing the withholding obligation, one Party shall provide legal evidence in advance and obtain the consent of other Parties).

### Article 3 Change in Target Equity and Easy Go equity

### Paragraph 3.01 Capital Increase

The Transferor or **LETV Holdings** shall complete the industrial and commercial registration for the Target Company's capital increase of US$230 million from this Agreement is signed and becomes effective until the fulfillment of paragraphs 3.02 and 3.03 of this Agreement.

### Article 3.02    Industrial and Commercial Registration Change Related to Target Equity

Within forty-five working days after this Agreement is signed and becomes effective, the Target Company shall complete the industrial and commercial registration change related to the equity transfer at the industrial and commercial registration authority, and obtain the new Business License for Enterprise Legal Person of the Target Company after the completion of the industrial and commercial registration change, a copy of which (bearing the official seal of the Target Company) shall be submitted to the Target Company.

The Parties shall provide appropriate assistance in the course of the industrial and commercial registration change (if needed).

### Article 3.03 Industrial and Commercial Registration Change Related to **Easy Go Equity**

Within three working days after this Agreement is signed and becomes effective, the Parties shall prompt the designated overseas affiliates of Taoyun Capital, Lucky Clover and the Actual Controller of LeEco to complete the signing and entry into force of the overseas equity transfer agreement, and complete the industrial and commercial registration change related to the Easy Go Equity within the time limit specified in the overseas equity transfer agreement.

The Parties shall provide appropriate assistance in the course of the industrial and commercial registration change (if needed).

### Article 4 Equity Repurchase

**Article 4.01 Equity Repurchase**

Upon reaching consensus among the interested parties such as the designated overseas affiliates of Taoyun Capital, the Transferor, and the Actual Controller of LeEco, the Transferor may require to repurchase part or all of the equity at the agreed reasonable price and at the time approved by the Parties (provisional 15% annual interest rate)   ("Repurchase").

**Article 5 Representations and Warranties of the Transferor**

**A**rticle 5.01 The Transferor is a person with full capacity for civil conduct.

**Article** 5.02 The Transferor has all the necessary powers, authorizations and capabilities to sign and deliver all transaction documents, fulfill its obligations under this Agreement and other transaction documents, and assume legal liability for the legal consequences. Each transaction document, once being signed and delivered, shall constitute a valid and legally binding obligation to the Company and its existing shareholders and may be enforced in accordance with its respective terms.

**Article** 5.03 The Transferor hereby represents and warrants to the Transferee that, unless otherwise stated in advance, the Transferor's representations are true, accurate and complete in material terms as of the date of this Agreement.

**A**rticle 5.04 The Transferor shall promptly obtain the resolution documents of the Company related to the equity transfer specified in this Agreement, and the legal documents on waiver of the right of first refusal that by other shareholders.

**A**rticle 5.05 The Transferor is the legal owner of the Target Equity, and no pledge or other security interest or any other third party rights have been created on the Target Equity.

**A**rticle 5.06 As of the signing date of this Agreement, except as disclosed to the Transferee by the Transferor, there is no situation that causes or may cause tax disputes, tax penalties or relevant judicial proceedings against the Transferee; the Target Company has not been involved in any disputes, punishments or judicial proceedings, including but not limited to any litigation, arbitration, administrative proceedings, enforcement measures or enforcement proceedings; there are no undisclosed Excess Unliquidated Obligations to be assumed by the Target Company and no cause of the above-mentioned obligations; the tax penalties, litigation, arbitration, administrative proceedings, enforcement measures, coercive measures, and Excess Unliquidated Obligations arisen prior to the date hereof shall be settled by the Target Company, however, the liability and damages for the Target Equity arising therefrom shall be borne by the Transferor.

**Article** 5.07 The execution, delivery and performance of this Agreement and being a Party to this Agreement shall not violate or contravene any laws, regulations or government directives applicable to any of its assets, property or business.

### Article 6 Representations and Warranties of the Transferee

**A**rticle 6.01 The Transferee is an enterprise legal person established and validly existing according to law, and has the qualifications and rights of civil subjects that are compatible with the conclusion and performance of this Agreement. Once being duly authorized, signed and delivered by the Parties, this Agreement shall constitute a legal, valid and binding obligation to the Transferee and may be enforced in accordance with the terms hereof. The Transferee is not subject to any bankruptcy, restructuring, insolvency, litigation or other claims that generally affect the rights of its creditors.

**Article** 6.02 Except for the lawful authorization to sign and execute this Agreement, the Transferee's execution and performance of this Agreement will not violate its business license, shareholder agreement, limited partnership agreement, articles of association (as applicable) or similar organization documents and will not violate any relevant laws or any government authorization, or any other agreement to which it is a Party (or binding it). In addition, there is no occurred and unsettled litigation, arbitration or other judicial or administrative proceedings which will affect its ability to perform any of its obligations under this Agreement.

**T**he source of the funds used by the Transferee to pay the first part of the Transaction Consideration is legal. There is no violation of any applicable laws and regulations, and no claim against or liability of the Company will be incurred.

**Article** 6.04 The execution, delivery and performance of this Agreement and being a Party to this Agreement shall not violate or contravene any laws, regulations or government directives applicable to any of its assets, property or business.

### Article 7 liability for breach of contract

Article 7.01 **I**f any Party violates the provisions hereof and causes any loss to the other Parties, it shall bear the corresponding liability for compensation and pay all the litigation costs including the lawyer's fee incurred by the other Parties. In case of late payment, the default Party shall pay liquidated damages to other Parties at five over ten thousand of the unpaid amount for each day of delay.

### Article 8 Miscellaneous

### Article 8.01 Interpretation and Interpretation Principles

(a) In this Agreement, "shall" and "should" are mandatory and have the same meaning as "must"; "may" is authoritative, the actor has the right to decide to act or not

to act. The Party enjoying a right may exercise or waiver on the right, and the freedom to choose and decide lies with that Party.

(b) "Writing" means any form of recordable information that can be identified by normal means of visualization, including but not limited to fax, electronic transmission, e-mail, SMS, letters, etc.

(c) References to or use of "hereunder" include all terms of this Agreement and its items, objectives, sentences, phases and words. "Article" includes and only includes the specified article and the paragraphs, items, sentences, phrases and words thereof. The "Clause" includes and only includes the specified Clause and all the items, sentences and words thereof, "Items" "Includes and includes only the specified items and all the items, sentences, phrase and words thereof.

(d) References to "Parties" shall include all Parties listed in the preamble to this Agreement, and the Parties shall only assume individual, independent and non-joint legal obligations with respect to their own rights and obligations under this Agreement (unless otherwise expressly agreed).

(e) "Including" or "including but not limited to", is merely used as an enumeration and shall not to be construed as limiting, restricting, or excluding any other includible items than those enumerated.

(f) "Delivery" means the legal fact that movable objects such as movable property or right certificates are transferred between entities.

(g) "Law" means the law that applies generally or specifically to a particular matter under this Agreement. Subject to the provisions on governing law under   Article 8.12 hereof, references to "applicable law" refer not only to the laws enacted and enforced by the specific national or regional legislature in accordance with the applicable procedures, but also the normative documents enacted by local    legislature, the state or local judicial organs or administrative organs in accordance with the applicable procedures and generally accepted by the country or region as    legally binding, regardless of whether they are named as laws, norms, regulations, rules, decisions, orders, opinions, notices or other. These laws shall be implemented, enforced and universally legally binding at the time of signing this Agreement, as amended and revised by the competent authorities from time to time.

(h) "Judgment" means the judgment or ruling made by a court of competent jurisdiction in accordance with the applicable procedural law and substantive law; or the arbitration award made by the arbitral tribunal of competent jurisdiction in accordance with the applicable arbitral proceedings and substantive law agreed upon herein.

(i) Any reference to "proceedings" shall include litigation proceedings and arbitration proceedings. Litigation proceedings shall include criminal, civil and administrative litigation proceedings; the arbitration proceedings shall include labor arbitration proceedings, commercial arbitration proceedings, international arbitration proceedings and other types of arbitration proceedings.

(j) Both "within" and "in" shall include this number/day; "over" shall not include this number/day.

(k) Where any amount and number are used, in case of inconsistency between the capitals and lower-case letters, or inconsistency between the Arabic numerals and the Chinese numerals, the capitals or Chinese number shall prevail.

(l) Any reference to "day" means a calendar day, starting from 0:00 am Beijing time until 24 hours later. References to "working days" or "business days" means any day or days other than Saturdays, Sundays and holidays, rest days in accordance with the applicable laws of the People's Republic of China or other countries or regions. Except as otherwise required by the context, if any of the rights or obligations under this Agreement are to be exercised or performed on a non-working day, the exercise or performance shall be extended to the first working day after that date. "Day" includes the day, and "next day" is the day following the alleged day.

(m) Any reference to "yuan" or "YUAN" means the common currency of the People's Republic of China. References to "dollars" refer to the statutory common currency of the United States of America. Unless otherwise expressly agreed to use US dollars or other currencies, any payment obligations under this Agreement shall be denominated, settled and paid in RMB.

(n) Any reference to "Chinese" shall mean the simplified Chinese characters commonly used in the mainland of the People's Republic of China in conformity with the standards for the use of Chinese languages and characters issued by the State Language Commission of the People's Republic of China.

### Article 8.02 Confidentiality

(a) Confidential information under this Agreement, (i) for any individual, confidential information shall include the information contained in the Resident Identity Card of the People's Republic of China, other national or regional passport and other identification documents, such as the person's telephone number, mobile phone number or other contact information, home address, office address, marriage status, property information, etc. (ii) for any entity, confidential information shall include its patented technology, software source code, know-how, trade secrets, product development plan, pricing strategy, business method, investment, acquisition, reorganization, bank loan, bond issuance, listing plan, employee recruitment plan,

financial accounting information, etc.; (iii) for any matter or Transaction under this Agreement, confidential information shall include pre-contact, negotiation, meeting, conference, communication, mail, letter, fax and the drafting, modification, negotiation, signing, payment, delivery of or under the transaction agreement (including this Agreement),etc.; (iv) for the above information or other information, against which appropriate confidentiality measures have been taken, or have been identified as "confidential", which the information holder is unwilling to disclose or make it known by others, and the disclosure or known to others of which will cause economic loss to or other significant adverse effects on information holder shall constitute the confidential information under this Agreement.

(b) Unless compulsorily disclosed, anyone who acquires, receives, saves, uses, copies and transmits confidential information is obliged to take appropriate confidentiality measures so that they are not disclosed, revealed or known to others. "Compulsory disclosure" means the disclosure made according to legal, judicial or administrative requirements, including disclosure to any relevant government department or stock exchange in accordance with applicable laws or stock exchange rules. In the event of a mandatory disclosure, the disclosing Party shall, at the reasonable time prior to the disclosure and to the extent permitted by applicable law, consult with the confidential information provider and do its utmost to keep the disclosed information confidential. However, for the purposes of completion of this Agreement or the Transaction hereunder, one Party may disclose the confidential information to its affiliates or intermediary agencies such as legal counsel, financial advisors, etc., and shall ensure that the recipient of the information fully understands, knows and agrees to assume the same obligation of confidentiality as the disclosing Party. In addition, no Party may use confidential information in any way for any other purpose.

(c)For any information disclosed or permitted to be disclosed by either this Agreement or any Party hereto, becomes or has been publicly available at the time of disclosure for reasons not attributable to any Party or its affiliates, or is derived from any bona fide third party, the recipient of the information shall not assume confidentiality liability within the scope of the information obtained. However, in no event shall any information be deemed to be non-confidential solely due to any provision that no confidentiality liability shall be assumed.

### Article 8.03 Effectiveness, Amendment and Termination

(a) This Agreement shall become effective upon being signed and and/or stamped by the legal representatives or the authorized representatives of the Parties or by themselves ("Signature").

(b) Upon signing on the signing page of this Agreement, each of the Parties shall be deemed to have fully understood and acknowledged the rights of the Parties and the

terms and conditions hereof, agreed to perform all of the obligations hereunder after the entry into force of this Agreement, be willing to be bound by all of the terms and conditions hereof and assume any legal liability arising herefrom. The Parties agree that only affixing the official seal to the signature page or signatory place hereof without the signature of the legal representative or authorized representative, or the official seal being a non-contract special seal such as financial special seal, or signing this Agreement by the person authorized by the legal representative or failure of the signatory to obtain written authorization at the time of signature or after signature shall not affect the entry into force of this Agreement. Any objection to the validity of this Agreement on the grounds that there is only the seal without the signature, this Agreement is signed by other person than the legal representative, the seal is non-contract special seal or the representative is authorized shall be invalid.

(c) This Agreement shall not be amended without the agreement of the Parties. Any valid amendment shall be made in separate written supplementary agreement to this Agreement after reaching consensus .If any Party hereto initiates or files a lawsuit or arbitral proceedings, and the court, tribunal or arbitral tribunal of competent jurisdiction ultimately rules that any clause or wording of this Agreement is invalid   or unenforceable ("Invalid Clause") and have to be modified, the Parties shall jointly complete the amendment through good faith negotiation and based on the basic principle of maximizing compliance with this Agreement, so that the matters proposed and the rights and obligations of the Parties hereunder can be completed and achieved to the maximum extent. If, within fifteen (15) days after the ruling takes effect, the Parties are still unable to reach an agreement on the amendment of this Agreement, then:

    (i)   this Agreement may be un-amended and such invalid clause shall be deemed and construed to have not been formulated or contained herein from the effectiveness of this Agreement; or,

    (ii) if the invalid clause actually constitutes the fundamental clause hereof, or the invalidity or non-existence of such clause will lead to the fundamental purpose of this Agreement being unfulfilled or uncontinued performance of this Agreement, this Agreement shall be terminated.

(d) Each Party hereto shall use its reasonable and best efforts to abide by and perform this Agreement. This Agreement shall not be terminated without the agreement of the Parties except

    (i) if any court, tribunal or arbitral tribunal of competent jurisdiction rules, in accordance with applicable law, that all or part of the terms hereof is invalid, revoked or unenforced, or if any government department decides to terminate all or part of this Agreement, this Agreement or the corresponding terms shall be terminated;

(ii) If any Party seriously violates this Agreement, which leads to the fundamental purpose of this Agreement being unfulfilled or uncontinued performance of this Agreement, this Agreement shall be terminated;

(iii) Termination in accordance with Article 7 of this Agreement.

(e) Under the above circumstances, the Party who decides to terminate the agreement shall issue a notice of termination to the other Parties and this Agreement shall terminate as of the effective date of the notice.

### Article 8.04 Transfer of Rights and Obligations

No rights and obligations under this Agreement may be transferred to any other third party without the unanimous consent of the other Parties. In case of the transfer of any rights and obligations, the Transferor shall notify the other Parties in writing and obtain their consents before proceeding with the transfer.

### Article 8.05 No Waiver

Except as otherwise provided by laws and regulations or as otherwise agreed in this Agreement, failure to exercise, being unable to exercise or delay in exercise of any of its rights, powers or remedies under this Agreement or obtained according to this Agreement shall not constitute the waiver on such or any other rights, powers or remedies. The waiver on part of the rights by any Party shall not constitute waiver or exemption from other rights that are not expressly waived.

### Article 8.06 Notice

(a) Unless otherwise agreed, all notices, complaints, claims, demands and other information communicates ("Notices") under this Agreement shall be made in writing and delivered by hand, courier, fax, or registered mail (postage prepaid and return receipt required).Notwithstanding the foregoing, if the Parties send notice by electronic communication in accordance with commercial practices or past transaction habits and the recipient raises no objection, such notice shall be deemed to have the same legal effect as the written notice. For the purposes of this Agreement, the so-called electronic communication means the use of instant messaging methods such as e-mail, messages of mobile phones and other mobile communication devices, WeChat, QQ or SKYPE to transmit information or to issue notifications. In case of agreement on electronic communication, the recipient shall provide an accurate number or account to ensure that the notice can be delivered in time. The notice shall be sent to the address provided by the Parties on the signing page of this Agreement, or other address changed after this Agreement is signed, as long as the Party changes the address according to the actual situation and immediately informs the other Party of the changed address. The notice

shall specify the matters involved, the completion requirements and conditions, and the deadline, and shall be written in Chinese. If the notice is used to report an incident, it shall state the time, place, process, cause and result of the incident and provide evidence. In the case of a correction notice, specific errors or defects shall also be indicated.

(b) A notice sent under this Agreement shall be deemed to be served validly ("Service") if any of the following conditions are satisfied:

(i) if sent by electronic communication, the notice shall be deemed to be validly served on the day when the email is successfully sent actually or as indicated;

(ii) if delivered by a person, the notice shall be deemed to be validly served on the date of delivery by the person;

(i) if sent by registered mail, the notice shall be deemed to be validly served on the seventh day after the date of mailing (by postmark);

(iv) if sent by courier, the notice shall be deemed to be validly served on the third day after the delivery of it to the courier service.

(c) In the case of any of the above-mentioned services, if the recipient informs the sender on the day following the date of service and expressly indicates that no notice has been received, the notice shall be deemed not to have been served and the Parties shall immediately negotiate and determine to resend the notice ("Resent Notice").The above mentioned service rules shall still be applicable to the Resent Notice. In the event that any notice cannot be severed due to untrue or inaccurate address provided by the recipient, or although the notice has been served, the recipient fails to accept process or understand the notice in a timely manner, resulting in the failure of the purpose of the notice and losses to the recipient ("Failure of Notice"), the recipient shall bear all losses; if the sender suffers any loss due to the Failure of Notice, the sender shall have the right to obtain compensation from the recipient.

**Article 8.07 Integrity**

This Agreement shall constitute the entire agreement among the Parties with respect to the subject matter hereof and this Agreement shall have the legal effect of replacing any prior written or oral agreement among the Parties on the subject matter hereof.

**Article 8.08 Severability**

If any terms or provisions of this Agreement are deemed to be invalid or unenforceable in any jurisdiction, such terms or provisions shall be void only in such

invalid or unenforceable scope, and the remainder shall not be affected and remain in full force and effect. The invalidity and unenforceability of any provision in a jurisdiction shall not affect its legal effect in other jurisdictions. It shall remain in full force and effect in other jurisdictions. In addition, if any provision of this Agreement is deemed to be invalid or unenforceable and will become effective or enforceable in case of deletion part thereof, then such provision shall be modified to the extent necessary to make it effective and enforceable.

### Article 8.09 Independent Clause

The provisions on the liability for breach of contract, confidentiality, notice, governing law and dispute resolution hereof shall have fully independent legal effect. The invalidity, cancellation or termination of the entire (or part) of this Agreement shall not affect the legal effect of such provisions, which shall continue to be valid.

### Article 8.10 Headings

Any headings in this Agreement are for convenience of reading only and do not constitute a summary or explanation of any of the terms of this Agreement, nor do they have any effect on the interpretation of any terms.

### Article 8.11 Languages

This Agreement is written, interpreted, retained and performed in the Simplified Chinese version of the People's Republic of China. Any Party may translate it into any other language according to the respective needs. However, in the event of any conflict, inconsistency or discrepancy in the writing, interpretation, and performance of the terms in any other language and in the language of this Agreement, the Chinese version shall prevail.

### Article 8.12 Governing Law and Dispute Resolution

This Agreement, any transaction, action, conduct or arrangement under this Agreement, and all rights and obligations of the Parties under this Agreement shall be governed by the laws of the People's Republic of China and shall be construed in accordance with such laws.

In the event of any dispute arising from this Agreement, any Party shall have the right to file litigation with the People's Court of competent jurisdiction at the place where this Agreement is signed.

### 8.13

This Agreement is made in eight originals with each Party holding one (1) original, and the remaining (2) originals shall be used for registration with the registration authority (if required), each of which shall have the same legal effect.

(The remainder is left blank intentionally)

**(Signature Page of the Equity Transfer Agreement)**

Signed by**: Shanghai Zheyun Business Consulting Partnership (Limited Partnership) (Official Seal)**

signature:

Position:

Signatory: Wu Meng

signature:

Signed by**: Beijing Dongfang Cheyun Information Technology Co., Ltd. (official seal)**

signature:

Position:

Signed by**: LETV Holdings (Beijing) Co., Ltd. (official seal)**

signature:

Position:

Signed by**: Taoyun Capital Group Co., Ltd. (official seal)**

signature:

Position:

Signed by: Jia Yueting

signature:



Case 2:19-bk-24804-VZ    Doc 562    Filed 04/03/20    Entered 04/03/20 20:44:50    Desc
Main Document    Page 51 of 127

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document entitled (*specify):* **DEBTOR'S NOTICE OF OBJECTION AND OBJECTION TO CLAIM 54 FILED BY BEIJING LAN CAPITAL INVESTMENT LLP aka BLUE GIANT; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF YUETING JIA AND SHAN HE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **April 2, 2020,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **April 2, 2020,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

United States Bankruptcy Court
Central District of California
Attn:  Hon. Vincent Zurzolo
Edward R. Roybal Federal Bldg./Courthouse
255 East Temple Street, Suite 1360
Los Angeles, CA  90012

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 2, 2020    Nancy H. Brown | /s/ Nancy H. Brown |
|---|---|
| *Date*          *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                        **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:328782.1 46353/002

## SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ

### 1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)

- Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com
- Jerrold L Bregman    ecf@bg.law, jbregman@bg.law
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Lei Lei Wang Ekvall    lekvall@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Stephen D Finestone    sfinestone@fhlawllp.com
- Richard H Golubow    rgolubow@wghlawyers.com, pj@wcghlaw.com;jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com
- Ben H Logan    blogan@omm.com
- Robert S Marticello    Rmarticello@swelawfirm.com, gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- David W. Meadows    david@davidwmeadowslaw.com
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Victor A Sahn    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Felix T Woo    fwoo@ftwlawgroup.com, admin@ftwlawgroup.com
- Claire K Wu    ckwu@sulmeyerlaw.com, mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- David B Zolkin    dzolkin@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

DOCS_LA:328782.1 46353/002

**F 9013-3.1.PROOF.SERVICE**

Fill in this information to identify the case:

Debtor 1    Yueting Jia

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:    Central District of California

Case number    2:19-bk-24804-VZ

Filed: USBC - Central District of California
Yueting Jia    (B10)
19-24804 (VPZ)

**YT1**

0000000054

**RECEIVED**

JAN 2 4 2020

**LEGAL SERVICES**

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Beijing Lan Capital Investment Fund Management LLP (a.k.a. Blue Giant)
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Jie Feng
Name
12 Floors, Block AB, Wantong Center, No.6 Chaowai St., Chaoyang District
Number        Street
Beijing                                          1000005
City                    State                    ZIP Code

Contact phone  +86 15801607199

Contact email  fengjie0201@126.com

Where should payments to the creditor be sent? (if different)

_____
Name
_____
Number        Street
_____
City                    State                    ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____        Filed on _____
                                                                                              MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $_____77,273,920.10__   Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Personal Guarantee

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $_____

Amount of the claim that is secured:    $_____

Amount of the claim that is unsecured:  $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Yes. *Check one:*

Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.

$_____

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/21/2020
                   MM / DD / YYYY

JIE FENG
    Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Jie | | Feng |
| | First name | Middle name | Last name |
| Title | Project Manager | | |
| Company | TWC Group Co., Ltd | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 12 Floors, Block AB, Wantong Center, No.6 Chaowai St., Chaoyang District | | |
| | Number        Street | | |
| | Beijing | | |
| | City | State | ZIP Code |
| Contact phone | +86 15801607199 | Email | fengjie0201@126.com |

# Exhibit 1 – Itemized List of Claim Amount

The items included in Beijing Lan Capital Investment Fund Management LLP 's claim of $ 77,273,920.10 are as follow:

$ 28,973,400.00 Principal,

$ 48,300,520.10 Interest.

# Exhibit 2 –Investor Rights Agreement

**DRAFT VERSION**

### INVESTOR RIGHTS AGREEMENT

among

### BEIJING LAN CAPITAL INVESTMENT FUND MANAGEMENT LLP,

### LEVIEW MOBILE & INTELLIGENT INFORMATION TECHNOLOGY (BEIJING) CO., LTD.,

### LEVIEW MOBILE LTD..,

### LE LTD.,

and

### YUETING JIA

Dated May 18, 2015

**TABLE OF CONTENTS**

SECTION 1 INTERPRETATION ................................................................................ 4

SECTION 2 CONDITIONS PRECEDENT TO COMPLETION ................................. 10

SECTION 3 OBLIGATIONS OF THE COMPANY, THE OWNER AND THE
INVESTOR BETWEEN EXECUTION AND COMPLETION ................................... 11

SECTION 4 REPRESENTATIONS AND WARRANTIES ........................................ 12

SECTION 5 INVESTOR RIGHTS............................................................................ 13

SECTION 6 CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS ....... 26

SECTION 7 FEES AND EXPENSES ........................................................................ 27

SECTION 8 INDEMNIFICATION .......................................................................... 27

SECTION 9 TERMINATION .................................................................................. 28

SECTION 10 NOTICES .......................................................................................... 29

SECTION 11 MISCELLANEOUS .......................................................................... 29

SECTION 12 GOVERNING LAW AND DISPUTE RESOLUTION ......................... 32

**SCHEDULES**

SCHEDULE 1  SHAREHOLDING STRUCTURE OF THE GROUP

SCHEDULE 2  COLLECTIVE WARRANTIES

SCHEDULE 3  INVESTOR WARRANTIES

**INVESTOR RIGHTS AGREEMENT** (this "Agreement") made on April 13, 2015,
**AMONG:**

(1)  **LEVIEW MOBILE & INTELLIGENT INFORMATION TECHNOLOGY
(BEIJING) CO., LTD.** (乐视移动智能信息技术（北京）有限公司), a
company organized and existing under the laws of China with its registered
office at No. 2, Linkong Erlu, Wenhuaying Country, Gaoliying Town, Shunyi
District, Beijing, PRC (the "Borrower");

(2)  **LEVIEW MOBILE LTD.**, an exempted company incorporated and existing
under the laws of the Cayman Islands with its company number 296318 and
registered office at Sertus Chambers, P.O. Box 2547, Cassia Court, Camana
Bay, Grand Cayman, Cayman Islands (the "Company");

(3)  **LE LTD.**, an exempted company incorporated and existing under the laws of
the Cayman Islands with its company number 295848 and registered office at
Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman,
Cayman Islands (the "Cayman Co");

(4)  **YUETING JIA** (贾跃亭), holder of PRC Identification Card Number of
14262319731215081X, Linfen City, Shanxi Province, PRC (the "Owner"); and

(5)  **BEIJING LAN CAPITAL INVESTMENT FUND MANAGEMENT. LLP**
（北京蓝巨置业投资基金管理中心（有限合伙）），a company organized
and existing under the laws of China with its registered office at 1607,E1,
Oriental Plaza,No.1 DONG Chang`an Street,Dongcheng
District,Beijing,PRC(the "Investor").

**RECITALS:**

(A) The Investor intends to invest into the Company or the Cayman Co;

(B) To facilitate the investment by the Investor in the Company or the Cayman Co,
prior to or on the date of the execution of this Agreement, the Borrower, the
Investor and the affiliates of the Investor entered into an loan agreement (the "Loan
Agreement"), pursuant to which the Investor and its affiliates will offer certain loan
with a principal amount of RMB[310, 000, 000. 00] (the "Debt") for 3years;

(C) The Parties desire to enter into this Agreement and make the respective
representations, warranties, covenants and agreements set forth herein on the terms
and conditions set forth herein.

**AGREEMENT:**

3

**SECTION 1**
**INTERPRETATION**

1.1  <u>Definitions</u>. In this Agreement, unless the context otherwise requires the
following words and expressions have the following meanings:

"<u>Accounting Standards</u>" means the International Financial Reporting Standards
(IFRS) or the Accounting Principles Generally Accepted in China (Chinese
GAAP) adopted by the Company and applied on a consistent basis.

"<u>Affiliate</u>" of a Person (the "<u>Subject Person</u>") means (a) in the case of a Person
other than a natural person, any other Person that directly or indirectly Controls,
is Controlled by or is under common Control with the Subject Person and (b) in
the case of a natural person, any other Person that directly or indirectly is
Controlled by the Subject Person or is a Relative of the Subject Person. In the
case of an Investor, the term "<u>Affiliate</u>" includes (v) any shareholder of the
Investor, (w) any of such shareholder's general partners or limited partners, (x)
the fund manager managing such shareholder (and general partners, limited
partners and officers thereof) and (y) trusts controlled by or for the benefit of
any such individuals referred to in (v), (w) or (x).

"<u>Basic Documents</u>" means this Agreement, the Loan Agreement, the Company
Charter Documents and the Onshore Contracts.

"<u>Big Four Accounting Firms</u>" means Deloitte Touche Tohmatsu Limited,
PricewaterhouseCoopers, Ernst & Young Global Limited and Klynveld Peat
Marwick Goerdeler.

"<u>Board</u>" means the board of directors of the Company as from time to time
constituted.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on
which commercial banks in the PRC, HKSAR or Cayman Islands are required
or authorized by law or executive order to be closed or on which a tropical
cyclone warning no. 8 or above or a "black" rainstorm warning signal is hoisted
in HKSAR at any time between 9:00 a.m. and 5:00 p.m. Hong Kong time.

"<u>BVI Co</u>" means Lele Holding Ltd., a business company incorporated and
existing under the laws of the British Virgin Islands with its company number
1859050 and registered office at P.O. Box 905, Quastisky Building, Road Town,
British Virgin Islands.

"<u>China</u>" or the "<u>PRC</u>" means the People's Republic of China and for the purpose
of this Agreement shall exclude HKSAR, Taiwan and the Macau Special
Administrative Region.

"<u>Collective Warranties</u>" means the representations, warranties and undertakings
of the Company and the Owner set forth in <u>Schedule 2</u>.

4

"Company Charter Documents" means the Memorandum of Association and Articles of Association of the Company.

"Control" of a Person means (a) ownership of more than 50% of the shares in issue or other equity interests or registered capital of such Person or (b) the power to direct the management or policies of such Person, whether through the ownership of more than 50% of the voting power of such Person, through the power to appoint a majority of the members of the board of directors or similar governing body of such Person, through contractual arrangements or otherwise.

"Encumbrance" means (a) any mortgage, charge (whether fixed or floating), pledge, lien (other than lien created by operation of law), hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, and (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person.

"Event of Default" has the meaning set forth in Section 5.1(b)(i) of this Agreement.

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital or joint venture or other ownership interest.

"Existing Business" means the business of researching, designing, developing, manufacturing, selling and marketing of mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Governmental Authority" means any nation or government or any province or state or any other political subdivision thereof; any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality or any political subdivision thereof, any court, tribunal or arbitrator, the governing body of any securities exchange and any other self-regulatory organization.

"Group" means collectively the BVI Co, the Cayman Co, the Company, the HK Co, the WFOE (upon its incorporation) the Onshore Companies and any other Person in which the BVI Co, the Cayman Co, the Company, the HK Co or the WFOE directly or indirectly owns a majority interest and "Group Member" means any of them.

"HK Co" means Leview Mobile HK Limited, a limited company incorporated and existing under the laws of HKSAR with its company number 2205943 and registered office at RM 504, 5/F Valley Centre, No. 80-82 Morrison Hill Road, Wanchai, HKSAR.

"HKSAR" means the Hong Kong Special Administrative Region of the PRC.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Issuance Date" means the date on which the Investor and its affiliates disburse the loan to the Borrower pursuant to the Loan Agreement.

"Investor Warranties" means the representations, warranties and undertakings of the Investor set forth in Schedule 3.

"Lefeng Mobile" means Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司), a company incorporated under the laws of the PRC.

"Maturity Date" means the third-year anniversary of the Issuance Date.

"Mortgaged Shares" means (i) 4000 Ordinary Shares owned by the Cayman Co in the Company on the date of the closing of the Debt's conversion into the Convertible Debt, if applicable, and (ii) any shares acquired in respect of Mortgaged Shares by reason of a stock split, stock dividend, reclassification or otherwise.

"Onshore Companies" means Beijing Pala Culture & Media Co., Ltd. (北京百乐文化传媒有限公司), Lefeng Mobile and the Borrower, which incorporated under the laws of the PRC, and "Onshore Company" means any of them.

"Onshore Contracts" means agreements to be entered into between the WFOE, Lefeng Mobile, the Owner or any of their Affiliates, including an exclusive consulting and services agreement, an exclusive call option agreement, an equity pledge agreement, a voting right proxy agreement and a business operation agreement, each in the form and the substance reasonably satisfactory to the Investor.

"Ordinary Shares" means the ordinary shares having a par value of US$0.0001 per share in the capital of the Company.

6

"<u>Party</u>" or "<u>Parties</u>" means any signatory or the signatories to this Agreement and any Person who subsequently becomes a party to this Agreement pursuant to the terms and conditions hereof.

"<u>Person</u>" means any natural person, firm, company, governmental authority, joint venture, partnership, association or other entity (whether or not having separate legal personality).

"<u>Redemption Date</u>" has the meaning set forth in Section 5.1(c)(ii) of this Agreement.

"<u>Related Party</u>" means (a) any shareholder of any Group Member, (b) any director of any Group Member, (c) any officer of any Group Member, (d) any Relative of a shareholder, director or officer of any Group Member, (e) any Person in which any Group Member, any shareholder, director or officer of any Group Member has any interest other than a passive shareholding of less than five percent in a publicly listed company, or over which a Related Party exercises Control or significant influence through contractual arrangements, voting, management or directorship position or ownership, and (f) any other Affiliate of any Group Member.

"<u>Redemption Price</u>" has the meaning set forth in Section 5.1(c)(iii) of this Agreement.

"<u>Relevant Securities</u>" means Qualified Financing Securities or other securities into which the Debt or the Convertible Debt may be convertible.

"<u>Qualified Financing</u>" means any issue of preferred shares or equity-linked convertible debt securities of the Company after the Issuance Date but on or before the Maturity Date to institutional investors (other than the Investor) on terms and conditions that would be reasonably acceptable to prudent, sophisticated investors in light of the circumstances, or any other issuance of equity securities of the Company after Issuance Date.

"<u>Qualified Financing Securities</u>" means the securities to be issued by the Company in connection with the Qualified Financing.

"Qualified IPO" mean Initial Public Offerings of the option and other securities (or shares or other securities of related enterprises instituted by any merger, restructuring or other plans for the purpose of Initial Public Offerings as appropriate) of the Company.

"<u>Relative</u>" of a natural person means the spouse of such person, and any parent, grandparent, child, grandchild, sibling, uncle, aunt, nephew, or niece of such person or such person's spouse.

"<u>Restructuring</u>" means the restructuring the result of which (i) is the corporate structure set forth in <u>Schedule 1A</u> hereof as of the date of this Agreement and as of the Issuance Date respectively; and (ii) will be the corporate structure set forth in <u>Schedule 1B</u> hereof within the timeframe after the Issuance Date agreed

upon by the Investor, the Owner and the Company in this Agreement."RMB" means the renminbi yuan, the lawful currency of the PRC.

"US$" means United States Dollars, the lawful currency of the United States of America.

"Warranties" means the Collective Warranties and the Investor Warranties.

"WFOE" means Lesai Mobile Technology (Beijing) Co., Ltd. (乐赛移动科技（北京）有限公司), a wholly foreign-owned enterprise to be organized and existing under the laws of China.

1.2    Terms Defined Elsewhere in this Agreement.  The following terms are defined in this Agreement as follows:

| | |
|---|---|
| "Agreement" | Preamble |
| "Borrower" | Preamble |
| "Breach" | Section 5.1(b)(i)(3) |
| "Company" | Preamble |
| "Cayman Co" | Preamble |
| "Confidential Information" | Section 6.1 |
| "Convertible Debt" | Section 5.2(a)(i)(1) |
| "Convertible Notice" | Section 5.2(c)(i) |
| "Default Notice" | Section 5.1(b)(iii) |
| "Disposed Shares" | Section 5.4(a) |
| "Disposition" | Section 5.4(a) |
| "Disposition Notice" | Section 5.4(a) |
| "Dispute" | Section 12.2(a) |
| "Election Period" | Section 5.3(d) |
| "Financing Terms" | Section 6.1 |
| "HKIAC" | Section 12.2(a) |
| "Indemnified Party" | Section 8.1 |
| "Indemnifying Party" | Section 8.1 |
| "Investor" | Preamble |
| "Losses" | Section 8.1 |
| "Loan Agreement" | Recitals |
| "Debt" | Recitals |
| "New Securities" | Section 5.3(a) |
| "Observer" | Section 5.7 |
| "Owner" | Preamble |
| "Preemptive Right" | Section 5.3(a) |
| "Pro Rata Share" | Section 5.3(b) |
| "Redemption Notice" | Section 5.1(a) |
| "Redemption Request" | Section 5.1(c)(i) |
| "Representatives" | Section 6.1 |
| "Tag-along Right" | Section 5.4(a) |
| "Tag-along Shares" | Section 5.4(b) |
| "Transaction" | Section 5.2(f) |
| "Valuation" | Section 5.2(b)(i)(3) |

8

1.3    Interpretation.

(a)    <u>Directly or Indirectly</u>. The phrase "<u>directly or indirectly</u>" means directly, or indirectly through one or more intermediate Persons or through contractual or other arrangements, and "<u>direct or indirect</u>" has the correlative meaning.

(b)    <u>Gender and Number</u>. Unless the context otherwise requires, all words (whether gender-specific or gender neutral) shall be deemed to include each of the masculine, feminine and neuter genders, and words importing the singular include the plural and vice versa.

(c)    <u>Headings</u>. Headings are included for convenience only and shall not affect the construction of any provision of this Agreement.

(d)    <u>Include not Limiting</u>. "<u>Include</u>," "<u>including</u>," "<u>are inclusive of</u>" and similar expressions are not expressions of limitation and shall be construed as if followed by the words "<u>without limitation</u>."

(e)    <u>Law</u>. References to "<u>law</u>" shall include all applicable laws, regulations, rules and orders of any Governmental Authority, securities exchange or other self-regulating body, any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment; and "<u>lawful</u>" shall be construed accordingly.

(f)    <u>References to Documents</u>. References to this Agreement include the Schedules and Exhibits, which form an integral part hereof. A reference to any Section, Schedule or Exhibit is, unless otherwise specified, to such Section of, or Schedule or Exhibit to this Agreement. The words "<u>hereof</u>," "<u>hereunder</u>" and "<u>hereto</u>," and words of like import, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular Section hereof or Schedule or Exhibit hereto. A reference to any document (including this Agreement) is to that document as amended, consolidated, supplemented, novated or replaced from time to time.

(g)    <u>Time</u>. If a period of time is specified and dates from a given day or the day of a given act or event, such period shall be calculated exclusive of that day.

(h)    <u>Writing</u>. References to writing and written include any mode of reproducing words in a legible and non-transitory form including emails and faxes.

(i)    <u>Language</u>. This Agreement is drawn up in the English language. If this Agreement is translated into any language other than English, the English language text shall prevail.

9

## SECTION 2
## CONDITIONS PRECEDENT TO COMPLETION

2.1     <u>Conditions Precedent to Obligations of Investor at Completion</u>.  The obligation
of the Investor to complete the loan at the Issuance Date is subject to the
fulfillment, prior to or simultaneously with the Issuance Date, of the following
conditions, any one or more of which may be waived by the Investor in writing,
*provided* that if any of the following conditions is waived by the Investor on or
before the Issuance Date, the Company, the Owner and the Borrower shall
cause such conditions to be fulfilled promptly after the Issuance Date if
requested by the Investor in writing:

(a)     the Collective Warranties remaining true and correct in all material
respects on the Issuance Date as provided in Section 4.5, except for
those representations and warranties that already contain any materiality
qualification, which representations and warranties, to the extent already
so qualified, shall instead be true and correct in all respects as so
qualified as of the Issuance Date;

(b)     each of the Group Members, the Onshore Companies and the Owner
having performed and complied in all material respects with all of its
agreements and obligations contained in the Basic Documents to which
it is a party that are required to be performed or complied with by it on
or before the Issuance Date;

(c)     the Investor having completed its business, legal and financial due
diligence review of the Company and its subsidiaries and the results of
that review shall be satisfactory to the Investor;

(d)     each of the Group Members and the Onshore Companies having duly
attended to and carried out all corporate procedures that are required
under the laws of its place of incorporation or establishment to effect its
execution, delivery and performance of the Basic Documents to which it
is a party, and the transactions contemplated hereby and thereby;

(e)     all consents and approvals of, notices to and filings or registrations with
any Governmental Authority or any other Person required to
consummate the transactions contemplated under this Agreement and
the other Basic Documents (to the extent that such transactions are to be
completed on or prior to the Issuance Date), shall have been obtained or
made (including all required approvals for the Restructuring and all
required approvals and registration of the establishment of the WFOE
and the direct or indirect ownership by any PRC residents of an interest
in the Company including registrations pursuant to the Notice on
Relevant Issues Concerning Foreign Exchange Control on Domestic
Residents' Corporate Financing and Roundtrip Investment through
Offshore Special Purpose Vehicles issued by State Administration of
Foreign Exchange on July 4, 2014 and any subsequent similar rules,
amendments or supplements of the PRC) and copies thereof having been
provided to the Investor;

10

(f)    there being no Governmental Authority or other Person that has:

    (i)    instituted or threatened in writing any legal, arbitral or administrative proceedings against the Owner, any Group Member, or the Onshore Companies to restrain, prohibit or otherwise challenge the loan by the Investor or any of the other transactions contemplated under the Basic Documents (including without limitation, the Restructuring); or

    (ii)    proposed or enacted any statute or regulation which would prohibit, materially restrict or materially delay implementation of the transactions contemplated under the Basic Documents (including without limitation, the Restructuring), or the operation of the Group as a whole after the Issuance Date as contemplated in the Basic Documents;

2.2    <u>Conditions Precedent to Obligations of Company at Completion</u>.  The Company's obligation to procure the Borrower to complete the issuance of the loan at the Issuance Date is subject to the fulfillment, prior to or simultaneously with the Issuance Date, of the following conditions, any one or more of which may be waived by the Company or the Borrower:

(a)    the Investor Warranties remaining true and correct in all material respects on the Issuance Date as provided in Section 4.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Issuance Date;

(b)    the Investor having performed and complied in all material respects with all of its agreements and obligations contained in this Agreement and the other Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Issuance Date;

(c)    the Investor having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party, and the transactions contemplated hereby and thereby; and

(d)    each of the Basic Documents to which an Investor is a party having been executed by the Investor and delivered to the Company or the Borrower.

**SECTION 3**
**OBLIGATIONS OF THE COMPANY, THE OWNER AND THE**
**INVESTOR BETWEEN EXECUTION AND COMPLETION**

3.1    <u>Notices of Breaches by the Company, the Borrower and the Owner</u>.  From the date hereof until the Issuance Date, except as disclosed in the Basic Documents or otherwise as contemplated thereunder, the Company and the Borrower shall,

and the Company and the Owner shall cause each of the other Group Members and Onshore Companies to, conduct its respective business in a manner so as to ensure that the Collective Warranties continue to be true and correct on and as of the Issuance Date as if made on and as of Issuance Date. The Company, the Borrower and the Owner shall give the Investor prompt notice of any event, condition or circumstance occurring prior to the Issuance Date that would constitute a breach of any Collective Warranty if such Collective Warranty were made as at any date between the date hereof and the Issuance Date, or that would constitute a breach of any terms and conditions contained in this Agreement.

3.2     Business Operation. From the date hereof until the Issuance Date, the Company and the Owner shall, and shall cause each other Group Member or the Borrower where applicable to, (i) carry on their respective business in the ordinary course; (ii) comply in all material respects with all applicable law and other requirements relating to the operation of their respective businesses; and (iii) with no less diligence and efforts that would be applied in the absence of the transactions contemplated hereunder.

3.3     Notifications. Until the Issuance Date, each Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 2 becoming incapable of being satisfied.

3.4     Further Action. The Parties shall use all reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

## SECTION 4
## REPRESENTATIONS AND WARRANTIES

4.1     Collective Warranties. The Company, the Cayman Co, the Borrower and the Owner, severally and jointly, represent, warrant and undertake to the Investor in the terms of the Collective Warranties and acknowledge that the Investor in entering into this Agreement is relying on such Collective Warranties.

4.2     Investor Warranties. The Investor represents, warrants and undertakes to the Company in the terms of the Investor Warranties and acknowledges that the Company in entering into this Agreement is relying on the Investor Warranties.

4.3     Knowledge of Claims. No investigation by or on behalf of any Party shall prejudice any claim made by such Party under the indemnity contained in Section 8 or operate to reduce any amount recoverable thereunder, provided that a Party shall have no liability for (i) any breach of or inaccuracy in the Warranties made by such Party to the extent the Indemnified Party has actual knowledge, at or prior to the Issuance Date of such breach or inaccuracy, (ii)

12

any breach of or failure to perform any covenant or obligations of such Party which are required to be performed at or prior to the Issuance Date hereunder, to the extent that the Indemnified Party has actual knowledge, at or prior to the Issuance Date of such breach or failure.

4.4    Separate and Independent. The Collective Warranties shall be separate and independent and save as expressly provided shall not be limited by reference to any other paragraph or anything in this Agreement or the Schedules.

4.5    Bring-Down to Completion. The Warranties shall be deemed to be repeated as at the Issuance Date as if they were made on and as of the Issuance Date, other than such Warranties as are made specifically as of another specified date, which shall be true and correct as of such date, and all references therein to the date of this Agreement were references to the Issuance Date.

4.6    Survival of Warranties. All of the Warranties shall survive the Issuance Date for a period of 18 months after the Issuance Date, *provided* that the warranties set forth in Sections 2, 10 and 12 of Schedule 2 and Sections 2 and 4 of Schedule 3 should survive indefinitely.

## SECTION 5
## INVESTOR RIGHTS

5.1    Redemption.

(a)    Redemption on Maturity. The Investor shall have the right to require the Borrower to redeem the Debt on the Maturity Date or upon or immediately following the second-year anniversary of the Issuance Date at the Redemption Price (defined as below) by delivering a prior written notice (the "Redemption Notice") to the Borrower following the Redemption Procedure set forth in Section 5.1(c).

(b)    Redemption on Event of Default.

(i)    The occurrence of any one or more of the following events shall constitute an "Event of Default":

(1)    the Borrower or the Company shall fail to pay debt that is due and payable or any other amount (if any) when due in accordance with the terms hereof;

(2)    the change of actual controller of the Company or the Borrower;

(3)    any representation, warranty, covenant, undertaking, certification or statement made by or on behalf of the Company or the Borrower in any Basic Documents or in any certificate or other document delivered pursuant thereto shall have been materially incorrect, misleading or false in any material respect when made (a "Breach")

13

and, if capable of being remedied, has not been remedied within thirty (30) days after being notified in writing of such Breach by the Investor; provided that such Breach has caused or is likely to cause a material adverse change on the business of the Group as a whole or on the rights and liabilities of the Investor under the Basic Documents;

(4)    any breach of the undertakings and covenants as specified in Sections 5.5, 5.6, 5.7 and 5.8 of this Agreement.

(5)    the Company, the Borrower or any of their respective significant or material Affiliates shall commence any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to any Group Member, or seeking to adjudicate any Group Member bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to any Group Member or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for any Group Member or for all or any substantial part of its assets;

(6)    the involuntary delisting of Leshi Internet Information Technology Corp., Beijing (乐视网信息技术（北京）股份有限公司, 300104.CH);

(7)    the Company shall fail to deliver the Relevant Securities when such Relevant Securities are required to be delivered following conversion of the Debt or the Convertible Debt (defined as below) in accordance with the terms hereof.

(ii)    Upon the occurrence of an Event of Default, the Company shall give the Investor a prompt notice of the occurrence of such Event of Default.

(iii)    Upon the occurrence and during the continuance of an Event of Default, the Investor may, by notice in writing to the Borrower (the "<u>Default Notice</u>"), request the Event of Default to be remedied within ten (10) Business Days or other time the Investor may deem to be reasonable.

(iv)    Upon the Borrower's or any of its applicable Affiliates' failure to remedy the default in accordance with the Default Notice, the Investor shall be entitled to declare the Debt in whole, and require the Borrower to redeem the Debt on the Redemption Date at the Redemption Price by delivering a Redemption Notice

14

to the Borrower following the Redemption Procedure set forth in
Section 5.1(c).

(c)    Redemption Procedures.

(i)    On or before the Redemption Date, the Investor shall surrender a
request for redemption (the "Redemption Request") to the
Borrower, in the manner and at the place designated in the
Redemption Notice. Upon the surrender of the Redemption
Request to the Borrower, the applicable Redemption Price shall
be payable to the order of the Investor.

(ii)    The Redemption Date for Section 5.1(a) shall be Maturity Date
or the second-year anniversary of the Issuance Date, as the case
may be, and for Section 5.1(b) shall be 3rd Business Day after the
date of Redemption Notice.

(iii)    The Investor upon exercise of its redemption right shall have the
right to redeem the Debt at the Redemption Price, which is
calculated as the total outstanding principal amount with respect
to the Debt, plus any accrued and unpaid interest at 15% per
annum calculated by using the then outstanding principal amount
multiplied by actual number of days elapsed since the Issuance
Date divided by 365 days; the payment is to be made by cash,
and the Investor may request for the cash payment to come from
the Owner or other companies and institutions designated by the
Owner.

(iv)    The payment shall become due and payable on the Redemption
Date, and calculated from and including the Issuance Date until
the payment date, plus any accrued and unpaid interest.

(v)    If prior to the Maturity Date the Investor is unable to exercise its
right to convert the Debt into any shares in the Company or the
Cayman Co, as the case may be, as the result of the non-
occurrence e of any Qualified Financing for a reason attributable
to the Borrower, the Company, the Cayman Co or the Owner, the
Investor upon exercise of its redemption right shall have the right
to redeem the Debt at a new redemption price, which is
calculated as the total outstanding principal amount with respect
to the Debt, plus any accrued and unpaid interest at 25% per
annum calculated by using the then outstanding principal amount
multiplied by actual number of days elapsed since the Issuance
Date divided by 365 days; the payment is to be made by cash,
and the Investor may request for the cash payment to come from
the Owner or other companies and institutions designated by the
Owner.

(vi)    If the Investor, at its own election, does not exercise its right to
convert the Debt which the Investor may subscribe prior to the

15

Qualified Financing into preferred shares of the Company or the Cayman Co or subscribe or receive any shares of the Company or the Cayman Co on the Qualified Financing prior to the Maturity Date as provided in Section 5.2(a)(i), the Investor shall be entitled to redeem the Debt at the Redemption Price in accordance with Section 5.1(c)(iii).

5.2    <u>Conversion</u>.

(a)    <u>General</u>.

(i)    After the Issuance Date, the Investor shall have the right to, or have one of its qualified offshore Affiliates to:

(1)    convert the Debt into certain convertible Debts (the "<u>Convertible Debt</u>") to be issued by the Company, which may be, at the election of the Investor, converted into preferred shares of the Company or the Cayman Co at any time agreed by the Parties prior to any Qualified Financing in accordance with this Section 5.2; or

(2)    directly convert the Debt into certain preferred shares of the Company or the Cayman Co on the Qualified Financing.

(ii)    Upon the Investor's exercise of its right to convert the Debt into the Convertible Debt, the Mortgaged Shares shall be mortgaged to the Investor for the benefit of the Investor to secure the payment and other obligations of the Company under the applicable transaction documents.

(iii)    Upon the Investor's exercise of its right to directly convert the Debt into preferred shares of the Company or the Cayman Co on a Qualified Financing, the Investor agrees to invest certain amount of cash in a foreign currency (the "<u>Investment Consideration</u>") into the Company or the Cayman Co in exchange for certain number of preferred shares of the Company or the Cayman Co, and upon the receipt of the Investor Consideration, the Borrower undertakes and covenants to, or the Company and the Owner shall cause the Borrower to, subject to the compliance with applicable PRC laws and the agreement of parties on the details:

(1)    use the Investment Consideration to redeem the Note and release the Investor's payment obligation under the Note; or

(2)    use other funds to redeem the Note and release the Investor's obligation under the Note, the amount of which shall be equal to the Investment Consideration.

16

    (iv)    The Owner and the Cayman Co undertake, and shall procure to the extent permitted by law, that the Investor shall enjoy the same rights set forth under this Section 5, in the event that the Debt or the Convertible Debt held by the Investor is converted to the Cayman Co shares, at the election of the Investor, on the Qualified Financing as specified under this Section 5.2.

(b)    <u>Conversion on Qualified Financing</u>. The Investor shall be entitled to exercise its right of conversion as specified under this Section 5.2(b).

    (i)    Should a Qualified Financing occur prior to the Maturity Date, the Investor shall have the right, but not the obligation, to convert the then outstanding amount owing under Debt or the Convertible Debt, in whole, into preference shares subject to Section 5.2(c) in accordance with the method as follows:

    (1)    if converted to the Company shares:

<u>outstanding principal amount x (1 + 15% x actual days elapsed since Issuance Date /365)</u>

85% x per share price as at the Company's Qualified Financing

    (2)    if converted to Cayman Co shares and by then Cayman Co has had a first Qualified Financing:

<u>outstanding principal amount x (1 + 15% x actual days elapsed since Issuance Date /365)</u>

85% x per share price as at Cayman Co's first Qualified Financing

or

    (3)    if converted to Cayman Co shares and by then the Cayman Co has not had a first Qualified Financing, the Investor shall negotiate with the Owner of the valuation (the "<u>Valuation</u>") of Cayman Co and the shares shall be calculated as follows:

<u>outstanding principal amount x (1 + 15% x actual days elapsed since Issuance Date /365)</u>

85% x per share price as at the Valuation

    (ii)    Within 30 Business Days after the request of the Investor, the Owner shall procure that the Company shall deliver to the Investor all legal, financial and business information, the final form of the transaction documents with respect to the financing, and such other materials related thereto that may be reasonably requested by the Investor.

    (iii)    Except for Section 5.2(b)(i)(3), Qualified Financing Securities issued to the Investor upon conversion of the Debt or the Convertible Debt shall be identical with respect to rights, preferences and designations as, and shall rank *pari passu* with,

the Qualified Financing Securities issued to the investors in the Qualified Financing and Investor shall otherwise be entitled to rights under the applicable Qualified Financing definitive documents, as the case may be, on parity with the investors thereunder.

(c)    Conversion Procedures.

(i)    Subject to compliance with the procedures set forth in Section 5.2, the conversion rights set forth in this Agreement shall be exercised by the Investor at any time during usual business hours on a Business Day, at the registered office of the Company (or such other office or agency of the Company as the Company and the Investor may agree), accompanied by a conversion notice (the "Convertible Notice") specifying (i) that the Investor elects to convert the entire Debt or the Convertible Debt and (ii) subject to the transfer restrictions as agreed, the name or names (with address) in which a certificate or certificates for the Relevant Securities are to be issued.

(ii)    As soon as practicable and in any event within 5 Business Days after the date of the Conversion Notice, the Company shall:

(1)    take all actions and execute all documents necessary to effect the issuance and to the extent the Relevant Securities are in the form of equity securities, registration of such Relevant Securities on the register of the Company (including, where applicable, giving all necessary instruction to the relevant share registry to effect such issuance) and deliver to the Investor certified copies of the register of members reflecting the Relevant Securities in the name of the Investor or its nominee or assignee, and

(2)    deliver to the Investor (x) where the Relevant Securities are in the form of equity securities, certificate(s) representing the number of validly issued, fully paid and non-assessable Relevant Securities calculated in accordance with Section 5.2, as the case may be and (y) where the Relevant Securities are in the form of equity-linked securities, certificate(s) representing the principal amount of Relevant Securities calculated in accordance with Section 5.2(b)(i)(1) or 5.2(b)(i)(2).

(d)    Fractional Shares. If the conversion of the Debt or the Convertible Debt would result in the issuance of any fractional share, the Company shall, at its option, round upwards and issue one additional share or pay to the Investor the portion of the principal amount convertible into such fractional share.

(e)   <u>Availability of Equity Securities</u>. The Company covenants that it will at all times reserve and maintain authority to issue the maximum number of Equity Securities issuable upon conversion of the Debt or the Convertible Debt. The Company covenants that all Equity Securities, when issued or delivered pursuant to Section 5.2(c), shall be duly and validly issued, shall rank *pari passu* with all other Equity Securities issued in the Qualified Financing, as the case may be, and where they are in the form of equity securities non-assessable, fully paid, free and clear of all Encumbrances, other than Encumbrances arising under the Basic Documents or created, imposed or agreed in writing by the Investor.

(f)   <u>Reorganization, Reclassification</u>. Subject to the terms of the applicable agreement with respect to the Debt or the Convertible Debt, in case of any merger, amalgamation, arrangement or consolidation of the Company or any capital reorganization, reclassification or other change of outstanding Ordinary Shares (each, a "<u>Transaction</u>"), the Company shall execute and deliver to the Investor at least 30 days prior to effecting such Transaction a certificate, signed by a director of the Company, stating that the rights of the Investor shall continue to be recognized and not prejudiced by the Transaction and appropriate provision shall be made therefor in the agreement, if any, relating to such Transaction. The provisions of this Section 5.2(f) and any equivalent thereof in any such certificate similarly shall apply to successive transactions.

(g)   <u>Legend</u>. The Investor shall agree to the imprinting, so long as required by law, of a legend on certificates representing all of the Investor's Relevant Securities issuable upon conversion of the Debt or the Convertible Debt in substantially the following form:

LEVIEW MOBILE LTD.. (THE "COMPANY") IS A COMPANY INCORPORATED UNDER THE LAWS OF THE CAYMAN ISLANDS, AND THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL NOT BE SOLD, ASSIGNED, TRANSFERRED, EXCHANGED, MORTGAGED, PLEDGED OR OTHERWISE DISPOSED OF OR ENCUMBERED WITHOUT COMPLIANCE WITH THE ARTICLES OF ASSOCIATION OF THE COMPANY, DATED FEBRUARY 3, 2015, AMONG THE COMPANY AND THE SHAREHOLDERS OF THE COMPANY, AS AMENDED AND RESTATED FROM TIME TO TIME. COPIES OF SUCH ARTICLES OF ASSOCIATION ARE ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES OR SECURITIES ISSUED UPON CONVERSION THEREOF ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF SUCH ARTICLES OF ASSOCIATION.

5.3   Preemptive Right.

(a)   The Company hereby grants to the Investor the right of first refusal to purchase the Investor's Pro Rata Share (as defined below), of all (or any part) of any Equity Securities (the "New Securities") that the Company may from time to time issue after the Issuance Date (the "Preemptive Right").

(b)   An Investor's "Pro Rata Share" for purposes of the Preemptive Right is the ratio of (a) the number of Ordinary Shares held by the Investor on or after the conversion, or, prior to the conversion, the number of Ordinary Shares that would have been held by the Investor as if the Debt or the Convertible Debt held by the Investor were converted into preferred shares, in each case, as if on a fully-converted basis immediately prior to the issuance of the New Securities (assuming full conversion of all preferred shares and full conversion or exercise of all outstanding convertible securities, rights, options and warrants held by the Investor), to (b) the total number of Ordinary Shares (including preferred shares on an as-converted basis and assuming that all outstanding options or warrants) then outstanding immediately prior to the issuance of New Securities (assuming full conversion of preferred shares and full conversion or exercise of all outstanding convertible securities, rights, options and warrants).

(c)   In the event the Company proposes to undertake an issuance of New Securities, it shall give the Investor written notice of its intention, describing the type of New Securities, and their price and the terms upon which the Company proposes to issue the same. The Investor shall have 10 days after any such notice is mailed or delivered to agree to purchase the Investor's Pro Rata Share of such New Securities and to indicate whether the Investor desires to exercise its Preemptive Right for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.

(d)   In the event the Investor fails to exercise fully the Preemptive Right, if any within said 10 day-period (the "Election Period"), the Company shall have 120 days thereafter to sell or enter into an agreement (pursuant to which the sale of New Securities covered thereby shall be closed, if at all, within 120 days from the date of said agreement) to sell that portion of the New Securities with respect to which the Investor's Preemptive Right set forth in this Section 5.3(a) was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Company's notice to the Investor delivered pursuant to Section 5.3(c). In the event the Company has not sold within such 120-day period following the Election Period, or such 120-day period following the date of said agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investor in the manner provided in this Section 5.3.

20

5.4     Tag-along Right.

    (a)    Following any conversion of the Debt or the Convertible Debt held by the Investor, if any of the shares (the "Disposed Shares") in the Company directly or indirectly held by the Owner is to be sold to any third party (the "Disposition"), the Investor may elect to exercise its tag-along right (the "Tag-along Right") and participate on a pro-rata basis in the Disposition on the same terms and conditions as set forth in the written notice (the "Disposition Notice") to the Company and the Investor sent by the Owner, which notice shall state:(i) the name of the Owner, (ii) the name and address of the proposed purchaser, (iii) the number of shares to be disposed; (iv) the amount and form of the proposed consideration for the Disposition, (v) any other material business relations between the Owner and the purchaser, and (vi) the other terms and conditions of the proposed Disposition. In the event that the proposed consideration for the Disposition includes consideration other than cash, the Disposition Notice shall include a calculation of then fair market value of such consideration and an explanation of the basis for such calculation.

    (b)    To exercise its Tag-along Right, the Investor must give the Owner, as applicable, written notice to that effect within 40 days after delivery of the Disposition Notice, and upon giving such notice the Investor shall be deemed to have effectively exercised the Tag-along Right. The Investor may sell all or any part of that number of Shares (the "Tag-along Shares") held by the Investor equal to the product obtained by multiplying (x) the number of Disposed Shares by (y) a fraction, the numerator of which is the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) at the time owned by the Investor and the denominator of which is the aggregate number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) owned by the Investor and other convertible Debt holders plus the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) then owned by the Owner, as applicable.

5.5     Information Rights.  After the Issuance Date, the Company or the Borrower shall regularly deliver to the Investor information relating to the daily business operation of the Company and the Borrower, including but not limited, to the following documents or reports:

    (a)    within 90 days after the end of each fiscal year of the Company and the Borrower, a consolidated income statement and statement of cash flows for the Company and the Borrower for such fiscal year and a consolidated balance sheet for the Company and the Borrower as of the end of the fiscal year, audited and certified by one of the Big Four Accounting Firms accepted by the Board, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period;

(b)    (i) within 45 days after the end of each quarter, a consolidated income statement and statement of cash flows for the Company and the Borrower for such quarter and a consolidated balance sheet for the Company and the Borrower as of the end of such quarter, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period, and (ii) promptly following the end of each quarter an up-to-date capitalization table, and both items (i) and (ii) shall be certified by the chief financial officer or the financial controller of the Company and the Borrower;

(c)    within 20 days of the end of each month, a consolidated unaudited income statement and statement of cash flows for such month and a consolidated balance sheet for the Company and the Borrower as of the end of such month, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period (except for customary year-end adjustments and except for the absence of Debts) and certified by the chief financial officer of the Company and the Borrower;

(d)    a comprehensive operating budget forecasting the Company's and the Borrower's revenues, expenses, and cash position for the following fiscal year within 30 days prior to the end of each fiscal year, in reasonable detail on a monthly basis, broken down by different operating subsidiaries and associated companies; and

(e)    as soon as practicable, any other information reasonably determined by the Board or reasonably requested by the Investor.

5.6    Inspection Rights. After the Issuance Date, the Company and the Borrower shall, and the Company and the Owner shall cause each of the other Group Members to, give to the Investor and its Representatives reasonable access, upon reasonable prior notice, to the premises and the books and records, and instruct its officers and employees to furnish all information and explanations to the Investor or any such Persons as the Investor may reasonably request during normal business hours, under the supervision of a Company officer and in such a manner as not to interfere with the normal business operations of the Company or any other Group Member.

5.7    Appointment of Board Observer. As long as the Debt or the Convertible Debt is outstanding or the Investor holds any share in the Company after conversion, the Company shall procure that the Investor shall be entitled to, from time to time, at its own expense, and at any time, to designate one individual that is an employee or officer of the Investor or any of its Affiliates (the "Observer") to attend all meetings of the Board and all committees thereof (whether in person, by telephone or other) in a non-voting observer capacity.

5.8    Reserved Matters. From the Issuance Date until the occurrence of the Qualified Financing, the following matters in connection with the Company shall be subject to the Investor's prior written consent:

(a)    any amendment or modification to the Company Charter Documents;

(b)    any material change to the nature or scope of the business of the Company;

(c)    any material merger, amalgamation, scheme or arrangement, reorganization, restructuring, or consolidation of the Company or any of its subsidiaries;

(d)    any liquidation, winding up, dissolution, disposition, reorganization, or arrangement of the Company or any of its subsidiaries;

(e)    any change to the size or composition of the board of directors of the Company or any of its subsidiaries;

(f)    any change to the accounting policies or the auditor of the Company not in compliance with the International Financial Reporting Standards, Generally Accepted Accounting Principles or Hong Kong Financial Reporting Standards;

(g)    appointment or removal of any key employees of the Company;

(h)    determination or adjustment of the pricing basis of transactions between the Company and any of its related parties;

(i)    any related party transaction entered into by the Company in excess of US$10 million (or its equivalent in other currencies) individually or in

23

excess of US$90 million in the aggregate over any 12 consecutive calendar months period; and

(j) any other material matters of the Company.

5.9 <u>Dividend</u>. After the full conversion of the Debt or the Convertible Debt held by the Investor into preferred shares upon occurrence of the initial Qualified Financing, the Investor shall be entitled to participate any dividend distribution declared by the Company from time to time.

5.10 <u>Business Plan</u>. The Company shall formulate and implement a five-year business operation plan, which shall be approved by the Investor and shall set forth the Company's development strategy, financial forecast, operational capital expenditure plan and implementation plan.

5.11 <u>Lock-up</u>. Subject to a 90-day prior written notice to the Investor, the Owner may transfer or assign, directly or indirectly, his interest in the Company or Cayman Co at any time prior to the full conversion or redemption of the Debt or the Convertible Debt; <u>*provided*</u> that the forgoing transfer or assignment will not result in the Owner ceasing to be the Company's and the Cayman Co's actual controlling person; <u>*provided*</u> further that if the forgoing transfer or assignment will result in the Owner ceasing to the Company's and the Cayman Co's actual controlling person, such transfer or assignment will be subject to the Investor's prior written consent.

5.12 <u>Restructuring</u>.

(a) The Company, the Cayman Co and the Borrower shall, and the Owner shall cause the applicable Group Members and the Onshore Companies to:

(i) complete all the steps of the Restructuring in accordance with all applicable laws and reasonably satisfactory to the Investor within 6 months after the Issuance Date, which will result in a corporate structure consistent with the structure set forth in <u>Schedule 1B</u> hereof; and

(ii) duly perform each Onshore Contract to which it is a party in accordance with the terms thereof.

(b) So long as any of the Debt or the Convertible Debt remains outstanding, the Owner shall not without the prior consent of the Investor, sell, give, assign, hypothecate, pledge, encumber, grant a security interest in or otherwise dispose of, or suffer to exist (whether by operation of law or otherwise) any Encumbrance on any equity interest in the Onshore Companies.

(c) All the following assets related to the Existing Business held or owned by any Affiliate of the Owner other than the Group and the Onshore Companies shall be transferred or assigned to the Onshore Companies or

24

the WFOE, as the case may be, within 12 months following the Issuance Date, which may be extended subject to the Investor's prior written consent:

(i)     all the employment agreements of Xing FENG (冯幸), Lin MA (马麟), Zhizhong AN (安志忠), Zhanliang CUI (崔战良) and Zhisheng DONG (董志升);

(ii)    all the relevant Intellectual Property;

(iii)   all the material contracts, including but not limited to, purchase contracts with suppliers and sales contracts with customers; and

(iv)    all the applicable licenses or permits required by law or applicable Governmental Authority to conduct the Existing Business.

## SECTION 6
## CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS

6.1 <u>General Obligation</u>. Each Party undertakes to the other Parties that it shall not reveal, and that it shall procure that its directors, equity interest holders, partners, representatives, members, advisors (including auditors, accountants, consultants, financial advisors and attorneys), financing sources, officers, employees and agents (collectively, "<u>Representatives</u>") do not reveal, the Confidential Information to any third party without the prior written consent of other Parties or use any Confidential Information in such manner that is detrimental to the Company or the concerned Party, as the case may be. Each Party shall be responsible for any breach of obligations set forth herein by any of its Affiliates, its Representatives or its Affiliates' Representatives, and shall procure that its Affiliates, its Representatives or its Affiliates' Representatives shall comply with the obligations set forth in this Section 6 as of it were a party to this Agreement. The term "<u>Confidential Information</u>" as used in this Section 6 means, (a) any information concerning the organization, business, technology, safety records, investment, finance, marketing, business plans, transactions or affairs of any Party or any Group Member or any of their respective directors, officers or employees (whether conveyed in written, oral or in any other form and whether such information is furnished before, on or after the date of this Agreement) and (b) the terms and existence of this Agreement, the Loan Agreement and the Onshore Contracts (other than the Basic Documents that are required by law or any applicable Governmental Authority to be publicly filed or disclosed) (collectively, the "<u>Financing Terms</u>"); <u>provided</u>, that Confidential Information does not include information that (i) is or becomes publicly known or available through no breach of this Agreement, (ii) is rightfully acquired free of restrictions on its disclosure, or (iii) is independently developed without any use of or reference to any Confidential Information.

6.2 <u>Exceptions</u>. The provisions of Section 6.1 shall not apply to:

(a) disclosure by a Party to its Representative, *provided* that such Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(b) disclosure by a Party to its Affiliates and their respective Representatives, *provided* that such Affiliate and Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(c) disclosure, after giving prior notice to the other Parties to the extent practicable under the circumstances and subject to any practicable arrangements to protect confidentiality, to the extent required under the rules of any stock exchange on which the shares of a Party or its parent company are listed or by law or any applicable Governmental Authority and only to the extent required thereby; or

(d) disclosure of any Confidential Information other than the Financing Terms by any Group Member, the Owner or their Representatives of any

26

of such Confidential Information to a third party in connection with any existing or proposed transaction or other contractual relationship of any Group Member or their Affiliates, *provided* that such third party (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality.

6.3    Publicity. Except as required by law, by any Governmental Authority, by any relevant stock exchange on which the shares of a Party or its parent company are listed or otherwise agreed by all the Parties, no public release or public announcement concerning the relationship or involvement of the Parties shall be made by any Party.

## SECTION 7   FEES AND EXPENSES

7.1    General. Each Party shall pay all of its own costs and expenses incurred in connection with or relating to the negotiation, execution, delivery and performance of the Basic Documents and the transaction contemplated thereby Each of the Parties hereto shall bear its own costs and expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the other Basic Documents and the transactions contemplated hereby and thereby.

## SECTION 8   INDEMNIFICATION

8.1    Scope of Indemnification. Each Party (an "Indemnifying Party") shall indemnify and hold the other Parties and their directors, officers and agents (collectively, the "Indemnified Party") harmless from and against any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever, including but not limited to any investigative, legal and other expenses incurred in connection with, and any amounts paid in settlement of, any pending or threatened legal action or proceeding, but excluding consequential damages, special or incidental damages, indirect damages, punitive damages, lost profits, and diminution in value (collectively, "Losses") resulting from or arising out of: (i) the breach of any warranty of such Indemnifying Party contained in the Basic Documents or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of such Indemnifying Party contained in the Basic Documents for reasons other than gross negligence or willful misconduct of the Indemnified Party. The Company, the Borrower and the Owner shall jointly and severally indemnify the Investor and its directors, officers, and agents harmless and against any Losses resulting from or arising out of: (i) the breach of any warranty of the Company, the Borrower and the Owner contained in this Agreement or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of the Company, the Borrower or the Owner contained in this Agreement for reasons other than gross negligence or willful misconduct of the Indemnified Party. In calculating the amount of any Losses of an Indemnified Party hereunder, there shall be subtracted the amount

27

of any insurance proceeds and third-party payments received by the Indemnified Party with respect to such Losses.

8.2     Notice of Claims; Procedures.  If an Indemnified Party makes any claim against an Indemnifying Party for indemnification, the claim shall be in writing and shall state in general terms the facts upon which such Indemnified Party makes the claim.  In the event of any claim or demand asserted against an Indemnified Party by a third party upon which the Indemnified Party may claim indemnification, the Indemnifying Party shall give written notice to the Indemnified Party within 30 days after receipt from the Indemnified Party of the claim referred to above, indicating whether such Indemnifying Party intends to assume the defense of the claim or demand.  If an Indemnifying Party assumes the defense, such Indemnifying Party shall have the right to fully control and settle the proceeding, provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed.  If the Indemnifying Party elects not to assume the defense or fails to make such an election with the 30-day period, the Indemnified Party may, at its option, defend, settle, compromise or pay such action or claim; provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

## SECTION 9    TERMINATION

9.1     Effective Date; Termination.  This Agreement shall become effective upon execution by all of the Parties and shall continue in force until terminated in accordance with Section 9.2.

9.2     Events of Termination.  This Agreement may be terminated at any time prior to the Issuance Date as follows:

    (a)     at the election of the Investor, if the Company, the Borrower, the WFOE, if applicable, or the Owner has materially breached any Collective Warranty, or any other covenant or agreement of the Company, the Borrower, the WFOE, if applicable, or the Owner contained in any Basic Document, which breach cannot be cured or, if it is capable of being cured, is not cured within 30 days after the Company, the WFOE, if applicable, and the Owner being notified in writing of the same;

    (b)     at the election of the Company, if the Investor has materially breached any Investor Warranty, or any other covenant or agreement of the Investor contained in the Basic Documents, which breach cannot be cured or, if capable of being cured, is not cured within 30 days after the Investor being notified in writing of the same; or

    (c)     by written consent of the Company, WFOE, if applicable, the Owner and the Investor.

9.3    Survival. If this Agreement is terminated in accordance with Section 9.2, it shall become void and of no further force and effect, except for the provisions of Section 6 (Confidentiality; Restriction on Announcements), Section 7 (Fees and Expenses), Section 8 (Indemnification), this Section 9, Section 10 (Notices), Section 11 (Miscellaneous), and Section 12 (Governing Law and Dispute Resolution); provided, however, that such termination shall, unless otherwise agreed by the Parties, be without prejudice to the rights of any Party in respect of a breach of this Agreement prior to such termination.

## SECTION 10    NOTICES

10.1    Notices. Each notice, demand or other communication given or made under this Agreement shall be in writing in English and delivered or sent to the relevant Party at its address or fax number set out below (or such other address or fax number as the addressee has by five days' prior written notice specified to the other Parties). Any notice, demand or other communication given or made by letter between countries shall be delivered by air mail. Any notice, demand or other communication so addressed to the relevant Party shall be deemed to have been delivered, (a) if delivered in person or by messenger, when proof of delivery is obtained by the delivering party; (b) if sent by post within the same country, on the third day following posting, and if sent by post to another country, on the seventh day following posting; and (c) if given or made by fax, upon dispatch and the receipt of a transmission report confirming dispatch.

10.2    Addresses and Fax Numbers. The initial address and facsimile for each Party for the purposes of this Agreement are:

if to the Investor:

1103, 11/F, Tower W1, 【 】 , 1 East
【 】 Avenue, 【 】 District, Beijing,
100190, PRC
Attention: Xu Yongqiang (许勇强)
Facsimile: +86 10 8518 0809

if to the Company, the Borrower or
the Owner:

16/F, Leshi Building, No. 105,
Yaojiayuan Road, Chaoyang District,
Beijing, 100025, PRC
Attention: Wei DENG (邓伟)

## SECTION 11 MISCELLANEOUS

11.1    Enforcement Action. For the avoidance of doubt, any obligation on the part of the Investor to make the investment hereunder is made solely to the Company,

29

the Borrower, the WFOE, if applicable, and the Owner, and no other Person shall have any right to enforce such obligation against the Investor.

11.2    <u>No Partnership</u>.  The Parties expressly do not intend hereby to form a partnership, either general or limited, under any jurisdiction's partnership law. The Parties do not intend to be partners one to another, or partners as to any third party, or create any fiduciary relationship among themselves, solely by virtue of the Investor's status as the holder of the Debt or the Convertible Debt.

11.3    <u>Amendment</u>. This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the Parties.

11.4    <u>Waiver</u>. No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. Without limiting the foregoing, no waiver by a Party of any breach by any other Party of any provision hereof shall be deemed to be a waiver of any subsequent breach of that or any other provision hereof.

11.5    <u>Entire Agreement</u>. This Agreement (together with the other Basic Documents, any other documents referred to herein or therein and any documents executed to implement the transactions contemplated by the Basic Documents) constitutes the whole agreement between the Parties relating to the subject matter hereof and supersedes any prior agreements or understandings relating to such subject matter.

11.6    <u>Severability</u>. Each and every obligation under this Agreement shall be treated as a separate obligation and shall be severally enforceable as such and in the event of any obligation or obligations being or becoming unenforceable in whole or in part. To the extent that any provision or provisions of this Agreement are unenforceable they shall be deemed to be deleted from this Agreement, and any such deletion shall not affect the enforceability of this Agreement as remain not so deleted.

11.7    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts including counterparts transmitted by telecopier or facsimile, each of which shall be deemed an original, but all of which signed and taken together, shall constitute one document.

11.8    <u>Consent to Specific Performance</u>. The Parties declare that it is impossible to measure in money the damages that would be suffered by a Party by reason of the failure by any other Party to perform any of the material obligations hereunder and that, in addition to all other remedies, each Party will be entitled to seek specific performance and seek injunctive or other equitable relief as a remedy for any such breach or failure to perform its material obligations hereunder.

11.9    <u>Transfer; Assignment</u>. This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns. This Agreement shall not be assigned without the express written consent of all the Parties (which consent may be granted or withheld in the sole discretion of any Party), and any purported assignment without such consent shall be void, *provided* that, to the extent permitted by the applicable laws, the Investor shall be entitled to transfer or assign its rights and obligations under the Basic Documents to any of its Affiliates with a prior written notice to the Company.

## SECTION 12
## GOVERNING LAW AND DISPUTE RESOLUTION

12.1    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE HKSAR APPLICABLE TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN SUCH JURISDICTION, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF ANY JURISDICTION.

12.2    Dispute Resolution.

(a)    Any dispute, controversy or, claim or difference of any kind whatsoever arising out of, relating to or in connection with this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof, the validity, scope and enforceability of this arbitration provision and any dispute regarding no-contractual obligations arising out of or relating to it (the "Dispute") shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Center (the "HKIAC") in accordance with the HKIAC arbitration rules in force at the time of the commencement of the arbitration. However, if such rules are in conflict with the provisions of this Section 12.2, including the provisions concerning the appointment of arbitrators, the provisions of this Section 12.2 shall prevail.

(b)    The law of this arbitration clause shall be Hong Kong law. The seat of arbitration shall be Hong Kong.

(c)    The number of arbitrators shall be three and the language of the arbitration proceedings and written decisions or correspondence shall be English.

(d)    Any party to the Dispute shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the tribunal.

IN WITNESS WHEREOF this Agreement has been executed on the day and year first above written.

**COMPANY:**

LEVIEW MOBILE LTD.

By: _____
*Authorized Signature(s)*

**CAYMAN CO:**

LE LTD.

By: _____
Name: Yueting Jia (贾跃亭)
Title: Director

**BORROWER:**

**LEVIEW MOBILE & INTELLIGENT**
**INFORMATION TECHNOLOGY**
**(BEIJING) CO. LTD.**
(乐视移动智能信息技术（北京）有限
公司)

By: _____

**OWNER:**

**YUETING JIA (贾跃亭)**

_____

**PRC Identification Card Number:**

IN WITNESS WHEREOF this Agreement has been executed on the day
and year first above written.

INVESTOR:

BEIJING LAN CAPITAL INVESTMENT
FUND MANAGEMENT, LLP
(北京蓝巨置业投资基金管理中心（有限合
伙））

By: _____
Name:
Title: authorized signatory

**SCHEDULE 1**
**SHAREHOLDING STRUCTURE OF THE GROUP**

## SCHEDULE 1A

### SHAREHOLDING STRUCTURE OF THE GROUP AS OF THE DATE OF THIS AGREEMENT



**SCHEDULE 1B**

**SHAREHOLDING STRUCTURE OF THE GROUP AFTER COMPLETION OF RESTRUCTURING**



2

**SCHEDULE 2**

**COLLECTIVE WARRANTIES**

**Definitions**

In this Schedule, capitalized terms not otherwise defined have the meanings set forth in this Agreement, and the following terms have the meanings specified:

"Contracts" means all contracts, agreements, licenses, engagements, leases, financial instruments, purchase orders, commitments and other contractual arrangements, that are currently subsisting and not terminated or completed.

"Environmental Laws" means any and all applicable current PRC or non-PRC national, federal, state, or local Law, statutes, rules, regulation, orders, ordinances, guidance documents, judgments, authorizations by any Governmental Authority, or any other requirement of any Governmental Authority relating to (a) environmental matters, (b) the generation, use, storage, transportation or disposal of hazardous substances, or (c) occupational safety and health, industrial hygiene, handling and disposal of medical waste, land use or the protection of human, plant or animal health or welfare.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Liabilities" means all indebtedness and other liabilities of any nature whatsoever, actual or contingent, and whether or not of a nature required to be disclosed in the accounts of the Group.

"Litigation" has the meaning set forth in Section 11 of this Schedule 2.

"Permits" means all permits, consents, approvals, authorizations, franchises, certifications and licenses from, and all registrations with, any Governmental Authority.

**The Warranties**

The Company, the WFOE, if applicable, and the Owner hereby, severally and jointly, represent and warrant to the Investor that the following representations and warranties are true and complete as of the date hereof and the Issuance Date, except as otherwise stated.

1.    **CORPORATE MATTERS**

    (a)    Organization, Good Standing and Qualification. Each of the Group Members and the Onshore Companies has been duly incorporated and

organized, is validly existing and, where applicable, is (i) in good standing and (ii) in compliance with all registration and approval requirements. Each of the Group Members and the Onshore Companies has the corporate power and authority to own and operate its assets and properties and to carry on its business as currently conducted and as contemplated to be conducted.

(b)    Charter Documents. The Company Charter Documents and the constitutional documents of the Onshore Companies furnished to the Investor are effective, have not been superseded and are true and complete.

(c)    Capitalization and Shareholding Structure of the Group. The shareholding structure of the Group set forth in Schedule 1A are true, complete and correct description of the share capital of such entity on the date hereof and on the Issuance Date. Immediately following the Issuance Date, the authorized capital of the Company will consist of only one class of shares, namely, 50,000 Ordinary Shares, par value US$0.0001 per share, 100% of which are duly and validly issued, fully paid, nonassessable, and outstanding, and were issued in accordance with all applicable laws.

(d)    Options, Warrants and Reserved Shares. Except for (A) the Debt or the Convertible Debt, if applicable, and (B) the preferred shares issuable upon conversion of the Debt or the Convertible Debt and any rights to be granted pursuant to the Basic Documents, there are no outstanding options, warrants, rights (including conversion or preemptive rights) or agreements for the subscription or purchase from any Group Member of any Equity Securities of any Group Member or any securities convertible into or ultimately exchangeable or exercisable for any Equity Securities of any Group Member.

(e)    Other Rights With Respect to Shares. Except as provided in the Basic Documents, no voting or similar agreements exist in relation to the Equity Securities of any Group Member that are presently outstanding or that may hereafter be issued.

(f)    Subsidiaries. Save for the HK Co and the WFOE, if applicable, the Company does not directly or indirectly own any interests in or Control any other entities. Neither of the HK Co or the WFOE, if applicable, directly or indirectly owns any interests in or Controls any other entities.

(g)    Corporate Records. The registers of shareholders, resolutions and all other documents of the Group required to be kept or filed with any relevant Governmental Authority have been kept, filed or submitted for filing.

(h)    Competitive Activities. The Owner does not hold any equity interests in any entity that carries on any business that competes with the business of

any Group Member, or the Onshore Company as presently conducted or as contemplated to be conducted, except the ownership of shares in publicly traded companies representing less than five percent of the outstanding share capital of such company.

(i) Qualified IPO. The owner shall press the Company to fulfill IPO at a stock market in China A, USA or Hong Kong during a reasonable period after this financing. The detail related IPO shall be negotiated and decided when the Investor's first exercise of its right to convert the Debt into the Convertible Debt.

2.    **AUTHORIZATION AND VALIDITY OF TRANSACTIONS**

(a)    Authorization.  Each of the Company, the Owner, the other Group Members and the Onshore Companies has the power and authority to execute, deliver and perform the Basic Documents to which it/he is a party.  All actions on the part of the Company, the Owner, the other Group Members and the Onshore Companies necessary for the authorization, execution, delivery of and the performance of all of its/his obligations under the Basic Documents have been taken or will be taken prior to the Issuance Date.

(b)    Valid Issuance of Stock.  The preferred shares when issued upon conversion of the Debt or the Convertible Debt will be duly authorized and validly issued, fully paid and non-assessable, free of restrictions on transfer other than restrictions on transfer under this Agreement, the Debt or the Convertible Debt and any applicable securities or corporate laws.

(c)    Enforceability.  The Basic Documents to which any Group Member, the Owner or the Onshore Company is a party will, when executed, be the valid and binding obligation of such Group Member, the Owner or the Onshore Company, enforceable against such Group Member, the Owner or the Onshore Company, as applicable, in accordance with their respective terms, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium; (ii) similar laws affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

(d)    Consents and Approvals.  On or prior to the Issuance Date, all consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any Governmental Authority or any other Person required in connection with the execution, delivery and performance by the Group, the Onshore Companies and the Owner of the Basic Documents or the consummation of the transactions contemplated hereby or thereby (including without limitation, the Restructuring) have been duly obtained in compliance with all applicable laws.

(e) <u>No Breach</u>. The execution and delivery by any Group Member, the Onshore Company and the Owner of each of the Basic Documents to which it is a party and the implementation and performance by such Group Member, the Onshore Company and the Owner of all the transactions contemplated under such Basic Documents (including without limitation, the Restructuring) do not and will not:

(i) breach or constitute a default under the Company Charter Documents or the constitutional document of any other Group Member or the Onshore Company;

(ii) result in a breach of, or constitute a default under, any Contract to which any Group Member, the Onshore Company or the Owner is a party or by which such Group Member, the Onshore Company or the Owner or their respective property or assets is bound or result in the creation or increasing of any obligation on such Group Member, the Onshore Company or the Owner (whether to make payment or otherwise) to any Person; or

(iii) result in a violation or breach of or default under any applicable law.
except, in the case of clauses (ii) and (iii), as could not materially and adversely affect the ability of any Group Member, the Onshore Company or the Owner to carry out its obligations under, and to consummate the transactions contemplated by, the Basic Documents to which it is a party.

3.    **LEGAL COMPLIANCE**

(a) <u>No Violation of Law.</u> None of the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation, which may have a material adverse effect on the ability of any Group Member to conduct its business as currently conducted or as contemplated to be conducted.

(b) <u>Permits and Registrations</u>. Each Group Member and the Onshore Company has all Permits and has completed all government registrations necessary for the conduct of its business as currently conducted and as contemplated to be conducted and to own its assets. None of the Group Members or the Onshore Company is in material breach of or default under any such Permit, and there is no reason to believe any such Permit shall be suspended, cancelled or revoked.

4.    **ENVIRONMENTAL ISSUES**

Each Group Member and the Onshore Company is currently in compliance with all Environmental Laws and has at all times complied with all Environmental Laws in all material aspects.

5.   **PROPERTIES AND ASSETS**

    (a)    <u>Status of Properties and Assets</u>. Each Group Member and the Onshore Company owns or has the right to use all material properties and assets currently used by it in the conduct of its business as currently conducted and contemplated to be conducted. The properties and assets owned by the Group and Onshore Company are free and clear of all Encumbrances. The tangible assets and real property of each Group Member and the Onshore Company have been properly maintained and are in working condition, and are in all respects in a condition that is adequate for the intended uses of such assets, subject to continued repair and replacement in accordance with past practice.

    (b)    <u>General Liabilities</u>. None of the Group Members or the Onshore Company has any obligations or liabilities or any nature, whether accrued, absolute or contingent, whether liquidated or unliquidated, and whether now due or to become due, except for trade or business obligations and liabilities incurred in the ordinary course of business since such entity's inception.

6.   **CONTRACTS AND TRANSACTIONS**

    (a)    <u>Validity of Material Contracts</u>.
        (i)    No Group Member or the Onshore Company is in breach of or has knowledge of the invalidity of or grounds for rescission, avoidance or repudiation of any material contract to which the Group Member or the Onshore Company is a party, nor has any Group Member or the Onshore Company received notice of any intention to terminate any such material contract.

        (ii)    To the best knowledge of the Company, the WFOE and the Owner, no party with whom a Group Member or an Onshore Company has entered into any material contract is in default thereunder, except for defaults which would not have a material adverse effect on the financial condition of the Group or the Onshore Companies; to the best knowledge of the Company, the WFOE and the Owner, there are no circumstances likely to give rise to any such default.

    (b)    <u>Brokers and Finders</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Company and the Owner.

7.   **FINANCIAL MATTERS**

    (a)    <u>Liabilities</u>. Neither the Group nor the Onshore Companies with respect to its Existing Business has any Liabilities other than (i) Liabilities reflected or reserved against in their respective accounts, a true and

complete copy of which has been delivered to the Investor; (ii) Liabilities incurred in the ordinary course of business; or (iii) Liabilities in relation to the Basic Documents. No Group Member or the Onshore Company has guaranteed any indebtedness of any other Person.

(b)    <u>Financial Materials</u>. All the accounts, books, registers, ledgers and financial and other material records of whatsoever kind of each Group Member and the Onshore Company which have been provided to the Investor are accurate and complete in all material respects; and they present a true and fair view of the financial, contractual and trading position of each Group Member and the Onshore Company and of its respective facilities and machinery, fixed and current assets and liabilities (actual and contingent), debtors, creditors and work-in-progress.

## 8.    TAX, RECORDS AND RETURNS

(a)    <u>Compliance with Laws</u>. None of the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation regarding Tax which may result in any liability or criminal or administrative sanction or otherwise having a material adverse effect on any Group Member or the Onshore Company, other than such violation that has been rectified or resolved and does not have any foreseeable liability or criminal or administrative sanction or otherwise.

(b)    Tax Returns and Payments. Each Group Member or the Onshore Company has filed all tax returns and reports as required by law, and such returns and reports are true and correct in all material respects. Each Group Member or the Onshore Company has paid all taxes and other assessments due and none of the Group Members is or will become liable to pay any fine, penalty, surcharge or interest in relation to Tax with respect to activities of any Group Member prior to the Completion Date. There have been no extraordinary examinations or audits of any tax returns or reports by any applicable Governmental Authority. There are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

(c)    <u>Deductions and Withholdings</u>. Each Group Member and the Onshore Company has made all deductions and withholdings in respect, or on account, of any Tax from any payments made by it which it is obliged or entitled to make and has duly accounted in full to the appropriate authority for all amounts so deducted or withheld.

(d)    <u>Preferred Tax Treatments</u>. All exemptions, reductions and rebates of Taxes granted to the Group by a Governmental Authority are in full force and effect and have not been terminated. To the knowledge of the Company, the WFOE, if applicable, and the Owner, the transactions contemplated under the Basic Documents will not, and, there is no other circumstance or event that will, result in any such exemption, reduction

or rebate being cancelled or terminated, whether retroactively or for the
future.

9.    **OPERATIONS**

    (a)    <u>Current Operations</u>. There is no existing fact or circumstance that will
have a material adverse effect on the ability of any Group Member or the
Onshore Company to conduct its business as currently conducted and
contemplated to be conducted.

    (b)    <u>General Change</u>. Since the date hereof, there has been no material
adverse change in the financial position of the Group or the Onshore
Company relating to the Existing Business.

11.    **EMPLOYEES**

    (a)    <u>Status of Employees</u>.

        (i)    No Group Member, or the Onshore Company has at any time since
its establishment had, or is being threatened in writing by, any
strike, collective work stoppage or other material labor dispute.

        (ii)    The Group and the Onshore Company each has complied in all
material respects with all applicable laws regarding employees,
employee benefits, employee safety and labor matters for all of
their employees.

    (b)    <u>Employment Agreements and Compensation Arrangements</u>. Except as
required by law, the labor contract and employee non-competition,
intellectual property assignment and confidentiality agreement between
the WFOE, if applicable, and each key employee, no Group Member is a
party to or is bound by any currently effective employment contract
(other than contracts that can be terminated on an at-will basis), deferred
compensation agreement, pension, provident, superannuation, life
assurance, disability or other similar schemes or arrangements, bonus
plan, incentive plan, profit sharing plan, retirement agreement or other
employee compensation agreement.

11.    **CLAIMS AND PROCEEDINGS**

    (a)    <u>No Litigation</u>. No Group Member, the Onshore Company, or the Owner
is engaged in or has been notified that it is the subject of any litigation,
arbitration or administrative or criminal proceedings (collectively,
"<u>Litigation</u>"), whether as plaintiff, defendant or otherwise. None of the
shareholders or equity interest holders of any Group Member, or the
Onshore Company, directors of any such entity is engaged in or has been
notified that it is the subject of any Litigation, whether as plaintiff,
defendant or otherwise, which has had or may have an adverse effect on
any Group Member, or the Onshore Company. There is no judgment,
decree, or order of any court in effect against any Group Member or the

Onshore Company. There is no judgment, decree, or order of any court in effect with respect to the Existing Business against Lefeng Mobile or the Owner. None of the Group Members or the Onshore Company is in default with respect to any order of any Governmental Authority to which it/he is a party or by which it/he is bound. Neither Lefeng Mobile nor the Owner is in default with respect to any order of any Governmental Authority with respect to the Existing Business to which it/he is a party or by which it/he is bound.

(b)     <u>No Pending Proceedings</u>. No Litigation is pending or, to the knowledge of the Owner, the Company and the WFOE, if applicable, threatened against any Group Member, or the Onshore Company; no Litigation in relation to the Existing Business is pending or, to the knowledge of the Owner, the Company and the WFOE, if applicable, against Lefeng Mobile or the Owner.

(c)     <u>No Undertaking; No Injunction</u>. None of the Group Members, or the Onshore Company nor any shareholder, director, officer or agent of any of the foregoing entities is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force. Neither Lefeng Mobile nor any of its shareholder, director, officer or agent is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force in relation to Existing Business.

(d)     <u>No Insolvency</u>. No order has been made and no resolution has been passed for the winding up or liquidation as dissolution of any Group Member or the Onshore Company. No distress, execution or other process has been levied on the whole or a substantial part of the assets of any Group Member or the Onshore Company. None of the Group Members or the Onshore Company is insolvent or unable to pay its debts as they fall due.

(e)     <u>No Investigation or Inquiry</u>. No Group Member, the Onshore Company, or the Owner (in relation to the foregoing entities) is the subject of any investigation or inquiry by any Governmental Authority with respect to the Existing Business and there are no facts which are likely to give rise to any such investigation or inquiry.

12.   **INTELLECTUAL PROPERTY**

(a)     Each Group Member and the Onshore Company owns or otherwise has the right or license to use all Intellectual Property as necessary for the operation of the Existing Business without, to the knowledge of the Company and the Owner, any violation or infringement of the rights of any third party, free and clear of all Encumbrances. There is no claim, proceeding or litigation pending or, to the knowledge of the Company and the Owner, threatened against any Group Member or the Onshore Company, contesting their right to use its Intellectual Property, asserting

the misuse thereof, or asserting the infringement or other violation of any Intellectual Property of any third party.

(b)   There are no pending proceedings or claims in which any Group Member or the Onshore Company alleges that any Person is infringing upon, or otherwise violating, its Intellectual Property rights. Nor have any such proceedings or claims been served, instituted or asserted by any Group Member or the Onshore Company.

(c)   None of the key employees of any Group Member and the Onshore Company is obligated under any Contract, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her best efforts to promote the interests of his/her employer, or that would conflict with the business of his/her employer as presently conducted, or that would prevent such employees from assigning to his/her employer inventions conceived or reduced to practice or copyrights for materials developed in connection with services rendered to it.

13.   **RESTRUCTURING**

The Restructuring has been carried on by the Company in compliance with applicable laws.

14.   **DISCLOSURE**

(a)   <u>No Misrepresentation</u>. No representation, warranty or statement by the Company, the WFOE, if applicable, and the Owner in this Agreement, any other Basic Document, or in any Exhibit, Schedule, Appendix, statement or certificate furnished to the Investor pursuant to any Basic Document, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein, in the light of the circumstances under which they were made, not misleading.

(b)   Full Disclosure. There is no fact or circumstance relating to the affairs of any Group Member and the Onshore Companies which has not been disclosed to the Investor and which if the disclosed information might reasonably have been expected to influence the decision of the Investor to purchase the Debt.

## SCHEDULE 3

### INVESTOR WARRANTIES

1. <u>Organization, Good Standing and Qualification</u>. The Investor and its general partner have been duly established or incorporated and organized, is validly existing and, where applicable, in good standing.

2. <u>Authorization</u>. The Investor has the full power, authority and legal right to own assets and carry on its business. The Investor and its general partner are not in receivership or liquidation or have taken any steps to enter into liquidation, and no petition has been presented for the winding-up of the Investor. There are no grounds on which a petition or application could be based for the winding-up or appointment of a receiver of the Investor or its general partner.

3. The execution, delivery and performance of this Agreement by the Investor will not:

   (a)  violate any provision of its partnership agreement or the Memorandum of Association or Articles of Association of the Investor's general partner;

   (b)  require the Investor to obtain any consent, approval or action of, or make any filing with or give any notice to, any Governmental Authority or any other third party pursuant to any agreement to which the Investor is a party or by which the Investor is bound;

   (c)  conflict with or result in any material breach or violation of any of the terms and conditions of, or constitute (or with notice or lapse of time or both constitute) a default under, any agreement to which the Investor is a party or by which the Investor is bound;

   (d)  violate any court order, judgment, injunction, award, decree or writ against, or binding upon, the Investor or upon its securities, properties or business; or

   (e)  violate any law or regulation of the country where the Investor is incorporated or any other jurisdiction in which the Investor maintains a business presence.

4. <u>Enforceability</u>. The Investor, acting through its general partner, has the full power and authority to enter into, execute and deliver the Basic Documents to which it is a party and to perform the transactions contemplated hereby and thereby. The execution and delivery by the Investor, acting through its general partner, of the Basic Documents to which it is a party and the performance by the Investor of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other action of the Investor. Assuming the due authorization, execution and delivery hereof by the other parties hereto, the Basic Documents to which the Investor is a party constitutes the legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium;(ii) similar laws

affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

5. <u>Financing</u>. The Investor has sufficient immediately available funds to pay, in cash, the principal amount of the Debt at the Issuance Date.

6. <u>Litigation</u>. As of the date hereof, no Litigation by or against the Investor is pending or, to the best knowledge of the Investor, threatened in writing, which could affect the legality, validity or enforceability of the Basic Documents to which it is a party, or the consummation of the transactions contemplated hereby and thereby.

# Exhibit 3 –Notice of Repayment

北京蓝巨盟业投资基金管理中心（有限合伙）

# 还款通知函

**乐视移动智能信息技术（北京）有限公司：**

  贵司及其关联方与我司已于 2015 年 5 月 18 日签订生效的《INVESTOR RIGHTS AGREEMENT》、《借款合同》及《承诺函》（合称 **"交易文件"**），贵司向我司借款人民币 2 亿元整，**贾跃亭先生及乐视控股（北京）有限公司**（**"乐视控股"**）对上述本金和利息的还款义务承担连带清偿责任。上述全套交易文件签署后，我司已向贵司支付上述全额借款 2 亿元人民币，贵司出具收款确认书予以确认。按照交易文件的约定，贵司及其关联方在债务偿还条件触发时，需按时向我司偿还上述全部债务的本金及约定的利息（**"债务偿还"**）。

  依据《INVESTOR RIGHTS AGREEMENT 》第 5.1 条 Redemption 关于债权人有权行使赎回权；现我司正式决定行使上述权利，并通知贵司如下：

一、 贵司于出借日满第二周年日 2017 年 5 月 18 日（"还款日"）向我司履行还款义务，即偿还债务本金 2 亿人民币；

二、 贵司于还款日归还债务本金时，应一并归还以年化利率 25%计算的相应两年期利息 60,000,000 元人民币、40,000,000 元人民币，合计 100,000,000 元人民币。

三、 以上合计 300,000,000 元人民币，**贾跃亭先生及乐视控股**对该笔款项负连带清偿责任。

北京蓝巨置业投资基金管理中心（有限合伙）

四、 我司指定还款账户如下：

开户行：招商银行北京东方广场支行

户名：北京蓝巨置业投资基金管理中心（有限合伙）

资金账户：▮▮▮▮▮▮▮▮▮▮▮▮

因贵司的还款期限即将届至，本还款通知函拟提请贵司知晓上述还款日的全额还款义务，并积极准备和筹措还款资金，在还款日前将全额本金和利息以电汇方式支付至上述指定还款账户。

如贵司未能在该期限内完成全额还款义务，我司将直接采取法律途径追索上述款项以及由此遭受的一切损失，不限于罚息、违约损害赔偿，以及保全费、执行费、律师费、差旅费等实现债权相关的所有费用，同时考虑在相关新闻媒体上进行公告。

我司启动法律程序时将不再有任何通知，敬请审慎对待。


以上请知悉。


北京蓝巨置业投资基金管理中心（有限合伙）（公章）：

Beijing LAN Capital Investment Fund Management LLP

# Notice of Repayment

## LETV Mobile Intelligent Information Technology (Beijing) Co., Ltd.,

In accordance with the *INVESTOR RIGHTS AGREEMENT*, the *Loan Contract* and the *Commitment Letter* (collectively the **"Transaction Documents"**) signed and effective on May 18, 2015 between you, your affiliates and us, you have borrowed RMB 200 million from us, and **Jia Yueting** and LETV Holdings (Beijing) Co., Ltd. (**"LETV Holdings"**) shall be jointly and severally liable for repayment of the principal and interest. After signing all the Transaction Documents, we paid the loan RMB 200 million fully to you, and you confirmed by issuing the receipt confirmation. According to the Transaction Documents, when the debt repayment conditions are triggered, you and your affiliates shall repay the principal and agreed interest of all debts to us on time (**"Debt Repayment"**).

According to Article 5.1 Redemption of the *INVESTOR RIGHTS AGREEMENT*, the creditors shall have the right to exercise their right of redemption, so we now formally decide to exercise the right and inform you as follows:

1. You shall repay the principal RMB 200 million of the debt to us on the second anniversary May 18, 2017 (the "Repayment Date") of the lending date;

2. When repaying the principal of the debt on the Repayment Date, you shall also pay corresponding two-year interest RMB 60,000,000 and RMB 40,000,000 (RMB 100,000,000 in total) at an annualized rate of 25%.

3. **Jia Yueting** and **LETV Holdings** shall be jointly and severally liable for repayment of the total amount RMB 300,000,000.

4. Our designated repayment account is as follows:

Bank of deposit: Beijing Oriental Plàza Subbranch of China Merchants Bank

Beijing LAN Capital Investment Fund Management LLP

Account name: Beijing LAN Capital Investment Fund Management LLP

Account number: 1109 1633 0210 101

Since your repayment period is about to expire, this Notice is to inform you of your obligation to repay in full on the Repayment Date, so that you will actively prepare and raise the repayment funds and pay the principal and interest in full to the designated repayment account above by telegraphic transfer before the Repayment Date.

If you fail to repay in full within the time limit, we will take legal actions directly to recover the amount and all losses incurred therefrom, not limited to default interest, damage compensation for breach of contract, preservation fees, enforcement fees, attorney's fees, travel expenses and other expenses related to the realization of debt, and consider making an announcement in relevant news media.

We will not give any further notice when we start the legal proceedings. Please remain cautious.

Please notice above.

Beijing LAN Capital Investment Fund Management LLP (official seal)

# Exhibit 4 –Loan Contract of LETV Mobile

# 借款合同

出借方：北京蓝巨置业投资基金管理中心（有限合伙）

借款方：乐视移动智能信息技术（北京）有限公司

借款方为进行经营活动，向出借方申请借款，经双方协商，特订立本合同，以便共同遵守。

一、借款种类：　人民币

二、借款用途：　经营所需

三、借款金额人民币 【2】亿 元整（RMB【200,000,000.00】）。

四、借款利息为每年百分之十五 。

五、借款和还款期限：借款时间共叁年，自借款发放之日起，至三年期限届满之日止。

六、还款方式：　现金

七、出借方将借款汇至借款方以下银行账户：

户名：乐视移动智能信息技术（北京）有限公司

账号：████████

开户行：民生银行建国门支行

八、保证条款

1、借款方必须按照借款合同规定的用途使用借款，不得挪作他用，不得用借款进行违法活动。

2、借款方必须按照合同规定的期限还本付息。



3、借款方有义务接受出借方的检查、监督借款的使用情况，了解借款方的计划执行、经营管理、财务活动、物资库存等情况。借款方应提供有关的计划、统计、财务会计报表及资料。

4、乐视控股（北京）有限公司及其实际控制人贾跃亭为还款责任提供连带保证。

九、违约责任

1、借款方如逾期不还借款，出借方有权追回借款，并按银行规定加收每日万分之五的罚息。

2、出借方未按期提供借款，应按违约数额和延期天数，付给借款方违约金。违约金数额的计算应与加收借款方的罚息计算相同。

十、争议解决：因执行本合同发生争议，由当事人双方协商解决。协商不成的，双方同意由出借方所在地有管辖权的人民法院管辖。

十一、其他

1、本合同非因不可抗力情况发生，任何一方当事人不得擅自变更或解除合同。当事人一方发生不可抗力，应及时采用书面形式通知其他当事人并提供证明。

2、本合同经双方同意后可以变更或解除。合同解除的，借款方已占用的借款和应付的利息，仍应按本合同的规定偿付。

3、出借方有权在借款期间内将本协议的债权转让给其关联方，借款方在此承诺并知悉上述转让事宜，不影响借款方继续履行本协议

约定的义务。

　　4、本合同如有未尽事宜，须经合同双方当事人共同协商，作出
补充规定，补充规定与本合同具有同等效力。

　　5、本合同正本一式二份，出借方、借款方各执一份。

出借方（盖章）：北京蓝巨置业投资基金管理中心（有限合伙）

执行事务合伙人委派代表或授权代表（签字）：

借款方（盖章）：乐视移动智能信息技术（北京）有限公司（公章）

法人代表或授权代表签字：

签约日期：2015 年 6 月　　日

签约地点：北京

证明

本单位 乐视移动智能信息技术（北京）有限公司，收到贵单位 北

京蓝巨置业投资基金管理中心（有限合伙）以下款项：

2015 年 6 月 15 日借款 120,000,000 元（大写壹亿贰仟万元整）

2015 年 6 月 30 日借款 80,000,000 元（捌仟万元整）

特此证明！

乐视移动智能信息技术（北京）有限公司

2015 年 7 月 8 日

# Loan Contract

Lender: Beijing LAN Capital Investment Fund Management LLP

Borrower: LETV Mobile Intelligent Information Technology (Beijing) Co., Ltd.

The Borrower applies to the Lender for a loan for the purpose of carrying out business activities. The parties hereby enter into this Contract through negotiation for mutual compliance.

I. Type of Loan: RMB

II. Purpose of Loan: Business

III. Loan Amount: RMB [200] million (RMB [200,000,000.00]).

IV. Loan Interest: Fifteen percent per annum.

V. Loan Term and Repayment Period: The loan term is three years from the date on which the loan is issued to the date of expiration of the three-year term.

VI. Mode of Repayment: Cash

VII. The Lender shall remit the loan to the following bank account of the Borrower:

Account name: LETV Mobile Intelligent Information Technology (Beijing) Co., Ltd.

Account number ████████████

Bank of deposit: Jianguomen Subbranch of Minsheng Bank

VIII. Warranties

1. The Borrower must use the loan for the purpose specified in this Contract and may not use it for any other purpose or for any illegal activities.

2. The Borrower must repay the principal and interest within the time limit specified in this Contract.

3. The Borrower shall be obliged to accept the Lender's inspection and supervision of the use of the loan and understanding of the Borrower's plan execution, management, financial activities, material storage, etc. The Borrower

shall provide relevant plans, statistics, financial and accounting reports and information.

4. LETV Holdings (Beijing) Co., Ltd. and its actual controller Jia Yueting shall offer joint and several warranty for repayment.

IX. Liability for Breach

1. If the Borrower fails to repay the loan within the time limit, the Lender shall have the right to recover the loan and charge an additional default interest of five ten-thousandths per day as stipulated by the bank.

2. If the Lender fails to provide the loan in due time, it shall pay the Borrower liquidated damages according to the amount of the default and the number of days of delay. The amount of liquidated damages shall be calculated in the same manner as the default interest payable by the Borrower.

X. Dispute Resolution: Any dispute arising from the execution of this Contract shall be resolved by the parties through negotiation. If no agreement can be reached through negotiation, the parties agree to be under the jurisdiction of the people's court with jurisdiction in the place where the Lender is located.

XI. Miscellaneous

1. This Contract shall not be altered or terminated by either party without force majeure. In the event of force majeure, either party shall promptly notify the other party in writing and provide certificates.

2. This Contract may be altered or terminated with the consent of both parties. In the event of termination of this Contract, the loan occupied by the Borrower and the interest payable shall still be repaid in accordance with this Contract.

3. The Lender shall have the right to transfer the debt under this Contract to its affiliates during the loan term, and the Borrower hereby undertakes and knows the aforesaid transfer, which shall not affect the Borrower's continued performance of obligations under this Contract.

4. Anything not specified herein shall be subject to supplementary provisions made by the parties through negotiation, which shall have the same effect as this Contract.

5. This Contract is made in two originals, with one for the Lender and one for the Borrower.

Lender (seal): Beijing LAN Capital Investment Fund Management LLP

Appointed or Authorized Representative of the Executive Partner (signature):



Borrower (seal): LETV Mobile Intelligent Information Technology (Beijing) Co., Ltd.

Legal or Authorized Representative (signature):

Date: June 2015

Place: Beijing

## Certificate

This is to certify that we, **LETV Mobile Intelligent Information Technology (Beijing) Co., Ltd.,** have received the following amount from you, Beijing LAN Capital Investment Fund Management LLP:

Loan RMB 120,000,000 (in words: RMB One Hundred and Twenty Million only) on June 15, 2015

Loan RMB 80,000,000 (in words: RMB Eighty Million only) on June 30, 2015

LETV Mobile Intelligent Information Technology (Beijing) Co., Ltd.

July 8, 2015

息技术（北京）

专业的法律翻译综合服务商                                        *Tel:010-5654 2019*
*Website:www.lanhaifanyi.com*

## 翻译证明

## CERTIFICATE

敬启者：

To Whom It May Concern,

　　兹证明我公司北京蓝海译通翻译服务有限公司，以下简称"我公司"，为下列文件的翻译提供者，并以此函证明中文原文与英文翻译件内容表达一致。

　　This is to certify that we, Beijing Lan Hai Translation Service Co., Ltd., is the provider of the documents listed below, and certify with this CERTIFICATE that the Chinese original is truly and accurately expressed by its corresponding English translation.

文件列表：

List of documents:

1. 《借款及优先认购权之框架协议-5.2 亿-2016.7.16.》

   《framework Agreement for Loan and Preemptive Right-520 million-2016.7.16》

2. 《还款通知书》

   《Notice of Repayment》

3. 《乐视移动借款合同-2 亿-2015.6》

   《Loan Contract of LETV Mobile-200 million-2015.6》

4. 《三中院判决（2017）京 03 民初 248 号》

   《Civil Judgment of the Third Intermediate People's Court of Beijing(2017) Jing 03 Min Chu No. 248》

5. 《回购担保协议 》

   《Repurchase Guarantee Agreement》

6. 《商业保理业务合同》

   《Commercial Factoring Business Contract》



专业的法律翻译综合服务商
Website:www.lankaifanyi.com

*Tel:010-5654 2019*

7.  《商业保理业务合同服务费协议》

    《Agreement on Service Fee under the Commercial Factoring Business Contract》

8.  《补充协议》

    《Supplementary Agreement》

北京蓝海译通翻译服务有限公司
Beijing Lan Hai Translation Service Co., Ltd.
2020年1月23日
January 23, 2020



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA  90067

A true and correct copy of the foregoing document entitled: **NOTICE OF OBJECTION TO CLAIM** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **April 3, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **April 3, 2020**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**VIA U.S. MAIL**
United States Bankruptcy Court
Central District of California
Attn:  Hon. Vincent Zurzolo
Edward R. Roybal Federal Bldg./Courthouse
255 East Temple Street, Suite 1360
Los Angeles, CA  90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 3, 2020 | Nancy H. Brown | */s/ Nancy H. Brown* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ**
**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- Jerrold L Bregman    ecf@bg.law, jbregman@bg.law
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Lei Lei Wang Ekvall    lekvall@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Stephen D Finestone    sfinestone@fhlawllp.com
- Richard H Golubow    rgolubow@wghlawyers.com,
  pj@wcghlaw.com;jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- Alexandra N Krasovec    krasovec.alexandra@dorsey.com, claridge.vanessa@dorsey.com
- Ben H Logan    blogan@omm.com
- Robert S Marticello    Rmarticello@swelawfirm.com,
  gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- David W. Meadows    david@davidwmeadowslaw.com
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Victor A Sahn    vsahn@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.in
  foruptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Felix T Woo    fwoo@ftwlawgroup.com, admin@ftwlawgroup.com
- Claire K Wu    ckwu@sulmeyerlaw.com,
  mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- David B Zolkin    dzolkin@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.