# EXHIBIT 3

# DEPOSITION OF DANIEL McGILL, VOLUME I - 05/15/2018

# HAN'S SAN JOSE HOSPITALITY vs. LE HOLDINGS (BEIJING) CO.

CONDENSED TRANSCRIPT AND CONCORDANCE

PREPARED BY:

NOGARA REPORTING SERVICE
5 Third Street, Suite 415
San Francisco, CA 94103
Phone: (415) 398-1889
FAX: (415) 398-0611



Case 2:19-bk-24804-VZ   Doc 667-3   Filed 04/23/20   Entered 04/23/20 20:47:28   Desc
Exhibit 3   Page 3 of 8

BSA   DEPOSITION OF DANIEL MCGILL, VOLUME I - 05/15/2018
HAN'S SAN JOSE HOSPITALITY vs LE HOLDINGS (BEIJING) CO.   XMAX(9/9)

Page 33

(1) name of Le Holdings?
(2) A. Yes.
(3) Q. Okay. And were they the parent company of
(4) Le Technology, to your knowledge?
(5) A. Speculating --
(6) MR. BUHA: Objection. Calls for a legal
(7) conclusion. Speculation.
(8) THE WITNESS: I never saw any organizational
(9) documents to that effect, but that was my
(10) understanding.
(11) MR. GOODELL: Q. Do you know -- how many
(12) people that worked in the subject property worked
(13) for both Le Technology and Le Holdings?
(14) A. I don't know.
(15) MR. GOODELL: Let's mark this as Exhibit 2.
(16) (Plaintiff's Exhibit 2 marked for
(17) identification.)
(18) MR. GOODELL: Q. Have you ever seen this
(19) document before, Mr. McGill?
(20) A. Yes, I believe.
(21) Q. What is this document?
(22) A. This is the lease.
(23) Q. Do you remember the first time you saw
(24) this document?
(25) A. No.

Page 34

(1) Q. And you testified earlier you looked at
(2) this document from time to time in determining Le
(3) Technology's obligations under the lease, correct?
(4) A. Yes.
(5) Q. I want to direct your attention -- first
(6) of all, do you know an individual by the name of
(7) Dongge Jiang?
(8) A. No, not that I know of.
(9) Q. D-o-n-g-g-e, last name J-i-a-n-g?
(10) A. No. I mean, a lot of my former colleagues
(11) had American names adopted. Candidly, I don't
(12) know. I wasn't always correlating the two.
(13) Q. Gotcha. Did you know an individual by the
(14) name of Bob Ye?
(15) A. Yes.
(16) Q. Did you work with him on a regular basis?
(17) A. No.
(18) Q. No. Who did you work with on a regular
(19) basis at Le Technology?
(20) A. Dan Poritzky and I worked together until
(21) his departure. And then there was an admin who was
(22) support. Dan Gallagher, legal. Yeah, there
(23) weren't really many people left towards the end.
(24) Q. Okay. So you're aware at a certain
(25) point -- well, first of all, let's go to Page 2 of

Page 35

(1) this document. And you see where it says the -- on
(2) the second entry line on the page, the rent from
(3) March of 2017 to February 2018, see it says a
(4) monthly installment of base rent is $199,856.40?
(5) Do you see that?
(6) A. Yes.
(7) Q. Okay. Is that your recollection of what
(8) the monthly rent was at that time?
(9) A. Yes.
(10) Q. And do you know who was responsible at Le
(11) Technology for paying the rent?
(12) MR. WERTHEIM: When you say "responsible,"
(13) you're talking about the person who wrote the check
(14) or are you talking -- calling for a legal
(15) conclusion?
(16) MR. GOODELL: I'm definitely not talking about
(17) calling for a legal conclusion. I'm using the
(18) terminology in its regular -- the way it's
(19) typically used, so --
(20) THE WITNESS: Our accounting group. And,
(21) again, same statement relative to names. I cannot
(22) recall specifically those names.
(23) MR. GOODELL: Q. So it's the accounting group
(24) at Le Technology?
(25) A. Correct.

Page 36

(1) Q. And are you aware that at a certain point
(2) in 2017 Le Technology quit making payments under
(3) this lease?
(4) MR. BUHA: Objection. Vague as to the use of
(5) the word "quit."
(6) (Reporter interruption.)
(7) MR. GOODELL: You objected as vague as to the
(8) word "quit," I believe.
(9) MR. BUHA: That's correct.
(10) MR. WERTHEIM: You can answer.
(11) THE WITNESS: Yes, but I don't have any direct
(12) knowledge of when that occurred.
(13) MR. GOODELL: Q. Were you still working there
(14) -- while you were still working there, were you
(15) aware that Le Technology wasn't making payments
(16) under the lease?
(17) A. If I recall correctly, I remember being in
(18) arrears, yes. But I can't speak specifically to
(19) when that began or how many months we were behind
(20) or whether it wasn't ultimately paid without my
(21) knowledge.
(22) Q. Do you know who signed this document on
(23) behalf of Le Technology?
(24) MR. WERTHEIM: Are you asking him to look at a
(25) certain page or without looking?

Case 2:19-bk-24804-VZ   Doc 667-3   Filed 04/23/20   Entered 04/23/20 20:47:28   Desc
Exhibit 3   Page 4 of 8

BSA   DEPOSITION OF DANIEL MCGILL, VOLUME I - 05/16/2018
HAN'S SAN JOSE HOSPITALITY vs. LE HOLDINGS (BEIJING) CO.   XMAX(10/10)

**Page 37**

(1) MR. GOODELL: Without looking.
(2) THE WITNESS: No.
(3) MR. GOODELL: Q. Are you familiar -- would it
(4) surprise you to learn that Chaoying Deng signed
(5) this document on behalf of Le Technology?
(6) MR. MARTINEZ: Objection to form.
(7) Argumentative.
(8) MR. WERTHEIM: Join.
(9) THE WITNESS: Would it surprise me, no.
(10) MR. GOODELL: Q. Okay.
(11) A. Now that you mention it, I do -- I mean,
(12) through the lease I recall, yes. You -- you shook
(13) my memory.
(14) Q. Gotcha. I think earlier you testified
(15) you've never spoken to Chaoying Deng?
(16) A. I have spoken to Chaoying.
(17) Q. Oh, you have spoken.
(18) A. Not with respect to this lease.
(19) Q. Okay. When's the last time you spoke to
(20) her?
(21) A. Gosh, good question. A year ago, maybe.
(22) I mean, if not end of 2016, maybe early '17. I
(23) don't recall exactly.
(24) Q. And what did you speak with her regarding?
(25) A. We -- let me recall. We had some LeEco

**Page 38**

(1) employees who were, I think, sharing space in
(2) Gardena, in one of the offices down in Southern
(3) California.
(4) Q. Their headquarters in Gardena?
(5) A. Yes.
(6) Q. So LeEco employees there as well, too,
(7) correct?
(8) A. Yeah. I just -- there was a Regus service
(9) suite in which there were LeEco employees, and
(10) there were discussions around incorporating them or
(11) allowing them to colocate. And so Chaoying and I
(12) discussed that.
(13) Q. Okay. And did you speak with her prior to
(14) that conversation?
(15) A. No.
(16) Q. That's the only time you spoke to her?
(17) A. Yes.
(18) THE WITNESS: Can I respond to an email?
(19) MR. WERTHEIM: Of course, if you need to take
(20) a break.
(21) MR. GOODELL: If you need to take a quick
(22) break, that's okay, like a three-minute break.
(23) We're going to have to go off the record on this.
(24) MR. WERTHEIM: Why don't we just stay on the
(25) record.

**Page 39**

(1) MR. GOODELL: Okay.
(2) MR. WERTHEIM: He looks like he'll be done in
(3) 30 seconds.
(4) MR. GOODELL: Okay.
(5) MR. WERTHEIM: If you need more time, just
(6) tell us.
(7) THE WITNESS: Okay. Thanks.
(8) MR. GOODELL: Let's mark this as Exhibit 3.
(9) (Plaintiff's Exhibit 3 marked for
(10) identification.)
(11) MR. WERTHEIM: Steven, are you still there?
(12) MR. BUHA: Yes, I am.
(13) MR. WERTHEIM: Okay.
(14) MR. GOODELL: Q. Have you ever seen this
(15) document before, Mr. McGill?
(16) A. I have not.
(17) Q. Do you see the top of it where it has the
(18) -- it says "LeEco"? Do you see that?
(19) A. I do.
(20) Q. Do you see on the right side of the
(21) document where it says "Le Technology"?
(22) A. Uh-huh.
(23) Q. Did Le Technology documents that you saw
(24) during your time there frequently have the LeEco
(25) logo on them like that?

**Page 40**

(1) A. The LeEco logo, yes, often.
(2) Q. So that was a -- I think earlier you --
(3) I'm sorry?
(4) A. That was our corporate letterhead.
(5) Q. That was your corporate letterhead. I
(6) think earlier you testified that was a brand name
(7) of --
(8) A. That's correct.
(9) Q. -- of Le Technology?
(10) A. Yes.
(11) Q. Okay. And do you know who the founder of
(12) Le Technology was?
(13) A. I believe it was YT, which --
(14) Q. Jia Yueting?
(15) A. Correct.
(16) Q. Okay. Do you know who the founder of
(17) Faraday & Future was that? Was that Jia Yueting as
(18) well?
(19) A. That's my understanding.
(20) Q. Okay. So he's pretty involved in both
(21) companies, right?
(22) MR. MARTINEZ: No. Lacks foundation, calls
(23) for speculation, also argumentative question.
(24) MR. WERTHEIM: Join as to use of the word
(25) "involved." Vague and ambiguous.

Case 2:19-bk-24804-VZ   Doc 667-3   Filed 04/23/20   Entered 04/23/20 20:47:28   Desc
Exhibit 3   Page 5 of 8

BSA   DEPOSITION OF DANIEL McGILL, VOLUME I - 05/15/2018   XMAX(11/11)
HAN'S SAN JOSE HOSPITALITY vs. LE HOLDINGS (BEIJING) CO.

Page 41

(1) MR. MARTINEZ: Join as to all objections.
(2) THE WITNESS: My understanding, yes.
(3) MR. GOODELL: Q. Okay. So you said Daniel
(4) Gallagher was the vice president/general counsel of
(5) LeEco. Earlier you testified to that, correct?
(6) A. Correct.
(7) Q. And he's identified on this document as
(8) being the vice president and general counsel,
(9) correct?
(10) A. Correct.
(11) Q. And so as of the date of this document,
(12) were you still working for Le Technology, November
(13) 30th, 2017?
(14) A. No.
(15) MR. GOODELL: Let's do 4.
(16)     (Plaintiff's Exhibit 4 marked for
(17)     identification.)
(18) MR. GOODELL: Q. All right. Have you ever
(19) seen this news story before?
(20) A. Yes, I think so.
(21) Q. You have. Okay. And what is this news
(22) story regarding?
(23) A. The new 80,000 square foot North American
(24) headquarters in San Jose for the LeEco. It's
(25) announcing, what, the opening? Yeah.

Page 42

(1) Q. Uh-huh. And you see on the second page of
(2) this document -- so just for the record, this is
(3) the subject property that you worked at, correct?
(4) A. Correct.
(5) Q. Okay. And the second page of this
(6) document, you see there's a quote from Jia Yueting,
(7) identified as LeEco chairman and CEO? Do you see
(8) that?
(9) A. I do.
(10) Q. Okay. Can you read that into the record?
(11) A. You would like me to read it into the
(12) record?
(13) Q. Yeah.
(14) A. That whole paragraph?
(15) Q. Just "Silicon Valley" --
(16) A. Sure. "'Silicon Valley is critically
(17) important to our global growth strategy,' said
(18) LeEco chairman and CEO Yueting Jia. 'Silicon
(19) Valley is known for its unique talent and culture
(20) of innovation and inspiration, which aligns
(21) perfectly with LeEco's mission to bring
(22) extraordinary experiences to people everywhere.
(23) We're looking forward to sharing our vision of one
(24) connected ecosystem with U.S. consumers - where
(25) users can create a seamless premium, connected

Page 43

(1) experience across all of our lifestyle products.'"
(2) Q. All right. So is this consistent with
(3) your understanding that Jia Yueting was the
(4) chairman and CEO of LeEco?
(5) A. Yes.
(6) Q. Okay. And what was your understanding of
(7) what LeEco -- what did LeEco sell, to your
(8) understanding?
(9) A. To my understanding, LeEco sold sort of a
(10) fleet of devices, including a phone, TV, smartphone
(11) and smart TV. They have a smart bike. And that
(12) was the extent in the U.S.
(13) Q. What about Le Technology?
(14) MR. MARTINEZ: Vague and ambiguous. What
(15) about it?
(16) MR. GOODELL: Q. What did they sell?
(17) A. To the best of my knowledge, I use those
(18) interchangeably.
(19) Q. Okay. Was any -- were any products made
(20) at the subject -- when I say "the subject
(21) property," you understand I'm referring to --
(22) A. Sure.
(23) Q. Okay. 3553 North First Street, San Jose,
(24) correct?
(25) A. Yes.

Page 44

(1) Q. Were any products made at the subject
(2) property?
(3) MR. MARTINEZ: Vague and ambiguous.
(4) THE WITNESS: No, there were not.
(5) MR. GOODELL: Q. Did you see any -- were
(6) there any electric cars stored on the subject
(7) property?
(8) MR. MARTINEZ: Vague and ambiguous.
(9) THE WITNESS: Not that I know of.
(10) MR. GOODELL: Q. Okay. You said at a certain
(11) point -- I guess you testified that as soon as you
(12) got there, you were aware of Faraday & Future
(13) employees working on the subject property, correct?
(14) A. Yes.
(15) Q. When you first got there, about what
(16) percentage, to your estimation, of the subject
(17) property did Faraday & Future employees occupy?
(18) MR. WERTHEIM: Well, objection, it lacks
(19) foundation.
(20)     But go ahead.
(21) THE WITNESS: Approximately five percent,
(22) maybe.
(23) MR. GOODELL: Q. All right. By the time you
(24) left the employ -- being employed by Le Technology,
(25) what was the percentage of the subject property

Case 2:19-bk-24804-VZ    Doc 667-3    Filed 04/23/20    Entered 04/23/20 20:47:28    Desc
Exhibit 3    Page 6 of 8

BSA    DEPOSITION OF DANIEL MCGILL, VOLUME I - 05/15/2018
HAN'S SAN JOSE HOSPITALITY vs. LG HOLDINGS (BEIJING) CO.    XMAX(12/12)

Page 45

(1) that Faraday & Future employees were occupying?
(2)   A. Twenty percent, maybe.
(3)   Q. And what -- to your knowledge, what were
(4) the Faraday -- strike that.
(5)       What is your understanding of what Faraday
(6) & Future -- what their business is?
(7)   A. Development of autonomous vehicle
(8) technology, an actual physical car.
(9)   Q. But just to clarify, you never saw -- were
(10) you ever aware if Faraday & Future had actually
(11) completed producing a car during your time there?
(12)   A. Outside of what I saw in like the launch,
(13) they had a launch in San Francisco, no. I never
(14) had direct knowledge of there being a vehicle
(15) completed.
(16)   Q. Did you go to the launch?
(17)   A. I did.
(18)   Q. Did a lot of your co-workers go to the
(19) launch, too?
(20)   A. A handful.
(21)   Q. Was the launch announced by Le Technology?
(22)   A. Yeah, if memory -- I was brand new, but I
(23) believe that's correct.
(24)   MR. GOODELL: This is going to be -- what are
(25) we on? 5, I believe?

Page 46

(1)   MR. WERTHEIM: Yes.
(2)   MR. MARTINEZ: Yes.
(3)       (Plaintiff's Exhibit 5 marked for
(4)       identification.)
(5)   MR. GOODELL: Q. Have you ever seen this
(6) document before?
(7)   A. No.
(8)   Q. You've never seen it?
(9)   MR. MARTINEZ: Asked and answered.
(10)   MR. GOODELL: Q. Let me turn you to the last
(11) page. Have you ever -- during your time at working
(12) for Le Technology, did you ever have -- see
(13) Chaoying Deng's signature?
(14)   A. On the lease, yes.
(15)   Q. Okay. Is it -- does that look like her
(16) signature at the top of this document?
(17)   MR. WERTHEIM: This is the last page, Page 5
(18) of a document entitled "Subordination
(19) Non-Disturbance and Attornment Agreement"?
(20)   MR. GOODELL: Yes.
(21)   THE WITNESS: I really can't say.
(22)   MR. GOODELL: Q. That's fine.
(23)   A. Yeah.
(24)   Q. In July 2017, was -- Faraday & Future was
(25) occupying the subject property, correct?

Page 47

(1)   MR. WERTHEIM: Asked and answered.
(2)   MR. MARTINEZ: Also calls for a legal
(3) conclusion.
(4)   THE WITNESS: There might have been a head or
(5) two in the space.
(6)   MR. GOODELL: Q. So during your time as
(7) director of real estate for Le Technology, you were
(8) never shown this document?
(9)   MR. MARTINEZ: It's argumentative.
(10)   THE WITNESS: Not that I recall.
(11)   MR. GOODELL: Q. Well, take your time to
(12) review it.
(13)   A. Sure. (Witness reviews document.)
(14)       No, I never saw this document.
(15)   Q. Did Le Technology ever ask, to your
(16) knowledge -- well, first of all, let me start.
(17)       Did you ever contact Han's San Jose
(18) Hospitality, LLC, and ask for permission for
(19) Faraday & Future to occupy the subject property?
(20)   A. No.
(21)   Q. So you never did. Okay. Did anyone else,
(22) to your knowledge, at Le Technology ask Han's San
(23) Jose Hospitality, LLC, for permission for Faraday &
(24) Future to occupy the subject property?
(25)   MR. WERTHEIM: When you say "ask," that would

Page 48

(1) be verbal or written?
(2)   MR. GOODELL: I think the word -- yes.
(3)   THE WITNESS: Not to the best of my knowledge,
(4) that I recall.
(5)   MR. GOODELL: Q. Okay. Would that be within
(6) your purview, to handle a request such as that?
(7)   A. Theoretically, yes.
(8)   Q. Okay. So no one at Le Technology
(9) instructed you to ask permission from Han's San
(10) Jose Hospitality for permission for Faraday &
(11) Future to occupy the subject property?
(12)   A. Correct.
(13)   Q. Who was your boss at Le Technology?
(14)   A. When I was hired, I originally reported to
(15) Dan Poritzky. And then when Dan left, it was
(16) really quite ambiguous and a little unclear as far
(17) as who I directly reported to. Shaun Williams is
(18) who I interfaced with for the majority.
(19)   Q. How do you spell his name?
(20)   A. Williams.
(21)   Q. Just S-e-a-n or -- to your knowledge?
(22)   A. Oh, S-h-a-u-n.
(23)   Q. Okay. Do you know where -- who is he
(24) working for now?
(25)   A. I don't know. I don't know. I know he's

Case 2:19-bk-24804-VZ    Doc 667-3    Filed 04/23/20    Entered 04/23/20 20:47:28    Desc
Exhibit 3    Page 7 of 8

DEPOSITION OF DANIEL McBIEL, VOLUME I - 03/15/2018
BSA    HAN'S SAN JOSE HOSPITALITY vs. LESHI HOLDINGS (BEIJING) CO.    XMAX(20/20)

Page 77

(1)  A. Yeah.
(2)  Q. Are you aware of the public statement Jia
(3) Yueting made not too long ago, where he had to
(4) repay a lot of his shares that he borrowed from
(5) Leshi Internet Technology?
(6)    Are you familiar with that?
(7)  A. No.
(8)  Q. Okay. So you -- did you hear any
(9) discussion, while you were at Le Technology, that
(10) Jia Yueting had a lot of his own money -- you know,
(11) loaned a lot of money and borrowed a lot of money
(12) from Le Technology?
(13)  MR. MARTINEZ: Lacks foundation. Calls for
(14) hearsay. Going beyond the scope.
(15)  MR. BUHA: Join.
(16)  THE WITNESS: That YT had borrowed a lot of
(17) money from --
(18)  MR. GOODELL: Q. Well, let's break that down.
(19) Yeah. First of all, that he borrowed money from --
(20) from Le Technology.
(21)  A. No, I did not have knowledge of that.
(22)  Q. What about him investing his own money in
(23) Le Technology?
(24)  A. That was always the understanding, yeah.
(25)  Q. Right. Okay.

Page 78

(1)  A. At least my understanding.
(2)  Q. Gotcha. The last page of this document,
(3) it identifies a person named Hong -- Hong -- Hongli
(4) Wan.
(5)  A. I see it.
(6)  Q. Are you familiar with who that is?
(7)  A. No, sir.
(8)  Q. And then Chaoying Deng, again, do you see
(9) below it?
(10)  A. I see that.
(11)  Q. Are you familiar with -- familiar with
(12) what the Articles of Incorporation is?
(13)  A. Generally?
(14)  Q. Yes.
(15)  A. Yes.
(16)  Q. Have you ever seen a document such as the
(17) last two pages of Exhibit 8 before?
(18)  MR. WERTHEIM: 8 or 9?
(19)  MR. GOODELL: 9. Thank you.
(20)  THE WITNESS: Have I seen a document like
(21) this. Yeah, I'm sure I have along the way.
(22)  MR. GOODELL: Q. Okay. When you worked at
(23) Apple, did you have a much better understanding of
(24) -- you said -- testified earlier that Le Technology
(25) is opaque to you. When you worked at Apple, was it

Page 79

(1) much less opaque --
(2)  A. Yes.
(3)  Q. -- as far as the structure of the company?
(4) Yes?
(5)  A. Yes.
(6)  Q. In what way?
(7)  A. Just a clear understanding of the
(8) leadership structure.
(9)  Q. Gotcha. Compared to where you work now,
(10) is where you work now the clearer leadership
(11) structure than Le Technology?
(12)  A. Yes.
(13)  Q. Would you say Le Technology is the most
(14) opaque leadership structure of anywhere you've
(15) worked?
(16)  A. Yes.
(17)  Q. And why do you think that was?
(18)  MR. MARTINEZ: Calls for speculation.
(19)  MR. BUHA: Join.
(20)  THE WITNESS: Why would I think that was? I
(21) don't know. I mean, it was always -- why was that?
(22) I honestly don't know. I assumed -- I attributed
(23) it to being a Chinese company that just had an
(24) exceptionally complex, for tax reasons, legal
(25) structure. And I -- I was blissfully ignorant to

Page 80

(1) anything beyond that.
(2)  MR. GOODELL: 10.
(3)    (Plaintiff's Exhibit 10 marked for
(4)    identification.)
(5)  MR. GOODELL: Q. All right. Do you see on
(6) the first page of this -- first of all, have you
(7) ever seen this document before?
(8)  A. No, I have not.
(9)  Q. All right. Do you see Paragraph 3 of this
(10) document, it identifies an address: 525 Maple
(11) Avenue, Torrance, California?
(12)  A. I see that, yeah.
(13)  Q. Is that the address of the LA property you
(14) were testifying about earlier that you worked on
(15) for Le Technology?
(16)  A. No.
(17)  Q. Okay, it's not. It's a different address.
(18)  A. Yes.
(19)  Q. Did you ever visit this property?
(20)  A. No, not to the best of my knowledge. Do
(21) you know what was there?
(22)  Q. I don't.
(23)  A. No, I don't -- I don't think I ever
(24) visited this property.
(25)  Q. Okay. If we continue on this document,

Case 2:19-bk-24804-VZ    Doc 667-3    Filed 04/23/20    Entered 04/23/20 20:47:28    Desc
Exhibit 3    Page 8 of 8

DEPOSITION OF DANIEL McGILL, VOLUME I - 05/15/2018
HAN'S SAN JOSE HOSPITALITY vs. LE HOLDINGS (BEIJING) CO.
BSA                                                                            XMAX(31/31)

## Page 121

CERTIFICATE OF WITNESS

---o0o---

I, DANIEL McGILL, hereby declare under penalty of perjury that I have read the foregoing deposition testimony; and that the same is a true and correct transcription of my said testimony except as corrected pursuant to my rights under Section 2025.520(b)-(d) of the California Code of Civil Procedure.

_____
Signature

_____
Date

## Page 122

STATE OF CALIFORNIA  )
                     )
COUNTY OF SAN FRANCISCO )

I, CINDY TUGAW, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 8211 of the California Code of Civil Procedure, do hereby certify that

DANIEL McGILL,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Dated the 30th day of May, 2018.

CINDY TUGAW
CSR No. 4805 (California)

## Page 123

Daniel McGill
1688 St. Anthony Drive
San Jose, CA 95125
Date: May 30, 2018
Re: Han's vs. Le Technology, et al.
Deposition Date: Tuesday, May 15, 2018
Dear Mr. McGill,

Please be advised the original transcript of your deposition is ready for your review.

Pursuant to CCP Section 2025.520(a), you have 30 days following the date of this notice to read, correct if necessary, and sign your transcript unless the attending parties and the deponent agree on the record or otherwise in writing to a longer or shorter time period. The deponent may change the form or the substance of the answer to a question, and may either approve the transcript of the deposition by signing it, or refuse to approve the transcript by not signing it. You are not required by law to read and sign your deposition transcript. All parties will be informed of the corrections. The original transcript will then be sealed and sent to the examining attorney pursuant to the applicable law.

You may either come to our office to read and sign the original transcript, or you may contact your attorney or the attorney who arranged for you to be present at your deposition. If they have ordered a copy of the transcript, you may review their copy and make corrections by submitting, signing and returning the attached form. If you choose to review your transcript at our office, please call first to make an appointment. Should you have any question regarding these instructions, please call.

Sincerely,

NOGARA REPORTING SERVICE
5 Third Street, Suite 415
San Francisco, California 94103
(415) 398-1889
cc: All counsel, original deposition