# EXHIBIT 4

1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             IN AND FOR THE COUNTY OF SANTA CLARA

3

4

5   HAN'S SAN JOSE HOSPITALITY,
    LLC,
6
                    Plaintiff,
7
    v.                              No.   17CV317221
8
    LE HOLDINGS (BEIJING) CO.,
9   LTD; LE TECHNOLOGY, INC.;
    FARADAY & FUTURE, INC.,
10  and DOES 1 to 10,

11                  Defendants.
    _____/
12          Deposition of

13      DANIEL PORITZKY

14   Wednesday, May 16, 2018

15      **CERTIFIED COPY**

16

17

18

19

20   REPORTED BY:  CINDY TUGAW, CSR #4805

21

22
                NOGARA REPORTING SERVICE
23              5 Third Street, Suite 415
             San Francisco, California 94103
24                  (415) 398-1889

25

1    THE WITNESS:  I was only there for, you know,        12:51:11

2   seven months or around there.  We were just getting   12:51:15

3   through the entitlements, and then a decision was      12:51:18

4   made to sell the land.                                 12:51:25

5    MR. GOODELL:  Q.  Who was the land sold to?           12:51:34

6    A.  I don't know their -- I don't know the            12:51:37

7   proper name.  I thought of them as Genzon,             12:51:42

8   G-e-n-z-o-n, but I don't know the entity.  I was       12:51:46

9   never privy to those documents.                        12:51:49

10    Q.  Did you ever meet an individual by the           12:51:52

11   name of Jia Yueting?                                  12:51:56

12    A.  Is that YT?                                       12:51:57

13    Q.  Yeah, YT.                                         12:51:58

14    A.  Yes.                                              12:51:59

15    Q.  How many times have you met him                   12:52:02

16   personally?                                           12:52:05

17    A.  I would estimate ten times.                       12:52:08

18    Q.  What was his role at LeEco?                        12:52:13

19    A.  He was -- he was the head guy.                    12:52:17

20    Q.  Did you report to him?                            12:52:18

21    A.  No.                                               12:52:21

22    Q.  Do you know if anyone above you reported          12:52:25

23   to him?                                               12:52:28

24    A.  Do I know of people that reported to -- I        12:52:32

25   don't know how the org chart really above my world    12:52:37

<< NOGARA REPORTING SERVICE >>        18

| | | |
|---|---|---|
| 1 | worked.  So I don't know. | 12:52:42 |
| 2 | Q.  Okay.  When you met with him in person, | 12:52:48 |
| 3 | what did you discuss? | 12:52:49 |
| 4 | A.  The land. | 12:52:52 |
| 5 | Q.  The land that remains a dilapidated | 12:52:54 |
| 6 | parking lot? | 12:52:55 |
| 7 | A.  Yeah.  We talked about design.  We talked | 12:52:57 |
| 8 | about entitlements.  We talked about, you know, do | 12:53:00 |
| 9 | we want to create a hotel here, residential.  We | 12:53:04 |
| 10 | talked about how we were going to re-entitle the | 12:53:07 |
| 11 | land. | 12:53:15 |
| 12 | Q.  And what did he inform you?  What was his | 12:53:17 |
| 13 | desire as far as re-entitling the land? | 12:53:20 |
| 14 | A.  He was generally onboard with our | 12:53:23 |
| 15 | recommendations.  What we were trying to do was | 12:53:27 |
| 16 | create the optimal campus for a user for LeEco, but | 12:53:33 |
| 17 | we were also trying to maximize value at the same | 12:53:37 |
| 18 | time.  And, you know, those don't necessarily have | 12:53:41 |
| 19 | to intersect.  They kind of ran parallel. | 12:53:45 |
| 20 | So he was -- he liked what we were doing, | 12:53:47 |
| 21 | and he had his own ideas sometimes, but he was | 12:53:51 |
| 22 | generally onboard with what we were doing. | 12:53:54 |
| 23 | Q.  Gotcha.  Did you ever interact with anyone | 12:53:59 |
| 24 | working for a company named Faraday Future? | 12:54:02 |
| 25 | A.  Yes. | 12:54:05 |

1       Q.   Who at Faraday did you interact with?                12:54:19

2       A.   I -- on the -- the -- the people in LA,              12:54:29

3  Chaoying.  I don't know how to spell her name.                 12:54:31

4       Q.   Is that Chaoying Deng?                               12:54:36

5       A.   Yes.                                                 12:54:36

6       Q.   What did you interact with her regarding?            12:54:41

7       A.   I would help them a little bit on leasing.           12:54:46

8  I would help them a little bit on financing.  They             12:54:51

9  had their own land that they had -- they had                   12:54:55

10  bought.  And so I -- at different points I -- I               12:55:02

11  helped them a little bit.                                     12:55:04

12      Q.   So you did work for Faraday Future as                12:55:05

13  well, correct?                                                12:55:06

14      A.   No.  I -- I -- I did not.  So they -- I              12:55:14

15  feel like -- I don't know if this is a guess or an            12:55:21

16  estimate.  They had a resource that knew real                 12:55:23

17  estate.  I was not a tech guy.  I was not a user              12:55:27

18  guy.  I was a real estate guy.  And so I think that           12:55:31

19  they knew that they -- there was a real estate guy,           12:55:36

20  and they would call sometimes and ask for my                  12:55:41

21  advice.                                                       12:55:41

22      Q.   So they called you and asked for you --              12:55:43

23  your advice regarding leasing and financing?                  12:55:45

24      A.   Yes.                                                 12:55:49

25      Q.   And what sort of advice did you give them?           12:55:52

| | | |
|---|---|---|
| 1 | MR. WERTHEIM:  Objection.  Vague and | 12:55:55 |
| 2 | ambiguous.  Also not even close to relevant to this | 12:55:58 |
| 3 | case. | 12:55:58 |
| 4 | But go ahead. | 12:55:59 |
| 5 | THE WITNESS:  I don't remember the specifics. | 12:56:03 |
| 6 | MR. GOODELL:  Q.  Do you remember a particular | 12:56:05 |
| 7 | project they called you and asked you for advice | 12:56:06 |
| 8 | on? | 12:56:07 |
| 9 | A.  They had some land in Nevada that they | 12:56:11 |
| 10 | were going to build, you know, their global | 12:56:17 |
| 11 | headquarters on.  They had some land that they | 12:56:22 |
| 12 | optioned in Vallejo.  And they had, you know, a | 12:56:30 |
| 13 | couple different leases.  I don't remember the | 12:56:37 |
| 14 | specifics without having the ability to go back to | 12:56:43 |
| 15 | emails and such.  I just don't.  I don't have that | 12:56:46 |
| 16 | information. | 12:56:46 |
| 17 | Q.  Do you know if they followed your advice? | 12:56:49 |
| 18 | A.  I don't know. | 12:56:51 |
| 19 | Q.  How many times have you spoken with | 12:56:54 |
| 20 | Chaoying Deng? | 12:57:00 |
| 21 | A.  Ten -- five to ten times, probably. | 12:57:03 |
| 22 | Q.  Was it your understanding she was also | 12:57:05 |
| 23 | involved with LeEco? | 12:57:07 |
| 24 | MR. WERTHEIM:  Objection as to use of the word | 12:57:10 |
| 25 | "involved."  Vague and ambiguous. | 12:57:14 |

| | | |
|---|---|---|
| 1 | MR. BUHA:  Join. | 12:57:16 |
| 2 | THE WITNESS:  I don't -- I don't -- I wasn't | 12:57:18 |
| 3 | privy to how all that worked outside of my little | 12:57:23 |
| 4 | bubble of real estate.  This was a frustration for | 12:57:27 |
| 5 | me, but I didn't -- I didn't know.  I suspected | 12:57:33 |
| 6 | that she was doing stuff.  I -- I don't know. | 12:57:37 |
| 7 | MR. GOODELL:  Q.  So you said it was a source | 12:57:38 |
| 8 | of frustration.  It was frustrating.  What exactly | 12:57:43 |
| 9 | was frustrating? | 12:57:45 |
| 10 | A.  I've spent 19 years of my career driving | 12:57:47 |
| 11 | profits and making investors money.  This was the | 12:57:51 |
| 12 | first time, and only time, that I was -- I was a -- | 12:57:54 |
| 13 | I was an expense.  I was there to serve a role that | 12:57:58 |
| 14 | wasn't going to drive profits, that wasn't | 12:58:02 |
| 15 | important in the overall company.  I was -- I was a | 12:58:05 |
| 16 | real estate guy at a tech company. | 12:58:07 |
| 17 | So normally I built myself into a leader, | 12:58:11 |
| 18 | built myself into someone that drove profits and | 12:58:15 |
| 19 | helped investors and all that, but I -- I -- I | 12:58:18 |
| 20 | didn't know what the heck was going on up there. | 12:58:24 |
| 21 | Q.  And you said that was frustrating to you, | 12:58:28 |
| 22 | correct? | 12:58:29 |
| 23 | A.  Sure. | 12:58:30 |
| 24 | Q.  And do you have an idea -- would you | 12:58:35 |
| 25 | characterize the management structure there as | 12:58:38 |

| | | |
|---|---|---|
| 1 | A.  And so I just wasn't here, and I just -- I | 13:03:02 |
| 2 | didn't -- I wasn't the -- I wasn't here also when | 13:03:05 |
| 3 | they entered into the lease document.  And so I -- | 13:03:10 |
| 4 | I kind of fit this little six- or seven-month | 13:03:13 |
| 5 | window with a focus on the land. | 13:03:21 |
| 6 | MR. WERTHEIM:  But to answer his question, do | 13:03:22 |
| 7 | you have any of those documents? | 13:03:24 |
| 8 | THE WITNESS:  No. | 13:03:39 |
| 9 | MR. GOODELL:  Q.  Okay.  So you physically | 13:03:43 |
| 10 | worked out of 3553 North First Street? | 13:03:49 |
| 11 | A.  Yes. | 13:03:50 |
| 12 | Q.  Did you ever work -- have you ever met an | 13:03:53 |
| 13 | individual by the name of Shaun Williams? | 13:03:55 |
| 14 | A.  Yes. | 13:03:59 |
| 15 | MR. GOODELL:  Let's mark this as 13. | 13:04:20 |
| 16 | (Plaintiff's Exhibit 13 marked for | 13:04:20 |
| 17 | identification.) | 13:04:21 |
| 18 | MR. GOODELL:  Q.  Is that -- this is a | 13:04:24 |
| 19 | photograph.  Does that look like Mr. Williams | 13:04:26 |
| 20 | and -- | 13:04:26 |
| 21 | A.  Yes. | 13:04:26 |
| 22 | Q.  Does that look like Jia Yueting? | 13:04:35 |
| 23 | A.  Yep. | 13:04:36 |
| 24 | MR. WERTHEIM:  Okay.  Let him finish -- | 13:04:36 |
| 25 | THE WITNESS:  Sorry. | 13:04:36 |

1    MR. WERTHEIM:   -- the question before you give          13:04:36

2    your answer.                                             13:04:36

3    MR. GOODELL:   Q.   Is this the 3553 North First        13:04:40

4    Street property?                                         13:04:41

5    A.   Yes.                                                13:04:41

6    Q.   How many times do you recall seeing                13:04:45

7    Mr. Jia Yueting at that property?                        13:04:51

8    A.   He would visit for anywhere from two to,           13:04:56

9    you know, ten days kind of thing.   But, you know, I    13:05:04

10   don't remember the exact number of days he was          13:05:07

11   there.                                                   13:05:07

12   Q.   Two to ten days a month or --                      13:05:12

13   A.   Sometimes, but then there would be a               13:05:13

14   couple of months where he wouldn't be there.            13:05:15

15   Q.   All right.                                          13:05:17

16   A.   I -- I don't have -- I couldn't give you           13:05:19

17   an accurate count of how many days he was there.        13:05:23

18   Q.   Did any Faraday Future employees occupy            13:05:27

19   the 3553 North First Street property?                   13:05:32

20   A.   Yes.                                                13:05:33

21   Q.   Do you know the names of any of these              13:05:35

22   employees?                                               13:05:39

23   A.   I -- my interaction with the Faraday               13:05:41

24   employees was more Chaoying and their Los Angeles       13:05:48

25   people.   I wasn't -- I wasn't dealing with the --      13:05:53

| | | |
|---|---|---|
| 1 | the San Jose people very much. | 13:05:55 |
| 2 | MR. WERTHEIM:  Okay.  But -- so listen to the | 13:05:56 |
| 3 | question.  He asked you who at that San Jose | 13:05:59 |
| 4 | property did you interact with. | 13:06:01 |
| 5 | MR. MARTINEZ:  What were their names? | 13:06:03 |
| 6 | MR. GOODELL:  That was what my question was. | 13:06:06 |
| 7 | THE WITNESS:  John Quach. | 13:06:11 |
| 8 | MR. WERTHEIM:  Spell his last name, please, if | 13:06:14 |
| 9 | you can. | 13:06:15 |
| 10 | THE WITNESS:  I don't remember how to spell | 13:06:16 |
| 11 | it. | 13:06:20 |
| 12 | MR. GOODELL:  Q.  Who's another person at that | 13:06:23 |
| 13 | property who worked for Faraday you interacted | 13:06:25 |
| 14 | with? | 13:06:30 |
| 15 | A.  That might be it for Northern California, | 13:06:33 |
| 16 | because I again was working on the land.  I mean, I | 13:06:38 |
| 17 | wasn't -- I wasn't -- it just wasn't part of my | 13:06:41 |
| 18 | world. | 13:06:43 |
| 19 | Q.  Do you -- are you aware of LeEco ever | 13:06:48 |
| 20 | attempting to sublease the 3553 North First Street | 13:06:51 |
| 21 | property? | 13:06:53 |
| 22 | A.  Not while I was there, no. | 13:06:57 |
| 23 | Q.  Are you aware of LeEco entering into a | 13:07:02 |
| 24 | sublease agreement with Faraday for their occupancy | 13:07:04 |
| 25 | of that property? | 13:07:08 |

| | | |
|---|---|---|
| 1 | A.  I think there was something.  I wasn't | 13:07:13 |
| 2 | privy to that, but I remember it was discussed at | 13:07:22 |
| 3 | some point.  I don't know if anything was ever | 13:07:25 |
| 4 | created, signed or delivered.  I just -- it was -- | 13:07:30 |
| 5 | that had to do with the finance people and the | 13:07:33 |
| 6 | accounting people. | 13:07:33 |
| 7 | Q.  What are the names of the people who would | 13:07:35 |
| 8 | have been -- who would have more knowledge of that | 13:07:37 |
| 9 | than you? | 13:07:40 |
| 10 | MR. MARTINEZ:  Calls for speculation. | 13:07:41 |
| 11 | Answer if you know. | 13:07:47 |
| 12 | THE WITNESS:  There's a -- there's a woman, | 13:07:53 |
| 13 | Huizhi. | 13:07:54 |
| 14 | MR. GOODELL:  Q.  How do you spell that? | 13:07:55 |
| 15 | A.  I have absolutely no idea. | 13:07:56 |
| 16 | Q.  Say it again. | 13:07:57 |
| 17 | A.  Huizhi. | 13:07:58 |
| 18 | Q.  Huizhi.  Do you know what letter that | 13:08:01 |
| 19 | starts with? | 13:08:03 |
| 20 | A.  (Witness shakes head.) | 13:08:05 |
| 21 | MR. WERTHEIM:  Do you want to buy a vowel?  W, | 13:08:10 |
| 22 | maybe? | 13:08:10 |
| 23 | THE WITNESS:  I'm not trying to be | 13:08:12 |
| 24 | disrespectful.  I have no idea of the consonant.  A | 13:08:15 |
| 25 | lot of these names, you know, were Chinese, and I | 13:08:17 |

| | | |
|---|---|---|
| 1 | that discussion with? | 13:11:58 |
| 2 | A.   It was some of the accounting and finance | 13:12:01 |
| 3 | team, and I do not remember their names. | 13:12:07 |
| 4 | Q.   And where did these discussions take | 13:12:10 |
| 5 | place? | 13:12:11 |
| 6 | A.   At 3553 North First Street. | 13:12:15 |
| 7 | Q.   When you first began working for LeEco, | 13:12:23 |
| 8 | was Faraday Future already occupying the property? | 13:12:34 |
| 9 | A.   Yes.  They were in there temporarily until | 13:12:39 |
| 10 | they occupied a building on the Yahoo land. | 13:12:48 |
| 11 | Q.   And about how many Faraday Future | 13:12:55 |
| 12 | employees were in the property at that time? | 13:12:58 |
| 13 | A.   No idea. | 13:13:01 |
| 14 | Q.   Vague, I mean, a rough estimation? | 13:13:02 |
| 15 | A.   I don't know. | 13:13:04 |
| 16 | Q.   Okay.  About how much of the 3553 North | 13:13:09 |
| 17 | First Street building were Faraday -- did Faraday & | 13:13:12 |
| 18 | Future occupy when you first began working for | 13:13:14 |
| 19 | LeEco? | 13:13:15 |
| 20 | A.   I don't know. | 13:13:15 |
| 21 | Q.   Was there any signage in the building that | 13:13:18 |
| 22 | indicated where these employees worked? | 13:13:23 |
| 23 | A.   I don't remember any signage saying | 13:13:26 |
| 24 | Faraday Future is in the building. | 13:13:30 |
| 25 | Q.   Okay.  How did you learn that Faraday | 13:13:31 |

| | | |
|---|---|---|
| 1 | identification.) | 13:40:29 |
| 2 | MR. GOODELL:  Q.  Have you seen this document | 13:40:30 |
| 3 | before, Mr. Poritzky? | 13:40:32 |
| 4 | A.  Yep.  Yes. | 13:40:33 |
| 5 | Q.  What is this document? | 13:40:38 |
| 6 | A.  It's a press release to talk about me and | 13:40:46 |
| 7 | what I was going to do for the land that they just | 13:40:49 |
| 8 | bought. | 13:40:52 |
| 9 | Q.  See where it says, "In July, LeEco | 13:40:56 |
| 10 | purchased 3.1 million square feet of entitled land | 13:41:00 |
| 11 | from Yahoo to build the future home of LeEco's | 13:41:04 |
| 12 | global headquarters"? | 13:41:04 |
| 13 | Do you see that? | 13:41:05 |
| 14 | A.  Yes. | 13:41:05 |
| 15 | Q.  So that was the land you were talking | 13:41:07 |
| 16 | about earlier? | 13:41:08 |
| 17 | A.  Yes. | 13:41:08 |
| 18 | Q.  How far away was that from -- this land | 13:41:11 |
| 19 | from the 3533 North First Street land? | 13:41:14 |
| 20 | A.  I'd say about two miles. | 13:41:17 |
| 21 | Q.  And you see on the second page it has a | 13:41:24 |
| 22 | quote from an individual by the name of Richard | 13:41:26 |
| 23 | Ren, who was identified as president of LeEco North | 13:41:31 |
| 24 | America? | 13:41:32 |
| 25 | A.  Yes. | 13:41:33 |

| | | |
|---|---|---|
| 1 | Q.  Did -- are you familiar with Mr. Ren? | 13:41:34 |
| 2 | A.  Yes. | 13:41:34 |
| 3 | Q.  Did he hire you? | 13:41:43 |
| 4 | A.  He -- I had an interview with him.  I | 13:41:46 |
| 5 | don't know if you'd say he hired me. | 13:41:49 |
| 6 | Q.  Does he still work for LeEco? | 13:41:52 |
| 7 | MR. MARTINEZ:  Lacks foundation. | 13:41:53 |
| 8 | MR. WERTHEIM:  If you know. | 13:41:55 |
| 9 | THE WITNESS:  I don't know. | 13:41:57 |
| 10 | MR. GOODELL:  Q.  When's the last time you | 13:41:58 |
| 11 | spoke to Mr. Ren? | 13:42:01 |
| 12 | A.  One or two days before he had me fired. | 13:42:07 |
| 13 | Q.  Before you were fired or -- | 13:42:08 |
| 14 | A.  Yeah. | 13:42:09 |
| 15 | Q.  So you sound like you weren't really happy | 13:42:11 |
| 16 | with the way that you were let go from the company, | 13:42:14 |
| 17 | is that correct? | 13:42:18 |
| 18 | A.  I was fired.  I had never been fired | 13:42:24 |
| 19 | before. | 13:42:27 |
| 20 | Q.  Okay.  The day that you were terminated, | 13:42:28 |
| 21 | did you have to leave immediately? | 13:42:30 |
| 22 | A.  Yes. | 13:42:33 |
| 23 | Q.  While we were off the record just now, | 13:42:37 |
| 24 | your counsel indicated that, on Page 134 of the | 13:42:42 |
| 25 | documents of a previous exhibit -- | 13:42:44 |

| | | |
|---|---|---|
| 1 | A.   Yeah. | 13:42:44 |
| 2 | Q.   -- there's an individual that you | 13:42:45 |
| 3 | previously identified as Huizhi. | 13:42:51 |
| 4 | A.   Huizhi. | 13:42:52 |
| 5 | Q.   Huizhi.  And that -- | 13:42:52 |
| 6 | A.   That's her. | 13:42:53 |
| 7 | Q.   And, for the record, it's LE TECH 134, and | 13:42:58 |
| 8 | she -- this person is identified as Huizhi Lo? | 13:43:02 |
| 9 | A.   Yes. | 13:43:02 |
| 10 | Q.   And that Huizhi Lo, is that someone that | 13:43:05 |
| 11 | worked in the accounting department? | 13:43:06 |
| 12 | A.   Yes. | 13:43:08 |
| 13 | Q.   And those were the individuals that you | 13:43:10 |
| 14 | recall that were involved in a discussion regarding | 13:43:12 |
| 15 | Faraday potentially or actually subleasing the | 13:43:18 |
| 16 | property, is that correct? | 13:43:20 |
| 17 | MR. MARTINEZ:  Misstates testimony. | 13:43:23 |
| 18 | THE WITNESS:  Yes. | 13:43:24 |
| 19 | MR. GOODELL:  Q.   Okay.  Thank you. | 13:43:27 |
| 20 | Do you know if -- is Huizhi, is that -- is | 13:43:31 |
| 21 | that a female? | 13:43:31 |
| 22 | A.   Yes. | 13:43:32 |
| 23 | Q.   Do you know if she still resides in | 13:43:35 |
| 24 | California? | 13:43:37 |
| 25 | A.   I don't know. | 13:43:38 |

| | | |
|---|---|---|
| 1 | Q. Not -- not 3553 North First Street? | 13:44:50 |
| 2 | A. Correct. | 13:44:50 |
| 3 | Q. Not that one. | 13:44:51 |
| 4 | A. Correct. Four buildings on Patrick Henry. | 13:44:55 |
| 5 | And this was the 49er's parking lot. One of my | 13:44:59 |
| 6 | first tasks was to fix up this building so that | 13:45:02 |
| 7 | Faraday employees could go and work in that | 13:45:05 |
| 8 | building. | 13:45:07 |
| 9 | Q. Right. | 13:45:09 |
| 10 | A. That's -- that's really the relevant -- | 13:45:14 |
| 11 | You're going to object as to relevant. That's what | 13:45:17 |
| 12 | I dealt with with the Faraday -- that's what was | 13:45:20 |
| 13 | one of my first tasks, to get that ready for them. | 13:45:23 |
| 14 | Q. Okay. But the 3553 property -- | 13:45:26 |
| 15 | A. Yeah, I don't know if those people all | 13:45:28 |
| 16 | came from 3553. I don't know if it was for future | 13:45:31 |
| 17 | hiring. I don't know if it was for -- you know, | 13:45:34 |
| 18 | they came up from LA. I just know that I had to | 13:45:36 |
| 19 | get that ready for them and -- and then I checked | 13:45:40 |
| 20 | up, you know, a few weeks later, and the building | 13:45:43 |
| 21 | was -- you know, had people in it. | 13:45:46 |
| 22 | Q. Okay. And that was the -- that other | 13:45:48 |
| 23 | building? | 13:45:48 |
| 24 | A. Yes. | 13:45:49 |
| 25 | Q. Okay. As far as the 3553 property, are | 13:45:52 |

| | | |
|---|---|---|
| 1 | We'll work off this, but I need to get that back, | 14:01:10 |
| 2 | then. | 14:01:11 |
| 3 | THE WITNESS:  It was Chaoying and another guy | 14:01:24 |
| 4 | signed it, another Asian name that I don't know. | 14:01:28 |
| 5 | MR. GOODELL:  Q.  So let's go to the document. | 14:01:29 |
| 6 | If you could turn to LE TECH 42, please. | 14:01:34 |
| 7 | A.  I've got to drink this at 2:00 o'clock, so | 14:01:36 |
| 8 | I'm sorry. | 14:01:36 |
| 9 | Q.  Yeah, that's fine. | 14:01:42 |
| 10 | A.  Yeah. | 14:01:43 |
| 11 | Q.  Okay.  So Chaoying Deng, you see her | 14:01:46 |
| 12 | signature right there? | 14:01:47 |
| 13 | A.  Yes. | 14:01:48 |
| 14 | Q.  So she signed this on behalf of Le | 14:01:50 |
| 15 | Technology? | 14:01:50 |
| 16 | A.  Yes. | 14:01:50 |
| 17 | Q.  Okay.  And you also interacted with her in | 14:01:53 |
| 18 | her capacity at Faraday, you testified to earlier, | 14:01:55 |
| 19 | correct? | 14:01:56 |
| 20 | A.  Yes. | 14:01:58 |
| 21 | Q.  You see she's identified as the chief | 14:02:00 |
| 22 | executive officer of Le Technology on this | 14:02:02 |
| 23 | document?  Do you see that? | 14:02:03 |
| 24 | A.  Yeah.  I didn't know that that was her | 14:02:05 |
| 25 | title, but I see that's written there. | 14:02:08 |

| | | |
|---|---|---|
| 1 | the loan docs. | 14:40:50 |
| 2 | There's a certain part of the loan on the | 14:40:52 |
| 3 | land that I was an expert on.  The guaranteed | 14:40:56 |
| 4 | portion, I didn't -- I had no need to know that.  I | 14:41:01 |
| 5 | had heard that from someone in LA. | 14:41:05 |
| 6 | MR. WERTHEIM:  Are you done with Exhibit 10, | 14:41:17 |
| 7 | Counsel? | 14:41:29 |
| 8 | MR. GOODELL:  For now. | 14:42:01 |
| 9 | (Plaintiff's Exhibit 18 marked for | 14:42:01 |
| 10 | identification.) | 14:42:02 |
| 11 | MR. GOODELL:  Q.  Have you ever seen this | 14:42:04 |
| 12 | document before? | 14:42:05 |
| 13 | A.  I remember reading it. | 14:42:09 |
| 14 | Q.  Is this referring to the 3553 North First | 14:42:12 |
| 15 | Street property? | 14:42:13 |
| 16 | A.  Yes. | 14:42:14 |
| 17 | Q.  And you see on the second page of this | 14:42:16 |
| 18 | document where it says -- there's a quote from Jia | 14:42:20 |
| 19 | Yueting, and you see he's identified -- I'm sorry, | 14:42:25 |
| 20 | do you see that? | 14:42:26 |
| 21 | A.  (Witness nods head.) | 14:42:26 |
| 22 | Q.  Is that a yes? | 14:42:26 |
| 23 | A.  Yes. | 14:42:29 |
| 24 | MR. WERTHEIM:  Counsel, didn't we use this as | 14:42:31 |
| 25 | an exhibit yesterday, just to be clear? | 14:42:33 |

| | | |
|---|---|---|
| 1 | MR. GOODELL:  We might have. | 14:42:34 |
| 2 | MR. MARTINEZ:  So is it Exhibit 18, though?  I | 14:42:37 |
| 3 | mean, you didn't mark it.  I didn't hear you say -- | 14:42:38 |
| 4 | MR. GOODELL:  Yes, it's Exhibit 18. | 14:42:42 |
| 5 | Q.  So you see where it says, "Silicon Valley | 14:42:52 |
| 6 | is critically important to our global growth | 14:42:52 |
| 7 | strategy"? | 14:42:53 |
| 8 | Do you see that? | 14:42:53 |
| 9 | A.  Yes. | 14:42:53 |
| 10 | Q.  Was that consistent with your discussions | 14:42:55 |
| 11 | with him? | 14:42:56 |
| 12 | MR. WERTHEIM:  Objection.  Lacks foundation. | 14:43:01 |
| 13 | Was the question "with him"?  Because I may not | 14:43:04 |
| 14 | have heard you. | 14:43:05 |
| 15 | MR. GOODELL:  Yes, "with him." | 14:43:06 |
| 16 | MR. WERTHEIM:  The question lacks foundation. | 14:43:09 |
| 17 | THE WITNESS:  This article was written before | 14:43:12 |
| 18 | I was employed, so it's hard for me to know exactly | 14:43:17 |
| 19 | what he was saying then. | 14:43:20 |
| 20 | MR. GOODELL:  Q.  But earlier you testified | 14:43:21 |
| 21 | you spoke to him about ten times, is that right? | 14:43:24 |
| 22 | A.  Yes. | 14:43:24 |
| 23 | Q.  And it was always about developing that | 14:43:28 |
| 24 | other property -- | 14:43:30 |
| 25 | A.  Yes. | 14:43:30 |

CERTIFICATE OF WITNESS

---o0o---

I, DANIEL PORITZKY, hereby declare under penalty of perjury that I have read the foregoing deposition testimony; and that the same is a true and correct transcription of my said testimony except as corrected pursuant to my rights under Section 2025.520(b)-(d) of the California Code of Civil Procedure.

_____
Signature

_____
Date

1   STATE OF CALIFORNIA     )
                            )
2   COUNTY OF SAN FRANCISCO )

3           I, CINDY TUGAW, a Certified Shorthand

4   Reporter of the State of California, duly

5   authorized to administer oaths pursuant to Section

6   8211 of the California Code of Civil Procedure, do

7   hereby certify that

8                   DANIEL PORITZKY,

9   the witness in the foregoing deposition, was by me

10  duly sworn to testify the truth, the whole truth

11  and nothing but the truth in the within-entitled

12  cause; that said testimony of said witness was

13  reported by me, a disinterested person, and was

14  thereafter transcribed under my direction into

15  typewriting and is a true and correct transcription

16  of said proceedings.

17          I further certify that I am not of counsel

18  or attorney for either or any of the parties in the

19  foregoing deposition and caption named, nor in any

20  way interested in the outcome of the cause named in

21  said caption.

22          Dated the 30th day of May, 2018.

23

24                  CINDY TUGAW
                    CSR No. 4805 (California)
25

1    Daniel Poritzky
     734 Los Palos Drive
2    Lafayette, CA 94549

3    Date:  May 30, 2018
     Re:  Han's vs. Le Technology, et al.
4    Deposition Date:  Wednesday, May 16, 2018

5    Dear Mr. Poritzky,

6            Please be advised the original transcript
     of your deposition is ready for your review.
7            Pursuant to CCP Section 2025.520(a), you
     have 30 days following the date of this notice to
8    read, correct if necessary, and sign your
     transcript unless the attending parties and the
9    deponent agree on the record or otherwise in
     writing to a longer or shorter time period.  The
10   deponent may change the form or the substance of
     the answer to a question, and may either approve
11   the transcript of the deposition by signing it, or
     refuse to approve the transcript by not signing it.
12   You are not required by law to read and sign your
     deposition transcript.  All parties will be
13   informed of the corrections.  The original
     transcript will then be sealed and sent to the
14   examining attorney pursuant to the applicable law.
             You may either come to our office to read
15   and sign the original transcript, or you may
     contact your attorney or the attorney who arranged
16   for you to be present at your deposition.  If they
     have ordered a copy of the transcript, you may
17   review their copy and make corrections by
     submitting, signing and returning the attached
18   form.  If you choose to review your transcript at
     our office, please call first to make an
19   appointment.  Should you have any question
     regarding these instructions, please call.

20
     Sincerely,
21

22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition

216.75.227.166

This site uses cookies. By continuing to browse this Business Wire site (and/or any other Business Wire website), you accept
the use of cookies.  Learn more (/portal/site/home/privacy/)

**I Accept**

**Business Wire**
A Berkshire Hathaway Company

LeEco

# LeEco Formally Announces Opening of New, 80,000 Square Foot North American Headquarters in Silicon Valley with Ribbon-Cutting Ceremony

*Chinese Consul General in San Francisco and San Jose Mayor Join LeEco to Celebrate the Unveiling of the New Facility, Which Can Support up to 800 New Workers*

This site uses cookies. By continuing to browse this Business Wire site (and/or any other Business Wire website), you accept the use of cookies.



LeEco's new 80,000 square foot North American headquarters in San Jose. (Photo: Business Wire)

April 28, 2016 11:00 AM Eastern Daylight Time

SAN JOSE, Calif.–(BUSINESS WIRE)–LeEco, a leading global internet company, today will hold a ribbon-cutting ceremony and press conference to formally establish its new, 80,000 square foot North American headquarters in San Jose, a facility that can support as many as 800 new employees. The headquarters will also be the future home of LeEco's autonomous driving research center, the LeFuture AI Institute.

"Silicon Valley is critically important to our global growth strategy," said LeEco Chairman and CEO Yueting Jia. "Silicon Valley is known for its unique talent and culture of innovation and inspiration, which aligns perfectly with LeEco's mission to bring extraordinary experiences to people everywhere. We're looking forward to sharing our vision of one connected ecosystem with U.S. consumers – where users can create a seamless, premium connected experience across all of our lifestyle products."

Chinese Consul General in San Francisco Luo Linquan, San Jose Mayor Sam Liccardo and LeEco senior leadership will speak with media and give attendees a look into LeEco's full ecosystem of content, platforms and devices.

This site uses cookies. By continuing to browse this Business Wire site (and/or any other Business Wire website), you accept the use of cookies.

When:    Today, April 28

Time:    12:30 p.m. doors open; 1:00 – 1:30 p.m. program

Where:   3553 North 1st Street, San Jose, Calif.

**I Accept**

"LeEco is an innovative, global company that creates excellent experiences for its customers," said Luo Linquan, Chinese Consul General in San Francisco. "On behalf of the Chinese Consulate-General in San Francisco, I would like to extend a warm welcome and congratulate LeEco on their growth and expansion with their new North America headquarters."

"I am grateful to LeEco for choosing to locate its new headquarters in North San Jose, further cementing San Jose's role as a world leader in innovation," said Mayor Sam Liccardo. "On behalf of the City of San Jose, I congratulate LeEco on the opening of its new headquarters, where its hundreds of employees will continue to drive innovation for decades to come."

LeEco has made major headlines recently, starting with its global announcement event on April 20 in Beijing, which was broadcast through Facebook Live, cementing LeEco as the first company to use the API for a large-scale launch. The news included a peek at the stunning and disruptively priced second-generation smartphones, an all-new 4th-generation SuperTV, the LeEco VR headset and its autonomous LeSEE electric vehicle concept car.

LeSEE was showcased along with the second generation of Aston Martin's Rapide S at the Beijing Auto Show on April 25. Additionally, LeEco announced that it will be partnering with Faraday Future to fund a world-class autonomous driving research center in Silicon Valley.

The company has also attracted top-shelf talent across its ecosystem businesses and recently announced the strategic hires of Danny Bowman to Chief Revenue Officer and Shawn Williams to Chief Administrative Officer. Both previously held executive positions at Samsung.

Earlier this year, at the Consumer Electronics Show in Las Vegas, LeEco announced its ambitious plans to rapidly expand its global footprint by entering India and the U.S. market with its ecosystem of technology and content offerings.

**About LeEco**

LeEco is a leading global technology company that provides breakthrough experiences through its open, integrated ecosystem of streaming content, platforms, and smart devices that fit perfectly into a broad spectrum of lifestyles. LeEco opens new opportunities for consumers, by offering a jaw-dropping array of next-generation tech and content spanning smartphones, TVs, sports, film, live entertainment and connected mobility. LeEco was recently named one of Fast Company's 2016 "Most Innovative Companies," and Alphr's "Best of Mobile World Congress – Most Innovative Company." To learn more, visit LeEco's official website and follow them on Facebook and Twitter.

Contacts

LeEco

Chi Tung

805-451-6175

chitung@le.com

or

Zeno Group for LeEco

Mandi Hefflinger

310-566-3986

Mandi.hefflinger@zenogroup.com

This site uses cookies. By continuing to browse this Business Wire site (and/or any other Business Wire website), you accept the use of cookies.

**I Accept**