# EXHIBIT 5

```
 1           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                     FOR THE COUNTY OF SANTA CLARA
 3
 4    HAN'S SAN JOSE HOSPITALITY LLC,    )
 5              Plaintiff,               )
 6         vs.                           ) Case No.
 7    LE HOLDINGS (BEIJING) CO., LTD; LE ) 17 CV317221
 8    TECHNOLOGY, INC.; FARADAY &        )
 9    FUTURE; AND DOES 1 TO 10,          )
10              Defendants.              )
                                         )
11    _____
12
13
14           VIDEOTAPED DEPOSITION OF CHAOYING DENG
15                  LOS ANGELES, CALIFORNIA
16                 THURSDAY, JUNE 21, 2018
17
18
19
20    REPORTED BY:
21    SHAWNA HIGGINS
22    CSR NO. 10646
23    JOB NO. 2935842
24
25    PAGES 1 - 244
```

Page 1

## Page 14

1  relations.    09:24:05
2  Q. Okay. Do you frequently interact with    09:24:08
3  government officials as part of your job duties?    09:24:11
4  A. Just started about two months ago.    09:24:13
5  Q. And do you communicate with them in English    09:24:16
6  as part of your job duties?    09:24:24
7  A. Yes.    09:24:26
8  Q. And are those United States government    09:24:27
9  officials?    09:24:29
10  A. Correct.    09:24:30
11  Q. And you said you started that position a    09:24:32
12  few months ago. What was your position at Faraday    09:24:40
13  Future prior to that time?    09:24:42
14  A. Vice president of the administration and    09:24:43
15  director of finance.    09:24:47
16  Q. And what were your job duties as part of    09:24:48
17  that role?    09:24:55
18  A. So as a director of finance I work with    09:24:56
19  accounting department and our product finance    09:25:03
20  department to basically manage cash flows, corporate    09:25:08
21  budget.    09:25:14
22  Q. Okay. And how long did you work in that    09:25:16
23  role?    09:25:22
24  A. Three or four years.    09:25:22
25  Q. Okay. And did you work in any other roles    09:25:29

## Page 15

1  prior to that time at Faraday Future?    09:25:39
2  A. No.    09:25:41
3  Q. Okay. Have you ever worked for a company    09:25:41
4  called Le Technology?    09:25:46
5  MR. MARTINEZ: Vague and ambiguous.    09:25:48
6    Answer if you understand.    09:25:49
7  THE WITNESS: I never worked for them. On paper    09:25:52
8  I was the CEO, but I never got paid from them and I    09:25:56
9  don't participate in any of the management    09:26:02
10  decisions.    09:26:05
11  BY MR. GOODELL:    09:26:05
12  Q. Okay. When you say on paper you worked for    09:26:06
13  them, what does that mean?    09:26:09
14  A. I don't work for them. And I know in early    09:26:10
15  registration they use my name to register the    09:26:16
16  business.    09:26:20
17  Q. Did they do that without your permission?    09:26:20
18  A. With my permission.    09:26:24
19  Q. Okay.    09:26:25
20  A. But it was understood it's just a role on    09:26:26
21  paper, I'm not supposed to manage the company, I'm    09:26:30
22  not participating in any management role.    09:26:33
23  Q. So you just agreed that they could tell the    09:26:36
24  world you were a CEO, but you didn't want to do any    09:26:38
25  work for them?    09:26:41

## Page 16

1  A. Correct.    09:26:42
2  Q. Okay. And you're aware there are documents    09:26:42
3  filed with the Secretary of State identifying to the    09:26:46
4  world that you were the CEO of Le Technology?    09:26:47
5  A. I am aware of.    09:26:50
6  Q. And you're aware you signed a lease at    09:26:51
7  issue in this case that said that you were signing    09:26:53
8  this document on behalf of Le Technology?    09:26:55
9  A. I don't know which one you're referring.    09:26:58
10  MR. MARTINEZ: Assumes facts, lacks foundation.    09:26:59
11  BY MR. GOODELL:    09:27:02
12  Q. Did you sign the lease for the property    09:27:04
13  that's at issue in this case which is 3553 North    09:27:07
14  First Street, San Jose, California?    09:27:11
15  A. I don't recall.    09:27:14
16  Q. You don't recall if you signed it. Okay.    09:27:14
17    Let's go ahead and mark this as Exhibit 1.    09:27:15
18    (The document referred to was marked by the    09:27:20
19  reporter as Exhibit 1 for identification.)    09:27:21
20  BY MR. GOODELL:    09:27:21
21  Q. So I want to direct your attention to --    09:27:50
22  this will be one of the last pages towards the end.    09:27:59
23  MR. MARTINEZ: Just for the record the witness    09:28:03
24  has in front of her Exhibit 1 which appears to be a    09:28:05
25  copy of the lease for 3553 North First Street. And    09:28:09

## Page 17

1  is there a page number you want the witness to look    09:28:16
2  at?    09:28:18
3  MR. GOODELL: Well, this particular document is    09:28:19
4  not Bates stamped, so if I can assist the witness it    09:28:20
5  would be --    09:28:26
6  MR. MARTINEZ: If you point me to the page you    09:28:30
7  want, that will help.    09:28:32
8  MR. GOODELL: I think this copy doesn't have the    09:28:56
9  signature on it. I apologize. That one does.    09:28:58
10  THE WITNESS: Are you looking at this page?    09:29:00
11  BY MR. GOODELL:    09:29:01
12  Q. Yes, ma'am. Is that your signature on that    09:29:01
13  page?    09:29:04
14  A. Definitely not my handwriting signature.    09:29:04
15  Q. It would have been an electronic signature?    09:29:06
16  A. Correct.    09:29:09
17  Q. Did you give permission for that electronic    09:29:09
18  signature to be affixed to that page?    09:29:12
19  A. I don't recall.    09:29:14
20  Q. You said you don't recall. Do you think    09:29:14
21  anyone did that without your permission?    09:29:17
22  A. Possibly.    09:29:19
23  Q. Okay. Do you dispute that Le Technology    09:29:21
24  entered into that lease?    09:29:27
25  A. I don't.    09:29:29

5 (Pages 14 - 17)

**Page 18**

1  Q. You don't dispute that?  09:29:29
2  A. I don't dispute. I heard they had a lease.  09:29:31
3  Q. Okay. And so you never -- have you ever  09:29:33
4  seen that document before?  09:29:37
5  A. No.  09:29:37
6  Q. That's the first time you saw that  09:29:38
7  document?  09:29:40
8  A. Correct.  09:29:40
9  Q. Okay. But you were aware for several years  09:29:41
10 Le Technology occupied that property, correct?  09:29:46
11 A. Correct.  09:29:48
12 Q. And you never contested any issue with  09:29:48
13 Le Technology occupying that property at that time?  09:29:53
14    MR. MARTINEZ: Objection, vague and ambiguous,  09:29:55
15 overly broad.  09:29:57
16    Answer if you understand it.  09:29:58
17    THE WITNESS: I don't object.  09:30:01
18 BY MR. GOODELL:  09:30:02
19 Q. Okay. So you're not testifying that you  09:30:03
20 did not give permission to -- for that to be affixed  09:30:06
21 to that page, you just don't remember?  09:30:09
22 A. Correct.  09:30:10
23 Q. Okay. Did you frequently, or did you on  09:30:11
24 any other occasions did you sign contracts on behalf  09:30:21
25 of Le Technology?  09:30:24

**Page 19**

1  A. Yes.  09:30:25
2  Q. Okay. And those were contracts involving  09:30:25
3  real estate, correct?  09:30:30
4  A. I was asked to sign documents that I don't  09:30:31
5  recall which particular are real estate or any other  09:30:38
6  documents.  09:30:42
7  Q. Who asked you to sign these documents?  09:30:42
8  A. The legal department of Le Tech.  09:30:44
9  Q. And so I think you testified you were the  09:30:47
10 CEO, you were -- of Le Technology, correct?  09:30:56
11    MR. MARTINEZ: Misstates facts.  09:30:59
12    Answer if you can.  09:31:01
13    THE WITNESS: As I said before, you know, my  09:31:02
14 knowledge of me involved with Le Tech is on  09:31:06
15 registration I am CEO, but I'm not in management  09:31:12
16 role --  09:31:16
17 BY MR. GOODELL:  09:31:16
18 Q. Right.  09:31:16
19 A. -- and participate in any decision making  09:31:16
20 process.  09:31:19
21 Q. But you consented to them informing the  09:31:20
22 world that you were the chief executive officer of  09:31:24
23 Le Technology, right?  09:31:24
24 A. Yes.  09:31:24
25 Q. And you signed contracts on their behalf,  09:31:25

**Page 20**

1  correct?  09:31:27
2  A. Sometimes.  09:31:27
3  Q. Right. Okay. So at the same time you were  09:31:28
4  in management at Faraday Future you were identified  09:31:37
5  to the world as the CEO of Le Technology, correct?  09:31:41
6  A. Yes.  09:31:43
7  Q. Okay. Prior to working at Faraday Future  09:31:47
8  where did you work prior to that time?  09:31:57
9  A. I worked for a film production company.  09:31:59
10 Q. What was the name of that company?  09:32:05
11 A. Division Pictures U.S.A.  09:32:22
12 Q. Where are they located?  09:32:26
13 A. At the time in Santa Monica.  09:32:27
14 Q. Were you residing in California at that  09:32:31
15 time?  09:32:35
16 A. Yes.  09:32:35
17 Q. And what did you do for Division Pictures?  09:32:37
18 A. I was director of operation.  09:32:45
19 Q. And what were your daily duties as the  09:32:50
20 director of operations at Division Pictures?  09:33:00
21 A. Administrative role mostly, helping hiring  09:33:05
22 people, process the payroll.  09:33:12
23 Q. Okay. So were you working as like an admin  09:33:26
24 or a secretary or --  09:33:30
25 A. No, I mean I have staff, but I manage the  09:33:31

**Page 21**

1  operations; so interviewing people, hiring them, pay  09:33:37
2  them, pay the bills, but I don't participate in the  09:33:43
3  project decision making.  09:33:49
4  Q. Did Division Pictures, are there any movies  09:33:53
5  I would know that they helped produce or create?  09:33:55
6  A. That in U.S. office I don't believe so.  09:33:58
7  They're movies still in development.  09:34:05
8  Q. And prior -- Division Pictures you just  09:34:07
9  said you were director of operations. Was there any  09:34:21
10 other role you worked in for Division Pictures?  09:34:29
11 A. No.  09:34:32
12 Q. Where did you work prior to Division  09:34:32
13 Pictures?  09:34:34
14 A. Another film production company in China.  09:34:35
15 Q. What was the name of that company?  09:34:38
16 A. New Pictures Film Studio, I think. It's  09:34:50
17 been a while.  09:34:57
18 Q. New Pictures Film?  09:34:58
19 A. New Pictures Film Studio, I think.  09:35:00
20 Q. So going back to the other contracts that  09:35:04
21 you signed on behalf of Le Technology, did you  09:35:13
22 review those contracts before you signed them?  09:35:18
23 A. No.  09:35:20
24    MR. MARTINEZ: Overly broad, lacks foundation.  09:35:21
25 ///

6 (Pages 18 - 21)

Page 26

1  A. 1987.  09:41:06
2  Q. And prior to that did you reside in China?  09:41:06
3  A. I studied and lived in Japan for a year.  09:41:11
4  Q. And prior to that?  09:41:15
5  A. In China.  09:41:16
6  Q. Were you born in China?  09:41:17
7  A. Yes.  09:41:20
8  Q. How did you come to work for Faraday  09:41:20
9  Future?  09:41:27
10  A. I was working for New Pictures  09:41:27
11  developing -- distributing a film and I come across  09:41:33
12  meeting my current boss, YT, he invited me.  09:41:40
13  MR. MARTINEZ: Can you say his full name?  09:41:47
14  THE WITNESS: Yeuting Jai.  09:41:49
15  BY MR. GOODELL:  09:41:51
16  Q. Jia Yeuting?  09:41:53
17  A. Yes. He invited me to join his production  09:41:54
18  company which is Le Vision Pictures.  09:41:59
19  THE REPORTER: I'm sorry?  09:42:05
20  THE WITNESS: Le Vision. L-E Pictures, USA.  09:42:07
21  BY MR. GOODELL:
22  Q. Is that part of the brand name LeEco, Le  09:42:08
23  Vision?  09:42:12
24  MR. MARTINEZ: Vague and ambiguous, lacks  09:42:12
25  foundation.  09:42:15

Page 27

1  THE WITNESS: I think -- I'm not so sure about  09:42:15
2  the capital structure, but I think that's one of the  09:42:21
3  Le Holding subsidiary.  09:42:24
4  BY MR. GOODELL:  09:42:27
5  Q. All right. And Jai Yeuting founded LeEco,  09:42:28
6  correct?  09:42:31
7  A. Correct.  09:42:32
8  Q. And he still owns LeEco, correct?  09:42:32
9  A. That part I don't know.  09:42:35
10  MR. MARTINEZ: Lacks foundation.  09:42:37
11  Answer if you know.  09:42:38
12  THE WITNESS: I don't know.  09:42:39
13  BY MR. GOODELL:
14  Q. Is there ever a time you're aware that Jai  09:42:42
15  Yeuting did not own LeEco?  09:42:47
16  MR. MARTINEZ: Lacks foundation, vague and  09:42:49
17  ambiguous.  09:42:51
18  THE WITNESS: I really don't know.  09:42:51
19  BY MR. GOODELL:  09:42:51
20  Q. But you do know he founded it?  09:42:52
21  A. Yes.  09:42:53
22  Q. And you do know he's still involved in?  09:42:54
23  MR. MARTINEZ: Vague and ambiguous.  09:42:57
24  THE WITNESS: That from last year, things  09:43:00
25  happened that I am a not aware of, so I don't  09:43:03

Page 28

1  know --  09:43:05
2  BY MR. GOODELL:
3  Q. But prior to last year he was involved in  09:43:05
4  LeEco?  09:43:08
5  MR. MARTINEZ: Counsel, let her finish her  09:43:08
6  answers, please.  09:43:10
7  BY MR. GOODELL:  09:43:12
8  Q. Did you ever work for LeEco as well?  09:43:16
9  A. No.  09:43:18
10  Q. And did Jia Yueting start, excuse me, found  09:43:20
11  Faraday Future as well?  09:43:30
12  A. Yes.  09:43:31
13  Q. And what is his current role in Faraday  09:43:31
14  Future?  09:43:39
15  A. CEO.  09:43:39
16  Q. And you were a CEO at Faraday Future as  09:43:40
17  well, correct?  09:43:44
18  A. Sometime ago.  09:43:44
19  Q. Yeah. In fact, in the same time you were  09:43:48
20  CEO of Le Technology you were the CEO of Faraday  09:43:52
21  Future, correct?  09:43:55
22  A. Correct.  09:43:55
23  Q. Now, you were telling me the advisors had  09:43:56
24  told you to sign contracts on behalf of  09:44:08
25  Le Technology. Did those advisors also work for  09:44:10

Page 29

1  Faraday Future as well?  09:44:13
2  A. No.  09:44:14
3  Q. Okay. Let's turn our attention to the  09:44:14
4  property at issue in this case which is 3553 North  09:44:26
5  First Street, San Jose, California.  09:44:30
6  Have you ever visited that property?  09:44:32
7  A. Yes.  09:44:33
8  Q. Did you ever have an office in that  09:44:34
9  property?  09:44:37
10  A. No.  09:44:37
11  Q. How many times have you been to the  09:44:37
12  property?  09:44:41
13  A. I can recall twice.  09:44:42
14  Q. And when were those visits?  09:44:44
15  A. I can't remember the, exactly the dates and  09:44:50
16  the month actually. So I was there at their grand  09:44:54
17  opening.  09:44:58
18  Q. The one with the mayor of San Jose?  09:45:00
19  A. You know, I don't know. I only was  09:45:05
20  assigned to take care of Chinese consulate, the  09:45:08
21  representative from Chinese consulate.  09:45:12
22  Q. Have you ever communicated with the mayor  09:45:14
23  of San Jose's office regarding that property?  09:45:22
24  A. No.  09:45:23
25  Q. So you were there for the -- on behalf of  09:45:23

8 (Pages 26 - 29)

### Page 78

1  Q. What was -- I mean should I -- is  11:00:51
2  Le Technology still engaged in business?  11:01:04
3  A. I don't know.  11:01:07
4  Q. Don't know. When is the last time you  11:01:08
5  heard of them producing a new product?  11:01:11
6  A. In China I think they may still producing  11:01:13
7  products.  11:01:20
8  Q. Okay.  11:01:21
9  A. The U.S. office is just a representative  11:01:22
10  distribution arm, I believe.  11:01:27
11  Q. Where is that office located now?  11:01:29
12  A. Which office? China?  11:01:32
13  Q. No, the U.S. office?  11:01:34
14  A. San Jose.  11:01:36
15  Q. Where in San Jose?  11:01:37
16  A. That I don't know.  11:01:39
17  Q. You're aware at a certain point  11:01:40
18  Le Technology and Faraday Future both vacated the  11:01:44
19  property at issue in this case, correct?  11:01:46
20  A. Correct.  11:01:48
21  Q. Okay. Okay. So we're getting back to who  11:01:49
22  would be responsible for asking permission from  11:02:11
23  Han's San Jose for Faraday's occupancy for the  11:02:15
24  property. You identified Bob Ye as being one such  11:02:20
25  person, correct?  11:02:23

### Page 79

1  A. Yes.  11:02:24
2  Q. Did you ever interact with Han's San Jose  11:02:24
3  Hospitality?  11:02:29
4  A. No.  11:02:29
5  Q. No? Have you ever spoken with Peter Lo?  11:02:30
6  A. No.  11:02:32
7  Q. Did you ever interact with the prior  11:02:34
8  landlord of this property, BSREP Rio Robles, LLC?  11:02:43
9  A. No.  11:02:47
10  Q. Were you involved in any way of Le  11:02:48
11  Technology's purchase of the other property in  11:02:54
12  San Jose where the -- that Yahoo sold to them?  11:02:57
13  A. I'm not part of it.  11:03:00
14  Q. Were you aware of it?  11:03:02
15  A. Yes.  11:03:03
16  Q. Did you go to some grand opening of that  11:03:04
17  property as well?  11:03:07
18  A. No.  11:03:07
19  Q. Okay. Have you ever visited that property?  11:03:08
20  A. I drove by it.  11:03:11
21  Q. You drove by. Okay.  11:03:12
22    So to your knowledge you have no knowledge  11:03:14
23  of Le Technology ever requesting permission from  11:03:24
24  anyone at Han's San Jose Hospitality for Faraday  11:03:26
25  Future occupying the property at issue in this case?  11:03:29

### Page 80

1  A. I'm not aware of.  11:03:32
2  Q. Okay. You don't have any emails or any  11:03:35
3  documents showing any requests by Le Technology for  11:03:38
4  Faraday Future to occupy the property?  11:03:46
5  A. No.  11:03:48
6  Q. Let's turn our attention to Faraday Future.  11:03:48
7    Did Faraday Future ever communicate with  11:03:53
8  Han's San Jose Hospitality to request for their  11:03:56
9  permission to occupy the property at issue in this  11:04:01
10  case?  11:04:04
11  A. I don't believe so.  11:04:04
12  Q. We're on 7.  11:04:05
13    (The document referred to was marked by the  11:04:33
14  reporter as Exhibit 7 for identification.)  11:04:34
15  BY MR. GOODELL:  11:04:34
16  Q. Have you ever seen this document before?  11:04:57
17  A. I don't recall.  11:05:01
18  Q. Let's turn our attention to the last page  11:05:08
19  of this document. Is that your signature?  11:05:14
20  A. Yes.  11:05:22
21  Q. Okay. Did you read this document before  11:05:23
22  you signed it?  11:05:26
23  A. (Witness shakes head.)  11:05:27
24  Q. You shook your head. Is that a no?  11:05:31
25  MR. MARTINEZ: Lacks foundation. She does not  11:05:33

### Page 81

1  recall seeing it.  11:05:34
2  THE WITNESS: No.  11:05:36
3  BY MR. GOODELL:  11:05:36
4  Q. You didn't read this document before you  11:05:37
5  signed it?  11:05:39
6  A. As I said before, if the counsel says to  11:05:40
7  sign it, I will sign it. Usually I don't read it.  11:05:44
8  Q. Okay. And do you see you signed this  11:05:47
9  document on behalf of Le Technology?  11:05:53
10    Do you see that?  11:05:56
11  A. Yes.  11:05:57
12  Q. It says authorized signer for  11:05:59
13  Le Technology.  11:06:02
14    Do you see that?  11:06:03
15  A. Yes.  11:06:03
16  Q. Then beneath that there's some --someone  11:06:03
17  notarized your signature as of July 14, 2017?  11:06:06
18  A. Yes.  11:06:09
19  Q. So at that time you were still authorized  11:06:12
20  to sign documents relating to this real property on  11:06:15
21  behalf of Le Technology, correct?  11:06:19
22  A. For the property --  11:06:21
23  MR. MARTINEZ: Calls for a legal conclusion.  11:06:28
24  BY MR. GOODELL:  11:06:29
25  Q. Is 3553 North First Street the property at  11:06:29

21 (Pages 78 - 81)

### Page 82

1  issue in this case?   11:06:31
2  A. Looks like, yes.   11:06:36
3  Q. Okay. All right.   11:06:38
4  Let's go to page number two of this   11:06:44
5  document, paragraph G. It says:   11:07:02
6  "Tenant has not assigned, mortgaged,   11:07:09
7  sublet, encumbered, or otherwise   11:07:12
8  transferred any or all of its interest   11:07:14
9  under the lease and during the term of the   11:07:17
10  loan agrees to not assign, mortgage,   11:07:19
11  sublet, encumber, or otherwise transfer   11:07:20
12  any or all of its interest in the lease   11:07:22
13  without the prior written consent of   11:07:24
14  lender."   11:07:26
15  Now, did Le Technology ever ask for the   11:07:27
16  permission of the lender, which is identified here   11:07:29
17  as Industrial Commercial Bank of China National   11:07:33
18  Association prior to Faraday Future occupying the   11:07:36
19  property?   11:07:40
20  A. That I don't know.   11:07:40
21  Q. Have you ever seen any written request that   11:07:41
22  was made to this lender prior to Faraday Future   11:07:44
23  occupying the property?   11:07:48
24  A. No.   11:07:49
25  Q. Okay. Who would -- who else at   11:07:50

### Page 83

1  Le Technology at this time, who would have been the   11:08:10
2  person responsible for asking for request for this   11:08:15
3  lender?   11:08:17
4  MR. MARTINEZ: Calls for speculation, lacks   11:08:18
5  foundation.
6  Answer if you know, please.   11:08:19
7  THE WITNESS: Either Bob or Richard.   11:08:21
8  BY MR. GOODELL:   11:08:24
9  Q. Okay. Who is Richard?   11:08:24
10  A. Richard Ren. Last name R-E-N. Was named,   11:08:26
11  actually he served as capacity of a CEO of Le Tech.   11:08:35
12  Q. What do you mean he served as capacity of   11:08:40
13  CEO?   11:08:45
14  A. He's calling the shots, he's making all the   11:08:45
15  management decisions.   11:08:48
16  Q. Where does he work now?   11:08:49
17  A. That I don't know. He resigned. I don't   11:08:51
18  even know when, what time.   11:08:56
19  Q. Richard R-E-N, where does he reside?   11:08:58
20  A. He's in China now.   11:09:03
21  Q. He's in China.   11:09:05
22  So did you -- you said he was really the   11:09:07
23  CEO, so your testimony you were the paper CEO and he   11:09:22
24  was the real CEO?   11:09:24
25  MR. MARTINEZ: Argumentative.   11:09:26

### Page 84

1  THE WITNESS: Yes.   11:09:27
2  BY MR. GOODELL:   11:09:29
3  Q. Why wasn't he listed as the CEO if he was   11:09:30
4  the one making all of the decisions to your   11:09:33
5  knowledge?   11:09:35
6  MR. MARTINEZ: Calls for speculation.   11:09:36
7  THE WITNESS: My knowledge is as I stated   11:09:37
8  earlier, I was called in to sign set of paperwork   11:09:39
9  removing me and he was named replacement --   11:09:46
10  BY MR. GOODELL:   11:09:50
11  Q. Okay.   11:09:51
12  A. -- of the document.   11:09:52
13  Q. Okay. And I think you testified you're not   11:09:52
14  sure when that occurred?   11:09:56
15  A. Correct.   11:09:57
16  Q. Was it some point in the past year?   11:09:58
17  A. You know, it was signed late 2016. After   11:10:01
18  that I don't know what happened to that.   11:10:08
19  Q. But we went over the statement of   11:10:13
20  information. It still had you listed after that,   11:10:16
21  correct?   11:10:18
22  A. Correct.   11:10:18
23  Q. Do you have a copy of that document?   11:10:19
24  A. I don't. They didn't produce one for me.   11:10:24
25  Q. Do you know if he signed that document?   11:10:27

### Page 85

1  A. I don't know.   11:10:31
2  Q. Okay. Was his signature on the document   11:10:32
3  when you signed it?   11:10:34
4  A. I don't recall.   11:10:35
5  Q. Who is Jiawei Wang? G-I-A-W-E-I (sic), last   11:10:36
6  name Wang, W-A-N-G?   11:10:46
7  A. He's currently serve as head of capital   11:10:51
8  group for Faraday Future.   11:10:55
9  Q. Is that Jai Yeuting's cousin?   11:10:57
10  A. I would say nephew.   11:11:00
11  Q. Nephew, right. That's what I read. Okay.   11:11:06
12  Isn't he listed on the new statement of   11:11:07
13  information as serving in, yeah, all three roles as   11:11:10
14  Faraday & Future's CEO, secretary, chief financial   11:11:14
15  officer, right?   11:11:17
16  A. Yes, that's why -- he replaced me, so I   11:11:18
17  don't remember exactly what month, what day my role   11:11:21
18  and his role switch, so, yes, I know at the time he   11:11:24
19  became the CEO.   11:11:31
20  Q. And now I think earlier you testified Jai   11:11:32
21  Yeuting is the CEO?   11:11:37
22  A. Correct.   11:11:38
23  Q. Do you know when that occurred?   11:11:40
24  A. Sometime October last year.   11:11:40
25  Q. Okay. Are you aware that in the statement   11:11:42

22 (Pages 82 - 85)

**Page 86**

1  of information filed on February 15, 2018 it has   11:11:48
2  Jiawei Wang listed as serving in all three roles?   11:11:51
3      MR. MARTINEZ: Do you have the document to show   11:11:56
4  the witness?   11:11:57
5      MR. GOODELL: Yeah.   11:11:58
6      MR. MARTINEZ: Are you marking this as 8?   11:12:15
7      MR. GOODELL: Mark it as 8, yeah.   11:12:17
8      (The document referred to was marked by the
9  reporter as Exhibit 8 for identification.)   11:12:32
10     THE WITNESS: Yes.   11:12:32
11  BY MR. GOODELL:   11:12:33
12     Q. So was Jiawei Wang the CEO as of the date   11:12:36
13  of the document? This document was filed, page   11:12:41
14  number two of this document, Jiawei Wang is listed   11:12:43
15  as serving as CEO, secretary, and chief financial   11:12:46
16  officer of Faraday Future as of February 15, 2018.   11:12:49
17     Do you see that?   11:12:52
18     A. Yes.   11:12:53
19     Q. Is that accurate?   11:12:53
20     A. Accurate.   11:12:55
21     Q. Okay. Then the first page of this document   11:12:56
22  has you listed as CEO and the secretary of   11:13:10
23  February 1, 2017. Is that accurate?   11:13:13
24     A. Accurate.   11:13:15
25     Q. Okay. Let's go back to the deposition   11:13:16

**Page 87**

1  notice which is --   11:13:34
2     A. Number?   11:13:40
3     Q. -- exhibit number -- it's over there.   11:13:40
4     MR. MARTINEZ: Two.   11:13:45
5     MR. GOODELL: Two.   11:13:46
6     THE WITNESS: Okay.   11:13:47
7  BY MR. GOODELL:   11:13:47
8     Q. So let's pick back up where we were on page   11:13:50
9  five. We were going over document requests and I   11:13:54
10  want to finish going through those.   11:13:56
11     Okay. So category 8 asks for you to   11:13:59
12  produce all documents and communications referring   11:14:06
13  to Faraday Future, Inc.'s, occupancy of the subject   11:14:09
14  property.   11:14:12
15     Do you see that?   11:14:12
16     A. Yes.   11:14:12
17     Q. Did you produce all documents and   11:14:13
18  communications that you have referring to Faraday   11:14:16
19  Future, Inc.'s occupancy, of the subject property?   11:14:19
20     A. Yes.   11:14:22
21     Q. Okay. And that was just in those documents   11:14:22
22  you handed me earlier?   11:14:26
23     A. Correct.   11:14:26
24     Q. Nine:   11:14:27
25     "Please produce any and all documents   11:14:30

**Page 88**

1  evidencing communications between yourself   11:14:31
2  and plaintiff referring to the lease."   11:14:33
3     Did you produce all such documents   11:14:36
4  responsive to category 9?   11:14:38
5     A. Yes.   11:14:39
6     Q. Okay. Why don't you do this, why don't you   11:14:42
7  review category 10. Would it be helpful to say it   11:14:52
8  out loud or are you comfortable reading--   11:15:00
9     A. I'll read it.   11:15:04
10    Q. Can you read category 10 to yourself to   11:15:04
11  category 37 and let me know if there are any   11:15:14
12  documents besides Exhibit 3 which were produced here   11:15:27
13  today in your possession, custody, or control that   11:15:30
14  are responsive to those questions?   11:15:33
15    A. (Witness complies.)   11:15:36
16    To 32 you said?   11:16:46
17    Q. 37.   11:18:25
18    A. 37. Yes.   11:18:48
19    Q. Okay. Are there any documents besides the   11:18:50
20  ones you produced today that are responsive to those   11:18:53
21  categories?   11:18:55
22    A. Not that I am aware of.   11:18:56
23    Q. Okay. 38 asks for any and all documents   11:18:58
24  exchanged between you and Jai Yeuting referring to   11:19:04
25  the subject property.   11:19:07

**Page 89**

1     Do you see that?   11:19:09
2     A. Yes.   11:19:09
3     Q. Do you have any -- are there any documents   11:19:09
4  responsive to that request in your possession,   11:19:11
5  custody, or control?   11:19:13
6     A. No. As I said earlier, I never discussed   11:19:14
7  this with him.   11:19:18
8     Q. Okay. 39:   11:19:19
9     "Please produce any and all documents   11:19:19
10    referring to your decision to vacate the   11:19:23
11    subject property."   11:19:23
12    Do you see that?   11:19:23
13    A. Yes.   11:19:24
14    Q. Do you have any documents responsive to   11:19:25
15  that besides documents you produced here today?   11:19:30
16    A. No.   11:19:33
17    Q. Do you have any documents referring to any   11:19:34
18  corporate minutes of Faraday Future since January 1,   11:19:37
19  2017?   11:19:41
20    MR. MARTINEZ: For the record, we objected to   11:19:41
21  that. It's beyond the scope. If you want to seek a   11:19:43
22  motion to compel, please proceed with that, but that   11:19:46
23  has nothing to do with this case.   11:19:48
24  BY MR. GOODELL:   11:19:51
25    Q. Do you have any documents responsive to   11:19:51

23 (Pages 86 - 89)

## Page 102

1  related to Le Technology, correct?  11:34:02
2  A. Correct.  11:34:03
3  Q. Okay. Up until that point he was the  11:34:03
4  leader of Le Technology, right?  11:34:06
5  A. Yes.  11:34:07
6  Q. And he remains the leader of Faraday  11:34:07
7  Future, correct?  11:34:10
8  A. He was a founder investor, but he had held  11:34:10
9  zero managerial positions in FF.  11:34:16
10  Q. Until now?  11:34:20
11  A. Yes, last year.  11:34:22
12  Q. And he was the founder investor of  11:34:24
13  Le Technology too, right?  11:34:27
14  A. I believe so. Not personally though.  11:34:28
15  Q. What's that?  11:34:33
16  A. Not personally.  11:34:34
17  Q. What do you mean not personally?  11:34:35
18  A. Because Le Technology must be a subsidiary  11:34:37
19  of Le Holdings.  11:34:41
20  Q. And he founded Le Holdings too, right?  11:34:42
21  A. Right.  11:34:45
22  Q. Le Holdings is a defendant. You signed the  11:34:45
23  lease on behalf of Le Holdings too, right,  11:34:48
24  Exhibit 1?  11:34:52
25  A. Did I? On behalf of Le Holdings.  11:34:52

## Page 103

1  MR. MARTINEZ: Take a look.  11:34:57
2  BY MR. GOODELL:  11:35:04
3  Q. It may be Dongge actually.  11:35:04
4  A. I don't have any position of Le Holdings so  11:35:07
5  I shouldn't have signed anything on behalf of Le  11:35:10
6  Holding.  11:35:13
7  MR. MARTINEZ: Directing the witness to the  11:35:24
8  signature page.  11:35:25
9  THE WITNESS: Got it.  11:35:33
10  BY MR. GOODELL:
11  Q. Who signed on behalf of Le Holdings?  11:35:37
12  A. Yeah, DG.  11:35:40
13  Q. Dongge Jiang for the record?  11:35:42
14  A. Right.  11:35:44
15  Q. What was his role in Le Holdings?  11:35:45
16  A. He was the chairman office director, or  11:35:49
17  director of chairman's office.  11:35:58
18  Q. Who is the chairman?  11:36:00
19  A. Jai Yeuting.  11:36:03
20  Q. Okay. Do you know a company called Ocean  11:36:06
21  View Drive, Inc.?  11:36:18
22  A. Yes.  11:36:20
23  Q. What does that company do?  11:36:20
24  A. It's a property holding company.  11:36:22
25  Q. You hold property? So what does that mean  11:36:24

## Page 104

1  property holding company?  11:36:28
2  A. The company was set up to strictly to  11:36:29
3  purchase the property.  11:36:33
4  Q. What property is that?  11:36:35
5  A. Number 7, a couple houses, Marguerite  11:36:36
6  Drive, Rancho Palos Verdes.  11:36:43
7  Q. Who resides in these houses?  11:36:45
8  MR. MARTINEZ: Objection. What does it have to  11:36:47
9  do with the case at all? This is not a party to the  11:36:49
10  case. There's no affiliation between this and the  11:36:52
11  First Street. I have asked for an offer of proof  11:36:55
12  because this isn't just a general, you know, get to  11:36:58
13  ask anything you want about anything. You've got to  11:37:01
14  show some relation to the case at hand which is in  11:37:04
15  San Jose relating to a commercial property.  11:37:07
16  MR. GOODELL: First of all, counsel, this is  11:37:09
17  publicly available information. Secretary of  11:37:11
18  State's website you can download --  11:37:13
19  MR. MARTINEZ: Okay.  11:37:14
20  MR. GOODELL: -- this company's information.  11:37:15
21  MR. MARTINEZ: That's a non-sequitur.  11:37:17
22  MR. GOODELL: No, and they're -- I don't need to  11:37:19
23  belabor the point. I'm happy to do so off the  11:37:23
24  record, but there are alter ego allegations in this  11:37:25
25  case.  11:37:29

## Page 105

1  MR. MARTINEZ: Between Le Technologies and  11:37:30
2  Faraday.  11:37:31
3  MR. GOODELL: No, it also applies to Jai Yeuting  11:37:32
4  controlling all the different companies.  11:37:34
5  MR. MARTINEZ: That's not in the complaint. So  11:37:37
6  I don't see the connection.  11:37:39
7  MR. GOODELL: Well, counsel, you can make your  11:37:40
8  decision. I don't think there's any basis to  11:37:42
9  instruct the witness not to answer what I'm asking  11:37:44
10  about. I'm not even getting to that personal  11:37:47
11  information. I'm asking what this company does.  11:37:49
12  All this is reasonably calculated to the discovery  11:37:51
13  of admissible evidence.
14  MR. MARTINEZ: I haven't heard anything to  11:37:54
15  suggest that it is.  11:37:56
16  MR. GOODELL: I'm going to reask my question.  11:37:56
17  MR. MARTINEZ: Let me quickly -- I'm going  11:37:59
18  to -- you have one allegation about an alter ego in  11:38:00
19  this.  11:38:07
20  MR. GOODELL: And that's all I need.  11:38:08
21  MR. MARTINEZ: Okay. And all it says is  11:38:09
22  defendants were agents, servants, employees, alter  11:38:12
23  egos, superiors, successors in interest, joint  11:38:15
24  ventures and/or coconspirators of each other.  11:38:18
25  Mr. Jai is not a defendant in this action. Ocean  11:38:23

27 (Pages 102 - 105)

Veritext Legal Solutions
866 299-5127

### Page 210

1  employees and contractors or permit change  03:38:32
2  of control to occur. If tenant desires  03:38:36
3  landlord's consent to any transfer, tenant  03:38:38
4  shall an provide landlord with notice of  03:38:40
5  the terms of the proposed transfer  03:38:42
6  including its proposed effective date,  03:38:44
7  shall not be less than 30 days nor more  03:38:46
8  than 180 days after the effective date of  03:38:48
9  the transfer notice. The description of  03:38:51
10  the portion of the premises to be  03:38:54
11  transferred and a copy of all existing  03:38:55
12  executed and/or proposed documentation  03:38:58
13  pertaining to the proposed transfer."  03:39:00
14  Goes on from there.  03:39:04
15  Now, that sublease that we're -- that, you  03:39:05
16  know, you -- so far all that's been produced is an  03:39:08
17  unexecuted copy, but it was produced today. Was  03:39:12
18  that document to your knowledge ever sent to my  03:39:16
19  client, which is Han's San Jose Hospitality?  03:39:18
20  A. I don't know.  03:39:20
21  Q. Okay. And did -- following up with the  03:39:21
22  language of that, did Le Technology or Faraday  03:39:31
23  Future provide landlord with notice of the terms of  03:39:35
24  Faraday's proposed occupancy of the property?  03:39:38
25  A. I don't know.  03:39:41

### Page 211

1  Q. Okay. Did anyone at Han's San Jose tell  03:39:42
2  you or Faraday Future it was okay for them to occupy  03:39:51
3  the subject property?  03:39:56
4  MR. MARTINEZ: Vague and ambiguous.  03:39:57
5  THE WITNESS: Say that again. Did anyone?  03:39:58
6  MR. GOODELL: Can you read it back, Madam Court  03:40:01
7  Reporter?
8  (Record read:  03:40:17
9    Q. Did anyone at Han's San Jose tell
10    you or Faraday Future it was okay for them
11    to occupy the subject property?)  03:40:19
12  THE WITNESS: Han is the landlord?  03:40:19
13  BY MR. GOODELL:  03:40:23
14  Q. Yes.  03:40:24
15  A. Okay. I don't, I don't know. Nobody  03:40:24
16  talked to me about it.  03:40:29
17  Q. Okay. Or to anyone else at Faraday Future  03:40:30
18  to your knowledge?  03:40:34
19  A. I don't know.  03:40:34
20  Q. Or to anyone else at Le Technology to your  03:40:35
21  knowledge?  03:40:38
22  A. No.  03:40:38
23  Q. Okay. Let's go to page 25. Bottom of  03:40:39
24  19.2.1. 19.2 it says:  03:41:42
25    "Upon any default landlord shall have  03:41:49

### Page 212

1  in addition to any other remedies  03:41:51
2  available to landlord at law or in equity  03:41:53
3  which shall be cumulative and nonexclusive
4  the option to pursue any one more of the  03:41:58
5  following remedies which shall be  03:42:00
6  cumulative and nonexclusive without any
7  notice or demand." If you go down it  03:42:08
8  says: "Landlord may terminate this lease  03:42:08
9  in which event tenant shall immediately  03:42:10
10  surrender the premises to landlord and if  03:42:13
11  tenant fails to do so landlord may without  03:42:13
12  prejudice to any other remedy it may have  03:42:16
13  for possession or arrearages in rent enter  03:42:18
14  upon and take possession of the premises  03:42:22
15  and expel or remove tenant and any other  03:42:22
16  person who may occupying the premises or  03:42:25
17  any part thereof without being liable for  03:42:28
18  prosecution or any claim or damages  03:42:30
19  therefor and landlord may recover from  03:42:33
20  tenant the following;  03:42:35
21  The worth at the time of the award of the  03:42:36
22  unpaid rent which had been earned at the
23  time of such termination, plus the worth  03:42:40
24  at the time of the award of the amount by  03:42:42
25  which the unpaid rent which would have  03:42:44

### Page 213

1  been earned after termination until the  03:42:46
2  time of award exceeds the amount of such  03:42:47
3  rental loss that tenant proves could have  03:42:50
4  been reasonably avoided."  03:42:52
5  Now, do you know if Le Technology ever  03:42:55
6  tried to demonstrate to my client that, you know,  03:42:56
7  how much rent, rental loss could have been  03:43:02
8  reasonably avoided by my client by being able to  03:43:07
9  re-let it quickly?  03:43:11
10  A. I don't know.  03:43:11
11  Q. Okay. And the only any sort of  03:43:12
12  compensation you're aware of Le Technology making to  03:43:15
13  my client for their breach of this lease is that  03:43:18
14  email we went over earlier with Bob Ye?  03:43:21
15  A. Correct.  03:43:24
16  Q. That's the only one?  03:43:25
17  A. Yeah.  03:43:28
18  Q. Let's go back to the third amended  03:43:28
19  complaint.  03:44:06
20  A. Third exhibit?  03:44:09
21  Q. Yeah.  03:44:09
22  MR. MARTINEZ: It's Exhibit 6.  03:44:10
23  MR. GOODELL: Exhibit 6, yeah.  03:44:11
24  BY MR. GOODELL:  03:44:14
25  Q. Exhibit 6, paragraph 28.  03:44:20

## Page 214

1  It says plaintiffs -- so we went over the  03:44:27
2  provision I just read on page 7, paragraph 28. And  03:44:38
3  then underneath that it says:  03:44:45
4      "Plaintiff's broker had informed them  03:44:49
5      it is anticipated to take 6 to 12 months  03:44:51
6      to re-let the property. As a result of  03:44:54
7      paragraph 19.2.1 above plaintiff alleges  03:44:55
8      that defendants are liable for unpaid  03:44:59
9      rents since their breach and until any new  03:45:01
10     tenant is found, as well as brokerage  03:45:03
11     costs and any renovations done to the  03:45:05
12     building for the new tenant, the exact  03:45:09
13     determination of these damages will be  03:45:10
14     determined in truth or in trial."  03:45:12
15  Did you -- does Le Technology dispute that  03:45:16
16  it will take 6 to 12 months for my client to re-let  03:45:18
17  the property?  03:45:22
18  A. I don't know who is making the call.  03:45:22
19  Q. Do you think that sounds like a correct  03:45:26
20  amount of time to rent a huge building like that?  03:45:28
21  MR. MARTINEZ: Lacks foundation, calls for  03:45:31
22  speculation, expert opinion. Also argumentative.  03:45:33
23  THE WITNESS: It all depends. I don't know.  03:45:37
24  The property, if it's hot, it could take no time.  03:45:39
25  ///

## Page 215

1  BY MR. GOODELL:  03:45:43
2  Q. Do you have any evidence to suggest that it  03:45:49
3  should take no time for my client to re-let the  03:45:51
4  property?  03:45:53
5  A. I don't have evidence or anything. I'm  03:45:54
6  just saying could happen.  03:45:56
7  Q. All right.  03:45:58
8  I want to -- actually we should mark this.  03:46:57
9  Let's do that.  03:47:04
10  (The document referred to was marked by the  03:47:05
11  reporter as Exhibit 21 for identification.)  03:47:07
12  BY MR. GOODELL:  03:47:07
13  Q. Look at the last page of Exhibit 21. Is  03:47:32
14  that your signature?  03:47:40
15  A. Yes.  03:47:41
16  Q. Okay. Did you review this document before  03:47:42
17  you signed it?  03:47:45
18  A. No.  03:47:45
19  Q. No, you didn't. Okay.  03:47:46
20  You just signed it without reviewing it?  03:47:48
21  A. Let me read this. I just signed it, but I  03:47:55
22  didn't read this.  03:48:28
23  Q. That explains because some of the answers  03:48:29
24  here today are different from what's in here. Let's  03:48:31
25  go to interrogatory 62. You said, did you sign a  03:48:34

## Page 216

1  lease with any other party to the action for your  03:48:42
2  use of subject property and you answered no. Your  03:48:44
3  testimony here today was you don't know, so is it --  03:48:48
4  MR. MARTINEZ: Vague and ambiguous, incoherent.  03:48:52
5  THE WITNESS: Sorry.  03:48:54
6  BY MR. GOODELL:  03:48:55
7  Q. So forget the answer. Again, you have  03:48:55
8  testified several times you don't know if Faraday  03:48:58
9  Future signed a document to occupy the property at  03:49:01
10  issue in this case; correct?  03:49:05
11  A. Right.  03:49:07
12  Q. That's all I need to know. You gave a  03:49:07
13  different statement here, but you didn't read it.  03:49:14
14  MR. MARTINEZ: Objection to the commentary and  03:49:16
15  argument. Just ask questions so we can proceed.  03:49:18
16  The question also is not what you're characterizing  03:49:22
17  it as. As phrased it's incoherent.  03:49:25
18  MR. GOODELL: I disagree. We can let the court  03:49:29
19  or jury decide on that.  03:49:31
20  BY MR. GOODELL:  03:49:39
21  Q. All right. Let's go to interrogatory 63.  03:49:39
22  A. What is it?  03:50:04
23  MR. MARTINEZ: 63, page 39.  03:50:05
24  BY MR. GOODELL:  03:50:13
25  Q. Did you ever ask the plaintiff's permission  03:50:15

## Page 217

1  to occupy the subject property?  03:50:16
2  MR. MARTINEZ: Wait. Sorry. Are you asking  03:50:19
3  about the interrogatory or are you asking separately  03:50:21
4  whether Ms. Deng asked for permission?  03:50:24
5  MR. GOODELL: No, I'm asking about the  03:50:26
6  interrogatory.  03:50:28
7  MR. MARTINEZ: Then the interrogatory is asking  03:50:28
8  a question about Faraday & Future.  03:50:30
9  MR. GOODELL: Counsel, I know what it's asking.  03:50:32
10  MR. MARTINEZ: That's why I asked for  03:50:34
11  clarification.  03:50:35
12  MR. GOODELL: Okay.  03:50:36
13  BY MR. GOODELL:  03:50:37
14  Q. So the answer that you -- that was given  03:50:38
15  here which you signed a verification under oath for,  03:50:39
16  Ms. Deng, said that:  03:50:39
17      "Plaintiff consented to responding  03:50:43
18      party occupying the subject property.  03:50:47
19      Plaintiff through its representatives and  03:50:49
20      agents visited the subject property  03:50:50
21      including on or around July 2017 and  03:50:52
22      observed responding party personnel  03:50:55
23      occupying the premises and on information  03:50:56
24      and belief understood them to be operating  03:51:00
25      on behalf of responding party."  03:51:02

55 (Pages 214 - 217)

```
 1     of another electric vehicle for LeEco,
 2     whose CEO Jia Yueting has invested
 3     hundreds of millions into FF."
 4        So did Faraday Future have a plan or does          04:22:21
 5     have a plan to develop another electric vehicle for  04:22:25
 6     LeEco?                                                04:22:28
 7        MR. MARTINEZ: Assumes facts.                       04:22:29
 8        THE WITNESS: That I don't know.                    04:22:30
 9        MR. MARTINEZ: Beyond the scope, oppressive,        04:22:32
10     harassing.                                            04:22:34
11     BY MR. GOODELL:                                       04:22:34
12        Q. Has Jai Yeuting invested hundreds of            04:22:34
13     millions into FF?                                     04:22:38
14        MR. MARTINEZ: Beyond the scope, has nothing to     04:22:40
15     do with anything related to this case at all.         04:22:41
16     BY MR. GOODELL:                                       04:22:45
17        Q. Is that accurate, Ms. Deng?                     04:22:45
18        A. He did invest a lot of money.                   04:22:46
19        Q. Let's take a five-minute break and I think      04:22:51
20     we're pretty close to being done.                     04:23:15
21        THE VIDEOGRAPHER: This is the end of media         04:23:17
22     number six. Off the record at 4:23 p.m.               04:23:18
23        (Off the record.)                                  04:23:21
24        THE VIDEOGRAPHER: We are back on the record at     04:35:48
25     4:35 p.m. This is beginning the media number seven.   04:35:55
                                                          Page 238
```

```
 1     BY MR. GOODELL:                                       04:35:59
 2        Q. During your time at Le Technology,              04:36:02
 3     Ms. Deng, did Jai Yeuting ever promise orally or in   04:36:06
 4     writing that he would be personally liable for the    04:36:13
 5     debts of that corporation?                            04:36:15
 6        MR. MARTINEZ: Objection to the form of             04:36:16
 7     question.                                             04:36:17
 8        THE WITNESS: No.                                   04:36:19
 9     BY MR. GOODELL:                                       04:36:19
10        Q. During your time at Farady Future did Jai       04:36:20
11     Yeuting ever state orally or in writing that he       04:36:24
12     would be personally liable for the debts of the       04:36:27
13     corporation?
14        A. I don't recall.                                 04:36:31
15        Q. So he could have done that and you just         04:36:31
16     don't recall?                                         04:36:34
17        A. Right.                                          04:36:34
18        Q. Okay. Has Le Technology or Faraday Future,      04:36:34
19     have they ever employed the same attorney for a       04:36:49
20     single matter?                                        04:36:52
21        A. Not that I am aware of.                         04:36:53
22        Q. Okay. Has Le Technology ever procured           04:36:56
23     labor, services, or merchandise for Faraday Future?   04:37:09
24        A. Say that again.                                 04:37:12
25        Q. Has Le Technology ever procured labor,          04:37:16
                                                          Page 239
```

```
 1     services, or merchandise for Faraday Future?          04:37:21
 2        A. No.                                             04:37:23
 3        MR. MARTINEZ: Vague and ambiguous.                 04:37:25
 4     BY MR. GOODELL:                                       04:37:26
 5        Q. Has Faraday Future ever procured labor,         04:37:26
 6     services, or merchandise for Le Technology?           04:37:28
 7        A. No.                                             04:37:30
 8        Q. Has Le Technology diverted assets to            04:37:31
 9     Faraday Future?                                       04:37:39
10        A. No.                                             04:37:40
11        Q. Has Farady Future diverted assets to            04:37:41
12     Le Technology?                                        04:37:44
13        A. No.                                             04:37:46
14        Q. So earlier this -- you testified the Ocean     04:37:50
15     View Drive Corporation was a property holding         04:38:07
16     corporation, correct?                                 04:38:10
17        A. Yes.                                            04:38:10
18        Q. And that was the sole reason it was             04:38:11
19     created?                                              04:38:14
20        MR. MARTINEZ: Objection, beyond the scope,         04:38:14
21     harassing and oppressive.                             04:38:16
22        THE WITNESS: Yes.                                  04:38:19
23     BY MR. GOODELL:                                       04:38:20
24        Q. Did Jai Yeuting to your knowledge ever          04:38:25
25     review Exhibit 1?                                     04:38:29
                                                          Page 240
```

```
 1        MR. MARTINEZ: The lease.                           04:38:30
 2        THE WITNESS: He does not speak English.            04:38:31
 3     BY MR. GOODELL:                                       04:38:33
 4        Q. Okay. Did Jai Yeuting ever review the           04:38:33
 5     sublease document we were looking at earlier between  04:38:39
 6     Faraday Future and Le Technology?                     04:38:42
 7        A. No, he wouldn't.                                04:38:43
 8        MR. GOODELL: That may be all I have.               04:38:55
 9        MR. MARTINEZ: Okay.                                04:38:58
10        MR. GOODELL: So he essentially you're going        04:38:58
11     to -- a transcript is going to be typed up today of   04:39:01
12     all of my questions, your answers. You will have a    04:39:03
13     time -- opportunity to review it and if you make any  04:39:07
14     substantive changes to it though, I will be able to   04:39:13
15     comment on that and it could impact your credibility  04:39:16
16     at trial or other proceedings in this case. And       04:39:19
17     that's it.                                            04:39:23
18        THE WITNESS: Okay.                                 04:39:23
19        MR. MARTINEZ: Okay. Thank you.                     04:39:25
20        THE VIDEOGRAPHER: This concludes today's           04:39:27
21     testimony given by Chaoying Deng. Seven media were    04:39:28
22     recorded and will be retained by Veritext Solutions.  04:39:33
23     We are off the record at 4:39 p.m.                    04:39:36
24        THE REPORTER: Steve, do you need a copy?           04:39:40
25        MR. BUHA: Can I give you my email address and      04:39:49
                                                          Page 241
```

Veritext Legal Solutions
866 299-5127

| | |
|---|---|
| 1  we will coordinate after?           04:40:06<br>2  THE REPORTER: Sure.<br>3  (The deposition was concluded at 4:39 p.m.)<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>Page 242 | 1  CERTIFICATE<br>2<br>3  STATE OF CALIFORNIA ) ss<br>4  COUNTY OF LOS ANGELES)<br>5  I, SHAWNA HIGGINS, Certified Shorthand Reporter No.<br>6  10646 for the State of California, do hereby certify:<br>7  That the foregoing deposition was taken before me at<br>8  the time and place therein set forth, at which time the<br>9  witness was put under oath by me;<br>10  That the testimony of the witness and all objections<br>11  made at the time of the examination were recorded<br>12  stenographically by me, were thereafter transcribed by<br>13  me by means of computer and the foregoing is a true<br>14  record of same.<br>15  I further certify that I am neither counsel for nor<br>16  related to any party to said action, nor in any way<br>17  interested in the outcome thereof.<br>18  IN WITNESS WHEREOF, I have subscribed my name this<br>19  5th day of July, 2018.<br>20<br>21<br>22<br>23  *Shawna Higgins*<br>24  SHAWNA HIGGINS<br>25  CSR NO. 10646<br>Page 244 |

1  I, CHAOYING DENG, do hereby declare under penalty of
2  perjury that I have read the foregoing transcript; that
3  I have made any corrections as appear noted, in ink,
4  initialed by me, or attached hereto; that my testimony
5  as contained herein, as corrected, is true and correct.
6  Executed this       day of           , 2018,
7  at             , California.
8
9
10
11
12  _____
13  SIGNATURE OF THE WITNESS
14
15
16
17
18
19
20
21
22
23
24
25
Page 243



EXHIBIT
7
6-21-2018

**RECORDATION REQUESTED BY:**
Industrial and Commercial Bank of China (USA) National Association
Northern California Regional Office
345 California Street, Suite 1700
San Francisco, CA  94104

**WHEN RECORDED MAIL TO:**
Industrial and Commercial Bank of China (USA) National Association
Northern California Regional Office
345 California Street, Suite 1700
San Francisco, CA  94104

**SEND TAX NOTICES TO:**
Han's San Jose Hospitality LLC
2220 O'Toole Avenue
San Jose, CA  95131

FOR RECORDER'S USE ONLY

**NOTICE: THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT RESULTS IN YOUR SECURITY INTEREST IN THE COLLATERAL BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

# SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT AND ESTOPPEL CERTIFICATE

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT dated June 29, 2017 ("Agreement"), is made and executed among Han's San Jose Hospitality LLC, whose address is 2220 O'Toole Avenue, San Jose, CA  95131 ("Landlord"); LE Technology, Inc.; and LE Holdings (Beijing) Co., Ltd., whose address is 3553 North First Street, San Jose, CA  95134 ("Tenant"); and Industrial and Commercial Bank of China (USA) National Association, Northern California Regional Office, 345 California Street, Suite 1700, San Francisco, CA  94104 ("Lender").

**SUBORDINATED LEASE.** ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ The following information is the summary of the basic terms and conditions of the Subordinated Lease:  Landlord's predecessor-in-interest and Tenant entered into a written lease dated December ____, 2015 (the "Original Lease"), and together with all modifications, extensions, replacements, renewals, assignments and amendments thereof shall be collectively referred to as the "Lease".

**REAL PROPERTY DESCRIPTION.** The Lease covers a portion of the following described real property (the "Real Property") located in Santa Clara County, State of California:

   See Exhibit "A", which is attached to this Agreement and made a part of this Agreement as if fully set forth herein.

The Real Property or its address is commonly known as 3553 North First Street, San Jose, CA  95134. The Assessor's Parcel Number for the Real Property is 097-55-012.

**SUPERIOR INDEBTEDNESS.** Lender has extended or has agreed to extend the following described financial accommodations to Landlord, secured by the Real Property (the "Superior Indebtedness"):

   An indebtedness as evidenced by a promissory note dated June 29, 2017, in the original principal amount of $21,600,000.00, to be executed by Borrower and payable to Lender or its order (herein referred to as the "Note"), and any and all amendments, modifications, extensions or renewals of the Note (whether evidenced by the Note or otherwise); together with the payment of interest on such indebtedness and the payment of all other sums (with interest as therein provided) according to the terms of the Note (and any and all amendments, modifications, extensions, or renewals thereof).

**LENDER'S LIEN.** The Superior Indebtedness is or will be secured by the Real Property and evidenced by a mortgage, deed of trust, or other lien instrument, dated June 29, 2017, from Landlord to Lender (the "Lender's Lien"). As a condition to the granting of the requested financial accommodations, Lender has required that the Lender's Lien be and remain superior to the Subordinated Lease and all of Tenant's rights in the Real Property ("Lease Rights").

**REQUESTED FINANCIAL ACCOMMODATIONS.** Landlord and Tenant each want Lender to provide financial accommodations to Landlord in the form of the Superior Indebtedness. Landlord and Tenant each represent and acknowledge to Lender that Landlord and Tenant will



# SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
Loan No: 601490000114437           (Continued)           Page 2

benefit as a result of these financial accommodations from Lender to Landlord, and Landlord and Tenant acknowledge receipt of valuable consideration for entering into this Agreement.

**IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE SUFFICIENCY AND RECEIPT OF WHICH ARE HEREBY ACKNOWLEDGED, LENDER, LANDLORD, AND TENANT HEREBY AGREE AS FOLLOWS:**

**ESTOPPEL CERTIFICATE.** Tenant hereby certifies to and agrees with Lender that as of the date of this Agreement, Lender is relying on all of the following certifications and agreements of Tenant as consideration for Lender executing this Agreement:

     (A) The Lease is in full force and effect and is the valid and binding obligation of Tenant, enforceable in accordance with its terms.

     (B) All requirements for the commencement and validity of the Lease have been satisfied.

     (C) Neither Tenant nor Landlord is in default under the Lease and no event has occurred and no condition exists, which with the giving of notice, the passage of time, or both, would constitute a default by Tenant or Landlord under the Lease.

     (D) There are no defenses, counterclaims or setoffs against rents or charges due or which may become due under the Lease and no claim by Tenant of any nature exists against Landlord under the Lease. All obligations of Landlord have been fully performed.

     (E) None of the rent, which Tenant is required to pay under the Lease, has been prepaid, or will in the future be prepaid, more than one month in advance.

     (F) The Lease shall not after the date of this Agreement be modified, terminated, or amended, without the prior written consent of Lender for any termination and each such amendment or modification. Any attempted modification, termination, or amendment without the prior written consent of Lender shall be void.

     (G) Tenant has not assigned, mortgaged, sublet, encumbered or otherwise transferred any or all of its interest under the Lease and, during the term of the Loan, agrees to not assign, mortgage, sublet, encumber, or otherwise transfer any or all of its interest under the Lease without the prior written consent of Lender.

**SUBORDINATION.** Notwithstanding anything in the Lease to the contrary, the parties acknowledge and agree that the Lease and Lease Rights are and shall be subject and subordinate in right, interest and lien, and for all purposes, to Lender's Lien, and to all renewals, modifications, consolidations, replacements, and extensions thereof, and to any subsequent lien of the Lender with which Lender's Lien may be spread or consolidated, to the full extent of the principal sum and all other amounts secured thereby and interest thereon. Tenant will not cause the Lease to be subordinated to any interests other than those held by or made for the benefit of Lender, and its successors and assigns, without the prior written consent of Lender.

**NON-DISTURBANCE.** So long as the Lease is in full force and effect and Tenant is not in default under the Lease beyond any applicable cure period, Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default of the Loan under the Note and/or under Lender's Lien unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or pursuing such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action. If the Lease has not been terminated, then, when Lender succeeds to the interest of Landlord, the Lender shall not terminate or disturb Tenant's possession of Tenant's premises under the Lease, except in accordance with the terms of the Lease and this Agreement.

**ATTORNMENT.** If Lender shall succeed to the interest of the Landlord under the Lease, and the Lease shall not have expired or been terminated in accordance with the terms of the Lease or this Agreement, Tenant shall, from and after such event, attorn to Lender, all rights and obligations under the Lease to continue as though the interest of Landlord had not terminated. Such attornment shall be effective and self-operative without the execution of any further instrument on the part of the parties hereto. Tenant agrees, however, to execute and deliver at any time and from time to time, upon the request of Lender, any instrument or certificate which, in the sole judgment of Lender, may be necessary or appropriate in any such foreclosure proceeding or otherwise to evidence such attornment.

**NO LIABILITY FOR LENDER.** Lender in the event of attornment shall have the same remedies in the event of any default by Tenant (beyond any period given Tenant to cure such default) in the payment of annual base rent or additional rent or in the performance of any of the terms, covenants, and conditions of the Lease on Tenant's part to be performed that are available to Landlord under the Lease. Tenant shall have the same remedies against Lender for the breach of an agreement contained in the Lease that Tenant might have had against Landlord if Lender had not succeeded to the interest of Landlord; provided, however, that Lender shall not be:

     (A) Liable for any act or omission of or any claims against any prior landlord, including Landlord; or



## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
Loan No: 601490000114437   (Continued)   Page 3

(B) Subject to any offsets or defenses which Tenant might have against any prior landlord, including Landlord; or

(C) Bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord, including Landlord; or

(D) Bound by any amendment or modification of the Lease, or waiver of any of its terms, made without its consent; or

(E) Liable for any sum that any prior landlord, including Landlord, owed to Tenant, including without limitation any security deposit, unless the amount owed was actually delivered to Lender; or

(F) Bound by any surrender, cancellation, or termination of the Lease, in whole or in part, agreed upon between Landlord and Tenant; or

(G) Liable for any construction obligation of any prior landlord, including Landlord; or

(H) Liable for any breach of representation or warranty of any prior landlord, including Landlord.

**NEW LEASE.** If Lender shall succeed to the interest of the Landlord under the Lease, upon the written request of Lender to Tenant, Tenant shall execute and deliver to Lender a lease of the Real Property upon the same terms and conditions as the Lease between Landlord and Tenant, which lease shall cover any unexpired term of the Lease existing prior to such transfer.

**ACKNOWLEDGMENT AND AGREEMENT BY LANDLORD.** Landlord, as landlord under the Lease, acknowledges and agrees for itself and its heirs, successors and assigns to each of the following:

(A) This Agreement does not in any way release Landlord from its obligations to comply with the terms, provisions, conditions, covenants, agreements and clauses of the Note, Lender's Lien or any other documents executed in connection with the Loan.

(B) In the event of a default under the Note, or any of the other documents executed in connection with the Loan, Landlord hereby consents to Tenant's attornment to Lender and, upon such event, Tenant shall pay all rent and all other sums due under the Lease to Lender as provided in the Lease.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Agreement, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Landlord also will pay any court costs, in addition to all other sums provided by law.

**Authority.** Any person who signs this Agreement on behalf of Landlord and Tenant represents and warrants that he or she has authority to execute this Agreement.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Counterparts.** This Agreement may be executed in multiple counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts, taken together, shall constitute one and the same Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.**

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and, shall be effective when actually



## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
Loan No: 601490000114437                    (Continued)                                    Page 4

delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing among Lender, Landlord, and Tenant shall constitute a waiver of any of Lender's rights or of any of Landlord's and/or Tenant's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors.** This Agreement shall extend to and bind the respective heirs, personal representatives, successors and assigns of the parties to this Agreement.

**NOTICE: THIS AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN, A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.**

**EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT, AND EACH PARTY AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JUNE 29, 2017.**

LANDLORD:

HAN'S SAN JOSE HOSPITALITY LLC

By:_____
    Xiaokai Zeng, Chief Executive Officer of Han's San Jose Hospitality LLC

LENDER:

INDUSTRIAL AND COMMERCIAL BANK OF CHINA (USA) NATIONAL ASSOCIATION

X_____
Tung Min Ho              JianLong Wen
Vice President &         Senior Vice President &
Business Manager         Trade Finance Manager

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**
Loan No: 601490000114437                                (Continued)                                                Page 5

**TENANT:**

**LE TECHNOLOGY, INC.**

By: _/s/_____
    Authorized Signer for LE Technology, Inc.

By: _____
    Authorized Signer for LE Technology, Inc.


**LE HOLDINGS (BEIJING) CO., LTD.**

By: _____
    Authorized Signer for LE Holdings (Beijing) Co., Ltd.

By: _____
    Authorized Signer for LE Holdings (Beijing) Co., Ltd.

---

## CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF California                              )
                                                                     ) SS
COUNTY OF Los Angeles                       )

On July 14, 2017, 20 2017 before me, Sandy Gilliam, Notary
                                                                                           (here insert name and title of the officer)
personally appeared Chaoying Deng, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.


WITNESS my hand and official seal.

Signature _/s/ Sandy Gilliam_

SANDY GILLIAM
COMM. # 2118103
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES JULY 17, 2019

(Seal)