# EXHIBIT 6

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                    FOR THE COUNTY OF SANTA CLARA
 3
 4       _____
         HAN'S SAN JOSE HOSPITALITY,      )
 5       LLC                              )
                                          )
 6                    Plaintiff,          )
                                          )
 7            vs                          )  No. 17CV317221
                                          )
 8       LE HOLDINGS (BEIJING) CO.,       )
         LTD; LE TECHNOLOGY, INC.;        )
 9       FARADAY & FUTURE; and DOES 1     )
         to 10,                           )
10                                        )
                      Defendants.         )
11       _____)
12
13
14                     DEPOSITION OF MICHAEL DO
15                       Los Angeles, California
16                      Friday, August 24, 2018
17                             Volume I
18
19
20
21       Reported by:
         LYNN GEARHART, RPR
22       CSR No. 9466
23       JOB No. 2986050
24
25       PAGES 1 - 109
```

Page 1

**Page 10**

1  Q  Do you understand the difference between those two
2  things?
3  A  Yes.
4  Q  Have you had any alcohol or taken any other
5  medication that would interfere with your ability to
6  testify accurately and completely here today?
7  A  No.
8  Q  And you understand the oath the court reporter just
9  gave you is the same oath you would take in a courtroom and
10 it obligates you to tell the truth.
11 A  Yes.
12 Q  Okay. Great. Who is your current employer, Mr. Do?
13 A  Awesome Office, Inc.
14 Q  How do you spell that?
15     THE REPORTER: Awesome?
16     THE WITNESS: Awesome Office, Inc. They also do
17 business as Snack Nation.
18 BY MR. GOODELL:
19 Q  Okay. How long have you been working for them?
20 A  Since November -- since November 1st.
21 Q  Okay. And who did you work for prior to that time?
22 A  Faraday Future.
23 Q  And what do you do for Snack Nation?
24 A  I'm the controller.
25 Q  Controller. And what did you do for Faraday Future?

**Page 11**

1  A  I was the accounting manager, senior accounting
2  manager.
3  Q  Senior accounting -- okay. And what caused you to
4  leave Faraday Future?
5  A  They were having financial problems.
6  Q  Okay. And prior to coming here today, have you
7  talked to any of the other lawyers in this room?
8  A  No.
9  Q  I think you sent me an email how long this is going
10 to take, and I responded it's like two to three hours.
11 Have you -- has anyone else written you about this
12 deposition?
13 A  No.
14 Q  Okay. How long did you work for Faraday & Future?
15 A  Approximately six months.
16 Q  Okay. Were part of your duties as a senior
17 accounting manager at Faraday & Future to review invoices,
18 things of that nature?
19 A  Yes.
20 Q  Okay. Were you familiar with a property in San Jose
21 that Faraday & Future occupied?
22 A  Somewhat, yes.
23 Q  And are you familiar with the company called Le
24 Technology?
25 A  Yes.

**Page 12**

1  Q  Can you explain their relationship with Faraday
2  Future to me?
3  A  It would be a guess, but I believe that they were --
4  they're either a parent company or an affiliated company.
5  I didn't totally understand the corporate structure of
6  Faraday Future and Le Technology.
7  Q  Okay. But what caused you to believe that they were
8  a parent company or an affiliate?
9  A  Because I think it was just well known at Faraday
10 Future that -- you know, that Le Technology and that --
11 that it was all owned by the same owner.
12 Q  And who is that?
13 A  YT.
14 Q  Again, for the record, is that Jia --
15 A  Yes.
16 Q  Let me make sure we get this in the record. Jia Yue
17 Ting?
18 A  That sounds about right.
19 Q  And where did you work for Faraday Future, what
20 office?
21 A  Down in Gardena.
22 Q  Now, were there Le Technology employees, to your
23 knowledge, that worked in that office?
24 A  Yes.
25 Q  Do you know their names?

**Page 13**

1  A  No.
2  Q  Did you ever work on any Le Technology projects?
3  A  No.
4  Q  And when you said it was widely known the parent
5  com- -- that Faraday & Future was a parent company -- or
6  I'm sorry, that Le Technology was a parent company or
7  affiliate of Faraday & Future --
8  A  Yeah.
9  Q  -- do you remember, just looking at specifics, any
10 specific person that said something like that to you?
11 A  No. When I say it's widely known, it was -- you can
12 Google it, and there was lots of news articles about it.
13 Q  But did anyone at Faraday Future -- did you ever
14 have a conversation about the relationship between the two
15 companies?
16 A  I can't recall. Yeah.
17 Q  But you do recall during your time there being
18 general understating that Le Technology was a parent
19 company or affiliate of Faraday Future.
20 A  Or an affiliated company, yes.
21 Q  Parent company or an affiliate.
22 A  Yes.
23 Q  And there was some discussion beyond news articles
24 on that.
25 A  Yes.

4 (Pages 10 - 13)

## Page 14

1  Q  Okay. Did you see any documents during your time at
2  Faraday Future evidencing this relationship between the two
3  companies?
4  A  I can't recall.
5  Q  And just to be clear for the record, did you ever
6  work for Le Technology?
7  A  No.
8      MR. GOODELL: Okay. Let's mark this as Exhibit 1.
9      (Exhibit 1 was marked for identification
10     by the court reporter and is attached hereto.)
11 BY MR. GOODELL:
12 Q  Have you ever seen a copy of this document?
13 A  Yes. This is what was given to me.
14 Q  By the process server?
15 A  Yes.
16 Q  So do you remember when you received this document?
17 A  I think it was last week.
18     MR. GOODELL: Okay. Let's mark this as Exhibit 2.
19     (Exhibit 2 was marked for identification
20     by the court reporter and is attached hereto.)
21 BY MR. GOODELL:
22 Q  Have you ever seen a copy of this document?
23 A  Yes.
24 Q  And when is the first time you saw a copy of this
25 document?

## Page 15

1  A  When I received this. It was sometime last week.
2  Q  Okay. Prior to working at Faraday Future who did
3  you work for?
4  A  I worked for a technology company in Santa Monica
5  called Science Media.
6  Q  What did you do for them?
7  A  I was the accounting manager.
8  Q  How long have you been in accounting?
9  A  My whole life.
10 Q  So when did you graduate from college?
11 A  2001.
12 Q  So since then?
13 A  Yeah.
14 Q  Was your degree in accounting?
15 A  My degree was in finance. I have a master's in
16 accounting.
17 Q  Got you.
18    (Exhibit 3 was marked for identification
19    by the court reporter and is attached hereto.)
20 BY MR. GOODELL:
21 Q  All right. Have you ever seen this document before?
22 Starting -- let's look at -- for the record these are
23 Bates-numbered Faraday 1 through 76. The first page of
24 this document is Faraday 1. You see there's an email
25 that's written on behalf of Michael Do?

## Page 16

1  A  Yeah.
2  Q  Did you type out this email at the top of this
3  document?
4  A  Yeah.
5  Q  And do you remember typing out this email?
6  A  Yes.
7  Q  Do you remember -- this email, you see where it says
8  it references an attached invoice? Do you say that? Just
9  on --
10 A  Is it in here?
11 Q  Yeah. Well, let's get to that. I'd like you to
12 confirm that. So let's go to Faraday 3. It's the third
13 page.
14 A  Oh, the third page. Okay.
15 Q  Do you see this document?
16 A  Yes.
17 Q  Do you remember if this document was attached to as
18 part of this email, Faraday 1?
19 A  Repeat your question.
20 Q  First of all, do you remember seeing -- and that's
21 okay. Do you remember seeing Faraday 3 before?
22 A  I believe so.
23 Q  And take your time to look at it.
24 A  I'm sorry. It's just that I see lots of invoices in
25 my life. It's hard to remember any specific one.

## Page 17

1  Q  Sure. I understand. But you believe you've seen
2  Faraday 3.
3  A  Yes.
4  Q  Okay. Let's go back to Faraday 1. And it asked
5  you -- or you say, "Hi, are either of you familiar with
6  this arrangement to rent out space to LeTV? If so, can you
7  confirm the accuracy of the attached invoice?"
8  A  Okay.
9  Q  You see -- did you type that out?
10 A  Yes.
11 Q  Okay. Did you receive a response to that email, do
12 you remember?
13 A  I -- I don't remember.
14 Q  Do you know if Faraday 3 was ever paid?
15 A  I don't remember.
16 Q  Okay. Do you -- remember when I was asking you
17 earlier about an office space in San Jose?
18 A  Yes.
19 Q  Okay. Does this refresh your recollection of this
20 office space?
21 A  Yes.
22 Q  Prior to receiving this email, had you heard of this
23 office space?
24 A  Yes. Yes.
25 Q  And did Faraday Future occupy that office?

**Page 18**

1  A  Yes.
2  Q  Do you see where it says Huizhi -- do you know an
3  individual by the name of Huizhi Lo?
4  A  No.
5  Q  Prior to getting this email had you ever spoken to
6  her?
7  A  No.
8  Q  Okay. Did you ever speak with her after getting
9  this email?
10  A  Like on the phone? No, never.
11  Q  Did you ever exchange emails --
12  A  Just exchanged emails occasionally, yes.
13  Q  Okay. So this email is sent to Joylyn Belli and
14  John Quach?
15  A  Uh-huh.
16  Q  When's the last time you spoke with John Quach?
17  A  Probably in September or October of last year.
18  Q  Last year?
19  A  Maybe, yeah.
20  Q  Who's Joylyn Belli?
21  A  I don't know.
22  Q  But you sent this email to her or --
23  A  Well, it was -- I think I was just replying --
24  either replying all, or I might have been instructed to
25  contact her with questions about the office.

**Page 19**

1  Q  Okay. Did you -- was it your responsibility to pay
2  invoices like this, Faraday 3?
3  A  Yes.
4  Q  Okay. It was.
5  A  Yes.
6  Q  Okay. So do you -- sitting here today, do you
7  know -- I know I kind of asked this when I throw down on
8  it. Do you know if this was paid?
9  A  I don't know if it was paid.
10  Q  Okay. Do you know if any money during your time as
11  an accountant at Faraday Future was paid to Le Technology
12  for this office space?
13  A  No.
14  Q  You don't know?
15  A  I -- my answer is no, like, we did not pay.
16  Q  You did not pay.
17  A  Yeah. At my time, during my time at Faraday.
18  Q  Okay. Did you ever see -- let's -- actually, let's
19  go to -- let's go to this.
20    (Exhibit 4 was marked for identification
21    by the court reporter and is attached hereto.)
22  BY MR. GOODELL:
23  Q  Okay. Have you ever seen -- so Exhibit 4 is Faraday
24  77 through 94. Have you ever -- take your time to look at
25  the first page of this. Have you ever seen this email?

**Page 20**

1  MR. MARTINEZ: Are you referring to 77?
2  MR. GOODELL: Yes.
3  THE WITNESS: I don't -- I can't recall whether I've
4  seen this specific email.
5  BY MR. GOODELL:
6  Q  You can't recall if you've seen this specific email?
7  A  No.
8  Q  Okay. Let's turn to Faraday 82. Have you ever seen
9  this document before? Starting on 82 to 80 -- or actually
10  to 94.
11  A  No.
12  Q  No. Did you ever see any written agreement between
13  Le Technology and Faraday Future for the occupancy of the
14  property in San Jose we're discussing?
15  A  No.
16  Q  Were you ever told there was a written agreement
17  between the two companies?
18  A  I was never told that there was a written agreement.
19  Q  Okay. Did you ever see -- so earlier you testified
20  that no money was paid, and you're responsible paying
21  invoice. Did anyone explain to you why Faraday wasn't
22  going to be paying Le Technology for occupying that
23  property?
24  A  Because there were -- like, I guess you'd call them
25  intercompany expenses where, you know, we would have --

**Page 21**

1  like, we would be paying directly for certain Le Technology
2  expenses and vice versa.
3  Q  Okay. So you were told that because you guys were
4  paying for Le Technology expenses, you didn't have to pay
5  to occupy the property.
6  A  Not exactly, but, you know, there were -- there were
7  just a lot of -- at the time there were just a lot of,
8  like, you know, crisscrossed expenses. At the time we were
9  just accumulating all the expenses. So there was no, you
10  know, physical -- there was no exchange of money at the
11  time that I was there.
12  Q  And that was because of this crisscross of expenses.
13  A  Yeah. And we were just sort of accumulating them,
14  like, on either sets of -- you know, for both companies.
15  Q  So both companies were paying the other side's
16  expenses.
17  A  Yes. Yes.
18  Q  Okay. So who mentioned that to you, that that would
19  be the reason why you wouldn't be paying an invoice for
20  this property?
21  A  I can't recall. I mean part of it, it would have
22  been my decision to not pay Le Technologies for this rent
23  because, you know, we were still sort of accumulating
24  expenses on our books on their behalf, and -- what else?
25  What else didn't we pay? And, yeah, I think, like, for the

**Page 22**

1 most part we just didn't have enough money at the time.
2   Q   Okay.
3   A   Yeah.
4   Q   When you say expenses, these are a significant
5 amount of expense, would you say?
6   A   Yeah. There was -- there was some research -- yeah,
7 research and development expenses.
8   Q   Okay. Millions of dollars of expenses you guys were
9 paying?
10  A   I can't recall.
11  Q   Circling back to my original question a minute or so
12 ago, for the record, so do you remember anyone -- I know
13 you said part of it was your decision, but anyone else who
14 you discussed this decision with to not pay for the
15 property in San Jose?
16  A   Chaoying.
17  Q   Chaoying. So you would have had that -- discussed
18 that with her.
19  A   Yes.
20  Q   And did she agree with that decision?
21  A   Yes.
22  Q   Now, what was your understanding of her role at Le
23 Technology?
24  A   I -- I don't believe she had a role, but I'm not 100
25 percent sure.

**Page 23**

1   Q   What was your understanding of her role at Faraday?
2   A   She was the president.
3   Q   Okay.
4   A   Yeah.
5   Q   The president of the company?
6   A   Yes.
7   Q   Do you have an understanding or are you aware that
8 she was listed as the CEO of Le Technology?
9   A   I can't say that I was aware of that, no.
10  Q   Did you ever visit the San Jose property?
11  A   Never, no.
12  Q   And remind me when you started working for Faraday?
13  A   April, 2017.
14  Q   It wasn't that long of a time?
15  A   No.
16  Q   And who was your boss?
17  A   Chaoying.
18  Q   Chaoying. Do you know an individual named Pascal
19 Corsari? I might be misspelling --
20  A   Yes.
21  Q   Do you know how to spell his name again?
22  A   C-o-u-s-t-a-r.
23  Q   Coustar, Pascal Coustar. And was he on your team
24 or --
25  A   Yes.

**Page 24**

1   Q   Was he on the same level as you or --
2   A   No. He was -- I would say that he's probably at a
3 higher level.
4   Q   Okay. Do you think -- did he play any part of this
5 decision to not pay Le Technology due to the crisscross of
6 expenses you testified about?
7   A   No.
8   Q   No?
9   A   No.
10  Q   So you testified you and Chaoying discussed this
11 decision. Do you know anyone else who would have been part
12 of that decision?
13  A   No.
14  Q   Do you know if any of this was ever discussed with
15 YT?
16  A   I don't know.
17  Q   Okay. So we know it's -- you know, the significant
18 crisscrossing of expenses. Do you remember, like, any
19 specific expenses, sitting here today, you can remember
20 that Faraday was paying for Le Technology?
21  A   No. I mean, so we were -- we were doing R&D to
22 develop a vehicle for Le Technology, and that -- those R&D
23 expenses should have been paid for by Le Technologies. At
24 the time nobody was just -- like, you know, neither Le
25 Technology or Faraday was paying their -- either bills to

**Page 25**

1 one another. Does that make sense?
2   Q   It does.
3   A   Okay.
4   Q   Okay. So basically both companies were doing work
5 for the other companies, but neither one was paying the
6 other company.
7   A   Essentially, yes.
8   Q   Were bills being sent between the two companies?
9   A   Except for this one for the rent, I'm not aware of
10 any bills being sent.
11  Q   As an accountant did this strike you as odd?
12  A   Yes. Yeah.
13  Q   And why was it odd?
14  A   It just -- it was odd because, you know, we just --
15 we didn't have any processes in place to -- or make sure
16 that we were accumulating all of those expenses and getting
17 them documented and billed out to the other party.
18  Q   So is it fair to say they weren't following standard
19 accounting procedures?
20  A   I don't believe that there are any standard
21 procedures for this, but, you know, they just -- they
22 simply didn't have a procedure or process in place for
23 this. I wouldn't --
24  Q   Just no procedure or process.
25  A   Right.

7 (Pages 22 - 25)

**Page 26**

1  Q  Is that part of the reason you left or --
2  A  No.
3  Q  Okay. It's just --
4  A  Part of it was personal too. I had family stuff
5  going on.
6  Q  I don't need to get into that. Okay.
7     Let's go back to Faraday 77. So you see this email,
8  Dan -- let's go through this email from Dan Gallagher to
9  these list of individuals here. Let's go through some of
10 them. So did you work closely with Chaoying Deng?
11 A  Yes.
12 Q  Okay. Did you speak with her on a daily basis?
13 A  Yes.
14 Q  And again, your job, a significant part of it was
15 paying invoices, paying costs and things of that nature?
16 A  Yeah.
17 Q  And did she have to okay things that were paid on
18 behalf of Faraday?
19 A  Yes.
20 Q  What about -- so Huizhi Lo, you exchanged some
21 emails?
22    MR. MARTINEZ: Asked and answered.
23 BY MR. GOODELL:
24 Q  That's just an objection. You can answer.
25 A  I'm sorry. What?

**Page 27**

1  Q  Huizhi Lo --
2  A  Yes.
3  Q  -- did you guys exchange some emails?
4  A  Yes.
5  Q  What about Dan McGill? You ever spoken with him?
6  A  I emailed him.
7  Q  What did you email him about?
8  A  About -- I believe I emailed him about the -- about
9  this arrangement, this rental arrangement, because we
10 didn't know how much we should be expensing as rent expense
11 for -- for the property.
12 Q  Okay. So let's back that up. So you emailed Dan
13 McGill. So when you say rent expense, rent expense to who?
14 A  To LeEco.
15 Q  So when you say billing or rent expense, I'm not --
16 so Faraday expensed that out on their books as rent.
17 A  Yes. We were -- we were expensing some amount of
18 monthly rent to -- for the office space.
19 Q  Okay. So as part of, like, the books at Faraday --
20 A  Right, right.
21 Q  But no money was being paid because of the
22 crisscross of expenses --
23 A  Yeah. Right. And we were just simply --
24    MR. MARTINEZ: Objection. Compound, argumentative,
25 loading up the facts. Just ask one question at a time.

**Page 28**

1     MR. GOODELL: Witness can --
2  Q  Continue your answer.
3     MR. MARTINEZ: If he understands the question.
4     THE WITNESS: What's the question? Can you repeat
5  the question again.
6     MR. GOODELL: Can you, Madam Court Reporter, read it
7  back?
8     (Record read.)
9     MR. MARTINEZ: Overly broad.
10    Go ahead, answer if you can.
11    THE WITNESS: I think in this arrangement we -- we
12 weren't paying anything because we were unsure of how much
13 we would be expensing for the rent expense in San Jose.
14 BY MR. GOODELL:
15 Q  And then you did expense a certain amount at some
16 point.
17 A  Yes. And we --
18    MR. MARTINEZ: Asked and answered.
19    THE WITNESS: Yes.
20 BY MR. GOODELL:
21 Q  How much did you expense?
22 A  I can't recall.
23 Q  Okay. Do you know if it was over $100,000?
24 A  It was over $100,000.
25 Q  Per month.

**Page 29**

1  A  Yes.
2  Q  Okay. And did you ever discuss this decision to
3  expense the rent for this property with John Quach?
4  A  I don't recall.
5  Q  So you said you exchanged emails with Dan McGill
6  over this; correct?
7  A  I believe so.
8  Q  And you said that you were trying to figure out how
9  much to expense. That was what you discussed in those
10 emails; correct?
11 A  Right.
12 Q  Do you remember what he said on this topic?
13 A  I don't recall.
14 Q  Okay. And this was all done by email; right?
15 A  Yes.
16 Q  Did you ever talk to him on the phone about this
17 topic?
18 A  No.
19 Q  Have you ever met him in person?
20 A  No.
21 Q  Who made the decision besides you to expense this
22 as -- to list the rent for this property as an expense at
23 Faraday Future?
24 A  Repeat that again.
25 Q  Who made the decision -- I'll take out the "besides

8 (Pages 26 - 29)

**Page 30**

1  you," because I'm not sure you've said that yet. Who made
2  the decision to list as an expense on Faraday's books this
3  rent of the San Jose property?
4    A  Jia.
5    Q  That was Jia. Did you play a part in that decision?
6    A  Yes. I would say that that is a standard accounting
7  practice, to expense rent expense.
8    Q  Got you. Even though money wasn't being paid for
9  it, you thought that compensation was being paid because of
10  the crisscross of expenses; correct?
11    A  For the R&D, yes.
12    Q  Thank you. And so you talked to Dan McGill about
13  this at Le Technology?
14      MR. MARTINEZ: Misstates the record.
15  BY MR. GOODELL:
16    Q  You exchanged emails with him about it.
17    A  Yes.
18    Q  Did he agree to this arrangement?
19    A  I can't recall.
20    Q  Okay. Did you discuss with anyone at Le Technology
21  this decision to not pay rent because of the crisscrossing
22  of expenses?
23      MR. MARTINEZ: Misstates the record. He
24  specifically testified that the rent --
25      MR. GOODELL: Counsel, you do not need to give a

**Page 31**

1  speech.
2      MR. MARTINEZ: You can't --
3      MR. GOODELL: I'm asking a question.
4      MR. MARTINEZ: You're yelling now.
5      MR. GOODELL: I'm asking a question. I'm not --
6      MR. MARTINEZ: Well, you can't lie and say --
7      MR. GOODELL: I'm not lying, Counsel.
8      MR. MARTINEZ: Yes, you are.
9      MR. GOODELL: I'm asking a question.
10      MR. MARTINEZ: You're yelling and lying. So stop
11  it.
12      MR. GOODELL: Just because you don't like the
13  testimony. No one's lying.
14      MR. MARTINEZ: Why don't you ask him questions about
15  what he testified to rather than what you want him to
16  testify to.
17      MR. GOODELL: Okay.
18    Q  Ignore him. Please --
19      MR. MARTINEZ: No, you can't tell him to be ignored.
20  I'm entitled --
21      MR. GOODELL: Okay. You're entitled to make
22  objections.
23      MR. MARTINEZ: Stop yelling.
24      MR. GOODELL: You're not representing this witness.
25  I'm not yelling.

**Page 32**

1      MR. MARTINEZ: Yes, you are. You've been yelling
2  for the last few minutes.
3      MR. GOODELL: Okay. I'm not. And a bunch of people
4  here can testify that I'm not.
5      MR. MARTINEZ: So why don't you ask --
6      MR. GOODELL: I'm going to change my question,
7  Counsel. If you want to instruct him not to answer, that's
8  fine. We'll have another motion to compel since we already
9  have at least one.
10      MR. MARTINEZ: Ask a question that reflects the
11  record. Stop making up facts.
12      MR. GOODELL: I didn't make up any facts.
13      MR. MARTINEZ: Okay.
14      MR. GOODELL: Madam Reporter, could you read back
15  the question.
16      (Record read as follows:
17      "Q  Did you discuss with anyone at Le
18  Technology this decision to not pay rent because
19  of the crisscrossing of expenses?
20      MR. MARTINEZ: Same objections.
21      THE WITNESS: What does that mean? Do I answer the
22  question?
23      MR. GOODELL: Answer the question, yes.
24      THE WITNESS: I believe I spoke with Chaoying about
25  it.

**Page 33**

1  BY MR. GOODELL:
2    Q  On her -- in her hat at Le Technology or --
3    A  As my boss at Faraday.
4    Q  Did you discuss this with anyone at Le Technology?
5    A  No.
6    Q  Do you know if Chaoying discussed this with anyone
7  at Le Technology?
8    A  I don't know.
9    Q  So you discussed with Dan McGill this trying to come
10  up with a figure to expense.
11    A  Correct.
12    Q  Okay. So he knew that you all were doing that.
13    A  Yes.
14    Q  Did he interpose any objection to that?
15    A  I don't recall.
16    Q  Okay. So let's go to Andrew Wolstan. Have you ever
17  spoken to him?
18    A  Yes.
19    Q  Okay. Does he -- what was his role at Le
20  Technol- -- I mean, I'm sorry, at Faraday Future?
21    A  He was legal counsel.
22    Q  When's the last time you spoke to him?
23    A  I can't recall. He left before I did so before
24  October. Maybe in October.
25    Q  Okay. Did you ever discuss with him this decision

## Page 34

1  regarding this arrangement of the San Jose property?
2       MR. MARTINEZ: Instruct not to answer. You're
3  asking about a privileged communication.
4       MR. GOODELL: That's fine.
5   Q  Todd Norman, have you ever spoken with him?
6   A  No.
7   Q  Jason Caskey?
8   A  No.
9   Q  Okay. Let's go down to the bottom of Faraday 77.
10  You see this email, it says from Chaoying Deng?
11  A  Yes.
12  Q  Do you -- did you ever get emails from her at
13  cydeng@le.com?
14  A  No.
15  Q  Did you ever get emails from anyone at Faraday
16  Future from -- in which their email address ended in
17  le.com?
18  A  I don't recall.
19  Q  You see where it says from Chaoying Deng to Huizhi
20  Lo? And it says "Huizhi, I agree with you, we should
21  execute a sublease agreement." You see that?
22  A  Yes.
23  Q  Did she ever mention to you if a sublease agreement
24  had been executed?
25  A  I don't recall.

## Page 35

1   Q  Did she ever mention any sort of -- did she ever
2   mention any of her discussions on this topic with anyone at
3   Le Technology to you?
4   A  I can't recall.
5   Q  Okay. Okay. Now, did you ever get any invoices for
6   snacks and office supplies from the San Jose property?
7   A  No.
8   Q  Okay. Did you ever get another invoice besides
9   Faraday 3, to your knowledge?
10      MR. MARTINEZ: Vague and ambiguous. Ever saw
11  another invoice besides Faraday 3?
12  BY MR. GOODELL:
13  Q  For the subject property.
14  A  I can't recall.
15  Q  So besides the Faraday 3, were any of the other
16  expenses on the property, any of the other invoice expenses
17  sent to you?
18  A  I think there might have been some utility bills.
19  Q  Okay. And did you pay those bills?
20  A  Yes.
21  Q  Okay. Let's go to Faraday 4. Can you read into the
22  record this email that was sent from John Quach to you, it
23  appears.
24  A  Uh-huh.
25  Q  Can you read it into the record.

## Page 36

1   A  "Hey Michael" -- you want me to read --
2   Q  Yeah, if you can read.
3   A  -- this email from John?
4   Q  Yeah.
5   A  "Hey Michael, This is absurd. The verbal agreement
6   that I had with Dan McGill regarding this matter was to be
7   charged a percentage of the space we occupied. The
8   building is 86,000 square feet. We occupy (at most) 16,000
9   square feet, which is less than 19% of total space
10  ($42,000). I'm not sure what email agreement they are
11  referring to, but you should check with Chaoying or DG.
12  Signed John."
13  Q  Okay. Did you ever respond to this email?
14  A  I can't recall.
15  Q  Did you hear anything more about this verbal
16  agreement referenced in this email?
17  A  I can't recall.
18  Q  Did you ever talk to John about this verbal
19  agreement?
20  A  I can't recall.
21  Q  Did you ever talk to Chaoying about this verbal
22  agreement?
23  A  Probably. Yeah.
24  Q  What did she say about it?
25  A  I can't -- that, I can't recall. I don't remember

## Page 37

1   the details.
2   Q  Did anyone ever tell you there was no verbal
3   agreement?
4   A  No.
5   Q  No one ever said that to you.
6   A  No.
7   Q  Okay. After you got this email that was never said.
8   A  That was never said.
9   Q  Okay. You used the word Le TV in Faraday 4 as part
10  of this email. What's -- what's your understanding of the
11  relationship between Le TV and Le Technology?
12  A  Just one of the many affiliated companies.
13  Q  Okay. Is there a reason you called it Le TV?
14  A  No. It's just --
15  Q  Okay. I mean -- sorry.
16  A  It's just the name that I most associate with LeEco.
17  Q  Okay. Got you. And is LeEco -- in your mind, was
18  there a distinction between LeEco and Le Technology?
19      MR. MARTINEZ: Lacks foundation.
20      THE WITNESS: Repeat that again.
21  BY MR. GOODELL:
22  Q  In your mind, was there a distinction between LeEco
23  and Le Technology?
24  A  Yes.
25  Q  Okay.

10 (Pages 34 - 37)

### Page 42

1  Q  What did he do for Faraday?
2  A  He was a recruiter.
3  Q  Okay. Did he recruit you?
4  A  No.
5  Q  Who recruited you?
6  A  Teddy Kang.
7  Q  Is he still with Faraday?
8  A  I don't know.
9  Q  All right. Anyone else you recognize?
10  A  No.
11  Q  Let's go to -- did you ever pay an invoice to a
12  company called Camello?
13  A  I can't recall.
14  Q  Let's go to Faraday 45. Have you ever seen this
15  document?
16  A  No.
17  Q  Faraday 46, you ever seen this?
18  A  No.
19  Q  All right. Faraday 47. Do you know an individual
20  by the name of Calvin Nguyen?
21  A  No.
22  Q  And this references a $10,000 needed for a retainer
23  to Camello. Do you know if that 10,000 was ever paid?
24  A  I can't recall.
25  Q  When it says PR here, what does that stand for, if

### Page 43

1  you know?
2  A  Purchase requisition.
3  Q  And what is the SAP?
4  A  It's an ERP system, an accounting system.
5  Q  An accounting system. What does ERP stand for?
6  A  Enterprise Resource Planning.
7  Q  Then it says purchase then create a PO. What is
8  that?
9  A  A purchase order.
10  Q  Prior to coming here today had you ever heard of
11  this lawsuit?
12  A  No.
13  Q  Are you familiar -- did you ever talk with anyone
14  from Han's San Jose Hospitality?
15  A  No.
16  Q  Do you know if Faraday ever notified them of their
17  occupying the property?
18  A  I don't -- repeat that again.
19  Q  Do you know if Faraday ever notified Han's San Jose
20  of the fact that they were going to occupy the San Jose
21  property?
22  A  I don't know.
23  (Exhibit 6 was marked for identification
24  by the court reporter and is attached hereto.)
25  BY MR. GOODELL:

### Page 44

1  Q  Have you ever seen this document before?
2  A  No.
3  Q  Did Chaoying Deng ever tell you that she had
4  reviewed the lease between Le Technology and Han's for the
5  San Jose property?
6  A  She never told me that.
7  Q  Did anyone at Faraday mention they looked at the
8  lease?
9  A  No.
10  Q  Did anyone at Faraday, during your time there, ever
11  speak of Han's San Jose at all?
12  A  No.
13  Q  Did anyone ever speak of asking permission from
14  Han's San Jose to occupy the San Jose property?
15  A  No.
16  Q  Have you ever seen any documents during your time at
17  Faraday in which Faraday requested permission to occupy the
18  San Jose property from Han's San Jose?
19  A  Repeat that again.
20  MR. GOODELL: Madam Court Reporter, could you read
21  it back.
22  (Record read.)
23  THE WITNESS: No.
24  (Exhibit 7 was marked for identification
25  by the court reporter and is attached hereto.)

### Page 45

1  BY MR. GOODELL:
2  Q  Have you ever seen this document before?
3  A  No.
4  Q  Take your time to review all pages of it. I want to
5  see if you've seen any of these documents before.
6  A  Okay. I've never seen any of these.
7  Q  Okay.
8  (Exhibit 8 was marked for identification
9  by the court reporter and is attached hereto.)
10  BY MR. GOODELL:
11  Q  Have you ever read this article before from The
12  Verge about "Inside Faraday Future's house of cards"?
13  A  Yes.
14  Q  When did you first read it?
15  A  When it came out.
16  Q  Were you still working at Faraday then?
17  A  No.
18  Q  Let's go to page 3 of this article.
19  A  Uh-huh.
20  Q  First full paragraph on the page, "Either way,
21  according to multiple sources, many remaining employees are
22  planning their exits, or have left. Others are simply no
23  longer showing up for work; when YT arrived at the
24  company's Gardena, California, headquarters on the morning
25  of Monday, November 20th to meet a group of potential

1  investors, he found so few employees on site that an email,
2  which was obtained by The Verge, was sent to staff by
3  Faraday Future's head of go-to market strategy that
4  reinforced the company's work hours."
5      Did you ever see that email?
6   A  I was not employed at Faraday at this time.
7   Q  Were people not showing up to work when you were
8  there?
9   A  No. I mean -- let me be clear. People were showing
10 up to work while I was there.
11  Q  Okay. It says, in the last sentence on this page,
12 "And many sources say that he left Deng, who had little
13 experience running the accounting of a company this large,
14 in charge of the money." Was it your impression that
15 Ms. Deng had a lot of experience or little experience
16 running the accounting of a company this large?
17     MR. MARTINEZ: Lacks foundation.
18     THE WITNESS: Repeat that again.
19     MR. GOODELL: Court reporter can read it back.
20     (Record read.)
21     THE WITNESS: She -- it was in my opinion that she
22 lacked the experience to run the accounting for a company
23 that large.
24 BY MR. GOODELL:
25  Q  She was running the accounting; correct?

Page 46

1   A  Let me repeat that. She was in charge of the
2  finances for a company that large.
3   Q  And she lacked the requisite experience, in your
4  opinion.
5   A  Yes.
6   Q  All right. Let's go to page 6. And it says, the
7  last sentence of the first para, top of the page, "And
8  there was confusion among employees about LeSee, which
9  appeared to outsiders to be a competitor to Faraday
10 Future's car." Do you have an understanding of who LeS- --
11 who or what LeSee is?
12  A  LeSee was one of the affiliates.
13  Q  Okay. You say it's -- was that a company?
14  A  I believe so.
15  Q  The next sentence says, "Patents filed with the US
16 Patent and Trademark Office show that Faraday Future's
17 intellectual property was shared with LeSee." Were you
18 informed of that during your time there?
19  A  I was not informed of that during my time there.
20  Q  But was it your understanding that there was
21 intellectual property shared between the two companies?
22  A  Yes.
23  Q  It says, "The ultimate goal, according to multiple
24 employees familiar with Faraday Future's manufacturing
25 plans, was to produce the LeSee car using the same

Page 47

1  production lines Faraday would use to make its own car, the
2  FF91." Did you have an understanding of that while you
3  were there at Faraday?
4   A  Yes.
5   Q  Okay. That that was the ultimate goal?
6   A  The strategy changed multiple times, but there was a
7  point where that was one of the goals.
8   Q  Okay. Let's go to page 10. It says, "But what
9  former employees describe is that, financially, Faraday
10 Future was run more like an affiliate of LeEco, with people
11 like Deng wielding power at more than one of these
12 companies. Was that your impression while you were there?
13  A  Yeah.
14  Q  Okay. Did you ever -- the next it says, "According
15 to one former employee, YT and Deng justified this
16 closeness by saying these companies were 'a family.'" Did
17 anyone ever say that, use that terminology to you?
18  A  No.
19  Q  Okay. Okay. Second full paragraph, "The mechanics
20 of exactly how Deng moved money in and out of Faraday
21 Future wasn't completely clear to former employees who
22 spoke to The Verge. That includes those who would
23 typically have an understanding of their company's cash
24 flow. But it essentially worked like this: Deng would
25 bring requests for money to YT and a small cohort of top

Page 48

1  executives across the companies he ran in China, including
2  YT's nephew Jiawei Wang; that money would then be deposited
3  into a bank only Deng had access to, before making its way
4  to Faraday Future, former employees say. The money was
5  then used to pay the company payroll and occasionally pay
6  suppliers, but some of it would go to other LeEco
7  subsidiaries, these people say."
8      Is this an accurate reflection of the accounting
9  while you were there?
10     MR. MARTINEZ: It's compound, lacks foundation at
11 this point.
12     THE WITNESS: Some of it -- some of this is true.
13 BY MR. GOODELL:
14  Q  Okay. Which part of it?
15  A  That -- you know, that money would come in from --
16 from, you know, YT or some of his other companies, and it
17 would be used to pay suppliers and the company payroll.
18 The last part I'm not too sure about, "some of it would go
19 to other LeEco subsidiaries."
20  Q  You're not sure about that part?
21  A  Yeah.
22  Q  You're not saying that didn't happen. You're just
23 not sure.
24  A  I'm not sure about it.
25  Q  And you just said that this money was coming from

Page 49

13 (Pages 46 - 49)

## Page 50

1  YT, to your understanding.
2  A  To my understanding.
3  Q  What's that understanding based on?
4  A  That they were coming from, you know, these, like,
5  LeEco affiliated companies.
6  Q  Got you.  Did you ever hear reports of KPMG cutting
7  ties with Faraday?
8  A  Yes.
9  Q  Did that happen while you were there?
10  A  That happened before I joined.
11  Q  What did you hear about that?
12  A  What do you mean?
13  Q  Did anyone ever inform you of the reason that KPMG
14  cut ties with Faraday?
15  A  No.  Yeah, no.
16  Q  Did you know a C. Ed Raman?
17  A  No.
18  Q  Did you ever hear of a -- ever heard of a
19  corporation called Ocean View Drive, Inc.?
20  A  Yes.
21  Q  Did you ever get invoices that you had to pay from
22  that corporation?
23  A  No.
24  Q  How did you hear of that, the name of that
25  corporation?

## Page 51

1  A  It's where -- I think that was a property company.
2     Repeat that.  How did I hear about Ocean View
3  Property?
4  Q  Yeah.  Ocean View Drive, Inc.
5  A  That's where the -- you know, some of our executives
6  lived.
7  Q  When you say that's where -- that's the name of a
8  corporation.  So you're referring to there's a property
9  associated with this corporation.
10  A  Yes.
11  Q  Is that property in Rancho Palos Verdes?
12  A  Yes.
13  Q  Is it three mansions?
14     MR. MARTINEZ:  Lacks foundation.
15     THE WITNESS:  I don't recall.  I don't know.
16  BY MR. GOODELL:
17  Q  So did you ever tasked with the -- given the task of
18  paying any expenses for that corporation?
19  A  No.
20  Q  Did you ever visit those properties?
21  A  Once.
22  Q  What was the occasion for your visit?
23  A  Like a company party.
24  Q  Do you know who lived in those properties?
25  A  Chaoying.

## Page 52

1  Q  Did YT live there?
2  A  Yes.
3  Q  Okay.  So let's go to the bottom of page 15.  It
4  says, "But some sources say the houses were more than
5  shelter.  According to two former employees with knowledge
6  of Faraday Future's finances, YT and Deng tried to use
7  these houses as collateral to raise money for the company
8  in 2016.  Since they weren't owned by Faraday Future, the
9  company's finance team stopped the effort."
10     You see that?  Did you hear anything about the
11  attempt to use these -- use houses as collateral to raise
12  money for the company?
13  A  In 2016?  No.
14  Q  Did you hear about it after that?
15  A  We used the houses for collateral in 2017.
16  Q  Okay.  So you borrowed money against the houses --
17  A  Yes.
18  Q  -- to raise money for Faraday?
19  A  Yes.
20  Q  All right.  Let's go to page 16.
21     It says, "One lawsuit filed against YT includes Deng
22  and Ocean View Drive, Inc. as defendants.  The plaintiff,
23  Miles Bernal, claims to have been employed to help run
24  operations at the mansions, and argues that he was
25  wrongfully terminated from the company.  The lawsuit argues

## Page 53

1  the YT and Deng 'used Ocean View Drive, Inc. to engage in
2  illegal and improper activities,' including the co-mingling
3  of funds and the personal use of company assets and money."
4     Did you hear about this lawsuit?
5  A  Yes.
6  Q  Do you know how it was resolved?
7  A  No.
8  Q  Did you know Miles Bernal?
9  A  No.
10  Q  What did you hear about the lawsuit?
11  A  Through this article.
12  Q  Okay.  All right.  Let's go to page 17.
13     MR. MARTINEZ:  If you need a break, you can take
14  one.  We've been going for over an hour.
15     THE WITNESS:  Yeah, if you guys don't mind.
16     MR. GOODELL:  Sure.
17     (Recess.)
18  BY MR. GOODELL:
19  Q  So let's go to page 17.
20  A  Yep.
21  Q  It says, "In another lawsuit, Beim Maple Properties
22  is suing for breach of contract, and asking for damages of
23  more than $15 million, claiming owed in future rent.  Beim
24  evicted Faraday Future from a small office in Torrance,
25  California, that was being used as a design studio at the

**Page 58**

1  area, would that be accurate, to your knowledge?
2  A  I would not -- I would not -- I couldn't answer
3  that.
4  Q  Well, he testified his primary residence was in San
5  Jose, but another lawyer at this table acted like he lived
6  here in the south.
7      MR. MARTINEZ: He does, three days of the week.
8  I've told that you many times.
9      MR. GOODELL: Per his own testimony. That's all
10 right. We'll deal with it in court.
11     MR. MARTINEZ: I will move for sanctions if you move
12 for sanctions on that basis.
13     MR. GOODELL: Go right ahead.
14 Q  So "The posts were also publicly denounced by YT.
15 One of Gu's posts in particular apparently sparked YT's
16 legal action.... 'If they think this document is false,
17 they can sue me in court.'" And "his lawyers called Gu's
18 behavior 'a continuous and systematic effort by an
19 individual to intimidate, harass, and defame a stranger
20 over the internet.'"
21     Do you know who represented YT in that case?
22 A  I don't know.
23 Q  Did you ever talk to Stefan Krause?
24 A  Yes.
25 Q  Okay. What did he do for Faraday?

**Page 59**

1  A  He was their CFO.
2  Q  Okay.
3      MR. MARTINEZ: Is it "Stef-on" or "Stee-" --
4      THE WITNESS: "Stef-on."
5  BY MR. GOODELL:
6  Q  And did you report to him?
7  A  No.
8  Q  Did your boss report to him?
9  A  No.
10 Q  So it says here he "decided to sever LeEco's
11 partnership with Aston Martin." You see that? Stefan
12 Krause?
13 A  Uh-huh.
14 Q  Okay. Were you aware of that occurring?
15 A  Yes.
16 Q  So Stefan Krause, for Faraday, was severing some of
17 LeEco's partnerships?
18 A  Yes.
19 Q  So it says, "Krause" -- turn to the next page --
20 "tried to detangle company's finances and make them more
21 transparent, former employees who recently left the company
22 say. But YT's reluctance to relinquish control as majority
23 stakeholder and decision-maker, and his refusal to explore
24 Chapter 11 bankruptcy, stood in the way, according to these
25 people."

**Page 60**

1  Q  Did you see any evidence of him trying to detangle
2  the company's finances while you were there?
3  A  Yes.
4  Q  Were you there when he resigned?
5  A  Yes.
6  Q  Do you know why he resigned?
7  A  Yes.
8  Q  And why did he resign?
9  A  Because YT refused to explore Chapter 11 bankruptcy.
10 Q  Okay. Did he tell you that, Stefan Krause?
11 A  No.
12 Q  So who told you that?
13     MR. MARTINEZ: If it's -- if it's an answer that
14 comes from counsel, then do not answer, and in fact, I'm
15 going to instruct you, if the question is calling for
16 something that you learned from counsel, don't answer.
17     THE WITNESS: Okay.
18 BY MR. GOODELL:
19 Q  So did you learn that from counsel?
20 A  Well, I --
21     MR. GOODELL: Well, I'm asking him because I have to
22 know if he can answer the question.
23     THE WITNESS: I can't answer the question. How
24 about that?
25 BY MR. GOODELL:

**Page 61**

1  Q  Okay. Then just say that. That's fine.
2      MR. MARTINEZ: What you're supposed to say, Counsel,
3  is I only want to know if it comes from someone besides
4  counsel. You don't ask if the question -- if the
5  information came from counsel.
6      MR. GOODELL: What you're supposed to do when
7  someone asks to you take a deposition within 70 miles, you
8  say it's okay. You don't lie and then make me come all the
9  way down here and then have to pay expenses. So you're the
10 one who's a liar, actually.
11     MR. GOODELL: Mr. Goodell, I wrote in an email that
12 the majority of the workweek Mr. Quach is here. That is a
13 true fact. I'm sorry if it hurts your feeling you had to
14 come down here.
15     MR. GOODELL: I'm going to move for sanctions
16 against you personally because of that.
17     MR. MARTINEZ: Okay. Fine. Just explain --
18     MR. GOODELL: The record's very clear in the email.
19 Go back and read them.
20     MR. MARTINEZ: I have.
21     MR. GOODELL: Okay. Good. You can tell the judge
22 that. You can tell the judge why -- no one's ever done
23 that to me in ten years. That's absolutely ridiculous.
24     MR. MARTINEZ: By the way, you said you were going
25 to be L.A. anyway.

Page 66

1   A   No.
2   Q   No?
3   A   No.
4   Q   Okay. So how do you know it was being expensed?
5   Just orally discussed?
6   A   Because we had an intercompany payables account
7   and -- yeah, I think that every month we would -- we would
8   expense some portion of rent expense related to San Jose.
9   Q   Right.
10  A   Yeah.
11  Q   Okay. And you said every month. So where was this
12  expenses sent? Or was it just kept on Faraday's records?
13  A   Yes, yes, that we would record the expense.
14  Q   So there should be documents out there showing 3553
15  North First Street expense for this amount.
16  A   If you were to -- if you were to log into the
17  accounting system, yeah, there should be some documentation
18  in there.
19  Q   Okay.
20      (Exhibit 9 was marked for identification
21  by the court reporter and is attached hereto.)
22  BY MR. GOODELL:
23  Q   Have you ever seen this document before?
24  A   No.
25  Q   Have you read this article?

Page 67

1   A   No.
2       (Exhibit 10 was marked for identification
3   by the court reporter and is attached hereto.)
4   BY MR. GOODELL:
5   Q   Have you read this article?
6   A   Yep.
7   Q   You have?
8   A   Yes.
9   Q   Okay. Was this while you were there or --
10  A   I don't believe so. I think I left after this
11  article came out.
12  Q   Was Nick Sampson still working at Faraday Future?
13  A   I don't know.
14  Q   You never spoke with Nick Sampson?
15  A   I can't recall.
16  Q   Well, Michael Dunne?
17  A   Michael Dunne. I can't recall ever speaking to
18  Michael Dunne.
19  Q   Have you ever met YT? Yes?
20  A   Once, yes.
21  Q   Where did you meet him?
22  A   At the office.
23  Q   Okay. In Gardena?
24  A   Uh-huh.
25  Q   So you always worked out of the Gardena office.

Page 68

1   A   Yes.
2   Q   Was part of your responsibility doing payroll?
3   A   Yes.
4   Q   Okay. Did you -- was part of your payroll Le
5   Technology employees?
6   A   No.
7   Q   What about Le TV?
8   A   No.
9   Q   What about any of the Le subsidiaries?
10  A   No.
11  Q   No?
12  A   Only Faraday.
13  Q   Okay. Did you go to the CES in Las Vegas?
14  A   No.
15  Q   Do you know people who were there?
16  A   Yes.
17  Q   Let's go to the page -- there's not numbers at the
18  bottom, but there's a car, and then there's the next
19  page, the next page after the car.
20  A   Uh-huh.
21  Q   It says, "Then reality started to set in.
22      "After emerging publicly in late 2015, the company
23  geared up to reveal a car at the Consumer Electronics Show
24  Las Vegas. The hype was enormous, and the expectation was
25  that Faraday would have something more than a concept to

Page 69

1   show off.
2       "Except it didn't. Faraday baffled the audience
3   with a concept that looked straight out of the next Batman
4   movie. Even as a supposed showcase for their technology,
5   as concept cars often are, it didn't live up to the hype -
6   or seem realistic to the crowd expecting a 'real' car at
7   CES. The 'real car' was said to be coming, even in
8   testing."
9       Did you hear accounts of this while you were at
10  Faraday?
11  A   I mean just through reading these articles.
12  Q   Was a car ever made while you were at Faraday?
13  A   Yes.
14  Q   Okay. What car was that?
15  A   The FF91.
16  Q   Okay. Have any of those been sold?
17  A   I don't know that answer.
18  Q   Were any of the invoices you were sent to pay for Le
19  Technology expenses?
20  A   No.
21  Q   So you weren't sent invoices.
22  A   Repeat that.
23  Q   You weren't sent invoices for any of the Le
24  Technology expenses?
25  A   No.

**Page 70**

1  Q  So the crisscrossing of expenses, those were things
2  you just -- that Faraday did on behalf of Le Technology?
3  A  Yeah. So when I say crisscross expenses, I meant,
4  like, for the property there were, like, printer leases.
5  Okay. I think -- so those printer leases were paid for on
6  behalf of -- they were paid by LeEco for the Faraday
7  employees.
8  Q  Right.
9  A  Does that make sense?
10  Q  Yes.
11  A  Okay. And so there might have been -- so when I say
12  crisscrossed expenses, that's what I meant.
13  Q  Okay. So the two different companies would pay for
14  things on behalf of the other company.
15  A  Correct.
16  Q  It sounded like there was a significant amount of
17  things, which is why the property at issue in this case,
18  rent wasn't paid; correct?
19  A  Yes.
20      (Exhibit 11 was marked for identification
21  by the court reporter and is attached hereto.)
22  BY MR. GOODELL:
23  Q  Did anyone ever use the word "affiliate" to describe
24  the relationship between Le Technology and Faraday?
25  A  Yeah.

**Page 71**

1  Q  Who? Who used that word?
2  A  I used that word.
3  Q  While you were there?
4  A  Yeah.
5  Q  Besides you who used that word?
6  A  Maybe just like talking to folks within my team,
7  Monica.
8  Q  Monica.
9  A  Monica Gomez.
10  Q  Did Chaoying ever use that word?
11  A  I can't recall if she ever used that word.
12  Q  What about "subsidiary"? Did Chaoying ever use that
13  word?
14  A  I can't recall if she ever used that word
15  specifically.
16  Q  Did you ever hear Chaoying describe the relationship
17  between the two companies?
18  A  I can't recall if she ever described to me the
19  relationship.
20  Q  What about Stefan Krause? Did he ever describe the
21  relationship?
22  A  I never spoke to Stefan about the relationship.
23  Q  Let's look at the document/exhibit in front of you.
24  Have you ever seen this before?
25  A  No.

**Page 72**

1  Q  Let's go to the lease which is towards the back.
2  Have you ever seen this lease before?
3  A  Yes.
4  Q  You have seen this lease?
5  A  Yes.
6  Q  When did you see it?
7  A  I -- I don't know the specific date.
8  Q  What was the occasion for you seeing it?
9  A  I provided this to our auditors.
10  Q  KPMG?
11  A  No.
12  Q  What auditors were those?
13  A  BDO.
14  Q  Do you know if any payments were made on this lease?
15  A  I don't know.
16  Q  Did you ever get any invoices regards this lease?
17  A  No.
18  Q  Let's go back to the lease at issue in this case you
19  were looking at earlier.
20     MR. MARTINEZ: Exhibit 6.
21  BY MR. GOODELL:
22  Q  Have you ever seen this? You said earlier you'd
23  never seen this before.
24  A  No, I've never seen this lease.
25  Q  Let me direct your attention to page 42.

**Page 73**

1  A  Uh-huh.
2  Q  Okay. Have you ever seen Chaoying Deng's signature?
3  A  Uh-huh.
4  Q  Does that look like it on this page?
5  A  Yeah.
6  Q  Have you ever seen Dongge Jiang's signature?
7  A  No.
8  Q  Do you know Dongge Jiang?
9  A  No.
10  Q  Do you know a company called Le Holdings?
11  A  Yes.
12  Q  What's your understanding of what they do?
13  A  I don't -- I -- I believe that they were just
14  another one of the subsidiaries of --
15  Q  Going back to what's in front of you, you see how
16  Chaoying signed her signature -- you testified appears to
17  be her signature -- is in the line before the Le
18  Technology.
19  A  Uh-huh.
20  Q  Were you aware that she had signed this lease on
21  behalf of Le Technology?
22  A  I was not aware.
23  Q  Does that surprise you or --
24  A  Does it surprise me that --
25  Q  Yes, does it surprise you?

19 (Pages 70 - 73)

Exhibit 6    Page 16 of 19

## Page 78

1  Q  The question is -- oh, okay. All right. That's
2  fine.
3  A  Okay.
4     (Exhibit 14 was marked for identification
5  by the court reporter and is attached hereto.)
6  BY MR. GOODELL:
7  Q  Have you ever seen this document before?
8  A  No.
9  Q  Do you know an individual by the name of -- let's
10 look at his name. I don't want to mispronounce it. It's
11 page 4.
12 A  No.
13 Q  What about the names below it?
14 A  No.
15 Q  Okay. Look at the next page. You see the
16 signature?
17 A  Yeah.
18 Q  You see how -- is that Chaoying's signature, to your
19 knowledge?
20    MR. MARTINEZ: There's two signatures on the page.
21 BY MR. GOODELL:
22 Q  The top signature.
23 A  Yeah.
24 Q  You see it says, "Authorized signer for Le
25 Technology"?

## Page 79

1  A  Yeah.
2  Q  So you had testified earlier you were talking to
3  Chaoying almost on a daily basis around summer 2017?
4  A  Uh-huh.
5  Q  Were you aware that she was signing documents like
6  this on behalf of Le Technology?
7  A  I wasn't aware.
8  Q  Did she ever mention that to you?
9  A  No.
10 Q  No? Do you remember when -- wasn't it that Faraday
11 began occupying this property?
12 A  I don't know.
13    (Exhibit 15 was marked for identification
14 by the court reporter and is attached hereto.)
15 BY MR. GOODELL:
16 Q  Have you ever read this article?
17 A  Yeah.
18 Q  Do you remember when you read it?
19 A  I don't remember.
20 Q  Was it while you were at Faraday?
21 A  Yeah, it was probably while I was at Faraday.
22 Q  It says, "LeEco's Car Was Designed By Faraday Future
23 Employees Who Didn't Get Paid For It" is the title of
24 article; correct?
25 A  Uh-huh.

## Page 80

1  Q  It says, in the second page, "In December 2015,
2  employees at Faraday's headquarters in Gardena, California,
3  received a mandate from Jia: Design a prototype LeEco car
4  that could be shown off publicly at a spring event in
5  Beijing. According to several former employees, some of
6  Faraday's designers were pulled off of their core projects
7  to work on the vehicle."
8     Did anyone tell you about that occurring?
9  A  No.
10 Q  "And in April 2016, LeEco unveiled a sleek, electric
11 sedan called LeSee." Are you familiar with the LeSee?
12 A  Yes.
13 Q  Did Faraday help produce that car?
14 A  Yes.
15 Q  Did Faraday pay for some of the expenses of that
16 car?
17 A  Yes.
18 Q  It says, "Back in California, some Faraday employees
19 were unsettled, sources told BuzzFeed News. Though they'd
20 designed the car for LeEco per Jia's request, they were not
21 given credit for doing so, and the company didn't receive
22 payment in exchange." You see that?
23 A  Uh-huh.
24 Q  "And the development of the LeSee had distracted
25 them from work on Faraday's own vehicles." You see that?

## Page 81

1  A  Uh-huh.
2  Q  "'(The LeSee project) certainly added pressure onto
3  the design team. It crunched timelines,' a former employee
4  with knowledge of the project told BuzzFeed News. 'It
5  certainly made getting deadlines met that much more
6  difficult.'"
7     Did you hear reports of these employees not given
8  credit for designing the car?
9  A  I didn't hear about that.
10 Q  Did you hear about the company not receiving payment
11 in exchange?
12 A  Well, as I mentioned to you earlier, this is some of
13 those inter- -- what we consider those intercompany
14 expenses, like --
15 Q  Okay.
16 A  So, yes, it did not get paid.
17 Q  Got you.
18    Are you familiar with the Nevada State Treasurer
19 calling Faraday a Ponzi scheme?
20 A  Yes.
21 Q  Did that happen while you were there?
22 A  Yes.
23 Q  Was there a lot of discussion about that around the
24 office?
25 A  No.

21 (Pages 78 - 81)

866 299-5127

## Page 82

1    (Exhibit 16 was marked for identification
2  by the court reporter and is attached hereto.)
3  BY MR. GOODELL:
4   Q  Have you seen this document before?
5   A  No.
6   Q  It says, "Faraday Future CEO Accused Of Setting Up
7  Hundreds of Shell Companies To 'Escape Debts' In Lawsuit."
8  You see that?
9   A  Uh-huh.
10  Q  Have you heard anyone else use that terminology?
11  A  Shell company?
12  Q  Yeah.
13  A  No.
14  Q  Let's go to the second page. It talks about a
15 "Chinese-based firm Beijing MVC Consultant Company says it
16 entered into an agreement in April 2016 with one of Jia's
17 subsidiaries to conduct a survey of potential customers in
18 China for Faraday's first production car, the FF 91."
19   Are you familiar with this agreement?
20  A  No.
21  Q  Okay. Did you ever see this invoice? It's
22 referenced in the second paragraph, $180,000 invoice?
23  A  No.
24  Q  Are you aware of the lawsuit --
25  A  No.

## Page 83

1   Q  -- in the Chinese court referenced below, early
2  2017?
3   A  No.
4   Q  Are you aware of Jia being put on the debtor
5  blacklist in China?
6   A  Yes.
7   Q  Are you aware of Vizio suing LeEco?
8   A  Yes.
9   Q  Are you aware of the deal between Vizio and LeEco?
10  A  Yes.
11  Q  Was Faraday involved in that?
12  A  No.
13  Q  How did you hear about the deal? Don't tell me if
14 it's a lawyer.
15  A  Just news articles.
16  Q  Okay. The next page -- actually it might be page 3.
17 "Jia has been accused of commingling funds and creating
18 confusing corporate structures in the past." You see that?
19  A  What page is this?
20  Q  3.
21  A  Yes.
22  Q  Have you heard of those accusations?
23  A  Yes.
24  Q  How did you hear about them?
25  A  It's the news; right? Yeah.

## Page 84

1   Q  It says, "When irregularities became apparent in
2  Faraday's books in 2016, the company's then-director of
3  corporate financing directly raised concerns about apparent
4  commingling of funds due to the convoluted corporate
5  structure of Jia's empire, a lack of internal controls, and
6  insufficient bank account procedures."
7    Do you know which -- the name of the person they're
8  referring to, the then-director of corporate financing?
9   A  I don't know.
10   MR. MARTINEZ: Lacks foundation.
11 BY MR. GOODELL:
12  Q  Do you know, who was the director of corporate
13 financing when you were there?
14  A  We didn't have one.
15  Q  Okay. Did anyone else raise -- while you were
16 there, did you hear anyone else raise concerns about
17 apparent commingling of funds due to the convoluted
18 corporate structure of the empire?
19   MR. MARTINEZ: Objection to form, particularly the
20 "anyone else."
21   THE WITNESS: Well -- yes.
22 BY MR. GOODELL:
23  Q  Who? Who was that?
24  A  Pascal.
25  Q  Pascal? What did he have to say about that issue?

## Page 85

1    MR. MARTINEZ: If it's a conversation where an
2  attorney was present for Faraday, then don't answer the
3  question.
4    THE WITNESS: Yeah, I can't answer that question.
5  BY MR. GOODELL:
6   Q  There was an attorney present?
7   A  Yes.
8   Q  Okay. Pascal was not an attorney, though, for the
9  record.
10  A  No.
11  Q  Okay. Besides conversations with an attorney, did
12 anyone else raise lack of internal controls as a concern of
13 theirs at Faraday?
14  A  Yeah, myself. Myself.
15  Q  You raised it?
16  A  Yeah.
17  Q  Who did you raise it to?
18  A  Chaoying.
19  Q  What did she have to say in response?
20  A  She didn't have much of a response.
21  Q  What caused you to raise that as an issue?
22  A  It was the bookkeeping was messy. Yeah. It was
23 just -- it was very difficult to audit the books.
24  Q  So you graduated college in 2002?
25  A  Uh-huh.

22 (Pages 82 - 85)

1  Q  Is there anywhere else that had more of a lack of
2  internal controls you've worked since then?
3  A  I mean I work with -- primarily with startups, so
4  yes.
5  Q  Okay. There have been?
6  A  Yes.
7  Q  You ever worked for a company as big as Faraday
8  before?
9  A  Southern -- yes, Southern California Edison.
10  Q  Was their accounting similar to Faraday's?
11  A  No.
12  Q  It was a lot more organized?
13  A  Yes.
14  Q  Was there any other company you've worked for same
15  size as Faraday?
16  A  No.
17  Q  Did you hear -- did anyone else raise this concern,
18  a reference here about insufficient bank account
19  procedures?
20     MR. MARTINEZ: Objection. Form of the question.
21     THE WITNESS: No.
22 BY MR. GOODELL:
23  Q  It says, "There's also the overlap of Jia's
24  projects. As Faraday raised to introduce the FF 91 at the
25  2017 CES conference, for example, Jia had members of the

Page 86

1  startup's team pulled away to finish a different electric
2  car for LeEco...." Did you hear of that occurring?
3  A  No.
4     MR. GOODELL: Take another quick break.
5     THE WITNESS: Okay.
6     (Recess.)
7     (Exhibit 17 was marked for identification
8  by the court reporter and is attached hereto.)
9 BY MR. GOODELL:
10  Q  Have you seen this document before?
11  A  No.
12  Q  I know earlier you said you had never heard of this
13  lawsuit before you got served with my subpoena?
14  A  Uh-huh.
15     (Exhibit 18 was marked for identification
16  by the court reporter and is attached hereto.)
17 BY MR. GOODELL:
18  Q  Have you ever seen this document before?
19  A  No.
20  Q  Are you familiar with Beijing Consulting Company?
21  A  No.
22  Q  I think we discussed this briefly earlier, but did
23  you ever see any invoices from them?
24  A  No.
25  Q  Okay. What about -- you ever heard of Rohde &

Page 87

1  Schwarz?
2  A  No.
3  Q  Are you familiar -- did you ever pay any invoices of
4  theirs?
5  A  No. Not -- I -- I don't know.
6  Q  Okay. Are you familiar, you aware that they're
7  suing Le Technology right now in San Jose?
8  A  No, I wasn't aware of that.
9  Q  Did you guys ever pay for -- when you were at
10  Faraday, did you pay any electronic equipment for Le
11  Technology?
12  A  I mean we purchased televisions from Le TV.
13  Q  But what about from outside -- not the affiliates or
14  the subsidiaries, but outside companies. Did you purchase
15  technologies that Le Technology used?
16  A  I'm not aware of anything like that.
17  Q  Did anyone ever tell you that Le Technology's assets
18  were offshore, LeEco's assets were offshore and hard to get
19  to?
20  A  I can't answer that question.
21  Q  Okay. Are you aware of Le Technology or LeEco
22  transferring its assets to Faraday?
23  A  I'm not aware.
24  Q  Okay. Are you aware of any of the LeEco
25  subsidiaries in the U.S., like operational companies with

Page 88

1  employees today?
2  A  Repeat that.
3     MR. GOODELL: You want to repeat that, Madam Court
4  Reporter.
5     (Record read.)
6     THE WITNESS: No, I'm not.
7 BY MR. GOODELL:
8  Q  You're not aware if they are?
9  A  I'm not aware if they are. I don't know what the --
10  I don't know what they're doing. I don't -- yeah, I don't
11  know what they're --
12  Q  When you quit working at Faraday, at that time was
13  Le Technology, to your knowledge, still an operational
14  company?
15     MR. MARTINEZ: Lacks foundation.
16     Answer if you know.
17     THE WITNESS: I'm not aware.
18 BY MR. GOODELL:
19  Q  Do you know what Le Technology's business was?
20  A  Ali -- wait.
21  Q  Le Technology.
22  A  Le Technology. No.
23  Q  Okay. So you earlier, I know -- so I guess when we
24  looked at the email you wrote, you called it Le TV.
25  A  Yeah.

Page 89

23 (Pages 86 - 89)

## Page 106

1  don't have firsthand information about that; is that
2  correct?
3  A  That's correct.
4  Q  Now, with respect to the Le Tech side, do you have
5  firsthand information about how much Mr. Jia owns of that
6  company?
7  A  Oh, no.
8  Q  No. Okay. No further questions.
9        FURTHER EXAMINATION
10 BY MR. GOODELL:
11 Q  Okay. I have just a couple follow-up questions.
12 The questions that Mr. Martinez was asking you about how
13 much he owned, and so I understand you were answering no.
14 I understand that. So you don't understand exact
15 percentage of how much he owned. But you had an
16 understanding from working there, which you discussed
17 earlier -- correct? -- that he did own a portion of these
18 companies; correct?
19 A  Yes.
20 Q  Okay. You just don't know exactly how much.
21 A  Correct.
22 Q  Okay. I think that's all I have.
23        FURTHER EXAMINATION
24 BY MR. MARTINEZ:
25 Q  What is the source -- without getting into attorney-

## Page 107

1  client discussions, what is the source of information that
2  Mr. Jia owned Le Tech or the Le Tech side of the companies,
3  for you?
4  A  I think it was just -- it was just common belief.
5  Q  Have you reviewed any documents that so indicated
6  it?
7  A  No.
8     MR. MARTINEZ:  No further questions.
9        FURTHER EXAMINATION
10 BY MR. GOODELL:
11 Q  When you say it was common belief, there were
12 conversations that were had between you and other employees
13 about this belief; correct?
14 A  Yeah, like Pascal.
15 Q  Okay. Pascal and who else?
16    MR. MARTINEZ:  Don't answer if it's an attorney.
17    MR. GOODELL:  That's fine.
18    THE WITNESS:  No. It's -- I don't know. I mean it
19 was just -- it was just common -- it was just common -- I'd
20 say that it was just, like, common culture knowledge that,
21 like, YT was in charge of all of these different companies.
22    MR. GOODELL:  Sounds good to me.
23    MR. MARTINEZ:  Nothing further.
24    MR. GOODELL:  Okay.
25    (TIME NOTED: 11:56 a.m.)

## Page 108

1        I, MICHAEL DO, do hereby declare under
2  penalty of perjury that I have read the foregoing
3  transcript; that I have made such corrections as noted
4  herein, in ink, initialed by me, or attached hereto; that
5  my testimony as contained herein, as corrected, is true and
6  correct.
7        EXECUTED this _____ day of _____,
8  _____, at _____, _____.
9           (City)         (State)

13  _____
14     MICHAEL DO
15     Volume I

## Page 109

1        I, the undersigned, a Certified Shorthand Reporter
2  of the State of California, do hereby certify:
3        That the foregoing proceedings were taken before me
4  at the time and place herein set forth; that any witnesses
5  in the foregoing proceedings, prior to testifying, were
6  placed under oath; that a verbatim record of the
7  proceedings was made by me using machine shorthand which
8  was thereafter transcribed under my direction; that the
9  foregoing transcript is a true record of the testimony
10 given.
11       Further, that if the foregoing pertains to the
12 original transcript of a deposition in a Federal Case,
13 before completion of the proceedings, review of the
14 transcript [ ] was [ ] was not requested.
15       I further certify that I am neither financially
16 interested in the action nor a relative or employee of any
17 attorney or any party in this action.
18       IN WITNESS WHEREOF, I have this date subscribed my
19 name.
20 Dated: 9/7/2018

23 *Lynn Gearhart*
24 LYNN GEARHART, RPR
25 CSR No. 9466

28 (Pages 106 - 109)

Veritext Legal Solutions
866 299-5127