# EXHIBIT 7

**DEPOSITION OF JOYLYN BELLI - 10/03/2018**

**HAN'S SAN JOSE HOSPITALITY vs. LE HOLDINGS (BEIJING) CO.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



**Page 9**

(1)    identification)

(2)    **MR. GOODELL:**  If there's anything besides

(3) Exhibit 2 that would be responsive -- if you want to

(4) start reading on Page 5.  And there are definitions

(5) that are -- that are referenced in the prior pages that

(6) you may need to look at to know whether or not there

(7) were documents responsive.

(8)    Counsel, while the witness is looking at this,

(9) I see another copy.  Can we make a copy of that so I

(10) can refer to it?

(11)   **MR. MARTINEZ:**  That's fine.  I did make a mark

(12) on it, but --

(13)   **MR. GOODELL:**  Okay.  That's fine.

(14)   Would you make copies of this?

(15)   **MR. CHANG:**  Sure.

(16)   (Witness reviewing document)

(17)   **THE WITNESS:**  Okay.

(18)   **MR. GOODELL:  Q.**  Okay.  Besides Exhibit 2, do

(19) you have any documents in your possession that are

(20) responsive to those requests you just looked at?

(21)   **A.**  I don't.

(22)   **Q.**  Okay.  So take a look at Exhibit 2.  Is this

(23) an e-mail that you typed out?

(24)   **A.**  It is.

(25)   **Q.**  Okay.  And did you send this e-mail on about

**Page 10**

(1) Tuesday, October 24th, 2017 at 9:54 a.m.?

(2)    **A.**  Yes.

(3)    **Q.**  Okay.  And on the second -- so below that,

(4) there's an e-mail.  And it says it's from an individual

(5) by the name of Shaojie Chu.  Do you know who that is?

(6)    **A.**  Yes.

(7)    **Q.**  Who is Shaojie Chu?

(8)    **A.**  I knew her as Amy.

(9)    **Q.**  Who did she work for?

(10)   **A.**  She worked for Faraday.

(11)   **Q.**  Did she work for Le Technology as well?

(12)   **A.**  I didn't know that she did.

(13)   **Q.**  Okay.  It was your understanding that she

(14) worked for Faraday?

(15)   **A.**  Correct.

(16)   **Q.**  Did she work in the same office as you?

(17)   **A.**  For a time.

(18)   **Q.**  And what was the address of that office?

(19)   **A.**  3553 North First Street.

(20)   **Q.**  And the e-mail says, "Good morning, Michael.

(21) Please find attached bill to FF for San Jose office

(22) October rent, utilities.  Have a nice day, Amy."

(23)   Did I fairly state the e-mail?

(24)   **A.**  Yes.

(25)   **Q.**  Okay.  And it appears that you forwarded this

**Page 11**

(1) e-mail to John Quach; is that correct?

(2)    **A.**  Correct.

(3)    **Q.**  Did you receive a response after you forwarded

(4) this e-mail?

(5)    **A.**  No.

(6)    **Q.**  Okay.  Look at Page 2 of Exhibit 2.  What is

(7) this document?

(8)    **A.**  It looks like a debit memo.

(9)    **Q.**  Was that attached to the e-mail we were just

(10) looking at?

(11)   **A.**  Yes.

(12)   **Q.**  Okay.  And it says, "1, Charge FF Office Rent

(13) Fee" and it says "$90,000."  Do you see that?

(14)   **A.**  Yes.

(15)   **Q.**  All right.  Was that the monthly ren was paying for this office?

(16)

(17)   **A.**  I don't know.

(18)   **Q.**  Okay.  Do you know if this invoice was ever

(19) paid?

(20)   **A.**  I don't know.

(21)   **Q.**  Who is your current employer?

(22)   **A.**  Faraday Future.

(23)   **Q.**  What is your job title for Faraday Future?

(24)   **A.**  Office manager.

(25)   **Q.**  How long have you work for Faraday Future?

**Page 12**

(1)    **A.**  I worked for Faraday -- I worked for -- since

(2) February of 2018.

(3)    **Q.**  Who did you work for prior to that time?

(4)    **A.**  Byton.

(5)    **Q.**  Who?

(6)    **A.**  Byton, B-Y-T-O-N.

(7)    **Q.**  Okay.  B-Y-T-O-N.  What is their -- what do

(8) they do?

(9)    **A.**  Same as Faraday.  It's automated -- autonomous

(10) driving car.

(11)   **Q.**  Autonomous driving car.  Do you know who

(12) started that company?

(13)   **MR. MARTINEZ:**  Byton, you mean?

(14)   **MR. GOODELL:**  Yes, Byton.

(15)   **THE WITNESS:**  A German name.  I'm not

(16) recalling them right now.

(17)   **MR. GOODELL:  Q.**  Did Jia Yueting have

(18) anything to do with Byton, to your knowledge?

(19)   **A.**  No, not to my knowledge.

(20)   **Q.**  Okay.  And do you know -- when I say

(21) "Jia Yueting," do you know who I'm referring to?

(22)   **A.**  Yes.

(23)   **Q.**  Have you ever met him?

(24)   **A.**  Not personally.

(25)   **Q.**  Okay.  Did you ever work for a company called

**Page 13**

(1) Le Technology?

(2)   **A.** LeEco?

(3)   **Q.** LeEco, okay. And did you work for them at the

(4) same time that you worked for Faraday Future?

(5)   **A.** For a short period of time.

(6)   **Q.** Okay. And what was the period of time which

(7) you worked for both companies?

(8)   **A.** Two months.

(9)   **Q.** And what were those months?

(10)   **A.** October-November.

(11)   **Q.** Of 2017?

(12)   **A.** Yes -- excuse me, 2016.

(13)   **Q.** In 2016? Okay.

(14)   What was your office address at that time?

(15)   **A.** 4995 Patrick Henry Drive, Santa Clara.

(16)   **Q.** Was this the building that was bought from

(17) Yahoo!?

(18)   **A.** Yes.

(19)   **Q.** Tell me about your day-to-day duties during

(20) those two months when you worked for both companies.

(21)   **A.** So I supported the office that was the Faraday

(22) office. And I actually just worked for Faraday, and so

(23) would get lunches together, provide snacks, order

(24) office supplies, order break room supplies, and just

(25) general support of whatever needs the office may have.

**Page 14**

(1) It was an office.

(2)   **Q.** And what did you do for Le Technology during

(3) that time?

(4)   **A.** I didn't work for Le Technology at that time.

(5)   **Q.** Okay. Well, my question was the time period

(6) when you worked for both companies, what was your

(7) day-to-day duties were during that time period.

(8)   **A.** So -- so, I'm sorry. I didn't work for

(9) Le Technology then.

(10)   **Q.** Okay. You testified earlier that you worked

(11) for both companies for two months, correct?

(12)   **A.** Yes.

(13)   **Q.** Okay. And when were those two months?

(14)   **A.** October, November.

(15)   **Q.** 2016?

(16)   **A.** 2016.

(17)   **Q.** During October-November 2016, what were your

(18) day-to-day duties?

(19)   **A.** It was office management and supporting the

(20) team on -- in Patrick Henry.

(21)   **Q.** Okay. And during that time, you testified

(22) that you ordered break supplies, ordered supplies,

(23) things of that nature?

(24)   **A.** Mm-hmm. Yes.

(25)   **Q.** Now, did you do that for Le Technology and

**Page 15**

(1) Faraday Future during that two-month period?

(2)   **A.** No. I -- for Le Technology during that time,

(3) I followed up on some billing. They had an event, the

(4) Big Bang, and it was billing for hotels.

(5)   **Q.** Now, when you worked for Le Technology during

(6) that time, were you paid separately by them?

(7)   **A.** No.

(8)   **Q.** So you were just paid by Faraday?

(9)   **A.** No, I was paid by Le Technology October and

(10) November.

(11)   **Q.** Only Le Technology?

(12)   **A.** Yes.

(13)   **Q.** Okay. Now, when you were doing billing, were

(14) you sending bills between the two companies?

(15)   **A.** I was just reconciling the invoice that came

(16) in to make sure that the person who went into the hotel

(17) room really actually was there, just reconciling a

(18) bill.

(19)   **Q.** Okay. You say "went into" -- what hotel room

(20) are you referring to?

(21)   **A.** Trying to think. The hotel was -- I don't

(22) remember which hotel we used. It was on First Street.

(23) I'm sorry. I really -- I can't recall what hotel we

(24) used.

(25)   **Q.** That's fine. And was that a common

**Page 16**

(1) occurrence, people were coming to this hotel?

(2)   **A.** No, this was just for this one event.

(3)   **Q.** Oh, this one event. Okay.

(4)   **A.** Mm-hmm.

(5)   **Q.** So if my understanding is correct, so certain

(6) people were expensing hotel costs; is that fair to say?

(7)   **A.** It was -- to be honest, I really don't recall

(8) the details of what I was doing. It had something to

(9) do with the invoice that came in from the hotel.

(10)   **Q.** Mm-hmm. And you were just trying to make sure

(11) that people actually went to the hotel after the

(12) invoice was submitted?

(13)   **A.** I can't recall exactly. Yeah, I'm sorry. I

(14) can't recall exactly what I was doing. It was about,

(15) you know, maybe -- I don't know if it was like matching

(16) up the date that they said they were there with the

(17) invoice itself that said this person was here from this

(18) date to that date, just to confirm possibly -- sorry.

(19)   **Q.** Gotcha, okay. And these individuals that you

(20) were confirming their stay at a hotel, do you know

(21) which companies they worked for?

(22)   **A.** No.

(23)   **Q.** Do you know, did any of these individuals work

(24) for Faraday Future?

(25)   **A.** I don't know.

**Page 17**

(1)    **Q.** Do you know if any of these individuals worked
(2) for Le Technology?
(3)    **A.** I don't know.
(4)    **Q.** Okay. So your entire work for Le Technology
(5) was during this two-month period in October and
(6) November 2016; is that correct?
(7)    **A.** I'm sorry. Repeat that question.
(8)    **Q.** My understanding of what you testified to
(9) earlier is that you only worked for Le Technology in
(10) October and November 2016.
(11)    **A.** So prior to working for Faraday, I worked for
(12) Le Technology.
(13)    **Q.** Okay. When was this prior time period that
(14) you worked for Le Technology?
(15)    **A.** January 2016, I began at Le Technology.
(16)    **Q.** Okay. And you worked -- how long was that
(17) stint working for Le Technology?
(18)    **A.** So it was January until I moved over to
(19) Faraday, with doing a little bit of that invoicing
(20) thing in October. But just from -- so from January to
(21) October.
(22)    **Q.** Okay. So then you worked for both of them
(23) from October-November. And then where did you work
(24) after that?
(25)    **A.** Faraday Future.

**Page 18**

(1)    **Q.** Okay. Starting in like December 2016?
(2)    **A.** Mm-hmm, yeah.
(3)    **MR. GOODELL:** Okay.
(4)    (Plaintiff's Exhibit 3 marked for
(5)    identification)
(6)    **MR. GOODELL: Q.** Have you ever seen this
(7) document before?
(8)    **A.** Yes.
(9)    **Q.** Is this your Linked-In page?
(10)    **A.** It is.
(11)    **Q.** So let's go -- we have you listed on your
(12) Linked-In page, you say, "Office Manager, Faraday
(13) Future/LeEco." Do you see that?
(14)    **A.** I do.
(15)    **Q.** Did you type that?
(16)    **A.** I did.
(17)    **Q.** It says here you provided business support to
(18) over six departments. It grew from 60 to 300 people,
(19) from business cards to preparing conference space and
(20) logistics for high-level external meetings," is that
(21) correct?
(22)    **A.** It is.
(23)    **Q.** Is there a reason that you put the two
(24) companies together there?
(25)    **A.** I think it was my transitional -- first, I'm

**Page 19**

(1) not a very techie person, so I don't really jump into
(2) Linked-In all that much. And I just have never went
(3) back in to fix it up.
(4)    **Q.** And then you say, "Selected to support Faraday
(5) Future's (a LeEco sister company) diverse and new
(6) Silicon Valley branch to build out office operational
(7) standards and practices, including creating office
(8) space, planning."
(9)    What led your understanding -- to your
(10) understanding for Faraday Future being a LeEco sister
(11) company?
(12)    **A.** I just always heard the buzz in the office
(13) that they were sister companies.
(14)    **Q.** Okay. Do you recall who in the office
(15) referred to them as a sister company?
(16)    **A.** No.
(17)    **Q.** Okay. It says, "Procured vendors for
(18) snacks/beverage service and coordinated with multiple
(19) caterers for daily lunch service." Do you see that?
(20)    **A.** Yes.
(21)    **Q.** Is that an accurate reflection of what you've
(22) done for Faraday Future/LeEco during this time?
(23)    **A.** Yes.
(24)    **Q.** Okay. And did you procure vendors for both
(25) companies?

**Page 20**

(1)    **A.** Yes.
(2)    **Q.** And of the vendors you procured, do you know
(3) which company was paying them?
(4)    **A.** Of the vendors when I was working for Faraday
(5) Future, it was Faraday Future.
(6)    **Q.** And when you were working for Le Technology?
(7)    **A.** It was Le Technology.
(8)    **Q.** Did you actually see checks being sent out?
(9)    **A.** No.
(10)    **Q.** Okay. So what led to your understanding that
(11) each company was paying for their own vendors?
(12)    **A.** Because I submitted to the specific accounting
(13) departments.
(14)    **Q.** So you just submitted -- that's what your
(15) understanding is based upon is submitting the invoice
(16) to the accounting department?
(17)    **A.** Yes.
(18)    **Q.** Okay. Do you know an individual by the name
(19) of Michael Do?
(20)    **A.** Not personally.
(21)    **Q.** Have you ever met him?
(22)    **A.** I've possibly seen him in passing, yeah.
(23)    **Q.** Did you ever -- have you always worked in the
(24) Bay Area?
(25)    **A.** Yes.

**Page 33**

(1) discussing with several other groups, and in light of
(2) the negative press, only one was willing to bid.
(3)        So my question is did you hear of other
(4) vendors not wanting to work with Faraday because of
(5) negative press?
(6)    **A.** No.
(7)    **Q.** Okay. Did you hear any vendors not wanting to
(8) work for Le Technology because of negative press?
(9)    **A.** No.
(10)    **Q.** Do you know of this company by the name of
(11) Camello?
(12)    **A.** I -- yes, I know Camello.
(13)    **Q.** Okay. What is your understanding of what they
(14) do?
(15)    **A.** Construction.
(16)    **Q.** Okay. Did they do any work on the 3553 North
(17) First Street property?
(18)    **A.** Yes.
(19)    **Q.** Okay. What did they do on it?
(20)    **A.** I think they -- they renovated it to make
(21) it -- open up the space. I think they renovated it to
(22) make it occupied -- what is the word -- to make it
(23) occupancy for what LeEco wanted.
(24)    **Q.** Is that to make it -- for cars or --
(25)    **A.** No. Office space.

**Page 34**

(1)    **Q.** Office space. When you say "what they
(2) wanted," do you know what they wanted?
(3)    **A.** Office space.
(4)    **Q.** Okay. So what exactly, to your knowledge, is
(5) it that they did on the property?
(6)    **A.** Meeting rooms.
(7)    **Q.** Okay.
(8)    **A.** Possibly wiring for, you know, all the tech
(9) computer stuff that had to be wired in.
(10)    **Q.** Mm-hmm.
(11)    **A.** As I recall, it's meeting rooms and just maybe
(12) pulling wires for pods of workstations.
(13)    **Q.** Do you know an individual by the name
(14) of William Wang?
(15)    **A.** No.
(16)    **Q.** Do you know an individual by the name of
(17) Charles Shieh? I might be mis- -- let me spell it for
(18) you.
(19)    **A.** Sure.
(20)    **Q.** S-H-I-E-H?
(21)    **A.** No.
(22)    **Q.** Okay. What about Dongge Jiang?
(23)    **A.** Yes.
(24)    **Q.** Who was your understanding of who he worked
(25) for?

**Page 35**

(1)    **A.** Faraday.
(2)    **Q.** What is your understanding of what he did for
(3) Faraday?
(4)    **A.** Head of HR -- I'm sorry, not head -- excuse
(5) me, not head of HR. Recruiting -- administration
(6) maybe.
(7)    **Q.** Okay. Was it your understanding he worked for
(8) Le Technology as well?
(9)    **A.** At one point, I know -- I believe he worked
(10) there.
(11)    **Q.** Do you know what he did for Le Technology?
(12)    **A.** I can't recall his title.
(13)    **Q.** Do you know if there was an overlap between
(14) those two periods?
(15)    **A.** I don't know.
(16)    **Q.** So we established earlier that there was an
(17) overlap during your employment between the two
(18) companies. Did you have an understanding of any other
(19) employees having overlapped who were working for both
(20) at the same time?
(21)    **A.** I don't know.
(22)    **Q.** So just to be clear for the record, you're not
(23) saying that that didn't happen; you're just not aware
(24) of that happening?
(25)    **A.** Yes.

**Page 36**

(1)    **MR. GOODELL:** Okay.
(2)    (Plaintiff's Exhibit 8 marked for
(3) identification.)
(4)    **MR. GOODELL: Q.** Have you ever seen this
(5) article before?
(6)    **A.** No.
(7)    **Q.** This property in Santa Clara, did you ever
(8) work out of this office?
(9)    **MR. MARTINEZ:** Vague and ambiguous.
(10)    **MR. GOODELL: Q.** The second page talks about
(11) the property lies within -- gives the address. It says
(12) 3005 Democracy Way. Did you ever work out of that
(13) office?
(14)    **A.** No.
(15)    **Q.** Did you ever deal with invoices that were sent
(16) to that office?
(17)    **A.** No.
(18)    **Q.** Did you ever see any invoices that were sent
(19) to this office?
(20)    **A.** No.
(21)    **Q.** Did you have an understanding of Faraday
(22) providing or being a guarantor to the loan that was
(23) used to purchase this office?
(24)    **A.** No.
(25)    **Q.** Did you have an understanding of Faraday being

**Page 49**

(1) Don't answer the question.

(2) She wants a break.

(3) **MR. GOODELL:** Okay. That's a violation --

(4) **MR. MARTINEZ:** No, it's not.

(5) **MR. GOODELL:** -- of the ethical rules the

(6) Court ordered us to comply with.

(7) Actually, it is, so we're not off the record.

(8) **THE REPORTER:** I need agreement from both

(9) counsel to go off the record.

(10) **MR. MARTINEZ:** Well, we're taking a break.

(11) **MR. GOODELL:** No, I'm not --

(12) **MR. MARTINEZ:** If he's going to leave the

(13) record open, then we'll just take a break. The witness

(14) needs a break.

(15) **MR. GOODELL:** Okay. The only question I was

(16) going to ask the witness whether or not any of those 10

(17) employees still work for Le Technology.

(18) I would request that the witness answer that

(19) question. It's a very simple question, and then we'll

(20) take a break.

(21) **MR. MARTINEZ:** No. Let's take a break.

(22) You can answer it when we get back.

(23) **MR. GOODELL:** Q. Okay. So you're he obeying

(24) your counsel's instruction not to answer that question?

(25) **A.** Yes.

**Page 50**

(1) **MR. GOODELL:** The witness is leaving the room.

(2) She said "yes."

(3) **THE REPORTER:** So are we off the record?

(4) **MR. GOODELL:** That's fine. We can go off the

(5) record. The witness -- Mr. Martinez and his client

(6) left the room.

(7) (Recess taken)

(8) **MR. GOODELL:** Okay. All right. So back on

(9) the record.

(10) **Q.** So prior to us going off the record, I asked

(11) you, of the 10 employees that you mentioned that worked

(12) at 3553 North First Street for Le Technology, are you

(13) aware of any of those individuals still working for

(14) that company?

(15) **A.** No.

(16) **Q.** Now, also prior to going off the record, you

(17) mentioned a figure of 80 employees working there, and

(18) you said you were confused. Now, were those 80

(19) employees working for Faraday Future?

(20) **A.** Correct.

(21) **Q.** Okay. So prior to the property being vacant,

(22) there were 80 employees working for Faraday Future and

(23) 10 working for Le Technology, correct?

(24) **A.** Correct.

(25) **Q.** And were you aware if any of those individuals

**Page 51**

(1) worked for both companies?

(2) **A.** No, no.

(3) **Q.** No, you're not aware?

(4) **A.** No, they did not work -- to my knowledge.

(5) **Q.** To your knowledge.

(6) **A.** They did not, no.

(7) **Q.** When I say "prior to vacating the property,"

(8) so obviously that would mean immediately vacating it --

(9) but when the property was first occupied -- when

(10) Faraday first began occupying the property, was it the

(11) same number of employees working for both companies, to

(12) your knowledge?

(13) **A.** When -- I'm just going to repeat it back to

(14) you. So when Faraday moved into First Street?

(15) **Q.** Mm-hmm.

(16) **A.** Was it the same number of people that Eco had?

(17) **Q.** Yes.

(18) **A.** When I --

(19) **Q.** So, okay. When you first moved into -- let's

(20) do it like this.

(21) When Faraday first started occupying the

(22) subject property -- this is called the subject

(23) property -- how many individuals, to your knowledge,

(24) worked for LeEco/Le Technology at that property?

(25) **A.** In July, there was about 10.

**Page 52**

(1) **Q.** Okay. And then in November 2017, there was

(2) still 10?

(3) **A.** No. I don't know an exact figure, but not all

(4) 10 were there.

(5) **Q.** Okay. And when Faraday began occupying the

(6) property in July 2017, it was about 80 employees?

(7) **A.** Correct.

(8) **Q.** And when they left the property, was it about

(9) 80 employees?

(10) **A.** No.

(11) **Q.** How many was it then?

(12) **A.** 50.

(13) **Q.** Okay. Was that due to layoffs, to your

(14) knowledge?

(15) **A.** No. It was due to the fact the company was

(16) going through a rough patch.

(17) **Q.** Right.

(18) **A.** People just started looking for other options.

(19) **MR. GOODELL:** Gotcha. Okay.

(20) (Plaintiff's Exhibit 13 marked for

(21) identification)

(22) **MR. GOODELL:** Q. Have you seen this document

(23) before?

(24) **MR. MARTINEZ:** Take a look at all three pages,

(25) please.

DEPOSITION OF JOYLYN BELLI - 10/03/2018

Case 2:19-bk-24804-VZ Doc 603-7 Filed 04/23/20 Entered 04/23/20 20:47:28 Desc
BSA CHANGE OF HOSPITAL HOLDING BEN 94/23/20 MAX(14/14)
Exhibit 7    Page 8 of 19

**Page 53**

(1)     THE WITNESS: No, I haven't.
(2)     MR. GOODELL: Q. Okay. So I think we
(3) discussed Dan Gallagher earlier.
(4)     A. No.
(5)     Q. No, we didn't? Do you know Dan Gallagher?
(6)     A. I do.
(7)     Q. What was your understanding of who he worked
(8) for?
(9)     A. LeEco.
(10)    Q. Did he work for Faraday as well?
(11)    A. No, not to my knowledge.
(12)    Q. Do you see there's a -- on 354, there's an
(13) e-mail. And it's an e-mail discussing an individual
(14) "Shoji Chu" we just talked about earlier?
(15)    A. Yes.
(16)    Q. He says, "Greetings, Andrew. I hope all is as
(17) well in your world. I was contacted yesterday about
(18) having a Faraday employee perform accounting functions
(19) for LeEco on a temporary basis. Her name is Shoji Chu,
(20) and she's going to be doing the following:
(21)    "Customers billing.
(22)    "Inter-companies reconciliation, billing, and
(23) collection.
(24)    "Assisting in accounting work, including
(25) bookkeeping and analysis and any other administrative

**Page 54**

(1) work for Finance department as required.
(2)    "Since we may have this immediate need and
(3) there may be other needs in the future, I think we
(4) should put a proper inter-company agreement in place to
(5) preserve the separate entity structure.
(6)    "Attached is a very generic draft I put
(7) together a while ago. I propose we use to cover this
(8) and other potential services between the companies.
(9)    "Please give it a look and let me know you
(10) have any questions/comments."
(11)    Did you hear anyone discuss this need to
(12) preserve, quote, "the separate entity structure" that
(13) Mr. Gallagher uses in this e-mail?
(14)    A. No.
(15)    Q. Do you know why he said that, he said that
(16) the -- an agreement to be put in place to preserve the
(17) separate entity structure?
(18)    A. No.
(19)    MR. MARTINEZ: Calls for speculation.
(20)    MR. GOODELL: Q. Okay. Was there a concern
(21) that maybe people would look at the same companies --
(22) the companies as the same, or did you ever hear about
(23) that?
(24)    A. No.
(25)    Q. Okay. Do you know an individual by the name

**Page 55**

(1) of Dave Medrano?
(2)    A. Yes.
(3)    Q. Who did he work for, to your knowledge?
(4)    A. LeEco.
(5)    Q. Okay. What did he do for LeEco?
(6)    A. HR.
(7)    Q. Okay. And what about Jason Caskey?
(8)    A. Yes, I know Jason.
(9)    Q. Who did he work for?
(10)   A. LeEco.
(11)   Q. What did he do for LeEco?
(12)   A. Attorney.
(13)   Q. An attorney. Okay. Do either of those
(14) individuals still work for LeEco, to your knowledge?
(15)   A. Not to my knowledge.
(16)   Q. Did they both work out of the subject
(17) property?
(18)   A. Yes.
(19)   (Plaintiff's Exhibit 14 marked for
(20)   identification)
(21)   MR. GOODELL: Q. Have you ever seen this
(22) document before?
(23)   A. No.
(24)   Q. Let me turn -- direct your attention to Page 8
(25) of 9 on this document.

**Page 56**

(1)    A. Sorry, I --
(2)    MR. MARTINEZ: It's the [indicating].
(3)    THE WITNESS: Oh, okay.
(4)    MR. GOODELL: Q. Have you ever seen
(5) Dongge Jiang's signature?
(6)    A. No.
(7)    Q. Okay. Do you recognize that signature there?
(8)    MR. MARTINEZ: Lacks foundation.
(9)    THE WITNESS: I see it's his name. I don't
(10) know that it's his signature.
(11)   MR. GOODELL: Q. Okay. So you've never seen
(12) his signature?
(13)   MR. MARTINEZ: Asked and answered.
(14)   THE WITNESS: No.
(15)   MR. GOODELL: Q. Did you hear anything during
(16) your time at either one of the companies about this
(17) guarantee that's referenced in this document?
(18)   A. Can you repeat the question, please?
(19)   Q. Well, before we get to the question, have you
(20) ever heard of a company, LeEco V, Limited?
(21)   A. No.
(22)   Q. What about Le V Merger Sub, Inc.?
(23)   A. No.
(24)   Q. Okay. The question is did you, during your
(25) time working for Le Tech or for Faraday, did you hear

**Page 57**

(1) any discussion of this guarantee that's referenced in
(2) the exhibit before you?
(3)　　A. No.
(4)　　(Plaintiff's Exhibit 15 marked for
(5)　　identification)
(6)　　MR. GOODELL: Q. Okay. Direct your attention
(7) towards the bottom of the page. It appears to be an
(8) e-mail from you to a number of individuals. Do you see
(9) that?
(10)　　A. I do.
(11)　　Q. Do you remember sending this e-mail?
(12)　　A. I think -- I don't remember, but I sent it,
(13) yeah.
(14)　　Q. Okay. Yes. Do you see where it says, "I need
(15) someone to please call me on this today? The lease is
(16) now running 130 days past due and is in danger of being
(17) charged off."
(18)　　Do you know what lease that's referring to?
(19)　　MR. MARTINEZ: Do you see that?
(20)　　MR. GOODELL: FARADAY-300.
(21)　　THE WITNESS: Okay.
(22)　　MR. GOODELL: "I need someone to please call
(23) me" --
(24)　　MR. MARTINEZ: Oh, in the small print. Sorry.
(25)　　THE WITNESS: There we go.

**Page 58**

(1)　　So do I know what this lease is referring to?
(2)　　MR. GOODELL: Q. Yeah, what lease they're
(3) referring to here.
(4)　　A. Printer.
(5)　　Q. Okay. Was this Faraday's printer or was this
(6) Le Technology's printer?
(7)　　A. Le Technology's printer.
(8)　　Q. And you're -- at this time, were you working
(9) for Le Technology?
(10)　　A. No, I was working for Faraday.
(11)　　Q. But did you -- but you were having to respond
(12) to an inquiry regarding a Le Technology lease while you
(13) worked for Faraday?
(14)　　A. Yes.
(15)　　Q. Did you frequently do that during your time at
(16) Faraday?
(17)　　A. No.
(18)　　Q. Do you know why you did it on this occasion?
(19)　　A. We had just -- they left the printer, and we
(20) used it.
(21)　　Q. Okay. Do you know if this invoice was paid?
(22)　　A. I do not.
(23)　　(Plaintiff's Exhibit 16 marked for
(24)　　identification)
(25)　　MR. GOODELL: Q. This seems to be an expanded

**Page 59**

(1) version of the e-mail chain we were just looking at.
(2) So have you seen this before?
(3)　　A. Yes.
(4)　　Q. Okay. Do you see where it says "plus
(5) Chaoying" at the top?
(6)　　A. Yes.
(7)　　Q. Do you know what that's referring to?
(8)　　A. Yes.
(9)　　Q. Who?
(10)　　A. Chaoying Deng.
(11)　　Q. Did you interact with Chaoying Deng frequently
(12) during this time?
(13)　　A. About once a week.
(14)　　Q. What were the subjects of your interactions?
(15)　　A. I dialed into a office manager meeting they
(16) held weekly in Gardena.
(17)　　Q. Is that with different office managers or --
(18)　　A. It was -- yeah. It was just their group, and
(19) I just would dial in to listen to what was happening in
(20) the company and bring up any issues that may have
(21) been -- need to be addressed in our office.
(22)　　Q. How many other offices did Faraday have at
(23) this time, to your knowledge?
(24)　　A. Just Silicon Valley office and Gardena.
(25)　　Q. At this point -- I'm sorry.

**Page 60**

(1)　　The bottom of this document, FARADAY-284, it
(2) appears to be an e-mail you typed on August 29th, 2017
(3) at 10:20 a.m. And it appears that you say, "Hey
(4) everyone, At this point, with our headcount in the SV
(5) office, I think we only need one printer. Let me know
(6) if you have any other questions. Best, Joylyn."
(7)　　Did you type that email?
(8)　　A. Yes, I did.
(9)　　Q. And when you said the "headcount in the SV
(10) office," is that still the 80 people we were talking
(11) about earlier?
(12)　　MR. MARTINEZ: Misstates the record. The
(13) witness said within 80 to 50.
(14)　　THE WITNESS: Could have been --
(15)　　MR. GOODELL: Q. So it was between 80 and 50?
(16)　　A. By August, it probably was -- I don't have an
(17) accurate number, but -- 50 --
(18)　　Q. Between 50 and 80, correct?
(19)　　A. In August? We weren't at 80.
(20)　　Q. Okay.
(21)　　A. So it could have been 60.
(22)　　Q. Okay. So you all were just using one printer
(23) at that time right?
(24)　　A. Yes.
(25)　　(Plaintiff's Exhibit 17 marked for

**Page 61**

(1)      identification)
(2)      **MR. GOODELL:  Q.**  Okay.  Have you ever seen
(3) this document before?
(4)      **A.**  Yes.
(5)      **Q.**  Did you see it as part of your preparation for
(6) this deposition?
(7)      **A.**  I don't -- yeah, I saw this.
(8)      **Q.**  Okay.  How much time did you spend preparing
(9) for this deposition?
(10)      **A.**  An hour.
(11)      **Q.**  When did that occur, yesterday or --
(12)      **A.**  Yes.
(13)      **Q.**  Did you meet with anyone to prepare for this
(14) deposition?
(15)      **A.**  Just a phone conversation.
(16)      **Q.**  Mr. Martinez?
(17)      **A.**  Yes.
(18)      **Q.**  So do you remember receiving this e-mail from
(19) John Quach on September 12th, 2017?
(20)      **A.**  Yes.
(21)      **Q.**  So we'd established earlier that Le Technology
(22) had about 10 employees working there; is that correct,
(23) at this time?
(24)      **A.**  In September, probably not 10.
(25)      **Q.**  Okay.  So was a lot of the building vacant at

**Page 62**

(1) this time?
(2)      **A.**  Yes.
(3)      **Q.**  86,000-square-foot building.  So how much --
(4) how much of the building would you estimate -- would
(5) you say more than half the building was vacant at this
(6) time?
(7)      **MR. MARTINEZ:**  Calls for speculation.
(8)      Answer it if you can.
(9)      **THE WITNESS:**  Yes.
(10)      **MR. GOODELL:  Q.**  Okay.  And is DG, is your
(11) understanding, does that refer to Dongge?
(12)      **A.**  Yes.
(13)      **Q.**  Do you know who he was working for at that
(14) time?
(15)      **A.**  No.
(16)      **Q.**  Did you have an understanding of who he was
(17) working for at that time?
(18)      **A.**  I believe he was working for Faraday.
(19)      **Q.**  Okay.  Did you ever discuss the verbal
(20) agreement mentioned in John Quach's e-mail with him?
(21)      **A.**  No.
(22)      **Q.**  Did anyone else discuss that agreement with
(23) you?
(24)      **A.**  No.
(25)      **Q.**  Earlier there was -- we -- the document that

**Page 63**

(1) was produced here today was an e-mail which you
(2) forwarded to FYI.  Do you remember that?
(3)      **A.**  Mm-hmm.
(4)      **Q.**  Did you ever get a response to that e-mail?
(5)      **MR. MARTINEZ:**  You can take a look at it if
(6) you want.  I think it was Exhibit 2.
(7)      **MR. GOODELL:**  Yes.
(8)      **THE WITNESS:**  From what I can remember, when I
(9) asked John about it verbally, he said they were looking
(10) into it.
(11)      **MR. GOODELL:  Q.**  Did you ever discuss it with
(12) Chaoying?
(13)      **A.**  No.
(14)      **Q.**  Were you ever instructed to pay any sort of
(15) rent to Le Technology?
(16)      **A.**  No.
(17)      **Q.**  Do you know if anyone else was instructed to
(18) do that?
(19)      **A.**  Not to my knowledge.
(20)      **Q.**  Do you know an individual by the name of
(21) Eva Long?
(22)      **A.**  Yes.
(23)      **Q.**  Who did she work for, to your knowledge?
(24)      **A.**  LeEco.
(25)      **Q.**  What did she do for LeEco?

**Page 64**

(1)      **A.**  She's an attorney.
(2)      **Q.**  Did you ever see her prepare legal documents?
(3)      **A.**  No.
(4)      **Q.**  Have you ever spoken with her?
(5)      **A.**  Yes.
(6)      **Q.**  When was the last time you spoke to her?
(7)      **A.**  Maybe -- maybe October of 2016?
(8)      **Q.**  2016 or 2017?
(9)      **A.**  2017, I'm sorry.
(10)      **Q.**  Okay.
(11)      **A.**  Hold on, hold on.  2016, Yes.  So when I was
(12) still working for LeEco, because after I left, I didn't
(13) talk to her.
(14)      **Q.**  Do you know why so much of the building was
(15) vacant during your time at the subject property?
(16)      **A.**  Layoffs.
(17)      **Q.**  Do you know an individual by the name of --
(18) it's on FARADAY-221, Jiansheng Zheng?
(19)      **MR. MARTINEZ:**  Did you see it?
(20)      **THE WITNESS:**  No, I don't.
(21)      **MR. GOODELL:  Q.**  What about Bob Ye?
(22)      **A.**  No.
(23)      **Q.**  You don't know who Bob Ye is?
(24)      **MR. MARTINEZ:**  Asked and answered.
(25)      **MR. GOODELL:  Q.**  You've never spoken with

**Page 65**

(1) him?

(2) **MR. MARTINEZ:** Objection, form of question.

(3) Answer if you know.

(4) **THE WITNESS:** I -- Bob Ye may have been -- and

(5) I'm not being squirrelly here. Some of the Chinese

(6) names, they use the American names. And I'm not quite

(7) sure if he was somebody that I helped get a car once

(8) for, you know, when he was traveling in. . .

(9) **MR. GOODELL: Q.** Qing Ye, Q-I-N-G?

(10) **A.** I'm sorry. If -- he may have been somebody I

(11) helped that came into finance that I maybe got a rental

(12) car for him. That's -- it's just become so blurry.

(13) **Q.** Whenever you got the rental car for this

(14) person you're not sure of who they are, do you know

(15) what company they were working for?

(16) **A.** LeEco.

(17) **Q.** Was that when you worked at LeEco or you

(18) worked at Faraday?

(19) **A.** Yes, LeEco. So I don't know if it's the same

(20) individual, if this person's the individual I'm

(21) thinking of.

(22) **Q.** Understood. Do you know an individual by the

(23) name of Emily Morales?

(24) **A.** Yes.

(25) **Q.** Who did she work for?

**Page 66**

(1) **A.** Faraday Future.

(2) **Q.** Does she still work for Faraday Future?

(3) **A.** Yes.

(4) **Q.** What does she do for Faraday Future?

(5) **A.** She's in the accounting department.

(6) **Q.** Did she ever work for LeEco?

(7) **A.** Not to my knowledge.

(8) **Q.** Did you ever work in the accounting

(9) department?

(10) **A.** No.

(11) **Q.** Did you ever hear anyone refer to the

(12) accounting procedures as messy at Faraday Future?

(13) **A.** No.

(14) **Q.** Do you know Pascal Coustar?

(15) **A.** I've heard the name.

(16) **Q.** Have you ever spoken with him?

(17) **A.** No.

(18) **Q.** Have you ever heard of him raising an

(19) objection to the lack of accounting procedures at

(20) Faraday Future?

(21) **A.** No.

(22) **Q.** Have you ever heard of a Michael Do raising

(23) objections to lack of accounting procedures at Faraday

(24) Future?

(25) **A.** No.

**Page 67**

(1) **Q.** What was your understanding of Chaoying Deng's

(2) role at Faraday Future during the time of the occupancy

(3) of the subject property?

(4) **A.** She was head of administration.

(5) **Q.** What was your understand of her role in

(6) Le Technology during your time of the occupancy of the

(7) subject property?

(8) **A.** I -- I don't know what her role was for

(9) Le Technology.

(10) **Q.** Did you have an understanding, did she play a

(11) role at Le Technology at any time?

(12) **A.** Yes, but it was unclear.

(13) **Q.** How did you hear of her playing a role at

(14) Le Technology?

(15) **A.** Because we used -- as an office manager, I

(16) used her credit card to pay for Costco, or occasionally

(17) I would -- excuse me.

(18) Her credit card was on file at Costco to

(19) purchase, when I worked in the Redwood City office when

(20) I first started for LeEco. That's how I -- that's the

(21) only connection I knew with Chao --

(22) **MR. GOODELL:** Okay. I'm sorry. Could you

(23) read that back? I didn't. . .

(24) (Record read)

(25) **MR. GOODELL:** So Chaoying Deng had a credit

**Page 68**

(1) card at Costco, a LeEco credit card at Costco; is that

(2) correct?

(3) **A.** She had a credit card that I used at Costco.

(4) **Q.** Okay. Do you know, was it a Le Technology or

(5) a LeEco credit card?

(6) **A.** Yes.

(7) **Q.** Okay. And that's -- when you say -- was that

(8) back in the fall of 2016, or when was that?

(9) **A.** I started in January of 2016, so.

(10) **Q.** So at that time, Chaoying had --

(11) Chaoying Deng, Ms. Deng, had a Costco credit card that

(12) was a Le Technology credit card?

(13) **A.** It was a credit card that we used for Costco.

(14) **Q.** Okay. Did it say -- was it her personal card,

(15) or was it a Le Technology corporate card with her name

(16) on it?

(17) **A.** Corporate card.

(18) **Q.** With her name on it?

(19) **A.** Mm-hmm. So we used the numbers; I never saw

(20) the card.

(21) **Q.** So you never saw the physical card. Gotcha.

(22) Did you ever speak with her about using that

(23) card or. . .

(24) **A.** No.

(25) **Q.** Do you know if Faraday was ever -- well, let

DEPOSITION OF JOYLYN BELLI - 10/03/2018

Case 2:19-bk-24804-VZ  Doc 603-7 Filed 04/23/20  Entered 04/23/20 20:47:28  Desc
BSA  CHANGE OF HOST  Exhibit 7  Page 12 of 19  HOLDING BRIDGE INV.  MAX(18/18)

**Page 69**

(1) me ask a you more broader question.

(2)     Did you ever see, during your time at either

(3) one of the companies, Faraday paying a bill to

(4) Le Technology for anything?

(5)     **A.** No.

(6)     **Q.** Not a single thing ever?

(7)     **MR. MARTINEZ:** That's argumentative.

(8)     **MR. GOODELL:** No, it's not argumentative.

(9) I'm -- it's for the record.

(10)     **MR. MARTINEZ:** It's argumentative, asked and

(11) answered.

(12)     You can answer it again.

(13)     **THE WITNESS:** No.

(14)     **MR. GOODELL:  Q.** Conversely, did you ever see

(15) Le Technology pay a bill to Faraday for anything ever?

(16)     **A.** No.

(17)     **Q.** Did you ever see any money change hands

(18) between the two companies for anything?

(19)     **A.** No.

(20)     **Q.** Okay.  Not for the printers, not for the

(21) snacks, not for rent, not for anything?

(22)     **A.** No.

(23)     **Q.** Okay.  "No," right?

(24)     **A.** No.

(25)     **MR. MARTINEZ:** That's argumentative, too.

**Page 70**

(1)     **MR. GOODELL:.** All right.  Justin, can you --

(2)     **MR. CHANG:** Sorry.  I can't put it on mute,

(3) but I can lower the volume.

(4)     **MR. GOODELL:  Q.** Did anyone ever explain to

(5) you why the two companies didn't pay each other for the

(6) various goods and services that they exchanged?

(7)     **MR. MARTINEZ:** Assumes facts.

(8)     **THE WITNESS:** I'm sorry.  I'm going to repeat

(9) this back.

(10)     Did anybody ever explain to me why we didn't

(11) pay for goods and services?  No.

(12)     **MR. GOODELL:  Q.** No?

(13)     **A.** I didn't inquire.

(14)     **Q.** Well, like, earlier we looked at this

(15) agreement, I think, regarding Shaojie Chu doing

(16) accounting services.

(17)     **A.** Mm-hmm.

(18)     **Q.** Right?

(19)     **A.** Mm-hmm.

(20)     **Q.** So were you aware of whether Le Technology was

(21) ever paid for her work?

(22)     **A.** I wasn't aware.

(23)     **Q.** Okay.  Did you see other bills that Faraday

(24) paid to other vendors?

(25)     **A.** No.

**Page 71**

(1)     **Q.** Okay.  Did you hear about other vendors being

(2) paid during your time at Faraday Future?

(3)     **A.** No.  What I dealt with was mostly a Costco

(4) order, so my stuff was really on a Visa.  So I just

(5) paid through Visa.

(6)     **Q.** So as part of an office manager [sic], did you

(7) open mail?

(8)     **A.** No.

(9)     **Q.** Okay.  Did you answer the phones?

(10)     **A.** We didn't have phones.

(11)     **Q.** Do you still -- you have phones?

(12)     **A.** We don't.

(13)     **Q.** You don't have phones?

(14)     **A.** We don't have a central phone system, no.

(15)     **Q.** Okay.  How do you call people then?

(16)     **A.** Cell phone.

(17)     **Q.** Okay.  So you guys don't have an office --

(18)     **A.** Company -- we have company phones.

(19)     **Q.** Okay.  So you don't have a land line?

(20)     **A.** We do not.

(21)     **Q.** You've never -- you all have never had a land

(22) line?

(23)     **A.** Correct.

(24)     **Q.** Was that ever explained to you, why you all

(25) don't have a land line?

**Page 72**

(1)     **A.** No.  No, we just. . .

(2)     **Q.** Have you ever worked for another company that

(3) doesn't have a land line?

(4)     **A.** No.

(5)     **Q.** Yeah, it's just puzzling to me.  I've never

(6) worked for a business that didn't have a land line.

(7) Okay.

(8)     Do you all have a fax machine or --

(9)     **A.** No.

(10)     **Q.** Do you have computers at work?

(11)     **A.** Yes, scanners.

(12)     **Q.** Do you have desktops or laptops?

(13)     **A.** Both.

(14)     **Q.** Do you know of a mansion in Rancho Palos

(15) Verdes?  Did you hear discussion of that at your time

(16) at Faraday?

(17)     **A.** I've heard of a -- a mansion?  No.

(18)     **Q.** Or a property or let's just say a very nice

(19) home in Rancho Palos Verdes, have you heard of that?

(20)     **A.** I've heard of a home in L.A., but I don't know

(21) where the --

(22)     **Q.** Have you heard of Faraday borrowing money

(23) against that home?

(24)     **A.** No, no.

(25)     **Q.** Is that home used for guests that come to the

**Page 73**

(1) L.A. area, to your knowledge?
(2)     **MR. MARTINEZ:** Lacks foundation.
(3)     **THE WITNESS:** I don't -- I don't know.  I know
(4) there's -- I don't know.  I know there's a clubhouse.
(5)     **MR. GOODELL: Q.** Mm-hmm.  Is that used for
(6) Faraday executives, the clubhouse?
(7)     **A.** I believe so.
(8)     **MR. MARTINEZ:** Lacks foundation.
(9)     **MR. GOODELL: Q.** Sorry.  Can you repeat that.
(10)     **A.** I believe so.
(11)     **Q.** Okay.  Is that where Chaoying lives, to your
(12) knowledge?
(13)     **A.** I don't know.  I don't know where she lives.
(14)     **Q.** Have you heard of the LLC Ocean View Drive
(15) LLC?  Have you seen that name?
(16)     **A.** No.
(17)     (Plaintiff's Exhibit 18 marked for
(18)     identification)
(19)     **MR. GOODELL: Q.** Have you ever read this
(20) article before?
(21)     **A.** I've seen this article.
(22)     **Q.** When did you first see it?
(23)     **A.** Online, when it came out.
(24)     **Q.** Okay.  So the title of the article is "Faraday
(25) Future admits its employees designed parts of LeEco's

**Page 74**

(1) electric car."  Then the by-line is, "New patents add
(2) another knot to the tangled relationship between the
(3) two companies."
(4)     Did you ever discuss this article with anyone?
(5)     **A.** No.
(6)     Well, actually, let me retract that.  I --
(7)     **MR. MARTINEZ:** Don't answer if it's involves
(8) discussion with an attorney from Faraday.
(9)     **THE WITNESS:** Then I can't answer it.
(10)     **MR. GOODELL: Q.** So besides a
(11) discussion with an attorney for Faraday, did you ever
(12) discuss this article with anyone?
(13)     **A.** No, actually.
(14)     **Q.** Okay.  Do you remember when you first saw this
(15) article?
(16)     **MR. MARTINEZ:** Asked and answered.
(17)     **MR. GOODELL:** She said when it came out.
(18)     **Q.** Do you remember when it came out?
(19)     **A.** Well, it says "September."  I mean --
(20)     **MR. GOODELL: Q.** Does that -- do you remember
(21) seeing it around that time, September 2017?
(22)     **A.** So the attorney that was working for Faraday
(23) would talk about these things.
(24)     **MR. MARTINEZ:** You're not -- don't answer if
(25) it involves conversation for you and --

**Page 75**

(1)     **THE WITNESS:** Right.
(2)     **MR. GOODELL: Q.** I don't want to know about
(3) what you told an attorney.  I'm just trying to focus on
(4) when you first read this article.
(5)     **MR. MARTINEZ:** And just to clarify, it's not
(6) just what you told an attorney; it's what the attorney
(7) told you.
(8)     **MR. GOODELL:** Sure, that's fine.
(9)     **Q.** So the article says that, "New patents
(10) published today by the U.S. Patent and Trademark Office
(11) show that Faraday Future was responsible for at least
(12) some of the design of the LeSee, an all-electric car
(13) belonging to the Chinese conglomerate LeEco."
(14)     Have you ever had of the LeSee?
(15)     **A.** Yes.
(16)     **Q.** Okay.  And this article says that it's
(17) all-electric car belonging to the Chinese conglomerate
(18) LeEco.  Is that your understanding as well?
(19)     **A.** Yes.
(20)     **Q.** Goes on to say that -- it references another
(21) report that LeEco is a major investor in Faraday
(22) Future.  Is that your understanding as well?
(23)     **A.** No.
(24)     **Q.** Okay.
(25)     **A.** Well, "major investor"?

**Page 76**

(1)     **Q.** Mm-hmm?
(2)     **A.** No.  No.
(3)     **Q.** Okay.  You're saying that they're not a major
(4) investor, or just you don't know if they're a --
(5)     **A.** I don't know.
(6)     **Q.** Okay.  Okay.  Goes on to say that LeEco is
(7) "using the American startup's resources" -- it's
(8) referring to Faraday -- "to work on it's own electric
(9) car under the LeSee brand."
(10)     Is it your understanding that that part of the
(11) story is correct?
(12)     **A.** No, it's not.  To my knowledge, that isn't
(13) happening or that didn't happen.
(14)     **Q.** It didn't happen.  Okay.  And then it says --
(15) there's a reference.  Then it says, "FF" -- quotes a
(16) representative, "FF and LeSee have agreements in place
(17) to share specific IP and technologies between the two
(18) companies."
(19)     "These design patents," again in a quote, "are
(20) two examples of work that were developed by Faraday
(21) Future and shared with LeSee via our mutual agreement
(22) for use across the FF and LeSee brands."
(23)     Is it your understanding that that quote is
(24) inaccurate, or what's your understanding of that quote?
(25)     **A.** I can't substantiate that quote because I

DEPOSITION OF JOYLYN BELLI - 10/03/2018

Case 2:19-bk-24804-VZ Doc 603-7 Filed 04/23/20 Entered 04/23/20 20:47:28 Desc
BSA HAN'S SAN GABRIEL HOLDING (HEARING) MAX(20/20)
Exhibit 7    Page 14 of 19

**Page 77**

(1) don't know who said it, and I don't really have
(2) knowledge of what people are working on.
(3)    **Q.**  Okay.  You're not testifying that that
(4) statement is inaccurate?
(5)    **A.**  I don't -- I don't have insight as to that
(6) statement.
(7)    **Q.**  Understood.  It goes on to say, "One patent is
(8) for vehicle exterior design, and while it never
(9) mentions LeEco or the LeSee Pro that LeEco debuted in
(10) the U.S. last October, the picture included in the
(11) filing unmistakably illustrates that car.  The
(12) inventors named on this patent are Richmond S. Kim, who
(13) is FF's VP of design, and Brian Sung Oh, FF's chief
(14) creative designer."
(15)    Are you familiar with Richard S. Kim?
(16)    **A.**  I've heard of him.
(17)    **Q.**  Have you heard of him being the vice president
(18) of design for Faraday?
(19)    **A.**  I'm just going to turn this down.
(20)    (Cell phone interruption)
(21)    **MR. MARTINEZ:**  Fancy ringer.
(22)    **THE WITNESS:**  Yes.  Can you repeat that?
(23)    **MR. GOODELL:**  Madam Court Reporter, could you
(24) read that back?
(25)    (Record read)

**Page 78**

(1)    **MR. GOODELL:  Q.**  And what about
(2) Brian Sung Oh, is that -- is he FF's chief creative
(3) designer?
(4)    **A.**  I don't recall that name.
(5)    **Q.**  Then it goes on to mention the other patent is
(6) for a steering wheel.  It says, "FF's former lead
(7) designer, Charles LeFranc, is listed as the inventor."
(8) Are you familiar with Charles LeFranc?
(9)    **A.**  No, I'm not.
(10)    **Q.**  It says the, "Illustration in the patent
(11) filing clearly shows a steering wheel that bears
(12) LeEco's logo.  Both patents were filed in March 2016,
(13) one month before LeEco originally unveiled the LeSee in
(14) China."
(15)    If you go to the page after the page I was
(16) just reading, it shows the patent that they're
(17) referring to filed with the U.S. Patent and Trademark
(18) Office.
(19)    Does that look like a LeEco logo in the middle
(20) that patent steering wheel picture?
(21)    **A.**  I can't really identify that.
(22)    **Q.**  So it's your testimony that's not a LeEco
(23) logo?
(24)    **MR. MARTINEZ:**  No, that's argumentative.
(25)    **MR. GOODELL:**  Well, I'm asking a question.

**Page 79**

(1)    **MR. MARTINEZ:**  Asked and answered.  The
(2) witness already said she could not identify it.
(3)    **MR. GOODELL:  Q.**  So you're not testifying
(4) that that's not a LeEco logo, correct?
(5)    **MR. MARTINEZ:**  The testimony is what it is.
(6)    **MR. GOODELL:**  The witness can answer the
(7) question.
(8)    **MR. MARTINEZ:**  It's an argumentative question,
(9) asked and answered.
(10)    If you can identify it, answer the question.
(11)    If you can't, so indicate.
(12)    **THE WITNESS:**  It -- I mean, to me, I don't --
(13) it doesn't scream out that.  If I look hard enough, I
(14) guess I can see an L and an E there, but at first pass
(15) looking at it, I don't see it, truthfully.
(16)    **MR. GOODELL:  Q.**  Okay.  Let's go to the next
(17) page.
(18)    So it talks about, "Multiple outlets,
(19) including The Verge have found that LeEco's involvement
(20) in FF runs much deeper than just money.  LeEco's CEO,
(21) Jia Yueting, has had his hands in the operations of FF
(22) for a while now.  In addition to being named last month
(23) to a 'Global Executive Committee' at FF, Yueting was
(24) also given the position of 'Chief Internet Ecosystem
(25) Officer' for the company, while SVP of Engineering Nick

**Page 80**

(1) Sampson -- the de facto face of the company -- now
(2) answers to him."
(3)    Are you aware of Jia Yueting being named the
(4) Global Executive Committee at FF?
(5)    **A.**  I think there was a Global Executive
(6) Committee, yes.
(7)    **Q.**  And was Jia Yueting a part of it, to your
(8) knowledge?
(9)    **A.**  I don't recall.
(10)    **Q.**  Was Jia Yueting ever the CEO of FF, to your
(11) knowledge?
(12)    **A.**  I don't recall.
(13)    **Q.**  Does he now run FF, to your knowledge?
(14)    **A.**  He's in charge, yes.
(15)    **Q.**  Okay.  And was he in charge of LeEco as well?
(16)    **A.**  Yes.
(17)    (Plaintiff's Exhibit 19 marked for
(18) identification)
(19)    **MR. GOODELL:  Q.**  Have you ever seen this
(20) e-mail before?
(21)    **A.**  No.
(22)    **Q.**  Do you know an individual by the name of
(23) Peter Luo?
(24)    **A.**  No.
(25)    **Q.**  Have you ever spoken with anyone at Han's San

**Page 81**

(1) Jose Hospitality LLC?

(2)    **A.** No.

(3)    **Q.** If you go to the second page of this, it's the

(4) English translation of this e-mail. It's from Bob Ye

(5) at Le Technology to Peter Luo, the CFO for Han's.

(6)    And in this email, Mr. Le makes a number of

(7) representations regarding Le Technology's assets, debt,

(8) and cash. He said the total of debt it is $115 million

(9) U.S.

(10)    Did you ever hear any mention of

(11) Le Technology's total debt in summer of 2017?

(12)    **A.** No.

(13)    **Q.** Okay. It says debt concerning China's portion

(14) is $108 million U.S. Did you ever hear any mention of

(15) that?

(16)    **A.** No.

(17)    **Q.** Debt concerning the U.S. portion,

(18) $7 million U.S.

(19)    Have you ever heard any mention of that?

(20)    **A.** No.

(21)    **Q.** Are you aware of Le Technology transferring

(22) assets to Faraday Future at any time?

(23)    **A.** No.

(24)    **Q.** Do you know if Le Technology has any assets

(25) anymore?

**Page 82**

(1)    **A.** I don't know.

(2)    **Q.** Okay. And we established that you're not

(3) aware of anyone working besides this one individual you

(4) know their first name but not their last, working at Le

(5) Technology now, right?

(6)    **A.** Right.

(7)    **Q.** Mr. Ye says total assets plus cash is

(8) 2 million to $2 1/2 million U.S.

(9)    Do you know if that's an accurate

(10) representation?

(11)    **A.** No.

(12)    **Q.** Then he goes on to provide a -- somewhat of a

(13) threat that they're going to proceed with bankruptcy.

(14)    Did you hear Le Technology mention filing for

(15) bankruptcy in the summer of 2017?

(16)    **A.** No.

(17)    **Q.** Did you hear any discussion of them doing

(18) that?

(19)    **A.** Chatter in the office.

(20)    **Q.** You heard some chatter in the office about

(21) that?

(22)    **A.** (Nods head up and down)

(23)    **Q.** Did you hear any chatter in the office about

(24) Faraday Future, certain executives wanting other

(25) executives to file for bankruptcy at that time?

**Page 83**

(1)    **A.** No.

(2)    **Q.** Did you hear chatter about Mr. Krause being

(3) forced out because Faraday Future wouldn't file for

(4) bankruptcy?

(5)    **A.** No.

(6)    **Q.** You didn't hear about that? Okay.

(7)    So Mr. Ye goes on to say, "Your Company will,

(8) at most, receive 1 percent to 2 percent of the total

(9) assets remaining, which means Your Company will receive

(10) approximately 20,000 to $30,000 U.S. in compensation."

(11)    Did you hear Le Technology make similar kind

(12) of threats to other companies about their creditors

(13) receiving pennies on the dollar of the debts owed?

(14)    **MR. MARTINEZ:** It's argumentative.

(15)    **THE WITNESS:** (Shakes head negatively)

(16)    **MR. GOODELL: Q.** Okay. Did you hear -- he

(17) goes on to say, "In addition, we have already located a

(18) law firm specializing in bankruptcy law to provide

(19) services regarding restructure and reorganization of

(20) our Northern California company."

(21)    Did you hear any chatter about Le Technology

(22) reaching out to a law firm to try to file for

(23) bankruptcy to avoid their creditors?

(24)    **A.** No.

(25)    **Q.** No? He goes on to say, "We sincerely hope

**Page 84**

(1) that both sides can resolve the cancellation of the

(2) lease in an amicable manner."

(3)    Did you here any discussion at Faraday Future

(4) of Le Technology canceling the lease on the subject

(5) property?

(6)    **A.** No.

(7)    **Q.** What was your understanding of why you ended

(8) up moving out? What was your understanding of why that

(9) occurred?

(10)    **A.** They couldn't pay the rent.

(11)    **Q.** Who couldn't pay the rent?

(12)    **A.** LeEco.

(13)    **Q.** Did anyone at Faraday ever offer to contribute

(14) to the rent to your knowledge?

(15)    **A.** Not to my knowledge.

(16)    **Q.** Do you have any knowledge of anyone at Faraday

(17) asking Han's San Jose Hospitality LLC for permission to

(18) occupy the subject property?

(19)    **A.** No.

(20)    **Q.** Did you ever see any Han's San Jose

(21) Hospitality LLC representatives walking around the

(22) subject property and observing Faraday employees there?

(23)    **A.** Not that I can recall.

(24)    **Q.** Okay. Was there signage in your -- in the

(25) building that indicated where Faraday employees worked?

**Page 85**

(1)   **A.** Yes.

(2)   **Q.** Okay.  And how big was this signage?

(3)   **A.** 11 by 14.

(4)   **Q.** Okay.  And did you ever -- did anyone in the

(5) office ever mention the filing of this lawsuit, which

(6) began as an unlawful detainer?  Did you ever hear

(7) discussion of that?

(8)   **A.** No.

(9)   **MR. GOODELL:**  We'll take another

(10) three-to-five-minute break.

(11)   **MR. MARTINEZ:**  Sure.  Maybe a little bit

(12) longer.

(13)   **MR. GOODELL:**  Okay.  Ten-minute break?

(14)   **MR. MARTINEZ:**  Yeah, that sounds good.

(15)   (Recess taken)

(16)   **MR. GOODELL:  Q.**  So Ms. Belli --

(17)   **MR. MARTINEZ:**  Belli.

(18)   **MR. GOODELL:  Q.**  -- Belli, earlier you

(19) testified that there were approximately 10

(20) Le Technology employees, between 50 and 80

(21) Faraday Future employees that occupied the property

(22) during your time at the subject property.

(23)   Do you have an estimation of about how big --

(24) how much of the subject property that Le Technology was

(25) occupying?

**Page 86**

(1)   **A.** It was a very small footprint.

(2)   **Q.** So is it fair so say Faraday Future was

(3) occupying the vast majority of the subject property?

(4)   **A.** If your comparing it to Faraday's workforce,

(5) yes.

(6)   **Q.** Would you say a lot more space?

(7)   **A.** Well, the space they inhabited was actually a

(8) pretty decent size, even though their head count was

(9) small.

(10)   **Q.** Okay.  But Faraday's was larger?

(11)   **A.** Yes.

(12)   **MR. GOODELL:**  Let's mark this.

(13)   (Plaintiff's Exhibit 20 marked for

(14)   identification)

(15)   **MR. GOODELL:  Q.**  Did you ever see this

(16) document before?

(17)   **A.** No.

(18)   **Q.** Take your time and look through it.

(19)   Are you familiar with the company that was a

(20) prior landlord in this property, BSREP Rio Robles LLC?

(21)   **A.** No.

(22)   **Q.** During your time at Le Technology, were you

(23) aware of who was responsible for paying the rent, what

(24) person, on this property?

(25)   **A.** No.

**Page 87**

(1)   (Plaintiff's Exhibit 21 marked for

(2)   identification)

(3)   **MR. GOODELL:  Q.**  Have you ever seen this

(4) article before, Ms. Belli?

(5)   **A.** No.

(6)   **Q.** Have you ever heard of the auditor KPMG?

(7)   **A.** No -- no, no.

(8)   **Q.** Do you know that they were -- well, then I

(9) guess I take it that you're unaware if they were ever

(10) auditing Faraday Future?

(11)   **A.** No, no.

(12)   **Q.** The article mentions on Page -- in several

(13) places, but one place at the top of Page 2, it says --

(14) it refers to the Faraday's books.  It says it was a

(15) company with no coherent corporate structure, financial

(16) statements in complete disarray, and a $60,000 per

(17) month lunch bill.  Did you ever see an invoice of

(18) $60,000 --

(19)   **A.** No.

(20)   **Q.** -- for lunch?  No?

(21)   Or  did you ever hear anyone else refer to the

(22) company having no coherent corporate structure?

(23)   **A.** No.

(24)   **Q.** Do you know Richard Otto?

(25)   **A.** No.

**Page 88**

(1)   **Q.** Do you know Syed Rahman?

(2)   **A.** No.

(3)   **Q.** S-Y-E-D, R-A-H-M-A-N?

(4)   **A.** No.

(5)   **Q.** Have you ever heard of her the construction

(6) firm AECOM, A-E-C-O-M, for the record?

(7)   **A.** No.

(8)   **MR. MARTINEZ:**  Here's -- in this exhibit

(9) [indicating].

(10)   **MR. GOODELL:**  Okay.

(11)   **MR. MARTINEZ:**  Just so you know.

(12)   **MR. GOODELL:  Q.**  Who do you currently report

(13) to at Faraday Future?

(14)   **A.** Vince Nguyen.

(15)   **Q.** What's his name?

(16)   **A.** Vince Nguyen.

(17)   **Q.** What is his job title?

(18)   **A.** I don't know.  I think he's -- I don't know

(19) what his official title -- I think managing and

(20) recruiting.  And I think he kind of overtook John's

(21) role in our office.  And I'm not sure his title

(22) reflects that.

(23)   **Q.** John who?

(24)   **A.** Quach.

(25)   **Q.** My understanding was John Quach was a

**Page 93**

(1) heard the term, the name Le Holding. I don't know what
(2) the relationship is with Le Technology.
(3)     **Q.** Okay. The document that I just showed you,
(4) the lease, which was the lease between Le Technology
(5) and my client's predecessor at interest, has Le
(6) Holdings as a party.
(7)     Was it your -- so at the subject property, was
(8) there any Le Holdings employees, to your knowledge,
(9) working there?
(10)     **MR. MARTINEZ:** Object to the form of the
(11) question.
(12)     **THE WITNESS:** That -- no. I don't -- I don't
(13) know -- I'm not aware of any.
(14)     **MR. GOODELL: Q.** Okay. So during your tenure
(15) as working for Le Technology and Faraday Future, no
(16) one's ever identified themselves as an employee of
(17) Le Holdings?
(18)     **A.** That's correct.
(19)     **Q.** Are you aware of Dongge Jiang working for
(20) Le Holdings?
(21)     **A.** No.
(22)     **Q.** Did you ever, during your time as an office
(23) manager, see any documents referencing
(24) Le Holdings?
(25)     **A.** No.

**Page 94**

(1)     **Q.** So what have you heard about Le Holdings
(2) besides me asking these questions in the last few
(3) minutes?
(4)     **A.** I've just heard the name, Le Holdings. And
(5) this was a long time ago down in Redwood City when I
(6) first started at LeEco.
(7)     **Q.** Was there any Le Holdings signage in the
(8) subject property?
(9)     **A.** No.
(10)     **Q.** Okay. Did you ever have to enter or have to
(11) deal with any invoices or see any references to a
(12) vendor by the name Rohde & Schwarz?
(13)     **A.** No.
(14)     **Q.** Are you aware they sued Le Technology for
(15) unpaid invoices?
(16)     **A.** No.
(17)     **Q.** Did you hear any discussion of Le Technology
(18) telling creditors that they don't have any assets
(19) anymore, using that as a bargaining chip in
(20) negotiation?
(21)     **A.** No, never.
(22)     **Q.** Never heard that? Specifically with Rohde &
(23) Schwarz, are you familiar with that?
(24)     **A.** No.
(25)     **Q.** No? Okay. Did you ever talk to Mr. Godsil

**Page 95**

(1) about anything involving Faraday Future?
(2)     **A.** No.
(3)     **Q.** Okay. Have you ever heard his name before
(4) coming here today?
(5)     **A.** No.
(6)     (Plaintiff's Exhibit 22 marked for
(7)     identification)
(8)     **MR. GOODELL: Q.** All right. Have you read
(9) this article?
(10)     **A.** No.
(11)     **Q.** Heard any discussion about Chinese court
(12) freezing $182 million in assets tied to LeEco Chairman
(13) Jia Yueting?
(14)     **A.** Office gossip, yes.
(15)     **Q.** What did people in the office say about that?
(16)     **A.** Was that the money was being frozen, that the
(17) Chinese courts were not happy with him.
(18)     **Q.** Did you ever hear about him being put on a
(19) debtor blacklist?
(20)     **A.** No.
(21)     **Q.** Have you ever heard of a company by the name
(22) of Le Mobil?
(23)     **A.** No, no.
(24)     **Q.** Look at the second page of this article. It's
(25) a quote attributed to Jia. It says, "The cash problems

**Page 96**

(1) at the nonpublicly traded businesses are more serious
(2) than when this crisis erupted. Our businesses are
(3) constantly using cash to repay loans, having a huge
(4) impact on their operations."
(5)     Did you ever hear any discussion about these
(6) cash problems in your time at either one of these
(7) companies?
(8)     **MR. MARTINEZ:** Lacks foundation, vague and
(9) ambiguous.
(10)     Answer if you can.
(11)     **THE WITNESS:** Not -- no. I mean --
(12)     **MR. GOODELL: Q.** But you testified earlier
(13) you heard discussion of financial difficulties,
(14) correct?
(15)     **A.** More office chatter than real discussion.
(16)     **Q.** What was the office chatter?
(17)     **A.** That they were cash strapped.
(18)     **Q.** That they were what?
(19)     **A.** They were cash strapped.
(20)     **Q.** Cash strapped. And what was the reason that
(21) people gave for them being cash strapped?
(22)     **A.** I don't recall.
(23)     (Plaintiff's Exhibit 23 marked for
(24)     identification)
(25)     **MR. GOODELL: Q.** All right. Have you ever

**Page 97**

(1) seen this document before?
(2) **A.** No.
(3) **Q.** Okay. Now, are you aware of Faraday occupying
(4) a commercial property in Torrance?
(5) **A.** No.
(6) **Q.** No? Never heard of that?
(7) **A.** No.
(8) **Q.** Are you aware -- was Chaoying Deng, did she
(9) ever tell you that she was a Director of Finance at
(10) Faraday?
(11) **A.** No.
(12) **Q.** Okay. Did you ever see her identified as a
(13) president or secretary of Faraday?
(14) **A.** Possibly I saw something that said she was
(15) secretary.
(16) **Q.** Okay. Do you know who the CFO -- can you tell
(17) me everyone who you've known has been identified as CFO
(18) at Faraday?
(19) **A.** CFO?
(20) **Q.** Chief financial officer?
(21) **A.** Yeah, I don't know. I know that sounds
(22) strange, but I don't. CFO, I don't -- I don't recall.
(23) **Q.** Have you ever been explained the corporate
(24) structure of Faraday during your time there?
(25) **A.** No.

**Page 98**

(1) **Q.** Does that surprise you that you were never
(2) explained that?
(3) **A.** Not the way I came in because I didn't get --
(4) it -- I didn't get on-boarded in Gardena. I was
(5) on-boarded in Silicon Valley, so I didn't get the full
(6) dog-and-pony show that you get and get to see
(7) everything so not really.
(8) **Q.** Besides Jia Yueting, what's your understanding
(9) of the current -- who's another officer of the
(10) corporation right now, to your knowledge?
(11) **A.** I -- I don't -- I don't know.
(12) **Q.** Okay. Besides officer of the corporation,
(13) who's your understanding of who's in charge besides
(14) Jai Yueting?
(15) **A.** DG Jiang.
(16) **Q.** Dongge Jiang?
(17) **A.** Yes.
(18) **Q.** He's in charge of Faraday?
(19) **A.** Yes.
(20) **Q.** Who else?
(21) **A.** I know there's a couple that are specific to
(22) certain -- I don't know who's in finance. I don't even
(23) know who's in legal. I don't know -- I'm sorry. I'm
(24) really bad with names. I don't know who's in charge
(25) of, like, the car manufacturing. I don't know.

**Page 99**

(1) (Plaintiff's Exhibit 24 marked for
(2) identification)
(3) **MR. GOODELL: Q.** Have you ever seen this
(4) article?
(5) **A.** No.
(6) **Q.** Are you aware of Faraday having a Nevada
(7) factory?
(8) **A.** Yes.
(9) **Q.** Do you know, is that factory still in
(10) operation?
(11) **A.** No.
(12) **Q.** Do you know why it was shut down?
(13) **A.** I don't think there was funding to make it
(14) happen.
(15) **Q.** So on the second page, it says -- there's a
(16) quote attributed to the Nevada State Treasurer. Says,
(17) "This is a Ponzi scheme. You have a new company that
(18) has never built a car building a new plant in the
(19) middle of the desert financed by a mysterious Chinese
(20) billionaire. At some point, as with Bernie Madoff, the
(21) game ends."
(22) Have you ever seen that quote before?
(23) **A.** I actually have read that before.
(24) **Q.** Is there any discussion of that at the office?
(25) **A.** No. No, not that one.

**Page 100**

(1) **Q.** Which -- when did you first hear that, read
(2) about that quote?
(3) **A.** I think I read it online in a different
(4) article.
(5) **Q.** Okay. So you said "not that one." Is there
(6) discussions of other news articles at the office?
(7) **A.** They were with the attorney.
(8) **Q.** Okay. Yeah, don't tell me that.
(9) Toward the bottom of this page, says, "Earlier
(10) Tuesday, LeEco's parent, LeShi Holdings, said it had
(11) secured commitments in China for $600 million to
(12) support LeEco."
(13) Had you ever heard of LeShi Holdings being
(14) referred to as LeEco's parent?
(15) **A.** I can't -- I can't recall. I may have read
(16) that.
(17) **Q.** Well, you know, earlier you testified in your
(18) Linked-In profile, talked about the sister
(19) relationship.
(20) **A.** Right.
(21) **Q.** So I'm just curious if you ever heard of a
(22) parent relationship.
(23) **A.** Yeah, I -- I'm sorry. I can't really can't
(24) recall.
(25) **MR. GOODELL:** Okay.

DEPOSITION OF JOYLYN BELLI - 10/03/2018

BSA Case 2:19-bk-24804-VZ HAN'S DGoE 607 HOSPIFilITed 04/23/20 LEntEredNG 04/23/20 20:47:28 Desc
MAX(27/27)
Exhibit 7   Page 19 of 19

**Page 105**

(1)            CERTIFICATE OF WITNESS

(2)               ---o0o---

(3)       I, JOYLYN BELLI, hereby declare under penalty

(4) of perjury that I have read the foregoing deposition

(5) testimony and that the same is a true and correct

(6) transcription of my said testimony except as I have

(7) corrected pursuant to my rights under Section

(8) 2025.520(b)-(d) of the California Code of Civil

(9) Procedure.

(10)

(11)

(12)

(13)

(14)               _____

                       Signature

(15)

(16)               _____

                         Date

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 106**

(1) STATE OF CALIFORNIA    )

                           ) ss.

(2) COUNTY OF MARIN        )

(3)       I, DEBORAH FUQUA, a Certified Shorthand

(4) Reporter of the State of California, duly authorized to

(5) administer oaths pursuant to Section 2025.520(b)-(d) of

(6) the Code of Civil Procedure, do hereby certify that

(7)            JOYLYN BELLI,

(8) the witness in the foregoing deposition, was by me duly

(9) sworn to testify the truth, the whole truth, and

(10) nothing but the truth in the within entitled cause;

(11) that said testimony of said witness was reported by me,

(12) a disinterested person, and was thereafter transcribed

(13) under my direction into typewriting and is a true and

(14) correct transcription of said proceedings.

(15)       I further certify that I am not of counsel or

(16) attorney for either or any of the parties in the

(17) foregoing deposition and caption named, nor in any way

(18) interested in the outcome of the cause named in said

(19) caption.

(20)       Dated the 19th day of October, 2018.

(21)

(22)

(23)

(24)

(25)            DEBORAH FUQUA
               CSR NO. 12948

**Page 107**

(1) JOYLYN BELLI
   C/O Damian Martinez, Esq.
(2) Andrade Gonzalez LLP
   634 South Spring Street, Top Floor
(3) Los Angeles, California 90014
   Date:  October 19, 2018
(4) Re: Han's Hospitality v. Le Holdings
   Deposition Date: October 3, 2018
(5) Dear Ms. Belli:
(6)
(7) Please be advised that the original transcript of your
   deposition is ready for your review.
(8)
   Pursuant to Section 2025.520(b)-(d) you have 30 days
(9) following the date of this notice to read, correct and
   sign your transcript unless the attending parties and
(10) the deponent agree on the record or otherwise in
   writing to a longer or shorter time period.   The
(11) deponent may change the form or the substance of the
   answer to a question, and may either approve the
(12) transcript of the deposition by signing it, or refuse
   to approve the transcript by not signing it.  You are
(13) not required by law to read and sign your deposition
   transcript.   All parties will be informed of the
(14) corrections.  The original transcript will then be
   sealed and sent to the examining attorney pursuant to
(15) the applicable law.
(16) You may either come to our office to read and sign the
   original transcript, or you may contact your attorney
(17) or the attorney who arranged for you to be present at
   your deposition.  If they have ordered a copy of the
(18) transcript, you may review their copy and make
   corrections by submitting, signing and returning the
(19) attached form.  If you choose to review your transcript
   at our office, please call first to make an
(20) appointment.  Should you have any question regarding
   these instructions, please call.
(21)
   Sincerely,
(22)
   NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
   San Francisco, CA 94103
(24) (415)-398-1889
(25) cc:  All counsel; original deposition