1  Richard M. Pachulski (CA Bar No. 90073)
   Jeffrey W. Dulberg (CA Bar No. 181200)
2  Malhar S. Pagay (CA Bar No. 189289)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, California 90067
4  Telephone: 310/277-6910
   Facsimile: 310/201-0760
5  Email: rpachulski@pszjlaw.com
          jdulberg@pszjlaw.com
6          mpagay@pszjlaw.com
   Counsel for Debtor and Debtor in Possession

7

8              **UNITED STATES BANKRUPTCY COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
9                  **LOS ANGELES DIVISION**

10  In re:                              Case No. 2:19-bk-24804-VZ

11  YUETING JIA,[1]                     Chapter 11

12              Debtor.                 **NOTICE OF FILING OF PLAN
                                        SUPPLEMENT TO DEBTOR'S THIRD
13                                      AMENDED PLAN OF REORGANIZATION
                                        UNDER CHAPTER 11 OF THE
14                                      BANKRUPTCY CODE**

15                                      Plan Confirmation Hearing
                                        Date:      May 21, 2020
16                                      Time:      9:30 a.m. (Pacific time)
                                        Place:     Courtroom 1368
17                                                 Roybal Federal Building
                                                   255 E. Temple Street
18                                                 Los Angeles, California 90012
                                        Judge:     Hon. Vincent P. Zurzolo
19                                      [Relates to Docket No. 464]

20      **PLEASE TAKE NOTICE** that in accordance with the *Order (I) Granting Motion to*

21  *Approve Adequacy of Fourth Amended Disclosure Statement, (II) Approving Voting and Tabulation*

22  *Procedures, (III) Setting Confirmation Hearing and Related Deadlines, (IV) Waiving Certain Local*

23  *Rules and Procedures, (V) Vacating Order to Show Cause and (VI) Granting Related Relief,* entered

24  on March 20, 2020 [Docket No. 485] (the "Disclosure Statement Order"), Yueting Jia, the debtor

25  and debtor in possession in the above-captioned Chapter 11 Case (the "Debtor"), filed the *Motion*

26

27  ───────────────
    [1] The last four digits of the Debtor's federal tax identification number are 8972. The Debtor's mailing address is 91
28  Marguerite Drive, Rancho Palos Verdes, CA 90275.

    DOCS_LA:329179.1 46353/002

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*For Order (I) Confirming Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code; and (II) Approving Settlement Pursuant To Bankruptcy Rule 9019; Request for Discharge on the Effective Date* [Docket No. 657] (the "Motion") on April 23, 2020.

**PLEASE TAKE FURTHER NOTICE** that the *Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 464] (the "Plan")[2] contemplates the submission of certain documents (or forms thereof), schedules, and exhibits (the "Plan Supplement") in advance of the Confirmation Hearing.

**PLEASE TAKE FURTHER NOTICE** that the Debtor hereby files the following Plan Supplement documents:

- **Exhibit A**    Form of Trust Agreement
- **Exhibit B**    Terms of the KCBI Settlements
- **Exhibit C**    Exit Financing Term Sheet
- **Exhibit D**    Members of the Creditor Trust Committee
- **Exhibit E**    Supplement to Schedule A of the Plan

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtor currently does not contemplate seeking to reject any executory contracts or unexpired leases under the Plan, however, and the Debtor reserves the right to alter, amend, modify, or supplement any of the documents contained in the Plan Supplement in accordance with the terms of the Plan.

**PLEASE TAKE FURTHER NOTICE** that if you wish to obtain copies of the Plan Supplement, you may do so by (i) calling Epiq Corporate Restructuring LLC (the "Voting Agent"), at (855) 963-0391 (for U.S. callers), (400) 120-3077 (for Chinese callers), or (503) 520-4401 (for international callers) and requesting copies of the Plan Supplement, which will then be mailed to you

---

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  free of charge, (ii) visiting (a) the Voting Agent's website: *https://dm.epiq11.com/yt1*, where the

2  Plan Supplement will be posted and can be reviewed free of charge or (b) the Bankruptcy Court's

3  website: **www.cacb.uscourts.gov**, or (iii) contacting the Voting Agent by email at

4  *tabulation@epiqglobal.com* (please reference "YT" in the subject line) and requesting copies of the

5  Plan Supplement, which will then be mailed to you free of charge. Note that a PACER password and

6  login are needed to access documents on the Bankruptcy Court's website.

7

8  Dated:    April 25, 2020              PACHULSKI STANG ZIEHL & JONES LLP

9                                        By    */s/Malhar S. Pagay*
10                                              Richard M. Pachulski
                                                Jeffrey W. Dulberg
11                                              Malhar S. Pagay

12                                              Attorneys for Debtor and Debtor in
                                                Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# Exhibit A

**Form of Trust Agreement**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Confidential**

**FORM OF CREDITORS TRUST AGREEMENT**

**DATED          , 2020**

# CREDITORS TRUST AGREEMENT

This CREDITORS TRUST AGREEMENT (this "**Agreement**") is made as of this [●] day of [●], 2020 (the "**Effective Date**"), by and between Yueting Jia, a natural person at 91 Marguerite Drive, Rancho Palos Verdes, CA (the "**Reorganized Debtor**" and prior to the Effective Date, the "**Debtor**"), and Jeffrey D. Prol, as the Trustee (the "**Trustee**"), and establishes the liquidating trust (the "**Trust**") in accordance with the Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of March 20, 2020 (the "**Plan**") and the Findings of Fact, Conclusions of Law, and Order Confirming the Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "**Confirmation Order**"). Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

## RECITALS

**WHEREAS**, on October 14, 2019 (the "**Petition Date**"), the Debtor, filed a voluntary petition for relief under chapter 11 of title 11 ("**Chapter 11 Case**") of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware, the venue of which was thereafter transferred to the United States Bankruptcy Court for the Central District of California Los Angeles Division (the "**Bankruptcy Court**");

**WHEREAS**, the Plan was confirmed by the Bankruptcy Court on _____ and became effective on the Effective Date;

**WHEREAS**, the Trust is created pursuant to, and to effectuate the Plan for the primary purpose of administering, maintaining, and liquidating the assets set forth in **Schedule A** (the "**Trust Assets**") in accordance with the Plan and Confirmation Order with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust;

**WHEREAS**, the Trust is created on behalf of, and for the sole benefit of, holders of Allowed Debt Claims and the Reorganized Debtor[3] (each such holder, a "**Beneficiary**" and collectively, the "**Beneficiaries**");

**WHEREAS**, the powers, authority, responsibilities and duties of the Trustee shall be governed by this Agreement, the Plan, the Confirmation Order, and any applicable orders issued by the Bankruptcy Court; and

**WHEREAS**, the Trust is intended to qualify as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Reorganized Debtor and the Trustee agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  Capitalized terms used in this Agreement shall have the respective meanings set forth below:

"**ACT**" has the meaning set forth in Section 3.4.

---

[3] [NTD: additional beneficiaries to be included if any parties make Trust Elections under Article IV of the Plan.]

"**Administrative Expense Claim**" has the meaning set forth in Article 1.1 of the Plan.

"**Aggregate Asserted Debt Claim Amount**" means the aggregate Debt Claim Allocation Amounts of all  Debt Claims asserted against the Debtor as of the Effective Date plus the total amount reserved for Late Filed Debt Claims pursuant to Section 4.8(c).

"**Allowed**" has the meaning set forth in Article 1.1 of the Plan. For the avoidance of doubt, (i) payments received by the holder of an Allowed Claim prior to the Petition Date shall reduce the Allowed amount of such Claim, and (ii) Allowed Debt Claim or Allowed China Secured Claim means such portion of a Debt Claim or China Secured Claim that is Allowed, even when the remaining portion of the same Claim is disputed.

"**Allowed KCBI Claimant**" means a holder of an Allowed Debt Claim who also holds a guarantee from a Key China Business Individual on the same obligation underlying their Allowed Debt Claim and has voluntarily agreed to settle their claims against such Key China Business Individual.

"**Applicable Law**" means with respect to any person (including any individual, corporation, partnership, limited liability company, association, trust or other entity or organization), any transnational, domestic or foreign federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated, or applied by a Governmental Authority that is binding upon or applicable to such person, as amended unless expressly specified otherwise.

"**Business Day**" means a day, other than Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"**Bankruptcy Actions**" has the meaning set forth in Article 11.9 of the Plan.

"**Bankruptcy Actions Limitation Period**" has the meaning set forth in Article 11.9 of the Plan.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the local rules of the Bankruptcy Court.

"**Call Option**" means the call option to purchase shares of FF Intelligent held by Season Smart, subject to conditions set forth in the Restructuring Agreement, exercise of which is subject to Section 4.3.6.

"**China Debtor List Covenant**" has the meaning set forth in Article 11.4(c) of the Plan.

"**China Secured Claim**" has the meaning set forth in Article 1.1 of the Plan.

"**Chinese Courts**" means any applicable court or courts in the People's Republic of China.

"**Claim**" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtor.

"**Collatera**l" means any property of the Debtor subject to a valid, unavoidable, perfected, and enforceable Lien on, or security interest in, such property.

"**Compliance Certificate**" means the certificate that each Holder (not including the Reorganized Debtor) must complete prior to receiving Trust Distributions, which certifies (a) the Holder has complied with the China Debtor List Covenant, (b) that the Holder has not initiated, and will not initiate, any YT Claims during the Standstill Period, (c) that the Holder acknowledges and agrees that it will comply with Article 11.4(c) of the Plan and Section 4.9 hereof and will take all steps and execute any documents requested by the Reorganized Debtor to evidence releases in Article 11.4(c) of the Plan, and (d) if applicable, the Holder has complied

with Article 6.6 of the Plan and the release of Wei Gan's personal liability pursuant to the Wei

Gan Settlement. A form of the Compliance Certificate is attached as **Exhibit A** hereto.

"**Committee Member**" has the meaning set forth in Section 8.1.

"**Confirmation Date**" means the date upon which the Bankruptcy Court enters the

Confirmation Order on the docket of the Chapter 11 Case.

"**Creditor Trust Committee**" means the committee that represents the Beneficiaries

with responsibilities, functions, and authorities as prescribed herein.

"**Debt Claim**" has the meaning set forth in Article 1.1 of the Plan.

"**Debt Claim Allocation Amount**" means, the Debt Claim Base Amount plus the Debt

Claim Supplemental Amount, and for any Allowed KCBI Claimant, 105% of the sum of the

Debt Claim Base Amount and the Debt Claim Supplemental Amount.  For purposes of allocating

Trust Interests based on Debt Claim Allocation Amounts pursuant to Section 3.1, all Allowed

China Secured Claims shall be treated as Allowed Debt Claims. For the avoidance of doubt, if a

portion of an Allowed China Secured Claim has been Allowed as a Deficiency Claim, the holder

of such Allowed China Secured Claim shall only receive Trust Interests on behalf of their

Deficiency Claim. Pursuant to Article 4.3 of the Plan, to the extent the holder of an Allowed

China Secured Claim has not received the value of the Collateral securing its Allowed China

Secured Claim on or before the initial Debt Claim Distribution Date, such Allowed China

Secured Claim shall be treated as a Debt Claim for all purposes under the Plan and Trust

Agreement as of such Debt Claim Distribution Date. For Claims denominated in currencies other

than U.S. dollars, the exchange rate used to calculate the conversion between such currency and

U.S. dollars shall be the closing rate listed on Wall Street Journal on October 14, 2019. The

exchange rate of RMB to U.S. dollars on October 14, 2019 is 1 U.S. dollar = 7.0676 RMB.

"**Debt Claim Base Amount**" means that portion of a  Debt Claim that constitutes outstanding principal.

"**Debt Claim Distribution Amount**" means on any Debt Claim Distribution Date, the Debt Claim Allocation Amount minus any Other Distributions and Trust Distributions received by the holder of an Allowed Debt Claim before such Debt Claim Distribution Date.

"**Debt Claim Distribution Date**" mean a Trust Distribution Date on which the Trustee makes distributions of any Distributable Proceeds to the fourth priority of the Distribution Waterfall.

"**Debt Claim Supplemental Amount**" means an amount equal to 0.33% of the Debt Claim Base Amount times the number of whole months that the Debt Claim Base Amount was incurred prior to the Petition Date.

"**Deficiency Claim**" has the meaning set forth in Article 1.1 of the Plan.

"**Distributable Proceeds**" means any distributable proceeds received by the Trust from any disposition, or dividends or distributions in respect, of any Trust Assets after the payment of claims, expenses, and liabilities pursuant to Section 4.7 hereof.

"**Distribution Event**" means the receipt of Distributable Proceeds by the Trust.

"**Distribution Waterfall**" means the distribution schedule set forth on **Schedule B** hereto.

"**DIP Financing**" means the debtor in possession financing pursuant to that certain Secured Debtor in Possession Promissory Note, by and between Pacific Technology, as Lender, and the Debtor, as Borrower dated as of February 27, 2020, as amended from time to time.

"**FF**" means Faraday & Future Inc., a company incorporated in the State of California.

"**FF Global**" means FF Global Partners LLC, a Delaware limited liability company.

"**FF Intelligent**" means FF Intelligent Mobility Global Holdings Ltd., a Cayman Islands company (formerly known as Smart King Ltd.).

"**FF Top**" means FF Top Holding Ltd., a company organized in the British Virgin Islands and an indirectly wholly-owned subsidiary of Pacific Technology.

"**Governmental Authority**" means any transnational, domestic or foreign federal, state or local governmental, regulatory or administrative authority, department, court, tribunal, agency, commission, official, including any political subdivision thereof, any "self-regulatory organization" as defined in Section 3(a)(26) of the Securities Exchange Act of 1934 and any United States or foreign securities exchange, futures exchange, commodities exchange or contract market and any other governmental authority or instrumentality.

"**Holder**" has the meaning set forth in Section 3.2.

"**Initial Term**" has the meaning set forth in Section 10.1.

"**Injunctions**" means those certain preliminary injunctions, freezing orders, and/or similar orders from courts in the British Virgin Islands and the United States federal courts situated in the state of California that certain Trust Assets are subject to.

"**IPO**" means closing of the sale of shares of capital stock (or American Depositary Shares representing such shares) with respect to the shares of outstanding capital stock of FF Intelligent or such other relevant listing vehicle, as applicable, to the public in a firm-commitment underwritten public offering pursuant to an effective registration statement and listing of such securities on the New York Stock Exchange, Nasdaq, the Hong Kong Stock Exchange, the London Stock Exchange, or any other internationally recognized stock exchange (including China).

"**Key China Business Individual**" means those certain Chinese individuals who voluntarily enter into a KCBI Settlement with an Allowed KCBI Claimant.

"**KCBI Settlement**" means a voluntary settlement agreement under Bankruptcy Rule 9019 between a Key China Business Individual, an Allowed KCBI Claimant, and the Reorganized Debtor; the Reorganized Debtor's contribution toward such settlement is reflected in the Distribution Waterfall.

"**Late Filed Debt Claim**" means a Debt Claim filed after the applicable deadline set by the Bankruptcy Court to file claims in the Chapter 11 Case.

"**Liability Release Date**" has the meaning set forth in Article 11.4(c) of the Plan.

"**Lien**" means a lien as defined in section 101(37) of the Bankruptcy Code.

"**Liquidation Event**" means with respect to Pacific Technology, FF Intelligent, any of their respective material direct or indirect subsidiaries, or any future public listing vehicle for the global subsidiaries of FF Intelligent or Pacific Technology, each of the following events to the extent that the event materially reduces the direct or indirect percentage ownership in FF Intelligent or such other future public listing vehicle by the Trust other than by virtue of an equity investment by a bona fide third party: (a) the commencement of an assignment for the benefit of creditors, a receivership, a case under chapter 7 of the Bankruptcy Code, or a similar insolvency proceeding; (b) the effective date of a liquidating plan under chapter 11 of the Bankruptcy Code, or (c) the effective date of a reorganization plan under chapter 11 of the Bankruptcy Code, *provided* that internal reorganizations (including mergers or dissolutions for tax or other purposes) that do not adversely impact the value of the Trust's direct or indirect interests in FF Intelligent or such other future public listing vehicle are not intended to be Liquidation Events.

"**Marketable Securities**" means securities that are registered under securities law or listed on a stock exchange or quotation system.

"**Other Distribution**" means in each case, to the extent received after the Petition Date (a) any amounts the holder of an Allowed Debt Claim actually receives from the primary obligor or any guarantor besides the Debtor, of such Debt Claim based on such holder's contractual agreement with such primary obligor or guarantor, (b) if the primary debt obligation underlying such Debt Claim is satisfied in whole or in part by conversion to equity in any jurisdiction, the corresponding reduction in the amount of the Debt Claim on account of such conversion, or (c) any amounts the holder of an Allowed China Secured Claim or Allowed Debt Claim actually receives upon the disposition of any Seized China Assets.

"**Pacific Technology**" means Pacific Technology Holding LLC, a Delaware limited liability company.

"**Petition Date**" means October 14, 2019, the date on which the Debtor filed his petition for relief commencing the Chapter 11 Case.

"**Plan Arbitration Procedures**" has the meaning set forth in Article 1.1 of the Plan.

"**Plan Term Sheet**" means the chapter 11 plan term sheet, as amended, filed by the Debtor with the United States Bankruptcy Court for the Central District of California as Exhibit B to the Disclosure Statement approved by the Bankruptcy Court on March 20, 2020, setting forth the material terms of the Plan.

"**Priority Non-Tax Claim**" has the meaning set forth in Article 1.1 of the Plan.

"**Priority Tax Claim**" has the meaning set forth in Article 1.1 of the Plan.

"**Professional**" has the meaning set forth in Article 1.1 of the Plan.

"**Pro Rata Share**" means the respective Debt Claim Allocation Amount for each holder of an Allowed Debt Claim in relation to the aggregate Debt Claim Allocation Amounts of all Allowed Debt Claims.

"**Qualifying Financing**" has the meaning set forth in Section 4.3.6.

"**Register**" has the meaning set forth in Section 3.2.

"**Restructuring Agreement**" means the Restructuring Agreement, dated as of December 31, 2018 by and among Smart King Ltd. (n/k/a FF Intelligent), the Debtor, Season Smart Limited, and other parties thereto.

"**Schedules**" means the schedules of assets and liabilities filed by the Debtor on October 17, 2019 [Docket No. 28] and amended on March 9, 2020 [Docket No. 427], as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

"**Season Smart**" means Season Smart Limited, a British Virgin Islands company.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Seized China Assets**" means any assets that (a) (i) have already been collateralized by the Debtor or an obligor, guarantor, or pledgor, (ii) have already been pledged by the Debtor or an obligor, guarantor, or pledgor, or (iii) the Debtor, or an obligor, guarantor, or pledgor owns and (b) have been seized, attached, or frozen by Chinese judiciary authorities in connection with Chinese enforcement actions on account of any China Secured Claims or Debt Claims.

"**Standstill Period**" means, the period of four years after the Effective Date by which each holder of an Allowed Debt Claim or Allowed China Secured Claim agrees to not assert any new YT Claims in any non-U.S. jurisdiction; *provided*, *however*, that such holder may continue to prosecute any actions commenced prepetition against the Debtor up to judgment and pursue

Other Distributions through judicial authorities in the PRC to satisfy such holder's Debt Claim or

China Secured Claim through a mechanism that will be mutually agreed to by the parties,

including claims against primary obligors solely based on such holder's contractual agreements

with such primary obligors (for the avoidance of doubt, such holder may not bring unwinding or

alter ego type claims against such primary obligors); *provided further*, *however*, that (i) the

Standstill Period shall terminate in the event a Liquidation Event occurs during the Standstill

Period and (ii) if an IPO occurs during the Initial Term, the Standstill Period shall be

automatically extended through the conclusion of the period on restriction of disposition for the

Trust FF Intelligent Shares as set forth on **Schedule C** attached hereto. All limitations periods

applicable to all YT Claims in any non-U.S. jurisdictions, to the extent not previously expired,

shall be tolled for the duration of the Standstill Period.

"**Term**" means the term of the Trust.

"**Transfer**" means an offer, pledge, sale, contract to sell, option, purchase, or grant any

option, right, or warrant to purchase, lend, or otherwise transfer or dispose of directly or

indirectly, or enter into any swap, hedging, or other arrangement that transfers to another, in

whole or in part, any of the economic consequences of ownership.

"**Trust Distribution**" means any distributions paid from the Trust to the Holders.

"**Trust Distribution Affidavit**" means the affidavit to be provided by Holders (but not

including the Reorganized Debtor) no later than seven (7) Business Days prior to each Trust

Distribution Date, which identifies any amounts (or value with respect to Collateral) received by

such Holder from Other Distributions as of the date of the affidavit.

"**Trust Distribution Date**" means the date, which shall occur no less frequently than annually so long as there are Distributable Proceeds, on which the Trustee makes distributions of any Distributable Proceeds pursuant to the Distribution Waterfall.

"**Trust FF Intelligent Shares**" means 147,058,823 outstanding Class B shares of FF Intelligent held by and transferred from FF Top to the Trust pursuant to the Warrant.

"**Trust Financing**" means a committed financing in an amount of [●], pursuant to that certain [Trust Financing Agreement], dated as of [●] by and [among/between] [Reorganized Debtor] and [●], to fund the operation of the Trust for the Initial Term and to make payments required to be made in connection with the Plan.

"**Trust Interest**" has the meaning set forth in Section 3.1.

"**Undetermined Claim Holding Beneficiary**" has the meaning set forth in Section 4.8.

"**U.S. Secured Claim**" has the meaning set forth in Article 1.1 of the Plan.

"**Warrant**" has the meaning set forth in the **Schedule A** listing the Trust Assets.

"**Wei Gan Settlement**" has the meaning set forth in Article 6.6 of the Plan.

"**YT Claims**" has the meaning set forth in Article 11.4(a) of the Plan.

Section 1.2    Interpretation and Rules of Construction. For purposes of this Agreement and unless otherwise specified herein (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (ii) any reference in this Agreement to an existing document, schedule, or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (iii) any reference to an entity as a holder of a Claim includes that entity's permitted successors and assigns; and (iv) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitations, and shall be deemed to be followed by the words "without limitation."

Section 1.3    Incorporation of Plan.  The Plan is hereby incorporated into this Agreement and made a part hereof by this reference; *provided*, *however*, that in the event of any conflict between the terms of the Plan and this Agreement, the terms of the Plan will control and govern. For the avoidance of doubt, any matters in this Agreement not contemplated by the Plan shall be governed by this Agreement.

## ARTICLE II

## ESTABLISHMENT OF THE TRUST

Section 2.1    <u>Creation and Name</u>.  There is hereby created the Trust, which shall be known as [NAME OF THE TRUST], and is the same Trust referred to as the Trust under the Plan. The Trustee may conduct the affairs of the Trust under the name of [NAME OF THE TRUST].

Section 2.2    <u>Declaration of Trust</u>.  In consideration of the confirmation of the Plan under the Bankruptcy Code, the discharge of the Debtor pursuant to the Bankruptcy Code under the Confirmation Order, and the releases by Holders under Article XI of the Plan, the Reorganized Debtor and the Trustee have executed this Agreement and, effective on the Effective Date, the Trust Assets are hereby deemed to have been irrevocably assigned, transferred, and conveyed to the Trust and/or to the Trustee on behalf of the Trust free and clear of any lien, claim, or interest in such property of any other person or entity, to have and to hold unto the Trustee forever, in trust nevertheless, under and subject to the terms and conditions of this Agreement and of the Plan, for the benefit of the Beneficiaries and their successors and assigns as permitted for under the Plan and this Agreement.  The use and distribution of Trust Assets to the Beneficiaries shall be made in accordance with this Agreement and the Plan.

Section 2.3    <u>Purpose of the Trust</u>.  The Trust is established to hold, manage, and maximize  the Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.

Section 2.4    <u>Trustee</u>.  The Trustee is Jeffrey D Prol, a partner at the firm of Lowenstein Sandler LLP, and any successor trustee appointed under <u>ARTICLE VII</u>.

## ARTICLE III

## BENEFICIARIES AND TRUST INTERESTS

Section 3.1    <u>Trust Interests</u>.[4]

(a)    Upon the transfer of the Trust Assets to the Trust, (i) each holder of an Allowed Debt Claim as of the Effective Date will receive an initial beneficial interest in the Trust (the "**Trust Interest**") based on its Debt Claim Allocation Amount in relation to the Aggregate Asserted Debt Claim Amount, (ii) the Undetermined Claim Holding Beneficiary will receive an initial Trust Interest based on (y) the Aggregate Asserted Debt Claim Amount minus the aggregate Debt Claim Allocation Amounts of all Allowed Debt Claims as of the Effective Date, in relation to (z) the Aggregate Asserted Debt Claim Amount, and (iii) the Reorganized Debtor shall receive a Trust Interest representing its interest in the Distribution Waterfall (all of which beneficial interests shall be adjusted as appropriate to take into account Claims described in clause (c) of the Distribution Waterfall).  The Trust Interests shall not be evidenced by certificates. The initial beneficial interests described in (i) and (ii) above shall thereafter be re-determined as described in <u>Section 4.8</u> to appropriately reflect the disposition of Debt Claims after the Effective Date.

---

[4] [NTD: appropriate priorities to be included as necessary if parties make Trust Elections under Article IV of the Plan.]

(b)    If so requested by a holder of the Trust Interest, the Trustee shall hold the Trust Interests on behalf of such holder and record the same in the Register until such holder obtains necessary approval to hold the Trust Interests either pursuant to its internal procedures or Applicable Law.

Section 3.2    Identification of Holders of Trust Interests.  The holders of Trust Interests (each, a "**Holder**" and, collectively, the "**Holders**") shall be recorded and set forth in the official register maintained by the Trustee (the "**Register**") expressly for such purpose.

Section 3.3    Transferability.  Trust Interests may be transferred upon written notice to the Trustee in compliance with Fed. R. Bankr. P. 3001(e) and any Applicable Law. Notwithstanding the foregoing, the Trust Interests may not be transferred to the extent that such transfer would (a) based on the advice of counsel to the Trust, jeopardize the Trust's or the Undetermined Claim Holding Beneficiary's tax treatment; (b) cause the Trust to become subject to any governmental controls or regulations that affect the administration of the Trust or the Trust Assets, including, but not limited to, any SEC reporting requirements; (c) violate Applicable Law (including any securities law) or any instrument to which the Trust is a party or by which it is bound; or (d) cause the Trust to become an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 3.4    Registration. THE TRUST INTEREST HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), AND (A) MAY BE OFFERED, RESOLD, PLEDGED, HYPOTHECATED, OR TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF THE CREDITORS TRUST AGREEMENT DATED AS OF [●], 2020 BETWEEN THE TRUSTEE AND THE REORGANIZED DEBTOR AND (I) PURSUANT TO ANY AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT, OR (II) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT (IF ANY), IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF THE UNITED STATES OR ANY STATE THEREOF OR ANY OTHER RELEVANT JURISDICTIONS, (B) THE PURCHASER OF THESE SECURITIES IS REQUIRED, AND EACH SUBSEQUENT PURCHASER WILL BE REQUIRED, TO NOTIFY ANY PURCHASER OF THESE SECURITIES OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE, IF THEN APPLICABLE, AND (C) IN THE CASE OF (A)(I) ABOVE, THE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED, HYPOTHECATED OR TRANSFERRED WITHOUT AN OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE THAT SUCH OFFER, SALE, PLEDGE, HYPOTHECATION, OR TRANSFER IS IN COMPLIANCE HEREWITH.

**ARTICLE IV**

**ADMINISTRATION OF TRUST ASSETS**

Section 4.1    Responsibilities of Trustee.  The Trustee will exercise reasonable business judgment in liquidating the Trust Assets and make timely distributions pursuant to the Distribution Waterfall consistent with the duty to maximize the value of the Trust Assets.

Section 4.2    Initial Valuation of Trust Assets.  On or after the Effective Date, the Reorganized Debtor may, at its sole expense, engage an independent valuation firm to conduct a valuation of the Trust Assets (other than the proceeds of the Trust Financing) as of the Effective Date. The Trustee shall cooperate in good faith with such independent valuation firm as it conducts its valuation. If the Reorganized Debtor chooses not to engage an independent

valuation firm, as soon as practicable after the Effective Date, the Reorganized Debtor shall make a good faith determination of the fair market value of the Trust Assets transferred to the Trust as of the Effective Date. In either case, the Trustee shall apprise the Holders in writing of the valuation, and this valuation shall be used consistently by all parties (including, without limitation, the Debtor, the Reorganized Debtor, the Trustee and the Holders) for federal income tax purposes.

Section 4.3    Distributions; Disposition; Withholding

*Section 4.3.1    Distribution Waterfall*.  On each Trust Distribution Date and subject to the satisfaction of requirements set forth in this Section 4.3, the Trustee shall distribute the Distributable Proceeds in accordance with the Distribution Waterfall. A Trust Distribution Date shall occur on: (i) sixty (60) days following the occurrence of a Distribution Event, and (ii) the termination of the Trust; *provided, however*, that the Trustee shall retain amounts (a) reasonably necessary to meet contingent liabilities and to maintain the value of the Trust Assets, (b) needed to pay or reserve for anticipated amounts of reasonable administrative expenses (including any taxes imposed on the Trust or in respect of the Trust Assets of the Trust), and (c) needed to satisfy other liabilities incurred or assumed by the Trust (or to which the Trust Assets are otherwise subject), all for the Term and in accordance with this Agreement. The Trustee may delay or defer the distribution of any Distributable Proceeds (whether cash, securities, or other property) received by the Trustee in respect of the Trust Assets to any of the Holders if the Trustee determines, in its reasonable sole discretion, that such deferral or delay is in the best interests of the Holders (including if such distribution would violate any court order or Applicable Laws); *provided* that a Trust Distribution Date shall occur at least annually as long as there are Distributable Proceeds.

*Section 4.3.2    Trust Distribution Affidavit*.  No later than seven (7) Business Days prior to each Debt Claim Distribution Date, each Holder (not including the Reorganized Debtor) shall provide a Trust Distribution Affidavit to the Trustee. On each Debt Claim Distribution Date, the Trustee will, (i) allocate Trust Distributions to each Holder pursuant to the Distribution Waterfall on account of such Holder's Debt Claim Distribution Amount calculated in accordance with the information provided in the Trust Distribution Affidavit and (ii) reserve distributions for such Holders who have not submitted their Trust Distribution Affidavits prior to the applicable Debt Claim Distribution Date, in the amount that they would have otherwise received, pursuant to the Distribution Waterfall (assuming that the amount (or value with respect to Collateral) they received from Other Distributions (i) is zero (if no Trust Distribution Affidavit has been previously submitted by the Holder) or (ii) remains the same as reported in last Trust Distribution Affidavit submitted by the Holder). If a Holder (not including the Reorganized Debtor) (i) submits a Trust Distribution Affidavit that contains misstatements or omissions as determined under Section 4.3.4 or (ii) fails to submit a Trust Distribution Affidavit prior to the termination or dissolution of the Trust, such Holder shall be deemed to have forfeited its Trust Interests and any reserved distributions shall revert to the Trust for the ratable benefit of Holders (including the Reorganized Debtor) pursuant to the Distribution Waterfall.

*Section 4.3.3    Compliance Certificate*. As a condition to receiving any Trust Distributions, each Holder (but not including the Reorganized Debtor) must provide the Trustee with the Compliance Certificate within ninety (90) days after the date the Holder's Claim becomes Allowed. If a Holder (i) submits a Compliance Certificate that contains misstatements or omissions as determined under Section 4.3.4 or (ii) fails to timely submit a Compliance Certificate (subject to the notice period set forth in Section 4.3.4), such Holder shall be deemed to have forfeited its Trust Interests and any reserved distributions shall revert to the Trust for the ratable benefit of Holders (including the Reorganized Debtor) pursuant to the Distribution Waterfall.

*Section 4.3.4    Disputing Trust Distribution Affidavits and Compliance Certificates;*

*Timeliness of Compliance Certificates.*

(a)      The Reorganized Debtor or the Trustee may dispute in good faith any Trust Distribution Affidavit or Compliance Certificate by providing the Holder with ten (10) days' notice of such dispute that sets forth the alleged inaccuracies in the Trust Distribution Affidavit or Compliance Certificate. If the Reorganized Debtor or the Trustee (as applicable) and the Holder are unable to reach an agreement within thirty (30) days, either party may seek arbitration under the Plan Arbitration Procedures, which may result in the forfeiture of the Holder's Trust Interests if the Trust Distribution Affidavit or Compliance Certificate is determined to include material misstatements or omissions.

(b)      The Reorganized Debtor or the Trustee may dispute the failure of a Holder to timely file a Compliance Certificate by providing such Holder with ten (10) days' notice of forfeiture of the Holder's Trust Interests for failure to timely submit a Compliance Certificate; *provided* that such Holder may seek arbitration under the Plan Arbitration Procedures that their neglect to timely file a Compliance Certificate was excusable under the standards of the Bankruptcy Code.

(c)      For the avoidance of doubt, once Trust Interests of a Holder are forfeited pursuant to Section 4.3.2 and Section 4.3.3, such Holder shall no longer be deemed as a Holder under this Agreement and no further Trust Distributions shall be distributed to such Holder.

*Section 4.3.5   Limitations on Disposition of Trust FF Intelligent Shares.* The Trustee shall not Transfer or distribute the Trust FF Intelligent Shares prior to the earlier of (a) the IPO, without the consent of FF Top,[5] (b) a Liquidation Event, and (c) expiration of the Term. The post-IPO disposition of any Trust FF Intelligent Shares directly owned by the Trust that are Marketable Securities shall be governed in accordance with **Schedule C** attached hereto. At any time upon the request of the managing member of Pacific Technology, and subject to applicable securities law, the Trustee shall distribute the Marketable Securities in kind in lieu of any cash distribution to the Holders, who shall be subject to the same selling restrictions set forth in **Schedule C**. The value of the Marketable Securities shall be the average closing trading price for the five consecutive trading days immediately prior to the distribution.[6]

*Section 4.3.6   Limitations on Disposition of the Call Option.* The Trustee shall obtain the consent of FF Global prior to any exercise or transfer of the Call Option by the Trust. Upon request by FF Global, the Trustee shall directly transfer, or transfer the underlying economic rights of, the Call Option (including by exercising the Call Option and thereafter conveying the related shares in FF Intelligent to the applicable counterparty) as requested by FF Global in connection with a bona fide unrelated third-party financing of FF Intelligent and its subsidiaries, as follows: (i) 50% of the Call Option (based on the underlying shares of FF Intelligent or the related economic value of such shares) to the counterparty of a bona fide unrelated third-party financing providing FF Intelligent and its subsidiaries with not less than $100 million of net proceeds (i.e., net of any commissions charged by financial advisors), (ii) 100% of the Call Option (based on the underlying shares of FF Intelligent or the related economic value of such shares) to the counterparty of a bona fide unrelated third-party financing providing FF Intelligent and its subsidiaries with not less than $250 million of net proceeds (i.e., net of any commissions

---

[5] [NTD: to be consistent with rights of Class B ordinary shareholders.]

[6] [NTD: certain Trust Assets may also be subject to certain restrictions on disposition set forth in the [Fourth] Amended and Restated Limited Liability Company Agreement of Pacific Technology.]

charged by financial advisors), or (iii) a ratable percentage of the Call Option (based on the underlying shares of FF Intelligent or the related economic value of such shares) to the counterparty of a bona fide unrelated third-party financing providing FF Intelligent and its subsidiaries with net proceeds (i.e., net of any commissions charged by financial advisors) greater than $100 million and less than $250 million (i.e., an additional 1% of the Call Option for each additional $3 million of net proceeds beyond $100 million) ((i), (ii), or (iii), a "**Qualifying Financing**"), *provided* that FF Global may request that the Trustee transfer the Call Option for a financing of FF Intelligent and its subsidiaries other than a Qualifying Financing subject to the consent of Trustee and approval by a majority of the Creditor Trust Committee in their respective business judgment. For the avoidance of doubt, any consideration paid, if any, in exchange for the transfer of the Call Option either as part of a separate transaction providing for such transfer or attributable to the transfer of the Call Option in a financing transaction, whether in conjunction with a Qualifying Financing or otherwise, shall be paid directly to the Trust and shall constitute Trust Assets.

Section 4.4    Separation of Interests.  After the Trustee makes Trust Distributions sufficient to satisfy subsection (iv) of the fifth priority of the Distribution Waterfall, 95% of the remaining Trust Assets that constitute Marketable Securities shall be distributed in kind to the Reorganized Debtor or otherwise at his direction and this Trust Agreement shall be automatically amended to eliminate any duties of the Reorganized Debtor.[7]

Section 4.5    Books and Records.  The Trustee shall maintain in respect of the Trust and the Holders books and records relating to the Trust Assets and income of the Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof.  Such books and records shall be maintained on a cash or other comprehensive basis of accounting necessary to facilitate compliance with the tax reporting requirements of the Trust.  Nothing in this Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Trust, or as a condition for managing any payment or distribution out of the Trust Assets.  The Holders shall have the right, upon thirty (30) days' prior written notice delivered to the Trustee, to inspect such books and records (including financial statements, if any), provided that, if so requested, such Holder shall have entered into a confidentiality agreement satisfactory in form and substance to the Trustee, and provided further that no Holder may inspect any privileged document.

Section 4.6    Investment and Safekeeping of Trust Assets.  Subject to Section 5.2(d), cash held pending distribution may, to the extent permitted by Applicable Law, be invested by the Trustee in (a) direct obligations of, or obligations guaranteed by, the United States of America (including, without limitation, United States Treasury Bills); (b) obligations of any agency or corporation that is or may hereafter be created by or pursuant to an Act of the Congress of the United States as an agency or instrumentality thereof; or (c) demand deposits or short-term certificates of deposit at any bank or trust company that has, at the time of acquisition by the Trustee of such investments, capital stock, and surplus aggregating at least $100 million and whose short-term debt obligations are rated by at least two nationally recognized statistical rating organizations in one of the two highest categories therefor.  Such investments shall mature in such amounts and at such times as, in the judgment of the Trustee at the times such investments are made, are necessary, or as are desirable with a view to providing funds when needed to make payments from the Trust Assets.

Section 4.7    Payment of Claims, Expenses and Liabilities.  Subject to Section 5.2, the Trustee shall pay from the Trust Assets all claims, expenses, charges, liability, and obligations of the Trust and all liabilities and obligations that the Trustee specifically assumes and agrees to

---

[7] [NTD: mechanism to be developed for the allocation of non-Marketable Securities and other assets reaming in the Trust.]

pay pursuant to this Agreement, including among the foregoing, and without limiting the generality of the foregoing, interest, penalties, taxes, assessments, and public charges of every kind and nature and the costs, charges, and expenses connected with or incurred as a result of the execution or administration of this Trust and such other payments and disbursements as are provided in this Agreement or that may be determined to be a proper charge against the Trust Assets by the Trustee. The Trustee shall reserve such amounts out of the proceeds of the Trust Financing or other Trust Assets as shall be necessary to protect against any potential tax claims or liabilities; *provided, however*, the Trustee shall not retain cash in excess of a reasonable amount necessary to meet or protect against such claims, expenses, and liabilities.

Section 4.8    The Undetermined Claim Holding Beneficiary.

(a)    This Agreement is intended to establish a separate trust (the "**Undetermined Claim Holding Beneficiary**") to serve as a beneficiary on behalf of Debt Claims that are Allowed after the Effective Date. The Trustee shall act as trustee of the Undetermined Claim Holding Beneficiary and shall have the authority to take any reasonably necessary actions consistent with this Section 4.8 as necessary, including, but not limited to, (y) memorializing a separate trust agreement in respect of the Undetermined Claim Holding Beneficiary consistent with the Plan and this Agreement and with substantially similar governance terms as this Agreement, and (z) performing tax reporting and satisfying tax obligations, if any, in a manner consistent with Section 9.3(b) of this Agreement. The Undetermined Claim Holding Beneficiary shall have no purpose other than to hold beneficial interests in the Trust for the potential benefit of Debt Claims that may be Allowed after the Effective Date until such Debt Claims have been finally resolved. For the avoidance of doubt, nothing in Section 3.1 or this Section 4.8(a) shall affect the priorities of distributions that are to be made to under the Distribution Waterfall.

(b)    Upon the allowance or disallowance of a Debt Claim after the Effective Date, the respective Trust Interests of all holders of Allowed Debt Claims and the Undetermined Claim Holding Beneficiary shall be automatically and without further action by any party be re-determined in accordance with the formulas in Section 3.1 as of the date of (and to give effect to) such allowance or disallowance. Following such adjustment, each holder of an Allowed Debt Claim shall be deemed to have a Trust Interest entitling it to the share of distributions to which it is then entitled under the Distribution Waterfall.

(c)    In order for a Late Filed Debt Claim to be Allowed, the Reorganized Debtor must request the allowance of such Late Filed Debt Claim and the Reorganized Debtor and the Trustee shall make commercially reasonable efforts to agree that allowance of such Late Filed Debt Claim in a particular amount is in the best interests of the Reorganized Debtor and the Trust. If the Reorganized Debtor and the Trustee do not agree to the allowance or amount of any Late Filed Debt Claim, the dispute shall be resolved pursuant to the Plan Arbitration Procedures. In seeking the allowance of any Late Filed Debt Claim, the Reorganized Debtor shall bear the burden of demonstrating that allowance of such Late Filed Debt Claim is in the best interests of the Reorganized Debtor and the Trust. Notwithstanding the foregoing, the maximum aggregate amount of Late Filed Debt Claims that may be Allowed under the Plan shall not exceed 10% of the total amount of Allowed Debt Claims at the time of allowance of the Late Filed Debt Claim.

Section 4.9    Compliance with Article 11.4(c) of the Plan. In accordance with Article 11.4(c) of the Plan, within ninety (90) days after the (a) applicable Liability Release Date with

respect to Allowed Debt Claims (including Allowed China Secured Claims treated as Allowed Debt Claims pursuant to Article 4.3 of the Plan), (b) the date of satisfaction in full of an Allowed China Secured Claim and, if applicable, the occurrence of the Liability Release Date with respect to any Deficiency Claim on account of such Allowed China Secured Claim, or (c) the date of allowance of a Late Filed Debt Claim, each holder of an Allowed Debt Claim, Allowed China Secured Claim, or Allowed Late Filed Debt Claim shall (as a condition to receiving further Trust Distributions, including any Trust Distributions upon the termination or dissolution of the Trust) (i) withdraw or retract any litigations, enforcement actions, arbitrations, and any other proceedings against the Debtor from the courts and judicial authorities in all jurisdictions, including, but not limited to, the Chinese Courts, or confirm with the judicial authorities that the Reorganized Debtor has settled all of his debt obligations or legal responsibilities to such holder and (y) file and execute any documents requested by the Reorganized Debtor to evidence the above release. The Reorganized Debtor reserves all rights to seek enforcement by the Chinese Courts of the rights provided in Article 11.4(c) of the Plan.

Section 4.10    Compliance with Laws.  Any and all distributions of Trust Assets and proceeds of borrowings, if any, shall be in compliance with Applicable Laws.

## ARTICLE V

## AUTHORITY OF TRUSTEE

Section 5.1    Authority of Trustee.  Subject to Section 5.2 and other restrictions or limitations set forth in this Agreement, in connection with the administration of the Trust, the Trustee is authorized to perform any and all acts necessary or desirable to accomplish the purposes of the Trust, including but not limited to:

(a)    to make distributions to the Holders as required under the terms of the Plan and this Agreement in an expeditious but orderly manner in accordance with the terms of the Plan, Confirmation Order, this Agreement and Treasury Regulation 301.7701-4(d) with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust;

(b)    to incur any reasonable and necessary expenses in liquidating the Trust Assets;

(c)    to exercise (and to determine whether it is in the Trust's best interest whether to exercise) the Warrant to transfer the Trust FF Intelligent Shares to the Trust upon dissolution of the Injunctions;

(d)    to commence Bankruptcy Actions prior to the Bankruptcy Actions Limitations Period in accordance with, and pursuant to, the limitations set forth in Article 11.9 of the Plan;

(e)    to control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof, subject to any limitations set forth elsewhere in this Agreement;

(f)     to otherwise perform the functions and take the actions provided for or permitted by this Agreement and the Plan and in any other agreement executed by the Trustee on behalf of the Trust pursuant to the Plan; and

(g)     to hold the Trust Interests on behalf of the Holder if such Holder requests so pursuant to <u>Section 3.1(b)</u>.

Section 5.2     <u>Limitations to Trustee's Authority</u>. Notwithstanding anything herein to the contrary, the Trustee shall not engage in any trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust, and shall not commingle any of the Trust Assets with its own property or the property of any other person. The Trustee shall not take any of the following actions without the prior approval of the Creditor Trust Committee:

(a)     incur expenses on behalf of the Trust in excess of US$50,000; *provided, however*, that such approval shall be deemed granted if not specifically denied within ten (10) Business Days after a written request from the Trustee;

(b)     retain and pay professionals, including legal counsel, independent accounting firms, valuation firms, or third parties to assist with the administration of the Trust Assets; *provided, however*, that such approval shall be deemed granted if not specifically denied within ten (10) Business Days after a written request from the Trustee;

(c)     sell or transfer any Trust Assets except as otherwise set forth in this Agreement;

(d)     invest any moneys held by the Trust other than pursuant to <u>Section 4.6</u>; *provided, however*, that such approval shall be deemed granted if not specifically denied within ten (10) Business Days after a written request from the Trustee;

(e)     settle or compromise any litigation claim that constitutes a Trust Asset in excess of US$5 million; *provided, however*, that such approval shall be deemed granted if not specifically denied within ten (10) Business Days after a written request from the Trustee;

(f)     take any action that would result in the Trust becoming an "investment company" within the meaning of the Investment Company Act of 1940, as amended;

(g)     amend this Agreement in any manner that is adverse to the Beneficiaries;

(h)     initiate a Bankruptcy Action under section 548 of the Bankruptcy Code (in accordance with, and subject to, the limitations set forth in Article 11.9 of the Plan), which initiation shall require an affirmative vote of four members of the Creditor Trust Committee;

(i)     initiate a Bankruptcy Action under section 542 of the Bankruptcy Code (in accordance with, and subject to, the limitations set forth in Article 11.9 of the Plan), which initiation shall require an affirmative vote of at least three members of the Creditor Trust Committee; or

(j)      upon request of the FF Global, transfer the Call Option for a financing of FF Intelligent and its subsidiaries other than a Qualifying Financing pursuant to <u>Section 4.3.5</u>.

Section 5.3      <u>Special Information Rights of the Trustee</u>.  The Reorganized Debtor shall use commercially reasonable efforts to provide the Trustee with the following information on a confidential, professional eyes only basis, to the extent such information has been prepared by FF Intelligent or FF for reporting to their financing sources or shareholders. The Trustee may share such information on a confidential and aggregated basis with the Creditor Trust Committee.

(a)      within ninety (90) days after the end of each calendar year, audited consolidated financial statements of FF Intelligent or such other future public listing vehicle for the global subsidiaries of FF Intelligent;

(b)      within forty-five (45) days after the end of each of the first three quarters in each year of FF Intelligent, a consolidated balance sheet of FF Intelligent and its subsidiaries, together with related consolidated statement of operations and retained earnings, consolidated statement of stockholders' equity, and consolidated statement of cash flows for such fiscal quarter;

(c)      not more than ninety (90) days after the beginning of each fiscal year of FF Intelligent, an annual business plan and budget of FF Intelligent and its subsidiaries; and

(d)      such other regular financial reporting, if any, prepared by FF Intelligent for its lenders and shareholders.

## ARTICLE VI

### THE TRUSTEE

Section 6.1      <u>Number and Qualifications</u>.  There is one Trustee of the Trust.[8]

Section 6.2      <u>Performance Review</u>. The Reorganized Debtor and the Creditor Trust Committee will conduct an annual performance review of the Trustee to determine whether the Trustee has complied with his or her (a) fiduciary duties pursuant to this Agreement and (b) duty to maximize the value of the Trust Assets, including the Trust's interests in FF Intelligent. If the Reorganized Debtor determines in good faith that the Trustee has failed in his or her duty to maximize value of the Trust Assets because the Trustee's actions have adversely affected the business, financial condition, or prospects of FF Intelligent, the Reorganized Debtor shall have the right to request that the Creditor Trustee Committee remove the Trustee pursuant to <u>Section 7.2</u>, which consent by the Creditor Trustee Committee shall not be unreasonably withheld or delayed. If there is a dispute between the Reorganized Debtor and the Creditor Trustee Committee regarding the removal of the Trustee pursuant to this <u>Section 6.2</u>, either party may request that the dispute be resolved pursuant to Plan Arbitration Procedures.

Section 6.3      <u>Standard of Care; Indemnification, Exculpation</u>.  The Trustee, acting in the capacity as the Trustee or in any other capacity contemplated by this Agreement, shall act as

---

[8] [NTD: additional qualifications to be included.]

a fiduciary and shall not be personally liable in connection with the affairs of the Trust or to any person except for such of the Trustee's acts or omissions that constitute fraud, willful misconduct, or gross negligence as determined by a final order of a court of competent jurisdiction.  The Trustee shall not be personally liable to the Trust or to any person for the acts or omissions of any employee or agent of the Trust unless the Trustee acted with fraud, gross negligence, or willful misconduct as determined by a final order of a court of competent jurisdiction, in the selection, retention, or supervision of such employee or agent of the Trust. Except in those situations in which the Trustee is not exonerated of personal liability as provided above, the Trustee (including any successor trustee) shall be indemnified by the Trust against and held harmless by the Trust from any losses, claims, damages, liabilities, or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Trustee may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against the Trustee in connection with any matter arising out of or related to this Agreement or the affairs of the Trust.  If the Trustee becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with this Agreement or the affairs of the Trust, the Trust shall periodically advance or otherwise reimburse on demand the Trustee's reasonable legal and other expenses (including, without limitation, the cost of any investigation, and attorneys' fees, disbursements, and related expenses) incurred in connection therewith, but the Trustee shall be required to repay promptly to the Trust the amount of any such advances or reimbursed expenses paid to the Trustee to the extent that it shall be ultimately determined that the Trustee engaged in fraud, willful misconduct, or gross negligence in connection with the affairs of the Trust with respect to which such expenses were paid.  The Trustee may obtain customary fiduciary and/or errors and omissions liability insurance. The Trust may indemnify and hold harmless the employees and agents of the Trust to the same extent as provided in this Section 6.3 for the Trustee.  The provisions of this Section 6.3 shall remain available to and be binding on any former Trustee or the estate of any deceased Trustee, and to any successor Trustee.

Section 6.4    Reliance by Trustee.  The Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, or other instrument or document that the Trustee reasonably believes to be genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles or emails, to have been sent by the proper party or parties, and the Trustee may reasonably rely as to the truth of the statements and correctness of the opinions expressed therein.  The Trustee may consult with counsel, and any opinion of counsel shall be full and complete authorization and protection in respect to any action taken or suffered by the Trustee in accordance therewith. The Trustee is entitled to engage independent legal counsel and financial advisors to assist with its evaluation of any matters with respect to the Trust, including any Liquidation Event, subject to Section 5.2.

Section 6.5    Reliance by Persons Dealing With the Trust.  In the absence of actual knowledge to the contrary, any person dealing with the Trust shall be entitled to rely on the authority of the Trustee to act in connection with the acquisition, management, or disposition of Trust Assets and shall have no obligation to inquire into the existence of such authority.

Section 6.6    Expense Reimbursement and Compensation. As compensation for the performance of all services in connection with its role as Trustee hereunder, the Trustee shall be paid [●].[9]

Section 6.7    Confidentiality.  The Trustee shall, while serving as Trustee under this Agreement and for a period of twelve (12) months following the termination of this Agreement or following the earlier of its removal or resignation hereunder, hold strictly confidential and not

---

[9] [NTD: Trustee compensation to be included.]

use for personal gain any material, non-public information of or pertaining to any entity to which any of the Trust Assets relates or of which it has become aware in its capacity as Trustee.

# ARTICLE VII

## SUCCESSOR TRUSTEE

Section 7.1    Resignation.  The Trustee may resign by giving not less than sixty (60) days' prior written notice of the proposed effective date of resignation to the Creditor Trust Committee, with such resignation to take effect only when a successor Trustee has been appointed. If the Trustee resigns, the Creditor Trust Committee shall be authorized to appoint a successor Trustee who satisfies the qualifications set forth in Section 6.1 and is subject to approval by the Reorganized Debtor (which approval shall not be unreasonably withheld).  The Trustee shall continue to serve as the Trustee after notice of resignation until a successor Trustee has been appointed.  Nothing in this Section 7.1 shall restrict the right of removal of the Trustee as provided in Section 7.2.

Section 7.2    Removal.  The Trustee may be removed by the Creditor Trust Committee at any time for Cause, and the Trustee shall be removed by the Creditor Trust Committee, if the Reorganized Debtor determines that the Trustee has failed in his or her duty to maximize value of the Trust Assets because the Trustee's actions have adversely affected the business, financial condition, or prospects of FF Intelligent pursuant to Section 6.2. If the Trustee is removed pursuant to this Section 7.2, the Creditor Trust Committee shall appoint a successor Trustee who satisfies the qualifications set forth in Section 6.1 by majority vote of the Creditor Trust Committee, subject to the approval of the Reorganized Debtor (which approval shall not be unreasonably withheld). The removal shall be effective immediately upon written notice to the Trustee.  For the purpose of this Section 7.2, the term "**Cause**" means (a) any act or omission that constitutes fraud, willful misconduct, or gross negligence in connection with the affairs of the Trust, (b) such physical or mental disability that substantially prevents the Trustee from performing his or her duties as Trustee hereunder, (c) any breach of fiduciary duty by, or unresolved conflict of interest involving, the Trustee or any affiliate thereof, or (d) the Trustee's failure of its annual performance review under Section 6.2. If a successor Trustee is not appointed or does not accept its appointment pursuant to Section 7.2 or Section 7.3 within seventy-five (75) days following such action for removal of the predecessor Trustee, any Holder (including the Reorganized Debtor) may petition any court of competent jurisdiction for the appointment of a successor Trustee.

Section 7.3    Acceptance of Appointment by Successor Trustee.  Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder, and shall file such acceptance with the Trust records.  Such successor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of its predecessor in the Trust with like effect as if originally named herein; *provided*, *however*, that a removed or resigning Trustee shall, nevertheless, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments required to convey and transfer to such successor Trustee under the Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee.

Section 7.4    Continuance of Trust.  The death, resignation, or removal of the Trustee shall not operate to terminate the Trust created by this Agreement or revoke any existing agency (other than the agency of the former Trustee as Trustee) created pursuant to this Agreement or invalidate any action taken by the Trustee.  The Trustee agrees that the provisions of this Agreement shall be binding upon and inure to the benefit of the Trustee and the Trustee's heirs, legal and personal representatives, and successors or assigns, as the case may be.  In the event of the resignation or removal of the Trustee, the Trustee shall promptly (a) execute and deliver by the effective date of resignation or removal such documents, instruments, and other writings as

may be reasonably requested by the successor Trustee to effect the termination of the resigning or removed Trustee's capacity under this Agreement and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee; (b) deliver to the successor Trustee all documents, instruments, records, and other writings relating to the Trust as may be in the possession or under the control of the resigning or removed Trustee; and (c) otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee. The resigning or removed Trustee hereby irrevocably appoints the successor Trustee as his or her attorney-in-fact and agent with full power of substitution for and in his or her name, place and stead to do any and all such acts that such resigning or removed Trustee is obligated to perform under this <u>Section 7.4</u>. Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment.

**ARTICLE VIII**

**CREDITOR TRUST COMMITTEE**

Section 8.1    <u>Composition and Qualification</u>.  The Creditor Trust Committee shall consist of no more than five holders of Allowed Debt Claims or their designees (each, a "**Committee Member**"). The initial Committee Members shall be [●], [●], [●], [●], and [●]. If a Committee Member resigns or is removed by the Trustee for Cause, the Trustee may appoint a holder of an Allowed Debt Claim (or its designee) who is not currently a Committee Member, as a replacement Committee Member.[10] For the purpose of this <u>Section 8.1</u>, "**Cause**" means (a) any act or omission determined by the Trustee to constitute fraud, willful misconduct, or gross negligence in connection with a Committee Member's performance of his or her duties as a Committee Member, (b) such physical or mental disability that substantially prevents the Committee Member from performing his or her duties as Committee Member hereunder, or (c) any breach of fiduciary duty by the Committee Member.

Section 8.2    <u>Fiduciary Duties</u>.  The Committee Members, when taking any action in their capacity as such, shall serve as fiduciaries to the Beneficiaries and not act in their individual interests.

Section 8.3    <u>Action of the Committee</u>.  The Creditor Trust Committee shall act by the vote of a majority (over 50%) of the members thereof, unless otherwise provided herein.

Section 8.4    <u>Expenses and Advisors</u>.  The Committee Members shall not be compensated for serving as a Committee Member, but shall be reimbursed for all reasonable out-of-pocket expenses incurred in connection with their service on the Creditor Trust Committee, other than the fees and expenses of counsel to individual Committee Members. The Creditor Trust Committee, upon the unanimous approval of the Committee Members, may employ advisors for reasonable specified purposes unanticipated to be within the scope or responsibility of the Trustee but necessary for the fulfillment of the Creditor Trust Committee's duties, and the Trustee will pay the fees and expenses of any such advisors retained by the Creditor Trust Committee.

Section 8.5    <u>Information Rights of the Creditor Trust Committee</u>.  The Trustee shall cause to be prepared and distributed to the Creditor Trust Committee, who may further distribute to the Holders, within forty-five (45) days after the end of each calendar quarter and within ninety (90) days after the end of each calendar year (a) a statement of net assets of the Trust, (b) a statement of changes in net assets of the Trust, (c) a statement of cash flows of the Trust, (d) a schedule summarized by type of investments and assets, indicating acquisitions and

---

[10] [NTD: additional qualifications for the replacement of a Committee Member to be provided.]

dispositions, and (e) a summary listing of the status of the resolution of claims involving the Trust or any of the Trust Assets, if any.

Section 8.6    Dissolution of the Creditor Trust Committee.  When each holder of an Allowed Debt Claim has received Trust Distributions exceeding their respective Debt Claim Distribution Amounts plus an amount equal to their Pro Rata Share of $500,000,000, the Creditor Trust Committee shall be automatically dissolved. Upon dissolution of the Creditor Trust Committee, the following authority and functions of the Creditor Trust Committee shall automatically be assumed by the Reorganized Debtor: (i) the authority to receive a resignation notice of Trustee, remove the Trustee, and appoint a successor Trustee under Section 7.1 and Section 7.2, (ii) the approval right, in that approval by the Creditor Trust Committee throughout this Agreement shall be read as approval by the Reorganized Debtor, including approval required under Section 4.3.6, Section 4.6, Section 5.2, Section 10.3, and Section 11.1, and (iii) the information rights enjoyed by the Creditor Trust Committee shall be enjoyed by the Reorganized Debtor.

## ARTICLE IX

## REPORTING; REPORTS TO HOLDERS OF TRUST INTERESTS

Section 9.1    Securities Laws.  If the Trustee determines, with the advice of counsel, that the Trust is required to comply with the registration and reporting requirements of the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Trustee shall take any and all actions to comply with such reporting requirements and file periodic reports with the SEC.

Section 9.2    Treatment of Transfer of Trust Assets; Liquidating Trust Interests.  As provided in the Plan, the Trust Assets will be treated by all parties (including, without limitation, the Debtor, the Reorganized Debtor, the Trustee, and the Beneficiaries) for U.S. federal income tax purposes as being transferred by the Debtor to the Beneficiaries and the Undetermined Claim Holding Beneficiary with each receiving an undivided interest therein in proportion to (i) Beneficiaries other than the Reorganized Debtor based on their Debt Claim Allocation Amount in relation to the Aggregate Asserted Debt Claim Amount and (ii) the Undetermined Claim Holding Beneficiary in an amount to be determined based on the (y) the Aggregate Asserted Debt Claim Amount minus the aggregate Debt Claim Allocation Amounts of all Allowed Debt Claims as of the Effective Date, in relation to (z) the Aggregate Asserted Debt Claim Amount (adjusted as appropriate to take into account Claims described in clause (c) of the Distribution Waterfall), as determined by the Trustee, and then by such Beneficiaries and the Undetermined Claim Holding Beneficiary to the Trust in exchange for the Trust Interests for the benefit of such Beneficiaries in accordance with the Plan.

Section 9.3    Tax Reporting.

(a)    Promptly following the end of each calendar year, the Trustee shall submit to the Reorganized Debtor and, each Holder appearing on the Register during such year a separate statement setting forth such person's items of income, gain, loss, deduction, or credit attributable to the Trust.  The Trustee shall also submit to each Holder appearing on the Register during such year a separate statement setting forth the amounts and dates of each distribution made to such Holder from the Trust during such year.  Allocations of taxable income of the Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of Trust Interests, taking into account all prior and concurrent distributions from the Trust.  Similarly, taxable losses of the

Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Trust Assets.  For this purpose, the tax book value of the Trust Assets shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

(b)    Federal Income Tax.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Trustee),

(i)    the Trustee shall file returns for the Trust as a grantor trust for U.S. federal income tax purposes pursuant to Treasury Regulations Section 1.671-4(a) or as a partnership, as reasonably determined by the Reorganized Debtor and the Trustee with the advice of competent tax counsel.

(ii)    the Trustee shall (i) treat the Undetermined Claim Holding Beneficiary as a non-grantor trust in accordance with the trust provisions of the IRC (sections 641 et seq.) or such other entity deemed appropriate by the Trustee in its sole discretion, (ii) file all applicable tax and information returns and, if applicable, timely pay, from the applicable Trust assets on a current basis, all taxes on any income or gain of the Undetermined Claim Holding Beneficiary that may become due consistently with such treatment, and (iii) to the extent permitted by applicable law, report consistently for federal, state and local income tax purposes.

Section 9.4    Other Reporting.  The Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Trust that are required by any governmental authority.

**ARTICLE X**

**DURATION AND TERMINATION OF TRUST**

Section 10.1    Term of Trust.  Unless otherwise provided herein, the Trust will terminate five (5) years after the Effective Date (such five-year term, the "**Initial Term**"), unless otherwise extended pursuant to Section 10.2, but in no event shall the Term be extended beyond the tenth anniversary of the Effective Date unless the Chapter 11 Case with respect to the Debtor is reopened to obtain a court order extending the Term.

Section 10.2    Extension of the Initial Term.

(a)    If an IPO occurs during the Initial Term, the Term shall be automatically extended through the conclusion of the period on restriction of disposition for the Trust FF Intelligent Shares as set forth on **Schedule C** attached hereto.

(b)    If an IPO has not occurred during the Initial Term, the Trustee may elect to extend the Term for successive one-year periods (or such other periods as the Trustee determines to be appropriate) to the extent necessary to allow for the orderly liquidation of any remaining Trust Assets.

Section 10.3    Obligations of the Trustee upon Termination.  Upon termination of the Trust, the Trustee shall obtain a valuation of the Trust Assets as of the termination date (performed by an independent valuation firm selected by the Trustee and approved by the Creditor Trust Committee, if applicable, and the Reorganized Debtor) and shall, as promptly as practicable following the completion of the independent valuation, distribute the Trust Assets in kind to the Holders (including Reorganized Debtor) in accordance with the Distribution Waterfall.

Section 10.4    Dissolution of Trust. The Trustee shall dissolve and wind up the Trust and distribute the Trust Assets upon the expiration of (a) the Initial Term, if no extension (automatic or otherwise) is exercised or (b) the expiration of any extended term of the Trust. The Trustee may dissolve the Trust before the end of the Initial Term or any extended Term if: (a) all of the Trust Assets have been distributed in accordance with the Distribution Waterfall, including any distributions to the Reorganized Debtor or (b) a Liquidation Event has occurred.

Section 10.5    Conditional on Confirmation Order.  If the discharge of claims against the Debtor under the Plan and the Confirmation Order is revoked for any reason, all Trust Interests shall be revoked and Trust Distributions made shall be deemed invalid and be restored. Trustee shall immediately transfer, assign and deliver all right, title and interest in the remaining portion of the Trust Assets free and clear of any lien, claim or interest in such property to Debtor, and to execute, acknowledge, and deliver such instruments and do such further acts as may be necessary or proper to transfer to the Debtor any portion of the Trust Assets so to restore the Debtor and all Holders to the *status quo ante* as of the day immediately preceding entry of the Confirmation Order. This Trust shall be immediately terminated with no further effect.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1    Amendment.  This Agreement may only be amended with the approval of the Creditor Trust Committee, the Trustee, and the Reorganized Debtor; *provided* that technical amendments to this Agreement may be made, as necessary, to clarify this Agreement or enable the Trustee to effectuate the terms of this Agreement, by the Trustee without the approval of the Reorganized Debtor.  Notwithstanding this Section 11.1, any amendments to this Agreement shall not be inconsistent with the purpose and intention of the Trust or the Plan.

Section 11.2    Intention of Parties to Establish Trust.  This Agreement is intended to create a trust for federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Agreement may be amended to comply with such federal income tax laws, which amendments may apply retroactively.

Section 11.3    Laws as to Construction.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law.

Section 11.4    Dispute Resolution. Any suit, action, or other claims arising out of or based upon this Agreement shall be submitted to arbitration pursuant to the Plan Arbitration Procedures. For the avoidance of doubt, notwithstanding the Plan Arbitration Procedures, the Bankruptcy Court shall retain ultimate supervisory jurisdiction over the administration of the Trust until the end of the Term.

Section 11.5    Severability.  If any provision of this Agreement or the application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of

such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 11.6    Notices.  Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended:

If to the Trustee:

[●]
[●]
[●]

with copies to:

[●]
[●]
[●]

If to the Reorganized Debtor:
91 Marguerite Drive
Rancho Palos Verdes, CA 90275

with copies to:

[●]
[●]
[●]

Section 11.7    Headings.  The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**DEBTOR**

_____
Yueting Jia

**TRUSTEE**

_____
Jeffrey D Prol, as Trustee

SCHEDULE A

**TRUST ASSETS**

(a)     100% of the Preferred Units issued by Pacific Technology Holding LLC, having such rights, privileges, and preferences as set forth in the [Fourth] Amended and Restated Limited Liability Company Agreement of Pacific Technology Holding LLC, as amended from time to time;

(b)     100% of the [Preferred B Units][11] issued by Pacific Technology Holding LLC, having such rights, privileges, and preferences as set forth in the [Fourth] Amended and Restated Limited Liability Company Agreement of Pacific Technology Holding LLC, as amended from time to time;

(c)     fully-paid up warrant granted by Pacific Technology pursuant to its Fourth Restated and Amended Limited Liability Company Agreement to receive the 147,058,823 Trust FF Intelligent Shares, exercisable upon (a) the lifting or discharge of the Injunctions and (b) no later than the closing of the IPO (the "**Warrant**").[12]

(d)     following the exercise of the Warrant and the indefeasible transfer of the Trust FF Intelligent Shares to the Trust, the Trust FF Intelligent Shares;

(e)     all financial assets of the Debtor (i.e., accounts, securities, or real property) wherever located, whether owned directly or through any nominee, including, but not limited, to any Seized China Assets of the Debtor in existence as of the Effective Date and remaining after the satisfaction of any claims recoverable from such assets under Applicable Law but excluding (i) any exempt assets of the Debtor under section 522 of the Bankruptcy Code, (ii) income of the Debtor after the Petition Date listed on Schedule J of the Debtor's Schedules of Assets and Liabilities [Docket No. 28], and (iii) the Debtor's rental agreements with Warm Time Inc. and any income derived from such rental agreements, or the proceeds thereof, *provided* that the inclusion of such assets in the Trust does not include the right to assert (x) any YT Claims except as set forth in Article 11.4(c) of the Plan or (y) causes of action of the Debtor's estate except for those expressly permitted in Article 11.9 of the Plan;

(f)     all interests, claims, and causes of action owned by the Debtor (including through any nominee) in connection with Beijing Dongfang Cheyun Information Technology Co., Ltd. in existence of the Effective Date;

(g)     the rights to recover property in accordance with Article 11.9 of the Plan and all proceeds thereof;

---

[11] NTD: Name to be confirmed pursuant to the amended and restated PT LLC Agreement.
[12] Structure to be confirmed by tax counsel.

(h)     the Call Option, subject to the rights of FF Global as set forth in Section 4.3.6 of the Trust Agreement, which Call Option may not be exercised or transferred by the Trust without the consent of FF Global;

(i)      the proceeds of the Trust Financing that are in excess of payments required to be made under the Plan;

(j)      the Debtor's interests in Ford Field International Limited, a company organized in the British Virgin Islands; and

(k)     the cash contributions in the amount of $1,250,000 from Wei Gan pursuant to the Wei Gan Settlement.

## SCHEDULE B

## DISTRIBUTION WATERFALL

Trust Assets shall be distributed as follows:

(a)     First, to repay any amounts due and payable under the Trust Financing as of the Trust Distribution Date, if any, pursuant to the terms thereof;

(b)     Second, to repay any amounts due and payable under the DIP Financing if extended past the Effective Date pursuant to the terms of the DIP Note;

(c)     Third, holders of an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or U.S. Secured Claim who have elected to receive Trust Interests in full and complete settlement, release, and discharge of their claim against the Debtor, are entitled to receive all Distributable Proceeds until each holder of such claims has received aggregate Trust Distributions (in cash or in kind) equal to the full amount of such holder's Allowed amount (upon occurrence of which, such holders shall not receive any further Trust Distributions, including any Trust Distributions upon dissolution of the Trust); if at a given Trust Distribution Date, Distributable Proceeds are insufficient to satisfy all Allowed amounts of such claims, distributions shall be allocated pro rata based on their respective Allowed amounts; [1]

(d)     Fourth,  all remaining Trust Distributions shall be allocated (i) 95% to holders of Allowed Debt Claims, to be further allocated based on their respective Pro Rata Share), until each holder of an Allowed Debt Claim has received aggregate Trust Distributions (in cash or in kind) pursuant to this clause (d) equal to the full amount of such holder's Debt Claim Distribution Amount (upon occurrence of which, the distribution allocation set forth in this clause (d) shall no longer apply to any further Trust Distributions, including any Trust Distributions upon dissolution of the Trust) and (ii) 5% to the Reorganized Debtor (or the economic equivalent of such Trust Distributions), *provided* that to the extent of any KCBI Settlements, such 5% shall be reduced so that the Pro Rata Share of distributions pursuant to clause (i) are the same as such distributions would be in the absence of such settlements;

(e)     Fifth, after all holders of Allowed Debt Claims have received Trust Distributions equal to their respective Debt Claim Distribution Amounts, any remaining Trust Distributions shall be allocated between the holders of Allowed Debt Claims (to be further allocated based on their Pro Rata Share) and the Reorganized Debtor, as follows:

---

[1] [NTD: Mechanism to be included to provide (i) holdback for Undetermined Claim Holding Beneficiary to the extent any Debt Claims are undetermined on the Debt Claim Distribution Date, and (ii) distribution of any excess amount held back to Holders of Allowed Debt Claims after the determination of all Debt Claims.]

| Aggregate Trust Distributions Pursuant to Clause (e) | Reorganized Debtor | Holders of Allowed Debt Claims |
|---|---|---|
| (i) Amounts less than or equal to $1 billion | 50% | 50% |
| (ii) If the aggregate Trust Distributions pursuant to Clause (e) exceeds $1 billion, for the portion exceeding $1billion but no more than $2 billion | 70% | 30% |
| (iii) If the aggregate Trust Distributions pursuant to Clause (e) exceeds $2 billion, for the portion that exceeds $2 billion but no more than $3 billions | 80% | 20% |
| (iv) If the aggregate Trust Distributions pursuant to Clause (e) exceeds $3 billion, for the portion that exceeds $3 billion but no more than $4 billion | 90% | 10% |
| (v) Automatic distribution of 95% to the Reorganized Debtor and amendment of the Trust Agreement if the aggregate Trust Distributions pursuant to Clause (e) exceeds $4 billion, for the portion that exceeds $4 billion. | 95% | 5% |

## SCHEDULE C

## RESTRICTIONS ON DISPOSITION OF TRUST FF INTELLIGENT SHARES

## POST-IPO

| | |
|---|---|
| Entry into Lockup Agreement | The Trust will enter into a lockup agreement (the "**Lockup Agreement**") with the same terms and conditions regarding the sale of the Trust FF Intelligent Shares of any lockup and sale restriction agreement that the insiders and management of FF Intelligent or FF are subject to in connection with the underwriting of the Trust FF Intelligent Shares. |
| In connection with IPO | The Trust may sell the lesser of (a) what is permitted under the Lockup Agreement or other sale restriction arrangement with the underwriters of the IPO and FF Intelligent or such other relevant listing vehicle and (b) 5% of the Trust FF Intelligent Shares the Trust owns at the time of the IPO. |
| Subsequent Sales | The Trust may sell the lesser of (a) what is permitted under (i) the Lockup Agreement or other sale restriction arrangement with the underwriters and FF Intelligent or such other relevant listing vehicle and (ii) Applicable Law, and (b):<br><br>• No more than 1% of Trust FF Intelligent Shares the Trust owns at the time of the IPO per month in the first year after any "no sale" period (under any Lockup Agreement or any Applicable Law);<br><br>• No more than 2% of Trust FF Intelligent Shares the Trust owns at the time of the IPO per month in the second year after any "no sale" period (under any Lockup Agreement or any Applicable Law);<br><br>• No more than 3% of Trust FF Intelligent Shares the Trust owns at the time of the IPO per month in the third year after any "no sale" period (under any Lockup Agreement or any Applicable Law); and<br><br>• No more than 4% of Trust FF Intelligent Shares the Trust owns at the time of the IPO per month in the fourth year after any "no sale" period (under any Lockup Agreement or any Applicable Law). |

| | There shall be no limitations after the fourth year after any "no sale" period (under any Lockup Agreement or any Applicable Law). |
| --- | --- |

**EXHIBIT A**

**FORM OF COMPLIANCE CERTIFICATE**

## **EXHIBIT B**

## **INITIAL CREDITOR TRUST COMMITTEE**

**Exhibit B**

**Terms of the KCBI Settlements**

- Terms not defined herein shall have the definitions set forth in the Trust Agreement attached hereto as Exhibit A.

- Each Key China Business Individual ("KCBI") settlement will be among the following parties:  (i) Yueting Jia, as the reorganized debtor (the "Reorganized Debtor"); (ii) the applicable KCBI, and (iii) the KCBI Claimant. The list of potential KCBI Claimants is included on Schedule C attached to the Plan.

- Subject to the agreement by the KCBI and the KCBI Claimant on acceptable terms as between such parties, (i) the KCBI will be provided a Debt Claim Allocation Amount equal to 105% of the sum of the Debt Claim Base Amount and the Debt Claim Supplemental Amount and (ii) the Reorganized Debtor will agree to reduce his distribution in the fourth priority of the Distribution Waterfall (as set forth in the Trust Agreement) on a dollar for dollar basis so that the pro rata distributions to holders of Trust Interests (other than the KCBI Claimant) are the same as if the KCBI settlement had not been entered into.

- Each KCBI settlement shall be subject to approval by the Bankruptcy Court under Bankruptcy Rule 9019.

## **Exhibit C**

**Exit Financing Term Sheet**

**Summary of Terms and Conditions ("Term Sheet")[14]**
**Yueting Jia's**
**Secured Exit Financing**
April 25, 2020

    This Term Sheet represents an outline of the terms pursuant to which Pacific Technology Holding LLC, a Delaware limited liability company ("Lender"), commits to provide the exit financing and facilitate the exit of Yueting Jia's (the "Reorganized Debtor") exit from bankruptcy under title 11 of the United States Code in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court") being administered under Case No. 19-24804 (the "Chapter 11 Case") upon the terms and conditions set forth in the under that certain letter regarding the Amendment to DIP Note, dated on or around the date hereof (the "Letter Amendment"), and this Term Sheet (the "Exit Financing"), to the Reorganized Debtor, and the creditors' trust formed for the benefit of the creditors formed in connection with the plan of reorganization (the "Chapter 11 Plan") under 11 U.S.C. §§ 101 et seq. (as now and hereafter in effect, or any successor statute, the "Bankruptcy Code") for the Reorganized Debtor (the "Creditor's Trust", and together with Reorganized Debtor, the "Borrower"). The Exit Financing will be payable solely by the Creditor's Trust with priority over all other distributions.

| | |
|---|---|
| LOAN STRUCTURE | The Exit Financing shall consist of a term loan in the maximum amount of $5,000,000 (subject to any reduction in accordance with the terms of this Term Sheet, the "Exit Financing Commitment") which will be advanced as set forth herein and used by the Borrower to make payments required under the Chapter 11 Plan and the funding of the Creditor's Trust. The Exit Financing documents shall reflect the terms and provisions set forth in this Term Sheet and shall otherwise be substantially consistent with the DIP Note; provided that certain provisions, including the representations and warranties, covenants and events of default, shall be modified in a manner appropriate to reflect the emergence of Reorganized Debtor from the Chapter 11 Case.<br><br>On April 23, 2020, Lender will have prefunded $1,000,000 of the Exit Financing Commitment by placing such amount in a client trust account held by Pachulski Stang Ziehl & Jones LLP (the "Trust Account").<br><br>On May 19, 2020, provided Funding Condition (i) is timely met, Lender will prefund $2,750,000 of the Exit Financing Commitment by placing such amount in the Trust Account; provided that Lender will use commercially reasonable efforts to place such amount in the Trust Account by May 18, 2020.<br><br>If $2,750,000 of the Exit Financing Commitment is not placed by Lender in the Trust Account by May 19, 2020, then before the end of the business day on May 19, 2020, the Reorganized Debtor will advise the Bankruptcy Court that he is not going forward with the hearing confirming the Borrowing Order (the "Confirmation Hearing") on May 21, 2020 and at the Reorganized Debtor's option, that the Reorganized Debtor is seeking a continuance of the Confirmation Hearing or intends to convert the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code.<br><br>Provided all closing conditions are met, Lender will fund $1,250,000 into the Trust Account on the Effective Date (as defined in the Chapter |

---

[14] [NTD: Subject to ongoing review by the Creditors Committee, Lender, and the Debtor.]

| | |
|---|---|
| | 11 Plan); provided that if Wei Gan funds $1,000,000 of the settlement payment payable by her under the Chapter 11 Plan on or prior to May 26, 2020, then (i) the Exit Financing Commitment shall be reduced by $1,000,000 and (ii) Lender shall only be required to fund the remaining $250,000 on the 90th day after the Effective Date to the extent (a) the Fee Excess (as defined below) is insufficient to pay such amount in full and (b) Wei Gan fails to pay the $250,000 settlement payment payable by her under the Chapter 11 Plan on or before the 90th day after the Effective Date. |
| FEE EXCESS | Within two business days following the approval of final fee applications of Professionals (as defined in the Chapter 11 Plan) by the Bankruptcy Court, the following amount (the "Fee Excess") will be returned to the Lender from the Trust Account: the difference between (x) the sum of (i) all DIP Financing, (ii) all funded Exit Financing, (iii) the settlement payment paid by Wei Gan (if paid), and (iv) the contributions of the Debtor from his postpetition salary and (y) the sum of (i) the amount required to pay administrative expenses, (ii) $1,250,000 set aside for expenses of the Creditor's Trust and (iii) $250,000. Unless and until Wei Gan has paid the $250,000 due on the 90th day after the Effective Date, $250,000 will be held in the Trust Account and only released to the Lender if Wei Gan pays timely. If Wei Gan does not pay the $250,000 within 90 days of the Effective Date, the $250,000 held by Trust Account will be released to the Creditor's Trust, but if Wei Gan subsequently pays the $250,000 that amount will be immediately turned over to the Lender. |
| EXIT FINANCING ORDER | The "Exit Financing Order" shall mean an order entered by the Bankruptcy Court consistent with the terms hereof (as amended in a manner acceptable to the Lender) authorizing the Exit Financing on a final basis on the terms described herein (or as amended in a manner acceptable to the Lender), which order shall not be subject to appeal, reconsideration or review. |
| PREPAYMENTS | Amount outstanding under the Exit Financing may be voluntarily repaid at any time without premium or penalty, and any such amounts prepaid may not be reborrowed.<br><br>The Exit Financing shall contain mandatory prepayments provisions, including, but not limited to the following:<br>• Proceeds of any refinancings or borrowings; and<br>• Excess cash held by the Creditor's Trust<br>• Proceeds of transactions |
| CLOSING DATE | Immediately following the satisfaction of the closing condition and the occurrence of the Effective Date. |
| MATURITY DATE | The maturity date of the Exit Financing (the "Maturity Date") shall be the second anniversary of the Effective Date. |
| INTEREST | The interest shall be:<br>• 1 - 12 months following the closing date of the Exit Financing, 8.75%; and<br>• 13 - 24 months following the closing date of the Exit Financing, 12.75%;<br><br>All interest will be paid in kind and the rate at all times will be limited to the maximum amount permitted by law. |

| | |
|---|---|
| SECURITY INTEREST; RECOURSE | The Exit Financing shall be secured by a first priority perfected security interest in all of the Exit Collateral and shall be payable solely from the Exit Collateral with no recourse to any other assets of the Borrower. |
| EXIT COLLATERAL | "Exit Collateral" shall mean all now owned or acquired assets and property transferred by the Reorganized Debtor to the Creditor's Trust, whether real or personal, tangible or intangible or otherwise, whenever acquired, and any and all proceeds therefrom, including without limitation: all other cash, accounts, deposit accounts, securities accounts, investment property, vehicles, documents, chattel paper, instruments, general intangibles, fixtures, letter of credit rights, accounts receivable, tax refunds, investment property, inventory, goods, plants and equipment, equipment, software, licenses, real property, leaseholds, all intercompany claims, any proceeds from insurance policies, and any and all proceeds therefrom, all intellectual property, including membership interests in Pacific Technologies and West Coast LLC. |
| CLOSING CONDITIONS | Customary closing conditions and conditions precedent for financing this nature, including without limitation: <br><br> (i) execution and delivery of an exit financing and all related documentation; <br><br> (ii) the Exit Financing Order by the Bankruptcy Court; <br><br> (iii) by May 7, 2020, the Reorganized Debtor will have received sufficient votes to confirm the Chapter 11 Plan; (b) on May 25, 2020, the Bankruptcy Court will have entered an order confirming the Chapter 11 Plan; or (c) on June 30, 2020 the Chapter 11 Plan will have become effective (each of the following a "Funding Condition"); if any Funding Condition has not been met by the date specified, then all Exit Financing prefunded in the Trust Account will be returned to Lender two (2) days after providing notice to the Committee. If the Committee "validly objects" in accordance with this Term Sheet on or prior to the second day after such notice is given by Lender or a representative thereof, then the amount estimated on good faith by the Committee as damages to the bankruptcy estate for Lender's breach shall be held back from the return of funds to Lender and retained in the Trust Account until the matter is resolved in accordance with this Term Sheet; <br><br> (iv) the occurrence of the Effective Date; and <br><br> (v) such other closing conditions and conditions precedent that are satisfactory to Lender. |
| RETURN OF PREFUNDED EXIT FINANCING | The only basis for the committee to "validly object" to the return of the Exit Financing is if there is a good faith allegation that (i) Lender defaulted in its obligations to prefund the May 19th payment or fund the Effective Date payment (if Wei Gan fails to timely fund), which obligations are separate and distinct from any of Lender's obligations under the DIP Note (and any such default under the DIP Note would not be a valid basis to object to return of the Exit Financing), and (ii) such breach caused damages to the bankruptcy estate. <br><br> If the Committee validly objects to turnover of any portion of the Exit Financing, the Committee and the Lender must first mediate the dispute. |

| | |
|---|---|
| | In the first instance, the parties agree that Mitchell Goldberg would be the mediator.  If Mitchell Goldberg is unavailable, the Committee and Lender will attempt to mutually agree on a different mediator.  If the Committee and Lender cannot agree on a mediator, the Bankruptcy Court will then choose. <br><br> If the mediation is unsuccessful, the Bankruptcy Court will resolve whether Lender defaulted and the amount of damages, if any. |
| COVENANTS | Customary affirmative, negative, and financial covenants for exit financings of this nature and such other covenants that are satisfactory to Lender (including, without limitation, (i) delivery of financial statements, cash flow forecasts, variance reports and notices of events of default and (ii) customary negative covenants including limitations on liens, investments, loans and advances, indebtedness, sales of assets, affiliate transactions or entry into material contractual obligations without the consent of Lender). |
| EVENTS OF DEFAULT | Customary events of default for exit financings of this type, subject to customary grace periods and cure periods to be agreed (each, an Event of Default"), including without limitation, failure to comply with covenants in the Exit Financing documents. |
| DIP AMENDMENT | The Reorganized Debtor and the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case (the "Committee") agree that Lender's obligations hereunder are subject to the performance of the Reorganized Debtor and the Committee of their obligations under that Letter Amendment. |
| MISCELLANEOUS | Among other customary miscellaneous provisions, the following: <br> • Indemnification of Lender and each of their directors, officers, employees, agents, shareholders, affiliates, members and advisors. <br> • Reimbursement of all fees, costs and expenses of Lender (including without limitation, all fees and expenses of legal counsel, financial advisors, or any other professionals, consultants or advisors retained by Lender (including all accrued and unpaid fees and expenses). <br> • Subject to definition documentation (including, without limitation, any promissory notes, agreements, security agreements, motions, the Exit Financing Order, and such other agreements, exhibits, schedules, instruments, filings as determined by the Lender in its sole discretion) satisfactory in each and every respect to the Lender in their sole discretion. <br> • Governing Law: California |

**Exhibit D**

**Members of the Initial Creditor Trust Committee**

Subject to the Debtor's approval, the members of the initial Creditor Trust Committee shall be:

1.  Ping An Bank, Ltd. Beijing Branch;

2.  China Minsheng Trust Co., Ltd.;

3.  Shanghai Leyu Chuangye Investment Management Center LP;

4.  Jiangyin Hailan Investment Holding Co., Ltd.; and

5.  Shanghai Qichengyueming Investment Partnership Enterprise.

**Exhibit E**

**Supplement to Schedule A of the Plan**

Pursuant to the *Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 464] (the "Plan")[15] the Debtor previously disclosed his intention to preserve Causes of Action in Article 8.3 of the Plan, as set forth below:

Except as otherwise provided in the Plan (including with respect to the Yidao Claims and as set forth in Article 11.4 of the Plan), or in any contract, instrument, or other agreement or document entered into in connection with the Plan, including the Plan Supplement, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss any and all claims, counterclaims, defenses, and rights (including setoff rights) that may be asserted in the Causes of Action, suits, and proceedings listed on the "Schedule of Retained Actions," attached as Schedule A to the Plan ("Schedule A") (collectively, the "Retained Actions"), whether at law or in equity, whether known or unknown, that the Debtor or his Estate may hold against any Entity (other than Claims, rights, Causes of Action, suits, and proceedings released pursuant to Articles 6.6, 11.4, or 11.9 of the Plan), without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.

The Reorganized Debtor expressly reserves all rights to prosecute any and all Retained Actions against any Entity. Unless any Retained Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Retained Actions for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Retained Action upon, after, or as consequence of, confirmation or consummation of the Plan.

---

[15] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

Notwithstanding and without limiting the generality of <u>Article 8.3</u> of the Plan, the specific types of Causes of Action detailed below are expressly preserved by the Debtor and/or the Reorganized Debtor.

The below includes entities that are party to or that the Debtor believes may become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial.  Unless otherwise released by the Plan, the Debtor expressly reserves all Causes of Action against or related to all entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, including, without limitation, dealers, creditors, customers, employees, utilities, suppliers, vendors, insurers, sureties, factors, lenders, bondholders, lessors or any other parties, regardless of whether such entity is included below.

In addition to the Retained Actions that currently appear on Schedule A to the Plan the Debtor (i) supplements Schedule A with the divorce action pending before Judge Wang Yang (Case Number 2019-89234) filed on November, 15, 2019 by the Debtor's estranged wife Wei Gan in the People's Court of Chaoyang District, Beijing, China under Article 12(1) of the Civil Procedure Law of the People's Republic of China, (ii) reserves and retains and may enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss any and all claims, rights, and Causes of Action for contribution, reimbursement, or other legal and equitable rights relating to obligations for which another party may be co-liable for any debt of the Debtor, including, without limitation, the parties and debts identified on Schedule H of the Debtor's *Schedules of Assets and Liabilities* [Docket No. 28] (as amended, modified, or supplemented by *Amended Schedules of Assets and Liabilities and Statement of Financial Affairs* [Docket No. 427]) (collectively, the "<u>Contribution Actions</u>"), and (iii) identifies the specified actions listed below.  For the avoidance of doubt, all Contribution Actions shall be treated as Retained Actions under the Plan, and the Debtor and/or the Reorganized Debtor hereby retains rights to contribution and subrogation with respect to any of the Contribution Actions.

Without limiting the foregoing, the Debtor reserves claims of subrogation against the creditor and claims of contribution against the co-Debtor identified below:

| **Creditor** | **Co-Debtor** |
|---|---|
| SHENZHEN LETV XINGEN #1 INVESTMENT MGT | 乐视控股（北京）有限公司 /LE HOLDINGS (BEIJING) CO., LTD. |
| SHENZHEN LETV XINGEN #1 INVESTMENT MGT | 乐安影云（天津）文化传播合伙企业（有限合伙） /LEAN YINGYUN (TIANJIN) CULTURE COMMUNICATION LIMITED PARTNERSHIP |
| SHENZHEN LETV XINGEN #1 INVESTMENT MGT | 乐正荣通（天津）文化传播合伙企业（有限合伙） /LEZHENG RONGTONG (TIANJIN) CULTURE COMMUNICATION LIMITED PARTNERSHIP |
| SHENZHEN LETV XINGEN #1 INVESTMENT MGT | 乐普影天（天津）文化传播合伙企业（有限合伙） /LEPU YINGTIAN (TIANJIN) CULTURE COMMUNICATION LIMITED PARTNERSHIP |
| SHENZHEN LETV XINGEN M&A FUND INVEST MGT | 乐视控股（北京）有限公司 /LE HOLDINGS (BEIJING) CO., LTD. |
| SHENZHEN LETV XINGEN M&A FUND INVEST MGT | 乐视网信息技术(北京)股份有限公司/Leshi Internet Information and Technology Corp.,Bei Jing |
| China Evergrande Group | Smart King Ltd |
| CHONGQING LETV COMMERCIAL FACTORING CO | 乐视控股（北京）有限公司 /LE HOLDINGS (BEIJING) CO., LTD. |
| TIANJIN JIARUI HUIXIN CORP MGT CO LTD | Xinle Asset Management (Tianjin) Partnership (Limited Partnership) |

| | |
|---|---|
| TIANJIN JIARUI HUIXIN CORP MGT CO LTD | 乐视网信息技术(北京)股份有限公司/Leshi Internet Information and Technology Corp.,Bei Jing |
| TIANJIN JIARUI HUIXIN CORP MGT CO LTD | Le Shi Zhi Xin Electronic Technology (Tianjin) Limited |
| TIANJIN YINGXIN XINHENG INV CONSULTING | 乐视控股（北京）有限公司 /LE HOLDINGS (BEIJING) CO., LTD. |
| Liu Hong（Letv） | Liu Hong |
| SHI, PENG | SHI, PENG |
| CENTURY SAGE SCIENTIFIC HK LIMITED | LETV SPORTS CULTURE INDUSTRY DEVELOPMENT (BEIJING) CO., LTD. |

Additionally, the Debtor reserves all causes of action against those parties listed below:

| **Name** |
|---|
| LIU, HONG （FF Henry Liu) |
| SHAN, LIUHUAN |
| SHAN, LIUHUAN |
| BEIJING LAN CAPITAL INVESTMENT FUND MGMT |
| SHANGHAI LAN CAI ASSET MANAGEMENT CO LTD |
| SHENZHEN JINCHENG COMM FACTORING CO LTD |
| TAO YUN CAPITAL CO LTD AKA TWC GROUP CO |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA  90067**

A true and correct copy of the foregoing document entitled (*specify*):
**NOTICE OF FILING OF PLAN SUPPLEMENT TO DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **April 25, 2020,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **April 25, 2020,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **April 25, 2020,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 25, 2020 | Sophia L. Lee | /s/ *Sophia L. Lee* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                        **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:329178.1 46353/002

**SERVICE INFORMATION FOR CASE NO. 2:19-bk-24804-VZ**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- Tanya Behnam    tbehnam@polsinelli.com, tanyabehnam@gmail.com
- Jerrold L Bregman    ecf@bg.law, jbregman@bg.law
- Jeffrey W Dulberg    jdulberg@pszjlaw.com
- Lei Lei Wang Ekvall    lekvall@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Stephen D Finestone    sfinestone@fhlawllp.com
- Richard H Golubow    rgolubow@wghlawyers.com, pj@wcghlaw.com;jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- Ben H Logan    blogan@omm.com
- Robert S Marticello    Rmarticello@swelawfirm.com, gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- David W. Meadows    david@davidwmeadowslaw.com
- Kevin Meek    kmeek@robinskaplan.com, kevinmeek32@gmail.com;kmeek@ecf.inforuptcy.com
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com
- Kelly L Morrison    kelly.l.morrison@usdoj.gov
- Matthew J Olson    olson.matthew@dorsey.com, stell.laura@dorsey.com
- Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- Diana M Perez    , diana-perez-7352@ecf.pacerpro.com
- Christopher E Prince    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- Victor A Sahn    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com
- Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- Benjamin Taylor    btaylor@taylorlawfirmpc.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Felix T Woo    fwoo@ftwlawgroup.com, admin@ftwlawgroup.com
- Claire K Wu    ckwu@sulmeyerlaw.com, mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- David B Zolkin    dzolkin@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:329178.1 46353/002