CHRISTOPHER E. PRINCE (SBN 183553)
cprince@lesnickprince.com
LESNICK PRINCE & PAPPAS LLP
315 West Ninth Street, Suite 705
Los Angeles, California 90015
Telephone: (213) 291-8984
Facsimile: (213) 493-6596

DANIEL J. SAVAL (*pro hac vice*)
daniel.saval@kobrekim.com
DONG NI (DONNA) XU (*pro hac vice*)
donna.xu@kobrekim.com
KOBRE & KIM LLP
800 Third Ave
New York, NY 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220

Attorneys for Creditor
Shanghai Lan Cai Asset Management Co, Ltd.

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>YUETING JIA,<br><br>               Debtor. | Case No. 2:19-bk-24804-VZ<br><br>**DECLARATION OF TIMOTHY DE SWARDT IN SUPPORT OF SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.'S OBJECTION TO DEBTOR'S MOTION TO CONFIRM THIRD AMENDED PLAN**<br><br>Hearing:<br>Date: May 21, 2020<br>Time: 9:30 a.m.<br>Place: Courtroom 1368<br>       Edward R. Roybal Federal Building<br>       255 East Temple Street<br>       Los Angeles, California 90012<br>Judge: Honorable Vincent P. Zurzolo |

I, Timothy de Swardt, hereby declare under penalty of perjury that the following is true and correct:

1.     I am a lawyer with Kobre & Kim (BVI) LP in the British Virgin Islands ("BVI").

2.     I obtained my B.A. degree from Columbia University in 2008, my M.Sc. from the University of Oxford in 2010, and my LL.B. from the University of Law (formerly known as the College of Law) in the United Kingdom in 2013. I was called to the bar in England in October 2013. I was admitted to the BVI Bar in January 2015 and have continually practiced BVI law since that time.

3.     I make this declaration in support of SLC's Objection to Debtor's Motion for Confirmation of the Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code.

4.     In this declaration, reference to:

    a.     The "Award" means the final arbitration award issued by the Beijing Arbitration Center against Mr. Jia in favor of SLC in the People's Republic of China on January 22, 2018

    b.     "BVI" means the British Virgin Islands

    c.     "Conyers" means Conyers Trust Company (BVI) Limited, the registered agent of FF Peak and FF Top in the BVI

    d.     "Creditor Trust" has the meaning set out in the Reorganization Plan

    e.     "Disclosure Statement" means the Fourth Amended Disclosure Statement with Respect to Debtor's Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code [Dkt. No. 465]

    f.     "ECSC CPR" means the Eastern Caribbean Supreme Court Civil Procedure Rules 2000, the civil procedure rules applying in the BVI High Court

    g.     "FF GP" has the meaning set out in the Reorganization Plan

    h.     "FF Intelligent Shares" has the meaning set out in the Reorganization Plan

i.    "FF Intelligent Transfer Right" has the meaning set out in the Reorganization Plan

j.    "FF Peak" means FF Peak Holding Limited, a company incorporated in the BVI

k.    "FF Peak Shares" means the entire issued share capital of FF Peak

l.    "FF Top" means FF Top Holding Ltd., a company incorporated in the BVI

m.    "FF Top Shares" means the entire issued share capital of FF Top

n.    "Pacific Technology" means Pacific Technology Holding LLC, a limited liability company registered in Delaware

o.    "Preferred Units" has the meaning set out in the Reorganization Plan

p.    "PT LLCA" means the Third Amended and Restated Limited Liability Company Agreement of Pacific Technology dated July 5, 2019

q.    "New PT Units" has the meaning set out in the Reorganization Plan

r.    "Recognition Order" means the order made on December 5, 2018 by the BVI Court in which it enforced the Award a judgment of the BVI Court

s.    "Recognition Proceedings" means the proceedings to enforce the Award in the BVI

t.    "Reorganization Plan" means Mr. Jia's Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated March 17, 2020

u.    "Reply Brief" means the Debtor's Omnibus Reply to Responses to the Third Amended Disclosure Statement with Respect to the Second Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code [Dkt. No. 458]

v.    "SLC" means Shanghai Lan Cai Asset Management Co., Ltd.

w.    "Trust FF Intelligent Shares" has the meaning set out in the Reorganization Plan

x.  "Worldwide Freezing Orders" means the worldwide freezing orders made against FF Peak and FF Top by the BVI Court on December 5, 2018 and continued until further order of the BVI Court on December 19, 2018.

5.  In this declaration, I review and analyze the two Worldwide Freezing Orders made against FF Peak and FF Top in the BVI. I will explain why I believe, among other things, that certain aspects of the Reorganization Plan likely breach the Worldwide Freezing Orders; why the Reorganization Plan is unlikely to unlock value for the benefit of Mr. Jia's creditors in light of the Worldwide Freezing Orders; and why the prospects of discharging the Worldwide Freezing Orders are, in my view, limited. Finally, I will set out additional claims that SLC can make against FF Peak, FF Top, and others in the BVI as a result of their likely breach of the Worldwide Freezing Orders in July 2019, which would further impede the Reorganization Plan.

6.  I structure this declaration into the following sections:

a.  Introduction

b.  BVI Law

c.  Chronology of Events in BVI

d.  Factual and Legal Bases of the Worldwide Freezing Orders

e.  The Scope and Effect of the Worldwide Freezing Orders

f.  The Reorganization Plan Likely Breaches the Worldwide Freezing Orders

g.  The Reorganization Plan Will Not Unlock Value

h.  Prospects of Discharging the Freezing Orders

i.  Unlawful Means Conspiracy Claim

**BVI Law**

7.  BVI law is comprised of statute, equitable principles, and common law. In all three areas, BVI law largely follows English law, although there are some differences.

8.  The BVI is a member of the Eastern Caribbean Supreme Court ("**ECSC**"), a superior court of record for the member states and territories of the Organisation of Eastern Caribbean States.

KOBRE & KIM LLP
ATTORNEYS AT LAW

9.      The BVI High Court is the court of first instance for most civil claims. Its decisions may be appealed to the ECSC Court of Appeal, whose decisions in turn may be appealed to the Privy Council in London, England. Decisions of the ECSC Court of Appeal and Privy Council are binding.

10.      Decisions of the English courts and other English common law jurisdictions, such as the Cayman Islands, are persuasive but not binding.

**Chronology of Events in BVI**

11.      On November 27, 2018, SLC applied to the BVI High Court to enforce the Award against Mr. Jia under s. 85 of the Arbitration Act 2013. At the same time, SLC applied to the BVI High Court for worldwide freezing orders against FF Peak and FF Top. Kobre & Kim (BVI) LP acts for SLC in the BVI Recognition Proceedings.

12.      The applications were made without notice and came before Mr. Justice Wallbank for hearing on December 5, 2018. Mr. Peter Tyers-Smith, a partner in Kobre & Kim's Cayman Islands and BVI offices, and I appeared as counsel for SLC.

13.      At the December 5 hearing, Mr. Justice Wallbank granted both the Recognition Order (a true and correct copy of which is attached hereto as **Exhibit 1**) against Mr. Jia and the Worldwide Freezing Orders against FF Peak and FF Top (a true and correct copy of which are attached hereto as **Exhibit 2**). Because a freezing order granted *ex parte* will cease to have effect after 28 days by operation of BVI law, a further hearing on notice (the "**Return Date Hearing**"), is usually held within 28 days to consider whether to continue the freezing order or not. *See* ECSC CPR at 17.4(4). The court scheduled a Return Date Hearing for December 19, 2018 in this case.

14.      Kobre & Kim served the Worldwide Freezing Orders on FF Peak and FF Top on December 6, 2018. We served FF Peak and FF Top's registered agent, Conyers, the following day with the same orders. We also served Mr. Jia with the Worldwide Freezing Orders, the Recognition Order and all other papers filed in the BVI Recognition Proceedings, on 14 December 2018 by leaving the papers at his last known place of residence, and separately by couriering them to the

1    same address via FedEx on 18 December 2019. I describe the service history on Mr. Jia, and SLC's

2    compliance with BVI law in serving these documents, in further detail below.

3        15.    I appeared for SLC at the Return Date Hearing of December 19, 2018, which was

4    before Mr. Justice Adderley. Mr. Andrew Willins of the law firm Appleby appeared for FF Peak

5    and FF Top. Mr. Jia did not appear through any counsel.

6        16.    At the December 19 hearing, Mr. Justice Adderley granted an order continuing the

7    Worldwide Freezing Orders until further order of the court, without prejudice to FF Peak and FF

8    Top's right to apply to discharge the Freezing Orders (a true and correct copy of which is attached

9    hereto as **Exhibit 3**).

10        17.    While Mr. Jia is correct to say that the Worldwide Freezing Orders were initially

11    granted *ex parte*, they have been continued until further order of the Court following the appearance

12    of counsel for FF Peak and FF Top before the BVI Court. Appleby are still counsel of record for

13    FF Peak and FF Top in the BVI.

14        18.    The Worldwide Freezing Orders remain in force to this day. To date no application

15    has been made to discharge them, whether by FF Peak, FF Top, Mr. Jia, or anyone else.

16

17    **Factual and Legal Bases of the Freezing Orders**

18        19.    As set out in the Second Affirmation of Kang Jian, (a true and correct copy of which

19    is attached hereto as **Exhibit 4**) an attorney for SLC based in Kobre & Kim's Hong Kong office,

20    dated November 27, 2018, SLC came to learn of Mr. Jia's assets in BVI through the publication of

21    an emergency arbitral award in unrelated proceedings, on November 23, 2018. *Id.* at 25.

22    Specifically, SLC learned that Mr. Jia had structured his interests in Faraday Future through two

23    intermediate BVI companies, FF Peak and FF Top. *Id.* at 36. The emergency arbitral award

24    disclosed that FF Peak owned FF Top, and that FF Top owned 33% of Smart King, the parent

25    company of Faraday Future. *Id.*

26        20.    Further, SLC learnt that Mr. Jia had recently transferred his interests in FF Peak and

27    FF Top to a nominee, Lian Bossert, while apparently retaining beneficial ownership over those

28

5

DECLARATION OF TIMOTHY DE SWARDT

assets. *Id.* at 37-43. Moreover, there was a possibility that FF Top could sell its own assets, i.e. its shares in Smart King. The recent and potential dissipation of these assets – along with Mr. Jia's track record of defaults and his structuring of his assets through offshore companies – gave SLC concern that unless they took quick action to freeze Mr. Jia's interests in FF Peak and FF Top, he could place them beyond the reach of creditors.

21.     It was on that basis that SLC applied to the BVI High Court for the Worldwide Freezing Orders on November 27, 2018.

22.     A freezing order is an order that restrains a party from "*(i) dealing with any asset whether located within the jurisdiction or not; and (ii) removing from the jurisdiction assets located there.*" *See* ECSC CPR at 17.1(j). The purpose of a freezing order is to prevent dissipation of assets that might ultimately be available to satisfy a money judgment. *Black Swan Investments I.S.A v. Harvest View Limited & Others,* BVIHCV 2009/399 at 11. They can be made in aid of domestic or foreign proceedings, as well as in aid of arbitration proceedings. *See* the Virgin Islands Arbitration Act, 2013 (Act No. 13/2013), Section 43; *Koshigi Limited & anor v. Donna Union Foundation*, BVICHMAPP 2018/0043 and 2018/0050 (Jan. 17, 2019).  In this case, the Worldwide Freezing Orders were granted in aid of the Applicant's Recognition Proceedings.

23.     The tests for granting a freezing order are derived both from statute and case law. The statutory test is that it is "just and convenient" to make the order. *See* the Eastern Caribbean Supreme Court (Virgin Islands) Act 1968, Section 24 (Cap. 80). This has been expanded in case law both in England and the BVI. The case law establishes that, to obtain a freezing order, a claimant must demonstrate:

a.     that he has a good arguable case ("*…one which is more than barely capable of serious argument, but not necessarily one which the judge considers would have a better than 50 per cent chance of success*") against the defendant on the merits of the case; and

KOBRE & KIM LLP
ATTORNEYS AT LAW

DECLARATION OF TIMOTHY DE SWARDT

b.      that without a freezing order, there is a real risk that a judgment in the claimant's favor would not be satisfied because the defendant would remove or dissipate his assets.

See *Gilfanov & anor v. Polyakov & ors* BVIHCMAP 2016/0009 at 25 (Feb. 13, 2017) (citing *Ninemia Maritime Corp. v Trave Schiffahrtsgesellschaft GmbH & Co. KG (The "Niedersachsen")* [1984] 1 All ER 398 at 404D).

24.     The applicant typically is required to provide written undertakings to the Court that it will pay damages to the respondent caused by the issuance of the freezing order, should it later turn out the freezing order was wrongly granted.

25.     There are additional requirements if the freezing order is claimed against a non-party to the underlying suit (as was the case with FF Peak and FF Top). There must be "*good reason to suppose that the assets in relation to which a freezing order is imposed would become available to satisfy the judgment which the claimant seeks.*" See *Algosaibi v. Saad* (2011) 1 CILR 178 at 42. *Algosaibi* was applied in the BVI in *Gilfanov*. That might be because the substantive defendant can cause the assets held by the third party to be used to satisfy the judgment, or because there is some other process of enforcement by which the claimant can obtain recourse to the assets held by the third party. *Id.* at 43.

26.     SLC persuaded the BVI Court that it met all these tests, i.e. that:

a.      it had a good arguable case for the enforcement of the Award against Mr. Jia in the BVI; and

b.      that without freezing relief, there was a real risk that the Award would not be satisfied; and

c.      that the assets to be frozen – the shares in, and assets of, FF Peak and FF Top – could be available to satisfy the Award, through some process of enforcement, in this case most likely through the appointment of a receiver.

KOBRE & KIM LLP
ATTORNEYS AT LAW

DECLARATION OF TIMOTHY DE SWARDT

**The Scope and Effect of the Worldwide Freezing Orders**

27.    The Worldwide Freezing Orders create two primary restraints on FF Peak and FF Top at paragraphs 4(a) and 4(b).

28.    The first restraint, set out in paragraph 4(a), is a restriction relating to the entire issued share capital of each of FF Peak and FF Top.

29.    In particular, paragraph 4(a)(i) of the Worldwide Freezing Orders provides that the respondent is "*restrained (acting by and/or on the instruction of its directors, officers and/or agents) from in any way disposing of, dealing with or diminishing the value of the* [FF Peak/Top Shares]*, whether they are in or outside the BVI, whether they are jointly, beneficially, legally owned or otherwise up to the same value.*"

30.    Further relevant restrictions in paragraph 4(a) include:

    a.    paragraph 4(a)(ii), which restrains the respondent from registering any change in the legal ownership of the FF Peak or FF Top Shares, and

    b.    paragraph 4(a)(vii), which restrains each respondent from "*effecting or allowing to be created or effected any changes, variations or amendments to any agreement, trust and/or any other similar arrangement in relation to which the FF Peak* [or FF Top] *Shares are held.*"

31.    The restrictions at paragraph 4(a) would likely be breached, in my view, if either of the following were to happen:

    a.    FF Peak or FF Top, or anyone acting on their behalf, agreed to transfer, or took any steps to transfer, their underlying assets for no consideration. This would diminish the value of the issued share capital of FF Peak and FF Top, in breach of paragraph 4(a)(i) of the Worldwide Freezing Orders.

    b.    FF Peak or FF Top, or any acting on their behalf, took any steps to deal with the beneficial interests in their own issued share capital. To cause, permit, or record a change in the beneficial ownership of the FF Peak and FF Top Shares would amount at least to:

8

DECLARATION OF TIMOTHY DE SWARDT

i.     "*dealing with*" the "*entire issued share capital*" whether that is "*jointly, beneficially, legally owned or otherwise*" in breach of paragraph 4(a)(i) of the Worldwide Freezing Orders; and

ii.    "*allowing to be effected*" a "*change…. to [a] trust and/or any other similar arrangement in relation which the [FF Peak/Top Shares] are held*" in breach of paragraph 4(a)(vii) of the Worldwide Freezing Orders.

32.    The second restraint in the Worldwide Freezing Orders is set out at paragraph 4(b). It restrains FF Peak and FF Top from "*in any way transferring, disposing of, pledging, charging, diminishing the value of, encumbering or dealing with its assets up to the value of US $10,800,312.00*" [i.e. the value of the Award]. These assets are defined as the "Relevant Assets" and they specifically include "*any shares in Smart King Limited*" (now known as FF Intelligent) at paragraph 4(c)(i) of the Worldwide Freezing Orders.

33.    Under this provision, FF Peak and FF Top must ensure that a sufficient number of their shares in Smart King, equal in value to the Award, remain entirely untouched and unencumbered. Paragraph 4(b) requires FF Peak and FF Top not to deal with these assets in any way.

34.    The restriction at paragraph 4(b) would likely be breached, in my view, if FF Peak or FF Top, or anyone acting on their behalf, agreed to transfer, or took any steps to transfer, some or all of their interests in FF Intelligent for no consideration, when their remaining assets would be insufficient to pay the Award.

35.    I believe these terms are common terms in freezing orders made in the BVI. I exhibit further examples of freezing orders from other cases with similar terms to the ones at issue, with appropriate redactions of the parties' names and assets, at **Exhibit 5**.

**The Reorganization Plan Likely Breaches the Worldwide Freezing Orders**

36.    Paragraph 6.2 of the Reorganization Plan provides that the following is to happen upon its approval:

> On the Effective Date, the managing member of Pacific Technology shall amend the PT LLCA to:
>
> (i)    provide that the Trust is a member of Pacific Technology and the holder of 100% of the preferred membership units of Pacific Technology (the "Preferred PT Units");
>
> (ii)    issue new units of Pacific Technology to the Trust (the "New PT Units"), entitling the Trust to 100% of the economic value of 147,058,823 Class B shares of FF Intelligent (the "Trust FF Intelligent Shares"); and
>
> (iii)    grant the Trust a fully paid-up warrant to receive the Trust FF Intelligent Shares consistent with the FF Intelligent Transfer Right with no further action necessary by the Debtor or Reorganized Debtor, exercisable upon the dissolution of the Injunctions (the "Warrant").
>
> The Preferred PT Units and the New PT Units shall vest in the Trust free and clear of any and all Liens, claims, encumbrances, contractual restrictions, and other interests pursuant to section 363 of the Bankruptcy Code

37.    The way this is worded leaves the impression that the only actions to take place on approval of the Reorganization Plan will occur at the level of Pacific Technology, and therefore that FF Peak and FF Top will not need to do anything in breach of the Worldwide Freezing Orders.

38.    However, in my view this is not correct. As I explain below, in my view Step (iii) cannot occur without FF Top breaching paragraphs 4(a)(i) and 4(b) of the Worldwide Freezing Orders. Further, steps (i) and (ii) will likely require FF Top and FF Peak to make changes to their

KOBRE & KIM LLP
ATTORNEYS AT LAW

1   beneficial ownership records maintained in the British Virgin Islands which would likely violate

2   paragraphs 4(a)(i) and (vii) of the Worldwide Freezing Orders.

3       39.    First, step (iii) would not be possible in the absence of the "the FF Intelligent

4   Transfer Right," which is defined as "*the Debtor's contractual right to direct Pacific Technology*

5   *to direct FF Peak to direct FF Top to transfer the Trust FF Intelligent Shares to the Trust*." *See*

6   Reorganization Plan at 7:13-15.

7       40.    The FF Intelligent Transfer Right needs to be scrutinized carefully. Mr. Jia is not a

8   member of Pacific Technology and even his nominee, Ms. Bossert, is not the managing member.

9   How then does Mr. Jia have the right to direct Pacific Technology to do anything?

10      41.    The Disclosure Statement reveals that the Trust FF Intelligent Shares "*may be*

11  *transferred under YT's direction pursuant to the PT LLCA*". *See* Disclosure Statement at 29:5-8.

12  In examining the PT LLCA (a true and correct copy of which is attached hereto as **Exhibit 6**), it

13  becomes clear that the FF Intelligent Transfer Right only exists based on agreement made by FF

14  Top on or about July 5, 2019 to transfer the FF Intelligent Shares at the direction of Mr. Jia, for no

15  consideration. That agreement by FF Top is evidenced in paragraph 14(c) of the PT LLCA which

16  states:

17      *(c) Notwithstanding the terms of this Agreement, the Members are aware*

18      *that FF Top Holdings Ltd., a British Virgin Islands company and a*

19      *Subsidiary of the Company (**"FF Top"**), holds 600 million Class B preferred*

20      *shares in Smart King Ltd., a C an Islands company and also a Subsidiary of*

21      *the Company (**"Smart King"**), and that FF Top proposes to transfer*

22      *147,058,823 ordinary shares of Smart King to YT's creditor trust or a third*

23      *Person designated by YT (the **"Proposed Smart King Transfer"**), and*

24      *hereby approve and authorize the Proposed Smart King Transfer and the*

25      *transactions contemplated thereby. For the avoidance of doubt, there is no*

26      *need for the Members to approve the Proposed Smart King Transfer and any*

27      *actions by the Members with respect to, in relation to and/or for the purpose*

28

*of the Proposed Smart King Transfer are hereby authorized, approved and*

*ratified.*

42.    As evidenced above, the PT LLCA discloses is that FF Top has <u>already</u> "proposed" the Proposed Smart King Transfer, that Pacific Technology has <u>already</u> approved the Proposed Smart King Transfer, and that the Proposed Smart King Transfer is <u>already</u> effective without any further action required by Pacific Technology or its members. That is how Mr. Jia now has the FF Intelligent Transfer Right "*pursuant to the PT LLCA*" even though he not a member, much less the managing member, of Pacific Technology. The Disclosure Statement fails to reveal the critical involvement of FF Top in creating this right.[1]

43.    In my considered view, in proposing and agreeing to the Proposed Smart King Transfer, FF Top has likely violated paragraph 4(b) of the Worldwide Freezing Order against FF Top.  Namely, FF Top has "*pledged*," "*encumbered*" or "*dealt with*" its assets, i.e. the Trust FF Intelligent Shares. Further, FF Top has also "*diminished the value*" of the issued share capital of both FF Peak and FF Top, by pledging to transfer the Trust FF Intelligent Shares at the direction of Mr. Jia, for no consideration. That likely places FF Top in violation of paragraph 4(a)(i) of the Worldwide Freezing Order against FF Top.

44.    Second, it is likely that steps (i) and (ii) in paragraph 6.2 of the Reorganization Plan would:

        a.    amount to changing the beneficial ownership  of FF Peak and FF Top. Specifically, the plan will result in Mr. Jia/Ms. Bossert's Preferred Units in Pacific Technology, the sole owner of FF Peak, being transferred to the

---

[1]    I also note that the Disclosure Statement does not reveal that FF Peak and FF Top were party to the Restructuring Agreement dated December 31, 2018 between Mr. Jia, Season Smart, Smart King, and others. However, the PT LLCA reveals this to be so. The Restructuring Agreement was executed some 21 days after service of the Worldwide Freezing Orders on FF Peak and FF Top. From what the Disclosure Statement reveals about the Restructuring Agreement, it appears that FF Peak and FF Top may have breached the terms of the Worldwide Freezing Orders in entering into it – insofar as, for example, they diminished the value of their shares in Smart King (n/k/a FF Intelligent), and hence the value of their own shares. In addition, the PT LLCA also reveals that the non-managing member of Pacific Technology was given permission to transfer its units without consent of the managing member. SLC is currently seeking a copy of the Restructuring Agreement from Mr. Jia, FF Peak, and FF Top, and it reserves its rights in respect of any breach that may be identified.

1  Creditor Trust. FF Peak and FF Top, and those acting on their behalf, are

2  restrained from dealing with the beneficial interest in their shares in

3  paragraph 4(a)(i) of the Worldwide Freezing Orders; and/or

4  b.     constitute the changing of an agreement, trust and/or other similar

5  arrangement in relation to which the FF Peak and FF Top Shares are held.

6  FF Peak and FF Top, and those acting on their behalf, are restrained from

7  effecting or allowing to be effected any such change under paragraph

8  4(a)(vii) of the Worldwide Freezing Orders.

9       45.     Further, to consummate this change, it would in my view likely require FF Peak and

10  FF Top's registered agent, Conyers, to register a change in the companies' beneficial ownership

11  records that must be maintained in the BVI under statute. *See* the Virgin Islands Beneficial

12  Ownership Secure Search System Act, 2017, Section 10. In my view, if Conyers were to record a

13  change in beneficial ownership from Mr. Jia (or Ms. Bossert) to his Creditor Trust, it would likely

14  violate paragraphs 4(a)(i), 4(a)(vii), and 17 of the Worldwide Freezing Orders.

15       46.     In his Reply Brief, Mr. Jia says that "*it is inconceivable that a BVI court would*

16  *exercise extraterritorial jurisdiction over Pacific Technology, a Delaware LLC, to enjoin the*

17  *amendment of its limited liability company agreement or the issuance of the New PT Units to the*

18  *Trust.*" *See* Reply Brief at 4:19-22.

19       47.     That misstates and misunderstands the scope of the Worldwide Freezing Orders. In

20  making the Worldwide Freezing Orders, the BVI Court did not enjoin Pacific Technology or any

21  other party outside the jurisdiction of the BVI Court from doing anything. The orders simply

22  restrain FF Peak and FF Top, and those with notice of the Worldwide Freezing Orders within the

23  jurisdiction of the BVI Court, from effecting, or allowing to be effected, changes to the beneficial

24  ownership of their own shares. That is no more and no less than the BVI Court does in restraining

25  FF Top and FF Peak from effecting, or allowing to be effected, changes to the legal ownership of

26  their shares. In neither case does the BVI Court enjoin a foreign party outside its jurisdiction. Thus,

27  if Pacific Technology sought to sell its legal interest in FF Peak to FF GP, neither buyer nor seller

28

KOBRE & KIM LLP
ATTORNEYS AT LAW

1    would be enjoined by the BVI Court. But FF Peak would be prevented from making any changes

2    to its share register, and the sale could not be effected in the BVI.

3         48.    The point is illustrated by the actions of Conyers in this exact case. On April 27,

4    2019, Appleby wrote to Kobre & Kim, noting that "*Season Smart Limited [ ] had security ... over*

5    *the shares which FF Peak Holdings Limited [ ] holds in FF Top*" and that this security had been

6    released (a true and correct copy of which is attached hereto as **Exhibit 7**). However, Conyers

7    would not file the release, and so even though the release was properly executed by persons outside

8    the jurisdiction of the BVI court, the release could not be perfected. As Appleby candidly

9    acknowledged, Conyers took that view "*that it is not entitled to remove any applicable notation or*

10   *to make those filings without either your client's consent, or a Court order*" *Id.* at 4. SLC

11   subsequently consented to the release, but Conyers' reluctance to even remove an encumbrance on

12   the FF Top Shares shows the difficulty faced by persons outside the BVI in effecting their dealings

13   with the FF Top and FF Peak Shares.

14

15   **The Reorganization Plan Will Not Unlock Value**

16        49.    Even if the Reorganization Plan were to be approved, I do not believe it will unlock

17   value from Mr. Jia's indirect beneficial interests in Faraday Future for the benefit of his creditors.

18        50.    FF Peak and FF Top will still be subject to the Worldwide Freezing Orders both

19   before and after plan approval, and even after plan approval, the Reorganization Plan will only

20   result in the Creditor Trust receiving Mr. Jia's indirect interests in already-frozen assets. Those

21   assets will remain frozen unless and until the Worldwide Freezing Orders are discharged. For the

22   reasons discussed below, I view the prospects of discharging those orders as limited.

23        51.    Irrespective of completion of the steps proposed in paragraph 6.2 of the

24   Reorganization Plan, FF Peak and FF Top will remain subject to the Worldwide Freezing Orders.

25   They cannot pay any distributions to their shareholders, so Pacific Technology will not receive

26   income from FF Peak, with which it could pay any distributions to its members (including the

27   Creditor Trust). Nor can FF Top transfer the Trust FF Intelligent Shares to the Creditor Trust (or

28

1    indeed anyone else) pursuant to the FF Intelligent Transfer Right, as contemplated in the

2    Reorganization Plan. In my view, all of these actions would likely violate the prohibitions in 4(a)(i)

3    and likely 4(b) of the Worldwide Freezing Orders.

4    52.    The Pacific Technology/FF Peak/FF Top structure is essentially in a state of

5    economic freeze unless and until the Worldwide Freezing Orders are discharged.

6    53.    What is more, as I explain below, if the Reorganization Plan is approved, FF Top

7    and FF Peak will have an independent and direct legal liability to SLC that is separate to Mr. Jia's

8    personal debt liability to SLC. Specifically, SLC has the right to file, and will file, a tort claim

9    against (at least) FF Top, FF Peak, Pacific Technology, Ms. Bossert, and FF GP for conspiracy to

10   injure by unlawful means. I explain this in further detail below. For present purposes, I note that

11   the value of FF Peak and FF Top (and hence the Preferred Units and New PT Units transferred to

12   the Creditor Trust) would be diminished as a result of this new liability.

13

14   **Prospects of Discharging the Worldwide Freezing Orders**

15   54.    Although Mr. Jia has entered into bankruptcy in the United States, the Worldwide

16   Freezing Orders remain in place in the BVI. Moreover, no application has been made by any party

17   to discharge the Worldwide Freezing Orders.

18   55.    The plan contemplates Mr. Robert Moon, as foreign representative, will apply to

19   discharge the Worldwide Freezing Orders. I note that at one point, Mr. Jia's Disclosure Statement

20   contemplated that Mr. Moon would make the necessary applications under Part XVIII of the

21   Insolvency Act 2003, but that is not in force and never has been. He now relies on Part XIX instead.

22   *See* Disclosure Statement at 31:5-13.

23   56.    However, in my view even Part XIX would not confer standing on Mr. Moon to

24   apply to discharge the injunctions. Part XIX only allows a foreign representative to make

25   applications in respect of "*property that is subject to or involved in the foreign proceeding in*

26   *respect of which the foreign representative is authorized.*" *See* the Virgin Islands Insolvency Act,

27   2003 (No. 5 of 2003), Section 467(1). The only property which Mr. Moon has been authorized by

28

KOBRE & KIM LLP
ATTORNEYS AT LAW

DECLARATION OF TIMOTHY DE SWARDT

this Court to deal with is the "*property of the Debtor's estate*." *See* Order Granting Debtor's Motion Authorizing Robert Moon to Act as Foreign Representative Pursuant to Section 1505 of the Bankruptcy Code [Docket No. 376]. Because of the opaque asset structures used by Mr. Jia, I am advised by my U.S. colleagues that FF Peak and FF Top are not currently "*property of the Debtor's estate*" as a matter of U.S. bankruptcy law, nor would they be even if the Reorganization Plan is approved.

57.     Therefore, I do not believe that Mr. Moon has the necessary standing before the BVI Court to make any applications in respect of FF Peak and FF Top, including an application to discharge the Worldwide Freezing Orders.

58.     Even assuming Mr. Moon had standing to apply to make applications in respect of FF Peak and FF Top, I believe there are firm grounds to maintain the Worldwide Freezing Orders.

59.     First, SLC still has a good arguable case for the enforcement of the Award or, alternatively, damages in tort against FF Peak and FF Top. I am advised by my U.S. colleagues that there are legitimate arguments to be made against confirmation of the Reorganization Plan. Moreover, as I set out below, FF Peak and FF Top would likely attract independent liabilities to SLC (separate from Mr. Jia's liability) in tort that would provide a separate basis to impose freezing orders against FF Peak and FF Top in the BVI.

60.     Second, there remains a real risk of dissipation. As SLC has already successfully argued before the BVI Court, Mr. Jia is a dishonest person with a long and checkered history of avoiding payment of creditors, and an ability to structure and hide his assets. In any case, the assets in question are not currently in the control of an independent, court-appointed administrator – on Mr. Jia's own case they are in the hands of his 29 year old nephew – nor will they be. On the face of Mr. Jia's Disclosure Statement, FF Peak and FF Top are under the control of Pacific Technology which itself is under the control of FF GP, which is the managing member of Pacific Technology, FF Peak's direct parent. FF GP is also said to own 80% of Pacific Technology (see chart at Exhibit I, Pre-Effective Date Structure of FF Intelligent). *See* Disclosure Statement, Exhibit I. None of that changes after plan approval (see chart at Exhibit I, Post-Effective Date Structure of FF Intelligent).

KOBRE & KIM LLP
ATTORNEYS AT LAW

DECLARATION OF TIMOTHY DE SWARDT

*Id.* According to the Disclosure Statement, FF GP's managing partner is Jiawei Wang. *Id.* at 27:22

Jiawei Wang is Mr. Jia's nephew and is "*readily familiar with the Debtor's financial affairs*." *See* Declaration of Jiawei (Jerry) Wang In Support of Motion for Order (I) Confirming Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code; and (II) Approving Settlement Pursuant to Bankruptcy Rule 9019 [Dkt. No. 660] at 2:4-6.

61.    Third, there remains a process by which SLC can satisfy the Award: receivership. As matters stand, Mr. Jia still personally retains the FF Intelligent Transfer Right, by which he can direct the transfer of the Trust FF Intelligent Shares to a third person of his choice. According to the PT LLCA, the FF Intelligent Transfer Right requires no further approvals, authorizations, or ratifications.   Where (as here) the debtor has rights to the assets tantamount to ownership, it is possible to appoint a receiver over a debtor's power to transfer assets. This follows from the Privy Council's decision in *Tasarruf Mevduati Sigorta Fonu v. Merrill Lynch Bank and Trust Company (Cayman) Limited and others* [2011] UKPC 17 at 59-61, where the Privy Council held that a receiver could be appointed over a debtor's power to revoke a trust when that debtor had rights tantamount to ownership of the trust assets. Moreover, if freezing relief was to be imposed on the basis FF Top and FF Peak's direct liabilities to SLC – which I believe would arise on approval of the Reorganization Plan, as set out below – the assets of FF Peak (being its shares in FF Top) and FF Top (being its shares in FF Intelligent) would be directly available to satisfy any judgment resulting from that claim.

62.    In my view, the objections raised by Mr. Jia in his Reply Brief do not provide grounds to discharge the Worldwide Freezing Orders.

63.    First, Mr. Jia says first that the BVI proceedings have not been validly commenced. *See* Reply Brief at 5:9-11. The BVI proceedings were commenced by way of *ex parte* application. That is expressly provided for in the ECSC CPR at 43.10, which states:

1)    *This rule has effect as to the –*

DECLARATION OF TIMOTHY DE SWARDT

       a.      *enforcement of an award not made by the court but which is enforceable by virtue of a statutory provision as if it were an order of the court; and*

       b.      *registration of such an award so that it may be enforceable as if it were an order of the court.*

  2)  *In this rule –*

       a.      *"award" means the award, order or decision which it is sought to enforce; and*

       b.      *"outside body" means any authority other than the court.*

  3)  *The general rule is that an application –*

       a.      *for permission to enforce an award; or*

       b.      *to register an award;*

  *may be made without notice but must be supported by evidence on affidavit.*

  4)  *The general rule does not apply where a rule or statutory provision requires notice to be given.*

64.     Rule 43.10(a) applies in this case, because SLC enforced the Award under the Arbitration Act 2013, which provides in relevant part that "*an award, whether made in or outside the Virgin arbitral awards Islands, in arbitral proceedings by an arbitral tribunal is, by leave of the Court, enforceable in the same manner as a judgment or order of the Court that has the same effect.*" *See* the Virgin Islands Arbitration Act, 2013 (Act No. 13/2013), Section 81.

65.     The proceedings to enforce the Award were made by way of *ex parte* application in compliance with Rule 43.10(3) (a true and correct copy of which is attached hereto as **Exhibit 8**). Mr. Jia's objection thus has no merit.

66.     Second, Mr. Jia then says, the BVI proceedings and the Worldwide Freezing Orders have not been validly served on the Debtor. This argument is misplaced for the following reasons:

18

DECLARATION OF TIMOTHY DE SWARDT

a.  As a threshold point, the BVI Injunctions are not made against Mr. Jia, but FF Peak and FF Top. They permit service on Mr. Jia at paragraph 5(d), but they do not require it.

b.  In any case, Mr. Jia has been validly served with both the BVI Proceedings and the Worldwide Freezing Orders. The ECSC CPR at 6.4(1)(b) provides that documents other than a claim form may be served on an individual "*by leaving it or posting it at or to… that person's usual or last known place of residence.*" SLC has not commenced proceedings by way of claim form, and has complied with ECSC CPR 6.4(1)(b) by couriering all the papers in the BVI proceedings and the BVI Injunctions themselves to Mr. Jia's last-known place of residence, namely 7 Marguerite Drive, Rancho Palos Verdes, CA 90275 on 18 December 2018. A true and correct copy of the FedEx receipt and delivery confirmation is attached hereto as **Exhibit 9**. In addition, a process server personally left the court papers at Mr. Jia's address on 14 December 2018. True and correct copies of the service report and photos of the documents so delivered are attached hereto as **Exhibit 10**.

67.  Third, Mr. Jia goes on to say "*the BVI Injunctions are being improperly maintained in that, since they were obtained, SLC has not advanced its case in the BVI for over a year. Since the commencement of the Chapter 11 Case, grounds for permission to enforce the Chinese arbitral award and an arguable risk of dissipation have ceased to exist.*" *See* Reply Brief at 5:12-16.

68.  Again, there is nothing in this because:

a.  SLC has already obtained the Recognition Order in the BVI, which gives it permission to enforce the Award in the BVI as if it were a judgment of the BVI Court. There are no further steps required to advance its recognition claim. Mr. Jia could have applied to set aside the Recognition Order within 21 days of it being served on him, but he did not do so. See *Recognition*

KOBRE & KIM LLP
ATTORNEYS AT LAW

DECLARATION OF TIMOTHY DE SWARDT

*Order* at 2. What that remains to be done is to take steps to execute on Mr. Jia's assets, which SLC was preparing to do prior to Mr. Jia's bankruptcy.

b.    The grounds for risk of dissipation have actually increased by virtue of the likely breach of the Worldwide Freezing Order that I have described at paragraph 43 above. Further, as I have noted above, FF Peak and FF Top are not part of Mr. Jia's bankruptcy estate in the hands of an independent court-appointed trustee, but in the hands of Mr. Jia's 29 year old nephew (as managing partner of FF GP), and nominees and third parties whom he appears to control. Even after the plan is approved, FF GP will continue to own 80% of the equity in Pacific Technology, and will remain as the managing member of Pacific Technology, which in turn owns 100% of FF Peak and FF Top. In other words, the plan does not (and cannot) place FF Peak and FF Top in the control of Mr. Jia's Creditor Trust.

69.    Mr. Jia's fourth and final grounds for discharging the freezing orders is that "*SLC is abusing the BVI Injunctions, a provisional remedy which confers no security interest, to obtain an unfair advantage over other similarly situated creditors in this Chapter 11 Case*". *See* Reply Brief at 5:16-18. I do not believe SLC has acted improperly or unfairly by applying for and obtaining the Worldwide Freezing Orders, which it was entitled to seek under BVI law. None of Mr. Jia, FF Peak, or FF Top has applied to set aside the Worldwide Freezing Orders, and they have been continued by order of the BVI Court until further order. Nor has SLC obtained any security interest for its claim in the BVI courts.

**Unlawful Means Conspiracy Claim**

70.    As I have explained above, FF Top has already likely breached the Worldwide Freezing Order against it by proposing the Proposed Smart King Transfer. Pacific Technology, at the same time and in the same document, ratified the Proposed Smart King Transfer, by and through its then-members, Ms. Bossert and FF GP. The PT LLCA says that no further action is required.

This can only mean that FF Peak also agreed to the Proposed Smart King Transfer, because Pacific Technology cannot give instructions to FF Top directly; they must pass through FF Peak which wholly owns FF Top. In short, FF Top was not acting alone in breaching the Worldwide Freezing Order.

71.    In my view, the breach by FF Top, acting in combination with FF Peak, Pacific Technology, FF GP and Ms. Bossert was a contempt of court in the BVI. It gave Mr. Jia what he calls the "FF Intelligent Transfer Right": the right to direct Pacific Technology to direct FF Peak to direct FF Top to transfer the Trust FF Intelligent Shares, pursuant to the PT LLCA. The FF Intelligent Transfer Right is a critical piece of Mr. Jia's Reorganization Plan: without it, Pacific Technology cannot grant the so-called "Warrant," which is the third step envisaged on plan approval at paragraph 6.2(a) of the Reorganization Plan. If approved and implemented, SLC contends the Reorganization Plan would cause damage to SLC, equal to the value of its debt claim less the value of the "Trusts Interests" that it receives when its debt claim is discharged.

72.    On these facts, I believe SLC has a tort claim for conspiracy to injure by unlawful means against FF Top, FF Peak, Pacific Technology, FF GP and Ms. Bossert (and any others who may have been knowingly involved in breaching the Worldwide Freezing Order against FF Top).

73.    By way of explanation, the "*tort is committed where two or more persons combine and take action which is unlawful in itself with the intention of causing damage to a third party who does incur the intended damage. It is not necessary for the injured party to prove that causing him damage was the main or predominant purpose of the combination but that purpose must be part of the combiners' intentions*" (Clerk & Lindsell on Torts, 22nd Ed. at para. 24-98). The United Kingdom Supreme Court recently confirmed that breach of a freezing order, in contempt of court, would constitute "unlawful means" for the purposes of the tort. *See JSC BTA Bank v. Khrapunov* [2019] UKSC 19 at 16. In the same case, the Supreme Court also confirmed that it is a distinct tort, and not a form of secondary liability, but a primary one. *Id.*

74.    In the result, each of FF Top, FF Peak, Pacific Technology, FF GP, and Ms. Bossert would have new liabilities to SLC in monetary damages on approval of the Reorganization Plan,

DECLARATION OF TIMOTHY DE SWARDT

even though SLC's debt claim against Mr. Jia might be discharged and replaced with so-called Trust Interests.

75.     Kobre & Kim has prepared a draft statement of claim to be filed in the BVI High Court if the Reorganization Plan is in fact approved and SLC's debt claim is discharged, a true and correct copy of which is attached hereto as **Exhibit 11** for the convenience of the Court.

Executed this 7th day of May, 2020.
Tortola, British Virgin Islands

_____

Timothy de Swardt

# EXHIBIT 1

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION



**FILED**
Registrar's Office
Eastern Caribbean
Supreme Court

Filed Date:27/11/2018 16:27

CLAIM NO. BVIHC (COM) 198 of 2018

IN THE MATTER OF THE ARBITRATION ACT 2013

Effective Date:05/12/2018 15:39

AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN
ARBITRAL AWARD ADMINSTERED BY
THE BEIJING ARBITRATION COMMISSION

Fees Paid:20.00

BETWEEN:

### SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.

Applicant

- and -

### JIA YUETING

Respondent

---

## ORDER

---

**BEFORE:**    Mr Justice Wallbank (Ag)

**MADE:**    5 December 2018

**ENTERED:**    5 December 2012

**UPON** the Applicants' without notice application dated 27 November 2018 pursuant CPR 43.10(3) and s.84(1)(b) and 85 of the Arbitration Act 2013 coming on for hearing

**AND UPON** hearing Counsel for the Applicants

**AND UPON** reading the First Affirmation of Kang Jian and the exhibits thereto dated 27 November 2018

1

**NOTICE**

**ENFORCEMENT OF THE JUDGMENT OR ORDER HEREIN MAY NOT TAKE
PLACE UNTIL AFTER THE EXPIRY OF THE TIME PERIOD IN PARAGRAPH 3**

**IT IS ORDERED THAT:**

1. The Applicant has permission to enforce the arbitral award dated 22 January 2018 ("**the Final Award**") against the Respondent in the same manner and to the same effect as a judgment or order of the High Court.

2. The period within which any application may be made by the Respondent to set aside this Order shall be 21 days from the date of service. The Respondent must give no less than 14 days' notice to the Applicant of such application

3. The Applicant may not execute this Order until the expiry of 21 days from the date of service of this Order on the Respondent or the determination of any application that may be made by the Respondent under paragraph 2 above

4. If no application is made by the Respondents in accordance with paragraph 2 above, the Respondent shall pay the Applicant's costs of this Application to be assessed if not agreed within 21 days.

**BY THE COURT**

**THE REGISTRAR**

2

IN THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION

CLAIM NO. BVIHC (COM) 198 of 2018

IN THE MATTER OF THE ARBITRATION ACT 2013
AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN
ARBITRAL AWARD ADMINSTERED BY
THE BEIJING ARBITRATION COMMISSION

BETWEEN:

SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.

Applicant

- and -

JIA YUETING

Respondent

_____

**ORDER**

_____

**Kobre & Kim (BVI) LP**
**Legal Practitioners for the Applicants**
Tel: 284 852 1600
Email: peter.tyers-smith@kobrekim.com
Ref. 03787.001

3

# EXHIBIT 2



FILED

Register s Office
Eastern Caribbean
Supreme Court

Filed Date:27/11/2018 15:37

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION

CLAIM NO. BVIHC (COM) 198 of 2018

Effective Date:05/12/2018 15:39

IN THE MATTER OF THE ARBITRATION ACT 2013
AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN
ARBITRAL AWARD MADE IN AN ARBITRATION          Fees Paid:20.00
ADMINISTERED BY THE BEIJING ARBITRATION COMMISSION

BETWEEN:

SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.

Applicant

- and -

(1) JIA YUETING

Respondents

(2) FF PEAK HOLDING LIMITED
(3) FF TOP HOLDING LTD.

NCA Respondents

---

### ORDER
*Injunction against FF Peak Holding Limited*

---

### PENAL NOTICE

IF YOU FAIL TO COMPLY WITH THE TERMS OF THIS ORDER YOU MAY BE
HELD IN CONTEMPT OF COURT AND YOUR DIRECTORS AND OFFICERS MAY
BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING
WHICH HELPS OR PERMITS THE SECOND RESPONDENT TO BREACH THE
TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT
AND MAY BE IMPROSONED OR HAVE THEIR ASSETS SEIZED

**THIS ORDER**

1.    This is a Freezing Injunction made against **FF PEAK HOLDINGS LTD ("FF PEAK"** or
the **"Second Respondent"**)) on 5 December 2018 by Justice Wallbank on the application
of **SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.** (the **"Applicant"**) The
Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in
Schedule B at the end of this Order.

2.    This Order was made without notice to Second Respondent. The Second Respondent has
a right to apply to the court to vary or discharge this Order (see paragraph 13 below).

3.    There will be a further hearing in respect of this Order on 19 December 2018 at 10am with
a time estimate of 15 minutes for directions only (the **"Return Date"**).

**FREEZING INJUNCTION**

4.    Until after the conclusion of the Return Date or further order of the Court, the Second
Respondent is, without the prior written consent of the Applicant's legal representatives:

(a)    restrained (acting by and/or on the instruction of its directors, officers and/or
agents) from:

(i)    in any way disposing of, dealing with or diminishing the value of the entire
issued share capital of FF Peak (the **"FF Peak Shares"**), whether they are in
or outside the BVI, whether they are jointly, beneficially, legally owned or
otherwise up to the same value;

(ii)    registering or causing to be registered any change in the legal ownership of
the FF Peak Shares in any way, including but not limited to sale, exchange,
contribution, and/or transfer;

(iii)    in any way recognising or causing to be recognised or recorded in FF Peak's
Register of Shares (the **"Register"**) any such purported change in or transfer
of all or part of the legal ownership of the FF Peak Shares;

(iv)    in any way recognising or recording or causing to be recognised or recorded on the Register any change or transfer of the ownership of all or part of the equitable interest in the FF Peak Shares, including but not limited to by way of encumbrance, pledge, lien or charge over the FF Peak Shares;

(v)    removing or allowing or instructing or causing to be removed or instructing the removal of the share certificate(s) pertaining to the FF Peak Shares from the territory of the Virgin Islands;

(vi)    cancelling the FF Peak Shares and/or reissuing the FF Peak Shares, or causing or instructing the same; and

(vii)    effecting or allowing to be created or effected any changes, variations or amendments to any agreement, trust and/or any other similar arrangement in relation to which the FF Peak Shares are held;

(b)    restrained from in any way transferring, disposing of, pledging, charging diminishing the value of, encumbering or dealing with its assets up to the value of US$10,800,312.00 (the "**Relevant Assets**") whether they are inside or outside the Virgin Islands, without first providing the Applicant with at least 14 days written notice; and

(c)    for the purposes of this Order, the Relevant Assets are any assets of FF Peak whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this Order the Second Respondent's assets include any asset that it has the power, directly or indirectly, to dispose of or deal with as if it were its own. The Second Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its direct or indirect instructions. The Relevant Assets include but are not limited to the following assets that may be held directly and indirectly by the Second Respondent:

(i)    any shares in FF Top Holding Limited (a company registered in the BVI with company number 1913133; and

       (ii)     any shares in Smart King Limited (a company incorporated in the Cayman Islands) (the "**Smart King Shares**")

5.    The Applicant shall have the right to notify third parties outside the jurisdiction of the High Court of the existence of this Order, including (but not limited to):

    a.    Conyers Trust Company (BVI) Limited, as registered agent of FF Peak and FF Top;

    b.    Lian Bossert as legal owner of the FF Peak Shares;

    c.    FF Top as legal owner of the Smart King Shares;

    d.    Jia Yeutung as beneficial owner of the FF Peak, FF Top and Smart King Shares.

**PROVISION OF INFORMATION**

6.    Unless paragraph 7 applies, the Second Respondent must immediately and to the best of its ability inform the Applicant's Legal Practitioners of all its assets worldwide exceeding US$1000 in value whether in its own name or not and whether solely or jointly owned, giving the value, location and sufficient details of all such assets to enable the Applicant to identify them.

7.    If the provision of any of this information is likely to incriminate the Second Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Second Respondent liable to be fined or have its assets seized, or its directors or officers may be imprisoned.

8.    Unless paragraph 7 of this Order applies, within 5 working days after being served with this order, a director of the Second Respondent must personally swear and serve on the Applicant's Legal Practitioners an affidavit:

(a) setting out the information described in paragraph 6 above; and

(b) exhibiting copies of all documents which relate to the receipt, transfer of, or dealing with any monies or assets described in paragraph 4 of this Order including the FF Peak Shares and the Relevant Assets.

## EXCEPTIONS TO THIS ORDER

9.    This Order will cease to have effect if the Respondent -

(a) provides security by paying the sum of US$10,800,312.00 into court, to be held to the Order of the court; or

(b) makes provision for security in that sum by another method agreed in writing with the Applicant's Legal Practitioners

10.    This Order does not prohibit the Second Respondent from spending a reasonable sum on legal advice and representation. But before spending any money the Second Respondent must tell the Applicant's legal representatives where the money is to come from including the bank account and the source of the funding.

11.    This Order does not prohibit the Second Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business.

12.    The Second Respondent may agree with the Applicant's legal representatives that this Order should be varied, but any agreement must be in writing.

## COSTS

13.    The costs of this application are reserved to the Return Date.

## VARIATION OR DISCHARGE OF THIS ORDER

14.    Anyone served with or notified of this Order may apply to the court at any time to vary or discharge this Order (or so much of it as affects that person), but they must first inform the Applicant's legal representatives. If any evidence is to be relied upon in support of the application, the substance of it must be served on the Applicant's legal representatives no less than 48 hours' in advance.

## INTERPRETATION OF THIS ORDER

15.    A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

16.    A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

17.    Effect of this Order:

It is a contempt of court for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be imprisoned, fined or have their assets seized.

18.    Set off by banks:

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the respondent before it was notified of this Order.

19.    Withdrawals by the Second Respondent:

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this Order.

20.    Persons outside the BVI:

(a)    Except as provided in paragraph (b) below, the terms of this Order do not affect or concern anyone outside the jurisdiction of this Court.

(b)    The terms of this Order will affect the following persons in a country or state outside the jurisdiction of this court:

    (i)    the Second Respondent or its officer or agent appointed by power of attorney;

    (ii)    any person who:

        (A)    is subject to the jurisdiction of this Court;

        (B)    has been given written notice of this Order at his residence or place of business within the jurisdiction of this Court; and

        (C)    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this Order; and

    (iii)    any other person, only to the extent that this Order is declared enforceable by or is enforced by a court in that country or state.

## ASSETS LOCATED OUTSIDE VIRGIN ISLANDS

21.    Nothing in this Order shall, in respect of assets located outside BVI, prevent any third party from complying with:

(a)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b)    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.



DEPUTY REGISTRAR

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this Order should be sent to:-

The Court Office is located at the Registry of the High Court, 2nd Floor SAKAL Building, Wickham's Cay PO Box 418 Road Town Tortola, British Virgin Islands: Telephone +1 (284) 468 5001 or +1 (284) 468 4909. Email: commercialdivisionvi@gov.vg. The Court office is open between 8:30 am and 4:30 pm Monday to Friday except public holidays.

**NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVE**

The Applicant's legal representatives are Kobre & Kim (BVI) LP, Commerce House, Waterfront Drive, Road Town, Tortola, British Virgin Islands; Telephone: 284 852 1600, Email: peter.tyers-smith@kobrekim.com; Ref. 03787.001

## SCHEDULE A

**AFFIDAVITS**

The Applicant relied on the following affidavit—

| Name | No. of affidavit | Date sworn | Filed on behalf of |
|------|------------------|------------|--------------------|
| (1) Kang Jian | 2 | 27 November 2018 | Applicant |

## SCHEDULE B

**UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1)     If the Court later finds that this Order has caused loss to the Second Respondents and decides that it should be compensated for that loss, the Applicant will comply with any order that the Court may make up to the value of US$10,800,312.00.

(2)     Anyone notified of this Order will be given a copy of it by the Applicant's legal representatives.

(3)     The Applicant shall pay the reasonable costs of anyone other than the Second Respondent that have been incurred as a result of this Order including the costs of finding out whether that person holds any of such Respondent's assets and if the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the Court may make.

(4)     If this Order ceases to have effect, the Applicant shall immediately take all reasonable steps to inform in writing anyone to whom it has given notice of this Order, or who it has reasonable grounds for supposing may act upon this Order that it has ceased to have effect.

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION

CLAIM NO. BVIHC (COM) 198 of 2018

IN THE MATTER OF THE ARBITRATION ACT 2013

AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN
ARBITRAL AWARD ADMINISTERED BY THE
BEIJING ARBITRATION COMMISSION

BETWEEN:

SHANGAHI LAN CAI ASSET MANAGEMENT CO, LTD.

Applicant

- and -

JIA YUETING (1)

Respondents

FF PEAK HOLDING LIMITED (2)
FF TOP HOLDING LTD. (3)

NCA Respondents

---

**ORDER**
*Injunction Against FF Peak Holding Limited*

---

**Kobre & Kim (BVI) LP**
**Legal Practitioners for the Applicants**
Tel: 284 852 1600
Email: peter.tyers-smith@kobrekim.com
Ref. 03787.001



IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION

Filed Date:27/11/2018 15:37

Effective Date:05/12/2018 15:39

CLAIM NO. BVIHC (COM) 198 of 2018

IN THE MATTER OF THE ARBITRATION ACT 2013
AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN
ARBITRAL AWARD MADE IN AN ARBITRATION          Fees Paid:20.00
ADMINISTERED BY THE BEIJING ARBITRATION COMMISSION

BETWEEN:

SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.

Applicant

- and -

(1) JIA YUETING

Respondents

(2) FF PEAK HOLDING LIMITED
(3) FF TOP HOLDING LTD.

NCA Respondents

---

**ORDER**
*Injunction Against FF Top Holding Ltd.*

---

PENAL NOTICE

IF YOU FAIL TO COMPLY WITH THE TERMS OF THIS ORDER YOU MAY BE
HELD IN CONTEMPT OF COURT AND YOUR DIRECTORS AND OFFICERS MAY
BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING
WHICH HELPS OR PERMITS THE THIRD RESPONDENT TO BREACH THE
TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT
AND MAY BE IMPROSONED OR HAVE THEIR ASSETS SEIZED

**THIS ORDER**

1.  This is a Freezing Injunction made against **FF TOP HOLDINGS LTD.** ("**FF TOP**" or
    the "**Third Respondent**")) on 5 December 2018 by Justice Wallbank on the application of
    **SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.** (the "**Applicant**") The
    Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in
    Schedule B at the end of this Order.

2.  This Order was made without notice to Third Respondent. The Third Respondent has a
    right to apply to the court to vary or discharge this Order (see paragraph 13 below).

3.  There will be a further hearing in respect of this Order on 19 December 2018 at 10am with
    a time estimate of 15 minutes for directions only (the "**Return Date**").

**FREEZING INJUNCTION**

4.  Until after the conclusion of the Return Date or further order of the Court, the Third
    Respondent is, without the prior written consent of the Applicant's legal representatives:

    (a)   restrained (acting by and/or on the instruction of its directors, officers and/or
          agents) from:

          (i)    in any way disposing of, dealing with or diminishing the value of the entire
                 issued share capital of FF Top (the "**FF Top Shares**"), whether they are in or
                 outside the BVI, whether they are jointly, beneficially, legally owned or
                 otherwise up to the same value;

          (ii)   registering or causing to be registered any change in the legal ownership of the
                 FF Top Shares in any way, including but not limited to sale, exchange,
                 contribution, and/or transfer;

          (iii)  in any way recognising or causing to be recognised or recorded in FF Top's
                 Register of Shares (the "**Register**") any such purported change in or transfer
                 of all or part of the legal ownership of the FF Top Shares;

(iv) in any way recognising or recording or causing to be recognised or recorded on the Register any change or transfer of the ownership of all or part of the equitable interest in the FF Top Shares, including but not limited to by way of encumbrance, pledge, lien or charge over the FF Top Shares;

(v) removing or allowing or instructing or causing to be removed or instructing the removal of the share certificate(s) pertaining to the FF Top Shares from the territory of the Virgin Islands;

(vi) cancelling the FF Top Shares and/or reissuing the FF Top Shares, or causing or instructing the same; and

(vii) effecting or allowing to be created or effected any changes, variations or amendments to any agreement, trust and/or any other similar arrangement in relation to which the FF Top Shares are held;

(b) restrained from in any way transferring, disposing of, pledging, charging diminishing the value of, encumbering or dealing with its assets up to the value of US$10,800,312.00 (the "**Relevant Assets**") whether they are inside or outside the Virgin Islands, without first providing the Applicant with at least 14 days written notice; and

(c) for the purposes of this Order, the Relevant Assets are any assets of FF Top whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this Order the Third Respondent's assets include any asset that it has the power, directly or indirectly, to dispose of or deal with as if it were its own. The Third Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its direct or indirect instructions. The Relevant Assets include but are not limited to the following assets that may be held directly and indirectly by the Third Respondent:

(i) any shares in Smart King Limited (a company incorporated in the Cayman Islands) (the "**Smart King Shares**")

5.   The Applicant shall have the right to notify third parties outside the jurisdiction of the High Court of the existence of this Order, including (but not limited to):

   a.   Conyers Trust Company (BVI) Limited, as registered agent of FF Peak and FF Top;

   b.   FF Peak as legal owner of the FF Top Shares;

   c.   Smart King as issuer of the Smart King Shares;

   d.   Jia Yueting as beneficial owner of FF Peak, the FF Top Shares, and the Smart King Shares.

**PROVISION OF INFORMATION**

6.   Unless paragraph 7 applies, the Third Respondent must immediately and to the best of its ability inform the Applicant's Legal Practitioners of all its assets worldwide exceeding US$1000 in value whether in its own name or not and whether solely or jointly owned, giving the value, location and sufficient details of all such assets to enable the Applicant to identify them.

7.   If the provision of any of this information is likely to incriminate the Third Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Third Respondent liable to be fined or have its assets seized, or its directors or officers may be imprisoned.

8.    Unless paragraph 7 of this Order applies, within 5 working days after being served with this order, a director of the Third Respondent must personally swear and serve on the Applicant's Legal Practitioners an affidavit:

(a) setting out the information described in paragraph 6 above; and

(b) exhibiting copies of all documents which relate to the receipt, transfer of, or dealing with any monies or assets described in paragraph 4 of this Order including the FF Top Shares and the Relevant Assets.

**EXCEPTIONS TO THIS ORDER**

9.    This Order will cease to have effect if the Respondent -

(a) provides security by paying the sum of US$10,800,312.00 into court, to be held to the Order of the court; or

(b) makes provision for security in that sum by another method agreed in writing with the Applicant's Legal Practitioners

10.    This Order does not prohibit the Third Respondent from spending a reasonable sum on legal advice and representation. But before spending any money the Third Respondent must tell the Applicant's legal representatives where the money is to come from including the bank account and the source of the funding.

11.    This Order does not prohibit the Third Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business.

12.    The Third Respondent may agree with the Applicant's legal representatives that this Order should be varied, but any agreement must be in writing.

**COSTS**

13.    The costs of this application are reserved to the Return Date.

## VARIATION OR DISCHARGE OF THIS ORDER

14.    Anyone served with or notified of this Order may apply to the court at any time to vary or discharge this Order (or so much of it as affects that person), but they must first inform the Applicant's legal representatives. If any evidence is to be relied upon in support of the application, the substance of it must be served on the Applicant's legal representatives no less than 48 hours' in advance.

## INTERPRETATION OF THIS ORDER

15.    A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

16.    A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

17.    Effect of this Order:

It is a contempt of court for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be imprisoned, fined or have their assets seized.

18.    Set off by banks:

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the respondent before it was notified of this Order.

19.    Withdrawals by the Third Respondent:

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this Order.

20.    Persons outside the BVI:

(a)    Except as provided in paragraph (b) below, the terms of this Order do not affect or concern anyone outside the jurisdiction of this Court.

(b)    The terms of this Order will affect the following persons in a country or state outside the jurisdiction of this court:

    (i)    the Third Respondent or its officer or agent appointed by power of attorney;

    (ii)    any person who:

        (A)    is subject to the jurisdiction of this Court;

        (B)    has been given written notice of this Order at his residence or place of business within the jurisdiction of this Court; and

        (C)    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this Order; and

    (iii)    any other person, only to the extent that this Order is declared enforceable by or is enforced by a court in that country or state.

## ASSETS LOCATED OUTSIDE VIRGIN ISLANDS

21.    Nothing in this Order shall, in respect of assets located outside BVI, prevent any third party from complying with:

(a)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(b)    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.



DEPUTY REGISTRAR

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this Order should be sent to:-

The Court Office is located at the Registry of the High Court, 2nd Floor SAKAL Building, Wickham's Cay PO Box 418 Road Town Tortola, British Virgin Islands: Telephone +1 (284) 468 5001 or +1 (284) 468 4909. Email: commercialdivisionvi@gov.vg. The Court office is open between 8:30 am and 4:30 pm Monday to Friday except public holidays.

**NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVE**

The Applicant's legal representatives are Kobre & Kim (BVI) LP, Commerce House, Waterfront Drive, Road Town, Tortola, British Virgin Islands; Telephone: 284 852 1600, Email: peter.tyers-smith@kobrekim.com; Ref. 03787.001

## SCHEDULE A

**AFFIDAVITS**

The Applicant relied on the following affidavit—

| Name | No. of affidavit | Date sworn | Filed on behalf of |
|------|------------------|------------|--------------------|
| (1)  Kang Jian | 2 | 27 November 2018 | Applicant |

## SCHEDULE B

**UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1)     If the Court later finds that this Order has caused loss to the Third Respondent and decides that it should be compensated for that loss, the Applicant will comply with any order that the Court may make up to the value of US$ US$10,800,312.00.

(2)     Anyone notified of this Order will be given a copy of it by the Applicant's legal representatives.

(3)     The Applicant shall pay the reasonable costs of anyone other than the Third Respondent that have been incurred as a result of this Order including the costs of finding out whether that person holds any of such Respondent's assets and if the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the Court may make.

(4)     If this Order ceases to have effect, the Applicant shall immediately take all reasonable steps to inform in writing anyone to whom it has given notice of this Order, or who it has reasonable grounds for supposing may act upon this Order that it has ceased to have effect.

**IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION**

**CLAIM NO. BVIHC (COM) 198 of 2018**

**IN THE MATTER OF THE ARBITRATION ACT 2013**

**AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN
ARBITRAL AWARD ADMINISTERED BY THE
BEIJING ARBITRATION COMMISSION**

**BETWEEN:**

**SHANGAHI LAN CAI ASSET MANAGEMENT CO, LTD.**

Applicant

- and -

**JIA YUETING (1)**

Respondents

**FF PEAK HOLDING LIMITED (2)
FF TOP HOLDING LTD. (3)**

NCA Respondents

---

**ORDER**
*Injunction Against FF Peak Holding Limited*

---

**Kobre & Kim (BVI) LP
Legal Practitioners for the Applicants**
Tel: 284 852 1600
Email: peter.tyers-smith@kobrekim.com
Ref. 03787.001

# EXHIBIT 3

Case Number :BVIHCOM2018/0198

**FILED**
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION

Submitted Date:16/10/2019 13:01

Filed Date:16/10/2019 13:01

CLAIM NO. BVIHC (COM) 198 of 2018

Fees Paid:72.59

IN THE MATTER OF THE ARBITRATION ACT 2013

AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN ARBITRAL
AWARD MADE IN AN ARBITRATION ADMINISTERED BY THE BEIJING
ARBITRATION COMMISSION

BETWEEN:

### SHANGAHI LAN CAI ASSET MANAGEMENT CO, LTD.

Applicant

- and -

### (1) JIA YUETING

Respondent

### (2) FF PEAK HOLDING LIMITED
### (3) FF TOP HOLDING LIMITED

NCA Respondents

---

### ORDER

---

**BEFORE:** The Honourable Mr Justice Adderley

**MADE:** 19 December 2018

**ENTERED:** 17 October 2019

**UPON** the Applicant's application dated 14 December 2018 for continuation of the freezing orders made on 5 December 2018 against the Second and Third Respondents (the "**Continuation Application**") coming on for hearing.

**AND UPON** reading the evidence filed in support of the Continuation Application.

**AND UPON** hearing Counsel for the Applicant and Counsel for the NCA Respondents, there being no appearance by Jia Yueting

1

**IT IS ORDERED THAT:**

1. The freezing orders granted on 5 December 2018 (the **Freezing Orders**) against the NCA Respondents shall continue until further order of this Court, without prejudice to the NCA Respondents right to set aside or vary the Freezing Orders under paragraph 13 thereof, including on any of the grounds which would have been available at the return date.

2. Costs reserved.

**BY THE COURT**

*Dep.*REGISTRAR (Ag.)

2

**IN THE EASTERN CARIBBEAN SUPREME
COURT
IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION**

**CLAIM NO. BVIHC (COM) 198 of 2018**

**IN THE MATTER OF THE ARBITRATION
ACT 2013**

**AND IN THE MATTER OF AN
APPLICATION TO ENFORCE AN
ARBITRAL AWARD MADE IN AN
ARBITRATION ADMINISTERED BY THE
BEIJING ARBITRATION COMMISSION**

**BETWEEN:**

**SHANGAHI LAN CAI ASSET
MANAGEMENT CO, LTD.**

Applicant

- and -

**(1)    JIA YUETING**

Respondent

**(2)    FF PEAK HOLDING LIMITED**
**(3)    FF TOP HOLDING LIMITED**

NCA Respondents

---

**ORDER**

---

Kobre & Kim (BVI) LP
Legal Practitioners for the Applicant
Commerce House, Waterfront Drive
PO Box 3099 PMB 50
Tortola, VG1110
284-852-1600
timothy.deswardt@kobrekim.com

3

# EXHIBIT 4



FILED
Registrar's Office
Eastern Caribbean
Supreme Court

Kang. J
Second Affirmation
Applicant
Exhibit G12
Sworn: 27 November 2018
Filed: 27 November 2018

Filed Date:27/11/2018 18:37

Effective Date:30/11/2018 08:30

Fees Paid:274.20

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**VIRING ISLANDS**
**COMMERCIAL DIVISION**


**CLAIM NO. BVIHC (COM)        of 2018**


**IN THE MATTER OF THE ARBITRATION ACT 2013**
**AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN**
**ARBITRAL AWARD MADE IN AN ARBITRATION**
**ADMINISTERED BY THE BEIJING ARBITRATION COMMISSION**

**BETWEEN:**

**SHANGHAI LAN CAI ASSET MANAGEMENT LIMITED**

Applicant


- and -


**(1) JIA YUETING**

Respondents


**(2) FF PEAK HOLDING LIMITED**
**(3) FF TOP HOLDING LIMITED**

NCA Respondents

_____


**SECOND AFFIRMATION OF KANG JIAN**

_____


I, Kang Jian of 6/F ICBC Tower, 3 Garden Road, Central, Hong Kong do solemnly sincerely and truly affirm and say as follows:

1

**I. Introduction**

1.      I am a solicitor of Kobre & Kim, a Hong Kong firm of solicitors which is an affiliate of Kobre & Kim LLP.  I am admitted to practice in Hong Kong and am duly authorised to make this affirmation on behalf of the Applicant.

2.      I am the same Kang Jian that has affirmed an affirmation ("**Kang 1**") in support of the Applicant's application under s.84(1)(b) and s.85 of the Arbitration Act 2013 ("**the s.85 Application**") to enforce an arbitral award issued by the Beijing Arbitration Commission dated 22 January 2018 ("**the Final Award**") against the First Respondent in the same manner as a judgment of this Honourable Court.

3.      I am duly authorised to make this affirmation in support of the Applicant's application for an injunction against the Second and Third Respondents in aid of the Applicant's enforcement and execution of the Final Award in the same manner as a judgment of this Court.

4.      Unless stated otherwise, the facts and matters deposed to herein are derived from documents and materials in my possession available to me through my firm's representation of the Applicant. Insofar as matters to which I depose are within my own knowledge, they are true. Insofar as matters to which I depose are not within my own knowledge, such matters are true to the best of my knowledge and belief.

5.      Attached to this affirmation is a paginated bundle of documents marked "**KJ2**" and unless stated otherwise numbers appearing in square brackets are references to the pages of KJ2.

6.      In this affirmation, the following terms of reference shall carry the corresponding stated meaning:

6.1.      "**Jia**" or "**the First Respondent**" shall mean Jia Yueting, a citizen of the People's Republic of China currently residing in the state of California;

2

6.2.     "**FF Peak**" or "**the Second Respondent**" shall mean FF Peak Holding Limited, a limited liability company incorporated in the British Virgin Islands;

6.3.     "**FF Top**" or "**the Third Respondent**" shall mean FF Top Holding Limited, a limited liability company incorporated in the British Virgin Islands;

6.4.     "**the Loan Agreement**" shall mean the loan agreement between the Applicant and LeTV Sports Culture Develop (Beijing) Co., Limited  ("**LeTV Sports**") dated 1 December 2016;

6.5.     "**the RGA**" shall mean the Repurchase and Guarantee Agreement between the Applicant on the one hand and TV Plus Holdings (Beijing) Limited ("**TV Plus**") and the First Respondent on the other also dated 1 December 2016;

6.6.     "**the BAC Arbitration**" shall mean the arbitration commenced by the Applicant on 28 June 2017 under the rules and procedures of the Beijing Arbitration Commission ("**BAC**") against LeTV Sports, TV Plus and the First Respondent pursuant to Article XIII(II) of the Loan Agreement and Article XI(3) of the RGA;

6.7.     "**the BAC Tribunal**" shall mean the arbitral tribunal constituted under the rules and procedures of the BAC consisting of Mr. Wu Shengchun, Madam Kang Le and Mr. Han Xu;

6.8.     "**Faraday**" shall mean Faraday & Future Inc, a company registered in California established to develop, manufacture and sell intelligent electric vehicles;

6.9.     "**Smart Technology**" shall mean Smart Technology Holdings Limited, an exempted limited liability company incorporated in the Cayman Islands;

6.10.    "**Smart King**" shall mean Smart King Limited, an exempted limited liability company incorporated in the Cayman Islands;

3

6.11.    "**Season Smart**" shall mean Season Smart Limited, a limited liability company incorporated in the British Virgin Islands;

6.12.    "**the HKIAC Arbitration**" shall mean the arbitration instigated by Smart King against Season Smart and Jia on 3 October 2018 under the rules and procedures of the Hong Kong International Arbitration Centre pursuant to paragraph 16.5 of a shareholder agreement entered into around November 2017; and

6.13.    "**the HKIAC Award**" shall mean the emergency award issued in the HKIAC Arbitration on 25 October 2018.

7.    The remainder of this affirmation is divided into the following sections:

7.1.    **Section II** addresses the background to the BAC Arbitration and the Final Award;

7.2.    **Section III** addresses the position and status of Smart King as a joint venture vehicle between FF Top, Season Smart and the Faraday Equity Incentive Program for Employees;

7.3.    **Section IV** addresses Jia's control and ultimate ownership of FF Top;

7.4.    **Section V** addresses (a) the Applicant's good arguable case for recognition of the Final Award and for its subsequent enforcement by way of equitable execution over Jia's ultimate interest in the share capital of FF Top (b) the real risk that unless restrained by injunction the Final Award, once enforceable as a judgment of this Court will remain unsatisfied and (c) why it is just and convenient to grant an injunction;

7.5.    **Section VI** addresses the Applicant's duty of full and frank disclosure; and

7.6.    **Section VII** addresses the Applicant's cross-undertaking in damages.

4

**II. The BAC Arbitration and Final Award**

8.  As I have set out in Kang 1 in support of the s.85 Application, the BAC Arbitration was initiated by the Applicant against LeTV Sports under the Loan Agreement and against TV Plus and Jia under the RGA, to recover a loan advanced by the Applicant as lending agent to LeTV Sports as borrower.

9.  Under the Loan Agreement, the Applicant, acting as agent of Lancai.cn, an internet finance information service platform operated by Beijing Lancai Information Technology Co., Ltd ("**Lancai Technology**") agreed to facilitate a loan of CNY 50,000,000 (approximately US $7,200,000) to LeTV Sports for 12 months with interest of 7.5% per annum. A certified English language translation of the Loan Agreement is exhibited at pages 1 to 15.

10. Under Part II of the RGA, [**18**], TV Plus and Jia, as guarantors, agreed to guarantee the performance of the Loan Agreement by LeTV Sports and agreed to be jointly and severally liable under the Loan Agreement. I should emphasize that Jia is the founder of the LeEco Group of which LeTV Sports and TV Plus are part. Accordingly Jia was the substantial shareholder of LeTV Sports. I exhibit a certified English language translation of the RGA at [**16 to 25**]. I also exhibit at [**26 to 29**] the respective shareholding charts of LeTV Sports and TV Plus showing Jia was the substantial shareholder of those two companies, downloaded at www.tianyancha.com, a leading company records database in China, together with English language translations of the same.

11. Pursuant to Article III(IV) of the Loan Agreement [**5**], interest was due to be paid on 15 March, 15 June, 15 September and 15 December 2017. LeTV Sports paid contractual interest to the Applicant under the Loan Agreement up and until 15 March 2017, however since then, LeTV Sports failed to pay any interest due under the Loan Agreement. Consequently, the Applicant initiated the BAC Arbitration which was accepted by the BAC on 28 June 2017. Subsequently, but prior to the final hearing in the BAC Arbitration, LeTV Sports failed to repay any of the principal or accrued interest fell due pursuant to the Loan Agreement.

5

12.     The case number assigned to the BAC Arbitration was "(2017) Jing Chong Cai Zi No. 1504." On 21 September 2017, the BAC Tribunal was properly constituted. The seat of the BAC Arbitration was Beijing, the PRC. None of the parties opposed the composition of the BAC Tribunal.

13.     At the first hearing held on 27 October 2017, despite being notified in writing, all respondents failed to appear or be represented by counsel.

14.     On 1 December 2017, the BAC Tribunal held the second hearing. All the parties appeared at the hearing through their representatives and made their respective submissions.  On 22 January 2018, the BAC Tribunal made the Final Award.  I exhibit a certified English language translation of the Final Award at **[30 to 54]**.

15.     In summary, LeTV Sports raised the following defences:

15.1.     LeTV Sports had no knowledge of the Loan Agreement or the loan, and that TV Plus, Jia and the Applicant effectively conspired to execute the Loan Agreement ("**the Conspiracy Defence**" – Final Award Part II (I) [**44**]);

15.2.     the Applicant, as mere lending agent had no standing to recover the loan and in any event had assigned its recovery rights to an assignee Tao Yun Capital Group Co., Ltd. on July 14, 2017  ("**the Standing Defence**" – Final Award Part II (II), [**44 to 45**]);

15.3.     the loan money had never been advanced to LeTV Sports, but rather to a bank account maintained by Beijing Duo Le Zhi Hui Technology Co., Ltd. at Ping An Bank, which LeTV Sports had never directed ("**the Loan Receipt Defence**" – Final Award Part II (III) [**46 to 47**]);

16.     The Conspiracy Defence was rejected by the BAC Tribunal which found that the Loan Agreement had been executed with LeTV Sports' official seal and that LeTV Sports had given the management of its official seal to TV Plus. The BAC Tribunal concluded that there was no evidence of any collusion (Final Award Part II (I) [**44**]).

6

17.   The BAC Tribunal rejected the Standing Defence on the basis that the Applicant was expressly authorised to act as lending agent with centralized debt management powers which included taking legal measures to recover debts (Final Award Part II (II) [**45 to 46**]). Although the Applicant had assigned the debt arising from the Loan Agreement, it had not yet perfected the assignment by giving notice to LeTV Sports and accordingly retained the ability to take legal action to recover the loan (Final Award Part II (II) [**46**]).

18.   The Loan Receipt Defence was rejected on the basis that on 2 December 2016, both Beijing Duo Le Zhi Hui Technology Co., Ltd and LeTV Sports jointly issued an Acknowledgment of Receipt of Payment for the full amount of the loan proceeds (Final Award Part II (III) [**47**]).

19.   Other than those defences also relied on by LeTV Sports, in summary, TV Plus and Jia raised the following additional defences:

19.1.   the conditions for liability to arise under the guarantee had not been satisfied ("**the Conditions Precedent Defence**")  (Final Award Part II (VII) [**50**]); and

19.2.   the RGA was unlawful insofar as it imposed personal liability on Jia because it circumvented the limitations on corporate limited liability ("**the Limited Liability Defence**") (Final Award Part II (VII) [**51**]).

20.   The Conditions Precedent Defence was rejected by the BAC Tribunal, as the RGA clearly specified the manner of the guarantee and the scope of TV Plus and Jia's liability for the defaults of LeTV Sports (Final Award Part II (VII) [**50**]). Jia's Limited Liability Defence was also dismissed as being without "*factual or legal basis*" (Final Award Part II (VII) [**51**]).

21.   The BAC Tribunal accordingly made, among others, the following orders:

7

21.1.   LeTV Sports, TV Plus and Jia shall jointly and severally pay the principal amount of CNY 50,000,000 to the Applicant;

21.2.   LeTV Sports, TV Plus and Jia shall jointly and severally pay the Applicant interest of the principal amount at the interest rate of 7.5% per annum from 15 March 2017 until all the outstanding amount has been paid up.  Up to 15 September 2017, such interest was CNY 1,890,410.96;

21.3.   LeTV Sports, TV Plus and Jia shall jointly and severally pay the Applicant the default interest of the principal amount at the interest rate of 16.5% per annum from 2 December 2017 until all the outstanding amount has been paid up;

21.4.   LeTV Sports, TV Plus and Jia shall jointly and severally pay the Applicant costs of the BAC Arbitration of CNY 507,028 and the expenses of the Tribunal of CNY 319,740; and

21.5.   All the sums above shall be paid up within 10 days after service of the Award on LeTV Sports, TV Plus and Jia.  Otherwise, the respondents shall pay 200% of the payable interest (i.e. 48% per annum) according to Article 253 of the Civil Procedure Law of the PRC[1].

22.   An English language version of the excerpts of Civil Procedure Law of the PRC, including Articles 232 [**56**] and 253 [**59**], from the website of the Supreme People's Court of the PRC is at [**55 to 62**].

23.   As the place of BAC Arbitration was Beijing, the PRC, which is a party to the New York Convention, the Final Award is a Convention Award as defined under Section 2 of the Arbitration Act 2013.

---

[1] I verily believe that there is a typographical error in the Final Award here, "Article 253 of the Civil Procedural Law of the PRC" should be "Article 232 of the Civil Procedural Law of the PRC".

24.     The Final Award was served on Jia's arbitration counsel on 24 January 2018. I exhibit a copy of the express mail receipt acknowledgment sheet signed by Jia's arbitration counsel Zou Yi dated 24 January 2018 together with an English language translation of the same at **[63 to 64]**. As of the date of this Affirmation, the Final Award has not been paid and remains outstanding. The total amount outstanding under the Final Award up to 27 November 2018 is CNY 74,954,165.26 (US $10,800,312.00).

**III. The Smart King Joint Venture**

25.     On 8 November 2018, Smart King petitioned the U.S. District Court for the Central District of California to confirm the HKIAC Award ("**the Petition**"). Attached to the Petition as Exhibit A was the HKIAC Award itself. These are documents freely accessible to the public and are exhibited at **[65 to 151]**. Although the Petition was filed on 8 November 2018, the Applicant did not become aware of the Petition, the full contents of the HKIAC Award or indeed the details about the Smart King joint venture and Jia's interest in it, until 23 November 2018.

26.     The details of the Smart King joint venture ("**the Smart King JV**") are set out clearly in the HKIAC Award and I summarize them here for the convenience of the Court. I have also prepared a structure chart showing the various companies involved in the deal and Jia's interest in them at **[236].**

27.     Jia established and owned Faraday in 2014. Its business was (and is) to develop, manufacture, and sell intelligent electric vehicles. The company is currently developing an electric vehicle called the FF 91 for market (paragraph 43 of the HKIAC Award [**84**]).

28.     In 2017, Faraday began to search for a Series A investor to fund its ongoing operations and to increase manufacturing to bring the FF 91 to market (paragraph 45 of the HKIAC Award [**85**]).

29.    As the HKIAC Award sets out at paragraph 47, [**85**], Season Smart agreed to invest $2 billion in Faraday over several years in November 2017.

30.    Season Smart is a direct or indirect wholly-owned subsidiary of Evergrande Health Industry Group Limited (paragraph 11 of the HKIAC Award [**80**]).

31.    Season Smart's investment in Faraday was achieved through a reverse triangular merger. As a result of the merger:

   31.1.    Smart King was established as a joint venture vehicle;

   31.2.    Season Smart owns 45% of the Smart King;

   31.3.    Jia's holding company FF Top owns 33%;

   31.4.    Faraday's equity incentive program for employees owns 22%;

   31.5.    the company that originally owned Faraday, a Cayman company named FF Global Holding Ltd., was merged with Smart King's subsidiary, MergerSub, and renamed Smart Technology;

   31.6.    Smart Technology indirectly owns 100% of Faraday, meaning Smart King itself is the 100% indirect owner of Faraday Future. (See paragraph 47 of the HKIAC Award [**85**]).

32.    While FF Top only owns 33% of the shares of Smart King, it does have the right to appoint a majority of board directors to the company (paragraph 49 of the HKIAC Award [**85**]). Specifically, FF Top can appoint 5 directors, and Season Smart can appoint 2 (*id*.). It follows, therefore, that whoever controls FF Top in turn has actual control of Smart King and its subsidiaries, including Faraday. As the HKIAC Award sets out, FF Top is Jia's holding company (paragraph 47 of the HKIAC Award [**85**]).

33.     However, Season Smart does exercise some control of Smart King's ability to secure future capital, through certain consent rights over Faraday's financial operations (paragraph 49 of the HKIAC Award [**85**]).

34.     It appears that the exercise of those consent rights combined with Smart King's desire to secure further capital led Smart King to seek urgent relief from an emergency arbitrator in the HKIAC Arbitration against Season Smart.

**IV. Jia's Control and Ultimate Ownership of FF Peak and FF Top**

35.     As set out at paragraph 57 of the HKIAC Award, Jia originally owned the entire issued share capital of FF Peak. FF Peak is referred to as "Founder TopCo" in the HKIAC Award and merger documentation (paragraphs 56-57 of the HKIAC Award [**88 to 91**]).

36.     As the HKIAC Award explains, Jia's interest in Faraday arises from his 33% interest in Smart King, which is held by "*Mr. Jia's holding company, FF Top Holding Ltd*" (paragraph 47 of the HKIAC Award [**85**]). It appears therefore that Jia owned FF Peak, which in turn owns FF Top, which in turns owns 33% of Smart King ("**the Smart King Shares**").

37.     However, on 26 July 2018, Jia transferred his holding in FF Peak to a third party, namely Ms. Lian Bossert (paragraph 59 of the HKIAC Award [**91**]). By doing so, Ms. Bossert in turn came to hold legal title to the entire issued share capital of FF Peak, and thereby assumed ultimate control of FF Top and FF Top's interest in the Smart King JV and the Smart King Shares.

38.     It appears that this transfer was initiated as part of an agreement between Season Smart and Smart King to accelerate Season Smart's investment (paragraph 56 of the HKIAC Award [**88**]) (the "**Accelerated Payments**").

39.     The Accelerated Payments were necessary because Smart King needed a cash injection. Smart King argued that without further funding, it would become insolvent (Petition at paragraph 13 [**28**]; HKIAC Award at paragraphs 142, 151, and 158, [**109, 110 and 112**]).

40.     Although Smart King says that Ms. Bossert was specifically endorsed by Season Smart as an acceptable third party (paragraph 95 of the HKIAC Award [**99**]), Season Smart says that Ms. Bossert is a mere nominee for Jia. Season Smart argued among things that:

40.1.   "*The financial standing and the source of funding of the transferee in acquiring the relevant Founder TopCo shareholding from Mr Jia had not been disclosed and were unclear, casting serious doubt on whether Mr Jia had fully and genuinely transferred his interests to the transferee and was no longer the ultimate controlling shareholder of Founder TopCo.*"

40.2.   On 21 August 2018, a PRC governmental authority (the Guangzhou Nansha Development Zone Investment and Trade Promotion Institute) had issued a letter expressly indicating its concerns about Jia and requesting further information to assess and verify whether he remained as the ultimate controller of the Faraday entity in the PRC and was responsible for the Faraday China business and operations. (See paragraph 63 of the HKIAC Award [**92**]).

41.     I have conducted a search for "Lian Bossert" of public records available on the internet, and through Westlaw. As a result of this search I am aware that:

41.1.   it appears from her LinkedIn profile that she is currently a 24 year old "Senior Event Coordinator" at the "Visionary Group": [**152**].

41.2.   media articles point to the fact that her LinkedIn profile previously showed her to have been a "Communications Specialist" at LeEco, which is one of Jia's major businesses [**233**]. This information appears to have now been removed from her

LinkedIn profile [**234**]. She is likely to be the daughter of Deng Chaoying, another employee and agent of Jia.

41.3.    indeed, this is still the employment information about her shown on www.zoominfo.com: [**155**]; the ZoomInfo report shows she worked in San Jose.

41.4.    the Westlaw search shows that Ms Bossert previously lived in San Jose: [**160**].

42.    Smart King itself appears to accept that Ms. Bossert is a bare nominee of Jia in the emergency arbitration. According to the HKIAC Award at paragraphs 100-102, [**100 to 101**], and paragraph 120, [**104-105**], Smart King argued that:

> *"100.    [...] all that was required under the Transaction Agreements was a mechanical transfer by Mr Jia of the legal interest in his shares to a third party acceptable to Season Smart," and Mr Jia had complied with that requirement. Season Smart did not have the additional right under the Transaction Agreements to assess the sufficiency of the consideration paid for the shares or the "genuineness" of the transfer, a right which Smart King submitted would be wholly subjective and unworkable.*

> *101. In this regard, Smart King also argued that the commercial context ran in Smart King's favour. Mr Jia's stake in Smart King was worth approximately US$1.48 billion, and no reasonable commercial party would expect a transfer of that magnitude to be arranged in 30 days, let alone the two weeks it in fact took for Ms Bossed to come in to the company."*

> *102. This argument was also supported by the evidence of Jerry Wang, Vice President of Global Capital Markets for Faraday, who testified that Evergrande's representatives (James Xia, Jimmy Wong and Jianjun Peng) had explained to him orally that the FF Principal Transfer Requirement would be met by finding a non-Chinese nominee to hold Mr Jia's shares, and that it would be acceptable for Mr Jia to keep the economic interest relating to those shares. Indeed, said Mr Wang, disposing of Mr Jia's shares for value would have been impossible at the time given Faraday's financial condition."*

> *120. [...] that both Parties understood that the requirement that Mr Jia no longer be the "ultimate controlling shareholder…" might be satisfied by transfer to a nominee such as Lian Bossert".*

43.     Season Smart was not satisfied that Jia had divested himself of the beneficial interest in his shares in FF Peak, and this appears to have been accepted by Smart King on the basis that this was not required under the Transaction Agreement. Equally Season Smart was not "*satisfied Mr Jia has genuinely resigned as director of the relevant companies and it is likely that he is in fact acting as a shadow director controlling or directing the decisions of directors closely associated with him*" (paragraphs 65 and 67 of the HKIAC Award [**92 to 93**]). Consequently, Smart Season did not make any of the Accelerated Payments (paragraphs 61-62 of the HKIAC Award [**91 to 92**]).

44.     On 21 September 2018, the board of Smart King resolved that Smart King could seek all available alternative financing and conduct negotiations with third party financing sources as may be identified by a majority of the Board "*if Evergrande does not promptly accept Smart King's reasonable proposal*" (paragraph 68 of the HKIAC Award [**93**]). Smart King was concerned that Season Smart would exercise its consent rights so as to block any external funding into Smart King, which was "purely tactical."

45.     At paragraph 12 of the Petition, Smart King claims that Season Smart "*is deliberately starving Smart King of the cash it needs to stay solvent. It appears to be doing so either to push Smart King into bankruptcy (thereby avoiding its future payment obligations and/or allowing it to seize control of Smart King's valuable assets and intellectual property in a fire sale), or to force Smart King and the other counterparties to the Transaction Agreements to renegotiate those Agreements*": [**68**].

46.     Smart King subsequently launched the HKIAC Arbitration on an urgent basis seeking to enjoin Season Smart from asserting any of its consent rights under the merger agreements in respect of any alternative capital financing (paragraph 69 of the HKIAC Award [**93**]). Smart King later was successful in obtaining emergency relief, albeit the emergency injunction was formulated in a slightly different way. The emergency arbitrator ordered (paragraph 206 of the HKIAC Award[**122 to 123**]), that:

    "*Until a Final Award is rendered by the Tribunal to be constituted pursuant to the Notice of Arbitration filed with the Claimant's Application for Emergency Relief, or such earlier*

*time as determined by the Tribunal, the entering into of a proposal (the Proposal) which meets the conditions set out below will be deemed not to be a Reserved Matter for the purposes of Section 8 and Schedule II of the SHA and Sections 33.1 and 49.2 and Schedule I of the Smart King Articles of Association (the "*Purported Consent Rights"*), to the extent it otherwise would. The conditions are as follows:*

    i.   *The Proposal has been approved by a majority of Smart King's board of directors;*

    ii.   *The total value of alternative debt or equity financing entered into by Smart King which would, but for this Order, otherwise be subject to the Purported Consent Rights (if those rights remain on foot, a matter on which this Order does not take a view) is capped at US\$500 million;*

    iii.   *If the Proposal involves issuing new equity securities:*

        1.   *The Proposal will not have the effect of diluting Season Smart's shareholding disproportionately to other classes of shareholders;*

        2.   *The Proposal will be based on a price-per-share that is no less than the current value of Season Smart's shares, taking into account the price-per-share that Season Smart agreed to invest at in November 2017 as well as the US\$800 million in Subscription Payments that Season Smart has made since that date (the Minimum PPS). If the potential investor is unwilling to pay the Minimum PPS, then the Proposal may allow for any existing shareholder to sell its shares to the potential investor at such price as is necessary to ensure that the overall Proposal for the new equity raise is based on the Minimum PPS;*

        3.   *The Proposal will include preemptive rights in favour of Season Smart, meaning specifically that, under the Proposal, Season Smart shall have the right to purchase shares at the same price of the newly issued equity as offered to the potential investor, up to such number of shares as would be necessary to maintain its stake in Smart King.*"

47.    Therefore it would appear that Jia has retained control and beneficial ownership of the Smart King Shares which are worth in the region of US\$1.48 billion.

## V. The Injunction Sought Against FF Peak and FF Top

    *(i) The Order Sought*

48.    As I have explained above, legal title to the issued share capital of FF Peak ("**the FF Peak Shares**") was recently transferred by Jia to Ms Bossert to hold as his nominee. Therefore Jia appears to have retained control over FF Peak and therefore control over the issued share capital of FF Top ("**the FF Top Shares**"), and consequently the business and assets of FF Top, specifically the Smart King Shares.

49.    Although Jia's stake in the Smart King JV, specifically the Smart King Shares, is seemingly worth in the region of US$1.48 billion, he has not demonstrated any inclination to satisfy the Final Award, which is almost 12 month old, and accruing interest at the annual rate of 48%.

50.    The Applicant applies for an injunction against FF Peak and FF Top so that it may effectively enforce and execute the Final Award as a BVI judgment against the FF Peak or FF Top Shares that are controlled and ultimately owned by Jia. The Applicant believes the FF Top Shares are, or are likely to be amenable to the appointment of a receiver by way of equitable execution. A receiver will be able to take control of FF Top, via the FFPeak/FF Top Shares and then take steps to realize its assets, including the Smart King Shares, to the value of the Final Award. A sale of the Smart King Shares appears to be permissible in the circumstances prescribed by paragraph 206(b)(iii)(2) of the HKIAC Award [**123**].

51.    The Applicant seeks an injunction to preserve status quo pending the determination of the s.85 Application. Firstly, the Applicant seeks an order to restrain FF Peak and FF Top from giving effect to any attempt by Jia to transfer ownership of the FF Peak and/or FF Top Shares to a third party.

52.    For example, now that his holding structure is accessible by his creditors and the public at large through the Petition and the HKIAC Award, Jia may be, and indeed is likely to be, inclined to direct Ms Bossert to transfer the FF Peak Shares to a third party who may later attempt to argue that it acquired those shares in good faith, without notice of an injunction against FF Top and for consideration thereby undermining the Applicant's subsequent efforts to appoint a receiver over the FF Top Shares.

16

53.     The Applicant seeks a like injunction against FF Peak because Jia could just as easily direct Ms Bossert and FF Peak to transfer the FF Top Shares to a third party who could later attempt to claim that they are no longer controlled or beneficially owned by Jia, and therefore not susceptible to enforcement by equitable execution.

54.     Second, the Applicant seeks a freezing order against FF Peak and FF Top enjoining it from disposing of or dissipating the value of its assets, whether situate in or outside the BVI, including the Smart King Shares without first obtaining the consent of the Applicant, up to the value of the Final Award, plus interest and costs.

55.     The Applicant understands that there are three evidential and legal requirements that must be satisfied before this Court will grant the Orders sought. I will leave the legal requirements to the Applicant's BVI legal practitioner to address in submissions, however, to the extent relevant and permissible I will set out the evidence upon which those submissions will be based in the following sections.

*(ii) Good Arguable Case*

56.     The Applicant has already established its rights against Jia in the BAC Arbitration and holds a final, valid and binding arbitral award against him. Jia has not sought to challenge the Final Award in the curial Court of the PRC.

57.     As I have stated in paragraph 23 above, the Final Award is a Convention Award and therefore may be summarily enforced in the BVI on application under s.84(1)(b) and s.85 of the Arbitration Act 2013.

58.     I do not believe there are any grounds within the scope of s.86 (which mirror Article V of the New Yok Convention) of the Arbitration Act 2013 that would enable Jia to resist enforcement of the Final Award.

59.     I understand that in order to grant the orders sought against FF Peak and FF Top, the Applicant must demonstrate that it has a good arguable case or good reason to suppose that

17

these companies hold assets that may be available to satisfy the Final Award once enforceable as a judgment of this Court.

60.     As I set out in paragraph 37 above, until 26 July 2018 Jia was the sole owner of the FF Peak Shares. FF Peak remains the sole owner of the FF Top Shares, which in turn owns the Smart King Shares that appear to be worth US$1.48 billion. Although the FF Peak Shares were transferred to Ms Bossert, it is clear from the HKIAC Award, paragraph 102 [**101**], that she holds those shares as nominee.

61.     In the HKIAC Arbitration, Smart King, the board of which is effectively controlled by Jia's representatives, argued that "***Mr Jia's*** *stake in Smart King was worth US$1.48 billion…*" (emphasis supplied, HKIAC Award paragraph 101 [**101**]). This appears to be a candid and accurate statement of the real position, that notwithstanding the interposition of FF Top, FF Peak and Ms Bossert, Jia is to be regarded as the owner of the Smart King Shares. Using the same rationale, Jia is to be regarded as the owner of the FF Peak and FF Top Shares.

62.     I believe Jia is almost certainly able to call for Ms Bossert to transfer the FF Peak Shares back to him or otherwise direct her to cause FF Peak to transfer the FF Top Shares to him. As will be developed in submissions, the Applicant as an effective BVI judgment creditor is able to appoint a receiver by way of equitable execution over whatever may be considered in equity as the assets of Jia. Accordingly, the Applicant has a good arguable case or good reason to suppose that:

62.1.   the FF Peak Shares belong to Jia in equity and therefore may be amenable to equitable execution through the appointment of a receiver;

62.2.   the FF Top Shares belong to Jia in equity and therefore may be amenable to equitable execution through the appointment of a receiver;

62.3.   the Smart King Shares belong to Jia in equity and therefore may be amendable to equitable execution through the appointment of a receiver

18

63.     Once appointed, a receiver would be in a position to take control of FF Top, through for example voting on the FF Top Shares to take control of FF Top and thereafter taking steps to realise its assets, including the Smart King Shares, which could be used to satisfy the BVI judgment based on the Final Award.

64.     Accordingly I believe that there is good reason to suppose that FF Peak and FF Top hold assets, specifically the FF Top Shares and the Smart King Shares that may be amenable to execution of the Final Award in the same manner as a BVI judgment.

*(iii) Real Risk of the Final Award enforceable as a Judgment of this Court remaining Unsatisfied*

65.     I also understand that the Applicant must demonstrate that there is a real risk that unless the orders sought on this application are granted, Jia will direct or cause FF Peak and/or FF Top to deal with their assets in such a manner as to leave the Final Award and any order giving permission to enforce it as a BVI judgment unsatisfied.

66.     I believe that the following evidence amply demonstrates a real risk that Jia will deal with his assets, including those he holds in and through FF Peak and FF Top, in a manner that will leave any order permitting the Final Award to be enforced as a judgment of this Court unsatisfied.

**(a)   Jia' Contumelious and Unconscionable Disregard for Financial Obligations**

*1.   Jia's Staggering Personal Indebtedness*

67.     It would appear that by July 2017, Jia was facing multiple enforcement actions in China from his creditors. On 17 July 2017, an application to enforce a judicial document was filed against Jia in the Beijing No.3 Intermediate People's Court ("**the Beijing Court**") for CNY 575,030,000.00 (US$82,847,792.27). Another enforcement application against Jia was filed in the Beijing Court on the same day for CNY 598,995,277.00 (US$86,300,603.00). On 29 December 2017, Jia was declared by the Beijing Court as a "discredited person subject to enforcement" for refusing "to perform his obligations under a settlement

agreement without any justified reasons". I exhibit hereto two print-outs from the Supreme People's Court of the PRC's web-based register together with English language translations at pages 192 to 195.

68.     Another similar enforcement application against Jia for CNY 304,017,169.00 (US$43,801,456.03) was also filed on 17 July 2017.  As a result, Jia was again declared on 10 January 2010 as a "discredited person subject to enforcement" for refusing "to perform his obligations under a settlement agreement without any justified reasons".  I exhibit the relevant register print-outs together with English language translations at pages 196 to 197.

69.     A further application against Jia was filed in the Beijing Court on 8 August 2017 for CNY 1,403,251,304.11 (US$202,174,273.59) and as a result Jia was again declared as a "discredited person subject to enforcement" for "breach of the property reporting system" on 7 March 2018. I exhibit the relevant judgment register print out together with English language translation at pages 198 to 199.

70.     On 4 September 2017 another enforcement application against Jia was filed in the Beijing Court for the sum of CNY 210,501,384.00 (US$30,328,113).  As a result, Jia was restricted from prohibited consumptions [**201**]. Two enforcement applications against Jia were filed both on 28 September 2017 for CNY 462,100,000 (US$66,577,334.76) and CNY 305,096,301.37 (US$ 43,956,932) and Jia was again declared as a "discredited person subject to enforcement" for "breach of the property reporting system" on 11 and 14 December 2017 [**203 and 205**]. On 9 January 2018, another enforcement application for CNY 300,000,000 (US$43,222,680) was filed against Jia.  Jia was again declared as a "discredited person subject to enforcement" for "breach of the property reporting system" on 17 May 2018 [**207**]. I exhibit the relevant judgment register print outs together with English language translations at [**200 to 207**].

71.     On the basis of these debts alone which are in no event exhaustive, Jia is indebted to his creditors for at least approximately US$555,252,252.65 and has been declared by the PRC Court as a discredited person subject to enforcement multiple times.

*2.  Jia's LeEco Group of Companies Incurred Huge Indebtedness*

72.    In addition to Jia's personal indebtedness, LeEco appears to be indebted in the sum of at least US$941 million. I exhibit hereto at **[208 to 209]** a press article from Business Insider dated 25 January 2018 detailing LeEco's indebtedness to Leshi Internet Information and Technology, the Shenzen, China-based listed arm of LeEco.

73.    In December 2017, the local Hong Kong-based unit of LeEco, LE Corporation Limited, filed to voluntarily winding-up the company's affairs. On 21 February 2018, the Hong Kong High Court made an order for the winding-up of LE Corporation. I exhibit a news article from The Standard dated 22 February 2018 referring to such winding-up order at pages 210 to 211.

74.    Moreover, as appears from Section II above, LeTV Sports and TV Plus, both companies substantially owned by Jia breached their financial obligations to the Applicant under the Loan Agreement and the RGA and have also failed to satisfy the Final Award.

*3.  Jia's financial defaults has led to his designation as "Discredited Person" by the PRC Court*

75.    The register of 'discredited persons' is maintained and enforced by the PRC Supreme Court against the PRC's worst debtors and is aimed at curbing reckless consumption in the light of the debtor's obligations to his or her creditors.

76.    The designation is enforced through the imposition of 'consumption' restrictions such as a prohibition against purchasing airplane tickets and higher class train tickets, staying in luxury hotels, purchasing real estate or luxurious furnishings, leasing high-end office buildings or purchasing private wealth management products. The consumption restrictions are enforced through criminal penalties by the PRC Supreme Court. I exhibit

hereto, copies and English language translations of each of the nine (9) consumption restrictions orders entered against Jia at **[212 to 229]**.

4.  *The CSRC issued an unprecedented mandate for Jia to return to the PRC to face his Creditors*

77.     In September 2017, the China Securities Regulatory Commission ("**CSRC**") demanded that Jia return to the PRC to face creditors' claims. On 25 December 2017 the CSRC issued an unprecedented mandate that Jia return to PRC by 31 December 2017. Although Jia expressed public remorse for his 'debt crisis' he refused to return to the PRC and elected to remain in the US to develop his interests in Faraday. I exhibit hereto a news report from Financial Times dated 2 January 2018 confirming the CSRC's mandate and Jia's refusal or failure to comply at **[230 to 231]**.

5.  *Jia Attempts to Raise Thin and Demonstrably Implausible Defences to Avoid Financial Obligations*

78.     As I have set out above, Jia resigned from his position as chairman of LeEco in July 2017 and left the PRC soon after. Notwithstanding the fact that Jia purported to express a "*deep sense of guilt and remorse*" [**230**], this did not prevent him or LeTV Sports and TV Plus, both companies substantially controlled by him, from raising clearly thin and implausible defences in the BAC Arbitration.

79.     By the second hearing of the BAC Arbitration on 1 December 2017, over US$500 million in claims had be filed in the Beijing Court to be enforced against Jia. As I have referred to above, LeTV Sports, a company substantially owned by Jia, attempted to argue that it had no knowledge of the Loan and that Jia conspired with TV Plus and the Applicant to execute the Loan. LeTV Sports also attempted to argue that it had not received the loan proceeds.

80.     Whilst the BAC Tribunal dismissed the Conspiracy Defence and the Payment Receipt Defence, I believe the very fact they were raised at all, especially considering Jia's

22

extensive personal debt, is further reflection of his poor standards of commercial morality and irresponsible approach to his financial obligations.

6.  *Jia Incurs Liabilities Far Beyond His Means and Continues to Do So*

81.    It is evident from the sheer scale of Jia's personal debts and the cascade manner in which those debts rapidly crystalized as I have set out in paragraph 67 to 71 above, that Jia has no meaningful appreciation for his ability to service and meet his liabilities.

82.    Moreover, it appears that Jia continues to purchase wealth management and planning products through using offshore structures to hold his interests in Smart King. This appears to be in breach of the 'consumption restrictions' imposed by the PRC Supreme Court as I have alluded to above.

**(b)  Jia is Experienced in the Use of Offshore Structures and Has Reason to Rearrange his Affairs in the Light of the Petition**

83.    Of course one of the principal benefits to using BVI nominee and corporate holding structures is the privacy they afford their owners. It is clear that Jia is well accustomed to using such nominees and structures. As appears from the HKIAC Award at paragraph 63 [**92**], Jia understands how such structures can be used to give the appearance that he has relinquished interest or involvement in business investments and activities.

84.    More importantly, until the Petition and the HKIAC Award were made available publicly, the Applicant, and presumably the rest of Jia's creditors had no insight into Jia's assets outside of the PRC. In particular, because HKIAC Awards are confidential, it was unknown to the Applicant how Jia held his interest in Faraday or the value of that interest.

85.    Now that the existence of the holding structure that runs through FF Peak and FF Top is in the public domain, there is little doubt that Jia's creditors are in a position to take action, just as the Applicant is, against Jia's offshore assets, which appear to be valued at US$1.48

23

billion.  I exhibit an online article published on 21 November 2018 referring to the contents in the HKIAC Award at **[232 to 235]**.

86.     Jia will of course know this and in the light of the fact that his interest and involvement in the Smart King JV are already the subject of intense dispute with Season Smart, he is unlikely to leave those interests exposed to external creditors.

87.     It would be possible for Jia to direct Ms Bossert to transfer the FF Peak Shares or indeed the FF Top Shares to an undisclosed third party or settle them in trust. Moreover, as appears from paragraph 206 of the HKIAC Award, FF Top will be able to sell the Smart King Shares if the price-per-share minimum threshold is not met by the third party investor. I understand that as a BVI company, it is permissible under BVI law for FF Top to direct that any sale proceeds are paid to a third party regardless of whether such payment has an corporate benefit to FF Top. It would be very easy in these circumstances for any proceeds of sale of the Smart King Shares to be routed to Jia outside of the FF Top/FF Peak/Bossert structure.

*(iv) Just & Convenient*

88.     Finally, I understand that the Court has a discretion whether to order the injunctions sought by the Applicant even if the first two requirements have been met. I understand that this is predominantly a legal issue for argument.

89.     I would however highlight that the purpose of the injunctions to prevent Jia from dealing with his assets in a manner that leaves the Final Award, which is now almost 12 months old, unsatisfied. Jia appears to have abandoned the PRC and his legacy of staggering debt. Although his move to the US and focus on Faraday appears to be part of a rescue mission, Jia has given no indication to the Applicant that he intends to satisfy the Final Award.

90.     The success of Faraday may be central to Jia's ability to satisfy the Final Award and indeed any other debts. However, the orders sought by the Applicant do not completely prevent Jia or the other Respondents from dealing with their assets; the orders sought simply lock

24

down the FF Peak Shares and FF Top Shares and prevent the Respondents from dissipating or dealing with their assets without the Applicant's knowledge and consent.

91.    The alternative is to leave Jia in full control. But as history has shown, Jia does not meet his financial obligations when left unrestrained with disastrous consequences.


### VI. Full & Frank Disclosure

92.    As the Application is made and intended to be dealt with *ex parte* without notice to any of the Respondents, and at the same time as the hearing of the s.85 Application, I now set out details of matters that I believe the Respondents might seek to advance if they had notice of the Application, in order to comply with the duty of full and frank disclosure which lies on the Applicant.

93.    As I explained in Kang 1, the information about Jia's interests in FF Peak and FF Top is derived not from my personal knowledge but what is said in the HKIAC Award. The Applicant has no means to verify the correctness or the accuracy of such information.  That said, given Jia was a party to the HKIAC Arbitration, and was legally represented, I verily believe that if such information is incorrect or inaccurate, Jia would have raised it to the emergency arbitrator in those proceedings. Further, the source of the emergency arbitrator's knowledge appears to be the merger agreements themselves (HKIAC Award at paragraph 47, footnotes 4 and 5: [**85**]).

94.    First, the Respondents may argue that the injunctions sought by the Applicant would not serve a useful purpose. That is because Jia's interest in FF Peak appears to have *already* been dissipated, and FF Top's 33% interest in Smart King does not itself appear to be at risk, subject to what I say at paragraphs 97 to 100 below. Instead, it appears that the alternative financing arrangements being considered by Smart King would involve the issuance of new shares in Smart King, which is a Cayman company, as opposed to any of the BVI Companies.

95.    Second, and again subject to what I say at paragraphs 97 to 100 below, the HKIAC Awards shows evidence that there are existing constraints in place against asset dissipation, and that the transfer of Jia's shares to Ms. Bossert was initiated as part of the agreement between Smart King and Season Smart as a precondition for the Accelerated Payments to be made by Season Smart (paragraph 56 of the HKIAC Award: [**88 to 90**]). As to the constraints:

95.1.    The agreement relating to Season Smart's Accelerated Payments to Smart King appears to limit the potential transferees of Jia's interest in Faraday Future (held through FF Peak) to identified third parties that are acceptable to and endorsed by Season Smart (paragraph 56 of the HKIAC Award: [**89**]).

95.2.    It appears Ms. Bossert has executed a deed of adherence that binds her in the same way as Jia was previously bound (paragraph 95 of the HKIAC Award: [**99**]).

96.    Third, I note that if freezing orders are obtained, they may disrupt the ongoing efforts to refinance Smart King, which is seeking at least several hundred million dollars, and up to $1.2 billion, in emergency funding. The Court may wish to weigh that disruption against the fact that the Final Award is relatively modest in size by comparison ($10.6 million), albeit still a very large sum of money. The reasons for the potential disruption are:

96.1.    A freezing order against FF Peak would prevent Ms. Bossert from disposing of her shares. I understand that Season Smart wishes Jia to distance himself, from an ownership perspective, from Smart King as part of the refinancing arrangements. (HKIAC Award at paragraph 56: [**88**]). However, Season Smart does not believe that Ms. Bossert is independent of Jia, as I have explained above.

96.2.    A freezing order against FF Top preventing it from disposing of its interest in Smart King would prevent one of the alternative financing arrangements under consideration by Smart King, and which has been approved (subject to particular

26

conditions) in the HKIAC Award. See paragraph 206(b)(iii)(2) of the HKIAC Award: [**123**].

97.    Against this, the Applicant believes the freezing orders sought would serve a useful purpose because Ms. Bossert could not go on to transfer the shares in FF Peak a further time, potentially rendering them not amenable to execution by way of equitable receivership. As matters stand, and because Ms. Bossert appears simply to be a nominee, the Applicant believes that a receivership order could ultimately made over those shares or indeed the FF Top Shares, as I have explained above, in order to satisfy the Final Award.

98.    Further, the Applicant remains seriously concerned about Jia's transfer of his shares and the subsequent actions of Smart King (a majority of whose directors are appointed by Jia or those close to him) for the following reasons:

98.1.    Ms. Bossert appears to be a nominee of Jia who has not acquired the shares in FF Peak for good and valuable consideration, as explained above. It appears that FF Peak has not received the $1.48 billion value of the shares (paragraph 101 of the HKIAC Award: [**101**]).

98.2.    Whatever the reasons for the transfer of Jia's shares in FF Peak, it demonstrates the ease by which they can be moved.

98.3.    The HKIAC Award obtained by Smart King makes it easier for Smart King, which is effectively controlled by Jia's board representation, and FF Top to dilute or move their assets. The HKIAC Award:

98.3.1.    Effectively removes the consent right that Season Smart would otherwise have to approve or veto an alternative funding source for Smart King (paragraph 206(b) of the HKIAC Award: [**122**]), subject to certain safeguards quoted above at paragraph 206(b)(iii), including paying a minimum purchase price ("**Minimum PPS**"); and

27

      98.3.2. Directs that, in the event that Smart King cannot find a potential investor willing to pay the Minimum PPS, the alternative financing proposal may allow for "*any existing shareholder to sell its shares to the potential investor at such price as is necessary to ensure that the overall Proposal for the new equity raise is based on the Minimum PPS*". This last point is especially concerning to the Applicant because it suggests that FF Top's interest in Smart King may in fact be at risk of dissipation.

99.    I also note that if the merger agreement is unwound – which is the relief that Smart King seeks in the HKIAC arbitration (paragraphs 90-91 of the HKIAC Award: [**98**]) – then it appears there would be no constraints at all on Jia disposing of his interest in Faraday.

100.    I understand that there are procedural and legal matters that will be raised by the Applicant's legal practitioner at the hearing of this Application that are also relevant to full and frank disclosure.

## VII. Cross-undertaking in Damages

101.    I confirm that the Applicant is prepared to give an undertaking to the Court up to the value of the Final Award.

## VIII. Conclusions

102.    I therefore respectfully request the Court to make an order against the Second and Third
Respondents in the terms sought.

Affirmed by the abovenamed                )
at  27/F, Henley Building, Central, Hong Kong
this 27th day of November  2018           )

Before me,

LEUNG Ming Shan John Bosco
Solicitor, Hong Kong SAR
Messrs. Dennis Fong & Co.

This Affirmation is filed on behalf of the Applicant.

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**VIRING ISLANDS**
**COMMERCIAL DIVISION**


**CLAIM NO. BVIHC (COM)          of 2018**


**IN THE MATTER OF THE ARBITRATION ACT 2013**
**AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN**
**ARBITRAL AWARD ADMINSTERED BY**
**THE BEIJING ARBITRATION COMMISSION**


**BETWEEN:**

**SHANGAHI LAN CAI ASSET MANAGEMENT LIMITED**

Applicant

- and -


**JIA YUETING (1)**

Respondents

**FF PEAK HOLDING LIMITED (2)**
**FF TOP HOLDING LIMITED (3)**

NCA Respondents

_____

**SECOND AFFIRMATION OF KANG JIAN**

_____


KOBRE & KIM (BVI) LP

**Legal Practitioners for the Applicants**
Tel: 284 852 1600
Email: peter.tyers-smith@kobrekim.com
Ref. 3787.001

# EXHIBIT 5

FILED
Registrar's Office

NOV 0 9 2017

Virgin Islands
at 9:00am

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION
CLAIM NO. BVIHC (COM)██ OF 2017
BETWEEN:-

COMMERCIAL DIVISION ECSC
COURT FEES

$25.00
Virgin Islands

██████████

**Applicant**

v

██████████

**Respondent**

### ORDER

### PENAL NOTICE

IF YOU FAIL TO COMPLY WITH THE TERMS OF THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND YOUR DIRECTORS AND OFFICERS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

**BEFORE:**    The Honourable Justice Gerhard Wallbank [Ag]

**DATED:**     31 October 2017

**ENTERED:**    9 November 2017

**UPON HEARING** ████████████████████████████
████████ ████████ ████████

**THIS ORDER**

1

1. This is a Freezing Injunction made against ███████████████ ("███████" or the "**Respondent**") on 31ˢᵗ October 2017 by Justice Wallbank on the application of ██████ ██ (the "**Applicant**"). The Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2. This Order was made at a hearing without notice to the Respondent. The Respondent has a right to apply to the court to vary or discharge the Order (see paragraph 10 below).

3. There will be a further hearing in respect of this order on 14ᵗʰ November 2017 at 2 p.m. (the "return date").

**FREEZING INJUNCTION**

4. Until after the return date or further order of the Court, the Respondent is without the prior written consent of the Applicant's legal representatives:

   (a) restrained (acting by and/or on the instruction of its directors, officers and/or agents) from:

   (ii) In any way disposing of, dealing with or diminishing the value of the entire shareholding in ███████ (the "**Shares**"), whether they are in or outside the BVI, whether in its name or not and whether jointly owned beneficially, legally or otherwise up to the same value;

   (iii) registering or causing to be registered any change in the legal ownership of the Shares in any way, including but not limited to sale, exchange, contribution, and/or transfer;

   (iv) in any way recognising or causing to be recognised or recorded in ███████ Register of Shares (the "**Register**") any such purported change in or transfer of all or part of the legal ownership of the Shares;

   (v) in any way recognising or recording or causing to be recognised or recorded on the Register any change or transfer of the ownership of all or part of the equitable interest in the Shares, including but not limited to by way of encumbrance, pledge, lien or charge over the Shares;

(vi)  removing or allowing or instructing or causing to be removed or instructing the removal of the share certificate(s) pertaining to the Shares from the territory of the Virgin Islands;

(vii)  cancelling the Shares and/or reissuing the Shares, or causing or instructing the same; and

(viii)  effecting or allowing to be created or effected any changes, variations or amendments to any agreement, trust and/or any other similar arrangement in relation to which the Shares are held;

(b)  restrained from in any way transferring, disposing of, pledging, charging diminishing the value of, encumbering or dealing with its assets up to the value of ███████ (the "**Relevant Assets**") whether they are inside or outside the Virgin Islands, without first providing the Applicant with at least 14 days written notice; and

(c)  for the purposes of this Order, the Relevant Assets are any assets of ████ whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this Order the Respondent's assets include any asset that it has the power, directly or indirectly, to dispose of or deal with as if it were its own. The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its direct or indirect instructions. The Relevant Assets include but are not limited to the following assets that may be held directly and indirectly by ████:

(i)  any shares in ████████ (a company registered in the BVI with company number ████); and

(ii)  the proceeds from the sale by ████████████ ████████

5.  The Applicant shall have the right to notify third parties outside the jurisdiction of the High Court of the existence of this Order, including (but not limited to):



a.          as registered agent of

b.          as directors of      ;

c.          as directors

**EXCEPTIONS TO THIS ORDER**

6.     This Order does not prohibit the Respondent from spending US$20,000.00 on legal advice and representation. But before spending any money the Respondent must tell the Applicant's legal representatives where the money is to come from including the bank account.

7.     This Order does not prohibit the Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business.

8.     The Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this Order should be varied in any other respect, but any agreement must be in writing.

**COSTS**

9.     The costs of this application are reserved.

**VARIATION OR DISCHARGE OF THIS ORDER**

10.     Anyone served with or notified of this Order may apply to the court at any time to vary or discharge this Order (or so much of it as affects that person), but they must first inform the Applicant's legal representatives. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's legal representatives in advance.

**INTERPRETATION OF THIS ORDER**

11.     A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

12.   A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

13.   Effect of this Order:

It is a contempt of court for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be imprisoned, fined or have their assets seized.

14.   Set off by banks:

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the respondent before it was notified of this Order.

15.   Withdrawals by the Respondent:

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this Order.

16.   Persons outside the BVI:

(a)   Except as provided in paragraph (b) below, the terms of this Order do not affect or concern anyone outside the jurisdiction of this Court.

(b)   The terms of this Order will affect the following persons in a country or state outside the jurisdiction of this court:

(i)   the Respondent or its officer or agent appointed by power of attorney;

(ii)   any person who:

(A)   is subject to the jurisdiction of this Court;

(B)   has been given written notice of this Order at his residence or place of business within the jurisdiction of this Court; and

5

      (C)      is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this Order; and

   (iii)     any other person, only to the extent that this Order is declared enforceable by or is enforced by a court in that country or state.

**Assets located outside Virgin Islands**

17    Nothing in this Order shall, in respect of assets located outside BVI, prevent any third party from complying with:

    (a)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

    (b)    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

BY THE COURT

DeP **REGISTRAR**

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this Order should be sent to:-

The Court Office located at the Registry of the High Court, 2nd floor SAKAL Building, Wickham's Cay, PO Box 418 Road Town, Tortola, British Virgin Islands: Telephone +1 (284) 468 5001 or +1 (284) 468 4909 | Email: supremecourt@gov.vg or commercialdivisionvi@gov.vg. The Court Office is open between 9:00 am and 2:00 pm, Monday to Friday except public holidays.

BVI Commercial Division in St. Lucia located 2nd Floor, Renham Building, No. 1 William Peter Blvd Castries, St. Lucia is open between 9:00 am and 4:00 pm, Monday to Friday except public holidays. Tel: +1 (758) 452 6484 | E-filing for authorized BVI Law firms at bvicommercial@eccourts.org;

**NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVE**

The Applicant's legal representatives are Harney Westwood & Riegels, Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands; Telephone (284) 494 2233, Fax (284) 494 3398; Ref PAF/045599.0003

## SCHEDULE A

**AFFIDAVITS**

The Applicant relied on the following affidavit—

| Name | No. of affidavit | Date sworn | Filed on behalf of |
|------|------------------|------------|--------------------|
| (1) ███████ | 1 | 16 October 2017 | Applicant |

## SCHEDULE B

**UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1)   If the Court later finds that this Order has caused loss to any of the Respondents and decides that such Respondent or Respondents should be compensated for that loss, the Applicant will comply with any order that the Court may make.

(2)   Anyone notified of this Order will be given a copy of it by the Applicant's legal representatives.

(3)   The Applicant shall pay the reasonable costs of anyone other than the Respondent that have been incurred as a result of this Order including the costs of finding out whether that person holds any of such Respondent's assets and it the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the Court may make.

(4)   If this Order ceases to have effect, the Applicant shall immediately take all reasonable steps to inform in writing anyone to whom it has given notice of this Order, or who it has reasonable grounds for supposing may act upon this Order, that it has ceased to have effect.

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION
CLAIM NO. BVIHC (COM)    OF 2017
BETWEEN:-



**Applicant**

v

**Respondent**

**ORDER**



**Legal practitioners for Applicant**

Tel                    Fax

**FILED**
Registrar's Office

DEC 2 5 2017

Virgin Islands
at _____ 12:32 am

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL COURT
CLAIM NO.: BVIHC (COM) ▆ OF 2017

BETWEEN:-

▆▆▆▆▆▆▆▆

*Claimant*

-v-

▆▆▆▆▆▆▆▆

*Defendants*

---

### ORDER

---

### PENAL NOTICE

IF YOU FAIL TO COMPLY WITH THE TERMS OF THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND YOUR DIRECTORS AND OFFICERS MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE DEFENDANTS TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

BEFORE: The Honourable Mr Justice Adderley

DATED: 24 December 2017

ENTERED: 25 December 2017

UPON the Claimant filing an application for an Order pursuant to Rule 17 of the CPR dated 21 December 2017 (the *Application*)

AND UPON the Application coming on for hearing

1

4C4

AND UPON the Court reading the Affirmation of ▮▮▮▮ dated 21 December 2017 and the affirmation of ▮▮▮▮ dated 22 December 2017 and the exhibits thereto

AND UPON HEARING Counsel for the Claimant, ▮▮▮▮

AND UPON Counsel for the Claimant undertaking to the Court in the terms of Schedule B hereto

**THIS ORDER**

1.  This is a Freezing Order made against ▮▮▮▮ (the *First Defendant*) and ▮▮▮▮ (the *Second Defendant*) on 24 December 2017 by Justice Adderley on the application of ▮▮▮▮ (the *Claimant*). The Judge read the Affirmation listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.  This Order was made at a hearing without notice to the Defendants. The Defendants have a right to apply to the court to vary or discharge the Order (see paragraph 18 below).

3.  There will be a further hearing in respect of this Order on **17 January 2018** at the Commercial Division of the High Court sitting in Tortola (the *return date*) scheduled for two hours for the inter partes hearing .

**FREEZING ORDER**

4.  Until after the return date or further order of the Court, the First and Second Defendants are each, without the prior written consent of the Claimant's legal representatives, restrained from in any way transferring, disposing of, pledging, charging, encumbering, diminishing the value of, or dealing with any of his or its assets, whether in his or its name or not and whether owned jointly, beneficially, legally, or otherwise, up to a value of US$95,865,387.

5.  Until after the return date or further order of the Court, the First and Second Defendants are, without the prior written consent of the Claimant's legal representatives restrained (acting by and/or on the instruction of its directors, officers and/or agents mutatis mutandis ) from:

(a)     in any way disposing of, diminishing, or dealing with the value of the entire shareholding in the Second Defendant (the *Shares*), whether in his or its name or not, and whether owned jointly, beneficially, legally, or otherwise;

(b)     registering or causing to be registered any change in the legal ownership of the Shares in any way, including but not limited to sale, exchange, contribution, and/or transfer;

(c)     in any way recognising or causing to be recognised in the Second Defendant's register of shares any such purported change in or transfer of all or any part of the legal ownership of the Shares;

(d)     in any way recognising or recording or causing to be recognised or recorded on the register of the shares of the Second Defendant any change or transfer of the ownership of all or part of the equitable interest in the Shares, including but not limited to by way of encumbrance, pledge, lien or charge over the Shares;

(e)     removing, or allowing or instructing or causing to be removed, or instructing the removal of, the share certificates pertaining to the Shares from the territory of the Virgin Islands;

(f)     cancelling the Shares and/or reissuing the Shares, or causing or instructing the same; and

(g)     effecting or allowing to be created or effected any changes, variations or amendments to any agreement, trust and/or any other similar arrangement in relation to which the Shares are held.

6.      For the purposes of this Order, "assets" are all assets of a Defendant worldwide, whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this Order, the Defendants' assets include any asset that it has the power, directly or indirectly, to dispose of or deal with as if it were its own. The Defendants are to be regarded as having such power if a third party holds or controls the asset in accordance with its direct or indirect instructions. Assets include but are not limited to the following assets that may be directly and/or indirectly held by the Defendants:

456

(a) shares in ███████ ██ ██ (a company incorporated under the laws of Japan) ████);

(b) shares in ███████ ██ ██ (a company incorporated under the laws of Japan) ████; and

(c) shares in ██████ ███ (a company incorporated under the laws of Japan) ████);

7. The Defendants have no power to deal with the shares in ████████████

8. The Second Defendant has no corporate authority, capacity or power to procure, by way of resolution or at all, that any of its assets, including shares in ████ ████ ███ ██ ████ be transferred, encumbered, assigned, pledged, mortgaged or charged.

9. The Claimant shall have the right to notify third parties outside the jurisdiction of the High Court of the existence of this Order, and to seek enforcement and/or recognition of the same in, including but not limited to, the Courts of Singapore, Japan and Thailand.

**PROVISION OF INFORMATION**

10. Unless paragraph 11 applies, the Defendants must by 4 pm (BVI time) on 27 December 2017 or 72 hours after receipt of this order whichever is later, and to the best of their ability, inform the Claimant's solicitors of all their assets, giving the value, location and details of all such assets.

11. If the provision of any of this information is likely to incriminate a Defendant, that Defendant may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Defendant liable to be imprisoned, fined or have his assets seized.

12. The Defendants must each by 4 pm (BVI time) on 27 December 2017 or within 72 hours after receipt of this order whichever is later, and to the best of their ability, notify the Claimant of the identity of all securities holding companies that hold shares in ████ for or on behalf of that Defendant, and the location of share certificates for shares in ████ if issued.

4

13.    Within 3 working days after being served with this Order, the Defendants must each swear and serve on the Claimant's solicitors an affidavit setting out the above information.

**EXCEPTIONS TO THIS ORDER**

14.    This Order does not prohibit the Defendants each from spending US$50,000.00 on legal advice and representation. Before spending any money, the Defendants must tell the Claimant's legal representatives where the money is to come from including the bank account.

15.    This Order does not prohibit the Defendants from dealing with or disposing of any of its assets in the ordinary and proper course of business.

16.    The Defendants may agree with the Claimant's legal representatives that the above spending limits should be increased or that this Order should be varied in any other respect, but any agreement must be in writing.

**COSTS**

17.    The costs of this application are reserved.

**VARIATION OR DISCHARGE OF THIS ORDER**

18.    Anyone served with or notified of this Order may apply to the court at any time to vary or discharge this Order (or so much of it as affects that person), but they must first inform the Claimant's legal representatives. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Claimant's legal representatives in advance.

**INTERPRETATION OF THIS ORDER**

19.    To the extent the First Defendant is ordered not to do something, he must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement

20.    To the extent the Second Defendant is ordered not to do something, it must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

458

**PARTIES OTHER THAN THE CLAIMANT AND DEFENDANTS**

21.    Effect of this Order:

It is a contempt of court for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be imprisoned, fined or have their assets seized.

22.    Set off by banks:

This Order does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the Defendants before it was notified of this Order.

23.    Withdrawals by the Defendants:

No bank need enquire as to the application or proposed application of any money withdrawn by the Defendants if the withdrawal appears to be permitted by this Order.

24.    Persons outside the BVI:

(a)    This Order has worldwide effect.

(b)    For the avoidance of doubt and without limiting the foregoing, the terms of this Order will affect the following persons in a country or state outside the jurisdiction of this court:

(i)    the Defendants and their officers or agents appointed by power of attorney;

(ii)    any person who:

(A)    is subject to the jurisdiction of this Court;

(B)    has been given written notice of this Order at his residence or place of business within the jurisdiction of this Court; and

(C)    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this Order; and

(iii)    any other person, only to the extent that this Order is declared enforceable by or is enforced by a court in that country or state.

## ASSETS LOCATED OUTSIDE VIRGIN ISLANDS

25.    Nothing in this Order shall, in respect of assets located outside BVI, prevent any third party from complying with:

(a)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Defendants; and

(b)    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Claimant's solicitors.



BY ORDER OF THE COURT

REGISTRAR

## COMMUNICATIONS WITH THE COURT

All communications to the Court about this Order should be sent to:-

The Court Office is located at the Registry of the High Court, the Court House, Road Town, Tortola, British Virgin Islands; Telephone (284) 468 5001 , Fax (284) 494 6664. The office is open between 8.30 am and 4.30 pm, Monday to Friday, except public holidays.

460

**NAME AND ADDRESS OF CLAIMANT'S LEGAL REPRESENTATIVE**

The Claimant's legal representatives are ███████████████████████

████████████████████████████████████████████████████████

████████████

8

461

## SCHEDULE A

**AFFIDAVITS**

The Claimant relied on the following affirmation—

| Name | No. of affirmation | Date sworn | Filed on behalf of |
|------|--------------------|------------|--------------------|
| (1) ▓▓▓▓▓ | 1 | 21 December 2017 | Claimant |
| (2) ▓▓▓▓▓ | 1 | Signed 22 December | Claimant |

## SCHEDULE B

**UNDERTAKINGS GIVEN TO THE COURT BY THE CLAIMANT**

(1)    If the Court later finds that this Order has caused loss to any of the Defendants and decides that such Defendant or Defendants should be compensated for that loss, the Claimant will comply with any order that the Court may make.

(2)    Anyone notified of this Order will be given a copy of it by the Claimant's legal representatives.

(3)    The Claimant shall pay the reasonable costs of anyone other than the Defendants that have been incurred as a result of this Order including the costs of finding out whether that person holds any of such Defendants' assets and it the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Claimant will comply with any order the Court may make.

(4)    If this Order ceases to have effect, the Claimant shall immediately take all reasonable steps to inform in writing anyone to whom it has given notice of this Order, or who it has reasonable grounds for supposing may act upon this Order, that it has ceased to have effect.

462

IN THE EASTERN CARIBBEAN SUPREME
COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION
CLAIM NO.: BVIHC (COM) ██ OF 2017

BETWEEN:-



*Claimant*

-v-

*Defendants*

---

**ORDER**

---



Legal Practitioners for the Claimant

463

Case Number :BVIHCOM2019/█

```
┌──────────────────┐
│      FILED       │
│   HIGH COURT     │
│   TERRITORY OF   │
│ THE VIRGIN ISLANDS│
└──────────────────┘
```

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

**Submitted Date:10/04/2019 09:34**

CLAIM NO. BVIHC (COM) █ of 2019

**Filed Date:10/04/2019 09:34**

**Fees Paid:72.59**

IN THE MATTER OF THE ARBITRATION ACT 2013

AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN ARBITRAL AWARD
MADE IN THE HONG KONG INTERNATIONAL ARBITRATION CENTRE

BETWEEN:



Applicants

- and -

Respondents

---

**ORDER**

*Injunction against* █████████████

---

### PENAL NOTICE

**IF YOU FAIL TO COMPLY WITH THE TERMS OF THIS ORDER YOU MAY BE
HELD IN CONTEMPT OF COURT AND YOUR DIRECTORS AND OFFICERSMAY
BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING
WHICH HELPS OR PERMITS THE SECOND RESPONDENT TO BREACH THE
TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT
AND MAY BE IMPROSONED OR HAVE THEIR ASSETS SEIZED**

**THIS ORDER**

1. This is a Freezing Injunction made against  or the "**Second Respondent**")) on 9 April 2019 by Justice Green QC (Ag) on the application of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "**Applicants**") The Judge read the Affidavit listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2. This Order was made without notice to Second Respondent. The Second Respondent has a right to apply to the court to vary or discharge this Order (see paragraph 15 below).

3. There will be a further hearing in respect of this Order on 2 May 2019 (a date within 28 days per CPR 17.4(4)) (the "**Return Date**")

**FREEZING INJUNCTION**

4. Until after the conclusion of the Return Date or further order of the Court, the Second Respondent is, without the prior written consent of the Applicants' legal representatives:

   a. restrained (acting by and/or on the instruction of its directors, officers and/or agents) from:

      i. in any way disposing of, dealing with or diminishing the value of the entire issued share capital of ▮▮▮▮▮▮▮ (the ▮▮▮▮▮▮▮▮▮▮ whether they are in or outside the BVI, whether they are jointly, beneficially, legally owned or otherwise up to the same value;

      ii. registering or causing to be registered any change in the legal ownership of the ▮▮▮▮▮▮▮▮▮ in any way, including but not limited to sale, exchange, contribution, and/or transfer;

iii. in any way recognising or causing to be recognised or recorded in  Register of Shares (the "**Register**") any such purported change in or transfer of all or part of the legal ownership of the ██████████;

iv. in any way recognising or recording or causing to be recognised or recorded on the Register any change or transfer of the ownership of all or part of the equitable interest in the  including but not limited to by way of encumbrance, pledge, lien or charge over the ████ █████████;

v. removing or allowing or instructing or causing to be removed or instructing the removal of the share certificate(s) pertaining to the ████  from the territory of the Virgin Islands;

vi. cancelling the ██████████ and/or reissuing the ██████████ ████, or causing or instructing the same; and

vii. effecting or allowing to be created or effected any changes, variations or amendments to any agreement, trust and/or any other similar arrangement in relation to which the  are held;

b. restrained from in any way transferring, disposing of, pledging, charging diminishing the value of, encumbering or dealing with its assets up to the value of ██████████ (the "**Relevant Assets**") whether they are inside or outside of the Virgin Islands, without first providing the Applicant with at least 14 days written notice.

5. For the purposes of this Order, the Relevant Assets are any assets of ██████████ whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this Order the Second Respondent's assets include any asset that it has the power, directly or indirectly, to dispose of or deal with as if it were its own. The Second Respondent is to be regarded as having such power if a third party holds or controls the

asset in accordance with its direct or indirect instructions. The Relevant Assets include but are not limited to the following assets that may be held directly and indirectly by the Second Respondent:

(i)  any shares or American Depository Shares in  (a company registered in the Cayman Islands); or

(ii)  any proceeds from the sale of shares or American Depository Shares in

6.  The Applicants shall have the right to notify third parties outside the jurisdiction of the High Court of the existence of this Order, including (but not limited to):

a.  as registered agent of

b.

c.  as registered agent of

d.  the depository of the American Depositary Shares in

e.  as purchaser of American Depositary Shares in and

f.

## PROVISION OF INFORMATION

7.  Unless paragraph 8 applies, the Second Respondent must immediately and to the best of its ability inform the Applicant's Legal Practitioners of all its assets worldwide exceeding US$ 1,000 in value whether in its own name or not and whether solely or jointly owned,

giving the value, location and sufficient details of all such assets to enable the Applicant to identify them.

8. If the provision of any of this information is likely to incriminate the Second Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Second Respondent liable to be fined or have its assets seized, or its directors or officers may be imprisoned.

9. Unless paragraph 8 of this Order applies, within 5 working days after being served with this order, a director of the Second Respondent must personally swear and serve on the Applicants' Legal Practitioners an affidavit:

   a. setting out the information described in paragraph 7 above; and

   b. exhibiting copies of all documents which relate to the receipt, transfer of, or dealing with any monies or assets described in paragraphs 4-5 of this Order including the ▉▉▉▉▉▉▉▉ Shares and the shares in ▉▉▉▉▉▉▉▉▉▉▉

## EXCEPTIONS TO THIS ORDER

10. This Order will cease to have effect if the Second Respondent -

    a. provides security by paying the sum of US$ 13,790,310.27 into court, to be held to the Order of the court; or

    b. makes provision for security in that sum by another method agreed in writing with the Applicant's Legal Practitioners

11. This Order does not prohibit the Second Respondent from spending a reasonable sum on legal advice and representation. But before spending any money the Second Respondent

must tell the Applicants' legal representatives where the money is to come from including the bank account and the source of the funding.

12. This Order does not prohibit the Second Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of business.

13. The Second Respondent may agree with the Applicants' legal representatives that this Order should be varied, but any agreement must be in writing.

**COSTS**

14. The Second Respondent shall pay the costs of this Application.

**VARIATION OR DISCHARGE OF THIS ORDER**

15. Anyone served with or notified of this Order may apply to the court at any time to vary or discharge this Order (or so much of it as affects that person), but they must first inform the Applicants' legal representatives. If any evidence is to be relied upon in support of the application, the substance of it must be served on the Applicants' legal representatives no less than 48 hours' in advance.

**INTERPRETATION OF THIS ORDER**

16. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

17. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANTS AND RESPONDENTS

18. Effect of this Order:

It is a contempt of court for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be imprisoned, fined or have their assets seized.

19. Set off by banks:

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the respondent before it was notified of this Order.

20. Withdrawals by the Second Respondent:

No bank need enquire as to the application or proposed application of any money withdrawn by the Second Respondent if the withdrawal appears to be permitted by this Order.

21. Persons outside the BVI:

a. Except as provided in paragraph (b) below, the terms of this Order do not affect or concern anyone outside the jurisdiction of this Court.

b. The terms of this Order will affect the following persons in a country or state outside the jurisdiction of this court:

i.  the Second Respondent or its officer or agent appointed by power of attorney;

    ii.    any person who:

        1.    is subject to the jurisdiction of this Court;

        2.    has been given written notice of this Order at his residence or place of business within the jurisdiction of this Court; and

        3.    is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this Order; and

    iii.    any other person, only to the extent that this Order is declared enforceable by or is enforced by a court in that country or state.

## ASSETS LOCATED OUTSIDE VIRGIN ISLANDS

22. Nothing in this Order shall, in respect of assets located outside the BVI, prevent any third party from complying with:

    a.    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Second Respondent; and

    b.    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicants' legal representatives.

## COMMUNICATIONS WITH THE COURT

23. All communications to the Court about this Order should be sent to:-

The Court Office is located at the Registry of the High Court, 2nd Floor SAKAL Building, Wickham's Cay PO Box 418 Road Town Tortola, British Virgin Islands: Telephone +1 (284) 468 5001 or +1 (284) 468 4909. Email: commercialdivisionvi@gov.vg. The Court office is open between 8:30 am and 4:30 pm Monday to Friday except public holidays.

## NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVE

24. The Applicants' legal representatives are ███████ ████████████████████
███████████████████████████████████████████
████████████████████████

**BY ORDER OF THE COURT**

_____
REGISTRAR

## SCHEDULE A

**AFFIDAVITS**

The Applicant relied on the following affirmation—

| *Name* | *No. of affirmation* | *Date sworn* | *Filed on behalf of* |
|---|---|---|---|
| (1) ▮▮▮▮ | 2 | 29 March 2019 | Applicants |

## SCHEDULE B

## UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANTS

(1)    If the Court later finds that this Order has caused loss to any of the Respondents and decides that such Respondent or Respondents should be compensated for that loss, the Applicants will comply with any order that the Court may make.

(2)    Anyone notified of this Order will be given a copy of it by the Applicants' legal representatives.

(3)    The Applicants shall pay the reasonable costs of anyone other than the Second Respondent that have been incurred as a result of this Order including the costs of finding out whether that person holds any of such Respondent's assets and if the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the Court may make.

(4)    If this Order ceases to have effect, the Applicants shall immediately take all reasonable steps to inform in writing anyone to whom it has given notice of this Order, or who it has reasonable grounds for supposing may act upon this Order that it has ceased to have effect.

**IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION**

**CLAIM NO. BVIHC (COM)** ▇ **of 2019**

**IN THE MATTER OF THE ARBITRATION ACT 2013**

**AND IN THE MATTER OF AN APPLICATION TO
ENFORCE ANARBITRAL AWARD MADE IN THE
HONG KONG INTERNATIONAL ARBITRATION CENTRE**

**BETWEEN:**



Applicants

– and –

Respondents

─────────────────────────

**ORDER**

─────────────────────────

**Legal Practitioners for the Applicants**

**Case Number :BVIHCOM2019/**█████

**FILED**
**HIGH COURT**
**TERRITORY OF**
**THE VIRGIN ISLANDS**

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS**
**COMMERCIAL DIVISION**

**Submitted Date:12/04/2019 11:35**

**Filed Date:12/04/2019 11:35**

**BVIHC (COM) NO.** ███ **OF 2019**

**Fees Paid:72.59**

**IN THE MATTER OF AN APPLICATION FOR A FREEZING INJUNCTION IN AID OF
ENFORCMENT OF A FOREIGN JUDGMENT**

**BETWEEN:**

████████████████

_Applicant_

-and-

██████████████████

████████████████████

████████████

██████████████████

_Respondents_

**ORDER**

_Injunction Against_ ████████████████

**PENAL NOTICE**

**IF YOU FAIL TO COMPLY WITH THE TERMS OF THIS ORDER YOU MAY BE
HELD IN CONTEMPT OF COURT AND YOUR DIRECTORS AND OFFICERS MAY
BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED**

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING
WHICH HELPS OR PERMITS THE SECOND RESPONDENT TO BREACH THE
TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT
AND MAY BE IMPROSONED OR HAVE THEIR ASSETS SEIZED**

**THIS ORDER**

1.  This is a Freezing Injunction made against ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ("▮▮▮▮▮" or the **"Second Respondent")** on 11 April 2019 by Mr. Justice Adderley (Ag.)
    on the Application of ▮▮▮▮▮▮▮▮▮▮ (the **"Applicant"**). Judge read the Affidavit
    listed in Schedule A and Accepted the undertakings set out in Schedule B at the end of this
    Order.

2.  This Order was made without notice to the Second Respondent. The Second Respondent has
    a right to apply to the Court to vary or discharge this Order (see paragraph 14 below).

3.  There will be a further hearing in respect of this Order on 9 May 2019 at 11 am with a time
    estimate of 30 minutes (the **"Return Date"**).

**FREEZING INJUNCTION**

4.  Until after the conclusion of the Return Date or further order of the Court, the Second
    Respondent is, without the prior written consent of the Applicant's Legal Practitioners:

    (a)  Restrained (acting by and/or on the instruction of its directors, officers and/or agents)
         from:

         (i)    In any way disposing of, dealing with or diminishing the value of the entire issued
                share capital of ▮▮▮▮(the ▮▮▮▮▮▮▮▮ whether they are in or outside of
                the BVI, whether they are jointly, beneficially, legally owned or otherwise up to
                the same value;

         (ii)   Registering or causing to be registered any change in the legal ownership of the
                ▮▮▮▮ shares in any way, including but not limited to sale, exchange,
                contribution, and/or transfer;

         (iii)  In any way recognizing or causing to be recognized or recorded in ▮▮▮▮
                Register of Shares (the **"Register"**) any such purported change in or transfer of
                all or part of the legal ownership of the ▮▮▮ shares;

         (iv)   In any way recognizing or recording or causing to be recognized or recorded on
                the Register any change or transfer of the ownership of all or part of the equitable
                interest in the ▮▮▮▮ ▮▮▮ including but not limited to by the way of
                encumbrance, pledge, lien or charge over the ▮▮▮ ▮▮▮;

         (v)    Removing or allowing or instructing or causing to be removed or instructing the
                removal of the share certificate (s) pertaining to the ▮▮▮ ▮▮▮ from the
                Territory of the Virgin Islands;

         (vi)   Cancelling the ▮▮▮ ▮▮▮ and/or reissuing the ▮▮▮ ▮▮▮ or causing or
                instructing the same; and

         (vii)  Effecting or allowing to be created or effected any changes, variations or

amendments to any agreement, trust and/or other similar arrangement in relation to which the █████ █████ are held;

(b) Restrained from in any way transferring, disposing of, pledging, charging, diminishing the value of, encumbering or dealing with its assets up to the value of US$ 13,818,983.71 (the "**Relevant Assets**") whether they are inside or outside the Territory of the Virgin Islands, without first providing the Applicant or his Legal Practitioners with at least 14 days written notice; and

(c) For the purposes of this Order, the Relevant Assets are any assets of ████ whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this Order the Second Respondent's assets include any asset that it has the power, directly or indirectly, to dispose of or deal with as if it were its own. The Second Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its direct or indirect instructions. The Relevant Assets include but are not limited to the following assets that may be held directly and indirectly by the Second Respondent:

  (i)    Any shares in ███████████████████ a company registered in Hong Kong with company number ████████████; and

  (ii)   ██████████ representing the value received for the sale of ███████████ shares held by ███████

5. The Applicant shall have the right to notify third parties within and outside of the jurisdiction of the Commercial Court of the existence of this Order, including (but not limited to):

  a.   █████████ as the listed beneficial owner of the █████ █████

  b.   ███████████ as the presumed actual beneficial owner of the ████ Shares;

  c.   ████████████████ a BVI company ██████████

  d.   ████████████ (as registered agent of ██████████

  e.   ████████████████████ (as registered agent of █████████

  f.   ███████████████ (as registered agent of ████████

  g.   ██████████████████████ and,

  h.   ██████

## PROVISION OF INFORMATION

6. Unless paragraph 7 applies, the Second Respondent must immediately and to the best of its ability inform the Applicant's Legal Practitioners of all its assets worldwide exceeding

US$1000 in value whether in its own name or not and whether solely or jointly owned, giving the value, location and sufficient details of all such assets to enable the Applicant to identify them.

7. If the provision of any of this information is likely to incriminate the Second Respondent, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Second Respondent liable to be fined or have its assets seized, or its directors or officers may be imprisoned.

8. Unless paragraph 7 of this Order applies, within 5 working days after being served with this Order, a director of the Second Respondent must personally swear and serve on the Applicant's Legal Practitioners an affidavit:

    (a) Setting out the information described in paragraph 6 above; and

    (b) Exhibiting copies of all documents which relate to the receipt, transfer of, or dealing with any monies or assets described in paragraph 4 of this Order including the ███████ ███████ and Relevant Assets.

## EXCEPTIONS TO THIS ORDER

9. This Order will cease to have effect if the Second Respondent:

    (a) Provides security by paying the sum of ███████████████ into Court, to be held to the Order of the Court; or

    (b) Makes provision for security in that sum by another method agreed in writing with the Applicant's Legal Practitioners.

10. This Order does not prohibit the Second Respondent from spending a reasonable sum on legal advice and representation. However, before spending any money the Second Respondent must tell the Applicant's Legal Practitioners where the money is to come from including the bank account and the source of the funding.

11. This Order does not prohibit the Second Respondent from dealing with or disposing of any of its assets in the ordinary and proper course of its business.

12. The Second Respondent may agree with the Applicant's Legal Practitioners that this Order should be varied, but any agreement must be in writing.

## COSTS

13. The costs of this Application are reserved to the Return Date.

## VARIATION OR DISCHARGE OF THIS ORDER

14. Anyone served with or notified of this Order may apply to the Court at any time to vary or

discharge this Order (or so much of it as affects that person), but they must first inform the Applicant's Legal Practitioners. If any evidence is to be relied upon in support of the Application, the substance of it must be served on the Applicant's Legal Practitioners no less than 48 hours in advance.

## INTERPRETATION OF THIS ORDER

15. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

16. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

17. Effect of this Order:

It is a contempt of court for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be imprisoned, fined or have their assets seized.

18. Set off by banks:

This Order does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the Seond Respondent before it was notified of this Order.

19. Withdrawals by the Second Respondent:

No bank need enquire as to the application or proposed application of any money withdrawn by the Second Respondent if the withdrawal appears to be permitted by this Order.

20. Persons outside the Territory of the Virgin Islands:

(a) Except as provided in paragraph (b) below, the terms of this Order do not affect or concern anyone outside of the jurisdiction of this Court.

(b) The terms of this Order will affect the following persons in a country or state outside the jurisdiction of this Court:

    i.    The Second Respondent or its officers or agents appointed by power of attorney;

    ii.    Any person who:

        A. Is subject to the jurisdiction of this Court;

B. Has been given written notice of this Order at his residence or place of business within the jurisdiction of this Court; and

C. Is able to prevent acts or omissions outside of the jurisdiction of this Court which constitute or assist in a breach of the terms of this Order; and

iii.  Any other person, only to the extent that this Order is declared enforceable by or is enforced by a court in that country or state.

## ASSETS LOCATED OUTSIDE THE TERRITORY OF THE VIRGIN ISLANDS

21. Nothing in this Order shall, in respect of assets located outside the Territory of the Virgin Islands, prevent any third party from complying with:

(a) What it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Second Respondent; and

(b) Any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's Legal Practitioners.

## COMMUNICATIONS WITH THE COURT

22. All communications to the Court about this Order should be sent to:-

The Court Office which is located at the Registry of the High Court, 2nd Floor SAKAL Building, Wickham's Cay, P.O. Box 418, Road Town, Tortola, British Virgin Islands: Telephone +1 (284)4685001 or +1 (284)468 4908. Email: commercialdivisionvi@gov.vg. The Court Office is open between 8:30 am and 4:30 pm Monday to Friday except public holidays.

## NAME AND ADDRESS OF APPLICANT'S LEGAL PRACTITIONERS

23. The Applicant's Legal Practitioners are:

**BY ORDER OF THE COURT**

**REGISTRAR**

## SCHEDULE A

**AFFIDAVITS**

The Applicant relied on the following affidavit—

| *Name* | *No. of affirmation* | *Date sworn* | *Filed on behalf of* |
|---|---|---|---|
| (1) ▮▮▮▮ | 1 | 3 April 2019 | Applicant |

## SCHEDULE B

**UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1)     If the Court later finds that this Order has caused loss to the First Respondent and decides that it should be compensated for that loss, the Applicant will comply with any order that the Court may make.

(2)     Anyone notified of this Order will be given a copy of it by the Applicant's representatives.

(3)     The Applicant shall pay the reasonable costs of anyone other than the First Respondent that have been incurred as a result of this Order including the costs of finding out whether that person holds any of the First Respondent's assets and if the Court later finds that this Order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the Court may make.

(4)     If this Order ceases to have effect, the Applicant shall immediately take all reasonable steps to inform in writing anyone to whom it has given notice of this Order, or who it has reasonable grounds for supposing may act upon this Order that it has ceased to have effect.

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS**
**COMMERCIAL DIVISION**

BVIHC (COM) NO. ███ OF 2019

**IN THE MATTER OF AN APPLICATION FOR A FREEZING
INJUNCTION IN AID OF ENFORCMENT OF A FOREIGN JUDGMENT**

BETWEEN:

████████████████

<u>**Applicant**</u>

-and-

██  ██████████████████
██  ████████████████████████
██  ███████████
██  ███████████████████

<u>**Respondents**</u>

---

**ORDER**

*Injunction Against* █████████████████

---

███████████████████

Legal Practitioners for the Applicant

███████████████
████████████████
████████████████
██████████████

# EXHIBIT 6

EXECUTION VERSION

### THIRD AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY AGREEMENT
### OF
### PACIFIC TECHNOLOGY HOLDING LLC

This Third Amended and Restated Limited Liability Company Agreement (this "**Agreement**") of PACIFIC TECHNOLOGY HOLDING LLC (the "**Company**") is made and entered into as of July 5, 2019 (the "**Effective Date**") by and among the Company, Lian Bossert (the "**Non-Managing Member**"), FF Global Partners LLC, a Delaware limited liability company ("**FF Global**") and each other Person who is admitted as a member of the Company from time to time in accordance with the provisions of this Agreement (each a "**Member**" and collectively, the "**Members**").

### RECITALS

WHEREAS, the Company was formed on July 26, 2018 under the provisions of the Delaware Limited Liability Company Act (6 *Del.C.* §18-101, *et seq.*), as amended from time to time (the "**Act**"), as a result of the filing of a Certificate of Formation with the Secretary of State of the State of Delaware;

WHEREAS, the Non-Managing Member has entered into that certain Limited Liability Company Agreement of the Company, dated as of May 7, 2019 pursuant to which he was named the "**Managing Member**" of the Company (the "**LLC Agreement**");

WHEREAS, FF Global has entered into that certain Subscription Agreement with the Company pursuant to which FF Global subscribed for and the Company issued to FF Global an aggregate of 362,352,941 Common Units (the "**Subscription Agreement**") at $0.50 per Common Unit;

WHEREAS, the Non-Managing Member desires to admit FF Global as a Member of the Company and to amend and restate the LLC Agreement to appoint FF Global as the "Managing Member" in the Non-Managing Member's place, as set forth more particularly herein; and

WHEREAS, this Agreement amends, restates, supersedes and replaces the LLC Agreement in its entirety.

NOW, THEREFORE, the Members agree as follows:

1.    **Name**. The name of the Company is "Pacific Technology Holding LLC".

2.    **Organization**. The Company has been organized as a Delaware limited liability company pursuant to the provisions of the Act. Membership in and management of the Company shall be governed by the terms and conditions set forth in this Agreement.

3.    **Purpose**. The purpose and business of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary, customary, convenient or incidental to the foregoing.

4.    **Powers**. In furtherance of its purposes, but subject to all of the provisions of this Agreement, the Company shall have the power and is hereby authorized to:

(a)    acquire by purchase, lease, contribution of property or otherwise, own, hold, sell, convey, transfer or dispose of any real, personal or intangible property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(b)    act as a trustee, executor, nominee, bailee, director, officer, manager, agent or in some other fiduciary capacity for any Person and to exercise all of the powers, duties, rights and responsibilities associated therewith;

(c)    take any and all actions necessary, convenient or appropriate as trustee, executor, nominee, bailee, director, officer, manager, agent or other fiduciary, including the granting or approval of waivers, consents or amendments of rights or powers relating thereto and the execution of appropriate documents to evidence such waivers, consents or amendments;

(d)    operate, purchase, maintain, finance, improve, own, sell, convey, assign, mortgage, lease or demolish or otherwise dispose of any real, personal or intangible property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(e)    borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, secure the same by mortgage, pledge or other lien on the assets of the Company; and prepay in whole or in part, refinance, recast, increase, modify or extend any indebtedness of the Company and, in connection therewith, execute any extensions, renewals or modifications of any mortgage or security agreement securing such indebtedness;

(f)    invest any funds of the Company pending use, payment or distribution of the same pursuant to the provisions of this Agreement;

(g)    enter into, perform and carry out contracts of any kind, including, without limitation, contracts with any Person affiliated with a Member, necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes of the Company;

(h)    employ or otherwise engage employees, managers, contractors, advisors, attorneys and consultants and pay reasonable compensation for such services;

(i)    enter into partnerships, limited liability companies, trusts, associations, corporations or other ventures with other Persons in furtherance of the purposes of the Company; and

2

(j)     do such other things and engage in such other activities related to the foregoing as may be necessary, convenient or incidental to the conduct of the business of the Company, and have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

**5.     Principal Office**. The principal business office of the Company shall be located at such location as may hereafter be determined by the Managing Member.

**6.     Filings; Agent for Service of Process**.

(a)     Certificate of Formation. A Certificate of Formation has been filed with the Secretary of State of the State of Delaware. The Managing Member or an Officer shall execute, deliver and file (i) any amendments to the Certificate of Formation deemed necessary or desirable by the Managing Member and (ii) any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

(b)     Registered Agent. The name and address of the registered agent and office of the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

**7.     Members**.

(a)     Member. Exhibit A attached hereto and as amended from time to time sets forth for each Member of the Company, such Member's name and present mailing address and the amount and series of Units of the Member in the Company.

(b)     Initial Capital Contribution. The Members have subscribed for and own that percentage of the Company's membership interests as set forth beside each such Member's name under the column entitled "Percentage Interest" on Exhibit A attached hereto, as amended from time to time. Each Member has contributed (or will contribute) certain cash, assets or property to the Company in exchange for such membership interests in the amount set forth beside each such Member's name under the column entitled "Capital Contribution" on Exhibit A attached hereto, as amended from time to time. Each Member acknowledges and agrees that, as part of its initial Capital Contribution to the Company, the Managing Member is permitted to make Capital Contributions after the date of this Agreement in an aggregate amount up to $181,176,470.60 without the consent of the Non-Managing Member as further described in Exhibit A attached hereto.

(c)     Additional Contributions. No Member shall be required to make or, except as contemplated above, be permitted to make any additional Capital Contributions to the Company without the consent of the Managing Member.

(d)     Additional Members. One or more additional members, including substitute members, may be admitted to the Company with the consent of the Managing Member. Prior to

3

the admission of any such additional members to the Company, the Members shall amend this Agreement to make such changes as the Members shall determine to be necessary to reflect the fact that the Company shall have such additional members (or substitute members). Each additional member (or substitute member) shall execute and deliver a supplement or counterpart to this Agreement (each, a "**Joinder**"), as necessary, under which it shall become a "Member" hereunder. The Managing Member may amend Exhibit A hereto to reflect such additional or substitute members as may be required from time to time.

(e)    Membership Interests; Certificates. Upon any Member's request, the Company will issue a certificate to such Member representing the membership interests held by such Member.

## 8.    Management by Managing Member.

(a)    Member-Managed. In accordance with Section 18-402 of the Act, management of the Company shall be vested in the "Managing Member". The Managing Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Delaware. The Managing Member has the authority to bind the Company. As of the date hereof, the Managing Member shall be FF Global.

(b)    Officers. The Managing Member may, from time to time as the Managing Member deems advisable, appoint officers of the Company (each an "**Officer**" and collectively, the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person. Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this Section 8 may be revoked at any time by the Managing Member.

(c)    Reliance. Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Managing Member as to the identity and authority of a manager, an Officer or other person to act on behalf of the Company or any Member.

(d)    Certain Tax Matters.

(i)    FF Global Partners LLC, or such other Person designated by the Managing Member shall be designated the "partnership representative" (the "**Partnership Representative**") as defined in Code Section 6223 and the Company and the Members shall complete any necessary actions (including executing any requested certificates or other documents) to effectuate such designation. The Partnership Representative may make any elections available to be made as Partnership Representative, and shall make the election described in Code Section 6226(a)(1) (as in effect following the effective date of its amendment by Section 1101 of the Bipartisan Budget

4

Act of 2015) to impose any adjustment to taxes proposed by the IRS with respect to the Company on the Persons that held membership interests in the Company during the tax period(s) of such proposed adjustment, in accordance with each such Person's distributive share of the Company's net income for such tax period(s).

(ii)     The Partnership Representative shall receive no compensation for its services as such.  All reasonable and documented third party costs and expenses incurred by the Partnership Representative in performing his, her or its duties as such (including legal and accounting fees and expenses) shall be borne by the Company.  Nothing herein shall be construed to restrict the Company from engaging an accounting firm to assist the Partnership Representative in discharging his, her or its duties hereunder.  The Company shall indemnify and hold harmless the Partnership Representative with respect to any Proceeding brought against it in connection with any Proceeding related to the Partnership Representative acting in their respective capacities as such, except in actions in which the Partnership Representative is found to have acted fraudulently or willfully negligent with respect to its rights and responsibilities as the Partnership Representative.

(iii)     Notwithstanding anything to the contrary herein, neither the Partnership Representative nor the Managing Member shall take any action with respect to tax matters of the Company (including any settlement or compromise of any tax dispute of the Company) that would disproportionately affect the tax liability of a Member or its direct or indirect owners in a material and adverse manner without such Member's prior written consent.

(iv)     The Managing Member may make, or cause to be made, all elections of the Company for U.S. federal income and all other tax purposes.

(v)     Each Member agrees that such Member will not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(vi)     At the expense of the Company, the Managing Member will endeavor to cause the complete and accurate preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and its Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, and no later than one hundred twenty (120) days after the end of such Fiscal Year, the Managing Member will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year. Upon request of any Member, the Company will provide tax data in electronic form as reasonably requested within one hundred twenty (120) days after the end of such Fiscal Year.  The Managing Member will have the right to select the external firm that prepares the Company's tax returns.

5

(vii)    All funds of the Company will be deposited in its name, or in such name as may be designated by the Managing Member, in such checking, savings or other accounts, or held in its name in the form of such other investments as will be designated by the Managing Member. The funds of the Company will not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company will be made exclusively upon the signature or signatures of such Officer or Officers as the Managing Member may designate.

**9.    Units Generally; Issuance of Additional Interest; Redemption**.    The membership interests of the Members will be represented by issued and outstanding Units, which may be divided into one or more types, classes or series as determined by the Managing Member. Each type, class or series of Units will have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. As of the date hereof, the Company is authorized to issue two classes of Units, designated as "Common Units" and "Preferred Units." The Company will maintain a schedule, attached hereto as Exhibit A, of all Members, their respective mailing addresses and the amount and series of Units held by them (the "**Members Schedule**"), and will update the Members Schedule upon the issuance or Transfer to any new or existing Member. As of the date hereof, all Preferred Units are held by the Non-Managing Member. The Members Schedule will be kept confidential but will be available for review at the Company to all holders of Units.

(b)    Upon the affirmative approval of the Managing Member, the Company shall be authorized to issue up to 362,352,941 Common Units. With the consent of the Managing Member, the Company may create and issue to Members or additional Persons who may be admitted to the Company as Members (a) additional Common Units (including other classes or series thereof having different rights), (b) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into membership interests and (c) warrants, options or other rights to purchase or otherwise acquire membership interests in the Company (any of the foregoing, "**Additional Interests**"); In connection with any approved issuance of Additional Interests to any Person hereunder, such Person shall, at the Company's request, execute and deliver a Joinder and enter into such other documents and instruments to effect such issuance as are required by the Managing Member. Upon the issuance of any Additional Interests and the payment of the Capital Contribution with respect thereto (if any), the Capital Account of the recipient of such Additional Interests shall be adjusted pursuant to Section 13.

(c)    Holders of the Preferred Units shall have rights, privileges and preference to receive Distributions and allocation of Economic Interests in preference to holders of the Common Units including the special allocation rights described in Section 16.

(d)    Upon the Transfer of any Preferred Units from the Non-Managing Member to a third party or to FF Global, all of the Preferred Units so Transferred shall automatically convert into Common Units without any further action of the Managing Member.

6

(e)     Each Member acknowledges and agrees that, to the extent that any Member holding the Common Units (i) breaches the terms of this Agreement or any other agreements or contracts between such Member and the Company or (ii) conducts his or herself in any manner which is detrimental to the Company, as determined by the Managing Member in its sole discretion, then the Company has the right, but not the obligation, to redeem any or all of the Common Units then held by such Member at a price determined by the Managing Member, which shall not be less than the original purchase price paid by such Member for such Common Units. All Units that are redeemed pursuant to this Section 9(e) shall be cancelled immediately.

(f)     If either Faraday & Futures Inc., a California corporation, or Smart King files for bankruptcy or undergoes any similar Proceeding, the Company shall redeem all of the Units issued to holders of the Common Units at a price equal to the amount of purchase price that has been paid by such Member to the Company prior to and as of the date of such redemption *plus* reasonable interest determined by the Company in its sole discretion; *provided, that* such interest shall in no event exceed six percent (6%) per annum. All Units that are redeemed pursuant to this Section 9(f) shall be cancelled immediately.

(g)     To the extent any holder of the Common Units redeems any Units issued to its members and has such Units cancelled, the Company may redeem a corresponding amount of Units from such holder of Common Units at the same consideration as such holder redeems its own Units. All Units that are redeemed pursuant to this Section 9(g) shall be cancelled immediately.

(h)     In the event that a Qualified IPO has not been consummated by Smart King or any other listing vehicle, as the case may be, on or prior to the sixth (6th) anniversary of the Effective Date, then at the written request to the Company (the "**Redemption Request**") by the holders of a majority of the then outstanding Common Units (the "**Common Units Majority**"), the Company shall redeem all but not less than all of the Common Units held by such holder(s). "**Qualified IPO**" shall mean the closing of the initial public offering of Smart King or other listing vehicle, as applicable, with a post-money market valuation (based on the price per share offered to the public in the offering) of at least US$1.5 billion on the New York Stock Exchange, Nasdaq Global Market System, Hong Kong Stock Exchange or any other exchange or quotation system that is approved by the Board of Directors of Smart King.

(i)     The total redemption price for the Common Units redeemed pursuant to this Section 9(h) shall be equal to (i) the amount of the total purchase price that has been paid by such holder as of the date of the redemption and (ii) eight percent (8%) compounded interest per annum thereupon until the date of such redemption (the "**Redemption Price**").

(ii)    The closing of the redemption of the Common Units pursuant to this Section 9(h) (the "**Redemption Closing**") will take place within one hundred and twenty (120) days of the date of the Redemption Request at the offices of the Company, or such earlier date or other place as the Common Units Majority and the Company may mutually agree in writing. At the Redemption Closing, subject to applicable laws, the Company shall, from any source of assets or

7

funds legally available therefor, redeem each Common Unit by paying in cash therefor the Redemption Price against surrender by such holder at the Company's principal office of the certificate representing such Common Unit. From and after the Redemption Closing, if the Company makes the Redemption Price available to a holder of a Common Unit, all rights of the holder of such Common Unit (except the right to receive the Redemption Price therefor) will cease with respect to such Common Unit, and such Common Unit will not thereafter be Transferred on the books of the Company or be deemed outstanding for any purpose whatsoever.

        **10.**    **Other Business**. The Members may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

        **11.**    **Exculpation and Indemnification**. The Members shall not be subject to any fiduciary or other duties to the maximum extent permitted by applicable law. No Member or Officer shall be liable to the Company, or any other Person or entity who has an interest in the Company, for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Officer in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Member or Officer by this Agreement, except that a Member or Officer shall be liable for any such loss, damage or claim incurred by reason of such Member's or Officer's willful misconduct. To the fullest extent permitted by applicable law, a Member or Officer shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Member or Officer by reason of any act or omission performed or omitted by such Member or Officer in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Member or Officer by this Agreement, except that no Member or Officer shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Member or Officer by reason of willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 11 shall be provided out of and to the extent of Company assets only, and no Member shall have personal liability on account thereof.

        **12.**    **Term**. The term of the Company shall be perpetual unless the Company is dissolved and terminated in accordance with Section 17.

        **13.**    **Capital Accounts**.

        (a)    Capital Accounts. A separate capital account (a "**Capital Account**") shall be maintained for each Member in accordance with Section 1.704-1(b)(2)(iv) of the U.S. Treasury Regulations promulgated under the Code (the "**Treasury Regulations**"), and this Section 13 shall be interpreted and applied in a manner consistent with said Section of the Treasury Regulations. The Company will maintain Capital Accounts for each Member in accordance with the following provisions:

8

(i)　the Company will credit to each Member's Capital Account (A) such Member's Capital Contributions, (B) such Member's distributive share of Net Profit and any items in the nature of income or gain which are specially allocated to such Member pursuant to this Agreement, and (C) the amount of any Company liabilities assumed by such Member or to which any property distributed to such Member is subject;

(ii)　the Company will debit from each Member's Capital Account (A) the amount of cash distributed to such Member pursuant to any provision of this Agreement, (B) the Gross Asset Value of any Company assets (other than cash) distributed to such Member pursuant to any provision of this Agreement, (C) such Member's distributive share of Net Loss and any items in the nature of expenses or losses which are specially allocated to such Member pursuant to this Agreement, and (D) the amount of any liabilities of such Member considered, under Section 752 of the Code, to be assumed by the Company or to which any property contributed by such Member to the Company is subject;

(iii)　in the event any interest is Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred interest;

(iv)　in determining the amount of any liability for purposes of subparagraphs (i) and (ii) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations; and

(v)　the foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations; and in the event that the Managing Member shall determine it is prudent to modify the manner in which the Capital Accounts, or any additions thereto or subtractions therefrom, are computed in order to comply with such Treasury Regulations, the Managing Member may make such modification, *provided* that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 17 hereof upon the dissolution of the Company.

### 14.　Assignments.

(a)　A Member may not Transfer in whole or in part such Member's membership interests in the Company to any Person without the prior written consent of the Managing Member; *provided, however*, that, without the consent of the Managing Member, the non-Managing Member may Transfer its Units to any Person at any time in accordance with the terms and subject to the conditions set forth in that certain Restructuring Agreement, made as of December 31, 2018, by and among Season Smart Limited, FF Top Holding Ltd., FF Peak Holding Ltd., Yueting Jia, the Company, Smart King and other parties thereto.

(b)    Notwithstanding anything to the contrary herein, any otherwise permitted Transfer shall be null and void if such Transfer would cause the Company to become a "publicly traded partnership" within the meaning of Code Section 7704(b) or fail to satisfy the "private placement" safe harbor from treatment as a "publicly traded partnership" (as described in Treasury Regulations Section 1.7704-1(h)).

(c)    Notwithstanding the terms of this Agreement, the Members are aware that FF Top Holdings Ltd., a British Virgin Islands company and a Subsidiary of the Company ("**FF Top**"), holds 600 million Class B preferred shares in Smart King Ltd., a Cayman Islands company and also a Subsidiary of the Company ("**Smart King**"), and that FF Top proposes to Transfer 147,058,823 ordinary shares of Smart King to YT's creditor trust or a third Person designated by YT (the "**Proposed Smart King Transfer**"), and hereby approve and authorize the Proposed Smart King Transfer and the transactions contemplated thereby. For the avoidance of doubt, there is no need for the Members to approve the Proposed Smart King Transfer and any actions by the Members with respect to, in relation to and/or for the purpose of the Proposed Smart King Transfer are hereby authorized, approved and ratified.

**15.    Fiscal Year**.  The fiscal year shall be the twelve (12)-month period ending on December 31 of each applicable calendar year ("**Fiscal Year**"), or such other period as determined by the Managing Member.

**16.    Partnership Status; Distributions; Allocations**.

(a)    Partnership Status for Tax Purposes.  The Members intend that the Company shall be treated as a partnership for U.S. federal and, if applicable, state income tax purposes, and the Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  Neither the Company nor any Member shall make any election or take any other action inconsistent with such intent.

(b)    Distributions.  All distributions of cash or other assets of the Company (a "**Distribution**") shall be made solely to the Members when and as determined by the Managing Member, subject to the Act and in accordance to the following:

(i)    First, so long as at the time of a proposed Distribution, the holders of the Common Units shall not have received an aggregate Distribution (in cash or in kind) equal to their Capital Contribution, 100% of the Distributions shall be made to such holders of the Common Units in proportion to their respective Capital Contribution plus an interest of 8% per annum.

(ii)    Second, holders of the Preferred Units shall receive all Distributions until the aggregate amount distributed to such holders shall equal to $1.02 billion plus an interest of 8% per annum.

(iii)    Third, holders of the Preferred Units shall receive 10% of the remaining Distributions (after the Distributions in paragraphs (i) and (ii) above).

10

        (iv)     Thereafter, Distributions shall be made to all Members in proportion to their respective Percentage Interests.

        (c)     Tax Distributions. Notwithstanding any other provision of this Agreement to the contrary, to the extent that the Company has distributable cash, the Company may, in the sole discretion of the Managing Member, make pro rata Distributions to each Member at least equal to such Member's Cumulative Tax Liability less the cumulative amount of Distributions received by such Member under Section 16(b) (each a "**Tax Distribution**"). Such Tax Distributions, to the extent paid, shall be made on a quarterly basis or at such earlier times as the Managing Member deems appropriate and shall be treated as advances of, or offsets to, future Distributions under this Agreement (as determined by the Managing Member). The term "**Cumulative Tax Liability**" means the product of (i) the cumulative excess of taxable income over taxable losses or tax credits (to the extent usable against such income) of the Company allocated to a Member pursuant to this Agreement and (ii) the highest combined marginal federal, state and local tax rates (including any tax on "net investment income") applicable at the time of the relevant allocation to any Member, for an individual or corporation resident in New York City, New York (taking into account any tax imposed on "net investment income" as well as the deductibility of state and local income taxes for U.S. federal income tax purposes). Any and all Tax Distributions under this Section 16(c) shall be treated as advances of Distributions and shall be taken into account in determining the amount of Distributions to the Members under Section 16(b) and Section 17.

        (d)     Distributions in Kind. Subject to any requirements set forth in Section 16(b), the Managing Member is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company; *provided, however,* that Tax Distributions will only be made in cash. In any non-cash Distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the fair market value of such securities or property would be distributed among the Members pursuant to Section 16(b). Any Distribution of securities will be subject to such conditions and restrictions as the Managing Member determines are required or advisable to ensure compliance with the Act. In furtherance of the foregoing, the Managing Member may require that the Members execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

        (e)     Allocation of Net Income and Net Loss. General Allocation of Net Profit and Net Loss. After giving effect to the special allocations set forth in Section 16(f), Net Profit or Net Loss, as the case may be, for any Fiscal Year or other period for which such allocation is made shall be allocated among the Members in a manner such so as to ensure, to the extent possible, that the Capital Accounts of the Members as of the end of such period conform, in the reasonable judgment of the Managing Member, with the economics of this Agreement in

11

accordance with Section 16(b) and Section 17. The allocations made pursuant to this Section 16(e) are intended to comply with the provisions of Section 704(b) of the Code and the Treasury Regulations thereunder and, in particular, to reflect the Economic Interests in the Company of the Members as set forth in this Agreement, and this Section 16(e) shall be interpreted in a manner consistent with such intention.

(f)     Special Allocations. The Managing Member shall make special allocations under this Section 16(f) in accordance with the provisions of the Treasury Regulations under Section 704 of the Code, minimum gain chargeback, including Member minimum gain chargeback, qualified income offset and gross income allocation as they deem necessary in order to cause the allocations under this Section 16(f) to comply with the provisions of Section 704 of the Code and the Treasury Regulations thereunder.

(g)     Other Allocation Rules. For purposes of determining the Net Profit, Net Loss or any other items applicable to any period, Net Profit, Net Loss and any other such items shall be determined on a daily, monthly or other basis, as determined by the Managing Member in its reasonable discretion using any permissible method under Section 706 of the Code and the Treasury Regulations promulgated thereunder.

(ii)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be allocated among the Members in the same proportions as they share Net Profit or Net Loss, as the case may be, for the Fiscal Year or other period for which such allocation is made.

(iii)     In accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated to the Members so as to take account of the variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial value on the date of contribution to the Company as determined by the Managing Member in its reasonable discretion. Allocations of income, gain, loss and deduction with respect to any such assets shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its value in the same manner as under Section 704(c) of the Code and the Treasury Regulations promulgated thereunder. Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this paragraph (c) are solely for federal, state and local taxes and shall not affect, or in any way be taken into account in computing any Member's Capital Account or share of Net Profit, Net Loss or other items or Distributions pursuant to any provision of this Agreement.

(iv)     All elections, decisions and other matters concerning the allocation of profits, gains and losses among the Members, and accounting procedures, not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Managing Member in its reasonable discretion.

12

(h)    Tax Allocations. Notwithstanding any provision of this Agreement, each item of income, gain, loss, deduction or credit as determined for U.S. federal income tax purposes shall be allocated in the same manner as the related items are allocated under Section 16(e), *provided* that the Managing Member may adjust such allocations as may be necessary or desirable to ensure that such allocations are in accordance with the interests of the Members in the Company, or otherwise comply with the applicable provisions of the Code and Treasury Regulations (including, for the avoidance of doubt, Section 704(c) of the Code and the regulations promulgated thereunder). All matters concerning allocations for U.S. federal, state and local income tax purposes (including accounting procedures) not expressly provided for by the terms of this Agreement shall be determined in good faith by the Managing Member in a manner intended to satisfy the requirements of the Code, Treasury Regulations and applicable provisions of the U.S. federal, state or local tax laws. Allocations pursuant to this Section 16(h) are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

(i)    Allocations in Respect of Transferred Units. In the event of a Transfer during any Fiscal Year made in compliance with the provisions of Section 14 of this Agreement, Net Profit, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year will be determined, except as reasonably determined by the Managing Member, using the interim closing of the books method in accordance with applicable Treasury Regulations.

17.    **Dissolution; Liquidation**.

(a)    The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of each Member, (ii) the occurrence of any other event that terminates the continued membership of the last remaining Member in the Company unless the business of the Company is continued in a manner permitted by the Act, or (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)    Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Managing Member shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Members under this Agreement shall continue.

(c)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and Distribution of the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Members in accordance with Section 16(b) hereof.

13

(d)     Following the completion of the winding up of the activities of the Company, the Managing Member shall file a certificate of cancellation in accordance with the Act. Upon filing of the certificate of cancellation, the existence of the Company shall cease, except for the purpose of suits, other Proceedings and appropriate action as provided in the Act. The Managing Member shall have the authority to distribute any Company property discovered after dissolution and take such other action as may be necessary on behalf of and in the name of the Company.

(e)     Proceeds from a Sale Event, or a sale or liquidation of all or substantially all of the assets of the Company, after payment of, or adequate provision for, the debts and obligations of the Company, including the expenses of its liquidation and dissolution, the payment of any liabilities to its officers or Members, if any, other than liabilities to Members for Distributions shall be distributed promptly after the consummation of any such event and applied in the following priorities:

(i)     First, to fund reserves to the extent deemed appropriate by the Managing Member for contingent, conditional, unmatured or other liabilities of the Company not otherwise paid or provided for; *provided* that, upon the expiration of such period of time as the Managing Member shall deem advisable, the balance of such reserves remaining after payment of such liabilities shall be distributed in the manner hereinafter set forth; and

(ii)     Thereafter, to the Members in accordance with Section 16(b).

**18.     Miscellaneous**.

(a)     Amendments. This Agreement may be amended only by the consent of each Member and only in writing pursuant to a document specifically designating it as an amendment to this Agreement.

(b)     Governing Law. This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware, exclusive of its conflict of laws principles. In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable provision, which being valid, legal and enforceable, comes closest to the economic effect and intent of the parties underlying the invalid, illegal or unenforceable provision.

(c)     Headings. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provisions hereof.

(d)     Severability. In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be

14

affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

(e)     Creditors. None of the provisions of this Agreement shall be for the benefit of or enforced by any creditor of the Company or the Members.

(f)     Survival of Indemnity. All rights to indemnification permitted in this Agreement and payment of associated expenses shall not be affected by the termination, dissolution or bankruptcy of the Company or the withdrawal, insolvency or bankruptcy of any Member.

(g)     Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the parties hereto and the parties entitled to indemnification pursuant to Section 11) any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

(h)     Entire Agreement. This Agreement, together with the Certificate of Formation, and all related Annexes, Exhibits and Schedules, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter. To the extent there is any conflict or inconsistency between the terms of this Agreement and any other agreements entered or to be entered into by and between any Member and the Company, this Agreement shall prevail.

(i)     Definitions. For purposes of this Agreement:

(i)     "**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with, such Person.

(ii)    "**Capital Contribution**" means with respect to any Member, the total amount of cash and the initial Gross Asset Value of property (other than cash) contributed or deemed contributed to the capital of the Company made by or on behalf of such Member, whether as an initial Capital Contribution or as an additional Capital Contribution.

(iii)   "**Code**" means the Internal Revenue Code of 1986, as amended

(iv)    "**Control**" (including the terms "**Controlling,**" "**Controlled by**" and "**under Common Control with**") means, with respect to any Person, the possession, directly or indirectly, of the power to direct the policies and management of such Person, whether through ownership of voting securities, by contract or otherwise.

(v)     "**Depreciation**" means, for each Taxable Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for U.S. federal income tax purposes with respect to an asset for such period, except that if the Gross Asset Value of an asset differs from its adjusted basis for U.S. federal income tax purposes at the beginning of such period, Depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value

15

as the U.S. federal income tax depreciation, amortization or other cost recovery deduction for such period bears to such beginning adjusted tax basis; *provided, however*, that if the adjusted basis for U.S. federal income tax purposes of an asset at the beginning of such period is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managing Member.

      (vi)    "**Economic Interest**" means a Member's share of the Company's Net Profits, Net Losses and Distributions pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members, or any right to receive information concerning the business and affairs of the Company.

      (vii)    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

      (viii)    "**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes, except as follows:

      (A)    The initial Gross Asset Value of any asset contributed or deemed contributed by a Member to the Company will be the fair market value of such asset as reasonably determined by the Managing Member at the time it is accepted by the Company, unreduced by any liability secured by such asset, as reasonably determined by the Managing Member.

      (B)    The Gross Asset Values of all Company assets will be adjusted to equal their respective fair market values, unreduced by any liabilities secured by such assets, as reasonably determined by the Managing Member as of the following times, if the Managing Member reasonably determines that such adjustment is necessary or appropriate to reflect the relative membership interests of the Members in the Company: (i) the acquisition of additional membership interests by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the Distribution by the Company to a Member of more than a de minimis amount of cash or property as consideration for membership interests; (iii) the liquidation or dissolution of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of a membership interest in the Company (other than a de minimis interest), including without limitation a grant of membership interests intended to be "profits interests" for U.S. federal income tax purposes, as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member of the Company; (v) the acquisition of an interest in the Company by any new or existing Member upon the exercise of a noncompensatory option or warrant in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(s); and (vi) at such other times as the Managing Member shall reasonably determine necessary or advisable in order to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2. If any noncompensatory options or warrants are outstanding upon the occurrence of an event described in paragraph (B)(1) through (B)(vi) of this definition,

16

the Company shall adjust the Gross Asset Values of its properties in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(f)(1) and 1.704-1(b)(2)(iv)(h)(2).

(C)     The Gross Asset Value of any asset of the Company distributed to any Member will be adjusted to equal the fair market value of such asset, unreduced by any liability secured by such asset, on the date of Distribution as reasonably determined by the Managing Member.

(D)     The Gross Asset Values of the Company's assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided, however*, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (D) to the extent that an adjustment pursuant to subparagraph (B) above is made in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (D).

(E)     If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (A), (B) or (D) of this definition, such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

(ix)     "**Net Profit**" or "**Net Loss**" means, mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such period, determined in accordance with Section 703(a) of the Code, with the adjustments provided in the regulations thereunder and the regulations under Section 704 of the Code; provided, however, that items which are specially allocated pursuant to Section 16(e) hereof shall not be taken into account in computing Net Profit or Net Loss.

(x)     "**Percentage Interest**" means, with respect to each Member, such Member's percentage of the Company's membership interests as set forth on Exhibit A hereto (as the same may be amended from time to time).

(xi)     "**Person**" means an individual, a corporation, a partnership, a joint venture, a trust, an unincorporated organization, a limited liability company, a government and any agency or political subdivision thereof.

(xii)     "**Proceeding**" means any claim, suit, action, proceeding, arbitration, administrative notice, administrative action or investigation.

(xiii)     "**Sale Event**" means any of the following: (i) the acquisition, directly or indirectly, by any "Person" or "group" (as such terms are used in Section 13(d)(3) of the Exchange Act) (other than one or more of the Members or any of their Affiliates), in a single transaction or in a related series of transactions, of beneficial ownership (within the meaning of Rule 13d-3 under

17

the Exchange Act) of more than 50% of the total voting power or the voting securities of the Company, whether as a result of the issuance of securities, any merger, consolidation, recapitalization, tender offer or exchange offer, reclassification, liquidation or dissolution or otherwise or (ii) the sale, transfer or disposition (including by way of license, lease or otherwise) of all or substantially all of the assets of the Company (on a consolidated basis) to any Person or group (other than the Company or its wholly-owned Subsidiaries or its wholly-owned Subsidiaries).

(xiv)   "**Subsidiary**" means, with respect to any Person, any entity of which (i) 30% of the total voting power of shares of stock or equivalent ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, trustees or other members of the applicable governing body thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if no such governing body exists at such entity, a majority of the total voting power of shares of stock or equivalent ownership interests of the entity is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or Control the managing member or general partner of such limited liability company, partnership, association or other business entity.

(xv)   "**Taxable Year**" means the taxable year of the Company determined under Section 706 of the Code.

(xvi)   "**Transfer**" means, with respect to a Member, to sell, assign, pledge, encumber, transfer or otherwise dispose of, whether directly or indirectly, voluntarily or involuntarily or by operation of law, all or a portion of its, his or her membership interest in the Company. The terms "**Transfers**", "**Transferred**" and "**Transferring**" shall have correlative meanings.

(xvii)   "**Unit**" means a unit representing a fractional part of the membership interests of the Members and will include all types and classes of units, including Preferred Units and Common Units; *provided, however*, that any type or class of Unit will have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the membership interests represented by such type or class or series of Unit will be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

*(Remainder of page intentionally left blank. Signature pages follow.)*

18

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement effective as of the above stated date.

**MANAGING MEMBER:**

**FF GLOBAL PARTNERS LLC**

By: _____
Name: Nan Yang
Title: Secretary

**NON-MANAGING MEMBER:**

**LIAN BOSSERT**

_____

Lian Bossert

**IN WITNESS WHEREOF,** the undersigned have duly executed this Agreement effective as of the above stated date.

**MANAGING MEMBER:**

**FF GLOBAL PARTNERS LLC**

By: _____

Name: Nan Yang

Title: Secretary

**NON-MANAGING MEMBER:**

**LIAN BOSSERT**

_____

Lian Bossert

## Exhibit A

| Name of Member | Address of Member | Units | Percentage Interest | Capital Contribution |
|---|---|---|---|---|
| FF Global Partners LLC | FF Global Partners LLC N, Rolling Hills Estate CA 90274 | 362,352,941 Common Units | 80% | $16,464,147.31 |
| Lian Bossert | 850 Wilcox Ave Apt 201, Los Angeles CA 90038 | 90,588,235 Preferred Units | 20% | $444,738,412, represented by one ordinary share of FF Peak Holding Ltd., a business company incorporated under the laws of the British Virgin Islands ("FF Peak"), which represents all of the issued and outstanding equity interests in FF Peak |

# EXHIBIT 7

# APPLEBY

**Kobre & Kim (BVI) LP**
Commerce House
Road Town, Tortola
British Virgin Islands

Attention: **Timothy de Swardt**

**Email** awillins@applebyglobal.com

**Direct Dial** +1 284 393 5323
**Fax** +1 284 494 7279

**Appleby Ref:** AW/4444373.0001

**By Email**

27 April 2019

British Virgin Islands
Office
Jayla Place
Wickhams Cay 1
PO Box 3190
Road Town
Tortola
British Virgin Islands
VG 1110

Tel +1 284 494 4742
Fax +1 284 494 7279

applebyglobal.com

Dear Sirs

**BVIHCM2018/0198 – Shanghai Lan Cai Asset Management Co, Ltd v. Jia Yueting et al**

1    We refer to the above matter and to the orders made on 6 December 2018.

2    You will be aware that FF Top Holding Limited (**FF Top**) is a shareholder in a Cayman Islands vehicle, Smart King Limited (**Smart King**).  You will also be aware that Season Smart Limited (**Season Smart**) had security over the shares held by FF Top in Smart King and over the shares which FF Peak Holdings Limited (**FF Peak**) holds in FF Top.  That security is registered with the Registry of Corporate Affairs.

3    Our clients were recently successful in resolving the disputes between the shareholders in Smart King, which were standing in the way of securing the financing necessary to ensure the future success of Smart King and to maximise the value of its shares.  Those agreements are the subject of wide confidentiality agreements, but we understand them to have:

(i)    Resulted in the release of the security which Season Smart holds over the shares issued by FF Peak in FF Top and over the shares which FF Top holds in Smart King (the **Mortgaged Property**).

(ii)    The effect of enabling Smart King to secure the investment and lending which is necessary to protect the viability of Smart King, and thus to maximise the value of the shares which FF Top holds in Smart King.

4    We enclose copies of the Deeds of Release which formally release the security over the Mortgaged Property.  FF Top and FF Peak have asked their Registered Agents to formally remove any applicable notion on the Registers, and to file notice of the release with the Registrar of Corporate Affairs.  You will appreciate that those are simple administrative acts which themselves have no legal

1683592.1

significance to the existence or otherwise of any security interests. However, we understand that the Registered Agent of FF Top and FF Peak has taken the view that it is not entitled to remove any applicable notation or to make those filings without either your client's consent, or a Court order.

5      That approach is obviously misconceived because:

(i)      The charge which Season Smart held over the Mortgaged Property has already been released by the terms, *inter alia*, of the Deed of Release. All the removal of any notion and the filing the requisite document with the Registrar of Corporate Affairs would do is to formalize that release;

(ii)     It is obviously to the benefit of FF Top and FF Peak that the security which Season Smart held over the Mortgaged Property is released.

6      We would ask you to provide your client's immediate confirmation that it consents to the removal of any notation, and to the filing by the Registered Agent of the requisite documents with the Registrar of Corporate Affairs to bring about the release of the security which Season Smart holds over the Mortgaged Property.

7      In default of your confirmation, we have instructions to apply to the Court and to seek all appropriate orders against your client, including as to costs, fortification and the discharge of the injunction.

Yours faithfully

**APPLEBY**

Bermuda ■ British Virgin Islands ■ Cayman Islands ■ Guernsey ■ Hong Kong ■ Isle of Man ■ Jersey ■ London ■ Mauritius ■ Seychelles ■ Shanghai ■ Zurich

# EXHIBIT 8

**FILED**
Registrar's Office
Eastern Caribbean
Supreme Court

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION

Filed Date:27/11/2018 18:37

CLAIM NO. BVIHC (COM)          of 2018

IN THE MATTER OF THE ARBITRATION ACT 2013

Effective Date:30/11/2018 08:30

AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN
ARBITRAL AWARD ADMINSTERED BY
THE BEIJING ARBITRATION COMMISSION

Fees Paid:811.84

BETWEEN:

SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.

Applicant

- and -

**(1) JIA YUETING**

Respondent

---

NOTICE OF APPLICATION (WITHOUT NOTICE)
FOR THE ENFORCEMENT OF A FOREIGN ARBITRAL AWARD
(CPR 43.10(3), s.84(1)(b) and 85 Arbitration Act 2013)

---

TAKE NOTICE that the Applicant, Shanghai Lan Cai Asset Management Co, Ltd., whose address for service is Kobre & Kim (BVI) LP, Commerce House, Waterfront Drive, Road Town, Tortola, British Virgin Islands, applies without notice to the Court pursuant to CPR 43.10(3) and ss.84(1)(b) and s.85 of the Arbitration Act 2013 for an order against the Respondents in the following terms:

1. That a final arbitral award issued by an arbitral tribunal constituted under the rules and procedures of the Beijing Arbitration Commission dated 22 January 2018 against the Respondent ("**the Final Award**") may be enforced in the same manner as a judgment or order of this Court;

2. That the Respondent shall have 21 days following service of the Order made under paragraphs 1 and 2 above to apply to set aside such Order;

3. That the costs of this Application be paid by the Respondent to be assessed if not agreed; and

4. Such further or alternative orders or relief as the Court deems appropriate.

A draft order is attached to this application.

The grounds of this Application are as follows:

1. The Final Award is binding on the Respondent and has not been set aside or suspended by a competent authority;

2. Duly authenticated and/or certified copies of the Final Award and the original arbitration agreement as between the Applicants and Respondent will be produced in accordance with s.85 of the Arbitration Act 2013;

3. None of the grounds for refusing to enforce the Final Award are made out; and

4. The Respondents have failed or refused to satisfy the Final Award.

Further details are set out in the First Affirmation of Kang Jian dated 27 November 2018.

The Application will be heard by the Judge on _____ and the estimated length of the hearing is 1.5 hours.

Dated this 27th day of November 2018

Timothy de Swardt
Kobre & Kim (BVI) LP
Legal Practitioners for the Applicant

The court office is at the High Court Registry, Road Town, Tortola, British Virgin Islands, telephone number (284) 468 5001, fax (284) 468 4951. The office is open between 8:30am and 4.30pm Monday to Friday except public holidays.

The Applicants' address for service is c/o Kobre & Kim BVI, Commerce House, Waterfront Drive, Road Town, Tortola, VG 1110, telephone number (284) 852 1600, fax number (284) 852 1620, email timothy.deswardt@kobrekim.com

IN THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE
VIRING ISLANDS
COMMERCIAL DIVISION

CLAIM NO. BVIHC (COM)          of 2018

IN THE MATTER OF THE ARBITRATION ACT 2013
AND IN THE MATTER OF AN APPLICATION TO ENFORCE AN
ARBITRAL AWARD ADMINSTERED BY
THE BEIJING ARBITRATION COMMISSION

BETWEEN:

SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.
Applicant

- and -

JIA YUETING

Respondent

_____

NOTICE OF APPLICATION (WITHOUT NOTICE)
FOR THE ENFORCEMENT OF A FOREIGN ARBITRAL AWARD

_____

**Kobre & Kim (BVI) LP**
**Legal Practitioners for the Applicants**
Tel: 284 852 1600
Email: timothy.deswardt@kobrekim.com
Ref. 03787.001

# EXHIBIT 9



December 19,2018

Dear Customer:

The following is the proof-of-delivery for tracking number **784489216182**.

---

### Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Residence |
| Signed for by: | Signature not required | Delivery location: | RANCHO PALOS VERDES, CA |
| Service type: | FedEx First Overnight | Delivery date: | Dec 18, 2018 08:19 |
| Special Handling: | Deliver Weekday | | |
| | Residential Delivery | | |

NO SIGNATURE REQUIRED
Proof-of-delivery details appear below; however, no signature is available for this FedEx Express shipment because a signature was not required.

---

### Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 784489216182 | Ship date: | Dec 17, 2018 |
| | | Weight: | 11.0 lbs/5.0 kg |

| | |
|---|---|
| **Recipient:** | **Shipper:** |
| RANCHO PALOS VERDES, CA US | SAN FRANCISCO, CA US |

Thank you for choosing FedEx.

# EXHIBIT 10

| | |
|---|---|
| **From:** | tommy@dtrac.firstlegal.com on behalf of T Tilcock <tommy@dtrac.firstlegal.com> |
| **Sent:** | Friday, December 14, 2018 7:36 PM |
| **To:** | Emma Kiver; mguarino@firstlegalnetwork.com; ndprocess@firstlegalnetwork.com |
| **Subject:** | First Legal Update for Ctrl# [311824] - Shanghai Lan Cai v Jia    Yueting - BVIHC(com) 2018/0198 - SHANGHAI V YUETING |

NOTE:This is an automated email.Do Not Reply

Control#:  311824
Job Date: 12/07/18
Submitted By: Emma Kiver
Service Type: ASPPROC
Claim Number: SHANGHAI V YUETING

Case Number: BVIHC(com) 2018/0198

Documents: Frz Order x2;Order;Sek Argu;Hearing bundle;Auth bundle;N

DELIVERY INFO:

Deliver To: Jia Yueting
Delivery Add: 7 Marguerite Dr.
Delivery City: Rancho PV
Del State/Zip: CA90275

CONFIRMATION INFO:
Delivery Date: 12/14/18 Time: 16:35 Signed: Left inside gate.







# EXHIBIT 11

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS**
**COMMERCIAL DIVISION**

**BVIHC (COM) NO.    OF 2020**

**BETWEEN:**

**SHANGHA LAN CAI ASSET MANAGEMENT CO, LTD.**

<u>**Claimant**</u>

**- and -**

**(1) FF TOP HOLDING LTD.**
**(2) FF PEAK HOLDING LIMITED**
**(3) PACIFIC TECHNOLOGY HOLDING LIMITED**
**(4) LIAN BOSSERT**
**(5) FF GLOBAL PARTNERS LLC**

<u>**Defendants**</u>

---

**STATEMENT OF CLAIM**

---

**The Parties**

1.  The Claimant ("**SLC**") is and was at all material times a corporation organized and existing under the laws of the PRC. The registered address of the Applicant is at Room 1049, Block 6, 112-118 Gaoyi Road, Baoshan District, Shanghai, PRC.

2.  The First Defendant ("**FF Top**") is a company incorporated in the British Virgin Islands ("**BVI**") that legally owns approximately 6 million Class B shares in FF Intelligent Mobility Global Holdings Ltd. (formerly known as Smart King Limited), a company incorporated in the Cayman Islands ("**FF Intelligent**"). FF Intelligent indirectly owns Faraday Future, Inc. ("**Faraday Future**"), a company incorporated in California that is in the business of manufacturing electric vehicles. Faraday Future was founded by the well-known Chinese businessman Jia Yueting ("**Mr Jia**").

3.  The Second Defendant ("**FF Peak**") is a company incorporated in the British Virgin Islands ("**BVI**"). FF Peak is the sole legal owner of FF Top.

4.  The Third Defendant ("**Pacific Technology**") is a limited liability company registered in

1

Delaware. Pacific Technology is the sole legal owner of FF Peak.

5.   The Fourth Defendant ("**Ms Bossert**") was the sole owner of the preferred units in Pacific Technology, until she transferred them to West Coast LLC on or about 31 July 2019. Until that time, Ms Bossert owned the preferred units as nominee for Mr Jia. She now owns Mr Jia's interests in West Coast LLC as nominee for Mr Jia. Ms Bossert was the managing member of Pacific Technology until 5 July 2010, when she became the non-managing member.

6.   The Fifth Defendant ("**FF Global**") is a limited liability company registered in Delaware. At the date of issuing this claim, FF Global owns 100% of the common units in Pacific Technology and is the managing member of Pacific Technology.

**The Freezing Orders**

7.   SLC commenced an arbitration against Mr Jia before the Beijing Arbitration Commission (the "**BAC**"), which the BAC accepted on 28 June 2017. On 22 January 2018, the BAC issued an award against Mr Jia in favour of SLC in the amount of ¥50,826,768 (the "**Award**"). To date and inclusive of principal interest and post-default interest, the Award amounts to ¥82,450,055.67 (approximately US $11.6 million).

8.   On 27 November 2018, SLC applied to the High Court of the BVI to enforce the Award as if it were a judgment of the Court (the "**Enforcement Application**").

9.   At the same time, SLC applied for worldwide freezing orders against FF Peak and FF Top (the "**Freezing Orders Application**").

10.  On 5 December 2018, the BVI Court granted SLC's Enforcement Application and Freezing Orders Application. The BVI Court entered freezing orders against FF Peak and FF Top on 6 December 2018 (the "**Freezing Orders**").

11.  On 6 December 2018, SLC served the Freezing Orders on FF Peak and FF Top at their registered office with Conyers Trust Company (BVI) Limited ("**Conyers**"). The service letter in respect of each freezing order was endorsed by Conyers at 5:10pm on that day.

12.  On 19 December 2018, the Freezing Orders were continued until further order of the BVI Court, following an *inter partes* hearing at which FF Peak and FF Top were represented by legal counsel.

13.  The Freezing Orders against FF Peak and FF Top are substantively similar. Among other things, they restrain FF Peak and FF Top from:

13.1.   in any way disposing of, dealing with, or diminishing the value of the entire issued share capital of FF Peak and FF Top whether they are in or outside the BVI, whether they are jointly, beneficially, or legally owned up to the same value (para. 4(a)(i)); and

2

13.2.   effecting or allowing to be created any changes, variations or amendments to any agreement, trust, and /or any other similar arrangement in relation to which the FF Peak Shares and FF Top Shares are held (para. 4(a)(vii)); and

13.3.   in any way transferring, disposing of, pledging, charging, diminishing the value of, encumbering or dealing with their assets up to the value US$10,800,312.00 (para. 4(b)).

**The Defendants' Conspiracy to Injure SLC by Unlawful Means**

14. The Defendants combined and conspired together to injure SLC by unlawful means, namely by agreeing to transfer certain shares held by FF Top in FF Intelligent to a third party or creditor trust at the direction of Mr Jia, in breach of the Freezing Orders and in contempt of court (the "**Conspiracy**").

15. Pursuant to and in furtherance of the Conspiracy, the Defendants carried out a series of overt acts that had the foreseeable result of harming SLC:

15.1.   On or about 5 July 2019, FF Top, with the concurrence and approval of the other Defendants, proposed to transfer 147,058,823 shares in FF Intelligent (the "**FF Intelligent Shares**") to a third party or creditor trust nominated by Mr Jia for no consideration (the "**FF Top Proposal**"), which was in breach of paragraphs 4(a)(i) and 4(b) of the Freezing Orders and in contempt of court.

15.2.   Ms Bossert and FF Global with the concurrence and approval of the other Defendants, approved and authorized the FF Top Proposal "and the transactions contemplated thereby", including the disposition of the FF Intelligent Shares at the direction of Mr Jia, without any further action required by the members of Pacific Technology, as set out in Pacific Technology's Third Amended and Restated Limited Liability Company Agreement dated 5 July 2019 (the "**PT Ratification**").

16. As a result of the matters pleaded to at paragraphs 14 to 15 above:

16.1.   The value of the issued share capital in FF Peak and FF Top decreased.

16.2.   Mr Jia entered into bankruptcy on 14 October 2019, having acquired, pursuant to the PT Ratification set out in the PT LLCA, what he describes as a "*contractual right to direct Pacific Technology to direct FF Peak to direct FF Top to dispose of the FF Intelligent Shares*" (the "**FF Intelligent Transfer Right**").

16.3.   Mr Jia sought to reorganize his assets and discharge the debt claims against him, including the claim of SLC, as set out most recently in his Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated 17 March 2020 (the "**Reorganization Plan**") – a plan that depends and relies on the existence of the FF Intelligent Transfer Right.[1]

---

[1] For the avoidance of doubt, Mr Jia also relied on the existence of the FF Intelligent Transfer Right in his First and Second Amended Plans of Reorganization Under Chapter 11 of the Bankruptcy Code dated 27 January 2020 and 3

17. As set out in paragraph 6.2 of Mr Jia's Reorganization Plan, FF Global proposed that on the date the Reorganization Plan becomes effective:

    17.1.   West Coast LLC would no longer hold any preferred units in Pacific Technology; and instead Mr Jia's creditor trust would own 100% of the preferred units;

    17.2.   Pacific Technology would issue new units (the "**New PT Units**") to Mr Jia's creditor trust, entitling the creditor trust to 100% of the economic value of the FF Intelligent Shares;

    17.3.   Pacific Technology would grant Mr Jia's creditor trust a fully paid-up warrant to receive the Trust FF Intelligent Shares consistent with the FF Intelligent Transfer Right with no further action necessary by Mr Jia exercisable upon the dissolution of the Freezing Orders (the "**Warrant**").

18. The California Court approved the Reorganization Plan on [date]. SLC's debt claim against Mr Jia was discharged at the same time.

19. Had the Defendants not taken the steps described in paragraphs 14 – 15 above, in breach of the Freezing Orders, Mr Jia would not have been able to propose or issue his Reorganization Plan, which depended and relied on the existence of the FF Intelligent Transfer Right, which in turn depended and relied on the PT Ratification and the FF Top Proposal. It follows that:

    19.1.   The Reorganization Plan could never be approved, because it could not have been made in the absence of the FF Intelligent Transfer Right, the PT Ratification, and the FF Top Proposal, in the first place.

    19.2.   The preferred units of Pacific Technology would continue to be held by Mr Jia's nominee, Lian Bossert, through West Coast LLC.

    19.3.   Pacific Technology would not issue the New PT Units.

    19.4.   Pacific Technology would not grant the Warrant to Mr Jia's creditor trust.

    19.5.   SLC would continue to have a debt claim against Mr Jia that was not susceptible to discharge and replacement with a share in the trust assets of Mr Jia's creditor trust (the "**Trust Interests**") as contemplated in Mr Jia's Reorganization Plan.

    19.6.   SLC would not have incurred costs objecting to and opposing the Reorganization Plan.

20. In the premises, SLC has suffered loss and damage.

PARTICULARS OF LOSS AND DAMAGE

---

March 2020 respectively.

20.1.  SLC has suffered loss and damage equal to the value of its debt claim against Mr Jia to enforce the Award less the value of its Trust Interests.

20.2.  Further, SLC has suffered loss and damage equal to the amounts it has incurred in (a) opposing the Reorganization Plan, which could not have been issued but for the Conspiracy, and (b) issuing and prosecuting this claim.

21. Further, SLC is entitled to and claims interest at such rate and for such period as the Court thinks fit on all sums which it may be awarded by the Court.

AND SLC Claims

1) Damages
2) Interest
3) Costs

Peter Tyers-Smith
Timothy de Swardt

I [*name*] am authorized to sign this Statement of Claim for and on behalf of SLC. I believe the facts stated in the Amended Statement of Claim are true.

Dated:

Signed:

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015.

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF TIMOTHY DE SWARDT IN SUPPORT OF SHANGHAI LAN CAI ASSET MANAGEMENT CO, LTD.'S OBJECTION TO DEBTOR'S MOTION TO CONFIRM THIRD AMENDED PLAN** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 05/07/2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Tanya Behnam**    tbehnam@polsinelli.com, tanyabehnam@gmail.com
- **Jerrold L Bregman**    ecf@bg.law, jbregman@bg.law
- **Jeffrey W Dulberg**    jdulberg@pszjlaw.com
- **Lei Lei Wang Ekvall**    lekvall@swelawfirm.com,
  lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- **Stephen D Finestone**    sfinestone@fhlawllp.com
- **Richard H Golubow**    rgolubow@wghlawyers.com,
  pj@wcghlaw.com;jmartinez@wghlawyers.com;Meir@virtualparalegalservices.com
- **Jared T. Green**    , spappa@svglaw.com
- **Robbin L. Itkin**    robbin.itkin@dlapiper.com, cheryleigh.bullock@dlapiper.com;robbin-itkin-6765@ecf.pacerpro.com
- **Mette H Kurth**    mkurth@foxrothschild.com, mette-kurth-7580@ecf.pacerpro.com
- **Ben H Logan**    blogan@omm.com
- **Robert S Marticello**    Rmarticello@swelawfirm.com,
  gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- **David W. Meadows**    david@davidwmeadowslaw.com
- **Kevin Meek**    kmeek@robinskaplan.com, kevinmeek32@gmail.com;kmeek@ecf.inforuptcy.com
- **John A Moe**    john.moe@dentons.com, glenda.spratt@dentons.com
- **Kelly L Morrison**    kelly.l.morrison@usdoj.gov
- **Matthew J Olson**    olson.matthew@dorsey.com, stell.laura@dorsey.com
- **Malhar S Pagay**    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- **Diana M Perez**    , diana-perez-7352@ecf.pacerpro.com
- **Christopher E Prince**    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com
- **Victor A Sahn**    vsahn@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com;dlee@metallawgroup.com;dlee@ecf.inforuptcy.com
- **Randye B Soref**    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com
- **Benjamin Taylor**    btaylor@taylorlawfirmpc.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Ryan A Witthans**    rwitthans@fhlawllp.com
- **Felix T Woo**    fwoo@ftwlawgroup.com, admin@ftwlawgroup.com
- **Claire K Wu**    ckwu@sulmeyerlaw.com,
  mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com
- **Emily Young**    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- **David B Zolkin**    dzolkin@ztlegal.com, maraki@ztlegal.com,sfritz@ztlegal.com

☐ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL**:

On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**

(state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 05/07/2020 | Christopher E. Prince | /s/Christopher E. Prince |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2012*                                                                     **F 9013-3.1.PROOF.SERVICE**