# Exhibit 3

FILED

JAN 24 2018

CLERK OF THE COURT
SUPERIOR COURT OF CA
COUNTY OF SANTA CLARA
BY _____ DEPUTY

G. REYES

**NELSON W. GOODELL, ESQ., SBN 264734**
The Goodell Law Firm
5 Third Street, Suite 1100
San Francisco, CA 94103
Tel. No. (415) 495-3950 (office)
Fax No. (415) 495-6900 (fax)
nelson@goodelllawsf.com

Attorney for Plaintiff
HAN'S SAN JOSE HOSPITALITY LLC

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| HAN'S SAN JOSE HOSPITALITY LLC, <br><br> Plaintiff, <br><br> v. <br><br> LE HOLDINGS (BEIJING) CO., LTD; LE TECHNOLOGY, INC.; and DOES 1 to 10, <br><br> Defendants. | **Case No: 17 CV317221** <br><br> **SECOND AMENDED COMPLAINT FOR** <br><br> 1) **Breach of Contract** <br> 2) **Breach of Implied Covenant of Good Faith and Fair Dealing** <br> 3) **Intentional Interference with Contract Relations** |

Plaintiff, Han's San Jose Hospitality LLC ("Plaintiff"), on information and belief, allege as

follows:

## INTRODUCTION

1.  This is an action for breach of contract and related claims arising out of a written rental

agreement ("Lease") for the commercial property commonly known as 3553 North First

Street, San Jose, CA 95134 ("Subject Property").

2. Defendants have failed to pay rent as per the terms of the written contact for the Subject Property since September 2017.

3. On October 12, 2017 Plaintiff's filed an Unlawful Detainer Complaint, beginning this instant action. On November 30, 2017 Defendants informed Plaintiff they had vacated the property, however, they have failed to pay any rent since September, 2017.

4. The Plaintiff now seeks damages according to proof, as discussed below, to all Defendants herein material breach of a long-term lease.

<u>**JURISDITCIONAL ALLEGATIONS**</u>

5. Plaintiff HAN'S SAN JOSE HOSPITALITY LLC is, and was at all times material to this Complaint, a corporation organized and existing under the laws of the State of California, doing business in Santa Clara County, California.

6. Defendant LE HOLDINGS (BEIJING) CO., LTD ("LE HOLDINGS") is, and was at all times material to this Complaint a company organized under the laws of the People's Republic of China.

7. Defendant LE TECHNOLOGY, INC. ("LE TECHNOLOGY") is, and was at all times material to this Complaint, a corporation organized and existing under the laws of the State of California, doing business in Santa Clara County, California. LE TECHNOLOGY is a domestic subsidiary of LE HOLDINGS.

8. On information and believe Plaintiff alleges that LeEco is an affiliate of LE TECHNOLOGY.

9. Defendant FARADAY&FUTURE INC. ("FARADAY&FUTURE") is, and was at all times material to this Complaint, a corporation organized and existing under the laws of the State of California, doing business in Santa Clara County, California.

10. The Subject Property is located in San Jose, California, which is located within Santa Clara County.

11. Jurisdiction of the Court over the instant controversy is based upon Cal. Civ. Proc. § 88.

12. Venue is properly placed in Santa Clara County, California, pursuant to Cal. Civ. Proc. § 392 as is it the closest court to the location of the Subject Property.

13. At all times mentioned herein, whenever an act or omission of a business entity is alleged, said allegation shall be deemed to mean and include an allegation that the business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees, acting within the course and scope of their duties, that the act or omission was authorized and/or ratified by the business entity.

14. Plaintiff is informed and believe and thereon allege that, at all mentioned times herein, Defendants were agents, servants, employees, alter egos, superiors, successors in interest, joint venturers and/or co-conspirators of each other and in doing the things herein after mentioned, or acting within the course and scope of their authority of such agents, servants, employees, alter egos, superior, successors in interest, joint venturers and/or co-conspirators with the permission and consent of their co-defendants and, consequently, each Defendant named herein is jointly and severally liable to Plaintiff for the damages and harm sustained as a result of their wrongful conduct.

## STATEMENT OF FACTS

15. On or about March 15, 2016 Plaintiff's predecessor-in-interest and Defendant LE TECHNOLOGY and LE HOLDINGS entered into a written agreement to rent to Defendants the premises located at 3553 North First Street, San Jose, California 95134 ("Subject Property"). The Lease was for 10 years, beginning on March 15, 2016 until

February 28, 2026. The "Monthly Installment of Base Rent" began at $193,826.25 and

increased each after each twelve month period. From March 1, 2017 – February 28, 2018,

the time period for which the present controversy occurred, the monthly rent was set at

$199,856.40, approximately $6,661.88 per day. *(See* Lease, attached as Exhibit 1, pg. 2)

16. The Lease states rent "shall be paid in advance on or before the first day of each calendar

month." (Exh. 1, pg. 8 ¶ 3.1.) Defendants LE TECHNOLOGY and LE HOLDINGS have

failed to pay rent since September 1, 2017. To date, the base rent owed is $799,425.60

17. The Lease also contains a provisions concerning "Additional Rent Upon Default by

Tenant" in which Tenants must pay "within ten (10) days after a Default on the Lease as

Additional Rent all Inducements incurred or grated prior to the Default including: (i)

payment of the Allowance ( as described in the Tenant Work Letter); (ii) commissions to

Landlord's and/or Tenant's real estate broker; and/or (iii) attorneys' fees and related costs

incurred and/or paid by Landlord in connection with the negotiation and preparation of

this Lease." (Exh. 1, pg. 8-9 ¶ 3.2.)  To date, Tenant has not paid any Additional Rent.

18. Also as per terms of the lease, any rent not paid within 10 days after notice shall bear an

interest rate of 12% from its due date until paid. (Exh. 1, pg. 8-9 ¶ 3.1.)

19. The Lease requires Tenants, Defendants LE TECHNOLOGY and LE HOLDINGS, to

pay certain expenses in addition to rent, including (1) expenses for maintain the building,

such as insurance and landscaping fees; (2) their share of taxes for the year; (3) and a

Management Fee, which is equal to 3% of the of the total rent (Base rent and Additional

rent) payable by the Tenant for the year. (Exh. 1, pg. 9 ¶ 4 – Expenses and Taxes.)  To

date, these additional expenses plus the Base rent total over $1.2 million.

20. Per the terms of the Lease, Tenants under the lease are permitted to sublet the Premises.

Paragraph 14.8.1 **Permitted Affiliate Transfer** So long as Le Technology and/or Le Holdings…is the Tenant and in occupancy and possession of at least seventy-five percent (75%) of the Premises, Tenant shall have the right to assign this Lease or sublease the Premises (or any portion thereof) to an affiliate of Le Technology and/or Le Holdings…so long as (i) at least 15 business days before the Transfer, Tenant notifies Landlord of Such Transfer and delivers to Landlord any documents or information reasonably requested by landlord relating thereto, including reasonable documentation that the Transfer satisfies the requirements of this Section 14.8.1…(iii) the Affiliate has a net worth…immediately after the Transfer that is reasonable sufficient to fulfill the obligations on party of the Tenant to be performed or observed under this Lease…and (v) the Transfer is made in good faith operating business purpose and not in order to evade the requirements of this Section 14.

(Exh. 1, pg. 22 ¶ 14.8.1.)

21. Defendants LE TECHNOLOGY and LE HOLDING never told Plaintiff, Landlord, about an unauthorized occupant or subtenant of theirs, FARADAY&FUTURE, prior to this company taking possession of the subject property. Had Defendants abided by the Lease and informed Plaintiffs that they had a subtenant, Landlord would have exercised their rights under 14.8.1 and to ask for documents demonstrating the net worth. International news organizations have been reporting that FARADAY&FUTURE and affiliate LeEco do not have sufficient net worth to sustain their operations and had Plaintiff known of these subtenants they would never have consented. Moreover, Plaintiff would have been well within their rights not to consent, given the failing financial health of all three Defendants.

22. Indeed, Jia Yueting, the founder of LeEco is also a main backer of FARADAY&FUTURE, INC. Mr. Yueting was placed on a debtor's blacklist by the Chinese government. It is reported that Mr. Yueting owes $72 million, and that LeEco owes a substantial sum as well to other creditors. In addition, the online webpage of

Fortune magazine stated that LeEco's "own ambitious expansion plans have left it scrounging for capital and unable to pay some suppliers."

23. Plaintiff never informed any of the Defendants herein that they consented to this transfer, and never accepted rent from FARADAY&FUTURE.

24. On information and believe, Plaintiff also alleges that Defendants breached paragraph 14.8.1, as it requires that a "Transfer [be] made for a good faith operating purpose and not in order to evade the requirements of this **Section 14**." Section 14, paragraph 14.2. states that a landlord cannot withhold consent for a proposed transfer unless "[t]he proposed transferee has a character or reputation or is engaged in a business that is not reasonable consistent with the quality of the Building or the Project" (Exh. 1, pg. 20 ¶ 14.2.2) among other reasons. In these recent times the character and reputation of the three Defendants has been abysmal, as noted above, and Plaintiff would never have consented to any affiliates of LE TECHNOLOGY, including LeEco or FARADAY&FUTURE, to take possession of the property as the direct result of their international attempts to avoid their obligations as reported by numerous international news organizations.

25. Additionally if "Tenant is in Default, the Landlord is irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any transferee under any sublease, license or other occupancy agreement to make all payments under such agreement directly to Landlord (which Landlord shall apply towards Tenant's obligations hereunder) until such Default is cured. Such transferee shall rely upon any representation by Landlord that Tenant is in Default, without any need for confirmation thereof by Tenant." (Exh. 1, pg. 22 ¶ 14.7.) Defendants LE TECHNOLOGY failed to pay rent beginning with September 1, 2017,

Plaintiff is thus entitled to the consideration from FARADAY&FUTURE to LE

TECHONOLOGY and LE HOLDINGS to cure their default.

26. Pursuant to Civ. Code section 1995.330 an assignee who receives a transfer in violation

of a restriction on a transfer of a tenants interest in a lease is jointly and severally liable

with the tenant for contract damages under section 1995.320 . Consequently,

FARADA&FUTURE is jointly and severally liable for the unpaid rent, as well as the

material breach of the provision restricting transfer of any interest in the subject property,

with the other defendants.

27. Paragraph 15.2 of the Lease details that upon expiration or early termination of the Lease,

the Tenant, without expense to the Landlord shall remove from the Premises all debris

and rubbish, all furniture, equipment, trade fixtures and other articles of personal property

owned or placed by Tenant and repair all damage to the premises and building resulting

from such removal. (Exh. 1, pg. 22-23 ¶ 15.2.) Upon the Defendants leaving the property,

the Plaintiffs re-entered the property on December 4, 2017 and noticed about 80 ceiling

tiles were gone, and large amounts of trash and the company name signs were left behind.

The Defendants also took 12 Electric Vehicle Charging Systems from the parking lot.

Defendants thus failed to surrender the property in the as per the required terms of the

Lease and breached the contract.

28. Upon an default, the Landlord may terminate the Lease, and the Landlord may recover

from the Tenant:

   a.  The worth at the time of award of the unpaid Rent which had been earned
      at time of such termination; plus

   b.  The worth at the time of award of the amount by which the unpaid Rent
      which would have been earned after termination until the time of award
      exceeds the amount of such rental loss that Tenant proves could have been
      reasonably avoided; plus

  c. The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such Rent loss that Tenant proves could be reasonably avoided; plus

  d. Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations hereunder or which in the ordinary course of things would be likely to result therefrom, Including brokerage commissions, advertising expenses, expenses of remodeling any portion o the Premises for a new tenant (whether for the same or a different use), and any special concessions made to obtain a new tenant; plus

  e. At Landlord's option, such other amounts in addition to or in lieu of the foregoing as maybe permitted from time to time by Law.

(Exh. 1, pg. 25-26 ¶ 19.2.1) Plaintiff's broker has informed them it is anticipated to take 6-12 months to re-let the property. As a result of Paragraph 19.2.1 above, Plaintiff alleges that Defendants are liable for unpaid rent since their breach and until a new tenant is found, as well as brokerage costs and any renovations done to the building for the new tenant, the exact determinations of these damages will be determined at truth during trial.

29. As mentioned above, Defendants LE HOLDINGS and LE TECHNOLOGY failed to pay rent beginning on September 1, 2017.

30. On October 3, 2017 Plaintiff personally served a Notice to Pay Rent or Quit on the Defendants at the Subject Property. A copy of the Notice to Pay Rent or Quit was also sent via Federal Express courier for overnight delivery and overnight mail to the Defendant's at the Subject Property, and arrived on October 4, 2017.  The Notice included an election of forfeiture of the lease.

31. After receiving no response to the Three Day Notice, Plaintiff filed a Complaint for an Unlawful Detainer on October 12, 2017 and commenced this instant action. (*See* Complaint, filed October 12, 2017) Defendant, LE TECHONOLOGY filed a Demurrer to Plaintiff's Complaint for Unlawful Detainer on October 23, 2017. Plaintiff

subsequently filed a First Amended Complaint for Unlawful Detainer on October 27, 2017.

32. Defendant, LE TECHONOOGY filed a Demurrer to the First Amended Complaint on November 3, 2017.

33. On November 30, 2017 Defendant LE TECHNOLOGY mailed a letter to Plaintiff's counsel stating they, along with LE HOLDINGS, had vacated the Subject Property. The letter also contained a key to the Subject Property.

34. On December 11, 2017, Plaintiff and Defendant LE TECHNOLOGY filed a joint stipulation to vacate the trial date on the hearing on the demurrer and to convert the case to an ordinary civil action pursuant to Civ. Code § 1952.3(a).

35. Plaintiff hereby elects to terminate the Lease and the defendants' right to possession thereunder pursuant to the lease and Civil Code section 1951.2.

36. Despite Plaintiff's best diligent efforts, the Plaintiff has been unable to release the Premises to date.

37. Plaintiff's real estate brokerage has informed Plaintiff that it will take 6-12 months to find a suitable tenant, given the substantial annual rent for a large commercial building such as this.

38. Accordingly, the Plaintiff has been harmed by all Defendants material breach of the lease by failing to pay rent, in accordance with the lease.

### FIRST CAUSE OF ACTION

**BREACH OF CONTRACT**

**(Against All Defendants)**

39. Plaintiff re-alleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

40. On or about March 15, 2016 Defendants, LE TECHNOLOGY and LE HOLDINGS, entered into a Lease with Plaintiff's predecessor-in-interest, BSREP RIO ROBLES, LLC. to rent the commercial office building commonly known as 3553 North First Street, San Jose, California, 95134 from March 15, 2016 until February 28, 2026.

41. The lease is a valid, enforceable, written contract.

42. According to page two of the Lease, the monthly rent would increase every 12 months. For the months of March 2017 – February 2018 Defendants were to pay Plaintiffs $199,856.40 for each month as rent, approximately $6,661.88 per day.

43. In September 2017, Defendants stopped paying rent and have made no payments to Plaintiff since September, 2017. As of December, 2017 Defendants owe $799,425.60 in Base rent.

44. Defendants have breached their contractual duty under the lease by failing to pay rent for the past four months.

45. In addition, the Defendants breached the lease by failing to timely notify the Plaintiff and request permission before FARADAY&FUTURE occupied the subject premises, as described.

46. Pursuant to Civil Code section 1995.330, FARADAY&FUTURE is jointly and severally liable for the damages that Plaintiff has sustained from the other Defendants, since FARADAY&FUTURE is an unauthorized assignee of an interest in the subject premises.

47. As a result, Plaintiff alleges that FARADAY&FUTURE'S conduct intentionally interfered with the rental contract between LE TECHNOLOGY and HAN'S SAN JOSE HOPITALITY and made performance by LE TECHNOLOGY more difficult or more expense.

48. On this score, FARADAY&FUTURE was well aware of this prohibition on an unauthorized use of the property as they are partners with LeEco, and Jia YueTing recently became the Chief Executive Officer of FARADAY&FUTURE.  Mr. Yueting was also the founder of the other Defendants subsidiary, LeEco.

49. Mr. YueTing reportedly has a net worth of over $3.8 billion, which makes these Defendants decision to breach this lease with impunity particularly egregious.

50. Indeed, there have been recent protests outside of Mr. Yueting's offices in China from other creditors furious about his refusal to repay their debts.

51. Many international news organizations, including Reuters and Fortune, have reported recently on these Defendants financial woes.

52. The Plaintiff has fully performed under the contract and has satisfied all conditions precedent thereunder by providing LE TECHNOLOGY and LE HOLDINGS with the subject premises in good condition.

53. WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against All Defendants)

54. Plaintiff re-alleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

55. The Plaintiff and Defendants LE HOLDINGS and LE TECHNOLOGY are in contract for the lease of the Subject Property from March 2016 – February 2026. Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

56. Defendants have acted in bad faith by not paying rent and making several misrepresentations to Plaintiff about their plan of action. Defendants have wrongfully and intentionally breached the duty of good faith by failing to perform under the contract and continuing to occupy the Subject Property for three months.

57. Defendants' breach of the covenant of good faith and fair dealing has proximately and directly caused damages to Plaintiff.

58. WHEREFORE, Plaintiff prays for judgment as set forth below.

### THIRD CAUSE OF ACTION

### INTERNTIONAL INTERFERENCE WITH CONTRACT RELATIONS

### (Against Faraday& Future Inc.)

59. Plaintiff re-alleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

60. On information and belief, Plaintiff alleges Defendants LE TECHNOLOGY and LE HOLDINGS, without permission, invited FARADAY&FUTURE to occupy the subject premises, despite the fact that they did not have permission from the Plaintiff.

61. Indeed, the founder of LeEco, Mr.Yueting, is also a main backer of FARADAY&FTURE. FARADAY&FUTURE has been facing financial struggles of their own and were unable to contribute to any rent as an unauthorized occupant. As a result, Plaintiff alleges Defendant LE TECHNOLOGY did not receive any funds from

FARADAY, which affected their ability to meet their own rental obligations under the lease.

62. As a result, Plaintiff alleges that FARADAY&FUTURE'S conduct intentionally interfered with the rental contract between LE TECHNOLOGY and HAN'S SAN JOSE HOPITALITY and made performance by LE TECHNOLOGY more difficult or more expense.

63. On this score, FARADAY&FUTURE was well aware of this prohibition on an unauthorized use of the property as they are partners with LeEco, and Jia YueTing recently became the Chief Executive Officer of FARADAY&FUTURE. Mr. Yueting was also the founder of the other Defendants subsidiary, LeEco.

64. Mr. YueTing reportedly has a net worth of over $3.8 billion, which makes these Defendants decision to breach this lease with impunity particularly egregious.

65. As such, FARADAY'S unauthorized use of the property was a substantial factor in causing Plaintiff's harm.

66. WHEREFORE, Plaintiff prays for judgment as set forth below.


## **PRAYER**

WHEREFORE, Plaintiff prays judgement jointly and severally against the defendants, and each of them, as follows:

1.  Unpaid rent since September 1, 2017 with 12% interest;

2.  For future unpaid pursuant to Civil Code section 1951.2 according to proof;

3.  All unpaid Expenses and Taxes as provided for in the Lease;

4.  Costs incurred by Landlord in securing a new tenant;

5.  General damages according to proof;

6.  Special damages according to proof;

7.  Expectation damages according to proof;

8.  For interest as provided by law;

9.  For costs of suit incurred herein, including attorney's fees;

10. For such other and further relief as the Court may deem just and proper.

Dated: ~~December 22, 2018~~ January 24

The Goodell Law Firm

By: _____
Nelson Goodell
Attorney for Plaintiff
Han's San Jose Hospitality LLC

- 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>Exhibit 1</u>**

## OFFICE LEASE

### 3553 NORTH FIRST STREET, SAN JOSE, CALIFORNIA

This Office Lease ("**Lease**"), dated as of the date set forth in Section 1.1, is made by and between **BSREP RIO ROBLES LLC**, a Delaware limited liability company ("**Landlord**"), on the one hand, and **LE TECHNOLOGY, INC.**, a California corporation, and **LE HOLDINGS (BEIJING) CO., LTD.**, a company organized under the laws of the People's Republic of China (collectively, the "**Tenant**"), on the other hand.  The following exhibits are incorporated herein and made a part hereof: **Exhibit A-1** (Outline of Premises); **Exhibit A-2** (Legal Description of Land); **Exhibit B** (Work Letter); **Exhibit C** (Form of Confirmation Letter); **Exhibit D** (Rules and Regulations); **Exhibit E** (Judicial Reference); **Exhibit F** (Additional Provisions); **Exhibit G** (Hazardous Materials Disclosure Certificate); **Exhibit H** (Memorandum of Lease); and **Exhibit I** (Purchase Agreement).

### BASIC LEASE INFORMATION

| TERMS OF LEASE | | DESCRIPTION |
|---|---|---|
| 1. | **Effective Date:** | December ___, 2015 |
| 2. | **Premises.** | |
| | 2.1 | "**Building**": | 3553 North First Street, San Jose, California |
| | 2.2 | "**Premises**": | The entire Building, except for the portion leased to the tenant under the Verizon Lease (hereinafter defined), the interior of which Building contains approximately eighty-six thousand one hundred forty-five (86,145) rentable square feet of space, the outline and location of which is set forth in **Exhibit A-1**. |
| | 2.3 | "**Land**": | The parcel of land upon which the Building is located, as more particularly described on the legal description attached hereto as **Exhibit A-2**. |
| | 2.4 | "**Project**": | The Building and the Land, together with any and all any parking areas, driveways, walkways, landscaping, and any and all other improvements and/or facilities located therein, thereunder and/or thereon. |
| 3. | **Term.** | |
| | 3.1 | Term: | The term of this Lease (the "**Term**") shall commence on the Commencement Date and end on the Expiration Date (or any earlier date on which this Lease is terminated as provided herein). |
| | 3.2 | "**Commencement Date**": | |
| | | | March 15, 2016 |
| | 3.3 | "**Expiration Date**": | |
| | | | February 28, 2026 |

4814-8820-0107v2
HAL\22817007

4.    "Base Rent":

| Period During Term | Monthly Base Rent Per Rentable Square Foot (rounded to the nearest 100th of a dollar) | Monthly Installment of Base Rent | Annualized Base Rent |
|---|---|---|---|
| March 15, 2016 – February 28, 2017 | $2.25 | $193,826.25 | $2,325,915.00 |
| March 1, 2017 – February 28, 2018 | $2.32 | $199,856.40 | $2,398,276.80 |
| March 1, 2018 – February 28, 2019 | $2.39 | $205,886.55 | $2,470,638.60 |
| March 1, 2019 – February 29, 2020 | $2.46 | $211,916.70 | $2,543,000.40 |
| March 1, 2020 – February 28, 2021 | $2.53 | $217,946.85 | $2,615,362.20 |
| March 1, 2021 – February 28, 2022 | $2.61 | $224,838.45 | $2,698,061.40 |
| March 1, 2022 – February 28, 2023 | $2.69 | $231,730.05 | $2,780,760.60 |
| March 1, 2023 – February 29 2024 | $2.77 | $238,621.65 | $2,863,459.80 |
| March 1, 2024 – February 28, 2025 | $2.85 | $245,513.25 | $2,946,159.00 |
| March 1, 2025 – February 28, 2026 | $2.94 | $253,266.30 | $3,039,195.60 |

5.    "Tenant's Share" of Building:      100%

6.    "Tenant's Share" of Project        100%

7.    "Permitted Use":                   R&D Use.  As used herein, "R&D Use" means general office and research and development.

8.    "Security Deposit":                $253,266.30, as more particularly described in <u>Section 21</u>.

       Prepaid Base Rent:                $193,826.25, as more particularly described in <u>Section 3</u>.

       Prepaid Additional Rent:          $34,458.00, as more particularly described in <u>Section 3</u>.

-2-

| | | |
|---|---|---|
| 9. | Parking: | All parking spaces located at the Project as of the Effective Date, of which two hundred sixty-eight (268) are regular spaces, seven (7) are handicap spaces and zero (0) are motorcycle spaces, subject to applicable Laws (defined in Article 5), including any applicable transportation management program applicable to the Project. |
| 10. | Address of Tenant: | Before the Commencement Date: |

LE TECHNOLOGY, INC.
1100 Island Drive
Redwood City, CA 94065
Attn: Office Manager

LE HOLDINGS (BEIJING) CO., LTD.
c/o Leshi Holdings (Beijing) Co. Ltd.
16f Letv Building, Yaojiayuan Road, Chaoyang District, BJ 100025
Attn: Chief Financial Officer

From and after the Commencement Date:
3553 North First Street
San Jose, California 95134
Attn: _____

| | | |
|---|---|---|
| 11. | Address of Landlord: | BSREP Rio Robles LLC |

250 Vesey Street, 15ᵗʰ Floor
New York, NY 10281-1023
Attn: Mr. Thomas Diamond
Thomas.Diamond@brookfield.com

with copies to:

BSREP Rio Robles LLC
181 Bay Street, Suite 300
Toronto, ON M5J 2T3
Attn: Mr. Thomas Diamond
Thomas.Diamond@brookfield.com

and

Berliner Cohen, LLP
Ten Almaden Boulevard, Eleventh Floor
San Jose, CA 95113-2233
Attn: Harry A. Lopez

| | | |
|---|---|---|
| 12. | Broker(s): | Giant Realty ("Tenant's Broker"), representing Tenant, and CBRE, Inc. ("Landlord's Broker"), representing Landlord. |
| 13. | "Tenant Improvements": | Defined in Exhibit B. |

-3-

14.    "Verizon Lease":    That certain Ground and Rooftop Lease Agreement, dated April 18, 2002, as amended by that certain First Amendment to Ground and Rooftop Lease Agreement, dated as of January 11, 2006 (such lease, as amended, shall hereinafter sometimes be referred to as the **"Verizon Lease")**, by and between Landlord (as successor-in-interest to NetIQ Corporation, a Delaware corporation), as lessor, and GTE Mobilnet of California Limited Partnership, doing business as Verizon Wireless (**"Verizon")**, as lessee.    Landlord and Tenant acknowledge that a portion of the Project is currently subject to the Verizon Lease. Tenant represents and warrants that Landlord has delivered to Tenant, and Tenant has reviewed, a copy of the Verizon Lease.

1.    PREMISES AND EXTERIOR AREAS.

1.1    <u>The Premises</u>.

1.1.1    Subject to the terms hereof, Landlord hereby leases the Premises to Tenant and Tenant hereby leases the Premises from Landlord. Landlord and Tenant agree and acknowledge that any statement of square footage set forth in this Lease, or that may have been used in calculating any of the economic terms hereof, is an approximation which Landlord and Tenant agree is reasonable and conclusive and binding upon the parties. In furtherance of the preceding sentence, but without limiting the generality thereof, Landlord and Tenant hereby agree and acknowledge that, except as set forth in this grammatical paragraph below, no economic terms based upon such approximated square footage shall be subject to revision regardless of whether any future or differing measurements of the Premises are consistent or inconsistent therewith, and irrespective of whether the actual rentable square footage is more or less. Landlord shall have the right at any time to re-measure the Premises in accordance with industry-wide measurement standards (or measurement standards utilized in the San Francisco Bay Area/Silicon Valley metropolitan area) in Landlord's reasonable discretion. At any time Landlord may deliver to Tenant a notice substantially in the form of **Exhibit C**, as a confirmation of the information set forth therein.  Tenant shall execute and return (or, by notice to Landlord, reasonably object to) such notice within five (5) business days after receiving it, and if Tenant fails to do so, Tenant shall be deemed to have executed and returned it without exception.

1.1.2    Landlord shall use commercially reasonable efforts to deliver possession of the Premises to Tenant for the construction of the Tenant Improvement Work (as defined in the Work Letter attached hereto as **Exhibit B** (**"Tenant Work Letter")**) as soon as reasonably practicable after the Effective Date, with such delivery scheduled to occur within three (3) business days after the Effective Date (**"Scheduled Delivery Date")**. If Landlord is unable to deliver possession of the Premises to Tenant on or before the Scheduled Delivery Date, or any other date, Landlord shall not be subject to any liability therefor, and such failure shall not affect the validity of this Lease or the obligations of Tenant hereunder, but, in such event, the delivery date shall be the date that Landlord actually delivers possession of the Premises to Tenant for the construction of the Tenant Improvement Work (such date of actual delivery of possession being the **"Premises Delivery Date")**; provided, however, that, if Landlord fails to deliver the Premises to Tenant on the Scheduled Delivery Date for any reason other than delays caused by Tenant (it being the intent of the parties that such Scheduled Delivery Date shall be extended one (1) day for each day of any such Tenant delays), then the Commencement Date set forth in the Basic Lease Information (i.e., March 15, 2016) will be extended by one day for each day that shall have elapsed between the Scheduled Delivery Date and the Premises Delivery Date. From and after the Premises Delivery Date, Tenant shall have the right to construct the Tenant Improvement Work in the Premises in accordance with the Tenant Work Letter. The period commencing with the Premises Delivery Date and expiring on the date which is one (1) day prior to the Commencement Date shall hereinafter sometimes be referred to as the **"Construction Period."**  During the Construction Period, Tenant shall not be obligated to pay Base Rent and/or Tenant's Share of Direct Expenses, but shall pay for any and all Utility

-4-

Services (as defined in Section 6.1 below) and otherwise comply with all of the terms and conditions of this Lease. If Tenant completes the Tenant Improvement Work prior to the Commencement Date, Tenant shall have the right to occupy the Premises prior to such Commencement Date without the payment of Base Rent and/or Tenant's Share of Direct Expenses, but otherwise subject to all of the terms and conditions of this Lease; provided, however, that, if Tenant does not complete the Tenant Improvement Work until after the expiration of the Construction Period, the Commencement Date shall not be delayed as a result thereof. Except as specifically set forth in this Lease, Tenant agrees to accept the Premises in their condition and configuration existing on the date hereof, without any obligation of Landlord to provide or pay for any work or services related to the improvement of the Premises, Land and/or Project and without any representation or warranty regarding the condition of the Premises, Land and/or Project or their suitability for the conduct of Tenant's business. By taking possession of the Premises, Tenant acknowledges that the Premises are then in the condition and configuration required hereunder.

1.2    **Exterior Areas**.  Subject to the Rules and Regulations (defined in **Exhibit D**), Tenant may use, for ingress and egress to and from the Building (and any other use and/or purpose for which such area(s) were designed and/intended), any driveways, walkways, entryways, parking areas, landscaped areas, patios, and/or any other portions of the Land that are designated from time to time by Landlord for such use by Tenant (collectively, the "**Exterior Areas**").  Landlord reserves the right to close temporarily, make alterations or additions to, or change the location of elements of the Project and the Exterior Areas, and any inconvenience suffered by Tenant in connection therewith shall not subject Landlord to any liability for any loss or damage resulting therefrom, constitute a constructive eviction, or entitle Tenant to any abatement of Rent.

2.    **LEASE TERM.**

2.1    **Term**.  The Term shall commence and, unless ended sooner or extended as herein provided, shall expire on the Commencement Date and Expiration Date, respectively, specified in Section 3 of the Basic Lease Information.  Without limiting the foregoing, if the Premises Delivery Date is delayed for any reason, then (a) this Lease shall not be void or voidable by either party, and (b) Landlord shall not be liable to Tenant for any loss or damage resulting therefrom.  This Lease shall be a binding contractual obligation effective upon execution and delivery hereof by Landlord and Tenant.

2.2    **Extension Option**.

2.2.1    **Option Term**.  Subject to the terms and conditions set forth below, Tenant shall have one (1) option ("**Extension Option**") to extend the initial Term of this Lease ("**Initial Term**") with respect to the entire Premises, for a period of five (5) years (such five (5) year period being the "**Option Term**").   If Tenant properly exercises the Extension Option hereunder, all of the terms, covenants and conditions of this Lease shall continue in full force and effect during the Option Term, including provisions regarding payment of Additional Rent, which shall remain payable on the terms herein set forth, except that the Base Rent payable by Tenant during the Option Term shall be as calculated in accordance with Section 2.2.3 and Section 2.2.4 below, (b) Tenant shall continue to possess and occupy the entire Premises in their existing condition, "as is" as of the commencement of the Option Term, and subject to the terms of Article 11 below, Landlord shall have no obligation to repair, remodel, improve or alter the Premises, to perform any other construction or other work of improvement upon the Premises, or to provide Tenant with any construction or refurbishing allowance whatsoever, and (c) Tenant shall have no further rights to extend the Term of this Lease after the expiration of the Option Term.

2.2.2    **Exercise**.  To exercise the Extension Option, Tenant must deliver an unconditional, unequivocal and binding notice to Landlord ("**Option Exercise Notice**"), in accordance with the terms of Section 25.1 below, with respect to the Extension Option, not sooner than twelve (12) months, nor later than nine (9) months, prior to the Expiration Date, the time of such exercise being of the essence.  If Tenant fails to timely give the Option Exercise Notice in strict accordance with the immediately preceding sentence, Tenant will be deemed to have waived the Extension Option.  Tenant shall have no right to extend the Initial Term, except as expressly provided in this

-5-

Section 2.2.  If duly exercised in accordance with the terms and conditions of this Section 2.2, the Option Term shall commence upon the expiration of the Initial Term.

2.2.3    Market Rate Calculation.  The Base Rent payable by Tenant for the Premises during the Option Term shall be one hundred percent (100%) of the Market Rate (as defined below) for the Premises, valued as of the commencement of the Option Term, determined in the manner hereinafter provided.  As used herein, the term "Market Rate" shall mean the annual amount of Base Rent at which tenants, as of the commencement of the Option Term, are leasing non-sublease, non-equity space under then prevailing ordinary rental market practices (e.g., not pursuant to extraordinary rental, promotional deals or other concessions to tenants which deviate from what is the then prevailing ordinary practice), at arm's length, that is comparable to the Premises and located in comparable first class office/R&D projects in the submarket in which the Project is located (the "Comparison Projects"), based upon binding lease transactions for tenants in the Comparison Projects that, where possible, commence or are to commence within six (6) months prior to or within six (6) months after the commencement of the Option Term ("Comparison Leases").  Comparison Leases shall include renewal and new non-renewal tenancies, but shall exclude subleases and leases of space subject to another tenant's expansion rights.  Rental rates payable under Comparison Leases shall be adjusted to account for variations between this Lease and the Comparison Leases with respect to: (a) the length of the Option Term compared to the lease term of the Comparison Leases; (b) rental structure, including, without limitation, rental rates per rentable square foot (including type, gross or net, and if gross, adjusting for base year or expense stop), additional rental, escalation provisions, all other payments and escalations; (c) the size of the Premises compared to the size of the premises of the Comparison Leases; (d) free rent, moving expenses and other cash payments, allowances or other monetary concessions affecting the rental rate; (e) the age and quality of construction of the buildings (including compliance with applicable codes); and (f) leasehold improvements and/or allowances, including the amounts thereof in renewal leases, and taking into account, in the case of renewal leases (including this Lease), the value of existing leasehold improvements to the renewal tenant (but ascribing no value to (A) any tenant improvements installed by or on behalf of Tenant, at Tenant's sole cost and expense (i.e., not by way of the Allowance described in Section 1.1 of the Tenant Work Letter), and/or (B) Tenant's specific use of any tenant improvements installed by or on behalf of Tenant pursuant to this Lease, irrespective of whether any such tenant improvements were installed at Tenant's sole cost and expense, or by way of such Allowance, it being the intent of the parties that the determination of the Market Rate shall only take into account the value, if any, such tenant improvements would have to the average prospective tenant at such time).  No consideration shall be given to (i) the fact that Landlord is or is not required to pay a real estate brokerage commission in connection with Tenant's exercise of its right to extend the Term, or the fact that landlords are or are not paying real estate brokerage commissions in the Comparison Leases, or (ii) any period of rental abatement, if any, granted to tenants in Comparison Leases during the period allotted for the design, permitting and construction of tenant improvements.  Notwithstanding anything to the contrary contained in this Lease, in no event shall the Market Rate payable by Tenant during the Option Term be less than the Base Rent payable by Tenant to Landlord at the expiration of the Initial Term.

2.2.4    Base Rent Determination.  The Base Rent payable by Tenant for the Premises during the Option Term shall be determined as follows:

(a)    If Tenant provides Landlord with its unconditional, unequivocal and binding notice of exercise pursuant to Section 2.2.2 above, then, prior to the commencement of the Option Term, Landlord shall deliver to Tenant a good faith written proposal of the Market Rate ("Landlord's Initial Proposal").  Within twenty-one (21) days after receipt of Landlord's Initial Proposal, Tenant shall notify Landlord in writing (1) that Tenant accepts Landlord's Initial Proposal or (2) that Tenant elects to submit the determination of Market Rate to arbitration in accordance with Sections 2.2.4(b) through 2.2.4(d) below.  If Tenant does not give Landlord a timely notice in response to Landlord's Initial Proposal, Landlord's Initial Proposal shall be binding upon Tenant.

(b)    If Tenant timely elects to submit the determination of Market Rate to arbitration, Landlord and Tenant shall first negotiate in good faith in an attempt to determine the Market Rate.  If Landlord and

-6-

Tenant are able to agree within thirty (30) days following the delivery of Tenant's notice to Landlord electing arbitration (or if Tenant accepts Landlord's Initial Proposal), then such agreement shall constitute a determination of Market Rate for purposes of this Section, and the parties shall immediately execute an amendment to this Lease stating the Base Rent for the Option Term. If Landlord and Tenant are unable to agree on the Market Rate within such 30-day negotiating period, then within fifteen (15) days after the expiration of such negotiating period, the parties shall meet and concurrently deliver to each other in envelopes their respective good faith estimates of the Market Rate (set forth on a net effective rentable square foot per annum basis) (respectively, "**Landlord's Determination**" and "**Tenant's Determination**"). Landlord's Determination may be more or less than Landlord's Initial Proposal. If the higher of such estimates is not more than one hundred five percent (105%) of the lower, then the Market Rate shall be the average of the two. Otherwise, the dispute shall be resolved by arbitration in accordance with <u>Sections 2.2.4(c)</u> and <u>2.2.4(d)</u> below.

(c)    Within seven (7) days after the exchange of estimates, the parties shall select as an arbitrator an independent real estate broker with at least ten (10) years of experience in leasing commercial office/R&D space in the metropolitan area in which the Project is located (a "**Qualified Appraiser**"). If the parties cannot agree on a Qualified Appraiser, then within a second period of seven (7) days, each shall select a Qualified Appraiser and within ten (10) days thereafter the two appointed Qualified Appraisers shall select an independent Qualified Appraiser and the independent Qualified Appraiser shall be the sole arbitrator. If one party shall fail to select a Qualified Appraiser within the second seven (7) day period, then the Qualified Appraiser chosen by the other party shall be the sole arbitrator.

(d)    Within twenty-one (21) days after submission of the matter to the arbitrator, the arbitrator shall determine the Market Rate by choosing whichever of the estimates submitted by Landlord and Tenant the arbitrator judges to be more accurate. The arbitrator shall notify Landlord and Tenant of its decision, which shall be final and binding. If the arbitrator believes that expert advice would materially assist him or her, the arbitrator may retain one or more qualified persons to provide expert advice. The fees of the arbitrator and the expenses of the arbitration proceeding, including the fees of any expert witnesses retained by the arbitrator, shall be paid by the party whose estimate is not selected. Each party shall pay the fees of its respective counsel and the fees of any witness called by that party.

(e)    If the Option Term commences before the matter is resolved by agreement between the parties, or a decision is rendered in any arbitration commenced pursuant to this <u>Section 2.2</u>, until such resolution occurs or decision is rendered, the Tenant's monthly payments of Base Rent shall be in an amount equal to Landlord's determination of the Market Rate. Within ten (10) business days following the resolution of such dispute by the parties or the decision of the arbitrator, as applicable, Tenant shall pay to Landlord, or Landlord shall pay to Tenant, the amount of any deficiency or excess, as the case may be, in the Base Rent theretofore paid.

2.2.5    <u>Rights Personal to LETV</u>. Tenant's right to exercise the Extension Option is personal to, and may be exercised only by, LE TECHNOLOGY, INC., a California corporation ("**Le Technology**"), and LE HOLDINGS (BEIJING) CO., LTD., a company organized under the laws of the People's Republic of China ("**Le Holdings (Beijing)**"), it being the intent of the parties that the Extension Option must be exercised, if at all, by both Le Technology and Le Holdings (Beijing) (and in no event by only one such entity) (for purposes of this Lease, Le Technology and Le Holdings (Beijing) shall hereinafter collectively referred to as "**LETV**"); provided, however, that, subject to the terms and conditions of this <u>Section 2.2.5</u> below, the Extension Option may be exercised by (i) Le Technology (individually), (ii) Le Holdings (Beijing) (individually) or (iii) (A) any Permitted LETV Affiliate Assignee to which this Lease is assigned without Landlord's consent pursuant to the express terms and conditions of <u>Section 14.8.1</u> below, or (B) any Permitted Successor Transferee to which this Lease is assigned without Landlord's consent pursuant to the express terms and conditions of <u>Section 14.8.2</u> below (any such assignee being a "**Permitted Assignee**"). The Extension Option may be exercised only if the exercising entity(ies) (i.e., (A) Le Technology and/or Le Holdings (Beijing) or (B) a Permitted Assignee) continues to occupy at least seventy-five percent (75%) of the Premises at the time of such exercise. LETV (i.e., Le Technology and Le Holdings (Beijing),

-7-

collectively) hereby agrees and acknowledges that, if the Extension Option is exercised by (i) Le Technology (individually), (ii) Le Holdings (Beijing) (individually) or (iii) a Permitted Assignee (any such individual exercising entity being an "**Individual Exercising Entity**"), then, in any such event, both entities comprising "LETV" shall remain fully liable for any and all obligations of the "Tenant" accruing under this Lease during the Option Term (and any extensions thereof). In furtherance of the preceding sentence, at Landlord's election (in Landlord's sole and absolute discretion), the right of an Individual Exercising Entity to exercise the Extension Option may be subject to the condition precedent that both entities comprising "LETV" and the Individual Exercising Entity (if the Individual Exercising Entity is not one of the entities comprising "LETV") execute and deliver to Landlord, concurrently with the Individual Exercising Entity's delivery of written notice of exercise of the Extension Option an amendment to this Lease (in form and content acceptable to Landlord, in Landlord's reasonable discretion) between (i) Landlord, (ii) LETV and (iii) the Individual Exercising Entity (if the Individual Exercising Entity is not one of the entities comprising "LETV") that provides, among other things, that LETV and such Individual Exercising Entity shall be jointly and severally liable under this Lease during the Option Term (and any extensions thereof). Other than a Permitted Assignee, no assignee or subtenant shall have any right to exercise the Extension Option granted herein. In addition, if Tenant is in Default at the time it exercises the Extension Option or at any time thereafter until the commencement of the Option Term, Landlord shall have, in addition to all of its other rights and remedies under this Lease, the right (but not the obligation), in Landlord's sole and absolute discretion, to terminate the Extension Option, and to unilaterally revoke and nullify Tenant's exercise of the Extension Option (which termination, revocation and nullification on the part of Landlord shall be evidenced by written notice delivered to Tenant), in which case this Lease shall expire on the expiration of the Initial Term, unless earlier terminated pursuant to the terms hereof, and Tenant shall have no further rights under this Lease to renew or extend the Term.

3.      **RENT.**

        3.1     <u>Payment of Rent</u>.   Tenant shall pay all Base Rent and Additional Rent (defined below) (collectively, "**Rent**") to Landlord or Landlord's agent, without prior notice or demand or any setoff or deduction, at the place Landlord may designate from time to time. As used herein, "**Additional Rent**" means all amounts, other than Base Rent, that Tenant is required to pay Landlord hereunder. Monthly payments of Base Rent (subject to the last grammatical paragraph of <u>Section 4</u> of the Basic Lease Information) and monthly payments of "Direct Expenses" (defined in <u>Section 4.1</u>) (collectively, "**Monthly Rent**") shall be paid in advance on or before the first day of each calendar month during the Term; provided, however, that the installment of Base Rent for the first full calendar month for which Base Rent is payable hereunder and the installment of Direct Expenses for the first full calendar month for which such Additional Rent is payable hereunder shall be paid upon Tenant's execution and delivery hereof. Except as otherwise provided herein, all other items of Additional Rent shall be paid within 10 business days after Landlord's request for payment. Rent for any partial calendar month shall be prorated based on the actual number of days in such month. Without limiting Landlord's other rights or remedies, (a) if any installment of Rent is not received by Landlord or its designee within five (5) business days after its due date, Tenant shall pay Landlord a late charge equal to 5% of the overdue amount; and (b) any Rent that is not paid within 10 days after its due date shall bear interest, from its due date until paid, at the lesser of 12% per annum or the highest rate permitted by Law; provided, however, that not more than once during each twelve (12) month period, Landlord shall give Tenant a notice of delinquency, and five (5) day cure period following such notice, with respect to such late payment of Rent before imposing such late charge and/or accruing interest on unpaid Rent. Tenant's covenant to pay Rent is independent of every other covenant herein.

        3.2     <u>Additional Rent Upon Default by Tenant</u>.   Landlord and Tenant acknowledge that to induce Tenant to enter into this Lease, and in consideration of Tenant's agreement to perform all of the terms, covenants and conditions to be performed by Tenant under this Lease, as and when performance is due during the Term, Landlord has incurred (or will incur) significant costs, including, without limitation, the following: (i) payment of the Allowance (as described in the Tenant Work Letter); (ii) commissions to Landlord's and/or Tenant's real estate broker; and/or (iii) attorneys' fees and related costs incurred and/or paid by Landlord in connection with the negotiation and preparation of this Lease (collectively, the "**Inducements**"). Landlord and Tenant further

-8-

acknowledge that Landlord would not have granted the Inducements to Tenant but for Tenant's agreement to perform all of the terms, covenants, conditions and agreements to be performed by it under this Lease for the entire Term, and that Landlord's agreement to incur such expenditures and grant such concessions is, and shall remain, conditioned upon Tenant's faithful performance of all of the terms, covenants, conditions and agreements to be performed by Tenant under this Lease for the entire Term.  Accordingly, if a Default by Tenant shall occur hereunder, Landlord shall be relieved of any unfulfilled obligation to grant Inducements hereunder, or to incur further expenses in connection therewith, and Tenant shall pay, as liquidated damages for Landlord's granting the Inducements and not as a penalty, within ten (10) days after the occurrence of the Default, as Additional Rent, the amount of those Inducements incurred or granted prior to the date of the default (the "**Pre-Default Inducements**").  Landlord may or, at Tenant's request, shall, after the occurrence of a Default, forward a statement to Tenant setting forth the amount of the Pre-Default Inducements, but the failure to deliver such a statement shall not be or be deemed to be a waiver of the right to collect the Pre-Default Inducements or to extend the date upon which such amount shall be due and payable.  Notwithstanding the foregoing, Landlord shall not be entitled to recover Pre-Default Inducements if, and to the extent that, Tenant proves that such recovery would be duplicative of amounts that Landlord is otherwise entitled to recover pursuant to California Civil Code Sections 1951.2 or 1951.4, as applicable.

4.    **EXPENSES AND TAXES.**

4.1    <u>General Terms</u>.  In addition to Base Rent, Tenant shall pay, in accordance with Section 4.4, for each Expense Year (defined in <u>Section 4.2.1</u>), an amount equal to the sum of the following (collectively, the "**Direct Expenses**"): (a) Tenant's Share of Expenses for such Expense Year, plus (b) Tenant's Share of Taxes for such Expense Year, plus (c) a management fee (the "**Management Fee**") equal to three percent (3%) of the Rent (i.e., Base Rent and Additional Rent) payable by Tenant for the applicable Expense Year.  The Management Fee, Tenant's Share of Expenses and Tenant's Share of Taxes for any partial Expense Year shall be prorated based on the number of days in such Expense Year.  In the event either the Premises and/or the Project is expanded or reduced, then, as applicable, Tenant's Share of the Building and/or Tenant's Share of the Project shall be appropriately adjusted, and as to the calendar year in which such change occurs, the applicable Tenant's Share(s) for such year shall be determined on the basis of the number of days during that particular calendar year that each such Tenant's Share(s) was/were in effect.

4.2    <u>Definitions</u>.  As used herein, the following terms have the following meanings:

4.2.1    "**Expense Year**" means each calendar year in which any portion of the Term occurs, the parties acknowledging that Tenant's payment of Direct Expenses shall begin on the Commencement Date (i.e., March 15, 2016), notwithstanding the later commencement of the payment of Base Rent hereunder.

4.2.2    "**Expenses**" means any and all expenses, costs and amounts that Landlord pays or accrues during any Expense Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation of the Project.  Without limiting the generality of the preceding sentence, Expenses may include (i) the cost of supplying all utilities, the cost of operating, repairing, maintaining and renovating the utility, telephone, mechanical, sanitary, storm- drainage, and elevator systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections, the cost of contesting any Laws that may affect Expenses, and the costs of complying with any governmentally-mandated transportation-management or similar program; (iii) the cost of all insurance premiums and commercially reasonable deductibles; (iv) the cost of landscaping and relamping; (v) the cost of parking-area operation, repair, restoration, and maintenance; (vi) third-party fees and other costs, including consulting fees, legal fees and accounting fees, of all contractors and consultants in connection with the management, operation, maintenance and repair of the Land; (vii) payments under any equipment-rental agreements; (viii) wages, salaries and other compensation, expenses and benefits, including taxes levied thereon, of all persons engaged in the operation, maintenance and security of the Land, and costs of training, uniforms, and employee enrichment for such persons; (ix) the costs of operation, repair, maintenance and replacement of all systems and equipment (and

-9-

components thereof) of the Land; (x) the cost of janitorial, alarm, security and other services, replacement of wall and floor coverings, ceiling tiles and fixtures in Exterior Areas, maintenance and replacement of curbs and walkways, repair to roofs and any and all re-roofing; (xi) rental or acquisition costs of supplies, tools, equipment, materials and personal property used in the maintenance, operation and repair of the Land; (xii) the cost of capital improvements, or any other capital expenditures that are (A) intended to effect economies in the operation or maintenance of the Project or reduce current or future Expenses, (B) enhance the safety or security of the Project its occupants, (C) replacements, repairs or modifications of the Building (including replacing the roof membrane/covering), Land and/or Project (including, without limitation, any and all Exterior Areas) that are required to keep the same in good and operable condition and repair or (D) required under any Law, excluding any such capital improvements or other capital expenditures made or incurred to remedy a noncompliance with any Laws, to the extent the work associated with such compliance was required to be performed prior to the date of this Lease (based on the current interpretation of such Laws by applicable governmental authorities as of the date such compliance was required); and (xiii) payments under any existing or future reciprocal easement agreement, transportation management agreement, cost-sharing agreement or other covenant, condition, restriction or similar instrument affecting the Project.

The specific examples of Expenses set forth above are in no way intended to and shall not limit the costs comprising Expenses, nor shall such examples in any way be deemed or construed to obligate Landlord to incur such costs and/or to provide such services, perform such work and/or to take such actions, except as Landlord may be expressly required in other provisions of this Lease, or except as Landlord, in its sole and absolute discretion, may elect. All costs incurred by Landlord in good faith in connection with the ownership, operation, maintenance, repair, replacement and management of the Premises shall be deemed conclusively binding on Tenant.

It is the intent of the parties that (1) the Base Rent set forth in this Lease shall be a net payment to Landlord, (2) except as otherwise expressly set forth in this Lease, this Lease shall continue for the full Term notwithstanding any occurrence preventing or restricting use and occupancy of the Building, Exterior Areas and/or Project, including, without limitation, any damage or destruction affecting the Building, and any action by governmental authority relating to or affecting the Project, (3) Base Rent shall be absolutely payable without offset, reduction or abatement for any cause, except as otherwise expressly provided in this Lease, (4) Landlord shall not bear any costs or expenses relating to the Building and/or Project, or provide any services or do any act in connection with the Building and/or Project, except as otherwise specifically provided in this Lease and (5) Tenant shall pay, in addition to Base Rent, Additional Rent to cover such costs and expenses relating to the Building and/or Project.

4.2.3    "Taxes" means all federal, state, county or local governmental or municipal taxes, fees, charges, assessments, levies, licenses or other impositions, whether general, special, ordinary or extraordinary, that are paid or accrued during any Expense Year (without regard to any different fiscal year used by such governmental or municipal authority) because of or in connection with the ownership, leasing or operation of the Project. Taxes shall include (a) real estate taxes; (b) general and special assessments; (c) transit taxes; (d) leasehold taxes; (e) personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems, appurtenances, furniture and other personal property used in connection with the Project; (f) any tax on the rent, right to rent or other income from any portion of the Project or against the business of leasing any portion of the Building; (g) any assessment, tax, fee, levy or charge imposed by any governmental agency, or by any non-governmental entity pursuant to any private cost-sharing agreement, in order to fund the provision or enhancement of any fire-protection, street-, sidewalk- or road-maintenance, refuse-removal or other service that is (or, before the enactment of Proposition 13, was) normally provided by governmental agencies to property owners or occupants without charge (other than through real property taxes); and (h) any assessment, tax, fee, levy or charge allocable or measured by the area of the Premises or by the Rent payable hereunder, including any business, gross income, gross receipts, sales or excise tax with respect to the receipt of such Rent; provided, however, if at any time after the date of this Lease the methods of taxation now prevailing shall be altered so that in lieu of or as a supplement to or a substitute for the whole or any part of any Taxes, there shall be assessed or levied (1) a tax, assessment, levy, imposition or charge wholly or partially as a net income, capital or franchise levy or otherwise on the rents, issues, profits or

-10-

income derived therefrom, or (2) a tax, assessment, levy (including but not limited to any municipal, state or federal levy), imposition or charge measured by or based in whole or in part upon the real property and imposed upon Landlord, or (3) a license fee measured by the rent payable under this Lease, then all such taxes, assessments or levies or the part thereof so measured or based, shall be deemed to be included in the term "Taxes."

4.3 **Intentionally Omitted**.

4.4 **Calculation and Payment of Expenses and Taxes**.

4.4.1 **Statement of Actual Expenses and Taxes; Payment by Tenant**. Landlord shall use commercially reasonable efforts to give to Tenant, within 120 days after the end of each Expense Year, a statement (the "Statement") setting forth the actual Expenses and Taxes for such Expense Year. If the amount paid by Tenant for such Expense Year pursuant to Section 4.4.2 is less or more than the sum of Tenant's Direct Expenses for such Expense Year (as such amounts are set forth in such Statement), Tenant shall pay Landlord the amount of such underpayment, or receive a credit in the amount of such overpayment, with or against the Rent then or next due hereunder; provided, however, that if this Lease has expired or terminated and Tenant has vacated the Premises, Tenant shall pay Landlord the amount of such underpayment, or Landlord shall pay Tenant the amount of such overpayment (less any Rent due), within 30 days after delivery of such Statement. Any failure of Landlord to timely deliver the Statement for any Expense Year shall not diminish either party's rights under this Section 4.

4.4.2 **Statement of Estimated Expenses and Taxes**. Landlord shall endeavor to give to Tenant, for each Expense Year, a statement (the "Estimate Statement") setting forth Landlord's reasonable estimate of the Direct Expenses (the "Estimated Direct Expenses") for such Expense Year. Upon receiving an Estimate Statement, Tenant shall pay, with its next installment of Base Rent, an amount equal to the excess of (a) the amount obtained by multiplying (i) the sum of the Estimated Direct Expenses (as such amount is set forth in such Estimate Statement), by (ii) a fraction, the numerator of which is the number of months that have elapsed in the applicable Expense Year (including the month of such payment) and the denominator of which is 12, over (b) any amount previously paid by Tenant for such Expense Year pursuant to this Section 4.4.2. Until Landlord delivers a new Estimate Statement (which Landlord may do at any time), Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the sum of the Estimated Direct Expenses, as such amount is set forth in the previous Estimate Statement. Any failure of Landlord to timely deliver any Estimate Statement shall not diminish Landlord's rights to receive payments and revise any previous Estimate Statement under this Section 4.

4.4.3 **Retroactive Adjustment of Taxes**. Notwithstanding any contrary provision hereof, if, after Landlord's delivery of any Statement, an increase or decrease in Taxes occurs for the applicable Expense Year (whether by reason of reassessment, error, or otherwise), Taxes for such Expense Year shall be retroactively adjusted. If, as a result of such adjustment, it is determined that Tenant has under- or overpaid Tenant's Share of such Taxes, Tenant shall pay Landlord the amount of such underpayment, or receive a credit in the amount of such overpayment, with or against the Rent then or next due hereunder; provided, however, that if this Lease has expired or terminated and Tenant has vacated the Premises, Tenant shall pay Landlord the amount of such underpayment, or Landlord shall pay Tenant the amount of such overpayment (less any Rent due), within 30 days after such adjustment is made.

4.5 **Charges for Which Tenant Is Directly Responsible**. Tenant shall pay, 10 days before delinquency, any taxes levied against Tenant's equipment, furniture, fixtures and other personal property located in or about the Premises. If any such taxes are levied against Landlord or its property (or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or other personal property of Tenant), Landlord may pay such taxes (or such increased assessment) regardless of their (or its) validity, in which event Tenant, upon demand, shall repay to Landlord the amount so paid. If the Leasehold Improvements (defined in Section 7.1) are assessed for real property tax purposes at a valuation higher than the valuation at which tenant improvements conforming to Landlord's "building standard" in other space in the Building

-11-

are assessed, the Taxes levied against Landlord or the Project by reason of such excess assessed valuation shall be deemed taxes levied against Tenant's personal property for purposes of this Section 4.5. Notwithstanding any contrary provision hereof, Tenant shall pay, 10 days before delinquency, (i) any rent tax, sales tax, service tax, transfer tax or value added tax, or any other tax respecting the rent or services described herein or otherwise respecting this transaction or this Lease; and (ii) any taxes assessed upon the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of any portion of the Project.

5.    USE; COMPLIANCE WITH LAWS.  Tenant shall not (a) use the Premises and/or Project for any purpose other than the Permitted Use, or (b) do anything in or about the Premises and/or Project that violates any of the Rules and Regulations, damages the reputation of the Project, interferes with, injures or annoys other occupants of the Building, or constitutes a nuisance. Tenant, at its expense, shall comply with all Laws relating to (i) the operation of its business at the Project, (ii) the use, condition, configuration or occupancy of the Premises, or (iii) the Project Systems (defined in Section 7.1.1). If, in order to comply with any such Law, Tenant must obtain or deliver any permit, certificate or other document evidencing such compliance, Tenant shall provide a copy of such document to Landlord promptly after obtaining or delivering it. If any structural and/or other alterations, additions or improvements to the Building and/or Project are required under Law (or any such requirement is enforced) as a result of any Tenant-Insured Improvement (defined in Section 10.2.2), the installation of any trade fixture, any particular use (as distinguished from general R&D Use) of the Premises, and/or any applications made by or on behalf of Tenant for governmental permits, licenses or approvals, Tenant, upon demand, shall (x) at Landlord's option, either perform such alterations, additions and/or improvements, at Tenant's sole cost and expense, or pay Landlord the cost and expense of performing such alterations, additions or improvements, and (y) pay Landlord a coordination fee equal to 5% of the cost and expense of performing such alterations, additions and/or improvements. As used herein, "Law" means any existing or future law, ordinance, regulation or requirement of any governmental authority having jurisdiction over the Project or the parties. Without limiting the generality of the foregoing, Tenant shall, at its sole cost and expense, cause the Base Building and the Exterior Areas to comply with all Laws (including the Americans with Disabilities Act ("ADA")), irrespective of whether such compliance is triggered by the acts and/or omissions of Tenant, or otherwise.

6.    SERVICES.

6.1    Utility Services.  Tenant shall pay directly to the providers thereof, before delinquency, all charges for water, gas, electricity, telephone, sewer service, waste pick-up and any other utilities, materials or services furnished directly to or used by Tenant in or about the Premises (collectively, "Utility Services"), including (a) meter, use and/or connection fees, hook-up fees, or standby fees, and (b) penalties for discontinued or interrupted service. Notwithstanding the foregoing, if any Utility Service is not separately provided or metered to the Premises, then the cost of such Utility Service allocable to Tenant on a prorata basis (as reasonably and equitably allocated by Landlord) shall be included in Expenses; provided, however, that if Landlord reasonably determines that Tenant is using more than its pro rata share of such Utility Service not separately metered or provided to the Premises (as determined based on the rentable square footage of the Premises relative to the total rentable square footage served by such Utility Service), then Landlord, in its reasonable discretion, may (i) require Tenant to pay to Landlord, as Additional Rent, an amount equal to Landlord's reasonable estimate of the cost of such excess use, and/or (ii) install, at Tenant's expense, a separate meter to measure Tenant's use of such Utility Service; provided, however, that Landlord shall in no event be entitled to collect more than one hundred percent (100%) of the cost incurred by Landlord in connection with any such Utility Services. Tenant's electrical usage shall not exceed the capacity of the feeders to the Premises or the risers or wiring installation. Without limiting the foregoing, Tenant shall pay the cost of all Utility Services consumed in connection with the operation of any supplemental or specialty Project Systems (as defined in Section 7.1.1 below) serving the Premises. Without limiting its obligations, Tenant, at its sole cost and expense, shall directly contract for the provision of any and all trash disposal, janitorial service and customary cleaning (other than exterior window washing), all of which shall be provided on a regular basis and otherwise in a manner consistent with a Class "A" office/R&D project, and all necessary interior pest control service, so that the Premises and Project are at all times kept neat, broom-clean and pest-free, in all events in a first-class manner.

-12-

Tenant shall, at Tenant's sole cost and expense, provide such janitorial (including exterior window-washing), pest-control and landscaping services for the exterior of the Building and any Exterior Areas, and such lighting for the Parking Areas (defined in Section 24), as Landlord reasonably determines is appropriate.

6.2    **Service Interruption**.  Any interruption or cessation of Utility Services resulting from any cause, including any entry for repairs or any renovation, redecoration or rehabilitation of any area of the Project (each, a "**Service Interruption**"), shall not render Landlord liable to Tenant, constitute a constructive eviction, or excuse Tenant from any obligation hereunder.

7.    **TENANT REPAIRS AND ALTERATIONS.**

7.1    **Repairs; Maintenance and Replacements**.

7.1.1    **Tenant's Obligations**.  Subject to Section 11, Tenant, at its sole cost and expense, shall perform, in compliance with all Laws, in a prompt, diligent and workmanlike manner, any and all maintenance and repairs (including replacements) in and to the Premises, Exterior Areas, Land and Project, and keep the same in good condition and repair (as adjudged by institutional owners and institutional lenders of Class "A" office/R&D projects).  Tenant's maintenance, repair and replacement obligations shall include: (a) any and all leasehold improvements in the Building, whenever and by whomever installed or paid for, including any Tenant Improvements, any Alterations (defined in Section 7.2), and any leasehold improvements installed pursuant to any prior lease ("**Prior Alterations**") (collectively, the "**Leasehold Improvements**"); (b) all Project Systems; (c) all Lines (defined in Section 23); and (d) the Base Building.  As used herein, "**Project Systems**" means all of the following, to the extent the same serve the Building and/or Project, and/or are located in, on (including the roof of) or under the Building and/or Land: any and all heating, ventilation, air-conditioning (including distribution components and systems, VAV boxes, ducting, diffusers and distribution lines), plumbing, sewer, drainage, mechanical, electrical, fire/life-safety, elevator, escalator, security systems (including card key systems, locks and doors and other access systems), and other systems and equipment, including all electrical facilities, equipment and appliances, including lighting, switches, light bulbs, ballasts, light fixtures, lamps, fans, exhaust equipment or systems, and electrical motors, energy management control systems and equipment and/or any interior controls or design features that are customarily installed as part of the leasehold improvements in the Premises, whenever and by whomever installed or paid for.

Without limiting the generality of the foregoing, Tenant, at its sole cost and expense, with respect to any and all heating, ventilation and air-conditioning systems serving the Building and/or any portion thereof (each, an "**HVAC Unit**"), shall (a) keep such HVAC Unit(s) in as good working order and condition as exists upon its installation (or, if later, on the date Tenant takes possession of the Premises); (b) maintain in effect, with a contractor reasonably approved by Landlord, a contract for the maintenance and repair of such HVAC Unit (which contract shall require the contractor, at least once every three (3) months, to (i) inspect such HVAC Unit and provide to Tenant a report of any defective conditions, together with any recommendations for maintenance, repair or parts-replacement, all in accordance with the manufacturer's recommendations, and (ii) replace filters, oil and lubricate machinery, replace parts, adjust drive belts, change oil and perform other preventive maintenance, including annual maintenance of duct work and interior unit drains, and annual caulking of sheet metal and re-caulking of jacks and vents); (c) follow all reasonable recommendation of such contractor; and (d) promptly provide to Landlord a copy of such contract and each report issued thereunder.  Tenant shall have the benefit of any warranties available to Landlord regarding the Project Systems to the extent such warranties cover maintenance and repairs for which Tenant is responsible hereunder.  If access to the roof of the Building is required in order to perform any of Tenant's obligations under this Section 7.1.1, such access shall be subject to such reasonable rules and procedures as Landlord may impose in light of the Verizon Lease, or otherwise, and Tenant shall maintain the affected portion of the roof in a clean and orderly condition and shall not interfere with use of the roof by Landlord, Verizon or any other licensee.  Notwithstanding the foregoing, Landlord may, during the existence of a Default (or, at any time, with respect to the HVAC Units, Base Building and/or Exterior Areas), perform on Tenant's behalf any of Tenant's obligations under this Section 7.1.1, in

4814-8820-0107v2
HALL\22817007

which case Tenant shall pay Landlord, upon demand, the cost of such work, plus a coordination fee equal to 10% of such cost.

Tenant hereby agrees and acknowledges that its repair and replacement obligations pursuant to this Lease (including, without limitation, this Section 7.1) may include capital expenditures and repairs whose benefit may extend beyond the term of this Lease.  In the event that any repair or maintenance obligation required to be performed by Tenant hereunder may affect the structural integrity of the Building (e.g., roof, foundation, structural members of the exterior walls) or any Project Systems (e.g., plumbing, electrical, HVAC, fire and life safety), prior to commencing any such repair, Tenant shall provide Landlord with written notice of the necessary repair or maintenance and a brief summary of the structural component or components of the Building, and/or the Project Systems, that may be affected by such repair or maintenance.  Within ten (10) business days after Landlord's receipt of Tenant's written notice, Landlord shall have the right, but not the obligation, to elect to cause such repair or maintenance to be performed by Landlord, or a contractor selected and engaged by Landlord, but at Tenant's sole cost and expense.

7.1.2    Additional Tenant Obligations.  Without limiting the generality of the foregoing, Tenant shall perform any and all maintenance and repairs (including replacements) to, and keep in good condition and repair, (i) the Base Building and (ii) the Exterior Areas, which obligations on the part of Tenant shall include, without limitation, any and all routine maintenance and repairs thereof (including, without limitation, painting, sealing, patching and waterproofing).  For purposes, hereof the "Base Building" shall mean, collectively, the (x) structural elements and/or components of the Building (including, without limitation, the foundation, the footings, the floor slab, structural elements of the roof and the load-bearing and/or exterior walls of the Building), (y) roof coverings/membrane and (z) windows.  For purposes hereof, the Exterior Areas shall include, without limitation, the parking facilities, pavement, landscaping, sprinkler systems, sidewalks, driveways, curbs lighting systems and all other facilities, lines, systems, equipment and improvements in, on or under the Exterior Areas and serving the Project.

7.2    Alterations.  Tenant may not make any improvement, alteration, addition or change to the Premises or to any mechanical, plumbing or HVAC facilities or other systems serving the Premises (an "Alteration") without Landlord's prior consent, which consent shall be requested by Tenant not less than 30 days before commencement of work and shall not be unreasonably withheld by Landlord, provided, however, that, without limiting the reasonable grounds upon which Landlord may withhold its consent, it shall be deemed reasonable for Landlord to withhold its consent to any Alteration which could affect the Project Systems and/or Base Building, could result in a higher frequency of (or more severe) injuries to persons and/or damage to property, could unreasonably interfere with the normal operations of Verizon under the Verizon Lease, is visible from the exterior of the Building, is/are not of comparable or better quality and/or of substantially similar utility as the Building-standard leasehold improvements existing at the Project as of the date of installation and/or performance thereof, and/or adversely affect the functionality of the Premises and/or impede, impair or diminish (in Landlord's reasonable discretion) Landlord's ability to market the Premises for lease upon the expiration or earlier termination of this Lease (collectively, "Significant Alterations").  Notwithstanding the foregoing, Tenant shall be permitted to make Alterations that do not constitute Significant Alterations hereunder without Landlord's prior consent, provided that such Alterations (a) cost, individually, or in the aggregate, less than Twenty-five Thousand Dollars ($25,000.00) in any one (1) calendar year, and are cosmetic in nature ("Minor Alterations"), and (b) prior to commencing any such Minor Alterations, Tenant provides Landlord with not less than ten (10) business days' prior written notice thereof, which shall include a copy of any governmental permits required to complete such Minor Alterations (if any).  For any Significant Alterations and for any Minor Alterations that require governmental approvals, (a) Tenant, before commencing work, shall deliver to Landlord, and obtain Landlord's approval of, plans and specifications; (b) Landlord, in its discretion, may require Tenant to obtain security for performance satisfactory to Landlord; (c) Tenant shall deliver to Landlord "as built" drawings (in CAD format, if requested by Landlord), completion affidavits, full and final lien waivers, and all governmental approvals; and (d) Tenant shall pay Landlord upon demand (i) Landlord's reasonable out-of-pocket

-14-

expenses incurred in reviewing the work, and (ii) a coordination fee equal to 5% of the cost of the work; provided, however, that this clause (d) shall not apply to any Tenant Improvements.

7.3    **Tenant Work**.  Before commencing any repair or Alteration ("**Tenant Work**"), Tenant shall deliver to Landlord, and obtain Landlord's approval of, (a) names of contractors, subcontractors, mechanics, laborers and materialmen; (b) evidence of contractors' and subcontractors' insurance; and (c) any required governmental permits; provided, however, that, for Minor Alterations, no prior approval of Tenant's proposed contractors, subcontractors, mechanics, laborers or materialmen shall be required if such persons or entities are selected by Tenant from a list of pre-approved construction personnel provided by Landlord or, at Landlord's option, from a list of construction personnel provided by Tenant and pre-approved by Landlord.  Tenant acknowledges that the foregoing is not an exclusive list of the reasons why Landlord may reasonably disapprove a proposed general contractor.  Tenant shall perform all Tenant Work (i) in a good and workmanlike manner using materials of a quality reasonably approved by Landlord; (ii) in compliance with any approved plans and specifications, all Laws, the National Electric Code, and Landlord's construction rules and regulations; and (iii) in a manner that does not impair the Base Building.  If, as a result of any Tenant Work, Landlord becomes required under Law to perform any inspection, give any notice, or cause such Tenant Work to be performed in any particular manner, Tenant shall comply with such requirement and promptly provide Landlord with reasonable documentation of such compliance.  Landlord's approval of Tenant's plans and specifications shall not relieve Tenant from any obligation under this Section 7.3.  In performing any Tenant Work, Tenant shall not use contractors, services, labor, materials or equipment that, in Landlord's reasonable judgment, would disturb labor harmony with any workforce or trades engaged in performing other work or services at the Project.

8.    **LANDLORD'S PROPERTY**.  All Leasehold Improvements shall become Landlord's property upon installation and without compensation to Tenant.  Notwithstanding the foregoing, except as otherwise notified by Landlord, Tenant, at its expense and before the expiration or earlier termination hereof, shall remove any Tenant-Insured Improvements, repair any resulting damage to the Premises or Building, and restore the affected portion of the Premises to its condition and configuration existing before the installation of such Tenant-Insured Improvements (or, at Landlord's election, to a Building-standard tenant-improved condition and configuration, as determined by Landlord); provided, however, that Tenant shall have no obligation to remove (A) any of the Tenant Improvements constructed pursuant to the Tenant Work Letter, unless the same constitute Specialized Improvements, or (B) any Prior Alterations.  If (and only if) Tenant's request for Landlord's approval of any proposed Alterations contains a specific request that Landlord identify any portion of such Alterations that Landlord will require Tenant to remove as provided above, then Landlord will, at the time it approves such Alterations, identify such portion of the Alterations, if any, that Landlord will require Tenant to so remove.  Landlord and Tenant hereby agree and acknowledge that, if Landlord does not receive from Tenant the specific written request(s) described in the preceding sentence, Landlord may make its election regarding removal, restoration and reconfiguration no later than thirty (30) days prior to the end of the term of this Lease.  If Tenant fails to timely perform any work required under the preceding sentence, Landlord may perform such work at Tenant's expense.  As used herein, "**Specialized Improvements**" means Tenant-Insured Improvements that are not normal and customary general office improvements consistent with a standard office/R&D configuration, including, if the same were to be installed in the Premises, the following: any specialty or supplemental Project Systems or other equipment or facilities relating to the use of the Premises for purposes other than general office use, including any security system and/or card access system, equipment or facilities serving a computer server room, "clean room" or laboratory space; internal stairwells; raised floors; meeting rooms (other than a customary number of conference rooms of customary size); classroom facilities; kitchens and cafeterias (as distinguished from customary kitchenette areas); and any areas requiring floor reinforcement or enhanced systems requirements (including library, file or computer rooms if they have any such requirements).  In connection with Landlord's approval of the Construction Drawings pursuant to the Tenant Work Letter, upon Tenant's specific written request therefor at the time Tenant seeks such approval from Landlord, Landlord shall identify if any of the Tenant Improvements shown thereon constitute Specialized Improvements.

-15-

9.    **LIENS.**  Tenant shall keep the Project free from any lien arising out of any work performed, material furnished or obligation incurred by or on behalf of Tenant.  Tenant shall remove any such lien within 10 business days after notice from Landlord, and if Tenant fails to do so, Landlord, without limiting its remedies, may pay the amount necessary to cause such removal, whether or not such lien is valid.  The amount so paid, together with reasonable attorneys' fees and expenses, shall be reimbursed by Tenant upon demand.

10.    **INDEMNIFICATION; INSURANCE.**

10.1    <u>Indemnification</u>.

10.1.1    <u>Tenant's Indemnification</u>.  Tenant waives all claims against Landlord, its Security Holders (defined in <u>Section 17</u>), Landlord's managing agent(s), their (direct or indirect) owners, and the beneficiaries, trustees, officers, directors, employees and agents of each of the foregoing (including Landlord, the "**Landlord Parties**") for the following, including if caused by any active or passive act, omission or neglect of any Landlord Party or by any act or omission for which liability without fault or strict liability may be imposed: (i) any damage to person or property (or resulting from the loss of use thereof), except to the extent such damage is caused by the gross negligence or willful misconduct of Landlord and not covered by (i.e., exceeding the coverage limits) the insurance required to be carried by Tenant hereunder or to the extent such limitation on liability is prohibited by law, or (ii) any failure to prevent or control any criminal or otherwise wrongful conduct by any third party or to apprehend any third party who has engaged in such conduct.  Tenant shall indemnify, defend, protect, and hold the Landlord Parties harmless from any obligation, loss, claim, action, liability, penalty, damage, cost or expense (including reasonable attorneys' and consultants' fees and expenses) (each, a "**Claim**") that is imposed or asserted by any third party and arises from (a) any cause in, on or about the Premises, (b) occupancy of the Premises by, or any negligence or willful misconduct of, Tenant, any party claiming by, through or under Tenant, their (direct or indirect) owners, or any of their respective beneficiaries, trustees, officers, directors, employees, agents, contractors, licensees or invitees (including Tenant, the "**Tenant Parties**"), or (c) any breach by Tenant of any representation, covenant or other term contained herein.  The foregoing indemnification, defense and hold harmless obligations shall apply regardless of any active or passive negligence of the Landlord Parties and regardless of whether liability without fault or strict liability may be imposed upon the Landlord Parties; provided, however, that, with respect to any Landlord Party, Tenant's obligations under this Section shall be inapplicable (i) to the extent such Claims arise from the gross negligence or willful misconduct of Landlord, and are not covered by (i.e., exceeding the coverage limits) the insurance required to be carried by Tenant hereunder, or (ii) to the extent such obligations are prohibited by applicable Laws.

10.2    <u>Tenant's Insurance</u>.  Tenant shall maintain the following coverages in the following amounts:

10.2.1    Commercial General Liability Insurance covering claims of bodily injury, personal injury and property damage arising out of Tenant's operations and contractual liabilities (covering the performance by Tenant of its indemnity, defense and hold harmless obligations), including coverage formerly known as broad form, on an occurrence basis, for limits of liability not less than:

| | |
|---|---|
| Bodily Injury and<br>Property Damage Liability | $2,000,000 each occurrence<br>$4,000,000 annual aggregate |
| Personal Injury Liability | $2,000,000 each occurrence<br>$4,000,000 annual aggregate |
| Umbrella Liability Coverage | $10,000,000 each occurrence<br>$10,000,000 annual aggregate |

4814-9820-0107v2
HAL\22817007

Umbrella liability insurance may be used to achieve the above minimum commercial general liability limits, provided that the policy coverages are absolutely concurrent, and otherwise satisfy all of the requirements of this Article 10.

10.2.2    Property Insurance covering (i) all office furniture, trade fixtures, office and other equipment, free-standing cabinet work, movable partitions, merchandise and all other items of Tenant's property in the Premises installed by, for, or at the expense of Tenant, and (ii) the Tenant Improvements and any and all other Leasehold Improvements installed by or for the benefit of Tenant, whether pursuant to this Lease or pursuant to any prior lease or other agreement to which Tenant was a party ("**Tenant-Insured Improvements**").  Such insurance shall be written on a special cause of loss form for physical loss or damage, for the full replacement cost value (subject to reasonable deductible amounts) new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance, and shall include coverage for damage or other loss caused by fire or other peril, including vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, and explosion, and providing business interruption coverage for a period of one year.

10.2.3    Workers' Compensation statutory limits and Employers' Liability limits of $1,000,000.

10.3    <u>Form of Policies</u>.  The minimum limits of insurance required to be carried by Tenant shall not limit Tenant's liability.  Such insurance shall be issued by an insurance company that has an A.M. Best rating of not less than A-VIII and shall be in form and content reasonably acceptable to Landlord.  Tenant's Commercial General Liability Insurance shall (a) name the Landlord Parties and any other party designated by Landlord ("**Additional Insured Parties**") as additional insureds by appropriate clause or endorsement; and (b) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and non-contributing with Tenant's insurance.  Landlord shall be designated as a loss payee with respect to Tenant's Property Insurance on any Tenant-Insured Improvements.  Tenant shall deliver to Landlord, on or before the Premises Delivery Date and at least 30 days before the expiration dates thereof, certificates from Tenant's insurance company on the forms currently designated "ACORD 25" (Certificate of Liability Insurance) and "ACORD 28" (Evidence of Commercial Property Insurance) or the equivalent.  Attached to the ACORD 25 (or equivalent) there shall be an endorsement naming the Additional Insured Parties as additional insureds, and attached to the ACORD 28 (or equivalent) there shall be an endorsement designating Landlord as a loss payee with respect to Tenant's Property Insurance on any Tenant-Insured Improvements, and each such endorsement shall be binding on Tenant's insurance company and shall name Landlord as a "cancellation notice recipient".  Upon Landlord's request, Tenant shall deliver to Landlord, in addition to such certificates, copies of the policies of insurance required to be carried under Section 10.2 showing that the Additional Insured Parties are named as additional insureds, and that Landlord is designated as a loss payee with respect to Tenant's Property Insurance on any Tenant-Insured Improvements.

10.4    <u>Subrogation</u>.  Each party waives, and shall cause its insurance carrier to waive, any right of recovery against the other party, any of its (direct or indirect) owners, or any of their respective beneficiaries, trustees, officers, directors, employees or agents for any loss of or damage to property which loss or damage is (or, if the insurance required hereunder had been carried, would have been) covered by the waiving party's property insurance.  For purposes of this Section 10.4 only, (a) any deductible with respect to a party's insurance shall be deemed covered by, and recoverable by such party under, valid and collectable policies of insurance, and (b) any contractor retained by Landlord to install, maintain or monitor a fire or security alarm for the Building shall be deemed an agent of Landlord.

10.5    <u>Additional Insurance Obligations</u>.  Tenant shall maintain such increased amounts of the insurance required to be carried by Tenant under this Section 10, and such other types and amounts of insurance covering the Premises and Tenant's operations therein, as may be reasonably requested by Landlord, but not in excess of the amounts and types of insurance then being required by landlords of buildings comparable to and in the vicinity of the Building.

-17-

10.6    **Landlord's Insurance**.  Subject to reimbursement as an Expense in accordance with the provisions of Article 4 hereof, Landlord may procure and maintain in effect throughout the Lease Term commercial general liability insurance, property insurance, flood insurance, earthquake insurance, terrorism insurance and/or such other types of insurance as are normally carried by reasonably prudent owners of commercial properties substantially similar to, and in the vicinity of, the Project. Such coverages shall be in such amounts, from such companies and on such other terms and conditions as Landlord may from time to time reasonably determine, and Landlord shall have the right, but not the obligation, to change, cancel, decrease or increase any insurance coverages in respect of the Building, add additional forms of insurance as Landlord shall deem reasonably necessary, and/or obtain umbrella or other policies covering both the Building and other assets owned by or associated with Landlord or its affiliates, in which event the cost thereof shall be equitably allocated; provided, however, that Landlord shall, at all times during the Lease Term, maintain "special causes of loss" (or similar) property insurance coverage on the Base Building in the amount of the full replacement value thereof as reasonably estimated by Landlord (without deduction for depreciation), subject to reasonable deductible amounts.

11.    **CASUALTY DAMAGE.**

11.1    **Completion Estimate; Termination Rights**.  Tenant shall promptly notify Landlord of any damage to the Premises resulting from any fire or other casualty.  With reasonable promptness after discovering the casualty, Landlord shall provide Tenant with written notice (the "**Completion Estimate**") stating (a) whether the Landlord Repairs (defined below) will include the Tenant-Insured Improvements, and (b) Landlord's reasonable estimate of the amount of time required, using standard working methods (without the payment of overtime or other premiums), to substantially complete the Landlord Repairs.  As used herein, "**Landlord Repairs**" means the repair and restoration of the Base Building, any Exterior Areas serving or providing access to the Premises, and, if so elected by Landlord in the Completion Estimate, the Tenant-Insured Improvements.  If the Completion Estimate indicates that the Landlord Repairs cannot be substantially completed within 270 days after commencement, then Landlord may terminate this Lease upon 60 days' prior written notice to Tenant delivered within 10 days after Landlord's delivery of the Completion Estimate.  In addition, Landlord, by notice to Tenant within 90 days after Landlord's discovery of damage to the Premises or the Project, may, whether or not the Premises are affected, terminate this Lease if: (i) any Security Holder terminates any ground lease or requires that any insurance proceeds be used to pay any mortgage debt; (ii) any damage to Landlord's property is not fully covered by Landlord's insurance policies; (iii) the damage occurs during the last 12 months of the Lease Term; (iv) Landlord decides to rebuild the Building or Exterior Areas so that it or they will be substantially different structurally or architecturally; or (v) any owner, other than Landlord, of any damaged portion of the Project does not intend to repair such damage.  In the event of such termination by Landlord or Tenant pursuant to this Section, neither party shall have any obligations to the other under this Lease, except for obligations arising before such termination or obligations that survive the expiration or earlier termination of this Lease, and except that Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's property insurance required under Section 10.3 above with respect to the Tenant-Insured Improvements.

11.2    **Repair and Restoration**.  If this Lease is not terminated pursuant to Section 11.1 above, Landlord shall promptly and diligently perform the Landlord Repairs, subject to reasonable delays for insurance adjustment or other events of Force Majeure.  Such repair and restoration shall be to substantially the same condition that existed before the casualty, except for any modifications required by Law or any Security Holder, and except for any modifications to the Exterior Areas that are deemed desirable by Landlord, are consistent with the character of the Project, and do not materially impair access to the Premises.  If this Lease is not terminated pursuant to Section 11.1 above and the Landlord Repairs include the Tenant-Insured Improvements, then (a) Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under Section 10.3 above with respect to such Tenant-Insured Improvements; (b) if the estimated cost of repairing and restoring such improvements exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, Tenant shall pay such excess cost to Landlord within 15 days after Landlord's demand; and (c) within 15 days after Landlord's demand, Tenant shall also pay Landlord the amount of any additional excess costs

-18-

that may be determined during the performance of such repair and restoration. If this Lease is not terminated pursuant to Section 11.1 above and the Landlord Repairs exclude any of the Tenant-Insured Improvements, then Tenant, at its expense and in accordance with Sections 7.2 and 7.3 above, shall repair any damage to such improvements and restore them to their original condition. Landlord shall not be liable for any inconvenience or annoyance to Tenant or its invitees, or for any injury to Tenant's business, resulting from any fire or other casualty or from any repair of damage resulting therefrom; provided, however, that if any fire or other casualty damages the Premises or any Exterior Areas necessary for Tenant's access to the Premises, then, during any time that, as a result of such damage, any portion of the Premises are untenantable or inaccessible and is not occupied by Tenant, the Monthly Rent shall be abated in proportion to the rentable square footage of such portion of the Premises. If the Landlord Repairs exclude any of the Tenant-Insured Improvements, Tenant's right to rent abatement under the preceding sentence shall continue until the earlier to occur of (i) the date that the repair and restoration of such Tenant-Insured Improvements is completed by Tenant, (ii) the date that is reasonably determined by Landlord to be the date on which Tenant would have completed the repair and restoration of such improvements if Tenant had used reasonable diligence in connection therewith, or (iii) the date that Tenant recommences business operations in the damaged portion of the Premises. Notwithstanding the foregoing, if the damage resulting from any fire or other casualty is due to the fault or neglect of any Tenant Parties, there shall be no abatement of rent.

    11.3    **Waiver of Statutory Provisions.** The provisions of this Lease, including this Article 11, constitute an express agreement between Landlord and Tenant with respect to any damage to or destruction of any part of the Premises, the Building or the Project, and any Law, including Sections 1932(2) and 1933(4) of the California Civil Code, relating to rights or obligations concerning damage or destruction in the absence of an express agreement between the parties shall not apply.

12.    **NONWAIVER.** No provision hereof shall be deemed waived by either party unless it is waived by such party expressly and in writing, and no waiver of any breach of any provision hereof shall be deemed a waiver of any subsequent breach of such provision or any other provision hereof. Landlord's acceptance of Rent shall not be deemed a waiver of any preceding breach of any provision hereof, other than Tenant's failure to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of such acceptance. No acceptance of payment of an amount less than the Rent due hereunder shall be deemed a waiver of Landlord's right to receive the full amount of Rent due, whether or not any endorsement or statement accompanying such payment purports to effect an accord and satisfaction. No receipt of monies by Landlord from Tenant after the giving of any notice, the commencement of any suit, the issuance of any final judgment, or the termination hereof shall affect such notice, suit or judgment, or reinstate or extend the Term or Tenant's right of possession hereunder.

13.    **CONDEMNATION.** If any part of the Premises or Project is permanently taken for any public or quasi-public use or purpose, by power of eminent domain or by private purchase in lieu thereof (a "Taking"), which is so substantial that the Premises cannot reasonably be used by Tenant for the operation of its business, then either Landlord or Tenant may terminate this Lease. In addition, if twenty-five percent (25%) or more of the Building, the Project or the parking areas for the Building or the Project is subject to a Taking without affecting the Premises, then Landlord may terminate this Lease as of the date of such Taking. Any such termination shall be effective as of the date possession is required to be surrendered to the authority, and the terminating party shall provide written notice of termination to the other party within 45 days after it first receives written notice of such surrender date. Except as provided above in this Article 13, neither party may terminate this Lease as a result of a Taking. Tenant shall not assert any claim against Landlord or the authority for any compensation because of any Taking and Landlord shall be entitled to the entire award of compensation; provided, however, that Tenant shall have the right to file any separate claim available to Tenant for any Taking of Tenant's personal property or any fixtures that Tenant has the right hereunder to remove upon the expiration hereof, and for moving expenses, so long as such claim does not diminish the award available to Landlord or any Security Holder and is payable separately to Tenant. If this Lease is terminated pursuant to this Article 13, all Rent shall be apportioned as of the date of such termination. If a Taking occurs and this Lease is not so terminated, the Monthly Rent shall be abated, for the period of such Taking, in

-19-

proportion to the percentage of the rentable square footage of the Premises, if any, that is subject to (or rendered inaccessible by) such Taking.

## 14.    ASSIGNMENT AND SUBLETTING.

14.1    **Transfers**.    Tenant shall not, without Landlord's prior consent, assign, mortgage, pledge, hypothecate, encumber, permit any lien to attach to, or otherwise transfer this Lease or any interest hereunder, permit any assignment or other transfer hereof or any interest hereunder by operation of law, enter into any sublease or license agreement, otherwise permit the occupancy or use of any part of the Premises by any persons other than Tenant and its employees and contractors, or permit a Change of Control (defined in Section 14.6) to occur (each, a "Transfer"). If Tenant desires Landlord's consent to any Transfer, Tenant shall provide Landlord with (i) notice of the terms of the proposed Transfer, including its proposed effective date (the "Contemplated Effective Date"), which shall not be less than 30 days nor more than 180 days after the effective date of the Transfer Notice, a description of the portion of the Premises to be transferred (the "Contemplated Transfer Space"), a calculation of the Transfer Premium (defined in Section 14.3), and a copy of all existing executed and/or proposed documentation pertaining to the proposed Transfer, and (ii) current financial statements of the proposed transferee (or, in the case of a Change of Control, of the proposed new controlling party(ies)) certified by an officer or owner thereof and any other information reasonably required by Landlord in order to evaluate the proposed Transfer (collectively, the "Transfer Notice"). Within 30 days after receiving the Transfer Notice, Landlord shall notify Tenant of (a) its consent to the proposed Transfer, (b) its refusal to consent to the proposed Transfer, or (c) its exercise of its rights under Section 14.4. Any Transfer made without Landlord's prior consent shall, at Landlord's option, be void and shall, at Landlord's option, constitute a Default (defined in Section 19). Tenant shall pay Landlord's standard processing fee (which fee may change from time to time) and attorneys' fees incurred in connection with Landlord's review of any proposed Transfer, whether or not Landlord consents to it.

14.2    **Landlord's Consent**.    Subject to Section 14.4, Landlord shall not unreasonably withhold its consent to any proposed Transfer.    Without limiting other reasonable grounds for withholding consent, it shall be deemed reasonable for Landlord to withhold consent to a proposed Transfer if:

14.2.1    The proposed transferee is not a party of reasonable financial strength in light of the responsibilities to be undertaken in connection with the Transfer on the date the Transfer Notice is received; or

14.2.2    The proposed transferee has a character or reputation or is engaged in a business that is not reasonably consistent with the quality of the Building or the Project; or

14.2.3    The proposed transferee is a governmental entity or a nonprofit organization; or

14.2.4    In the case of a proposed sublease, license or other occupancy agreement, the rent or occupancy fee charged by Tenant to the transferee during the term of such agreement, calculated using a present value analysis, is less than 90% of the rent being quoted by Landlord or its Affiliate (defined in Section 14.8) at the time of such Transfer for comparable space in the Project for a comparable term, calculated using a present value analysis; provided, however, that if no comparable space in the Project is available for lease for a comparable term at the time of the proposed Transfer, then the foregoing restriction on the proposed effective rent shall be inapplicable; or

14.2.5    The proposed transferee or any of its Affiliates, on the date the Transfer Notice is received, leases or occupies (or, at any time during the 6-month period ending on the date the Transfer Notice is received, has negotiated with Landlord to lease) space in the Project.

Notwithstanding anything else herein to the contrary, if Landlord consents to any Transfer pursuant to this Section 14.2 but Tenant does not enter into such Transfer within six (6) months thereafter, such consent shall no

-20-

longer apply and such Transfer shall not be permitted unless Tenant again obtains Landlord's consent thereto pursuant and subject to the terms of this Article 14 (including Landlord's right of recapture, if any, under Section 14.4 below). Notwithstanding anything to the contrary in this Lease, if Tenant claims that Landlord has unreasonably withheld its consent under this Section 14.2 or otherwise has breached or acted unreasonably under this Article 14, its sole remedies shall be a suit for contract damages (subject to Article 20 below) or declaratory judgment and an injunction for the relief sought, and Tenant hereby waives all other remedies, including any rights under California Civil Code Section 1995.310 and any other right at law or equity to terminate this Lease. In addition, to the extent permitted under applicable Laws, Tenant hereby waives, on behalf of any proposed transferee, any remedies against Landlord arising out of any unreasonable withholding of consent to a proposed Transfer or any breach of this Article 14, except for any right to obtain a declaratory judgment or injunction for the relief sought.

14.3    **Transfer Premium**.  If Landlord consents to a Transfer, Tenant shall pay Landlord an amount equal to 50% of any Transfer Premium (defined below).  As used herein, "**Transfer Premium**" means (a) in the case of an assignment, any consideration (including payment for Leasehold Improvements) paid by the assignee for such assignment, less any brokerage commissions (not to exceed commissions typically paid in the market at the time of such subletting or assignment) and reasonable attorneys' fees paid by Tenant in connection with the Transfer ("**Recoverable Expenses**"); (b) in the case of a sublease, license or other occupancy agreement, for each month of the term of such agreement, the amount by which all rent and other consideration paid by the transferee to Tenant pursuant to such agreement exceeds the Monthly Rent payable by Tenant hereunder with respect to the Contemplated Transfer Space (less any Recoverable Expenses, as amortized on a monthly, straight-line basis over the term of such agreement); and (c) in the case of a Change of Control, any consideration (including payment for Leasehold Improvements) paid by the new controlling party(ies) to the prior controlling party(ies) on account of this Lease, less any Recoverable Expenses.  Payment of Landlord's share of the Transfer Premium shall be made (x) in the case of an assignment or a Change of Control, within 10 days after Tenant or the prior controlling party(ies), as the case may be, receive(s) the consideration described above, and (y) in the case of a sublease, license or other occupancy agreement, with respect to each month of the term of such agreement, within five (5) business days after Tenant receives the rent and other consideration described above.

14.4    **Landlord's Right to Recapture**.  Notwithstanding any contrary provision hereof, except in the case of a Permitted Transfer (defined in Section 14.8), Landlord, by notifying Tenant within 30 days after receiving a Transfer Notice, may terminate this Lease with respect to the Contemplated Transfer Space as of the Contemplated Effective Date.  If the Contemplated Transfer Space is less than the entire Premises, then Base Rent, Tenant's Share, and the number of parking spaces to which Tenant is entitled under Section 9 of the Basic Lease Information shall be deemed adjusted on the basis of the percentage of the rentable square footage of the Premises retained by Tenant.  Upon request of either party, the parties shall execute a written agreement prepared by Landlord memorializing such termination.

14.5    **Effect of Consent**.  If Landlord consents to a Transfer, (i) such consent shall not be deemed a consent to any further Transfer, (ii) Tenant shall deliver to Landlord, promptly after execution, an executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, and (iii) Tenant shall deliver to Landlord, upon Landlord's request, a complete statement, certified by an independent CPA or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium. In the case of an assignment, the assignee shall assume in writing, for Landlord's benefit, all of Tenant's obligations hereunder. No Transfer, with or without Landlord's consent (without limiting the generality of the foregoing, no Permitted Transfer(s) (as defined in Section 14.8 below)), shall relieve Tenant or any guarantor hereof from any liability hereunder. Notwithstanding any contrary provision hereof, Tenant, with or without Landlord's consent, shall not enter into, or permit any party claiming by, through or under Tenant to enter into, any sublease, license or other occupancy agreement that provides for payment based in whole or in part on the net income or profit of the subtenant, licensee or other occupant thereunder.

-21-

14.6    **Change of Control.** As used herein, "**Change of Control**" means (a) if Tenant is a closely held professional service firm, the withdrawal or change (whether voluntary, involuntary or by operation of law) of 50% or more of its equity owners within a 12-month period; and (b) in all other cases, any transaction(s) resulting in the acquisition of a Controlling Interest (defined below) by one or more parties that did not own a Controlling Interest immediately before such transaction(s). As used herein, "**Controlling Interest**" means any direct or indirect equity or beneficial ownership interest in Tenant that confers upon its holder(s) the direct or indirect power to direct the ordinary management and policies of Tenant, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary in this Lease, no Change of Control or change in the Controlling Interest shall be deemed to have occurred through the transfer of ownership of voting securities listed on a recognized securities exchange.

14.7    **Effect of Default.** Any sublease, license, concession or other occupancy agreement entered into by Tenant shall be subordinate and subject to the provisions of this Lease, and if this Lease is terminated during the term of any such agreement, Landlord shall have the right to: (i) treat such agreement as cancelled and repossess the Contemplated Transfer Space by any lawful means, or (ii) require that the transferee attorn to and recognize Landlord as its landlord (or licensor, as applicable) under such agreement. If Tenant is in Default, Landlord is irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any transferee under any sublease, license or other occupancy agreement to make all payments under such agreement directly to Landlord (which Landlord shall apply towards Tenant's obligations hereunder) until such Default is cured. Such transferee shall rely upon any representation by Landlord that Tenant is in Default, without any need for confirmation thereof by Tenant. No collection or acceptance of rent by Landlord from any transferee shall be deemed a waiver of any provision of this Article 14, an approval of any transferee, or a release of Tenant from any obligation under this Lease, whenever accruing. In no event shall Landlord's enforcement of any provision of this Lease against any transferee be deemed a waiver of Landlord's right to enforce any term of this Lease against Tenant or any other person.

14.8    **Permitted Transfers.** Notwithstanding any contrary provision hereof, so long as no Default shall then exist under this Lease, subject to the satisfaction of the conditions set forth below, Tenant may, without Landlord's consent pursuant to Section 14.1, assign this Lease, or sublet the Premises (or any portion thereof), as follows (any such assignment and/or sublease being a "**Permitted Transfer**"):

14.8.1    **Permitted Affiliate Transfer.** So long as Le Technology and/or Le Holdings (Beijing) and/or a Permitted LETV Affiliate Assignee (as defined below) is the Tenant and in occupancy and possession of at least seventy-five percent (75%) of the Premises, Tenant shall have the right to assign this Lease or sublease the Premises (or any portion thereof) to an Affiliate of Le Technology and/or Le Holdings (Beijing) (any such assignment or sublease being a "**Permitted Affiliate Transfer**"), so long as (i) at least 15 business days before the Transfer, Tenant notifies Landlord of such Transfer and delivers to Landlord any documents or information reasonably requested by Landlord relating thereto, including reasonable documentation that the Transfer satisfies the requirements of this Section 14.8.1; (ii) in the case of an assignment, the assignee executes and delivers to Landlord, at least 15 business days before the assignment, a commercially reasonable instrument pursuant to which the assignee assumes, for Landlord's benefit, all of Tenant's obligations hereunder; (iii) the Affiliate has a net worth (as determined in accordance with GAAP, but excluding patents, copyrights and other intellectual property, goodwill and any other intangible assets ("**Net Worth**")) immediately after the Transfer that is reasonably sufficient to fulfill the obligations on the part of the "Tenant" to be performed or observed under this Lease (as the same may have been amended); (iv) the transferee is qualified to conduct business in the State of California; and (v) the Transfer is made for a good faith operating business purpose and not in order to evade the requirements of this Section 14. As used herein, "**Affiliate**" means, with respect to any party, a domestic entity formed, existing and governed pursuant to the laws of one of the fifty (50) sates of the United States of America (or the District of Columbia) that (i) controls, is under common control with, or is controlled by such party, and (ii) shall conduct business operations in the Premises substantially similar to those of LETV (and otherwise in compliance with the terms and conditions of this Lease), and (iii) will not cause Landlord to be in violation of any other lease in the Project (including, without limitation, any "non-competition" provision set forth therein) in effect as of the Effective Date. The rights granted under this

-22-

Section 14.8.1 to effectuate a Permitted Affiliate Transfer are personal to Le Technology and Le Holdings (Beijing) and may not be transferred or assigned to any third party, other than (i) an Affiliate of LETV to which this Lease is assigned pursuant to this Section 14.8.1 ("Permitted LETV Affiliate Assignee") or (ii) a Permitted Successor Transferee (as defined in Section 14.8.2 below).

14.8.2   Permitted Successor Transfer.   So long as Le Technology and/or Le Holdings (Beijing) and/or a Permitted LETV Affiliate Assignee is the Tenant and in occupancy and possession of at least seventy-five percent (75%) of the Premises, Tenant shall have the right to assign this Lease to a domestic entity formed, existing and governed pursuant to the laws of one of the fifty (50) states of the United States of America (or the District of Columbia), so long as such assignment is not a subterfuge by Tenant to avoid its obligations under this Lease, which domestic entity is a successor to Le Technology and/or Le Holdings (Beijing) by (1) merger or consolidation or (2) the purchase of all or substantially all of the assets of Le Technology and/or Le Holdings (Beijing) (any such assignment being a "Permitted Successor Transfer," and any entity to which this Lease is assigned pursuant to the terms and conditions of this Section 14.8.2 being a "Permitted Successor Transferee"), so long as (i) at least 15 business days before the Transfer, Tenant notifies Landlord of such Transfer and delivers to Landlord any documents or information reasonably requested by Landlord relating thereto, including reasonable documentation that the Transfer satisfies the requirements of this Section 14.8.2; (ii) the assignee executes and delivers to Landlord, at least 15 business days before the assignment, a commercially reasonable instrument pursuant to which the assignee assumes, for Landlord's benefit, all of Tenant's obligations hereunder; (iii) (A) the successor entity has a Net Worth immediately after the Transfer that is not less than the Net Worth of the non-surviving entity(ies) (i.e., as applicable, Le Technology and/or Le Holdings (Beijing) or the Permitted LETV Affiliate Assignee) immediately before the Transfer, and (B) if Tenant is a closely held professional service firm, at least 75% of its equity owners existing 12 months before the Transfer are also equity owners of the successor entity; (iv) the transferee is qualified to conduct business in the State of California; (v) the Transfer is made for a good faith operating business purpose and not in order to evade the requirements of this Section 14; (vi) the transferee shall conduct business operations in the Premises substantially similar to those of LETV (and otherwise in compliance with the terms and conditions of this Lease), and (vii) the Transfer will not cause Landlord to be in violation of any other lease in the Project (including, without limitation, any "non-competition" provision set forth therein) in effect as of the Effective Date. The rights granted under this Section 14.8.2 to effectuate a Permitted Successor Transfer are personal to Le Technology and Le Holdings (Beijing) and may not be transferred or assigned to any third party, other than a Permitted LETV Affiliate Assignee.

15.   SURRENDER.

15.1   Required Repairs.   Upon the expiration or earlier termination hereof, and subject to Sections 8 and 11 and this Section 15, Tenant shall surrender possession of the Premises to Landlord in good condition and repair and as thereafter improved by Landlord and/or Tenant, except for reasonable wear and tear and repairs that are Landlord's express responsibility hereunder. Without limiting the foregoing, Tenant, at its expense, before surrendering the Premises, shall have caused (a) all interior walls of the Premises to have been repaired if marked or damaged; (b) all carpets to have been shampooed and cleaned and all floors to have been cleaned and waxed; (c) all broken, marred or nonconforming acoustical ceiling tiles to have been replaced; and (d) the Project Systems (but excluding any HVAC Unit for which Landlord has assumed the responsibility for repair pursuant to Section 7.1.1) to have been audited, serviced and repaired by a reputable and licensed service firm reasonably acceptable to Landlord, and otherwise put in good order (including replacement of any burned-out or broken light bulbs or ballasts). If Tenant fails to timely perform any work required under this Section 15.1, Landlord may do so, in which case Tenant shall pay Landlord, upon demand, the cost of such work plus a coordination fee equal to 10% of such cost.

15.2   Required Removal.   Before the expiration or earlier termination hereof, Tenant, without expense to Landlord, shall (a) remove from the Premises all debris and rubbish and all furniture, equipment, trade fixtures, Lines, free-standing cabinet work, movable partitions and other articles of personal property that are owned or placed in the Premises by Tenant or any party claiming by, through or under Tenant (except for any Lines not required to be

-23-

removed under Section 23), and (b) repair all damage to the Premises and Building resulting from such removal. If Tenant fails to timely perform such removal and repair, Landlord may do so at Tenant's expense (including storage costs). If Tenant fails to remove such property from the Premises, or from storage, within 30 days after notice from Landlord, any part of such property shall be deemed, at Landlord's option, either (x) conveyed to Landlord without compensation, or (y) abandoned. Notwithstanding anything to the contrary contained in this Lease, in no event shall Tenant be required to remove (i) the Tenant Improvements (other than the Specialized Improvements, if any) or (ii) any Prior Alterations.

16.    **HOLDOVER.** If Tenant fails to surrender the Premises upon the expiration or earlier termination hereof, Tenant's tenancy shall be subject to the terms and conditions hereof; provided, however, that such tenancy shall be a tenancy at sufferance only, for the entire Premises, and Tenant shall pay Monthly Rent (on a per-month basis without reduction for any partial month) at a rate equal to twice the Monthly Rent applicable during the last calendar month of the Term. Nothing in this Section 16 shall limit Landlord's rights or remedies or be deemed a consent to any holdover. If Landlord is unable to deliver possession of the Premises to a new tenant or to perform improvements for a new tenant as a result of Tenant's holdover, Tenant shall be liable for all resulting damages, including lost profits, incurred by Landlord, but only to the extent such holdover occurs more than thirty (30) days after notice from Landlord that Landlord has entered into, or will enter into, a lease with such new tenant.

17.    **SUBORDINATION; ESTOPPEL CERTIFICATES.** This Lease shall be subject and subordinate to all existing and future ground or underlying leases, mortgages, trust deeds and other encumbrances against the Building or Project, all renewals, extensions, modifications, consolidations and replacements thereof (each, a "**Security Agreement**"), and all advances made upon the security of such mortgages or trust deeds, unless in each case the holder of such Security Agreement (each, a "**Security Holder**") requires in writing that this Lease be superior thereto. Upon any termination or foreclosure (or any delivery of a deed in lieu of foreclosure) of any Security Agreement, Tenant, upon request, shall attorn, without deduction or set-off, to the Security Holder or purchaser or any successor thereto and shall recognize such party as the lessor hereunder provided that such party agrees not to disturb Tenant's occupancy so long as no Default exists. Within 10 business days after request by Landlord, Tenant shall execute such further instruments as Landlord may reasonably deem necessary to evidence the subordination or superiority of this Lease to any Security Agreement. Tenant waives any right it may have under Law to terminate or otherwise adversely affect this Lease or Tenant's obligations hereunder upon a foreclosure. Within 10 business days after Landlord's request, Tenant shall execute and deliver to Landlord a commercially reasonable estoppel certificate in favor of such parties as Landlord may reasonably designate, including current and prospective Security Holders and prospective purchasers, certifying the following information: (i) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as modified, is in full force and effect); (ii) the dates to which the rental and other charges are paid in advance, if any; (iii) the amount of Tenant's Security Deposit, if any; (iv) acknowledging that there are not, to Tenant's actual knowledge (without duty of investigation or inquiry), any uncured defaults on the part of Landlord hereunder, and no events or conditions then in existence which, with the passage of time or notice or both, would constitute a default on the part of Landlord hereunder, or specifying such defaults, events or conditions, if any are claimed; and (v) such other information regarding this Lease as may be reasonably requested by Landlord. The "**Additional Provisions**" attached hereto as **Exhibit F** are incorporated herein by this reference and made a part hereof.

18.    **ENTRY BY LANDLORD.** At all reasonable times and upon reasonable prior notice to Tenant, or in an emergency, Landlord may enter the Premises to (i) inspect the Premises; (ii) show the Premises to prospective purchasers, current or prospective Security Holders or insurers, or, during the last 9 months of the Term (or while an uncured Default exists), prospective tenants; (iii) post notices of non-responsibility; or (iv) perform maintenance, repairs or alterations. At any time and without notice to Tenant, Landlord may enter the Premises to perform required services. If reasonably necessary, Landlord may temporarily close any portion of the Premises to perform maintenance, repairs or alterations. In an emergency, Landlord may use any means it deems proper to open doors to and in the Premises. No entry into or closure of any portion of the Premises pursuant to this Section 18 shall render Landlord liable to Tenant, constitute a constructive eviction, or excuse Tenant from any obligation hereunder;

-24-

provided, however, that Landlord shall use commercially reasonable efforts to minimize the disruption to Tenant's use and enjoyment of the Premises.  Tenant acknowledges and agrees that, to the extent Tenant does not facilitate Landlord's access to the Premises or certain portions thereof, Landlord shall be absolved from the obligation to perform any services under this Lease within such portion of the Premises.

19.    **DEFAULTS; REMEDIES.**

19.1    <u>Events of Default</u>.  The occurrence of any of the following shall constitute a "Default":

19.1.1    Any failure by Tenant to pay any Rent when due; or

19.1.2    Except where a specific time period is otherwise set forth for Tenant's cure herein (in which event Tenant's failure to cure within such time period shall be a Default), and except as otherwise provided in this <u>Section 19.1</u>, any breach by Tenant of any other provision hereof where such breach continues for 30 days after written notice from Landlord; provided that if such breach cannot reasonably be cured within such 30-day period, Tenant shall not be in Default as a result of such breach if Tenant diligently commences such cure within such period, thereafter diligently pursues such cure, and completes such cure within 60 days after Landlord's written notice; or

19.1.3    Abandonment or vacation of all or a substantial portion of the Premises by Tenant; or

19.1.4    Any breach by Tenant of <u>Sections 14</u>, <u>17</u> or <u>18</u> where such breach continues for more than two (2) business days after written notice from Landlord; or

19.1.5    Tenant becomes in material breach of <u>Section 25.3</u>.

If Tenant breaches a particular provision hereof (other than a provision requiring payment of Rent) on three (3) separate occasions during any 12-month period, Tenant's subsequent breach of such provision shall be, at Landlord's option, an incurable Default.  The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by Law, and Landlord shall not be required to give any additional notice in order to be entitled to commence an unlawful detainer proceeding.

19.2    <u>Remedies Upon Default</u>.  Upon any Default, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity (which shall be cumulative and nonexclusive), the option to pursue any one or more of the following remedies (which shall be cumulative and nonexclusive) without any notice or demand:

19.2.1    Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy it may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

(a)    The worth at the time of award of the unpaid Rent which had been earned at the time of such termination; plus

(b)    The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

-25-

(c)      The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such Rent loss that Tenant proves could be reasonably avoided; plus

(d)      Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations hereunder or which in the ordinary course of things would be likely to result therefrom, including brokerage commissions, advertising expenses, expenses of remodeling any portion of the Premises for a new tenant (whether for the same or a different use), and any special concessions made to obtain a new tenant; plus

(e)      At Landlord's option, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by Law.

As used in Sections 19.2.1(a) and (b), the "worth at the time of award" shall be computed by allowing interest at a rate per annum equal to the lesser of (i) the annual "Bank Prime Loan" rate cited in the Federal Reserve Statistical Release Publication G.13(415), published on the first Tuesday of each calendar month (or such other comparable index as Landlord shall reasonably designate if such rate ceases to be published) plus two (2) percentage points, or (ii) the highest rate permitted by Law. As used in Section 19.2.1(c), the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1%.

19.2.2   Landlord shall have the remedy described in California Civil Code § 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover Rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies hereunder, including the right to recover all Rent as it becomes due.

19.2.3   Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 19.2.1 and 19.2.2, or any Law or other provision hereof), without prior demand or notice except as required by Law, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

19.3   **Efforts to Relet.** Unless Landlord provides Tenant with express notice to the contrary, no re-entry, repossession, repair, maintenance, change, alteration, addition, reletting, appointment of a receiver or other action or omission by Landlord shall (a) be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Premises, or (b) operate to release Tenant from any of its obligations hereunder. Tenant waives, for Tenant and for all those claiming by, through or under Tenant, California Civil Code § 3275 and California Code of Civil Procedure §§ 1174(c) and 1179 and any existing or future rights to redeem or reinstate, by order or judgment of any court or by any legal process or writ, this Lease or Tenant's right of occupancy of the Premises after any termination hereof.

19.4   **Landlord Default.** Landlord shall not be in default hereunder unless it fails to begin within 30 days after notice from Tenant, or fails to pursue with reasonable diligence thereafter, the cure of any breach by Landlord of its obligations hereunder. Tenant hereby waives any right to terminate or rescind this Lease as a result of any default by Landlord hereunder or any breach by Landlord of any promise or inducement relating hereto, and Tenant agrees that its remedies for any such matter shall be limited to a suit for damages and/or injunction. Before exercising any remedies for a default by Landlord, Tenant shall give notice and a reasonable time to cure to any Security Holder of which Tenant has been notified.

-26-

20. **LANDLORD EXCULPATION.** Notwithstanding any contrary provision hereof: (a) the liability of the Landlord Parties to Tenant shall be limited to an amount equal to the lesser of (i) Landlord's interest in the Building, or (ii) the equity interest Landlord would have in the Building if the Building were encumbered by third-party debt in an amount equal to 80% of the value of the Building (as such value is determined by Landlord); (b) Tenant shall look solely to Landlord's interest in the Building for the recovery of any judgment or award against any Landlord Party; (c) no Landlord Party shall have any personal liability for any judgment or deficiency, and Tenant waives and releases such personal liability on behalf of itself and all parties claiming by, through or under Tenant; (d) the limitations of liability contained in this Article 20 shall inure to the benefit of the Landlord Parties' present and future partners, members, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns. Under no circumstances shall any present or future partner or member of Landlord (if Landlord is a partnership or limited liability company) or any trustee or beneficiary of Landlord (if Landlord or any partner or member of Landlord is a trust) have any liability for the performance of Landlord's obligations under this Lease; and (e) no Landlord Party shall be liable for any injury or damage to, or interference with, Tenant's business, including loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, or for any form of consequential damages and/or indirect, incidental, exemplary and/or punitive damages of any kind or nature, in each case, however occurring.

21. **SECURITY DEPOSIT.**

21.1    **Security Deposit.** Tenant has deposited with Landlord the sum set forth in Section 8 of the Basic Lease Information (i.e., $253,266.30) as security for the full and faithful performance of every provision of this Lease to be performed by Tenant. If Tenant breaches any provision, covenant or condition of this Lease, including but not limited to the payment of Basic Rental or Additional Rent, Landlord may (but shall not be required to) use all or any part of the Security Deposit for the payment of any sums in default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of said Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount and Tenant's failure to do so shall be an Event of Default under this Lease. If monthly Basic Rental is increased, whether pursuant to the terms of this Lease, or otherwise, the amount of the Security Deposit required to be maintained by Tenant shall also be increased so as to equal, at all times and from time to time, one (1) month's Basic Rental. Landlord shall not be required to keep this Security Deposit separate from its general funds and Tenant shall not be entitled to interest on such deposit. Within thirty (30) days after the expiration of the Lease Term, and provided there exists no default by Tenant hereunder, the Security Deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to Tenant's assignee), provided that subsequent to the expiration (or earlier termination) of this Lease, Landlord may retain from said Security Deposit (a) any and all amounts necessary to cure any default in the payment of Basic Rental and/or Additional Rent, to repair any damage to the Premises caused by the Tenant, and to clean the Premises upon termination of the Lease, (b) any amounts that Landlord may incur or be obligated to incur in exercising Landlord's rights under this Lease and (c) any expense, loss or damage that Landlord reasonably estimates it may suffer because of Tenant's default (including, without limitation, any and all amounts of Basic Rental and/or Additional Rent that would have been due under this Lease had the Lease remained in effect for the entire term). Without limiting the generality of the preceding sentence, Landlord and Tenant hereby agree that Landlord may, in addition, claim and retain from the Security Deposit those sums necessary to compensate Landlord for any other loss or damage caused by the act or omission of Tenant or Tenant's officers, agents, employees, independent contractors or invitees or the default of Tenant under this Lease (beyond the notice and cure periods set forth in Section 19.1 above (except that such notice and cure periods shall in no event apply from and after the expiration or earlier termination of this Lease)), including, without limitation, the unamortized portion of any leasing commissions and tenant improvements costs (which commissions and tenant improvements costs shall be amortized over the Lease Term) incurred by Landlord in connection with this Lease and any damages to which Landlord is entitled under applicable law (including, without limitation, § 1951.2 of the California Civil Code) as a result of Tenant's default under the Lease (beyond any applicable notice and cure periods (except that such notice and cure periods shall in no event apply from and after the expiration or earlier termination of this Lease)). Should Landlord sell its interest in the Premises

-27-

during the term hereof, and if Landlord deposits with the purchaser thereof the then unappropriated funds deposited by Tenant as aforesaid, Landlord shall be discharged from any liability with respect to such Security Deposit. Tenant hereby waives the provisions of California Civil Code § 1950.7, and all other provisions of law now or hereafter in force, that provide that Landlord may claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant, or to clean the Premises.

22.    **CONFIDENTIALITY.** Tenant acknowledges and agrees that the economic and noneconomic terms of this Lease are confidential and constitute proprietary information of Landlord. Disclosure of such terms could adversely affect the ability of Landlord to negotiate other leases (and/or lease amendments) and impair Landlord's relationship with third parties. Accordingly, Tenant agrees that it, and its partners, members, shareholders, officers, directors, employees and attorneys, shall not disclose, by public filings or otherwise, the terms and conditions of this Lease ("**Confidential Information**"), to any third party (other than the following third parties, if (and solely to the extent that) such disclosure is necessary in connection with the conduct of Tenant's business operations; provided, however, that, prior to any such disclosure, Tenant shall instruct any and all such third party(ies) in writing, for the benefit of Landlord, to comply with the terms and conditions of this Section 22 (and provide such parties with a copy of this Section 22): Tenant's directors, officers, partners, employees, legal counsel, accountants, lenders, potential lenders, investors, potential investors, brokers, financial advisors and similar professionals and consultants), either directly or indirectly, without the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole and absolute discretion. The foregoing restriction shall not apply if Tenant is required to disclose the Confidential Information in response to a subpoena, regulatory, administrative or court order, or pursuant to any applicable law or regulation (it being the intent of the parties that Tenant shall have the right to disclose the terms of this Lease, as amended, to regulators and auditors (including the Securities and Exchange Commission) to the extent such disclosure is deemed necessary by Tenant to comply with any applicable law or regulation; provided however, that, in such event, Tenant shall, before making any such disclosure (other than in connection with a public filing required pursuant to any applicable law or regulation) (A) provide Landlord with prompt written notice of such required disclosure, (B) at Tenant's sole cost, take all reasonable steps to resist or narrow such requirement, including, without limitation, preparing and filing a request for confidential treatment of the Confidential Information and (C) if disclosure of the Confidential Information is required by subpoena or other regulatory, administrative or court order, or for regulatory, auditor or legal compliance, Tenant shall provide Landlord with as much advance notice of the possibility of such disclosure as practical so that Landlord may attempt to stop such disclosure or obtain an order concerning such disclosure. The form and content of a request by Tenant for confidential treatment of the Confidential Information shall be provided to Landlord at least five (5) business days before its submission to the applicable governmental agency and is subject to the prior written approval of Landlord. In addition, Tenant may disclose the terms of this Lease to prospective assignees of this Lease and prospective subtenants under this Lease with whom Tenant is actively negotiating such an assignment or sublease.

23.    **COMMUNICATIONS AND COMPUTER LINES.** All Lines installed pursuant to this Lease shall be (a) installed in accordance with Section 7; and (b) clearly marked with adhesive plastic labels (or plastic tags attached to such Lines with wire) to show Tenant's name, suite number, and the purpose of such Lines (i) every six (6) feet outside the Premises (including the electrical room risers and any Exterior Areas), and (ii) at their termination points. Landlord may designate specific contractors for work relating to vertical Lines. Unless otherwise notified by Landlord, Tenant, at its expense and before the expiration or earlier termination hereof, shall remove all Lines and repair any resulting damage. As used herein, "Lines" means all communications or computer wires and cables serving the Premises, whenever and by whomever installed or paid for, including any such wires or cables installed pursuant to any prior lease.

24.    **PARKING.** Tenant may park, free of charge (except as expressly provided below), in the parking areas located in the Project (collectively, the "**Parking Areas**"), subject to and, upon the following terms and conditions. Subject to Verizon's rights under the Verizon Lease, Tenant shall be entitled to use all of the unreserved parking spaces located in the Parking Areas, as set forth in Section 9 of the Basic Lease Information. Tenant shall pay Landlord any fees, taxes or other charges imposed by any governmental or quasi-governmental agency in

-28-

connection with the Parking Areas. Landlord shall not be liable to Tenant, nor shall this Lease be affected, if any parking is impaired by (or any parking charges are imposed as a result of) any Law. Tenant shall comply with all rules and regulations established by Landlord from time to time for the orderly operation and use of the Parking Areas, including any sticker or other identification system and the prohibition of vehicle repair and maintenance activities in the Parking Areas. Tenant's use of the Parking Areas shall be at Tenant's sole risk, and Landlord shall have no liability for any personal injury or damage to or theft of any vehicles or other property occurring in the Parking Areas or otherwise in connection with any use of the Parking Areas by Tenant or its employees or invitees. Landlord may alter the size, configuration, design, layout or any other aspect of the Parking Areas, and, in connection therewith, temporarily deny or restrict access to the Parking Areas, in each case without abatement of Rent or liability to Tenant; provided, however, Landlord shall use commercially reasonable efforts to provide adequate alternate parking reasonably acceptable to Tenant. Tenant's parking rights under this Section 24 are solely for the benefit of Tenant's employees and invitees and such rights may not be transferred without Landlord's prior consent, except pursuant to a Transfer permitted under Section 14.

25.    **MISCELLANEOUS.**

25.1    Notices. No notice, demand, statement, designation, request, consent, approval, election or other communication given hereunder ("Notice") shall be binding upon either party unless (a) it is in writing; (b) it is (i) sent by certified or registered mail, postage prepaid, return receipt requested, (ii) delivered by a nationally recognized courier service, or (iii) delivered personally; and (c) it is sent or delivered to the address set forth in Section 10 or 11 of the Basic Lease Information, as applicable, or to such other place (other than a P.O. box) as the recipient may from time to time designate in a Notice to the other party. Any Notice shall be deemed received on the earlier of the date of actual delivery or the date on which delivery is refused, or, if Tenant is the recipient and has vacated its notice address without providing a new notice address, three (3) days after the date the Notice is deposited in the U.S. mail or with a courier service as described above.

25.2    Force Majeure. If either party is prevented from performing any obligation hereunder by any strike, act of God, war, terrorist act, shortage of labor or materials, governmental action, civil commotion or other cause beyond such party's reasonable control ("Force Majeure"), such obligation shall be excused during (and any time period for the performance of such obligation shall be extended by) the period of such prevention; provided, however, that this Section 25.2 shall not (a) permit Tenant to hold over in the Premises after the expiration or earlier termination hereof, (b) excuse any of Tenant's obligations under Sections 3, 4, 5, 10, 21 or 25.3 or any of Tenant's obligations whose nonperformance would interfere with another occupant's use, occupancy or enjoyment of its premises or the Project or (c) excuse (or extend any time period for the performance of) (i) any obligation to remit money or deliver credit enhancement or (ii) any of Tenant's obligations whose breach could result in any liability on the part of any Landlord Party.

25.3    Representations and Covenants. Tenant represents, warrants and covenants that (a)Tenant is, and at all times during the Term will remain, duly organized, validly existing and in good standing under the Laws of the state of its formation and qualified to do business in the State of California; (b) neither Tenant's execution of nor its performance under this Lease will cause Tenant to be in violation of any agreement or Law; (c) Tenant (and any guarantor hereof) has not, and at no time during the Term will have, (i) made a general assignment for the benefit of creditors, (ii) filed a voluntary petition in bankruptcy or suffered the filing of an involuntary petition by creditors that remained or will remain undischarged for a period of sixty (60) days, (iii) suffered the appointment of a receiver to take possession of all or substantially all of its assets, (iv) suffered the attachment or other judicial seizure of all or substantially all of its assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally; (d) no party that (other than through the passive ownership of interests traded on a recognized securities exchange) constitutes, owns, controls, or is owned or controlled by Tenant, any guarantor hereof or any subtenant of Tenant is, or at any time during the Term will be, (i) in violation of any Laws relating to terrorism or money laundering, or (ii)a person listed in any sanctions-related list of designated persons maintained by the Office of Foreign Assets Control (OFAC) of the U.S. Department of the

-29-

Treasury, the U.S. Department of State, or by the United Nations Security Council, or other relevant sanctions authority, or a person operating, organized or resident in a country subject to comprehensive sanctions; and (e) neither Tenant, nor to its knowledge any of its respective agents, consultants, distributors, joint venture partners or other persons acting on the Tenant's behalf, has (i) used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any government official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption laws; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. Tenant, its subsidiaries, and their respective officers and employees, and to their knowledge, their directors and agents, are and have been in compliance with economic or financial sanctions or trade embargoes administered or enforced by the U.S. government, including OFAC or the Department of State, or by the United Nations Security Council, or other relevant sanctions authority.

25.4    **Energy Performance Disclosure Information.** Tenant hereby acknowledges that Landlord may be required to disclose certain information concerning the energy performance of the Building pursuant to California Public Resources Code Section 25402.10 and the regulations adopted pursuant thereto (collectively the **"Energy Disclosure Requirements"**). Tenant hereby acknowledges prior receipt of the Data Verification Checklist, as defined in the Energy Disclosure Requirements (the **"Energy Disclosure Information"**), and agrees that Landlord has timely complied in full with Landlord's obligations under the Energy Disclosure Requirements. Tenant acknowledges and agrees that (i) Landlord makes no representation or warranty regarding the energy performance of the Building or the accuracy or completeness of the Energy Disclosure Information, (ii) the Energy Disclosure Information is for the current occupancy and use of the Building and that the energy performance of the Building may vary depending on future occupancy and/or use of the Building, and (iii) Landlord shall have no liability to Tenant for any errors or omissions in the Energy Disclosure Information. If and to the extent not prohibited by any applicable Laws, Tenant hereby waives any right Tenant may have to receive the Energy Disclosure Information, including, without limitation, any right Tenant may have to terminate this Lease as a result of Landlord's failure to disclose such information. Further, Tenant hereby releases Landlord from any and all losses, costs, damages, expenses and/or liabilities relating to, arising out of and/or resulting from the Energy Disclosure Requirements, including, without limitation, any liabilities arising as a result of Landlord's failure to disclose the Energy Disclosure Information to Tenant prior to the execution of this Lease. Tenant's acknowledgment of the AS-IS condition of the Premises pursuant to the terms of this Lease shall be deemed to include the energy performance of the Building. Tenant further acknowledges that pursuant to the Energy Disclosure Requirements, Landlord may be required in the future to disclose information concerning Tenant's energy usage to certain third parties, including, without limitation, prospective purchasers, lenders and tenants of the Building (the **"Tenant Energy Use Disclosure"**). Tenant hereby (A) consents to all such Tenant Energy Use Disclosures, and (B) acknowledges that Landlord shall not be required to notify Tenant of any Tenant Energy Use Disclosure. Further, Tenant hereby releases Landlord from any and all losses, costs, damages, expenses and liabilities relating to, arising out of and/or resulting from any Tenant Energy Use Disclosure. The terms of this Section 25.4 shall survive the expiration or earlier termination of this Lease.

25.5    **Attorneys' Fees.** In any action or proceeding between the parties, including any appellate or alternative dispute resolution proceeding, the prevailing party may recover from the other party all of its costs and expenses in connection therewith, including reasonable attorneys' fees and costs. Tenant shall pay all reasonable attorneys' fees and other fees and costs that Landlord incurs in interpreting or enforcing this Lease or otherwise protecting its rights hereunder (a) where Tenant has failed to pay Rent when due, or (b) in any bankruptcy case, assignment for the benefit of creditors, or other insolvency, liquidation or reorganization proceeding involving Tenant or this Lease.

4814-8820-0107v2
HAL\22817007

25.6    <u>Brokers</u>.  Tenant represents to Landlord that it has dealt only with Tenant's Broker as its broker in connection with this Lease.  Tenant shall indemnify, defend, and hold Landlord harmless from all claims of any brokers, other than Tenant's Broker, claiming to have represented Tenant in connection with this Lease.  Landlord represents to Tenant that it has dealt only with Landlord's Broker as its broker in connection with this Lease. Landlord shall indemnify, defend and hold Tenant harmless from all claims of any brokers, including Landlord's Broker, claiming to have represented Landlord in connection with this Lease.  Tenant acknowledges that any Affiliate of Landlord that is involved in the negotiation of this Lease is representing only Landlord, and that any assistance rendered by any agent or employee of such Affiliate in connection with this Lease or any subsequent amendment or other document related hereto has been or will be rendered as an accommodation to Tenant solely in furtherance of consummating the transaction on behalf of Landlord, and not as agent for Tenant.  Landlord shall pay Landlord's Broker any leasing commissions, fees or other amounts due as a result of this Lease, pursuant to a separate agreement between Landlord and Landlord's Broker, and Landlord's Broker shall pay Tenant's Broker any such commission fees or other amounts pursuant to a separate agreement between Landlord's Broker and Tenant's Broker.  The terms of this <u>Section 25.6</u> shall survive the expiration or earlier termination of the Lease.

25.7    <u>Governing Law; Venue; WAIVER OF TRIAL BY JURY</u>.  This Lease shall be construed and enforced in accordance with the Laws of the State of California, including, without limitation, the laws of the State of California applicable to contracts made and to be performed in the State of California.  In order to induce Landlord to enter into this Lease, and as a material part of the consideration therefor, Le Holdings (Beijing) hereby expressly (a) agrees that all actions or proceedings relating directly or indirectly to this Lease shall, at the option of Landlord, be litigated in courts located within the State of California, (b) consents to the jurisdiction of any such court and consents to the service of process in any such action or proceeding by personal delivery or any other method permitted by law and (c) waives any defense of forum non conveniens, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Lease.  The undersigned Le Holdings (Beijing) designates and appoints Le Technology, or any successor of Le Technology, whose address is 3553 North First Street, San Jose, California (i.e., at the Premises), and such other persons located in California as may hereafter be selected by Le Holdings (Beijing) which irrevocably agree in writing to so serve as Le Holdings (Beijing)'s agent to receive on Le Holdings (Beijing)'s behalf service of all process in any such proceedings in any such court, such service being hereby acknowledged by Le Holdings (Beijing) to be effective and binding service in every respect.  A copy of any such process so served shall be mailed to Le Holdings (Beijing) at agent's address in accordance with above.    If any agent appointed by Le Holdings (Beijing) hereunder refuses to accept service, Le Holdings (Beijing) hereby agrees that service upon Le Holdings (Beijing) by mail at the Premises shall constitute sufficient notice.  Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of Landlord to bring proceedings against Le Holdings (Beijing) hereunder in the courts of any other jurisdiction.

THE PARTIES WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE OR ANY EMERGENCY OR STATUTORY REMEDY.

25.8    <u>Waiver of Statutory Provisions; Certified Access Specialist</u>.  Each party waives California Civil Code§§ 1932(2) and 1933(4).  Tenant waives (a) any rights under (i) California Civil Code §§ 1932(1), 1941, 1942, 1950.7 or any similar Law, or (ii) California Code of Civil Procedure § 1265.130; and (b) any right to terminate this Lease under California Civil Code § 1995.310.  For purposes of Section 1938 of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Premises have not undergone inspection by a Certified Access Specialist (CASp) and in connection therewith:  (i) Tenant assumes all risk of, and agrees that Landlord shall not be liable for, any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) sustained as a result of the Premises not having been inspected by a Certified Access Specialist (CASp); (ii) Tenant hereby acknowledges and agrees that Tenant's indemnity obligations set forth in this Lease shall include any and all claims relating to or arising as a result of the Premises not having been

-31-

inspected by a Certified Access Specialist (CASp); and (iii) Landlord may require, as a condition to its consent to any Alterations, that any architect retained by Tenant in connection with such Alterations be certified as a Certified Access Specialist (CASp), and that following the completion of such Alterations, such architect shall certify the Premises as meeting all applicable construction-related accessibility standards pursuant to California Civil Code Section 55.53.

25.9    **Interpretation.** As used herein, the capitalized term "Section" refers to a section hereof unless otherwise specifically provided herein. As used in this Lease, the terms "herein," "hereof," "hereto" and "hereunder" refer to this Lease and the term "include" and its derivatives are not limiting. Any reference herein to "any part" or "any portion" of the Premises, the Project or any other property shall be construed to refer to all or any part of such property. Wherever this Lease requires Tenant to comply with any Law, rule, regulation, procedure or other requirement or prohibits Tenant from engaging in any particular conduct, this Lease shall be deemed also to require Tenant to cause each of its employees, licensees, invitees and subtenants, and any other party claiming by, through or under Tenant, to comply with such requirement or refrain from engaging in such conduct, as the case may be. Wherever this Lease requires Landlord to provide a customary service or to act in a reasonable manner (whether in incurring an expense, establishing a rule or regulation, providing an approval or consent, or performing any other act), this Lease shall be deemed also to provide that whether such service is customary or such conduct is reasonable shall be determined by reference to the practices of owners of buildings that are comparable to the Building in size, age, class, quality and location. Tenant waives the benefit of any rule that a written agreement shall be construed against the drafting party. For purposes hereof, (a) a matter (such as the application or violation of a Law) shall be deemed to result from a particular use (as distinguished from general R&D Use) of the Premises if such matter results from such use and a different R&D Use could be made of the Premises without resulting in such matter; and (b) a matter (such as compliance with a Law) shall be deemed to be required for a particular use (as distinguished from general R&D Use) of the Premises if such matter is required for such use and a different R&D Use could be made of the Premises without requiring such matter.

25.10    **Entire Agreement.** This Lease sets forth the entire agreement between the parties relating to the subject matter hereof and supersedes any previous agreements (none of which shall be used to interpret this Lease). Tenant acknowledges that in entering into this Lease it has not relied upon any representation, warranty or statement, whether oral or written, not expressly set forth herein. This Lease can be modified only by a written agreement signed by both parties.

25.11    **Other.** Landlord, at its option, may cure any Default, without waiving any right or remedy or releasing Tenant from any obligation, in which event Tenant shall pay Landlord, upon demand, the cost of such cure. If any provision hereof is void or unenforceable, no other provision shall be affected. Submission of this instrument for examination or signature by Tenant does not constitute an option or offer to lease, and this instrument is not binding until it has been executed and delivered by both parties. If Tenant is comprised of two or more parties, their obligations shall be joint and several, and Le Technology and Le Holdings (Beijing) hereby expressly agree and acknowledge that each such entity is bound by the terms and conditions of this sentence. Time is of the essence with respect to the performance of every provision hereof in which time of performance is a factor. So long as Tenant performs its obligations hereunder, Tenant shall have peaceful and quiet possession of the Premises against any party claiming by, through or under Landlord, subject to the terms hereof. Landlord may transfer its interest herein, in which event Landlord shall be released from, Tenant shall look solely to the transferee for the performance of, and the transferee shall be deemed to have assumed, all of Landlord's obligations arising hereunder after the date of such transfer (including the return of any Security Deposit) and Tenant shall attorn to the transferee. No rights to any view or to light or air over any property are granted to Tenant hereunder. The expiration or termination hereof shall not relieve either party of any obligation that accrued before, or continues to accrue after, such expiration or termination. Concurrently with the execution and delivery of this Lease, Tenant shall provide Landlord with written evidence satisfactory to Landlord that the individuals executing this Lease on behalf of Tenant are authorized to execute this Lease and bind Tenant.

-32-

26.    **RIGHTS RESERVED TO LANDLORD.**  Notwithstanding any contrary provision hereof, provided that the same does not unreasonably interfere with Tenant's use of the Premises or the Parking Areas, Landlord may, without liability to Tenant, (a) make repairs or alterations to the Project, and in doing so transport any required material through the Premises, close entrances, doors, corridors, elevators and other facilities in the Project, open any ceiling in the Premises, and temporarily suspend services or use of Exterior Areas, all during normal business hours (provided, however, that, upon Tenant's request, Landlord, to the extent reasonably practicable, shall perform such work after normal business hours if Tenant pays all resulting overtime and other incremental expense increases resulting therefrom); (b) install, use and maintain through the Premises, pipes, conduits, wires and ducts serving the Premises and/or Project; (c) install, operate, maintain and repair any satellite dish, antennae, equipment, or other facility on the roof of the Building or use the roof in any other manner, and permit any entity selected by Landlord to undertake the foregoing; and (d) take any other action that Landlord deems reasonable in connection with the operation, maintenance or preservation of the Building or the Project.  In addition, Landlord reserves all rights not expressly granted to Tenant hereunder.

27.    **SIGNAGE.**

27.1    **Signage Rights.**  Tenant shall not, without Landlord's prior approval, place on any portion of the Premises any sign, placard, lettering, banner, display, graphic, decor or other advertising or communicative material that is visible from outside the Building; provided, however, that subject to this Section 27, Tenant, at its expense, may install the following signage which shall identify LETV and, to the extent permitted below, a Permitted Signage Transferee (collectively, "**Signage**"): (i) one (1) sign identifying "LETV" on both sides of the monument sign for the Premises, and (ii) one (1) sign identifying "LETV" on the exterior of the Building.  The graphics, materials, size, color, design, lettering, lighting (if any), specifications, manner and method of installation and exact location of the Signage (collectively, the "**Signage Specifications**") shall be subject to Landlord's approval, which shall not be unreasonably withheld provided that the same are consistent with Landlord's signage standards in effect at the time ("**Signage Criteria**").  In addition, the Signage and Signage Specifications shall be subject to Tenant's receipt of all required governmental permits and approvals, and shall be subject to all applicable Laws and the Signage Criteria.  Tenant hereby acknowledges that, notwithstanding Landlord's approval of the Signage and/or Signage Specifications, Landlord has made no representation or warranty to Tenant that Tenant will be able to obtain such approvals and permits.  Tenant shall pay all costs associated with the Signage, including costs of design, construction, permitting, installation, maintenance, repair and removal.  Tenant shall maintain the Signage in good condition and repair during the Term.  Before the expiration or earlier termination hereof, Tenant shall remove the Signage and repair any damage to the Building and/or Project (including any fading or discoloration) caused by the Signage or its removal.

27.2    **Rights Personal to Tenant; Occupancy Requirement.**  Tenant's rights under Section 27.1 are personal to, and may be exercised only by, LETV and not by any assignee, subtenant, licensee or other transferee of LETV's interest in this Lease; provided, however, that such rights may be transferred to an entity to which this Lease is assigned pursuant to a Permitted Transfer effectuated in accordance with the express terms and conditions of Section 14.8 above, and exercised by any such assignee (a "**Permitted Signage Transferee**") so long as such assignee (a) occupies 100% of the Premises; and (b) does not have a name or logo that (i) in Landlord's reasonable judgment (taking into consideration the level and visibility of the Signage), is inconsistent with the first-class character, reputation and quality of the Project or would otherwise reasonably offend a landlord of a building comparable to the Project, or (ii) conflicts with any contractual or legal obligation of Landlord.  Notwithstanding any contrary provision hereof, if at any time the entirety of the Premises is not occupied, as applicable, by LETV or a Permitted Signage Transferee, then Tenant's (and any Permitted Signage Transferee's) rights under Section 27.1 shall terminate and Tenant shall remove the Signage in accordance with Section 27.1.

28.    **HAZARDOUS MATERIALS AND MOLD.**

28.1    **Hazardous Materials.**

4814-8820-0107v2
HAL\22817007

28.1.1   <u>Definitions</u>. As used herein, the following terms shall have the following meanings:

(a)    "**Hazardous Material**" means any material or substance that is now or hereafter defined or regulated by any Law or governmental authority thereunder as radioactive, toxic, hazardous, or waste, or a chemical known to the State of California to cause cancer or reproductive toxicity, including (i) petroleum and any of its constituents or byproducts, (ii) radioactive materials, (iii) asbestos in any form or condition, and (iv) substances or materials regulated by any of the following, as amended from time to time, and any rules promulgated thereunder: the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. §§9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§6901, et seq.; the Toxic Substances Control Act, 15 U.S.C. §§2601, et seq.; the Clean Water Act, 33 U.S.C. §§1251 et seq.; the Clean Air Act, 42 U.S.C. §§7401 et seq.; The California Health and Safety Code; The California Water Code; The California Labor Code; The California Public Resources Code; or The California Fish and Game Code.

(b)    Tenant shall be deemed to "**Use**" a quantity of Hazardous Material if any Tenant Party brings upon, produces, treats, stores, handles, discharges, disposes of, or otherwise uses such quantity of such Hazardous Material in or about the Premises or Project.

(c)    "**Disclosure Certificate**" means a Hazardous Materials Disclosure Certificate substantially in the format of <u>Exhibit G</u>.

28.1.2   <u>Use of Hazardous Materials</u>.  Tenant shall not Use any quantity of any Hazardous Material (other than quantities and types of office and janitorial supplies typically associated with general office use) unless (a) such Use is described in the most recent Disclosure Certificate provided by Tenant to Landlord, and (b) Landlord has approved such Use.  Landlord shall provide Tenant with notice approving or disapproving of any proposed Use of any quantity of any Hazardous Material within 30 days after receiving a Disclosure Certificate describing such proposed Use (provided that Tenant does not submit a new Disclosure Certificate to Landlord more frequently than once per calendar year).  Landlord may withhold or condition such approval in its sole and absolute discretion.  If the Disclosure Certificate attached as <u>Exhibit G</u> (which is hereby provided by Tenant to Landlord) describes one or more specific Use(s) of one or more specific quantities of one or more specific Hazardous Materials, Landlord hereby approves such Use(s) for purposes of this <u>Section 28.1.2</u>.

28.1.3   <u>Compliance with Law; Indemnification</u>.  Without limiting its obligations, Tenant, at its expense, shall (a) cause any Use of Hazardous Materials by Tenant to comply with Law, including by obtaining and complying with all governmental permits necessary for such compliance; and (b) indemnify, defend and hold the Landlord Parties harmless from and against any Claims (including diminution in value of the Premises or Project, damages for the loss or restriction on use of leasable space or of any amenity of the Premises or Project, damages arising from any adverse impact on marketing of space in the Project, Remedial Work (defined below), and amounts paid in settlement of Claims) arising from any such Use.

28.1.4   <u>Inspection</u>.  Landlord, at its option, may, at any time (but not more than once in any calendar year unless Landlord has Reasonable Cause (defined below)), enter the Premises and perform such inspections, tests and investigations as may be reasonably necessary to determine whether Tenant is in compliance with the provisions of this <u>Section 28.1</u> (a "**Compliance Inspection**"); provided, however, that Landlord shall not conduct a Compliance Inspection more frequently than once in any calendar year unless Landlord has Reasonable Cause (defined below)).  Tenant shall reimburse to Landlord the costs of any Compliance Inspection within 30 days after Landlord's demand; provided, however, that Landlord shall pay such costs if (a) Landlord does not have Reasonable Cause for such Compliance Inspection, and (b) the most recent Disclosure Certificate provided by Tenant pursuant to <u>Section 28.1.2</u> states that Tenant's current and proposed future Uses of Hazardous Materials are limited to de minimis amounts of Hazardous Materials customarily used in office buildings.  For purposes hereof, Landlord shall be deemed to have "**Reasonable Cause**" for a Compliance Inspection if and only if (x) Landlord has

-34-

reasonable cause to believe that Tenant has breached any provision of this Section 28.1, or (y) such Compliance Inspection is required by any governmental agency.

28.1.5   Landlord Notification.  Tenant shall promptly provide Landlord with complete copies of all documents, correspondence and other written materials submitted or received by or on behalf of Tenant concerning environmental issues at the Premises or the Project, including any written material relating to any actual or potential release, discharge, spill, investigation, compliance, cleanup or abatement of Hazardous Materials or any actual or potential cause of action, claim or legal proceeding relating thereto.  Tenant shall use commercially reasonable efforts, within 24 hours after discovering any unauthorized release, spill or discharge of Hazardous Materials in, on, or about the Premises or Project, to provide notice to Landlord fully describing such event.  Without limiting the foregoing, Tenant, within 24 hours of receiving any warning, notice of violation, permit suspension or similar disciplinary measure relating to Tenant's actual or alleged failure to comply with any Law or permit relating to Hazardous Materials, shall provide notice to Landlord of the same.

28.1.6   Remedial Work.  If any investigation or monitoring of site conditions or any clean-up, containment, restoration, removal or remediation of Hazardous Materials at or about the Premises or Project (collectively, "Remedial Work") is required by Law (or is otherwise necessary to render the Premises suitable for unrestricted use) as a result of any Use of Hazardous Materials by any Tenant Party, then Tenant, at Landlord's option, shall either perform such Remedial Work at Tenant's cost or pay Landlord, within 30 days after demand, the cost of performing such Remedial Work.  All Remedial Work performed by Tenant shall be performed in compliance with applicable Laws, by contractors approved by Landlord, under the supervision of a consulting engineer approved by Landlord, and otherwise in accordance with Section 7.3.  Tenant shall reimburse Landlord, within 30 days after demand, Landlord's reasonable attorneys' and experts' fees and costs incurred in connection with monitoring or reviewing any Remedial Work.

28.2     Mold.  Because mold spores are present essentially everywhere and mold can grow in almost any moist location, Tenant acknowledges the necessity of adopting and enforcing good housekeeping practices, ventilation and vigilant moisture control within the Premises (particularly in kitchen areas, janitorial closets, bathrooms, in and around water fountains and other plumbing facilities and fixtures, break rooms, in and around outside walls, and in and around HVAC systems and associated drains) for the prevention of mold (such measures, "Mold Prevention Practices").  Without limiting its obligations, Tenant, at its expense, shall keep and maintain the Premises in good order and condition in accordance with the Mold Prevention Practices and acknowledges that the control of moisture, and prevention of mold within the Premises, are integral to its obligations under this Lease.  Without limiting the foregoing, Tenant shall promptly notify Landlord if it observes, suspects, has reason to believe that any Mold Conditions (as defined below) exist at the Premises, or if Tenant receives any notice from a governmental agency of complaints regarding the indoor air quality at the Premises.  As used herein, "Mold Conditions" mean, collectively, the presence of mold or any other conditions at the Premises that reasonably could be expected to cause or result from mold or fungus, including observed or suspected instances of water damage, condensation, seepage, leaks or any other water penetration (from any source, internal or external), mold growth, mildew, repeated complaints of respiratory ailments or eye irritation by Tenant's employees or any other occupants of the Premises.

28.3     Surrender.  At the expiration or earlier termination hereof, Tenant, without limiting its obligations, shall surrender the Premises to Landlord free of (a) any Hazardous Materials, placed or exacerbated in, about or near the Premises by any Tenant Party, and (b) any Mold Condition caused or exacerbated by any Tenant Party.

## 29.   INTENTIONALLY OMITTED

## 30.   ROOF TOP EQUIPMENT

4814-8820-0107v2
HAL\22817007

**30.1    Right to Use.**  Subject to Verizon's rights under the Verizon Lease, upon no less than thirty (30) days prior written notice, Tenant shall have the right to use such portion(s) of the roof of the Building (any such portion(s) of the roof being the "Roof Space") as may be reasonably necessary from time to time to install, operate and maintain (provided, however, that the purchase, installation, operation and maintenance thereof shall be at Tenant's sole cost and expense) customary equipment, such as satellite dishes and telecommunications equipment, and any other equipment related thereto (such equipment being collectively referred to herein as the "**Roof Space Equipment**"). Tenant shall provide Landlord with schematics for the Roof Space Equipment Tenant desires to install in the Roof Space showing the size, height and space requirements for the Roof Space Equipment. Thereafter, Landlord and Tenant shall mutually agree upon the location of the Roof Space based on available locations that will accommodate the Roof Space Equipment without interference with equipment then used by Verizon as of the date of installation by Tenant of its Roof Space Equipment. Tenant acknowledges and agrees that Landlord leases other portions of the Building roof to Verizon and that Tenant's use of the Building roof for the Roof Space Equipment shall be in common with Verizon.

**30.2    Installation; Relocation.**  The installation of any Roof Space Equipment shall be treated as an Alteration subject to all of the terms and conditions of Section 7.2 of this Lease.  Without limiting the generality of the foregoing, the size, height and placement of all Roof Space Equipment shall be subject to Landlord's reasonable review and approval and Tenant shall, at Tenant's sole cost and expense, screen and/or cover all Roof Space Equipment as reasonably directed by Landlord.  In no event shall Tenant penetrate the roof during the installation, maintenance, repair or removal of the Roof Space Equipment.  Tenant shall, at Tenant's sole cost and expense, install, construct, maintain, use, repair and remove Tenant's Roof Space Equipment in compliance with all laws, statutes, permit requirements, building codes, ordinances and governmental rules and regulations now in force or which may hereafter be enacted or promulgated.  Tenant's installation, construction, use, maintenance, repair and removal of Roof Space Equipment in the Roof Space shall not obstruct, impair or interfere with the rights of Verizon under the Verizon Lease.  If Landlord requires access to the portion of the roof within the Roof Space for maintenance and repair, Landlord shall give Tenant written notice of such requirement and the dates on which Landlord proposes to perform such maintenance and repair.  Prior to the date specified in Landlord's notice, Tenant shall, at Tenant's sole cost and expense, take all actions necessary to remove the Roof Space Equipment from the Roof Space and make the Roof Space available to Landlord for roof maintenance and repair.  Upon completion of the roof maintenance and repair, Tenant shall reinstall the Roof Space Equipment at its sole cost and expense.  If emergency roof repairs are necessary, Landlord may itself remove the Roof Space Equipment from the affected area, after first using reasonable efforts to notify Tenant, and Landlord shall not be liable to Tenant for any loss, cost, damage or expense arising from such removal during an emergency.  In connection with the installation by Tenant of the Roof Space Equipment, Landlord shall grant Tenant access to and use of the Building risers, to the extent reasonably necessary.

**30.3    Landlord Approval Right.**  Any contractor or person selected by Tenant to perform any work contemplated for the installation, maintenance, repair or removal of the Roof Space Equipment and all plans and specifications for such work shall first be reasonably approved by Landlord in writing.  In order to allow Landlord time to post a notice of non-responsibility, no such work by or on behalf of Tenant shall be allowed to commence until ten (10) business days following receipt by Landlord of written notice of the date Tenant proposes to commence the installation, maintenance, repair or removal of the applicable Roof Space Equipment.

**30.4    Removal.**  Upon the expiration or earlier termination of this Lease, Tenant shall promptly remove all Roof Space Equipment, all anchors, and all separate meters and cabling and repair any damage to the roof of the Building and other areas of the Project caused by such removal and return the Roof Space to Landlord in the same condition as received, ordinary wear and tear and events of casualty excepted.

**30.5    Indemnity.**  Tenant shall indemnify, defend and hold Landlord, its partners, members, officers, directors, employees, agents and contractors and Landlord's property and all tenants, occupants, invitees and licensees of Landlord harmless from and against all liabilities, claims, actions, causes of action, losses, damages,

-36-

injuries, liens, costs and expenses, including attorneys' fees and costs of suit, arising out of or relating to the installation, construction, presence, use, maintenance, repair, or removal of Roof Space Equipment; provided, however, that the foregoing agreement to indemnify, defend and hold harmless shall not extend to claims not covered by Tenant's insurance to the extent arising from the gross negligence or willful misconduct of Landlord. Such obligations of Tenant under this Article 30 shall survive the expiration or earlier termination of this Lease.

30.6    **Assumption of Risk.** Tenant acknowledges that Landlord has no obligation to protect, secure, install, construct, maintain, repair or remove any Roof Space Equipment, and Tenant hereby assumes all risk of loss or damage to or from the Roof Space Equipment from any cause. Tenant hereby waives all claims against Landlord and its partners, officers, directors, employees, agents and contractors with respect to such loss or damage.

30.7    **Permits.** Tenant shall obtain all necessary municipal, state and federal permits and authorizations required to install, maintain and operate the Roof Space Equipment and pay any charges levied by governmental agencies which are the result of Tenant having the Roof Space Equipment.

31.    OPTION TO PURCHASE.

31.1    **Grant of Purchase Option.** In consideration of the terms and conditions of this Lease, and other valuable consideration the receipt and sufficiency of which is hereby acknowledged, Landlord hereby grants Tenant the right ("**Purchase Option**") to purchase the Project for the amount of Thirty-six Million Six Hundred Seventy-seven Thousand Eight Hundred Ninety Dollars ($36,677,890.00) ("**Purchase Price**"), subject to the terms and conditions of this Article 31 below. Landlord and Tenant hereby agree and acknowledge that Tenant shall be entitled to record a memorandum of lease, in the form and content attached hereto as Exhibit H ("**Memorandum of Lease**"), and only such Memorandum of Lease, in the Official Records of Santa Clara County for the sole purpose of acknowledging the existence of this Lease and the Purchase Option.

31.2    **Exercise of Purchase Option.** So long as no Default on the part of Tenant shall have occurred under this Lease, Tenant may exercise the Purchase Option by delivering, on or before October 31, 2016, both (i) to Landlord, an unconditional, unequivocal and binding written notice to Landlord exercising the Purchase Option (such notice being the "**Purchase Option Notice**") and (ii) with Chicago Title – Santa Clara County (the "**Escrow Holder**"), in good funds, the amount of One Million Dollars ($1,000,000.00) ("**Deposit**"), the time of such exercise (and delivery of the Deposit) being of the essence. If Tenant fails to timely give the Purchase Option Notice (together with the concurrent delivery of the Deposit) in strict compliance with the immediately preceding sentence, Tenant shall be conclusively deemed to have waived the Purchase Option, and the terms and conditions of this Article 31 shall be deemed null and void *ab initio*. Tenant shall have no right to purchase the Project, except as expressly provided in this Article 31.

31.2.1    **Pre-Exercise Inspection Rights.** On or before July 31, 2016, upon prior written notice to Landlord (as set forth below), subject to any reasonable requirements imposed by Landlord in connection therewith due to the scope and/or complexity thereof (including, without limitation, accompaniment by a Landlord representative, commercially reasonable insurance and/or bonding requirements), Tenant and its representatives shall, at Tenant's sole cost and expense, be permitted to examine, inspect and investigate the Project (collectively, the "**Pre-Exercise Inspections**"), including, but not limited to, to the extent in Landlord's control or possession, any and all reasonably-requested, non-proprietary books, records and other information relating to the Project (collectively, the "**Project Information**"). Tenant shall maintain as confidential the Project Information and any and all materials and/or other information obtained about the Project, and shall not disclose any Project Information to any third party; provided, however, that Tenant shall have the right to disclose Project Information to prospective lenders and involved third parties who require information to assist Tenant in Tenant's due diligence investigations of the Project, provided that Tenant shall require such prospective lenders and involved third parties to maintain the confidentiality of any and all such Project Information. If Tenant does not exercise the Purchase Option, and/or,

-37-

following any such exercise, escrow fails to close for any reason, any and all Project Information shall be promptly returned to Landlord.  Tenant shall have the right to conduct any Pre-Exercise Inspections, so long as, in each such instance, Tenant notifies Landlord in writing or via e-mail of its intent, and the scope of the examination, inspection and/or investigation in question, not less than three (3) business days prior to the occurrence of the same.  Tenant shall have the right to conduct, at its sole cost and expense, any inspections, studies or tests that Tenant deems appropriate in determining the condition of the Project; provided, however, Tenant shall not perform any sampling, boring drilling or other physically intrusive and/or invasive testing into the structures, ground, improvements and/or any other elements of the Project, including, without limitation, any so-called Phase II environmental assessment, without the prior written consent of Landlord (which consent shall not be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing, Tenant shall have the right to conduct a non-intrusive, non-invasive Phase I environmental assessment without obtaining Landlord's prior consent, provided that such Phase I shall not include any sampling, boring, drilling or other physically intrusive and/or invasive testing into the structures, ground, improvements and/or any other elements of the Project.   The persons or entities performing the Pre-Exercise Inspections shall be properly licensed and qualified and shall have obtained any and all appropriate permits for performing relevant tests and shall have delivered such permits to Landlord, prior to performing any such tests.  Each Pre-Exercise Inspection, and the results thereof, shall be deemed Project Information, and remain confidential, and Tenant shall furnish to Landlord, promptly following the receipt thereof, all third-party reports, studies and assessments of the Project or improvements thereon.  Tenant hereby agrees and acknowledges that any and all insurance, exculpation, indemnification, repair, maintenance, replacement, restoration, casualty and other relevant provisions of this Lease shall apply with respect to the Pre-Exercise Inspections.

      31.2.2   Pre-Exercise Title Review.  As soon as reasonably practicable following Landlord's receipt of Tenant's written request therefor, which written request by Tenant shall be delivered to Landlord on or before July 31, 2016, Landlord shall deliver to Tenant a preliminary title report relating to the Project issued by First American Title Insurance Company, along with a copy of each instrument listed as an exception therein (the "Title Report").  In addition, Tenant shall have the right, in Tenant's sole and absolute discretion, to engage a licensed surveyor to perform an ALTA survey (the "Survey") of the Project.  Landlord shall pay the charge for the Title Report.  If Tenant, in its sole and absolute discretion, objects to (A) if applicable, the Survey or (B) any of the exceptions shown in the Title Report or any other matter affecting title to the Project, Tenant shall provide Landlord with a written notice of such objections (the "Objection Letter"), which notice shall contain a reasonably detailed explanation of such objections, on or before the date that is sixty (60) days after Tenant's receipt of the Title Report.  If Tenant does not deliver an Objection Letter on or before the date that is sixty (60) days after Tenant's receipt of the Title Report, Tenant shall be deemed to have accepted all of the exceptions contained in the Title Report (other than any Monetary Encumbrances (as defined in Section 4.1 of the Purchase Agreement described in Section 31.3 below)), the form and substance of any Survey, and all matters shown thereon.  In the event any such objections are timely made by Tenant, Landlord shall have the right, but not the obligation, exercisable by delivery of a written notice to Tenant (any such notice being the "Landlord's Response Notice"), within five (5) business days after Landlord's receipt of Tenant's Objection Letter (the "Landlord's Response Period") to notify Tenant of Landlord's election to cure (by removal, endorsement (in form reasonably satisfactory to Tenant) or otherwise in a manner reasonably satisfactory to Tenant), if Tenant duly exercises the Purchase Option, any such objections, in the manner specified in the Landlord's Response Notice, on or before the Closing Date specified in Section 9.2 of the Purchase Agreement.  Without limiting the manner(s) in which Landlord may reasonably cure any such exception to which Tenant shall have objected pursuant to an Objection Letter, the procurement by Landlord of a commitment for the issuance of a title policy (or endorsement thereto) by the Title Company, insuring Tenant against the exception or other matter, shall be deemed to be a cure of such exception or matter as long as the Title Company agrees to delete such exception or affirmatively insure over such exception by endorsement in a form reasonably satisfactory to Tenant.  Landlord's failure to deliver a Landlord's Response Notice within the Landlord's Response Period shall be conclusively deemed to be Landlord's election to not cure and/or remove any such exceptions or other matters affecting title (other than Monetary Encumbrances).  If there are objections timely made by Tenant that Landlord elects (or is deemed to have elected) not to cure and/or remove, then, notwithstanding anything to the contrary contained in this Lease and/or the Purchase Agreement, Tenant's delivery of a Purchase Option Notice and the Deposit shall be conclusively deemed

-38-

to be Tenant's unconditional agreement to accept title to the Project subject to all exceptions to title set forth in the Title Report as of the date of such delivery, and any and all other Approved Exceptions (as defined in the Purchase Agreement) as of the date of such delivery, as applicable, other than Monetary Encumbrances, and all matters shown on any Survey, as applicable.

If (1) Tenant duly exercises the Purchase Option in accordance with the terms and conditions of this Article 31, and (2) any title exceptions set forth in Tenant's Objection Letter which Landlord shall have expressly agreed to cure in a Landlord's Response Notice are not so cured as of the Closing Date (or arrangements for such cure to be effective as of the Closing Date are not made) by Landlord in the manner provided in Landlord's Response Notice, then Tenant may, as its sole and exclusive remedy, elect to either: (A) waive such objection(s) and consummate the transaction contemplated by the Purchase Agreement without adjustment to the Purchase Price or (B) terminate the Purchase Agreement, in which case (x) all rights, obligations and liabilities of Landlord and Tenant under the Purchase Agreement (except any rights, obligations and liabilities that expressly survive the termination of the Purchase Agreement) shall terminate, (y) the Deposit shall be promptly returned to Tenant and (z) this Lease shall remain in full force and effect.

31.2.3    **Pre-Exercise Confirmation of Seller's Representations and Warranties**. Tenant shall have the right to request in writing, at any time before it exercises the Purchase Option, that Landlord either confirm in writing the accuracy of the representations and warranties set forth in Section 10.1 of the Purchase Agreement, or if not accurate, specify the manner in which the representations and warranties are inaccurate by delivery of a proposed schedule of exceptions setting forth specific facts and/or circumstances that qualify or limit the representations set forth in Section 10.1 of the Purchase Agreement (the "**Schedule of Exceptions**"). Landlord shall notify Tenant of such confirmation and/or any required disclosures, if any, to be included in the Schedule of Exceptions, within five (5) business days after Landlord's receipt of Tenant's written request.

31.3    **Purchase Agreement**. If the Purchase Option is duly exercised in accordance with the terms and conditions of this Article 31 above, then (A) within two (2) business days after such exercise, Landlord shall deliver to Tenant the Agreement of Purchase and Sale attached hereto as Exhibit I ("**Purchase Agreement**") with the blanks contained in such Exhibit I completed to reflect the specific closing date (and other dates) which are applicable after taking into account the date of Tenant's exercise of the Purchase Option, and Landlord and Tenant's execution and delivery of such Purchase Agreement and (B) within three (3) business days thereafter, Landlord and Tenant shall duly execute and deliver to each other fully-executed counterpart originals of the Purchase Agreement. If Tenant fails to duly execute and deliver the Purchase Agreement within two (2) business days after Tenant's receipt of written notice from Landlord of Tenant's failure to strictly comply with the first sentence of this Section 31.3, Tenant shall be conclusively deemed to have waived the Purchase Option, and the terms and conditions of this Article 31 shall be deemed null and void *ab initio*. If Landlord fails to duly execute and deliver the Purchase Agreement within two (2) business days after Landlord's receipt of written notice from Tenant of Landlord's failure to strictly comply with the first sentence of this Section 31.3, Tenant may pursue one of the following remedies, each of which shall be Tenant's sole and exclusive remedy:

(i)    Enforce specific performance of Landlord's obligation to duly execute and deliver the Purchase Agreement, in which case this Lease shall remain in full force and effect in accordance with the terms and conditions hereof, and Tenant shall have no claim for damages or any other remedy against Landlord; provided, however, if Tenant fails to file suit for specific performance against Landlord in a court having jurisdiction in Santa Clara County on or before the date thirty (30) days following the date upon which Landlord was to have delivered the executed Purchase Agreement (time being of the essence), then Tenant shall be deemed to have waived its right to seek such specific performance.

(ii)    Terminate the Purchase Option (and withdraw its signature to the Purchase Agreement) by written notice delivered to Landlord within thirty (30) days following the date upon which Landlord was to have delivered the executed Purchase Agreement (time being of the essence), and, in the event of such termination, (A)

-39-

Tenant shall be entitled to the prompt return of the Deposit and to receive an amount equal to all actual and documented out-of-pocket costs incurred by Tenant in connection with Tenant's due diligence inspections with respect to the Property prior to duly exercising the Purchase Option (including, without limitation, attorneys' fees, costs incurred in connection with obtaining third-party reports and studies and any other out-of-pocket costs actually incurred in connection with Tenant's Pre-Exercise Inspections and title review pursuant to Section 31.2 above), (B) the terms and conditions of this Article 31 shall be deemed null and void *ab initio* and (C) this Lease shall remain in full force and effect.

31.4    **Personal Rights; No Default.**  Tenant's right to exercise the Purchase Option is personal to, and may be exercised only by LETV (i.e., concurrently by both Le Technology and Le Holdings (Beijing)), it being the intent of the parties that no assignee or subtenant shall have any right to exercise the Purchase Option granted herein; provided, however, that the Purchase Option may be exercised by (i) Le Technology (individually), (ii) Le Holdings (Beijing) (individually) or (iii) any Permitted Assignee.  In addition, if a Default on the part of Tenant shall have occurred under this Lease (as the same may have been amended), or if a default in the performance or observance of the obligations on the part of the Tenant to be performed or observed under this Lease shall exist at the time it exercises the Purchase Option or at any time thereafter, Landlord shall have, in addition to all of its other rights and remedies under this Lease, the right (but not the obligation), in Landlord's sole and absolute discretion, to terminate the Purchase Agreement, and to unilaterally revoke and nullify Tenant's exercise of the Purchase Option, in which case this Lease shall remain in full force and effect, and expire on the expiration of the Initial Term, unless earlier terminated pursuant to the terms hereof, and Tenant shall have no further rights under this Lease to purchase the Project.

31.5    **Effect of Exercise; No Termination of Lease.**    Landlord and Tenant hereby agree and acknowledge that, notwithstanding (x) Tenant's exercise of the Purchase Option, (y) Landlord's and Tenant's mutual execution and delivery of the Purchase Agreement and/or (z) anything to the contrary contained in this Lease, the Purchase Agreement and/or applicable law, it is the intent of the parties that this Lease (as the same may have been amended), and Landlord's and Tenant's respective rights and obligations hereunder (including, without limitation, Tenant's obligation to pay Base Rent and Additional Rent), shall remain in full force and effect, and shall in no event terminate, unless and until the Project is conveyed to Tenant pursuant to, and in accordance with, the terms and conditions of the Purchase Agreement, as evidenced by the recordation of a grant deed.

(SIGNATURES ARE ON THE FOLLOWING PAGE)

4814-8820-0107v2
HAL\22817007

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed the day and date first above written.

LANDLORD:

BSREP RIO ROBLES LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

TENANT:

LE TECHNOLOGY, INC.,
a California corporation

By: _____
Name: _____
Title: _____
        [chairman] [president] [vice-president]

By: _____
Name: _____
Title: _____
        [secretary] [assistant secretary] [chief
        financial office] [assistant treasurer]

LE HOLDINGS (BEIJING) CO., LTD.,
a company organized under the laws of the People's Republic
of China

By: _____
Name: _____
Title: _____
        [chairman] [president] [vice-president]

By: _____
Name: _____
Title: _____
        [secretary] [assistant secretary] [chief
        financial office] [assistant treasurer]

-41-

4814-8820-0107v2
HAL\22817007

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed the day and date first above written.

LANDLORD:

**BSREP RIO ROBLES LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

TENANT:

**LE TECHNOLOGY, INC.,**
a California corporation

By: _Chaoying Deng_
    Chaoying Deng (Dec 11, 2015)

Name:    Chaoying Deng

Title:    Chief Executive Officer

**LE HOLDINGS (BEIJING) CO., LTD.,**
a company organized under the laws of the People's Republic of China

By: _Dongge Jiang_
    Dongge Jiang (Dec 17, 2015)

Name:    Dongge Jiang

Title:    Director, Overseas Operations

**EXHIBIT A-1**
**3553 NORTH FIRST STREET, SAN JOSE, CA**
**OUTLINE OF PREMISES**

See Attached

A-1



RIO ROBLES AVENUE

NORTH FIRST STREET

**EXHIBIT A-2
LEGAL DESCRIPTION OF LAND**

See Attached

#894-4829734590Gv8
HAL\22817007

## LEGAL DESCRIPTION OF LAND

That certain real property in the City of San Jose, County of Santa Clara, State of California, described as follows:

PARCEL ONE:

ALL OF PARCEL A, AS SHOWN ON THAT CERTAIN PARCEL MAP, BEING A RESUBDIVISION OF LOTS 1, 2 AND 4 OF TRACT 7408, WHICH PARCEL MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA ON MAY 27, 1983 IN BOOK 513 OF MAPS, PAGES 24 AND 25.

PARCEL TWO:

A 10 FOOT PRIVATE STORM DRAIN EASEMENT OVER PARCEL B OF THE ABOVE REFERRED TO PARCEL MAP, LYING ADJACENT TO AND SOUTHWESTERLY OF THE SOUTHWESTERLY LINE OF THAT CERTAIN 20 FOOT LANDSCAPE EASEMENT, AS ESTABLISHED BY INSTRUMENT RECORDED IN BOOK G330, PAGE 504 OF OFFICIAL RECORDS, AND EXTENDING FROM THE NORTHWESTERLY LINE OF PARCEL A, TO THE SOUTHEASTERLY LINE OF THAT CERTAIN PUBLIC SERVICE EASEMENT, AS ESTABLISHED BY INSTRUMENT RECORDED IN BOOK H156, PAGE 275, SERIAL #7522745, OFFICIAL RECORDS, AND BEING ALSO SHOWN ON THE PARCEL MAP FIRSTLY ABOVE REFERRED TO.

APN: 097-55-012

EXHIBIT B

3553 NORTH FIRST STREET, SAN JOSE, CA

WORK LETTER

As used in this **Exhibit B** ("Work Letter"), the following terms shall have the following meanings: "Agreement" means the Office Lease to which this Work Letter is attached. "Tenant Improvements" means all improvements to be constructed in the Building pursuant to this Work Letter. "Tenant Improvement Work" means the construction of the Tenant Improvements, together with any related work (including demolition) that is necessary to construct the Tenant Improvements.

1    ALLOWANCE.

1.1    Allowance. Tenant shall be entitled to a one-time tenant improvement allowance in the amount of One Million Seven Hundred Twenty-two Thousand Nine Hundred Dollars ($1,722,900.00) (i.e., $20.00/rsf x 86,145 rsf = $1,722,900.00) ("Allowance") to be applied toward the Allowance Items (defined in Section 1.2 below). Tenant shall be responsible for all costs associated with the Tenant Improvement Work, including the costs of the Allowance Items, to the extent such costs exceed the lesser of (a) the Allowance, or (b) the aggregate amount that Landlord is required to disburse for such purpose pursuant to this Work Letter. Notwithstanding any contrary provision of the Agreement, if Tenant fails to use the entire Allowance within twelve (12) months following the Delivery Date, any unused amounts shall revert to Landlord, and Tenant shall have no further rights with respect thereto.

1.2    Disbursement of Allowance.

1.2.1    Allowance Items. Except as otherwise provided in this Work Letter, the Allowance shall be disbursed by Landlord only for the following items (the "Allowance Items"): (a) the fees of the Architect (defined in Section 2.1 below) and the Engineers (defined in Section 2.1 below), and any fees incurred by Landlord for review of the Plans (defined in Section 2.1 below) by Landlord's third party consultants; (b) plan-check, permit and license fees relating to performance of the Tenant Improvement Work; (c) the cost of performing, installing or constructing the Tenant Improvement Work, including the cost of procuring the materials used to perform, install or construct the Tenant Improvements, after hours charges, testing and inspection costs, hoisting and trash removal costs, and contractors' fees and general conditions; (d) the cost of any change to the base, shell or core of the Building required by the Plans (including if such change is due to the fact that such work is prepared on an unoccupied basis), including all direct architectural and/or engineering fees and expenses incurred in connection therewith; (e) the cost of any change to the Plans or Tenant Improvement Work required by Law; (f) sales and use taxes; (g) any out-of-pocket costs expended by Landlord in connection with the performance of the Tenant Improvement Work; and (h) the fees and costs associated with Landlord's construction manager.

1.2.2    Disbursement. Subject to the provisions of this Work Letter, following the completion of the Tenant Improvement Work, and Tenant's payment of the Final Costs (as defined in Section 3.2.1 below), Landlord shall make one (1) disbursement of the Allowance to reimburse Tenant for Allowance Items. Landlord shall authorize the release of such reimbursement amount, for Tenant's benefit, subject to the following terms and conditions. As soon as reasonably practicable after the completion of the Tenant Improvement Work, Tenant shall deliver to Landlord: (i) a request for payment, in AIA G-702/G-703 format, or another format reasonably acceptable to Landlord, showing the schedule of values, by trade, and detailing the completion of the Tenant Improvement Work; (ii) invoices from all of Tenant's Agents (defined in Section 3.1.2 below) for labor rendered and materials delivered to the Building; and (iii) executed unconditional mechanics' lien releases from all of Tenant's Agents which shall comply with the appropriate provisions, as reasonably determined by Landlord, of California Civil Code Section 8138. Tenant's request for payment shall be deemed Tenant's acceptance and approval of the work furnished and/or the

B-1

materials supplied as set forth in Tenant's payment request. Thereafter, Landlord shall deliver a check to Tenant in the amount of the lesser of (a) the amount requested by Tenant pursuant to the preceding sentence, or (b) the amount of the Allowance, provided that Landlord does not dispute such request for payment based on any failure of the work to comply with the Approved Construction Drawings (defined in Section 2.4 below), or otherwise to be of the required quality, or for any other reason. Landlord's payment of such amount shall not be deemed Landlord's approval or acceptance of the work furnished or materials supplied as described in Tenant's payment request.

Notwithstanding the foregoing, or anything else to the contrary contained in this Work Letter, Landlord shall in no event be obligated to disburse the Allowance, unless and until all of the following shall have occurred (a) the completion of the Tenant Improvement Work; (b) Tenant's delivery to Landlord of (i) properly executed mechanic's lien releases in compliance with California Civil Code Section 8138, as contemplated in the immediately preceding grammatical paragraph above, (ii) a certificate from the Architect, in a form reasonably acceptable to Landlord, certifying that the Tenant Improvement Work has been substantially completed, and (iii) evidence that all required governmental approvals required for Tenant to legally occupy the Building have been obtained; (c) Tenant's performance of its obligations under clause (i) of the third sentence of Section 3.3 below; and (d) Tenant's compliance with Landlord's standard "close-out" requirements regarding city approvals, closeout tasks, the general contractor, financial close-out matters, and tenant vendors. Notwithstanding anything to the contrary contained in the Agreement and/or this Work Letter, Landlord shall in no event be obligated to disburse the Allowance (and/or any portion thereof) (A) at any time that a default by Tenant exists under the Agreement and/or this Work Letter and/or (B) unless and until the Final Costs have been paid in full by Tenant.

## 2    PLANS.

2.1    <u>Selection of Architect/Plans</u>. Tenant shall retain an architect/space planner (the "Architect") and engineering consultants (the "Engineers") (provided that such Architect and Engineers shall have first been reasonably approved in writing by Landlord) to prepare all architectural plans for the Building and all engineering working drawings relating to the structural, mechanical, electrical, plumbing, HVAC, life-safety, and sprinkler work in the Building. The plans and drawings to be prepared by the Architect and the Engineers hereunder shall be referred to herein collectively as the "Plans." All Plans shall (a) comply with the drawing format and specifications reasonably required by Landlord, (b) be consistent with Landlord's requirements for avoiding aesthetic, engineering or other conflicts with the design, capacity and function of the Building and Base Building systems/Project Systems, and (c) otherwise be subject to Landlord's approval, which shall not be unreasonably withheld. Tenant shall cause the Architect to verify, in the field, the dimensions and conditions as shown on the relevant portions of the base Building plans, and Landlord shall have no responsibility in connection therewith. Landlord's review of the Plans and approval of the Approved Construction Drawings (defined in Section 2.3 below) shall be for its sole benefit and shall not create or imply any obligation on the part of Landlord to review the same for Tenant's benefit, whether with respect to quality, design, compliance with Law or any other matter. Accordingly, notwithstanding any review of the Plans by Landlord or any of its space planners, architects, engineers or other consultants, and notwithstanding any advice or assistance that may be rendered to Tenant by Landlord or any such consultant, Landlord shall not be liable for any error or omission in the Plans or have any other liability relating thereto. Without limiting the foregoing, Tenant shall be responsible for ensuring (x) that all elements of the design of the Plans comply with Law and are otherwise suitable for Tenant's use of the Building, and (y) that no Tenant Improvement impairs any system or structural component of the Building, and Landlord's approval of the Construction Drawings (defined in Section 2.3 below) shall not relieve Tenant from such responsibility.

2.2    <u>Space Plan</u>. Tenant shall cause the Architect to prepare a space plan for the Tenant Improvement Work, including a layout and designation of all offices, rooms and other partitioning, and equipment to be contained in the Building, together with their intended use (the "Space Plan"), and shall deliver four (4) copies of the Space Plan, signed by Tenant, to Landlord for its approval. Landlord shall provide Tenant with notice approving or reasonably disapproving the Space Plan within five (5) business days after the later of Landlord's receipt thereof or the mutual execution and delivery of the Lease. If Landlord disapproves the Space Plan, Landlord's notice of disapproval shall

B-2

describe with reasonable specificity the basis for such disapproval and the changes that would be necessary to resolve Landlord's objections. If Landlord disapproves the Space Plan, Tenant shall cause the Space Plan to be modified and resubmitted to Landlord for its approval. Such procedure shall be repeated as necessary until Landlord has approved the Space Plan. At Landlord's option, before submitting the Construction Drawings, Tenant shall supply Landlord with intermediate stages of the Plans.

2.3    **Construction Drawings**. After Landlord approves the Space Plan, Tenant shall cause the Architect and the Engineers to complete the architectural, engineering and final architectural working drawings for the Tenant Improvement Work in a form that is sufficient to enable subcontractors to bid on the work and to obtain all applicable permits (collectively, the "**Construction Drawings**"), and shall deliver four (4) copies of the Construction Drawings, signed by Tenant, to Landlord for its approval. Notwithstanding the foregoing, at Tenant's option, the Construction Drawings may be prepared in two phases (first the architectural drawings, then engineering drawings consistent with the previously provided architectural drawings), provided that each phase shall be subject to Landlord's approval. Landlord shall provide Tenant with notice approving or reasonably disapproving the Construction Drawings (or the applicable component thereof) within ten (10) business days after the later of Landlord's receipt thereof or the mutual execution and delivery of the Agreement. If Landlord disapproves the Construction Drawings (or any component thereof), Landlord's notice of disapproval shall describe with reasonable specificity the basis for such disapproval and the changes that would be necessary to resolve Landlord's objections. If Landlord disapproves the Construction Drawings (or any component thereof), Tenant shall cause the Construction Drawings to be modified and resubmitted to Landlord for its approval. Such procedure shall be repeated as necessary until Landlord has approved the Construction Drawings (or the applicable component thereof). Tenant shall not commence the Tenant Improvement Work until after the Construction Drawings are approved by Landlord. No revision may be made to the approved Construction Drawings (the "**Approved Construction Drawings**") without Landlord's prior written consent, which shall not be unreasonably withheld. Unless otherwise expressly specified in the Approved Construction Drawings, the Tenant Improvement Work shall be performed using the then-current Project-standard materials, equipment, fixtures, finishes, colors and specifications, all as determined by Landlord.

2.4    **Permits**. Tenant shall submit the Approved Construction Drawings to the appropriate municipal authorities and otherwise apply for and obtain from such authorities all applicable building permits necessary to allow the Contractor to commence and complete the performance of the Tenant Improvement Work (the "**Permits**"). Tenant shall coordinate with Landlord in order to allow Landlord, at its option, to take part in all phases of the permitting process and shall supply Landlord, as soon as possible, with all plan check numbers and dates of submittal. Notwithstanding any contrary provision of this Section 2.4, Tenant, and not Landlord or its consultants, shall be responsible for obtaining any Permit or certificate of occupancy; provided, however, that Landlord shall cooperate with Tenant in executing permit applications and performing other ministerial acts reasonably necessary to enable Tenant to obtain any Permit or certificate of occupancy. Tenant shall not commence construction until all Permits are obtained.

3    CONSTRUCTION.

3.1    **Selection of Contractors**.

3.1.1    **The Contractor**. Tenant shall retain a general contractor (the "**Contractor**") to perform the Tenant Improvement Work. The Contractor shall be selected by Tenant, by notice to Landlord, from a list of general contractors provided by Landlord or, at Landlord's option, from a list of general contractors provided by Tenant and approved by Landlord. For purposes of this Section 3.1.1, Landlord's approval of a proposed general contractor shall not be considered unreasonably withheld if such general contractor (a) does not have trade references reasonably acceptable to Landlord, (b) does not maintain insurance as required under the terms of the Lease, (c) cannot be bonded for the work in an amount equal to 150% of the Final Costs (defined in Section 3.2.1 below), (d) does not provide current financial statements reasonably acceptable to Landlord, or (e) is not licensed as

B-3

a contractor in the state/municipality in which the Building is located. Tenant acknowledges that the foregoing is not an exclusive list of the reasons why Landlord may reasonably disapprove a proposed general contractor.

**3.1.2    Tenant's Agents.** All subcontractors, laborers, materialmen and suppliers used by Tenant (such subcontractors, laborers, materialmen, and suppliers, together with the Contractor, to be referred to herein collectively as "Tenant's Agents") must be approved by Landlord. Such approval shall not be unreasonably withheld; provided, however, that Landlord may require Tenant to retain certain subcontractors designated by Landlord.

**3.2    Construction.**

**3.2.1    Construction Contract; Final Costs.** Tenant shall not enter into a construction contract with the Contractor ("Contract") unless it complies with Section 3.2.3 below and has been reviewed and approved by Landlord, which approval shall not be unreasonably withheld. Before commencing construction of the Tenant Improvement Work, Tenant shall deliver to Landlord a detailed breakdown of the schedule of values, by trade, of the final costs that will be or have been incurred, as set forth more particularly in Section 1.2 above, in connection with the performance of the Tenant Improvement Work and that form the basis for the amount of the Contract (the "Final Costs"). If the Final Costs exceed the Allowance, then, concurrently with its delivery to Landlord of the Final Costs, and before commencing performance of the Tenant Improvement Work, Tenant shall deliver to Landlord written evidence (reasonably satisfactory to Landlord) that Tenant has cash on hand in the aggregate amount of (A) such excess (the "Over-Allowance Amount") and (B) the portion of the Final Costs not constituting the Over-Allowance Amount.

**3.2.2    Landlord's General Conditions for Tenant Improvement Work.** The Tenant Improvement Work shall be performed in a good and workmanlike manner and in strict accordance with the Approved Construction Drawings. Tenant shall cause Tenant's Agents to submit to Landlord schedules of all work relating to the Tenant Improvement Work, whereupon Landlord, within five (5) business days, shall inform Tenant's Agents of any necessary changes thereto, and Tenant shall cause Tenant's Agents to adhere to such corrected schedule. Tenant shall abide by all rules established by Landlord relating to the performance of the Tenant Improvement Work, including rules relating to the use of freight, loading dock and service elevators; any required shutdown of utilities (including life-safety systems); storage of materials; and coordination of work.

**3.2.3    Warranty of Contractor.** Tenant shall cause the Contractor to agree to be responsible for (a) the repair, replacement and/or removal, without additional charge, of any portion of the Tenant Improvement Work that is or becomes defective, in workmanship, materials or otherwise, on or before the date occurring one (1) year after the later to occur of (i) completion of the Tenant Improvement Work, or (ii) the Commencement Date; and (b) the repair of any damage to the Building and/or Exterior Areas resulting from such repair, replacement and/or removal. Such agreement shall be expressly set forth in the Contract and, by its terms, shall inure to the benefit of both Landlord and Tenant as their respective interests may appear, and shall be enforceable by either Landlord or Tenant. Upon Landlord's request, Tenant shall provide Landlord with any assignment or other assurance that may be necessary to enable Landlord to enforce such agreement directly against the Contractor.

**3.2.4    Insurance Requirements.** Tenant shall carry "Builder's All Risk" insurance in an amount equal to the Final Costs (as such amount may increase as a result of any change orders), covering the Tenant Improvement Work (which amount shall in no event be less than the full replacement cost of such Tenant Improvement Work), together with such other insurance as Landlord may reasonably require.

**3.2.5    Compliance.** The Tenant Improvement Work shall comply in all respects with (i) all applicable Laws; (ii) all applicable standards of the American Insurance Association (formerly, the National Board of Fire Underwriters) and the National Electrical Code; and (iii) all applicable building material manufacturer's specifications. Without limiting the foregoing, if, as a result of Tenant's performance of the Tenant Improvement Work, Landlord becomes required under Law to perform any inspection or give any notice relating to the Building or

B-4

the Tenant Improvement Work, or to ensure that the Tenant Improvement Work is performed in any particular manner, Tenant shall comply with such requirement on Landlord's behalf and promptly thereafter provide Landlord with reasonable documentation of such compliance.

3.2.6    **Inspection by Landlord**. Notwithstanding any contrary provision of the Lease, Landlord, at any time without notice to Tenant, may enter the Building to inspect the Tenant Improvement Work. Neither Landlord's performance of such inspection nor its failure to perform such inspection shall result in a waiver of any of Landlord's rights hereunder or be deemed to imply Landlord's approval of the Tenant Improvement Work. If, by notice to Tenant, Landlord identifies any defect in the Tenant Improvement Work, Tenant shall promptly cause the Contractor to correct such defect at no expense to Landlord. Notwithstanding any contrary provision of the Agreement, if a defect in the Tenant Improvement Work so identified by Landlord might adversely affect any system or structural component of the Building, the curtain wall or exterior appearance of the Building, or Verizon's use of the Project, or might give rise to liability on the part of Landlord to any third party, then (a) Landlord may, upon prior written notice to Tenant and at Tenant's expense (subject to reimbursement from the Allowance), take such action (including suspension of the Tenant Improvement Work) as Landlord reasonably deems necessary to correct such defect, and (b) until such defect is corrected, Landlord shall have no obligation to disburse any portion of the Allowance.

3.2.7    **Meetings**. From and after the Delivery Date, Tenant shall hold weekly meetings with the Architect and the Contractor regarding the progress of the preparation of Plans, the obtaining of the Permits, and the performance of the Tenant Improvement Work. Such meetings shall be held at such location within the Project as may be designated by Landlord from time to time, and at a reasonable time of which Tenant shall provide Landlord with at least three (3) business days' prior notice. Landlord may attend such meetings, and, upon Landlord's request, Tenant shall cause Tenant's Agents to attend such meetings. Tenant shall cause minutes of such meetings to be prepared and copies thereof to be delivered promptly to Landlord. One such meeting per month shall include a review of the Contractor's current request for payment.

3.3    **Tenant's Covenants**. Within ten (10) days after completing the Tenant Improvement Work, Tenant shall cause a Notice of Completion to be recorded in the office of the Recorder of the county in which the Building is located, in accordance with California Civil Code § 8182 or any successor statute, and shall furnish a copy thereof to Landlord upon such recordation. If Tenant fails to do so, Landlord may execute and file the same on behalf of Tenant as Tenant's agent for such purpose, at Tenant's expense. Within thirty (30) days after completing the Tenant Improvement Work, (a) Tenant shall cause the Architect and the Contractor to (i) update the Approved Construction Drawings as necessary to reflect all changes made to the Approved Construction Drawings during the course of construction, (ii) certify to the best of their knowledge that the updated drawings are true and correct, which certification shall survive the expiration or termination of the Lease, and (iii) deliver to Landlord two (2) CD ROMS of such updated drawings in accordance with Landlord's CAD Format Requirements (defined below); and (b) Tenant shall deliver to Landlord copies of all warranties, guaranties, and operating manuals and information relating to the improvements, equipment, and systems in the Building. For purposes hereof, "Landlord's CAD Format Requirements" shall mean (w) the version is no later than current Autodesk version of AutoCAD plus the most recent release version, (x) files must be unlocked and fully accessible (no "cad-lock", read-only, password protected or "signature" files), (y) files must be in ".dwg" format, and (z) if the data was electronically in a non-Autodesk product, then files must be converted into "dwg" files when given to Landlord.

4    **MISCELLANEOUS.** Notwithstanding any contrary provision of the Agreement and/or this Work Letter, if Tenant fails to perform any of its obligations under the Agreement and/or this Work Letter before the Tenant Improvement Work is completed, then (a) Landlord's obligations under this Work Letter shall be excused, and Landlord may cause the Contractor to cease performance of the Tenant Improvement Work, until such failure is cured, and (b) Tenant shall be responsible for any resulting delay in the completion of the Tenant Improvement Work. This Work Letter shall not apply to any space other than the Building.

4834-8820-7045-2405 v8
HAL\22817007

**EXHIBIT C**

**3553 NORTH FIRST STREET, SAN JOSE, CA**

**CONFIRMATION LETTER**

_____, 2011

To:    _____

       _____

       _____

       _____

Re: Office Lease (the "Lease") dated December __, 2015, between **BSREP RIO ROBLES LLC**, a Delaware limited liability company ("**Landlord**"), on the one hand, and **LE TECHNOLOGY, INC.**, a California corporation, and **LE HOLDINGS (BEIJING) CO., LTD.**, a company organized under the laws of the People's Republic of China (collectively, the "**Tenant**"), on the other hand, concerning the building located at 3553 North First Street, San Jose, California.

Lease ID:                _____
Business Unit Number:   _____

Dear_____

In accordance with the Lease, Tenant accepts possession of the Premises and confirms the following:

A.    The Commencement Date is _____ and the Expiration Date is _____

B.    The exact number of rentable square feet within the Premises is 86,145 square feet, subject to Section 1.1.1 of the Lease.

C.    Tenant's Share of the Project is 100% subject to Sections 1.1.1 and 4.3 of the Lease.

Please acknowledge the foregoing by signing all three (3) counterparts of this letter in the space provided below and returning two (2) fully executed counterparts to my attention. Please note that, pursuant to Section 2.1 of the Lease, if Tenant fails to execute and return (or, by notice to Landlord, reasonably object to) this letter within five (5) days after receiving it, Tenant shall be deemed to have executed and returned it without exception.

                    "Landlord":

                    **BSREP RIO ROBLES LLC**,
                    a Delaware limited liability company

                    By:    _____
                    Name:  _____
                    Title: _____

C-1

4894-8329-5905 v8
HAL\22817007

Agreed and Accepted as of _____, 2015.

"Tenant":

**LE TECHNOLOGY, INC.,**
a California corporation


By: _____
Name: _____
Title: _____


**LE HOLDINGS (BEIJING) CO., LTD.,**
a company organized under the laws of the People's Republic of China


By: _____
Name: _____
Title: _____

HAL\22817007

EXHIBIT D

3553 NORTH FIRST STREET, SAN JOSE, CA

RULES AND REGULATIONS

Tenant shall comply with the following rules and regulations (as modified or supplemented from time to time, the "Rules and Regulations"). Landlord shall not be responsible to Tenant for the nonperformance of any of the Rules and Regulations by any third party. In the event of any conflict between the Rules and Regulations and the other provisions of this Lease, the latter shall control.

1.      Tenant shall not alter any lock or install any new or additional locks or bolts on any doors or windows of the Premises without obtaining Landlord's prior consent. Tenant shall bear the cost of any lock changes or repairs required by Tenant. Two (2) keys will be furnished by Landlord for the Premises, and any additional keys required by Tenant must be obtained from Landlord at a reasonable cost to be established by Landlord. Upon the termination of this Lease, Tenant shall restore to Landlord all keys of stores, offices and toilet rooms furnished to or otherwise procured by Tenant, and if any such keys are lost, Tenant shall pay Landlord the cost of replacing them or of changing the applicable locks if Landlord deems such changes necessary.

2.      Landlord may prescribe the weight, size and position of all safes and other heavy property brought into the Building and also the times and manner of moving the same in and out of the Building. Safes and other heavy objects shall, if considered necessary by Landlord, stand on supports of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property. Any damage to the Building, its contents, occupants or invitees resulting from Tenant's moving or maintaining any such safe or other heavy property shall be the sole responsibility and expense of Tenant (notwithstanding Sections 7 and 10.4 of this Lease).

3.      Employees of Landlord shall not perform any work or do anything outside their regular duties unless under special instructions from Landlord.

4.      No sign, advertisement, notice or handbill shall be exhibited, distributed, painted or affixed by Tenant on any part of the Premises or the Building without Landlord's prior consent. Tenant shall not disturb, solicit, peddle or canvass any occupant of the Project.

5.      The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substance shall be thrown therein. Notwithstanding Sections 7 and 10.4 of this Lease, Tenant shall bear the expense of any breakage, stoppage or damage resulting from any violation of this rule by Tenant or any of its employees, agents, contractors, invitees or licensees.

6.      Tenant shall not overload the floor of the Premises, or mark, drive nails or screws or drill into the partitions, woodwork or drywall of the Premises, or otherwise deface the Premises, without Landlord's prior consent. Tenant shall not purchase bottled water, ice, towel, linen, maintenance or other like services from any person not approved by Landlord.

7.      Except for vending machines intended for the sole use of Tenant's employees and invitees, no vending machine or machines other than fractional horsepower office machines shall be installed, maintained or operated in the Premises; provided, however, that any and all machines shall be subject to the prior written consent of Landlord.

D-1

8.     No inflammable, explosive or dangerous fluids or substances shall be used or kept by Tenant in the Premises or about the Project, except for such substances as are typically found in similar premises used for general office purposes and are being used by Tenant in a safe manner and in accordance with all Laws. Without limiting the foregoing, Tenant shall not, without Landlord's prior consent, use, store, install, disturb, spill, remove, release or dispose of, within or about the Premises or any other portion of the Project, any asbestos-containing materials or any solid, liquid or gaseous material now or subsequently considered toxic or hazardous under the provisions of 42 U.S.C., Section 9601 et seq. or any other applicable environmental Law. Tenant shall comply with all Laws pertaining to and governing the use of these materials by Tenant and shall remain solely liable for the costs of abatement and removal. No burning candle or other open flame shall be ignited or kept by Tenant in the Premises or about the Project.

9.     Tenant shall not, without Landlord's prior consent, use any method of heating or air conditioning other than one approved by Landlord.

10.     Tenant shall not use or keep any foul or noxious gas or substance in or on the Premises, or occupy or use the Premises in a manner offensive or objectionable to Landlord or other occupants of the Project by reason of noise, odors or vibrations, or interfere with other occupants or those having business therein, whether by the use of any musical instrument, radio, CD player or otherwise. Tenant shall not throw anything out of doors, windows or skylights or down passageways.

11.     Tenant shall not bring into or keep within the Project, the Building or the Premises any animals (other than service animals), birds, aquariums, or, except in areas designated by Landlord, bicycles or other vehicles.

12.     No cooking shall be done in the Premises, nor shall the Premises be used for lodging, for living quarters or sleeping apartments, or for any improper, objectionable or immoral purposes. Notwithstanding the foregoing, Underwriters' laboratory-approved equipment and microwave ovens may be used in the Premises for heating food and brewing coffee, tea, hot chocolate and similar beverages for employees and invitees, provided that such use complies with all Laws.

13.     The Premises shall not be used for manufacturing or for the storage of merchandise except to the extent such storage may be incidental to the Permitted Use. Tenant shall not occupy the Premises as an office for a messenger-type operation or dispatch office, public stenographer or typist, or for the manufacture or sale of liquor, narcotics or tobacco, or as a medical office, a barber or manicure shop, or an employment bureau, without Landlord's prior consent. Tenant shall not engage or pay any employees in the Premises except those actually working for Tenant in the Premises, nor advertise for laborers giving an address at the Premises.

14.     Landlord may exclude from the Project any person who, in Landlord's judgment, is intoxicated or under the influence of liquor or drugs, or who violates any of these Rules and Regulations.

15.     Tenant shall not loiter in any Exterior Areas for the purpose of smoking tobacco products or for any other purpose, nor in any way obstruct such areas, and shall use them only as a means of ingress and egress for the Premises.

16.     Tenant shall store all its trash and garbage inside the Premises. No material shall be placed in the trash or garbage receptacles if, under Law, it may not be disposed of in the ordinary and customary manner of disposing of trash and garbage in the vicinity of the Building. All trash, garbage and refuse disposal shall be made only through entryways and elevators provided for such purposes at such times as Landlord shall designate. Tenant shall use commercially reasonable efforts to comply with Landlord's recycling program, if any.

17.     Tenant shall comply with all customary and reasonable safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

D-2

18.     Any persons employed by Tenant to do janitorial work shall be subject to Landlord's prior consent, and Tenant shall be responsible for all acts of such persons.

19.     No awning or other projection shall be attached to the outside walls of the Building without Landlord's prior consent. Other than Landlord's Building-standard window coverings, no curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises. All electrical ceiling fixtures hung in the Premises or spaces along the perimeter of the Building must be fluorescent and/or of a quality, type, design and a warm white bulb color approved in advance by Landlord. Neither the interior nor exterior of any windows shall be coated or otherwise sunscreened without Landlord's prior consent. Tenant shall abide by Landlord's regulations concerning the opening and closing of window coverings.

20.     Tenant shall not obstruct any sashes, sash doors, skylights, windows or doors that reflect or admit light or air into the halls, passageways or other public places in the Building, nor shall Tenant place any bottles, parcels or other articles on the windowsills.

21.     Tenant must comply with requests by Landlord concerning the informing of their employees of items of importance to the Landlord.

22.     Tenant must comply with the State of California "No-Smoking" law set forth in California Labor Code Section 6404.5 and with any local "No-Smoking" ordinance that is not superseded by such law.

23.     Landlord shall have no obligation to provide guard service or other security measures for the benefit of the Premises or the Project. Tenant assumes all responsibility for the protection of Tenant and its agents, employees, contractors and invitees, and the property thereof, from acts of third parties, including responsibility for keeping doors locked and other means of entry to the Premises closed, whether or not Landlord, at its option, elects to provide security protection for any portion of the Project. Tenant further assumes the risk that any safety or security device, service or program that Landlord elects, in its sole and absolute discretion, to provide may not be effective, or may malfunction or be circumvented by an unauthorized third party, and Tenant shall, in addition to its other insurance obligations under this Lease, obtain its own insurance coverage to the extent Tenant desires protection against losses resulting from such occurrences. Tenant shall cooperate in any reasonable safety or security program developed by Landlord or required by Law.

24.     All office equipment of an electrical or mechanical nature shall be placed by Tenant in the Premises in settings approved by Landlord, to absorb or prevent any vibration, noise or annoyance.

25.     Tenant shall not use any hand trucks except those equipped with rubber tires and rubber side guards.

26.     No auction, liquidation, fire sale, going-out-of-business or bankruptcy sale shall be conducted in the Premises without Landlord's prior consent.

27.     Without Landlord's prior consent, Tenant shall not use the name of the Project or Building or use pictures or illustrations of the Project or Building in advertising or other publicity or for any purpose other than as the address of the business to be conducted by Tenant in the Premises.

Landlord may from time to time modify or supplement these Rules and Regulations in a manner that, in Landlord's reasonable judgment, is appropriate for the management, safety, care and cleanliness of the Premises, the Building, the Exterior Areas and the Project, for the preservation of good order therein, and for the convenience of other occupants and tenants thereof. Landlord may waive any of these Rules and Regulations for the benefit of any tenant, but no such waiver shall be construed as a waiver of such Rule and Regulation in favor of any other party nor prevent Landlord from thereafter enforcing such Rule and Regulation against any tenant.

#894-86997054905v8
HAL\22817007

EXHIBIT E

3553 NORTH FIRST STREET, SAN JOSE, CA

JUDICIAL REFERENCE

IF THE JURY-WAIVER PROVISIONS OF SECTION 25.7 OF THIS LEASE ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW, THE PROVISIONS SET FORTH BELOW SHALL APPLY.

It is the desire and intention of the parties to agree upon a mechanism and procedure under which controversies and disputes arising out of this Lease or related to the Premises will be resolved in a prompt and expeditious manner. Accordingly, except with respect to actions for unlawful or forcible detainer or with respect to the prejudgment remedy of attachment, any action, proceeding or counterclaim brought by either party hereto against the other (and/or against its officers, directors, employees, agents or subsidiaries or affiliated entities) on any matters arising out of or in any way connected with this Lease, Tenant's use or occupancy of the Premises and/or any claim of injury or damage, whether sounding in contract, tort, or otherwise, shall be heard and resolved by a referee under the provisions of the California Code of Civil Procedure, Sections 638 - 645.1, inclusive (as same may be amended, or any successor statute(s) thereto) (the "Referee Sections"). Any fee to initiate the judicial reference proceedings and all fees charged and costs incurred by the referee shall be paid by the party initiating such procedure (except that if a reporter is requested by either party, then a reporter shall be present at all proceedings where requested and the fees of such reporter- except for copies ordered by the other parties- shall be borne by the party requesting the reporter); provided however, that allocation of the costs and fees, including any initiation fee, of such proceeding shall be ultimately determined in accordance with Section 25.5 of this Lease. The venue of the proceedings shall be in the county in which the Premises is located. Within 10 days of receipt by any party of a request to resolve any dispute or controversy pursuant to this Exhibit E, the parties shall agree upon a single referee who shall try all issues, whether of fact or law, and report a finding and judgment on such issues as required by the Referee Sections. If the parties are unable to agree upon a referee within such 10-day period, then any party may thereafter file a lawsuit in the county in which the Premises is located for the purpose of appointment of a referee under the Referee Sections. If the referee is appointed by the court, the referee shall be a neutral and impartial retired judge with substantial experience in the relevant matters to be determined, from Jams/Endispute, Inc., ADR Services, Inc. or a similar mediation/arbitration entity approved by each party in its sole and absolute discretion. The proposed referee may be challenged by any party for any of the grounds listed in the Referee Sections. The referee shall have the power to decide all issues of fact and law and report his or her decision on such issues, and to issue all recognized remedies available at law or in equity for any cause of action that is before the referee, including an award of attorneys' fees and costs in accordance with this Lease. The referee shall not, however, have the power to award punitive damages, nor any other damages that are not permitted by the express provisions of this Lease, and the parties waive any right to recover any such damages. The parties may conduct all discovery as provided in the California Code of Civil Procedure, and the referee shall oversee discovery and may enforce all discovery orders in the same manner as any trial court judge, with rights to regulate discovery and to issue and enforce subpoenas, protective orders and other limitations on discovery available under California Law. The reference proceeding shall be conducted in accordance with California Law (including the rules of evidence), and in all regards, the referee shall follow California Law applicable at the time of the reference proceeding. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain a prompt and expeditious resolution of the dispute or controversy in accordance with the terms of this Exhibit E. In this regard, the parties agree that the parties and the referee shall use best efforts to ensure that (a) discovery be conducted for a period no longer than 6 months from the date the referee is appointed, excluding motions regarding discovery, and (b) a trial date be set within 9 months of the date the referee is appointed. In accordance with Section 644 of the California Code of Civil Procedure, the decision of the referee upon the whole issue must stand as the decision of the court, and upon the filing of the statement of decision with the clerk of the court, or with the judge if there is no clerk, judgment may be entered thereon in the same manner as if the action had been tried by the court.

E-1

Any decision of the referee and/or judgment or other order entered thereon shall be appealable to the same extent and in the same manner that such decision, judgment, or order would be appealable if rendered by a judge of the superior court in which venue is proper hereunder.  The referee shall in his/her statement of decision set forth his/her findings of fact and conclusions of law.  The parties intend this general reference agreement to be specifically enforceable in accordance with the Code of Civil Procedure.  Nothing in this __Exhibit E__ shall prejudice the right of any party to obtain provisional relief or other equitable remedies from a court of competent jurisdiction as shall otherwise be available under the Code of Civil Procedure and/or applicable court rules.

E-2

EXHIBIT F

3553 NORTH FIRST STREET, SAN JOSE, CA

ADDITIONAL PROVISIONS

Capitalized terms used in this Exhibit not otherwise defined herein shall have the meaning given such terms in the Lease to which this Exhibit is attached (the "Lease").

I.    Provisions Required Under Existing Security Agreement.  Notwithstanding any contrary provision of the Lease:

A.    Permitted Use.  No portion of the Premises shall be used for any of the following uses: any pornographic or obscene purposes, any commercial sex establishment, any pornographic, obscene, nude or semi-nude performances, modeling, materials, activities, or sexual conduct or any other use that, as of the time of the execution hereof, has or could reasonably be expected to have a material adverse effect on the Project or its use, operation or value.

B.    Subordination and Attornment.

1.    This Lease shall be subject and subordinate to any Security Agreement (as defined in Article 17 of this Lease) existing as of the date of mutual execution and delivery of this Lease (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, an "Existing Security Agreement") or any loan document secured by any Existing Security Agreement (an "Existing Loan Document"). In the event of the enforcement by any Security Holder of any remedy under any Existing Security Agreement or Existing Loan Document, Tenant shall, at the option of the Security Holder or of any other person or entity succeeding to the interest of the Security Holder as a result of such enforcement, attorn to the Security Holder or to such person or entity and shall recognize the Security Holder or such successor in the interest as lessor under this Lease without change in the provisions thereof; provided, however, the Security Holder or such successor in interest shall not be liable for or bound by (i) any payment of an installment of rent or additional rent which may have been made more than thirty (30) days before the due date of such installment, (ii) any act or omission of or default by Landlord under this Lease (but the Security Holder, or such successor, shall be subject to the continuing obligations of Landlord to the extent arising from and after such succession to the extent of the Security Holder's, or such successor's, interest in the Project), (iii) any credits, claims, setoffs or defenses which Tenant may have against Landlord, or (iv) any obligation under this Lease to maintain a fitness facility at the Land.  Tenant, upon the reasonable request by the Security Holder or such successor in interest, shall execute and deliver an instrument or instruments confirming such attornment.  Notwithstanding the foregoing, in the event the Security Holder shall have entered into a separate subordination, attornment and non-disturbance agreement ("SNDA") directly with Tenant governing Tenant's obligation to attorn to the Security Holder or such successor in interest as lessor, the terms and provisions of such agreement shall supersede the provisions of this Subsection.  Tenant hereby agrees and acknowledges that Landlord will be under no duty or obligation hereunder to obtain an SNDA with respect to the Existing Security Agreement, nor will the failure or refusal of the Security Holder of any Existing Security Agreement to grant a non-disturbance agreement render Landlord liable to Tenant, or affect this Lease, in any manner.  In the event Landlord obtains an SNDA, or any other non-disturbance agreement hereunder for the benefit of Tenant, the parties acknowledge that this grammatical paragraph shall not apply, and the terms and provisions of such non-disturbance agreement shall supersede the provisions of this paragraph.  In addition, in the event of any conflict between the provisions of the SNDA, and the provisions of Section 1.C below, the provisions of the SNDA shall control.

2.    Intentionally Omitted

F-1

C.    Proceeds.

1.    As used herein, "Proceeds" means any compensation, awards, proceeds, damages, claims, insurance recoveries, causes or rights of action (whenever accrued) or payments which Landlord may receive or to which Landlord may become entitled with respect to the Project or any part thereof (other than payments received in connection with any liability or loss of rental value or business interruption insurance) in connection with any Taking of, or any casualty or other damage or injury to, the Project or any part thereof.

2.    Nothing in this Lease shall be deemed to entitle Tenant to receive and retain Proceeds except those that may be specifically awarded to it in condemnation proceedings because of the Taking of its trade fixtures and its leasehold improvements which have not become part of the Project and such business loss as Tenant may specifically and separately establish.  Nothing in the preceding sentence shall be deemed to expand any right Tenant may have under this Lease to receive or retain any Proceeds.

3.    Nothing in this Lease shall be deemed to prevent Proceeds from being held and disbursed by any Security Holder under any Existing Loan Documents in accordance with the terms of such Existing Loan Documents.  However, if, in the event of any casualty or partial Taking, any obligation of Landlord under this Lease to restore the Premises or the Building is materially diminished by the operation of the preceding sentence, then Landlord, as soon as reasonably practicable after the occurrence of such casualty or partial Taking, shall provide written notice to Tenant describing such diminution with reasonably specificity, whereupon, unless Landlord has agreed in writing, in its sole and absolute discretion, to waive such diminution, Tenant, by written notice to Landlord delivered within 10 days after receipt of Landlord's notice, shall have the right to terminate this Lease effective 10 days after the date of such termination notice.

F-2

**EXHIBIT G**

**3553 NORTH FIRST STREET, SAN JOSE, CA**

**HAZARDOUS MATERIALS DISCLOSURE CERTIFICATE**

Your cooperation in this matter is appreciated. Initially, the information provided by you in this Hazardous Materials Disclosure Certificate is necessary for the Landlord to evaluate your proposed uses of the premises (the "Premises") and to determine whether to enter into a lease agreement with you as tenant. If a lease agreement is signed by you and the Landlord (the "Lease"), you are to provide an update to the information initially provided by you in this certificate, and obtain Landlord's approval, before commencing a new Use (defined in Section 28.1.2 of the Lease) of Hazardous Materials (as defined in Section 28.1.1 of the Lease), all as provided in Section 28.1.2 of the Lease. Any questions regarding this certificate should be directed to, and when completed, the certificate should be delivered to:

Landlord:          c/o _____

                   _____

                   _____

                   Attn: _____
                   Phone: (___) ___-____

Name of (Prospective) Tenant _____

Mailing Address: _____

_____

Contact Person, Title and Telephone Number(s): _____

Contact Person for Hazardous Waste Materials Management and Manifests and Telephone Number(s): ___

_____

_____

Address of (Prospective) Premises: _____

Length of (Prospective) initial Term: _____

1.    GENERAL INFORMATION:

Describe the proposed operations to take place in, on, or about the Premises, including, without limitation, principal products processed, manufactured or assembled, and services and activities to be provided or otherwise conducted. Existing tenants should describe any proposed changes to on-going operations.

_____

_____

2.    USE, STORAGE AND DISPOSAL OF HAZARDOUS MATERIALS

2.1    Will any Hazardous Materials be used, generated, treated, stored or disposed of in, on or about the Premises? Existing tenants should describe any Hazardous Materials which continue to be used, generated, treated, stored or disposed of in, on or about the Premises.

G-1

Wastes                          Yes ☐    No ☐

Chemical Products               Yes ☐    No ☐

Other                           Yes ☐    No ☐

If Yes is marked, please explain: _____

_____

_____

2.2    If Yes is marked in Section 2.1 above, attach a list of any Hazardous Materials to be used, generated, treated, stored or disposed of in, on or about the Premises, including, for each Hazardous Material, the applicable hazard class, the maximum quantity(ies) to be present on or about the Premises at any given time; estimated annual throughput; the proposed location(s) and method of storage (excluding nominal amounts of ordinary household cleaners and janitorial supplies that are not regulated by any Law as a Hazardous Material); and the proposed location(s), method(s) and estimated frequency of, and the proposed contractors or subcontractors for, treatment or disposal. Existing tenants should attach a list setting forth the information requested above and such list should include actual data from on-going operations and the identification of any variations in such information from the prior year's certificate.

3.    STORAGE TANKS AND SUMPS

Is any above or below ground storage or treatment of gasoline, diesel, petroleum, or other Hazardous Materials in tanks or sumps proposed in, on or about the Premises? Existing tenants should describe any such actual or proposed activities.

Yes ☐    No ☐

If yes, please explain: _____

_____

_____

4.    WASTE MANAGEMENT

4.1    Has your company been issued an EPA Hazardous Waste Generator J.D. Number? Existing tenants should describe any additional identification numbers issued since the previous certificate.

Yes ☐    No ☐

4.2    Has your company filed a biennial or quarterly reports as a hazardous waste generator? Existing tenants should describe any new reports filed.

Yes ☐    No ☐

If yes, attach a copy of the most recent report filed.

5.    WASTEWATER TREATMENT AND DISCHARGE

5.1    Will your company discharge wastewater or other wastes to:

G-2

_____ storm drain?                    _____ sewer?

_____ surface water?                  _____ no wastewater or other wastes discharged

Existing tenants should indicate any actual discharges.  If so, describe the nature of any proposed or actual discharge(s).

_____

_____

_____

5.2    Will any such wastewater or waste be treated before discharge?

Yes ☐    No ☐

If yes, describe the type of treatment proposed to be conducted.  Existing tenants should describe the actual treatment conducted:

_____

_____

_____

6.    AIR DISCHARGES

6.1    Do you plan for any air filtration systems or stacks to be used in your company's operations in, on or about the Premises that will discharge into the air; and will such air emissions be monitored? Existing tenants should indicate whether or not there are any such air filtration systems or stacks in use in, on or about the Premises which discharge into the air and whether such air emissions are being monitored.

Yes ☐    No ☐

If yes, please describe: _____

_____

_____

6.2    Do you propose to operate any of the following types of equipment, or any other equipment requiring an air emissions permit? Existing tenants should specify any such equipment being operated in, on or about the Premises.

_____ Spray booth(s)              _____ Incinerator(s)

_____ Dip tanks                   _____ Other (Please describe)

_____ Drying oven(s)              _____ No Equipment Requiring Air Permits

If yes, please describe: _____

_____

_____

6.3    Please describe (and submit copies of with this Hazardous Materials Disclosure Certificate) any reports you have filed in the past 36 months with any governmental or quasi-governmental agencies or authorities related to air discharges or clean air requirements and any such reports

G-3

which have been issued during such period by any such agencies or authorities with respect to you or your business operations.

7.    HAZARDOUS MATERIALS DISCLOSURES

7.1    Has your company prepared or will it be required to prepare a Hazardous Materials management plan ("**Management Plan**") or Hazardous Materials Business Plan and Inventory ("**Business Plan**") pursuant to Fire Department or other governmental or regulatory agencies' requirements? Existing tenants should indicate whether or not a Management Plan is required and has been prepared.

Yes ☐      No ☐

If yes attach a copy of the Management Plan or Business Plan.  Existing tenants should attach a copy of any required updates to the Management Plan or Business Plan.

7.2    Are any of the Hazardous Materials, and in particular chemicals, proposed to be used in your operations in, on or about the Premises listed or regulated under Proposition 65? Existing tenants should indicate whether or not there are any new Hazardous Materials being so used which are listed or regulated under Proposition 65.

Yes ☐      No ☐

If yes, please explain: _____

_____

_____

8.    ENFORCEMENT ACTIONS AND COMPLAINTS

8.1    With respect to Hazardous Materials, has your company ever been subject to any agency enforcement actions, administrative orders, or consent decrees or has your company received requests for information, notice or demand letters, or any other inquiries regarding its operations? Existing tenants should indicate whether or not any such actions, orders or decrees have been, or are in the process of being, undertaken or if any such requests have been received.

Yes ☐      No ☐

If yes, describe the actions, orders or decrees and any continuing compliance obligations imposed as a result of these actions, orders or decrees and also describe any requests, notices or demands, and attach a copy of all such documents.  Existing tenants should describe and attach a copy of any new actions, orders, decrees, requests, notices or demands not already delivered to Landlord pursuant to the provisions of Section 28.1 of the Lease.

_____

_____

_____

8.2    Have there ever been, or are there now pending, any lawsuits against your company regarding any environmental or health and safety concerns?

Yes ☐      No ☐

G-4

If yes, describe any such lawsuits and attach copies of the complaint(s), cross- complaint(s), pleadings and other documents related thereto as requested by Landlord. Existing tenants should describe and attach a copy of any new complaint(s), cross- complaint(s), pleadings and other related documents not already delivered to Landlord pursuant to the provisions of Section 28.1 of the Lease.

_____

_____

8.3   Have there been any problems or complaints from adjacent tenants, owners or other neighbors at your company's current facility with regard to environmental or health and safety concerns? Existing tenants should indicate whether or not there have been any such problems or complaints from adjacent tenants, owners or other neighbors at, about or near the Premises and the current status of any such problems or complaints.

Yes ☐     No ☐

If yes, please describe. Existing tenants should describe any such problems or complaints not already disclosed to Landlord under the provisions of the signed Lease and the current status of any such problems or complaints.

_____

_____

9.   PERMITS AND LICENSES

Attach copies of all permits and licenses issued to your company with respect to its proposed operations in, on or about the Premises, including, without limitation, any Hazardous Materials permits, wastewater discharge permits, air emissions permits, and use permits or approvals. Existing tenants should attach copies of any new permits and licenses as well as any renewals of permits or licenses previously issued.

The undersigned hereby acknowledges and agrees that this Hazardous Materials Disclosure Certificate is being delivered to Landlord in connection with the evaluation of a Lease and, if such Lease is executed, will be attached thereto as an exhibit. The undersigned further acknowledges and agrees that if such Lease is executed, this Hazardous Materials Disclosure Certificate may be required to be updated from time to time in accordance with Section 28.1 of the Lease. The undersigned further acknowledges and agrees that the Landlord and its partners, lenders and representatives may rely upon the statements, representations, warranties, and certifications made herein and the truthfulness thereof in entering into the Lease and the continuance thereof throughout the term of the Lease, as it may be extended.

Tenant hereby certifies, represents and warrants that the information contained in this certificate is true and correct.

4834-6325-5605v8
HAL\22817007

(PROSPECTIVE) TENANT:

**LE TECHNOLOGY, INC.**
a California corporation


By: _____

Title: _____


**LE HOLDINGS (BEIJING) CO., LTD.,**
a _____ _____


By: _____
Name: _____
Title: _____

HAL\22817007

**Exhibit H**
**Memorandum of Lease**

H-1

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

_____

_____

_____

Attention: _____

APN: [_____]          (Space above this line for Recorder's use only)

**TRANSFER TAX – $0; TERM OF LEASE IS LESS THAN 35 YEARS.**

## MEMORANDUM OF
## OFFICE LEASE

THIS MEMORANDUM OF OFFICE LEASE (this "Memorandum") is made and entered into as of _____, 2015, by and between BSREP RIO ROBLES LLC, a Delaware limited liability company ("Owner"), and LE TECHNOLOGY, INC., a California corporation, and LE HOLDINGS (BEIJING) CO., LTD., a company organized under the laws of the People's Republic of China (collectively, the "Lessee").

WHEREAS:

A.    On or about the date hereof, Owner and Lessee have entered into an Office Lease (the "Lease") pursuant to which Owner leases to Lessee and Lessee leases from Owner certain premises (the "Premises"), which Premises are more particularly described in the Lease. The Premises are located in the building located at 3553 North First Street, San Jose, California (the "Building"). The Building is located on a parcel of land which is more particularly described in Exhibit A attached to this Memorandum and incorporated herein by this reference (the "Land"). The "Effective Date" of the Lease is _____, 2015.

B.    The term of the Lease commences on March 1, 2016 and continues until February 28, 2026 (unless earlier terminated). Subject to the terms and conditions of the Lease, Lessee or a Permitted Assignee (as such term is defined in the Lease) has the right to extend the term of the Lease for one (1) additional five (5) year period. The Lease also grants Lessee or a Permitted Assignee the option to purchase the Building and the Land, together with any and all parking areas, driveways, walkways, landscaping, and any and all other improvements and/or facilities located therein, thereunder and/or thereon (defined in the Lease, collectively, as the "Project"), subject to the terms and conditions of Article 31 of the Lease ("Purchase Option").

C.    The Parties desire to enter into this Memorandum, which is to be recorded, in order that third parties may have notice of the existence of (i) the leasehold interest of Lessee as set forth in the Lease and (ii) the Purchase Option granted to Lessee (to purchase the Project) as part of the Lease.

The Lease provides that the Purchase Option must be exercised, if at all, on or before October 31, 2016. If Lessee timely and duly exercises the Purchase Option, but fails to proceed with the closing of such purchase transaction for any reason when required to do so under the purchase agreement for such transaction, then the Purchase Option shall automatically terminate and be null and void. If Lessee fails to timely and duly exercise the Purchase Option, such Purchase Option shall automatically terminate and be null and void.

The rights and obligations of Owner and Lessee with respect to the Premises and Project shall be governed by the terms and conditions set forth in the Lease, and all of the terms, conditions, provisions and covenants of the Lease are hereby incorporated into this Memorandum by reference as though fully set forth herein. The Lease and this Memorandum shall be deemed to constitute a single instrument or document. In the event of any inconsistency between the terms of this Memorandum and the Lease, the applicable terms or provisions of the Lease shall prevail. This Memorandum is executed and recorded for the purpose of providing record notice of the execution, delivery and existence of the Lease. This Memorandum shall in no event be deemed or construed to alter, modify or supplement the Lease.

**[Signatures on the Following Page]**

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum as of the date set forth above.

**Owner:**

BSREP RIO ROBLES LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____


**Lessee:**

LE TECHNOLOGY, INC.,
a California corporation

By: _____

Name: _____

Title: _____
    [chairman] [president] [vice-president]


LE HOLDINGS (BEIJING) CO., LTD.,
a company organized under the laws of the People's Republic of China

By: _____

Name: _____

Title: _____
    [secretary] [assistant secretary] [chief
    financial office] [assistant treasurer]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF _____

On _____, 2015, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
SIGNATURE OF THE NOTARY PUBLIC

[SEAL]

4814-7421-3931v2

**EXHIBIT A
TO
MEMORANDUM OF
OFFICE LEASE**

**THE LAND**

**Exhibit I**
**Purchase Agreement**

I-1

## AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale ("**Agreement**"), dated as of _____ __, 201_ ("**Effective Date**"), is made and entered into by and between BSREP RIO ROBLES LLC, a Delaware limited liability company ("**Seller**"), on the one hand, and _____, a _____ _____ (collectively, the "**Buyer**"), on the other hand.

## RECITALS

A.      Seller is the owner of (i) that certain real property commonly known as 3553 North First Street, San Jose, California (APN 097-55-012), consisting of approximately six (6) acres of land, as more particularly described in Exhibit A attached hereto and made a part hereof ("**Land**"), together with a commercial building located thereon consisting of approximately eighty-six thousand one hundred forty-five (86,145) square feet ("**Building**"), and certain adjoining parking areas, driveways, walkways, landscaping, and any other improvements constructed thereon (collectively, the "**Improvements**") (the Land, Building and Improvements shall hereinafter sometimes be collectively referred to as the "**Real Property**"), (ii) certain personal property owned by Seller, if any, located in, on or about the Real Property or the Improvements and/or used in the operation or maintenance of the Improvements, as more particularly described on Exhibit B attached hereto (collectively, the "**Personal Property**"), (iii) easements, rights-of-way, appurtenances, rights and privileges, if any, appertaining to the Real Property (collectively, the "**Appurtenances**"), (iv) any and all intangible personal property (including, without limitation, governmental approvals, permits and development rights) owned by Seller and used exclusively by Seller in the use and operation of the Real Property (collectively, the "**Intangible Property**") and (v) certain transferable leases and any and all security deposits held by Seller in connection therewith (including the Building Lease described in Recital B below), contracts, agreements, warranties, guaranties, indemnities, claims, licenses, plans, drawings, specifications, surveys, and engineering reports, if any, relating to the Real Property, the Improvements, the Personal Property and the Appurtenances (collectively, the "**Contract Rights**"). The Real Property, Improvements, Personal Property, Appurtenances, Intangible Property and Contract Rights shall hereinafter sometimes be collectively referred to as the "**Property**."

B.      Pursuant to that certain Office Lease, dated as of December __, 2015, entered into by and between Seller, as "Landlord," and Buyer, [1] as the collective "Tenant," Seller leases to Buyer, and Buyer leases from Seller, the entire Building ("**Building Lease**"). Pursuant to Article 31 of the Building Lease, Seller granted Buyer the "Purchase Option" described therein. Prior to the Effective Date, Buyer exercised the Purchase Option by virtue of Buyer's delivery of the following in accordance with Section 31.2 of the Building Lease: (i) the Purchase Option Notice; and (ii) the Deposit (both as defined in such Section 31.2 of the Building Lease).

C.      As a result of Buyer's exercise of the Purchase Option, and in accordance with the terms and conditions of Section 31.3 of the Building Lease, Seller and Buyer desire to set forth in this Agreement the terms and conditions upon which Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Property.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in the Building Lease (including, without limitation, Article 31 thereof), and the mutual covenants and agreements set forth in this Agreement, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF PROPERTY

1.1      Sale.

Subject to the terms, covenants and conditions set forth herein, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, Seller's right, title and interest in and to the Property.

---

[1]  **NOTE TO DRAFT:** References to be updated as appropriate if the Building Lease is assigned to a Permitted Assignee.

1.2    Purchase Price.

(a)    The purchase price for the Property is Thirty-six Million Six Hundred Seventy-seven Thousand Eight Hundred Ninety Dollars ($36,677,890.00) ("**Purchase Price**"), as adjusted for costs and prorations as expressly provided in Section 9.4 below.

(b)    The Purchase Price shall be paid as follows:

(i)    Deposit.  Prior to the Effective Date, (i) Seller opened an escrow with Chicago Title – Santa Clara County (the "**Title Company**"), whose address is 675 N. 1st Street, Suite 900, San Jose, CA 95112, Attention: _____ ("**Escrow Holder**") and (ii) Buyer delivered to Escrow Holder the Deposit (as defined in Section 31.2 of the Building Lease).  The Deposit shall be held and disbursed by the Escrow Holder acting as escrow agent in accordance with this Agreement.  The Deposit shall be invested in a federally-issued or insured interest-bearing instrument or account, and any interest earned on the Deposit shall be paid to the party to which the Deposit is paid pursuant to the provisions of this Agreement; provided, however, Buyer shall be responsible for the payment of any and all taxes payable in connection with any interest earned on the Deposit.  If the sale of the Property is consummated in accordance with this Agreement, the Deposit shall be credited against the Purchase Price at the Close of Escrow (as defined in Section 9.2 below).  In the event of a termination of this Agreement by Seller or Buyer prior to Closing, the Deposit shall be applied (and released to Seller or Buyer, as applicable) as expressly provided in this Agreement.  Buyer hereby agrees and acknowledges that the "Rent" due and payable under the Building Lease, irrespective of whether such amounts accrue before or after the Effective Date, shall in no event be credited against the Purchase Price.

(ii)    Escrow Holder; Cash at Close.  On or before the Closing Date, Buyer shall deliver to the Escrow Holder cash in the amount of the balance of the Purchase Price ("**Closing Cash**").  The Closing Cash shall be credited against the Purchase Price at the Close of Escrow.  At the consummation of the purchase and sale contemplated under this Agreement (the "**Closing**"), the Closing Cash shall be released to Seller and credited against the Purchase Price.

(iii)    Liquidated Damages.  THE PARTIES HERETO AGREE THAT SELLER'S ECONOMIC DETRIMENT RESULTING FROM THE REMOVAL OF THE PROPERTY FROM THE REAL ESTATE MARKET FOR AN EXTENDED PERIOD OF TIME AND ANY CARRYING AND OTHER COSTS INCURRED AFTER THE REMOVAL OF THE PROPERTY FROM THE REAL ESTATE MARKET ARE IMPRACTICABLE OR EXTREMELY DIFFICULT TO ASCERTAIN.  THE PARTIES HERETO AGREE THAT THE AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE OF THE DAMAGES THAT WILL BE INCURRED BY SELLER IN THE EVENT OF A BREACH OR DEFAULT OF THIS AGREEMENT BY BUYER.  BUYER AGREES THAT, IN THE EVENT OF SUCH BREACH OR DEFAULT BY BUYER, SELLER, AS ITS SOLE AND EXCLUSIVE REMEDY FOR SUCH BREACH OR DEFAULT, SHALL BE ENTITLED TO RETAIN THE DEPOSIT, AS LIQUIDATED DAMAGES AND NOT AS A PENALTY.  BUYER FURTHER AGREES THAT THE BUILDING LEASE SHALL REMAIN IN FULL FORCE AND EFFECT NOTWITHSTANDING SELLER'S RETENTION OF THE DEPOSIT, IT BEING THE INTENT OF THE PARTIES THAT THE BUILDING LEASE SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH ITS TERMS.  SUCH RETENTION OF THE DEPOSIT BY SELLER IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO SECTIONS 1671, 1676 AND 1677 OF THE CALIFORNIA CIVIL CODE, AND SHALL NOT BE DEEMED TO CONSTITUTE A FORFEITURE OR PENALTY WITHIN THE MEANING OF SECTION 3275 OR SECTION 3369 OF THE CALIFORNIA CIVIL CODE, OR ANY SIMILAR PROVISION.  SELLER HEREBY WAIVES THE REMEDY OF SPECIFIC PERFORMANCE WITH RESPECT TO ANY DEFAULT BY BUYER OF ITS OBLIGATION TO PURCHASE THE PROPERTY, AND AGREES THAT THE LIQUIDATED DAMAGES SET FORTH HEREIN SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT BUYER BREACHES OR DEFAULTS IN ITS OBLIGATION TO PURCHASE THE PROPERTY HEREUNDER (PROVIDED, HOWEVER, THAT THE BUILDING LEASE SHALL REMAIN IN FULL FORCE AND EFFECT NOTWITHSTANDING BUYER'S BREACH OR DEFAULT UNDER THIS AGREEMENT AND/OR SELLER'S RETENTION OF THE DEPOSIT AS A RESULT THEREOF, IT BEING THE INTENT OF THE PARTIES THAT THE BUILDING LEASE SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH ITS TERMS).  THIS LIQUIDATED DAMAGES PROVISION SHALL NOT BE APPLICABLE TO ANY BREACH BY BUYER OF ANY INDEMNIFICATION, DEFENSE OR HOLD HARMLESS OBLIGATION OR RESTORATION OBLIGATION OF BUYER UNDER THIS AGREEMENT, OR ANY OTHER OBLIGATION OF BUYER THAT EXPRESSLY SURVIVES THE TERMINATION OF THIS AGREEMENT.  THIS LIQUIDATED DAMAGES PROVISION ALSO SHALL NOT SERVE AS A LIMITATION ON THE AMOUNT OF ATTORNEYS' FEES THAT SELLER MAY PURSUE OR COLLECT FROM BUYER IN THE EVENT SELLER INCURS ATTORNEYS' FEES IN ATTEMPTING TO COLLECT OR RETAIN THE LIQUIDATED DAMAGES REFERRED TO HEREIN.  BUYER HEREBY AGREES AND ACKNOWLEDGES THAT (a) THIS LIQUIDATED DAMAGES PROVISION SHALL IN NO EVENT BE DEEMED

OR CONSTRUED TO SERVE AS A LIMITATION ON THE AMOUNT OF DAMAGES, COSTS, EXPENSES, LOSSES OR ANY OTHER RIGHTS AND REMEDIES AVAILABLE TO SELLER, AS LANDLORD, UNDER THE BUILDING LEASE IN THE EVENT OF A "TENANT" DEFAULT THEREUNDER, WHETHER PURSUANT TO THE TERMS AND CONDITIONS OF SUCH BUILDING LEASE, APPLICABLE LAW, OR OTHERWISE, AND (b) THE DEPOSIT SHALL IN NO EVENT BE APPLIED AGAINST ANY SUCH DAMAGES, COSTS, EXPENSES OR OTHER LOSSES RESULTING FROM ANY SUCH TENANT DEFAULT UNDER THE BUILDING LEASE.  BY INITIALING THIS SECTION 1.2(b)(iii) BELOW, SELLER AND BUYER AGREE TO THE TERMS OF THIS SECTION 1.2(b)(iii).

INITIALS:SELLER _____ .        BUYER _____

1.3      Independent Contract Consideration.

Contemporaneously with the execution of this Agreement, Buyer shall deliver to Seller a check in the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration"), which amount, together with the parties' respective covenants and agreements set forth in the Building Lease, the parties bargained for and agreed to as consideration for the Seller's grant to Buyer of Buyer's right to purchase the Property pursuant to the terms hereof and for Seller's execution, delivery and performance of this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement, is nonrefundable under any circumstances and will be retained by Seller notwithstanding any other provisions of this Agreement.

**ARTICLE 2**
**CONDITIONS**

2.1      Conditions Precedent to Buyer's Obligations.

Buyer's obligation to purchase the Property is conditioned upon the following ("Buyer's Condition(s)"):

(a)      Seller's representations and warranties set forth in Section 10.1 shall be true and correct as of the Close of Escrow.

(b)      Seller shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed and complied with by it within the applicable time period set forth herein for performance of such covenants and agreements.  Time is of the essence.

(c)      Seller shall terminate those contracts and agreements relating to any Contract Rights (as defined in Recital A above) that Buyer wishes to terminate prior to the Closing Date (i) so long as, within ten (10) business days after the Effective Date, Buyer has notified Seller in writing of such contracts and agreements Buyer so wishes to terminate and (ii) solely to the extent any such contracts and/or agreements are expressly terminable prior to the Closing Date pursuant to the terms and conditions thereof.

(d)      The Title Company shall be irrevocably committed to issue to Buyer the Title Policy (as defined in Section 4.1 below), subject only to the Approved Exceptions (as defined in Section 4.1 below).

(e)      Seller shall have executed and delivered or caused to be delivered at Closing (1) all documents and executed counterparts of documents and instruments required by the express terms and conditions of this Agreement to be executed and delivered by Seller prior to the Closing Date and (2) solely to the extent Seller is entitled to obtain the same pursuant to the express terms and conditions of the documents in question, any estoppels reasonably requested by Buyer in writing, within ten (10) business days after the Effective Date, in connection with (i) any Property Leases (as defined in Section 10.1(s) below), (ii) any "CC&Rs" of record encumbering the Real Property as of the Effective Date (iii) any reciprocal easement agreements of record encumbering the Real Property as of the Effective Date and/or (iv) any material Property Contract (any such estoppels being the "Required Estoppels").

(f)      There shall not have been a material adverse change in the condition of the Property since the Effective Date (for any reason other than the acts and/or omissions of Buyer and/or Buyer's employees, agents, contractors, consultants, representatives and/or invitees).

If the condition set forth in Section 2.1(a) above is not satisfied (or waived in writing by Buyer in its sole and absolute discretion) on the Close of Escrow hereunder, then, as applicable, the provisions of Section 10.2 or Section 12.2 shall apply. If Seller fails to perform and comply with any material covenant required by this Agreement to be performed and complied with by it within the applicable time period set forth in this Agreement and such failure continues for a period of more than ten (10) business days following Seller's receipt of written notice from Buyer, then the condition set forth in Section 2.1(b), shall be deemed not satisfied and the provisions of Section 12.2 shall apply. If the conditions set forth in Sections 2.1(c), 2.1(d), 2.1(e) and/or 2.1(f) above is/are not satisfied (or waived in writing by Buyer in its sole and absolute discretion) on the Close of Escrow hereunder, then Section 2.3 below shall apply.

2.2    Seller's Conditions to Closing.

Seller's obligation to sell the Property and close escrow hereunder is conditioned upon the following ("Seller's Condition(s)"):

(a)    Buyer shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed and complied with by it within the applicable time period set forth herein for performance of such covenants and agreements. Time is of the essence.

(b)    Buyer's representations and warranties set forth in Section 10.3 shall be true and correct as of the Close of Escrow.

If Buyer fails to perform and comply with any material covenant required by this Agreement to be performed and complied with by it within the applicable time period set forth in this Agreement and such failure continues for a period of more than ten (10) business days following Buyer's receipt of written notice from Seller (except no such written notice shall be required if Buyer fails to close escrow on the date scheduled for Closing or fails to timely deposit the Deposit referred to above), then the condition set forth in Section 2.2(a) above shall be deemed not satisfied and Seller may terminate this Agreement by written notice to Buyer. In the event of such termination, the Deposit shall be retained by Seller, and the Building Lease shall remain in full force and effect in accordance with its terms. Seller shall be entitled to such Deposit as liquidated damages (as provided in Section 1.2(b)(iii) hereof), and all rights, obligations and liabilities of Seller and Buyer under this Agreement (except rights, obligations and liabilities that expressly survive the termination of this Agreement and/or arising out of any breach by Buyer of any of its obligations hereunder) shall terminate.

2.3    Closing Condition Failure.

If any condition set forth in Section 2.1 or Section 2.2 is not satisfied on the Closing Date (and such failure is not the result of a default under this Agreement by the party in whose favor such condition runs), then the party for whom such condition(s) precedent is/are not satisfied (and only such party) may, in its sole and absolute discretion:

(i)    terminate this Agreement by providing written notice to such effect to the other party, in which case (A) the Deposit shall be refunded, as applicable, to Buyer (if any Buyer's Condition(s) shall have failed), or Seller (if any Seller's Condition(s) shall have failed), (B) if any Buyer's Condition(s) shall have failed, and Section 12.2(a) otherwise applies, Buyer shall be entitled to receive the Buyer's Due Diligence Costs (as defined in Section 12.2(b)(ii) below), (C) in any and all cases, the Building Lease shall remain in full force and effect and (D) the parties shall have no further rights or obligations under this Agreement, except those obligations under this Agreement which expressly survive such termination, or

(ii)    waive such closing condition(s) at or prior to the Closing Date without any increase in, abatement of, or credit against the Purchase Price, or claim against the other party.

If either party elects to proceed to the Closing with actual knowledge of (1) a default in any of the covenants, agreements or obligations to be performed by the other party under this Agreement, and/or (2) except as otherwise expressly set forth in Section 10.2 below, an inaccuracy in or untruthfulness of any representation or warranty of the other party made in this Agreement or any of the closing documents, then, upon the consummation of the Closing, such party shall be deemed to have waived any such default and/or inaccuracy and shall have no claim against the other party on account thereof.

Notwithstanding the foregoing terms of this Section 2.3, if the condition set forth in sub-clause (2) of Section 2.1(e) above fails (i.e., any Required Estoppels are not delivered on or before the Closing), but the obtainment of any

such Required Estoppels within thirty (30) days is reasonably practicable, then Seller shall have the one-time right to extend the Closing Date for up to thirty (30) days to obtain and deliver any such Required Estoppels by giving notice to Buyer on or before the date that is one (1) business day prior to the scheduled Closing Date, and, in such event, Seller shall use all commercially reasonable and diligent efforts to obtain any and all such Required Estoppels on or before the Closing Date, as so extended.

## ARTICLE 3
## INDEPENDENT INVESTIGATION

3.1     Buyer's Independent Investigation.

Buyer acknowledges that, prior to the Effective Date, in accordance with Section 31.2.1 of the Building Lease, Buyer investigated (or had the opportunity to investigate) to the extent deemed necessary by Buyer, in its sole and absolute discretion, all matters relating to (i) title and governmental regulations affecting the Real Property, (ii) the development of the Real Property, together with all governmental and other legal requirements such as taxes, assessments, zoning, use permit requirements and building codes, and all land use, building, environmental and other statutes, rules, or regulations applicable to the Property, (iii) the economic feasibility of owning the Property; and (iv) any and all other matters relating to the physical, legal, economic and/or environmental condition of the Property, including, without limitation, the structural, electrical, and mechanical condition of the Real Property and the presence or absence of "Hazardous Materials" (defined below) in or from its soil and groundwater, or anywhere else in or around the Real Property. For purposes of this Agreement, the term "Hazardous Materials" shall mean any chemical, substance, waste or material which is deemed hazardous, toxic, a pollutant or a contaminant, under any federal, state or local statute, law, ordinance, rule, regulation or judicial or administrative order or decisions, now or hereafter in effect, or which has been shown to have significant adverse effects on human health or the environment. Hazardous Materials shall include, without limitation, substances defined as "hazardous substances," "hazardous materials," or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq.; in the regulations adopted and publications promulgated pursuant to such laws; and in the Hazardous Materials storage, use or discharge laws, regulations and ordinances of the County of Santa Clara.

## ARTICLE 4
## TITLE

4.1     Title Conveyance.

Subject to the terms and conditions of this Agreement, at the Closing, Seller shall convey title to the Real Property to Buyer by grant deed in the form attached hereto as Exhibit D ("Deed"). Title to the Real Property to be conveyed to Buyer shall be subject only to the Approved Exceptions. As used herein, "Approved Exceptions" shall mean: (i) non-delinquent liens for real estate taxes and assessments; (ii) any other liens, easements, encumbrances, covenants, conditions and restrictions, whether or not of record, existing as of the Effective Date, and approved or waived (and/or deemed approved and/or waived) by Buyer pursuant to Section 31.2.2 of the Building Lease; (iii) if Buyer does not obtain the Survey (as defined below), any exceptions to title which would be disclosed by a reasonable inspection or an accurate survey of the Real Property prior to the Effective Date; (iv) any liens, encumbrances and/or other exceptions to title which may be caused by the actions or omissions of Buyer or any of its agents, employees, contractors or consultants; and (v) the Building Lease and Verizon Lease (as defined in the Building Lease). Notwithstanding the foregoing, Seller shall satisfy and remove or cause to be satisfied and removed prior to the Close of Escrow, or at the Close of Escrow from the Purchase Price, all Monetary Encumbrances. As used in this paragraph, the term "Monetary Encumbrances" shall mean encumbrances or defects to title caused by the action or inaction of Seller which, by their terms, require Seller's payment of money in installments or at a fixed time, including, but not limited to, mortgages, deeds of trust, mechanic's or materialmens' liens and any tax or judgment liens encumbering the Property. Delivery of title in accordance with the foregoing shall be evidenced by the willingness of the Title Company to issue, at Closing, its standard Owner's American Land Title Association (ALTA) Policy of Title Insurance in the amount of the Purchase Price showing title to the Real Property vested in Buyer, subject only to the Approved Exceptions, and the standard exceptions and exclusions to coverage shown on such standard ALTA Policy of Title Insurance ("Title Policy"). If, following the Close of Escrow hereunder, Buyer has any objection to the condition of title of the Property conveyed by Seller to Buyer, Buyer shall be deemed to have waived any and all claims against Seller related to such condition of title and Buyer acknowledges that its sole recourse shall be against the Title Company with respect to such dispute. Buyer is relying upon the Title Policy to be issued to Buyer at Closing and Buyer's own investigations respecting Seller's title to the Property.

4.2    Inspection of Title and Survey Prior to the Effective Date.

Prior to the Effective Date, in accordance with the terms and conditions of Section 31.2.2 of the Building Lease, (A) Seller delivered to Buyer a preliminary title report on the Real Property issued by the Title Company, along with a copy of each instrument listed as an exception therein (the "Title Report") and (B) Buyer had the opportunity to obtain, in Buyer's sole and absolute discretion a current ALTA survey (the "Survey") of the Land and Improvements. Seller paid the charge for the Title Report, and shall pay the premium for the standard coverage portion of the Title Policy. Buyer shall be responsible for any extended-coverage costs for the Title Policy, and any and all endorsement(s) requested by Buyer. Buyer shall be responsible for the cost and expense of any Survey desired by Buyer, and any updates or supplements to the Survey. In no event shall Buyer be excused from its obligation to purchase the Property if the Title Company refuses to issue an extended ALTA policy because Buyer has failed or refused to provide Title Company with a survey acceptable to the Title Company, or for any other reason (other than any matter(s) in Seller's reasonable control).

4.3    Updated Title Report after the Effective Date.

If any update of the Title Report obtained by Buyer after the Effective Date discloses any new liens, encumbrances or other matters (not caused by the actions or omissions of Buyer or any of its agents, employees, contractors or consultants) which were not shown on the Title Report, as the same may have been updated, prior to the Effective Date, and such new title matter would have a materially adverse effect on the value of the Property or Buyer's ownership or operation thereof (each, a "New Title Matter"), then Buyer shall have the right to request that Seller remove or cure such New Title Matter at or prior to Closing by providing written notice to Seller within five (5) business days after receiving such updated Title Report (the "New Title Matter Objection Notice"). Buyer's failure to so notify Seller within such five (5) business day period shall be conclusively deemed to constitute Buyer's approval of such New Title Matter(s). If Buyer provides a New Title Matter Objection Notice to Seller, Seller may elect, in Seller's sole and absolute discretion, but subject to Section 11.1(g) below, by providing written notice (the "New Title Matter Election Notice") to Buyer within five (5) business days after Seller's receipt of such New Title Matter Objection Notice, (a) to elect to remove or cure such New Title Matter at or prior to Closing, or (b) not to remove or cure such New Title Matter; provided, however, if such New Title Matter qualifies as a Monetary Encumbrance, then such New Title Matter shall be removed in accordance with Section 4.1 above. If Seller does not provide a New Title Matter Election Notice to Buyer within such time period, then Seller (except with respect to Monetary Encumbrances) shall be deemed to have elected not to remove or cure such New Title Matter pursuant to clause (b) of the preceding sentence. If Seller elects or is deemed to have elected not to remove or cure a New Title Matter, then Buyer shall have the right to elect, as Buyer's sole and exclusive remedy, by providing written notice (the "New Title Matter Response Notice") to Seller within five (5) days after Buyer's receipt of the New Title Matter Election Notice (or Seller's deemed election not to remove or cure such New Title Matter), to (1) terminate this Agreement, in which case all rights, obligations and liabilities of Seller and Buyer under this Agreement (except rights, obligations and liabilities that expressly survive the termination of this Agreement) shall terminate, the Deposit shall be promptly returned to Buyer and the Building Lease shall remain in full force and effect or (2) proceed to Closing pursuant to this Agreement and accept title to the Real Property subject to such New Title Matter, without any credit against the Purchase Price for such New Title Matter. If Buyer does not provide a New Title Matter Response Notice to Seller within such time period, Buyer shall be deemed to have elected to proceed to Closing pursuant to clause (2) of the preceding sentence. In the event Seller elects to cure a New Title Matter pursuant to the terms and conditions of this Section 4.3, then Seller shall have the right, if reasonably necessary, to extend the Closing for up to ten (10) business days to effectuate such cure.

## ARTICLE 5
## AS IS SALE, RELEASE OF CLAIMS; INDEMNITY

5.1    "As-Is" Purchase.

BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT (a) BUYER HAS BEEN IN POSSESSION AND OCCUPANCY OF THE BUILDING SINCE DECEMBER ___, 2015 PURSUANT TO THE TERMS AND CONDITIONS OF THE BUILDING LEASE AND (b) EXCEPT AS EXPRESSLY SET FORTH IN SECTION 10.1 OR 11.1 OF THIS AGREEMENT, SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS WITH ALL FAULTS" BASIS. BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS (EXCEPT AS EXPRESSLY SET FORTH IN SECTION 10.1 OR 11.1 OF THIS AGREEMENT) OR IMPLIED, FROM SELLER OR ITS AGENTS AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING, WITHOUT LIMITATION: (I) THE QUALITY, NATURE, ADEQUACY AND PHYSICAL CONDITION OF THE REAL PROPERTY AND THE IMPROVEMENTS THEREON, INCLUDING,

BUT NOT LIMITED TO, THE AREA OF THE BUILDING AND THE LAND AND THE STRUCTURAL ELEMENTS, FOUNDATION, ROOF, APPURTENANCES, ACCESS, LANDSCAPING, PARKING FACILITIES AND THE ELECTRICAL, MECHANICAL, HVAC, PLUMBING, SEWAGE, AND UTILITY SYSTEMS, FACILITIES AND APPLIANCES, (II) THE QUALITY, NATURE, ADEQUACY, AND PHYSICAL CONDITION OF SOILS, GEOLOGY AND ANY GROUNDWATER, (III) THE EXISTENCE, QUALITY, NATURE, ADEQUACY AND PHYSICAL CONDITION OF UTILITIES SERVING THE PROPERTY, (IV) THE DEVELOPMENT POTENTIAL OF THE PROPERTY, AND THE PROPERTY'S USE, HABITABILITY, MERCHANTABILITY, OR FITNESS, SUITABILITY, VALUE OR ADEQUACY OF THE PROPERTY FOR ANY PARTICULAR PURPOSE, (V) THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTY OR ANY OTHER PUBLIC OR PRIVATE RESTRICTIONS ON USE OF THE PROPERTY, (VI) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY APPLICABLE CODES, LAWS, REGULATIONS, STATUTES, ORDINANCES, COVENANTS, CONDITIONS AND RESTRICTIONS OF ANY GOVERNMENTAL OR QUASI-GOVERNMENTAL ENTITY OR OF ANY OTHER PERSON OR ENTITY, (VII) THE PRESENCE OF HAZARDOUS MATERIALS (INCLUDING, WITHOUT LIMITATION, ASBESTOS OR ASBESTOS-CONTAINING MATERIALS AND LEAD-BASED PAINT) ON, UNDER OR ABOUT THE PROPERTY (OR IMPROVEMENTS THEREON) OR THE ADJOINING OR NEIGHBORING PROPERTY, (VIII) THE QUALITY OF ANY LABOR AND MATERIALS USED IN ANY IMPROVEMENTS ON THE PROPERTY, (IX) THE CONDITION OF TITLE TO THE PROPERTY, (X) THE INCOME THAT MAY BE GENERATED FROM THE PROPERTY, AND/OR (XI) THE ECONOMICS OF THE OPERATION OF THE PROPERTY. BUYER ACKNOWLEDGES THAT IT SHALL USE ITS INDEPENDENT JUDGMENT AND MAKE ITS OWN DETERMINATION AS TO THE SCOPE AND BREADTH OF THE DUE DILIGENCE INVESTIGATION WHICH IT SHALL MAKE RELATIVE TO THE PROPERTY.  EXCEPT AS EXPRESSLY SET FORTH IN SECTION 10.1 OR 11.1 OF THIS AGREEMENT, BUYER SHALL RELY UPON ITS OWN INVESTIGATION OF THE PHYSICAL, ENVIRONMENTAL, ECONOMIC AND LEGAL CONDITION OF THE PROPERTY AND THE IMPROVEMENTS THEREON (INCLUDING, WITHOUT LIMITATION, WHETHER THE PROPERTY IS LOCATED IN AN AREA WHICH IS DESIGNATED AS A SPECIAL FLOOD HAZARD AREA, DAM FAILURE INUNDATION AREA, EARTHQUAKE FAULT ZONE, SEISMIC HAZARD ZONE, HIGH FIRE SEVERITY AREA OR WILDLAND FIRE AREA, BY ANY FEDERAL, STATE OR LOCAL AGENCY).  BUYER UNDERTAKES AND ASSUMES THE RISKS ASSOCIATED WITH ALL MATTERS PERTAINING TO THE PROPERTY'S LOCATION IN ANY AREA DESIGNATED AS A SPECIAL FLOOD HAZARD AREA, DAM FAILURE INUNDATION AREA, EARTHQUAKE FAULT ZONE, SEISMIC HAZARD ZONE, HIGH FIRE SEVERITY AREA OR WILDLAND FIRE AREA, BY ANY FEDERAL, STATE OR LOCAL AGENCY. THE PROVISIONS OF THIS SECTION 5.1 SHALL INDEFINITELY SURVIVE THE CLOSE OF ESCROW HEREUNDER OR TERMINATION OF THIS AGREEMENT AND SHALL NOT BE MERGED INTO THE GRANT DEED.

      5.2     Release.

          (a)     Without limiting the above, Buyer waives on behalf of itself and its agents, employees, affiliates, successors and assigns, any and all right to recover from Seller (and/or its officers, directors, shareholders, members, employees, trustees, affiliates, agents, representatives, successors and/or assigns) (collectively, the "Seller Related Parties"), and forever releases and discharges Seller and the Seller Related Parties from any and all damages, claims, losses, liabilities, penalties, fines, liens, judgments, costs or expenses whatsoever (including, without limitation, attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of, or in any way be connected with or related to, the Property, including, without limitation, title to the Property, latent or patent construction defects applicable to the Building or any other portion of the Property, the physical, legal, economic and/or environmental condition of the Property (and/or any element thereof) or any law or regulation applicable thereto (including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Sections 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. Sections 1251 et seq.), the Toxic Substance Control Act (15 U.S.C. Sections 2601 et seq.), the California Hazardous Waste Control Law (California Health and Safety Code Sections 25100 et seq.), the Porter-Cologne Water Quality Control Act (California Water Code Sections 13000 et seq.), and the Safe Drinking Water and Toxic Enforcement Act (California Health and Safety Code Section 25249.5 et seq.)).  The preceding to the contrary notwithstanding, the provisions of this Section 5.2(a) and Section 5.2(b) below shall not be applicable to any material breach by Seller of (A) any of the representations and warranties made by Seller under the express terms of Section 10.1 of this Agreement or (B) any covenant on the part of Seller to be performed under the express terms and conditions of Section 11.1 of this Agreement.

          (b)     In connection with subsection (a) above, Buyer expressly waives the benefits of Section 1542 of the California Civil Code, which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(c)      Buyer hereby specifically acknowledges that Buyer has carefully reviewed this Section 5.2 and Sections 5.1 and 5.3 hereof, and discussed their import with legal counsel (or has chosen not to discuss their import with legal counsel), is fully aware of their consequences, and that the provisions of this Section 5.2 and Sections 5.1 and 5.3 hereof are a material part of the Agreement and shall survive the Close of Escrow hereunder.

Buyer's Initials: _____

5.3      Intentionally Omitted.

## ARTICLE 6
## RISK OF LOSS AND INSURANCE PROCEEDS

Buyer shall be bound to purchase the Property for the full Purchase Price as required by the terms hereof, without regard to the occurrence or effect of any damage to the Property or destruction of any improvements thereon or condemnation of any portion of the Property, provided that: (a) the cost to repair any such damage or destruction, does not exceed Five Hundred Fifty Thousand Dollars ($500,000.00), (b) the loss due to a condemnation does not permanently and materially impair the current use of the Property, and (c) upon the Closing, unless Seller elects (in Seller's sole and absolute discretion) to perform any necessary repairs (in which event the Closing hereunder shall be extended, if necessary, by a reasonable amount of time in order to allow for the completion of the repairs), there shall be a credit against the Purchase Price due hereunder equal to (x) the insurance proceeds paid to Seller with respect to the damage to the Property (except that there shall be no credit for any rental loss insurance proceeds allocable to the period prior to escrow closing hereunder), less any portion of such proceeds used to pay for repair of the damage or destruction, or (y) any condemnation awards actually collected by and paid to Seller as a result of any condemnation of the Property, or applicable portion thereof.  If the insurance proceeds or condemnation award, if applicable, have not been collected as of the Closing, then there shall be no reduction in and/or credit against the Purchase Price, provided that Seller shall assign to Buyer at Close of Escrow all of Seller's right to receive any insurance proceeds or condemnation award with respect to the damage to or condemnation of the Property, or applicable portion thereof (except there shall be no assignment to Buyer of any rental loss insurance proceeds allocable to the period prior to escrow closing hereunder).  For purposes of this Section 6, the cost to repair any damage or destruction to the Property shall be determined by an architect selected by Seller and reasonably approved by Buyer.

If the cost to repair the damage or destruction as specified above exceeds Five Hundred Fifty Thousand Dollars ($500,000.00), or the loss due to a condemnation permanently and materially impairs the current use of the Property, then (and only then) Buyer may (in its sole and absolute discretion), within five (5) business days after Buyer's receipt of Seller's written notice of, as applicable (i) the cost to repair the damage or destruction in question or (ii) the commencement of condemnation proceedings, either: (a) so long as such damage or destruction was not caused by Buyer (and/or its employees, agents, contractors, subtenant and/or invitees), terminate this Agreement by giving written notice to Seller within such five (5) business day period; or (b) consummate the purchase for the full Purchase Price as required by the terms hereof.  If Buyer so terminates this Agreement, then (x) the Deposit shall be returned to Buyer, (y) neither party shall have any further rights or obligations hereunder excepting those obligations that expressly survive the termination of this Agreement and (z) the Building Lease shall remain in full force and effect in accordance with (and subject to) the terms and conditions thereof.  If Buyer elects to proceed with the purchase or fails to give Seller notice within the above-referenced five (5) business day period of Buyer's termination of this Agreement in accordance with the terms and conditions of this grammatical paragraph above, then, upon the Closing, there shall be a credit against the Purchase Price due hereunder equal to the amount of any insurance proceeds or condemnation awards collected by Seller as a result of any such damage or destruction or condemnation under any policy of insurance carried by Seller with respect to such loss (except there shall be no credit for any rental loss insurance proceeds allocable to the period prior to escrow closing hereunder), less any sums expended toward the restoration or repair of the Property.  If the proceeds or awards have not been collected as of the Closing, then Seller shall assign to Buyer at Close of Escrow all of Seller's right to receive any insurance proceeds or condemnation award with respect to the damage to or condemnation of the Property, or applicable portion thereof (except there shall be no assignment to Buyer of any rental loss insurance proceeds allocable to the period prior to escrow closing hereunder).

## ARTICLE 7
### BROKERS AND EXPENSES

7.1    Brokers.

Each party hereto represents and warrants to the other that it has not engaged any broker or finder in connection with the transaction contemplated by this Agreement to whom a commission may be owed other than ▓▓▓▓▓▓ representing Seller, and ▓▓▓▓▓▓, representing Buyer. In the event escrow closes hereunder, Seller covenants and agrees to pay ▓▓▓▓▓▓ a commission at Closing pursuant to an agreement between Seller and ▓▓▓▓▓▓. Each party shall indemnify, defend and hold harmless the other on account of any claims, demands, causes of action, or judgments respecting payment of any sales commission, brokerage commission or finder's fee, including attorneys' fees and court costs, arising from or brought by any third party (other than ▓▓▓▓▓▓) who has dealt or claims to have dealt with such indemnifying party pertaining to the Property. The obligations under this Article 7 shall survive the close of escrow or, if the purchase and sale is not consummated, any termination of this Agreement.

## ARTICLE 8
### INTENTIONALLY OMITTED

## ARTICLE 9
### CLOSING AND ESCROW

9.1    Escrow Instructions.

Seller and Buyer agree to execute such reasonable escrow instructions as may be appropriate to enable the Title Company to comply with the terms of this Agreement and to consummate the sale of the Property to Buyer pursuant to the terms and conditions of this Agreement.

9.2    Closing.

The Closing hereunder shall be held at the offices of the Title Company, subject to the satisfaction (or waiver by such party in whose favor such conditions exist) of the conditions set forth in Sections 2.1 and 2.2 above, on the date that is sixty (60) days after the Effective Date (such date being the "Closing Date"), as such Closing Date may be extended pursuant to the express terms and conditions of Section 2.3, Section 4.3 and Section 6 above. Time is of the essence as to the Closing hereunder. The Closing Date may not be extended without the prior written approval of both Seller and Buyer (which approval may be given or withheld in the non-requesting party's sole and absolute discretion). The "Close of Escrow" hereunder shall mean the date that Seller's Deed conveying title to the Property is recorded in the Official Records of Santa Clara County, and Seller has received the Purchase Price less Seller's share of closing costs and other charges allocated to Seller hereunder.

9.3    Deposit of Documents.

(a)    At least one (1) business day prior to the Closing, Seller shall deposit into escrow the following items:

(i)    the duly executed and acknowledged Deed, in the form attached hereto as Exhibit D, conveying the Real Property to Buyer;

(ii)    two (2) counterpart originals of the Assignment, in the form attached hereto as Exhibit E ("Assignment"), duly executed by Seller;

(iii)    a duly executed Affidavit in compliance with Section 1445 of the Internal Revenue Code of 1986, as amended, certifying that Seller is not a "foreign person" or otherwise subject to federal tax withholding by Buyer in connection with this transaction; and

(iv)    if applicable, any Required Estoppels.

(b)      At least one (1) business day prior to the Closing, Buyer shall deposit into escrow the following items:

(i)      funds necessary to close this transaction, including, without limitation, the balance of the Purchase Price and Buyer's share of closing costs and prorations, and good funds necessary to close this transaction; and

(ii)      two (2) duly executed counterparts of the Assignment.

(c)      Buyer and Seller shall each deposit such other instruments as are reasonably required by the Title Company or otherwise required to close the escrow and consummate the purchase and sale of the Property in accordance with the terms hereof.

9.4      Prorations and Closing Costs.

(a)      Real property taxes and assessments; water, sewer and utility charges (calculated on the basis of the period covered) and any other expenses normal to the operation and maintenance of the Property shall all be prorated as of the Closing, on the basis of a 360-day year, after taking into account the parties' respective rights and obligations under the Building Lease. Seller and Buyer hereby agree that if any of the aforesaid prorations are not calculated accurately on the Closing Date, then the same shall be recalculated as soon as reasonably practicable after the Closing Date and either party owing the other party a sum of money based on such subsequent proration(s) shall promptly pay said sum to the other party. To the extent not inconsistent with any of the foregoing, any other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of real property similar to the Building, after taking into account the parties' respective rights and obligations under the Building Lease, shall be adjusted and prorated between Seller and Buyer accordingly.

(b)      Seller shall pay any and all County transfer taxes applicable to the sale. Seller and Buyer shall split "50/50" any and all City of San Jose transfer taxes applicable to the sale. Seller shall pay any and all escrow fees applicable to the sale and Buyer shall pay any and all recording charges associated with the Deed. Buyer shall pay any sales taxes and similar personal property transfer taxes applicable to the sale. Any other closing costs shall be shared by the parties as is customary in Santa Clara County, California. Except as otherwise provided in Section 13.4 and Section 13.5 below, each party shall bear its legal fees and costs incurred in this transaction.

## ARTICLE 10
## REPRESENTATIONS AND WARRANTIES

10.1      Seller's Representations and Warranties.

Except as set forth on the correspondingly numbered section of the Schedule of Exceptions (the "Schedule of Exceptions") delivered by Seller in accordance with Section 31.2.3 of the Building Lease, Seller hereby represents and warrants to Buyer the matters set forth below, and states that these representations are true and correct as of the date hereof and as of the Close of Escrow:

(a)      Organization and Authority. Seller has been duly organized and validly exists as a limited liability company in good standing in the State of California. Seller is the sole owner of, and has the full power and authority to sell and convey, the Real Property. Seller has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Seller at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Seller, enforceable in accordance with their terms.

(b)      Solvency. Seller has not (i) made a general assignment for the benefit of creditors (ii) filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of such person's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(c)    Possessory Rights.  There are no leases or other agreements (whether oral or written) affecting or relating to the right of any party with respect to the possession of the Real Property or any portion thereof, except for (i) the Building Lease and (ii) the Verizon Lease.

(d)    Terrorism.  (i) Seller is not named as a "Specially Designated National and Blocked Person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control or as a person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; (ii) Seller is not owned or controlled, directly or indirectly, by the government of any country that is subject to a United States Embargo; (iii) Seller is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by the United States Treasury Department as a "Specially Designated National and Blocked Person", or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and (iv) Seller is not engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation.

(e)    Other Agreements; Third Party Consents.  The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, will not conflict with or constitute a default under any of the terms, conditions or provisions of any other agreement to which Seller is a party or by which Seller is bound.  No consents or waivers of or by any third party are necessary to permit the consummation by Seller of the transaction contemplated by this Agreement (or, if any such consents and/or waivers are necessary, such consents or waivers have been obtained).

(f)    Litigation.  There are no existing claims, suits, actions, or legal proceedings pending against Seller, nor, to Seller's Knowledge, threatened (in writing), which would adversely affect Seller's ability to perform its obligations hereunder.

(g)    Condemnation.  There are no pending, nor, to Seller's Knowledge threatened (in writing), condemnation proceedings, nor are there any condemnation actions filed against the Property.

(h)    Licenses and Permits.  Seller has not received any written notice from any governmental or quasi-governmental agency having jurisdiction over the Property of any uncured violation or default of any license or permit issued to Seller of which the failure to cure would reasonably be expected to materially and adversely affect the use, operation or value of the Property.  All fees due and payable by Seller (as distinct from Buyer pursuant to the terms and conditions of the Building Lease) as of the date hereof with respect to any license and permits issued to Seller have been paid in full.

(i)    Notice of Assessment.  Seller has not received written notice of any special assessments or taxes against the Property from any governmental agency which relate to any planned public improvements with respect to the Property.

(j)    Environmental Notice.  To Seller's Knowledge, Seller has not received any (i) written notices from any governmental authority of any uncured violation of any applicable laws, rules, regulations ordinances or (ii) orders regarding any (1) environmental conditions at the Property or (2) release of Hazardous Materials from the Real Property.

(k)    Personal Property and Intangible Property.  All of the Personal Property and Intangible Property shall be owned by the Seller on the Closing Date, free and clear of all liens, encumbrances and security interests.

(l)    Tax Abatement Proceedings.  There is no currently pending appeal or abatement proceeding with respect to the real estate taxes assessed on the Real Property.

(m)    Property Contracts.  Attached as Exhibit C, is a list of all of the contracts and agreements (including equipment leases) affecting the Property to which Seller is a party, if any (collectively, "Property Contracts").  Seller has provided a true, accurate and complete copy of any and all such Property Contract(s) to Buyer.  Seller has neither given nor received written notice of any default under any such Property Contract which has not been fully cured, and neither Seller nor any other party to a Property Contract is otherwise in default of its obligations thereunder.  To Seller's Knowledge, (1) there is no fact or circumstance that with the passage of time, giving of notice, or both, would constitute a default under any Property Contracts and (2) all amounts owed by Seller under any Property Contract to date have been paid in full.

(n)    Non-Foreign Person.  Seller is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Code) for the purposes of the provisions of Section 1445(a) of the Code.

(o)    Violations. Seller has not received written notice of any material violation by Seller of any applicable laws that have not been cured or otherwise remedied prior to the date hereof.

(p)    Rights of First Refusal or Options to Purchase or Lease. Except for Buyer (and subject to the Verizon Lease described in the Building Lease), no other party has any rights-of-first refusal or options to purchase or lease the Property.

(q)    Property Information. To Seller's Knowledge, any third-party reports that Seller has provided to Buyer with respect to the Property is/are true, complete and accurate copies of such reports in Seller's control or possession.

(r)    Tax Filings. Seller has timely filed (subject to any extensions permitted by applicable law) with the appropriate governmental agencies all tax returns and tax reports with respect to the operation of the Property required to be filed by or on behalf of Seller prior to the Closing Date (other than federal, state and local income tax returns of Seller). Seller has not received written notice of any unpaid taxes, assessments, fees and other government charges levied upon its assets and income relating or attributable to the Property.

(s)    Property Leases. Attached as Exhibit D is a list of all of the Property Leases and the current security deposit amount, if any, under such Property Leases. Seller has provided a true, accurate and complete copy of any and all such Property Leases to Buyer. Seller has neither given nor received written notice of any default under any such Property Leases which has not been fully cured, and (i) neither Seller nor any other party to a Property Lease is otherwise in default of its obligations thereunder, (ii) to Seller's knowledge, there exists no fact or circumstance that with the passage of time, giving of notice, or both, would constitute a default thereunder and (iii) all amounts owed by Seller under any Property Lease to date have been paid in full and all obligations of Seller under any Property Lease, including, but not limited to, any landlord improvements and/or repairs, have been fully complied with and satisfied. As used herein, "Property Leases" means any (and all) of the leases for real property affecting the Property to which Seller (or any of its affiliates) is a party, including, without limitation, the Verizon Lease, but specifically excluding for purposes of this Agreement, the Building Lease.

The term "Knowledge", as used in this Agreement, means, with respect to a party, such party's actual knowledge after reasonable inquiry of officers, directors and other employees of such party reasonably believed to have knowledge of such matters; provided, however, that a party shall be deemed to have actual "knowledge" of a fact or matter if in exercising reasonable care an officer, director or other employee of such party would be expected to discover or become aware of that fact or matter in the course of carrying out his or her duties and responsibilities on behalf of such party.

10.2    New Information.

The preceding notwithstanding, Seller shall promptly advise Buyer if Seller acquires any information following the Effective Date which would make any of the representations and warranties set forth in Section 10.1 above untrue; provided that it shall not be a breach of such representation or warranty if the information which renders the representation or warranty untrue was not known by Seller as of the Effective Date. Subject to the preceding sentence, if Seller or Buyer acquires any information following the Effective Date (and before the Close of Escrow) which would make any of the representations or warranties untrue, then Section 12.2(b) below shall apply; provided, however, if the information causing any representation or warranty to be untrue is based on or caused by an act(s) of Buyer or any of the agents, employees, contractors or other representatives of Buyer, then Buyer shall in no event be entitled to any of the rights and/or remedies set forth in Section 2.3 above and/or Section 12.2(b) below.

If, prior to the Close of Escrow hereunder, Buyer becomes aware of any facts that make any of the representations or warranties set forth in Section 10.1 untrue, but Buyer nevertheless elects to close escrow hereunder, then (A) if the information which renders the representation or warranty untrue was not known by Seller as of the Effective Date and/or the information causing any representation or warranty to be untrue is based on or caused by an act(s) of Buyer or any of the agents, employees, contractors or other representatives of Buyer, Buyer shall be deemed to have waived any claim against Seller based on such representation or warranty that Buyer knew was untrue as of the Closing or (B) if the information which renders the representation or warranty untrue was known by Seller as of the Effective Date and the information causing any representation or warranty to be untrue is not based on or caused by an act(s) of Buyer or any of the agents, employees, contractors or other representatives, then Section 12.2(c) shall apply. The provisions of the immediately preceding sentence shall survive the Close of Escrow.

10.3    Buyer's Representations and Warranties.

Buyer hereby represents and warrants to Seller the matters set forth below, each of which is material and is being relied upon by Seller, and states that these representations are true and correct as of the date hereof and as of the Close of Escrow:

(a)    Solvency.  Buyer has not (i) made a general assignment for the benefit of creditors (ii) filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of such person's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Buyer's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(b)    Sanctions and Terrorism.  No party that constitutes, owns, controls, or is owned or controlled by Buyer is (i) a person listed in any sanctions-related list of designated persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury (OFAC), the U.S. Department of State, or by the United Nations Security Council, or other relevant sanctions authority, or a person operating, organized or resident in a country subject to comprehensive sanctions;; (ii) owned or controlled, directly or indirectly, by the government of any country that is subject to  comprehensive United States economic or financial sanctions or a United States Embargo; or (iii) acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by the United States Treasury Department as a "Specially Designated National and Blocked Person", or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that Buyer is not engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation.

(c)    Other Agreements; Third Party Consents.  The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, will not conflict with or constitute a default under any of the terms, conditions or provisions of any other agreement to which Buyer is a party or by which Buyer is bound.  No consents or waivers of or by any third party are necessary to permit the consummation by Buyer of the transaction contemplated by this Agreement (or, if any such consents and/or waivers are necessary, such consents or waivers have been obtained).

(d)    Litigation.  There are no existing claims, suits, actions, or legal proceedings pending against Buyer, nor to Buyer's Knowledge, threatened (in writing), which materially and adversely affect Buyer's ability to perform its obligations hereunder.

(e)    Compliance with Laws.  Neither Buyer, nor to its knowledge any of its respective agents, consultants, distributors, joint venture partners or other persons acting on Buyer's behalf, has (i) used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any government official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption laws; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit.  Buyer, its subsidiaries, and their respective officers and employees, and to their knowledge, their directors and agents, are and have been in compliance with economic or financial sanctions or trade embargoes administered or enforced by the U.S. government, including OFAC or the Department of State, or by the United Nations Security Council, or other relevant sanctions authority.

10.4    Survival of Representations and Warranties and Covenants.

The representations and warranties set forth in Section 10.1 and Section 10.3 above, and the covenants on the part of Seller to be performed pursuant to the express terms and conditions of Section 11.1 below, shall survive the Close of Escrow for a period of twelve (12) months and shall not merge into any of the documents delivered at Closing.  Buyer shall be deemed to have waived its right to bring a claim against Seller based on  a breach of both (i) any representation(s) and warranty(ies) set forth in Section 10.1 above and (ii) any covenants on the part of Seller to be performed pursuant to the express terms and conditions of Section 11.1 below, unless Buyer shall have filed an action against Seller based on such breach of such applicable representation(s) and warranty(ies) and/or covenants within twelve (12) months following the Close of Escrow.  Seller shall be

deemed to have waived its right to bring a claim against Buyer based on a breach of any representation(s) and warranty(ies) set forth in Section 10.3, unless Seller shall have filed an action against Buyer based on such breach of such applicable section within twelve (12) months following the Close of Escrow. The provisions of this Section 10.4 shall survive the Close of Escrow hereunder.

## ARTICLE 11
## ACTIONS AND OPERATIONS PENDING CLOSING

11.1    <u>Actions and Operations Pending Closing</u>.

Seller agrees that at all times prior to the Closing Date, but in all cases taking into account Buyer's and Seller's respective rights and obligations pursuant to the terms and conditions of the Building Lease, which Building Lease shall at all times remain in full force and effect in accordance with the terms and conditions thereof:

(a)    Subject to conditions beyond Seller's reasonable control, Seller shall operate and maintain the Property in the same manner as it has operated and maintained the Property prior to the Effective Date pursuant to its normal course of business.

(b)    After the Effective Date, Seller shall not enter into any new Property Contract, or cancel, modify or renew any existing Property Contract that is not cancelable upon sixty (60) or less days' notice and without payment of any penalty or termination fee, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. If Buyer fails to respond to a request for consent within five (5) business days after receipt of such request, such consent shall be deemed given.

(c)    Seller shall preserve in force any existing permits issued to Seller pursuant to the terms and conditions thereof. If any such permit issued to Seller shall be suspended or revoked, Seller shall promptly notify Buyer and, unless caused by the acts and/or omissions of Seller (and/or its employees, agents, contractors and/or invitees), shall take measures to cause the reinstatement of such permit.

(d)    Seller will maintain in effect all policies of casualty and liability insurance, or similar policies of insurance, with the same limits of coverage which it now carries with respect to the Property.

(e)    Seller shall not remove any Personal Property (as defined in Recital A above) located, installed or used in the Property as of the date hereof, other than in the ordinary course of business.

(f)    Seller shall provide copies of any written notices received by Seller from any governmental or quasi-governmental organizations regarding any violations of applicable law relating to the Property.

(g)    Seller will not create or knowingly permit any New Title Matter to be recorded against the Property that will not be released at Closing.

## ARTICLE 12
## DEFAULTS

12.1    <u>Buyer's Default</u>.

(a)    <u>Default</u>. Buyer shall be deemed to be in default under this Agreement if Buyer fails, for reasons other than Seller's default hereunder or the failure of a condition precedent to Buyer's obligation to perform hereunder, to meet, comply with or perform any covenant, agreement or obligation on Buyer's part required within the time limits and in the manner required in this Agreement or there shall have occurred a material breach of any representation or warranty made by Buyer; provided, however, no such default shall be deemed to have occurred unless and until Seller has given Buyer written notice thereof, describing the nature of the default, and Buyer has failed to cure such default within five (5) business days after the

receipt of such notice (but in any event before the Closing Date, unless such default occurs after Closing). The preceding to the contrary notwithstanding, no such written notice of default shall be required if Buyer fails to close escrow on the date scheduled for Closing or with respect to any failure by Buyer to timely deposit the Deposit referred to above.

(b)    Liquidated Damages. If Buyer defaults under this Agreement, Seller shall, as its sole and exclusive remedy as a result of such default, be entitled to retain the Deposit as liquidated damages pursuant to Section 1.2(b)(iii) of this Agreement, and the Building Lease shall remain in full force and effect in accordance with the terms and conditions thereof. The payment of such amount as liquidated damages is not intended as a forfeiture or penalty within the meaning of California Civil Code Sections 3275 or 3369, but is intended to constitute liquidated damages to Seller pursuant to California Civil Code Sections 1671, 1676 and 1677.

12.2    Seller's Default.

(a)    Default. Seller shall be deemed to be in default under this Agreement if Seller fails, for a reason other than Buyer's default hereunder or the failure of a condition precedent to Seller's obligation to perform hereunder, to meet, comply with, or perform any covenant, agreement or obligation on its part required within the time limits and in the manner required in the Agreement, or there shall have occurred a material breach of any representation or warranty made by Seller; provided, however, no such default shall be deemed to have occurred unless and until Buyer has given Seller written notice thereof, describing the nature of the default, and Seller has failed to cure such default within five (5) business days after receipt of such notice.

(b)    Remedies Before Closing. If Seller shall be deemed in default under Section 12.2(a) at or before Closing, and Buyer does not waive such default, Buyer may pursue one of the following remedies, each of which shall be Buyer's sole and exclusive remedy:

(i)    Enforce specific performance of this Agreement against Seller, in which case the Building Lease shall remain in full force and effect in accordance with the terms and conditions thereof, and Buyer shall have no claim for damages or any other remedy against Seller; provided, however, if Buyer fails to file suit for specific performance against Seller in a court having jurisdiction in Santa Clara County on or before the date thirty (30) days following the date upon which the Closing hereunder was to have occurred, then Buyer shall be deemed to have waived its right to seek specific performance of this Agreement.

(ii)    Terminate this Agreement by written notice delivered to Seller on or before the Closing Date, and, in the event of such termination of this Agreement due to Seller's default (A) provided that Buyer is ready, willing and able to close escrow hereunder on the Closing Date, Buyer shall be entitled to the prompt return of its Deposit and to receive an amount equal to all actual and documented out-of-pocket costs incurred by Buyer in connection with Buyer's due diligence inspections with respect to the Property (including, without limitation, attorneys' fees, costs incurred in connection with obtaining third-party reports and studies and any out-of-pocket costs actually incurred in connection with Tenant's Pre-Exercise Inspections and title review pursuant to Section 31.2 of the Building Lease) (collectively, the "Buyer's Due Diligence Costs") and (B) the Building Lease shall remain in full force and effect in accordance with the terms and conditions thereof. Subject to sub-clause (A) of the immediately preceding sentence, in no event shall Buyer be entitled to (a) seek to recover from Seller any monetary damages based on any breach or default by Seller at or before Closing and/or (b) terminate the Building Lease as a result of any such breach or default by Seller under this Agreement.

(c)    Remedies After Closing. If the Closing has occurred, Buyer shall not be entitled to bring a claim against Seller of any kind or nature; provided, however, that, if Buyer establishes that Seller shall have materially breached a representation or warranty contained in Section 10.1, or a covenant pursuant to the express terms and conditions of Section 11.1 above, that has not terminated or expired pursuant to Section 10.4 above, then Buyer may seek damages by reason thereof (not to exceed, in the aggregate, One Million Two Hundred Eighty Thousand Dollars ($1,280,000.00)), but in no event shall Buyer be entitled to consequential, special, indirect or exemplary damages. All other claims of Buyer against Seller shall be deemed waived to the extent provided in Section 5.2 above.

**ARTICLE 13**
**MISCELLANEOUS**

13.1    Notices.

Any notices required or permitted to be given hereunder shall be given in writing and shall be deemed to have been given when delivered by U.S. Mail, registered or certified, return receipt requested, postage prepaid, or by overnight delivery service showing receipt of delivery, or by personal delivery, or by facsimile transmission.  Notices and/or demands shall be addressed as follows:

To Buyer:

Le Technology, Inc.
P.O. Box 1296
Mountain View, CA 94041-9998

Le Technology, Inc.
1100 Island Drive, Suite 103
Redwood City, CA 94065
Attention:  Office Manager
Phone No.: (650) 394-8900

Le Holdings (Beijing) Co., Ltd.
c/o Leshi Holdings (Beijing) Co., Ltd.
Room 925, Level 8, No. 218 Tangli Road, Chaoyang District, Beijing
Attention: Chief Financial Officer
Phone No.: (650) 394-8900

To Seller:

BSREP Rio Robles LLC
181 Bay Street, Suite 300
Toronto, ON M5J 2T3
Attention: Mr. Thomas Diamond
Phone No.: _____
Fax No.: _____

with a copy to:

Berliner Cohen, LLP
Ten Almaden Boulevard, Eleventh Floor
San Jose, CA 95113-2233
Attention: Harry A. Lopez
        Phone No.: (408) 286-5800
        Fax No.: (408) 998-5388

or to such other address as either party may from time to time specify in writing to the other party.  Notices as aforesaid shall be effective upon actual receipt, or the next business day after delivery to a recognized overnight delivery service, or three (3) business days after the deposit in the U.S. mail, or upon confirmation of transmission by facsimile if transmitted by 5:00 p.m. (Pacific) (and if transmitted after 5:00 p.m. PST, then deemed received on the next succeeding day) provided such facsimile notice or demand is also sent by one of the other methods of delivery set forth above on the same date or next succeeding business day as the facsimile notice is sent.

13.2    Entire Agreement.

This Agreement, together with the Exhibits hereto and Section 31 of the Building Lease, together with the applicable Exhibits thereto, contains all representations, warranties and covenants made by Buyer and Seller and constitutes the entire understanding between the parties hereto with respect to the subject matter hereof. Any prior correspondence, memoranda or agreements are replaced in total by this Agreement together with the Exhibits hereto.

13.3    Time.

Time is of the essence in the performance of each of the parties' respective obligations contained herein.

13.4    Attorneys' Fees.

If either party hereto fails to perform any of its obligations under this Agreement or if any dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other party on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs, arbitration fees, if applicable, and reasonable attorneys' fees and disbursements.

13.5    Tax Deferred Exchange.

Each party agrees to reasonably cooperate with the other in the event a party attempts to effectuate a Section 1031 exchange with respect to the Property. Such reasonable cooperation shall not require the cooperating party to obtain title to any exchange or target property, execute any promissory note or other document or instrument which would or could impose personal liability upon such cooperating party, or incur any additional expense, cost or liability whatsoever (including, but not limited to, liabilities or warranties of title, or assumption of indebtedness) with regard to the Section 1031 exchange or exchanges. If Buyer is the party desiring to effect a Section 1031 exchange with respect to the Property, Seller agrees to convey title to the Property at Closing to a qualified intermediary designated by Buyer if so requested by Buyer in writing. The party attempting to effectuate a Section 1031 exchange hereby agrees to indemnify, defend and hold harmless the other party from any claim, damage, liability, demand, cause of action, loss, cost, or expense (including, without limitation, reasonable attorney's fees) the other party may suffer or incur as a result of the cooperating party's participation in the aforesaid exchange or exchanges. Notwithstanding the foregoing, a cooperating party's agreement hereunder to participate in a tax-deferred exchange or exchanges shall not extend the Closing Date hereunder. A cooperating party in such 1031 exchange shall not, by this Agreement or acquiescence to the exchange contemplated by this Section 13.5, (x) have its rights under this Agreement affected or diminished in any manner or (y) be responsible for compliance with or be deemed to have warranted to the other party that any exchange in fact complies with Section 1031 of the Internal Revenue Code of 1986, as amended. The obligations of Seller and Buyer under this Section 13.5 shall survive the Close of Escrow.

13.6    Assignment.

(a)    This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

(b)    Buyer shall not assign or transfer this Agreement or any of its rights or obligations under this Agreement to any person or entity without first obtaining Seller's written consent thereto (which consent may be given or withheld in Seller's sole and absolute discretion) except (i) for purposes of closing on the sale, to an entity that is owned or controlled, directly or indirectly, by Buyer, provided Buyer provides prior written notice to Seller given not less than three (3) business days prior to the Closing of such assignment and (ii) to a qualified intermediary pursuant to Section 13.5 above. Any assignee of Buyer's rights or obligations hereunder or in this Agreement, or any portion thereof, shall, as a condition to the effectiveness of such assignment, assume in writing all of Buyer's obligations under this Agreement and agree in writing to be bound by all of the terms of this Agreement (including, without limitation, the terms of Sections 5.1, 5.2 and 5.3 above) as if such assignee had executed this Agreement as the Buyer. Notwithstanding such assignment, Buyer shall not be released or relieved of any of its obligations under this Agreement.

13.7    Counterparts.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

13.8    Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of California. If Buyer is comprised of two or more parties, their obligations shall be joint and several, and such Buyer parties hereby expressly agree and acknowledge that each such entity is bound by the terms and conditions of this sentence. In order to induce Seller to enter into this Agreement, and as a material part of the consideration therefor, Buyer hereby expressly (a) agrees that all actions or proceedings relating directly or indirectly to this Agreement shall, at the option of Seller, be litigated in courts located within the State of California, (b) consents to the jurisdiction of any such court and consents to the service of process in any such action or proceeding by personal delivery or any other method permitted by law and (c) waives any defense of forum non conveniens, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. The undersigned Le Holdings (Beijing) Co., Ltd. ("Le Holdings (Beijing)") designates and appoints Le Technology, Inc., or any successor, whose address is 3553 North First Street, San Jose, California (i.e., the Building), and such other persons located in California as may hereafter be selected by Le Holdings (Beijing) which irrevocably agree in writing to so serve as Le Holdings (Beijing)'s agent to receive on Le Holdings (Beijing)'s behalf service of all process in any such proceedings in any such court, such service being hereby acknowledged by Le Holdings (Beijing) to be effective and binding service in every respect. A copy of any such process so served shall be mailed by registered mail to Le Holdings (Beijing) at agent's address in accordance with above. If any agent appointed by Le Holdings (Beijing) hereunder refuses to accept service, Le Holdings (Beijing) hereby agrees that service upon Le Holdings (Beijing) by mail at the Building shall constitute sufficient notice. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of Seller to bring proceedings against Le Holdings (Beijing) hereunder in the courts of any other jurisdiction.

13.9    Interpretation of Agreement.

Notwithstanding that Seller's legal counsel has drafted this Agreement, the doctrine or rule of construction that ambiguities in a written instrument are to be construed against the drafting party shall not be employed in connection with this Agreement. This Agreement shall be construed in accordance with its fair meaning. The article, section and other headings of this Agreement are for convenience of reference only and shall not be construed to affect the meaning of any provision contained herein. Where the context so requires, the use of the singular shall include the plural and vice versa and the use of the masculine shall include the feminine and the neuter. The term "person" shall include any individual, partnership, joint venture, corporation, trust, unincorporated association, limited liability company, any other entity and any government or any department or agency thereof, whether acting in an individual, fiduciary or other capacity.

13.10    Authority.

Each party represents and warrants to the other that this Agreement and all documents executed by the representing party which are to be delivered to the other party at Closing (a) are or at the time of Closing will be duly authorized, executed and delivered by the representing party, and (b) are or at the time of Closing will be legal, valid and binding obligations of the representing party. The representations and warranties contained in this Section 13.10 shall survive the Closing.

13.11    Amendments.

This Agreement may be amended or modified only by a written instrument signed by Buyer and Seller.

13.12    No Recording.

Neither this Agreement or any memorandum or short form thereof may be recorded by Buyer.

13.13    Further Documents.

In connection with the closing of the transaction described herein, each party agrees to execute and deliver any further documents which may be reasonable and necessary in carrying out the provisions of this Agreement.

13.14    Review by Qualified Counsel.

Buyer hereby agrees and acknowledges that (A) Seller has recommended to Buyer that Buyer engage, before the mutual execution and delivery of this Agreement, legal counsel to review and analyze on Buyer's behalf the terms and conditions of this Agreement and (B) Buyer has had the opportunity to engage and consult with such legal counsel and either has done so or elected (in its sole and absolute discretion) not to do so.

13.15    California Building Energy Use Disclosure.

Buyer acknowledges that Seller may be required to disclose certain information concerning the energy performance of the Property pursuant to California Public Resources Code Section 25402.10 and the regulations adopted pursuant thereto (collectively the "Energy Disclosure Requirements"). Buyer acknowledges that it will have received the Data Verification Checklist, as defined in the Energy Disclosure Requirements (the "Energy Disclosure Information"), prior to the expiration of the Feasibility Period, and Buyer agrees that by delivering Buyer's approval notice, Seller has timely complied in full with Seller's obligations (if any) under the Energy Disclosure Requirements. Buyer acknowledges and agrees that (i) Seller makes no representation or warranty regarding the energy performance of the Property or the accuracy or completeness of the Energy Disclosure Information, (ii) the Energy Disclosure Information is for the current occupancy and use of the Property and that the energy performance of the Property may vary depending on future occupancy and/or use of the Property, and (iii) Seller shall have no liability to Buyer for any errors or omissions in the Energy Disclosure Information. If and to the extent not prohibited by applicable law, Buyer hereby waives any right it may have to receive the Energy Disclosure Information, including, without limitation, any right Buyer may have to terminate this Agreement as a result of Seller's failure to disclose such information. Further, Buyer hereby releases Seller from any liability Seller may have to Buyer relating to the Energy Disclosure Information, including, without limitation, any liability arising as a result of Seller's failure to disclose the Energy Disclosure Information to Buyer prior to or after the execution of this Agreement. Buyer's approval of the condition of the Property pursuant to the terms of this Agreement shall be deemed to include Buyer's approval of the energy performance of the Property and the Energy Performance Disclosure Information. The terms of this Section 13.15 shall survive the recordation of the Deed or any earlier termination of this Agreement.

13.16    Exclusivity.

During the term of this Agreement, Seller shall not solicit, accept or negotiate any other offer or proposal or agreement regarding the sale of the Property, or any interest therein, or enter into any agreement, whether written or oral, with respect to the foregoing.

**[Signatures appear on following page]**

The parties hereto have executed this Agreement as of the day and year first above written.

**SELLER:**

**BSREP RIO ROBLES LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**BUYER:**

_____
a _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**EXHIBIT A**
**LEGAL DESCRIPTION OF REAL PROPERTY**

**EXHIBIT B**

**LIST OF PERSONAL PROPERTY**

**EXHIBIT C**
**PROPERTY CONTRACTS**

**EXHIBIT D**

**GRANT DEED**

Recording Requested by:                                    )
_____                                  )
                                                          )
After Recordation, Mail to:                               )
_____                                  )
_____                                  )
_____                                  )
Attn.: _____                                 )
                                                          )
                                                          )
                                                          )
And mail all tax statements:                    )         )
                                                          )
SAME AS ABOVE                                   )

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

The undersigned Grantor declares:
Documentary Transfer Tax is $_____.
(_X_) computed on full value of property conveyed
(___) computed on full value less value of liens and encumbrances remaining at time of sale
(___) Unincorporated area:
City of San Jose Transfer Tax is $_____

**GRANT DEED**

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, BSREP RIO ROBLES LLC, a Delaware limited liability company ("Grantor"), hereby grants to _____, a _____   _____ (collectively, the "Grantee"), the real property located in the City of San Jose, County of Santa Clara, State of California, described on Exhibit A attached hereto and made a part hereof (the "Real Property").

DATED: _____ __, 201_

[Signature page follows]

IN WITNESS WHEREOF, Grantor has executed this Grant Deed as of _____ __, 201_

**GRANTOR:**

BSREP RIO ROBLES LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

ACKNOWLEDGMENT

> A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                                    )
                                                                       )
COUNTY OF SANTA CLARA                          )

On _____ __, 201_, before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

**EXHIBIT A TO GRANT DEED**

<u>**DESCRIPTION OF PROPERTY**</u>

HAL\22817007

## EXHIBIT E

## <u>ASSIGNMENT</u>

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, BSREP RIO ROBLES LLC, a Delaware limited liability company ("Seller"), hereby assigns to _____, a _____ (collectively, the "Buyer"), all of Seller's right, title, and interest in, to and under the following:

1.      Those certain warranties and guaranties (collectively, "Warranties") more particularly described on Exhibit "A" attached hereto;

2.      Those certain management, equipment, security, service, maintenance, and other contracts (collectively, "Service Contracts") more particularly described in Exhibit "B" attached hereto;

3.      Any Contract Rights (including, without limitation, with respect to the Building Lease and Verizon Lease), as defined in that certain Agreement of Purchase and Sale dated as of _____ __, 201_, by and between Seller and Buyer ("Purchase Agreement"), owned by Seller in connection with the Real Property described in the Purchase Agreement, and Buyer hereby accepts such assignment and expressly assumes all of the obligations on the part of Seller to be performed or observed thereunder after the effective date hereof;

4.      Any Intangible Property, as defined in the Purchase Agreement, owned by Seller in connection with the Real Property described in the Purchase Agreement;

5.      Any and all Personal Property, as defined in the Purchase Agreement, owned by Seller in connection with the Real Property described in the Purchase Agreement, as more particularly described on <u>Exhibit B</u>; and

Buyer shall indemnify, defend and hold Seller harmless from any and all third-party claims, losses, expenses and liabilities of any kind arising out of or in connection with a breach by Buyer, and/or any act or omission of Buyer, with respect to the Building Lease, Verizon Lease and/or any other contracts and/or agreements with respect to which any Contract Rights are assigned to Buyer hereunder, and/or any Service Contracts, to the extent accruing after the Effective Date (as defined below) of this Assignment.

Seller shall indemnify, defend and hold Buyer harmless from any and all third-party claims, losses, expenses and liabilities of any kind arising out of or in connection with a breach by Seller, and/or any act or omission of Seller, with respect to the Building Lease, Verizon Lease and/or any other contracts and/or agreements with respect to which any Contract Rights are assigned to Buyer hereunder, and/or any Service Contracts, to the extent accruing prior to the Effective Date of this Assignment.

IN WITNESS WHEREOF, the parties have executed this Assignment as of this ___ day of _____, 201_ ("Effective Date").

**SELLER:**

**BSREP RIO ROBLES LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**BUYER:**

_____
a _____

By: _____
Name: _____
Title: _____

EXHIBIT "A" TO ASSIGNMENT
[To be attached]

EXHIBIT "B" TO ASSIGNMENT
[To be attached]