# <u>Exhibit 5</u>

Case 2:19-bk-24804-VZ    Doc 894-6    Filed 09/15/20    Entered 09/15/20 21:06:40    Desc
17CV317221
Santa Clara - Civil
Exhibit 5    Page 2 of 78

A. Nakamoto

**NELSON W. GOODELL, ESQ., SBN 264734**
The Goodell Law Firm
5 Third Street, Suite 1100
San Francisco, CA 94103
Tel. No. (415) 495-3950 (office)
Fax No. (415) 495-6900 (fax)
nelson@goodelllawsf.com

Attorney for Plaintiff
HAN'S SAN JOSE HOSPITALITY LLC

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 10/22/2018 5:22 PM
Reviewed By: A. Nakamoto
Case #17CV317221
Envelope: 2085071

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| HAN'S SAN JOSE HOSPITALITY LLC, )<br><br>Plaintiff, )<br>    v. )<br><br>LE HOLDINGS (BEIJING) CO., LTD; LE )<br>TECHNOLOGY, INC.; )<br>FARADAY&FUTURE INC.,  and DOES 1 to )<br>10, )<br><br>Defendants. )<br>_____ ) | **Case No: 17 CV317221**<br><br>**FOURTH AMENDED COMPLAINT FOR**<br><br>  1) **Breach of Contract**<br>  2) **Breach of Implied Covenant of Good Faith and Fair Dealing**<br>  3) **Intentional Interference with Contract Relations** |

Plaintiff, Han's San Jose Hospitality LLC ("Plaintiff"), on information and belief, alleges as

follows:

### <u>INTRODUCTION</u>

1.  This is an action for breach of contract and related claims arising out of a written rental

agreement ("Lease") for the commercial property commonly known as 3553 North First

Street, San Jose, CA 95134 ("Subject Property").

2. Defendants have failed to pay rent as per the terms of the written contact for the Subject Property since September 2017.

3. On October 12, 2017 Plaintiff filed an Unlawful Detainer Complaint, beginning this instant action. On November 30, 2017 Defendants informed Plaintiff they had vacated the property; however, they have failed to pay any rent since September 2017.

4. The Plaintiff now seeks damages according to proof, as discussed below, to all Defendants herein material breach of a long-term lease.

## JURISDICTIONAL ALLEGATIONS

1. Plaintiff HAN'S SAN JOSE HOSPITALITY LLC is, and was at all times material to this Complaint, a corporation organized and existing under the laws of the State of California, doing business in Santa Clara County, California.

2. Defendant LE HOLDINGS (BEIJING) CO., LTD ("LE HOLDINGS") is, and was at all times material to this Complaint a company organized under the laws of the People's Republic of China.

3. Defendant LE TECHNOLOGY, INC. ("LE TECHNOLOGY") is, and was at all times material to this Complaint, a corporation organized and existing under the laws of the State of California, doing business in Santa Clara County, California.  LE TECHNOLOGY is a domestic subsidiary of LE HOLDINGS.

4. LE TECHNOLOGY employees frequently refer to the company as LeEco.   Some Le Technology representatives claim that LeEco is a "brand name" that encompasses various operations of the businesses conducted and ran by Jia Yue-Ting, who is discussed below.

5. Plaintiff is informed and believes, and based thereon alleges, that Defendant Le Holding is a personal holding company organized and existing under the laws of the British Virgin

Islands, with its principal place of business in Chaoyang District, Beijing, P. R. China. Plaintiff is further informed and believes, and based thereon alleges, that Le Holding is an investment vehicle and personal holding company that is owned and controlled by Jia Yue-Ting and that it is the parent company of Defendant Le Technology.

6. Defendant FARADAY&FUTURE INC. ("FARADAY&FUTURE") is, and was at all times material to this Complaint, a corporation organized and existing under the laws of the State of California, doing business in Santa Clara County, California.

7. The Subject Property is located in San Jose, California, which is located within Santa Clara County.

8. Jurisdiction of the Court over the instant controversy is based upon Cal. Civ. Proc. § 88.

9. Venue is properly placed in Santa Clara County, California, pursuant to Cal. Civ. Proc. § 392 as is it the closest court to the location of the Subject Property.

10. At all times mentioned herein, whenever an act or omission of a business entity is alleged, said allegation shall be deemed to mean and include an allegation that the business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees, acting within the course and scope of their duties, that the act or omission was authorized and/or ratified by the business entity.

11. Plaintiff is informed and believe and thereon allege that, at all mentioned times herein, Defendants were agents, servants, employees, alter egos, superiors, successors in interest, joint venturers and/or co-conspirators of each other and in doing the things herein after mentioned, or acting within the course and scope of their authority of such agents, servants, employees, alter egos, superior, successors in interest, joint venturers and/or co-conspirators with the permission and consent of their co-defendants and, consequently,

each Defendant named herein is jointly and severally liable to Plaintiff for the damages and harm sustained as a result of their wrongful conduct.

## **GENERAL ALLEGATIONS**

12. For the past four years, FF, under the disastrous direction of its majority shareholder and acting CEO, Jia Yueting ("YT"), has worked to dupe the public, investors, and employees alike into believing that it is a cutting-edge technology company capable of fulfilling its promise to transform the electric car industry with a luxury, electric vehicle that would eventually be fully autonomous and provide customers with the ultimate "chauffeur driven experience."

13. YT is a disgraced Chinese entrepreneur who amassed a fortune through a Chinese streaming video service, Le Technology or LeEco, known as the "Netflix of China." According to one report, YT believe that, with Le Technology/LeEco's success, he could "take on every tech giant at once-Apple, Tesla, Netflix." Ex. 3 at 10 ("'Accidental Billionaire': How the Outlandish Ambition of Faraday Future's Financier Brought the Startup to its Knees").

14. YT has run Faraday and his other companies, including Le Technology, into the ground, which has caused Chinese regulators to call for YT to return to the country for questioning. Due to his Chinese companies' extensive and lingering outstanding debts, YT has been placed on an official "blacklist" by China's highest court, Supreme People's Court, which flags serial credit defaulters and prevents them, among other things, from being able to purchase flight and train tickets and certain other large-scale items. See Ex. 2 (Raymond Zhong and Carolyn Zhang, "China Names and Shames Tech Tycoon With Debt Blacklist," *The New York Times*, December 13, 2017, available at

https://www.nytimes.com/20i7/12/13/business/china-blacklist-jia-yueting-leeco.html).
On information and belief, YT has yet to return to China to answer for these other
questionable business practices and possible crimes.

15. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned,
each of the Defendants was acting as an agent, representative, servant, partner, or
employee of each of the other Defendants and was acting in the course and scope of such
agency, employment and representation. Plaintiff is further informed and believes, and
thereon alleges, that each of the Defendants directed, authorized, affirmed, consented to,
ratified, encouraged, approved, adopted, and/or participated in the acts or transactions of
each or any of the other Defendants as alleged herein.

16. Reports of financial issues and mismanagement at FF began to surface by the end of
2016, and questions about the company's future and YT's mismanagement circulated
throughout the automotive industry. See Ex. 9 (David Z. Morris, "Faraday Loses More
Execs, Adding to Widespread Problems," Fortune, Dec. 24, 2016, available ·at
http://fortune.com/2016/12/24/faraday-future-execs-depart/ (noting "Yeuting [*sic*] has
admitted to overextending his resources, and has reportedly failed to deliver promised
funding to Faraday Future")).

17. On information and belief, throughout the end of 2016 and into 2017, as a result of FF's
financial mismanagement and lack of rational, competent leadership, high level
executives began to resign, FF's auditor (a Big Four accounting firm) pulled out of its
contract due to findings of financial misconduct and inadequate records, suppliers
became unwilling to enter into contracts with FF for fear of not being paid, and rank-and-

file employees, frustrated with the company culture and lack of progress, began to leave the company in droves.

18. YT also blocked visibility into FF's financial dealings, which would later prove to be shady. On information and belief, the only individuals at FF with access to FF's funds and with knowledge of the source of those funds were YT and FF executive Chaoying Deng, a close ally of YT. An independent Big Four auditing company had attempted to audit FF in 2016, but ended its relationship with the company due to, among other things, "a lack of proper internal controls; a lack of transparency from Faraday decision-makers; insufficient bank account procedures for the various LeEco enterprises (including Le Technology), resulting in funds being commingled; unclear records to document and assign debt to incoming funds; and the fact that it took six months to review the finances of a company barely two years old without resolution." Ex. 15 at 4 ("Inside the Mess at Faraday Future that Drove Out One of the World's Top Auditors," Jalopnik, June 7, 2017, available at https://jalopnik.com/inside-the-mess-at-faraday-future-that-drove-out-one-of-1795736565).

19. Indeed, Faraday's own employees, including former Senior Accounting Manager Michael Do, have protested the fact that Faraday does not have formal accounting procedures in place, but Chaoying Deng and Jia Yue-Ting treated said protests with radio silence.

20. These desperate financial arrangements provided only very temporary relief from the consequences of YT's mismanagement. Throughout this time, when other options failed, money would mysteriously appear in FF's accounts. Upon information and belief, some of these mysterious cash infusions were from Le Technology, whose funds YT had

previously commingled with those of FF. Other Faraday executives at the time, including

Chief Financial Officer Stefan Krause questioned but was denied access to the source of

these funds, despite Mr. Krause's position as Chief Financial Officer.

### STATEMENT OF FACTS

21. On or about March 15, 2016 Plaintiff's predecessor-in-interest and Defendant LE

TECHNOLOGY and LE HOLDINGS entered into a written agreement to rent to

Defendants the premises located at 3553 North First Street, San Jose, California 95134

("Subject Property"). The Lease was for 10 years, beginning on March 15, 2016 until

February 28, 2026. The "Monthly Installment of Base Rent" began at $193,826.25 and

increased each after each twelve month period. From March 1, 2017 – February 28, 2018,

the time period for which the present controversy occurred, the monthly rent was set at

$199,856.40, approximately $6,661.88 per day. *(See* Lease, attached as Exhibit 1, pg. 2)

22. The Lease states rent "shall be paid in advance on or before the first day of each calendar

month." (Exh. 1, pg. 8 ¶ 3.1.) Defendants LE TECHNOLOGY and LE HOLDINGS have

failed to pay rent since September 1, 2017. To date, the base rent owed is nearly $3

million.

23. The Lease also contains a provisions concerning "Additional Rent Upon Default by

Tenant" in which Tenants must pay "within ten (10) days after a Default on the Lease as

Additional Rent all Inducements incurred or grated prior to the Default including: (i)

payment of the Allowance ( as described in the Tenant Work Letter); (ii) commissions to

Landlord's and/or Tenant's real estate broker; and/or (iii) attorneys' fees and related costs

incurred and/or paid by Landlord in connection with the negotiation and preparation of

this Lease." (Exh. 1, pg. 8-9 ¶ 3.2.)  To date, Tenant has not paid any Additional Rent.

24. Also as per terms of the lease, any rent not paid within 10 days after notice shall bear an interest rate of 12% from its due date until paid. (Exh. 1, pg. 8-9 ¶ 3.1.)

25. The Lease requires Tenants, Defendants LE TECHNOLOGY and LE HOLDINGS, to pay certain expenses in addition to rent, including (1) expenses for maintain the building, such as insurance and landscaping fees; (2) their share of taxes for the year; (3) and a Management Fee, which is equal to 3% of the of the total rent (Base rent and Additional rent) payable by the Tenant for the year. (Exh. 1, pg. 9 ¶ 4 – Expenses and Taxes.)  To date, these additional expenses plus the Base rent total over $1.2 million.

26. Per the terms of the Lease, Tenants under the lease are permitted to sublet the Premises only under specific terms and conditions.

> Paragraph 14.8.1 **Permitted Affiliate Transfer** So long as Le Technology and/or Le Holdings…is the Tenant and in occupancy and possession of at least seventy-five percent (75%) of the Premises, Tenant shall have the right to assign this Lease or sublease the Premises (or any portion thereof) to an affiliate of Le Technology and/or Le Holdings…so long as (i) at least 15 business days before the Transfer, Tenant notifies Landlord of Such Transfer and delivers to Landlord any documents or information reasonably requested by landlord relating thereto, including reasonable documentation that the Transfer satisfies the requirements of this Section 14.8.1…(iii) the Affiliate has a net worth…immediately after the Transfer that is reasonable sufficient to fulfill the obligations on party of the Tenant to be performed or observed under this Lease…and (v) the Transfer is made in good faith operating business purpose and not in order to evade the requirements of this Section 14.

(Exh. 1, pg. 22 ¶ 14.8.1.)

27. Defendants LE TECHNOLOGY and LE HOLDING never told Plaintiff, Landlord, about an unauthorized occupant/subtenant of theirs, FARADAY&FUTURE, prior to this company taking possession of the subject property. FARADAY and LE TECHNOLOGY employees refer to the other company as a "sister" company or a "parent" company.

28. All three Defendants were founded by Jia Yue-Ting who continues to own a substantial portion of all three companies and continues to run all three companies.  Indeed, it is common knowledge for employees of all three Defendants that Jia Yue-Ting runs all three companies.  Jia Yue-Ting regularly transfers assets between all three companies in order to avoid liability and in order to avoid paying creditors.   For this reason, Jia Yue-Ting is being sued by many other creditors, several of which are also seeking to pierce the corporate veil of his various entities. Jia Yue-Ting has created hundreds of shell corporations to hide his assets in order to avoid liability, including LeEco, LeEco Global Group, Le Technology, Le Holdings, and LeLe Holding.

29. Indeed, Le Technology uses the fact that it is undercapitalized and that its money is offshore as a bargaining chip in trying to settle its debts by telling creditors that they should take far less than they are owed since their money will be hard to locate.   Indeed, in this case, Le Technology representative Qing Ye did this as well, as is described herein.

30.  Had Defendants abided by the Lease and informed Plaintiffs that they had a subtenant, Landlord would have exercised their rights under 14.8.1 and to ask for documents demonstrating the net worth of FARADAY. International news organizations have been reporting that FARADAY&FUTURE and LE TECHNOLOGY/LeEco do not have sufficient net worth to sustain their operations and had Plaintiff known of these subtenants they would never have consented.  Moreover, Plaintiff would have been well within their rights not to consent, given the failing financial health of all three Defendants.

31. All three Defendants share many different officers, directors, and ownership. YT founded and owned a substantial share in all three companies, and essentially ran all three companies as his own private company. Dongge Jiang signed the lease at issue in this case on behalf of Le Holdings, and he also was an officer and director of both Le Technology and Faraday Future.  Mr. Dongge Jiang is one of the central figures at Faraday and is a leader of the company. For her part, Chaoying Deng was identified as the Chief Executive Officer of both Le Technology and Faraday Future during the times that both companies occupied the Subject Property. On information and belief, Plaintiff alleges that Ms. Deng worked for LE HOLDINGS as well.

32. Without permission from the Plaintiff, LE TECHNOLOGY's representative Dan McGill entered into an oral sublease agreement with FARADAY representative John Quach in which FARADAY was obligated to pay $110,000 per month, which constituted the total consideration that FARADAY was obligated to pay LE TECHNOLOGY/LE HOLDINGS for rent. Chaoying Deng, the Chief Executive Officer of both companies, agreed to this arrangement. This figure was determined by analyzing the amount of the Subject Property that Faraday occupied. On this point, the vast majority of the employees of the Subject Property from July 2017 until the Defendants vacated the Subject Property in November 2017 were Faraday employees. During this time period, the vast majority of the Subject Property was vacant.

33. This sublease agreement was memorialized and evidenced in invoices submitted by Le Technology/Le Holdings in September and October 2017 that demanded payment of $110,000 for both of these months.

34. Despite this agreement, FARADAY never paid a penny in rent to the other Defendants in this case, nor have they paid a penny in rent to the Plaintiffs.

35.  Putting aside the oral and written agreements entered into between the Defendants, FARADAY was obligated to pay rent to the other Defendants as a tenant at will.  Indeed, "[o]ne may become a tenant at will or a periodic tenant under an invalid lease, or without any lease at all, by occupancy with consent. Such tenancies carry with them the incidental obligation of rent, and the liability therefore arises not from contract but from the relationship of landlord and tenant. The tenant is liable by operation of law. Where there is a lease the liability of the tenant arising by operation of law is not superseded by the contractual obligation. Both liabilities exist simultaneously." *Ellingson v. Walsh* (1940) 15 Cal.2d 673, 675.

36. Chaoying Deng testified under oath in this case that, while she was identified as the CEO of Le Technology, this was done against her will and that she was merely a "paper CEO."

37.  Plaintiff never informed any of the Defendants herein that they consented to FARADAY being a subtenant or occupying the property in any fashion.

38. On information and believe, Plaintiff also alleges that Defendants breached paragraph 14.8.1, as it requires that a "transfer [be] made for a good faith operating purpose and not in order to evade the requirements of this **Section 14**." Section 14, paragraph 14.2. states that a landlord cannot withhold consent for a proposed transfer unless "[t]he proposed transferee has a character or reputation or is engaged in a business that is not reasonable consistent with the quality of the Building or the Project" (Exh. 1, pg. 20 ¶ 14.2.2) among other reasons. In these recent times the character and reputation of the three Defendants has been abysmal, as noted above, and Plaintiff would never have consented to any

affiliates of LE TECHNOLOGY or LE HOLDINGS, including LeEco or FARADAY&FUTURE, to take possession of the property as the direct result of their international attempts to avoid their obligations as reported by numerous international news organizations.

39. Additionally, the Lease provides that "Any sublease, license, concession or other occupancy agreement entered into by Tenant shall be subordinate and subject to the provisions of this Lease, and if this Lease is terminated during the term of any such agreement, Landlord shall have the right to: (i) treat such agreement as cancelled and repossess the Contemplated Transfer Space by any lawful means, or (ii) require that the transferee atom to and recognize Landlord as its landlord (or licensor, as applicable) under such agreement. If Tenant is in Default, the Landlord is irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any transferee under any sublease, license or other occupancy agreement to make all payments under such agreement directly to Landlord (which Landlord shall apply towards Tenant's obligations hereunder) until such Default is cured. Such transferee shall rely upon any representation by Landlord that Tenant is in Default, without any need for confirmation thereof by Tenant." (Exh. 1, pg. 22 ¶ 14.7.) Defendants LE TECHNOLOGY failed to pay rent beginning with September 1, 2017, Plaintiff is thus entitled to the consideration that FARADAY&FUTURE owes to LE TECHONOLOGY and LE HOLDINGS to cure their default, which amounted to $110,000 per month.

40. Consequently, FARADAY&FUTURE is jointly and severally liable for the unpaid rent, as well as the material breach of the provision restricting transfer of any interest in the subject property, with the other defendants.

41. Paragraph 15.2 of the Lease details that upon expiration or early termination of the Lease, the Tenant, without expense to the Landlord shall remove from the Premises all debris and rubbish, all furniture, equipment, trade fixtures and other articles of personal property owned or placed by Tenant and repair all damage to the premises and building resulting from such removal. (Exh. 1, pg. 22-23 ¶ 15.2.) Upon the Defendants leaving the property, the Plaintiffs re-entered the property on December 4, 2017 and noticed about 80 ceiling tiles were gone, and large amounts of trash and the company name signs were left behind. The Defendants also took 12 Electric Vehicle Charging Systems from the parking lot. Defendants thus failed to surrender the property in the as per the required terms of the Lease and breached the contract.

42. Upon a default, the Landlord may terminate the Lease, and the Landlord may recover from the Tenant:

   a. The worth at the time of award of the unpaid Rent which had been earned at time of such termination; plus
   b. The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus
   c. The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such Rent loss that Tenant proves could be reasonably avoided; plus
   d. Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations hereunder or which in the ordinary course of things would be likely to result therefrom, Including brokerage commissions, advertising expenses, expenses of remodeling any portion o the Premises for a new tenant (whether for the same or a different use), and any special concessions made to obtain a new tenant; plus
   e. At Landlord's option, such other amounts in addition to or in lieu of the foregoing as maybe permitted from time to time by Law.

(Exh. 1, pg. 25-26 ¶ 19.2.1) Despite hiring and consulting with numerous premier real estate brokers, Plaintiffs have been unable to re-let the premises to date. As

a result of Paragraph 19.2.1 above, Plaintiff alleges that Defendants are liable for unpaid rent since their breach and until a new tenant is found, as well as brokerage costs and any renovations done to the building for the new tenant, the exact determinations of these damages will be determined at trial.

43. As mentioned above, Defendants LE HOLDINGS and LE TECHNOLOGY failed to pay rent beginning on September 1, 2017.  The Defendants only began to fall into default on their rent after FARADAY began occupying the vast majority of the subject property, and failed to contribute a single penny in rent.   As such, FARADAY'S occupancy of the property, and failure to contribute to rent, played a substantial part in the default on the lease by the other Defendants.

44. Shortly prior to their default on the lease, in August 2017, Qing Ye, on behalf of LE HOLDINGS and LE TECHNOLOGY, wrote the Chief Executive Officer of the Plaintiff, Peter Luo, an e-mail in which he threatened to file bankruptcy unless the Plaintiff would agree to accept two months of rent in full satisfaction of their rental obligations, which extended another nine years.  Mr.  Ye did not mention Faraday or their occupancy of the property in this e-mail.

45. In this e-mail, Mr. Ye stated that Le Technology, the domestic subsidiary of LE HOLDINGS, had only $2 - $2.5 million in cash, but had $7 million in debt.   Thus, by Mr. Ye's own admissions, Le Technology was heavily undercapitalized.  In the e-mail, Mr. Ye stated that they would file for bankruptcy unless the Plaintiff agreed to accept the two additional months in rent mentioned above, plus the forfeiture of their security deposit (which effectively was approximately another month in rent).

46. On October 3, 2017 Plaintiff personally served a Notice to Pay Rent or Quit on the

Defendants at the Subject Property. A copy of the Notice to Pay Rent or Quit was also sent via Federal Express courier for overnight delivery and overnight mail to the Defendant's at the Subject Property, and arrived on October 4, 2017.   The Notice included an election of forfeiture of the lease.

47. After receiving no response to the Three Day Notice, Plaintiff filed a Complaint for an Unlawful Detainer on October 12, 2017 and commenced this instant action. (*See* Complaint, filed October 12, 2017)  Defendant, LE TECHNOLOGY filed a Demurrer to Plaintiff's Complaint for Unlawful Detainer on October 23, 2017. Plaintiff subsequently filed a First Amended Complaint for Unlawful Detainer on October 27, 2017.

48. On November 30, 2017 Defendant LE TECHNOLOGY mailed a letter to Plaintiff's counsel stating they, along with LE HOLDINGS, had vacated the Subject Property. The letter also contained a key to the Subject Property.

49. On December 11, 2017, Plaintiff and Defendant LE TECHNOLOGY filed a joint stipulation to vacate the trial date on the hearing on the demurrer and to convert the case to an ordinary civil action pursuant to Civ. Code § 1952.3(a).

50. Plaintiff hereby elects to terminate the Lease and the defendants' right to possession thereunder pursuant to the lease and Civil Code section 1951.2.

51. Despite Plaintiff's best diligent efforts, the Plaintiff has been unable to release the Premises to date.

52. Accordingly, the Plaintiff has been harmed by all Defendants material breach of the lease by failing to pay rent, in accordance with the lease.

## **FIRST CAUSE OF ACTION**

### BREACH OF CONTRACT

### (Against All Defendants)

53. Plaintiff re-alleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

54. Plaintiff is informed and believes, and based thereon alleges, that at all relevant times there existed a unity of interest and ownership between LE HOLDINGS, LE TECHNOLOGY, FARADAY FUTURE in that JIA YUE-TING owns a substantial portion of all three companies, founded all three companies, and runs all thee companies. Plaintiff is further informed and believes, and based thereon, alleges that adherence to the fiction of the separate existence of LE TECHNOLOGY, LE HOLDINGS and FARADAY FUTURE would permit an abuse of the corporate privilege and promote injustice by protecting FARADAY from liability for the wrongful acts committed by them through or under the names of either or both of LE HOLDINGS and/or LE TECHNOLOGY.

55. On or about March 15, 2016 Defendants, LE TECHNOLOGY and LE HOLDINGS, entered into a Lease with Plaintiff's predecessor-in-interest, BSREP RIO ROBLES, LLC. to rent the commercial office building commonly known as 3553 North First Street, San Jose, California, 95134 from March 15, 2016 until February 28, 2026.

56. The lease is a valid, enforceable, written contract.

57. According to page two of the Lease, the monthly rent would increase every 12 months. For the months of March 2017 – February 2018 Defendants were to pay Plaintiffs $199,856.40 for each month as rent, approximately $6,661.88 per day.  For the months of March 2018 to present, Defendants were to pay $1,647,092.40. (Monthly installment

2018 rate $205,886.55 x 8 months) = [$1,647,092.40]

58. In July 2017, many FARADAY employees moved into the Subject Property.   From that point on, the vast majority of employees at the Subject Property worked for FARADAY, and not the other two Defendants.

59. In September 2017, Defendant LE TECHNOLOGY stopped paying rent and have made no payments to Plaintiff since September, 2017. As of today, Defendants owe nearly $3 million in Base rent.

60. Thus, Defendants have breached their contractual duty under the lease by failing to pay rent for over a year.

61. In addition, the Defendants breached the lease by failing to timely notify the Plaintiff and request permission before FARADAY&FUTURE occupied the subject premises, as described above.

62. On this score, FARADAY&FUTURE was well aware of this prohibition on an unauthorized use of the property as they are partners and affiliates with Le Technology. Moreover, Chaoying Deng and Dongge Jiang, the signatories to the lease on behalf of Le Technology and Le Holdings, respectively, both held high-level positions at FARADAY. Moreover, Jia Yue-Ting founded all three companies and effectively ran all three companies.

63. The unity of interest present between Le Technology and the inequitable result that would follow by not having Faraday liable for Le Technology's decision to breach the lease with impunity is evidenced by Qing Ye's statement that Le Technology is undercapitalized and could not, and would not, pay the Plaintiff for its lease obligations. In addition, the fact that Faraday did not pay Le Technology a penny for its occupancy of

the subject property, despite its sublease agreement, is telling, as it is equally telling that both companies paid for each other's expenses willy-nilly and did not even invoice the other companies.

64.  Indeed, the very nature of the sublease agreement does not pass the smell-test.   Chaoying Deng, who participated in the negotiations of the sublease agreement, was the Chief Executive Officer of LE TECHNOLOGY and FARADAY, and Dongge Jiang worked for both companies at the time in a high-level position. In addition, Dongge Jiang signed the lease on behalf of LE HOLDINGS. Jia Yue-Ting was the majority shareholder of both companies, and the companies shared many other employees and intellectual property, and other high-level officers interacted with vendors and employees of each.    Thus, effectively, Chaoying Deng and Jia Yue-Ting negotiated with themselves in determining the terms of the sublease.  The companies commingled funds in such a way that KPMG, a highly respected accounting firm, refused to represent FARADAY.

65. Despite the fact that Le Technology entered into a sublease with Faraday, Faraday never paid Le Technology for rent. This was due to the fact that both companies frequently paid each other's expenses, and were effectively just treated as different arms of Mr. Jia Yue-Ting's operations. Indeed, the companies almost never even submitted invoices to each other for goods and services that they procured for the other company, let alone make any payments to each other for said goods or services.

66. On this point, Jia Yue-Ting decided to expense the amount of the monthly rent that Faraday would pay Le Technology in Faraday's expense account, even though Faraday never actually paid Le Technology.   The amount that Mr. Yue-Ting decided to expense

on Faraday's books a six-figure amount on a monthly basis.  On information and belief, this was done as a ruse to try to make it appear that the two companies were distinct in some way.

67. Further examples of the lengths that Le Technology went to attempt to draw a distinction between them is correspondence exchanged between the two companies where representatives of both company drew up another artificial contract for Faraday to perform accounting services for far below fair market value.   In said correspondence, the representatives state that the reason they are drawing up the contract is to attempt to give the appearance of the companies being separate companies.  Despite this contract, no money was ever exchanged between the two companies, despite the fact that Faraday was providing accounting services for them.

68. According to the companies' correspondence, the Faraday employee would perform the following broad services (among others) for Le: "Customers billing," "booking keeping [sic]," "analysis and any other administrative work for Finance department." The Statement of Work emphasizes in greater detail the intertwined nature of the work, which included reviewing "all invoices and check requests for approval," "[working] closely with all business department to ensure proper processing of invoices and approval."   In addition, Dan Gallagher, Legal Director at LeEco, describes the contract as "a very generic draft" that might be used in the future "to cover this and other potential services between the companies", notwithstanding that not a penny was being exchanged between the two companies for said services.  That a standing preexisting arrangement existed, allowing Le and Faraday to exchange services while preserving the illusion of separation, highlights further the established and deliberate nature of the scheme.

69. Chaoying Deng and Jia Yue-Ting, two of the top executives at both Faraday and Le Technology, made this decision to not have Faraday pay Le Technology for their rent for occupying the subject property, despite the sublease mentioned above.

70. On this point, the vast majority of employees at the subject property were Faraday employees, not Le Technology employees. Thus, on information and belief, the Plaintiff alleges that Le Technology signed the lease, rather than Faraday, in order to avoid liability due to their knowledge that they were undercapitalized in order to prevent having to pay their lease obligations.

71. Indeed, there were Faraday employees working at the Subject Property prior to July 2017, but it was not until the summer of 2017 that they entered into the sublease agreement described herein.

72. Despite the fact that Faraday was paying for research and development and many other expenses for Le Technology and vice-versa, very few invoices were exchanged between the two companies, as described earlier.

73. On this point, all three corporations were essentially used by Mr. Yue-Ting for his efforts to build an electric car and to further his technology business. This is demonstrated by the fact that Faraday employees were pulled away from their regular duties to help Le Technology develop the LeSee, a different electric car, and were not paid for doing so. Moreover, Le Technology and Faraday Future shared intellectual property and Faraday even helped patent designs with a Le Technology/LeEco logo.

74. In addition, Ms. Deng stated that Le Technology paid "FF SV current office utilities + management for a while *before we took over*", which further evidences that Faraday, not

Le Technology, was essentially managing the affairs between the two companies in relation to their Bay Area commercial property.

75.  In addition, Faraday and Le Technology and the other LeEco subsidiaries controlled and owned by Jia Yue-Ting had a similar arrangement with Faraday.   Indeed, a commercial property in Hanford, California also contained a substantial number of employees for both companies with Le Technology not paying a single penny in rent for occupying the premises, but with Le Mall (another LE TECHNOLOGY/LeEco affiliate) subleasing an entire floor of said building.  In addition, Faraday Future paid for Le Mall's employees lunches and were not reimbursed for said lunches.

76.  Moreover, a substantial number of people worked for both Le Technology and Faraday Future besides Dongge Jiang, Chaoying Deng and Jia Yue-Ting, including Vince Nguyen, Joylyn Belli, and Shaojie Chu, among other employees.  On this point, Dongge Jiang and Chaoying Deng were both corporate officers of Le Technology, and Jia Yue-Ting ran all three companies.

77. Faraday's Senior Accounting Manager, Michael Do, has testified that Chaoying Deng "lacked the experience to run the accounting for a company" the size of Faraday.  Mr. Do also testified that Faraday was run as an affiliate of Le Technology/LeEco, with Ms. Deng wielding power at the various companies.

78. Ms. Deng would bring in requests for money to Mr. Yue-Ting, and deposits from Mr. Yue-Ting and his companies would be "used to pay suppliers and the company payroll" at Faraday. Some of this money would also go to Le Technology and other subsidiaries.

79. In addition, Ms. Deng and Mr. Yue-Ting borrowed money against their personal residences to raise money for Faraday.

80. Faraday's Chief Financial Officer, Stefan Krause, also operated to sever relationships that Le Technology/LeEco had with other individuals, due to his desire to untangle the company's finances.   However, Mr. Yue-Ting refused to even explore the option of Chapter 11 bankruptcy, and instead decided to pursue a strategy of trying to avoid contractual obligations that Le Technology and its affiliates, such as FARADAY, owed to creditors.

81. On this point, Mr. Yue-Ting's refusal to file a Chapter 11 bankruptcy petition in order to reorganize and pay his creditors caused his Chief Financial Officer, Stefan Krause, to leave Faraday in protest.

82. As evidenced by the current complaint, FARADAY shared the same office space with Le Technology during this time-period and continues to share office space with Le Technology in Santa Clara. In addition, Jia Yue-Ting heavily borrowed, and lent, from LE HOLDINGS, LE TECHNOLOGY, and their various subsidiaries and provided no interest loans in which he served as both a borrower and a lender.   Following the creation of these loans, Jia Yue-Ting breached said loans and apologized in a public statement regarding said breach. In addition, Jia Yue-Ting and Faraday personally held themselves out as responsible and, in fact, paid many debts of Le Technology and Le Holdings.   Indeed, Faraday's Chief Financial Officer, Stefan Krause, personally investigated certain accounts that Le Technology was responsible for.

83.  As a result of the many examples of the unities of interest described herein and the fact that Le Technology and Le Holdings are inadequately capitalized, FARADAY is liable as an alter ego of LE TECHNOLOGY and LE HOLDINGS for these companies' breach of the contract entered into with the Plaintiff.

84. Indeed, as stated earlier, Chaoying Deng signed the lease on behalf of LE
TECHNOLOGY.  Ms. Deng was listed as the Chief Executive Officer of both LE
TECHNOLOGY and FARADAY during the time that FARADAY occupied the subject
property.

85. Consequently, FARADAY's subsequent decision to enter into a sublease agreement with
LE TECHNOLOGY, which permitted FARADAY to occupy the property and was in
direct violation of the lease, is yet another factor that renders FARADAY liable for LE
TECHNOLOGY'S breach of the lease, and indicates that it would be inequitable unless
FARADAY is held liable for LE TECHNOLOGY'S breach of the contract. This is
particularly the case considering that LE TECHNOLOGY permitted FARADAY to
occupy the property for at least five months without paying a penny of rent.

86. For her part, Ms. Deng testified that she understood that the lease at issue in this case
that was entered into between the Plaintiff and the other Defendants required Faraday to
make payments to the Plaintiff, in the event that the other Defendants defaulted on the
lease, but that no payments were made from Faraday to the Plaintiff any way.

87. Mr. Yue-Ting reportedly has a net worth of over $3.8 billion, which makes these
Defendants' decision to breach this lease with impunity particularly egregious.

88. Indeed, there have been recent protests outside of Mr. Yue-Ting's offices in China from
other creditors furious about his refusal to repay their debts.

89. Many international news organizations, including Reuters and Fortune, have reported
recently on these Defendants' financial woes.

90. The Plaintiff has fully performed under the contract and has satisfied all conditions
precedent thereunder by providing LE TECHNOLOGY and LE HOLDINGS with the

subject premises in good condition.

91. WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against All Defendants)

92. Plaintiff re-alleges and incorporates by reference the allegations in all paragraphs above as though fully set forth herein.

93. The Plaintiff and Defendants LE HOLDINGS and LE TECHNOLOGY are in contract for the lease of the Subject Property from March 2016 – February 2026. Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

94. Defendants have acted in bad faith by not paying rent and making several misrepresentations to Plaintiff about their plan of action. Defendants have wrongfully and intentionally breached the duty of good faith by failing to perform under the contract and continuing to occupy the Subject Property for four months

95. In addition, Defendants LE TECHNOLOGY and LE HOLDINGS acted in bad faith by entering into a contract that specifically required any subtenant of theirs to pay the rent to the Plaintiff in the event of their default on the lease. However, these Defendants entered into a sublease agreement that, despite calling for rent payments of $110,000 per month, these Defendants knew would never be paid, due to all three Defendants pattern and practice of not paying each other for various, goods, services, and property that the other Defendant uses.

96. Making this matter even more egregious is the fact that Chaoying Deng and Dongge Jiang were central figures at both Le Technology and Faraday Future, as Ms. Deng was the CEO of both companies and Dongge Jiang was an individual that is considered one of the leaders of Faraday.   Mr. Jiang also signed the lease on behalf of Le Holdings.

97. This act of bad faith was particularly problematic and acted in bad faith of their contractual obligations, which required them to seek approval from the Plaintiff and provide assurance of any subtenant's net worth prior to a sublease or other occupancy agreement being entered into.

98.  Faraday IS FURTHER LIABLE for breaching the implied covenant of good faith and fair dealing by lying to the Plaintiff and lying to the Plaintiff and the Plaintiff's lender, Industrial and Commercial Bank of China (USA) National Association, about their occupation of the property. Indeed, on July 14, 2017, Ms. Deng signed a Subordination, Non-Disturbance and Attornment Agreement that explicitly stated that "Tenant has not assigned, mortgaged, sublet, encumbered, or otherwise transferred any or all of its interest under the Lease and, during the term of the Loan, agrees to not… sublet any or all of its interest… without the prior written consent of Lender."   Thus, through this written document that was notarized, Ms. Deng, on behalf of LE TECHNOLOGY and on behalf of FARADAY FUTURE (since was their CEO at the time) falsely represented that LE TECHNOLOGY had not sublet the Subject Property when, in fact, they already had. Faraday had begun occupying the Subject Property several days prior to that, pursuant to the sublease agreement discussed earlier.

99. Defendants' breach of the covenant of good faith and fair dealing has proximately and directly caused damages to Plaintiff.

100.    In addition, for all of the reasons given above in this Complaint, Defendant Faraday Future is liable for this claim as an alter ego of LE TECHNOLOGY and LE HOLDINGS.

101.    WHEREFORE, Plaintiff prays for judgment as set forth below.

### THIRD CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH CONTRACT RELATIONS

### (Against Faraday & Future Inc.)

102.    In the alternative, the Plaintiff seeks to recover damages against FARADAY if there is no contract that can be enforced, alter ego or otherwise, against FARADAY.

103.    Defendants LE TECHNOLOGY and LE HOLDINGS, without permission, invited FARADAY&FUTURE to occupy the subject premises, despite the fact that they did not have permission from the Plaintiff.

104.    Indeed, the founder and head of Le Technology, Mr. Yue-Ting, was also the founder and head of FARADAY.   FARADAY&FUTURE has been facing financial struggles of their own and did not contribute to any rent as an unauthorized occupant. As a result, LE TECHNOLOGY did not receive any funds from FARADAY, which affected their ability to meet their own rental obligations under the lease.

105.    As a result, Plaintiff alleges that FARADAY&FUTURE'S conduct intentionally interfered with the rental contract between LE TECHNOLOGY and HAN'S SAN JOSE HOPITALITY and made performance by LE TECHNOLOGY more difficult or more expensive

106.    On this score, FARADAY&FUTURE was well aware of this prohibition on an unauthorized use of the property as they are, in their own employees words, a "sister"

company of LE TECHNOLOGY, and Jia Yue-Ting recently became the Chief Executive Officer of FARADAY&FUTURE.

107.     Mr. Yue-Ting reportedly has a net worth of over $3.8 billion, which makes these Defendants decision to breach this lease with impunity particularly egregious.

108.     In addition, Jia Yue-Ting has heavily borrowed from, and then lent, money to Le Holdings and Le Technology with no-interest loans.

109.     Faraday's intentional decision to interfere with the contract between the Plaintiff and the other Defendants was particularly egregious as Faraday, through its Chief Executive Officer Chaoying Deng, lied to the Plaintiff and the Plaintiff's lender, Industrial and Commercial Bank of China (USA) National Association, about their occupation of the property.  Indeed, on July 14, 2017, Ms. Deng signed a Subordination, Non-Disturbance and Attornment Agreement that explicitly stated that "Tenant has not assigned, mortgaged, sublet, encumbered, or otherwise transferred any or all of its interest under the Lease and, during the term of the Loan, agrees to not… sublet any or all of its interest… without the prior written consent of Lender."   Thus, through this written document that was notarized, Ms. Deng, on behalf of LE TECHNOLOGY and on behalf of FARADAY FUTURE (since was their CEO at the time) falsely represented that LE TECHNOLOGY had not sublet the Subject Property when, in fact, they already had. Faraday had began occupying the Subject Property several days prior to that, pursuant to the sublease agreement discussed earlier.

110.     Moreover, notwithstanding the fact that Faraday's Chief Executive Officer Chaoying Deng and other leader Dongge Jiang were well aware of the lease restrictions prohibiting their taking possession of the property as a subtenant or other occupant,

Faraday decided to interfere with the contract by assisting Le Technology and Le Holdings break the contract by permitting them to sublet the property at a rent of $110,000, with the tacit understanding that they would not pay a penny for said occupancy, due to the fact that the companies frequently procure goods, services, property, and guarantee loans for the other behalf, without ever paying each other for same.   This is all done because all three companies are essentially just arms of Jia Yue-Ting's personal business operations.   As described earlier, the lease required LE TECHNOLOGY to request permission from the Plaintiff before subletting the property, or permitting another person to occupy said property, and provided specific requirements of documentation demonstrating the subtenant or other occupant's financial health and net worth.

111.    Considering that the vast majority of the subject property was vacant at the time that the sublease was entered into, FARADAY'S intentional interference with the Plaintiff's contract with LE TECHNOLOGY and LE HOLDINGS substantially harmed the Plaintiff. If LE TECHNOLOGY had sublet the subject property to another tenant that had the requisite net worth and had the financial strength that the lease required, the Plaintiff could have, at a bare minimum, been paid that subtenant's rent when LE TECHNOLOGY fell into default on the lease, as the lease specifically requires.  Indeed, because the vast majority of the subject property was vacant, a suitable subtenant could have paid the vast majority of the rent. Consequently, a suitable subtenant, rather than another shell corporation of Jia Yue-Ting that never had any intention of paying rent, may have prevented the lease from ever falling to default in the first instance.

112.    Indeed, the unauthorized sublease that LE TECHNOLOGY and LE HOLDINGS entered into with FARADAY required FARADAY to pay $110,000 per month in rent. If an adequate subtenant had been procured, rather than FARADAY, the Plaintiff would have received $1.5 million in rent to present date, notwithstanding LE TECHNOLOGY'S default on the lease with the Plaintiff.

113.    Indeed, LeEco, Le Technology and all of its affiliates, including Faraday, were well-aware of the vast amount of negative publicity surrounding them during this time-period.  Their awareness is evidenced by Le Technology's Director of Real Estate, Dan McGill, stating in an e-mail that only one construction company would bid on a project for them because all other companies were afraid that they would not be paid, like countless other vendors. On information and belief, due to the extreme amount of negative publicity and the dismal state of their financial affairs, FARADAY deliberately concealed their occupancy of the Subject Property, and their sublease agreement, from the Plaintiff, as they knew that Plaintiff never would have consented to their occupying the subject property. Rather, Plaintiff would have wanted a subtenant, or other occupant, that would actually pay rent to LE TECHNOLOGY and LE HOLDINGS, which would have provided a much higher probability that Plaintiff would have been paid their rent from the other Defendants.

114.    As such, FARADAY'S unauthorized use of the property was a substantial factor in causing Plaintiff's harm.

115.    FARADAY'S conduct, as described herein, is malicious, fraudulent, and was done with reckless disregard of the Plaintiff's rights.   As such, the Plaintiff is entitled to punitive damages against FARADAY.

116.        WHEREFORE, Plaintiff prays for judgment as set forth below.

## **PRAYER**

WHEREFORE, Plaintiff prays judgement jointly and severally against the defendants, and each

of them, as follows:

1.   Unpaid rent since September 1, 2017 with 12% interest;

2.   For future unpaid pursuant to Civil Code section 1951.2 according to proof;

3.   All unpaid Expenses and Taxes as provided for in the Lease;

4.   Costs incurred by Landlord in securing a new tenant;

5.   General damages according to proof;

6.   Special damages according to proof;

7.   Expectation damages according to proof

8.   For punitive damages;

9.   For interest as provided by law;

10. For costs of suit incurred herein, including attorney's fees;

11. For such other and further relief as the Court may deem just and proper.


Dated: October 22, 2018

                                                The Goodell Law Firm


                                        By: _____

                                                Nelson Goodell
                                                Attorney for Plaintiff
                                                Han's San Jose Hospitality LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

## OFFICE LEASE

## 3553 NORTH FIRST STREET, SAN JOSE, CALIFORNIA

This Office Lease ("**Lease**"), dated as of the date set forth in Section 1.1, is made by and between **BSREP RIO ROBLES LLC**, a Delaware limited liability company ("**Landlord**"), on the one hand, and **LE TECHNOLOGY, INC.**, a California corporation, and **LE HOLDINGS (BEIJING) CO., LTD.**, a company organized under the laws of the People's Republic of China (collectively, the "**Tenant**"), on the other hand. The following exhibits are incorporated herein and made a part hereof: **Exhibit A-1** (Outline of Premises); **Exhibit A-2** (Legal Description of Land); **Exhibit B** (Work Letter); **Exhibit C** (Form of Confirmation Letter); **Exhibit D** (Rules and Regulations); **Exhibit E** (Judicial Reference); **Exhibit F** (Additional Provisions); **Exhibit G** (Hazardous Materials Disclosure Certificate); **Exhibit H** (Memorandum of Lease); and **Exhibit I** (Purchase Agreement).

## BASIC LEASE INFORMATION

| **TERMS OF LEASE** | | **DESCRIPTION** |
|---|---|---|
| 1. | **Effective Date:** | December ___, 2015 |
| 2. | **Premises.** | |
| 2.1 | "**Building**": | 3553 North First Street, San Jose, California |
| 2.2 | "**Premises**": | The entire Building, except for the portion leased to the tenant under the Verizon Lease (hereinafter defined), the interior of which Building contains approximately eighty-six thousand one hundred forty-five (86,145) rentable square feet of space, the outline and location of which is set forth in **Exhibit A-1**. |
| 2.3 | "**Land**": | The parcel of land upon which the Building is located, as more particularly described on the legal description attached hereto as **Exhibit A-2**. |
| 2.4 | "**Project**": | The Building and the Land, together with any and all any parking areas, driveways, walkways, landscaping, and any and all other improvements and/or facilities located therein, thereunder and/or thereon. |
| 3. | **Term.** | |
| 3.1 | **Term:** | The term of this Lease (the "**Term**") shall commence on the Commencement Date and end on the Expiration Date (or any earlier date on which this Lease is terminated as provided herein). |
| 3.2 | "**Commencement Date**": | |
| | | March 15, 2016 |
| 3.3 | "**Expiration Date**": | |
| | | February 28, 2026 |

-1-

4.   "Base Rent":

| Period During Term | Monthly Base Rent Per Rentable Square Foot (rounded to the nearest 100th of a dollar) | Monthly Installment of Base Rent | Annualized Base Rent |
|---|---|---|---|
| March 15, 2016 – February 28, 2017 | $2.25 | $193,826.25 | $2,325,915.00 |
| March 1, 2017 – February 28, 2018 | $2.32 | $199,856.40 | $2,398,276.80 |
| March 1, 2018 – February 28, 2019 | $2.39 | $205,886.55 | $2,470,638.60 |
| March 1, 2019 – February 29, 2020 | $2.46 | $211,916.70 | $2,543,000.40 |
| March 1, 2020 – February 28, 2021 | $2.53 | $217,946.85 | $2,615,362.20 |
| March 1, 2021 – February 28, 2022 | $2.61 | $224,838.45 | $2,698,061.40 |
| March 1, 2022 – February 28, 2023 | $2.69 | $231,730.05 | $2,780,760.60 |
| March 1, 2023 – February 29 2024 | $2.77 | $238,621.65 | $2,863,459.80 |
| March 1, 2024 – February 28, 2025 | $2.85 | $245,513.25 | $2,946,159.00 |
| March 1, 2025 – February 28, 2026 | $2.94 | $253,266.30 | $3,039,195.60 |

5.   "Tenant's Share" of Building:    100%

6.   "Tenant's Share" of Project:    100%

7.   "Permitted Use":    R&D Use. As used herein, "R&D Use" means general office and research and development.

8.   "Security Deposit":    $253,266.30, as more particularly described in Section 21.

Prepaid Base Rent:    $193,826.25, as more particularly described in Section 3.

Prepaid Additional Rent:    $34,458.00, as more particularly described in Section 3.

-2-

| 9. | Parking: | All parking spaces located at the Project as of the Effective Date, of which two hundred sixty-eight (268) are regular spaces, seven (7) are handicap spaces and zero (0) are motorcycle spaces, subject to applicable Laws (defined in <u>Article 5</u>), including any applicable transportation management program applicable to the Project. |
|---|---|---|

10. **Address of Tenant:**

Before the Commencement Date:

LE TECHNOLOGY, INC.
1100 Island Drive
Redwood City, CA 94065
Attn: Office Manager

LE HOLDINGS (BEIJING) CO., LTD.
c/o Leshi Holdings (Beijing) Co. Ltd.
16f Letv Building, Yaojiayuan Road, Chaoyang District, BJ 100025
Attn: Chief Financial Officer

From and after the Commencement Date:
3553 North First Street
San Jose, California 95134
Attn: _____

11. **Address of Landlord:**

BSREP Rio Robles LLC
250 Vesey Street, 15th Floor
New York, NY 10281-1023
Attn: Mr. Thomas Diamond
Thomas.Diamond@brookfield.com

with copies to:

BSREP Rio Robles LLC
181 Bay Street, Suite 300
Toronto, ON M5J 2T3
Attn: Mr. Thomas Diamond
Thomas.Diamond@brookfield.com

and

Berliner Cohen, LLP
Ten Almaden Boulevard, Eleventh Floor
San Jose, CA 95113-2233
Attn: Harry A. Lopez

12. **Broker(s):**

Giant Realty ("**Tenant's Broker**"), representing Tenant, and CBRE, Inc. ("**Landlord's Broker**"), representing Landlord.

13. **"Tenant Improvements":**

Defined in **Exhibit B**.

-3-

14. "Verizon Lease": That certain Ground and Rooftop Lease Agreement, dated April 18, 2002, as amended by that certain First Amendment to Ground and Rooftop Lease Agreement, dated as of January 11, 2006 (such lease, as amended, shall hereinafter sometimes be referred to as the "Verizon Lease"), by and between Landlord (as successor-in-interest to NetIQ Corporation, a Delaware corporation), as lessor, and GTE Mobilnet of California Limited Partnership, doing business as Verizon Wireless ("Verizon"), as lessee. Landlord and Tenant acknowledge that a portion of the Project is currently subject to the Verizon Lease. Tenant represents and warrants that Landlord has delivered to Tenant, and Tenant has reviewed, a copy of the Verizon Lease.

# 1. PREMISES AND EXTERIOR AREAS.

## 1.1 The Premises.

1.1.1 Subject to the terms hereof, Landlord hereby leases the Premises to Tenant and Tenant hereby leases the Premises from Landlord. Landlord and Tenant hereby agree and acknowledge that any statement of square footage set forth in this Lease, or that may have been used in calculating any of the economic terms hereof, is an approximation which Landlord and Tenant agree is reasonable and conclusive and binding upon the parties. In furtherance of the preceding sentence, but without limiting the generality thereof, Landlord and Tenant hereby agree and acknowledge that, except as set forth in this grammatical paragraph below, no economic terms based upon such approximated square footage shall be subject to revision regardless of whether any future or differing measurements of the Premises are consistent or inconsistent therewith, and irrespective of whether the actual rentable square footage is more or less. Landlord shall have the right at any time to re-measure the Premises in accordance with industry-wide measurement standards (or measurement standards utilized in the San Francisco Bay Area/Silicon Valley metropolitan area) in Landlord's reasonable discretion. At any time Landlord may deliver to Tenant a notice substantially in the form of **Exhibit C**, as a confirmation of the information set forth therein. Tenant shall execute and return (or, by notice to Landlord, reasonably object to) such notice within five (5) business days after receiving it, and if Tenant fails to do so, Tenant shall be deemed to have executed and returned it without exception.

1.1.2 Landlord shall use commercially reasonable efforts to deliver possession of the Premises to Tenant for the construction of the Tenant Improvement Work (as defined in the Work Letter attached hereto as **Exhibit B** ("Tenant Work Letter")) as soon as reasonably practicable after the Effective Date, with such delivery scheduled to occur within three (3) business days after the Effective Date ("Scheduled Delivery Date"). If Landlord is unable to deliver possession of the Premises to Tenant on or before the Scheduled Delivery Date, or any other date, Landlord shall not be subject to any liability therefor, and such failure shall not affect the validity of this Lease or the obligations of Tenant hereunder, but, in such event, the delivery date shall be the date that Landlord actually delivers possession of the Premises to Tenant for the construction of the Tenant Improvement Work (such date of actual delivery of possession being the "Premises Delivery Date"); provided, however, that, if Landlord fails to deliver the Premises to Tenant on the Scheduled Delivery Date for any reason other than delays caused by Tenant (it being the intent of the parties that such Scheduled Delivery Date shall be extended one (1) day for each day of any such Tenant delays), then the Commencement Date set forth in the Basic Lease Information (i.e., March 15, 2016) will be extended by one day for each day that shall have elapsed between the Scheduled Delivery Date and the Premises Delivery Date. From and after the Premises Delivery Date, Tenant shall have the right to construct the Tenant Improvement Work in the Premises in accordance with the Tenant Work Letter. The period commencing with the Premises Delivery Date and expiring on the date which is one (1) day prior to the Commencement Date shall hereinafter sometimes be referred to as the "Construction Period." During the Construction Period, Tenant shall not be obligated to pay Base Rent and/or Tenant's Share of Direct Expenses, but shall pay for any and all Utility

-4-

Services (as defined in Section 6.1 below) and otherwise comply with all of the terms and conditions of this Lease. If Tenant completes the Tenant Improvement Work prior to the Commencement Date, Tenant shall have the right to occupy the Premises prior to such Commencement Date without the payment of Base Rent and/or Tenant's Share of Direct Expenses, but otherwise subject to all of the terms and conditions of this Lease; provided, however, that, if Tenant does not complete the Tenant Improvement Work until after the expiration of the Construction Period, the Commencement Date shall not be delayed as a result thereof. Except as specifically set forth in this Lease, Tenant agrees to accept the Premises in their condition and configuration existing on the date hereof, without any obligation of Landlord to provide or pay for any work or services related to the improvement of the Premises, Land and/or Project and without any representation or warranty regarding the condition of the Premises, Land and/or Project or their suitability for the conduct of Tenant's business. By taking possession of the Premises, Tenant acknowledges that the Premises are then in the condition and configuration required hereunder.

1.2     **Exterior Areas.** Subject to the Rules and Regulations (defined in **Exhibit D**), Tenant may use, for ingress and egress to and from the Building (and any other use and/or purpose for which such area(s) were designed and/intended), any driveways, walkways, entryways, parking areas, landscaped areas, patios, and/or any other portions of the Land that are designated from time to time by Landlord for such use by Tenant (collectively, the "Exterior Areas"). Landlord reserves the right to close temporarily, make alterations or additions to, or change the location of elements of the Project and the Exterior Areas, and any inconvenience suffered by Tenant in connection therewith shall not subject Landlord to any liability for any loss or damage resulting therefrom, constitute a constructive eviction, or entitle Tenant to any abatement of Rent.

2.     **LEASE TERM.**

2.1     **Term.** The Term shall commence and, unless ended sooner or extended as herein provided, shall expire on the Commencement Date and Expiration Date, respectively, specified in Section 3 of the Basic Lease Information. Without limiting the foregoing, if the Premises Delivery Date is delayed for any reason, then (a) this Lease shall not be void or voidable by either party, and (b) Landlord shall not be liable to Tenant for any loss or damage resulting therefrom. This Lease shall be a binding contractual obligation effective upon execution and delivery hereof by Landlord and Tenant.

2.2     **Extension Option.**

2.2.1     **Option Term.** Subject to the terms and conditions set forth below, Tenant shall have one (1) option ("Extension Option") to extend the initial Term of this Lease ("Initial Term") with respect to the entire Premises, for a period of five (5) years (such five (5) year period being the "Option Term"). If Tenant properly exercises the Extension Option hereunder, all of the terms, covenants and conditions of this Lease shall continue in full force and effect during the Option Term, including provisions regarding payment of Additional Rent, which shall remain payable on the terms herein set forth, except that the Base Rent payable by Tenant during the Option Term shall be as calculated in accordance with Section 2.2.3 and Section 2.2.4 below, (b) Tenant shall continue to possess and occupy the entire Premises in their existing condition, "as is" as of the commencement of the Option Term, and subject to the terms of Article 11 below, Landlord shall have no obligation to repair, remodel, improve or alter the Premises, to perform any other construction or other work of improvement upon the Premises, or to provide Tenant with any construction or refurbishing allowance whatsoever, and (c) Tenant shall have no further rights to extend the Term of this Lease after the expiration of the Option Term.

2.2.2     **Exercise.** To exercise the Extension Option, Tenant must deliver an unconditional, unequivocal and binding notice to Landlord ("Option Exercise Notice"), in accordance with the terms of Section 25.1 below, with respect to the Extension Option, not sooner than twelve (12) months, nor later than nine (9) months, prior to the Expiration Date, the time of such exercise being of the essence. If Tenant fails to timely give the Option Exercise Notice in strict accordance with the immediately preceding sentence, Tenant will be deemed to have waived the Extension Option. Tenant shall have no right to extend the Initial Term, except as expressly provided in this

-5-

Section 2.2. If duly exercised in accordance with the terms and conditions of this Section 2.2, the Option Term shall commence upon the expiration of the Initial Term.

2.2.3   **Market Rate Calculation.** The Base Rent payable by Tenant for the Premises during the Option Term shall be one hundred percent (100%) of the Market Rate (as defined below) for the Premises, valued as of the commencement of the Option Term, determined in the manner hereinafter provided. As used herein, the term "Market Rate" shall mean the annual amount of Base Rent at which tenants, as of the commencement of the Option Term, are leasing non-sublease, non-equity space under then prevailing ordinary rental market practices (e.g., not pursuant to extraordinary rental, promotional deals or other concessions to tenants which deviate from what is the then prevailing ordinary practice), at arm's length, that is comparable to the Premises and located in comparable first class office/R&D projects in the submarket in which the Project is located (the "Comparison Projects"), based upon binding lease transactions for tenants in the Comparison Projects that, where possible, commence or are to commence within six (6) months prior to or within six (6) months after the commencement of the Option Term ("Comparison Leases"). Comparison Leases shall include renewal and new non-renewal tenancies, but shall exclude subleases and leases of space subject to another tenant's expansion rights. Rental rates payable under Comparison Leases shall be adjusted to account for variations between this Lease and the Comparison Leases with respect to: (a) the length of the Option Term compared to the lease term of the Comparison Leases; (b) rental structure, including, without limitation, rental rates per rentable square foot (including type, gross or net, and if gross, adjusting for base year or expense stop), additional rental, escalation provisions, all other payments and escalations; (c) the size of the Premises compared to the size of the premises of the Comparison Leases; (d) free rent, moving expenses and other cash payments, allowances or other monetary concessions affecting the rental rate; (e) the age and quality of construction of the buildings (including compliance with applicable codes); and (f) leasehold improvements and/or allowances, including the amounts thereof in renewal leases, and taking into account, in the case of renewal leases (including this Lease), the value of existing leasehold improvements to the renewal tenant (but ascribing no value to (A) any tenant improvements installed by or on behalf of Tenant, at Tenant's sole cost and expense (i.e., not by way of the Allowance described in Section 1.1 of the Tenant Work Letter), and/or (B) Tenant's specific use of any tenant improvements installed by or on behalf of Tenant pursuant to this Lease, irrespective of whether any such tenant improvements were installed at Tenant's sole cost and expense, or by way of such Allowance, it being the intent of the parties that the determination of the Market Rate shall only take into account the value, if any, such tenant improvements would have to the average prospective tenant at such time). No consideration shall be given to (i) the fact that Landlord is or is not required to pay a real estate brokerage commission in connection with Tenant's exercise of its right to extend the Term, or the fact that landlords are or are not paying real estate brokerage commissions in the Comparison Leases, or (ii) any period of rental abatement, if any, granted to tenants in Comparison Leases during the period allotted for the design, permitting and construction of tenant improvements. Notwithstanding anything to the contrary contained in this Lease, in no event shall the Market Rate payable by Tenant during the Option Term be less than the Base Rent payable by Tenant to Landlord at the expiration of the Initial Term.

2.2.4   **Base Rent Determination.** The Base Rent payable by Tenant for the Premises during the Option Term shall be determined as follows:

(a)   If Tenant provides Landlord with its unconditional, unequivocal and binding notice of exercise pursuant to Section 2.2.2 above, then, prior to the commencement of the Option Term, Landlord shall deliver to Tenant a good faith written proposal of the Market Rate ("Landlord's Initial Proposal"). Within twenty-one (21) days after receipt of Landlord's Initial Proposal, Tenant shall notify Landlord in writing (1) that Tenant accepts Landlord's Initial Proposal or (2) that Tenant elects to submit the determination of Market Rate to arbitration in accordance with Sections 2.2.4(b) through 2.2.4(d) below. If Tenant does not give Landlord a timely notice in response to Landlord's Initial Proposal, Landlord's Initial Proposal shall be binding upon Tenant.

(b)   If Tenant timely elects to submit the determination of Market Rate to arbitration, Landlord and Tenant shall first negotiate in good faith in an attempt to determine the Market Rate. If Landlord and

-6-

Tenant are able to agree within thirty (30) days following the delivery of Tenant's notice to Landlord electing arbitration (or if Tenant accepts Landlord's Initial Proposal), then such agreement shall constitute a determination of Market Rate for purposes of this Section, and the parties shall immediately execute an amendment to this Lease stating the Base Rent for the Option Term. If Landlord and Tenant are unable to agree on the Market Rate within such 30-day negotiating period, then within fifteen (15) days after the expiration of such negotiating period, the parties shall meet and concurrently deliver to each other in envelopes their respective good faith estimates of the Market Rate (set forth on a net effective rentable square foot per annum basis) (respectively, "**Landlord's Determination**" and "**Tenant's Determination**"). Landlord's Determination may be more or less than Landlord's Initial Proposal. If the higher of such estimates is not more than one hundred five percent (105%) of the lower, then the Market Rate shall be the average of the two. Otherwise, the dispute shall be resolved by arbitration in accordance with Sections 2.2.4(c) and 2.2.4(d) below.

(c)     Within seven (7) days after the exchange of estimates, the parties shall select as an arbitrator an independent real estate broker with at least ten (10) years of experience in leasing commercial office/R&D space in the metropolitan area in which the Project is located (a "**Qualified Appraiser**"). If the parties cannot agree on a Qualified Appraiser, then within a second period of seven (7) days, each shall select a Qualified Appraiser and within ten (10) days thereafter the two appointed Qualified Appraisers shall select an independent Qualified Appraiser and the independent Qualified Appraiser shall be the sole arbitrator. If one party shall fail to select a Qualified Appraiser within the second seven (7) day period, then the Qualified Appraiser chosen by the other party shall be the sole arbitrator.

(d)     Within twenty-one (21) days after submission of the matter to the arbitrator, the arbitrator shall determine the Market Rate by choosing whichever of the estimates submitted by Landlord and Tenant the arbitrator judges to be more accurate. The arbitrator shall notify Landlord and Tenant of its decision, which shall be final and binding. If the arbitrator believes that expert advice would materially assist him or her, the arbitrator may retain one or more qualified persons to provide expert advice. The fees of the arbitrator and the expenses of the arbitration proceeding, including the fees of any expert witnesses retained by the arbitrator, shall be paid by the party whose estimate is not selected. Each party shall pay the fees of its respective counsel and the fees of any witness called by that party.

(e)     If the Option Term commences before the matter is resolved by agreement between the parties, or a decision is rendered in any arbitration commenced pursuant to this Section 2.2, until such resolution occurs or decision is rendered, the Tenant's monthly payments of Base Rent shall be in an amount equal to Landlord's determination of the Market Rate. Within ten (10) business days following the resolution of such dispute by the parties or the decision of the arbitrator, as applicable, Tenant shall pay to Landlord, or Landlord shall pay to Tenant, the amount of any deficiency or excess, as the case may be, in the Base Rent theretofore paid.

2.2.5     **Rights Personal to LETV**. Tenant's right to exercise the Extension Option is personal to, and may be exercised only by, LE TECHNOLOGY, INC., a California corporation ("**Le Technology**"), and LE HOLDINGS (BEIJING) CO., LTD., a company organized under the laws of the People's Republic of China ("**Le Holdings (Beijing)**"), it being the intent of the parties that the Extension Option must be exercised, if at all, by both Le Technology and Le Holdings (Beijing) (and in no event by only one such entity) (for purposes of this Lease, Le Technology and Le Holdings (Beijing) shall hereinafter sometimes be collectively referred to as "**LETV**"); provided, however, that, subject to the terms and conditions of this Section 2.2.5 below, the Extension Option may be exercised by (i) Le Technology (individually), (ii) Le Holdings (Beijing) (individually) or (iii) (A) any Permitted LETV Affiliate Assignee to which this Lease is assigned without Landlord's consent pursuant to the express terms and conditions of Section 14.8.1 below, or (B) any Permitted Successor Transferee to which this Lease is assigned without Landlord's consent pursuant to the express terms and conditions of Section 14.8.2 below (any such assignee being a "**Permitted Assignee**"). The Extension Option may be exercised only if the exercising entity(ies) (i.e., (A) Le Technology and/or Le Holdings (Beijing) or (B) a Permitted Assignee) continues to occupy at least seventy-five percent (75%) of the Premises at the time of such exercise. LETV (i.e., Le Technology and Le Holdings (Beijing),

-7-

collectively) hereby agrees and acknowledges that, if the Extension Option is exercised by (i) Le Technology (individually), (ii) Le Holdings (Beijing) (individually) or (iii) a Permitted Assignee (any such individual exercising entity being an "**Individual Exercising Entity**"), then, in any such event, both entities comprising "LETV" shall remain fully liable for any and all obligations of the "Tenant" accruing under this Lease during the Option Term (and any extensions thereof). In furtherance of the preceding sentence, at Landlord's election (in Landlord's sole and absolute discretion), the right of an Individual Exercising Entity to exercise the Extension Option may be subject to the condition precedent that both entities comprising "LETV" and the Individual Exercising Entity (if the Individual Exercising Entity is not one of the entities comprising "LETV") execute and deliver to Landlord, concurrently with the Individual Exercising Entity's delivery of written notice of exercise of the Extension Option an amendment to this Lease (in form and content acceptable to Landlord, in Landlord's reasonable discretion) between (i) Landlord, (ii) LETV and (iii) the Individual Exercising Entity (if the Individual Exercising Entity is not one of the entities comprising "LETV") that provides, among other things, that LETV and such Individual Exercising Entity shall be jointly and severally liable under this Lease during the Option Term (and any extensions thereof). Other than a Permitted Assignee, no assignee or subtenant shall have any right to exercise the Extension Option granted herein. In addition, if Tenant is in Default at the time it exercises the Extension Option or at any time thereafter until the commencement of the Option Term, Landlord shall have, in addition to all of its other rights and remedies under this Lease, the right (but not the obligation), in Landlord's sole and absolute discretion, to terminate the Extension Option, and to unilaterally revoke and nullify Tenant's exercise of the Extension Option (which termination, revocation and nullification on the part of Landlord shall be evidenced by written notice delivered to Tenant), in which case this Lease shall expire on the expiration of the Initial Term, unless earlier terminated pursuant to the terms hereof, and Tenant shall have no further rights under this Lease to renew or extend the Term.

3.    **RENT.**

3.1    **Payment of Rent.** Tenant shall pay all Base Rent and Additional Rent (defined below) (collectively, "**Rent**") to Landlord or Landlord's agent, without prior notice or demand or any setoff or deduction, at the place Landlord may designate from time to time. As used herein, "**Additional Rent**" means all amounts, other than Base Rent, that Tenant is required to pay Landlord hereunder. Monthly payments of Base Rent (subject to the last grammatical paragraph of Section 4 of the Basic Lease Information) and monthly payments of "Direct Expenses" (defined in Section 4.1) (collectively, "**Monthly Rent**") shall be paid in advance on or before the first day of each calendar month during the Term; provided, however, that the installment of Base Rent for the first full calendar month for which Base Rent is payable hereunder and the installment of Direct Expenses for the first full calendar month for which such Additional Rent is payable hereunder shall be paid upon Tenant's execution and delivery hereof. Except as otherwise provided herein, all other items of Additional Rent shall be paid within 10 business days after Landlord's request for payment. Rent for any partial calendar month shall be prorated based on the actual number of days in such month. Without limiting Landlord's other rights or remedies, (a) if any installment of Rent is not received by Landlord or its designee within five (5) business days after its due date, Tenant shall pay Landlord a late charge equal to 5% of the overdue amount; and (b) any Rent that is not paid within 10 days after its due date shall bear interest, from its due date until paid, at the lesser of 12% per annum or the highest rate permitted by Law; provided, however, that not more than once during each twelve (12) month period, Landlord shall give Tenant a notice of delinquency, and five (5) day cure period following such notice, with respect to such late payment of Rent before imposing such late charge and/or accruing interest on unpaid Rent. Tenant's covenant to pay Rent is independent of every other covenant herein.

3.2    **Additional Rent Upon Default by Tenant.** Landlord and Tenant acknowledge that to induce Tenant to enter into this Lease, and in consideration of Tenant's agreement to perform all of the terms, covenants and conditions to be performed by Tenant under this Lease, as and when performance is due during the Term, Landlord has incurred (or will incur) significant costs, including, without limitation, the following: (i) payment of the Allowance (as described in the Tenant Work Letter); (ii) commissions to Landlord's and/or Tenant's real estate broker; and/or (iii) attorneys' fees and related costs incurred and/or paid by Landlord in connection with the negotiation and preparation of this Lease (collectively, the "**Inducements**"). Landlord and Tenant further

-8-

acknowledge that Landlord would not have granted the Inducements to Tenant but for Tenant's agreement to perform all of the terms, covenants, conditions and agreements to be performed by it under this Lease for the entire Term, and that Landlord's agreement to incur such expenditures and grant such concessions is, and shall remain, conditioned upon Tenant's faithful performance of all of the terms, covenants, conditions and agreements to be performed by Tenant under this Lease for the entire Term. Accordingly, if a Default by Tenant shall occur hereunder, Landlord shall be relieved of any unfulfilled obligation to grant Inducements hereunder, or to incur further expenses in connection therewith, and Tenant shall pay, as liquidated damages for Landlord's granting the Inducements and not as a penalty, within ten (10) days after the occurrence of the Default, as Additional Rent, the amount of those Inducements incurred or granted prior to the date of the default (the "**Pre-Default Inducements**"). Landlord may or, at Tenant's request, shall, after the occurrence of a Default, forward a statement to Tenant setting forth the amount of the Pre-Default Inducements, but the failure to deliver such a statement shall not be or be deemed to be a waiver of the right to collect the Pre-Default Inducements or to extend the date upon which such amount shall be due and payable. Notwithstanding the foregoing, Landlord shall not be entitled to recover Pre-Default Inducements if, and to the extent that, Tenant proves that such recovery would be duplicative of amounts that Landlord is otherwise entitled to recover pursuant to California Civil Code Sections 1951.2 or 1951.4, as applicable.

4. **EXPENSES AND TAXES.**

4.1     **General Terms.** In addition to Base Rent, Tenant shall pay, in accordance with Section 4.4, for each Expense Year (defined in Section 4.2.1), an amount equal to the sum of the following (collectively, the "**Direct Expenses**"): (a) Tenant's Share of Expenses for such Expense Year, plus (b) Tenant's Share of Taxes for such Expense Year, plus (c) a management fee (the "**Management Fee**") equal to three percent (3%) of the Rent (i.e., Base Rent and Additional Rent) payable by Tenant for the applicable Expense Year. The Management Fee, Tenant's Share of Expenses and Tenant's Share of Taxes for any partial Expense Year shall be prorated based on the number of days in such Expense Year. In the event either the Premises and/or the Project is expanded or reduced, then, as applicable, Tenant's Share of the Building and/or Tenant's Share of the Project shall be appropriately adjusted, and as to the calendar year in which such change occurs, the applicable Tenant's Share(s) for such year shall be determined on the basis of the number of days during that particular calendar year that each such Tenant's Share(s) was/were in effect.

4.2     **Definitions.** As used herein, the following terms have the following meanings:

4.2.1    "**Expense Year**" means each calendar year in which any portion of the Term occurs, the parties acknowledging that Tenant's payment of Direct Expenses shall begin on the Commencement Date (i.e., March 15, 2016), notwithstanding the later commencement of the payment of Base Rent hereunder.

4.2.2    "**Expenses**" means any and all expenses, costs and amounts that Landlord pays or accrues during any Expense Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation of the Project. Without limiting the generality of the preceding sentence, Expenses may include (i) the cost of supplying all utilities, the cost of operating, repairing, maintaining and renovating the utility, telephone, mechanical, sanitary, storm- drainage, and elevator systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections, the cost of contesting any Laws that may affect Expenses, and the costs of complying with any governmentally-mandated transportation-management or similar program; (iii) the cost of all insurance premiums and commercially reasonable deductibles; (iv) the cost of landscaping and relamping; (v) the cost of parking-area operation, repair, restoration, and maintenance; (vi) third-party fees and other costs, including consulting fees, legal fees and accounting fees, of all contractors and consultants in connection with the management, operation, maintenance and repair of the Land; (vii) payments under any equipment-rental agreements; (viii) wages, salaries and other compensation, expenses and benefits, including taxes levied thereon, of all persons engaged in the operation, maintenance and security of the Land, and costs of training, uniforms, and employee enrichment for such persons; (ix) the costs of operation, repair, maintenance and replacement of all systems and equipment (and

-9-

components thereof) of the Land; (x) the cost of janitorial, alarm, security and other services, replacement of wall and floor coverings, ceiling tiles and fixtures in Exterior Areas, maintenance and replacement of curbs and walkways, repair to roofs and any and all re-roofing; (xi) rental or acquisition costs of supplies, tools, equipment, materials and personal property used in the maintenance, operation and repair of the Land; (xii) the cost of capital improvements, or any other capital expenditures that are (A) intended to effect economies in the operation or maintenance of the Projector reduce current or future Expenses, (B) enhance the safety or security of the Projector its occupants, (C) replacements, repairs or modifications of the Building (including replacing the roof membrane/covering), Land and/or Project (including, without limitation, any and all Exterior Areas) that are required to keep the same in good and operable condition and repair or (D) required under any Law, excluding any such capital improvements or other capital expenditures made or incurred to remedy a noncompliance with any Laws, to the extent the work associated with such compliance was required to be performed prior to the date of this Lease (based on the current interpretation of such Laws by applicable governmental authorities as of the date such compliance was required); and (xiii) payments under any existing or future reciprocal easement agreement, transportation management agreement, cost-sharing agreement or other covenant, condition, restriction or similar instrument affecting the Project.

The specific examples of Expenses set forth above are in no way intended to and shall not limit the costs comprising Expenses, nor shall such examples in any way be deemed or construed to obligate Landlord to incur such costs and/or to provide such services, perform such work and/or to take such actions, except as Landlord may be expressly required in other provisions of this Lease, or except as Landlord, in its sole and absolute discretion, may elect. All costs incurred by Landlord in good faith in connection with the ownership, operation, maintenance, repair, replacement and management of the Premises shall be deemed conclusively binding on Tenant.

It is the intent of the parties that (1) the Base Rent set forth in this Lease shall be a net payment to Landlord, (2) except as otherwise expressly set forth in this Lease, this Lease shall continue for the full Term notwithstanding any occurrence preventing or restricting use and occupancy of the Building, Exterior Areas and/or Project, including, without limitation, any damage or destruction affecting the Building, and any action by governmental authority relating to or affecting the Project, (3) Base Rent shall be absolutely payable without offset, reduction or abatement for any cause, except as otherwise expressly provided in this Lease, (4) Landlord shall not bear any costs or expenses relating to the Building and/or Project, or provide any services or do any act in connection with the Building and/or Project, except as otherwise specifically provided in this Lease and (5) Tenant shall pay, in addition to Base Rent, Additional Rent to cover such costs and expenses relating to the Building and/or Project.

4.2.3   "Taxes" means all federal, state, county or local governmental or municipal taxes, fees, charges, assessments, levies, licenses or other impositions, whether general, special, ordinary or extraordinary, that are paid or accrued during any Expense Year (without regard to any different fiscal year used by such governmental or municipal authority) because of or in connection with the ownership, leasing or operation of the Project. Taxes shall include (a) real estate taxes; (b) general and special assessments; (c) transit taxes; (d) leasehold taxes; (e) personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems, appurtenances, furniture and other personal property used in connection with the Project; (f) any tax on the rent, right to rent or other income from any portion of the Projector as against the business of leasing any portion of the Building; (g) any assessment, tax, fee, levy or charge imposed by any governmental agency, or by any non-governmental entity pursuant to any private cost-sharing agreement, in order to fund the provision or enhancement of any fire-protection, street-, sidewalk- or road-maintenance, refuse-removal or other service that is (or, before the enactment of Proposition 13, was) normally provided by governmental agencies to property owners or occupants without charge (other than through real property taxes); and (h) any assessment, tax, fee, levy or charge allocable or measured by the area of the Premises or by the Rent payable hereunder, including any business, gross income, gross receipts, sales or excise tax with respect to the receipt of such Rent; provided, however, if at any time after the date of this Lease the methods of taxation now prevailing shall be altered so that in lieu of or as a supplement to or a substitute for the whole or any part of any Taxes, there shall be assessed or levied (1) a tax, assessment, levy, imposition or charge wholly or partially as a net income, capital or franchise levy or otherwise on the rents, issues, profits or

-10-

income derived therefrom, or (2) a tax, assessment, levy (including but not limited to any municipal, state or federal levy), imposition or charge measured by or based in whole or in part upon the real property and imposed upon Landlord, or (3) a license fee measured by the rent payable under this Lease, then all such taxes, assessments or levies or the part thereof so measured or based, shall be deemed to be included in the term "Taxes."

4.3 **Intentionally Omitted.**

4.4 **Calculation and Payment of Expenses and Taxes.**

4.4.1 **Statement of Actual Expenses and Taxes; Payment by Tenant.** Landlord shall use commercially reasonable efforts to give to Tenant, within 120 days after the end of each Expense Year, a statement (the "Statement") setting forth the actual Expenses and Taxes for such Expense Year. If the amount paid by Tenant for such Expense Year pursuant to Section 4.4.2 is less or more than the sum of Tenant's Direct Expenses for such Expense Year (as such amounts are set forth in such Statement), Tenant shall pay Landlord the amount of such underpayment, or receive a credit in the amount of such overpayment, with or against the Rent then or next due hereunder; provided, however, that if this Lease has expired or terminated and Tenant has vacated the Premises, Tenant shall pay Landlord the amount of such underpayment, or Landlord shall pay Tenant the amount of such overpayment (less any Rent due), within 30 days after delivery of such Statement. Any failure of Landlord to timely deliver the Statement for any Expense Year shall not diminish either party's rights under this Section 4.

4.4.2 **Statement of Estimated Expenses and Taxes.** Landlord shall endeavor to give to Tenant, for each Expense Year, a statement (the "Estimate Statement") setting forth Landlord's reasonable estimate of the Direct Expenses (the "Estimated Direct Expenses") for such Expense Year. Upon receiving an Estimate Statement, Tenant shall pay, with its next installment of Base Rent, an amount equal to the excess of (a) the amount obtained by multiplying (i) the sum of the Estimated Direct Expenses (as such amount is set forth in such Estimate Statement), by (ii) a fraction, the numerator of which is the number of months that have elapsed in the applicable Expense Year (including the month of such payment) and the denominator of which is 12, over (b) any amount previously paid by Tenant for such Expense Year pursuant to this Section 4.4.2. Until Landlord delivers a new Estimate Statement (which Landlord may do at any time), Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the sum of the Estimated Direct Expenses, as such amount is set forth in the previous Estimate Statement. Any failure of Landlord to timely deliver any Estimate Statement shall not diminish Landlord's rights to receive payments and revise any previous Estimate Statement under this Section 4.

4.4.3 **Retroactive Adjustment of Taxes.** Notwithstanding any contrary provision hereof, if, after Landlord's delivery of any Statement, an increase or decrease in Taxes occurs for the applicable Expense Year (whether by reason of reassessment, error, or otherwise), Taxes for such Expense Year shall be retroactively adjusted. If, as a result of such adjustment, it is determined that Tenant has under- or overpaid Tenant's Share of such Taxes, Tenant shall pay Landlord the amount of such underpayment, or receive a credit in the amount of such overpayment, with or against the Rent then or next due hereunder; provided, however, that if this Lease has expired or terminated and Tenant has vacated the Premises, Tenant shall pay Landlord the amount of such underpayment, or Landlord shall pay Tenant the amount of such overpayment (less any Rent due), within 30 days after such adjustment is made.

4.5 **Charges for Which Tenant is Directly Responsible.** Tenant shall pay, 10 days before delinquency, any taxes levied against Tenant's equipment, furniture, fixtures and other personal property located in or about the Premises. If any such taxes are levied against Landlord or its property (or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or other personal property of Tenant), Landlord may pay such taxes (or such increased assessment) regardless of their (or its) validity, in which event Tenant, upon demand, shall repay to Landlord the amount so paid. If the Leasehold Improvements (defined in Section 7.1) are assessed for real property tax purposes at a valuation higher than the valuation at which tenant improvements conforming to Landlord's "building standard" in other space in the Building

-11-

are assessed, the Taxes levied against Landlord or the Project by reason of such excess assessed valuation shall be deemed taxes levied against Tenant's personal property for purposes of this Section 4.5. Notwithstanding any contrary provision hereof, Tenant shall pay, 10 days before delinquency, (i) any rent tax, sales tax, service tax, transfer tax or value added tax, or any other tax respecting the rent or services described herein or otherwise respecting this transaction or this Lease; and (ii) any taxes assessed upon the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of any portion of the Project.

5.        USE; COMPLIANCE WITH LAWS. Tenant shall not (a) use the Premises and/or Project for any purpose other than the Permitted Use, or (b) do anything in or about the Premises and/or Project that violates any of the Rules and Regulations, damages the reputation of the Project, interferes with, injures or annoys other occupants of the Building, or constitutes a nuisance. Tenant, at its expense, shall comply with all Laws relating to (i) the operation of its business at the Project, (ii) the use, condition, configuration or occupancy of the Premises, or (iii) the Project Systems (defined in Section 7.1.1). If, in order to comply with any such Law, Tenant must obtain or deliver any permit, certificate or other document evidencing such compliance, Tenant shall provide a copy of such document to Landlord promptly after obtaining or delivering it. If any structural and/or other alterations, additions or improvements to the Building and/or Project are required under Law (or any such requirement is enforced) as a result of any Tenant-Insured Improvement (defined in Section 10.2.2), the installation of any trade fixture, any particular use (as distinguished from general R&D Use) of the Premises, and/or any applications made by or on behalf of Tenant for governmental permits, licenses or approvals, Tenant, upon demand, shall (x) at Landlord's option, either perform such alterations, additions and/or improvements, at Tenant's sole cost and expense, or pay Landlord the cost and expense of performing such alterations, additions or improvements, and (y) pay Landlord a coordination fee equal to 5% of the cost and expense of performing such alterations, additions and/or improvements. As used herein, "Law" means any existing or future law, ordinance, regulation or requirement of any governmental authority having jurisdiction over the Project or the parties. Without limiting the generality of the foregoing, Tenant shall, at its sole cost and expense, cause the Base Building and the Exterior Areas to comply with all Laws (including the Americans with Disabilities Act ("ADA")), irrespective of whether such compliance is triggered by the acts and/or omissions of Tenant, or otherwise.

6.        SERVICES.

6.1        Utility Services. Tenant shall pay directly to the providers thereof, before delinquency, all charges for water, gas, electricity, telephone, sewer service, waste pick-up and any other utilities, materials or services furnished directly to or used by Tenant in or about the Premises (collectively, "Utility Services"), including (a) meter, use and/or connection fees, hook-up fees, or standby fees, and (b) penalties for discontinued or interrupted service. Notwithstanding the foregoing, if any Utility Service is not separately provided or metered to the Premises, then the cost of such Utility Service allocable to Tenant on a prorata basis (as reasonably and equitably allocated by Landlord) shall be included in Expenses; provided, however, that if Landlord reasonably determines that Tenant is using more than its pro rata share of such Utility Service not separately metered or provided to the Premises (as determined based on the rentable square footage of the Premises relative to the total rentable square footage served by such Utility Service), then Landlord, in its reasonable discretion, may (i) require Tenant to pay to Landlord, as Additional Rent, an amount equal to Landlord's reasonable estimate of the cost of such excess use, and/or (ii) install, at Tenant's expense, a separate meter to measure Tenant's use of such Utility Service; provided, however, that Landlord shall in no event be entitled to collect more than one hundred percent (100%) of the cost incurred by Landlord in connection with any such Utility Services. Tenant's electrical usage shall not exceed the capacity of the feeders to the Premises or the risers or wiring installation. Without limiting the foregoing, Tenant shall pay the cost of all Utility Services consumed in connection with the operation of any supplemental or specialty Project Systems (as defined in Section 7.1.1 below) serving the Premises. Without limiting its obligations, Tenant, at its sole cost and expense, shall directly contract for the provision of any and all trash disposal, janitorial service and customary cleaning (other than exterior window washing), all of which shall be provided on a regular basis and otherwise in a manner consistent with a Class "A" office/R&D project, and all necessary interior pest control service, so that the Premises and Project are at all times kept neat, broom-clean and pest-free, in all events in a first-class manner.

-12-

Tenant shall, at Tenant's sole cost and expense, provide such janitorial (including exterior window-washing), pest-control and landscaping services for the exterior of the Building and any Exterior Areas, and such lighting for the Parking Areas (defined in Section 24), as Landlord reasonably determines is appropriate.

6.2     **Service Interruption.** Any interruption or cessation of Utility Services resulting from any cause, including any entry for repairs or any renovation, redecoration or rehabilitation of any area of the Project (each, a "**Service Interruption**"), shall not render Landlord liable to Tenant, constitute a constructive eviction, or excuse Tenant from any obligation hereunder.

7.     **TENANT REPAIRS AND ALTERATIONS.**

7.1     **Repairs; Maintenance and Replacements.**

7.1.1     **Tenant's Obligations.** Subject to Section 11, Tenant, at its sole cost and expense, shall perform, in compliance with all Laws, in a prompt, diligent and workmanlike manner, any and all maintenance and repairs (including replacements) in and to the Premises, Exterior Areas, Land and Project, and keep the same in good condition and repair (as adjudged by institutional owners and institutional lenders of Class "A" office/R&D projects). Tenant's maintenance, repair and replacement obligations shall include: (a) any and all leasehold improvements in the Building, whenever and by whomever installed or paid for, including any Tenant Improvements, any Alterations (defined in Section 7.2), and any leasehold improvements installed pursuant to any prior lease ("Prior Alterations") (collectively, the "**Leasehold Improvements**"); (b) all Project Systems; (c) all Lines (defined in Section 23); and (d) the Base Building. As used herein, "**Project Systems**" means all of the following, to the extent the same serve the Building and/or Project, and/or are located in, on (including the roof of) or under the Building and/or Land: any and all heating, ventilation, air-conditioning (including distribution components and systems, VAV boxes, ducting, diffusers and distribution lines), plumbing, sewer, drainage, mechanical, electrical, fire/life-safety, elevator, escalator, security systems (including card key systems, locks and doors and other access systems), and other systems and equipment, including all electrical facilities, equipment and appliances, including lighting, switches, light bulbs, ballasts, light fixtures, lamps, fans, exhaust equipment or systems, and electrical motors, energy management control systems and equipment and/or any interior controls or design features that are customarily installed as part of the leasehold improvements in the Premises, whenever and by whomever installed or paid for.

Without limiting the generality of the foregoing, Tenant, at its sole cost and expense, with respect to any and all heating, ventilation and air-conditioning systems serving the Building and/or any portion thereof (each, an "**HVAC Unit**"), shall (a) keep such HVAC Unit(s) in as good working order and condition as exists upon its installation (or, if later, on the date Tenant takes possession of the Premises); (b) maintain in effect, with a contractor reasonably approved by Landlord, a contract for the maintenance and repair of such HVAC Unit (which contract shall require the contractor, at least once every three (3) months, to (i) inspect such HVAC Unit and provide to Tenant a report of any defective conditions, together with any recommendations for maintenance, repair or parts-replacement, all in accordance with the manufacturer's recommendations, and (ii) replace filters, oil and lubricate machinery, replace parts, adjust drive belts, change oil and perform other preventive maintenance, including annual maintenance of duct work and interior unit drains, and annual caulking of sheet metal and re-caulking of jacks and vents); (c) follow all reasonable recommendation of such contractor; and (d) promptly provide to Landlord a copy of such contract and each report issued thereunder. Tenant shall have the benefit of any warranties available to Landlord regarding the Project Systems to the extent such warranties cover maintenance and repairs for which Tenant is responsible hereunder. If access to the roof of the Building is required in order to perform any of Tenant's obligations under this Section 7.1.1, such access shall be subject to such reasonable rules and procedures as Landlord may impose in light of the Verizon Lease, or otherwise, and Tenant shall maintain the affected portion of the roof in a clean and orderly condition and shall not interfere with use of the roof by Landlord, Verizon or any other licensee. Notwithstanding the foregoing, Landlord may, during the existence of a Default (or, at any time, with respect to the HVAC Units, Base Building and/or Exterior Areas), perform on Tenant's behalf any of Tenant's obligations under this Section 7.1.1, in

-13-

which case Tenant shall pay Landlord, upon demand, the cost of such work, plus a coordination fee equal to 10% of such cost.

Tenant hereby agrees and acknowledges that its repair and replacement obligations pursuant to this Lease (including, without limitation, this Section 7.1) may include capital expenditures and repairs whose benefit may extend beyond the term of this Lease. In the event that any repair or maintenance obligation required to be performed by Tenant hereunder may affect the structural integrity of the Building (e.g., roof, foundation, structural members of the exterior walls) or any Project Systems (e.g., plumbing, electrical, HVAC, fire and life safety), prior to commencing any such repair, Tenant shall provide Landlord with written notice of the necessary repair or maintenance and a brief summary of the structural component or components of the Building, and/or the Project Systems, that may be affected by such repair or maintenance. Within ten (10) business days after Landlord's receipt of Tenant's written notice, Landlord shall have the right, but not the obligation, to elect to cause such repair or maintenance to be performed by Landlord, or a contractor selected and engaged by Landlord, but at Tenant's sole cost and expense.

7.1.2   **Additional Tenant Obligations.** Without limiting the generality of the foregoing, Tenant shall perform any and all maintenance and repairs (including replacements) to, and keep in good condition and repair, (i) the Base Building and (ii) the Exterior Areas, which obligations on the part of Tenant shall include, without limitation, any and all routine maintenance and repairs thereof (including, without limitation, painting, sealing, patching and waterproofing). For purposes, hereof the "**Base Building**" shall mean, collectively, the (x) structural elements and/or components of the Building (including, without limitation, the foundation, the footings, the floor slab, structural elements of the roof and the load-bearing and/or exterior walls of the Building), (y) roof coverings/membrane and (z) windows. For purposes hereof, the Exterior Areas shall include, without limitation, the parking facilities, pavement, landscaping, sprinkler systems, sidewalks, driveways, curbs lighting systems and all other facilities, lines, systems, equipment and improvements in, on or under the Exterior Areas and serving the Project.

7.2   **Alterations.** Tenant may not make any improvement, alteration, addition or change to the Premises or to any mechanical, plumbing or HVAC facilities or other systems serving the Premises (an "**Alteration**") without Landlord's prior consent, which consent shall be requested by Tenant not less than 30 days before commencement of work and shall not be unreasonably withheld by Landlord, provided, however, that, without limiting the reasonable grounds upon which Landlord may withhold its consent, it shall be deemed reasonable for Landlord to withhold its consent to any Alteration which could affect the Project Systems and/or Base Building, could result in a higher frequency of (or more severe) injuries to persons and/or damage to property, could unreasonably interfere with the normal operations of Verizon under the Verizon Lease, is visible from the exterior of the Building, is/are not of comparable or better quality and/or or substantially similar utility as the Building-standard leasehold improvements existing at the Project as of the date of installation and/or performance thereof, and/or adversely affect the functionality of the Premises and/or impede, impair or diminish (in Landlord's reasonable discretion) Landlord's ability to market the Premises for lease upon the expiration or earlier termination of this Lease (collectively, "**Significant Alterations**"). Notwithstanding the foregoing, Tenant shall be permitted to make Alterations that do not constitute Significant Alterations hereunder without Landlord's prior consent, provided that such Alterations (a) cost, individually, or in the aggregate, less than Twenty-five Thousand Dollars ($25,000.00) in any one (1) calendar year, and are cosmetic in nature ("**Minor Alterations**"), and (b) prior to commencing any such Minor Alterations, Tenant provides Landlord with not less than ten (10) business days' prior written notice thereof, which shall include a copy of any governmental permits required to complete such Minor Alterations (if any). For any Significant Alterations and for any Minor Alterations that require governmental approvals, (a) Tenant, before commencing work, shall deliver to Landlord, and obtain Landlord's approval of, plans and specifications; (b) Landlord, in its discretion, may require Tenant to obtain security for performance satisfactory to Landlord; (c) Tenant shall deliver to Landlord "as built" drawings (in CAD format, if requested by Landlord), completion affidavits, full and final lien waivers, and all governmental approvals; and (d) Tenant shall pay Landlord upon demand (i) Landlord's reasonable out-of-pocket

-14-

4814-9820-0107v2
HAL\22817007

expenses incurred in reviewing the work, and (ii) a coordination fee equal to 5% of the cost of the work; provided, however, that this clause (d) shall not apply to any Tenant Improvements.

7.3     **Tenant Work.** Before commencing any repair or Alteration ("**Tenant Work**"), Tenant shall deliver to Landlord, and obtain Landlord's approval of, (a) names of contractors, subcontractors, mechanics, laborers and materialmen; (b) evidence of contractors' and subcontractors' insurance; and (c) any required governmental permits; provided, however, that, for Minor Alterations, no prior approval of Tenant's proposed contractors, subcontractors, mechanics, laborers or materialmen shall be required if such persons or entities are selected by Tenant from a list of pre-approved construction personnel provided by Landlord or, at Landlord's option, from a list of construction personnel provided by Tenant and pre-approved by Landlord. Tenant acknowledges that the foregoing is not an exclusive list of the reasons why Landlord may reasonably disapprove a proposed general contractor. Tenant shall perform all Tenant Work (i) in a good and workmanlike manner using materials of a quality reasonably approved by Landlord; (ii) in compliance with any approved plans and specifications, all Laws, the National Electric Code, and Landlord's construction rules and regulations; and (iii) in a manner that does not impair the Base Building. If, as a result of any Tenant Work, Landlord becomes required under Law to perform any inspection, give any notice, or cause such Tenant Work to be performed in any particular manner, Tenant shall comply with such requirement and promptly provide Landlord with reasonable documentation of such compliance. Landlord's approval of Tenant's plans and specifications shall not relieve Tenant from any obligation under this Section 7.3. In performing any Tenant Work, Tenant shall not use contractors, services, labor, materials or equipment that, in Landlord's reasonable judgment, would disturb labor harmony with any workforce or trades engaged in performing other work or services at the Project.

8.     **LANDLORD'S PROPERTY.** All Leasehold Improvements shall become Landlord's property upon installation and without compensation to Tenant. Notwithstanding the foregoing, except as otherwise notified by Landlord, Tenant, at its expense and before the expiration or earlier termination hereof, shall remove any Tenant-Insured Improvements, repair any resulting damage to the Premises or Building, and restore the affected portion of the Premises to its condition and configuration existing before the installation of such Tenant-Insured Improvements (or, at Landlord's election, to a Building-standard tenant-improved condition and configuration, as determined by Landlord); provided, however, that Tenant shall have no obligation to remove (A) any of the Tenant Improvements constructed pursuant to the Tenant Work Letter, unless the same constitute Specialized Improvements, or (B) any Prior Alterations. If (and only if) Tenant's request for Landlord's approval of any proposed Alterations contains a specific request that Landlord identify any portion of such Alterations that Landlord will require Tenant to remove as provided above, then Landlord will, at the time it approves such Alterations, identify such portion of the Alterations, if any, that Landlord will require Tenant to so remove. Landlord and Tenant hereby agree and acknowledge that, if Landlord does not receive from Tenant the specific written request(s) described in the preceding sentence, Landlord may make its election regarding removal, restoration and reconfiguration no later than thirty (30) days prior to the end of the term of this Lease. If Tenant fails to timely perform any work required under the preceding sentence, Landlord may perform such work at Tenant's expense. As used herein, "**Specialized Improvements**" means Tenant-Insured Improvements that are not normal and customary general office improvements consistent with a standard office/R&D configuration, including, if the same were to be installed in the Premises, the following: any specialty or supplemental Project Systems or other equipment or facilities relating to the use of the Premises for purposes other than general office use, including any security system and/or card access system, equipment or facilities serving a computer server room, "clean room" or laboratory space; internal stairwells; raised floors; meeting rooms (other than a customary number of conference rooms of customary size); classroom facilities; kitchens and cafeterias (as distinguished from customary kitchenette areas); and any areas requiring floor reinforcement or enhanced systems requirements (including library, file or computer rooms if they have any such requirements). In connection with Landlord's approval of the Construction Drawings pursuant to the Tenant Work Letter, upon Tenant's specific written request therefor at the time Tenant seeks such approval from Landlord, Landlord shall identify if any of the Tenant Improvements shown thereon constitute Specialized Improvements.

-15-

9.      **LIENS.** Tenant shall keep the Project free from any lien arising out of any work performed, material furnished or obligation incurred by or on behalf of Tenant. Tenant shall remove any such lien within 10 business days after notice from Landlord, and if Tenant fails to do so, Landlord, without limiting its remedies, may pay the amount necessary to cause such removal, whether or not such lien is valid. The amount so paid, together with reasonable attorneys' fees and expenses, shall be reimbursed by Tenant upon demand.

## 10.    INDEMNIFICATION; INSURANCE.

### 10.1    Indemnification.

10.1.1  **Tenant's Indemnification.** Tenant waives all claims against Landlord, its Security Holders (defined in Section 17), Landlord's managing agent(s), their (direct or indirect) owners, and the beneficiaries, trustees, officers, directors, employees and agents of each of the foregoing (including Landlord, the "**Landlord Parties**") for the following, including if caused by any active or passive act, omission or neglect of any Landlord Party or by any act or omission for which liability without fault or strict liability may be imposed: (i) any damage to person or property (or resulting from the loss of use thereof), except to the extent such damage is caused by the gross negligence or willful misconduct of Landlord and not covered by (i.e., exceeding the coverage limits) the insurance required to be carried by Tenant hereunder or to the extent such limitation on liability is prohibited by law, or (ii) any failure to prevent or control any criminal or otherwise wrongful conduct by any third party or to apprehend any third party who has engaged in such conduct. Tenant shall indemnify, defend, protect, and hold the Landlord Parties harmless from any obligation, loss, claim, action, liability, penalty, damage, cost or expense (including reasonable attorneys' and consultants' fees and expenses) (each, a "**Claim**") that is imposed or asserted by any third party and arises from (a) any cause in, on or about the Premises, (b) occupancy of the Premises by, or any negligence or willful misconduct of, Tenant, any party claiming by, through or under Tenant, their (direct or indirect) owners, or any of their respective beneficiaries, trustees, officers, directors, employees, agents, contractors, licensees or invitees (including Tenant, the "**Tenant Parties**"), or (c) any breach by Tenant of any representation, covenant or other term contained herein. The foregoing indemnification, defense and hold harmless obligations shall apply regardless of any active or passive negligence of the Landlord Parties and regardless of whether liability without fault or strict liability may be imposed upon the Landlord Parties; provided, however, that, with respect to any Landlord Party, Tenant's obligations under this Section shall be inapplicable (i) to the extent such Claims arise from the gross negligence or willful misconduct of Landlord, and are not covered by (i.e., exceeding the coverage limits) the insurance required to be carried by Tenant hereunder, or (ii) to the extent such obligations are prohibited by applicable Laws.

### 10.2    Tenant's Insurance. Tenant shall maintain the following coverages in the following amounts:

10.2.1  Commercial General Liability Insurance covering claims of bodily injury, personal injury and property damage arising out of Tenant's operations and contractual liabilities (covering the performance by Tenant of its indemnity, defense and hold harmless obligations), including coverage formerly known as broad form, on an occurrence basis, for limits of liability not less than:

| | |
|---|---|
| Bodily Injury and Property Damage Liability | $2,000,000 each occurrence $4,000,000 annual aggregate |
| Personal Injury Liability | $2,000,000 each occurrence $4,000,000 annual aggregate |
| Umbrella Liability Coverage | $10,000,000 each occurrence $10,000,000 annual aggregate |

-16-

Umbrella liability insurance may be used to achieve the above minimum commercial general liability limits, provided that the policy coverages are absolutely concurrent, and otherwise satisfy all of the requirements of this Article 10.

10.2.2 Property Insurance covering (i) all office furniture, trade fixtures, office and other equipment, free-standing cabinet work, movable partitions, merchandise and all other items of Tenant's property in the Premises installed by, for, or at the expense of Tenant, and (ii) the Tenant Improvements and any and all other Leasehold Improvements installed by or for the benefit of Tenant, whether pursuant to this Lease or pursuant to any prior lease or other agreement to which Tenant was a party ("**Tenant-Insured Improvements**"). Such insurance shall be written on a special cause of loss form for physical loss or damage, for the full replacement cost value (subject to reasonable deductible amounts) new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance, and shall include coverage for damage or other loss caused by fire or other peril, including vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, and explosion, and providing business interruption coverage for a period of one year.

10.2.3 Workers' Compensation statutory limits and Employers' Liability limits of $1,000,000.

10.3 **Form of Policies**. The minimum limits of insurance required to be carried by Tenant shall not limit Tenant's liability. Such insurance shall be issued by an insurance company that has an A.M. Best rating of not less than A-VIII and shall be in form and content reasonably acceptable to Landlord. Tenant's Commercial General Liability Insurance shall (a) name the Landlord Parties and any other party designated by Landlord ("**Additional Insured Parties**") as additional insureds by appropriate clause or endorsement; and (b) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and non-contributing with Tenant's insurance. Landlord shall be designated as a loss payee with respect to Tenant's Property Insurance on any Tenant-Insured Improvements. Tenant shall deliver to Landlord, on or before the Premises Delivery Date and at least 30 days before the expiration dates thereof, certificates from Tenant's insurance company on the forms currently designated "ACORD 25" (Certificate of Liability Insurance) and "ACORD 28" (Evidence of Commercial Property Insurance) or the equivalent. Attached to the ACORD 25 (or equivalent) there shall be an endorsement naming the Additional Insured Parties as additional insureds, and attached to the ACORD 28 (or equivalent) there shall be an endorsement designating Landlord as a loss payee with respect to Tenant's Property Insurance on any Tenant-Insured Improvements, and each such endorsement shall be binding on Tenant's insurance company and shall name Landlord as a "cancellation notice recipient". Upon Landlord's request, Tenant shall deliver to Landlord, in addition to such certificates, copies of the policies of insurance required to be carried under Section 10.2 showing that the Additional Insured Parties are named as additional insureds, and that Landlord is designated as a loss payee with respect to Tenant's Property Insurance on any Tenant-Insured Improvements.

10.4 **Subrogation**. Each party waives, and shall cause its insurance carrier to waive, any right of recovery against the other party, any of its (direct or indirect) owners, or any of their respective beneficiaries, trustees, officers, directors, employees or agents for any loss of or damage to property which loss or damage is (or, if the insurance required hereunder had been carried, would have been) covered by the waiving party's property insurance. For purposes of this Section 10.4 only, (a) any deductible with respect to a party's insurance shall be deemed covered by, and recoverable by such party under, valid and collectable policies of insurance, and (b) any contractor retained by Landlord to install, maintain or monitor a fire or security alarm for the Building shall be deemed an agent of Landlord.

10.5 **Additional Insurance Obligations**. Tenant shall maintain such increased amounts of the insurance required to be carried by Tenant under this Section 10, and such other types and amounts of insurance covering the Premises and Tenant's operations therein, as may be reasonably requested by Landlord, but not in excess of the amounts and types of insurance then being required by landlords of buildings comparable to and in the vicinity of the Building.

-17-

10.6    **Landlord's Insurance.**  Subject to reimbursement as an Expense in accordance with the provisions of Article 4 hereof, Landlord may procure and maintain in effect throughout the Lease Term commercial general liability insurance, property insurance, flood insurance, earthquake insurance, terrorism insurance and/or such other types of insurance as are normally carried by reasonably prudent owners of commercial properties substantially similar to, and in the vicinity of, the Project.  Such coverages shall be in such amounts, from such companies and on such other terms and conditions as Landlord may from time to time reasonably determine, and Landlord shall have the right, but not the obligation, to change, cancel, decrease or increase any insurance coverages in respect of the Building, add additional forms of insurance as Landlord shall deem reasonably necessary, and/or obtain umbrella or other policies covering both the Building and other assets owned by or associated with Landlord or its affiliates, in which event the cost thereof shall be equitably allocated; provided, however, that Landlord shall, at all times during the Lease Term, maintain "special causes of loss" (or similar) property insurance coverage on the Base Building in the amount of the full replacement value thereof as reasonably estimated by Landlord (without deduction for depreciation), subject to reasonable deductible amounts.

11.    **CASUALTY DAMAGE.**

11.1    **Completion Estimate; Termination Rights.**  Tenant shall promptly notify Landlord of any damage to the Premises resulting from any fire or other casualty.  With reasonable promptness after discovering the casualty, Landlord shall provide Tenant with written notice (the "**Completion Estimate**") stating (a) whether the Landlord Repairs (defined below) will include the Tenant-Insured Improvements, and (b) Landlord's reasonable estimate of the amount of time required, using standard working methods (without the payment of overtime or other premiums), to substantially complete the Landlord Repairs.  As used herein, "**Landlord Repairs**" means the repair and restoration of the Base Building, any Exterior Areas serving or providing access to the Premises, and, if so elected by Landlord in the Completion Estimate, the Tenant-Insured Improvements.  If the Completion Estimate indicates that the Landlord Repairs cannot be substantially completed within 270 days after commencement, then Landlord may terminate this Lease upon 60 days' prior written notice to Tenant delivered within 10 days after Landlord's delivery of the Completion Estimate.  In addition, Landlord, by notice to Tenant within 90 days after Landlord's discovery of damage to the Premises or the Project, may, whether or not the Premises are affected, terminate this Lease if: (i) any Security Holder terminates any ground lease or requires that any insurance proceeds be used to pay any mortgage debt; (ii) any damage to Landlord's property is not fully covered by Landlord's insurance policies; (iii) the damage occurs during the last 12 months of the Lease Term; (iv) Landlord decides to rebuild the Building or Exterior Areas so that it or they will be substantially different structurally or architecturally; or (v) any owner, other than Landlord, of any damaged portion of the Project does not intend to repair such damage.  In the event of such termination by Landlord or Tenant pursuant to this Section, neither party shall have any obligations to the other under this Lease, except for obligations arising before such termination or obligations that survive the expiration or earlier termination of this Lease, and except that Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's property insurance required under Section 10.3 above with respect to the Tenant-Insured Improvements.

11.2    **Repair and Restoration.**  If this Lease is not terminated pursuant to Section 11.1 above, Landlord shall promptly and diligently perform the Landlord Repairs, subject to reasonable delays for insurance adjustment or other events of Force Majeure.  Such repair and restoration shall be to substantially the same condition that existed before the casualty, except for any modifications required by Law or any Security Holder, and except for any modifications to the Exterior Areas that are deemed desirable by Landlord, are consistent with the character of the Project, and do not materially impair access to the Premises.  If this Lease is not terminated pursuant to Section 11.1 above and the Landlord Repairs include the Tenant-Insured Improvements, then (a) Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under Section 10.3 above with respect to such Tenant-Insured Improvements; (b) if the estimated cost of repairing and restoring such improvements exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, Tenant shall pay such excess cost to Landlord within 15 days after Landlord's demand; and (c) within 15 days after Landlord's demand, Tenant shall also pay Landlord the amount of any additional excess costs

-18-

ted09/15/20Entered09/15/20 21:06:40   Desc
Exhibit 5    Page 51 of 78

that may be determined during the performance of such repair and restoration.  If this Lease is not terminated pursuant to Section 11.1 above and the Landlord Repairs exclude any of the Tenant-Insured Improvements, then Tenant, at its expense and in accordance with Sections 7.2 and 7.3 above, shall repair any damage to such improvements and restore them to their original condition.  Landlord shall not be liable for any inconvenience or annoyance to Tenant or its invitees, or for any injury to Tenant's business, resulting from any fire or other casualty or from any repair of damage resulting therefrom; provided, however, that if any fire or other casualty damages the Premises or any Exterior Areas necessary for Tenant's access to the Premises, then, during any time that, as a result of such damage, any portion of the Premises are untenantable or inaccessible and is not occupied by Tenant, the Monthly Rent shall be abated in proportion to the rentable square footage of such portion of the Premises.  If the Landlord Repairs exclude any of the Tenant-Insured Improvements, Tenant's right to rent abatement under the preceding sentence shall continue until the earlier to occur of (i) the date that the repair and restoration of such Tenant-Insured Improvements is completed by Tenant, (ii) the date that is reasonably determined by Landlord to be the date on which Tenant would have completed the repair and restoration of such improvements if Tenant had used reasonable diligence in connection therewith, or (iii) the date that Tenant recommences business operations in the damaged portion of the Premises.  Notwithstanding the foregoing, if the damage resulting from any fire or other casualty is due to the fault or neglect of any Tenant Parties, there shall be no abatement of rent.

11.3    **Waiver of Statutory Provisions.**  The provisions of this Lease, including this Article 11, constitute an express agreement between Landlord and Tenant with respect to any damage to or destruction of any part of the Premises, the Building or the Project, and any Law, including Sections 1932(2) and 1933(4) of the California Civil Code, relating to rights or obligations concerning damage or destruction in the absence of an express agreement between the parties shall not apply.

12.    **NONWAIVER.**  No provision hereof shall be deemed waived by either party unless it is waived by such party expressly and in writing, and no waiver of any breach of any provision hereof shall be deemed a waiver of any subsequent breach of such provision or any other provision hereof.  Landlord's acceptance of Rent shall not be deemed a waiver of any preceding breach of any provision hereof, other than Tenant's failure to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of such acceptance.  No acceptance of payment of an amount less than the Rent due hereunder shall be deemed a waiver of Landlord's right to receive the full amount of Rent due, whether or not any endorsement or statement accompanying such payment purports to effect an accord and satisfaction.  No receipt of monies by Landlord from Tenant after the giving of any notice, the commencement of any suit, the issuance of any final judgment, or the termination hereof shall affect such notice, suit or judgment, or reinstate or extend the Term or Tenant's right of possession hereunder.

13.    **CONDEMNATION.**  If any part of the Premises or Project is permanently taken for any public or quasi-public use or purpose, by power of eminent domain or by private purchase in lieu thereof (a "Taking"), which is so substantial that the Premises cannot reasonably be used by Tenant for the operation of its business, then either Landlord or Tenant may terminate this Lease.  In addition, if twenty-five percent (25%) or more of the Building, the Project or the parking areas for the Building or the Project is subject to a Taking without affecting the Premises, then Landlord may terminate this Lease as of the date of such Taking.  Any such termination shall be effective as of the date possession is required to be surrendered to the authority, and the terminating party shall provide written notice of termination to the other party within 45 days after it first receives written notice of such surrender date.  Except as provided above in this Article 13, neither party may terminate this Lease as a result of a Taking.  Tenant shall not assert any claim against Landlord or the authority for any compensation because of any Taking and Landlord shall be entitled to the entire award of compensation; provided, however, that Tenant shall have the right to file any separate claim available to Tenant for any Taking of Tenant's personal property or any fixtures that Tenant has the right hereunder to remove upon the expiration hereof, and for moving expenses, so long as such claim does not diminish the award available to Landlord or any Security Holder and is payable separately to Tenant.  If this Lease is terminated pursuant to this Article 13, all Rent shall be apportioned as of the date of such termination.  If a Taking occurs and this Lease is not so terminated, the Monthly Rent shall be abated, for the period of such Taking, in

-19-

4814-9820-0107v2
HAL\22817087

proportion to the percentage of the rentable square footage of the Premises, if any, that is subject to (or rendered inaccessible by) such Taking.

## 14. ASSIGNMENT AND SUBLETTING.

14.1 **Transfers.** Tenant shall not, without Landlord's prior consent, assign, mortgage, pledge, hypothecate, encumber, permit any lien to attach to, or otherwise transfer this Lease or any interest hereunder, permit any assignment or other transfer hereof or any interest hereunder by operation of law, enter into any sublease or license agreement, otherwise permit the occupancy or use of any part of the Premises by any persons other than Tenant and its employees and contractors, or permit a Change of Control (defined in Section 14.6) to occur (each, a "Transfer"). If Tenant desires Landlord's consent to any Transfer, Tenant shall provide Landlord with (i) notice of the terms of the proposed Transfer, including its proposed effective date (the "Contemplated Effective Date"), which shall not be less than 30 days nor more than 180 days after the effective date of the Transfer Notice, a description of the portion of the Premises to be transferred (the "Contemplated Transfer Space"), a calculation of the Transfer Premium (defined in Section 14.3), and a copy of all existing executed and/or proposed documentation pertaining to the proposed Transfer, and (ii) current financial statements of the proposed transferee (or, in the case of a Change of Control, of the proposed new controlling party(ies)) certified by an officer or owner thereof and any other information reasonably required by Landlord in order to evaluate the proposed Transfer (collectively, the "Transfer Notice"). Within 30 days after receiving the Transfer Notice, Landlord shall notify Tenant of (a) its consent to the proposed Transfer, (b) its refusal to consent to the proposed Transfer, or (c) its exercise of its rights under Section 14.4. Any Transfer made without Landlord's prior consent shall, at Landlord's option, be void and shall, at Landlord's option, constitute a Default (defined in Section 19). Tenant shall pay Landlord's standard processing fee (which fee may change from time to time) and attorneys' fees incurred in connection with Landlord's review of any proposed Transfer, whether or not Landlord consents to it.

14.2 **Landlord's Consent.** Subject to Section 14.4, Landlord shall not unreasonably withhold its consent to any proposed Transfer. Without limiting other reasonable grounds for withholding consent, it shall be deemed reasonable for Landlord to withhold consent to a proposed Transfer if:

14.2.1 The proposed transferee is not a party of reasonable financial strength in light of the responsibilities to be undertaken in connection with the Transfer on the date the Transfer Notice is received; or

14.2.2 The proposed transferee has a character or reputation or is engaged in a business that is not reasonably consistent with the quality of the Building or the Project; or

14.2.3 The proposed transferee is a governmental entity or a nonprofit organization; or

14.2.4 In the case of a proposed sublease, license or other occupancy agreement, the rent or occupancy fee charged by Tenant to the transferee during the term of such agreement, calculated using a present value analysis, is less than 90% of the rent being quoted by Landlord or its Affiliate (defined in Section 14.8) at the time of such Transfer for comparable space in the Project for a comparable term, calculated using a present value analysis; provided, however, that if no comparable space in the Project is available for lease for a comparable term at the time of the proposed Transfer, then the foregoing restriction on the proposed effective rent shall be inapplicable; or

14.2.5 The proposed transferee or any of its Affiliates, on the date the Transfer Notice is received, leases or occupies (or, at any time during the 6-month period ending on the date the Transfer Notice is received, has negotiated with Landlord to lease) space in the Project.

Notwithstanding anything else herein to the contrary, if Landlord consents to any Transfer pursuant to this Section 14.2 but Tenant does not enter into such Transfer within six (6) months thereafter, such consent shall no

-20-

longer apply and such Transfer shall not be permitted unless Tenant again obtains Landlord's consent thereto pursuant and subject to the terms of this Article 14 (including Landlord's right of recapture, if any, under Section 14.4 below). Notwithstanding anything to the contrary in this Lease, if Tenant claims that Landlord has unreasonably withheld its consent under this Section 14.2 or otherwise has breached or acted unreasonably under this Article 14, its sole remedies shall be a suit for contract damages (subject to Article 20 below) or declaratory judgment and an injunction for the relief sought, and Tenant hereby waives all other remedies, including any rights under California Civil Code Section 1995.310 and any other right at law or equity to terminate this Lease. In addition, to the extent permitted under applicable Laws, Tenant hereby waives, on behalf of any proposed transferee, any remedies against Landlord arising out of any unreasonable withholding of consent to a proposed Transfer or any breach of this Article 14, except for any right to obtain a declaratory judgment or injunction for the relief sought.

14.3    **Transfer Premium.** If Landlord consents to a Transfer, Tenant shall pay Landlord an amount equal to 50% of any Transfer Premium (defined below). As used herein, "Transfer Premium" means (a) in the case of an assignment, any consideration (including payment for Leasehold Improvements) paid by the assignee for such assignment, less any brokerage commissions (not to exceed commissions typically paid by Tenant in the market at the time of such subletting or assignment) and reasonable attorneys' fees paid by Tenant in connection with the Transfer ("Recoverable Expenses"); (b) in the case of a sublease, license or other occupancy agreement, for each month of the term of such agreement, the amount by which all rent and other consideration paid by the transferee to Tenant pursuant to such agreement exceeds the Monthly Rent payable by Tenant hereunder with respect to the Contemplated Transfer Space (less any Recoverable Expenses, as amortized on a monthly, straight-line basis over the term of such agreement); and (c) in the case of a Change of Control, any consideration (including payment for Leasehold Improvements) paid by the new controlling party(ies) to the prior controlling party(ies) on account of this Lease, less any Recoverable Expenses. Payment of Landlord's share of the Transfer Premium shall be made (x) in the case of an assignment or a Change of Control, within 10 days after Tenant or the prior controlling party(ies), as the case may be, receive(s) the consideration described above, and (y) in the case of a sublease, license or other occupancy agreement, with respect to each month of the term of such agreement, within five (5) business days after Tenant receives the rent and other consideration described above.

14.4    **Landlord's Right to Recapture.** Notwithstanding any contrary provision hereof, except in the case of a Permitted Transfer (defined in Section 14.8), Landlord, by notifying Tenant within 30 days after receiving a Transfer Notice, may terminate this Lease with respect to the Contemplated Transfer Space as of the Contemplated Effective Date. If the Contemplated Transfer Space is less than the entire Premises, then Base Rent, Tenant's Share, and the number of parking spaces to which Tenant is entitled under Section 9 of the Basic Lease Information shall be deemed adjusted on the basis of the percentage of the rentable square footage of the Premises retained by Tenant. Upon request of either party, the parties shall execute a written agreement prepared by Landlord memorializing such termination.

14.5    **Effect of Consent.** If Landlord consents to a Transfer, (i) such consent shall not be deemed a consent to any further Transfer, (ii) Tenant shall deliver to Landlord, promptly after execution, an executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, and (iii) Tenant shall deliver to Landlord, upon Landlord's request, a complete statement, certified by an independent CPA or Tenant's chief financial officer, setting forth in detail the computation of any Transfer Premium. In the case of an assignment, the assignee shall assume in writing, for Landlord's benefit, all of Tenant's obligations hereunder. No Transfer, with or without Landlord's consent (without limiting the generality of the foregoing, no Permitted Transfer(s) (as defined in Section 14.8 below)), shall relieve Tenant or any guarantor hereof from any liability hereunder. Notwithstanding any contrary provision hereof, Tenant, with or without Landlord's consent, shall not enter into, or permit any party claiming by, through or under Tenant to enter into, any sublease, license or other occupancy agreement that provides for payment based in whole or in part on the net income or profit of the subtenant, licensee or other occupant thereunder.

-21-

14.6     **Change of Control.** As used herein, "Change of Control" means (a) if Tenant is a closely held professional service firm, the withdrawal or change (whether voluntary, involuntary or by operation of law) of 50% or more of its equity owners within a 12-month period; and (b) in all other cases, any transaction(s) resulting in the acquisition of a Controlling Interest (defined below) by one or more parties that did not own a Controlling Interest immediately before such transaction(s). As used herein, "Controlling Interest" means any direct or indirect equity or beneficial ownership interest in Tenant that confers upon its holder(s) the direct or indirect power to direct the ordinary management and policies of Tenant, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary in this Lease, no Change of Control or change in the Controlling Interest shall be deemed to have occurred through the transfer of ownership of voting securities listed on a recognized securities exchange.

14.7     **Effect of Default.** Any sublease, license, concession or other occupancy agreement entered into by Tenant shall be subordinate and subject to the provisions of this Lease, and if this Lease is terminated during the term of any such agreement, Landlord shall have the right to: (i) treat such agreement as cancelled and repossess the Contemplated Transfer Space by any lawful means, or (ii) require that the transferee attorn to and recognize Landlord as its landlord (or licensor, as applicable) under such agreement. If Tenant is in Default, Landlord is irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any transferee under any sublease, license or other occupancy agreement to make all payments under such agreement directly to Landlord (which Landlord shall apply towards Tenant's obligations hereunder) until such Default is cured. Such transferee shall rely upon any representation by Landlord that Tenant is in Default, without any need for confirmation thereof by Tenant. No collection or acceptance of rent by Landlord from any transferee shall be deemed a waiver of any provision of this Article 14, an approval of any transferee, or a release of Tenant from any obligation under this Lease, whenever accruing. In no event shall Landlord's enforcement of any provision of this Lease against any transferee be deemed a waiver of Landlord's right to enforce any term of this Lease against Tenant or any other person.

14.8     **Permitted Transfers.** Notwithstanding any contrary provision hereof, so long as no Default shall then exist under this Lease, subject to the satisfaction of the conditions set forth below, Tenant may, without Landlord's consent pursuant to Section 14.1, assign this Lease, or sublet the Premises (or any portion thereof), as follows (any such assignment and/or sublease being a "Permitted Transfer"):

14.8.1     **Permitted Affiliate Transfer.** So long as Le Technology and/or Le Holdings (Beijing) and/or a Permitted LETV Affiliate Assignee (as defined below) is the Tenant and in occupancy and possession of at least seventy-five percent (75%) of the Premises, Tenant shall have the right to assign this Lease or sublease the Premises (or any portion thereof) to an Affiliate of Le Technology and/or Le Holdings (Beijing) (any such assignment or sublease being a "Permitted Affiliate Transfer"), so long as (i) at least 15 business days before the Transfer, Tenant notifies Landlord of such Transfer and delivers to Landlord any documents or information reasonably requested by Landlord relating thereto, including reasonable documentation that the Transfer satisfies the requirements of this Section 14.8.1; (ii) in the case of an assignment, the assignee executes and delivers to Landlord, at least 15 business days before the assignment, a commercially reasonable instrument pursuant to which the assignee assumes, for Landlord's benefit, all of Tenant's obligations hereunder; (iii) the Affiliate has a net worth (as determined in accordance with GAAP, but excluding patents, copyrights and other intellectual property, goodwill and any other intangible assets ("Net Worth")) immediately after the Transfer that is reasonably sufficient to fulfill the obligations on the part of the "Tenant" to be performed or observed under this Lease (as the same may have been amended); (iv) the transferee is qualified to conduct business in the State of California; and (v) the Transfer is made for a good faith operating business purpose and not in order to evade the requirements of this Section 14. As used herein, "Affiliate" means, with respect to any party, a domestic entity formed, existing and governed pursuant to the laws of one of the fifty (50) sates of the United States of America (or the District of Columbia) that (i) controls, is under common control with, or is controlled by such party, and (ii) shall conduct business operations in the Premises substantially similar to those of LETV (and otherwise in compliance with the terms and conditions of this Lease), and (iii) will not cause Landlord to be in violation of any other lease in the Project (including, without limitation, any "non-competition" provision set forth therein) in effect as of the Effective Date.   The rights granted under this

-22-

Section 14.8.1 to effectuate a Permitted Affiliate Transfer are personal to Le Technology and Le Holdings (Beijing) and may not be transferred or assigned to any third party, other than (i) an Affiliate of LETV to which this Lease is assigned pursuant to this Section 14.8.1 ("Permitted LETV Affiliate Assignee") or (ii) a Permitted Successor Transferee (as defined in Section 14.8.2 below).

14.8.2 **Permitted Successor Transfer.** So long as Le Technology and/or Le Holdings (Beijing) and/or a Permitted LETV Affiliate Assignee is the Tenant and in occupancy and possession of at least seventy-five percent (75%) of the Premises, Tenant shall have the right to assign this Lease to a domestic entity formed, existing and governed pursuant to the laws of one of the fifty (50) states of the United States of America (or the District of Columbia), so long as such assignment is not a subterfuge by Tenant to avoid its obligations under this Lease, which domestic entity is a successor to Le Technology and/or Le Holdings (Beijing) by (1) merger or consolidation or (2) the purchase of all or substantially all of the assets of Le Technology and/or Le Holdings (Beijing) (any such assignment being a "Permitted Successor Transfer," and any entity to which this Lease is assigned pursuant to the terms and conditions of this Section 14.8.2 being a "Permitted Successor Transferee"), so long as (i) at least 15 business days before the Transfer, Tenant notifies Landlord of such Transfer and delivers to Landlord any documents or information reasonably requested by Landlord relating thereto, including reasonable documentation that the Transfer satisfies the requirements of this Section 14.8.2; (ii) the assignee executes and delivers to Landlord, at least 15 business days before the assignment, a commercially reasonable instrument pursuant to which the assignee assumes, for Landlord's benefit, all of Tenant's obligations hereunder; (iii) (A) the successor entity has a Net Worth immediately after the Transfer that is not less than the Net Worth of the non-surviving entity(ies) (i.e., as applicable, Le Technology and/or Le Holdings (Beijing) or the Permitted LETV Affiliate Assignee) immediately before the Transfer, and (B) if Tenant is a closely held professional service firm, at least 75% of its equity owners existing 12 months before the Transfer are also equity owners of the successor entity; (iv) the transferee is qualified to conduct business in the State of California; (v) the Transfer is made for a good faith operating business purpose and not in order to evade the requirements of this Section 14; (vi) the transferee shall conduct business operations in the Premises substantially similar to those of LETV (and otherwise in compliance with the terms and conditions of this Lease), and (vii) the Transfer will not cause Landlord to be in violation of any other lease in the Project (including, without limitation, any "non-competition" provision set forth therein) in effect as of the Effective Date. The rights granted under this Section 14.8.2 to effectuate a Permitted Successor Transfer are personal to Le Technology and Le Holdings (Beijing) and may not be transferred or assigned to any third party, other than a Permitted LETV Affiliate Assignee.

15.    **SURRENDER.**

15.1    **Required Repairs.** Upon the expiration or earlier termination hereof, and subject to Sections 8 and 11 and this Section 15, Tenant shall surrender possession of the Premises to Landlord in good condition and repair and as thereafter improved by Landlord and/or Tenant, except for reasonable wear and tear and repairs that are Landlord's express responsibility hereunder. Without limiting the foregoing, Tenant, at its expense, before surrendering the Premises, shall have caused (a) all interior walls of the Premises to have been repaired if marked or damaged; (b) all carpets to have been shampooed and cleaned and all floors to have been cleaned and waxed; (c) all broken, marred or nonconforming acoustical ceiling tiles to have been replaced; and (d) the Project Systems (but excluding any HVAC Unit for which Landlord has assumed the responsibility for repair pursuant to Section 7.1.1) to have been audited, serviced and repaired by a reputable and licensed service firm reasonably acceptable to Landlord, and otherwise put in good order (including replacement of any burned-out or broken light bulbs or ballasts). If Tenant fails to timely perform any work required under this Section 15.1, Landlord may do so, in which case Tenant shall pay Landlord, upon demand, the cost of such work plus a coordination fee equal to 10% of such cost.

15.2    **Required Removal.** Before the expiration or earlier termination hereof, Tenant, without expense to Landlord, shall (a) remove from the Premises all debris and rubbish and all furniture, equipment, trade fixtures, Lines, free-standing cabinet work, movable partitions and other articles of personal property that are owned or placed in the Premises by Tenant or any party claiming by, through or under Tenant (except for any Lines not required to be

-23-

4814-9820-0107v2
HALI22817007

removed under Section 23), and (b) repair all damage to the Premises and Building resulting from such removal. If Tenant fails to timely perform such removal and repair, Landlord may do so at Tenant's expense (including storage costs). If Tenant fails to remove such property from the Premises, or from storage, within 30 days after notice from Landlord, any part of such property shall be deemed, at Landlord's option, either (x) conveyed to Landlord without compensation, or (y) abandoned. Notwithstanding anything to the contrary contained in this Lease, in no event shall Tenant be required to remove (i) the Tenant Improvements (other than the Specialized Improvements, if any) or (ii) any Prior Alterations.

16.      HOLDOVER. If Tenant fails to surrender the Premises upon the expiration or earlier termination hereof, Tenant's tenancy shall be subject to the terms and conditions hereof; provided, however, that such tenancy shall be a tenancy at sufferance only, for the entire Premises, and Tenant shall pay Monthly Rent (on a per-month basis without reduction for any partial month) at a rate equal to twice the Monthly Rent applicable during the last calendar month of the Term. Nothing in this Section 16 shall limit Landlord's rights or remedies or be deemed a consent to any holdover. If Landlord is unable to deliver possession of the Premises to a new tenant or to perform improvements for a new tenant as a result of Tenant's holdover, Tenant shall be liable for all resulting damages, including lost profits, incurred by Landlord, but only to the extent such holdover occurs more than thirty (30) days after notice from Landlord that Landlord has entered into, or will enter into, a lease with such new tenant.

17.      SUBORDINATION; ESTOPPEL CERTIFICATES. This Lease shall be subject and subordinate to all existing and future ground or underlying leases, mortgages, trust deeds and other encumbrances against the Building or Project, all renewals, extensions, modifications, consolidations and replacements thereof (each, a "Security Agreement"), and all advances made upon the security of such mortgages or trust deeds, unless in each case the holder of such Security Agreement (each, a "Security Holder") requires in writing that this Lease be superior thereto. Upon any termination or foreclosure (or any delivery of a deed in lieu of foreclosure) of any Security Agreement, Tenant, upon request, shall attorn, without deduction or set-off, to the Security Holder or purchaser or any successor thereto and shall recognize such party as the lessor hereunder provided that such party agrees not to disturb Tenant's occupancy so long as no Default exists. Within 10 business days after request by Landlord, Tenant shall execute such further instruments as Landlord may reasonably deem necessary to evidence the subordination or superiority of this Lease to any Security Agreement. Tenant waives any right it may have under Law to terminate or otherwise adversely affect this Lease or Tenant's obligations hereunder upon a foreclosure. Within 10 business days after Landlord's request, Tenant shall execute and deliver to Landlord a commercially reasonable estoppel certificate in favor of such parties as Landlord may reasonably designate, including current and prospective Security Holders and prospective purchasers, certifying the following information: (i) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as modified, is in full force and effect); (ii) the dates to which the rental and other charges are paid in advance, if any; (iii) the amount of Tenant's Security Deposit, if any; (iv) acknowledging that there are not, to Tenant's actual knowledge (without duty of investigation or inquiry), any uncured defaults on the part of Landlord hereunder, and no events or conditions then in existence which, with the passage of time or notice or both, would constitute a default on the part of Landlord hereunder, or specifying such defaults, events or conditions, if any are claimed; and (v) such other information regarding this Lease as may be reasonably requested by Landlord. The "Additional Provisions" attached hereto as Exhibit F are incorporated herein by this reference and made a part hereof.

18.      ENTRY BY LANDLORD. At all reasonable times and upon reasonable prior notice to Tenant, or in an emergency, Landlord may enter the Premises to (i) inspect the Premises; (ii) show the Premises to prospective purchasers, current or prospective Security Holders or insurers, or, during the last 9 months of the Term (or while an uncured Default exists), prospective tenants; (iii) post notices of non-responsibility; or (iv) perform maintenance, repairs or alterations. At any time and without notice to Tenant, Landlord may enter the Premises to perform required services. If reasonably necessary, Landlord may temporarily close any portion of the Premises to perform maintenance, repairs or alterations. In an emergency, Landlord may use any means it deems proper to open doors to and in the Premises. No entry into or closure of any portion of the Premises pursuant to this Section 18 shall render Landlord liable to Tenant, constitute a constructive eviction, or excuse Tenant from any obligation hereunder;

-24-

4814-8820-0107v2
HAL\22817007

provided, however, that Landlord shall use commercially reasonable efforts to minimize the disruption to Tenant's use and enjoyment of the Premises. Tenant acknowledges and agrees that, to the extent Tenant does not facilitate Landlord's access to the Premises or certain portions thereof, Landlord shall be absolved from the obligation to perform any services under this Lease within such portion of the Premises.

## 19.   DEFAULTS; REMEDIES.

19.1   **Events of Default.** The occurrence of any of the following shall constitute a "Default":

19.1.1   Any failure by Tenant to pay any Rent when due; or

19.1.2   Except where a specific time period is otherwise set forth for Tenant's cure herein (in which event Tenant's failure to cure within such time period shall be a Default), and except as otherwise provided in this Section 19.1, any breach by Tenant of any other provision hereof where such breach continues for 30 days after written notice from Landlord; provided that if such breach cannot reasonably be cured within such 30-day period, Tenant shall not be in Default as a result of such breach if Tenant diligently commences such cure within such period, thereafter diligently pursues such cure, and completes such cure within 60 days after Landlord's written notice; or

19.1.3   Abandonment or vacation of all or a substantial portion of the Premises by Tenant; or

19.1.4   Any breach by Tenant of Sections 14, 17 or 18 where such breach continues for more than two (2) business days after written notice from Landlord; or

19.1.5   Tenant becomes in material breach of Section 25.3.

If Tenant breaches a particular provision hereof (other than a provision requiring payment of Rent) on three (3) separate occasions during any 12-month period, Tenant's subsequent breach of such provision shall be, at Landlord's option, an incurable Default. The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by Law, and Landlord shall not be required to give any additional notice in order to be entitled to commence an unlawful detainer proceeding.

19.2   **Remedies Upon Default.** Upon any Default, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity (which shall be cumulative and nonexclusive), the option to pursue any one or more of the following remedies (which shall be cumulative and nonexclusive) without any notice or demand:

19.2.1   Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy it may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

(a)   The worth at the time of award of the unpaid Rent which had been earned at the time of such termination; plus

(b)   The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

-25-

(c)    The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such Rent loss that Tenant proves could be reasonably avoided; plus

(d)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations hereunder or which in the ordinary course of things would be likely to result therefrom, including brokerage commissions, advertising expenses, expenses of remodeling any portion of the Premises for a new tenant (whether for the same or a different use), and any special concessions made to obtain a new tenant; plus

(e)    At Landlord's option, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by Law.

As used in Sections 19.2.1(a) and (b), the "worth at the time of award" shall be computed by allowing interest at a rate per annum equal to the lesser of (i) the annual "Bank Prime Loan" rate cited in the Federal Reserve Statistical Release Publication G.13(415), published on the first Tuesday of each calendar month (or such other comparable index as Landlord shall reasonably designate if such rate ceases to be published) plus two (2) percentage points, or (ii) the highest rate permitted by Law. As used in Section 19.2.1(c), the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus 1%.

19.2.2    Landlord shall have the remedy described in California Civil Code § 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover Rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies hereunder, including the right to recover all Rent as it becomes due.

19.2.3    Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 19.2.1 and 19.2.2, or any Law or other provision hereof), without prior demand or notice except as required by Law, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

19.3    **Efforts to Relet**. Unless Landlord provides Tenant with express notice to the contrary, no re-entry, repossession, repair, maintenance, change, alteration, addition, reletting, appointment of a receiver or other action or omission by Landlord shall (a) be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Premises, or (b) operate to release Tenant from any of its obligations hereunder. Tenant waives, for Tenant and for all those claiming by, through or under Tenant, California Civil Code § 3275 and California Code of Civil Procedure §§ 1174(c) and 1179 and any existing or future rights to redeem or reinstate, by order or judgment of any court or by any legal process or writ, this Lease or Tenant's right of occupancy of the Premises after any termination hereof.

19.4    **Landlord Default**. Landlord shall not be in default hereunder unless it fails to begin within 30 days after notice from Tenant, or fails to pursue with reasonable diligence thereafter, the cure of any breach by Landlord of its obligations hereunder. Tenant hereby waives any right to terminate or rescind this Lease as a result of any default by Landlord hereunder or any breach by Landlord of any promise or inducement relating hereto, and Tenant agrees that its remedies for any such matter shall be limited to a suit for damages and/or injunction. Before exercising any remedies for a default by Landlord, Tenant shall give notice and a reasonable time to cure to any Security Holder of which Tenant has been notified.

-26-

20.     **LANDLORD EXCULPATION.** Notwithstanding any contrary provision hereof: (a) the liability of the Landlord Parties to Tenant shall be limited to an amount equal to the lesser of (i) Landlord's interest in the Building, or (ii) the equity interest Landlord would have in the Building if the Building were encumbered by third-party debt in an amount equal to 80% of the value of the Building (as such value is determined by Landlord); (b) Tenant shall look solely to Landlord's interest in the Building for the recovery of any judgment or award against any Landlord Party; (c) no Landlord Party shall have any personal liability for any judgment or deficiency, and Tenant waives and releases such personal liability on behalf of itself and all parties claiming by, through or under Tenant; (d) the limitations of liability contained in this Article 20 shall inure to the benefit of the Landlord Parties' present and future partners, members, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns. Under no circumstances shall any present or future partner or member of Landlord (if Landlord is a partnership or limited liability company) or any trustee or beneficiary of Landlord (if Landlord or any partner or member of Landlord is a trust) have any liability for the performance of Landlord's obligations under this Lease; and (e) no Landlord Party shall be liable for any injury or damage to, or interference with, Tenant's business, including loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, or for any form of consequential damages and/or indirect, incidental, exemplary and/or punitive damages of any kind or nature, in each case, however occurring.

21.     **SECURITY DEPOSIT.**

21.1     **Security Deposit.** Tenant has deposited with Landlord the sum set forth in Section 8 of the Basic Lease Information (i.e., $253,266.30) as security for the full and faithful performance of every provision of this Lease to be performed by Tenant. If Tenant breaches any provision, covenant or condition of this Lease, including but not limited to the payment of Basic Rental or Additional Rent, Landlord may (but shall not be required to) use all or any part of the Security Deposit for the payment of any sums in default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of said Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount and Tenant's failure to do so shall be an Event of Default under this Lease. If monthly Basic Rental is increased, whether pursuant to the terms of this Lease, or otherwise, the amount of the Security Deposit required to be maintained by Tenant shall also be increased so as to equal, at all times and from time to time, one (1) month's Basic Rental. Landlord shall not be required to keep this Security Deposit separate from its general funds and Tenant shall not be entitled to interest on such deposit. Within thirty (30) days after the expiration of the Lease Term, and provided there exists no default by Tenant hereunder, the Security Deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to Tenant's assignee), provided that subsequent to the expiration (or earlier termination) of this Lease, Landlord may retain from said Security Deposit (a) any and all amounts necessary to cure any default in the payment of Basic Rental and/or Additional Rent, to repair any damage to the Premises caused by the Tenant, and to clean the Premises upon termination of the Lease, (b) any amounts that Landlord may incur or be obligated to incur in exercising Landlord's rights under this Lease and (c) any expense, loss or damage that Landlord reasonably estimates it may suffer because of Tenant's default (including, without limitation, any and all amounts of Basic Rental and/or Additional Rent that would have been due under this Lease had the Lease remained in effect for the entire term). Without limiting the generality of the preceding sentence, Landlord and Tenant hereby agree that Landlord may, in addition, claim and retain from the Security Deposit those sums necessary to compensate Landlord for any other loss or damage caused by the act or omission of Tenant or Tenant's officers, agents, employees, independent contractors or invitees or the default of Tenant under this Lease (beyond the notice and cure periods set forth in Section 19.1 above (except that such notice and cure periods shall in no event apply from and after the expiration or earlier termination of this Lease)), including, without limitation, the unamortized portion of any leasing commissions and tenant improvements costs (which commissions and tenant improvements costs shall be amortized over the Lease Term) incurred by Landlord in connection with this Lease and any damages to which Landlord is entitled under applicable law (including, without limitation, § 1951.2 of the California Civil Code) as a result of Tenant's default under the Lease (beyond any applicable notice and cure periods (except that such notice and cure periods shall in no event apply from and after the expiration or earlier termination of this Lease)). Should Landlord sell its interest in the Premises

-27-

during the term hereof, and if Landlord deposits with the purchaser thereof the then unappropriated funds deposited by Tenant as aforesaid, Landlord shall be discharged from any liability with respect to such Security Deposit. Tenant hereby waives the provisions of California Civil Code § 1950.7, and all other provisions of law now or hereafter in force, that provide that Landlord may claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant, or to clean the Premises.

22.      CONFIDENTIALITY. Tenant acknowledges and agrees that the economic and noneconomic terms of this Lease are confidential and constitute proprietary information of Landlord. Disclosure of such terms could adversely affect the ability of Landlord to negotiate other leases (and/or lease amendments) and impair Landlord's relationship with third parties. Accordingly, Tenant agrees that it, and its partners, members, shareholders, officers, directors, employees and attorneys, shall not disclose, by public filings or otherwise, the terms and conditions of this Lease ("Confidential Information"), to any third party (other than the following third parties, if (and solely to the extent that) such disclosure is necessary in connection with the conduct of Tenant's business operations; provided, however, that, prior to any such disclosure, Tenant shall instruct any and all such third party(ies) in writing, for the benefit of Landlord, to comply with the terms and conditions of this Section 22 (and provide such parties with a copy of this Section 22): Tenant's directors, officers, partners, employees, legal counsel, accountants, lenders, potential lenders, investors, potential investors, brokers, financial advisors and similar professionals and consultants), either directly or indirectly, without the prior written consent of Landlord, which consent may be given or withheld in Landlord's sole and absolute discretion. The foregoing restriction shall not apply if Tenant is required to disclose the Confidential Information in response to a subpoena, regulatory, administrative or court order, or pursuant to any applicable law or regulation (it being the intent of the parties that Tenant shall have the right to disclose the terms of this Lease, as amended, to regulators and auditors (including the Securities and Exchange Commission) to the extent such disclosure is deemed necessary by Tenant to comply with any applicable law or regulation; provided however, that, in such event, Tenant shall, before making any such disclosure (other than in connection with a public filing required pursuant to any applicable law or regulation) (A) provide Landlord with prompt written notice of such required disclosure, (B) at Tenant's sole cost, take all reasonable steps to resist or narrow such requirement, including, without limitation, preparing and filing a request for confidential treatment of the Confidential Information and (C) if disclosure of the Confidential Information is required by subpoena or other regulatory, administrative or court order, or for regulatory, auditor or legal compliance, Tenant shall provide Landlord with as much advance notice of the possibility of such disclosure as practical so that Landlord may attempt to stop such disclosure or obtain an order concerning such disclosure. The form and content of a request by Tenant for confidential treatment of the Confidential Information shall be provided to Landlord at least five (5) business days before its submission to the applicable governmental agency and is subject to the prior written approval of Landlord. In addition, Tenant may disclose the terms of this Lease to prospective assignees of this Lease and prospective subtenants under this Lease with whom Tenant is actively negotiating such an assignment or sublease.

23.      COMMUNICATIONS AND COMPUTER LINES. All Lines installed pursuant to this Lease shall be (a) installed in accordance with Section 7; and (b) clearly marked with adhesive plastic labels (or plastic tags attached to such Lines with wire) to show Tenant's name, suite number, and the purpose of such Lines (i) every six (6) feet outside the Premises (including the electrical room risers and any Exterior Areas), and (ii) at their termination points. Landlord may designate specific contractors for work relating to vertical Lines. Unless otherwise notified by Landlord, Tenant, at its expense and before the expiration or earlier termination hereof, shall remove all Lines and repair any resulting damage. As used herein, "Lines" means all communications or computer wires and cables serving the Premises, whenever and by whomever installed or paid for, including any such wires or cables installed pursuant to any prior lease.

24.      PARKING. Tenant may park, free of charge (except as expressly provided below), in the parking areas located in the Project (collectively, the "Parking Areas"), subject to and, upon the following terms and conditions. Subject to Verizon's rights under the Verizon Lease, Tenant shall be entitled to use all of the unreserved parking spaces located in the Parking Areas, as set forth in Section 9 of the Basic Lease Information. Tenant shall pay Landlord any fees, taxes or other charges imposed by any governmental or quasi-governmental agency in

-28-

connection with the Parking Areas. Landlord shall not be liable to Tenant, nor shall this Lease be affected, if any parking is impaired by (or any parking charges are imposed as a result of) any Law. Tenant shall comply with all rules and regulations established by Landlord from time to time for the orderly operation and use of the Parking Areas, including any sticker or other identification system and the prohibition of vehicle repair and maintenance activities in the Parking Areas. Tenant's use of the Parking Areas shall be at Tenant's sole risk, and Landlord shall have no liability for any personal injury or damage to or theft of any vehicles or other property occurring in the Parking Areas or otherwise in connection with any use of the Parking Areas by Tenant or its employees or invitees. Landlord may alter the size, configuration, design, layout or any other aspect of the Parking Areas, and, in connection therewith, temporarily deny or restrict access to the Parking Areas, in each case without abatement of Rent or liability to Tenant; provided, however, Landlord shall use commercially reasonable efforts to provide adequate alternate parking reasonably acceptable to Tenant. Tenant's parking rights under this Section 24 are solely for the benefit of Tenant's employees and invitees and such rights may not be transferred without Landlord's prior consent, except pursuant to a Transfer permitted under Section 14.

## 25.   MISCELLANEOUS.

25.1   **Notices.** No notice, demand, statement, designation, request, consent, approval, election or other communication given hereunder ("Notice") shall be binding upon either party unless (a) it is in writing; (b) it is (i) sent by certified or registered mail, postage prepaid, return receipt requested, (ii) delivered by a nationally recognized courier service, or (iii) delivered personally; and (c) it is sent or delivered to the address set forth in Section 10 or 11 of the Basic Lease Information, as applicable, or to such other place (other than a P.O. box) as the recipient may from time to time designate in a Notice to the other party. Any Notice shall be deemed received on the earlier of the date of actual delivery or the date on which delivery is refused, or, if Tenant is the recipient and has vacated its notice address without providing a new notice address, three (3) days after the date the Notice is deposited in the U.S. mail or with a courier service as described above.

25.2   **Force Majeure.** If either party is prevented from performing any obligation hereunder by any strike, act of God, war, terrorist act, shortage of labor or materials, governmental action, civil commotion or other cause beyond such party's reasonable control ("Force Majeure"), such obligation shall be excused during (and any time period for the performance of such obligation shall be extended by) the period of such prevention; provided, however, that this Section 25.2 shall not (a) permit Tenant to hold over in the Premises after the expiration or earlier termination hereof, (b) excuse any of Tenant's obligations under Sections 3, 4, 5, 10, 21 or 25.3 or any of Tenant's obligations whose nonperformance would interfere with another occupant's use, occupancy or enjoyment of its premises or the Project or (c) excuse (or extend any time period for the performance of) (i) any obligation to remit money or deliver credit enhancement or (ii) any of Tenant's obligations whose breach could result in any liability on the part of any Landlord Party.

25.3   **Representations and Covenants.** Tenant represents, warrants and covenants that (a)Tenant is, and at all times during the Term will remain, duly organized, validly existing and in good standing under the Laws of the state of its formation and qualified to do business in the State of California; (b) neither Tenant's execution of nor its performance under this Lease will cause Tenant to be in violation of any agreement or Law; (c) Tenant (and any guarantor hereof) has not, and at no time during the Term will have, (i) made a general assignment for the benefit of creditors, (ii) filed a voluntary petition in bankruptcy or suffered the filing of an involuntary petition by creditors that remained or will remain undischarged for a period of sixty (60) days, (iii) suffered the appointment of a receiver to take possession of all or substantially all of its assets, (iv) suffered the attachment or other judicial seizure of all or substantially all of its assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally; (d) no party that (other than through the passive ownership of interests traded on a recognized securities exchange) constitutes, owns, controls, or is owned or controlled by Tenant, any guarantor hereof or any subtenant of Tenant is, or at any time during the Term will be, (i) in violation of any Laws relating to terrorism or money laundering, or (ii)a person listed in any sanctions-related list of designated persons maintained by the Office of Foreign Assets Control (OFAC) of the U.S. Department of the

-29-

Treasury, the U.S. Department of State, or by the United Nations Security Council, or other relevant sanctions authority, or a person operating, organized or resident in a country subject to comprehensive sanctions; and (e) neither Tenant, nor to its knowledge any of its respective agents, consultants, distributors, joint venture partners or other persons acting on the Tenant's behalf, has (i) used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any government official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption laws; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. Tenant, its subsidiaries, and their respective officers and employees, and to their knowledge, their directors and agents, are and have been in compliance with economic or financial sanctions or trade embargoes administered or enforced by the U.S. government, including OFAC or the Department of State, or by the United Nations Security Council, or other relevant sanctions authority.

25.4     **Energy Performance Disclosure Information.** Tenant hereby acknowledges that Landlord may be required to disclose certain information concerning the energy performance of the Building pursuant to California Public Resources Code Section 25402.10 and the regulations adopted pursuant thereto (collectively the "**Energy Disclosure Requirements**"). Tenant hereby acknowledges prior receipt of the Data Verification Checklist, as defined in the Energy Disclosure Requirements (the "**Energy Disclosure Information**"), and agrees that Landlord has timely complied in full with Landlord's obligations under the Energy Disclosure Requirements. Tenant acknowledges and agrees that (i) Landlord makes no representation or warranty regarding the energy performance of the Building or the accuracy or completeness of the Energy Disclosure Information, (ii) the Energy Disclosure Information is for the current occupancy and use of the Building and that the energy performance of the Building may vary depending on future occupancy and/or use of the Building, and (iii) Landlord shall have no liability to Tenant for any errors or omissions in the Energy Disclosure Information. If and to the extent not prohibited by any applicable Laws, Tenant hereby waives any right Tenant may have to receive the Energy Disclosure Information, including, without limitation, any right Tenant may have to terminate this Lease as a result of Landlord's failure to disclose such information. Further, Tenant hereby releases Landlord from any and all losses, costs, damages, expenses and/or liabilities relating to, arising out of and/or resulting from the Energy Disclosure Requirements, including, without limitation, any liabilities arising as a result of Landlord's failure to disclose the Energy Disclosure Information to Tenant prior to the execution of this Lease. Tenant's acknowledgment of the AS-IS condition of the Premises pursuant to the terms of this Lease shall be deemed to include the energy performance of the Building. Tenant further acknowledges that pursuant to the Energy Disclosure Requirements, Landlord may be required in the future to disclose information concerning Tenant's energy usage to certain third parties, including, without limitation, prospective purchasers, lenders and tenants of the Building (the "**Tenant Energy Use Disclosure**"). Tenant hereby (A) consents to all such Tenant Energy Use Disclosures, and (B) acknowledges that Landlord shall not be required to notify Tenant of any Tenant Energy Use Disclosure. Further, Tenant hereby releases Landlord from any and all losses, costs, damages, expenses and liabilities relating to, arising out of and/or resulting from any Tenant Energy Use Disclosure. The terms of this Section 25.4 shall survive the expiration or earlier termination of this Lease.

25.5     **Attorneys' Fees.** In any action or proceeding between the parties, including any appellate or alternative dispute resolution proceeding, the prevailing party may recover from the other party all of its costs and expenses in connection therewith, including reasonable attorneys' fees and costs. Tenant shall pay all reasonable attorneys' fees and other fees and costs that Landlord incurs in interpreting or enforcing this Lease or otherwise protecting its rights hereunder (a) where Tenant has failed to pay Rent when due, or (b) in any bankruptcy case, assignment for the benefit of creditors, or other insolvency, liquidation or reorganization proceeding involving Tenant or this Lease.

-30-

25.6 **Brokers.** Tenant represents to Landlord that it has dealt only with Tenant's Broker as its broker in connection with this Lease. Tenant shall indemnify, defend, and hold Landlord harmless from all claims of any brokers, other than Tenant's Broker, claiming to have represented Tenant in connection with this Lease. Landlord represents to Tenant that it has dealt only with Landlord's Broker as its broker in connection with this Lease. Landlord shall indemnify, defend and hold Tenant harmless from all claims of any brokers, including Landlord's Broker, claiming to have represented Landlord in connection with this Lease. Tenant acknowledges that any Affiliate of Landlord that is involved in the negotiation of this Lease is representing only Landlord, and that any assistance rendered by any agent or employee of such Affiliate in connection with this Lease or any subsequent amendment or other document related hereto has been or will be rendered as an accommodation to Tenant solely in furtherance of consummating the transaction on behalf of Landlord, and not as agent for Tenant. Landlord shall pay Landlord's Broker any leasing commissions, fees or other amounts due as a result of this Lease, pursuant to a separate agreement between Landlord and Landlord's Broker, and Landlord's Broker shall pay Tenant's Broker any such commission fees or other amounts pursuant to a separate agreement between Landlord's Broker and Tenant's Broker. The terms of this Section 25.6 shall survive the expiration or earlier termination of the Lease.

25.7 **Governing Law; Venue; WAIVER OF TRIAL BY JURY.** This Lease shall be construed and enforced in accordance with the Laws of the State of California, including, without limitation, the laws of the State of California applicable to contracts made and to be performed in the State of California. In order to induce Landlord to enter into this Lease, and as a material part of the consideration therefor, Le Holdings (Beijing) hereby expressly (a) agrees that all actions or proceedings relating directly or indirectly to this Lease shall, at the option of Landlord, be litigated in courts located within the State of California, (b) consents to the jurisdiction of any such court and consents to the service of process in any such action or proceeding by personal delivery or any other method permitted by law and (c) waives any defense of forum non conveniens, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Lease. The undersigned Le Holdings (Beijing) designates and appoints Le Technology, or any successor of Le Technology, whose address is 3553 North First Street, San Jose, California (i.e., at the Premises), and such other persons located in California as may hereafter be selected by Le Holdings (Beijing) which irrevocably agree in writing to so serve as Le Holdings (Beijing)'s agent to receive on Le Holdings (Beijing)'s behalf service of all process in any such proceedings in any such court, such service being hereby acknowledged by Le Holdings (Beijing) to be effective and binding service in every respect. A copy of any such process so served shall be mailed by registered mail to Le Holdings (Beijing) at agent's address in accordance with above. If any agent appointed by Le Holdings (Beijing) hereunder refuses to accept service, Le Holdings (Beijing) hereby agrees that service upon Le Holdings (Beijing) by mail at the Premises shall constitute sufficient notice. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of Landlord to bring proceedings against Le Holdings (Beijing) hereunder in the courts of any other jurisdiction.

THE PARTIES WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE OR ANY EMERGENCY OR STATUTORY REMEDY.

25.8 **Waiver of Statutory Provisions; Certified Access Specialist.** Each party waives California Civil Code§§ 1932(2) and 1933(4). Tenant waives (a) any rights under (i) California Civil Code §§ 1932(1), 1941, 1942, 1950.7 or any similar Law, or (ii) California Code of Civil Procedure § 1265.130; and (b) any right to terminate this Lease under California Civil Code § 1995.310. For purposes of Section 1938 of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Premises have not undergone inspection by a Certified Access Specialist (CASp) and in connection therewith: (i) Tenant assumes all risk of, and agrees that Landlord shall not be liable for, any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) sustained as a result of the Premises not having been inspected by a Certified Access Specialist (CASp); (ii) Tenant hereby acknowledges and agrees that Tenant's indemnity obligations set forth in this Lease shall include any and all claims relating to or arising as a result of the Premises not having been

-31-

inspected by a Certified Access Specialist (CASp); and (iii) Landlord may require, as a condition to its consent to any Alterations, that any architect retained by Tenant in connection with such Alterations be certified as a Certified Access Specialist (CASp), and that following the completion of such Alterations, such architect shall certify the Premises as meeting all applicable construction-related accessibility standards pursuant to California Civil Code Section 55.53.

25.9 **Interpretation.** As used herein, the capitalized term "Section" refers to a section hereof unless otherwise specifically provided herein. As used in this Lease, the terms "herein," "hereof," "hereto" and "hereunder" refer to this Lease and the term "include" and its derivatives are not limiting. Any reference herein to "any part" or "any portion" of the Premises, the Project or any other property shall be construed to refer to all or any part of such property. Wherever this Lease requires Tenant to comply with any Law, rule, regulation, procedure or other requirement or prohibits Tenant from engaging in any particular conduct, this Lease shall be deemed also to require Tenant to cause each of its employees, licensees, invitees and subtenants, and any other party claiming by, through or under Tenant, to comply with such requirement or refrain from engaging in such conduct, as the case may be. Wherever this Lease requires Landlord to provide a customary service or to act in a reasonable manner (whether in incurring an expense, establishing a rule or regulation, providing an approval or consent, or performing any other act), this Lease shall be deemed also to provide that whether such service is customary or such conduct is reasonable shall be determined by reference to the practices of owners of buildings that are comparable to the Building in size, age, class, quality and location. Tenant waives the benefit of any rule that a written agreement shall be construed against the drafting party. For purposes hereof, (a) a matter (such as the application or violation of a Law) shall be deemed to result from a particular use (as distinguished from general R&D Use) of the Premises if such matter results from such use and a different R&D Use could be made of the Premises without resulting in such matter; and (b) a matter (such as compliance with a Law) shall be deemed to be required for a particular use (as distinguished from general R&D Use) of the Premises if such matter is required for such use and a different R&D Use could be made of the Premises without requiring such matter.

25.10 **Entire Agreement.** This Lease sets forth the entire agreement between the parties relating to the subject matter hereof and supersedes any previous agreements (none of which shall be used to interpret this Lease). Tenant acknowledges that in entering into this Lease it has not relied upon any representation, warranty or statement, whether oral or written, not expressly set forth herein. This Lease can be modified only by a written agreement signed by both parties.

25.11 **Other.** Landlord, at its option, may cure any Default, without waiving any right or remedy or releasing Tenant from any obligation, in which event Tenant shall pay Landlord, upon demand, the cost of such cure. If any provision hereof is void or unenforceable, no other provision shall be affected. Submission of this instrument for examination or signature by Tenant does not constitute an option or offer to lease, and this instrument is not binding until it has been executed and delivered by both parties. If Tenant is comprised of two or more parties, their obligations shall be joint and several, and Le Technology and Le Holdings (Beijing) hereby expressly agree and acknowledge that each such entity is bound by the terms and conditions of this sentence. Time is of the essence with respect to the performance of every provision hereof in which time of performance is a factor. So long as Tenant performs its obligations hereunder, Tenant shall have peaceful and quiet possession of the Premises against any party claiming by, through or under Landlord, subject to the terms hereof. Landlord may transfer its interest herein, in which event Landlord shall be released from, Tenant shall look solely to the transferee for the performance of, and the transferee shall be deemed to have assumed, all of Landlord's obligations arising hereunder after the date of such transfer (including the return of any Security Deposit) and Tenant shall attorn to the transferee. No rights to any view or to light or air over any property are granted to Tenant hereunder. The expiration or termination hereof shall not relieve either party of any obligation that accrued before, or continues to accrue after, such expiration or termination. Concurrently with the execution and delivery of this Lease, Tenant shall provide Landlord with written evidence satisfactory to Landlord that the individuals executing this Lease on behalf of Tenant are authorized to execute this Lease and bind Tenant.

-32-

26.     **RIGHTS RESERVED TO LANDLORD.** Notwithstanding any contrary provision hereof, provided that the same does not unreasonably interfere with Tenant's use of the Premises or the Parking Areas, Landlord may, without liability to Tenant, (a) make repairs or alterations to the Project, and in doing so transport any required material through the Premises, close entrances, doors, corridors, elevators and other facilities in the Project, open any ceiling in the Premises, and temporarily suspend services or use of Exterior Areas, all during normal business hours (provided, however, that, upon Tenant's request, Landlord, to the extent reasonably practicable, shall perform such work after normal business hours if Tenant pays all resulting overtime and other incremental expense increases resulting therefrom); (b) install, use and maintain through the Premises, pipes, conduits, wires and ducts serving the Premises and/or Project; (c) install, operate, maintain and repair any satellite dish, antennae, equipment, or other facility on the roof of the Building or use the roof in any other manner, and permit any entity selected by Landlord to undertake the foregoing; and (d) take any other action that Landlord deems reasonable in connection with the operation, maintenance or preservation of the Building or the Project. In addition, Landlord reserves all rights not expressly granted to Tenant hereunder.

27.     **SIGNAGE.**

27.1     **Signage Rights.** Tenant shall not, without Landlord's prior approval, place on any portion of the Premises any sign, placard, lettering, banner, display, graphic, decor or other advertising or communicative material that is visible from outside the Building; provided, however, that subject to this Section 27, Tenant, at its expense, may install the following signage which shall identify LETV and, to the extent permitted below, a Permitted Signage Transferee (collectively, "**Signage**"): (i) one (1) sign identifying "LETV" on both sides of the monument sign for the Premises, and (ii) one (1) sign identifying "LETV" on the exterior of the Building. The graphics, materials, size, color, design, lettering, lighting (if any), specifications, manner and method of installation and exact location of the Signage (collectively, the "**Signage Specifications**") shall be subject to Landlord's approval, which shall not be unreasonably withheld provided that the same are consistent with Landlord's signage standards in effect at the time ("**Signage Criteria**"). In addition, the Signage and Signage Specifications shall be subject to Tenant's receipt of all required governmental permits and approvals, and shall be subject to all applicable Laws and the Signage Criteria. Tenant hereby acknowledges that, notwithstanding Landlord's approval of the Signage and/or Signage Specifications, Landlord has made no representation or warranty to Tenant that Tenant will be able to obtain such approvals and permits. Tenant shall pay all costs associated with the Signage, including costs of design, construction, permitting, installation, maintenance, repair and removal. Tenant shall maintain the Signage in good condition and repair during the Term. Before the expiration or earlier termination hereof, Tenant shall remove the Signage and repair any damage to the Building and/or Project (including any fading or discoloration) caused by the Signage or its removal.

27.2     **Rights Personal to Tenant; Occupancy Requirement.** Tenant's rights under Section 27.1 are personal to, and may be exercised only by, LETV and not by any assignee, subtenant, licensee or other transferee of LETV's interest in this Lease; provided, however, that such rights may be transferred to an entity to which this Lease is assigned pursuant to a Permitted Transfer effectuated in accordance with the express terms and conditions of Section 14.8 above, and exercised by any such assignee (a "**Permitted Signage Transferee**") so long as such assignee (a) occupies 100% of the Premises; and (b) does not have a name or logo that (i) in Landlord's reasonable judgment (taking into consideration the level and visibility of the Signage), is inconsistent with the first-class character, reputation and quality of the Project or would otherwise reasonably offend a landlord of a building comparable to the Project, or (ii) conflicts with any contractual or legal obligation of Landlord. Notwithstanding any contrary provision hereof, if at any time the entirety of the Premises is not occupied, as applicable, by LETV or a Permitted Signage Transferee, then Tenant's (and any Permitted Signage Transferee's) rights under Section 27.1 shall terminate and Tenant shall remove the Signage in accordance with Section 27.1.

28.     **HAZARDOUS MATERIALS AND MOLD.**

28.1     **Hazardous Materials.**

-33-

28.1.1   **Definitions**. As used herein, the following terms shall have the following meanings:

(a)   "**Hazardous Material**" means any material or substance that is now or hereafter defined or regulated by any Law or governmental authority thereunder as radioactive, toxic, hazardous, or waste, or a chemical known to the State of California to cause cancer or reproductive toxicity, including (i) petroleum and any of its constituents or byproducts, (ii) radioactive materials, (iii) asbestos in any form or condition, and (iv) substances or materials regulated by any of the following, as amended from time to time, and any rules promulgated thereunder: the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. §§9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§6901, et seq.; the Toxic Substances Control Act, 15 U.S.C. §§2601, et seq.; the Clean Water Act, 33 U.S.C. §§1251 et seq.; the Clean Air Act, 42 U.S.C. §§7401 et seq.; The California Health and Safety Code; The California Water Code; The California Labor Code; The California Public Resources Code; or The California Fish and Game Code.

(b)   Tenant shall be deemed to "**Use**" a quantity of Hazardous Material if any Tenant Party brings upon, produces, treats, stores, handles, discharges, disposes of, or otherwise uses such quantity of such Hazardous Material in or about the Premises or Project.

(c)   "**Disclosure Certificate**" means a Hazardous Materials Disclosure Certificate substantially in the format of **Exhibit G**.

28.1.2   **Use of Hazardous Materials**. Tenant shall not Use any quantity of any Hazardous Material (other than quantities and types of office and janitorial supplies typically associated with general office use) unless (a) such Use is described in the most recent Disclosure Certificate provided by Tenant to Landlord, and (b) Landlord has approved such Use. Landlord shall provide Tenant with notice approving or disapproving of any proposed Use of any quantity of any Hazardous Material within 30 days after receiving a Disclosure Certificate describing such proposed Use (provided that Tenant does not submit a new Disclosure Certificate to Landlord more frequently than once per calendar year). Landlord may withhold or condition such approval in its sole and absolute discretion. If the Disclosure Certificate attached as **Exhibit G** (which is hereby provided by Tenant to Landlord) describes one or more specific Use(s) of one or more specific quantities of one or more specific Hazardous Materials, Landlord hereby approves such Use(s) for purposes of this **Section 28.1.2**.

28.1.3   **Compliance with Law; Indemnification**. Without limiting its obligations, Tenant, at its expense, shall (a) cause any Use of Hazardous Materials by Tenant to comply with Law, including by obtaining and complying with all governmental permits necessary for such compliance; and (b) indemnify, defend and hold the Landlord Parties harmless from and against any Claims (including diminution in value of the Premises or Project, damages for the loss or restriction on use of leasable space or of any amenity of the Premises or Project, damages arising from any adverse impact on marketing of space in the Project, Remedial Work (defined below), and amounts paid in settlement of Claims) arising from any such Use.

28.1.4   **Inspection**. Landlord, at its option, may, at any time (but not more than once in any calendar year unless Landlord has Reasonable Cause (defined below), enter the Premises and perform such inspections, tests and investigations as may be reasonably necessary to determine whether Tenant is in compliance with the provisions of this **Section 28.1** (a "**Compliance Inspection**"); provided, however, that Landlord shall not conduct a Compliance Inspection more frequently than once in any calendar year unless Landlord has Reasonable Cause (defined below). Tenant shall reimburse to Landlord the costs of any Compliance Inspection within 30 days after Landlord's demand; provided, however, that Landlord shall pay such costs if (a) Landlord does not have Reasonable Cause for such Compliance Inspection, and (b) the most recent Disclosure Certificate provided by Tenant pursuant to **Section 28.1.2** states that Tenant's current and proposed future Uses of Hazardous Materials are limited to de minimis amounts of Hazardous Materials customarily used in office buildings. For purposes hereof, Landlord shall be deemed to have "**Reasonable Cause**" for a Compliance Inspection if and only if (x) Landlord has

-34-

reasonable cause to believe that Tenant has breached any provision of this Section 28.1, or (y) such Compliance Inspection is required by any governmental agency.

28.1.5   **Landlord Notification.** Tenant shall promptly provide Landlord with complete copies of all documents, correspondence and other written materials submitted or received by or on behalf of Tenant concerning environmental issues at the Premises or the Project, including any written material relating to any actual or potential release, discharge, spill, investigation, compliance, cleanup or abatement of Hazardous Materials or any actual or potential cause of action, claim or legal proceeding relating thereto. Tenant shall use commercially reasonable efforts, within 24 hours after discovering any unauthorized release, spill or discharge of Hazardous Materials in, on, or about the Premises or Project, to provide notice to Landlord fully describing such event. Without limiting the foregoing, Tenant, within 24 hours of receiving any warning, notice of violation, permit suspension or similar disciplinary measure relating to Tenant's actual or alleged failure to comply with any Law or permit relating to Hazardous Materials, shall provide notice to Landlord of the same.

28.1.6   **Remedial Work.** If any investigation or monitoring of site conditions or any clean-up, containment, restoration, removal or remediation of Hazardous Materials at or about the Premises or Project (collectively, "**Remedial Work**") is required by Law (or is otherwise necessary to render the Premises suitable for unrestricted use) as a result of any Use of Hazardous Materials by any Tenant Party, then Tenant, at Landlord's option, shall either perform such Remedial Work at Tenant's cost or pay Landlord, within 30 days after demand, the cost of performing such Remedial Work. All Remedial Work performed by Tenant shall be performed in compliance with applicable Laws, by contractors approved by Landlord, under the supervision of a consulting engineer approved by Landlord, and otherwise in accordance with Section 7.3. Tenant shall reimburse Landlord, within 30 days after demand, Landlord's reasonable attorneys' and experts' fees and costs incurred in connection with monitoring or reviewing any Remedial Work.

28.2   **Mold.** Because mold spores are present essentially everywhere and mold can grow in almost any moist location, Tenant acknowledges the necessity of adopting and enforcing good housekeeping practices, ventilation and vigilant moisture control within the Premises (particularly in kitchen areas, janitorial closets, bathrooms, in and around water fountains and other plumbing facilities and fixtures, break rooms, in and around outside walls, and in and around HVAC systems and associated drains) for the prevention of mold (such measures, "**Mold Prevention Practices**"). Without limiting its obligations, Tenant, at its expense, shall keep and maintain the Premises in good order and condition in accordance with the Mold Prevention Practices and acknowledges that the control of moisture, and prevention of mold within the Premises, are integral to its obligations under this Lease. Without limiting the foregoing, Tenant shall promptly notify Landlord if it observes, suspects, has reason to believe that any Mold Conditions (as defined below) exist at the Premises, or if Tenant receives any notice from a governmental agency of complaints regarding the indoor air quality at the Premises. As used herein, "**Mold Conditions**" mean, collectively, the presence of mold or any other conditions at the Premises that reasonably could be expected to cause or result from mold or fungus, including observed or suspected instances of water damage, condensation, seepage, leaks or any other water penetration (from any source, internal or external), mold growth, mildew, repeated complaints of respiratory ailments or eye irritation by Tenant's employees or any other occupants of the Premises.

28.3   **Surrender.** At the expiration or earlier termination hereof, Tenant, without limiting its obligations, shall surrender the Premises to Landlord free of (a) any Hazardous Materials, placed or exacerbated in, about or near the Premises by any Tenant Party, and (b) any Mold Condition caused or exacerbated by any Tenant Party.

29.   **INTENTIONALLY OMITTED**

30.   **ROOF TOP EQUIPMENT**

4814-9620-0107v2
HAL\22817007

**30.1    Right to Use.** Subject to Verizon's rights under the Verizon Lease, upon no less than thirty (30) days prior written notice, Tenant shall have the right to use such portion(s) of the roof of the Building (any such portion(s) of the roof being the "**Roof Space**") as may be reasonably necessary from time to time to install, operate and maintain (provided, however, that the purchase, installation, operation and maintenance thereof shall be at Tenant's sole cost and expense) customary equipment, such as satellite dishes and telecommunications equipment, and any other equipment related thereto (such equipment being collectively referred to herein as the "**Roof Space Equipment**"). Tenant shall provide Landlord with schematics for the Roof Space Equipment Tenant desires to install in the Roof Space showing the size, height and space requirements for the Roof Space Equipment. Thereafter, Landlord and Tenant shall mutually agree upon the location of the Roof Space based on available locations that will accommodate the Roof Space Equipment without interference with equipment then used by Verizon as of the date of installation by Tenant of its Roof Space Equipment. Tenant acknowledges and agrees that Landlord leases other portions of the Building roof to Verizon and that Tenant's use of the Building roof for the Roof Space Equipment shall be in common with Verizon.

**30.2    Installation; Relocation.** The installation of any Roof Space Equipment shall be treated as an Alteration subject to all of the terms and conditions of Section 7.2 of this Lease. Without limiting the generality of the foregoing, the size, height and placement of all Roof Space Equipment shall be subject to Landlord's reasonable review and approval and Tenant shall, at Tenant's sole cost and expense, screen and/or cover all Roof Space Equipment as reasonably directed by Landlord. In no event shall Tenant penetrate the roof during the installation, maintenance, repair or removal of the Roof Space Equipment. Tenant shall, at Tenant's sole cost and expense, install, construct, maintain, use, repair and remove Tenant's Roof Space Equipment in compliance with all laws, statutes, permit requirements, building codes, ordinances and governmental rules and regulations now in force or which may hereafter be enacted or promulgated. Tenant's installation, construction, use, maintenance, repair and removal of Roof Space Equipment in the Roof Space shall not obstruct, impair or interfere with the rights of Verizon under the Verizon Lease. If Landlord requires access to the portion of the roof within the Roof Space for maintenance and repair, Landlord shall give Tenant written notice of such requirement and the dates on which Landlord proposes to perform such maintenance and repair. Prior to the date specified in Landlord's notice, Tenant shall, at Tenant's sole cost and expense, take all actions necessary to remove the Roof Space Equipment from the Roof Space and make the Roof Space available to Landlord for roof maintenance and repair. Upon completion of the roof maintenance and repair, Tenant shall reinstall the Roof Space Equipment at its sole cost and expense. If emergency roof repairs are necessary, Landlord may itself remove the Roof Space Equipment from the affected area, after first using reasonable efforts to notify Tenant, and Landlord shall not be liable to Tenant for any loss, cost, damage or expense arising from such removal during an emergency. In connection with the installation by Tenant of the Roof Space Equipment, Landlord shall grant Tenant access to and use of the Building risers, to the extent reasonably necessary.

**30.3    Landlord Approval Right.** Any contractor or person selected by Tenant to perform any work contemplated for the installation, maintenance, repair or removal of the Roof Space Equipment and all plans and specifications for such work shall first be reasonably approved by Landlord in writing. In order to allow Landlord time to post a notice of non-responsibility, no such work by or on behalf of Tenant shall be allowed to commence until ten (10) business days following receipt by Landlord of written notice of the date Tenant proposes to commence the installation, maintenance, repair or removal of the applicable Roof Space Equipment.

**30.4    Removal.** Upon the expiration or earlier termination of this Lease, Tenant shall promptly remove all Roof Space Equipment, all anchors, and all separate meters and cabling and repair any damage to the roof of the Building and other areas of the Project caused by such removal and return the Roof Space to Landlord in the same condition as received, ordinary wear and tear and events of casualty excepted.

**30.5    Indemnity.** Tenant shall indemnify, defend and hold Landlord, its partners, members, officers, directors, employees, agents and contractors and Landlord's property and all tenants, occupants, invitees and licensees of Landlord harmless from and against all liabilities, claims, actions, causes of action, losses, damages,

-36-

injuries, liens, costs and expenses, including attorneys' fees and costs of suit, arising out of or relating to the installation, construction, presence, use, maintenance, repair, or removal of Roof Space Equipment; provided, however, that the foregoing agreement to indemnify, defend and hold harmless shall not extend to claims not covered by Tenant's insurance to the extent arising from the gross negligence or willful misconduct of Landlord. Such obligations of Tenant under this Article 30 shall survive the expiration or earlier termination of this Lease.

30.6 **Assumption of Risk.** Tenant acknowledges that Landlord has no obligation to protect, secure, install, construct, maintain, repair or remove any Roof Space Equipment, and Tenant hereby assumes all risk of loss or damage to or from the Roof Space Equipment from any cause. Tenant hereby waives all claims against Landlord and its partners, officers, directors, employees, agents and contractors with respect to such loss or damage.

30.7 **Permits.** Tenant shall obtain all necessary municipal, state and federal permits and authorizations required to install, maintain and operate the Roof Space Equipment and pay any charges levied by governmental agencies which are the result of Tenant having the Roof Space Equipment.

31.   OPTION TO PURCHASE.

31.1   **Grant of Purchase Option.** In consideration of the terms and conditions of this Lease, and other valuable consideration the receipt and sufficiency of which is hereby acknowledged, Landlord hereby grants Tenant the right ("**Purchase Option**") to purchase the Project for the amount of Thirty-six Million Six Hundred Seventy-seven Thousand Eight Hundred Ninety Dollars ($36,677,890.00) ("**Purchase Price**"), subject to the terms and conditions of this Article 31 below. Landlord and Tenant hereby agree and acknowledge that Tenant shall be entitled to record a memorandum of lease, in the form and content attached hereto as Exhibit H ("**Memorandum of Lease**"), and only such Memorandum of Lease, in the Official Records of Santa Clara County for the sole purpose of acknowledging the existence of this Lease and the Purchase Option.

31.2   **Exercise of Purchase Option.** So long as no Default on the part of Tenant shall have occurred under this Lease, Tenant may exercise the Purchase Option by delivering, on or before October 31, 2016, both (i) to Landlord, an unconditional, unequivocal and binding written notice to Landlord exercising the Purchase Option (such notice being the "**Purchase Option Notice**") and (ii) with Chicago Title – Santa Clara County (the "**Escrow Holder**"), in good funds, the amount of One Million Dollars ($1,000,000.00) ("**Deposit**"), the time of such exercise (and delivery of the Deposit) being of the essence. If Tenant fails to timely give the Purchase Option Notice (together with the concurrent delivery of the Deposit) in strict compliance with the immediately preceding sentence, Tenant shall be conclusively deemed to have waived the Purchase Option, and the terms and conditions of this Article 31 shall be deemed null and void *ab initio.* Tenant shall have no right to purchase the Project, except as expressly provided in this Article 31.

31.2.1   **Pre-Exercise Inspection Rights.** On or before July 31, 2016, upon prior written notice to Landlord (as set forth below), subject to any reasonable requirements imposed by Landlord in connection therewith due to the scope and/or complexity thereof (including, without limitation, accompaniment by a Landlord representative, commercially reasonable insurance and/or bonding requirements), Tenant and its representatives shall, at Tenant's sole cost and expense, be permitted to examine, inspect and investigate the Project (collectively, the "**Pre-Exercise Inspections**"), including, but not limited to, to the extent in Landlord's control or possession, any and all reasonably-requested, non-proprietary books, records and other information relating to the Project (collectively, the "**Project Information**"). Tenant shall maintain as confidential the Project Information and any and all materials and/or other information obtained about the Project, and shall not disclose any Project Information to any third party; provided, however, that Tenant shall have the right to disclose Project Information to prospective lenders and involved third parties who require information to assist Tenant in Tenant's due diligence investigations of the Project, provided that Tenant shall require such prospective lenders and involved third parties to maintain the confidentiality of any and all such Project Information. If Tenant does not exercise the Purchase Option, and/or,

-37-

following any such exercise, escrow fails to close for any reason, any and all Project Information shall be promptly returned to Landlord. Tenant shall have the right to conduct any Pre-Exercise Inspections, so long as, in each such instance, Tenant notifies Landlord in writing or via e-mail of its intent, and the scope of the examination, inspection and/or investigation in question, not less than three (3) business days prior to the occurrence of the same. Tenant shall have the right to conduct, at its sole cost and expense, any inspections, studies or tests that Tenant deems appropriate in determining the condition of the Project; provided, however, Tenant shall not perform any sampling, boring drilling or other physically intrusive and/or invasive testing into the structures, ground, improvements and/or any other elements of the Project, including, without limitation, any so-called Phase II environmental assessment, without the prior written consent of Landlord (which consent shall not be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, Tenant shall have the right to conduct a non-intrusive, non-invasive Phase I environmental assessment without obtaining Landlord's prior consent, provided that such Phase I shall not include any sampling, boring, drilling or other physically intrusive and/or invasive testing into the structures, ground, improvements and/or any other elements of the Project. The persons or entities performing the Pre-Exercise Inspections shall be properly licensed and qualified and shall have obtained any and all appropriate permits for performing relevant tests and shall have delivered such permits to Landlord, prior to performing any such tests. Each Pre-Exercise Inspection, and the results thereof, shall be deemed Project Information, and remain confidential, and Tenant shall furnish to Landlord, promptly following the receipt thereof, all third-party reports, studies and assessments of the Project or improvements thereon. Tenant hereby agrees and acknowledges that any and all insurance, exculpation, indemnification, repair, maintenance, replacement, restoration, casualty and other relevant provisions of this Lease shall apply with respect to the Pre-Exercise Inspections.

31.2.2  **Pre-Exercise Title Review.** As soon as reasonably practicable following Landlord's receipt of Tenant's written request therefor, which written request by Tenant shall be delivered to Landlord on or before July 31, 2016, Landlord shall deliver to Tenant a preliminary title report relating to the Project issued by First American Title Insurance Company, along with a copy of each instrument listed as an exception therein (the "Title Report"). In addition, Tenant shall have the right, in Tenant's sole and absolute discretion, to engage a licensed surveyor to perform an ALTA survey (the "Survey") of the Project. Landlord shall pay the charge for the Title Report. If Tenant, in its sole and absolute discretion, objects to (A) if applicable, the Survey or (B) any of the exceptions shown in the Title Report or any other matter affecting title to the Project, Tenant shall provide Landlord with a written notice of such objections (the "Objection Letter"), which notice shall contain a reasonably detailed explanation of such objections, on or before the date that is sixty (60) days after Tenant's receipt of the Title Report. If Tenant does not deliver an Objection Letter on or before the date that is sixty (60) days after Tenant's receipt of the Title Report, Tenant shall be deemed to have accepted all of the exceptions contained in the Title Report (other than any Monetary Encumbrances (as defined in Section 4.1 of the Purchase Agreement described in Section 31.3 below)), the form and substance of any Survey, and all matters shown thereon. In the event any such objections are timely made by Tenant, Landlord shall have the right, but not the obligation, exercisable by delivery of a written notice to Tenant (any such notice being the "Landlord's Response Notice"), within five (5) business days after Landlord's receipt of Tenant's Objection Letter (the "Landlord's Response Period") to notify Tenant of Landlord's election to cure (by removal, endorsement (in form reasonably satisfactory to Tenant) or otherwise in a manner reasonably satisfactory to Tenant), if Tenant duly exercises the Purchase Option, any such objections, in the manner specified in the Landlord's Response Notice, on or before the Closing Date described in Section 9.2 of the Purchase Agreement. Without limiting the manner(s) in which Landlord may reasonably cure any such exception to which Tenant shall have objected pursuant to an Objection Letter, the procurement by Landlord of a commitment for the issuance of a title policy (or endorsement thereto) by the Title Company, insuring Tenant against the exception or other matter, shall be deemed to be a cure of such exception or matter as long as the Title Company agrees to delete such exception or affirmatively insure over such exception by endorsement in a form reasonably satisfactory to Tenant. Landlord's failure to deliver a Landlord's Response Notice within the Landlord's Response Period shall be conclusively deemed to be Landlord's election to not cure and/or remove any such exceptions or other matters affecting title (other than Monetary Encumbrances). If there are objections timely made by Tenant that Landlord elects (or is deemed to have elected) not to cure and/or remove, then, notwithstanding anything to the contrary contained in this Lease and/or the Purchase Agreement, Tenant's delivery of a Purchase Option Notice and the Deposit shall be conclusively deemed

-38-

to be Tenant's unconditional agreement to accept title to the Project subject to all exceptions to title set forth in the Title Report as of the date of such delivery, and any and all other Approved Exceptions (as defined in the Purchase Agreement) as of the date of such delivery, as applicable, other than Monetary Encumbrances, and all matters shown on any Survey, as applicable.

If (1) Tenant duly exercises the Purchase Option in accordance with the terms and conditions of this Article 31, and (2) any title exceptions set forth in Tenant's Objection Letter which Landlord shall have expressly agreed to cure in a Landlord's Response Notice are not so cured as of the Closing Date (or arrangements for such cure to be effective as of the Closing Date are not made) by Landlord in the manner provided in Landlord's Response Notice, then Tenant may, as its sole and exclusive remedy, elect to either: (A) waive such objection(s) and consummate the transaction contemplated by the Purchase Agreement without adjustment to the Purchase Price or (B) terminate the Purchase Agreement, in which case (x) all rights, obligations and liabilities of Landlord and Tenant under the Purchase Agreement (except any rights, obligations and liabilities that expressly survive the termination of the Purchase Agreement) shall terminate, (y) the Deposit shall be promptly returned to Tenant and (z) this Lease shall remain in full force and effect.

31.2.3   **Pre-Exercise Confirmation of Seller's Representations and Warranties.** Tenant shall have the right to request in writing, at any time before it exercises the Purchase Option, that Landlord either confirm in writing the accuracy of the representations and warranties set forth in Section 10.1 of the Purchase Agreement, or if not accurate, specify the manner in which the representations and warranties are inaccurate by delivery of a proposed schedule of exceptions setting forth specific facts and/or circumstances that qualify or limit the representations set forth in Section 10.1 of the Purchase Agreement (the "**Schedule of Exceptions**"). Landlord shall notify Tenant of such confirmation and/or any required disclosures, if any, to be included in the Schedule of Exceptions, within five (5) business days after Landlord's receipt of Tenant's written request.

31.3   **Purchase Agreement.** If the Purchase Option is duly exercised in accordance with the terms and conditions of this Article 31 above, then (A) within two (2) business days after such exercise, Landlord shall deliver to Tenant the Agreement of Purchase and Sale attached hereto as Exhibit I ("**Purchase Agreement**") with the blanks contained in such Exhibit I completed to reflect the specific closing date (and other dates) which are applicable after taking into account the date of Tenant's exercise of the Purchase Option, and Landlord and Tenant's execution and delivery of such Purchase Agreement and (B) within three (3) business days thereafter, Landlord and Tenant shall duly execute and deliver to each other fully-executed counterpart originals of the Purchase Agreement. If Tenant fails to duly execute and deliver the Purchase Agreement within two (2) business days after Tenant's receipt of written notice from Landlord of Tenant's failure to strictly comply with the first sentence of this Section 31.3, Tenant shall be conclusively deemed to have waived the Purchase Option, and the terms and conditions of this Article 31 shall be deemed null and void *ab initio*. If Landlord fails to duly execute and deliver the Purchase Agreement within two (2) business days after Landlord's receipt of written notice from Tenant of Landlord's failure to strictly comply with the first sentence of this Section 31.3, Tenant may pursue one of the following remedies, each of which shall be Tenant's sole and exclusive remedy:

(i)   Enforce specific performance of Landlord's obligation to duly execute and deliver the Purchase Agreement, in which case this Lease shall remain in full force and effect in accordance with the terms and conditions hereof, and Tenant shall have no claim for damages or any other remedy against Landlord; provided, however, if Tenant fails to file suit for specific performance against Landlord in a court having jurisdiction in Santa Clara County on or before the date thirty (30) days following the date upon which Landlord was to have delivered the executed Purchase Agreement (time being of the essence), then Tenant shall be deemed to have waived its right to seek such specific performance.

(ii)   Terminate the Purchase Option (and withdraw its signature to the Purchase Agreement) by written notice delivered to Landlord within thirty (30) days following the date upon which Landlord was to have delivered the executed Purchase Agreement (time being of the essence), and, in the event of such termination, (A)

-39-

Tenant shall be entitled to the prompt return of the Deposit and to receive an amount equal to all actual and documented out-of-pocket costs incurred by Tenant in connection with Tenant's due diligence inspections with respect to the Property prior to duly exercising the Purchase Option (including, without limitation, attorneys' fees, costs incurred in connection with obtaining third-party reports and studies and any other out-of-pocket costs actually incurred in connection with Tenant's Pre-Exercise Inspections and title review pursuant to Section 31.2 above), (B) the terms and conditions of this Article 31 shall be deemed null and void *ab initio* and (C) this Lease shall remain in full force and effect.

31.4    **Personal Rights; No Default.** Tenant's right to exercise the Purchase Option is personal to, and may be exercised only by LETV (i.e., concurrently by both Le Technology and Le Holdings (Beijing)), it being the intent of the parties that no assignee or subtenant shall have any right to exercise the Purchase Option granted herein; provided, however, that the Purchase Option may be exercised by (i) Le Technology (individually), (ii) Le Holdings (Beijing) (individually) or (iii) any Permitted Assignee. In addition, if a Default on the part of Tenant shall have occurred under this Lease (as the same may have been amended), or if a default in the performance or observance of the obligations on the part of the Tenant to be performed or observed under this Lease shall exist at the time it exercises the Purchase Option or at any time thereafter, Landlord shall have, in addition to all of its other rights and remedies under this Lease, the right (but not the obligation), in Landlord's sole and absolute discretion, to terminate the Purchase Agreement, and to unilaterally revoke and nullify Tenant's exercise of the Purchase Option, in which case this Lease shall remain in full force and effect, and expire on the expiration of the Initial Term, unless earlier terminated pursuant to the terms hereof, and Tenant shall have no further rights under this Lease to purchase the Project.

31.5    **Effect of Exercise; No Termination of Lease.** Landlord and Tenant hereby agree and acknowledge that, notwithstanding (x) Tenant's exercise of the Purchase Option, (y) Landlord's and Tenant's mutual execution and delivery of the Purchase Agreement and/or (z) anything to the contrary contained in this Lease, the Purchase Agreement and/or applicable law, it is the intent of the parties that this Lease (as the same may have been amended), and Landlord's and Tenant's respective rights and obligations hereunder (including, without limitation, Tenant's obligation to pay Base Rent and Additional Rent), shall remain in full force and effect, and shall in no event terminate, unless and until the Project is conveyed to Tenant pursuant to, and in accordance with, the terms and conditions of the Purchase Agreement, as evidenced by the recordation of a grant deed.

**(SIGNATURES ARE ON THE FOLLOWING PAGE)**

-40-

4814-9820-0107v2
HAL\22617007

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed the day and date first above written.

LANDLORD:

BSREP RIO ROBLES LLC,
a Delaware limited liability company

By:
Name:
Title:

TENANT:

LE TECHNOLOGY, INC.,
a California corporation

By:
Name:
Title:
*[chairman] [president] [vice-president]*

By:
Name:
Title:
*[secretary] [assistant secretary] [chief
financial office] [assistant treasurer]*

LE HOLDINGS (BEIJING) CO., LTD.,
a company organized under the laws of the People's Republic
of China

By:
Name:
Title:
*[chairman] [president] [vice-president]*

By:
Name:
Title:
*[secretary] [assistant secretary] [chief
financial office] [assistant treasurer]*

-41-

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed the day and date first above written.

LANDLORD:

**BSREP RIO ROBLES LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

TENANT:

**LE TECHNOLOGY, INC.,**
a California corporation

By: _____
Chaoying Deng (Dec 13, 2015)

Name:   Chaoying Deng

Title:   Chief Executive Officer

**LE HOLDINGS (BEIJING) CO., LTD.,**
a company organized under the laws of the People's Republic of China

By: _____
Dongge Jiang (Dec 17, 2015)

Name:   Dongge Jiang

Title:   Director, Overseas Operations

**EXHIBIT A-1
3553 NORTH FIRST STREET, SAN JOSE, CA
OUTLINE OF PREMISES**

See Attached

A-1



RIO ROBLES AVENUE

NORTH FIRST STREET

**EXHIBIT A-2**
**LEGAL DESCRIPTION OF LAND**

See Attached

A-2

## LEGAL DESCRIPTION OF LAND

That certain real property in the City of San Jose, County of Santa Clara, State of California, described as follows:

PARCEL ONE:

ALL OF PARCEL A, AS SHOWN ON THAT CERTAIN PARCEL MAP, BEING A RESUBDIVISION OF LOTS 1, 2 AND 4 OF TRACT 7408, WHICH PARCEL MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA ON MAY 27, 1983 IN BOOK 513 OF MAPS, PAGES 24 AND 25.

PARCEL TWO:

A 10 FOOT PRIVATE STORM DRAIN EASEMENT OVER PARCEL B OF THE ABOVE REFERRED TO PARCEL MAP, LYING ADJACENT TO AND SOUTHWESTERLY OF THE SOUTHWESTERLY LINE OF THAT CERTAIN 20 FOOT LANDSCAPE EASEMENT, AS ESTABLISHED BY INSTRUMENT RECORDED IN BOOK G330, PAGE 504 OF OFFICIAL RECORDS, AND EXTENDING FROM THE NORTHWESTERLY LINE OF PARCEL A, TO THE SOUTHEASTERLY LINE OF THAT CERTAIN PUBLIC SERVICE EASEMENT, AS ESTABLISHED BY INSTRUMENT RECORDED IN BOOK H156, PAGE 275, SERIAL #7522745, OFFICIAL RECORDS, AND BEING ALSO SHOWN ON THE PARCEL MAP FIRSTLY ABOVE REFERRED TO.

APN: 097-55-012